KATHRYN C. WANNER (Cal. Bar No. 269310)
Email: wannerk@sec.gov
M. LANCE JASPER (Cal. Bar No. 244516)
Email: jasperml@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Director
Amy J. Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>ZACHARY J. HORWITZ; AND 1INMM CAPITAL, LLC,<br><br>　　　　Defendants, | Case No. 2:21-CV-02927-CAS-GJSx<br><br>**COMPLAINT**<br><br>**JURY DEMAND**<br><br>**(FILED UNDER SEAL)** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1. The SEC brings this emergency action pursuant to authority conferred on it by Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Sections 21(d) and 21(e) of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78u(e), to restrain and enjoin the Defendants Zachary J. Horwitz ("Horwitz") and 1inMM Capital, LLC ("1inMM") (collectively "Defendants") from engaging in the acts, practices, and courses of business described in this Complaint and acts, practices, and courses of business of similar purport and object. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a) and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2. Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3. Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district. In addition, venue is proper in this district because Defendant Horwitz resides in this district and Defendant 1inMM has its principal place of business in this district.

## SUMMARY

4. Horwitz, a Los Angeles based actor, and his company 1inMM conducted an offering fraud and Ponzi scheme in violation of the federal securities laws. Since March 2014, until at least December 2019, Defendants raised over $690 million from investors by selling promissory notes issued by 1inMM, using fabricated agreements

and fake emails with prominent third party companies with whom Defendants had no actual business relationship. Horwitz then misappropriated and misused the offering proceeds, including for the purchase of a luxury home he has recently listed for sale.

5. Defendants represented that the purpose of the offering was to finance 1inMM's acquisition and licensing of distribution rights in specific movies, primarily from Latin America, to major media companies, mostly Netflix or Home Box Office ("HBO"). To persuade investors to purchase the promissory notes, Horwitz made materially false and misleading statements, including that he had experience acquiring and licensing distribution rights in movies to HBO and Netflix, and that he had, in the past, used the profits from those transactions to repay investors in 1inMM's promissory notes. Horwitz described himself to investors in company documents as bringing "a wealth of knowledge, reputation, and experience[.]" Defendants also claimed that HBO, Netflix, and other media corporations were 1inMM's "Strategic Partners[]".

6. Horwitz showed investors numerous fictitious documents to substantiate his claimed deals with HBO and Netflix, including numerous fake movie distribution agreements.

7. Defendants promised returns in excess of 35% on 1inMM's Promissory Notes.

8. In reality, 1inMM and Horwitz had no relationship with either HBO or Netflix and never licensed any movie rights to either company.

9. Instead, Horwitz misappropriated investor funds to pay putative returns on earlier investments.

10. In addition, in 2018 Horwitz misappropriated investor funds to purchase his $5.7 million personal home.

11. Horwitz also transferred some investor funds into his personal bank account. Moreover, since March 2014, until at least December 2019, Horwitz also spent lavishly from his personal bank account.

12. For example, in 2016 and 2017 alone, Horwitz spent over $100,000 on

2

trips to Las Vegas.  Then in 2018, after purchasing his Beverlywood home, Horwitz made payments to American Express of at least $1,842,840 and paid almost $700,000 to a celebrity interior designer.

13.     In late 2019, Horwitz began defaulting on outstanding notes issued by 1inMM, leaving investors with more than $234 million in unreturned principal.  Horwitz falsely blamed his default on refusals by HBO and Netflix to pay for distribution rights they had licensed from 1inMM and claimed he was engaged in promising negotiations with them to obtain past-due payments.

14.     From early 2020 to at least March 2021, Horwitz has been lulling investors with false promises that he and 1inMM are on the verge of reaching agreements with HBO and/or Netflix, and would soon be able to repay investors from the proceeds of those settlements.  To make his lies more convincing, Horwitz shows investors fabricated email communications with representatives of HBO as well as false collections accounts allegedly showing funds available from HBO and Netflix for distribution.

15.     On or about January 21, 2021, Horwitz listed his personal home for sale, threatening to dissipate all that may remain of the more than $690 million he raised from 1inMM's investors.

16.     As a result of the conduct alleged in this Complaint, Defendants violated Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), ("Securities Act"), Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 17j(b), ("Exchange Act"), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5.  Unless restrained and enjoined, Defendants will engage in future violations of the federal securities laws.  The SEC seeks an emergency asset freeze, accounting and document preservation order, as well as permanent injunctions, disgorgement of ill-gotten gains derived from the conduct alleged in the Complaint plus prejudgment interest thereon, and civil penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. §§ 78u(d)(3).

# DEFENDANTS

17. **Zachary J. Horwitz** ("Horwitz"), age 34, is a resident of Los Angeles, California, and the managing member of 1inMM. He controlled 1inMM and its bank accounts at all relevant times as its sole principal. Horwitz purports to be an actor based in Los Angeles.

18. **1inMM Capital, LLC** ("1inMM") is a California limited liability company formed in September 2013. Its principal place of business is Horwitz's home in Los Angeles, California. Neither 1inMM nor its securities offerings are registered with the Commission.

# FACTS

### A.   The Promissory Notes

19. Beginning in or about March 2014, Horwitz raised investor funds pursuant to promissory notes issued by 1inMM (the "Promissory Notes").

20. The Promissory Notes had maturities ranging from three months to twenty-four months, with the vast majority of those notes coming due in either six months or twelve months.

21. Principal amounts for the Promissory Notes ranged from approximately $35,000 to $1.5 million.

22. Each note provided for a specific amount to be paid at maturity, which typically equated to a profit of between 35 and 45 percent over the life of the note.

23. Defendants represented that 1inMM would use the proceeds from each Promissory Note to finance transactions in which Defendants would: (1) acquire distribution rights in a specific movie; (2) license those rights to a specific media company; and (3) use the profits from these transactions to satisfy the note.

24. In many instances, Horwitz provided investors documentation purporting to grant the investor a security interest in the movie rights acquired through the proceeds of that note.

25. The following table illustrates the terms of a representative sample of

Promissory Notes:

| Date | Putative Movie | Putative Licensee | Principal | Payment at Maturity | Maturity Date | Return at Maturity |
|---|---|---|---|---|---|---|
| Dec. 17, 2018 | *Active Measures* | Netflix | $1,398,000 | $1,994,700 | Dec. 17, 2019 (12 months) | 43% |
| Feb. 27, 2019 | *Lucia's Grace* | Netflix | $1,397,500 | $1,994,625 | Feb. 27, 2020 (12 months) | 43% |
| May 29, 2019 | *Run With The Hunted* | HBO | $744,500 | $1,004,084 | Nov. 29, 2019 (6 months) | 35% |
| June 12, 2019 | *Desolation* | HBO | $740,250 | $1,004,304 | Dec. 12, 2019 (6 months) | 35% |
| July 12, 2019 | *Blood Quantum* | HBO | $735,000 | $998,865 | Jan. 1, 2020 (6 months) | 36% |
| Oct. 18, 2019 | *La Melodie* | HBO | $739,850 | $997,840 | April 18, 2020 (6 months) | 35% |

26. Horwitz represented to investors that he and 1inMM would profit from these transactions by selling the movie rights to HBO or Netflix at a profit in excess of the profits paid to investors, and that Horwitz and 1inMM would retain this excess.

27. Horwitz told some investors that 1inMM would profit from the transactions in additional ways, including by retaining certain distribution rights acquired in the transactions and licensing those rights for 1inMM's benefit.

**B.     Identification and Solicitation of Investors**

28. Horwitz relied on personal relationships and word-of-mouth referrals to obtain investors.

29. Horwitz typically solicited investors in person, over the telephone, and via email.

30. Horwitz raised money from five principal investors, most of whom raised funds from friends, family, and other downstream investors for the purpose of investing in the Promissory Notes.

31. Horwitz's five principal investors raised funds from more than 200 downstream investors, some of whom raised funds from further downstream

5

investors to finance purchases of Promissory Notes.

32. Often, investors combined capital for the purchase of an individual Promissory Note.

33. In many instances, Horwitz was aware that investors were combining funds for the purchase of an individual Promissory Note.

### C. The Fraud

34. Horwitz told investors he had experience and relationships in the media content distribution industry, that he and 1inMM had existing business relationships with HBO and Netflix, and that he could use his experience and connections to acquire and sell distribution rights in movies to Netflix and HBO for a profit.

35. Horwitz represented that investments in the Promissory Notes were safe because Netflix and HBO were established media companies that had an urgent need for new content, were willing to pay Horwitz a premium to license the rights he acquired, and had the financial ability to pay for those rights.

36. Horwitz promised to use the proceeds from each note to purchase the rights to a specific movie, to license those rights to either HBO or Netflix, and to use the profits to repay the note.

37. Horwitz justified the relatively short maturities for the notes by representing that the standard payment timeline – and thus the time needed to repay investors on the notes – was twelve months for Netflix and six months for HBO.

38. Horwitz made these representations directly to investors over the telephone, in person, and via email.

39. For example:

(a) During a June 2017 telephone call, Horwitz falsely represented to a potential investor that 1inMM had licensed movies for distribution in Latin America to HBO and Netflix; that he had longstanding relationships with both HBO and Netflix; and that he and 1inMM had a successful track record of using investor funds to purchase distribution rights that he licensed to HBO and Netflix at a significant

6

markup. That potential investor subsequently invested approximately in 34 specific movies, each associated with a separate promissory note issued by 1inMM. Defendants defaulted on paying on 12 of those promissory notes, and owe at least $8,000,955 to this investor.

       (b)    On or about June 29, 2017, Horwitz met personally with another potential investor and represented that he would use that investor's funds to acquire the rights to specific movie titles and license those rights to HBO. That potential investor subsequently invested in 108 movies with corresponding promissory notes. At this time, Defendants owe this investor at least $8,746,227.81

    40.    To support his false representations, Horwitz sent documents to investors that purported to evidence his business dealings with HBO and Netflix, including distribution agreements that appeared to reflect agreements by Netflix and HBO to license rights from 1inMM in the specific movie titles for which investors had purchased the Promissory Notes.

    41.    For example, among numerous other fake distribution agreements, Horwitz provided investors with the following forged distribution agreements:

       (a)    Distribution agreement with HBO, dated June 1, 2019, for the movie titled "Behind the Walls."

       (b)    Distribution agreement with HBO, dated May 17, 2019, for the movie titled "Run With the Hunted."

       (c)    Distribution agreement with HBO, dated July 11, 2019, for the movie titled "Coyote Lake."

       (d)    Distribution agreement with Netflix, dated March 4, 2019, for the movie titled "Lucia's Grace."

    42.    At times, Horwitz provided putative investors with 1inMM annual reports, describing 1inMM's purported acquisitions and sales of rights in dozens of movies to Netflix and HBO.

    43.    Horwitz sent documents to investors via email, including through a

secure email account, and through at least one Dropbox account to which Horwitz and certain of his investors had access over the Internet.

44. Horwitz's representations and the documents he provided were important to investors who purchased the Promissory Notes.

45. It was particularly important to investors that Horwitz had business relationships with HBO and Netflix, and that HBO and Netflix were the ultimate purported counterparties to the business deals underlying their investments. Defendants advertised the security of these business relationships, stating in 1inMM's Annual Report, "[w]e believe that the safety of our investor's funds should always be our first priority . . . Through our solid relationships, we receive confirmation from each of our outputs indicating their desire to acquire the rights to any title we purchase prior to us releasing funds for the film[.]"

46. Investors found it credible that HBO and Netflix had an urgent need for new content, were willing to pay a premium for that content, had the financial ability to do so, and would pay 1inMM in a timely fashion for the rights they licensed. One investor stated that "I believed that if HBO was involved, my investment was safe."

47. Over time, 1inMM's investors were also deceived by Horwitz's consistent track record of paying large profits supposedly generated by his deals with Netflix and HBO.

48. Horwitz's representations were false and misleading, and the documents he sent investors were fabricated.

49. Horwitz and 1inMM did not have business relationships with Netflix or HBO and did not sign distribution agreements with Netflix or HBO. They did not acquire the movie rights funded by the Promissory Notes and did not sell those rights to Netflix or HBO.

50. Horwitz used investor funds to pay purported returns on previously issued notes, which induced investors to purchase additional notes and to raise funds from downstream investors.

51. For example, during at least the following periods, Defendants received investor funds into accounts that only contained investor funds, and immediately used those funds to pay returns to other investors:

    (a) March 2017, Horwitz made at least three payments to investors using funds raised from other investors, including, but not limited to, payments of $883,667, $713,758 and $721,128;

    (b) November 2018, Horwitz made at least four payments to investors using funds raised from other investors, including, but not limited to, payments of $861,288, $945,412, $929,560 and $929,680; and

    (c) June 2019, Horwitz made at least four payments to investors using funds raised from other investors, including, but not limited to, payments of $500,000, $931,387, $1,168,900 and $1,173,940.

52. In at least one instance, on or about the month of September 2017, Horwitz falsely represented to an investor group that he was personally co-investing in several of the Promissory Notes with them.

53. In fact, the funds Horwitz supplied were misappropriated from other investors.

54. In March of 2018, when it came time to pay off those Promissory Notes, 1inMM paid the investor group approximately $9 million purporting to be the return of principal and the agreed upon profit. In turn, the investor group paid Horwitz $2.33 million of that amount based on his co-investment.

55. In fact, this money was largely misappropriated from other investors.

56. Horwitz used his $2.33 million of the alleged co-investment, in combination with other money misappropriated directly from investors, to purchase his personal residence for approximately $5.7 million (in cash).

57. Horwitz completed the purchase of his residence by transferring over $5.6 million to the escrow company on March 28, 2018, the day after he received the $2.33 million, and shortly after transferring other investor funds to his personal

9

account.

58. Horwitz also deposited or transferred at least some investor funds to his personal bank accounts.

59. Horwitz used money from his personal City National Bank account ending in 5270, for lavish personal spending, including, but not limited to, extravagant trips to Las Vegas, flights on chartered jets, payments for high-end automobiles, a subscription service for luxury watches, and the previously described purchase of his multi-million-dollar home.

60. For example, in 2016 through 2017, Horwitz spent from his personal City National Bank account ending in 5270, $124,582 on trips to Las Vegas.

61. In 2018 alone, among other expenses, Horwitz spent the following:

    (a) payments to American Express of $1,842,840;

    (b) payments to a celebrity interior decorator of $691,800;

    (c) payments for high-end automobiles of $165,408;

    (d) payments for chartered jet flights of $137,072, and

    (e) payments for a luxury watch subscription service of $54,600.

**D. Lulling Conduct and Attempts to Raise Additional Funds**

62. In late 2019, Horwitz and 1inMM stopped making payments to investors for the outstanding Promissory Notes.

63. By text message and email, Horwitz provided investors false explanations for why he had stopped making payments.

64. Horwitz initially blamed HBO and Netflix for failing to make promised payments to 1inMM.

65. For example, Horwitz told one investor that while he had intended to sue HBO for non-payment, that he was instead able to obtain an alleged consolidated distribution agreement, pursuant to which HBO would immediately pay its past due payments to 1inMM.

66. Horwitz then sent that same investor documents that Horwitz claimed

were (1) a term sheet with HBO Latin America Holdings and (2) a draft form of the consolidated distribution agreement with HBO Latin America Holdings.

67. Horwitz then sent a text message to the investor with a picture of what Horwitz claimed was the signature page for that consolidated distribution agreement, allegedly signed by a Senior VP of Global Licensing to HBO Latin America Holdings.

68. The alleged term sheet, consolidated distribution agreement, and signature page to the consolidated distribution agreement between HBO Latin America Holdings and 1inMM were all fake.

69. There is no company named HBO Latin America Holdings. While HBO Latin America Holdings, LLC is a real company, it is merely a holding company and does not license any content.

70. Instead, HBO-Latin America Group is the entity that licenses third-party rights for content distributed by HBO in Latin America. HBO-Latin America Group never licensed content from 1inMM.

71. Throughout 2020, Horwitz lulled investors with false promises that negotiations with HBO and Netflix would soon lead to large payments to 1inMM and, in turn, the repayment of outstanding notes.

72. For example, Horwitz falsely claimed to one investor that HBO had agreed to pay 1inMM by October 15, 2020, but that HBO asked for a one-week grace period to remit payment, suggesting payment would be complete by the end of October 2020.

73. Horwitz then represented to at least some investors that on or about December 1, 2020, a collections account was established at Freeway Entertainment, a collections account management company, and that HBO had deposited money due to 1inMM in that account on multiple occasions.

74. In addition to falsely representing the existence of ongoing negotiations with HBO and Netflix, Horwitz sent investors fabricated documents purportedly

11

evidencing those negotiations, including falsified emails purportedly sent by representatives of HBO.

75. For example, Horwitz claimed to copy and paste fake emails from HBO into text messages that he then sent to investors, including an email suggesting that HBO had future business deals for 1inMM that would be very lucrative.

76. Horwitz promised investors that payment is forthcoming, and on or about March 12, 2021, by email, represented to some investors that "[g]ood news is that we heard back that we will have an 'execute-able' amendment by mid-next week that reflects a release of funds by April 9th (at the latest)."

77. Also on or about March 12, 2021, by email, Horwitz suggested to the representative of a different investor group that investors could provide funds to 1inMM to pay legal counsel in connection with 1inMM's alleged efforts to obtain payment from HBO, stating that "1inMM is not in a position to cover the full cost of litigation so options on the table are sharing the financial burden with investors (highly doubtful)[.]" Notably, approximately a month before Horwitz sent this email, on or about February 15, 2021, 1inMM's attorney had informed Netflix by email that he was withdrawing from representing 1inMM.

78. Horwitz's lulling statements are false and misleading because Defendants have never had any contractual or other business relationship with HBO or Netflix.

### E. Defendants Acted with a High Level of Scienter, or in the Alternative, Were Negligent

79. Horwitz acted with a high level of scienter.

80. Horwitz knew, or acted recklessly in not knowing, that the representations he made to investors in 1inMM about his and 1inMM's alleged business relationships with HBO and Netflix and his use of investor funds were materially false and misleading.

81. In addition, Horwitz's conduct was negligent. Horwitz's conduct in

1 offering and selling securities issued by 1inMM, while lying about his business relationships with HBO and Netflix and his intended use of investor funds was a departure from the ordinary standard of care of a person offering and selling securities.

82. Horwitz's state of mind is imputed to 1inMM because he controls it.

## FIRST CLAIM FOR RELIEF

**Fraud in the Connection with the Purchase and Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

**(against all Defendants)**

83. The SEC realleges and incorporates by reference paragraphs 1 through 82 above.

84. As set forth above, Defendants Horwitz and 1inMM made several material misrepresentations, and omitted material information, to 1inMM investors, including statements that they had business relationships with HBO and Netflix; that they had successfully sold movie rights to HBO and Netflix; and that they would use the proceeds of the Promissory Notes to buy and sell movie rights to HBO and Netflix.

85. In addition, Defendants Horwitz and 1inMM engaged in a scheme to defraud whereby they induced investors to invest in 1inMM, including: (1) by fabricating distribution agreements between 1inMM and HBO/Netflix, which they provided to investors; (2) by using investor funds to make Ponzi payments to previous investors, thereby giving the false impression that they had successfully purchased and licensed movie rights for a profit; and (3) by misappropriating millions of dollars in investor funds for the purchase of Horwitz's luxury home.

86. By engaging in the conduct described above, Defendants Horwitz and 1inMM, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: (a) employed devices, schemes, or

artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

87. By engaging in the conduct described above, Defendants Horwitz and 1inMM violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Sections 17(a) of the Securities Act

### (against All Defendants)

88. The SEC realleges and incorporates by reference paragraphs 1 through 82 above.

89. By engaging in the conduct described above, Defendants Horwitz and 1inMM obtained money or property by means of false statements to investors in connection with the offer or sale of investments in 1inMM, and omitted to disclose material information about 1inMM and Horwitz.

90. In addition, Defendants Horwitz and 1inMM engaged in a scheme to defraud whereby they induced investors to invest in 1inMM, including by (1) fabricating distribution agreements between 1inMM and HBO/Netflix, which they provided to investors; (2) by using investor funds to make Ponzi payments to previous investors, thereby giving the false impression that they had successfully purchased and licensed movie rights for a profit; and (3) by misappropriating millions of dollars in investor funds for the purchase of Horwitz's luxury home.

91. By engaging in the conduct described above, Defendants Horwitz and 1inMM, directly or indirectly, in the offer or sale of securities by the use of means or

1 instruments of transportation or communication in interstate commerce or by use of
2 the mails (a) employed devices, schemes, or artifices to defraud; (b) obtained money
3 or property by means of untrue statements of a material fact or by omitting to state a
4 material fact necessary in order to make the statements made, in light of the
5 circumstances under which they were made, not misleading; or (c) engaged in
6 transactions, practices, or courses of business which operated or would operate as a
7 fraud or deceit upon the purchaser.

8  92. Defendants Horwitz and 1inMM, with scienter, obtained money or
9 property by means of untrue statements of material fact or by omitting to state a
10 material fact necessary in order to make the statements made, in light of the
11 circumstances under which they were made, not misleading.  In the alternative,
12 Defendants Horwitz and 1inMM were negligent.

13  93. By engaging in the conduct described above, Defendants Horwitz and
14 1inMM violated, and unless restrained and enjoined will continue to violate, Section
15 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

**I.**

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

**II.**

Enter a temporary restraining order and preliminary injunction, in a form consistent with Rule 65 of the Federal Rules of Civil Procedure, freezing assets, requiring an accounting, prohibiting destruction of documents, and an order to show cause why the asset freeze should not continue until this matter is determined on the merits.

///
///

**III.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining the Defendants, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, and Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

**IV.**

Order Defendants to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon.

**VI.**

Order Defendants to pay civil penalties under Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), and Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d).

**VII.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VIII.**

Grant such other and further relief as this Court may determine to be just and necessary.

///
///
///
///
///

**Jury Demand**

The SEC demands a trial by jury on all claims so triable.

Dated:  April 5, 2021                              /s/ *Kathryn C. Wanner*
                                                                           Kathryn C. Wanner
                                                                           M. Lance Jasper
                                                                           Attorneys for Plaintiff
                                                                           Securities and Exchange Commission