CLERK, U.S. DISTRICT COURT

APR - 5 2021

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ RS _____ DEPUTY

KATHRYN C. WANNER (Cal. Bar No. 269310)
Email:  wannerk@sec.gov
M. LANCE JASPER (Cal. Bar No. 244516)
Email:  jasperml@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Director
Amy J. Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. **2:21-CV-02927-CAS-GJSx** |
| Plaintiff, | **PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF *EX PARTE* APPLICATION FOR AN ORDER (1) FREEZING ASSETS; (2) REQUIRING AN ACCOUNTING; (3) PROHIBITING DESTRUCTION OF DOCUMENTS; AND (4) TO SET A HEARING ON ORDER TO SHOW CAUSE** |
| vs. | |
| ZACHARY J. HORWITZ; AND 1INMM CAPITAL, LLC, | |
| Defendants. | **(FILED UNDER SEAL)** |

# **TABLE OF CONTENTS**

I.  INTRODUCTION ..................................................................................1

II. STATEMENT OF FACTS ....................................................................2

    A.  The 1inMM Promissory Notes ....................................................2

    B.  Identification and Solicitation of Investors .................................4

    C.  Defendants' Fraudulent Representations .....................................4

    D.  Defendants Lied about Business Relationships with Netflix and HBO ....................................................................................6

    E.  Horwitz's Extravagant Spending and Misappropriation of Investor Funds .......................................................................7

    F.  Horwitz's Recent Fraudulent Lulling Behavior and Efforts to Raise Additional Funds .......................................................8

    G.  Horwitz' Recent Dissipation of Investor Funds ..........................9

III. ARGUMENT .....................................................................................10

    A.  The SEC Has Made a *Prima Facie* Showing that Defendant Violated the Federal Securities Laws .........................................10

        1.  Defendants Offered and Sold Securities ...........................11

        2.  Defendants Violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 .........13

            a.  Defendants' fraudulent statements ................................13

            b.  Defendants' scheme to defraud .....................................15

            **c.**  Defendants obtained money ..........................................16

            d.  Defendants are acting with scienter ...............................16

            **e.**  Defendants are negligent ..............................................17

            **f.**  Defendants engaged in fraud in connection with purchase and sale and in the offer and sale of securities ..................................................................18

        3.  Defendants' Violations Are Likely to Be Repeated ...............19

    B.  An Emergency Asset Freeze Is Appropriate .....................................19

    C.  The Other Relief Sought by the SEC Is Necessary............................21

IV. CONCLUSION...................................................................................22

i

# **TABLE OF AUTHORITIES**

## **CASES**

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)................................................................13, 14

*Cooper v. Pickett*,
    137 F.3d 616 (9th Cir. 1997) .................................................15

*FTC v. Affordable Media, LLC*,
    179 F.3d 1228 (9th Cir. 1999) ...............................................20

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992) .................................................14, 15

*In re San Vicente Med. Partners Ltd.*,
    962 F.2d 1402 (9th Cir. 1992) ...............................................10

*Janus Capital Grp., Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011)................................................................14

*Johnson v. Couturier*,
    572 F.3d 1067 (9th Cir. 2009) ...............................................10, 20

*Lopes v. Vieira*,
    543 F. Supp. 2d 1149 (E.D. Cal. 2008) .................................18

*Lorenzo v. SEC*,
    587 U.S. ____, 139 S. Ct. 1094 (2019) .................................15

*McNabb v. SEC*,
    298 F.3d 1126 (9th Cir. 2002) ...............................................12

*Merrill Lynch, Pierce, Fenner & Smith Inc., v. Dabit*,
    547 U.S. 71 (2006)..................................................................18

*National Bank of Yugoslavia v. Drexel Burnham Lambert, Inc.*,
    678 F. Supp. 1010 (S.D.N.Y. 1991) ......................................12

*Pollack v. Laidlaw Holdings, Inc.*,
    27 F.3d 808 (2d Cir. 1994) ....................................................12

*Reebok Int'l, Ltd v. Marnatech Enterprises, Inc.*,
    970 F.2d 552 (9th Cir. 1992) .................................................21

*Reves v. Ernst & Young*,
    494 U.S. 56 (1990)..................................................................11, 12

*SEC v. Ahmed*,
    123 F. Supp. 3d 301 (D. Conn. 2015) ...................................20

*SEC v. Credit First Fund, LP*,
    No. CV 05-8741DSF (PJWx), 2006 WL 4729240
    (C.D. Cal. Feb. 13, 2006) .......................................................21

*SEC v. Dain Rauscher, Inc.,*
    254 F.3d 852 (9th Cir. 2001) ..........................................................10, 13, 14, 18

*SEC v. Fehn,*
    97 F.3d 1276 (9th Cir. 1996) ....................................................................14, 15

*SEC v. Hickey,*
    322 F.3d 1123 (9th Cir. 2003) ..................................................................10, 19

*SEC v. Hughes Capital Corp.*
    124 F.3d 449 (3d Cir.1997) ..............................................................................18

*SEC v. J.T. Wallenbrock & Assocs.,*
    313 F.3d 532 (9th Cir. 2002) ............................................................................13

*SEC v. Maillard,*
    2014 U.S. Dist. LEXIS 56456, 2014 WL 1660024 (S.D.N.Y. 2014) ..............20

*SEC v. Materia,*
    745 F.2d 197 (2d Cir. 1984) ............................................................................21

*SEC v. Murphy,*
    626 F.2d 633 (9th Cir. 1980) ....................................................................15, 19

*SEC v. Platforms Wireless,*
    617 F.3d 1072 (9th Cir. 2010) ..................................................................13, 14

*SEC v. R.G. Reynolds Enters., Inc.,*
    952 F.2d 1125 (9th Cir. 1991) ..........................................................................11

*SEC v. Rana Research, Inc.,*
    8 F.3d 1358 (9th Cir. 1993) ..............................................................................13

*SEC v. Rubera,*
    350 F.3d 1084 (9th Cir. 2003) ..........................................................................11

*SEC v. Sells,*
    2012 WL 3242551 (N.D. Cal. Aug. 10, 2012) ................................................16

*SEC v. SG Ltd.,*
    265 F.3d 42 (1st Cir. 2001) ..............................................................................11

*SEC v. Sripetch,*
    No. 20-CV-01864-H-AGS, 2020 WL 6396927
    (S.D. Cal. Nov. 2, 2020) ....................................................................10, 20, 21

*SEC v. Unifund SAL,*
    910 F.2d 1028 (2d Cir. 1990) ..........................................................................20

*SEC v. W. J. Howey Co.,*
    328 U.S. 293 (1946)..........................................................................................11

*SEC v. Wencke,*
    322 F.3d 1123 (9th Cir. 2003) ..........................................................................10

*SEC v. Wencke,*
   622 F.2d 1363 (9th Cir. 1980) ....................................................19, 21

*SEC v. Zandford,*
   535 U.S. 813 (2002)......................................................................18

*Simpson v. AOL Time Warner, Inc.,*
   452 F.3d 1040 (9th Cir. 2006), *vacated on other grounds sub nom.,*
   *Avis Budget Group, Inc. v. California State Teachers' Retirement*
   *System,* 552 U.S. 1162 (2008) ....................................................16

*Superintendent of Ins. v. Bankers Life & Casualty Co.,*
   404 U.S. 6 (1971)........................................................................18

*TSC Indus., Inc. v. Northway, Inc.,*
   426 U.S. 438 (1976)................................................................13, 14

*U.S. v. Nader,*
   542 F.3d 713 (9th Cir. 2008) .......................................................18

*U.S. v. Shields,*
   No. CR12-00410, 2014 U.S. Dist. LEXIS 134118
   (N.D. Cal. Sept. 23, 2014) ...........................................................17

*Utah Lighthouse Ministry v. Foundation for Apologetic Info. & Research,*
   527 F.3d 1045 (10th Cir. 2008) ....................................................18

**FEDERAL STATUTES**

**Securities Act of 1933**

Section 2(a)(1)
   [15 U.S.C. § 77b(a)(1)]................................................................11

Section 17(a)
   [15 U.S.C. § 77q(a)] ...................................................2, 10, 13, 18

Section 17(a)(1)
   [15 U.S.C. § 77q(a)(1)]................................................................15

Section 17(a)(2)
   [15 U.S.C. § 77q(a)(2)]................................................................14

Section 17(a)(3)
   [15 U.S.C. § 77q(a)(3)]................................................................15

**Securities Exchange Act of 1934**

Section 3(a)(10)
   [15 U.S.C. § 78c(a)(10)].........................................................11, 12

Section 10(b)
   [15 U.S.C. § 78j(b)] .................................2, 10, 13, 14, 15, 18

iv

**FEDERAL REGULATIONS**

Rule 10b-5
    [17 C.F.R. § 240.10b-5].........................................................................2, 10, 13, 18

Rule 10b-5(a)
    [17 C.F.R. § 240.10b-5(a)] ....................................................................15

Rule 10b-5(b)
    [17 C.F.R. § 240.10b-5(b)] ....................................................................13, 14

Rule 10b-5(c)
    [17 C.F.R. § 240.10b-5(c)] ....................................................................15

**FEDERAL RULES OF CIVIL PROCEDURE**

Fed. R. Civ. P. 65(b)(2).............................................................................22

I.    **INTRODUCTION**

Plaintiff Securities and Exchange Commission ("SEC") brings this emergency action against Defendants Zachary J. Horwitz ("Horwitz") and 1inMM Capital, LLC ("1inMM") (collectively "Defendants") for violations of the anti-fraud provisions of the federal securities laws, and, by this Application, the SEC seeks an order freezing Defendants' assets and other immediate relief.

From approximately March 2014 until at least December 2019, Horwitz and 1inMM raised at least $690 million from investors by selling promissory notes issued by 1inMM.  The purported purpose of those notes was to finance the acquisition and licensing of distribution rights in specific movies to major media companies, specifically, for the most part, Netflix or Home Box Office ("HBO").  To persuade investors to purchase the notes, Horwitz, who is an actor, represented that he had experience acquiring and licensing distribution rights in movies to HBO and Netflix, and that he had, in the past, used the profits from those transactions to repay investors in 1inMM's promissory notes.  He sometimes showed investors fabricated documents to substantiate his claimed deals with HBO and Netflix.  In reality, 1inMM and Horwitz had no relationship with either of those entities and never licensed any movie rights to either entity.  Instead, Horwitz misappropriated investor funds for lavish spending, including $5,727,776 on purchasing his personal home, and to pay putative returns on earlier investments.  In 2021 Horwitz listed his home for sale.

In late 2019, Horwitz began defaulting on outstanding notes issued by 1inMM, leaving investors with more than $234 million in unreturned principal.  Horwitz falsely blamed his default on refusals by HBO and Netflix to pay for distribution rights they had licensed from 1inMM.  From early 2020 to March 2021, Horwitz has been lulling investors with false promises that he and 1inMM were on the verge of settling with HBO and/or Netflix, and would soon be able to repay investors from the proceeds of those settlements.  Horwitz used false and misleading documents to support this lulling activity, including fabricated email communications with representatives of HBO.  As recently as March 12, 2021, Horwitz was representing to investors that he expected that

payments from HBO would be forthcoming by April 9, 2021.  However, as of the end of February 2021, Horwitz's personal bank account and the two 1inMM bank accounts have a total cumulative balance of only $6,526.

Horwitz's false and misleading statements about the 1inMM promissory notes violated the anti-fraud provisions of Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

The SEC seeks an emergency order to freeze all of Defendants' remaining assets, which are substantially less than the at least $234 million in Promissory Notes outstanding to investors.  An *ex parte* asset freeze is necessary to prevent Defendants from dissipating their few remaining assets so funds will be available to be paid both as disgorgement for the benefit of victims of the fraud and for a civil penalty.

## II.   STATEMENT OF FACTS

### A.   The 1inMM Promissory Notes

Horwitz raised investor funds pursuant to promissory notes issued by 1inMM (the "Promissory Notes").  Declaration of James Russell ("Russell Decl.") at ¶¶ 6, 11, 16, 24-26, 38, 39, Exs. 2 and 3; Declaration of Brett Cravatt ("Cravatt Decl.") at ¶ 11, Ex. 3.  The Promissory Notes had maturities ranging from three months to twenty-four months, with the vast majority of those notes coming due in either six months or twelve months.  Declaration of Jacob Wunderlin ("Wunderlin Decl.") at ¶ 9; Declaration of Joseph deAlteris ("deAlteris Decl.") at ¶ 9; Declaration of Matthew Schweinzger ("Schweinzger Decl.") at ¶ 9; Declaration of Lance Jasper ("Jasper Decl") at ¶¶ 5-7, Exs. 1, 2 and 3.  Principal amounts for the Promissory Notes ranged from approximately $35,000 to $1.5 million.  *Id.*  Each note provided for a specific amount to be paid at maturity, which typically equated to a profit of between 35 and 45 percent over the short life of the note.  *Id*.

Horwitz represented that 1inMM would use the proceeds from each Promissory

2

Note to finance transactions in which he would: (1) acquire distribution rights in a specific movie; (2) license those rights to a specific media company; and (3) use the profits from these transactions to satisfy the note.  *See* Russell Decl. at ¶¶ 8, 23, and 27; Cravatt Decl. at ¶¶ 11-12, Exs. 2, 3; Wunderlin Decl. at ¶¶ 4, 5, 8, 9; deAlteris Decl. at ¶¶ 4, 5, 8, 9; Schweinzger Decl. at ¶¶ 4, 5, 8, 9.  In many instances, Horwitz provided investors documentation purporting to grant the investor a security interest in the specific movie rights acquired through the proceeds of that note.  *See, e.g.*, Cravatt Decl. at ¶¶ 4, 10-12 and Ex. 3 at p. 39; *see also* Jasper Decl. at ¶¶ 8-13, Exs. 4-9.  The following table includes the terms of a representative sample of Promissory Notes that are in now default:

| Date | Putative Movie | Putative Purchaser | Principal | Payment at Maturity | Maturity Date | Imputed Return |
|---|---|---|---|---|---|---|
| Dec. 17, 2018 | *Active Measures* | Netflix | $1,398,000 | $1,994,700 | Dec. 17, 2019 (12 months) | 43% |
| Feb. 27 2019 | *Lucia's Grace* | Netflix | $1,397,500 | $1,994,625 | Feb. 27, 2020 (12 months) | 43% |
| May 29, 2019 | *Run With The Hunted* | HBO | $744,500 | $1,004,084 | Nov. 29, 2019 (6 months) | 35% |
| June 12, 2019 | *Desolation* | HBO | $740,250 | $1,004,304 | Dec. 12, 2019 (6 months) | 35% |
| July 12, 2019 | *Blood Quantum* | HBO | $735,000 | $998,865 | Jan. 1, 2020 (6 months) | 36% |
| Oct. 18, 2019 | *La Melodie* | HBO | $739,850 | $997,840 | April 18, 2020 (6 months) | 35% |

*See* Jasper Decl. at ¶¶ 8-13, Exs. 4-9; Cravatt Decl. at ¶ 11, Ex. 3 ("Run With the Hunted").

Horwitz represented to investors that he and 1inMM would profit from these transactions by licensing the rights to HBO or Netflix at a profit in excess of the

profits paid to investors, and that Horwitz and 1inMM would retain this excess.  *See* Russell Decl. at ¶¶ 23 and 27; Cravatt Decl. at ¶ 4, Exs. 2, 3; Wunderlin Decl. at ¶ 9; deAlteris Decl. at ¶ 9; Schweinzger Decl. at ¶ 9.  Horwitz told some investors that 1inMM would profit from the transactions in additional ways, including by retaining certain distribution rights acquired in the transactions and licensing those rights for 1inMM's benefit.  *See* Wunderlin Decl. at ¶ 9; deAlteris Decl. at ¶ 9; Schweinzger Decl. ¶ 9.

### B.    Identification and Solicitation of Investors

Horwitz relied on personal relationships and word-of-mouth referrals to obtain investors.  *See* Russell Decl. at ¶¶ 3-7; Cravatt Decl. at ¶ 3; Wunderlin Decl. at ¶ 3; deAlteris Decl. at ¶ 3; Schweinzger Decl. ¶ 3.  Horwitz raised money from five principal investors, most of whom raised funds from friends, family, and other downstream investors for the purpose of investing in the Promissory Notes.  *See* Declaration of Lorraine Pearson ("Pearson Decl.") at ¶ 16; Russell Decl. at ¶¶ 23 and 27; Cravatt Decl. at ¶ 4, Exs. 2, 3; Wunderlin Decl. at ¶¶ 8-10; deAlteris Decl. at ¶¶ 8-10; Schweinzger Decl. at ¶¶ 8-10.  Those principal investors raised funds from more than 200 downstream investors, some of whom raised funds from further downstream investors to finance purchases of Promissory Notes.  *See* Wunderlin Decl. at ¶ 8; Jasper Decl. at ¶¶ 7, 14-16, Exs. 3, 10.  Often, investors combined capital for the purchase of an individual Promissory Note, and Horwitz was aware, at least in many instances, that they were doing so.  *See* Jasper Decl. at ¶¶ 14-16, Ex. 3, 10.  Defendants sold promissory notes to investors in multiple states.  *See* Cravatt Decl. at ¶ 2; Wunderlin Decl. at ¶ 12; Jasper Decl. ¶¶ 39-41, Exs, 31-33.

### C.    Defendants' Fraudulent Representations

Horwitz, an actor, told investors he had experience and relationships in the media content distribution industry that he could use to acquire and sell distribution rights in movies to Netflix and HBO.  *See* Cravatt Decl. at ¶ 4; Wunderlin Decl. at ¶¶ 4, 6, and 10; deAlteris Decl. at ¶¶ 4, 6, and 10; Schweinzger Decl. at ¶¶ 4, 6, and 10;

*see* Jasper Decl. at ¶ 43, Ex. 35.  Horwitz represented that investments in the Promissory Notes were safe because Netflix and HBO were established media companies that had an urgent need for new content, were willing to pay Horwitz a premium to purchase the rights he acquired, and had the financial ability to pay for those rights.  *See* Wunderlin Decl. at ¶ 7; deAlteris Decl. at ¶ 7; Schweinzger Decl. ¶ 7; Russell Decl. at ¶ 23.  Horwitz promised to use the proceeds from each note to acquire the rights to a specific movie, to license those rights to either HBO or Netflix, and to use the profits to repay the note.  *See* Russell Decl. at ¶ 23; Cravatt Decl. at ¶¶ 10-12, Ex. 2; Wunderlin Decl. at ¶¶ 4-5; deAlteris Decl. at ¶¶ 4-5; Schweinzger Decl. at ¶¶ 4-5.  He justified the relatively short maturities for the notes by representing that the standard payment timeline – and thus the time needed to repay investors on the notes – was twelve months for Netflix and six months for HBO.  *See* Wunderlin Decl. at ¶ 9; deAlteris Decl. at ¶ 9; Schweinzger Decl. ¶ 9.  Horwitz made these representations directly to investors over the telephone, in person, and via email.  *See, e.g.*, Russell Decl. at ¶¶ 21-23; Cravatt Decl. at ¶¶ 4-5; Jasper Declaration at ¶¶ 18, 34-36, Exs. 11, 26-28.

To support these representations, Horwitz sent documents to investors that purported to evidence his business dealings with HBO and Netflix, including distribution agreements, which reflected agreements by Netflix and HBO to license rights from 1inMM in the specific movie titles for which investors had purchased the Promissory Notes.  *See* Russell Decl. at ¶ 25, Ex. 3; Cravatt Decl. at ¶ 12, Ex. 2; Wunderlin Decl. at ¶ 10; deAlteris Decl. at  ¶ 10; Schweinzger Decl. ¶ 10; Jasper Decl. at ¶ 19, Ex. 12.  At times, Horwitz provided corporate brochures and  "Annual Reports" that described 1inMM's purported acquisitions and sales of rights in dozens of movies to Netflix and HBO, and which described Netflix and HBO as 1inMM's "Strategic Partners[]".  *See, e.g.*, Jasper Decl. at ¶¶ 20, 34-36, Exs. 13, 26-28; Wunderlin Decl. at ¶ 10, Ex. 1.  Horwitz sent those documents to investors via email, including through a secure email account, and through at least one Dropbox account

to which Horwitz and certain of his investors had access over the Internet.  *See* Wunderlin Decl. at ¶ 10; deAlteris Decl. at ¶ 10; Schweinzger Decl. ¶ 10.

These documents and representations were important to investors who purchased the Promissory Notes.  *See* Wunderlin Decl. at ¶ 7; deAlteris Decl. at ¶ 7; Schweinzger Decl. ¶ 7.  It was particularly important to investors that Horwitz had business relationships with HBO and Netflix, and that HBO and Netflix were the ultimate purported counterparties to the business deals underlying their investments.  *See* Cravatt Decl. at ¶ 6; Wunderlin Decl. at ¶ 7; deAlteris Decl. at ¶ 7; Schweinzger Decl. ¶ 7.  Investors found it credible that HBO and Netflix had an urgent need for new content, were willing pay a premium for that content, had the financial ability to do so, and would pay 1inMM in a timely fashion for the rights they licensed.  *See* Cravatt Decl. at ¶ 6; Wunderlin Decl. at ¶ 7; deAlteris Decl. at ¶ 7; Schweinzger Decl. at ¶ 7; Russell Dec. at ¶ 23; Jasper Decl. at ¶¶ 8-13, Exs. 4-9.

Over time, 1inMM's investors were also deceived by Horwitz's consistent track record of paying large profits supposedly generated by his deals with Netflix and HBO.  *See* Cravatt Decl. at ¶ 7; Wunderlin Decl. at ¶¶ 4 and 5; deAlteris Decl. ¶¶ 4 and 5; Schweinzger Decl. ¶¶ 4 and 5.  One investor stated "Horwitz represented the investment opportunity as essentially risk-free, given HBO's appetite for product in the Latin America marketplace, the prices that HBO is willing to pay for Latin America distribution rights, and the long-standing successful track record Mr. Horwitz had with HBO."  Cravatt Decl. at ¶ 6.

### D.    Defendants Lied about Business Relationships with Netflix and HBO

Horwitz's representations were false and misleading, and the documents he sent investors were fabricated.  Horwitz and 1inMM did not have business relationships with Netflix or HBO and did not sign license agreements with Netflix or HBO.  *See* Declaration of Patrick Younan, Senior Litigation Administrator at Warner Media, LLC  ("Younan Decl.") at ¶¶ 2(a)-(c) and 4(a)-(c); *see also* Declaration of Melinda LeMoine, Director, Content litigation for Netflix, Inc. ("LeMoine Decl.") at

¶¶ 4-8, 12 and 13, Exs. C, D, E, F.  They did not acquire the movie rights funded by the Promissory Notes and did not sell those rights to Netflix or HBO.  *See* Younan Decl. at ¶¶ 2(a)-(c) and 4(a)-(c); LeMoine Decl. at ¶¶ 5-8, 12 and 13, Exs. D, E, and F.  Moreover, 1inMM was never even in Netflix's payment systems.  LeMoine Decl. at ¶ 5, Ex. D.  Defendants even showed investors forged emails with Netflix attorneys and showed investors fake licensing agreements with Netflix.  *See* LeMoine Decl. at ¶¶ 5-8, Exs. D, E, and F.

For example, Horwitz showed investors a fake licensing agreement between 1inMM and Netflix for the movies "Active Measures," directed by Jack Bryan and "Divide and Conquer: The Story of Roger Ailes," directed by Alexis Bloom.  *See* Cravatt Decl. ¶¶ 2-4, Ex. C.  Netflix however confirmed that the alleged licensing agreement was "not in Netflix's contract management system, the films it purported to license to Netflix had not been on the service, and the terms were so unusual as to be unrealistic."  Cravatt Decl. ¶ 6.  Horwitz also showed investors a fake email between himself and an individual allegedly at Netflix named Josh Goldberg and sent this email to an investor.  *See* Cravatt Decl. ¶¶ 5-6, Ex. E.  Netflix did not employ anyone named Josh Goldberg in January 2020, and the email was not a Netflix email address.  *See* Cravatt Decl. ¶ 6.

### E.  Horwitz's Extravagant Spending and Misappropriation of Investor Funds

Investor funds were deposited into at least the two 1inMM bank accounts and Horwitz's personal account.  Pearson Decl. at ¶ 15.  Horwitz, the signatory on all of 1inMM's bank accounts, also transferred funds from 1inMM's bank accounts to his personal account.  Pearson Decl. at ¶¶ 6-9, and 29, Exs. 2-5.  Money from that personal account was used for lavish personal spending, including in 2018 alone, payments to: American Express of $1,842,840; a celebrity interior decorator of $691,800; high end automobiles of $165,408; chartered jet flights of $137,072; and a luxury watch subscription service of $54,600.  Pearson Decl. at ¶ 29.  Previously, in

2017, Horwitz also used funds from his personal account for $124,582 for trips to Las Vegas, NV, of which approximately $58,000 was paid to Red Carpet VIP.  *Id.* at ¶ 29.

Horwitz also used investor funds to pay purported returns on previously issued notes, in other words, to make Ponzi payments.  Pearson Decl. at ¶¶ 20-22.  These payments induced investors to purchase additional notes and to raise funds from downstream investors.  *See* Cravatt Decl. at ¶ 7; Wunderlin Decl. at ¶¶ 4 and 5; deAlteris Decl. ¶¶ 4 and 5; Schweinzger Decl. ¶¶ 4 and 5.

In March of 2018, Horwitz used investor funds to purchase his personal residence, in the name of a trust, MJLZ, that Horwitz and his wife created.  *See* Pearson Decl. ¶¶ 23-28; *see* Jasper Decl. at ¶¶ 23 and 38, Exs. 16 and 30.  In total, Horwitz transferred $5,727,776 in investor funds to purchase his home.  Pearson Decl. ¶ 28.  Horwitz subsequently took out mortgages against the house, totaling more than $4 million.  *See* Jasper Decl. at ¶ 42, Ex. 34.  The house is currently listed for sale with an asking price of just under $6.5 million.  *See* Jasper Decl. at ¶¶ 24-27, Exs. 17-20.  Estimates on the value of that home from established real-estate websites range from $6.2 million to $6.5 million.  Jasper Decl. at ¶¶ 24-27, Exs. 17 and 21.

F.    **Horwitz's Recent Fraudulent Lulling Behavior and Efforts to Raise Additional Funds**

In late 2019, Horwitz and 1inMM stopped making payments for the outstanding Promissory Notes.  *See* Russell Decl. at ¶ 39; Cravatt Decl. at ¶¶ 5 and 13; Wunderlin Decl. at ¶ 12; deAlteris Decl. at ¶12; Schweinzger Decl. ¶12; Pearson Decl. at ¶ 17.  Horwitz initially blamed HBO and Netflix for failing to make promised payments to 1inMM.  *See* Russell Decl. at ¶ 43; Cravatt Decl. at ¶ 14.  Throughout 2020, he lulled investors with false promises that settlement negotiations with HBO and Netflix would soon lead to large payments to 1inMM and, in turn, the repayment of outstanding notes.  *See* Russell Decl. at ¶ 43; Cravatt Decl. at ¶ 14, 15, Exs. 4-13.  In addition to falsely representing the existence of ongoing negotiations with HBO and Netflix, Horwitz sent investors fabricated documents purportedly evidencing those

negotiations, including falsified emails purportedly sent by representatives of HBO. *See* Russell Decl. at ¶ 43; Cravatt Decl. at ¶ 14, 15, Exs. 4-18.

When pushed in March of 2020 by an investor to provide a copy of emails that Horwitz purportedly had received from HBO regarding payment of outstanding license fees, Horwitz told that investor that he was advised by his lawyers not to forward these communications so that HBO would not be concerned about a "confidentiality breach." Russell Decl. at Ex. 4 p.3.

Moreover, Defendants both received SEC subpoenas dated February 24, 2021. After initially obtaining counsel to represent them, Defendants and their counsel subsequently stopped interacting with the SEC, and have failed to produce any of the requested documents, and Horwitz did not appear on the date set for his testimony. Jasper Decl. ¶¶ 30 and 31, Exs. 23-25.

Even after receipt of the SEC's subpoena, Horwitz has continued to promise investors that payment is forthcoming, and recently represented that at least some investors would be repaid in full by April 2021. Jasper Decl. at ¶ 34 and 37, Exs. 26, 29. Horwitz even recently, as of March 12, 2021, suggested to the representative of one investor group that it could provide funds to 1inMM to pay legal counsel in connection with 1inMM's efforts to obtain payment from Netflix and HBO. *See* Jasper Decl. at ¶ 29, Ex. 22.

### G.  Horwitz' Recent Dissipation of Investor Funds

There is a substantial risk that Horwitz will dissipate the remaining investor assets in his personal accounts and the 1inMM bank accounts. As recently as February 2021, Horwitz transferred $23,756 from one 1inMM bank account to his personal account, leaving that 1inMM bank account with a balance of approximately $5. Pearson Decl. at ¶¶ 31(b) and 32(b). In addition, the only other 1inMM account has a balance of only $3,224 as of February 26, 2021, substantially less than the funds Horwitz raised. Pearson Decl. at ¶ 31(a).

## III.   **ARGUMENT**

"[F]ederal courts have inherent equitable authority to issue a variety of 'ancillary relief' measures in actions brought by the SEC to enforce the federal securities laws." *SEC v. Wencke*, 322 F.3d 1123, 1131 (9th Cir. 2003); *SEC v. Hickey*, 322 F.3d 1123, 1131 (9th Cir. 2003) (same); *see also In re San Vicente Med. Partners Ltd.*, 962 F.2d 1402, 1406 (9th Cir. 1992) ("Generally, federal courts enjoy wide discretion in fashioning relief and protective measures in SEC actions."). This includes the authority to issue an asset freeze. *See, e.g., Hickey*, 322 F.3d at 1131. The burden of proof that must be satisfied to obtain an asset freeze, moreover, is lower than what is necessary to obtain a temporary restraining order.   Courts consider a defendant's prior unlawful acts and the location of the assets in considering whether an asset freeze is warranted.  *See*, *e.g.*, *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009).  Unlike a private litigant, the SEC need not show the risk of irreparable injury.  *SEC v. Sripetch*, No. 20-CV-01864-H-AGS, 2020 WL 6396927, at *8 (S.D. Cal. Nov. 2, 2020) (fact that defendant had withdrawn funds from accounts at issue supported likelihood of dissipation).  A party seeking an asset freeze must only show, if relief is not granted, a likelihood of dissipation of the assets or other inability to recover damages.  *Id.* at *8 (citing *Johnson*, *id.*).

### A.   The SEC Has Made a *Prima Facie* Showing that Defendant Violated the Federal Securities Laws

The record establishes a *prima facie* case that Defendants have violated the antifraud provisions of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  Section 17(a) prohibits fraud in the offer or sale of securities, and Section 10(b) and Rule 10b-5 prohibit fraud in connection with the purchase or sale of any security.  *See* 15 U.S.C. § 77q(a); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 855 (9th Cir. 2001).  Defendants have violated both provisions.

### 1.  Defendants Offered and Sold Securities

The Promissory Notes that Defendants offered to the investors are clearly securities under the federal securities laws, under both *SEC v. W.J. Howey Co.*, 328 U.S. 2939 (1946) and *Reves v. Ernst & Young*, 494 U.S. 56 (1990).  First, the Promissory Notes fit squarely within the definition of securities under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act, since they are "investment contracts."  In *SEC v. W. J. Howey Co.*, 328 U.S. 293, 298-99 (1946), the Supreme Court defined an "investment contract" to require:  (1) the investment of money; (2) in a common enterprise; (3) with an expectation of profits to be derived solely from the efforts of the promoter.  *See SEC v. Rubera*, 350 F.3d 1084, 1090 (9th Cir. 2003); *SEC v. R.G. Reynolds Enters., Inc.*, 952 F.2d 1125, 1130 (9th Cir. 1991).

The Promissory Notes satisfy all three elements of the Howey test.  The first is satisfied because purchasers invested money in exchange for the notes.  The second is satisfied by the presence of vertical commonality because as Horwitz described the deals to investors, both the investors' and 1inMM's profits came out of the profit made by Horwitz's successful sale of movie rights for more than the amount putatively paid for those rights.  Horizontal commonality is also present because Horwitz pooled all investor funds and used some of those funds to make Ponzi payments.  *See SEC v. SG Ltd.*, 265 F.3d 42, 51 (1st Cir. 2001) (endorsing the Commission's suggestion that "Ponzi schemes typically satisfy the horizontal commonality standard.").  Because the ability to make Ponzi payments to investors was "fully predicated upon the net inflow of new money, the fortunes of the participants were inextricably intertwined."  *SG Ltd.*, 265 F.3d at 52.  Finally, the requirement that the profits be derived solely from the efforts of others is satisfied because 1inMM's investors expected the profits from their investments to be derived solely from Horwitz's efforts to acquire and license movie rights to Netflix and HBO.

The 1inMM investments are also notes, and thus securities under the *Reves* test.  The definition of a security under Section 2(a)(l) of the Securities Act and

Section 3(a)(10) of the Exchange Act includes "any note."  Under *Reves*, every note is presumed to be a security unless it bears a strong resemblance to a judicially-created list of non-security instruments, or it is determined that the note is of a type that should be added to the list.  *Id*. at 65, 67.  In making this determination, the Supreme Court identified four factors to consider: (1) the motivation of the parties for entering into the transaction; (2) the plan of distribution of the instrument; (3) the reasonable expectations of the investing public; and (4) whether there are any risk reducing factors that would make application of the securities laws unnecessary.  *Id*. at 66-67.  The Promissory Notes here satisfy the *Reves* factors.

The first factor is satisfied because purchasers bought the Promissory Notes for investment purposes and not for commercial or consumer purposes.  *Pollack v. Laidlaw Holdings, Inc.*, 27 F.3d 808, 811 (2d Cir. 1994) (investors understood that they were investing to "finance substantial investments"); *Reves*, 494 U.S. at 66.  The second is established based on "common trading" because the Promissory Notes were sold to a broad segment of the public, including investors in multiple states.  *McNabb v. SEC*, 298 F.3d 1126, 1132 (9th Cir. 2002) (citing *Reves*, 494 U.S. at 68).  1inMM primarily issued securities to five principal investment groups which, collectively, represented more than 200 investors in the notes.  *See id*. at 1132 (notes were "securities" even though sold to only six investors); *see also National Bank of Yugoslavia v. Drexel Burnham Lambert, Inc.*, 678 F. Supp. 1010, 1015-16 (S.D.N.Y. 1991) ("A debt instrument may be distributed to but one investor, yet be a 'security.'").

The third factor is satisfied because a reasonable member of the investing public would consider the Promissory Notes to be investments, given that the promised high returns were to be realized from profits generated by 1inMM's purported business of buying and licensing movie rights to major media companies.  *Reves*, 494 U.S. at 68-69.

Finally, there is no risk-reducing factor, such as an alternative regulatory

scheme, that would render application of the securities laws unnecessary. 1inMM's agreements to provide the acquired movie rights as collateral for some of the Promissory Notes was not a risk-reducing factor because 1inMM had no intention of acquiring those rights. *See SEC v. J.T. Wallenbrock & Assocs.*, 313 F.3d 532, 539 (9th Cir. 2002) (no risk-reducing factor when the "so-called collateralization [of the notes] appears to be a fiction"). Accordingly, the Promissory Notes are securities under the *Reves* factors as well.

## 2. Defendants Violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5

The SEC has made a *prima facie* showing that Defendants engaged in fraud in violation of Section 17(a) of the Securities Act and Section 10(b)/Rule 10b-5 of the Exchange Act. *See* 15 U.S.C. § 77q(a); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; *Dain Rauscher, Inc.*, 254 F.3d at 855.

### a. Defendants' fraudulent statements

To establish a *prima facie* claim for materially false misrepresentations or omissions under Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act/Rule 10b-5(b), the SEC must prove: (1) a material misrepresentation, misleading statement, or omission; (2) in connection with the purchase, offer, or sale of a security; (3) with scienter; and (4) in interstate commerce. *SEC v. Platforms Wireless*, 617 F.3d 1072, 1092 (9th Cir. 2010); *see also SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1364 (9th Cir. 1993). Defendants' misstatements and omissions must concern material facts. *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. *See TSC Indus., Inc.*, 426 U.S. at 449; *Platforms Wireless*, 617 F.2d at 1092. Liability arises not only from affirmative representations, but from failures to disclose material information. *Dain Rauscher*, 254 F.3d at 855-56. These provisions impose "'a duty to disclose material facts that are necessary to

13

make disclosed statements, whether mandatory or volunteered, not misleading.'" *SEC v. Fehn*, 97 F.3d 1276, 1290 n.12 (9th Cir. 1996)  (*quoting Hanon v. Dataproducts Corp*., 976 F.2d 497, 504 (9th Cir. 1992)).

The "maker" of a statement for purposes of Section 10(b) and Rule 10b-5(b) is "the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).  Section 17(a)(2) of the Securities Act also prohibits any person from obtaining money or property in the offer or sale of any security by means of any untrue statement of material fact or any omission of a material fact.  15 U.S.C. § 77q(a)(2).  "[I]n the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed."  *Id*. at 142-43.

Horwitz and 1inMM made false and misleading statements to induce investors to purchase the Promissory Notes, including statements that they had business relationships with HBO and Netflix; that they had successfully licensed movie rights to HBO and Netflix; and that they would use the proceeds of the Promissory Notes to buy and sell movie rights to HBO and Netflix.  Horwitz and 1inMM did not have business relationships with HBO or Netflix; they had never licensed movie rights to either of those entities; and they intended to misappropriate investor funds.

Violations of the antifraud provisions require that the misstatements and omissions concern material facts.  *Basic Inc. v. Levinson*, 485 U.S. at 231-32; *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. at 449.  A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision.  *See TSC Indus.*, 426 U.S. at 449; *Platforms Wireless*, 617 F.2d at 1092.  Liability arises not only from affirmative representations but also from failures to disclose material information.  *SEC v. Dain Rauscher, Inc.*, 254 F.3d at 855-56.  The antifraud provisions impose "'a duty to disclose material facts that are

necessary to make disclosed statements, whether mandatory or volunteered, not misleading.'" *SEC v. Fehn*, 97 F.3d 1276, 1290 n.12 (9th Cir. 1996) (*quoting Hanon v. Dataproducts Corp.*, 976 F.2d 497, 504 (9th Cir. 1992)). *See also SEC v. Murphy*, 626 F.2d 633, 653 (9th Cir. 1980) (profitability of an issuer was material to investors).

The false and misleading statements were material because they went to the heart of the investments, namely: the purpose of the proposed transactions, the use of investor proceeds, and the likelihood that 1inMM would be able to satisfy the Promissory Notes. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (fact is material if there is a substantial likelihood that a reasonable investor would consider the information important to an investment decision); *see also SEC v. Chemical Trust*, 2000 U.S. Dist. Lexis 19786 (S.D. Fla. 2000) (use or misuse of investor proceeds is material). It was particularly important to investors that Horwitz had business relationships with HBO and Netflix, and that he planned to use the proceeds of the Promissory Notes to license movie rights to those established companies. The purported involvement of these companies gave investors a false sense of the safety and of the likely profitability of their investments.

### b.    Defendants' scheme to defraud

Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) make it unlawful for any person to employ any scheme to defraud or to engage in any course of business to defraud, in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(a), (c). Sections 17(a)(1) and 17(a)(3) of the Securities Act prohibit the same conduct in the offer or sale of securities. 15 U.S.C. §§ 77q(a)(1), (a)(3). The Supreme Court recently addressed the scope of Rules 10b-5(a) and (c), and found that these provisions "capture a wide range of conduct." *Lorenzo v. SEC*, 587 U.S. ___, 139 S. Ct. 1094, 1101 (2019). To be liable for scheme to defraud, a defendant must "commit[] a manipulative or deceptive act in furtherance of the scheme." *Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir. 1997); *see also Simpson*

*v. AOL Time Warner, Inc.*, 452 F.3d 1040, 1048 (9th Cir. 2006), *vacated on other grounds sub nom., Avis Budget Group, Inc. v. California State Teachers' Retirement System,* 552 U.S. 1162 (2008) (defendant "must have engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme."); *SEC v. Sells*, 2012 WL 3242551, at *7 (N.D. Cal. Aug. 10, 2012).

Horwitz and 1inMM also engaged in deceptive conduct to induce investments in the Promissory Notes, including by fabricating distribution agreements between 1inMM and HBO/Netflix, which they provided to investors; by using investor funds to make Ponzi payments to previous investors, thereby giving the false impression that they had successfully purchased and licensed movie rights for a profit; and by misappropriating millions of dollars in investor funds, including for the purchase of Horwitz's luxury home. *Donell v. Kowell*, 533 F.3d 762, 777 (9th Cir. 2009) (Ponzi payments are deceptive acts made to create the appearance of a profitable business and to raise money from new investors); *SEC v. Private Equity Management Group*, No. CV 09-2901 PSG, 2009 WL 2019788, *14 (C.D. Cal. Jul. 2, 2009) (misappropriation of investor money is a scheme to defraud).

### c.    Defendants obtained money

For purposes of Securities Act Section 17(a)(2), Horwitz and 1inMM obtained money by means of the fraudulent statements because investors paid money for the Promissory Notes in reliance on those statements into an account held by Horwitz personally and into accounts held by 1inMM, which Horwitz controlled.  Horwitz and 1inMM also "obtained" these funds by misappropriating money received from investors and using them to pay personal expenses and purchase a personal residence.

### d.    Defendants are acting with scienter

Claims under Exchange Act Section 10(b) require a showing of scienter, while claims under Securities Act Sections 17(a)(2) and (3) require a showing of negligence.  *See Aaron v. SEC*, 446 U.S. 680, 701-02 (1980); *Vernazza v. SEC*, 327 F.3d 851, 859-60 (9th Cir. 2003).  Scienter is defined as a "mental state embracing

intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).  In the Ninth Circuit, scienter may be established by a showing of recklessness.  *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568-69 (9th Cir. 1990) (*en banc*).  Negligence may be proven by showing that a defendant failed to conform to the standard of care that would be exercised by a reasonable person.  *See SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 856 (9th Cir. 2001).

Horwitz acted with a high degree of scienter because, as the principal of 1inMM, sole signatory on its bank accounts, and the person with the purported relationships with HBO and Netflix, he knew that: (1) he and 1inMM did not have business relationships with HBO or Netflix; (2) he and 1inMM never licensed movie rights to HBO or Netflix; (3) he planned to misappropriate investor funds instead of acquiring movie rights; (4) his repayment of Promissory Notes came from investor funds, rather than profitable licensing transactions; and (5) the fabricated documents purporting to evidence interactions between him and HBO and Netflix were not real  Moreover, Horwitz's lies to investors to explain the delays in paying them the principal and profits owed constituted "lulling" behavior and provide additional evidence of his scienter.  *SEC v. Holschuh*, 694 F.2d 130, 144 (7th Cir. 1982) (finding that defendant's "subsequent lulling activities…were evidence as [part of] a scheme" to defraud); *U.S. v. Shields*, No. CR12-00410, 2014 U.S. Dist. LEXIS 134118, at *8-9 (N.D. Cal. Sept. 23, 2014) ("Courts…view 'lulling' mailing or wires, that is letters to victims of a fraud intended to 'lull' them into a false sense of security and thereby postpone inquiries, as furthering the fraudulent scheme…").

As 1inMM's managing member, Horwitz's scienter is imputed to 1inMM.  *See ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 477 (9th Cir. 2015); *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1089 (2d Cir. 1972).

### e.    Defendants are negligent

To establish negligence, the SEC must show that the defendants failed to conform to the standard of care that would be exercised by a reasonable person.  *See*

*Dain Rauscher*, 254 F.3d at 856; *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 453-54 (3d Cir.1997) (defining negligence in the securities context as the failure to exercise reasonable care or competence). Here, Defendants' raising money by entirely fabricating business relationships, forging documents, and making Ponzi payments, falls below the standard of care of any reasonable person in the securities industry.

### f. Defendants engaged in fraud in connection with purchase and sale and in the offer and sale of securities

Defendants' activities were clearly "in the offer or sale," and "in connection with the purchase or sale" of securities and in interstate commerce. The phrase "in connection with the purchase or sale" of a security is met when the fraud alleged "coincides with a securities transaction." *Merrill Lynch, Pierce, Fenner & Smith Inc., v. Dabit*, 547 U.S. 71, 85 (2006). Moreover, "in connection with" requires only that there be "deceptive practices touching" the purchase or sale of securities. *See Superintendent of Ins. v. Bankers Life & Casualty Co.*, 404 U.S. 6, 12-13 (1971); *see also SEC v. Zandford*, 535 U.S. 813, 819 (2002).[1] Here, Horwitz's misrepresentations and deceptive conduct spanned the many years of his continuous offerings of 1inMM's securities. Defendants raised at least $690 million from investors from March 2014 until at least December 2019.

The SEC has established a *prima facie* case that Defendants violated Section 10(b)/Rule 10b-5 and Section 17(a).

---

[1] Defendants' activities clearly occurred in interstate commerce, given Horwitz's use of the phone, email and wires to raise money from investors in multiple states. Email and the internet are instrumentalities of interstate commerce. *See, e.g.*, *U.S. v. Nader*, 542 F.3d 713, 717 (9th Cir. 2008) ("Telephones are instrumentalities of interstate commerce ..."); *Utah Lighthouse Ministry v. Foundation for Apologetic Info. & Research*, 527 F.3d 1045, 1054 (10th Cir. 2008) ("We agree that the Internet is generally an instrumentality of interstate commerce."); *see also Lopes v. Vieira*, 543 F. Supp. 2d 1149, 1174-75 (E.D. Cal. 2008) (use of means of interstate commerce and face-to-face meetings sufficient to allege jurisdiction).

### 3.      Defendants' Violations Are Likely to Be Repeated

In addition to making a *prima facie* showing of Defendants' securities laws violations, the record also shows a likelihood that these violations will be repeated. [2] Whether a likelihood of future violations exists depends upon the totality of the circumstances.  *See Murphy*, 626 F.2d at 655; *Fehn*, 97 F.3d at 1295-96.  The existence of past violations may give rise to an inference that there will be future violations.  *See Murphy*, 626 F.2d at 655.

Horwitz has recently engaged in lulling behavior where he made false promise to investors that settlement negations with HBO and Netflix would soon lead to large payments to 1inMM and, in turn, the repayment of outstanding notes.  Horwitz has continued to promise investors that payment is forthcoming, and recently represented that at least some investors would be repaid in full by April 2021.  Indeed, Horwitz even suggested to one investor group that it should provide funds to 1inMM to pay legal counsel in connection with the fake lawsuits that Defendants fabricated against HBO and Netflix.  Where Horwitz continues to lie to investors about their investments, there is a likelihood of future violations.

### B.      An Emergency Asset Freeze Is Appropriate

"Federal courts have inherent equitable authority to issue a variety of 'ancillary relief' measures in actions brought by the SEC to enforce the federal securities laws." *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980).  The Court's equitable powers include the authority to freeze assets of both parties and nonparties.  *See SEC v. Hickey*, 322 F.3d at 1131 (affirming asset freeze over nonparty brokerage firm controlled by defendant to effectuate disgorgement order against defendant). The purpose of an asset freeze is to prevent the dissipation of assets so that they may be available to be paid as disgorgement for the benefit of the victims of the fraud.  *Id.*

---

[2] None of the relief sought in this Application requires that the Court find that Defendants will continue to violate the securities laws, but, notably, the record here supports such a finding.

322 F.3d at 1132.  The Ninth Circuit has found that "the public interest in preserving the illicit proceeds [of a defendant's fraud] for restitution to the victims is great." *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1236 (9th Cir. 1999).  Courts have recognized that a disgorgement order will often be rendered meaningless unless an asset freeze is imposed prior to the entry of final judgment.  *See SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990).  "A party seeking an asset freeze must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages if relief is not granted."  *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009); *SEC v. Sripetch*, No. 20-CV-01864-H-AGS, 2020 WL 6396927, at *8 (S.D. Cal. Nov. 2, 2020) (citing *Johnson*, *id.*).

Here, Horwitz obtained at least $690 million by means of his fraudulent behavior.  Pearson Decl. at ¶ 16.  By 2019, Defendants defaulted on the outstanding Promissory Notes, leaving investors with more than $234 million in unreturned principal.  Pearson Decl. at ¶ 18.  As of February 26, 2021, he had dissipated a substantial portion of the amount of funds raised, and held only $3,297 in his personal account and approximately $3,229 in the two 1inMM bank accounts.  Pearson Decl. at ¶ 31(a)-(c).  Horwitz also mortgaged the house for over $4 million.  Horwitz has recently, as of January 21, 2021, listed for sale his multi-million dollar home, purchased with investor funds, suggesting that he intends to liquidate that asset and make it easier to dissipate.  *See* Jasper Decl., Ex. 21.

The SEC requests that the Court freeze all of Defendants' assets, as these assets are substantially less than the at least $234 million outstanding to investors, and the civil penalties the SEC will seek against Defendants.  Courts in SEC enforcement cases have entered asset freeze orders to preserve assets for disgorgement and the payment of monetary penalties.  *See, e.g., SEC v. Ahmed*, 123 F. Supp. 3d 301, 312 (D. Conn. 2015) (asset freeze preserves the *status quo*); *SEC v. Maillard*, 2014 U.S. Dist. LEXIS 56456, at *14, 2014 WL 1660024, at *4 (S.D.N.Y. 2014) ("The SEC is entitled upon an adequate showing ... to an asset freeze sufficient to preserve its

disgorgement remedy as well as assets necessary to pay civil monetary penalties."). The asset freeze is necessary to prevent Defendants from further dissipation of the proceeds from his fraud.  Moreover, Defendants have largely already emptied their bank accounts, further demonstrating a likelihood if dissipation.  *SEC v. Sripetch*, 2020 WL 6396927, at *8 (S.D. Cal. Nov. 2, 2020) (evidence showing bank accounts have been emptied supports issuance of an asset freeze); *SEC v. Credit First Fund, LP*, No. CV 05-8741DSF (PJWx), 2006 WL 4729240, at *15 (C.D. Cal. Feb. 13, 2006) (same).

### C.     The Other Relief Sought by the SEC Is Necessary

In addition to the asset freeze, the SEC also seeks an order for an accounting, prohibiting the destruction or alteration of evidence, and ordering that Defendants show cause why the asset freeze should not be continued for the duration of the case. Federal courts have "inherent equitable power to issue provisional remedies ancillary to its authority to provide final equitable relief." *Reebok Int'l, Ltd v. Marnatech Enterprises, Inc.*, 970 F.2d 552, 559 (9th Cir. 1992); *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980).  "[O]nce the equity jurisdiction of the district court properly has been invoked, the court has power to order all equitable relief necessary under the circumstances." *SEC v. Materia*, 745 F.2d 197, 200 (2d Cir. 1984).

The Court has broad equitable powers to order ancillary relief to require an accounting and prohibit document destruction. *See Wencke*, 622 F.2d at 1369.  Both orders are appropriate here.  The SEC is aware that Defendants hold bank accounts at City National Bank, and is unaware of any other accounts, and Defendants have not responded to the SEC's subpoena regarding any additional accounts.  Accordingly, the Court should order Horwitz to prepare an accounting, so the SEC can identify all the available assets to ensure that funds and assets are frozen properly and available to satisfy any future order of disgorgement or civil penalties against him. *See SEC v. Int'l Swiss Invs. Corp.*, 895 F.2d 1272 at 1276.  Likewise, an order preventing the destruction of evidence is necessary to allow the parties to prepare for a hearing on

the order to show cause and to prevent Defendants from destroying evidence of their violations.  The SEC also requests that the Court set this matter for a hearing to show cause prior to the expiration of the temporary asset freeze.  Fed. R. Civ. P. 65(b)(2).

**IV.**   **CONCLUSION**

For the foregoing reasons, the SEC respectfully requests that the Court Grant the requested relief.


Dated:  April 5, 2021                                        Respectfully submitted,


                                                            */s/ Kathryn C. Wanner*
                                                            KATHRYN C. WANNER
                                                            M. LANCE JASPER
                                                            Attorneys for Plaintiff
                                                            Securities and Exchange Commission