APPENDIX A

ASSIGNMENT

This assignment ("Assignment") between 1INMM CAPITAL LLC, located at (███████████
███████████) ("Assignor") and Movie Fund LLC, a Corporation located
at  (███████ █ █████████████████████) ("Assignee") is dated effective as of
(10/11/2019).

For good and valuable consideration, the receipt and sufficiency of which hereby acknowledged,
Assignor does hereby irrevocably and unconditionally sell, grant, convey, and assign unto
Assignee all of Assignor's rights, title and interest of every kind and nature, throughout the
universe, until assignee is paid ($997,615.00) at to which time all rights, title and interest of every
kind and nature revert back to Assignor and to that certain motion picture, currently entitled
"ICEMAN: THE TIME TRAVELLER" (the "Picture") based on the original screenplay entitled
"ICEMAN: THE TIME TRAVELLER" written by Fung Lam.

1.  Assignor hereby represents and warrants:

    1.1.    That Assignor is the sole and exclusive owner of the rights and privileges granted
            or to be granted to Assignee hereunder.
    1.2.    That, as of the effective date hereof, Assignor has the right to enter into this
            Assignment.
    1.3.    That, as of the effective date hereof, no part of the rights herein conveyed has in
            any way been encumbered, conveyed, assigned, transferred or otherwise disposed
            of and all such rights are therefore free and clear of any and all liens, claims,
            charges or encumbrances whatsoever in favor of any party whatsoever.

2.  Assignor shall indemnify Assignee, its successors, assigns, licensees and officers, and hold
    them harmless from and against any and all claims, liability, losses, damages, costs, expenses
    (including but not limited to attorney's fees) arising out of any breach by Assignor of any
    warranty made by Assignor hereunder.

3.  Assignee hereby assumes and agrees to be bound by all future obligations of Assignor which
    accrue after the date hereof.

4.  Assignor hereby waives the benefits of any provision of law known as "droit morale" or any
    similar law in any country of the world and agrees not to institute or permit any action or
    lawsuit on the ground that the Picture in any way constitutes an infringement of any "droit
    morale" and Assignor agrees that Assignor shall not, under any circumstances (including
    without limitation, the circumstances of a breach by Assignee) be entitled to enjoin the
    exhibition or other exploitation of the Picture, to terminate or rescind any rights granted to
    Assignee or to obtain any other form of equitable relief, specific performance or otherwise,
    any right to which Assignor expressly waives.

5.  This Assignment, and the rights granted hereunder, may not be assigned by Assignor to any
    person, firm or corporation. Assignee may assign this Assignment and the rights and services
    granted herein, together with the results and proceeds thereof, and the representations and
    warranties contained herein, to any person or entity.

Exhibit 7 Page 194
MOVIEFUND000410

6.  This Assignment shall be construed in accordance with the laws of the state of California and shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, licensees and assigns. This Assignment cannot be amended or modified except in a writing signed by all parties hereto.

IN WITNESS WHEREOF, THE PARTIES HERETO HAVE EXECUTED AND DELIVERED THIS ASSIGNMENT AS OF THE (11)th DAY OF OCTOBER, 2019.

1INMM CAPITAL, LLC ("Assignor")                    MOVIE FUND LLC ("Assignee")

By:_____                        By: _____

Its: MANAGING PARTNER                              Its: _____

Exhibit 7 Page 195
MOVIEFUND000411

**PROMISSORY NOTE**

**$ (1,006,590.00)**                                                                                    **(09/27/2019)**

Promise. 1INMM Capital, LLC, a limited liability entity established in the State of California, (the "Maker"), hereby promises to pay to Lender, Movie Fund LLC, a corporation with addresses at ████ █ ██████████████ ), (the "Payee"), an amount equal to (ONE MILLION SIX THOUSAND FIVE HUNDRED NINETY) Dollars ($1,006,590.00) in lawful money of the United States of America, which sum shall be due and payable on (03/27/2020) (the "Maturity Date"), in one (1) balloon payment, in like money at said office. Payment date shall be no later than six (6) months post confirmed funds transfer from Payee to Maker in the amount of (SEVEN HUNDRED FORTY-FOUR THOUSAND EIGHT HUNDRED FIFTY) Dollars ($744,850.00).

Prepayment Option. Maker may pay down at any time any portion of the  principal sum outstanding without any prepayment penalty.

Assignment of Rights. See Appendix A

Compounding of Unpaid Payments. The undersigned agrees that time is of the  essence and that in the event payment of principal or interest due under this Note is not  made when due, giving effect to any grace period which maybe applicable, the  outstanding balance of unpaid payments hereof shall immediately bear interest at  the rate of ten (10) percent per month, for so long as  such event of default continues.

Validity of Agreement to Conform to Law. All agreements between the undersigned and the holder of this Note are expressly limited so that in no contingency or event whatsoever, whether by reason of advancement of the proceeds hereof, acceleration of maturity of the unpaid principal balance, or otherwise, shall the amount paid or agreed to be paid to the holder hereof for the use, forbearance or detention of money advanced hereunder exceed the highest lawful rate permissible under any law which a court of competent jurisdiction may deem applicable hereto. If, from any circumstances whatsoever, fulfillment of any provision hereof or any instrument securing this Note or any other agreement referred to herein, at the time performance of such provision shall be due, shall involve transcending the limit of validity prescribed by law which a court of competent jurisdiction may deem applicable hereto, then, ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity, and if from any circumstances the holder hereof shall ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the

Exhibit 7 Page 196
MOVIEFUND000412

reduction of the unpaid principal balance due hereunder and not to the payment of interest. This provision shall control every other provision of all agreements between the undersigned and the holder hereof.

Maker's Default. At the option of the holder hereof exercised by written notice to the undersigned, this Note shall become immediately due and payable upon the maker's failure to pay when due any payment of principal, interest or expenses due hereunder; or (b) failure in the performance or observance of any of the terms or conditions of any mortgage, deed of trust, security agreement or other agreement securing, guaranteeing or otherwise pertaining to this Note after giving effect to any applicable curative period which may be contained therein. Upon the occurrence of any of the following specified Events of Default, as defined under the standard conventions and terminology prescribed for promissory notes drafted under Warren's California Forms for Principal, Interest, Insolvency, Breach of Covenants, Breach of Representation and Warranties, (each herein called an "Event of Default") then, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, the Payee may, by written notice to the Maker, declare the principal of and accrued interest in respect of this Note to be forthwith due and payable, whereupon the principal of and such unpaid accrued interest in respect of this Note shall become forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Maker. Furthermore, This note shall become due and payable before the above-mentioned maturity date immediately upon the happening of any of the following events affecting any maker or indorser thereof, to wit: voluntary or involuntary filing of a petition in bankruptcy or for reorganization, execution of an assignment for the benefit of creditors, calling meeting of creditors, appointment of liquidating agent or committee, offer of composition, entry of a judgment in excess of $ 10,000 which remains unsatisfied or for over 30 days, application for appointment or appointment of any receiver, issuance of warrant of attachment or death of any maker or indorser or on default of any other obligations to the Maker.

Collection Costs. If this Note or any installment of principal or interest is not paid when due, whether at maturity or by acceleration, the undersigned promises to pay all costs of collection, including without limitation, actual attorneys' fees, and all expenses in connection with the protection or realization of the assets and proceeds available this Note or the enforcement of any subsequent memorandum or agreement created in conjunction with this Note incurred by the holder hereof on account of such collection, whether or not suit is filed hereon or thereon; such costs and expenses shall include, without limitation, all costs, expenses and attorneys' fees actually incurred by the holder hereof in connection with any insolvency, bankruptcy, arrangement or other similar proceedings involving the undersigned, or involving any endorser or guarantor hereof, which in anyway affects the exercise by the holder hereof of its rights and remedies under this Note or under any mortgage, deed of trust, security agreement, guaranty or other agreement securing or pertaining to this Note.

Waiver of Notice. Presentment, demand, protest, notices of protest, dishonor and nonpayment of this Note and all notices of every kind are hereby waived by all parties to

Exhibit 7 Page 197
MOVIEFUND000413

this Note, whether the undersigned, principal, surety, guarantor or endorser, except as provided herein. To the extent permitted by applicable law, the defense of the statute of limitations is hereby waived by the undersigned.

<u>Death of Maker</u>. Maker of this note hereby waives all notice and demand and consent that this note shall become due and payable immediately upon the happening of any of said events. This note shall become due and payable on the Maturity Date, but payment shall be accelerated and become due and payable immediately if the Maker shall die. For the further security of the holder thereof, the undersigned covenants that so long as any part of the principal or interest of this note is outstanding and unpaid, it will not grant any security interest to any third party upon its property, or create any lien whatsoever thereon, without also thereby including therein this note, equally and ratably with every other evidence of debt, secured by any of the undersigned's property. If, while any part of the principal or interest is outstanding and unpaid, the maker hereof breaks this covenant, then the holder hereof may at his or its election, declare and make this note at once due and payable by written notice delivered to maker, and this remedy will be deemed cumulative and in addition to any other remedy available to the holder hereof. This note shall be paid without claim of set-off, counterclaim or deduction of any nature or for any cause whatsoever.

<u>Extensions Granted by Payee.</u> All indorsers hereunder agree that the holder of this note in case of non-payment thereof at maturity, or of any installment thereof when due, may grant to the maker or any indorser of said note any extension or extensions of time of payment thereof, in whole or in part, without notice to said indorsers or any of them and any such extension or extensions shall not affect in any way said indorsers' liability upon note, such indorsers hereby waiving demand, presentment of payment, notice of nonpayment and protest and do further agree that any holder of this note may in the event of default in the payment of principal of, or interest upon, this note or any installment thereof repossess and/or sell the (collateral) held as collateral security for the payment of this note without in any way relieving said indorsers, or any of them, of any liability by reason of such repossession and/or sale, applying the proceeds of sale of any such  asset less all costs to amount due under this note, and all indorsers agree to pay any deficiency on this note on demand.

<u>Litigation Fees</u>. In any action at law or in equity to enforce or construe any provisions or rights under this Note, the unsuccessful party or parties to such litigation, as determined by a court pursuant to a final offer, judgment or decree, shall pay to the successful party or parties all costs, expenses and reasonable attorneys' fees incurred by such successful party or parties (including, without limitation, such costs, expenses and fees on any appeal), which costs, expenses and attorneys' fees shall be included as part of any order, judgment or decree.

<u>General Provisions.</u> Principal and interest evidenced hereby are payable only in lawful money of the United States. The receipt of a check shall not, in itself, constitute payment hereunder unless and until paid in good funds. Whenever any payment on this Note shall be stated to be due on a day, which is not a business day, such payment shall be made on

Exhibit 7 Page 198
MOVIEFUND000414

the next succeeding business day and such extension of time shall be included in the computation of the payment of interest of this Note. This Note is to be governed by and construed in accordance with the laws of the State of California except to the extent United States federal law permits the holder to contract for, charge or receive a greater amount of interest. In any action brought under or arising out of this Note, the undersigned hereby consents to the in personam jurisdiction of any state or federal court  sitting in the state of California, and waives any claim or defense that such forum is not  convenient or proper, and consents to service of process by any means authorized by  California and/or Federal law.

THE UNDERSIGNED HEREBY WAIVES, AND COVENANTS THAT THE UNDERSIGNED WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS NOTE, THE SUBJECT MATTER HEREOF OR ANY DOCUMENT RELATING HERETO, IN EACH CASE WHETHER  NOW EXISTING OR HEREAFTER ARISING OR WHETHER IN CONTRACT OR IN  TORT OR OTHERWISE.

_____                    _____09/27/2019_____

1INMM Capital, LLC                                      Date
Zachary Horwitz, Manager

Exhibit 7 Page 199
MOVIEFUND000415

APPENDIX A

ASSIGNMENT

This assignment ("Assignment") between 1INMM CAPITAL LLC, located at (████████) ("Assignor") and Movie Fund LLC, a Corporation located at (████████) ("Assignee") is dated effective as of (09/27/ 2019).

For good and valuable consideration, the receipt and sufficiency of which hereby acknowledged, Assignor does hereby irrevocably and unconditionally sell, grant, convey, and assign unto Assignee all of Assignor's rights, title and interest of every kind and nature, throughout the universe, until assignee is paid ($1,006,590.00) at to which time all rights, title and interest of every kind and nature revert back to Assignor and to that certain motion picture, currently entitled "THE WARNING" (the "Picture") based on the original screenplay entitled "THE WARNING" written by Chris Sparling.

1.  Assignor hereby represents and warrants:

    1.1.  That Assignor is the sole and exclusive owner of the rights and privileges granted or to be granted to Assignee hereunder.
    1.2.  That, as of the effective date hereof, Assignor has the right to enter into this Assignment.
    1.3.  That, as of the effective date hereof, no part of the rights herein conveyed has in any way been encumbered, conveyed, assigned, transferred or otherwise disposed of and all such rights are therefore free and clear of any and all liens, claims, charges or encumbrances whatsoever in favor of any party whatsoever.

2.  Assignor shall indemnify Assignee, its successors, assigns, licensees and officers, and hold them harmless from and against any and all claims, liability, losses, damages, costs, expenses (including but not limited to attorney's fees) arising out of any breach by Assignor of any warranty made by Assignor hereunder.

3.  Assignee hereby assumes and agrees to be bound by all future obligations of Assignor which accrue after the date hereof.

4.  Assignor hereby waives the benefits of any provision of law known as "droit morale" or any similar law in any country of the world and agrees not to institute or permit any action or lawsuit on the ground that the Picture in any way constitutes an infringement of any "droit morale" and Assignor agrees that Assignor shall not, under any circumstances (including without limitation, the circumstances of a breach by Assignee) be entitled to enjoin the exhibition or other exploitation of the Picture, to terminate or rescind any rights granted to Assignee or to obtain any other form of equitable relief, specific performance or otherwise, any right to which Assignor expressly waives.

5.  This Assignment, and the rights granted hereunder, may not be assigned by Assignor to any person, firm or corporation. Assignee may assign this Assignment and the rights and services granted herein, together with the results and proceeds thereof, and the representations and warranties contained herein, to any person or entity.

Exhibit 7 Page 200
MOVIEFUND000416

6.  This Assignment shall be construed in accordance with the laws of the state of California and shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, licensees and assigns. This Assignment cannot be amended or modified except in a writing signed by all parties hereto.

IN WITNESS WHEREOF, THE PARTIES HERETO HAVE EXECUTED AND DELIVERED THIS ASSIGNMENT AS OF THE (27)th DAY OF SEPTEMBER 2019.

1INMM CAPITAL, LLC ("Assignor")                MOVIE FUND LLC ("Assignee")

By: _____              By: _____

Its: MANAGING PARTNER                   Its: _____

Exhibit 7 Page 201

MOVIEFUND000417

PROMISSORY NOTE

**$ (999,620.00)**                                                    **(10/11/2019)**

Promise. 1INMM Capital, LLC, a limited liability entity established in the State of California, (the "Maker"), hereby promises to pay to Lender, Movie Fund LLC, a corporation with addresses at (███████ █████████████████), (the "Payee"), an amount equal to (NINE HUNDRED NINETY-NINE THOUSAND SIX HUNDRED TWENTY) Dollars ($999,620.00) in lawful money of the United States of America, which sum shall be due and payable on (04/11/2020) (the "Maturity Date"), in one (1) balloon payment, in like money at said office. Payment date shall be no later than six (6) months post confirmed funds transfer from Payee to Maker in the amount of (SEVEN HUNDRED THIRTY-NINE THOUSAND TWO HUNDRED) Dollars ($739,200.00).

Prepayment Option. Maker may pay down at any time any portion of the  principal sum outstanding without any prepayment penalty.

Assignment of Rights. See Appendix A

Compounding of Unpaid Payments. The undersigned agrees that time is of the  essence and that in the event payment of principal or interest due under this Note is not  made when due, giving effect to any grace period which maybe applicable, the  outstanding balance of unpaid payments hereof shall immediately bear interest at  the rate of ten (10) percent per month, for so long as  such event of default continues.

Validity of Agreement to Conform to Law. All agreements between the undersigned and the holder of this Note are expressly limited so that in no contingency or event whatsoever, whether by reason of advancement of the proceeds hereof, acceleration of maturity of the unpaid principal balance, or otherwise, shall the amount paid or agreed to be paid to the holder hereof for the use, forbearance or detention of money advanced hereunder exceed the highest lawful rate permissible under any law which a court of competent jurisdiction may deem applicable hereto. If, from any circumstances whatsoever, fulfillment of any provision hereof or any instrument securing this Note or any other agreement referred to herein, at the time performance of such provision shall be due, shall involve transcending the limit of validity prescribed by law which a court of competent jurisdiction may deem applicable hereto, then, ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity, and if from any circumstances the holder hereof shall ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the

Exhibit 7 Page 202
MOVIEFUND000418

reduction of the unpaid principal balance due hereunder and not to the payment of interest. This provision shall control every other provision of all agreements between the undersigned and the holder hereof.

<u>Maker's Default</u>. At the option of the holder hereof exercised by written notice to the undersigned, this Note shall become immediately due and payable upon the maker's failure to pay when due any payment of principal, interest or expenses due hereunder; or (b) failure in the performance or observance of any of the terms or conditions of any mortgage, deed of trust, security agreement or other agreement securing, guaranteeing or otherwise pertaining to this Note after giving effect to any applicable curative period which may be contained therein. Upon the occurrence of any of the following specified Events of Default, as defined under the standard conventions and terminology prescribed for promissory notes drafted under Warren's California Forms for Principal, Interest, Insolvency, Breach of Covenants, Breach of Representation and Warranties, (each herein called an "Event of Default") then, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, the Payee may, by written notice to the Maker, declare the principal of and accrued interest in respect of this Note to be forthwith due and payable, whereupon the principal of and such unpaid accrued interest in respect of this Note shall become forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Maker. Furthermore, This note shall become due and payable before the above-mentioned maturity date immediately upon the happening of any of the following events affecting any maker or indorser thereof, to wit: voluntary or involuntary filing of a petition in bankruptcy or for reorganization, execution of an assignment for the benefit of creditors, calling meeting of creditors, appointment of liquidating agent or committee, offer of composition, entry of a judgment in excess of $ 10,000 which remains unsatisfied or for over 30 days, application for appointment or appointment of any receiver, issuance of warrant of attachment or death of any maker or indorser or on default of any other obligations to the Maker.

<u>Collection Costs</u>. If this Note or any installment of principal or interest is not paid when due, whether at maturity or by acceleration, the undersigned promises to pay all costs of collection, including without limitation, actual attorneys' fees, and all expenses in connection with the protection or realization of the assets and proceeds available this Note or the enforcement of any subsequent memorandum or agreement created in conjunction with this Note incurred by the holder hereof on account of such collection, whether or not suit is filed hereon or thereon; such costs and expenses shall include, without limitation, all costs, expenses and attorneys' fees actually incurred by the holder hereof in connection with any insolvency, bankruptcy, arrangement or other similar proceedings involving the undersigned, or involving any endorser or guarantor hereof, which in anyway affects the exercise by the holder hereof of its rights and remedies under this Note or under any mortgage, deed of trust, security agreement, guaranty or other agreement securing or pertaining to this Note.

<u>Waiver of Notice</u>. Presentment, demand, protest, notices of protest, dishonor and nonpayment of this Note and all notices of every kind are hereby waived by all parties to

Exhibit 7 Page 203
MOVIEFUND000419

this Note, whether the undersigned, principal, surety, guarantor or endorser, except as provided herein. To the extent permitted by applicable law, the defense of the statute of limitations is hereby waived by the undersigned.

<u>Death of Maker</u>. Maker of this note hereby waives all notice and demand and consent that this note shall become due and payable immediately upon the happening of any of said events. This note shall become due and payable on the Maturity Date, but payment shall be accelerated and become due and payable immediately if the Maker shall die. For the further security of the holder thereof, the undersigned covenants that so long as any part of the principal or interest of this note is outstanding and unpaid, it will not grant any security interest to any third party upon its property, or create any lien whatsoever thereon, without also thereby including therein this note, equally and ratably with every other evidence of debt, secured by any of the undersigned's property. If, while any part of the principal or interest is outstanding and unpaid, the maker hereof breaks this covenant, then the holder hereof may at his or its election, declare and make this note at once due and payable by written notice delivered to maker, and this remedy will be deemed cumulative and in addition to any other remedy available to the holder hereof. This note shall be paid without claim of set-off, counterclaim or deduction of any nature or for any cause whatsoever.

<u>Extensions Granted by Payee.</u> All indorsers hereunder agree that the holder of this note in case of non-payment thereof at maturity, or of any installment thereof when due, may grant to the maker or any indorser of said note any extension or extensions of time of payment thereof, in whole or in part, without notice to said indorsers or any of them and any such extension or extensions shall not affect in any way said indorsers' liability upon note, such indorsers hereby waiving demand, presentment of payment, notice of nonpayment and protest and do further agree that any holder of this note may in the event of default in the payment of principal of, or interest upon, this note or any installment thereof repossess and/or sell the (collateral) held as collateral security for the payment of this note without in any way relieving said indorsers, or any of them, of any liability by reason of such repossession and/or sale, applying the proceeds of sale of any such  asset less all costs to amount due under this note, and all indorsers agree to pay any deficiency on this note on demand.

<u>Litigation Fees</u>. In any action at law or in equity to enforce or construe any provisions or rights under this Note, the unsuccessful party or parties to such litigation, as determined by a court pursuant to a final offer, judgment or decree, shall pay to the successful party or parties all costs, expenses and reasonable attorneys' fees incurred by such successful party or parties (including, without limitation, such costs, expenses and fees on any appeal), which costs, expenses and attorneys' fees shall be included as part of any order, judgment or decree.

<u>General Provisions.</u> Principal and interest evidenced hereby are payable only in lawful money of the United States. The receipt of a check shall not, in itself, constitute payment hereunder unless and until paid in good funds. Whenever any payment on this Note shall be stated to be due on a day, which is not a business day, such payment shall be made on

Exhibit 7 Page 204
MOVIEFUND000420

the next succeeding business day and such extension of time shall be included in the computation of the payment of interest of this Note. This Note is to be governed by and construed in accordance with the laws of the State of California except to the extent United States federal law permits the holder to contract for, charge or receive a greater amount of interest. In any action brought under or arising out of this Note, the undersigned hereby consents to the in personam jurisdiction of any state or federal court  sitting in the state of California, and waives any claim or defense that such forum is not  convenient or proper, and consents to service of process by any means authorized by  California and/or Federal law.

THE UNDERSIGNED HEREBY WAIVES, AND COVENANTS THAT THE UNDERSIGNED WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS NOTE, THE SUBJECT MATTER HEREOF OR ANY DOCUMENT RELATING HERETO, IN EACH CASE WHETHER  NOW EXISTING OR HEREAFTER ARISING OR WHETHER IN CONTRACT OR IN  TORT OR OTHERWISE.

_____        _____10/11/2019_____

1INMM Capital, LLC                                      Date
Zachary Horwitz, Manager

Exhibit 7 Page 205
MOVIEFUND000421

APPENDIX A


ASSIGNMENT


This assignment ("Assignment") between 1INMM CAPITAL LLC, located at (███████████ ████████████████████████) ("Assignor") and Movie Fund LLC, a Corporation located at  (███████ ██ ████████████████████) ("Assignee") is dated effective as of (10/11/2019).


For good and valuable consideration, the receipt and sufficiency of which hereby acknowledged, Assignor does hereby irrevocably and unconditionally sell, grant, convey, and assign unto Assignee all of Assignor's rights, title and interest of every kind and nature, throughout the universe, until assignee is paid ($999,620.00) at to which time all rights, title and interest of every kind and nature revert back to Assignor and to that certain motion picture, currently entitled "THE WITNESS" (the "Picture") based on the original screenplay entitled "THE WITNESS" written by Kyu-Jang Cho.


1.  Assignor hereby represents and warrants:

      1.1.   That Assignor is the sole and exclusive owner of the rights and privileges granted or to be granted to Assignee hereunder.

      1.2.   That, as of the effective date hereof, Assignor has the right to enter into this Assignment.

      1.3.   That, as of the effective date hereof, no part of the rights herein conveyed has in any way been encumbered, conveyed, assigned, transferred or otherwise disposed of and all such rights are therefore free and clear of any and all liens, claims, charges or encumbrances whatsoever in favor of any party whatsoever.


2.  Assignor shall indemnify Assignee, its successors, assigns, licensees and officers, and hold them harmless from and against any and all claims, liability, losses, damages, costs, expenses (including but not limited to attorney's fees) arising out of any breach by Assignor of any warranty made by Assignor hereunder.


3.  Assignee hereby assumes and agrees to be bound by all future obligations of Assignor which accrue after the date hereof.


4.  Assignor hereby waives the benefits of any provision of law known as "droit morale" or any similar law in any country of the world and agrees not to institute or permit any action or lawsuit on the ground that the Picture in any way constitutes an infringement of any "droit morale" and Assignor agrees that Assignor shall not, under any circumstances (including without limitation, the circumstances of a breach by Assignee) be entitled to enjoin the exhibition or other exploitation of the Picture, to terminate or rescind any rights granted to Assignee or to obtain any other form of equitable relief, specific performance or otherwise, any right to which Assignor expressly waives.


5.  This Assignment, and the rights granted hereunder, may not be assigned by Assignor to any person, firm or corporation. Assignee may assign this Assignment and the rights and services granted herein, together with the results and proceeds thereof, and the representations and warranties contained herein, to any person or entity.


Exhibit 7 Page 206
MOVIEFUND000422

6.  This Assignment shall be construed in accordance with the laws of the state of California and shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, licensees and assigns. This Assignment cannot be amended or modified except in a writing signed by all parties hereto.

IN WITNESS WHEREOF, THE PARTIES HERETO HAVE EXECUTED AND DELIVERED THIS ASSIGNMENT AS OF THE (11)th DAY OF OCTOBER, 2019.


1INMM CAPITAL, LLC ("Assignor")                    MOVIE FUND LLC ("Assignee")


By: _____                        By: _____

Its: MANAGING PARTNER                              Its: _____


Exhibit 7 Page 207
MOVIEFUND000423

# EXHIBIT 8

**PROMISSORY NOTE**

**$ (998,865.00)**                                                                                    **(07/12/2019)**

Promise. 1INMM Capital, LLC, a limited liability entity established in the State of California, (the "Maker"), hereby promises to pay to Lender, JJMT CAPITAL LLC, a Delaware Limited Liability company located at  (███████████████ ███████████ ), (the "Payee"), an amount equal to (NINE HUNDRED NINETY-EIGHT THOUSAND EIGHT HUNDRED SIXTY FIVE) Dollars ($998,865.00) in lawful money  of the United States of America, which sum shall be due and payable on (01/12/2020)  (the "Maturity Date"), in one (1) balloon payment, in  like money at said office. Payment date shall be no later than SIX (6) months post confirmed funds transfer from Payee to Maker in the amount of (SEVEN HUNDRED THIRTY-FIVE THOUSAND) Dollars ($735,000.00).

Prepayment Option. Maker may pay down at any time any portion of the  principal sum outstanding without any prepayment penalty.

Assignment of Rights. See Appendix A

Compounding of Unpaid Payments. The undersigned agrees that time is of the  essence and that in the event payment of principal or interest due under this Note is not  made when due, giving effect to any grace period which maybe applicable, the  outstanding balance of unpaid payments hereof shall immediately bear interest at  the rate of ten (10) percent per month, for so long as  such event of default continues.

Validity of Agreement to Conform to Law. All agreements between the undersigned and the holder of this Note are expressly limited so that in no contingency or event whatsoever, whether by reason of advancement of the proceeds hereof, acceleration of maturity of the unpaid principal balance, or otherwise, shall the amount paid or agreed to be paid to the holder hereof for the use, forbearance or detention of money advanced hereunder exceed the highest lawful rate permissible under any law which a court of competent jurisdiction may deem applicable hereto. If, from any circumstances whatsoever, fulfillment of any provision hereof or any instrument securing this Note or any other agreement referred to herein, at the time performance of such provision shall be due, shall involve transcending the limit of validity prescribed by law which a court of competent jurisdiction may deem applicable hereto, then, ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity, and if from any circumstances the holder hereof shall ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the

Exhibit 8 Page 208

JJMT-SEC-0000462

reduction of the unpaid principal balance due hereunder and not to the payment of interest. This provision shall control every other provision of all agreements between the undersigned and the holder hereof.

Maker's Default. At the option of the holder hereof exercised by written notice to the undersigned, this Note shall become immediately due and payable upon the maker's failure to pay when due any payment of principal, interest or expenses due hereunder; or (b) failure in the performance or observance of any of the terms or conditions of any mortgage, deed of trust, security agreement or other agreement securing, guaranteeing or otherwise pertaining to this Note after giving effect to any applicable curative period which may be contained therein. Upon the occurrence of any of the following specified Events of Default, as defined under the standard conventions and terminology prescribed for promissory notes drafted under Warren's California Forms for Principal, Interest, Insolvency, Breach of Covenants, Breach of Representation and Warranties, (each herein called an "Event of Default") then, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, the Payee may, by written notice to the Maker, declare the principal of and accrued interest in respect of this Note to be forthwith due and payable, whereupon the principal of and such unpaid accrued interest in respect of this Note shall become forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Maker. Furthermore, This note shall become due and payable before the above-mentioned maturity date immediately upon the happening of any of the following events affecting any maker or indorser thereof, to wit: voluntary or involuntary filing of a petition in bankruptcy or for reorganization, execution of an assignment for the benefit of creditors, calling meeting of creditors, appointment of liquidating agent or committee, offer of composition, entry of a judgment in excess of $ 10,000 which remains unsatisfied or for over 30 days, application for appointment or appointment of any receiver, issuance of warrant of attachment or death of any maker or indorser or on default of any other obligations to the Maker.

Collection Costs. If this Note or any installment of principal or interest is not paid when due, whether at maturity or by acceleration, the undersigned promises to pay all costs of collection, including without limitation, actual attorneys' fees, and all expenses in connection with the protection or realization of the assets and proceeds available this Note or the enforcement of any subsequent memorandum or agreement created in conjunction with this Note incurred by the holder hereof on account of such collection, whether or not suit is filed hereon or thereon; such costs and expenses shall include, without limitation, all costs, expenses and attorneys' fees actually incurred by the holder hereof in connection with any insolvency, bankruptcy, arrangement or other similar proceedings involving the undersigned, or involving any endorser or guarantor hereof, which in anyway affects the exercise by the holder hereof of its rights and remedies under this Note or under any mortgage, deed of trust, security agreement, guaranty or other agreement securing or pertaining to this Note.

Waiver of Notice. Presentment, demand, protest, notices of protest, dishonor and nonpayment of this Note and all notices of every kind are hereby waived by all parties to

Exhibit 8 Page 209

JJMT-SEC-0000463

this Note, whether the undersigned, principal, surety, guarantor or endorser, except as provided herein. To the extent permitted by applicable law, the defense of the statute of limitations is hereby waived by the undersigned.

Death of Maker. Maker of this note hereby waives all notice and demand and consent that this note shall become due and payable immediately upon the happening of any of said events. This note shall become due and payable on the Maturity Date, but payment shall be accelerated and become due and payable immediately if the Maker shall die. For the further security of the holder thereof, the undersigned covenants that so long as any part of the principal or interest of this note is outstanding and unpaid, it will not grant any security interest to any third party upon its property, or create any lien whatsoever thereon, without also thereby including therein this note, equally and ratably with every other evidence on debt, secured by any of the undersigned's property. If, while any part of the principal or interest is outstanding and unpaid, the maker hereof breaks this covenant, then the holder hereof may at his or its election, declare and make this note at once due and payable by written notice delivered to maker, and this remedy will be deemed cumulative and in addition to any other remedy available to the holder hereof. This note shall be paid without claim of set-off, counterclaim or deduction of any nature or for any cause whatsoever.

Extensions Granted by Payee. All indorsers hereunder agree that the holder of this note in case of non-payment thereof at maturity, or of any installment thereof when due, may grant to the maker or any indorser of said note any extension or extensions of time of payment thereof, in whole or in part, without notice to said indorsers or any of them and any such extension or extensions shall not affect in any way said indorsers' liability upon note, such indorsers hereby waiving demand, presentment of payment, notice of nonpayment and protest and do further agree that any holder of this note may in the event of default in the payment of principal of, or interest upon, this note or any installment thereof repossess and/or sell the (collateral) held as collateral security for the payment of this note without in any way relieving said indorsers, or any of them, of any liability by reason of such repossession and/or sale, applying the proceeds of sale of any such asset less all costs to amount due under this note, and all indorsers agree to pay any deficiency on this note on demand.

Litigation Fees. In any action at law or in equity to enforce or construe any provisions or rights under this Note, the unsuccessful party or parties to such litigation, as determined by a court pursuant to a final offer, judgment or decree, shall pay to the successful party or parties all costs, expenses and reasonable attorneys' fees incurred by such successful party or parties (including, without limitation, such costs, expenses and fees on any appeal), which costs, expenses and attorneys' fees shall be included as part of any order, judgment or decree.

General Provisions. Principal and interest evidenced hereby are payable only in lawful money of the United States. The receipt of a check shall not, in itself, constitute payment hereunder unless and until paid in good funds. Whenever any payment on this Note shall be stated to be due on a day, which is not a business day, such payment shall be made on

Exhibit 8 Page 210

JJMT-SEC-0000464

the next succeeding business day and such extension of time shall be included in the computation of the payment of interest of this Note. This Note is to be governed by and construed in accordance with the laws of the State of California except to the extent United States federal law permits the holder to contract for, charge or receive a greater amount of interest. In any action brought under or arising out of this Note, the undersigned hereby consents to the in personam jurisdiction of any state or federal court sitting in the state of California, and waives any claim or defense that such forum is not convenient or proper, and consents to service of process by any means authorized by California and/or Federal law.

THE UNDERSIGNED HEREBY WAIVES, AND COVENANTS THAT THE UNDERSIGNED WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS NOTE, THE SUBJECT MATTER HEREOF OR ANY DOCUMENT RELATING HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING OR WHETHER IN CONTRACT OR IN TORT OR OTHERWISE.

_____                    _____07/12/19_____

1INMM Capital, LLC                                 Date
Zachary Horwitz, Manager

Exhibit 8 Page 211

JJMT-SEC-0000465

APPENDIX A

<u>ASSIGNMENT</u>

This assignment ("Assignment") between 1INMM CAPITAL LLC, located at ( ███████████ ██████████████████████ ) ("Assignor") and JJMT CAPITAL LLC, a Delaware Limited Liability company located at  ( ██████████████████████████ ) ("Assignee") is dated effective as of (07/12/2019).

For good and valuable consideration, the receipt and sufficiency of which hereby acknowledged, Assignor does hereby irrevocably and unconditionally sell, grant, convey, and assign unto Assignee all of Assignor's rights, title and interest of every kind and nature, throughout the universe, until assignee is paid (<u>$998,865.00</u>) at to which time all rights, title and interest of every kind and nature revert back to Assignor and to that certain motion picture, currently entitled "BLOOD QUANTUM" (the "Picture") based on the original screenplay entitled "BLOOD QUANTUM" written by Jeff Barnaby.

1.  Assignor hereby represents and warrants:

    1.1.  That Assignor is the sole and exclusive owner of the rights and privileges granted or to be granted to Assignee hereunder.
    1.2.  That, as of the effective date hereof, Assignor has the right to enter into this Assignment.
    1.3.  That, as of the effective date hereof, no part of the rights herein conveyed has in any way been encumbered, conveyed, assigned, transferred or otherwise disposed of and all such rights are therefore free and clear of any and all liens, claims, charges or encumbrances whatsoever in favor of any party whatsoever.

2.  Assignor shall indemnify Assignee, its successors, assigns, licensees and officers, and hold them harmless from and against any and all claims, liability, losses, damages, costs, expenses (including but not limited to attorney's fees) arising out of any breach by Assignor of any warranty made by Assignor hereunder.

3.  Assignee hereby assumes and agrees to be bound by all future obligations of Assignor which accrue after the date hereof.

4.  Assignor hereby waives the benefits of any provision of law known as "droit morale" or any similar law in any country of the world and agrees not to institute or permit any action or lawsuit on the ground that the Picture in any way constitutes an infringement of any "droit morale" and Assignor agrees that Assignor shall not, under any circumstances (including without limitation, the circumstances of a breach by Assignee) be entitled to enjoin the exhibition or other exploitation of the Picture, to terminate or rescind any rights granted to Assignee or to obtain any other form of equitable relief, specific performance or otherwise, any right to which Assignor expressly waives.

5.  This Assignment, and the rights granted hereunder, may not be assigned by Assignor to any person, firm or corporation. Assignee may assign this Assignment and the rights and services granted herein, together with the results and proceeds thereof, and the representations and warranties contained herein, to any person or entity.

Exhibit 8 Page 212

JJMT-SEC-0000466

6. This Assignment shall be construed in accordance with the laws of the state of California and shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, licensees and assigns. This Assignment cannot be amended or modified except in a writing signed by all parties hereto.

IN WITNESS WHEREOF, THE PARTIES HERETO HAVE EXECUTED AND DELIVERED THIS ASSIGNMENT AS OF THE (12)th DAY OF JULY 2019.

1INMM CAPITAL, LLC ("Assignor")          JJMT CAPITAL LLC ("Assignee")

By: _____          By: _____

Its: <u>MANAGING PARTNER</u>            Its: ___Managing Partner_____

Exhibit 8 Page 213

JJMT-SEC-0000467

# EXHIBIT 9

**PROMISSORY NOTE**

**$ (997,840.00)**                                                    **(10/18/2019)**

Promise. 1INMM Capital, LLC, a limited liability entity established in the State of California, (the "Maker"), hereby promises to pay to Lender, Pure Health Enterprises Inc., a corporation with addresses at ███████████████████ ), (the "Payee"), an amount equal to (<u>NINE HUNDRED NINETY-SEVEN THOUSAND EIGHT HUNDRED FORTY</u>) Dollars (<u>$997,840.00</u>) in lawful money of the United States of America, which sum shall be due and payable on (<u>04/18/2020</u>) (the "Maturity Date"), in one (1) balloon payment, in like money at said office. Payment date shall be no later than six (6) months post confirmed funds transfer from Payee to Maker in the amount of (<u>SEVEN HUNDRED THIRTY-NINE THOUSAND EIGHT HUNDRED FIFTY</u>) Dollars (<u>$739,850.00</u>).

<u>Prepayment Option</u>. Maker may pay down at any time any portion of the  principal sum outstanding without any prepayment penalty.

<u>Assignment of Rights.</u> See Appendix A

<u>Compounding of Unpaid Payments</u>. The undersigned agrees that time is of the  essence and that in the event payment of principal or interest due under this Note is not  made when due, giving effect to any grace period which maybe applicable, the  outstanding balance of unpaid payments hereof shall immediately bear interest at  the rate of ten (10) percent per month, for so long as  such event of default continues.

<u>Validity of Agreement to Conform to Law.</u> All agreements between the undersigned and the holder of this Note are expressly limited so that in no contingency or event whatsoever, whether by reason of advancement of the proceeds hereof, acceleration of maturity of the unpaid principal balance, or otherwise, shall the amount paid or agreed to be paid to the holder hereof for the use, forbearance or detention of money advanced hereunder exceed the highest lawful rate permissible under any law which a court of competent jurisdiction may deem applicable hereto. If, from any circumstances whatsoever, fulfillment of any provision hereof or any instrument securing this Note or any other agreement referred to herein, at the time performance of such provision shall be due, shall involve transcending the limit of validity prescribed by law which a court of competent jurisdiction may deem applicable hereto, then, ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity, and if from any circumstances the holder hereof shall ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the

Exhibit 9 Page 214

reduction of the unpaid principal balance due hereunder and not to the payment of interest. This provision shall control every other provision of all agreements between the undersigned and the holder hereof.

Maker's Default. At the option of the holder hereof exercised by written notice to the undersigned, this Note shall become immediately due and payable upon the maker's failure to pay when due any payment of principal, interest or expenses due hereunder; or (b) failure in the performance or observance of any of the terms or conditions of any mortgage, deed of trust, security agreement or other agreement securing, guaranteeing or otherwise pertaining to this Note after giving effect to any applicable curative period which may be contained therein. Upon the occurrence of any of the following specified Events of Default, as defined under the standard conventions and terminology prescribed for promissory notes drafted under Warren's California Forms for Principal, Interest, Insolvency, Breach of Covenants, Breach of Representation and Warranties, (each herein called an "Event of Default") then, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, the Payee may, by written notice to the Maker, declare the principal of and accrued interest in respect of this Note to be forthwith due and payable, whereupon the principal of and such unpaid accrued interest in respect of this Note shall become forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Maker. Furthermore, This note shall become due and payable before the above-mentioned maturity date immediately upon the happening of any of the following events affecting any maker or indorser thereof, to wit: voluntary or involuntary filing of a petition in bankruptcy or for reorganization, execution of an assignment for the benefit of creditors, calling meeting of creditors, appointment of liquidating agent or committee, offer of composition, entry of a judgment in excess of $ 10,000 which remains unsatisfied or for over 30 days, application for appointment or appointment of any receiver, issuance of warrant of attachment or death of any maker or indorser or on default of any other obligations to the Maker.

Collection Costs. If this Note or any installment of principal or interest is not paid when due, whether at maturity or by acceleration, the undersigned promises to pay all costs of collection, including without limitation, actual attorneys' fees, and all expenses in connection with the protection or realization of the assets and proceeds available this Note or the enforcement of any subsequent memorandum or agreement created in conjunction with this Note incurred by the holder hereof on account of such collection, whether or not suit is filed hereon or thereon; such costs and expenses shall include, without limitation, all costs, expenses and attorneys' fees actually incurred by the holder hereof in connection with any insolvency, bankruptcy, arrangement or other similar proceedings involving the undersigned, or involving any endorser or guarantor hereof, which in anyway affects the exercise by the holder hereof of its rights and remedies under this Note or under any mortgage, deed of trust, security agreement, guaranty or other agreement securing or pertaining to this Note.

Waiver of Notice. Presentment, demand, protest, notices of protest, dishonor and nonpayment of this Note and all notices of every kind are hereby waived by all parties to

Exhibit 9 Page 215

this Note, whether the undersigned, principal, surety, guarantor or endorser, except as provided herein. To the extent permitted by applicable law, the defense of the statute of limitations is hereby waived by the undersigned.

<u>Death of Maker</u>. Maker of this note hereby waives all notice and demand and consent that this note shall become due and payable immediately upon the happening of any of said events. This note shall become due and payable on the Maturity Date, but payment shall be accelerated and become due and payable immediately if the Maker shall die. For the further security of the holder thereof, the undersigned covenants that so long as any part of the principal or interest of this note is outstanding and unpaid, it will not grant any security interest to any third party upon its property, or create any lien whatsoever thereon, without also thereby including therein this note, equally and ratably with every other evidence of debt, secured by any of the undersigned's property. If, while any part of the principal or interest is outstanding and unpaid, the maker hereof breaks this covenant, then the holder hereof may at his or its election, declare and make this note at once due and payable by written notice delivered to maker, and this remedy will be deemed cumulative and in addition to any other remedy available to the holder hereof. This note shall be paid without claim of set-off, counterclaim or deduction of any nature or for any cause whatsoever.

<u>Extensions Granted by Payee.</u> All indorsers hereunder agree that the holder of this note in case of non-payment thereof at maturity, or of any installment thereof when due, may grant to the maker or any indorser of said note any extension or extensions of time of payment thereof, in whole or in part, without notice to said indorsers or any of them and any such extension or extensions shall not affect in any way said indorsers' liability upon note, such indorsers hereby waiving demand, presentment of payment, notice of nonpayment and protest and do further agree that any holder of this note may in the event of default in the payment of principal of, or interest upon, this note or any installment thereof repossess and/or sell the (collateral) held as collateral security for the payment of this note without in any way relieving said indorsers, or any of them, of any liability by reason of such repossession and/or sale, applying the proceeds of sale of any such  asset less all costs to amount due under this note, and all indorsers agree to pay any deficiency on this note on demand.

<u>Litigation Fees</u>. In any action at law or in equity to enforce or construe any provisions or rights under this Note, the unsuccessful party or parties to such litigation, as determined by a court pursuant to a final offer, judgment or decree, shall pay to the successful party or parties all costs, expenses and reasonable attorneys' fees incurred by such successful party or parties (including, without limitation, such costs, expenses and fees on any appeal), which costs, expenses and attorneys' fees shall be included as part of any order, judgment or decree.

<u>General Provisions.</u> Principal and interest evidenced hereby are payable only in lawful money of the United States. The receipt of a check shall not, in itself, constitute payment hereunder unless and until paid in good funds. Whenever any payment on this Note shall be stated to be due on a day, which is not a business day, such payment shall be made on

Exhibit 9 Page 216

the next succeeding business day and such extension of time shall be included in the computation of the payment of interest of this Note. This Note is to be governed by and construed in accordance with the laws of the State of California except to the extent United States federal law permits the holder to contract for, charge or receive a greater amount of interest. In any action brought under or arising out of this Note, the undersigned hereby consents to the in personam jurisdiction of any state or federal court sitting in the state of California, and waives any claim or defense that such forum is not convenient or proper, and consents to service of process by any means authorized by California and/or Federal law.

THE UNDERSIGNED HEREBY WAIVES, AND COVENANTS THAT THE UNDERSIGNED WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS NOTE, THE SUBJECT MATTER HEREOF OR ANY DOCUMENT RELATING HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING OR WHETHER IN CONTRACT OR IN TORT OR OTHERWISE.

_____                              _____10/18/19_____

1INMM Capital, LLC                                   Date
Zachary Horwitz, Manager

Exhibit 9 Page 217

APPENDIX A

<u>ASSIGNMENT</u>

This assignment ("Assignment") between 1INMM CAPITAL LLC, located at (█████████ ████████████████) ("Assignor") and Pure Health Enterprises Inc., a Corporation located at ( ██████████████████████ ) ("Assignee") is dated effective as of (<u>10/18/2019</u>).

For good and valuable consideration, the receipt and sufficiency of which hereby acknowledged, Assignor does hereby irrevocably and unconditionally sell, grant, convey, and assign unto Assignee all of Assignor's rights, title and interest of every kind and nature, throughout the universe, until assignee is paid (<u>$997,840.00</u>) at to which time all rights, title and interest of every kind and nature revert back to Assignor and to that certain motion picture, currently entitled "LA MELODIE" (the "Picture") based on the original screenplay entitled "LA MELODIE" written by Rachid Hami.

1.  Assignor hereby represents and warrants:

    1.1.   That Assignor is the sole and exclusive owner of the rights and privileges granted or to be granted to Assignee hereunder.
    1.2.   That, as of the effective date hereof, Assignor has the right to enter into this Assignment.
    1.3.   That, as of the effective date hereof, no part of the rights herein conveyed has in any way been encumbered, conveyed, assigned, transferred or otherwise disposed of and all such rights are therefore free and clear of any and all liens, claims, charges or encumbrances whatsoever in favor of any party whatsoever.

2.  Assignor shall indemnify Assignee, its successors, assigns, licensees and officers, and hold them harmless from and against any and all claims, liability, losses, damages, costs, expenses (including but not limited to attorney's fees) arising out of any breach by Assignor of any warranty made by Assignor hereunder.

3.  Assignee hereby assumes and agrees to be bound by all future obligations of Assignor which accrue after the date hereof.

4.  Assignor hereby waives the benefits of any provision of law known as "droit morale" or any similar law in any country of the world and agrees not to institute or permit any action or lawsuit on the ground that the Picture in any way constitutes an infringement of any "droit morale" and Assignor agrees that Assignor shall not, under any circumstances (including without limitation, the circumstances of a breach by Assignee) be entitled to enjoin the exhibition or other exploitation of the Picture, to terminate or rescind any rights granted to Assignee or to obtain any other form of equitable relief, specific performance or otherwise, any right to which Assignor expressly waives.

5.  This Assignment, and the rights granted hereunder, may not be assigned by Assignor to any person, firm or corporation. Assignee may assign this Assignment and the rights and services granted herein, together with the results and proceeds thereof, and the representations and warranties contained herein, to any person or entity.

Exhibit 9 Page 218

6.  This Assignment shall be construed in accordance with the laws of the state of California and shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, licensees and assigns. This Assignment cannot be amended or modified except in a writing signed by all parties hereto.

IN WITNESS WHEREOF, THE PARTIES HERETO HAVE EXECUTED AND DELIVERED THIS ASSIGNMENT AS OF THE (18)TH DAY OF OCTOBER 2019.

1INMM CAPITAL, LLC ("Assignor")                    PURE HEALTH INC ("Assignee")

By: _____                         By: _____

Its: <u>MANAGING PARTNER</u>                       Its: _____

Exhibit 9 Page 219

# EXHIBIT 10

## Jasper, Lance

| | |
|---|---|
| **From:** | Scott Cohen ████████████ |
| **Sent:** | Wednesday, February 24, 2021 3:51 PM |
| **To:** | Jasper, Lance |
| **Subject:** | Re: URGENT JJMT/1inMM Investor information |

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Lance Jasper:

████████ @ King and Spalding passed your information along. I am the owner of CDLLC which has invested 15 million dollars in what appears to be a Ponzi Scheme through JJMT and ultimately into 1inMM with Zach Horowitz. I have a group of investors that includes around 35 people that have been waiting for nearly 13 months for payment. People are beyond the point of me managing them and they are really in need of answers. Any insight you can provide to me would be extremely helpful. Come Friday, I will most likely be in a position to tell people regardless of if I should or not, what is going on. Please let me know if you have a moment or can possibly shed some light with what is going on!

Thank you!

Sincerely,

Scott Cohen

████████████



Exhibit 10 Page 220

# EXHIBIT 11



**Zach Horwitz**
to me ▾

Wed, Feb 8, 2017, 1:01 PM

Hey Buddy -

Answers below:

I have a few questions for you:

1. Between transaction 1 and 2 which is the time between the lender issuing wholeseller (1inMM) the loan, and the wholeseller purchasing the movie rights from the licensor; what is the security for the lender? If those two transactions are linear in nature and the loan must occur before the rights are purchased, then the assignment of rights document cannot be executed until the rights are purchased – and therefore cannot be used as collateral on the loan.

---- THIS IS TECHNICALLY CORRECT IN THE SENSE THAT BEFORE WE ACTUALLY LICENSE THE RIGHTS FROM THE FOREIGN SALES AGENT, WE OBVIOUSLY DO NOT OWN THE RIGHTS AND THEREFORE THE INVESTOR DOES NOT HAVE THEM AS COLLATERAL. THAT BEING SAID, MONIES ARE WIRED TO FOREIGN SALES COMPANY EITHER SAME DAY OR NEXT DAY AFTER INVESTOR WIRES MONEY SO THE "RISK-TIME" IS TYPICALLY LESS THAN 24 HOURS. ADDITIONALLY, IF FOREIGN SALES COMPANY DOES NOT LICENSE THE RIGHTS FOR WHATEVER REASON... WE OBVIOUSLY HAVE NOT USED THE FUNDS AND THEY WILL BE IMMEDIATELY RETURNED TO INVESTOR. LASTLY, BEFORE INVESTOR IS MADE AWARE OF OPPORTUNITY, 1INMM HAS SECURED CONFIRMATION THAT 1) FOREIGN SALES AGENT AGREES TO LICENSE PROJECT FOR X PRICE 2) PLATFORM HAS AGREED TO ACQUIRE PROJECT FOR X PRICE — SO THERE IS NO "FUND AND HOPE" SCENARIO... WE ARE ALWAYS CONFIDENT THAT EVERYTHING IS BUTTONED UP.

1. At transaction 2, is there any due diligence performed by 1inMM to assure that title on the asset is clean and no debt encumbrances are affecting the movie rights?

------ IN ALL LICENSING AGREEMENTS (BOTH BETWEEN 1INMM/SALE AGENT AND 1INMM/PLATFORM... THERE IS LANGUAGE THAT STATES THAT ALL TITLES ARE FREE AND CLEAR ETC ETC ETC... IF AT ANY POINT THIS IS NOT THE CASE, IT WOULD BE BREACH OF CONTRACT AND ALL MONIES WOULD BE PAID BACK TO 1INMM WITH PENALTY AND THEN PAID BACK TO INVESTOR. ADDITIONALLY, ALL SALES COMPANIES CANNOT LEGALLY BEGIN TO SELL A PROJECT WITHOUT THOROUGH CHAIN OF TITLE DUE DILIGENCE SO IF 1INMM HAS THE OPPORTUNITY TO ACQUIRE THE PROJECT...THE CHAIN OF TITLE HAS BEEN CLEARED.

The diagram he created seems to be accurate. Please let me know if there are additional questions.

Cheers!

–

*Zach Horwitz*

Exhibit 11 Page 221

# EXHIBIT 12

## DISTRIBUTION AGREEMENT

This Distribution Agreement ("Agreement"), dated (07/11/19), confirms the terms and conditions pursuant to which HBO Latin America Holdings ("HBO"), shall acquire from 1inMM Capital LLC, with an address at ███████████ ("1inMM"), certain distribution rights in the "Program" in the "Territory" (as such terms are defined below) subject to the terms contained herein, all as set forth below.

    1.    Definitions. All capitalized terms set forth herein, unless elsewhere defined, shall have the following meanings:

    a.    "Authorized Languages" means all languages, including all dubbed, voice-lectored and subtitled versions.

    b.    "Availability Date" shall have the meaning set forth in Section 4.

    c.    "Final Delivery" shall mean 1inMM's full, final and complete delivery of the Delivery Items for the Program (including any and all attempts to cure), of quality acceptable to HBO, as confirmed in writing by HBO.

    d.    "Distribution Expenses" means all costs and expenses incurred in connection with the release, delivery, marketing, distribution and exploitation of the Program and the Rights (as defined in Section 5), including, without limitation, all expenses for advertising, marketing, promotion, merchandizing, and publicity of the Program; all expenses for the full and complete delivery of Delivery Items (as hereinafter defined) and translation thereof; shipping, mailing and insurance costs; storage; cleaning and inspection; mastering, submastering, and duplication costs, duplication of scripts and music cue sheets; residuals; renewal of music synchronization licenses and master use licenses (to the extent same are the responsibility of Licensee); all taxes (other than corporate income taxes), whether sales, gross receipts, value added, withholding, remittance, excise, property, use, transfer or similar taxes, levies, customs duties, import charges, penalties, fines or interest, however denominated, imposed and whether by a governmental authority or taxing authority (whether federal, local, territorial or state of the United States or any country in the Territory); foreign language dubbing and/or subtitling; any Third Party Payments (as defined at Section 10.a.) to the extent paid for by HBO, and all other usual distribution costs customarily incurred.

    e.    "Gross Receipts" means the aggregate of all monies actually received by HBO from the exploitation of the Rights in the Territory, monies and royalties collected by a collecting society or governmental agency with respect to the exploitation of the Program on television from compulsory licenses, retransmission income, secondary broadcasts, tax rebates, less rebates, discounts, reasonable reserves for returns and bad debt (each of which will be liquidated within one (1) year from its establishment), credit adjustments, advertising agency commissions, security deposits, advances or other similar sums received until earned or forfeited or credited and any amounts received and thereafter refunded (except to the extent such sums are non-refundable) related to the Program. All Gross Receipts are the sole and exclusive property of HBO, subject only to 1inMM's contractual entitlements pursuant to Section 11 hereof.

    f.    "Latin America" means Anguilla, Antigua, Argentina, Aruba, Bahamas, Barbados, Barbuda, Belize, Bermuda, Bolivia, Bonaire, Brazil, Cayman Islands, Chile, Colombia, Costa Rica, Cuba, Curacao, Dominica, Dominican Republic, Ecuador, El Salvador, French Guiana, Grenada, Guadeloupe, Guatemala, Guyana, Haiti, Honduras, Jamaica, Martinique, Mexico, Montserrat, Nicaragua, Panama, Paraguay, Peru, Saba, St. Barthelemy, St.

Exhibit 12 Page 222

FOIA Confidential Treatment Requested

Eustatius, St. Kitts & Nevis, St. Lucia, St. Maarten, St. Martin, St. Vincent & Grenadines, Suriname, Trinidad & Tobago, Turks & Caicos, Uruguay, Venezuela, and British Virgin Islands.

      g.    "License Period" shall have the meaning set forth in Section 3.

      h.    "Program" means the live action feature length motion picture entitled "COYOTE LAKE" that was: (i) originally produced in English; (ii) directed by Sara Seligman starring Camilla Mendes, Charlie Weber and Adriana Barraza and (iii) will be theatrically released in Mexico and/or Brazil on a minimum of 150 screens.

      i.    "Television Rights" means the right to exhibit, distribute market, display, transmit, broadcast, perform, transmit, reproduce, advertise, publicize, sell copies of, license, derive revenues from, rent, dispose of, communicate publicly or privately, turn to account and otherwise exploit the Program by any form of television media now known or hereafter devised or commercially exploited (including, but not limited to subscription pay television, basic television, free television, pay-per-view, on demand, video-on-demand, free-on-demand, free-video-on-demand, subscription-video-on-demand, advertising-supported on demand, near-video-on-demand, hotel/motel, non-theatrical, electronic rental, download to rent, digital rental, electronic sell-through, digital sell-through, download to own, download to burn and on demand retention licensing), regardless of whether or how paid for, programmed, or marketed to the viewer, and regardless of how delivered to or received by the viewer (whether by over-the-air, cable, satellite, wire, fiber, ADSL, DSL, MDS, Internet, mobile, wireless, closed circuit, or other means, method, process, or device or delivery system now known or hereafter devised, discovered, created, or developed) in all versions, resolutions, formats, and sizes, and shall, for the avoidance of doubt, include without limitation reception on television sets, personal computers, IP-enabled devices, mobile devices, and analogous devices.

      j.    "Territory" shall mean Africa and Latin America.

  2.    Conditions Precedent. All of HBO's obligations hereunder will be subject to and conditioned upon the satisfaction of all of the following:

      a.    Full execution and delivery to HBO of this Agreement; and

      b.    Final Delivery (including HBO's receipt and written approval of: (i) a complete typewritten statement of all third party screen and paid advertising credit, name and likeness, and other third party obligations, restrictions and approval rights (including all third party obligations, restrictions and approvals necessary for HBO's creation of Local Language Versions) as further set forth in Paragraph 5 of the Legal Delivery section of Exhibit B (collectively, the "Paid Ad Restrictions"); (ii) all chain of title documents for the Program and documents necessary to establish 1inMM's valid copyright in the Program, and (iii) all Delivery Items) occurring no later than 02/10/2020 (the "Final Delivery Date").

  3.    License Period. The "License Period" means the period commencing on the Program's Availability Date and expiring three (3) years thereafter; provided, however, that the License Period shall include an additional exclusive play-off period of six (6) months for all licenses in existence as of the last day of the License Period during which HBO may continue to exercise the Rights.

Exhibit 12 Page 223

JJMT-SEC-0003639

## DISTRIBUTION AGREEMENT

This Distribution Agreement ("Agreement"), dated (07/02/19), confirms the terms and conditions pursuant to which HBO Latin America Holdings ("HBO"), shall acquire from 1inMM Capital LLC, with an address at ███████████████████████████ ("1inMM"), certain distribution rights in the "Program" in the "Territory" (as such terms are defined below) subject to the terms contained herein, all as set forth below.

    1.    Definitions. All capitalized terms set forth herein, unless elsewhere defined, shall have the following meanings:

    a.    "Authorized Languages" means all languages, including all dubbed, voice-lectored and subtitled versions.

    b.    "Availability Date" shall have the meaning set forth in Section 4.

    c.    "Final Delivery" shall mean 1inMM's full, final and complete delivery of the Delivery Items for the Program (including any and all attempts to cure), of quality acceptable to HBO, as confirmed in writing by HBO.

    d.    "Distribution Expenses" means all costs and expenses incurred in connection with the release, delivery, marketing, distribution and exploitation of the Program and the Rights (as defined in Section 5), including, without limitation, all expenses for advertising, marketing, promotion, merchandizing, and publicity of the Program; all expenses for the full and complete delivery of Delivery Items (as hereinafter defined) and translation thereof; shipping, mailing and insurance costs; storage; cleaning and inspection; mastering, submastering, and duplication costs, duplication of scripts and music cue sheets; residuals; renewal of music synchronization licenses and master use licenses (to the extent same are the responsibility of Licensee); all taxes (other than corporate income taxes), whether sales, gross receipts, value added, withholding, remittance, excise, property, use, transfer or similar taxes, levies, customs duties, import charges, penalties, fines or interest, however denominated, imposed and whether by a governmental authority or taxing authority (whether federal, local, territorial or state of the United States or any country in the Territory); foreign language dubbing and/or subtitling; any Third Party Payments (as defined at Section 10.a.) to the extent paid for by HBO, and all other usual distribution costs customarily incurred.

    e.    "Gross Receipts" means the aggregate of all monies actually received by HBO from the exploitation of the Rights in the Territory, monies and royalties collected by a collecting society or governmental agency with respect to the exploitation of the Program on television from compulsory licenses, retransmission income, secondary broadcasts, tax rebates, less rebates, discounts, reasonable reserves for returns and bad debt (each of which will be liquidated within one (1) year from its establishment), credit adjustments, advertising agency commissions, security deposits, advances or other similar sums received until earned or forfeited or credited and any amounts received and thereafter refunded (except to the extent such sums are non-refundable) related to the Program. All Gross Receipts are the sole and exclusive property of HBO, subject only to 1inMM's contractual entitlements pursuant to Section 11 hereof.

    f.    "Latin America" means Anguilla, Antigua, Argentina, Aruba, Bahamas, Barbados, Barbuda, Belize, Bermuda, Bolivia, Bonaire, Brazil, Cayman Islands, Chile, Colombia, Costa Rica, Cuba, Curacao, Dominica, Dominican Republic, Ecuador, El Salvador, French Guiana, Grenada, Guadeloupe, Guatemala, Guyana, Haiti, Honduras, Jamaica, Martinique, Mexico, Montserrat, Nicaragua, Panama, Paraguay, Peru, Saba, St. Barthelemy, St.

HBO-1inMM                                                       1

Exhibit 12 Page 224

FOIA Confidential Treatment Requested

Eustatius, St. Kitts & Nevis, St. Lucia, St. Maarten, St. Martin, St. Vincent & Grenadines, Suriname, Trinidad & Tobago, Turks & Caicos, Uruguay, Venezuela, and British Virgin Islands.

      g.     "License Period" shall have the meaning set forth in Section 3.

      h.     "Program" means the live action feature length motion picture entitled "BLOOD QUANTUM" that was: (i) originally produced in English; (ii) directed by Jeff Barnaby starring Devery Jacobs, Michael Greyeyes and Forrest Goodluck and (iii) will be theatrically released in Mexico and/or Brazil on a minimum of 120 screens.

      i.     "Television Rights" means the right to exhibit, distribute market, display, transmit, broadcast, perform, transmit, reproduce, advertise, publicize, sell copies of, license, derive revenues from, rent, dispose of, communicate publicly or privately, turn to account and otherwise exploit the Program by any form of television media now known or hereafter devised or commercially exploited (including, but not limited to subscription pay television, basic television, free television, pay-per-view, on demand, video-on-demand, free-on-demand, free-video-on-demand, subscription-video-on-demand, advertising-supported on demand, near-video-on-demand, hotel/motel, non-theatrical, electronic rental, download to rent, digital rental, electronic sell-through, digital sell-through, download to own, download to burn and on demand retention licensing), regardless of whether or how paid for, programmed, or marketed to the viewer, and regardless of how delivered to or received by the viewer (whether by over-the-air, cable, satellite, wire, fiber, ADSL, DSL, MDS, Internet, mobile, wireless, closed circuit, or other means, method, process, or device or delivery system now known or hereafter devised, discovered, created, or developed) in all versions, resolutions, formats, and sizes, and shall, for the avoidance of doubt, include without limitation reception on television sets, personal computers, IP-enabled devices, mobile devices, and analogous devices.

      j.     "Territory" shall mean Africa and Latin America.

    2.    Conditions Precedent. All of HBO's obligations hereunder will be subject to and conditioned upon the satisfaction of all of the following:

      a.     Full execution and delivery to HBO of this Agreement; and

      b.     Final Delivery (including HBO's receipt and written approval of: (i) a complete typewritten statement of all third party screen and paid advertising credit, name and likeness, and other third party obligations, restrictions and approval rights (including all third party obligations, restrictions and approvals necessary for HBO's creation of Local Language Versions) as further set forth in Paragraph 5 of the Legal Delivery section of Exhibit B (collectively, the "Paid Ad Restrictions"); (ii) all chain of title documents for the Program and documents necessary to establish 1inMM's valid copyright in the Program, and (iii) all Delivery Items) occurring no later than 01/25/2020 (the "Final Delivery Date").

    3.    License Period. The "License Period" means the period commencing on the Program's Availability Date and expiring three (3) years thereafter; provided, however, that the License Period shall include an additional exclusive play-off period of six (6) months for all licenses in existence as of the last day of the License Period during which HBO may continue to exercise the Rights.

HBO-1inMM

2

Exhibit 12 Page 225

JJMT-SEC-0003641

4.  Availability Date. The "Availability Date" means day and date with the Program's earliest video-on-demand availability date in the Mexico and/or Brazil, but in no event later than 02/25/2020.

5.  Rights.

a.  For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, 1inMM hereby grants to HBO, with respect to the Program, the exclusive rights throughout the Territory and during the Program's License Period to exploit, and to sublicense others the right to exploit the Television Rights in the Program (and all of its themes, materials and other elements), in all formats now known or hereafter devised (including, without limitation, high definition, standard definition and 3D), including the right to (and cause and license others to) market, advertise, publicize, derive revenues from and otherwise exploit the Program. Without limiting the generality of the foregoing, 1inMM hereby grants to HBO the sole, exclusive and irrevocable right to: (i) license the rights granted for the Program for exhibition on such terms as it deems appropriate, and HBO shall have complete discretion relating to the promotion and distribution of the Program; (ii) edit and to permit the editing of all prints of the Program to conform to time segment requirements or to the orders of any duly authorized public censorship authority and to insert commercial material at appropriate time intervals during the exhibition of the Program and to dub and subtitle and to permit the dubbing and subtitling of the Program in the Authorized Languages as it sees fit; (iii) translate the title of the Program into any language and, to the extent cultural differences necessitate that the title be changed, to change such title; (iv) manufacture and distribute, or cause to be manufactured and distributed, two-dimensional advertising, publicity and promotional materials of all types and kinds for use solely in connection with the exhibition and distribution of the Program based on the images and materials provided by 1inMM; and (v) include HBO's (or one or more of HBO's affiliates, HBO's or sub distributors) name, logo, trademark or emblem in such manner, position, form and substance as HBO may elect on the prints of the Program, and on all advertising and publicity material for the Program together with such words as HBO may elect indicating that the Program is being distributed by HBO or one of its sub distributors, licensees or any of its affiliates.

b.  Without limiting the foregoing, 1inMM further grants to HBO the right to use and license the use of trailers, excerpts, clips supplied by 1inMM or made by HBO and stills supplied by 1inMM from the Program in connection with the promotion and exploitation of the Program, to collect all copyright royalties, retransmission, private copy or similar monies relating to the Program, and to use the approved names, voices and likenesses, which 1inMM shall provide to HBO in a timely manner, of all persons who appear in, or above-the-line persons who rendered services in connection with, the production of the Program for the purpose of advertising and promoting the Program.

c.  1inMM acknowledges that any inadvertent, unavoidable, incidental and de minimus overspill of an unencrypted satellite signal outside of the Territory shall not constitute a breach of this Agreement.

d.  1inMM shall include the following credit information in any version of the Program authorized by 1inMM for exhibition hereunder as well as in all advertising and promotional materials authorized for exhibition or dissemination in association therewith: "[1inMM TO PROVIDE COPYRIGHT NOTICE]."

e.  The rights granted to HBO in this Section 5 shall be referred to herein as the "Rights".

HBO-1inMM

3

Exhibit 12 Page 226

JJMT-SEC-0003642

6.     Reserved Rights. All rights and licenses in the Program not granted to HBO hereunder (i.e., theatrical, derivative, novelization, souvenir, music publishing and music soundtrack rights, merchandising, publication, commercial tie-in and/or co-promotion (unless approved in writing by 1inMM but in no event on an exclusive basis), product placement, games, videogames, ring tones, alerts, wallpapers, screensavers, messaging applications, digital greeting cards, theme park and location based entertainment, remake, sequel, tv series, live stage/stage play, clip license rights (which excludes, for the avoidance of doubt, the right to use clips for promotional purposes as set forth in Section 5.b.), and all rights to the underlying material to the Program) are reserved by 1inMM and may be exploited by 1inMM without limitation or restriction by HBO except as may be set forth herein.

7.     Delivery. No later than thirty **(30) days after the execution of this Agreement,** 1inMM shall, at its sole cost and expense, deliver to HBO all elements, materials, documents and advertising and promotional materials set forth Exhibit B (which is attached hereto and incorporated herein by this reference), with respect to the Program (the "Delivery Items"). All Delivery Items shall be of first class technical quality suitable for the manufacture of first class broadcast quality exhibition materials of the Programs, as determined in HBO's sole discretion. HBO shall provide notice to 1inMM specifying any technical defect within thirty (30) days of receipt of the Delivery Items from 1inMM. Upon such notice to 1inMM, 1inMM shall either (i) correct the defect and redeliver the corrected Delivery Item or (ii) deliver a replacement Delivery Item within thirty (30) days of receipt of HBO's notice. Approval by HBO of less than all Delivery Items or any exploitation of the Program will not be deemed a waiver by HBO of 1inMM's obligation of complete delivery of the Program hereunder. In the event that 1inMM, or any distributor or licensee of 1inMM, has prepared or subsequently prepares a version of the Program dubbed and/or subtitled in any Authorized Language ("Local Language Version"), 1inMM shall provide and HBO shall have unrestricted access to such Local Language Version at no cost, including any dubbed or subtitled tracks of the Program. In no event shall Final Delivery (including any and all attempts to cure) occur later the Final Delivery Date.

8.     Distribution Fee. In connection with HBO's exploitation of Rights in the Territory, HBO shall retain a Distribution Fee as set forth in the table below:

| Gross Receipts | Distribution Fee |
|---|---|
| Gross Receipts equaling or less than US$400,000.00 | 25% |
| Gross Receipts over US$400,000.00 | 40% |

9.     Advance. Subject to the terms and conditions of this Agreement and provided all of the Conditions Precedent have been satisfied (including full and Final Delivery having occurred by the Final Delivery Date), and 1inMM is not in breach of this Agreement or, for the avoidance of doubt, any other agreement, HBO shall pay in connection with the Program, a fully recoupable and cross-collateralized advance (the "Advance") in an amount equal to Nine Hundred Ninety-Eight Thousand Eight Hundred Sixty-Five U.S. Dollars ($998,865.00), as further set forth in Section 12. Upon the satisfaction of all of the terms set forth herein, the Advance shall be due and payable in one lump sum payment six (6) months after HBO's receipt of a valid invoice from 1inMM.

Exhibit 12 Page 227

JJMT-SEC-0003643

10.    Certain Expenses.

a.      Third Party Payments. As between 1inMM and HBO, 1inMM shall be responsible for, and shall pay, all third party payments (other than performance fees for the public performance of any music contained in the Program) that may become payable as a result of HBO's exploitation of its rights hereunder ("Third Party Payments") including, without limitation, any and all mechanical reproduction fees, download fees, payments and/or tariffs with respect to exploitation, advertising and promotion of the Program and residuals, reuse fees, and participations in the proceeds (net or gross) of the Program. If 1inMM fails to make such payments, HBO shall have the right (but not the obligation) to make such Third Party Payments and may: (i) deduct from amounts payable to 1inMM hereunder any such amounts paid to third parties; and/or (ii) invoice 1inMM for any such amounts paid to third parties.

b.      Payment of Distribution Expenses. As between 1inMM and HBO, HBO shall be responsible for and shall pay all Distribution Expenses. Distribution Expense(s) incurred by HBO shall be deducted as provided in Section 11 below.

11.    Allocation of Gross Receipts. In full consideration of the Rights and the representations, warranties and covenants made by 1inMM hereunder, HBO shall pay to 1inMM, for the Program, an amount ("1inMM's Share") equal to one hundred percent (100%) of the Net Receipts (as defined below) derived from the distribution and exploitation of the Program by HBO. As used herein, the term "Net Receipts" shall mean all Gross Receipts less the following deductions in the following order of priority: (a) HBO's Distribution Fee as set forth in Section 8 on account of the exploitation of the Programs by HBO; (b) all Third Party Payments to the extent paid for by HBO; (c) all Distribution Expenses in connection with the exploitation of the Program by HBO; provided, however, that expenses for advertising, marketing, promotion and publicity of the Programs shall not exceed Five Percent (5%) of Gross Receipts without 1inMM's prior written consent, and (d) the Advance.

12.    Payments and Accounting Statements.

a.      HBO shall have the right to cross-collateralize the Gross Receipts (after HBO deducts its Distribution Fee) earned for exploitation of the Rights in the Program throughout the Territory and the Term for purposes of recouping the Distribution Expenses, Third Party Payments, and the Advance, and calculating 1inMM's Share.

b.      Subject to Section 11 hereof, HBO shall credit 1inMM's Share to the Program to 1inMM as follows: ninety (90) days after each quarter for the three (3) years

c.      All payments due hereunder shall be payable in U.S. Dollars. 1inMM hereby directs HBO to make any and all payments due under this Agreement to 1inMM as set forth below:

> **Bank Name:**  City National Bank
> **Bank Address:**  ██████████████
> **ABA Number:** 122016066
> **Account Number:** ███ 2944
> **Account Name:** 1INMM CAPITAL LLC

d.      HBO shall account to 1inMM and provide customary participations statements for the following periods in which related Gross Receipts are received: ninety (90) days after each quarter for the three (3) years. Such customary participations statements shall be in a form HBO customarily details such calculations for other licensors. If in any period the

HBO-1inMM

5

Exhibit 12 Page 228

FOIA Confidential Treatment Requested            JJMT-SEC-0003644

deductions allowed pursuant to this Agreement for the Programs exceed Gross Receipts reported for the Programs, such excess shall be deducted from Gross Receipts in each succeeding period, as applicable, until such excess has been totally recouped. Accounting Reports shall be sent to the parties as set forth in Section 20.

    e.  HBO shall not be liable for any default or delay in payments from any licensee of HBO with respect to the Programs, provided that HBO shall take commercially reasonable steps to cause such licensee to pay any monies owed by such licensee in connection with its license of the Programs.

  13.  <u>1inMM's Representations and Warranties</u>. 1inMM hereby covenants, warrants and represents to HBO each and all of the following.

    a.  The Program is protected by all the applicable copyright laws throughout the Territory and that such copyrights are and shall be valid and subsisting throughout the Territory during the Program's License Period.

    b.  The Program, when delivered to HBO and thereafter, will be free and clear of any lien, claim, charge, encumbrance, security interest, restriction, agreement, commitment or arrangement with any third party which would, in any way, interfere with, impair or adversely affect any of the Rights granted to HBO hereunder, and (other than as specifically provided in this Agreement) there are and will be no payments of any kind required to be made by HBO in respect of, or as result of, any use by HBO of such Program hereunder.

    c.  1inMM will not exploit and will not authorize any third party to exploit Television Rights in the Program prior to (and, for the avoidance of doubt, during) the License Period hereunder.

    d.  The Program shall not contain any product placement or product integration, except as set forth in a letter to HBO no later than the Final Delivery Date, signed by 1inMM, setting forth all product placement arrangements entered into in connection with the Program and the consideration provided by both the supplier (e.g., payment, free or discounted product) and the production (e.g., visible display of labels, verbal mention of brand, etc.). For any non-monetary consideration received from suppliers, 1inMM shall provide HBO an estimate of the value of such consideration (in U.S. Dollars). 1inMM's letter shall be accompanied by available substantiating documentation (e.g., written agreements, confirmation letters) as well as a listing of the footage notations determined on the same basis as the "Combined Continuity, Dialogue and Spotting List" at which all such product placements are seen or heard.

    e.  1inMM has obtained all of the rights, permissions and licenses (including all music synchronization licenses) required to enable HBO to fully exploit the Program pursuant to the terms of this Agreement including, without limitation, the right to use any performers' names, voices, likenesses and biographies to advertise and promote such Program.

    f.  No part of the Program (including the music contained therein) nor HBO's exercise of any rights granted hereunder will infringe upon the trademark, trade name, copyright, right of privacy, property right or any other right of any person or entity, and no part of the Program shall contain anything defamatory, tortious or which would violate the common law, statutes or regulations of any jurisdiction.

    g.  To the extent the Program or any underlying property is based upon or related to, events in the life of real persons, living or dead, or portrays real persons, 1inMM has obtained all personal releases and other rights necessary to permit HBO to exploit the Program in

Exhibit 12 Page 229

JJMT-SEC-0003645

the manner provided herein without violating any third party rights or incurring any obligation to any third party.

h.      1inMM has full power and authority to make this Agreement and has not done and will not do, or permit any person or entity to do, anything which would interfere with the full performance of 1inMM's obligations or HBO's rights hereunder; this Agreement is the legally valid and binding obligation of 1inMM enforceable against 1inMM in accordance with its terms; and 1inMM is a corporation duly formed and validly existing in good standing under the laws of Florida.

i.      The non-dramatic performing rights to all music contained in the Program are (a) controlled by BMI, ASCAP, SOCAN, SESAC or a performing rights society having jurisdiction in the Territory; (b) in the public domain; or (c) controlled by 1inMM (in which event such rights are hereby licensed to HBO to the extent necessary for the exercise of HBO's rights hereunder). 1inMM does not represent or warrant that HBO may exercise the performing rights in the music without the payment of a performing rights royalty or license fee for music falling within category (a). As between HBO and 1inMM, HBO shall be responsible for the payment of any required performing rights royalty or license fee.

j.      1inMM is familiar with and shall abide by the requirements of the Foreign Corrupt Practices Act and meets all the eligibility requirements for the safe harbor certification set forth in 18 U.S.C. section 2257A(h)(1) and 28 C.F.R. section 75.9(a)(1)-(3).

k.      All Delivery Items delivered by 1inMM as part of delivery hereunder are complete and accurate, and HBO will incur no liability to any third party from its reliance thereon and/or compliance therewith.

14.     HBO's Representations and Warranties. HBO hereby covenants, warrants and represents to 1inMM it has the full power and authority to make this Agreement; this Agreement is the legally valid and binding obligation of HBO enforceable against HBO in accordance with its terms; HBO is a corporation duly formed and validly existing in good standing under the laws of the state of California.

15.     Indemnification. Each party hereto (the "Indemnifying Party") shall indemnify, defend and hold harmless the other party, and its successors, licensees, assigns, and employees, officers and directors (collectively, for the purposes of this Section, referred to as "Indemnified Party") from and against any and all liability, loss, damage, cost and expense, including, without limitation, reasonable attorneys fees (but excluding lost profits or consequential damages) arising out of any breach or alleged breach (including, in the case of 1inMM as Indemnifying Party, a breach of 1inMM's delivery requirements hereunder), or claim by a third party with respect to any warranty, representation or agreement made by the Indemnifying Party herein. The Indemnified Party shall give prompt written notice to the Indemnifying Party of any claim to which the foregoing indemnification applies and the Indemnifying Party shall undertake, at its own cost and expense, the defense thereof, provided that the failure to provide such notice shall excuse the Indemnifying Party's obligations only to the extent such failure prejudices the Indemnifying Party. The Indemnified Party may, at its option and expense, engage its own counsel. If the Indemnified Party settles or compromises any such suit, claim or proceeding, the amount thereof shall be charged to the Indemnifying Party, provided that the Indemnifying Party's approval, to be reasonably exercised, has been secured. Neither party may settle any claim or action without the prior written consent of the other party if such settlement would in any manner materially impair or inhibit the quiet enjoyment of such other party's rights hereunder or would result in any manner of injunctive or injunctive-like relief.

HBO-1inMM

7

Exhibit 12 Page 230

JJMT-SEC-0003646

16.     Default. 1inMM shall be in default of this Agreement upon the occurrence of any of the following (collectively, the "1inMM Events of Default"): (i) 1inMM fails or refuses to perform its material obligations hereunder or breaches any material provision hereof, or (ii) 1inMM goes into receivership or liquidation, or becomes insolvent, or a petition under any bankruptcy act shall be filed by or against 1inMM (which petition, if filed against 1inMM, shall not have been dismissed within thirty days thereafter), or 1inMM executes an assignment for the benefit of creditors, or 1inMM takes advantage of any applicable insolvency, bankruptcy or reorganization or any other like or analogous statute, or experiences the occurrence of any event analogous to the foregoing. If 1inMM fails to cure a 1inMM Event of Default specified in (i) above that is curable within thirty (30) days from receipt of written notice from HBO of such default or immediately upon a 1inMM Event of Default under (ii) above that is not curable under (ii) above, HBO shall have the right to immediately terminate this Agreement. 1inMM acknowledges that the intellectual property rights and licenses in and to the Program granted to HBO herein would be governed by 11 USC Section 365(n) in the event of the commencement of a bankruptcy case by or of 1inMM. 1inMM acknowledges and agrees that, notwithstanding any rejection of this Agreement in any bankruptcy case, HBO may elect to continue to enjoy all exclusive rights and licenses granted in the Program for the entire License Period as provided herein.

17.     Copyright. 1inMM hereby acknowledges and agrees that the Program shall contain a copyright notice in the name of the copyright proprietor conforming to and complying with the requirements of the applicable copyright laws of the Territory, and HBO shall not remove or delete such copyright notice. Subject to 1inMM's prior written approval, not to be unreasonably withheld, conditioned or delayed, HBO may, in consultation with 1inMM, in its own name or in the name of the copyright proprietor, take such steps as HBO may deem necessary or appropriate by action at law or otherwise, to prevent any unauthorized reproductions, exhibition or distribution of the Program, any infringement of the copyright of the Program or any impairment of or encumbrance on the rights granted to HBO   hereunder, provided that should HBO commence any action in the name of 1inMM, HBO shall indemnify 1inMM against any out-of pocket costs, damages, and reasonable attorney fees. 1inMM agrees that it shall promptly execute and deliver to HBO the Assignment of Distribution Rights Under Copyright which is attached hereto as Exhibit A and incorporated herein by this reference and that upon the request of HBO it shall promptly execute and deliver to HBO such additional documents as HBO may need in connection with the foregoing. 1inMM hereby irrevocably appoints and designates HBO as its attorney-in-fact to exercise and file all such documents requested by HBO pursuant to this Section. This power-of-attorney is coupled with an interest.

18.     Distribution. All decisions concerning the advertising, marketing, distribution and exploitation of the Program and the rights herein granted shall be under HBO's sole and exclusive control, it being expressly understood that HBO shall not be required to continuously distribute the Program. The Program will be marketed appropriately as determined in HBO's good faith judgment, but in no event shall HBO be required to incur marketing costs. HBO makes no representation, warranty, guarantee or agreement as to the amount of receipts which may be derived from the distribution, exhibition or other exploitation of the Program and the Rights, nor does HBO guarantee the performance of any contract for the exhibition of the Program. Notwithstanding anything to the contrary contained herein, HBO shall have the right, in HBO's sole discretion, to withhold distribution of the Program or to withdraw the Program from distribution anywhere in the Territory at any time during the License Period.

Exhibit 12 Page 231

JJMT-SEC-0003647

19.    Insurance. 1inMM shall secure and maintain standard commercial general liability and errors and omissions liability insurance in the minimum amounts of $5,000,000 per occurrence/$5,000,000 aggregate with a deductible not larger than $25,000 until four (4) years after the initial exhibition of the Program, which policy(ies) shall be endorsed to name HBO Latin America Holdings, its parents, subsidiaries, licensees, successors, and related and affiliated companies, and their officers, directors, employees, agents, representatives, assigns and its subdistributors (collectively "Beneficiaries") as additional insureds as their interests may appear and shall contain an endorsement negating the "other insurance clause" therein, together with an endorsement that such policies are primary and that any insurance carried by the Beneficiaries is neither primary nor contributory. 1inMM shall deliver to HBO a certificate and endorsements evidencing such insurance concurrently with the execution of this Agreement. A prior thirty (30) days notice of cancellation or non-renewal will be provided to HBO and will be shown on the certificate.

20.    Notices. All notices, claims, certificates, requests, demands and other communications under this Agreement shall be made in writing and shall be delivered by hand or sent by facsimile, or sent, postage prepaid, by express mail, or reputable overnight courier service, and shall be deemed given when so delivered by hand; if faxed, on the business day of receipt as evidenced by a fax confirmation sheet, or two business days after deposit with an express mail or overnight courier to the parties at the following addresses (or at such other address for a party as shall be specified by like notice):

If to 1inMM:    1inMM Capital LLC



If to HBO:      HBO Latin America Holdings
                c/o Home Box Office International

 04
Sales Planning

With a copy to:

                Home Box Office



HBO-1inMM                                                                    9

Exhibit 12 Page 232

FOIA Confidential Treatment Requested                    JJMT-SEC-0003648

21.     Governing Law/Disputes.

a.      The internal laws of the State of California (as opposed to the choice of law rules) and the United States of America shall govern the validity, construction and interpretation of this Agreement, the performance by the parties of their respective obligations and all other causes of action (whether sounding in contract, in tort or arising under statute) arising out of or relating to this Agreement or to the Program.

b.      All actions, proceedings, controversies and claims based upon, arising out of or resulting from this Agreement, the breach thereof or its enforcement, arbitrability (including the scope of this arbitration provision) or interpretation shall be submitted to JAMS ("JAMS") for binding arbitration under its Comprehensive Arbitration Rules and Procedures if the matter in dispute is over $250,000 or under its Streamlined Arbitration Rules and Procedures if the matter in dispute is $250,000 or less (the "Rules"). Such Arbitration shall be held solely in Los Angeles, California, in the English language. Each arbitration shall be conducted by an arbitral tribunal (the "Arbitral Board") consisting of a single arbitrator who shall be mutually agreed upon by the parties. If the parties are unable to agree on an arbitrator, the arbitrator shall be appointed by JAMS. The arbitrator shall be a retired judge with at least ten (10) years experience in commercial matters. Except with respect to requests for interim relief, neither party shall be entitled or permitted to commence or maintain any action in a court of law with respect to any matter in dispute until such matter shall have been submitted to arbitration as herein provided and then only for the enforcement of the Arbitral Board's award. Neither party shall challenge or resist any enforcement action taken by the arbitrator against the losing party.  In addition, the prevailing party in any arbitration or legal proceeding relating to this Agreement shall be entitled to all reasonable expenses including, without limitation, reasonable attorney's fees. Each party shall be permitted to engage in formal discovery with respect to any dispute arising out of, in connection with or related to this Agreement, the provisions of Section 1283.05 of the California Code of Civil Procedure being incorporated herein by this reference.

c.      1inMM hereby acknowledges that the Program and the exploitation rights granted to HBO hereunder are of a special, unique, extraordinary and intellectual character which gives them a peculiar value, for the loss of which HBO cannot be reasonably or adequately compensated in damages in any action at law and that a breach of this Agreement by 1inMM will cause HBO irreparable injury and damage.  1inMM therefore expressly agrees that in the event of a breach or threatened breach of this Agreement by 1inMM, HBO shall be entitled to seek injunctive and other equitable relief against 1inMM in HBO's discretion to end or prevent such breach and to secure enforcement of this Agreement. Resort to such equitable relief, however, shall not be construed as a waiver of any other rights or remedies which HBO may have for damages or otherwise. Notwithstanding any other provision of this Agreement, 1inMM's sole remedy for any breach by HBO of this Agreement shall be an action at law for damages and 1inMM acknowledges that such damages are fully adequate to compensate 1inMM in the case of any breach by HBO hereunder. In no event shall 1inMM have any right to terminate this Agreement or seek or be entitled to rescission, injunctive or other equitable relief.

22.     Miscellaneous Terms.

a.      This Agreement constitutes the entire agreement of the parties and supersedes all prior oral or written agreements between them concerning the same subject. This Agreement may only be amended or modified by a written instrument executed by the parties to this Agreement. No failure or delay on the part of either party in exercising any of its respective rights hereunder upon any failure by the other party to perform or observe any condition,

HBO-1inMM                                                                                                    10

Exhibit 12 Page 233

JJMT-SEC-0003649

covenant or provision herein contained shall operate as a waiver thereof, nor shall any single or partial exercise of any such rights preclude any other or further exercise thereof or the exercise of any other or further exercise thereof or the exercise of any other right hereunder. Without limiting the foregoing, no payment by HBO shall constitute a waiver of any term or condition of this Agreement.

b.      This Agreement may not be assigned without the prior written consent of the other party except that HBO may assign this Agreement, or any part thereof.

c.      Each of the parties shall execute and deliver any further documents or instruments the other may reasonably request to carry out the intent of this Agreement.

d.      Nothing contained in this Agreement shall constitute a partnership between, or joint venture by, the parties hereto or constitute either party the agent of the other. Neither party shall hold itself out contrary to the terms of this Agreement and neither party shall become liable by reason of any representation, act or omission of the other contrary to the provisions hereof.

e.      Nothing expressed or referred to in this Agreement is intended or shall be construed to give any person or entity, other than the parties to this Agreement, or their permitted successors and assigns, any legal or equitable right, remedy or claim under or in respect thereof or any provision contained herein, it being the intention of the parties that this Agreement is for the sole and exclusive benefit of such parties, and any permitted successors and assigns of this Agreement and for the benefit of no other person or entity.

f.      The section headings contained in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

g.      This Agreement and all of its terms shall be confidential, and each party agrees that, except as may be required by law, it shall not make any disclosures with regard thereto without the prior written approval of the non-disclosing party.

h.      If any provision of this Agreement, or any covenant, obligation or agreement contained herein is determined by a court of competent jurisdiction to be invalid or unenforceable, such determination shall not affect any other provision, covenant, obligation or agreement, each of which shall be construed and enforced as if such invalid or unenforceable provision were not contained herein.  Such invalidity or unenforceability shall not affect any valid and enforceable application thereof, and each such provision, covenant, obligation or agreement, shall be deemed to be effective, operative, made, entered into or taken in the matter and to the full extent permitted by law.

i.      In the event of the occurrence of an event of force majeure which materially interferes with the production or delivery of the Program or with the rendition of 1inMM's material obligations hereunder, HBO shall have the right to suspend this Agreement and shall have the right, but not the obligation, to extend this Agreement by the length of any such suspension.

Exhibit 12 Page 234

JJMT-SEC-0003650

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by a duly authorized representative as of the date first set forth above.

**HBO LATIN AMERICA HOLDINGS**

By: _____

Its: _____

**1INMM CAPITAL LLC**

By: _____

Its: M.P. _____

JJMT-SEC-0003651

# EXHIBIT A
## ASSIGNMENT OF DISTRIBUTION RIGHTS
## UNDER COPYRIGHT

For good and valuable consideration, the receipt of which is hereby acknowledged, the undersigned, 1inMM Capital LLC ("1inMM"), hereby licenses, grants, transfers and assigns to

### HBO Latin America Holdings

*aka* "HBO" (a California corporation) and its successors and assigns ("Distributor"), the sole and exclusive right, under copyright, to exhibit, distribute, market, advertise, license or otherwise exploit the following feature length motion picture ("Program") throughout the Territory for the License Period as defined below, by means of television, howsoever delivered:

> **Title of Program**: COYOTE LAKE
>
> **Territory**: Africa and Anguilla, Antigua, Argentina, Aruba, Bahamas, Barbados, Barbuda, Belize, Bermuda, Bolivia, Bonaire, Brazil, Cayman Islands, Chile, Colombia, Costa Rica, Cuba, Curacao, Dominica, Dominican Republic, Ecuador, El Salvador, French Guiana, Grenada, Guadeloupe, Guatemala, Guyana, Haiti, Honduras, Jamaica, Martinique, Mexico, Montserrat, Nicaragua, Panama, Paraguay, Peru, Saba, St. Barthelemy, St. Eustatius, St. Kitts & Nevis, St. Lucia, St. Maarten, St. Martin, St. Vincent & Grenadines, Suriname, Trinidad & Tobago, Turks & Caicos, Uruguay, Venezuela, and British Virgin Islands.
>
> **License Period**: Commences on the Program's Availability Date and expires three (3) years thereafter; provided, however, that the License Period shall include an additional exclusive play-off period of six (6) months for all licenses in existence as of the last day of the License Period during which HBO may continue to exercise the Rights.

1inMM hereby irrevocably appoints Distributor as its attorney-in-fact, with full power and authority to do all such acts and things, and to execute, acknowledge, deliver, file, register and record the Program and all documents pertinent thereto, in the Copyright Office of the United States of America and in any other office or offices in any other jurisdictions in the name, stead and on behalf of the 1inMM, as Distributor may deem necessary or proper to accomplish the same, this being a power coupled with an interest.

Distributor is hereby empowered by 1inMM to bring, prosecute, defend and appear in suits, actions and proceedings of any nature, concerning any copyright in and to the Program or any infringement of such copyright or violation of any of the rights licensed to Distributor herein, but at the cost and expense of Distributor, and, at its option, Distributor may join the 1inMM as a party plaintiff or defendant in any such suit, action or proceeding. Any recovery of damages, penalties, costs or other amounts arising by reason of the infringement of any such copyright(s) or violation of the rights licensed to Distributor herein has been assigned, and shall be paid, to Distributor.

Exhibit 12 Page 236

JJMT-SEC-0003652

This Assignment is dated as of, and is subject to all of the terms, conditions and provisions of the Agreement between 1inMM and Distributor dated as of 08/09/2019.

1INMM CAPITAL LLC

Signed:

By: _E. Horwitz_

Its:_m.l._____ /_Authorized Signatory_

JJMT-SEC-0003653

# EXHIBIT 13

# 1NMM CAPITAL ANNUAL REPORT 2015

1NMM PRODUCTIONS

Exhibit 13 Page 238

# CHEERS TO OUR INVESTORS

Thank you for your investment and trust in 1inMM Capital over the past year. Our managing partners have worked tirelessly to provide a landscape that balances the protection of your investment with the proper amount of risk to garnish the profits that you have grown accustomed to obtaining. We could not be more pleased with our progress and we look extremely optimistically into our future.

Over the past year, we have managed our business model with the solid foundation that it was built on. We continue to source quality feature film projects, solidify our reputation and relationships with our current output deals and continuously search for additional

profitable partnerships. We are ecstatic to report that over the past year, we have acquired and successfully distributed 49 films through the 1inMM Capital banner without incurring a single loss in the process. But this is only the beginning…

As we look into the future, 1inMM Capital's road ahead is extremely bright. As many of you are aware, we have expanded our business model with HBO Entertainment and NETFLIX to not only service the thriving Latin American marketplace but now are distributing feature films to Australia and New Zealand as well. With this growth, we have the ability to safely and profitably

distribute more than 25 additional films per year, creating ample opportunity for investment and substantial growth of our thriving feature film library.

In the following pages, you will see the high level details of our investment overview. If you have any questions in regards to your investment/s or would like additional information in regards to the process, you know that we are always available.

Cheers!

1inMM Capital Team

Exhibit 13 Page 239

# OUR MANAGING PARTNERS

## ZACH HORWITZ
*PRINCIPLE*

Zach is responsible for the companies overall strategy, capital transactions, operations, investor relations and content acquisitions. With ample experience working with 1inMM Productions, 1inMM Capital's parent company, Zach brings a wealth of knowledge, reputation and experience when growing 1inMM Capital to a prominent force in the foreign distribution landscape. Zach's main focus is providing investors an unparalleled financial business model in which he highlights gaps in an already profitable marketplace and takes advantage of these niche markets in order to garner returns for investors. Zach is a serial entrepreneur, founding and successfully managing or exiting four companies since his graduation from Indiana University in 2009.

███ is responsible for bookkeeping, content acquisition, foreign sales agent relations and head of our Latin America distribution arm. ███ has an unprecedented knowledge of film production that allows him to have the ability of spotting projects at an early stage with the potential to become extremely profitable prior to being shopped at a film market. With these tools, Julio works closely with foreign sales agents to pinpoint projects for acquisition prior to them going on the market and eliminating the chance of a higher acquisition cost. Additionally, ███ has strong roots within the Latin American film landscape that allows 1inMM Capital to get inside access into an extremely difficult territory to capitalize. Julio is a credited commercial and film producer working with brands such as Porsche, Audi and Volkswagen prior to getting into film distribution.

Exhibit 13 Page 240

# OUR MANAGING PARTNERS

[REDACTED] is responsible for output deal relations with Netflix, Sony and HBO. [REDACTED] is a veteran in the business of distribution and acquisitions for Latin America. With over three decades of experience, his knowledge of the industry is unsurpassable. [REDACTED] founded [REDACTED] a leading programming distribution company for high quality products for television. This venture allowed him to negotiate multiple successful output deals with prominent companies such as Netflix, Sony Worldwide and HBO in Latin America, in addition to distributing Mexican films in the United States Hispanic video market. Prior to forming [REDACTED] was Vice President of TV Distribution in Latin America for [REDACTED] where he oversaw

all sales of TV and Theatrical product in Latin America, including Video On Demand, Pay-Per-View, Free TV, Basic Cable, Internet and Syndication. [REDACTED] was credited for creating synergies between [REDACTED] in Mexico and Latin America to launch Theatrical movies and DVD releases of movies, sequels, TV series and the licensing of products.

[REDACTED] is responsible for investor relations and partnership development. With ample knowledge of sales and negotiations, [REDACTED] an invaluable asset the 1inMM Capital team. [REDACTED] has handled film negotiations with studios such as Warner Brothers and Legendary pictures over the past 3 years. Specifically, [REDACTED] successfully negotiated and closed a deal with [REDACTED] for the rights to their blockbuster script, "The Lost Patrol". Currently the film is being packaged and hopes to hit theatres in 2015-2016. Outside of the film industry, [REDACTED] has been a high performing sales veteran who worked for

Exhibit 13 Page 241

# OUR STRATEGIC PARTNERSHIPS

**1NMM PRODUCTIONS**
PARENT COMPANY

*alebrije* entertainment
LEADING LATIN AMERICA DISTRIBUTION COMPANY


INTERNATIONAL FILM TRUST
FOREIGN SALES PARTNER

**HBO**
DISTRIBUTION PARTNER

BARNES MORRIS KLEIN MARK YORN BARNES & LEVINE
ENTERTAINMENT ATTORNEY

the exchange.
FOREIGN SALES PARTNER


IM GLOBAL
FOREIGN SALES PARTNER

**QED** INTERNATIONAL
FOREIGN SALES PARTNER

City **NATIONAL BANK**
The way up.
PRIMARY BANKING INSTITUTION

**SONY**
DISTRIBUTION PARTNER

**NETFLIX**
DISTRIBUTION PARTNER



Exhibit 13 Page 242

# OUR INVESTMENT FOCUS

**We believe that the safety of our investor's funds should always be our first priority.** Due to this notion, our strategy has been and will always be a collateralized investment approach to ensure that solid returns and safe investments are the pillars that solidify our foundation. The acquisition of each film that we acquire uses the asset acquired (Distribution Rights of the film) as collateral against any unexpected negative event that may occur. If, at any point, one of our current output deals (HBO / SONY / NETFLIX) would default on a payment owed to the company; the rights to distribute the film would immediately revert back to the distributor (1inMM Capital) and the distributor would place the film through a

different output deal. Through our solid relationships, we receive confirmation from each of our outputs indicating their desire to acquire the rights to any title we purchase PRIOR to us releasing funds for the film so that in the event of any unexpected occurrence, we are able to recover our investment through an alternative company.

*Due to this fact, in the event of one output platform defaulting on payment, 1inMM Capital has confirmation that this title will be acquired by a secondary deal and therefore making the investment whole. Simply stated, in the event that Netflix, HBO or SONY defaults on a payment, declares bankruptcy or displays contractual delinquency in any form, we simply sell the film to one of the two remaining output platforms that already have agreed to license the rights of the film.*

Exhibit 13 Page 243

# LIBRARY SNAPSHOT



Exhibit 13 Page 244

# EXHIBIT 15

**1inMM/Pathe HBO Deals - September 2017 Funding - March 2018 Maturity**

| Lender | Territory | Title Name | Funding Date | Maturity Date | Platform | Principal | Interest | Total Due |
|---|---|---|---|---|---|---|---|---|
| JJMT Capital | Europe | Le DouDou | 9/8/2017 | 3/8/2018 | HBO Studios | $973,500 | $282,380 | $1,255,880.00 |
| JJMT Capital | Europe | The Little Stranger | 9/8/2017 | 3/8/2018 | HBO Studios | $990,000 | $281,160 | $1,271,160.00 |
| JJMT Capital | Europe | La Ch'tite Famille | 9/11/2017 | 3/11/2018 | HBO Studios | $769,450 | $223,065 | $992,515.00 |
| JJMT Capital | Europe | Loro | 9/11/2017 | 3/11/2018 | HBO Studios | $730,820 | $214,055 | $944,875.00 |
| JJMT Capital | Europe | Capri: Batterie | 9/13/2017 | 3/13/2018 | HBO Studios | $805,000 | $226,205 | $1,031,205.00 |
| JJMT Capital | Europe | Alad'2 | 9/13/2017 | 3/13/2018 | HBO Studios | $780,150 | $238,725 | $1,018,875.00 |
| JJMT Capital | Europe | I'm So Excited | 9/15/2017 | 3/15/2018 | HBO Studios | $682,000 | $201,872 | $883,872.00 |
| JJMT Capital | Europe | Trance | 9/15/2017 | 3/15/2018 | HBO Studios | $625,740 | $179,587 | $805,327.00 |
| JJMT Capital | Europe | La Promesse De Laube | 9/22/2017 | 3/22/2018 | HBO Studios | $807,350 | $236,553 | $1,043,903.00 |
| JJMT Capital | Europe | L'attesa | 9/22/2017 | 3/22/2018 | HBO Studios | $733,050 | $208,928 | $941,978.00 |
| JJMT Capital | Europe | Twixt | 9/25/2017 | 3/25/2018 | HBO Studios | $761,000 | $232,866 | $993,866.00 |
| | | | | | **Totals** | **$8,658,060** | **$2,525,396** | **$11,183,456.00** |

**Notes**

*JJMT funded each deal title with ~80% capital from JJMT and ~20% capital from ZJH

**1inMM repaid each deal on or around the maturity date

***JJMT would repay ZJH the ~20% principal plus interest accrued at the end of the month for all matured Pathe deals in any given month

Exhibit 15 Page 245

JJMT-SEC-0005058

## DECLARATION OF ANITA PADILLA CERTIFYING RECORDS

## OF REGULARLY CONDUCTED BUSINESS ACTIVITY

I, the undersigned, Anita Padilla, pursuant to 28 U.S.C. § 1746, declare that:

1. I am employed by Escrow of The West as Executive Assistant to Galit Ofengart and by reason of my position am authorized and qualified to make this declaration. I am custodian of records and am familiar with the company's recordkeeping practices.

2. I further certify that the documents submitted herewith are true copies of records that were:

   (a) made at or near the time of the occurrence of the matters set forth therein, by, or from information transmitted by, a person with knowledge of those matters;

   (b) kept in the course of regularly conducted business activity; and

   (c) made by the regularly conducted business activity as a regular practice.

I declare under penalty and perjury that the foregoing is true and correct. Executed on 3/18/2021.

_____
Anita Padilla

Exhibit 16 Page 246



**Subject:**                    Re: Escrow 02-028786-GH 9615 Bolton Road

Hello,

the Buyer just informed me

The trust is "MJLZ TRUST" dated 1/30/2018 and the trustee is Leslie Klinger. ✓



On Jan 30, 2018, at 3:05 PM, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ wrote:

Hi the buyer needs to sign all as is... moving forward once amendment is signed we will change to trust. We will need the name of the trustee and the date of the trust first. Let me know if the draft is ok to send out. Regards, Gail.

If I can be of any further assistance, please do not hesitate to contact me.



1

Exhibit 16 Page 247



Click here for Disclosure.

 WARNING! WIRE FRAUD ADVISORY **Be aware! Wire fraud and email hacking / phishing attacks are on the rise! If you receive an email containing WIRE TRANSFER INSTRUCTIONS please call your escrow team immediately to verify the information prior to sending funds.**

**Subject:** Re: Escrow 02-028786-GH 9615 Bolton Road

Hi,

The name of the trust is "MJLZ TRUST"

Should we change all the paper work or just all going forward?



On Jan 30, 2018, at 2:23 PM, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ wrote:

Hi thank you. that's fine. Once they know the name of the trust and it is formed we can draw an assignment and vesting amendment. Regards, ▮▮▮▮

If I can be of any further assistance, please do not hesitate to contact me.



2

Exhibit 16 Page 248



Click here for Disclosure.

 WARNING! WIRE FRAUD ADVISORY **Be aware! Wire fraud and email hacking / phishing attacks are on the rise! If you receive an email containing WIRE TRANSFER INSTRUCTIONS please call your escrow team immediately to verify the information prior to sending funds.**



**Subject:** Re: Escrow 02-028786-GH 9615 Bolton Road

Hi,

FYI: The Buyers have expressed interest to take ownership in the name of a Trust. I know they are working with an attorney to set that up. The attorney is waiting for the prelim to proceed.

If you need to adjust or make any changes, feel free to ask them or I anything you need.



On Jan 30, 2018, at 1:27 PM, Marcia Sosnow <                              > wrote:

Good Afternoon:

The opening escrow package will be sent to you via DocuSign for your signature on the above transaction. Attached please find a copy of the NHD Report and a copy of the Buyer deposit for your review and to retain for your records. Included is the E-Signature Authorization for you to sign and return a copy to escrow.

3

Exhibit 16 Page 249

Please let us know if you have any questions.

Thank you.











Click here for Disclosure.



**W A R N I N G !   W I R E   F R A U D   A D V I S O R Y   \*\*Be aware!  Wire fraud and email hacking / phishing attacks are on
the rise!** If you receive an email containing WIRE TRANSFER INSTRUCTIONS please call your escrow team immediately to
verify the information prior to sending funds.\*\*

4

Exhibit 16 Page 250

 

## VESTING FORM

Date: January 30, 2018                                       Escrow No.: 02-028786-GH
TO: Escrow of the West
ESCROW HOLDER IS HEREBY INSTRUCTED BY THE UNDERSIGNED THAT TITLE TO THE PROPERTY IN THIS
ESCROW TO BE VESTED AS FOLLOWS:

1. YOUR NAME(S):  Zachary Horwitz                    Mallory Horwitz
   **You will need a picture identification in this name for your signature to be notarized.**

2. **PLEASE INDICATE ONE:**

   X  X   Husband and Wife                                         _____ Domestic Partners as joint tenants
   _____ Wife and Husband                                          _____ Domestic Partners as community
   _____ Wife and Wife                                                    property
   _____ Husband and Husband                                       _____ Registered Domestic Partners as
   _____ A Married Man as his sole and separate property **              Joint Tenants
   _____ A Married Woman as her sole and separate property **      _____ Registered Domestic Partners
   _____ A Single Man (never been married)                         _____ Registered Domestic Partners
   _____ A Single Woman (never been married)                             Community Property
   _____ An Unmarried Man (divorced, final filed)                  _____ Registered Domestic Partners
   _____ An Unmarried Woman (divorced, final filed)               _____ Tenants in Common (with a designated
   _____ A Widower (male)                                                percentage of interest)
   _____ A Widow (female)                                          _____ Registered Domestic Partner as his sole
   _____ A Trust, Corporation or LLC                                     and separate property   .

   _____
   Name of Trust, Corporation or LLC

3. ** IF YOUR STATUS IS SEPARATED OR YOU ARE MARRIED OR A REGISTERED DOMESTIC PARTNER, AND
   TAKING TITLE ALONE, your vesting will show "as sole and separate property." In this case, we will need the name
   of your spouse/partner. A Quitclaim Deed will be drawn and sent to you for your spouse's/partner's signature. IN
   THIS CASE, PLEASE PRINT YOUR SPOUSE'S/PARTNER'S NAME HERE:

   _____

4. IF TWO (2) OR MORE PEOPLE ARE TAKING TITLE TOGETHER, please check one of the following:
   _____ As Joint Tenants
   _____ As Community Property (husband and wife, domestic partners or same sex marriage only)
   _____ As Community Property with Right of Survivorship (husband and wife, domestic partners or same sex
   marriage only)
   _____ As Tenants in Common

5. ***IF TITLE IS HELD AS "TENANTS IN COMMON", or if more than one married or registered domestic partnered
   couple are taking title as Tenants in Common, please give the percentage of vesting interest of each person/couple to
   hold title:

   _____

**NOTE: SHOULD THERE BE ANY QUESTIONS REGARDING YOUR VESTING, CONSULT AN ATTORNEY OR YOUR
     C.P.A.**

BUYER(S):
        ┌─DocuSigned by:
        │  Zachary Horwitz
_____
Zachary Horwitz 7B3410F485...
        ┌─DocuSigned by:
        │  M.H.
_____
Mallory Horwitz 564E80366400...

Exhibit 16 Page 251





## E- SIGNATURE AUTHORIZATION

By the Live/Handwritten signatures provided below, Escrow holder is hereby authorized and instructed to accept electronic signatures from Buyer and Seller on the Purchase Agreement as provided to Escrow Holder. Furthermore, Escrow Holder is hereby authorized and instructed to accept electronic signatures from Buyer and Seller on Escrow Instructions, General Provisions, Amendments, and other documents as required to process and close escrow on the above property, providing the electronic signatures are obtained directly by Escrow Holder.

Buyer and Seller hereby release Escrow Holder from any and all liability and responsibility in connection with the verification of said electronic signatures and for any consequences as a result of acting on such signatures in connection with this transaction. This authorization shall survive the close of escrow.

**Buyer and Seller hereby acknowledge and agree that electronic signatures** *cannot be accepted for any instructions concerning the release or disbursement of funds from escrow, items that may require live/ handwritten signatures or for any items requiring acknowledgment or notarization by a Notary Public.*

**SELLERS:**

**BUYERS:**

Zachary Horwitz

Mallory Horwitz

Date:_____

Date: ___2|7|2018___

Exhibit 16 Page 252


ESCROW OF THE WEST



## AMENDED ESCROW INSTRUCTIONS

Property Address:    9615 Bolton Road, Los Angeles, CA  90034

**To: Escrow of the West - Gail Hershowitz**

**(1)**  **SELLER'S VESTING:** The Seller's vesting is hereby amended to read ▮▮▮▮▮▮ a California Limited Liability Company

(2)  **ASSIGNMENT OF BUYER'S INTEREST IN ESCROW - NO RELEASE OF ORIGINAL BUYER:** Zachary Horwitz and Mallory Horwitz ("Buyers") hereby assigns to Leslie Klinger, Trustee of The MJLZ Trust Dated January 30, 2018 ("Assignee"):

    **a.**  All interest in and to all right to acquire title to the property that is the subject of this escrow; and

    **b.**  All funds now on deposit to the account of Leslie Klinger, Trustee of The MJLZ Trust Dated January 30, 2018 in this escrow. No consideration is to be paid to Leslie Klinger through this escrow for or on account of this agreement.

Agreement: It is agreed between ▮▮▮▮▮▮ as Seller and Zachary Horwitz and Mallory Horwitz, as Buyers, and Leslie Klinger, Trustee of The MJLZ Trust Dated January 30, 2018, as Assignee, with respect to the California Residential Purchase Agreement and Joint Escrow Instructions ("RPA") and all other escrow instructions in this Escrow No. 02-028786- GH, as follows:

Seller hereby accepts Leslie Klinger, Trustee of The MJLZ Trust Dated January 30, 2018, as Assignee, in place of said Buyers as the substituted Buyer to said escrow and hereby agrees with Assignee to be bound by the terms of the RPA and all other escrow instructions in all respects as if Assignee was originally named therein as a party in place of said Buyer. Assignee agrees to perform in accordance with the RPA and all other escrow instructions and to be bound by all the terms therefor in all respects as if he/she/they were the originally named as buyer in the RPA and all other escrow instructions. Buyer shall remain jointly and severally liable with Assignee with respect to the RPA and all other escrow instructions.

All other terms and conditions of this escrow shall remain the same. All parties signing this instruction acknowledge receipt of a copy of same.

**SELLERS:**                                        **BUYERS:**



DocuSign by:
Zachary Horwitz

DocuSign by:
Mallory Horwitz

**ASSIGNEE:**

Leslie Klinger, Trustee of The MJLZ Trust Dated January 30, 2018
DocuSign by:
Leslie S. Klinger, Trustee
Leslie Klinger, Trustee

Exhibit 16 Page 253





### ESCROW OF THE WEST IS LICENSED BY THE DEPARTMENT OF BUSINESS OVERSIGHT OF THE STATE OF CALIFORNIA, LICENSE NUMBER 963-2166

## SUPPLEMENTAL ESCROW INSTRUCTIONS

**Escrow No.:** 02-028786-GH
**Date:** January 29, 2018

For clarification purposes, the following is restated from the Purchase Agreement (as defined herein) and shall apply as Supplemental Escrow Instructions ("Escrow Instructions") to Escrow of the West ("Escrow Holder"):

Buyer will hand you an **INITIAL DEPOSIT** of _____ $171,375.00
Prior to close of escrow, buyer will deposit an additional amount of _____ $5,541,125.00
plus closing costs and charges as required prior to the close of escrow in the form of a cashier's check or wire.

### TOTAL CONSIDERATION _____ **$5,712,500.00**

The undersigned will deliver to Escrow Holder any instructions or funds (in the form of cashier's check or certified funds) required to enable Escrow Holder to comply with these instructions, all of which Escrow Holder is authorized to use provided that on or before **March 29, 2018**, Escrow Holder is in a position to obtain a standard Policy of Title Insurance, with the usual title company's exceptions, through **Equity Title Company**, with a liability of at least the amount of the above total consideration (ALTA policy of Title Insurance to be delivered to lien holder), on the real property in the County of **Los Angeles**, State of California, described as follows:

LEGAL DESCRIPTION ATTACHED HERETO AS EXHIBIT "A" AND MADE A PART HEREOF

**PROPERTY ADDRESS: 9615 Bolton Road, Los Angeles, CA 90034**

**CLOSE OF ESCROW SHALL BE ON OR BEFORE: March 29, 2018**

**SHOWING TITLE VESTED IN: Zachary Horwitz and Mallory Horwitz, Complete Vesting To Follow**

**Exact Vesting to be provided prior to close of escrow:** The Seller, Escrow Holder and Agents are not qualified or permitted by law to advise Buyer on how to take title to the Property. If the Buyer has any questions regarding this matter, those questions must be directed to a licensed attorney or tax consultant of Buyer's choice. Escrow Holder is hereby authorized and instructed to affix Buyer's selected vesting to the Grant Deed upon written authorization from the Buyer without further approval of the Seller.

### FREE FROM ENCUMBRANCES EXCEPT:

(1)     General and Special County and City (if any) Taxes for the current fiscal year, not due or delinquent, including any special levies, payments for which are included therein and collected therewith.

(2)     Lien of Supplemental Taxes, if any, assessed pursuant to the provisions of Chapter 3.5 (commencing with Section 75) of the Revenue and Taxation Code of the State of California.

(3)     Covenants, Conditions, and Restrictions, reservations, easements for public utilities, districts, water companies,

(CONTINUED)

Seller's Initials: _____ / _____                                          Buyer's Initials: _____ / _____

Exhibit 16 Page 254

DocuSign Envelope ID: AFAC3016-CEC9-4632-8ACA-464C0D9471C6

 CALIFORNIA ASSOCIATION OF REALTORS®

**SELLER COUNTER OFFER No. 3**
**May not be used as a multiple counter offer.**
(C.A.R. Form SCO, 11/14)



Date _January 27, 2018_

This is a counter offer to the: ☐ Purchase Agreement, ☒ Buyer Counter Offer No. _2_, or ☐ Other _____ ("Offer"),
dated _January 26, 2018_, on property known as _9615 Bolton Rd, Los Angeles, CA 90034_ ("Property"),
between _Zachary Horwitz, Mallory Horwitz_ ("Buyer")
("Seller").

1. **TERMS:** The terms and conditions of the above referenced document are accepted subject to the following:
   A. **Paragraphs in the Offer that require initials by all parties, but are not initialed by all parties, are excluded from the final agreement unless specifically referenced for inclusion in paragraph 1C of this or another Counter Offer or an addendum.**
   B. **Unless otherwise agreed in writing, down payment and loan amount(s) will be adjusted in the same proportion as in the original Offer.**
   C. **OTHER TERMS:** _____

   _1. Purchase Price to be $5,712,500._

   _2. All other terms and conditions to remain the same._

   _____

   D. **The following attached addenda are incorporated into this Seller Counter offer:** ☐ Addendum No. _____
   ☐ _____  ☐ _____

2. **EXPIRATION:** This Seller Counter Offer shall be deemed revoked and the deposits, if any, shall be returned:
   A. Unless by 5:00pm on the third Day After the date it is signed in paragraph 4 (if more than one signature then, the last signature date)(or by _5:00_ ☐AM ☒PM on _01/28/2018_ (date)) (i) it is signed in paragraph 5 by Buyer and (ii) a copy of the signed Seller Counter Offer is personally received by Seller or agent _Judy Ross-Bunnage_, who is authorized to receive it.
   OR B. If Seller withdraws it anytime prior to Acceptance (CAR Form WOO may be used).
   OR C. If Seller accepts another offer prior to Buyer's Acceptance of this counter offer.

3. **MARKETING TO OTHER BUYERS:** Seller has the right to continue to offer the Property for sale. Seller has the right to accept any other offer received, prior to Acceptance of this Counter Offer by Buyer as specified in 2A and 5. In such event, Seller is advised to withdraw this Seller Counter Offer before accepting another offer.

4. **OFFER: SELLER MAKES THIS COUNTER OFFER ON THE TERMS ABOVE AND ACKNOWLEDGES RECEIPT OF A COPY.**

5. **ACCEPTANCE: I/We accept the above Seller Counter Offer (If checked ☐ SUBJECT TO THE ATTACHED COUNTER OFFER)** and acknowledge receipt of a Copy.
   Buyer _Zachary Horwitz_ Date _1/28/2018_ Time _3:25:16 PM PST_ ☐AM/☒PM
   Buyer _____ _Mallory Horwitz_ Date _/28/2018_ Time _11:44 PM_ ☐AM/☒PM

**CONFIRMATION OF ACCEPTANCE:**
_(JRB / ___)_ **(Initials) Confirmation of Acceptance:** A Copy of Signed Acceptance was personally received by Seller, or Seller's authorized agent as specified in paragraph 2A on (date) _1/28/18_ at _3:50_ ☐AM/☒PM. **A binding Agreement is created when a Copy of Signed Acceptance is personally received by Seller or Seller's authorized agent whether or not confirmed in this document.**

© 2014, California Association of REALTORS®, Inc.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
a subsidiary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

Reviewed by _____ Date _____

**SCO 11/14 (PAGE 1 OF 1)**

**SELLER COUNTER OFFER (SCO PAGE 1 OF 1)**

Caldwell Banker - Beverly Hills South, 166 N Canon Dr Beverly Hills, CA 90210   Phone: (310)285-7504   Fax: (310)278-4934   9615 Bolton Road
S. JUDY ROSS-BUNNAGE   Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com

Exhibit 16 Page 255

**FirstService**
RESIDENTIAL

Processed by

*WelcomeLink*

## Return Form

**CA-A71675**



**Seller**, please provide the following information:

Forwarding Address: _____

**Escrow**, please provide the following information:

The property will ☒ will not ☐ be occupied by the owners(s). Property will be occupied as of _____

All billings, correspondence for new owners, after COE should be mailed to Buyer's at:

9615 Bolton Rd. Los Angeles, CA 90034

List all new owners on title for said property:     MJLZ TRUST

MJLZ Trust

The undersigned hereby acknowledge the receipt of this document which specifies the fees due for the Resale Statement of Account, each understands its responsibilities as set forth herein, and each authorizes the Escrow Agent to pay to the Association and FirstService Residential California, the charges set forth, respectively, as currently shown or as may be amended before the Close of Escrow.

| | | DocuSigned by: | |
| --- | --- | --- | --- |
| | | *Zachary Horwitz* | 2/11/2018 |
| Seller's Signature | Date | Buyer's Signature | Date |
| | | Zachary Horwitz | |
| Name (print or type) | | Name (print or type) | |
| | | *Mallory Horwitz* | 2/6/2018 |
| Seller's Signature | Date | Buyer's Signature | Date |
| | | Mallory Horwitz | |
| Name (print or type) | | Name (print or type) | |

**Please forward this statement signed by all parties, escrow's closing statement(s), fees and sums due to:**

FirstService Residential California, LLC
15241 Laguna Canyon Road Irvine, CA 92618

Exhibit 16 Page 256





## CERTIFICATION OF TRUST

### PURSUANT TO CALIFORNIA PROBATE CODE SECTION 18100.5

TO:  Equity Title Company                                    Escrow No. 02-028786-GH

I(WE),  Leslie S Klinger _____, Trustee(s)/Successor trustee(s) confirm the following facts:

1.  THE  MJLZ Trust _____ (Name of Trust)
is
currently in existence and was created on  1/30/18  (Date of Creation of Trust).
2.  The settlor(s) of the trust are as follows:  Zachary and Hillary Horwitz
3.  The currently acting trustee(s) of the trust is(are):  Leslie S Klinger

4.  The power of the trustee(s) includes:  (a) The powers to sell, convey and exchange ☒ YES [  ] NO (Check one)  (b) The power to borrow money and encumber the trust property with a deed of trust or mortgage ☒ YES [  ] NO (Check one).
5.  The trust is (a) revocable ☒; (b) irrevocable [  ] (check the applicable box) and the following party(ies) if any, is (are) identified as having the power of to revoke the trust:  Settlors

6.  The trust (a) does [  ]; (b) does not have multiple trustees ☒ (check the applicable box).  If the trust has multiple trustees, the signatures of all the trustees or of any _____ of the trustees is required to exercise the powers of the trust.
7.  The trust identification number is as follows: ▮▮▮▮▮▮▮ (Social Security No./Employee ID)
8.  Title to trust assets shall be taken in the following fashion:  Leslie S. Klinger, Trustee of the
MJLZ Trust dated 1/30/18

The undersigned trustee(s) hereby declares (declare) that the trust has not been revoked, modified, or amended in any manner which would cause the representations contained herein to be incorrect.  The certification is being signed by all of the currently acting trustees and is being executed in conformity with the provisions of California Probate Code Section 18100.5, Chapter 350, Statutes of 1993.

Date:  Feb. 7, 2018

Leslie Klinger, Trustee

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of  Los Angeles

On  February 8, 2018  before me,  Cheryl Lin Shields, Notary Public,
A Notary Public personally appeared **Leslie Klinger**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

CHERYL LIN SHIELDS
Notary Public – California
Los Angeles County
Commission # 2118817
My Comm. Expires Jul 24, 2019

(Seal)

Exhibit 16 Page 257

**From:**
**Sent:** Friday, February 09, 2018 8:11 AM
**To:** 'Leslie Klinger'; Zach Horwitz; Mallory Horwitz
**Subject:** RE: Certification of Trust - re Zachary and Mallory Horwitz

Good Morning Leslie,

Received with thanks.

Zachary and Mallory, please sign and return the attached E-signature authorization (page 3 of attached) and return via email or fax. Also, we are still pending your docusign signatures. Please review, sign, and return. Thank you!

Exhibit 16 Page 258

# RECEIPTS AND DISBURSEMENTS LISTING

Escrow No. 02-028786-GH                          Date: March 29, 2018

By: ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅                          Buyer/Borrower:  Leslie Klinger

## RECEIPTS:

| DATE | TYPE | BANK | RECEIPT NO. | PAYEE | AMOUNT |
|------|------|------|-------------|-------|--------|
| 01/30/2018 | W | 1 | 26164 | Zachary Horwitz | 171,375.00 |
| 03/28/2018 | W | 1 | 26726 | Zachary Horwitz FBO The MJLZ Trust dated January 3 | 5,556,401.13 |

TOTAL RECEIPTS                          $ 5,727,776.13

## DISBURSEMENTS:

| DATE | TYPE | BANK | REF. NO. | PAYEE | AMOUNT |
|------|------|------|----------|-------|--------|
| 03/29/2018 | C | 1 | 103023 | Leslie Klinger, Trustee of The MJLZ | 1,040.00 |
| 03/29/2018 | W | 1 | 24403 | Bank of America - ▅▅▅▅▅▅▅ Property: 9615 Bo | 4,155,447.23 |
| 03/28/2018 | W | 1 | 24394 | ▅▅▅▅ - Equity Title Company - Property: 9 | 1,089,233.75 |
| 03/29/2018 | W | 1 | 24404 | ▅▅▅▅ - Equity Title Company - Property: 9 | 2,940.64 |
| 03/29/2018 | F | 1 | 10400 | Escrow of the West | 11,925.99 |
| 03/29/2018 | T | 1 | 40363 | Escrow of the West | 25.00 |
| 03/29/2018 | T | 1 | 40364 | Escrow of the West | 20.00 |
| 03/29/2018 | T | 1 | 40365 | Escrow of the West | 500.00 |
|  |  |  | Combined | Escrow of the West $300.00 |  |
|  |  |  | Combined | Admin fee $200.00 |  |
| 03/29/2018 | T | 1 | 40366 | Escrow of the West | 100.00 |
| 03/29/2018 | C | 1 | 103024 | Property ID | 99.00 |
| 03/29/2018 | C | 1 | 103025 | ▅▅▅▅▅▅▅▅▅ | 75.00 |
| 03/29/2018 | C | 1 | 103026 | ▅▅▅▅▅▅▅▅▅ | 835.00 |
| 03/29/2018 | C | 1 | 103027 | ▅▅▅▅▅ | 198.00 |
| 03/29/2018 | C | 1 | 103028 | Escrow of the West | 72.76 |
| 03/29/2018 | C | 1 | 103029 | Los Angeles Dept. of Water and Power | 15.00 |
| 03/29/2018 | C | 1 | 103030 | ▅▅▅▅▅ | 30.00 |
| 03/29/2018 | C | 1 | 103031 | ▅▅▅▅▅▅▅▅▅ | 249,559.18 |
| 03/29/2018 | C | 1 | 103032 | ▅▅▅▅▅▅▅▅▅ | 703.82 |
| 03/29/2018 | C | 1 | 103033 | ▅▅▅▅▅▅▅▅▅ | 737.00 |
| 03/29/2018 | C | 1 | 103034 | ▅▅▅▅▅▅▅▅▅ | 20,000.00 |
| 03/29/2018 | C | 1 | 103035 | ▅▅▅▅▅▅▅▅▅ | 27,460.44 |
| 03/29/2018 | C | 1 | 103036 | ▅▅▅▅▅▅▅▅▅ | 38,227.06 |
| 03/29/2018 | W | 1 | 24402 | * | 0.00 |
| 03/29/2018 | W | 1 | 24405 | ▅▅▅▅▅▅ - Property: 9615 Bolt | 101,856.16 |
|  |  |  | Combined | ▅▅▅▅▅ - Property: 9615 Bolt $101,856.15 |  |
|  |  |  | Combined | Escrow of the West - Property: 9615 Bolton Road, L $0.01 |  |
| 03/29/2018 | C | 1 | 103020 | The Agency | 26,675.10 |

TOTAL CHECKS ISSUED      5,727,776.13
CHECKS NOT WRITTEN              0.00
TOTAL                    5,727,776.13

BALANCED

Exhibit 16 Page 259      **0.00**

 

ESCROW OF THE WEST

## MASTER FINAL SETTLEMENT STATEMENT

**PROPERTY:** 9615 Bolton Road
Los Angeles, CA 90034

**BUYER:** Leslie Klinger, Trustee of The MJLZ Trust Dated January 30, 2018     **CLOSING/RECORD DATE:** March 29, 2018

**SELLER:** ▮▮▮▮▮▮▮     **ESCROW NO.:** 02-028786-GH

| SELLER DEBITS | CREDITS | | BUYER DEBITS | CREDITS |
|---|---|---|---|---|
| | | **FINANCIAL CONSIDERATION** | | |
| 5,712,500.00 | | Total Consideration | 5,712,500.00 | |
| | | Deposit from Zachary Horwitz | | 171,375.00 |
| | | Deposit from Zachary Horwitz FBO The MJLZ Trust dated January 30, 2018 | | 5,556,401.13 |
| | | **PAYOFF CHARGES - Banc of California [Total Payoff $1,042,936.44]** | | |
| 1,039,500.00 | | Principal Balance | | |
| 3,200.44 | | Interest on Principal Balance at $110.3600/day from 03/01/2018 to 03/29/2018 | | |
| 191.00 | | Recording Fee | | |
| 45.00 | | Reconveyance Fee | | |
| | | **PRORATIONS/ADJUSTMENTS** | | |
| | 7,078.05 | 2nd Install 2017-18 RE Taxes at $13,741.95/semi-annually from 03/29/2018 to 07/01/2018 | 7,078.05 | |
| | 181.26 | HOA 2017-18 Annual Assessment at $703.82/annually from 03/29/2018 to 07/01/2018 | 181.26 | |
| | | **COMMISSION CHARGES** | | |
| 85,687.50 | | | | |
| 128,531.25 | ▮▮▮▮▮▮▮ | | | |
| | | **H.O.A./MANAGEMENT** | 703.82 | |
| | ▮▮▮▮▮▮▮ | | | |
| 737.00 | | | | |
| | | **OTHER DEBITS/CREDITS** | | |
| 99.00 | | Property ID for Natural Hazard Disclosure Report | | |
| 75.00 | | | | |
| 835.00 | | | | |
| 198.00 | | | | |
| 72.76 | | | | |
| 15.00 | | | | |
| 30.00 | | | | |
| 249,559.18 | | | | |
| | | **TITLE/TAXES/RECORDING CHARGES - Equity Title Company** | | |
| 3,280.00 | | Title - Owner's Title Insurance(Binder Price) | | |
| 20.00 | | Title - Recording Service Fee | | |

Exhibit 16 Page 260

Closing Date: March 29, 2018
Date: March 29, 2018

Escrow No.: 02-028786-GH
Printed: March 29, 2018 · 10:47am

Page 2 of 2:

| SELLER DEBITS | CREDITS | | BUYER DEBITS | CREDITS |
|---|---|---|---|---|
| 125.00 | | Title - Sub Escrow Fee | | |
| 25.00 | | Title - Wire Fee | | |
| 39.00 | | Recording Grant Deed | | |
| 17.00 | | Recording Accommodation Lien Release | | |
| 6,283.75 | | Transfer Tax - County to Los Angeles County | | |
| 25,706.25 | | Transfer Tax - City to City of Los Angeles | | |
| 13,741.95 | | 2nd Install 2017-18 RE Taxes to Los Angeles County Tax Collector | | |
| | | **ESCROW CHARGES - Escrow of the West** | | |
| 6,063.00 | | Title - Escrow Fee | 6,063.00 | |
| 25.00 | | Title - Wire Fee | | |
| 150.00 | | Title - Admin Fee | 150.00 | |
| 50.00 | | Title - Archive Fee | 50.00 | |
| 10.00 | | Title - Messenger/Handling Fee | 10.00 | |
| 4,155,447.23 | | **Net Proceeds** | | |
| | | **Total Refund** | 1,040.00 | |
| $ 5,719,759.31 | $ 5,719,759.31 | **TOTAL** | $ 5,727,776.13 | $ 5,727,776.13 |

Exhibit 16 Page 261

**WIRE IN NO.**                     26726

Escrow of the West                     1 - 01 - City National Bank

**RECEIPT NO.**

ESCROW NO.                     DATE
02-028786-GH                     March 28, 2018

Property:  9615 Bolton Road, Los Angeles, CA,  90034

RECEIVED OF     Zachary Horwitz FBO The MJLZ Trust dated January 30, 2018

AMOUNT
$5,556,401.13
FIVE MILLION FIVE HUNDRED FIFTY-SIX THOUSAND FOUR HUNDRED ONE AND 13/100 DOLLARS

|  | ABA Number | Trans Number | Description |
|---|---|---|---|
| Wire In |  |  | Closing Proceeds |
|  |  |  |  |

FED Reference # or Checking Account Number  CNB

Received on behalf of BUYER/BORROWER

BY                                             Received After Hours [ ]
                                               Earnest Money:  No

20180328-0006035

FILE

Exhibit 16 Page 262

**WIRI! IN NO.**      26164

Escrow of the West      1 - 01 - City National Bank

**RECEIPT NO.**

ESCROW NO.          DATE
02-028786-GH          January 30, 2018

Property:  9615 Bolton Road, Los Angeles, CA,  90034

RECEIVED OF      Zachary Horwitz

AMOUNT
$171,375.00
ONE  HUNDRED  SEVENTY-ONE  THOUSAND  THREE  HUNDRED  SEVENTY-FIVE  AND  00/100  DOLLARS

|  | ABA Number | Trans Number | Description |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

FED  Reference # or Checking  Account  Number

Received on  behalf of <u>BUYER/BORROWER</u>

BY                             Received After Hours [ ]
Earnest Money:  Yes

FILE

Exhibit 16 Page 263

# EXHIBIT 17










♡ Save  ↗ Share  ••• More

**$6,495,000**   6 bd | 8 ba | 7,670 sqft

9615 Bolton Rd, Los Angeles, CA 90034

🔴 For sale  Zestimate®: **$6,295,000**

Est. payment: $28,553/mo  💲 Get pre-qualified

| Contact Agent | Take a Tour |

Overview | Facts and features | Price and tax history | Monthly ›

 **Love this home?** Sell your current home to Zillow, and close on your schedule.

| Zipcode | Check eligibility |




Street View

**Travel times** 🔵

🚗 Add work destination

## Overview

Time on Zillow **67 days** | Views **3,750** | Saves **189**

Located in the heart of Beverlywood, this reimagined Traditional estate by famed designer Lonni Paul checks off every detail from even the most selective of buyers. Immersed with natural light as you enter, a grand 2-story living area opening out to an outdoor patio. A custom milled formal dining room envelopes you with coved ceilings and hand woven wallpaper that sets the tone for a palette of finishes that pleases a true critiques eye.  An open floor plan leads to a chef's kitchen with an oversized island, butlers

**Read more**

Listed by:

Exhibit 17 Page 264

# EXHIBIT 18










## Zillow

♡ Save    ⤴ Share    ••• More

# $6,495,000

6 bd | 8 ba | 7,670 sqft

9615 Bolton Rd, Los Angeles, CA 90034

Est. payment: $28,553/mo  💲 Get pre-qualified

**Contact Agent**    **Take a Tour**

Overview    **Facts and features**    Price and tax history    Monthly ›

## Facts and features

| | | | |
|---|---|---|---|
| 🏠 **Type:** | SingleFamily | 🅿 **Parking:** | Paved, Garage - Two Door |
| 🗓 **Year built:** | 2017 | | |
| 🌡 **Heating:** | Central | 📐 **Lot:** | 8,902 sqft |
| ❄ **Cooling:** | Central Air | 🏷 **Price/sqft:** | $847 |

## Interior details

**Bedrooms and bathrooms**          **Appliances**
Bedrooms: 6                          Appliances included:

🔽 **See more facts and features**

**Services availability**

95.79  Sun Number™

**Have a question about this home?**

**Get a call**

## Estimated market value

Zestimate®
**$6,295,000**
Estimated sales range: **$5.98M - $6.61M**

**Zestimate history**

— This home
$6.3M

Today

Exhibit 18 Page 265

# EXHIBIT 19















# azillow

Save    Share    ••• More

## $6,495,QQQ    6bd    | -- |    7,670 sqft

9615 Bolton Rd, Los Angeles, CA 90034

Est. payment: $28,553/mo    Get pre-qualified

Contact Agent    Take a Tour

Overview    Facts and features    Price and tax history    Monthly >

## Facts and features

| | | | | |
|---|---|---|---|---|
| Type: | SingleFamily | | Parking: | Paved, Garage -Two Door |
| Year built: | 2017 | | | |
| Heating: | Central | | Lot: | 8,902 sqft |
| Cooling: | Central Air | | Price/sqft: | $847 |

## Interior details

**Bedrooms and bathrooms**
Bedrooms: 6

**Appliances**
Appliances included:

8  See more facts and features

## Services availability

95.79   Sun Number™

## Have a question about this home?

Get a call

## Estimated market value

Zestimate®
**$6,295,000**
Estimated sales range: $5.98M - $6.61M

## Zestimate history

This home
$6.3M

Exhibit 19 Page 266

Today

# EXHIBIT 20












 **Zillow**

♡ Save   ⬆ Share   ••• More

## $6,495,000   6 bd | 8 ba | 7,670 sqft

**9615 Bolton Rd, Los Angeles, CA 90034**

Est. payment: $28,553/mo  💲 Get pre-qualified

| Contact Agent | Take a Tour |
|---|---|

Overview   Facts and features   **Price and tax history**   Monthly ›

| Date | Event | Price | |
|---|---|---|---|
| 1/21/2021 | Listed for sale | $6,495,000 (+13.6%) | $847/sqft |
| | Source: CRMLS #20562762 Report | | |
| 3/29/2018 | Sold | $5,715,227 (-4.7%) | $745/sqft |
| | Source: CLAW #17273974 Report | | |
| 3/26/2018 | Listed for sale | $5,995,000 | $782/sqft |
| | Source: Coldwell Banker Residential Brokerage Report | | |
| 1/23/2018 | Listing removed | $5,995,000 | $782/sqft |
| | Source: Coldwell Banker Residential Brokerage - Beverly Hills South Report | | |
| 9/27/2017 | Listed for sale | $5,995,000 (+303.7%) | $782/sqft |
| | Source: Coldwell Banker Residential Brokerage Report | | |
| 10/9/2015 | Sold | $1,485,000 (-0.7%) | $194/sqft |
| | Source: CLAW #15929211 Report | | |
| 8/5/2015 | Pending sale | $1,495,000 | $195/sqft |
| | Source: Coldwell Banker Residential Brokerage - Beverly Hills South Report | | |

⌄ See complete price history

## Public tax history

| Year | Property Taxes | Tax Assessment |
|---|---|---|
| 2020 | $72,055 | $5,943,285 (+2%) |
| 2019 | $72,055 (+157.6%) | $5,826,750 (+150.8%) |
| 2018 | $27,967 | $2,322,846 (+53.4%) |

⌄ See complete tax history

Exhibit 20 Page 267

# EXHIBIT 21



Exhibit 21 Page 268

**9615 Bolton Rd,** Los Ange es, CA 90034

| $6,495,000 | 6 | 7 | 7,670 |
|---|---|---|---|
| Price | Beds | Ba hs | Sq F |



### Go tour this home

Located n the heart of Bever ywood, th s re mag ned Trad t ona estate by famed des gner Lonn Pau checks off every deta from even the most se ect ve of buyers. mmersed w th natura ght as you enter, a grand 2 story v ng area open ng out to an outdoor pat o. A custom m ed forma

Cont nue read ng ⌄

▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬

Redfin las checked: 2 minu es ago as upda ed Feb 2, 2021 • Source: TheM S

|   | TUESDAY<br>30<br>MAR | WEDNESDAY<br>31<br>MAR | THURSDAY<br>1<br>APR |   |
|---|---|---|---|---|

⌂ Tour in Person    ▯ our via Video Cha

**Schedule Tour**

's ree, wi h no obliga ion — cancel any ime

OR

**Start an Offer**

Ask a Ques ion    (562) 444-1987

## Price Insights

| L st Pr ce | $6,495,000 | Est. Mo. Payment | $29,899 |
|---|---|---|---|
| Redfin Est mate | $6,238,453 | Pr ce/Sq.Ft. | $847 |
| Buyer s Brokerage Comm ss on | 2.5% |  |  |

## Home Facts

| Status | Act ve | T me on Redfin | 68 days |
|---|---|---|---|
| Property Type | S ng e Fam y, Res dent a S ng e Fam y | Baths | 6 fu , 2 part a |
| HOA Dues | $59/month | Year Bu t | 2017 |
| Sty e | Trad t ona | Commun ty | Bever ywood V c n ty |
| Lot S ze | 8,902 Sq. Ft. | MLS# | 20 562762 |



🚗 min · Add a Commute

## Open Houses

🗓 No upcom ng open houses



💬 Live Chat

Exhibit 21 Page 269

**Tour on your schedule with Redfin**

◉ Tour n person  ○ Tour v a v deo chat

Tomorrow:  9:00 am  ·  10:00 am  ·  11:00 am  ·  12:00 pm  ·  1:00 pm  ·  More t mes

## Payment Calculator

### $29,899 per month

Find a Lender

| | |
|---|---|
| ● Pr nc pa and nterest | $21,775 |
| ● Property Taxes | $6,874 |
| ● HOA Dues | $59 |
| ● Homeowners nsurance | $1,191 |

| Home Pr ce | Down Payment | Loan Type | nterest Rate |
|---|---|---|---|
| $6,495,000 | 20% ($1,299,000) | 30 Year F xed | 2.953 % |





Exhibit 21 Page 270

## Property Details for 9615 Bolton Rd

### nterior Features

**Bedroom nformation**
Mas er Re rea , Walk nClose

**Bathroom nformation**
# o  a hs ( ull): 2
# o  a hs (3/4): 4
# o  a hs (1/2): 2
Double Vani y(s), Spli   a h

**Kitchen nformation**
Gas, Oven, Microwave
Gourme  Ki chen, Coun er  op, sland,  an ry

**Laundry nformation**
aundry on Upper  evel, aundry Room

**Additional Rooms**
reak as Nook, Ki chen sland,  ormal Dining Room
Dining Room
amily Room
Den
asemen , onus Room,  reak as Area, Cabana,
Den/O  ce, Dining Room,  n ry Room,  amily Room,
Grea Room, Gues -Maids Quar ers, Gym, Home  hea re,

iving Room, Mas er  edroom, Media Room, O  ce,
an ry,  a io Covered,  owder Room, S udy/O  ce, Walk-
n Close , Walk- n  an ry, Wine Cellar

**nterior Features**
uil - ns, Crown Moldings,  asemen , Co  ered Ceiling(s),
Open  loor  lan
Main  evel

**Fireplace nformation**
n  amily Room, Gas  ireplace, n Mas er  edroom, On
a io
# o  ireplaces: 3

**Flooring nformation**
Carpe ed  loors, Hardwood  loors,  ile  loors

**Equipment**
Alarm Sys em,  arbeque,  uil - ns, Cable, Dishwasher,
Dryer,  reezer, Garbage Disposal, Microwave,
Range/Oven, Re rigera or, Washer

**Heating & Cooling**
Cen ral Cooling
Cen ral Hea

### Parking / Garage

**Garage**
Driveway -  avers, 2 Car Garage

**Parking**
# o  arking Spaces ( o al): 4

### Exterior Features

**Building nformation**
o al  loors: 3
hree Or More  evels
De ached
De ached/No Common Walls
Securi y  ea ures: Owned

**Exterior Features**
O her S ruc ural  ea ures:  arbecue  riva e,  alcony,
Cus om  uil ,  rench Doors, Sliding Glass Doors

**Pool nformation**
n Ground  ool, Hea ed  ool
n Ground Spa

### Homeowners Association, School / Neighborhood, Utilities, Taxes / Assessments

**HOA nformation**
ee #1: $704
ee #1  requency: Annually

**Community nformation**
# o  Uni s in Complex ( o al): 1
A hle ic Cour : None

**Utility nformation**
Sewer: n S ree

**Assessment nformation**
Assessor  arcel Number: 4309-010-011

### Property / Lot Details

**Property nformation**
roper y  ype: Residen ial Single-  amily
roper y Condi ion: New Cons ruc ion

**Land nformation**
O her S ruc ures: None

**Lot nformation**
o Size (Sq.  .): 8,902
Zoning:  AR1
Special Zoning: None
o  oca ion:  ark Nearby

### Location Details, Documents & Disclosures, Listing nformation

**Location nformation**
Direc ions:  ico  ico o S  everly Drive Righ on o  ol on
Road

**Documents & Disclosures**
Disclosures: As  s

**Buyer's Brokerage Compensation** ⓘ
2.5%

De ails provided by  heM S and may no  ma ch  he public record.  earn more.

○ Live Chat

Exhibit 21 Page 271

## Sale & Tax History for 9615 Bolton Rd

**Sale History**        Tax H story

**Today**

| | | |
|---|---|---|
| ○ Jan 21, 2021 | L sted (Act ve) | $6,495,000 |
| Da e | heM  S #20-562762 | rice |

**Mar 2018, Sold for $5,712,500**

| | | |
|---|---|---|
| ○ Mar 29, 2018 | So d (Pub  c Records) | $5,712,500 (72.6%/yr) |
| Da e | ublic Records | rice |

See a  property h story ∨

## Schools

This home is wi hin  he  os Angeles Unified School Dis ric .

**Los Angeles's enrollment policy is not based solely on geography.** Please check  he school dis ric  websi e  o see all schools serving  his home.

Grea  Schools Ra ing

| | | | | |
|---|---|---|---|---|
| **7**/10 | 412 S uden s | ★★★★☆ 42 reviews | 0.5 m Dis ance | |
| Canfie d Avenue E ementary Schoo Public · K  o 5 · Serves  his home | | | | |
| **6**/10 | 245 S uden s | N/A | 6.0 m Dis ance | |
| Everest Va ue Char er · K  o 8 · Choice school | | | | |
| **5**/10 | 582 S uden s | ★★★★★ 2 reviews | 10.5 m Dis ance | |
| Asp re Pac fic Academy Char er · 6  o 12 · Choice school | | | | |
| **7**/10 | 1256 S uden s | ★★★★☆ 62 reviews | 1.9 m Dis ance | |
| Pa ms M dd e Schoo Public · 6  o 8 · Serves  his home | | | | |
| **6**/10 | 2602 S uden s | ★★★☆☆ 22 reviews | 0.8 m Dis ance | |
| A exander Ham  ton Sen or H gh Schoo Public · 9  o 12 · Serves  his home | | | | |
| **NR** | 70 S uden s | ★★★★☆ 2 reviews | 3.2 m Dis ance | |
| Wh tman Cont nuat on Schoo Public · 9  o 12 · Choice school | | | | |

Live Chat

Exhibit 21 Page 272

School da a provided by Grea Schools. School service boundaries are in ended o be used as re erence only. o veri y enrollmen
eligibili y or a proper y, con ac he school direc ly.

## Activity for 9615 Bolton Rd

| 👁 | ♡ | ✖ | 🏠 |
|---|---|---|---|
| **3,353** | **141** | **3** | **0** |
| Views | F vori es | X Ou s | Redfin Tours |

## Public Facts for 9615 Bolton Rd

| Beds | 6 | o Size | 8,902 Sq. Ft. |
|---|---|---|---|
| Ba hs | 8 | S yle | Single Family Residential |
| Finished Sq. F . | 7,608 | Year Buil | 2017 |
| Unfinished Sq. F . | — | Year Renova ed | 2017 |
| To al Sq. F . | 7,608 | Coun y | Los Angeles County |
| S ories | 1 | APN | 4309010011 |

Home ac s upda ed by coun y records on Mar 30, 2021.

## Flood Risk

**Flood Factor: Minimal (1/10) · Estimated FEMA Zone: X**

Most homes have some r sk of flood ng. Learn more n these two ndependent assessments,
F ood Factor and FEMA.

See flood r sk deta s ⌄

## Redfin Estimate

## $6,238,453

−$257K under lis price of $6.50M
Redfin Es ima e based on recen home sales. ⬤ View es ima e his ory.



Exhibit 21 Page 273



## Rental Estimate for 9615 Bolton Rd

### $20,076 - $23,730 / mo

| **Market trends for West Los Angeles** | $8,950 / mo | 28.4% |
|---|---|---|
| Single family home, 4+ beds | Median ren | Since Mar 2020 |

Ren al es ima e based on recen  ren als. 

---

## Neighborhood Info for 9615 Bolton Rd

Redfin › Ca  forn a › Los Ange es › Bever ywood

**Transportation in Beverlywood**

| 42 / 00 | 47 / 00 | 33 / 00 |
|---|---|---|
| Car Dependent | Some Trans t | Somewhat B keab e |
| Walk Score® | ransi  Score® | ike Score® |

Th s area  s **car dependent**    most errands requ re a car. **Transit is available**, w th a few nearby pub  c transportat on opt ons. There  s **a minimal amount of infrastructure for biking.**

**Beverlywood Real Estate Sales (Last 30 days)**

| | Median  is Price | $2.08M | Avg. # Offers | 1 |
|---|---|---|---|---|
| | Median $ / Sq. F . | $880 | Avg. Down Paymen | 30.0% |



Exhibit 21 Page 274

| | Median Sale / is | 97.7% | # Sold Homes | 6 |
|---|---|---|---|---|

**Market Competition in Beverlywood**

Ca cu a ed over  he  as  6 mon hs



46  **Somewhat Competitive**
Redfin Compe e Score™ ⓘ

0                                                                                    100

- Some homes get mu t p e offers.
- The average homes se  for about **2%** be ow  st pr ce and go pend ng  n around **49 days**.
- Hot homes can se  for about **2%** above  st pr ce and go pend ng  n around **33 days**.

**Median Real Estate Values**

| Location | List Price | $ / Sq. Ft. | Sale / List |
|---|---|---|---|
| everlywood | $2,085,000 | $880 | 97.7% |
| Sou h Rober son | $1,590,000 | $728 | 94.5% |
| Wes   os Angeles | $2,750,000 | $987 | 98.0% |
| 90034 | $1,490,000 | $796 | 100.3% |
| os Angeles | $980,000 | $594 | 100.7% |
| os Angeles Coun y | $858,000 | $530 | 101.0% |

**$/Sq. Ft. Houses in Beverlywood**

ased on homes you ve looked a .



Exhibit 21 Page 275

# EXHIBIT 22

 **Gmail**

Jacob Wunderlin ▆▆▆▆▆▆▆ >

## Latest
1 message

**Zach Horwitz** <zach@1inmm.com>                                                           Fri, Mar 12, 2021 at 9:19 PM
To: Jacob Wunderlin ▆▆▆▆▆▆▆▆▆▆▆▆▆ , Joe deAlteris ▆▆▆▆▆▆▆▆ , Matthew Schweinzger

Guys -

Regarding HBO, there has been much discussion/back and forth with KBK regarding the settlement as it currently stands and it simply will not work financially for all 4 investor groups and providing protection for 1inMM/myself from future legal issues. That being said, KBK does feel that there is a world in which we move forward with formal demands/litigation and by doing so - we land at a number that is higher (whether that be 2% or 20%) without actually having to go down the full litigation path. The issue with this approach is that we have to be fully ready to ride out the litigation which undoubtedly will be very long, very frustrating and extremely expensive. 1inMM is not in a position to cover the full cost of litigation so options on the table are sharing the financial burden with investors (highly doubtful), meet with an individual or individuals who fund these type of litigation but take a massive fee on the back-end for funding the legal costs upfront or finding a law-firm that will do the work and get paid once a settlement or resolution is reached. KBK is willing to discuss the situation and these options with JJMT counsel... just have ▆▆▆▆▆▆ respond to Patrick and they will find a time.

Netflix is a real problem at the moment. The combination of Luke's actions and investor accusations has caused massive issues for 1inMM and myself personally. I am complying with every single thing that is being asked of me and doing absolutely everything I can to assist, facilitate and explain whatever is needed but right now - it is a problem. I will let you know further information and progress as soon as I have that information and am able to share.

Feel free to reach out with questions or requests and I will do my best to answer as soon as possible.

*Zach Horwitz*
*Co-Founder | Managing Partner*
[www.1inMM.com](http://www.1inMM.com)
▆▆▆▆▆▆▆▆

*CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it contains confidential information that is legally privileged. This e-mail and any files transmitted with it are intended solely for the use of the individual or entity to whom they are addressed. If the reader of this e-mail is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any use, dissemination, forwarding, printing or copying of this e-mail or any attachments hereto is strictly prohibited. If you have received this e-mail in error please contact 1inMM Productions.*

# EXHIBIT 23



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
444 SOUTH FLOWER STREET, SUITE 900
LOS ANGELES, CA 90071

**LOS ANGELES**
**REGIONAL OFFICE**

**DIVISION OF ENFORCEMENT**

Lance Jasper, Esq.
Senior Counsel

February 24, 2021

VIA OVERNIGHT DELIVERY
1inMM Capital, LLC
9615 Bolton Road
Los Angeles, CA 90034

Re: In the Matter of 1inMM Capital, LLC, LA-5212

Dear Custodian of Records or Representative of 1inMM Capital, LLC:

The staff of the United States Securities and Exchange Commission is conducting an investigation in the matter identified above. The enclosed subpoena has been issued to **1inMM Capital, LLC** as part of this investigation. The subpoena requires you to provide us with documents and to give sworn testimony.

Please read the subpoena and this letter carefully. This letter answers some questions you may have about the subpoena. You should also read the enclosed SEC Form 1662. If you do not comply with this subpoena, the SEC may bring an action in Federal Court to enforce this subpoena. Failure to comply with a court order enforcing this subpoena may result in the court imposing a fine, imprisonment or both.

**Producing Documents**

*What materials do I have to produce?*

The subpoena requires **1inMM Capital, LLC** to provide us the documents described in the attachment to the subpoena. You must provide these documents by March 12, 2021. The attachment to the subpoena defines some terms (such as "document") before listing what you must provide.

You should produce each and every document in your possession, custody, or control, including any documents that are not in your immediate possession but that you have the ability to obtain. All responsive documents shall be produced as they are kept in the usual course of business, and shall be organized and labeled to correspond with the numbered paragraphs in the

Exhibit 23 Page 277

subpoena attachment. In that regard, documents should be produced in a unitized manner, *i.e.*, delineated with staples or paper clips to identify the document boundaries.

Documents responsive to this subpoena may be in electronic or paper form. Electronic documents such as email should be produced in accordance with the attached document entitled SEC Data Delivery Standards (the "Standards"). If you have any questions concerning the production of documents in an electronic format, please contact me as soon as possible but in any event before producing documents. **All electronic documents responsive to the document subpoena, including all metadata, must also be secured and retained in their native software format and stored in a safe place.** The staff may later request or require that you produce the native format.

For documents in paper format, you may send the originals, or, if you prefer, you may send copies of the originals. The Commission cannot reimburse you for the copying costs. If you are sending copies, the staff requests that you scan (rather than photocopy) hard copy documents and produce them in an electronic format consistent with the Standards. Alternatively, you may send us photocopies of the documents in paper format. **If you choose to send copies, you must secure and retain the originals and store them in a safe place.** The staff may later request or require that you produce the originals.

Whether you scan or photocopy documents, the copies must be identical to the originals, including even faint marks or print. Also, please note that if copies of a document differ in any way, they are considered separate documents and you must send each one. For example, if you have two copies of the same letter, but only one of them has handwritten notes on it, you must send both the clean copy and the one with notes.

If you <u>do</u> send us scanned or photocopied documents, please put an identifying notation on each page of each document to indicate that you produced it, and number the pages of all the documents submitted. (For example, if Jane Doe sends documents to the staff, she may number the pages JD-1, JD-2, JD-3, etc., in a blank corner of the documents.) Please make sure the notation and number do not conceal any writing or marking on the document. If you send us originals, please do not add any identifying notations.

In producing a photocopy of an original document that contains post-it(s), notation flag(s), or other removable markings or attachments which may conceal all or a portion of the markings contained in the original document, photocopies of the original document both with and without the relevant post-it(s), notation flag(s), or removable markings or attachments should be produced.

*Do I need to send anything else?*

You should enclose a list briefly describing each item you send. The list should state to which numbered paragraph(s) in the subpoena attachment each item responds. A copy of the subpoena should be included with the documents that are produced.

Exhibit 23 Page 278

Passwords for documents, files, compressed archives, and encrypted media should be provided separately either via email addressed to ██████████, or in a separate cover letter mailed separately from the data. Password correspondence should reference case number, case name and requesting SEC staff member.

Please include a cover letter stating whether you believe you have met your obligations under the subpoena by searching carefully and thoroughly for everything called for by the subpoena, and sending it all to us. Correspondence should reference case number, case name and requesting SEC staff member.

Please also provide a narrative description describing what you did to identify and collect documents responsive to the subpoena. At a minimum, the narrative should describe:

- who searched for documents;
- who reviewed documents found to determine whether they were responsive;
- what sources were searched (e.g., computer files, CDs, DVDs, thumb drives, flash drives, online storage media, hard copy files, diaries, datebooks, planners, filing cabinets, home office, work office, voice mails, home email, webmail, work email, backup tapes or other media);
- what third parties, if any, were contacted to obtain responsive documents (e.g., phone companies for phone records, brokerage firms for brokerage records); and
- where the original electronic and hardcopy documents are maintained and by whom.

*What if I do not send everything described in the attachment to the subpoena?*

The subpoena requires you to send <u>all</u> the materials described in it. If, for any reason – including a claim of attorney-client privilege – you do not produce something called for by the subpoena, you should submit a list of what you are not producing. The list should describe each item separately, noting:

- its author(s);
- its date;
- its subject matter;
- the name of the person who has the item now, or the last person known to have it;
- the names of everyone who ever had the item or a copy of it, and the names of everyone who was told the item's contents;
- the reason you did not produce the item; and
- the specific request in the subpoena to which the document relates.

If you withhold anything on the basis of a claim of attorney-client privilege or attorney work product protection, you should identify the attorney and client involved. If you withhold anything on the basis of the work product doctrine, you should also identify the litigation in anticipation of which the document was prepared.

Exhibit 23 Page 279

If documents responsive to this subpoena no longer exist because they have been lost, discarded, or otherwise destroyed, you should identify such documents and give the date on which they were lost, discarded or destroyed.

*Where should I send the materials?*

Please send the materials to:

ENF-CPU
U.S. Securities and Exchange Commission
█████████████████████

For smaller electronic productions under 10MB in size, the materials may be emailed to the following email address: ████████████████

Please also provide a duplicate copy of any document production cover letters to Lance Jasper, Esq. at ████████████. Additionally, please include the SEC matter number and the name of the requesting attorney when responding.  If you are represented by counsel, you should communicate with us through counsel.

## Testifying

*Where and when do I testify?*

The subpoena requires you to appear at 10:00 a.m. on March 12, 2021 to testify under oath by audio-visual teleconference means, using the Webex internet platform. You will be given access to the testimony session through a Webex invite which will be sent from SEC counsel Lance Jasper, Esq. to you and to your counsel, if you are represented by counsel.

A background questionnaire is also enclosed. During your testimony, the staff intends to ask background questions concerning, among other things, your residences, telephone numbers, education and employment. To expedite that part of the testimony, we request that you complete the enclosed questionnaire on a voluntary basis and provide it to the staff prior to your testimony.

## Other Important Information

*May I have a lawyer help me respond to the subpoena?*

Yes. You have the right to consult with and be represented by your own lawyer in this matter. If you are represented by a lawyer when you testify, your lawyer may advise and accompany you when you testify. We cannot give you legal advice.

*What will the Commission do with the materials I send and/or the testimony I provide?*

Exhibit 23 Page 280

The enclosed SEC Form 1662 explains how we may use the information you provide to the Commission. This form also has other important information for you. Please read it carefully.

*Has the Commission determined that anyone has done anything wrong?*

This investigation is a non-public, fact-finding inquiry. We are trying to determine whether there have been any violations of the federal securities laws. The investigation does not mean that we have concluded that anyone has violated the law. Also, the investigation does not mean that we have a negative opinion of any person, entity or security.

*Important Policy Concerning Settlements*

Please note that, in any matter in which enforcement action is ultimately deemed to be warranted, the Division of Enforcement will not recommend any settlement to the Commission unless the party wishing to settle certifies, under penalty of perjury, that all documents responsive to Commission subpoenas and formal and informal document requests in this matter have been produced.

*I have read this letter, the subpoena, and the SEC Form 1662, but I still have questions. What should I do?*

If you have any other questions, you may call me at ███████████ If you are represented by a lawyer, you should have your lawyer contact me.

Sincerely,

Lance Jasper, Esq.
Senior Counsel
Division of Enforcement

Enclosures:  Subpoena and Attachment
      SEC Data Delivery Standards
      SEC Form 1662
      Background Questionnaire

Exhibit 23 Page 281



## SUBPOENA

# UNITED STATES OF AMERICA
## SECURITIES AND EXCHANGE COMMISSION

### In the Matter of 1inMM Capital, LLC, LA-5212

**To:**   1inMM Capital, LLC
9615 Bolton Road
Los Angeles, CA 90034

---

☒   **YOU MUST PRODUCE** everything specified in the Attachment to this subpoena to officers of the Securities and Exchange Commission, at the place, date and time specified below:

ENF-CPU, U.S. Securities and Exchange Commission, ██████████████
██, no later than March 12, 2021 at 10:00 a.m.

---

☒   **YOU MUST TESTIFY** before officers of the Securities and Exchange Commission, at the place, date and time specified below:

10:00 a.m., Pacific Time, on March 12, 2021 to testify under oath by audio-visual teleconference means, using the Webex internet platform.

---

### FEDERAL LAW REQUIRES YOU TO COMPLY WITH THIS SUBPOENA.
If you do not comply with this subpoena, the SEC may bring an action in Federal Court to enforce this subpoena.
Failure to comply with a court order enforcing this subpoena may result in the court imposing a fine, imprisonment, or both.

By:   ██████████████                              Date:      February 24, 2021
Lance Jasper, Esq., Senior Counsel
U.S. Securities and Exchange Commission
Los Angeles Regional Office
444 South Flower Street, Suite 900
Los Angeles, CA 90071

---

I am an officer of the U.S. Securities and Exchange Commission authorized to issue subpoenas in this matter. The Securities and Exchange Commission has issued a formal order authorizing this investigation under Section 20(a) of the Securities Act of 1933 and Section 21(a) of the Securities Exchange Act of 1934.

NOTICE TO WITNESS: If you claim a witness fee or mileage, submit this subpoena with the claim voucher.

Exhibit 23 Page 282

**SUBPOENA ATTACHMENT FOR 1inMM Capital, LLC**

<u>In the Matter of 1inMM Capital, LLC, LA-5212</u>

February 24, 2021

**<u>Definitions</u>**

As used in this subpoena, the words and phrases listed below shall have the following meanings:

1.    "1inMM Capital" means the entity doing business under the name "1inMM Capital, LLC" and associated with you, including parents, subsidiaries, affiliates, predecessors, successors, officers, directors, employees, agents, general partners, limited partners, partnerships and aliases, code names, or trade or business names used by any of the foregoing.

2.    "1inMM Productions" means the entity doing business under the name "1inMM Productions, LLC" and associated with you, including parents, subsidiaries, affiliates, predecessors, successors, officers, directors, employees, agents, general partners, limited partners, partnerships and aliases, code names, or trade or business names used by any of the foregoing.

3.    "Zachary Horwitz" means the Zachary Horwitz associated with 1inMM Capital and every present or former agent, Representative, and alias of Zachary Horwitz.

4.    "Person" means a natural person, firm, association, organization, partnership, business, trust, corporation, bank or any other private or public entity.

5.    A "Representative" of a Person means any present or former family members, officers, executives, partners, joint-venturers, directors, trustees, employees, consultants, accountants, attorneys, agents, or any other representative acting or purporting to act on behalf of the Person.

6.    "Document" shall include, but is not limited to, any written, printed, or typed matter including, but not limited to all drafts and copies bearing notations or marks not found in the original, letters and correspondence, interoffice communications, slips, tickets, records, worksheets, financial records, accounting documents, bookkeeping documents, memoranda, reports, manuals, telephone logs, facsimiles, messages of any type, telephone messages, text messages, voice mails, tape recordings, notices, instructions, minutes, summaries, notes of meetings, file folder markings, and any other organizational indicia, purchase orders, information recorded by photographic process, including microfilm and microfiche, computer printouts, spreadsheets, and other electronically stored information, including but not limited to writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations that are stored in any medium from which information can be retrieved, obtained, manipulated, or translated.

7.    "Communication" means any correspondence, contact, discussion, e-mail, instant message, or any other kind of oral or written exchange or transmission of information (in the form of facts, ideas, inquiries, or otherwise) and any response thereto between two or more Persons or entities, including, without limitation, all telephone conversations, face-to-face meetings or conversations, internal or external discussions, or exchanges of a Document or Documents.

8.    "Concerning" means directly or indirectly, in whole or in part, describing, constituting, evidencing, recording, evaluating, substantiating, concerning, referring to, alluding to, in connection with, commenting

Exhibit 23 Page 283

on, relating to, regarding, discussing, showing, describing, analyzing or reflecting.

9.    An "Agreement" means any actual or contemplated (i) written or oral Agreement; (ii) term or provision of such Agreement; or (iii) amendment of any nature or termination of such Agreement. A request for any Agreement among or between specified parties includes a request for all Documents Concerning (i) any actual or contemplated Agreement among or between such parties, whether or not such Agreement included any other Person; (ii) the drafting or negotiation of any such Agreement; (iii) any actual or contemplated demand, request or application for any such Agreement, and any response thereto; and (iv) any actual or contemplated objection or refusal to enter into any such Agreement, and any response thereto.

10.   The term "Reviewed" means examined, assessed, considered, analyzed or evaluated.

11.   The term "you" and "your" means the Person to whom or entity to which this subpoena was issued.

12.   To the extent necessary to bring within the scope of this this subpoena any information or Documents that might otherwise be construed to be outside its scope:
      a.    the word "or" means "and/or";
      b.    the word "and" means "and/or";
      c.    the functional words "each," "every" "any" and "all" shall each be deemed to include each of the other functional words;
      d.    the masculine gender includes the female gender and the female gender includes the masculine gender; and
      e.    the singular includes the plural and the plural includes the singular.

13.   "Relevant Period" means the time period beginning January 1, 2014, and continuing to the date of this subpoena attachment, unless otherwise specified.

14.   "Payment" means any transfer of money or other value, including, but not limited to, property, physical assets, and digital assets.


## **Instructions**

1.    Unless otherwise specified, this subpoena calls for production of the original Documents and all copies and drafts of same. Documents responsive to this subpoena may be in electronic or paper form. Electronic Documents such as email should be produced in accordance with the attached Document entitled SEC Data Delivery Standards. All responsive electronic Documents, including all metadata, should also be produced in their native software format.

2.    For Documents in paper format, you may send the originals, or, if you prefer, you may send copies of the originals. The Commission cannot reimburse you for the copying costs. If you are sending copies, the staff requests that you scan (rather than photocopy) hard copy Documents and produce them in an electronic format consistent with the SEC Data Delivery Standards. Alternatively, you may send us photocopies of the Documents in paper format. If you choose to send copies, you must secure and retain the originals and store them in a safe place. The staff may later request or require that you produce the originals.

3.    Whether you scan or photocopy Documents, the copies must be identical to the originals, including even faint marks or print. Also, please note that if copies of a Document differ in any way, they are considered separate Documents and you must send each one. For example, if you have two copies of the same letter,

Exhibit 23 Page 284

but only one of them has handwritten notes on it, you must send both the clean copy and the one with notes.

4.    In producing a photocopy of an original Document that contains post-it(s), notation flag(s), or other removable markings or attachments which may conceal all or a portion of the markings contained in the original Document, photocopies of the original Document both with and without the relevant post-it(s), notation flag(s), or removable markings or attachments should be produced.

5.    Documents should be produced as they are kept in the ordinary course of business or be organized and labeled to correspond with the categories in this request. In that regard, Documents should be produced in a unitized manner, i.e., delineated with staples or paper clips to identify the Document boundaries.

6.    Documents should be labeled with sequential numbering (bates-stamped).

7.    You must produce all Documents created during, or Concerning, the period from January 1, 2014 to the date of this subpoena attachment, unless otherwise specified.

8.    The scope of any given request should not be limited or narrowed based on the fact that it calls for Documents that are responsive to another request.

9.    You are not required to produce exact duplicates of any Documents that have been previously produced to the Securities and Exchange Commission staff in connection with this matter. If you are not producing Documents based upon a prior production, please identify the responsive Documents that were previously produced.

10.    This subpoena covers all Documents in or subject to your possession, custody or control, including all Documents that are not in your immediate possession but that you have the effective ability to obtain, that are responsive, in whole or in part, to any of the individual requests set forth below. If, for any reason – including a claim of attorney-client privilege – you do not produce something called for by the request, you should submit a list of what you are not producing. The list should describe each item separately, noting:

    a.    its author(s);
    b.    its date;
    c.    its subject matter;
    d.    the name of the Person who has the item now, or the last Person known to have it;
    e.    the names of everyone who ever had the item or a copy of it, and the names of everyone who was told the item's contents;
    f.    the basis upon which you are not producing the responsive Document;
    g.    the specific request in the subpoena to which the Document relates;
    h.    the attorney(s) and the client(s) involved; and
    i.    in the case of the work product doctrine, the litigation for which the Document was prepared in anticipation.

11.    If Documents responsive to this subpoena no longer exist because they have been lost, discarded, or otherwise destroyed, you should identify such Documents and give the date on which they were lost, discarded or destroyed.

## **Documents to be Produced**

Produce the following Documents:

Exhibit 23 Page 285

1.      For 1inMM Capital, LLC, Documents sufficient to identify every officer, member, manager, employee, sub-contractor, and executive; the role(s) of such person with each entity; and the person's dates of association with each entity.

2.      For 1inMM Capital, LLC, Documents sufficient to identify every financial institution at which the entity held an account at any time during the period from January 1, 2014 to and including the date of this subpoena attachment; the names and account numbers associated with each such account; and the period of time during which the entity or entities held that account.

3.      For 1inMM Capital, LLC, Documents sufficient to identify all Payments, including, but not limited to, all transfers of value exceeding $1,000, regardless of the form or format of such transfer, made and/or received during the period from January 1, 2014 through and including the date of this subpoena attachment.

4.      Documents sufficient to identify all entities, individuals, and other persons from whom 1inMM Capital borrowed money, received investor funds, or received funds for investment or lending purposes (for example, in connection with promissory notes), including, but not limited to, all funds received by Zachary Horwitz Concerning or on behalf of 1inMM Capital and/or 1inMM Productions.

5.      For each entity, individual, and person identified in response to the preceding paragraph:

        A.      All Documents, Communications, and Agreements Concerning such entity, individual, or person, including, but not limited to, all Agreements Concerning investments Concerning 1inMM Capital and/or 1inMM Productions.

        B.      Documents sufficient to identify the use of all funds received by 1inMM Capital, 1inMM Productions, and/or Zachary Horwitz from each such entity, individual or person.

        C.      Documents sufficient to identify any repayment of such funds and the terms of such repayment, including the associated date(s) and interest payments or investment gains.

6.      Your general ledger or equivalent document(s).

7.      For 1inMM Capital, LLC, Documents sufficient to identify all accountants used or employed by such entity at any time during the period from January 1, 2014 through and including the date of this subpoena attachment and any opinion letters received from such accountant.

Exhibit 23 Page 286

8.  For 1inMM Capital, LLC, Documents sufficient to identify all legal counsel used or employed by such entity and any opinion letters received from such counsel (provided, however, that you should not produce privileged communications).

9.  For 1inMM Capital, LLC, Documents sufficient to identify all assets exceeding $10,000 in value as of the date of this subpoena attachment that were held by such entity on that date, regardless of the form or format of such assets, and Documents sufficient to identify the location of such assets.

10. All Agreements Concerning 1inMM Capital, 1inMM Productions, and/or Zachary Horwitz and any media company, including any company engaged in the business of licensing, distributing, producing or selling any film, television, or other media content or rights.

11. Documents sufficient to identify all entities affiliated with 1inMM Capital and/or 1inMM Productions at any time during the period from January 1, 2014 to and including the date of this subpoena attachment (including, but not limited to, all entities with which 1inMM Capital and/or 1inMM Productions had Agreements and/or paid or received funds), the nature of such affiliation(s), and the period(s) of time during which such entities were affiliated with 1inMM Capital and/or 1inMM Productions.

12. Documents sufficient to identify all business addresses used by 1inMM Capital and/or 1inMM Productions, including each address that only one or the other of those entities used, at any time during the period from January 1, 2014 to and including the date of this subpoena attachment.

13. For 1inMM Capital, LLC, all tax returns filed during the period from January 1, 2014 through and including the date of this subpoena attachment.

14. Documents sufficient to identify all funds and other Payments received by Zachary Horwitz, directly or indirectly, Concerning, from, or in connection with 1inMM Capital and/or 1inMM Productions.

15. Documents sufficient to identify all known sources of income during the period from January 1, 2014 to and including the date of this subpoena attachment for each of the following:

    A.  1inMM Capital;

    B.  1inMM Productions;

    C.  Zachary Horwitz.

Exhibit 23 Page 287

## BACKGROUND QUESTIONNAIRE

**Please respond to the following questions. Answering these questions will reduce the amount of time spent on background information when you testify. You may use the space provided, attaching additional sheets as necessary, or supply the information in a separate document. If you would like an electronic version of this document, please contact us and we will provide you with one.**

Today's date:  _____

1.  What is your full name?

2.  Have you ever been known by any other name? Yes _____   No _____
    If yes, list each such name and the period(s) in which you were known by that name.

3.  Date and place of birth?

4.  Country of citizenship?

5.  Marital Status?  Married ____   Divorced ____   Single ____

6.  List the names, ages, and occupations of your children, if any.

7.  List all residences you occupied at any time during the last three years, including vacation homes, beginning with your current residence.  For each residence, state the address, dates of residence, and all telephone numbers (including facsimile numbers) listed at that address.

ELECTRONIC COMMUNICATIONS ACCOUNTS

8.  List all telephone numbers and telecommunication services that were in your name or that you regularly used  [INSERT TIME PERIOD]. Include all residential business, cellular,

Exhibit 23 Page 288

credit card, and VOIP numbers, and services such as Google Voice, Skype, and video conference services. For each telephone number, state the name of the corresponding carrier (e.g., AT&T, Verizon, Vonage, Skype, etc.).

9.   List the universal resource locator (URL) for all websites or blogs that you established or for which you had the authority to control content at any time  [INSERT TIME PERIOD]. For each website, state the name(s) of the domain name registrar (e.g. GoDaddy) through which the URL was obtained, the name(s) of all individuals or entities who provided web site hosting or design services, whether the website contained primarily business or personal information, and the time period in which it was active.

10.  List all electronic mail addresses and social networking accounts (e.g.Facebook, LinkedIn, Twitter, Instagram, Flickr, Google+) that were in your name or that you regularly used at any time  [INSERT TIME PERIOD]. Include all personal, business, or shared electronic mail addresses and social networking accounts. For each electronic mail address and social networking account, state the name(s) of the corresponding internet service provider(s) (e.g. Google, Yahoo, AOL, or your employer), whether the address was used primarily for business or personal correspondence, and the time period in which it was active.

11.  List all usernames for instant messaging and similar electronic communications services (including, but not limited to, Bloomberg, Skype, whatsapp), other than those listed in response to questions above, that were in your name or that you regularly used at any time [INSERT TIME PERIOD]. Include all personal, business, and shared addresses. For each username, state the name(s) of the communication service provider (e.g. Google, AOL, etc.), whether the address was used primarily for business or personal correspondence, the time period in which it was active, and the name of the software application(s) (e.g. GTalk, ICQ, MSN Messenger) you used to access it.

Exhibit 23 Page 289

12. List all internet message boards and discussion forums (including, but not limited to, Money Maker Group, PNQI Message Board, Investors Hub Daily) of which you were a member or on which you posted messages at any time  [INSERT TIME PERIOD]. For each message board or discussion forum, state the service provider and your member name or identification information.

PUBLICLY-HELD COMPANIES

13. Are you now, or have you ever been, an officer or director of any publicly-held company? Yes ____ No ____.

14. Are you now, or have you ever been, a beneficial owner, directly or indirectly, of five per cent or more of any class of equity securities of any publicly held company?  Yes ____  No ____.

PRIVATELY-HELD COMPANIES

15. Are you now, or have you ever been, a beneficial owner, directly or indirectly, of any privately-held company (i.e., corporation, partnership, limited liability company or other corporate form)?

16. Are you now, or have you ever been, a manager or a member of any privately-held company (i.e., corporation, partnership, limited liability company or other corporate form)?

SECURITIES ACCOUNTS

Exhibit 23 Page 290

17. List all securities or brokerage accounts that you have held in your name, individually or jointly, at any time  [INSERT TIME PERIOD].  Include all foreign accounts.  For each such account, identify: (i) the brokerage firm; (ii) the location of the branch where your account is or was held; (iii) your broker; (iv) the type of account (i.e., cash, margin or IRA); (v) the account number; and (vi) whether any person has ever held discretionary authority or power of attorney over the account; if so, name such person(s).

18. List all securities or brokerage accounts (including foreign accounts), other than those listed in your answer to the previous question, in which you had any direct or indirect beneficial interest at any time  [INSERT TIME PERIOD].  For each such account, provide the information requested by the previous question.

19. List all securities or brokerage accounts (including foreign accounts), other than those listed in your answers to the two previous questions, over which you had any control at any time [INSERT TIME PERIOD].  For each such account, provide the information requested by the first question in this section.

BANK ACCOUNTS

20. List all accounts you have held in your name at any financial institution (i.e., bank, thrift, or credit union) at any time  [INSERT TIME PERIOD].  Include all foreign accounts.  For each such account, identify: (i) the financial institution; (ii) the address of the branch at which your account is or was held; (iii) the type of account (i.e., checking, savings, money market or IRA); (iv) the account number; and (v) whether any person has ever had discretionary authority or power of attorney over the account; if so, name such person(s).

Exhibit 23 Page 291

21. List all accounts at financial institutions (including foreign accounts), other than those listed in your answer to the previous question, in which you had any direct or indirect beneficial interest at any time  [INSERT TIME PERIOD].  For each such account, provide the information requested by the previous question.

22. List all accounts at financial institutions (including foreign accounts), other than those listed in your answers to the two previous questions, over which you had any control at any time [INSERT TIME PERIOD].  For each such account, provide the information requested by the first question in this section.

23. List any other accounts (including foreign accounts), other than those listed in your answers to the previous questions in this section, that were held in your name, in which you had any direct or indirect beneficial interest, or over which you had any control, that you have used to transfer funds  [INSERT TIME PERIOD], including, but not limited to, PayPal accounts. For each such account, provide the information requested by the first question in this section.

PRIOR PROCEEDINGS
24. Have you ever testified in any proceeding conducted by the staff of the Securities and Exchange Commission, a U.S. or foreign federal or state agency, a U.S. or foreign federal or state court, a stock exchange, the Financial Industry Regulatory Authority ("FINRA") or any other self-regulatory organization ("SRO"), or in any arbitration proceeding related to securities transactions?

25. Have you ever been deposed in connection with any court proceeding? Yes ____  No ____.

Exhibit 23 Page 292

26.  Have you ever been named as a defendant or respondent in any action or proceeding brought
by the SEC, any other U.S. or foreign federal agency, a state securities agency, FINRA, an
SRO, or any exchange?  Yes ____ No ____.

27. Have you ever been a defendant in any action (other than those listed in response to the
previous question) alleging violations of the federal securities laws? Yes ____ No ____.

28. Have you ever been a defendant in any criminal proceeding other than one involving a minor
traffic offense?  Yes ____ No ____.

EDUCATIONAL HISTORY
29. Provide the requested information about each educational institution that you have attended,
beginning with the most recent and working backward to the date that you completed high
school.

30. Other than courses taken in connection with institutions listed in response to question 29, list
any securities, accounting or business related courses taken since high school.  For each such
course, identify the date that the course was completed and the name of the institution or
organization that offered the course.

PROFESSIONAL LICENSES/CLUBS
31. Do you hold, or have you ever held, any professional license?  Yes ____ No ____.

Exhibit 23 Page 293

32. Are you, or have you ever been, a member of any professional or business club or organization?  Yes ____ No ____.

33. Are you, or have you been  [INSERT TIME PERIOD], a member of any social clubs, charities or nonprofit organizations?  Yes ____ No ____.

<u>EMPLOYMENT HISTORY</u>

34. Are you, or have you ever been, an employee of a broker, dealer, investment adviser, investment company, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization?   Yes ____ No ____.

35. State your employment activities, beginning with the present and working backward to the date that you completed high school and attach a recent copy of your resume or curriculum vitae. For each position you have held (including multiple positions or titles with the same employer), provide the following information:

CONTINUE ON ADDITIONAL SHEETS IF NECESSARY

Exhibit 23 Page 294



**U.S. Securities and Exchange Commission**

**Data Delivery Standards**

This document describes the technical requirements for paper and electronic document productions to the U.S. Securities and Exchange Commission (SEC).   ***Any questions or proposed file formats other than those described below must be discussed with the legal and technical staff of the SEC Division of Enforcement prior to submission.***

General Instructions.................................................................................................................... 1

Delivery Formats ....................................................................................................................... 2

   I.  Imaged Productions............................................................................................................3

      1.  Images ....................................................................................................................3

      2.  Image Cross-Reference File ...................................................................................3

      3.  Data File .................................................................................................................3

      4.  Text ........................................................................................................................3

      5.  Linked Native Files ...............................................................................................3

   II.  Native File Productions without Load Files ......................................................................4

   III.  Adobe PDF File Productions .............................................................................................4

   IV.  Audio Files .........................................................................................................................4

   V.  Video Files .........................................................................................................................4

   VI.  Electronic Trade and Bank Records ..................................................................................4

   VII.  Electronic Phone Records .................................................................................................4

   VIII.  Audit Workpapers ..............................................................................................................5

   IX.  Mobile Device Data ..........................................................................................................5

**General Instructions**

Due to COVID-19 restrictions the current, temporary mailing address for all physical productions sent to the SEC is:
**ENF-CPU, 6315 Bren Mar Drive, Suite 175, Alexandria, VA 22312**

Electronic files must be produced in their native format, i.e. the format in which they are ordinarily used and maintained during the normal course of business.  For example, an MS Excel file must be produced as an MS Excel file rather than an image of a spreadsheet. *(Note:  An Adobe PDF file is **not** considered a native file unless the document was initially created as a PDF.)*

In the event produced files require the use of proprietary software not commonly found in the workplace, the SEC will explore other format options with the producing party.

The proposed use of file de-duplication methodologies or *computer-assisted review* or *technology-assisted review* (TAR)  during

Exhibit 23 Page 295

the processing of documents must be discussed with and approved by the legal and technical staff of the Division of Enforcement (ENF).  If your production will be de-duplicated it is vital that you 1) preserve any unique metadata associated with the duplicate files, for example, custodian name and file location and, 2) make that unique metadata part of your production to the SEC.

General requirements for **ALL** document productions are:

1. A cover letter must be included with each production and should include the following information:
   a. Case number, case name and requesting SEC staff member name
   b. A list of each piece of media included in the production with its unique production volume number
   c. A list of custodians, identifying the Bates range for each custodian
   d. The time zone in which the emails were standardized during conversion
   e. Whether the production contains native files produced from Mac operating system environments
2. Data can be produced on CD, DVD, thumb drive, etc., using the media requiring the least number of deliverables and labeled with the following:
   a. Case number
   b. Production date
   c. Producing party
   d. Bates range (if applicable)
3. All submissions must be organized by **custodian** unless otherwise instructed.
4. All document family groups, i.e. email attachments, embedded files, etc., should be produced together and children files should follow parent files sequentially in the Bates numbering.
5. All load-ready collections should include only one data load file and one image pointer file.
6. All load-ready text must be produced as separate document-level text files.
7. All load-ready collections should account for custodians in the custodian field.
8. All load-ready collections must provide the extracted contents of any container files to ensure all relevant files are produced as separate records.
9. Audio files should be separated from data files if both are included in the production.
10. Only alphanumeric characters and the underscore character are permitted in file names and folder names. Special characters are not permitted.
11. All electronic productions submitted on media must be produced using industry standard self-extracting encryption software.
12. The SEC uses 7zip to access compressed files. Note that the SEC **cannot** accept files that use AES-256 Jpeg or pkAES-256-Cert Deflate compression methods, even if the files are created with 7zip. If you have any questions or need additional information, please reach out to the requesting SEC staff member.
13. Electronic productions of 20 GB or less are strongly encouraged to be submitted via Secure File Transfer. All Secure File Transfers should be sent to the SEC Centralized Production Unit (ENF-CPU@sec.gov) with a CC to the requesting SEC staff member. If you do not have your own Secure File Transfer application, you may reach out to the requesting SEC staff member for a link to the SEC system in order to upload your production. If using the SEC Secure File Transfer system, you will NOT be able to CC individuals outside the SEC on your upload transmission. Note that the SEC **cannot** accept productions made using file sharing sites such as Google Drive, Microsoft Office 365 or Dropbox.
14. Productions containing BSA or SAR material must be delivered on encrypted physical media. The SEC **cannot** accept electronic transmission of BSA or SAR material. Any BSA or SAR material produced should be segregated and appropriately marked as BSA or SAR material, or should be produced separately from other case related material.
15. Passwords for electronic documents, files, compressed archives and encrypted media must be provided separately either via email or in a cover letter apart from the media.
16. All electronic productions should be produced free of computer viruses.
17. Before producing forensically collected images, parties should reach out to the requesting SEC staff member in order to discuss appropriate handling.
18. Before producing unique data sets (large sets of relational data, website reconstruction, chat room data, etc.), parties should reach out to the requesting SEC staff member in order to discuss an appropriate production format.
19. Additional technical descriptions can be found in the addendum to this document.

Exhibit 23 Page 296

**\*Please note that productions sent to the SEC via United States Postal Service are subject to Mail Irradiation, and as a result electronic productions may be damaged.\***

**Delivery Formats**

**I.   Imaged Productions**

The SEC prefers that all scanned paper and electronic file collections be produced in a structured format including industry standard load files, Bates numbered image files, native files and searchable document-level text files.

**1.   Images**

a.  Black and white images must be 300 DPI Group IV single-page TIFF files
b.  Color images must be produced in JPEG format
c.  File names cannot contain embedded spaces or special characters (including the comma)
d.  Folder names cannot contain embedded spaces or special characters (including the comma)
e.  All image files must have a unique file name, i.e. Bates number
f.  Images must be endorsed with sequential Bates numbers in the lower right corner of each image
g.  The number of image files per folder should not exceed 2,000 files
h.  Excel spreadsheets should have a placeholder image named by the Bates number of the file
i.  AUTOCAD/photograph files should be produced as a single page JPEG file

**2.   Image Cross-Reference File**

The image cross-reference file (.LOG or .OPT) links the images to the database records. It should be a comma-delimited file consisting of seven fields per line with a line in the cross-reference file for every image in the database with the following format:

*ImageID,VolumeLabel,ImageFilePath,DocumentBreak,FolderBreak,BoxBreak,PageCount*

**3.   Data File**

The data file (.DAT) contains all of the fielded information that will be loaded into the database.

a.  The first line of the .DAT file must be a header row identifying the field names
b.  The .DAT file must use the following *Concordance®* default delimiters:

Comma ¶ ASCII character (020)
Quote þ ASCII character (254)

c.  If the .DAT file is produced in Unicode format it must contain the byte order marker
d.  Date fields should be provided in the format: mm/dd/yyyy
e.  Date and time fields must be two separate fields
f.  The time zone must be included in all time fields
g.  If the production includes imaged emails and attachments, the attachment fields must be included to preserve the parent/child relationship between an email and its attachments
h.  An OCRPATH field must be included to provide the file path and name of the extracted text file on the produced storage media.  The text file must be named after the FIRSTBATES.  Do not include the text in the .DAT file.
i.  For productions with native files, a LINK field must be included to provide the file path and name of the native file on the produced storage media. The native file must be named after the FIRSTBATES.
j.  BEGATTACH and ENDATTACH fields must be two separate fields
k.  A complete list of metadata fields is available in **Addendum A** to this document

**4.   Text**

Text must be produced as separate document-level text files, not as fields within the .DAT file. The text files must be named per the FIRSTBATES/Image Key and the full path to the text file (OCRPATH) should be included in the .DAT file. Text files may be in either ANSI or Unicode format, however, ALL text files must be in the same format within the same production. Note that productions containing text with foreign characters must produce text files in Unicode format to preserve the foreign characters. Text files must be in a separate folder, and the number of text files per folder should not exceed 2,000 files. There should be no special characters (including commas) in the folder names. For redacted documents, provide the full text for the redacted version.

**5.   Linked Native Files**

Copies of original email and native file documents/attachments must be included for all electronic productions.

Exhibit 23 Page 297

a. Native file documents must be named per the FIRSTBATES number
b. The full path of the native file must be provided in the .DAT file for the LINK field
c. The number of native files per folder should not exceed 2,000 files

Exhibit 23 Page 298

**II. Native File Production without Load Files**

With prior approval, native files may be produced without load files. The native files must be produced as they are maintained in the normal course of business and organized by custodian-named file folders. When approved, native email files (.PST or .MBOX) may be produced. A separate folder should be provided for each custodian.

**III. Adobe PDF File Production**

With prior approval, Adobe PDF files may be produced in native file format.

1. All PDFs must be unitized at the document level, i.e., each PDF must represent a discrete document.
2. PDF files should be produced in separate folders named by the custodian. The folders should not contain any special characters (including commas).
3. All PDF files must contain embedded text that includes all discernible words within the document, not selected text or image only. This requires all layers of the PDF to be flattened first.
4. If PDF files are Bates endorsed, the PDF files must be named by the Bates range.

**IV. Audio Files**

Audio files from telephone recording systems must be produced in a format that is playable using Microsoft Windows Media Player™. Additionally, the call information (metadata) related to each audio recording MUST be provided. The metadata file must be produced in a delimited text format. Field names must be included in the first row of the text file. The metadata must include, at a minimum, the following fields:

1) Caller Name:        Caller's name or account/identification number
2) Originating Number:  Caller's phone number
3) Called Party Name:   Called party's name
4) Terminating Number: Called party's phone number
5) Date:               Date of call
6) Time:               Time of call
7) Filename:           Filename of audio file

**V. Video Files**

Video files must be produced in a format that is playable using Microsoft Windows Media Player™.

**VI. Electronic Trade and Bank Records**

When producing electronic trade records, bank records, or financial statements, provide the files in one of the following formats:

1. MS Excel spreadsheet with header information detailing the field structure. If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details.

2. Delimited text file with header information detailing the field structure. The preferred delimiter is a vertical bar "|". If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details.

**VII. Electronic Phone Records**

When producing electronic phone records, provide the files in the following format:

1. MS Excel spreadsheet with header information detailing the field structure. If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details. Data must be formatted in its native format (i.e. dates in a date format, numbers in an appropriate numerical format, and numbers with leading zeroes as text).

   a. The metadata that must be included is outlined in **Addendum B** of this document. Each field of data must be loaded into a separate column. For example, Date and Start_Time must be produced in separate columns and not combined into a single column containing both pieces of information. Any fields of data that are provided in addition to those listed in **Addendum B** must also be loaded into separate columns.

Exhibit 23 Page 299

**VIII. Audit Workpapers**

The SEC prefers for workpapers to be produced in two formats: (1) With Bates numbers in accordance with the SEC Data Delivery Standards; and (2) in native format or if proprietary software was used, on a standalone laptop with the appropriate software loaded so that the workpapers may be reviewed as they would have been maintained in the ordinary course of business. The laptop must have printing capability, and when possible, the laptop should be configured to enable a Virtual Machine (VM) environment.

**IX. Mobile Device Data**

Before producing mobile device data (including but not limited to text messages) parties should reach out to the requesting SEC staff member in order to discuss the appropriate production format

Exhibit 23 Page 300

## ADDENDUM A

The metadata of electronic document collections should be extracted and provided in a .DAT file using the field definition and formatting described below:

| Field Name | Sample Data | Description |
|---|---|---|
| FIRSTBATES | EDC0000001 | First Bates number of native file document/email |
| LASTBATES | EDC0000001 | Last Bates number of native file document/email<br>**The LASTBATES field should be populated for single page documents/emails. |
| ATTACHRANGE | EDC0000001 - EDC0000015 | Bates number of the first page of the parent document to the Bates number of the last page of the last attachment "child" document |
| BEGATTACH | EDC0000001 | First Bates number of attachment range |
| ENDATTACH | EDC0000015 | Last Bates number of attachment range |
| PARENT_BATES | EDC0000001 | First Bates number of parent document/Email<br>**This PARENT_BATES field should be populated in each record representing an attachment "child" document |
| CHILD_BATES | EDC0000002; EDC0000014 | First Bates number of "child" attachment(s); can be more than one Bates number listed depending on the number of attachments<br>**The CHILD_BATES field should be populated in each record representing a "parent" document |
| CUSTODIAN | Smith, John | Email: Mailbox where the email resided<br>Native: Name of the individual or department from whose files the document originated |
| FROM | John Smith | Email: Sender<br>Native: Author(s) of document<br>**semi-colon should be used to separate multiple entries |
| TO | Coffman, Janice; LeeW [mailto:LeeW@MSN.com] | Recipient(s)<br>**semi-colon should be used to separate multiple entries |
| CC | Frank Thompson [mailto: frank_Thompson@cdt.com] | Carbon copy recipient(s)<br>**semi-colon should be used to separate multiple entries |
| BCC | John Cain | Blind carbon copy recipient(s)<br>**semi-colon should be used to separate multiple entries |
| SUBJECT | Board Meeting Minutes | Email: Subject line of the email<br>Native: Title of document (if available) |
| FILE_NAME | BoardMeetingMinutes.docx | Native: Name of the original native file, including extension |
| DATE_SENT | 10/12/2010 | Email: Date the email was sent<br>Native: (empty) |
| TIME_SENT/TIME_ZONE | 07:05 PM GMT | Email: Time the email was sent/ Time zone in which the emails were standardized during conversion.<br>Native: (empty)<br>**This data must be a separate field and cannot be combined with the DATE_SENT field |

Exhibit 23 Page 301

| TIME_ZONE | GMT | The time zone in which the emails were standardized during conversion.<br>Email: Time zone<br>Native: (empty) |
|---|---|---|
| LINK | D:\001\ EDC0000001.msg | Hyperlink to the email or native file document<br>**The linked file must be named per the FIRSTBATES number |
| MIME_TYPE | application/msword | The content type of an email or native file document as identified/extracted from the header |
| FILE_EXTEN | MSG | The file type extension representing the email or native file document; will vary depending on the format |
| AUTHOR | John Smith | Email: (empty)<br>Native: Author of the document |
| LAST_AUTHOR | Jane Doe | Email: (empty)<br>Native: Last Author of the document |
| DATE_CREATED | 10/10/2010 | Email: (empty)<br>Native: Date the document was created |
| TIME_CREATED/TIME_ZONE | 10:25 AM GMT | Email: (empty)<br>Native: Time the document was created including time zone<br>**This data must be a separate field and cannot be |
| DATE_MOD | 10/12/2010 | Email: (empty)<br>Native: Date the document was last modified |
| TIME_MOD/TIME_ZONE | 07:00 PM GMT | Email: (empty)<br>Native: Time the document was last modified including the time zone<br>**This data must be a separate field and cannot be |
| DATE_ACCESSD | 10/12/2010 | Email: (empty)<br>Native: Date the document was last accessed |
| TIME_ACCESSD/TIME_ZONE | 07:00 PM GMT | Email: (empty)<br>Native: Time the document was last accessed including the time zone<br>**This data must be a separate field and cannot be |
| PRINTED_DATE | 10/12/2010 | Email: (empty)<br>Native: Date the document was last printed |
| FILE_SIZE | 5,952 | Size of native file document/email in KB |
| PGCOUNT | 1 | Number of pages in native file document/email |
| PATH | J:\Shared\SmithJ\October Agenda.doc | Email: (empty)<br>Native: Path where native file document was stored including original file name. |
| INTFILEPATH | Personal Folders\Deleted Items\Board Meeting Minutes.msg | Email: original location of email including original file name.<br>Native: (empty) |
| INTMSGID | <000805c2c71b$75977050$cb8306d1@MSN> | Email: Unique Message ID<br>Native: (empty) |

Exhibit 23 Page 302

| HEADER | Return-Path: <example_from@dc.edu> X-SpamCatcher-Score:1[X] Received:from[136.167.40.119] (HELO dc.edu) by fe3.dc.edu (CommuniGate Pro SMTP4.1.8) with ESMTP-TLS id 61258719 for example_to@mail.dc.edu; Mon, 23 Aug 2004 11:40:10 -0400 Message-ID: <4129F3CA.2020509@dc.edu> Date: Mon, 23 Aug 2005 11:40:36 -400 From: Taylor Evans <example_from@dc.edu> User-Agent:Mozilla/5.0 (Windows;U; Windows NT 5.1; en-US;rv:1.0.1) Gecko/20020823 Netscape/7.0 X-Accept-Language:en-us,en MIME-Version:1.0 To: Jon Smith <example_to@mail.dc.edu> Subject:Business Development Meeting Content-Type: text/plain;charset=us-ascii; format=flowed Content-Transfer-Encoding:7bit | Email: The email header information Native: (empty) |
|---|---|---|
| MD5HASH | d131dd02c5e6eec4693d9a069 8aff95c 2fcab58712467eab4004583eb 8fb7f89 | MD5 Hash value of the document. |
| OCRPATH | TEXT/001/EDC0000001.txt | Path to extracted text of the native file |

Sample Image Cross-Reference File:

```
IMG0000001,,E:\001\IMG0000001.TIF,Y,,,
IMG0000002,,E:\001\IMG0000002.TIF,,,,
IMG0000003,,E:\001\IMG0000003.TIF,,,,
IMG0000004,,E:\001\IMG0000004.TIF,Y,,,
IMG0000005,,E:\001\IMG0000005.TIF,Y,,,
IMG0000006,,E:\001\IMG0000006.TIF,,,,
```

Exhibit 23 Page 303

## ADDENDUM B

For Electronic Phone Records, include the following fields in separate columns:
For Calls:
1) Account Number
2) Connection Date – Date the call was received or made
3) Connection Time – Time call was received or made
4) Seizure Time – Time it took for the call to be placed in seconds
5) Originating Number – Phone that placed the call
6) Terminating Number – Phone that received the call
7) Elapsed Time – The length of time the call lasted, preferably in seconds
8) End Time – The time the call ended
9) Number Dialed – Actual number dialed
10) IMEI Originating – Unique id to phone used to make call
11) IMEI Terminating– Unique id to phone used to receive call
12) IMSI Originating – Unique id to phone used to make call
13) IMSI Terminating- Unique id to phone used to receive call
14) Call Codes – Identify call direction or other routing information
15) Time Zone – Time Zone in which the call was received or placed, if applicable


For Text messages:
1) Account Number
2) Connection Date – Date the text was received or made
3) Connection Time – Time text was received or made
4) Originating Number – Who placed the text
5) Terminating Number – Who received the text
6) IMEI Originating – Unique id to phone used to make text
7) IMEI Terminating– Unique id to phone used to receive text
8) IMSI Originating - Unique id to phone used to make text
9) IMSI Terminating- Unique id to phone used to receive text
10) Text Code – Identify text direction, or other text routing information
11) Text Type Code – Type of text message (sent SMS, MMS, or other)
12) Time Zone – Time Zone in which the call was received or placed, if applicable

For Mobile Data Usage:
1) Account Number
2) Connection Date – Date the data was received or made
3) Connection Time – Time data was received or made
4) Originating number – Number that used data
5) IMEI Originating – Unique id of phone that used data
6) IMSI Originating - Unique id of phone that used data
7) Data or Data codes – Identify data direction, or other data routing information
8) Time Zone – Time Zone in which the call was received or placed, if applicable

Exhibit 23 Page 304

# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

## Supplemental Information for Persons Requested to Supply Information Voluntarily or Directed to Supply Information Pursuant to a Commission Subpoena

**A. False Statements and Documents**

Section 1001 of Title 18 of the United States Code provides that fines and terms of imprisonment may be imposed upon:

> [W]hoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully--
> (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
> (2) makes any materially false, fictitious, or fraudulent statement or representation; or
> (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry.

Section 1519 of Title 18 of the United States Code provides that fines and terms of imprisonment may be imposed upon:

> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States . . ., or in relation to or contemplation of any such matter.

**B. Testimony**

If your testimony is taken, you should be aware of the following:

1.  *Record*.  Your testimony will be transcribed by a reporter. If you desire to go off the record, please indicate this to the Commission employee taking your testimony, who will determine whether to grant your request. The reporter will not go off the record at your, or your counsel's, direction.

2.  *Counsel*.  You have the right to be accompanied, represented and advised by counsel of your choice. Your counsel may advise you before, during and after your testimony; question you briefly at the conclusion of your testimony to clarify any of the answers you give during testimony; and make summary notes during your testimony solely for your use. If you are accompanied by counsel, you may consult privately.

If you are not accompanied by counsel, please advise the Commission employee taking your testimony if, during the testimony, you desire to be accompanied, represented and advised by counsel. Your testimony will be adjourned once to afford you the opportunity to arrange to be so accompanied, represented or advised.

You may be represented by counsel who also represents other persons involved in the Commission's investigation. This multiple representation, however, presents a potential conflict of interest if one client's interests are or may be adverse to another's. If you are represented by counsel who also represents other persons involved in the investigation, the Commission will assume that you and counsel have discussed and resolved all issues concerning possible conflicts of interest. The choice of counsel, and the responsibility for that choice, is yours.

3.  *Transcript Availability*.  Rule 6 of the Commission's Rules Relating to Investigations, 17 CFR 203.6, states:

> A person who has submitted documentary evidence or testimony in a formal investigative proceeding shall be entitled, upon written request, to procure a copy of his documentary evidence or a transcript of his testimony on payment of the appropriate fees: *Provided, however*, That in a nonpublic formal investigative proceeding the Commission may for good cause deny such request. In any event, any witness, upon proper identification, shall have the right to inspect the official transcript of the witness' own testimony.

If you wish to purchase a copy of the transcript of your testimony, the reporter will provide you with a copy of the appropriate form. Persons requested to supply information voluntarily will be allowed the rights provided by this rule.

4.  *Perjury*.  Section 1621 of Title 18 of the United States Code provides that fines and terms of imprisonment may be imposed upon:

> Whoever--

Exhibit 23 Page 305

(1) having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true; or

(2) in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true.

5. *Fifth Amendment and Voluntary Testimony*. Information you give may be used against you in any federal, state, local or foreign administrative, civil or criminal proceeding brought by the Commission or any other agency.

You may refuse, in accordance with the rights guaranteed to you by the Fifth Amendment to the Constitution of the United States, to give any information that may tend to incriminate you.

If your testimony is not pursuant to subpoena, your appearance to testify is voluntary, you need not answer any question, and you may leave whenever you wish. Your cooperation is, however, appreciated.

6. *Formal Order Availability*. If the Commission has issued a formal order of investigation, it will be shown to you during your testimony, at your request. If you desire a copy of the formal order, please make your request in writing.

## C. Submissions and Settlements

Rule 5(c) of the Commission's Rules on Informal and Other Procedures, 17 CFR 202.5(c), states:

> Persons who become involved in . . . investigations may, on their own initiative, submit a written statement to the Commission setting forth their interests and position in regard to the subject matter of the investigation. Upon request, the staff, in its discretion, may advise such persons of the general nature of the investigation, including the indicated violations as they pertain to them, and the amount of time that may be available for preparing and submitting a statement prior to the presentation of a staff recommendation to the Commission for the commencement of an administrative or injunction proceeding. Submissions by interested persons should be forwarded to the appropriate Division Director or Regional Director with a copy to the staff members conducting the investigation and should be clearly referenced to the specific investigation to which they relate. In the event a recommendation for the commencement of an enforcement proceeding is presented by the staff, any submissions by interested persons will be forwarded to the Commission in conjunction with the staff memorandum.

The staff of the Commission routinely seeks to introduce submissions made pursuant to Rule 5(c) as evidence in Commission enforcement proceedings, when the staff deems appropriate.

Rule 5(f) of the Commission's Rules on Informal and Other Procedures, 17 CFR 202.5(f), states:

> In the course of the Commission's investigations, civil lawsuits, and administrative proceedings, the staff, with appropriate authorization, may discuss with persons involved the disposition of such matters by consent, by settlement, or in some other manner. It is the policy of the Commission, however, that the disposition of any such matter may not, expressly or impliedly, extend to any criminal charges that have been, or may be, brought against any such person or any recommendation with respect thereto. Accordingly, any person involved in an enforcement matter before the Commission who consents, or agrees to consent, to any judgment or order does so solely for the purpose of resolving the claims against him in that investigative, civil, or administrative matter and not for the purpose of resolving any criminal charges that have been, or might be, brought against him. This policy reflects the fact that neither the Commission nor its staff has the authority or responsibility for instituting, conducting, settling, or otherwise disposing of criminal proceedings. That authority and responsibility are vested in the Attorney General and representatives of the Department of Justice.

## D. Freedom of Information Act

The Freedom of Information Act, 5 U.S.C. 552 (the "FOIA"), generally provides for disclosure of information to the public. Rule 83 of the Commission's Rules on Information and Requests, 17 CFR 200.83, provides a procedure by which a person can make a written request that information submitted to the Commission not be disclosed under the FOIA. That rule states that no determination as to the validity of such a request will be made until a request for disclosure of the information under the FOIA is received. Accordingly, no response to a request that information not be disclosed under the FOIA is necessary or will be given until a request for disclosure under the FOIA is received. If you desire an acknowledgment of receipt of your written request that information not be disclosed under the FOIA, please provide a duplicate request, together with a stamped, self-addressed envelope.

Exhibit 23 Page 306

### E.  Authority for Solicitation of Information

*Persons Directed to Supply Information Pursuant to Subpoena*. The authority for requiring production of information is set forth in the subpoena. Disclosure of the information to the Commission is mandatory, subject to the valid assertion of any legal right or privilege you might have.

*Persons Requested to Supply Information Voluntarily*. One or more of the following provisions authorizes the Commission to solicit the information requested: Sections 19 and/or 20 of the Securities Act of 1933; Section 21 of the Securities Exchange Act of 1934; Section 321 of the Trust Indenture Act of 1939; Section 42 of the Investment Company Act of 1940; Section 209 of the Investment Advisers Act of 1940; and 17 CFR 202.5. Disclosure of the requested information to the Commission is voluntary on your part.

### F.  Effect of Not Supplying Information

*Persons Directed to Supply Information Pursuant to Subpoena*. If you fail to comply with the subpoena, the Commission may seek a court order requiring you to do so. If such an order is obtained and you thereafter fail to supply the information, you may be subject to civil and/or criminal sanctions for contempt of court. In addition, Section 21(c) of the Securities Exchange Act of 1934, Section 42(c) of the Investment Company Act of 1940, and Section 209(c) of the Investment Advisers Act of 1940 provide that fines and terms of imprisonment may be imposed upon any person who shall, without just cause, fail or refuse to attend and testify or to answer any lawful inquiry, or to produce books, papers, correspondence, memoranda, and other records in compliance with the subpoena.

*Persons Requested to Supply Information Voluntarily*. There are no direct sanctions and thus no direct effects for failing to provide all or any part of the requested information.

### G.  Principal Uses of Information

The Commission's principal purpose in soliciting the information is to gather facts in order to determine whether any person has violated, is violating, or is about to violate any provision of the federal securities laws or rules for which the Commission has enforcement authority, such as rules of securities exchanges and the rules of the Municipal Securities Rulemaking Board. Facts developed may, however, constitute violations of other laws or rules. Information provided may be used in Commission and other agency enforcement proceedings. Unless the Commission or its staff explicitly agrees to the contrary in writing, you should not assume that the Commission or its staff acquiesces in, accedes to, or concurs or agrees with, any position, condition, request, reservation of right, understanding, or any other statement that purports, or may be deemed, to be or to reflect a limitation upon the Commission's receipt, use, disposition, transfer, or retention, in accordance with applicable law, of information provided.

### H.  Routine Uses of Information

The Commission often makes its files available to other governmental agencies, particularly United States Attorneys and state prosecutors. There is a likelihood that information supplied by you will be made available to such agencies where appropriate. Whether or not the Commission makes its files available to other governmental agencies is, in general, a confidential matter between the Commission and such other governmental agencies.

Set forth below is a list of the routine uses which may be made of the information furnished.

1.  To appropriate agencies, entities, and persons when (a) it is suspected or confirmed that the security or confidentiality of information in the system of records has been compromised; (b) the SEC has determined that, as a result of the suspected or confirmed compromise, there is a risk of harm to economic or property interests, identity theft or fraud, or harm to the security or integrity of this system or other systems or programs (whether maintained by the SEC or another agency or entity) that rely upon the compromised information; and (c) the disclosure made to such agencies, entities, and persons is reasonably necessary to assist in connection with the SEC's efforts to respond to the suspected or confirmed compromise and prevent, minimize, or remedy such harm.

2.  To other federal, state, local, or foreign law enforcement agencies; securities self-regulatory organizations; and foreign financial regulatory authorities to assist in or coordinate regulatory or law enforcement activities with the SEC.

3.  To national securities exchanges and national securities associations that are registered with the SEC, the Municipal Securities Rulemaking Board; the Securities Investor Protection Corporation; the Public Company Accounting Oversight Board; the federal banking authorities, including, but not limited to, the Board of Governors of the Federal Reserve System, the Comptroller of the Currency, and the Federal Deposit Insurance Corporation; state securities regulatory agencies or organizations; or regulatory authorities of a foreign government in connection with their regulatory or enforcement responsibilities.

4.  By SEC personnel for purposes of investigating possible violations of, or to conduct investigations authorized by, the federal securities laws.

Exhibit 23 Page 307

5.  In any proceeding where the federal securities laws are in issue or in which the Commission, or past or present members of its staff, is a party or otherwise involved in an official capacity.

6.  In connection with proceedings by the Commission pursuant to Rule 102(e) of its Rules of Practice, 17 CFR 201.102(e).

7.  To a bar association, state accountancy board, or other federal, state, local, or foreign licensing or oversight authority; or professional association or self-regulatory authority to the extent that it performs similar functions (including the Public Company Accounting Oversight Board) for investigations or possible disciplinary action.

8.  To a federal, state, local, tribal, foreign, or international agency, if necessary to obtain information relevant to the SEC's decision concerning the hiring or retention of an employee; the issuance of a security clearance; the letting of a contract; or the issuance of a license, grant, or other benefit.

9.  To a federal, state, local, tribal, foreign, or international agency in response to its request for information concerning the hiring or retention of an employee; the issuance of a security clearance; the reporting of an investigation of an employee; the letting of a contract; or the issuance of a license, grant, or other benefit by the requesting agency, to the extent that the information is relevant and necessary to the requesting agency's decision on the matter.

10.  To produce summary descriptive statistics and analytical studies, as a data source for management information, in support of the function for which the records are collected and maintained or for related personnel management functions or manpower studies; may also be used to respond to general requests for statistical information (without personal identification of individuals) under the Freedom of Information Act.

11.  To any trustee, receiver, master, special counsel, or other individual or entity that is appointed by a court of competent jurisdiction, or as a result of an agreement between the parties in connection with litigation or administrative proceedings involving allegations of violations of the federal securities laws (as defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)) or pursuant to the Commission's Rules of Practice, 17 CFR 201.100 – 900 or the Commission's Rules of Fair Fund and Disgorgement Plans, 17 CFR 201.1100-1106, or otherwise, where such trustee, receiver, master, special counsel, or other individual or entity is specifically designated to perform particular functions with respect to, or as a result of, the pending action or proceeding or in connection with the administration and enforcement by the Commission of the federal securities laws or the Commission's Rules of Practice or the Rules of Fair Fund and Disgorgement Plans.

12.  To any persons during the course of any inquiry, examination, or investigation conducted by the SEC's staff, or in connection with civil litigation, if the staff has reason to believe that the person to whom the record is disclosed may have further information about the matters related therein, and those matters appeared to be relevant at the time to the subject matter of the inquiry.

13.  To interns, grantees, experts, contractors, and others who have been engaged by the Commission to assist in the performance of a service related to this system of records and who need access to the records for the purpose of assisting the Commission in the efficient administration of its programs, including by performing clerical, stenographic, or data analysis functions, or by reproduction of records by electronic or other means. Recipients of these records shall be required to comply with the requirements of the Privacy Act of 1974, as amended, 5 U.S.C. 552a.

14.  In reports published by the Commission pursuant to authority granted in the federal securities laws (as such term is defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)), which authority shall include, but not be limited to, section 21(a) of the Securities Exchange Act of 1934, 15 U.S.C. 78u(a)).

15.  To members of advisory committees that are created by the Commission or by Congress to render advice and recommendations to the Commission or to Congress, to be used solely in connection with their official designated functions.

16.  To any person who is or has agreed to be subject to the Commission's Rules of Conduct, 17 CFR 200.735-1 to 200.735-18, and who assists in the investigation by the Commission of possible violations of the federal securities laws (as such term is defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)), in the preparation or conduct of enforcement actions brought by the Commission for such violations, or otherwise in connection with the Commission's enforcement or regulatory functions under the federal securities laws.

17.  To a Congressional office from the record of an individual in response to an inquiry from the Congressional office made at the request of that individual.

18.  To members of Congress, the press, and the public in response to inquiries relating to particular Registrants and their activities, and other matters under the Commission's jurisdiction.

Exhibit 23 Page 308

19.  To prepare and publish information relating to violations of the federal securities laws as provided in 15 U.S.C. 78c(a)(47)), as amended.

20.  To respond to subpoenas in any litigation or other proceeding.

21.  To a trustee in bankruptcy.

22.  To any governmental agency, governmental or private collection agent, consumer reporting agency or commercial reporting agency, governmental or private employer of a debtor, or any other person, for collection, including collection by administrative offset, federal salary offset, tax refund offset, or administrative wage garnishment, of amounts owed as a result of Commission civil or administrative proceedings.

* * * * *

*Small Business Owners*: The SEC always welcomes comments on how it can better assist small businesses. If you would like more information, or have questions or comments about federal securities regulations as they affect small businesses, please contact the Office of Small Business Policy, in the SEC's Division of Corporation Finance, at 202-551-3460. If you would prefer to comment to someone outside of the SEC, you can contact the Small Business Regulatory Enforcement Ombudsman at http://www.sba.gov/ombudsman or toll free at 888-REG-FAIR. The Ombudsman's office receives comments from small businesses and annually evaluates federal agency enforcement activities for their responsiveness to the special needs of small business.

Exhibit 23 Page 309

# EXHIBIT 24



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
444 SOUTH FLOWER STREET, SUITE 900
LOS ANGELES, CA 90071

**LOS ANGELES**
**REGIONAL OFFICE**

**DIVISION OF ENFORCEMENT**

Lance Jasper, Esq.
Senior Counsel
███████████v

February 24, 2021

<u>VIA OVERNIGHT DELIVERY</u>
Zachary Horwitz
9615 Bolton Road
Los Angeles, CA 90034

Re: <u>In the Matter of 1inMM Capital, LLC, LA-5212</u>

Dear Mr. Horwitz:

The staff of the United States Securities and Exchange Commission is conducting an investigation in the matter identified above. The enclosed subpoena has been issued to you as part of this investigation. The subpoena requires you to provide us with documents and to give sworn testimony.

Please read the subpoena and this letter carefully. This letter answers some questions you may have about the subpoena. You should also read the enclosed SEC Form 1662. If you do not comply with this subpoena, the SEC may bring an action in Federal Court to enforce this subpoena. Failure to comply with a court order enforcing this subpoena may result in the court imposing a fine, imprisonment or both.

**Producing Documents**

*What materials do I have to produce?*

The subpoena requires you to provide us the documents described in the attachment to the subpoena. You must provide these documents by March 12, 2021. The attachment to the subpoena defines some terms (such as "document") before listing what you must provide.

You should produce each and every document in your possession, custody, or control, including any documents that are not in your immediate possession but that you have the ability to obtain. All responsive documents shall be produced as they are kept in the usual course of business, and shall be organized and labeled to correspond with the numbered paragraphs in the

Exhibit 24 Page 310

subpoena attachment. In that regard, documents should be produced in a unitized manner, *i.e.*, delineated with staples or paper clips to identify the document boundaries.

Documents responsive to this subpoena may be in electronic or paper form. Electronic documents such as email should be produced in accordance with the attached document entitled SEC Data Delivery Standards (the "Standards"). If you have any questions concerning the production of documents in an electronic format, please contact me as soon as possible but in any event before producing documents. **All electronic documents responsive to the document subpoena, including all metadata, must also be secured and retained in their native software format and stored in a safe place.** The staff may later request or require that you produce the native format.

For documents in paper format, you may send the originals, or, if you prefer, you may send copies of the originals. The Commission cannot reimburse you for the copying costs. If you are sending copies, the staff requests that you scan (rather than photocopy) hard copy documents and produce them in an electronic format consistent with the Standards. Alternatively, you may send us photocopies of the documents in paper format. **If you choose to send copies, you <u>must</u> secure and retain the originals and store them in a safe place.** The staff may later request or require that you produce the originals.

Whether you scan or photocopy documents, the copies must be identical to the originals, including even faint marks or print. Also, please note that if copies of a document differ in any way, they are considered separate documents and you must send each one. For example, if you have two copies of the same letter, but only one of them has handwritten notes on it, you must send both the clean copy and the one with notes.

If you <u>do</u> send us scanned or photocopied documents, please put an identifying notation on each page of each document to indicate that you produced it, and number the pages of all the documents submitted. (For example, if Jane Doe sends documents to the staff, she may number the pages JD-1, JD-2, JD-3, etc., in a blank corner of the documents.) Please make sure the notation and number do not conceal any writing or marking on the document. If you send us originals, please do not add any identifying notations.

In producing a photocopy of an original document that contains post-it(s), notation flag(s), or other removable markings or attachments which may conceal all or a portion of the markings contained in the original document, photocopies of the original document both with and without the relevant post-it(s), notation flag(s), or removable markings or attachments should be produced.

*Do I need to send anything else?*

You should enclose a list briefly describing each item you send. The list should state to which numbered paragraph(s) in the subpoena attachment each item responds. A copy of the subpoena should be included with the documents that are produced.

Exhibit 24 Page 311

Passwords for documents, files, compressed archives, and encrypted media should be provided separately either via email addressed to ▮▮▮▮▮▮▮▮▮▮, or in a separate cover letter mailed separately from the data. Password correspondence should reference case number, case name and requesting SEC staff member.

Please include a cover letter stating whether you believe you have met your obligations under the subpoena by searching carefully and thoroughly for everything called for by the subpoena, and sending it all to us. Correspondence should reference case number, case name and requesting SEC staff member.

Please also provide a narrative description describing what you did to identify and collect documents responsive to the subpoena. At a minimum, the narrative should describe:

- who searched for documents;
- who reviewed documents found to determine whether they were responsive;
- what sources were searched (e.g., computer files, CDs, DVDs, thumb drives, flash drives, online storage media, hard copy files, diaries, datebooks, planners, filing cabinets, home office, work office, voice mails, home email, webmail, work email, backup tapes or other media);
- what third parties, if any, were contacted to obtain responsive documents (e.g., phone companies for phone records, brokerage firms for brokerage records); and
- where the original electronic and hardcopy documents are maintained and by whom.

*What if I do not send everything described in the attachment to the subpoena?*

The subpoena requires you to send <u>all</u> the materials described in it. If, for any reason – including a claim of attorney-client privilege – you do not produce something called for by the subpoena, you should submit a list of what you are not producing. The list should describe each item separately, noting:

- its author(s);
- its date;
- its subject matter;
- the name of the person who has the item now, or the last person known to have it;
- the names of everyone who ever had the item or a copy of it, and the names of everyone who was told the item's contents;
- the reason you did not produce the item; and
- the specific request in the subpoena to which the document relates.

If you withhold anything on the basis of a claim of attorney-client privilege or attorney work product protection, you should identify the attorney and client involved. If you withhold anything on the basis of the work product doctrine, you should also identify the litigation in anticipation of which the document was prepared.

Exhibit 24 Page 312

If documents responsive to this subpoena no longer exist because they have been lost, discarded, or otherwise destroyed, you should identify such documents and give the date on which they were lost, discarded or destroyed.

*Where should I send the materials?*

    Please send the materials to:

        ENF-CPU
        U.S. Securities and Exchange Commission
        ███████████████████

    For smaller electronic productions under 10MB in size, the materials may be emailed to the following email address: ███████████████

    Please also provide a duplicate copy of any document production cover letters to Lance Jasper, Esq. at ███████████. Additionally, please include the SEC matter number and the name of the requesting attorney when responding. If you are represented by counsel, you should communicate with us through counsel.

## Testifying

*Where and when do I testify?*

    The subpoena requires you to appear at 10:00 a.m. on March 12, 2021 to testify under oath by audio-visual teleconference means, using the Webex internet platform. You will be given access to the testimony session through a Webex invite which will be sent from SEC counsel Lance Jasper, Esq. to you and to your counsel, if you are represented by counsel.

    A background questionnaire is also enclosed. During your testimony, the staff intends to ask background questions concerning, among other things, your residences, telephone numbers, education and employment. To expedite that part of the testimony, we request that you complete the enclosed questionnaire on a voluntary basis and provide it to the staff prior to your testimony.

## Other Important Information

*May I have a lawyer help me respond to the subpoena?*

    Yes. You have the right to consult with and be represented by your own lawyer in this matter. If you are represented by a lawyer when you testify, your lawyer may advise and accompany you when you testify. We cannot give you legal advice.

*What will the Commission do with the materials I send and/or the testimony I provide?*

Exhibit 24 Page 313

The enclosed SEC Form 1662 explains how we may use the information you provide to the Commission. This form also has other important information for you. Please read it carefully.

*Has the Commission determined that anyone has done anything wrong?*

This investigation is a non-public, fact-finding inquiry. We are trying to determine whether there have been any violations of the federal securities laws. The investigation does not mean that we have concluded that anyone has violated the law. Also, the investigation does not mean that we have a negative opinion of any person, entity or security.

*Important Policy Concerning Settlements*

Please note that, in any matter in which enforcement action is ultimately deemed to be warranted, the Division of Enforcement will not recommend any settlement to the Commission unless the party wishing to settle certifies, under penalty of perjury, that all documents responsive to Commission subpoenas and formal and informal document requests in this matter have been produced.

*I have read this letter, the subpoena, and the SEC Form 1662, but I still have questions. What should I do?*

If you have any other questions, you may call me at ███████████ If you are represented by a lawyer, you should have your lawyer contact me.

Sincerely,

Lance Jasper, Esq.
Senior Counsel
Division of Enforcement

Enclosures:      Subpoena and Attachment
                 SEC Data Delivery Standards
                 SEC Form 1662
                 Background Questionnaire

5

Exhibit 24 Page 314



# SUBPOENA

# UNITED STATES OF AMERICA
## SECURITIES AND EXCHANGE COMMISSION

**In the Matter of 1inMM Capital, LLC, LA-5212**

**To:**   Zachary Horwitz
9615 Bolton Road
Los Angeles, CA 90034

---

☒   **YOU MUST PRODUCE** everything specified in the Attachment to this subpoena to officers of the Securities and Exchange Commission, at the place, date and time specified below:

ENF-CPU, U.S. Securities and Exchange Commission, ██████████████████ ████, no later than March 12, 2021 at 10:00 a.m.

---

☒   **YOU MUST TESTIFY** before officers of the Securities and Exchange Commission, at the place, date and time specified below:

10:00 a.m., Pacific Time, on March 12, 2021 to testify under oath by audio-visual teleconference means, using the Webex internet platform.

---

### FEDERAL LAW REQUIRES YOU TO COMPLY WITH THIS SUBPOENA.
If you do not comply with this subpoena, the SEC may bring an action in Federal Court to enforce this subpoena.
Failure to comply with a court order enforcing this subpoena may result in the court imposing a fine, imprisonment, or both.

By:  ████████████████                    Date:    February 24, 2021
Lance Jasper, Esq., Senior Counsel
U.S. Securities and Exchange Commission
Los Angeles Regional Office
444 South Flower Street, Suite 900
Los Angeles, CA 90071

I am an officer of the U.S. Securities and Exchange Commission authorized to issue subpoenas in this matter. The Securities and Exchange Commission has issued a formal order authorizing this investigation under Section 20(a) of the Securities Act of 1933 and Section 21(a) of the Securities Exchange Act of 1934.

NOTICE TO WITNESS: If you claim a witness fee or mileage, submit this subpoena with the claim voucher.

Exhibit 24 Page 315

**SUBPOENA ATTACHMENT FOR ZACHARY HORWITZ**

<u>In the Matter of 1inMM Capital, LLC, LA-5212</u>

February 24, 2021

**<u>Definitions</u>**

As used in this subpoena, the words and phrases listed below shall have the following meanings:

1.   "1inMM Capital" means the entity doing business under the name "1inMM Capital, LLC" and associated with you, including parents, subsidiaries, affiliates, predecessors, successors, officers, directors, employees, agents, general partners, limited partners, partnerships and aliases, code names, or trade or business names used by any of the foregoing.

2.   "1inMM Productions" means the entity doing business under the name "1inMM Productions, LLC" and associated with you, including parents, subsidiaries, affiliates, predecessors, successors, officers, directors, employees, agents, general partners, limited partners, partnerships and aliases, code names, or trade or business names used by any of the foregoing.

3.   "Zachary Horwitz" means the Zachary Horwitz associated with 1inMM Capital and every present or former agent, Representative, and alias of Zachary Horwitz.

4.   "Person" means a natural person, firm, association, organization, partnership, business, trust, corporation, bank or any other private or public entity.

5.   A "Representative" of a Person means any present or former family members, officers, executives, partners, joint-venturers, directors, trustees, employees, consultants, accountants, attorneys, agents, or any other representative acting or purporting to act on behalf of the Person.

6.   "Document" shall include, but is not limited to, any written, printed, or typed matter including, but not limited to all drafts and copies bearing notations or marks not found in the original, letters and correspondence, interoffice communications, slips, tickets, records, worksheets, financial records, accounting documents, bookkeeping documents, memoranda, reports, manuals, telephone logs, facsimiles, messages of any type, telephone messages, text messages, voice mails, tape recordings, notices, instructions, minutes, summaries, notes of meetings, file folder markings, and any other organizational indicia, purchase orders, information recorded by photographic process, including microfilm and microfiche, computer printouts, spreadsheets, and other electronically stored information, including but not limited to writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations that are stored in any medium from which information can be retrieved, obtained, manipulated, or translated.

7.   "Communication" means any correspondence, contact, discussion, e-mail, instant message, or any other kind of oral or written exchange or transmission of information (in the form of facts, ideas, inquiries, or otherwise) and any response thereto between two or more Persons or entities, including, without limitation, all telephone conversations, face-to-face meetings or conversations, internal or external discussions, or exchanges of a Document or Documents.

8.   "Concerning" means directly or indirectly, in whole or in part, describing, constituting, evidencing, recording, evaluating, substantiating, concerning, referring to, alluding to, in connection with, commenting on, relating to, regarding, discussing, showing, describing, analyzing or reflecting.

Exhibit 24 Page 316

9.    An "Agreement" means any actual or contemplated (i) written or oral Agreement; (ii) term or provision of such Agreement; or (iii) amendment of any nature or termination of such Agreement. A request for any Agreement among or between specified parties includes a request for all Documents Concerning (i) any actual or contemplated Agreement among or between such parties, whether or not such Agreement included any other Person; (ii) the drafting or negotiation of any such Agreement; (iii) any actual or contemplated demand, request or application for any such Agreement, and any response thereto; and (iv) any actual or contemplated objection or refusal to enter into any such Agreement, and any response thereto.

10.    The term "Reviewed" means examined, assessed, considered, analyzed or evaluated.

11.    The term "you" and "your" means the Person to whom or entity to which this subpoena was issued.

12.    To the extent necessary to bring within the scope of this this subpoena any information or Documents that might otherwise be construed to be outside its scope:
     a.    the word "or" means "and/or";
     b.    the word "and" means "and/or";
     c.    the functional words "each," "every" "any" and "all" shall each be deemed to include each of the other functional words;
     d.    the masculine gender includes the female gender and the female gender includes the masculine gender; and
     e.    the singular includes the plural and the plural includes the singular.

13.    "Relevant Period" means the time period beginning January 1, 2014, and continuing to the date of this subpoena attachment, unless otherwise specified.

14.    "Payment" means any transfer of money or other value, including, but not limited to, property, physical assets, and digital assets.


**<ins>Instructions</ins>**

1.    Unless otherwise specified, this subpoena calls for production of the original Documents and all copies and drafts of same. Documents responsive to this subpoena may be in electronic or paper form. Electronic Documents such as email should be produced in accordance with the attached Document entitled SEC Data Delivery Standards. All responsive electronic Documents, including all metadata, should also be produced in their native software format.

2.    For Documents in paper format, you may send the originals, or, if you prefer, you may send copies of the originals. The Commission cannot reimburse you for the copying costs. If you are sending copies, the staff requests that you scan (rather than photocopy) hard copy Documents and produce them in an electronic format consistent with the SEC Data Delivery Standards. Alternatively, you may send us photocopies of the Documents in paper format. If you choose to send copies, you <u>must</u> secure and retain the originals and store them in a safe place. The staff may later request or require that you produce the originals.

3.    Whether you scan or photocopy Documents, the copies must be identical to the originals, including even faint marks or print. Also, please note that if copies of a Document differ in any way, they are considered separate Documents and you must send each one. For example, if you have two copies of the same letter, but only one of them has handwritten notes on it, you must send both the clean copy and the one with notes.

Exhibit 24 Page 317

4.     In producing a photocopy of an original Document that contains post-it(s), notation flag(s), or other removable markings or attachments which may conceal all or a portion of the markings contained in the original Document, photocopies of the original Document both with and without the relevant post-it(s), notation flag(s), or removable markings or attachments should be produced.

5.     Documents should be produced as they are kept in the ordinary course of business or be organized and labeled to correspond with the categories in this request. In that regard, Documents should be produced in a unitized manner, i.e., delineated with staples or paper clips to identify the Document boundaries.

6.     Documents should be labeled with sequential numbering (bates-stamped).

7.     You must produce all Documents created during, or Concerning, the period from January 1, 2014 to the date of this subpoena attachment, unless otherwise specified.

8.     The scope of any given request should not be limited or narrowed based on the fact that it calls for Documents that are responsive to another request.

9.     You are not required to produce exact duplicates of any Documents that have been previously produced to the Securities and Exchange Commission staff in connection with this matter. If you are not producing Documents based upon a prior production, please identify the responsive Documents that were previously produced.

10.    This subpoena covers all Documents in or subject to your possession, custody or control, including all Documents that are not in your immediate possession but that you have the effective ability to obtain, that are responsive, in whole or in part, to any of the individual requests set forth below. If, for any reason – including a claim of attorney-client privilege – you do not produce something called for by the request, you should submit a list of what you are not producing. The list should describe each item separately, noting:

   a.    its author(s);
   b.    its date;
   c.    its subject matter;
   d.    the name of the Person who has the item now, or the last Person known to have it;
   e.    the names of everyone who ever had the item or a copy of it, and the names of everyone who was told the item's contents;
   f.    the basis upon which you are not producing the responsive Document;
   g.    the specific request in the subpoena to which the Document relates;
   h.    the attorney(s) and the client(s) involved; and
   i.    in the case of the work product doctrine, the litigation for which the Document was prepared in anticipation.

11.    If Documents responsive to this subpoena no longer exist because they have been lost, discarded, or otherwise destroyed, you should identify such Documents and give the date on which they were lost, discarded or destroyed.

## **Documents to be Produced**

Produce the following Documents:

Exhibit 24 Page 318

1.      For each of 1inMM Capital and 1inMM Productions, Documents sufficient to identify every officer, member, manager, employee, sub-contractor, and executive; the role(s) of such person with each entity; and the person's dates of association with each entity.

2.      For each of 1inMM Capital and 1inMM Productions, Documents sufficient to identify every financial institution at which the entity held an account at any time during the period from January 1, 2014 to and including the date of this subpoena attachment; the names and account numbers associated with each such account; and the period of time during which the entity or entities held that account.

3.      For each of 1inMM Capital and 1inMM Productions, Documents sufficient to identify all Payments, including, but not limited to, all transfers of value exceeding $1,000, regardless of the form or format of such transfer, made and/or received during the period from January 1, 2014 through and including the date of this subpoena attachment.

4.      Documents sufficient to identify all entities, individuals, and other persons from whom 1inMM Capital and/or 1inMM Productions borrowed money, received investor funds, or received funds for investment or lending purposes (for example, in connection with promissory notes), including, but not limited to, all funds received by you Concerning or on behalf of 1inMM Capital and/or 1inMM Productions.

5.      For each entity, individual, and person identified in response to the preceding paragraph:

    A.      All Documents, Communications, and Agreements Concerning such entity, individual, or person, including, but not limited to, all Agreements Concerning investments Concerning 1inMM Capital and/or 1inMM Productions.

    B.      Documents sufficient to identify the use of all funds received by you, 1inMM Capital, and/or 1inMM Productions from each such entity, individual or person.

    C.      Documents sufficient to identify any repayment of such funds and the terms of such repayment, including the associated date(s) and interest payments or investment gains.

6.      For each of 1inMM Capital and 1inMM Productions, the entity's general ledger or equivalent document(s).

7.      For each of 1inMM Capital and 1inMM Productions, Documents sufficient to identify all accountants used or employed by such entity at any time during the period from January 1, 2014 through and including the date of this subpoena attachment and any opinion letters received from such accountant.

Exhibit 24 Page 319

8.      For each of 1inMM Capital and 1inMM Productions, Documents sufficient to identify all legal counsel used or employed by such entity and any opinion letters received from such counsel (provided, however, that you should not produce privileged communications).

9.      For each of 1inMM Capital and 1inMM Productions, Documents sufficient to identify all assets exceeding $10,000 in value as of the date of this subpoena attachment that were held by such entity on that date, regardless of the form or format of such assets, and Documents sufficient to identify the location of such assets.

10.     All Agreements Concerning you, 1inMM Capital, and/or 1inMM Productions and any media company, including any company engaged in the business of licensing, distributing, producing or selling any film, television, or other media content or rights.

11.     Documents sufficient to identify all entities affiliated with 1inMM Capital and/or 1inMM Productions at any time during the period from January 1, 2014 to and including the date of this subpoena attachment (including, but not limited to, all entities with which 1inMM Capital and/or 1inMM Productions had Agreements and/or paid or received funds), the nature of such affiliation(s), and the period(s) of time during which such entities were affiliated with 1inMM Capital and/or 1inMM Productions.

12.     Documents sufficient to identify all business addresses used by 1inMM Capital and 1inMM Productions, including each address that only one or the other of those entities used, at any time during the period from January 1, 2014 to and including the date of this subpoena attachment.

13.     For each of 1inMM Capital and 1inMM Productions, all tax returns filed during the period from January 1, 2014 through and including the date of this subpoena attachment.

14.     Documents sufficient to identify every account at a financial institution held by Zachary Horwitz, or for which Zachary Horwitz had signing, trading, or transfer authority at any time during the period from January 1, 2014 through and including the date of this subpoena attachment, including all bank accounts, and Documents sufficient to identify the financial institution, account names, and account numbers associated with each such account.

15.     Documents sufficient to identify every asset exceeding $10,000 in value held by you, or for which you had purchase, sale or transfer authority, as of the date of this subpoena attachment.

16.     Documents sufficient to identify every telephone number, telecommunications address (including, for example, Skype and WhatsApp), email address, and social media account used by you at any time during the period from January 1, 2014 through and including the date of this subpoena attachment.

Exhibit 24 Page 320

17.     Documents sufficient to identify every address at which you resided during the period from January 1, 2014 through and including the date of this subpoena attachment, and the period(s) of time during which you resided at each address.

18.     Documents sufficient to identify all funds and other Payments received by you, directly or indirectly, Concerning, from, or in connection with 1inMM Capital and/or 1inMM Productions.

19.     Documents sufficient to identify all sources of income during the period from January 1, 2014 to and including the date of this subpoena attachment for each of the following:

    A.     1inMM Capital;

    B.     1inMM Productions;

    C.     Zachary Horwitz.

Exhibit 24 Page 321

## <u>BACKGROUND QUESTIONNAIRE</u>

**Please respond to the following questions. Answering these questions will reduce the amount of time spent on background information when you testify. You may use the space provided, attaching additional sheets as necessary, or supply the information in a separate document. If you would like an electronic version of this document, please contact us and we will provide you with one.**

Today's date:  _____

1.  What is your full name?

2.  Have you ever been known by any other name? Yes _____   No _____
    If yes, list each such name and the period(s) in which you were known by that name.

3.  Date and place of birth?

4.  Country of citizenship?

5.  Marital Status?  Married ____   Divorced ____   Single ____

6.  List the names, ages, and occupations of your children, if any.

7.  List all residences you occupied at any time during the last three years, including vacation homes, beginning with your current residence.  For each residence, state the address, dates of residence, and all telephone numbers (including facsimile numbers) listed at that address.

ELECTRONIC COMMUNICATIONS ACCOUNTS

8.  List all telephone numbers and telecommunication services that were in your name or that you regularly used  [INSERT TIME PERIOD]. Include all residential business, cellular,

Exhibit 24 Page 322

credit card, and VOIP numbers, and services such as Google Voice, Skype, and video conference services. For each telephone number, state the name of the corresponding carrier (e.g., AT&T, Verizon, Vonage, Skype, etc.).

9. List the universal resource locator (URL) for all websites or blogs that you established or for which you had the authority to control content at any time  [INSERT TIME PERIOD]. For each website, state the name(s) of the domain name registrar (e.g. GoDaddy) through which the URL was obtained, the name(s) of all individuals or entities who provided web site hosting or design services, whether the website contained primarily business or personal information, and the time period in which it was active.

10. List all electronic mail addresses and social networking accounts (e.g.Facebook, LinkedIn, Twitter, Instagram, Flickr, Google+) that were in your name or that you regularly used at any time  [INSERT TIME PERIOD]. Include all personal, business, or shared electronic mail addresses and social networking accounts. For each electronic mail address and social networking account, state the name(s) of the corresponding internet service provider(s) (e.g. Google, Yahoo, AOL, or your employer), whether the address was used primarily for business or personal correspondence, and the time period in which it was active.

11. List all usernames for instant messaging and similar electronic communications services (including, but not limited to, Bloomberg, Skype, whatsapp), other than those listed in response to questions above, that were in your name or that you regularly used at any time [INSERT TIME PERIOD]. Include all personal, business, and shared addresses. For each username, state the name(s) of the communication service provider (e.g. Google, AOL, etc.), whether the address was used primarily for business or personal correspondence, the time period in which it was active, and the name of the software application(s) (e.g. GTalk, ICQ, MSN Messenger) you used to access it.

Exhibit 24 Page 323

12. List all internet message boards and discussion forums (including, but not limited to, Money Maker Group, PNQI Message Board, Investors Hub Daily) of which you were a member or on which you posted messages at any time  [INSERT TIME PERIOD]. For each message board or discussion forum, state the service provider and your member name or identification information.

PUBLICLY-HELD COMPANIES

13. Are you now, or have you ever been, an officer or director of any publicly-held company? Yes ____ No ____.

14. Are you now, or have you ever been, a beneficial owner, directly or indirectly, of five per cent or more of any class of equity securities of any publicly held company?  Yes ____   No ____.

PRIVATELY-HELD COMPANIES

15. Are you now, or have you ever been, a beneficial owner, directly or indirectly, of any privately-held company (i.e., corporation, partnership, limited liability company or other corporate form)?

16. Are you now, or have you ever been, a manager or a member of any privately-held company (i.e., corporation, partnership, limited liability company or other corporate form)?

SECURITIES ACCOUNTS

Exhibit 24 Page 324

17. List all securities or brokerage accounts that you have held in your name, individually or jointly, at any time  [INSERT TIME PERIOD].  Include all foreign accounts.  For each such account, identify: (i) the brokerage firm; (ii) the location of the branch where your account is or was held; (iii) your broker; (iv) the type of account (i.e., cash, margin or IRA); (v) the account number; and (vi) whether any person has ever held discretionary authority or power of attorney over the account; if so, name such person(s).

18. List all securities or brokerage accounts (including foreign accounts), other than those listed in your answer to the previous question, in which you had any direct or indirect beneficial interest at any time  [INSERT TIME PERIOD].  For each such account, provide the information requested by the previous question.

19. List all securities or brokerage accounts (including foreign accounts), other than those listed in your answers to the two previous questions, over which you had any control at any time [INSERT TIME PERIOD].  For each such account, provide the information requested by the first question in this section.

BANK ACCOUNTS
20. List all accounts you have held in your name at any financial institution (i.e., bank, thrift, or credit union) at any time  [INSERT TIME PERIOD].  Include all foreign accounts.  For each such account, identify: (i) the financial institution; (ii) the address of the branch at which your account is or was held; (iii) the type of account (i.e., checking, savings, money market or IRA); (iv) the account number; and (v) whether any person has ever had discretionary authority or power of attorney over the account; if so, name such person(s).

Exhibit 24 Page 325

21. List all accounts at financial institutions (including foreign accounts), other than those listed
in your answer to the previous question, in which you had any direct or indirect beneficial
interest at any time  [INSERT TIME PERIOD].  For each such account, provide the
information requested by the previous question.

22. List all accounts at financial institutions (including foreign accounts), other than those listed
in your answers to the two previous questions, over which you had any control at any time
[INSERT TIME PERIOD].  For each such account, provide the information requested by the
first question in this section.

23. List any other accounts (including foreign accounts), other than those listed in your answers
to the previous questions in this section, that were held in your name, in which you had any
direct or indirect beneficial interest, or over which you had any control, that you have used to
transfer funds  [INSERT TIME PERIOD], including, but not limited to, PayPal accounts.
For each such account, provide the information requested by the first question in this section.

PRIOR PROCEEDINGS
24. Have you ever testified in any proceeding conducted by the staff of the Securities and
Exchange Commission, a U.S. or foreign federal or state agency, a U.S. or foreign federal or
state court, a stock exchange, the Financial Industry Regulatory Authority ("FINRA") or any
other self-regulatory organization ("SRO"), or in any arbitration proceeding related to
securities transactions?

25. Have you ever been deposed in connection with any court proceeding? Yes ____ No ____.

Exhibit 24 Page 326

26.  Have you ever been named as a defendant or respondent in any action or proceeding brought by the SEC, any other U.S. or foreign federal agency, a state securities agency, FINRA, an SRO, or any exchange?  Yes ____  No ____.

27. Have you ever been a defendant in any action (other than those listed in response to the previous question) alleging violations of the federal securities laws? Yes ____  No ____.

28. Have you ever been a defendant in any criminal proceeding other than one involving a minor traffic offense?  Yes ____  No ____.

EDUCATIONAL HISTORY
29. Provide the requested information about each educational institution that you have attended, beginning with the most recent and working backward to the date that you completed high school.

30. Other than courses taken in connection with institutions listed in response to question 29, list any securities, accounting or business related courses taken since high school.  For each such course, identify the date that the course was completed and the name of the institution or organization that offered the course.

PROFESSIONAL LICENSES/CLUBS
31. Do you hold, or have you ever held, any professional license?  Yes ____  No ____.

Exhibit 24 Page 327

32. Are you, or have you ever been, a member of any professional or business club or organization?  Yes ____ No ____.

33. Are you, or have you been  [INSERT TIME PERIOD], a member of any social clubs, charities or nonprofit organizations?  Yes ____ No ____.

<u>EMPLOYMENT HISTORY</u>

34. Are you, or have you ever been, an employee of a broker, dealer, investment adviser, investment company, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization?   Yes ____ No ____.

35. State your employment activities, beginning with the present and working backward to the date that you completed high school and attach a recent copy of your resume or curriculum vitae. For each position you have held (including multiple positions or titles with the same employer), provide the following information:

CONTINUE ON ADDITIONAL SHEETS IF NECESSARY

Exhibit 24 Page 328



**U.S. Securities and Exchange Commission**

**<u>Data Delivery Standards</u>**

This document describes the technical requirements for paper and electronic document productions to the U.S. Securities and Exchange Commission (SEC).   **_<u>Any questions or proposed file formats other than those described below must be discussed with the legal and technical staff of the SEC Division of Enforcement prior to submission.</u>_**

General Instructions ................................................................................................................................ 1

Delivery Formats ..................................................................................................................................... 2

    I.  Imaged Productions ................................................................................................................. 3

        1.  Images .......................................................................................................................... 3

        2.  Image Cross-Reference File ........................................................................................ 3

        3.  Data File ...................................................................................................................... 3

        4.  Text .............................................................................................................................. 3

        5.  Linked Native Files .................................................................................................... 3

    II.  Native File Productions without Load Files ........................................................................... 4

    III.  Adobe PDF File Productions ................................................................................................ 4

    IV.  Audio Files ............................................................................................................................. 4

    V.  Video Files ............................................................................................................................. 4

    VI.  Electronic Trade and Bank Records ...................................................................................... 4

    VII.  Electronic Phone Records ..................................................................................................... 4

    VIII.  Audit Workpapers ................................................................................................................ 5

    IX.  Mobile Device Data ............................................................................................................. 5

**General Instructions**

<span style="color:red">Due to COVID-19 restrictions the current, temporary mailing address for all <u>physical productions</u> sent to the SEC is:</span>
<span style="color:red">**ENF-CPU, 6315 Bren Mar Drive, Suite 175, Alexandria, VA 22312**</span>

Electronic files must be produced in their native format, i.e. the format in which they are ordinarily used and maintained during the normal course of business.  For example, an MS Excel file must be produced as an MS Excel file rather than an image of a spreadsheet.  *(Note:  An Adobe PDF file is <u>not</u> considered a native file unless the document was initially created as a PDF.)*

In the event produced files require the use of proprietary software not commonly found in the workplace, the SEC will explore other format options with the producing party.

The proposed use of file de-duplication methodologies or *computer-assisted review* or *technology-assisted review* (TAR) during the processing of documents must be discussed with and approved by the legal and technical staff of the Division of Enforcement (ENF).  If your production will be de-duplicated it is vital that you 1) preserve any unique metadata associated with the duplicate files, for example, custodian name and file location and, 2) make that unique metadata part of your production to the

Exhibit 24 Page 329

SEC.

General requirements for **ALL** document productions are:

1. A cover letter must be included with each production and should include the following information:
   a. Case number, case name and requesting SEC staff member name
   b. A list of each piece of media included in the production with its unique production volume number
   c. A list of custodians, identifying the Bates range for each custodian
   d. The time zone in which the emails were standardized during conversion
   e. Whether the production contains native files produced from Mac operating system environments
2. Data can be produced on CD, DVD, thumb drive, etc., using the media requiring the least number of deliverables and labeled with the following:
   a. Case number
   b. Production date
   c. Producing party
   d. Bates range (if applicable)
3. All submissions must be organized by **custodian** unless otherwise instructed.
4. All document family groups, i.e. email attachments, embedded files, etc., should be produced together and children files should follow parent files sequentially in the Bates numbering.
5. All load-ready collections should include only one data load file and one image pointer file.
6. All load-ready text must be produced as separate document-level text files.
7. All load-ready collections should account for custodians in the custodian field.
8. All load-ready collections must provide the extracted contents of any container files to ensure all relevant files are produced as separate records.
9. Audio files should be separated from data files if both are included in the production.
10. Only alphanumeric characters and the underscore character are permitted in file names and folder names. Special characters are not permitted.
11. All electronic productions submitted on media must be produced using industry standard self-extracting encryption software.
12. The SEC uses 7zip to access compressed files. Note that the SEC **cannot** accept files that use AES-256 Jpeg or pkAES-256-Cert Deflate compression methods, even if the files are created with 7zip. If you have any questions or need additional information, please reach out to the requesting SEC staff member.
13. Electronic productions of 20 GB or less are strongly encouraged to be submitted via Secure File Transfer. All Secure File Transfers should be sent to the SEC Centralized Production Unit (ENF-CPU@sec.gov) with a CC to the requesting SEC staff member. If you do not have your own Secure File Transfer application, you may reach out to the requesting SEC staff member for a link to the SEC system in order to upload your production. If using the SEC Secure File Transfer system, you will NOT be able to CC individuals outside the SEC on your upload transmission. Note that the SEC **cannot** accept productions made using file sharing sites such as Google Drive, Microsoft Office 365 or Dropbox.
14. Productions containing BSA or SAR material must be delivered on encrypted physical media. The SEC **cannot** accept electronic transmission of BSA or SAR material. Any BSA or SAR material produced should be segregated and appropriately marked as BSA or SAR material, or should be produced separately from other case related material.
15. Passwords for electronic documents, files, compressed archives and encrypted media must be provided separately either via email or in a cover letter apart from the media.
16. All electronic productions should be produced free of computer viruses.
17. Before producing forensically collected images, parties should reach out to the requesting SEC staff member in order to discuss appropriate handling.
18. Before producing unique data sets (large sets of relational data, website reconstruction, chat room data, etc.), parties should reach out to the requesting SEC staff member in order to discuss an appropriate production format.
19. Additional technical descriptions can be found in the addendum to this document.

**\*Please note that productions sent to the SEC via United States Postal Service are subject to Mail Irradiation, and as a result electronic productions may be damaged.\***

Exhibit 24 Page 330

**Delivery Formats**

**I.    Imaged Productions**

The SEC prefers that all scanned paper and electronic file collections be produced in a structured format including industry standard load files, Bates numbered image files, native files and searchable document-level text files.

    **1.    Images**
a.   Black and white images must be 300 DPI Group IV single-page TIFF files
b.   Color images must be produced in JPEG format
c.   File names cannot contain embedded spaces or special characters (including the comma)
d.   Folder names cannot contain embedded spaces or special characters (including the comma)
e.   All image files must have a unique file name, i.e. Bates number
f.   Images must be endorsed with sequential Bates numbers in the lower right corner of each image
g.   The number of image files per folder should not exceed 2,000 files
h.   Excel spreadsheets should have a placeholder image named by the Bates number of the file
i.   AUTOCAD/photograph files should be produced as a single page JPEG file

    **2.    Image Cross-Reference File**

The image cross-reference file (.LOG or .OPT) links the images to the database records. It should be a comma-delimited file consisting of seven fields per line with a line in the cross-reference file for every image in the database with the following format:

*ImageID,VolumeLabel,ImageFilePath,DocumentBreak,FolderBreak,BoxBreak,PageCount*

    **3.    Data File**

The data file (.DAT) contains all of the fielded information that will be loaded into the database.

a.   The first line of the .DAT file must be a header row identifying the field names
b.   The .DAT file must use the following *Concordance*® default delimiters:

        Comma ¶ ASCII character (020)
        Quote þ ASCII character (254)

c.   If the .DAT file is produced in Unicode format it must contain the byte order marker
d.   Date fields should be provided in the format: mm/dd/yyyy
e.   Date and time fields must be two separate fields
f.   The time zone must be included in all time fields
g.   If the production includes imaged emails and attachments, the attachment fields must be included to preserve the parent/child relationship between an email and its attachments
h.   An OCRPATH field must be included to provide the file path and name of the extracted text file on the produced storage media.  The text file must be named after the FIRSTBATES.  Do not include the text in the .DAT file.
i.   For productions with native files, a LINK field must be included to provide the file path and name of the native file on the produced storage media. The native file must be named after the FIRSTBATES.
j.   BEGATTACH and ENDATTACH fields must be two separate fields
k.   A complete list of metadata fields is available in **Addendum A** to this document

    **4.    Text**

Text must be produced as separate document-level text files, not as fields within the .DAT file. The text files must be named per the FIRSTBATES/Image Key and the full path to the text file (OCRPATH) should be included in the .DAT file. Text files may be in either ANSI or Unicode format, however, ALL text files must be in the same format within the same production. Note that productions containing text with foreign characters must produce text files in Unicode format to preserve the foreign characters. Text files must be in a separate folder, and the number of text files per folder should not exceed 2,000 files. There should be no special characters (including commas) in the folder names. For redacted documents, provide the full text for the redacted version.

    **5.    Linked Native Files**

Copies of original email and native file documents/attachments must be included for all electronic productions.
a.   Native file documents must be named per the FIRSTBATES number
b.   The full path of the native file must be provided in the .DAT file for the LINK field
c.   The number of native files per folder should not exceed 2,000 files

Exhibit 24 Page 331

**II.   Native File Production without Load Files**

With prior approval, native files may be produced without load files. The native files must be produced as they are maintained in the normal course of business and organized by custodian-named file folders. When approved, native email files (.PST or .MBOX) may be produced. A separate folder should be provided for each custodian.

**III.   Adobe PDF File Production**

With prior approval, Adobe PDF files may be produced in native file format.

1.   All PDFs must be unitized at the document level, i.e., each PDF must represent a discrete document.
2.   PDF files should be produced in separate folders named by the custodian. The folders should not contain any special characters (including commas).
3.   All PDF files must contain embedded text that includes all discernible words within the document, not selected text or image only. This requires all layers of the PDF to be flattened first.
4.   If PDF files are Bates endorsed, the PDF files must be named by the Bates range.

**IV.   Audio Files**

Audio files from telephone recording systems must be produced in a format that is playable using Microsoft Windows Media Player™. Additionally, the call information (metadata) related to each audio recording MUST be provided. The metadata file must be produced in a delimited text format. Field names must be included in the first row of the text file. The metadata must include, at a minimum, the following fields:

1) Caller Name:          Caller's name or account/identification number
2) Originating Number:   Caller's phone number
3) Called Party Name:    Called party's name
4) Terminating Number:   Called party's phone number
5) Date:                 Date of call
6) Time:                 Time of call
7) Filename:             Filename of audio file

**V.   Video Files**

Video files must be produced in a format that is playable using Microsoft Windows Media Player™.

**VI.   Electronic Trade and Bank Records**

When producing electronic trade records, bank records, or financial statements, provide the files in one of the following formats:

1.   MS Excel spreadsheet with header information detailing the field structure. If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details.

2.   Delimited text file with header information detailing the field structure. The preferred delimiter is a vertical bar "|". If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details.

**VII.   Electronic Phone Records**

When producing electronic phone records, provide the files in the following format:

1.   MS Excel spreadsheet with header information detailing the field structure. If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details.  Data must be formatted in its native format (i.e. dates in a date format, numbers in an appropriate numerical format, and numbers with leading zeroes as text).

   a.   The metadata that must be included is outlined in **Addendum B** of this document. Each field of data must be loaded into a separate column.  For example, Date and Start_Time must be produced in separate columns and not combined into a single column containing both pieces of information.  Any fields of data that are provided in addition to those listed in **Addendum B** must also be loaded into separate columns.

Exhibit 24 Page 332

**VIII. Audit Workpapers**

    The SEC prefers for workpapers to be produced in two formats: (1) With Bates numbers in accordance with the SEC Data Delivery Standards; and (2) in native format or if proprietary software was used, on a standalone laptop with the appropriate software loaded so that the workpapers may be reviewed as they would have been maintained in the ordinary course of business. The laptop must have printing capability, and when possible, the laptop should be configured to enable a Virtual Machine (VM) environment.

**IX. Mobile Device Data**

    Before producing mobile device data (including but not limited to text messages) parties should reach out to the requesting SEC staff member in order to discuss the appropriate production format

Exhibit 24 Page 333

## ADDENDUM A

The metadata of electronic document collections should be extracted and provided in a .DAT file using the field definition and formatting described below:

| Field Name | Sample Data | Description |
|---|---|---|
| FIRSTBATES | EDC0000001 | First Bates number of native file document/email |
| LASTBATES | EDC0000001 | Last Bates number of native file document/email<br>**The LASTBATES field should be populated for single page documents/emails. |
| ATTACHRANGE | EDC0000001 - EDC0000015 | Bates number of the first page of the parent document to the Bates number of the last page of the last attachment "child" document |
| BEGATTACH | EDC0000001 | First Bates number of attachment range |
| ENDATTACH | EDC0000015 | Last Bates number of attachment range |
| PARENT_BATES | EDC0000001 | First Bates number of parent document/Email<br>**This PARENT_BATES field should be populated in each record representing an attachment "child" document |
| CHILD_BATES | EDC0000002; EDC0000014 | First Bates number of "child" attachment(s); can be more than one Bates number listed depending on the number of attachments<br>**The CHILD_BATES field should be populated in each record representing a "parent" document |
| CUSTODIAN | Smith, John | Email: Mailbox where the email resided<br>Native: Name of the individual or department from whose files the document originated |
| FROM | John Smith | Email: Sender<br>Native: Author(s) of document<br>**semi-colon should be used to separate multiple entries |
| TO | Coffman, Janice; LeeW [mailto:LeeW@MSN.com] | Recipient(s)<br>**semi-colon should be used to separate multiple entries |
| CC | Frank Thompson [mailto: frank_Thompson@cdt.com] | Carbon copy recipient(s)<br>**semi-colon should be used to separate multiple entries |
| BCC | John Cain | Blind carbon copy recipient(s)<br>**semi-colon should be used to separate multiple entries |
| SUBJECT | Board Meeting Minutes | Email: Subject line of the email<br>Native: Title of document (if available) |
| FILE_NAME | BoardMeetingMinutes.docx | Native: Name of the original native file, including extension |
| DATE_SENT | 10/12/2010 | Email: Date the email was sent<br>Native: (empty) |
| TIME_SENT/TIME_ZONE | 07:05 PM GMT | Email: Time the email was sent/ Time zone in which the emails were standardized during conversion.<br>Native: (empty)<br>**This data must be a separate field and cannot be combined with the DATE_SENT field |

Exhibit 24 Page 334

| TIME_ZONE | GMT | The time zone in which the emails were standardized during conversion.<br>Email: Time zone<br>Native: (empty) |
|---|---|---|
| LINK | D:\001\ EDC0000001.msg | Hyperlink to the email or native file document<br>**The linked file must be named per the<br>   FIRSTBATES number |
| MIME_TYPE | application/msword | The content type of an email or native file document as identified/extracted from the header |
| FILE_EXTEN | MSG | The file type extension representing the email or native file document; will vary depending on the format |
| AUTHOR | John Smith | Email: (empty)<br>Native: Author of the document |
| LAST_AUTHOR | Jane Doe | Email: (empty)<br>Native: Last Author of the document |
| DATE_CREATED | 10/10/2010 | Email: (empty)<br>Native: Date the document was created |
| TIME_CREATED/TIME_ZONE | 10:25 AM GMT | Email: (empty)<br>Native: Time the document was created including time zone<br>**This data must be a separate field and cannot be |
| DATE_MOD | 10/12/2010 | Email: (empty)<br>Native: Date the document was last modified |
| TIME_MOD/TIME_ZONE | 07:00 PM GMT | Email: (empty)<br>Native: Time the document was last modified including the time zone<br>**This data must be a separate field and cannot be |
| DATE_ACCESSD | 10/12/2010 | Email: (empty)<br>Native: Date the document was last accessed |
| TIME_ACCESSD/TIME_ZONE | 07:00 PM GMT | Email: (empty)<br>Native: Time the document was last accessed including the time zone<br>**This data must be a separate field and cannot be |
| PRINTED_DATE | 10/12/2010 | Email: (empty)<br>Native: Date the document was last printed |
| FILE_SIZE | 5,952 | Size of native file document/email in KB |
| PGCOUNT | 1 | Number of pages in native file document/email |
| PATH | J:\Shared\SmithJ\October Agenda.doc | Email: (empty)<br>Native: Path where native file document was stored including original file name. |
| INTFILEPATH | Personal Folders\Deleted Items\Board Meeting Minutes.msg | Email:  original location of email including original file name.<br>Native: (empty) |
| INTMSGID | <000805c2c71b$75977050$cb8306d1@MSN> | Email: Unique Message ID<br>Native: (empty) |

Exhibit 24 Page 335

| HEADER | Return-Path: <example_from@dc.edu> X-SpamCatcher-Score:1[X] Received:from[136.167.40.119] (HELO dc.edu) by fe3.dc.edu (CommuniGate Pro SMTP4.1.8) with ESMTP-TLS id 61258719 for example_to@mail.dc.edu; Mon, 23 Aug 2004 11:40:10 -0400 Message-ID: <4129F3CA.2020509@dc.edu> Date: Mon, 23 Aug 2005 11:40:36 -400 From: Taylor Evans <example_from@dc.edu> User-Agent:Mozilla/5.0 (Windows;U; Windows NT 5.1; en-US;rv:1.0.1) Gecko/20020823 Netscape/7.0 X-Accept-Language:en-us,en MIME-Version:1.0 To: Jon Smith <example_to@mail.dc.edu> Subject:Business Development Meeting Content-Type: text/plain;charset=us-ascii; format=flowed Content-Transfer-Encoding:7bit | Email: The email header information Native: (empty) |
|---|---|---|
| MD5HASH | d131dd02c5e6eec4693d9a069 8aff95c 2fcab58712467eab4004583eb 8fb7f89 | MD5 Hash value of the document. |
| OCRPATH | TEXT/001/EDC0000001.txt | Path to extracted text of the native file |

Sample Image Cross-Reference File:

```
IMG0000001,,E:\001\IMG0000001.TIF,Y,,,
IMG0000002,,E:\001\IMG0000002.TIF,,,,
IMG0000003,,E:\001\IMG0000003.TIF,,,,
IMG0000004,,E:\001\IMG0000004.TIF,Y,,,
IMG0000005,,E:\001\IMG0000005.TIF,Y,,,
IMG0000006,,E:\001\IMG0000006.TIF,,,,
```

Exhibit 24 Page 336

## ADDENDUM B

For Electronic Phone Records, include the following fields in separate columns:
For Calls:
1) Account Number
2) Connection Date – Date the call was received or made
3) Connection Time – Time call was received or made
4) Seizure Time – Time it took for the call to be placed in seconds
5) Originating Number – Phone that placed the call
6) Terminating Number – Phone that received the call
7) Elapsed Time – The length of time the call lasted, preferably in seconds
8) End Time – The time the call ended
9) Number Dialed – Actual number dialed
10) IMEI Originating – Unique id to phone used to make call
11) IMEI Terminating– Unique id to phone used to receive call
12) IMSI Originating – Unique id to phone used to make call
13) IMSI Terminating- Unique id to phone used to receive call
14) Call Codes – Identify call direction or other routing information
15) Time Zone – Time Zone in which the call was received or placed, if applicable


For Text messages:
1) Account Number
2) Connection Date – Date the text was received or made
3) Connection Time – Time text was received or made
4) Originating Number – Who placed the text
5) Terminating Number – Who received the text
6) IMEI Originating – Unique id to phone used to make text
7) IMEI Terminating– Unique id to phone used to receive text
8) IMSI Originating - Unique id to phone used to make text
9) IMSI Terminating- Unique id to phone used to receive text
10) Text Code – Identify text direction, or other text routing information
11) Text Type Code – Type of text message (sent SMS, MMS, or other)
12) Time Zone – Time Zone in which the call was received or placed, if applicable

For Mobile Data Usage:
1) Account Number
2) Connection Date – Date the data was received or made
3) Connection Time – Time data was received or made
4) Originating number – Number that used data
5) IMEI Originating – Unique id of phone that used data
6) IMSI Originating - Unique id of phone that used data
7) Data or Data codes – Identify data direction, or other data routing information
8) Time Zone – Time Zone in which the call was received or placed, if applicable

Exhibit 24 Page 337

# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

## Supplemental Information for Persons Requested to Supply Information Voluntarily or Directed to Supply Information Pursuant to a Commission Subpoena

### A. False Statements and Documents

Section 1001 of Title 18 of the United States Code provides that fines and terms of imprisonment may be imposed upon:

> [W]hoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully--
> (1)  falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
> (2)  makes any materially false, fictitious, or fraudulent statement or representation; or
> (3)  makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry.

Section 1519 of Title 18 of the United States Code provides that fines and terms of imprisonment may be imposed upon:

> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States . . ., or in relation to or contemplation of any such matter.

### B. Testimony

If your testimony is taken, you should be aware of the following:

1. *Record*.  Your testimony will be transcribed by a reporter. If you desire to go off the record, please indicate this to the Commission employee taking your testimony, who will determine whether to grant your request. The reporter will not go off the record at your, or your counsel's, direction.

2. *Counsel*.  You have the right to be accompanied, represented and advised by counsel of your choice. Your counsel may advise you before, during and after your testimony; question you briefly at the conclusion of your testimony to clarify any of the answers you give during testimony; and make summary notes during your testimony solely for your use. If you are accompanied by counsel, you may consult privately.

If you are not accompanied by counsel, please advise the Commission employee taking your testimony if, during the testimony, you desire to be accompanied, represented and advised by counsel. Your testimony will be adjourned once to afford you the opportunity to arrange to be so accompanied, represented or advised.

You may be represented by counsel who also represents other persons involved in the Commission's investigation. This multiple representation, however, presents a potential conflict of interest if one client's interests are or may be adverse to another's. If you are represented by counsel who also represents other persons involved in the investigation, the Commission will assume that you and counsel have discussed and resolved all issues concerning possible conflicts of interest. The choice of counsel, and the responsibility for that choice, is yours.

3. *Transcript Availability*.  Rule 6 of the Commission's Rules Relating to Investigations, 17 CFR 203.6, states:

> A person who has submitted documentary evidence or testimony in a formal investigative proceeding shall be entitled, upon written request, to procure a copy of his documentary evidence or a transcript of his testimony on payment of the appropriate fees: *Provided, however*, That in a nonpublic formal investigative proceeding the Commission may for good cause deny such request. In any event, any witness, upon proper identification, shall have the right to inspect the official transcript of the witness' own testimony.

If you wish to purchase a copy of the transcript of your testimony, the reporter will provide you with a copy of the appropriate form. Persons requested to supply information voluntarily will be allowed the rights provided by this rule.

4. *Perjury*.  Section 1621 of Title 18 of the United States Code provides that fines and terms of imprisonment may be imposed upon:

> Whoever--

Exhibit 24 Page 338

(1) having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true; or

(2) in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true.

5.   *Fifth Amendment and Voluntary Testimony*. Information you give may be used against you in any federal, state, local or foreign administrative, civil or criminal proceeding brought by the Commission or any other agency.

You may refuse, in accordance with the rights guaranteed to you by the Fifth Amendment to the Constitution of the United States, to give any information that may tend to incriminate you.

If your testimony is not pursuant to subpoena, your appearance to testify is voluntary, you need not answer any question, and you may leave whenever you wish. Your cooperation is, however, appreciated.

6.   *Formal Order Availability*. If the Commission has issued a formal order of investigation, it will be shown to you during your testimony, at your request. If you desire a copy of the formal order, please make your request in writing.

## C.  Submissions and Settlements

Rule 5(c) of the Commission's Rules on Informal and Other Procedures, 17 CFR 202.5(c), states:

Persons who become involved in . . . investigations may, on their own initiative, submit a written statement to the Commission setting forth their interests and position in regard to the subject matter of the investigation. Upon request, the staff, in its discretion, may advise such persons of the general nature of the investigation, including the indicated violations as they pertain to them, and the amount of time that may be available for preparing and submitting a statement prior to the presentation of a staff recommendation to the Commission for the commencement of an administrative or injunction proceeding. Submissions by interested persons should be forwarded to the appropriate Division Director or Regional Director with a copy to the staff members conducting the investigation and should be clearly referenced to the specific investigation to which they relate. In the event a recommendation for the commencement of an enforcement proceeding is presented by the staff, any submissions by interested persons will be forwarded to the Commission in conjunction with the staff memorandum.

The staff of the Commission routinely seeks to introduce submissions made pursuant to Rule 5(c) as evidence in Commission enforcement proceedings, when the staff deems appropriate.

Rule 5(f) of the Commission's Rules on Informal and Other Procedures, 17 CFR 202.5(f), states:

In the course of the Commission's investigations, civil lawsuits, and administrative proceedings, the staff, with appropriate authorization, may discuss with persons involved the disposition of such matters by consent, by settlement, or in some other manner. It is the policy of the Commission, however, that the disposition of any such matter may not, expressly or impliedly, extend to any criminal charges that have been, or may be, brought against any such person or any recommendation with respect thereto. Accordingly, any person involved in an enforcement matter before the Commission who consents, or agrees to consent, to any judgment or order does so solely for the purpose of resolving the claims against him in that investigative, civil, or administrative matter and not for the purpose of resolving any criminal charges that have been, or might be, brought against him. This policy reflects the fact that neither the Commission nor its staff has the authority or responsibility for instituting, conducting, settling, or otherwise disposing of criminal proceedings. That authority and responsibility are vested in the Attorney General and representatives of the Department of Justice.

## D.  Freedom of Information Act

The Freedom of Information Act, 5 U.S.C. 552 (the "FOIA"), generally provides for disclosure of information to the public. Rule 83 of the Commission's Rules on Information and Requests, 17 CFR 200.83, provides a procedure by which a person can make a written request that information submitted to the Commission not be disclosed under the FOIA. That rule states that no determination as to the validity of such a request will be made until a request for disclosure of the information under the FOIA is received. Accordingly, no response to a request that information not be disclosed under the FOIA is necessary or will be given until a request for disclosure under the FOIA is received. If you desire an acknowledgment of receipt of your written request that information not be disclosed under the FOIA, please provide a duplicate request, together with a stamped, self-addressed envelope.

Exhibit 24 Page 339

### E.  Authority for Solicitation of Information

*Persons Directed to Supply Information Pursuant to Subpoena*. The authority for requiring production of information is set forth in the subpoena. Disclosure of the information to the Commission is mandatory, subject to the valid assertion of any legal right or privilege you might have.

*Persons Requested to Supply Information Voluntarily*. One or more of the following provisions authorizes the Commission to solicit the information requested: Sections 19 and/or 20 of the Securities Act of 1933; Section 21 of the Securities Exchange Act of 1934; Section 321 of the Trust Indenture Act of 1939; Section 42 of the Investment Company Act of 1940; Section 209 of the Investment Advisers Act of 1940; and 17 CFR 202.5. Disclosure of the requested information to the Commission is voluntary on your part.

### F.  Effect of Not Supplying Information

*Persons Directed to Supply Information Pursuant to Subpoena*. If you fail to comply with the subpoena, the Commission may seek a court order requiring you to do so. If such an order is obtained and you thereafter fail to supply the information, you may be subject to civil and/or criminal sanctions for contempt of court. In addition, Section 21(c) of the Securities Exchange Act of 1934, Section 42(c) of the Investment Company Act of 1940, and Section 209(c) of the Investment Advisers Act of 1940 provide that fines and terms of imprisonment may be imposed upon any person who shall, without just cause, fail or refuse to attend and testify or to answer any lawful inquiry, or to produce books, papers, correspondence, memoranda, and other records in compliance with the subpoena.

*Persons Requested to Supply Information Voluntarily*. There are no direct sanctions and thus no direct effects for failing to provide all or any part of the requested information.

### G.  Principal Uses of Information

The Commission's principal purpose in soliciting the information is to gather facts in order to determine whether any person has violated, is violating, or is about to violate any provision of the federal securities laws or rules for which the Commission has enforcement authority, such as rules of securities exchanges and the rules of the Municipal Securities Rulemaking Board. Facts developed may, however, constitute violations of other laws or rules. Information provided may be used in Commission and other agency enforcement proceedings. Unless the Commission or its staff explicitly agrees to the contrary in writing, you should not assume that the Commission or its staff acquiesces in, accedes to, or concurs or agrees with, any position, condition, request, reservation of right, understanding, or any other statement that purports, or may be deemed, to be or to reflect a limitation upon the Commission's receipt, use, disposition, transfer, or retention, in accordance with applicable law, of information provided.

### H.  Routine Uses of Information

The Commission often makes its files available to other governmental agencies, particularly United States Attorneys and state prosecutors. There is a likelihood that information supplied by you will be made available to such agencies where appropriate. Whether or not the Commission makes its files available to other governmental agencies is, in general, a confidential matter between the Commission and such other governmental agencies.

Set forth below is a list of the routine uses which may be made of the information furnished.

1.  To appropriate agencies, entities, and persons when (a) it is suspected or confirmed that the security or confidentiality of information in the system of records has been compromised; (b) the SEC has determined that, as a result of the suspected or confirmed compromise, there is a risk of harm to economic or property interests, identity theft or fraud, or harm to the security or integrity of this system or other systems or programs (whether maintained by the SEC or another agency or entity) that rely upon the compromised information; and (c) the disclosure made to such agencies, entities, and persons is reasonably necessary to assist in connection with the SEC's efforts to respond to the suspected or confirmed compromise and prevent, minimize, or remedy such harm.

2.  To other federal, state, local, or foreign law enforcement agencies; securities self-regulatory organizations; and foreign financial regulatory authorities to assist in or coordinate regulatory or law enforcement activities with the SEC.

3.  To national securities exchanges and national securities associations that are registered with the SEC, the Municipal Securities Rulemaking Board; the Securities Investor Protection Corporation; the Public Company Accounting Oversight Board; the federal banking authorities, including, but not limited to, the Board of Governors of the Federal Reserve System, the Comptroller of the Currency, and the Federal Deposit Insurance Corporation; state securities regulatory agencies or organizations; or regulatory authorities of a foreign government in connection with their regulatory or enforcement responsibilities.

4.  By SEC personnel for purposes of investigating possible violations of, or to conduct investigations authorized by, the federal securities laws.

Exhibit 24 Page 340

5.  In any proceeding where the federal securities laws are in issue or in which the Commission, or past or present members of its staff, is a party or otherwise involved in an official capacity.

6.  In connection with proceedings by the Commission pursuant to Rule 102(e) of its Rules of Practice, 17 CFR 201.102(e).

7.  To a bar association, state accountancy board, or other federal, state, local, or foreign licensing or oversight authority; or professional association or self-regulatory authority to the extent that it performs similar functions (including the Public Company Accounting Oversight Board) for investigations or possible disciplinary action.

8.  To a federal, state, local, tribal, foreign, or international agency, if necessary to obtain information relevant to the SEC's decision concerning the hiring or retention of an employee; the issuance of a security clearance; the letting of a contract; or the issuance of a license, grant, or other benefit.

9.  To a federal, state, local, tribal, foreign, or international agency in response to its request for information concerning the hiring or retention of an employee; the issuance of a security clearance; the reporting of an investigation of an employee; the letting of a contract; or the issuance of a license, grant, or other benefit by the requesting agency, to the extent that the information is relevant and necessary to the requesting agency's decision on the matter.

10.  To produce summary descriptive statistics and analytical studies, as a data source for management information, in support of the function for which the records are collected and maintained or for related personnel management functions or manpower studies; may also be used to respond to general requests for statistical information (without personal identification of individuals) under the Freedom of Information Act.

11.  To any trustee, receiver, master, special counsel, or other individual or entity that is appointed by a court of competent jurisdiction, or as a result of an agreement between the parties in connection with litigation or administrative proceedings involving allegations of violations of the federal securities laws (as defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)) or pursuant to the Commission's Rules of Practice, 17 CFR 201.100 – 900 or the Commission's Rules of Fair Fund and Disgorgement Plans, 17 CFR 201.1100-1106, or otherwise, where such trustee, receiver, master, special counsel, or other individual or entity is specifically designated to perform particular functions with respect to, or as a result of, the pending action or proceeding or in connection with the administration and enforcement by the Commission of the federal securities laws or the Commission's Rules of Practice or the Rules of Fair Fund and Disgorgement Plans.

12.  To any persons during the course of any inquiry, examination, or investigation conducted by the SEC's staff, or in connection with civil litigation, if the staff has reason to believe that the person to whom the record is disclosed may have further information about the matters related therein, and those matters appeared to be relevant at the time to the subject matter of the inquiry.

13.  To interns, grantees, experts, contractors, and others who have been engaged by the Commission to assist in the performance of a service related to this system of records and who need access to the records for the purpose of assisting the Commission in the efficient administration of its programs, including by performing clerical, stenographic, or data analysis functions, or by reproduction of records by electronic or other means. Recipients of these records shall be required to comply with the requirements of the Privacy Act of 1974, as amended, 5 U.S.C. 552a.

14.  In reports published by the Commission pursuant to authority granted in the federal securities laws (as such term is defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)), which authority shall include, but not be limited to, section 21(a) of the Securities Exchange Act of 1934, 15 U.S.C. 78u(a)).

15.  To members of advisory committees that are created by the Commission or by Congress to render advice and recommendations to the Commission or to Congress, to be used solely in connection with their official designated functions.

16.  To any person who is or has agreed to be subject to the Commission's Rules of Conduct, 17 CFR 200.735-1 to 200.735-18, and who assists in the investigation by the Commission of possible violations of the federal securities laws (as such term is defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)), in the preparation or conduct of enforcement actions brought by the Commission for such violations, or otherwise in connection with the Commission's enforcement or regulatory functions under the federal securities laws.

17.  To a Congressional office from the record of an individual in response to an inquiry from the Congressional office made at the request of that individual.

18.  To members of Congress, the press, and the public in response to inquiries relating to particular Registrants and their activities, and other matters under the Commission's jurisdiction.

Exhibit 24 Page 341

19.  To prepare and publish information relating to violations of the federal securities laws as provided in 15 U.S.C. 78c(a)(47)), as amended.

20.  To respond to subpoenas in any litigation or other proceeding.

21.  To a trustee in bankruptcy.

22.  To any governmental agency, governmental or private collection agent, consumer reporting agency or commercial reporting agency, governmental or private employer of a debtor, or any other person, for collection, including collection by administrative offset, federal salary offset, tax refund offset, or administrative wage garnishment, of amounts owed as a result of Commission civil or administrative proceedings.

\* \* \* \* \*

*Small Business Owners*: The SEC always welcomes comments on how it can better assist small businesses. If you would like more information, or have questions or comments about federal securities regulations as they affect small businesses, please contact the Office of Small Business Policy, in the SEC's Division of Corporation Finance, at 202-551-3460. If you would prefer to comment to someone outside of the SEC, you can contact the Small Business Regulatory Enforcement Ombudsman at http://www.sba.gov/ombudsman or toll free at 888-REG-FAIR. The Ombudsman's office receives comments from small businesses and annually evaluates federal agency enforcement activities for their responsiveness to the special needs of small business.

Exhibit 24 Page 342

# EXHIBIT 25

**Jasper, Lance**

| | |
|---|---|
| **From:** | Quinn, Michael J. ████████████████ |
| **Sent:** | Tuesday, March 09, 2021 8:29 PM |
| **To:** | Jasper, Lance |
| **Cc:** | Hedges, Ryan S. |
| **Subject:** | In Re 1inMM Capital LLC LA-5212 |

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Mr. Jasper,

I am following up on the voicemail message I left this afternoon. We have been retained to represent Zach Horwitz in connection with the above entitled investigation. I was calling to introduce myself and my partner Ryan Hedges, who I've copied.  I will be in deposition with some of your colleagues tomorrow probably all day. Please let us know if there might be a good time for a call Thursday.  Thanks very much.

Regards,
Mike Quinn

Sent from my iPhone

CONFIDENTIALITY NOTE: This e-mail is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this e-mail message is not the intended recipient, or the employee or agent responsible for delivery of the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is prohibited. If you have received this e-mail in error, please notify us immediately by telephone at (312) 609-5038 and also indicate the sender's name. Thank you.

Vedder Price ████████████████████████████████
████████████████████████████████████ .

Exhibit 25 Page 343

# EXHIBIT 26

## Jasper, Lance

**From:** Ryan Spiegel █████████████████
**Sent:** Tuesday, March 30, 2021 7:12 PM
**To:** Jasper, Lance; ████████████████
**Subject:** RE: Document Request
**Attachments:** 1inMM Cap Overview.pdf; 1INMM CAPITAL INFO.PDF

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Lance,

ZH has conveyed to us that he and his legal team have been in negotiations with Warner Media after their amended agreement with HBOLA didn't pay as expected (the agreement they signed in Oct 2020). He told us on March 12 (via email) for the first time that they expect Warner Media to make the proposed payment in April 2021. We have since had communications with 1inMM to discuss this getting finalized and payments made on what is owed.

I attached an old email from 2017 that ZH sent that shows a brief recap of 1inMM and attached a 1inMM information deck that they sent us when we first started. It doesn't discuss the terms of the investments, but our participation agreements state those terms for each film we funded.

Thanks,

**Ryan Spiegel | Managing Partner | SAC Advisory Group, LLC**



Exhibit 26 Page 344

# EXHIBIT 27

| | |
|---|---|
| **From:** | Zach Horwitz |
| **To:** | Jeff Spiegel; Ryan Spiegel; Craig Cole |
| **Subject:** | 1inMM Cap Overview |
| **Date:** | Thursday, March 2, 2017 4:07:37 PM |

Hey Guys -

Here is a little snapshot overview of 1inMM Capital to date:

- Founded in 2014
- Sister company to 1inMM Productions
- Acquires the Latin American distribution rights for all windows of distribution
- All acquisitions are under $750,000.00. Films over $750,000.00 are bought by 1inMM Productions.
- Licenses all films to either HBO/Netflix or SONY in Latin America.
- Acquired and successfully licensed 11 films in 2014 / 38 in 2015 / 92 in 2016*
- Zero defaults on outstanding promissory notes
- $50+MM of deployed capital in fiscal 2016


*(27 Netflix / 50 HBO / 15 SONY) - 2016

-----
Let me know if you guys need any further info.

Cheers.

Zach Horwitz
*Co-Founder | Managing Partner*
*8157 Laurel View Dr. | Los Angeles | CA | 90069*
www.1inMM.com
Zach@1inMM.com


*CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it contains confidential information that is legally privileged. This e-mail and any files transmitted with it are intended solely for the use of the individual or entity to whom they are addressed. If the reader of this e-mail is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any use, dissemination, forwarding, printing or copying of this e-mail or any attachments hereto is strictly prohibited. If you have received this e-mail in error please contact 1nMM Productions.*

Exhibit 27 Page 345

# EXHIBIT 28



Exhibit 28 Page 346

1inMM Capital   |   ▓▓▓▓▓▓▓▓▓   |   Los Angeles, CA 90036   |   info@1inMM.com

# 1inMMcapital

THESE FILES ARE INTENDED SOLELY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHOM THEY ARE ADDRESSED. IF THE READER OF THIS DOCUMENT IS NOT THE INTENDED RECIPIENT OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE FILE TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY USE, DISSEMINATION, FORWARDING, PRINTING OR COPYING OF THIS FILE, ANY ASSOCIATED E-MAILS OR FILES HERE TO IS STRICTLY PROHIBITED.

THIS DOCUMENT AND ANY OTHER FILES OR ASSOCIATED E-MAIL MESSAGES CONTAIN CONFIDENTIAL  INFORMATION THAT IS LEGALLY PRIVILEGED.

Exhibit 28 Page 347

# DISCLOSURE

1inMM.com          1 in MM Capital

# 1inMMcapital

**is a private equity fund that focuses solely on the acquisition and distribution of feature length motion pictures through executed output deals with:**





SONY
make.believe

## OUR STRATEGIC PARTNERSHIPS

| 1inMM Productions | Alebrije Entertainment | One Key Entertainment |

Exhibit 28 Page 348

# INTRODUCTION

# 1inMMcapital

- Strategic focus on specific investments in acquisitions and distribution of feature length motion pictures.

- Financially capitalize on bridging the gap between domestic and Latin American markets.

- Strategic partnership with Netflix, Sony, HBO and Alebrije Entertainment in order to profit from the evolving Latin American market.

- Target commercially viable, elevated feature films to be distributed in Latin America.
  - Genres to include action, horror, thriller and sci-fi.

Exhibit 28 Page 349

# PARTNERSHIP: 1inMM Productions

# 1inMMcapital

- Leading programming distributor of high quality product for television.

- Specializes in worldwide content to be distributed in Latin American and U.S Hispanic Markets.

- Founded in 1999, Alebrije Entertainment has built a vast library of TV products including movies, formats, animations, documentary films, series and soap operas.

- With almost 15 years in the market, Alebrije prides themselves on being one of the most important and promissory independent distributors in this industry.

- Executive agreements with important producers such as 1inMM Productions, Archstone Distribution LLC, Acort International, Arrow Entertainment Inc., Cinema Management Group, NuVision Films and Imagination LLC.

Exhibit 28 Page 350

# PARTNERSHIP: Alebrije Entertainment

# 1inMMcapital

Co-Founded by 1inMM Productions and Alebrije Entertainment in order to capitalize and fulfill the current output deal that Alebrije Entertainment has in place with Netflix, Sony and HBO.

- One Key Entertainment is the legal entity in which 1inMM Capital will be funding the acquisition and distribution of feature length motion pictures through Netflix, Sony and HBO.

- One Key Entertainment co-assigns the rights of each film purchased from 1inMM Capital, proceeds to 1inMM Capital, for the length of the licensing period (10-15 years)

Exhibit 28 Page 351

# PARTNERSHIP: One Key Entertainment

# 1inMMcapital

## Zach Horwitz

- Independent thinker with a creative vision.

- Graduated from Indiana University and began his Doctoral Degree in Industrial/Organizational Business Psychology at The University of Chicago.

- Founded the fitness driven lifestyle brand FÜL. He took FÜL from inception to a multi-million dollar, multi-pronged fitness brand in less than 24 months. What started as a fast-casual restaurant with a healthy twist soon turned into seven locations throughout the Chicago area (including Protein Bar locations); FÜL fitness apparel sold in Target, Dick's Sporting Goods and Sports Authority; fitness supplements sold at GNC; and an urban FÜL Bag line. Horwitz sold a majority share to venture capitalists.

- Horwitz began working in the film industry with distribution and acquisitions after co-founding 1inMM Productions LLC with key principles within the venture capital landscape. Through these relationships Horwitz has worked to developed strategic partnerships, both domestically and Internationally, in which he has created a revolutionary acquisition and distribution output model.

- Driven, passionate negotiator.

- While attending ▮▮▮▮▮▮▮▮▮▮▮ arning his business degree, he came in on the ground floor to help establish Washington State's premiere wholesale and off-market property firm, Invest ▮▮▮▮

- High performing sales veteran who worked for prestigious companies including ▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

- Successfully negotiated and closed a deal with the studio ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

- ▮▮▮ partnered with Horwitz in May of 2012, where together they have successfully established 1inMM Productions as a leader in the industry.

Exhibit 28 Page 352

# THE TEAM: Executive Profiles

# 1inMMcapital

- Veteran in the business of distribution and acquisitions for Latin America. With over three decades of experience, his knowledge of the industry is unsurpassable.



- Innovative Producer with a fresh approach.

- Degrees in Business Administration and Film & Digital Studies

- Worked the film festival circuit, acquiring American content for Latin America and creating great relationships with distribution companies world-wide.

- Attends major film markets as a sales agent to acquire products to distribute worldwide.

- In 2012, ▮▮▮ partnered up with Zach Horwitz ▮▮▮ and 1inMM Productions with the goal to distribute American films to Latin America.

Exhibit 28 Page 353

# THE TEAM: Executive Profiles

# 1inMMcapital

Film distribution is the process of taking a completed feature length motion picture and placing it in and/or on platforms that allow the general public to view the finished production.



MULTIPLE WINDOWS OF DISTRIBUTION

| THEATRICAL | DVD | VOD | BASIC CABLE |
|---|---|---|---|
| • View the film in a movie theatre | • Buy a disc and watch it at home | • Video on Demand, Pay to "rent" it through your cable box, iTunes, Netflix, Hulu, Roku or any other transaction driven device or platform | • Wait for it to be "premiered" on a network such as ABC or TBS |

- Once a feature length motion picture is finished, the producer and/or financier/s of that film own the worldwide rights BUT they must sell these rights in order to recoup their investment of the film.
- Producers and/or financiers work with foreign sale agents to sell the rights of their film to each territory in the world in order to begin to recoup their investment.
- The foreign sales company then work with distributors, both foreign and domestic, in order to sell the right to distribute this film in each distributors given territory.
- Once these rights are sold to each distributor, that distributor then is able to release the film through the output deals that each distributor has in place in some or all windows of distribution.
- Thus, allowing the general public to view the same film, usually dubbed into different languages, all across the globe.

Exhibit 28 Page 354

# FEATURE FILM DISTRIBUTION: The Basics

# 1inMMcapital

- Representatives from 1inMM Capital travel to each major film market throughout the year in search of feature length films that meet the criteria for each output deal (Netflix, Sony, HBO).

SEARCH

- The title is then immediately sold to the selected output deal for the pre-negotiated licensing fee.

TITLE IS SOLD TO OUTPUT DEAL

STRATEGIC CONNECTIONS

- Through strategic connections within the industry, specifically foreign sales agents, meetings are set up at each market to discuss a plethora of films that meet the criteria of the output deals.



- If the profit margin meets 1inMM Capital's standards, a deal is closed with the Foreign Sales representative and the rights to distribute the given title is transferred to 1inMM Capital for the licensing period negotiated (10-15 years).

OBTAIN RIGHTS TO DISTRIBUTE

OUTREACH TO PLATFORMS

NEGOTIATIONS

- Once the films are narrowed down, 1inMM Capital representatives reach out to Netflix, Sony and HBO to obtain a letter of intent from each platform verifying that they will accept the titles in question and get the exact price that each platform will pay for the licensing of the title.

Exhibit 28 Page 355

- Once 1inMM Capital representatives have the letter of intent and licensing fee that will be paid per title/per output deal, the negotiations with the foreign sales agents begin



# WHAT WE DO: The Process

# EXHIBIT 29

| From: | Zach Horwitz |
|---|---|
| To: | Ryan Spiegel; Jeff Spiegel; craig cole |
| Subject: | Good News... Annoying News... |
| Date: | Friday, March 12, 2021 5:47:32 PM |

Hey Guys -

Good news and annoying news. Good news is that we heard back that we will have an "execute-able" amendment by mid-next week that reflects a release of funds by April 9th (at the latest) and that they will agree to a "non-refundable" good faith deposit (already followed up to clarify the amount of this deposit) at a mutually agreed upon law firm or CAA's escrow account that will be released to us if ANYTHING outside of the amendment happens. The annoying news is that we do not have that amendment in hand today.

Please let me know if you have any questions and I will do my best to answer. If you would like to jump on a call to discuss anything prior to receiving the amendment... just let us know and we will find a time.

Thank you and will be in touch with any further details if/as they come.

*Zach Horwitz*
*Co-Founder | Managing Partner*
*www.1inMM.com*
*Zach@1inMM.com*

*CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it contains confidential information that is legally privileged. This e-mail and any files transmitted with it are intended solely for the use of the individual or entity to whom they are addressed. If the reader of this e-mail is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any use, dissemination, forwarding, printing or copying of this e-mail or any attachments hereto is strictly prohibited. If you have received this e-mail in error please contact 1nMM Productions.*

Exhibit 29 Page 356

# EXHIBIT 30

## AIN: 4309-010-011

### INFORMATION REQUESTED: PAYMENT RECORDS FROM 2017 TO CURRENT

| DATE RECEIVED | CHECK NO. | INSTALLMENT AMOUNT | PAYMENT AMOUNT | MADE BY | PAYMENT METHOD | APPLIED TO | PENALTY AMOUNT | ADDITIONAL REMARKS |
|---|---|---|---|---|---|---|---|---|
| 11/30/20 | 80138547 | $36,027.56 | $36,027.56 | SLS | CHECK | 2020-000 1ST INSTALLMENT | | Refund of $18,013.78 as it was overpaid. Refunded to same as payee. |
| 12/09/20 | | $36,027.56 | $18,013.78 | ZACHARY HORWITZ 9615 BOLTON RD. LOS ANGELES, CA 90034 | ELECTRONIC | 2020-000 1ST INSTALLMENT | | PARTIAL PAYMENT |
| 03/31/20 | 7013 | $34,575.29 | $34,575.29 | NORTH AMERICAN TITLE COMPANY 00 | CHECK | 2019-000 2ND INSTALLMENT | | |
| 01/10/20 | 2574 | $38,032.81 | $38,032.81 | NORTH AMERICAN TITLE COMPANY 00 | CHECK | 2019-000 1ST INSTALLMENT | $3,457.52 | |
| 11/01/19 | | $22,274.22 | $22,274.22 | ZACHARY HORWITZ 9615 BOLTON RD. LOS ANGELES, CA 90034 | ELECTRONIC | 2018-010 SUPPLEMENTAL 2ND INSTALLMENT | $2,034.02 | |
| 04/01/19 | | $20,240.22 | $20,240.22 | ZACHARY HORWITZ 9615 BOLTON RD. LOS ANGELES, CA 90034 | ELECTRONIC | 2018-010 SUPPLEMENTAL 1ST INSTALLMENT | | |
| 04/01/19 | | $13,983.71 | $13,983.71 | ZACHARY HORWITZ 9615 BOLTON RD. LOS ANGELES, CA 90034 | ELECTRONIC | 2018-000 2ND INSTALLMENT | | |
| 11/05/18 | | $13,983.71 | $13,983.71 | ZACHARY HORWITZ 9615 BOLTON RD. LOS ANGELES, CA 90034 | ELECTRONIC | 2018-000 1ST INSTALLMENT | | |

Exhibit 30 Page 357

## AIN: 4309-010-011

### INFORMATION REQUESTED: PAYMENT RECORDS FROM 2017 TO CURRENT

| DATE RECEIVED | CHECK NO. | INSTALLMENT AMOUNT | PAYMENT AMOUNT | MADE BY | PAYMENT METHOD | APPLIED TO | PENALTY AMOUNT | ADDITIONAL REMARKS |
|---|---|---|---|---|---|---|---|---|
| 11/01/19 | | $5,522.22 | $5,522.22 | ZACHARY HORWITZ 9615 BOLTON RD. LOS ANGELES, CA 90034 | ELECTRONIC | 2017-010 SUPPLEMENTAL 2ND INSTALLMENT | | |
| 04/01/19 | | $5,011.12 | $5,011.12 | ZACHARY HORWITZ 9615 BOLTON RD. LOS ANGELES, CA 90034 | ELECTRONIC | 2017-010 SUPPLEMENTAL 1ST INSTALLMENT | | |
| 03/30/18 | 316018 | $13,741.95 | $13,741.95 | EQUITY TITLE COMPANY ████████ LO█ | CHECK | 2017-000 2ND INSTALLMENT | | |
| 12/02/17 | | $13,741.95 | $13,741.95 | | ELECTRONIC | 2017-000 1ST INSTALLMENT | | |

Page 2 of 2

Exhibit 30 Page 358

# EXHIBIT 31

**Secretary of State**
**Articles of Organization**
Limited Liability Company (LLC)

**LLC-1**

2 0 1 7 2 2 9

**FILE**
Secretary of
State of Cal

AUG 1 4

**IMPORTANT** — Read instructions before completing this form.

**Filing Fee** – $70.00

**Copy Fees** – First page $1.00; each attachment page $0.50; Certification Fee - $5.00

*Note:* LLCs may have to pay minimum $800 tax to the California Franchise Tax Board each year. For more information, go to *https://www.ftb.ca.gov.*

ICU **This Space For Offi**

**1. Limited Liability Company Name** (See Instructions – Must contain an LLC ending such as LLC or L.L.C. "LLC" will be

Vausse Films, LLC

**2. Business Addresses**

| a. Initial Street Address of Designated Office in California - Do not enter a P.O. Box | City (no abbreviations) | State |
|---|---|---|
| | Encino | CA |
| b. Initial Mailing Address of LLC, if different than item 2a | City (no abbreviations) | State |
| | | |

**3. Service of Process** (Must provide either Individual OR Corporation.)

INDIVIDUAL – Complete Items 3a and 3b only. Must include agent's full name and California street address.

| a. California Agent's First Name (if agent is not a corporation) | Middle Name | Last Name | |
|---|---|---|---|
| Randal | | O'Connor | |
| b. Street Address (if agent is not a corporation) - Do not enter a P.O. Box | City (no abbreviations) | | State |
| | Encino | | CA |

CORPORATION – Complete Item 3c. Only include the name of the registered agent Corporation.

| c. California Registered Corporate Agent's Name (if agent is a corporation) – Do not complete Item 3a or 3b |
|---|
| |

**4. Management** (Select only one box)

The LLC will be managed by:

(●) One Manager    ( ) More than One Manager    ( ) All LLC Member(s)

**5. Purpose Statement** (Do not alter Purpose Statement)

The purpose of the limited liability company is to engage in any lawful act or activity for which a limited may be organized under the California Revised Uniform Limited Liability Company Act.

**6. The information contained herein, including in any attachments, is true and correct.**

Brett Cravatt
Print your name here

LLC-1 (REV 04/2017)

2017 California S
www.sos.ca.g

Exhibit 31 Page 359

# EXHIBIT 32

## ENTITY INFORMATION

### ENTITY INFORMATION

**Entity Name:**

MOVIE FUND LLC

**Entity Number:**

E0447472017-7

**Entity Type:**

Domestic Limited-Liability Company (86)

**Entity Status:**

Default

**Formation Date:**

09/20/2017

**NV Business ID:**

NV20171602011

**Termination Date:**

Perpetual

**Annual Report Due Date:**

9/30/2020

**Series LLC:**

☐

**Restricted LLC:**

☐

Exhibit 32 Page 360

## REGISTERED AGENT INFORMATION

**Name of Individual or Legal Entity:**

JAMES T. RUSSELL

**Status:**

Active

**CRA Agent Entity Type:**

**Registered Agent Type:**

Non-Commercial Registered Agent

**NV Business ID:**

**Office or Position:**

**Jurisdiction:**

**Street Address:**

███████████████████████

**Mailing Address:**

**Individual with Authority to Act:**

**Fictitious Website or Domain Name:**

## OFFICER INFORMATION

☐ VIEW HISTORICAL DATA

| Title | Name | Address | Last Updated | Status |
|-------|------|---------|--------------|--------|
| Managing Member | JAMES T RUSSELL | ████████████ 89101, USA | 09/21/2017 | Active |

Exhibit 32 Page 361

**Page 1 of 1, records 1 to 1 of 1**

Filing History          Name History          Mergers/Conversions

Return to Search          Return to Results

Exhibit 32 Page 362

# EXHIBIT 33

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
### FORM D

### Notice of Exempt Offering of Securities

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden hours per response: | 4.00 |

### 1. Issuer's Identity

CIK (Filer ID Number)          Previous Names  [X] None

0001655037

Name of Issuer

JJMT CAPITAL, LLC

Jurisdiction of Incorporation/Organization

DELAWARE

Year of Incorporation/Organization

[ ] Over Five Years Ago
[X] Within Last Five Years (Specify Year) 2015
[ ] Yet to Be Formed

Entity Type

[ ] Corporation
[ ] Limited Partnership
[X] Limited Liability Company
[ ] General Partnership
[ ] Business Trust
[ ] Other (Specify)

### 2. Principal Place of Business and Contact Information

Name of Issuer

JJMT CAPITAL, LLC

Street Address 1                    Street Address 2

████████████████               ██████████

| City | State/Province/Country | ZIP/PostalCode | Phone Number of Issuer |
|---|---|---|---|
| CHICAGO | ILLINOIS | 60642 | 616-336-6893 |

### 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| SCHWEINZGER | MATTHEW | |

Street Address 1                    Street Address 2

███████████████████          ██████

████          ████████/Country          ZIP/PostalCode

CHICAGO          ILLINOIS          60607

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Exhibit 33 Page 363

Clarification of Response (if Necessary):

MANAGING MEMBER

| Last Name | First Name | Middle Name |
|---|---|---|
| DEALTERIS | JOSEPH | |

Street Address 1                Street Address 2

██████████████        ██████████

██████

CHICAGO              ILLINOIS                ZIP/PostalCode
                                             60614

Relationship: [X] Executive Officer  [ ] Director  [ ] Promoter

Clarification of Response (if Necessary):

MANAGING MEMBER

| Last Name | First Name | Middle Name |
|---|---|---|
| WUNDERLIN | JACOB | |

Street Address 1                Street Address 2

██████████████

City                State/Province/Country        ZIP/PostalCode
CHICAGO              ILLINOIS                      60657

Relationship: [X] Executive Officer  [ ] Director  [ ] Promoter

Clarification of Response (if Necessary):

MANAGING MEMBER

## 4. Industry Group

[ ] Agriculture

Banking & Financial Services
- [ ] Commercial Banking
- [ ] Insurance
- [ ] Investing
- [ ] Investment Banking
- [ ] Pooled Investment Fund

  Is the issuer registered as an investment company under the Investment Company Act of 1940?

  [ ] Yes     [ ] No

- [X] Other Banking & Financial Services

[ ] Business Services

Energy
- [ ] Coal Mining

Health Care
- [ ] Biotechnology
- [ ] Health Insurance
- [ ] Hospitals & Physicians
- [ ] Pharmaceuticals
- [ ] Other Health Care

[ ] Manufacturing

Real Estate
- [ ] Commercial
- [ ] Construction
- [ ] REITS & Finance
- [ ] Residential
- [ ] Other Real Estate

[ ] Retailing

[ ] Restaurants

Technology
- [ ] Computers
- [ ] Telecommunications
- [ ] Other Technology

Travel
- [ ] Airlines & Airports
- [ ] Lodging & Conventions
- [ ] Tourism & Travel Services
- [ ] Other Travel

[ ] Other

Exhibit 33 Page 364

☐ Electric Utilities

☐ Energy Conservation

☐ Environmental Services

☐ Oil & Gas

☐ Other Energy

## 5. Issuer Size

| Revenue Range | OR | Aggregate Net Asset Value Range |
|---|---|---|
| ☐ No Revenues | | ☐ No Aggregate Net Asset Value |
| ☐ $1 - $1,000,000 | | ☐ $1 - $5,000,000 |
| ☐ $1,000,001 - $5,000,000 | | ☐ $5,000,001 - $25,000,000 |
| ☐ $5,000,001 - $25,000,000 | | ☐ $25,000,001 - $50,000,000 |
| ☐ $25,000,001 - $100,000,000 | | ☐ $50,000,001 - $100,000,000 |
| ☐ Over $100,000,000 | | ☐ Over $100,000,000 |
| ☒ Decline to Disclose | | ☐ Decline to Disclose |
| ☐ Not Applicable | | ☐ Not Applicable |

## 6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)

☐ Investment Company Act Section 3(c)

☐ Rule 504(b)(1) (not (i), (ii) or (iii))

☐ Rule 504 (b)(1)(i)

☐ Rule 504 (b)(1)(ii)

☐ Rule 504 (b)(1)(iii)

☒ Rule 506(b)

☐ Rule 506(c)

☐ Securities Act Section 4(a)(5)

☐ Section 3(c)(1)          ☐ Section 3(c)(9)
☐ Section 3(c)(2)          ☐ Section 3(c)(10)
☐ Section 3(c)(3)          ☐ Section 3(c)(11)
☐ Section 3(c)(4)          ☐ Section 3(c)(12)
☐ Section 3(c)(5)          ☐ Section 3(c)(13)
☐ Section 3(c)(6)          ☐ Section 3(c)(14)
☐ Section 3(c)(7)

## 7. Type of Filing

☐ New Notice   Date of First Sale 2015-11-20   ☐ First Sale Yet to Occur
☒ Amendment

## 8. Duration of Offering

Does the Issuer intend this offering to last more than one year?   ☒ Yes   ☐ No

Exhibit 33 Page 365

## 9. Type(s) of Securities Offered (select all that apply)

☐ Equity

☒ Debt

☐ Option, Warrant or Other Right to Acquire Another Security

☐ Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security

☐ Pooled Investment Fund Interests

☐ Tenant-in-Common Securities

☐ Mineral Property Securities

☐ Other (describe)

## 10. Business Combination Transaction

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer?   ☐ Yes ☒ No

Clarification of Response (if Necessary):

## 11. Minimum Investment

Minimum investment accepted from any outside investor $10,000 USD

## 12. Sales Compensation

Recipient

(Associated) Broker or Dealer ☒ None

Street Address 1

City

Recipient CRD Number ☒ None

(Associated) Broker or Dealer CRD Number ☒ None

Street Address 2

State/Province/Country

ZIP/Postal Code

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States   ☐ All States   ☐ Foreign/non-US

## 13. Offering and Sales Amounts

Total Offering Amount           USD  or ☒ Indefinite

Total Amount Sold        $216,236,725 USD

Total Remaining to be Sold          USD  or ☒ Indefinite

Clarification of Response (if Necessary):

## 14. Investors

☐ Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering:   221

## 15. Sales Commissions & Finder's Fees Expenses

Exhibit 33 Page 366

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $0 USD ☐ Estimate

Finders' Fees $0 USD ☐ Estimate

Clarification of Response (if Necessary):

## 16. Use of Proceeds

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$0 USD ☐ Estimate

Clarification of Response (if Necessary):

## Signature and Submission

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*

- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of:  (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.

- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Rule 504 or Rule 506 for one of the reasons stated in Rule 504(b)(3) or Rule 506(d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| | | | | |

Exhibit 33 Page 367

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| JJMT CAPITAL, LLC | Joseph Dealteris | Joseph Dealteris | MANAGING MEMBER | 2019-03-14 |

*Persons who respond to the collection of information contained in this form are not required
to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Sec ion 102(a) of  he National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416
(Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securi ies  hat are the subject of this Form D are "covered securities" for
purposes of NSMIA, whe her in all instances or due to the nature of the offering that is the subject of this Form D, States cannot rou inely require offering materials
under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud
authority.

Exhibit 33 Page 368

# EXHIBIT 34

## ⊟ Location Information

**9615 BOLTON RD, LOS ANGELES, CA 90034-0104**

| | |
|---|---|
| **Latitude:** | 34.045220 |
| **Longitude:** | -118.397399 |
| **MSA Number:** | 4480 |
| **MSA Description:** | Los Angeles-Long Beach, CA |

## ⊟ Address Variations - 1 records found

| No. | Address |
|---|---|
| 1 | 9615 BOLTON RD<br>LOS ANGELES, CA 90034-1041 |

## ⊟ APN(s) - 1 records found

| No. | Number |
|---|---|
| 1 | 4309-010-011 |

## ⊟ Property Information - 2 records found

**No. 1**

| | |
|---|---|
| **Legal Description:** | TRACT # 13492 LOT 10 |
| **Land Usage:** | SFR |
| **Tax Year:** | 2019 |
| **Data Source:** | A |
| | *Property Sale Information* |
| **Sale Date:** | 02/24/2020 |
| **Sale Price:** | $5,712,500.00 |
| | *Mortgage Information* |
| **Lender:** | 5TH STREET CAP INC 5TH STREET CAP INC |
| **Loan Type:** | CONVENTIONAL |
| **Loan Amount:** | $4,095,000.00 |
| **Term Of Loan:** | 03/01/2060 |
| | *Assessment Information* |
| **Assessed Land Value:** | $4,080,000.00 |
| **Assessed Improvement Value:** | $1,746,750.00 |
| **Assessed Total Value:** | $5,826,750.00 |

**No. 2**

| | |
|---|---|
| **Legal Description:** | TRACT # 13492 LOT 10 |
| **Tax Year:** | 2020 |
| **Data Source:** | B |
| | *Property Sale Information* |
| **Sale Date:** | 02/13/2018 |
| **Sale Price:** | $5,715,227.00 |
| | *Assessment Information* |
| **Assessed Land Value:** | $4,161,600.00 |
| **Assessed Improvement Value:** | $1,781,685.00 |
| **Assessed Total Value:** | $5,943,285.00 |

Exhibit 34 Page 369

# EXHIBIT 35



Sign In



Enjoy unlimited streaming on Prime Video Start your 30-day free trial today



# Zach Avery (I)

Actor | Music Department



2:10 | Trailer       2 VIDEOS | 47 IMAGES

View Resume | Official Photos »

Zach Avery is known for his work on Last Moment of Clarity (2020), The White Crow (2018) and Farming (2018). See full bio »

More at IMDbPro »

📞 Contact Info: View agent, publicist, legal on IMDbPro

## Photos



47 photos | 2 videos »

## Quick Links

Biography              Filmography (by Job)
Awards                 Trailers and Videos
Photo Gallery

**Explore More**

## Here's What to Watch in April



Discover something for everyone this month with some choice picks for the best movies and TV to stream in April.

Watch the video »

**Share** this page:

## 2021 Oscar Nominees In and Out of Character



Check out our gallery of the 2021 Oscar nominees in the leading and supporting acting categories, as the characters they so brilliantly played and in real life.

See the full gallery »

## Known For



| Last Moment of Clarity | The White Crow | Farming | Fury |
|---|---|---|---|
| Sam Pivnic (2020) | Michael Jones (2018) | Officer Martin Fellows (2018) | SS Medic (2014) |

## Filmography

▲ Hide all | Show by… ▾ | Edit

Jump to: Actor | Music department

**Actor** (15 credits)                                    Hide ▲

Gateway (*post-production*)                                2021
Mike

                                                          2021

Exhibit 35 Page 370



**The Devil Below**
Jaime

**You're Not Alone** — 2020
Mark

**Last Moment of Clarity** — 2020
Sam Pivnic

**Farming** — 2018
Officer Martin Fellows

**The White Crow** — 2018
Michael Jones

**Trespassers** — 2018
Joseph

**Curvature** — 2017
Alex

**The Laughing Man** (Short) — 2016
Laughing Man

**Fury** — 2014
SS Medic (uncredited)

**Shifter** (Short) — 2014/I
Striker

**Nameless** (Short) — 2013/II
Basketball Player

**Feign** (Short) — 2012
Demon 3

**Game Time** — 2011/I
Rich Hanger

**G.E.D.** — 2009
Thug

**Music department** (1 credit)                     Hide ▲

**Columbia Tonight** (TV Series) (musician - 2 episodes) — 2016-2017
- Episode #1.2 (2017) ... (musician)
- Episode #1.1 (2016) ... (musician)

## Related Videos



## Personal Details                                  Edit

**Height:** 6' (1.83 m)

## Did You Know?                                      Edit

**Trivia:** Played football for Indiana University until an injury ended his NFL dreams. After graduating he entered the Doctoral program at the Chicago School of Professional Psychology.

## Contribute to This Page          Getting Started | Contributor Zone »

Edit page



### Related News

**'You're Not Alone' DVD Review**
23 March 2021 | Nerdly

**Movie Review – Last Moment of Clarity (2021)**
09 March 2021 | Flickeringmyth

**Watch an Exclusive "Purgatory" Clip from The Devil Below**
04 March 2021 | DailyDead

See all related articles »

### Around The Web          Powered by Taboola

Recalculate Your 2021 Virginia House Payment In A Few Steps
Quicken Loans NMLS# 3030

All Virginia Drivers Should Claim This (Check if You Qualify)
Comparisons.org

Virginia Homeowners Can Now Get Paid To Install Solar + Battery For No Cost At Install
Powerhome Solar

Green Data Centers, Powered by Intel®. Click to Learn More
Wall Street Journal for SuperMicro



### On Prime Video

Farming                          Watch Now
Fury                             Watch Now
Last Moment of Clarity           Watch Now
The White Crow                   Watch Now

See more on Prime Video »

### Watch on TV

**The White Crow**
Fri, Apr 02 12:44 AM PDT on STZCI (585)

**The White Crow**
Fri, Apr 02 9:46 AM PDT on STZCI (585)

Explore more on IMDb TV »

Exhibit 35 Page 371

# EXHIBIT 36



**This page is part of your document - DO NOT DISCARD**



# 20180298496



**Pages:
0004**

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

**03/29/18 AT 08:00AM**

| | |
|---|---|
| FEES: | 27.00 |
| TAXES: | 31,990.00 |
| OTHER: | 0.00 |
| PAID: | 32,017.00 |



**L E A D S H E E T**



201803290130002

**00015054713**



008989299

**SEQ:
02**

DAR - Title Company (Hard Copy)



**THIS FORM IS NOT TO BE DUPLICATED**

E536013

T15

Exhibit 36 Page 372

RECORDING REQUESTED BY:
Equity Title Company

AND WHEN RECORDED MAIL TO:

Leslie Klinger
9615 Bolton Road
Los Angeles, CA 90034



03/29/2018

*20180298496*

THIS SPACE FOR RECORDER'S USE ONLY

Title Order No.: LA1830133                                Escrow No.: 02-028786-GH

## GRANT DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S)

**DOCUMENTARY TRANSFER TAX is $6,283.75**
**CITY TRANSFER TAX $25,706.25**

[X] computed on full value of property conveyed, or
[ ] computed on full value less value of liens or encumbrances remaining at time of sale.
[ ] Unincorporated area    [X]  City of Los Angeles **AND**

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

█████████████████████████████████

hereby GRANT(s) to:

**Leslie Klinger, Trustee of The MJLZ Trust Dated January 30, 2018**

the real property in the City of Los Angeles, County of Los Angeles, State of California,
described as:
LEGAL DESCRIPTION ATTACHED HERETO AS EXHIBIT "A" AND MADE A PART
HEREOF

Also Known as:  9615 Bolton Road, Los Angeles, CA  90034
AP#: 4309-010-011

**DATED: February 13, 2018**

**Signature Page attached hereto**
**and made a part hereof**

MAIL TAX STATEMENTS TO PARTY SHOWN BELOW, IF NO PARTY SHOWN, MAIL AS DIRECTED ABOVE

Exhibit 36 Page 373

Title Order No . LA1830133
Escrow No   02-028786-GH

A.P. # 4309-010-011

**Signature Page**



A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA

COUNTY OF _LOS Angeles_

On _2/13/2018_                     before me,                                              A Notary Public personally

                                                                                         who proved to me on the
basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged
to me that he/she/they executed the same in his/her/their authorized capacity(ies) and that by his/her/their signature(s) on the
instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.
I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and
correct.
WITNESS my hand and official seal.

MAIL TAX STATEMENTS TO PARTY SHOWN BELOW, IF NO PARTY SHOWN, MAIL AS SHOWN

Exhibit 36 Page 374

ORDER NO. LA1830133

## EXHIBIT "A"

LOT 10 OF TRACT NO. 13492, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 297, PAGES 48 AND 49 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT THEREFROM ANY AND ALL RIGHT, TITLE AND INTEREST IN AND TO THE SUBSURFACE MINERAL ESTATE, LYING IN OR UNDER SAID LAND BELOW A DEPTH OF 500 FEET FROM THE SURFACE THEREOF WITHOUT, HOWEVER, THE RIGHT TO ENTER THE SURFACE OF SAID LAND OR ANY PORTION OF SUB-SURFACE OF SAID LAND ABOVE A DEPTH OF 500 FEET, AS CONVEYED IN THE QUITCLAIM DEED RECORDED FEBRUARY 25, 2013 AS INSTRUMENT NO. 20130284274, OF OFFICIAL RECORDS.

**\*\*\*END OF LEGAL DESCRIPTION\*\*\***

Exhibit 36 Page 375