FILED
CLERK, U.S. DISTRICT COURT

APR - 5 2021

CENTRAL DISTRICT OF CALIFORNIA
BY:          RS          DEPUTY

1  KATHRYN C. WANNER (Cal. Bar No. 269310)
   Email:  wannerk@sec.gov
2  M. LANCE JASPER (Cal. Bar No. 244516)
   Email:  jasperml@sec.gov
3
   Attorneys for Plaintiff
4  Securities and Exchange Commission
   Michele Wein Layne, Regional Director
5  Alka N. Patel, Associate Regional Director
   Amy J. Longo, Regional Trial Counsel
6  444 S. Flower Street, Suite 900
   Los Angeles, California 90071
7  Telephone: (323) 965-3998
   Facsimile: (213) 443-1904
8

9               UNITED STATES DISTRICT COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11

12  SECURITIES AND EXCHANGE          Case No.  **2:21-CV-02927-CAS-GJSx**
    COMMISSION,
13                                   **DECLARATION OF BRETT**
14            Plaintiff,             **CRAVATT**

15       vs.

16  ZACHARY J. HORWITZ; AND          **(FILED UNDER SEAL)**
    1INMM CAPITAL, LLC,
17
              Defendants.
18

19

20

21

22

23

24

25

26

27

28

# BRETT CRAVATT DECLARATION

I, Brett Cravatt, declare pursuant to 28 U.S.C. 1746 as follows:

1.      I have personal knowledge of the matters set forth herein, except as otherwise noted, and, if called as a witness, I could and would competently testify under oath to the facts stated herein.

2.      I currently reside in Manhattan Beach, California.  In approximately 2017, while I was still residing in Manhattan Beach, I was looking for investment opportunities.

3.      In approximately July of 2017, I was introduced to Zach Horwitz through Jason Page.  I knew Mr. Page for a few years having first met him at a charity event in Napa Valley in May of 2016.  My wife and I donated $25,000 to the "Do it for the Love" charity of which Laura Page, Mr. Page's wife, sat on the board.  We met each other at the event and became friends thereafter.  As we got to know each other better over the course of the next year, Mr. Page described a business opportunity to me with Mr. Horwitz and invited me to participate on a call with Mr. Horwitz to learn more.

4.      Before I made any investments, I had an initial call, on or about June 2017, wherein Mr. Horwitz presented me with the investment opportunity.  Mr. Horwitz identified himself and explained that he was the owner/principal of 1inMM, which had licensed movies for distribution in Latin America to HBO and Netflix and other companies like them.  He said he had long-standing relationships

CRAVATT DECLARATION

with both HBO and Netflix and had a successful track record using investor funds to purchase Latin America distribution rights in specific movie titles and then licensing those distribution rights to HBO and Netflix at a significant markup.  Mr. Horwitz said all of his investors had received the investment returns he initially said they would receive.  Mr. Horwitz described these investments as having limited-to-no risk because out of the hundreds and hundreds of movies he and his investors had purchased rights to, HBO elected to purchase the rights to all but four of the movies.  For the four movies HBO declined to purchase rights to, Mr. Horwitz told me he paid back his investors their principal.  Mr. Horwitz told me that HBO had a need for titles in the Latin America marketplace and had consistently paid him and his investors to acquire titles for the Latin America marketplace.  During the call, I noted that Mr. Horwitz was calling from his cell phone number (773) 724-0290.

5.     I had additional telephone conversations with Mr. Horwitz while I was located in Manhattan Beach, and subsequent to investing met with Mr. Horwitz and Mr. Page in person twice.  The first time was at Catch restaurant in Los Angeles and included our respective wives, and I recognized Mr. Horwitz's voice from our earlier telephone calls.  We met again near the end of 2019 at Boa steakhouse in Los Angeles with Mr. Page, where Mr. Horwitz assured me that HBO was simply late on a few payments and would be paying everything that is due within a few weeks.

CRAVATT DECLARATION

6.     I decided to invest with Mr. Horwitz for two reasons.  First, I was familiar with HBO as a company with more than enough financial resources to pay for titles that it acquires from 1inMM.  I believed that if HBO was involved, my investment was safe.  Second, Mr. Horwitz represented the investment opportunity as essentially risk-free, given HBO's appetite for product in the Latin America marketplace, the prices that HBO is willing to pay for Latin America distribution rights, and the long-standing successful track record Mr. Horwitz had with HBO.

7.     My initial investment, through my entity Vausse Films, in partnership with Mr. Page, was on August 3, 2017 and was paid on a timely basis, increasing my confidence in the arrangement with Mr. Horwitz.

8.     Later, I continued to co-invest, through my entity, Vausse Films, with Mr. Page.  Mr. Page, through his entity, Pure Health, and I, through my entity, Vausse Films, entered into a series of partnership agreements, beginning on May, 29, 2019, to provide the financing proposed by Mr. Horwitz for 12 titles.  A true and correct copy of an exemplar partnership agreement between Vausse Films and Pure Health is attached as Exhibit 1.

9.     In total, I invested with Mr. Horwitz for the acquisition of 34 titles.

10.     For each of the titles I invested in, Mr. Horwitz began the process by providing me with a list of potential movies available for investment.  The lists provided by Mr. Horwitz included the movie title and description, the price for the distribution rights, the duration of the investment, the mark-up to be paid by HBO,

CRAVATT DECLARATION

and the funding date.  A true and correct copy of an example of such a list is attached as Exhibit 19.

11.     For each investment, Mr. Horwitz then issued a promissory note in exchange for the investment through his entity, 1inMM.  A true and correct copy of an exemplar note, issued to Pure Health, on the title "Run with the Hunted," is attached as Exhibit 3.

12.     For each deal, approximately one or two weeks after Mr. Horwitz represented that the distribution rights had been purchased, Mr. Horwitz provided me with an executed single picture distribution agreement between HBO and 1inMM, which purportedly related to the specific picture I had invested in.  A true and correct copy of an exemplar single picture distribution agreement for the title "Run with the Hunted" between HBO Holdings, Inc. and 1inMM Capital LLC is attached as Exhibit 2.

13.     On November 29, 2019, Mr. Horwitz began failing to make payments on a timely basis.

14.     Mr. Horwitz represented that he was unable to pay on time due to HBO's own breach of the various agreements that it had with 1inMM, had told me he intended to sue HBO, but then represented to me that 1inMM and HBO were able to conclude a consolidated distribution agreement, combining the outstanding single picture distribution agreements, pursuant to which HBO would immediately remedy its past due payments owing to 1inMM.  A true and correct copy of the

CRAVATT DECLARATION

alleged executed non-binding HBO term sheet, on HBO letterhead, is attached as

Exhibit 4.  I obtained a copy of this document from Mr. Horwitz.  A true and

correct copy of the alleged draft long form Distribution Agreement with HBO is

attached as Exhibit 5, a true and correct copy of a screenshot of a text message

conversation from Mr. Horwitz containing the alleged executed signature page of

the final agreement is attached as Exhibit 6, and a true and correct copy of an

extracted version from the text message conversation of the alleged executed

signature page of the final agreement is attached as Exhibit 7.  A true and correct

copy of the titles Mr. Horwitz represented had been licensed by 1inMM to HBO is

attached as Exhibit 8.  A true and correct copy of a screenshot of text messages with

Mr. Horwitz, wherein he quotes an alleged email from HBO, in which HBO asks

for a grace period of one week to remit payment for the payment due on October

15, 2020, is attached as Exhibits 9-11.  A true and correct copy of a screenshot of

text messages with Mr. Horwitz, wherein Mr. Horwitz quotes an email he

represents to have come from HBO's Business Affairs and CEO, in which HBO

again references the remittance of payment and further proposes the parties discuss

a new "business opportunity" is attached as Exhibits 12-13.

15.	In approximately October or November 2020, Mr. Horwitz represented

by text message that a collections account was established at Freeway

Entertainment, a collections account management company, wherein HBO

payments made under the terms of the consolidated distribution agreement would

CRAVATT DECLARATION

be paid and from which they would be disbursed.  He further represented that money had been deposited in that account on multiple occasions.  A true and correct copy of the draft long form Collection Account Management Agreement is attached as Exhibit 14.  A true and correct copy of a screenshot of text messages with Mr. Horwitz, wherein he claims the balance of the Freeway collection account is $29 million dollars is attached as Exhibit 15.  A true and correct copy of a screenshot sent by Mr. Horwitz allegedly representing the Freeway portal, corroborating Mr. Horwitz's claim of money on deposit, is attached as Exhibit 16, and a true and correct copy of the embedded screenshot of the portal is attached as Exhibit 17.  A true and correct copy of a screenshot of text messages with Mr. Horwitz, wherein he represents the balance in the collections account had increased to $68 million dollars, is attached as Exhibit 18.

16.     While Mr. Horwitz assured me payment would be forthcoming once the consolidated distribution agreement with HBO was consummated, he is still past due on 12 titles.

17.     Based on representations by Mr. Horwitz, I believe I am currently owed in excess of $12,000,000 dollars in combined principal and interest of which $8,000,955 is principal.

CRAVATT DECLARATION

1    I declare under penalty of perjury under the laws of the United States of

2    America that the foregoing is true and correct.

3        Executed this 1st day of March 2021 in St. Barths                    .

4

5                                    _____

6                                    BRETT CRAVATT

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                    - 7 -                    CRAVATT DECLARATION

# EXHIBIT 1

# PARTNERSHIP AGREEMENT
## OF ___WATCH LIST, RUN WITH THE HUNTED, ARCTIC___

This Partnership agreement ("Agreement") is entered into and effective as of  MAY 29 2019, by Pure Health and Vausse Films, each of whom shall be referred to individually as a "Partner" and together as the "Partners".

The Partners desire to form a General Partnership under the laws of the State of California for the purposes and on the terms and conditions stated in this Agreement.

1. **Formation**. By this Agreement, the Partners form a General Partnership ("Partnership") under the laws of the State of California, on the following terms and conditions.

2. **Name**. The name of the Partnership is __MOVIE FUNDING_.

3. **Chief Executive Office**. The Partnership's chief executive office and place of business shall be located at _2070A WEST LINCOLN AVE_, Napa, in Napa County, California. From time to time, the Partners may change the chief executive office and/or establish other offices in accordance with the terms and conditions of this Agreement.

4. **Term**. The Partnership shall begin on the date of this Agreement and shall continue for six (6) months from that date, unless extended by the Partners' unanimous consent, or alternatively, dissolved and terminated by mutual agreement of Partners holding at least 51 percent of the Partnership interests, or finally as otherwise provided for in this Agreement.

5. **Purposes**. The purposes of the Partnership will be to finance motion pictures, television programming, and audiovisual works for broadcast in any medium, and to do all things reasonably incidental to or in furtherance of this purpose.

6. **Partnership's Powers**. The Partnership is empowered to do any and all things necessary, appropriate, or convenient for the furtherance and accomplishment of its purposes and for the protection and benefit of the Partnership and its properties.

7. **Filings**. The Partners, or any one of them, on the Partnership's behalf, may sign and cause to be filed and published an appropriate fictitious business name statement under the California Fictitious Business Name Act within 40 days after the Partnership begins doing business, within 40 days after any subsequent change in its membership, and before the expiration of any previously filed statement. Each other Partner appoints Jason Page as their agent and attorney-in-fact to execute on his or her behalf any fictitious business name statement relating to this Partnership.

8. **Initial Contributions**. Each Partner shall initially contribute to the Partnership's capital the amount listed in Attachment A of this Agreement. Each Partner's contribution shall be paid in full within 30 days after the date of this Agreement.

9. **Failure to Contribute**. If any Partner fails to pay or convey his or her initial contribution to the Partnership's capital at the time and in the form and amount required by this

Exhibit 1
Page 8

Agreement, the Partnership shall immediately dissolve and each Partner who has paid or conveyed all or any portion of his or her initial contribution to the Partnership's capital shall be entitled to a return of the funds and properties that he or she contributed. If the Partners shall have entered into a written agreement requiring an alternative procedure for continuing the Partnership, however, that alternative procedure shall be followed.

10. **No Withdrawal of Capital**. No Partner may withdraw capital from the Partnership without the consent of all the Partners.

11. **No Interest on Contributions**. No Partner shall be entitled to receive any interest on his or her capital contribution, except that, if a Partner is entitled to repayment of his or her contribution, the Partner shall be entitled to interest on the contribution not repaid at the rate of 10 percent per annum from the date when repayment should have been made.

12. **Loans to Partnership**.
   a. No Partner shall lend or advance money to or for the Partnership's benefit without the approval of all of the Partners.
   b. If any Partner, with the requisite consent of the other Partners, lends any money to the Partnership in addition to his or her contribution to its capital, the loan shall be a debt of the Partnership to that Partner and shall bear interest at the rate of 10 percent per annum.
   c. This liability shall not be regarded as an increase in the lending Partner's capital and shall not entitle the lending Partner to any increased share of the Partnership's profits.
   d. Any loan by a Partner to the Partnership shall be evidenced by a promissory note delivered to the lending Partner and executed in the name of the Partnership by the managing Partner.

13. **Division of Profits and Losses**. In the event that the Partnership's profits do not meet the required return to each Partners as listed in Attachment A of this Partnership Agreement, the Partnership's losses shall be allocated among the Partners in the same proportions as their percentage of return. If the Partnership's return falls below the principal capital contributions, the Finder Partners will not receive a return; and the Partnership's losses shall be allocated among the Producer Partners and the Silent Partners.

14. **Distribution of Profits**. The Partnership shall distribute to the Partners cash in proportion to their respective percentage of return as provided in Attachment A of this Agreement, unless the Partnership profits fall below the obligation set forth in this Agreement, any cash shall be disturbed in accordance with the above Section 13 of this Agreement.

15. **Fiscal Year**. The fiscal year of the Partnership shall be the calendar year.

16. **Accounting Method**. The Partnership books shall be kept on the cash basis.

17. **Maintenance of Capital Accounts**. An individual capital account shall be maintained for each Partner and the Partner's initial capital contribution in cash or property shall be credited to that account. Capital accounts shall be maintained in accordance with Treas

DocuSign Envelope ID: F0064A52-E853-4F06-AC4C-F534F12213FB

Reg §1.704-1(b)(2)(iv). No additional share of profits or losses shall inure to any Partner because of changes or fluctuations in the Partner's capital account.

**18. Adjustment of Capital Accounts.**

The capital account for each Partner shall be credited with or increased by the following:

**a.** Any additional capital contributions made by the Partner from time to time as authorized by this Agreement;

**b.** The Partner's share under this Agreement of the Partnership's profits; and

**c.** On the Partnership's dissolution and in its winding up, the credits authorized by the provisions of this Agreement that relate to adjustments of capital accounts in connection with liquidation.

The capital account for each Partner shall be debited with or reduced by the following:

**a.** Distributions to the Partner of cash or property, which property shall be valued for this purpose at its fair market value;

**b.** The Partner's share under this Agreement of the Partnership's losses and of any items then required under applicable tax laws, rules, and regulations to be debited to capital accounts of Partners, to the extent and in the manner so required; and

**c.** On the Partnership's dissolution and in its winding up, the debits authorized by the provisions of this Agreement that relate to adjustments of capital accounts in connection with liquidation.

In connection with the actual liquidation of the Partnership's properties on its dissolution and winding up, the capital account for each Partner shall be adjusted to reflect the following:

**a.** The results of operations for the fiscal period then ended;

**b.** The results of transactions in connection with the liquidation;

**c.** Unrealized gain or loss on Partnership property that is to be or has been transferred to creditors on account of their claims or distributed to Partners on account of their interests in the Partnership. The amount of such unrealized gain or loss shall be computed by comparing the fair market value of any such property to its adjusted basis for federal income tax purposes. The unrealized gain or loss shall be allocated to the Partners' capital accounts in the same manner as the gain or loss from the actual sale of such property would have been allocated; and

**d.** The distribution of cash or property to Partners made on the liquidation.

**19. Determination of Profit and Loss.** The Partnership's net profit or net loss for each fiscal year shall be determined as soon as practicable after the close of that fiscal year in accordance with the accounting principles employed in the preparation of the federal income tax return filed by the Partnership for that year, but without any special provisions for tax-exempt or partially tax-exempt income. If the Partnership assets include assets subject to Internal Revenue Code §704(c), the adjustments required under Internal Revenue Code §704(c) in the determination of any item of income, gain, loss, deduction, or credit shall not be taken into account in determining the same for book purposes.

Exhibit 1
Page 10

DocuSign Envelope ID: F0064A57E6F3-4F06-4C1C-E534E12213FB

20. **Profit and Loss Defined**. "Profit" and "loss" for all purposes of this Agreement shall be determined in accordance with the accounting method followed by the Partnership for Federal income tax purposes and otherwise in accordance with generally accepted accounting principles and procedures applied in a consistent manner. The calculation of profit and loss shall take into account Partnership income exempt from Federal income tax and Partnership expenses and costs not deductible or properly chargeable to capital for federal income tax purposes. Every item of income, gain, loss, deduction, credit, or tax preference entering into the computation of profit or loss shall be considered as allocated to each Partner in the same proportion as profit is allocated to that Partner for any year in which the Partnership operates at a profit, and in the same proportion as loss is allocated to that Partner for any year in which the Partnership operates at a loss. Any increase or reduction in the amount of any item of income, gain, loss, or deduction attributable to an adjustment to the basis of Partnership property made under a valid election under Internal Revenue Code §754 and under the corresponding provisions of applicable state and local income tax laws shall be charged or credited, as the case may be, and any increase or reduction in the amount of any item of credit or tax preference attributable to any such adjustment shall be allocated to the capital accounts of those Partners entitled to them under such code or laws.

21. **Partnership Books**. The Partnership shall keep proper and complete books of account of its business at its chief executive office. The Partnership shall provide its Partners and their agents and attorneys access to the books and records, and provide to former Partners and their agents and attorneys access to books and records pertaining to the period during which they were Partners. This right of access includes the opportunity to inspect and copy books and records during ordinary business hours. The Partnership may impose reasonable charges covering the cost of labor and material for copies of documents furnished. The accounting records shall be maintained in accordance with generally accepted bookkeeping practices for this type of business.

22. **Control of Business**. Each Partner shall participate in the control, management, and direction of the Partnership's business as listed below. In exercising this control, management, and direction, each Partner shall have the same vote as each other Partner.

    **a.** It is understood by the Partners that:

        **i.** "Producer" partners will manage the day-today tasks of the Partnership,

        **ii.** "Finder" partners will search for investment opportunities for the Partnership per the terms of the Purpose stated above.

        **iii.** "Silent" partners will solely contribute capital to the Partnership without handling any of its management.

    **b.** The Partners shall participate in the business of the Partnership as listed in Attachment A of this Agreement**.**

23. **Acts Requiring Consent of the other Partners**. The following acts may be done only with the consent of each Producer and Silent Partner(s):

Exhibit 1
Page 11

DocuSign Envelope ID: F0064A52-E953-4F06-6C1C-F534E12213FB

    **a.** Borrowing money in the Partnership's name, other than in the ordinary course of the Partnership's business or to finance any part of the purchase price of the Partnership's properties;

    **b.** Transferring, hypothecating, compromising, or releasing any Partnership claim except on payment in full;

    **c.** Selling, leasing, or hypothecating any Partnership property or entering into any contract for any such purpose, other than in the ordinary course of the Partnership's business and other than any hypothecation of Partnership property to secure a debt resulting from any transaction permitted under (1);

    **d.** Knowingly suffering or causing anything to be done whereby Partnership property may be seized or attached or taken in execution, or its ownership or possession otherwise endangered;

    **e.** Requests to make additional capital contributions; and

    **f.** Amending this Agreement.

**24. Handling Funds**. All Partnership funds shall be deposited with the Producer Partner for use in furtherance of the Partnership's purposes.

**25. Partners Not Entitled to Remuneration**. Except as provided elsewhere in this Agreement, no Partner shall be entitled to remuneration for acting in the Partnership business.

**26. Duty of Loyalty**. Each Partner owes a duty of loyalty to the Partnership and the other Partners, which includes the following:

    **a.** To account to the Partnership and hold as trustee for it any property, profit, or benefit derived by the Partner in the conduct and winding up of the Partnership business or derived from a use by the Partner of Partnership property or information, including the appropriation of a Partnership opportunity.

    **b.** To refrain from competing with the Partnership in the conduct or winding up of the Partnership business as or on behalf of a party having an interest adverse to the Partnership.

    **c.** Each Partner may maintain competitive interests in other partnerships as long as such other interests do not seek the same business opportunities as this Partnership, or to use any confidential information obtained from the other Partners or the Partnership itself to the detriment of the Partnership or the other Partners.

    **d.** Any Partner may engage in one or more businesses. Neither the Partnership nor any other Partner shall have any right to any income or profit derived by a Partner from any business activity permitted under this section.

Exhibit 1
Page 12

DocuSign Envelope ID: F0064A52-E853-4F06-6C1C-F534E12213FB

    e. The business of the Partnership may include the use of or be based upon Intellectual Property developed by or licensed to the Partnership. Partners shall not have the right to use the property of the Partnership in any other business.

27. **Waiver of Breach of Fiduciary Duty.** Any act of a Partner that otherwise would violate the fiduciary duties owed by a Partner to the Partnership may be approved by the written consent of the remaining Partners who do not participate in such act on full disclosure of all material facts by the Partner whose conduct otherwise is deemed to breach such fiduciary duties

28. **Duty of Care**. During the conduct of any Partnership business or when the Partnership is being wound up, no Partner shall be liable to the Partnership or any other Partner for losses sustained or liabilities incurred, unless it is determined that such conduct is grossly negligent or reckless, or intentional misconduct, or a knowing violation of la**w**.

29. **Duty of Good Faith and Fair Dealing**. Each Partner shall discharge its duties to the Partnership and the other Partners and exercise any rights consistently with the obligation of good faith and fair dealing.

30. **Furtherance of Partner's Interests**. A Partner does not violate a duty or obligation under this Agreement or controlling law merely because the Partner's conduct furthers the Partner's own interest.

31. **Admission of New Partners**. No new partner may join the Partnership without the written unanimous vote of the existing Partners, and only after such new Partner has agreed to be bound and executed this Agreement, in its then current form. Admission of a new Partner shall not cause dissolution of the Partnership. Any new Partner so admitted to the Partnership shall contribute capital to the Partnership as agreed by all Partners based on a valuation determination made on an annual basis and the consideration of the business being brought to the Partnership by the new Partner.

32. **Dissociation**. A Partner is dissociated from the Partnership on the occurrence of any of the following events:

    a. Delivery of written notice by the Partner setting forth the Partner's intention to withdraw as a Partner on the date set forth in the notice but in no event earlier than 30 days after receipt by the Partnership.

    b. As otherwise provided in this Agreement.

    c. The Partner's expulsion as provided in this Agreement.

    d. The Partner (a) becomes a debtor in bankruptcy; (b) executes an assignment for the benefit of creditors; (c) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidation of that Partner or of all or substantially all of that Partner's property; or (d) fails to have vacated or stayed the appointment of a trustee, receiver, or liquidator of the Partner or of all or substantially all of the Partner's property obtained without the Partner's consent or acquiescence, within 90 days after the appointment or within 90 days after the expiration of a stay.

Exhibit 1
Page 13

DocuSign Envelope ID: F0064A52-5B53-4F06-AC1C-F534F12213FB

e.  For any individual Partner, on: (a) the Partner's death; (b) the appointment of a guardian or general conservator for the Partner; or (c) a judicial determination that the Partner has otherwise become incapable of performing the Partner's duties under the Partnership agreement.

f.  Dissociation shall not cause dissolution of the Partnership.

33. **Expulsion under RUPA**. A Partner may be expelled from the Partnership by the vote of the other Partners holding at least 51 percent in capital interest of the Partnership (excluding the interest of the Partner to be expelled) if, by that vote, it is determined in the sole discretion of those Partners that:

a.  It is unlawful to carry on the Partnership business with that Partner;

b.  There has been a transfer of all or substantially all of that Partner's transferable interest in the Partnership, except a transfer for security purposes or issuance of a court's charging order, neither of which have been foreclosed on;

c.  Within 90 days after the Partnership notifies a corporate Partner that it will be expelled because it has filed a certificate of dissolution or the equivalent, its charter has been revoked, or its right to conduct business has been suspended by the jurisdiction of its incorporation, there is no revocation of such certificate of dissolution or no reinstatement of its charter or its right to conduct business; or

d.  A partnership, limited partnership, or limited liability company Partner has been dissolved and its business is being wound up.

e.  Expulsion shall become effective when written notice of expulsion is served on the expelled Partner. When the expulsion becomes effective, the expelled Partner's rights, powers, and authority as a Partner of the Partnership, including its rights to participate in the Partnership's profits and to draw any salary, shall terminate.

34. **Expulsion by Judicial Determination**. On application by the Partnership or another Partner, a Partner may be expelled from the Partnership by judicial determination because of any of the following:

a.  The Partner engaged in wrongful conduct that adversely and materially affected the Partnership business.

b.  The Partner willfully or persistently committed a material breach of the Partnership agreement or of a duty owed to the Partnership or the other Partners.

c.  The Partner engaged in conduct relating to the Partnership business that makes it not reasonably practicable to carry on the business in Partnership with the Partner.

35. **Purchase of Dissociated Partner's Interest**. Except as otherwise provided in this Agreement, if a Partner is dissociated from the Partnership and the remaining Partners do not elect to dissolve the Partnership, the Partnership shall cause the dissociated Partner's interest in the Partnership to be purchased on the following terms:

Exhibit 1
Page 14

DocuSign Envelope ID: F0064A52E9F59-4F06-4C4C-F534F12213FB

a.  The buyout price of a dissociated Partner's interest is the amount that would have been paid on settlement of a Partner's account under California Corporations Code §16807(b) had the business of the Partnership been wound up if, on the date of dissociation, the assets of the Partnership were sold at a price equal to the greater of the liquidation value or the value based on a sale of the entire business as a going concern without the dissociated Partner and the Partnership was wound up as of that date. Interest shall be paid from the date the amount owed becomes due to the date of payment.

b.  Damages for wrongful dissociation under Corporations Code §16602(b) and all other amounts owing from the dissociated Partner to the Partnership, whether or not presently due, shall be offset against the buyout price. Interest shall be paid from the date the amount owed becomes due to the date of payment.

c.  The Partnership shall indemnify, defend, and hold the dissociated Partner harmless from any Partnership liabilities, whether incurred before or after the event of dissociation, except liabilities incurred by an act of the dissociated Partner after dissociation (a) when the other party reasonably believed that the dissociated Partner was then a Partner, (b) the other party did not have notice of the Partner's dissociation, or (c) the other party is not deemed to have knowledge of the Partner's dissociation due to filing of a statement of Partnership authority or statement of dissociation.

    i.  If no agreement is reached for the purchase of the dissociated Partner's interest within 120 days after the dissociated partner's written demand for payment, the Partnership shall pay, or cause to be paid, in cash to the dissociated Partner the amount the Partnership estimates to be the buyout price and accrued interest, reduced by any offsets and accrued interest under this section.

    ii.  Payment shall be accompanied by all of the following:

        1.  A statement of Partnership assets and liabilities as of the date of dissociation.

        2.  The latest available Partnership balance sheet and income statement, if any.

        3.  An explanation of how the estimated amount of the payment was calculated.

        4.  A written notice that the payment is in full satisfaction of the obligation to purchase unless, within 120 days after the written notice, the dissociated partner commences an action to determine the buyout price or to determine any offset, or to decide other terms of the obligations to purchase.

DocuSign Envelope ID: F0064A52-F953-4F06-8C4C-F534E12218FB

    **d.** Should any dissociation occur within 90 days before the dissolution of a Partnership, then:

        **i.** All Partners who dissociate within 90 days before the dissolution shall be treated as Partners for purposes of ending up the Partnership's business on a dissolution of the Partnership; and

        **ii.** Any damage for wrongful dissociation and all other amounts owed by the dissociated Partner to the Partnership, whether or not presently due, shall be taken into account in determining the amount distributable to the dissociated Partner on such dissolution and winding up.

**36. Nontransferability of Interest**. A Partner's interest in the Partnership shall not be transferred, in whole or in part, except by unanimous written consent of the remaining Partners, intestate succession, testamentary disposition, or through a decree or judgment from a court of competent jurisdiction. Any other purported transfer of all or part of a Partner's interest shall be void and of no effect against the Partnership, any other Partner, any creditor of the Partnership, or any claimant against the Partnership. No such transfer shall constitute the transferee a Partner or entitle the transferee to any of the rights of a Partner, other than the right to receive as much of the transferor's share of Partnership distributions as is transferred to the transferee.

**37. Events of Dissolution**. The Partnership shall be dissolved, and its business shall be wound up, only on the occurrence of any of the following events:

    **a.** The earlier of: the completion of the Partnership Term as described in Paragraph 4 and/or the return of invested Capital as provided under Paragraph 5.

    **b.** The express will of all of the Partners to wind up the Partnership business.

    **c.** On expiration of 90 days after a Partner's dissociation by death, bankruptcy, incapacity, distribution by a trust or estate Partner of its entire interest, or termination of any entity Partner, or by a Partner's wrongful dissociation, unless before that time a majority in interest of the Partners agree to continue the Partnership.

    **d.** Any event that makes it unlawful for all or substantially all of the Partnership business to be continued if such event is not cured within 90 days after notice to the Partnership of the event.

    **e.** On application by a Partner, a judicial determination that any of the following apply:

        **i.** The economic purpose of the Partnership is likely to be unreasonably frustrated.

        **ii.** Another Partner has engaged in conduct relating to the Partnership business that makes it not reasonably practicable to carry on the business in Partnership with that Partner.

Exhibit 1
Page 16

    **iii.** It is not otherwise reasonably practicable to carry on the Partnership business in conformity with the Partnership agreement.

  **f.** As otherwise set forth in this Partnership Agreement.

**38. Termination After Dissolution; Waiver.**

  **a.** Except as provided in this Agreement, the Partnership continues after dissolution only for the purpose of winding up its business. The Partnership is terminated when the winding up of its business is completed.

  **b.** At any time after the dissolution of the Partnership and before the winding up of its business is completed, all of the Partners, including any dissociating Partner (other than a wrongfully dissociating Partner) may waive the right to have the Partnership's business wound up and the Partnership terminated. On such event, both of the following shall occur:

    **i.** The Partnership resumes carrying on its business as if dissolution had never occurred, and any liability incurred by the Partnership or a Partner after the dissolution and before the waiver is determined as if dissolution had never occurred; and

    **ii.** The rights of any third party accruing after commencement of dissolution or arising out of conduct in reliance on the dissolution before the third party knew or received a notification of the waiver may not be adversely affected.

**39. Persons Eligible to Wind Up Partnership.**

  **a.** After dissolution, a Partner who has not dissociated may participate in winding up the Partnership's business, subject to the right of a Partner or its legal representative to petition the court, for good cause shown, for judicial supervision.

  **b.** The legal representative of the last surviving Partner may wind up a Partner's business.

  **c.** The person winding up the Partnership business shall have all of the powers given by law to wind up the affairs of the Partnership.

  **d.** On dissolution where the partnership has filed a Statement of Partnership Authority, the Partnership shall cause to be filed a statement of dissolution under California Corporations Code §16805.

**40. Distribution of Assets.**

  **a.** On the winding up of the Partnership's business, the assets of the Partnership, including any contributions by the Partners required in this Agreement, shall be applied to discharge its obligations to creditors, including to the extent permitted by law Partners who are creditors. Any surplus shall be applied to pay in cash the net amount distributable to Partners in accordance with their rights to distributions under this Agreement.

Exhibit 1
Page 17

DocuSign Envelope ID: F0064A57-E953-4F06-AC1C-F534E12218FB

    **b.** Each Partner shall be entitled to a settlement of all Partnership accounts on winding up the Partnership business. In settling accounts among the Partners, the profits and losses that result from liquidation of the Partnership assets shall be credited and charged to the Partners' accounts. The Partnership shall make a distribution to a Partner in an amount equal to any excess of the credits over the charges in the Partner's account.

**41. Satisfaction of Obligations.** No Partner shall be required or liable to make any contribution beyond the Capital Contribution described in Attachment A.

**42. Non-circumvention and Non-solicitation.**

    a. All parties to this Agreement agree not to attempt to utilize confidential information obtained through this Agreement or any prior agreement or relationship for the purpose of circumventing it. Further, the parties agree to use best efforts, good faith, and fair dealing during this Agreement's term, and shall not seek to exploit confidential information obtained from the other.

    b. Without limiting the foregoing, each Partner agrees not to intentionally interfere in any manner with the other Partners' professional relationships, or with its clients, customers, suppliers, vendors, distributors, agents, contractors, representatives, members, or employees. Each Partner agrees to refrain from soliciting the employment of or otherwise engage any person who is employed by the Partnership as an employee, contractor or representative.

    c. Each party acknowledges that the restrictions contained in this Section are reasonable and necessary to protect the legitimate interests of the other and that any violation may result in irreparable injury to the aggrieved party.

    d. Each party agree that the other shall be entitled to preliminary and permanent injunctive relief, without the necessity of proving actual damages, as well as an equitable accounting of all earnings, profits and other benefits arising from any violation of this Section, which rights shall be cumulative and in addition to any other rights or remedies to which the aggrieved party may be entitled. In the event that any of the provisions of this Section or any other part of this Agreement should ever be adjudicated to exceed the time, geographic, product or service, or other limitations permitted by applicable law in any jurisdiction, then such provisions shall be deemed reformed in such jurisdiction to the maximum time, geographic, product or service, or other limitations permitted by applicable law. The terms of this Section are material provisions hereof and are material inducements to the parties entering into this Agreement and engaging in the relationship created hereby.

**43. Indemnification**. Except as otherwise provided in this Agreement, a Partner shall not be liable to, and the Partnership shall indemnify and hold the Partner harmless from, any and all expense and liability resulting from or arising out of any negligence or misconduct on the Partner's part to the extent that the amount is not covered by the applicable insurance carried by the Partnership; provided, however, that there shall be no indemnification if it

Exhibit 1
Page 18

is determined that the Partner's conduct is grossly negligent or reckless or if the Partner engages in any willful and material breach of any other obligations under this Agreement

44. **Amendments.** This agreement may be amended in writing at any time by a unanimous vote of the Partners.

45. **Notices**. Any written notice to any of the Partners required or permitted under this Agreement shall be deemed to have been duly given (a) on the date of service if served personally, by electronic mail or facsimile, with confirmation of delivery, on the party to whom notice is to be given, or (b) on the seventh day after mailing if mailed to the party to whom notice is to be given, first class postage prepaid, return receipt requested, and addressed to the addressee at the address stated opposite his or her name below or at the most recent address specified by written notice given to the sender by the addressee under this clause. Notices to the Partnership shall be similarly given, and addressed to it at its principal place of business.

46. **Counterparts**. The parties may execute this Agreement in two or more counterparts, which shall, in the aggregate, be signed by all the parties and constitute one agreement. Each counterpart shall be deemed an original instrument as against any party who has signed it.

47. **Governing Law**. This agreement is executed in and intended to be performed in the State of California, and the laws of that state (other than as to choice of laws) shall govern its interpretation and effect. Any action or proceeding arising out of, relating to or concerning this Agreement, including, without limitation, any claim of breach of contract or of one partner's fiduciary duty to the other partner(s) or to the partnership, shall be filed in the state courts of Napa County, California and in no other location. The parties hereby agree to be subject to the jurisdiction of Napa County courts, and waive the right to object to such location on the basis of venue.

48. **Successors**. This agreement shall be binding on and inure to the benefit of the respective successors, assigns, and personal representatives of the parties, except to the extent of any contrary provision in this Agreement.

49. **Severability**. If any term, provision, covenant, or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the rest of the agreement shall remain in full force and effect and shall in no way be affected, impaired, or invalidated.

50. **Headings**. Section, paragraph, and other headings contained in this Agreement are for reference purposes only and are in no way intended to describe, interpret, define, amplify, or limit the scope, extent, or intent of this Agreement or any provision of it.

51. **Further Action**. Each Partner shall execute and deliver such papers, documents, and instruments, and perform such acts as are necessary or appropriate, to implement the terms of the agreement and the intent of the parties to this Agreement.

DocuSign Envelope ID: F0064AE2-E9F3-4F06-8C1C-F534E12218FB

52. **Construction**. In construing this Agreement, no consideration shall be given to the fact or presumption that any party had a greater or lesser hand in drafting it.

53. **Gender**. In construing this Agreement, pronouns of any gender shall be deemed to include the other gender.

54. **Incorporation by Reference**. Every exhibit, schedule, and other appendix attached to and referred to in this Agreement is incorporated in this Agreement by reference.

55. **Attorney Fees**. If any party requires the services of an attorney to secure the performance of this Agreement or otherwise on the breach or default of another party to this Agreement, or, if any judicial remedy or arbitration is necessary to enforce or interpret any provision of this Agreement or the rights and duties of any person in relation to it, the prevailing party shall be entitled to reasonable attorney fees, costs, and other expenses, in addition to any other relief to which such party may be entitled. Any award of damages following judicial remedy or arbitration as a result of the breach of this Agreement or any of its provisions shall include an award of prejudgment interest from the date of the breach at the maximum amount of interest allowed by law.

56. **Entire Agreement**. This Agreement contains the entire agreement of the parties relating to the rights granted and obligations assumed in this Agreement. Any oral representations or modifications concerning this instrument shall be of no force or effect unless contained in a subsequent written modification signed by the party to be charged.

**– signatures below –**

IN WITNESS WHEREOF, the Partners have executed this Agreement effective as of the date set forth above.

Date: _____5/28/2019_____

_____
Pure Health

Date: _____5/28/2019_____

_____
Vausse Films

ATTACHMENT A OF PARTNERSHIP AGREEMENT
OF <u>WATCH LIST, RUN WITH THE HUNTED, ARCTIC</u>

1.  The Partners principal capital contributions to the Partnership are as follows:

| Partner | Contribution Amount | Total Return in U.S Dollars |
|---|---|---|
| PURE HEALTH | $222,275.00 | $500,379.00 |
| VAUSSE FILMS | $2,000,475.00 | $2,502,394.00 |
| TOTAL | $2,222,750.00 | $3,002,773.00 |

2.  The Partners shall participate in the business of the Partnership as follows:

| PARTNER | TITLE |
|---|---|
| PURE HEALTH | Producer |
| VAUSSE FILMS | Silent |

3.  The Partners shall receive the following percentage return on their principal contributions:

| PARTNER | PERCENTAGE OF CONTRIBUTED CAPITAL | RATE OF RETURN ON CONTRIBUTION AFTER RETURN OF PRINCIPAL |
|---|---|---|
| PURE HEALTH | 10% | 35.09% * |
| VAUSSE FILMS | 90% | 35.09% (25.09% net) * |

   * Pure Health as Producer, will receive 10% of Silent Partner's return of principal.

   * VAUSSE FILMS MOVIE BREAKDOWN

   * WATCH LIST $664,425 ROI 24.97% = $830,332

   * RUN WITH THE HUNTED $670,050 ROI 24.86% = $836,624

   * ARCTIC $666,000 ROI 25.44% = $835,438

Exhibit 1
Page 22

# EXHIBIT 2

## DISTRIBUTION AGREEMENT

This Distribution Agreement ("Agreement"), dated (05/17/19), confirms the terms and conditions pursuant to which HBO Holdings, Inc. ("HBO"), shall acquire from 1inMM Capital LLC, with an address at 3129-A S. La Cienega Blvd, Los Angeles, California, 90016 ("1inMM"), certain distribution rights in the "Program" in the "Territory" (as such terms are defined below) subject to the terms contained herein, all as set forth below.

1.     Definitions. All capitalized terms set forth herein, unless elsewhere defined, shall have the following meanings:

a.     "Authorized Languages" means all languages, including all dubbed, voice-lectored and subtitled versions.

b.     "Availability Date" shall have the meaning set forth in Section 4.

c.     "Final Delivery" shall mean 1inMM's full, final and complete delivery of the Delivery Items for the Program (including any and all attempts to cure), of quality acceptable to HBO, as confirmed in writing by HBO.

d.     "Distribution Expenses" means all costs and expenses incurred in connection with the release, delivery, marketing, distribution and exploitation of the Program and the Rights (as defined in Section 5), including, without limitation, all expenses for advertising, marketing, promotion, merchandizing, and publicity of the Program; all expenses for the full and complete delivery of Delivery Items (as hereinafter defined) and translation thereof; shipping, mailing and insurance costs; storage; cleaning and inspection; mastering, submastering, and duplication costs, duplication of scripts and music cue sheets; residuals; renewal of music synchronization licenses and master use licenses (to the extent same are the responsibility of Licensee); all taxes (other than corporate income taxes), whether sales, gross receipts, value added, withholding, remittance, excise, property, use, transfer or similar taxes, levies, customs duties, import charges, penalties, fines or interest, however denominated, imposed and whether by a governmental authority or taxing authority (whether federal, local, territorial or state of the United States or any country in the Territory); foreign language dubbing and/or subtitling; any Third Party Payments (as defined at Section 10.a.) to the extent paid for by HBO, and all other usual distribution costs customarily incurred.

e.     "Gross Receipts" means the aggregate of all monies actually received by HBO from the exploitation of the Rights in the Territory, monies and royalties collected by a collecting society or governmental agency with respect to the exploitation of the Program on television from compulsory licenses, retransmission income, secondary broadcasts, tax rebates, less rebates, discounts, reasonable reserves for returns and bad debt (each of which will be liquidated within one (1) year from its establishment), credit adjustments, advertising agency commissions, security deposits, advances or other similar sums received until earned or forfeited or credited and any amounts received and thereafter refunded (except to the extent such sums are non-refundable) related to the Program. All Gross Receipts are the sole and exclusive property of HBO, subject only to 1inMM's contractual entitlements pursuant to Section 11 hereof.

f.     "Latin America" means Anguilla, Antigua, Argentina, Aruba, Bahamas, Barbados, Barbuda, Belize, Bermuda, Bolivia, Bonaire, Brazil, Cayman Islands, Chile, Colombia, Costa Rica, Cuba, Curacao, Dominica, Dominican Republic, Ecuador, El Salvador, French Guiana, Grenada, Guadeloupe, Guatemala, Guyana, Haiti, Honduras, Jamaica, Martinique, Mexico, Montserrat, Nicaragua, Panama, Paraguay, Peru, Saba, St. Barthelemy, St.

Eustatius, St. Kitts & Nevis, St. Lucia, St. Maarten, St. Martin, St. Vincent & Grenadines, Suriname, Trinidad & Tobago, Turks & Caicos, Uruguay, Venezuela, and British Virgin Islands.

     g.     "License Period" shall have the meaning set forth in Section 3.

     h.     "Program" means the live action feature length motion picture entitled "RUN WITH THE HUNTED" that was: (i) originally produced in English; (ii) directed by John Swab starring Ron Perlman, Michael Pitt and William Forsythe and (iii) will be theatrically released in Mexico and/or Brazil on a minimum of 250 screens.

     i.     "Television Rights" means the right to exhibit, distribute market, display, transmit, broadcast, perform, transmit, reproduce, advertise, publicize, sell copies of, license, derive revenues from, rent, dispose of, communicate publicly or privately, turn to account and otherwise exploit the Program by any form of television media now known or hereafter devised or commercially exploited (including, but not limited to subscription pay television, basic television, free television, pay-per-view, on demand, video-on-demand, free-on-demand, free-video-on-demand, subscription-video-on-demand, advertising-supported on demand, near-video-on-demand, hotel/motel, non-theatrical, electronic rental, download to rent, digital rental, electronic sell-through, digital sell-through, download to own, download to burn and on demand retention licensing), regardless of whether or how paid for, programmed, or marketed to the viewer, and regardless of how delivered to or received by the viewer (whether by over-the-air, cable, satellite, wire, fiber, ADSL, DSL, MDS, Internet, mobile, wireless, closed circuit, or other means, method, process, or device or delivery system now known or hereafter devised, discovered, created, or developed) in all versions, resolutions, formats, and sizes, and shall, for the avoidance of doubt, include without limitation reception on television sets, personal computers, IP-enabled devices, mobile devices, and analogous devices.

     j.     "Territory" shall mean Africa and Latin America.

     2.     Conditions Precedent. All of HBO's obligations hereunder will be subject to and conditioned upon the satisfaction of all of the following:

     a.     Full execution and delivery to HBO of this Agreement; and

     b.     Final Delivery (including HBO's receipt and written approval of: (i) a complete typewritten statement of all third party screen and paid advertising credit, name and likeness, and other third party obligations, restrictions and approval rights (including all third party obligations, restrictions and approvals necessary for HBO's creation of Local Language Versions) as further set forth in Paragraph 5 of the Legal Delivery section of Exhibit B (collectively, the "Paid Ad Restrictions"); (ii) all chain of title documents for the Program and documents necessary to establish 1inMM's valid copyright in the Program, and (iii) all Delivery Items) occurring no later than 11/29/2019 (the "Final Delivery Date").

     3.     License Period. The "License Period" means the period commencing on the Program's Availability Date and expiring three (3) years thereafter; provided, however, that the License Period shall include an additional exclusive play-off period of six (6) months for all licenses in existence as of the last day of the License Period during which HBO may continue to exercise the Rights.

4.    Availability Date. The "Availability Date" means day and date with the Program's earliest video-on-demand availability date in the Mexico and/or Brazil, but in no event later than 12/29/2019.

5.    Rights.

a.    For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, 1inMM hereby grants to HBO, with respect to the Program, the exclusive rights throughout the Territory and during the Program's License Period to exploit, and to sublicense others the right to exploit the Television Rights in the Program (and all of its themes, materials and other elements), in all formats now known or hereafter devised (including, without limitation, high definition, standard definition and 3D), including the right to (and cause and license others to) market, advertise, publicize, derive revenues from and otherwise exploit the Program. Without limiting the generality of the foregoing, 1inMM hereby grants to HBO the sole, exclusive and irrevocable right to: (i) license the rights granted for the Program for exhibition on such terms as it deems appropriate, and HBO shall have complete discretion relating to the promotion and distribution of the Program; (ii) edit and to permit the editing of all prints of the Program to conform to time segment requirements or to the orders of any duly authorized public censorship authority and to insert commercial material at appropriate time intervals during the exhibition of the Program and to dub and subtitle and to permit the dubbing and subtitling of the Program in the Authorized Languages as it sees fit; (iii) translate the title of the Program into any language and, to the extent cultural differences necessitate that the title be changed, to change such title; (iv) manufacture and distribute, or cause to be manufactured and distributed, two-dimensional advertising, publicity and promotional materials of all types and kinds for use solely in connection with the exhibition and distribution of the Program based on the images and materials provided by 1inMM; and (v) include HBO's (or one or more of HBO's affiliates, HBO's or sub distributors) name, logo, trademark or emblem in such manner, position, form and substance as HBO may elect on the prints of the Program, and on all advertising and publicity material for the Program together with such words as HBO may elect indicating that the Program is being distributed by HBO or one of its sub distributors, licensees or any of its affiliates.

b.    Without limiting the foregoing, 1inMM further grants to HBO the right to use and license the use of trailers, excerpts, clips supplied by 1inMM or made by HBO and stills supplied by 1inMM from the Program in connection with the promotion and exploitation of the Program, to collect all copyright royalties, retransmission, private copy or similar monies relating to the Program, and to use the approved names, voices and likenesses, which 1inMM shall provide to HBO in a timely manner, of all persons who appear in, or above-the-line persons who rendered services in connection with, the production of the Program for the purpose of advertising and promoting the Program.

c.    1inMM acknowledges that any inadvertent, unavoidable, incidental and de minimus overspill of an unencrypted satellite signal outside of the Territory shall not constitute a breach of this Agreement.

d.    1inMM shall include the following credit information in any version of the Program authorized by 1inMM for exhibition hereunder as well as in all advertising and promotional materials authorized for exhibition or dissemination in association therewith: "[1inMM TO PROVIDE COPYRIGHT NOTICE]."

e.    The rights granted to HBO in this Section 5 shall be referred to herein as the "Rights".

HBO-1inMM

Exhibit 2  3
Page 25

6.   Reserved Rights. All rights and licenses in the Program not granted to HBO hereunder (i.e., theatrical, derivative, novelization, souvenir, music publishing and music soundtrack rights, merchandising, publication, commercial tie-in and/or co-promotion (unless approved in writing by 1inMM but in no event on an exclusive basis), product placement, games, videogames, ring tones, alerts, wallpapers, screensavers, messaging applications, digital greeting cards, theme park and location based entertainment, remake, sequel, tv series, live stage/stage play, clip license rights (which excludes, for the avoidance of doubt, the right to use clips for promotional purposes as set forth in Section 5.b.), and all rights to the underlying material to the Program) are reserved by 1inMM and may be exploited by 1inMM without limitation or restriction by HBO except as may be set forth herein.

7.   Delivery. No later than thirty (**30) days after the execution of this Agreement,** 1inMM shall, at its sole cost and expense, deliver to HBO all elements, materials, documents and advertising and promotional materials set forth Exhibit B (which is attached hereto and incorporated herein by this reference), with respect to the Program (the "Delivery Items"). All Delivery Items shall be of first class technical quality suitable for the manufacture of first class broadcast quality exhibition materials of the Programs, as determined in HBO's sole discretion. HBO shall provide notice to 1inMM specifying any technical defect within thirty (30) days of receipt of the Delivery Items from 1inMM. Upon such notice to 1inMM, 1inMM shall either (i) correct the defect and redeliver the corrected Delivery Item or (ii) deliver a replacement Delivery Item within thirty (30) days of receipt of HBO's notice. Approval by HBO of less than all Delivery Items or any exploitation of the Program will not be deemed a waiver by HBO of 1inMM's obligation of complete delivery of the Program hereunder. In the event that 1inMM, or any distributor or licensee of 1inMM, has prepared or subsequently prepares a version of the Program dubbed and/or subtitled in any Authorized Language ("Local Language Version"), 1inMM shall provide and HBO shall have unrestricted access to such Local Language Version at no cost, including any dubbed or subtitled tracks of the Program. In no event shall Final Delivery (including any and all attempts to cure) occur later the Final Delivery Date.

8.   Distribution Fee. In connection with HBO's exploitation of Rights in the Territory, HBO shall retain a Distribution Fee as set forth in the table below:

| Gross Receipts | Distribution Fee |
|---|---|
| Gross Receipts equaling or less than US$400,000.00 | 25% |
| Gross Receipts over US$400,000.00 | 40% |

9.   Advance. Subject to the terms and conditions of this Agreement and provided all of the Conditions Precedent have been satisfied (including full and Final Delivery having occurred by the Final Delivery Date), and 1inMM is not in breach of this Agreement or, for the avoidance of doubt, any other agreement, HBO shall pay in connection with the Program, a fully recoupable and cross-collateralized advance (the "Advance") in an amount equal to One Million Four Thousand Eighty-Four U.S. Dollars ($1,004,084.00), as further set forth in Section 12. Upon the satisfaction of all of the terms set forth herein, the Advance shall be due and payable in one lump sum payment six (6) months after HBO's receipt of a valid invoice from 1inMM.

Exhibit 2   4
Page 26

10.   Certain Expenses.

a.   Third Party Payments. As between 1inMM and HBO, 1inMM shall be responsible for, and shall pay, all third party payments (other than performance fees for the public performance of any music contained in the Program) that may become payable as a result of HBO's exploitation of its rights hereunder ("Third Party Payments") including, without limitation, any and all mechanical reproduction fees, download fees, payments and/or tariffs with respect to exploitation, advertising and promotion of the Program and residuals, reuse fees, and participations in the proceeds (net or gross) of the Program. If 1inMM fails to make such payments, HBO shall have the right (but not the obligation) to make such Third Party Payments and may: (i) deduct from amounts payable to 1inMM hereunder any such amounts paid to third parties; and/or (ii) invoice 1inMM for any such amounts paid to third parties.

b.   Payment of Distribution Expenses. As between 1inMM and HBO, HBO shall be responsible for and shall pay all Distribution Expenses. Distribution Expense(s) incurred by HBO shall be deducted as provided in Section 11 below.

11.   Allocation of Gross Receipts. In full consideration of the Rights and the representations, warranties and covenants made by 1inMM hereunder, HBO shall pay to 1inMM, for the Program, an amount ("1inMM's Share") equal to one hundred percent (100%) of the Net Receipts (as defined below) derived from the distribution and exploitation of the Program by HBO. As used herein, the term "Net Receipts" shall mean all Gross Receipts less the following deductions in the following order of priority: (a) HBO's Distribution Fee as set forth in Section 8 on account of the exploitation of the Programs by HBO; (b) all Third Party Payments to the extent paid for by HBO; (c) all Distribution Expenses in connection with the exploitation of the Program by HBO; provided, however, that expenses for advertising, marketing, promotion and publicity of the Programs shall not exceed Five Percent (5%) of Gross Receipts without 1inMM's prior written consent, and (d) the Advance.

12.   Payments and Accounting Statements.

a.   HBO shall have the right to cross-collateralize the Gross Receipts (after HBO deducts its Distribution Fee) earned for exploitation of the Rights in the Program throughout the Territory and the Term for purposes of recouping the Distribution Expenses, Third Party Payments, and the Advance, and calculating 1inMM's Share.

b.   Subject to Section 11 hereof, HBO shall credit 1inMM's Share to the Program to 1inMM as follows: ninety (90) days after each quarter for the three (3) years

c.   All payments due hereunder shall be payable in U.S. Dollars. 1inMM hereby directs HBO to make any and all payments due under this Agreement to 1inMM as set forth below:

> **Bank Name:** City National Bank
> **Bank Address:** 8641 Wilshire Blvd. Beverly Hills, CA 90211
> **ABA Number:** 122016066
> **Account Number:** 123820290
> **Account Name:** 1INMM CAPITAL LLC

d.   HBO shall account to 1inMM and provide customary participations statements for the following periods in which related Gross Receipts are received: ninety (90) days after each quarter for the three (3) years. Such customary participations statements shall be in a form HBO customarily details such calculations for other licensors. If in any period the

Exhibit 2   5
Page 27

deductions allowed pursuant to this Agreement for the Programs exceed Gross Receipts reported for the Programs, such excess shall be deducted from Gross Receipts in each succeeding period, as applicable, until such excess has been totally recouped. Accounting Reports shall be sent to the parties as set forth in Section 20.

      e.     HBO shall not be liable for any default or delay in payments from any licensee of HBO with respect to the Programs, provided that HBO shall take commercially reasonable steps to cause such licensee to pay any monies owed by such licensee in connection with its license of the Programs.

    13.    <u>1inMM's Representations and Warranties</u>. 1inMM hereby covenants, warrants and represents to HBO each and all of the following.

      a.     The Program is protected by all the applicable copyright laws throughout the Territory and that such copyrights are and shall be valid and subsisting throughout the Territory during the Program's License Period.

      b.     The Program, when delivered to HBO and thereafter, will be free and clear of any lien, claim, charge, encumbrance, security interest, restriction, agreement, commitment or arrangement with any third party which would, in any way, interfere with, impair or adversely affect any of the Rights granted to HBO hereunder, and (other than as specifically provided in this Agreement) there are and will be no payments of any kind required to be made by HBO in respect of, or as result of, any use by HBO of such Program hereunder.

      c.     1inMM will not exploit and will not authorize any third party to exploit Television Rights in the Program prior to (and, for the avoidance of doubt, during) the License Period hereunder.

      d.     The Program shall not contain any product placement or product integration, except as set forth in a letter to HBO no later than the Final Delivery Date, signed by 1inMM, setting forth all product placement arrangements entered into in connection with the Program and the consideration provided by both the supplier (e.g., payment, free or discounted product) and the production (e.g., visible display of labels, verbal mention of brand, etc.). For any non-monetary consideration received from suppliers, 1inMM shall provide HBO an estimate of the value of such consideration (in U.S. Dollars). 1inMM's letter shall be accompanied by available substantiating documentation (e.g., written agreements, confirmation letters) as well as a listing of the footage notations determined on the same basis as the "Combined Continuity, Dialogue and Spotting List" at which all such product placements are seen or heard.

      e.     1inMM has obtained all of the rights, permissions and licenses (including all music synchronization licenses) required to enable HBO to fully exploit the Program pursuant to the terms of this Agreement including, without limitation, the right to use any performers' names, voices, likenesses and biographies to advertise and promote such Program.

      f.     No part of the Program (including the music contained therein) nor HBO's exercise of any rights granted hereunder will infringe upon the trademark, trade name, copyright, right of privacy, property right or any other right of any person or entity, and no part of the Program shall contain anything defamatory, tortious or which would violate the common law, statutes or regulations of any jurisdiction.

      g.     To the extent the Program or any underlying property is based upon or related to, events in the life of real persons, living or dead, or portrays real persons, 1inMM has obtained all personal releases and other rights necessary to permit HBO to exploit the Program in

Exhibit 2   6
Page 28

the manner provided herein without violating any third party rights or incurring any obligation to any third party.

      h.    1inMM has full power and authority to make this Agreement and has not done and will not do, or permit any person or entity to do, anything which would interfere with the full performance of 1inMM's obligations or HBO's rights hereunder; this Agreement is the legally valid and binding obligation of 1inMM enforceable against 1inMM in accordance with its terms; and 1inMM is a corporation duly formed and validly existing in good standing under the laws of Florida.

      i.    The non-dramatic performing rights to all music contained in the Program are (a) controlled by BMI, ASCAP, SOCAN, SESAC or a performing rights society having jurisdiction in the Territory; (b) in the public domain; or (c) controlled by 1inMM (in which event such rights are hereby licensed to HBO to the extent necessary for the exercise of HBO's rights hereunder). 1inMM does not represent or warrant that HBO may exercise the performing rights in the music without the payment of a performing rights royalty or license fee for music falling within category (a). As between HBO and 1inMM, HBO shall be responsible for the payment of any required performing rights royalty or license fee.

      j.    1inMM is familiar with and shall abide by the requirements of the Foreign Corrupt Practices Act and meets all the eligibility requirements for the safe harbor certification set forth in 18 U.S.C. section 2257A(h)(1) and 28 C.F.R. section 75.9(a)(1)-(3).

      k.    All Delivery Items delivered by 1inMM as part of delivery hereunder are complete and accurate, and HBO will incur no liability to any third party from its reliance thereon and/or compliance therewith.

    14.    <u>HBO's Representations and Warranties</u>. HBO hereby covenants, warrants and represents to 1inMM it has the full power and authority to make this Agreement; this Agreement is the legally valid and binding obligation of HBO enforceable against HBO in accordance with its terms; HBO is a corporation duly formed and validly existing in good standing under the laws of the state of California.

    15.    <u>Indemnification</u>. Each party hereto (the "<u>Indemnifying Party</u>") shall indemnify, defend and hold harmless the other party, and its successors, licensees, assigns, and employees, officers and directors (collectively, for the purposes of this Section, referred to as "<u>Indemnified Party</u>") from and against any and all liability, loss, damage, cost and expense, including, without limitation, reasonable attorneys fees (but excluding lost profits or consequential damages) arising out of any breach or alleged breach (including, in the case of 1inMM as Indemnifying Party, a breach of 1inMM's delivery requirements hereunder), or claim by a third party with respect to any warranty, representation or agreement made by the Indemnifying Party herein. The Indemnified Party shall give prompt written notice to the Indemnifying Party of any claim to which the foregoing indemnification applies and the Indemnifying Party shall undertake, at its own cost and expense, the defense thereof, provided that the failure to provide such notice shall excuse the Indemnifying Party's obligations only to the extent such failure prejudices the Indemnifying Party. The Indemnified Party may, at its option and expense, engage its own counsel. If the Indemnified Party settles or compromises any such suit, claim or proceeding, the amount thereof shall be charged to the Indemnifying Party, provided that the Indemnifying Party's approval, to be reasonably exercised, has been secured. Neither party may settle any claim or action without the prior written consent of the other party if such settlement would in any manner materially impair or inhibit the quiet enjoyment of such other party's rights hereunder or would result in any manner of injunctive or injunctive-like relief.

Exhibit 2  7
Page 29

16.     Default. 1inMM shall be in default of this Agreement upon the occurrence of any of the following (collectively, the "1inMM Events of Default"): (i) 1inMM fails or refuses to perform its material obligations hereunder or breaches any material provision hereof, or (ii) 1inMM goes into receivership or liquidation, or becomes insolvent, or a petition under any bankruptcy act shall be filed by or against 1inMM (which petition, if filed against 1inMM, shall not have been dismissed within thirty days thereafter), or 1inMM executes an assignment for the benefit of creditors, or 1inMM takes advantage of any applicable insolvency, bankruptcy or reorganization or any other like or analogous statute, or experiences the occurrence of any event analogous to the foregoing. If 1inMM fails to cure a 1inMM Event of Default specified in (i) above that is curable within thirty (30) days from receipt of written notice from HBO of such default or immediately upon a 1inMM Event of Default under (ii) above that is not curable under (ii) above, HBO shall have the right to immediately terminate this Agreement. 1inMM acknowledges that the intellectual property rights and licenses in and to the Program granted to HBO herein would be governed by 11 USC Section 365(n) in the event of the commencement of a bankruptcy case by or of 1inMM. 1inMM acknowledges and agrees that, notwithstanding any rejection of this Agreement in any bankruptcy case, HBO may elect to continue to enjoy all exclusive rights and licenses granted in the Program for the entire License Period as provided herein.

17.     Copyright. 1inMM hereby acknowledges and agrees that the Program shall contain a copyright notice in the name of the copyright proprietor conforming to and complying with the requirements of the applicable copyright laws of the Territory, and HBO shall not remove or delete such copyright notice. Subject to 1inMM's prior written approval, not to be unreasonably withheld, conditioned or delayed, HBO may, in consultation with 1inMM, in its own name or in the name of the copyright proprietor, take such steps as HBO may deem necessary or appropriate by action at law or otherwise, to prevent any unauthorized reproductions, exhibition or distribution of the Program, any infringement of the copyright of the Program or any impairment of or encumbrance on the rights granted to HBO hereunder, provided that should HBO commence any action in the name of 1inMM, HBO shall indemnify 1inMM against any out-of pocket costs, damages, and reasonable attorney fees. 1inMM agrees that it shall promptly execute and deliver to HBO the Assignment of Distribution Rights Under Copyright which is attached hereto as Exhibit A and incorporated herein by this reference and that upon the request of HBO it shall promptly execute and deliver to HBO such additional documents as HBO may need in connection with the foregoing. 1inMM hereby irrevocably appoints and designates HBO as its attorney-in-fact to exercise and file all such documents requested by HBO pursuant to this Section. This power-of-attorney is coupled with an interest.

18.     Distribution. All decisions concerning the advertising, marketing, distribution and exploitation of the Program and the rights herein granted shall be under HBO's sole and exclusive control, it being expressly understood that HBO shall not be required to continuously distribute the Program. The Program will be marketed appropriately as determined in HBO's good faith judgment, but in no event shall HBO be required to incur marketing costs. HBO makes no representation, warranty, guarantee or agreement as to the amount of receipts which may be derived from the distribution, exhibition or other exploitation of the Program and the Rights, nor does HBO guarantee the performance of any contract for the exhibition of the Program. Notwithstanding anything to the contrary contained herein, HBO shall have the right, in HBO's sole discretion, to withhold distribution of the Program or to withdraw the Program from distribution anywhere in the Territory at any time during the License Period.

19. <u>Insurance</u>. 1inMM shall secure and maintain standard commercial general liability and errors and omissions liability insurance in the minimum amounts of $5,000,000 per occurrence/$5,000,000 aggregate with a deductible not larger than $25,000 until four (4) years after the initial exhibition of the Program, which policy(ies) shall be endorsed to name HBO Holdings, Inc., its parents, subsidiaries, licensees, successors, and related and affiliated companies, and their officers, directors, employees, agents, representatives, assigns and its subdistributors (collectively "<u>Beneficiaries</u>") as additional insureds as their interests may appear and shall contain an endorsement negating the "other insurance clause" therein, together with an endorsement that such policies are primary and that any insurance carried by the Beneficiaries is neither primary nor contributory. 1inMM shall deliver to HBO a certificate and endorsements evidencing such insurance concurrently with the execution of this Agreement. A prior thirty (30) days notice of cancellation or non-renewal will be provided to HBO and will be shown on the certificate.

20. <u>Notices</u>. All notices, claims, certificates, requests, demands and other communications under this Agreement shall be made in writing and shall be delivered by hand or sent by facsimile, or sent, postage prepaid, by express mail, or reputable overnight courier service, and shall be deemed given when so delivered by hand; if faxed, on the business day of receipt as evidenced by a fax confirmation sheet, or two business days after deposit with an express mail or overnight courier to the parties at the following addresses (or at such other address for a party as shall be specified by like notice):

If to 1inMM:   1inMM Capital LLC
              3129-A S. La Cienega
              Los Angeles, Ca 90016
              Attn: Zachary Horwitz

If to HBO:     HBO Holdings, Inc.
              c/o Home Box Office International
              2500 Broadway #4
              Santa Monica, California 90404
              Attn: Senior Vice President, Sales Planning
              Facsimile: 1-310-382-3000

With a copy to:

              Home Box Office
              2500 Broadway #4
              Santa Monica, California 90404
              Attn: General Counsel
              Facsimile: 1-310-244-0510

21.    Governing Law/Disputes.

a.      The internal laws of the State of California (as opposed to the choice of law rules) and the United States of America shall govern the validity, construction and interpretation of this Agreement, the performance by the parties of their respective obligations and all other causes of action (whether sounding in contract, in tort or arising under statute) arising out of or relating to this Agreement or to the Program.

b.      All actions, proceedings, controversies and claims based upon, arising out of or resulting from this Agreement, the breach thereof or its enforcement, arbitrability (including the scope of this arbitration provision) or interpretation shall be submitted to JAMS ("JAMS") for binding arbitration under its Comprehensive Arbitration Rules and Procedures if the matter in dispute is over $250,000 or under its Streamlined Arbitration Rules and Procedures if the matter in dispute is $250,000 or less (the "Rules"). Such Arbitration shall be held solely in Los Angeles, California, in the English language. Each arbitration shall be conducted by an arbitral tribunal (the "Arbitral Board") consisting of a single arbitrator who shall be mutually agreed upon by the parties. If the parties are unable to agree on an arbitrator, the arbitrator shall be appointed by JAMS. The arbitrator shall be a retired judge with at least ten (10) years experience in commercial matters. Except with respect to requests for interim relief, neither party shall be entitled or permitted to commence or maintain any action in a court of law with respect to any matter in dispute until such matter shall have been submitted to arbitration as herein provided and then only for the enforcement of the Arbitral Board's award. Neither party shall challenge or resist any enforcement action taken by the arbitrator against the losing party.  In addition, the prevailing party in any arbitration or legal proceeding relating to this Agreement shall be entitled to all reasonable expenses including, without limitation, reasonable attorney's fees. Each party shall be permitted to engage in formal discovery with respect to any dispute arising out of, in connection with or related to this Agreement, the provisions of Section 1283.05 of the California Code of Civil Procedure being incorporated herein by this reference.

c.      1inMM hereby acknowledges that the Program and the exploitation rights granted to HBO hereunder are of a special, unique, extraordinary and intellectual character which gives them a peculiar value, for the loss of which HBO cannot be reasonably or adequately compensated in damages in any action at law and that a breach of this Agreement by 1inMM will cause HBO irreparable injury and damage. 1inMM therefore expressly agrees that in the event of a breach or threatened breach of this Agreement by 1inMM, HBO shall be entitled to seek injunctive and other equitable relief against 1inMM in HBO's discretion to end or prevent such breach and to secure enforcement of this Agreement. Resort to such equitable relief, however, shall not be construed as a waiver of any other rights or remedies which HBO may have for damages or otherwise. Notwithstanding any other provision of this Agreement, 1inMM's sole remedy for any breach by HBO of this Agreement shall be an action at law for damages and 1inMM acknowledges that such damages are fully adequate to compensate 1inMM in the case of any breach by HBO hereunder. In no event shall 1inMM have any right to terminate this Agreement or seek or be entitled to rescission, injunctive or other equitable relief.

22.    Miscellaneous Terms.

a.      This Agreement constitutes the entire agreement of the parties and supersedes all prior oral or written agreements between them concerning the same subject. This Agreement may only be amended or modified by a written instrument executed by the parties to this Agreement. No failure or delay on the part of either party in exercising any of its respective rights hereunder upon any failure by the other party to perform or observe any condition,

covenant or provision herein contained shall operate as a waiver thereof, nor shall any single or partial exercise of any such rights preclude any other or further exercise thereof or the exercise of any other or further exercise thereof or the exercise of any other right hereunder. Without limiting the foregoing, no payment by HBO shall constitute a waiver of any term or condition of this Agreement.

b.     This Agreement may not be assigned without the prior written consent of the other party except that HBO may assign this Agreement, or any part thereof.

c.     Each of the parties shall execute and deliver any further documents or instruments the other may reasonably request to carry out the intent of this Agreement.

d.     Nothing contained in this Agreement shall constitute a partnership between, or joint venture by, the parties hereto or constitute either party the agent of the other. Neither party shall hold itself out contrary to the terms of this Agreement and neither party shall become liable by reason of any representation, act or omission of the other contrary to the provisions hereof.

e.     Nothing expressed or referred to in this Agreement is intended or shall be construed to give any person or entity, other than the parties to this Agreement, or their permitted successors and assigns, any legal or equitable right, remedy or claim under or in respect thereof or any provision contained herein, it being the intention of the parties that this Agreement is for the sole and exclusive benefit of such parties, and any permitted successors and assigns of this Agreement and for the benefit of no other person or entity.

f.     The section headings contained in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

g.     This Agreement and all of its terms shall be confidential, and each party agrees that, except as may be required by law, it shall not make any disclosures with regard thereto without the prior written approval of the non-disclosing party.

h.     If any provision of this Agreement, or any covenant, obligation or agreement contained herein is determined by a court of competent jurisdiction to be invalid or unenforceable, such determination shall not affect any other provision, covenant, obligation or agreement, each of which shall be construed and enforced as if such invalid or unenforceable provision were not contained herein. Such invalidity or unenforceability shall not affect any valid and enforceable application thereof, and each such provision, covenant, obligation or agreement, shall be deemed to be effective, operative, made, entered into or taken in the matter and to the full extent permitted by law.

i.     In the event of the occurrence of an event of force majeure which materially interferes with the production or delivery of the Program or with the rendition of 1inMM's material obligations hereunder, HBO shall have the right to suspend this Agreement and shall have the right, but not the obligation, to extend this Agreement by the length of any such suspension.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by a duly authorized representative as of the date first set forth above.

**HBO HOLDINGS, INC.**

By: _____

Its: _____

**1INMM CAPITAL LLC**

By: _____

Its: _____

# EXHIBIT A
## ASSIGNMENT OF DISTRIBUTION RIGHTS
## UNDER COPYRIGHT

For good and valuable consideration, the receipt of which is hereby acknowledged, the undersigned, 1inMM Capital LLC ("1inMM"), hereby licenses, grants, transfers and assigns to

### HBO Holdings, Inc.

*aka* "HBO" (a California corporation) and its successors and assigns ("Distributor"), the sole and exclusive right, under copyright, to exhibit, distribute, market, advertise, license or otherwise exploit the following feature length motion picture ("Program") throughout the Territory for the License Period as defined below, by means of television, howsoever delivered:

**Title of Program**: RUN WITH THE HUNTED

**Territory**: Africa and Anguilla, Antigua, Argentina, Aruba, Bahamas, Barbados, Barbuda, Belize, Bermuda, Bolivia, Bonaire, Brazil, Cayman Islands, Chile, Colombia, Costa Rica, Cuba, Curacao, Dominica, Dominican Republic, Ecuador, El Salvador, French Guiana, Grenada, Guadeloupe, Guatemala, Guyana, Haiti, Honduras, Jamaica, Martinique, Mexico, Montserrat, Nicaragua, Panama, Paraguay, Peru, Saba, St. Barthelemy, St. Eustatius, St. Kitts & Nevis, St. Lucia, St. Maarten, St. Martin, St. Vincent & Grenadines, Suriname, Trinidad & Tobago, Turks & Caicos, Uruguay, Venezuela, and British Virgin Islands.

**License Period**: Commences on the Program's Availability Date and expires three (3) years thereafter; provided, however, that the License Period shall include an additional exclusive play-off period of six (6) months for all licenses in existence as of the last day of the License Period during which HBO may continue to exercise the Rights.

1inMM hereby irrevocably appoints Distributor as its attorney-in-fact, with full power and authority to do all such acts and things, and to execute, acknowledge, deliver, file, register and record the Program and all documents pertinent thereto, in the Copyright Office of the United States of America and in any other office or offices in any other jurisdictions in the name, stead and on behalf of the 1inMM, as Distributor may deem necessary or proper to accomplish the same, this being a power coupled with an interest.

Distributor is hereby empowered by 1inMM to bring, prosecute, defend and appear in suits, actions and proceedings of any nature, concerning any copyright in and to the Program or any infringement of such copyright or violation of any of the rights licensed to Distributor herein, but at the cost and expense of Distributor, and, at its option, Distributor may join the 1inMM as a party plaintiff or defendant in any such suit, action or proceeding. Any recovery of damages, penalties, costs or other amounts arising by reason of the infringement of any such copyright(s) or violation of the rights licensed to Distributor herein has been assigned, and shall be paid, to Distributor.

This Assignment is dated as of, and is subject to all of the terms, conditions and provisions of the Agreement between 1inMM and Distributor dated as of 06/08/2019.

1INMM CAPITAL LLC

Signed:

By: Z, HORWITZ

Its: MP. _____ /Authorized Signatory

# EXHIBIT 3

**PROMISSORY NOTE**

**$ (1,004,084.00)**                                                      **(05/29/2019)**

Promise. 1INMM Capital, LLC, a limited liability entity established in the State of California, (the "Maker"), hereby promises to pay to Lender, Pure Health Enterprises Inc., an corporation with addresses at (2070A West Lincoln Ave. Napa, CA 94558), (the "Payee"), an amount equal to (ONE MILLION FOUR THOUSAND EIGHTY-FOUR) Dollars ($1,004,084.00) in lawful money of the United States of America, which sum shall be due and payable on (11/29/2019) (the "Maturity Date"), in one (1) balloon payment, in like money at said office. Payment date shall be no later than six (6) months post confirmed funds transfer from Payee to Maker in the amount of (SEVEN HUNDRED FORTY-FOUR THOUSAND FIVE HUNDRED) Dollars ($744,500.00).

Prepayment Option. Maker may pay down at any time any portion of the principal sum outstanding without any prepayment penalty.

Assignment of Rights. See Appendix A

Compounding of Unpaid Payments. The undersigned agrees that time is of the essence and that in the event payment of principal or interest due under this Note is not made when due, giving effect to any grace period which maybe applicable, the outstanding balance of unpaid payments hereof shall immediately bear interest at the rate of ten (10) percent per month, for so long as such event of default continues.

Validity of Agreement to Conform to Law. All agreements between the undersigned and the holder of this Note are expressly limited so that in no contingency or event whatsoever, whether by reason of advancement of the proceeds hereof, acceleration of maturity of the unpaid principal balance, or otherwise, shall the amount paid or agreed to be paid to the holder hereof for the use, forbearance or detention of money advanced hereunder exceed the highest lawful rate permissible under any law which a court of competent jurisdiction may deem applicable hereto. If, from any circumstances whatsoever, fulfillment of any provision hereof or any instrument securing this Note or any other agreement referred to herein, at the time performance of such provision shall be due, shall involve transcending the limit of validity prescribed by law which a court of competent jurisdiction may deem applicable hereto, then, ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity, and if from any circumstances the holder hereof shall ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the

Exhibit 3
Page 37

reduction of the unpaid principal balance due hereunder and not to the payment of interest. This provision shall control every other provision of all agreements between the undersigned and the holder hereof.

Maker's Default. At the option of the holder hereof exercised by written notice to the undersigned, this Note shall become immediately due and payable upon the maker's failure to pay when due any payment of principal, interest or expenses due hereunder; or (b) failure in the performance or observance of any of the terms or conditions of any mortgage, deed of trust, security agreement or other agreement securing, guaranteeing or otherwise pertaining to this Note after giving effect to any applicable curative period which may be contained therein. Upon the occurrence of any of the following specified Events of Default, as defined under the standard conventions and terminology prescribed for promissory notes drafted under Warren's California Forms for Principal, Interest, Insolvency, Breach of Covenants, Breach of Representation and Warranties, (each herein called an "Event of Default") then, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, the Payee may, by written notice to the Maker, declare the principal of and accrued interest in respect of this Note to be forthwith due and payable, whereupon the principal of and such unpaid accrued interest in respect of this Note shall become forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Maker. Furthermore, This note shall become due and payable before the above-mentioned maturity date immediately upon the happening of any of the following events affecting any maker or indorser thereof, to wit: voluntary or involuntary filing of a petition in bankruptcy or for reorganization, execution of an assignment for the benefit of creditors, calling meeting of creditors, appointment of liquidating agent or committee, offer of composition, entry of a judgment in excess of $ 10,000 which remains unsatisfied or for over 30 days, application for appointment or appointment of any receiver, issuance of warrant of attachment or death of any maker or indorser or on default of any other obligations to the Maker.

Collection Costs. If this Note or any installment of principal or interest is not paid when due, whether at maturity or by acceleration, the undersigned promises to pay all costs of collection, including without limitation, actual attorneys' fees, and all expenses in connection with the protection or realization of the assets and proceeds available this Note or the enforcement of any subsequent memorandum or agreement created in conjunction with this Note incurred by the holder hereof on account of such collection, whether or not suit is filed hereon or thereon; such costs and expenses shall include, without limitation, all costs, expenses and attorneys' fees actually incurred by the holder hereof in connection with any insolvency, bankruptcy, arrangement or other similar proceedings involving the undersigned, or involving any endorser or guarantor hereof, which in anyway affects the exercise by the holder hereof of its rights and remedies under this Note or under any mortgage, deed of trust, security agreement, guaranty or other agreement securing or pertaining to this Note.

Waiver of Notice. Presentment, demand, protest, notices of protest, dishonor and nonpayment of this Note and all notices of every kind are hereby waived by all parties to

Exhibit 3
Page 38

this Note, whether the undersigned, principal, surety, guarantor or endorser, except as provided herein. To the extent permitted by applicable law, the defense of the statute of limitations is hereby waived by the undersigned.

<u>Death of Maker</u>. Maker of this note hereby waives all notice and demand and consent that this note shall become due and payable immediately upon the happening of any of said events. This note shall become due and payable on the Maturity Date, but payment shall be accelerated and become due and payable immediately if the Maker shall die. For the further security of the holder thereof, the undersigned covenants that so long as any part of the principal or interest of this note is outstanding and unpaid, it will not grant any security interest to any third party upon its property, or create any lien whatsoever thereon, without also thereby including therein this note, equally and ratably with every other evidence of debt, secured by any of the undersigned's property. If, while any part of the principal or interest is outstanding and unpaid, the maker hereof breaks this covenant, then the holder hereof may at his or its election, declare and make this note at once due and payable by written notice delivered to maker, and this remedy will be deemed cumulative and in addition to any other remedy available to the holder hereof. This note shall be paid without claim of set-off, counterclaim or deduction of any nature or for any cause whatsoever.

<u>Extensions Granted by Payee.</u> All indorsers hereunder agree that the holder of this note in case of non-payment thereof at maturity, or of any installment thereof when due, may grant to the maker or any indorser of said note any extension or extensions of time of payment thereof, in whole or in part, without notice to said indorsers or any of them and any such extension or extensions shall not affect in any way said indorsers' liability upon note, such indorsers hereby waiving demand, presentment of payment, notice of nonpayment and protest and do further agree that any holder of this note may in the event of default in the payment of principal of, or interest upon, this note or any installment thereof repossess and/or sell the (collateral) held as collateral security for the payment of this note without in any way relieving said indorsers, or any of them, of any liability by reason of such repossession and/or sale, applying the proceeds of sale of any such  asset less all costs to amount due under this note, and all indorsers agree to pay any deficiency on this note on demand.

<u>Litigation Fees</u>. In any action at law or in equity to enforce or construe any provisions or rights under this Note, the unsuccessful party or parties to such litigation, as determined by a court pursuant to a final offer, judgment or decree, shall pay to the successful party or parties all costs, expenses and reasonable attorneys' fees incurred by such successful party or parties (including, without limitation, such costs, expenses and fees on any appeal), which costs, expenses and attorneys' fees shall be included as part of any order, judgment or decree.

<u>General Provisions.</u> Principal and interest evidenced hereby are payable only in lawful money of the United States. The receipt of a check shall not, in itself, constitute payment hereunder unless and until paid in good funds. Whenever any payment on this Note shall be stated to be due on a day, which is not a business day, such payment shall be made on

Exhibit 3
Page 39

the next succeeding business day and such extension of time shall be included in the computation of the payment of interest of this Note. This Note is to be governed by and construed in accordance with the laws of the State of California except to the extent United States federal law permits the holder to contract for, charge or receive a greater amount of interest. In any action brought under or arising out of this Note, the undersigned hereby consents to the in personam jurisdiction of any state or federal court sitting in the state of California, and waives any claim or defense that such forum is not convenient or proper, and consents to service of process by any means authorized by California and/or Federal law.

THE UNDERSIGNED HEREBY WAIVES, AND COVENANTS THAT THE UNDERSIGNED WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS NOTE, THE SUBJECT MATTER HEREOF OR ANY DOCUMENT RELATING HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING OR WHETHER IN CONTRACT OR IN TORT OR OTHERWISE.

_____                    _____5/29/19_____

1INMM Capital, LLC                                 Date
Zachary Horwitz, Manager

Exhibit 3
Page 40

APPENDIX A

<u>ASSIGNMENT</u>

This assignment ("Assignment") between 1INMM CAPITAL LLC, located at 5550 Wilshire Blvd #523 Los Angeles, CA 90036 ("Assignor") and Pure Health Enterprises Inc., a Corporation located at  2070A West Lincoln Ave. Napa, CA 94558 ("Assignee") is dated effective as of (05/29/2019).

For good and valuable consideration, the receipt and sufficiency of which hereby acknowledged, Assignor does hereby irrevocably and unconditionally sell, grant, convey, and assign unto Assignee all of Assignor's rights, title and interest of every kind and nature, throughout the universe, until assignee is paid ($1,004,084.00) at to which time all rights, title and interest of every kind and nature revert back to Assignor and to that certain motion picture, currently entitled "RUN WITH THE HUNTED" (the "Picture") based on the original screenplay entitled "RUN WITH THE HUNTED" written by John Swab.

1.  Assignor hereby represents and warrants:

    1.1.    That Assignor is the sole and exclusive owner of the rights and privileges granted or to be granted to Assignee hereunder.

    1.2.    That, as of the effective date hereof, Assignor has the right to enter into this Assignment.

    1.3.    That, as of the effective date hereof, no part of the rights herein conveyed has in any way been encumbered, conveyed, assigned, transferred or otherwise disposed of and all such rights are therefore free and clear of any and all liens, claims, charges or encumbrances whatsoever in favor of any party whatsoever.

2.  Assignor shall indemnify Assignee, its successors, assigns, licensees and officers, and hold them harmless from and against any and all claims, liability, losses, damages, costs, expenses (including but not limited to attorney's fees) arising out of any breach by Assignor of any warranty made by Assignor hereunder.

3.  Assignee hereby assumes and agrees to be bound by all future obligations of Assignor which accrue after the date hereof.

4.  Assignor hereby waives the benefits of any provision of law known as "droit morale" or any similar law in any country of the world and agrees not to institute or permit any action or lawsuit on the ground that the Picture in any way constitutes an infringement of any "droit morale" and Assignor agrees that Assignor shall not, under any circumstances (including without limitation, the circumstances of a breach by Assignee) be entitled to enjoin the exhibition or other exploitation of the Picture, to terminate or rescind any rights granted to Assignee or to obtain any other form of equitable relief, specific performance or otherwise, any right to which Assignor expressly waives.

5.  This Assignment, and the rights granted hereunder, may not be assigned by Assignor to any person, firm or corporation. Assignee may assign this Assignment and the rights and services granted herein, together with the results and proceeds thereof, and the representations and warranties contained herein, to any person or entity.

Exhibit 3
Page 41

6.  This Assignment shall be construed in accordance with the laws of the state of California and shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, licensees and assigns. This Assignment cannot be amended or modified except in a writing signed by all parties hereto.

IN WITNESS WHEREOF, THE PARTIES HERETO HAVE EXECUTED AND DELIVERED THIS ASSIGNMENT AS OF THE (29)th DAY OF MAY 2019.

1INMM CAPITAL, LLC ("Assignor")                    PURE HEALTH INC ("Assignee")

By: _____                    By: _____

Its: MANAGING PARTNER                           Its: _____

Exhibit 3
Page 42

# EXHIBIT 4



**Private & Confidential**

## SUBJECT TO CONTRACT AND BOARD APPROVAL

|  | HBO POSITION |
|---|---|
| **DISTRIBUTOR** | Home Box Office Latin America (HBO) |
| **LICENSOR** | 1inMM Capital (Licensor) |
| **TYPE OF CONTENT** | Feature Films |
| **PICTURES** | (Working) Title: **MULTIPLE TITLES**<br>Director(s)*:<br>Producer(s)*:<br>Writer(s)*:<br>Key Cast*:<br>Production Budget*:<br>Original Language*:<br>Runtime*:<br>Rating*: not lower than PG, not higher than R<br>Nationality of Picture*:<br><br><br>**US Release Condition*:** Titles shall be no less than 25 separate commercial screens, at single widest point, on a traditional 90 days window (as reported by Box Office Mojo and Comscore).<br><br>(*Key Element.  Any change subject to approval by HBO) |
| **TERRITORY** | Latin America including Brazil.<br><br>As customarily defined by HBO and including all territories and possessions. |
| **LICENSED LANGUAGES** | English/Spanish/Portuguese and all official languages of the Territory.<br><br>For the avoidance of doubt:<br>- Latin America (including in the entire Caribbean Basin, which shall include Bermuda and the Bahamas) HBO shall retain (i) exclusive English language rights and (ii) exclusive Spanish language rights. |
| **TERM** | 7 years (starting on the earlier of acceptance of Delivery to HBO or first commercial release date by HBO) |

SUBJECT TO CONTRACT AND BOARD APPROVAL

Exhibit 4
Page 43
1

| | |
|---|---|
| | +1 year if unrecouped at the end of the Term<br>+6 months non-exclusive sell off period |
| **LICENSED RIGHTS** | -  Home Entertainment Rights (inc. DVD, BD, PPV, EST, VOD, SVOD, DTO etc.)<br>-  Television Rights (inc. PTV, FTV, Catch Up etc.)<br>-  All Other Rights (inc. Non-Theatrical, Commercial Video, Hotel/Motel, Airlines/Ship, Clip, Merchandising, Sponsorship, Audio only, Theme Park, Interactive, Soundtrack, Stage, Literary Publishing, AV/VR etc.<br><br>All Licensed Rights shall be exclusive to HBO. |
| **CATCH-UP PAYMENTS** | **Definition**: Will include 100% of the past-due MG/Advances, 100% of past-due profit participation, and a 12.5% increase in originally agreed upon MG/Advance<br><br>**Timing**: Target date on or before August 31st 2020 (08/31/2020) pending approvals, unforeseen circumstances or a material delay by Licensor's failure to approve or execute the definitive amendment on terms that are consistent with this Term Sheet, then the payment date may be delayed to the extent necessary to account for such delay by Licensor.<br><br>**$ Amounts**: (as of 6/23/2020) *<br>-MG/Advances: $209,269,703.00<br>-12.5% Increase: $26,158,712.00<br>-Profit Participation: $41,075,533.10<br>**-TOTAL: 276,503,948.00**<br><br><br>*Dollar figures to be updated to reflect final execution date of contract* |
| **PARTIAL IMMEDIATE PAYMENT OF CATCH-UP PAYMENTS** | **Definition**: This is an upfront payment of the total Catch-Up Payment amount owed<br><br>**Timing**: 20 days after execution of agreement, with good faith commitment to pay as soon as possible<br><br>**$ Amount**: $5,500,000 |
| **LATE FEES** | HBO will pay 2% monthly accruing interest rate on any amounts not timely paid. HBO will be allowed an initial grace period of 5 calendar days following due date, after which time interest will begin to accrue immediately.<br><br>Additionally, this concept will not be retroactive in nature, but rather will apply only to the new dates established vis-à-vis the Amendment and on a go-forward basis |

| | |
|---|---|
| **HBO'S SHARE OF GROSS RECEIPTS** | Distributor Rights:<br>25% of Gross Receipts up to $800,000.00<br>45% of Gross Receipts over $800,000.00 |
| **GROSS RECEIPTS DEFINITION** | "Gross Receipts" means all non-refundable monies actually received by HBO net of all and any discounts, customs, duties, excise, value added, withholding or other taxes, levies, fees, commissions, refunds, credits, rebates, adjustments, restricted currencies, digital platform access charges, trade and anti-piracy fees and HBO shall be entitled to make accruals against any of the foregoing deductions. |
| **MINIMUM GUARANTEE PAYMENT (FOR FUTURE TITLES AND THOSE NOT YET OWING @ TIME OF EXECUTION OF AMENDMENT)** | **Schedule**:<br>- 40% 9 Months following acceptance of delivery to HBO;<br>- 50% within 15 days following the next calendar quarter;<br>- 10% within 15 days following the next calendar quarter.<br><br>*Example:*<br>- *Delivery on 1/1/2021*<br>- *1st payment deadline: 10/1/2021*<br>- *2nd payment deadline: 1/15/2022*<br>- *3rd payment deadline: 4/15/2022*<br><br>**% increase** for currently contracted titles that will fall subject to this schedule: 10% |
| **NEW LICENSING FEES (FOR 7-YEAR TERM EXTENSION)** | **Definition**: HBO's payment for increasing licensing term on currently contracted titles from 3 years to 7 years.<br><br>**Timing**: To be paid within 15 calendar days following execution of Amendment<br><br>**Cohort #'s**:<br>**CY2017**: 164 Titles<br>**CY2018**: 196 Titles<br>**CY2019**: 322 Titles<br>*Note: detailed list (including delivery/acceptance dates and initial MG/Advances) to be provided by HBO*<br><br>**Cohort $ Amounts**:<br>**CY2017**: $10,365/Title - $1,699,860<br>**CY2018**: $117,985/Title - $23,125,060<br>**CY2019**: $203,218/Title - $65,436,196<br>**TOTAL: 90,261,116** |
| **HBO'S RECOUPABLE COSTS** | The following costs shall be fully recoupable from Licensor's share of Gross Receipts:<br>- P&A Costs (if any)*;<br>- Minimum Guarantee;<br>- Origination Costs (inc. DLT, creation of dubs/subs, remastering, new format costs, etc.)*; |

|  | - Central Marketing Costs (if any)*;<br>- TV Costs calculated at 6% of Television Gross Receipts;<br>- Interest (Prime plus 3%)<br>- Additional Delivery Costs (if any)*;<br>- Overhead (if any)*;<br>- Any other costs (if any, to be mutually approved)*.<br><br>**Cap on certain costs:** 10% of Gross Receipts *(P&A costs, Origination costs, Central Marketing Costs, Additional Delivery Costs, Overhead costs, and Any Other Costs – taken together shall not exceed the % cap. Any excesses will require 1inMM's consent)* |
|---|---|
| **OPTION** | HBO to have an exclusive first and last matching right (on HBO's standard terms to be negotiated in good faith in the contract) to:<br><br>- Extend the Term;<br>- Acquire the Licensed Rights in the reserved territories<br>- Acquire all the rights currently licensed to 3rd party distributors (in the world excluding the Territory) as soon as they become available.  Where 3rd party distributors (will) have been granted a first/last option, HBO shall have a second/last option instead. |
| **DEFAULT** | See standard Distribution Agreement. |
| **DELIVERY MATERIALS** | - Delivery Date/s to be agreed in good faith.<br>- All delivery materials as per HBO's customary delivery schedule to be delivered at Licensor's cost, to a location designated by HBO.  No other distributor shall be delivered to earlier than HBO.<br>- All bonus material shall be fully cleared and bought out by Licensor.<br>- HBO shall have free access and free use of all of creative assets for the Picture created by the US Distributor(s) and Licensor (including but not limited to: teasers, trailers, TV/digital spots (inc. 30"/20"/6"/3", character spots), theatrical key art (inc. one sheet, quad, character art) home ent. key art (inc. digital packshot, digital landscape, DVD/BD wrap), clips, access to all social media assets etc.), which shall be fully cleared and bought out (including the music) for free use in HBO's Territory.<br>- Licensor will procure free access to and free use of Licensor's dubs and subs of the Picture, taking into account HBO's delivery and release requirements. |
| **HOLDBACKS** | Exploitation of the Picture shall be subject to HBO's standard holdback conditions (from time to time) and will be subject to mutual agreement |
| **MUSIC FEES & RESIDUALS** | All original score to be fully cleared and bought out for all in- and out-of-context exploitation.  All 3rd party music to be fully cleared and bought out for in-context use and a minimum of 2 (two) key 3rd party music tracks also fully cleared and bought out for out-of-context use.  Licensor shall be responsible for all residual payments or fees of any. |

**NON-BINDING**. The terms and conditions set forth herein do not constitute a binding offer or acceptance. This Offer is an expression of intent only, does not express the full agreement of the Parties, is subject to change, and is not binding on the Parties except where noted. The Parties do not intend to be legally bound until they enter into definitive agreements regarding the subject matter hereof.

**IN WITNESS WHEREOF,** the parties hereto have executed and delivered this Term Sheet as of June 23, 2020

**HOME BOX OFFICE LATIN AMERICA**

**By:**

**Name**:

**Title**:

**Date**:

**1INMM CAPITAL (LICENSOR)**

**By:**

**Name**: Zachary Horwitz

**Title**: Managing Member

**Date**:

# EXHIBIT 5

## DISTRIBUTION AGREEMENT

This Distribution Agreement ("Agreement"), dated October __, 2020 (the "Effective Date"), confirms the terms and conditions pursuant to which HBO Latin America Holdings ("HBO"), shall acquire from 1inMM Capital LLC, a California limited liability company with an address at 3129-A S. La Cienega Blvd, Los Angeles, California, 90016 ("1inMM"), certain distribution rights in the "Program" in the "Territory" (as such terms are defined below) subject to the terms contained herein, all as set forth below.

1.   Definitions. All capitalized terms set forth herein, unless elsewhere defined, shall have the following meanings:

a.   "Authorized Languages" means all languages, including all dubbed, voice-lectored and subtitled versions.

b.   "Availability Date" means day and date with the Program's earliest video-on-demand availability date in the Mexico and/or Brazil.

c.   "Final Delivery" shall mean 1inMM's full, final and complete delivery of the Delivery Items for the Program (including any and all attempts to cure), of quality acceptable to HBO, as confirmed in writing by HBO.

d.   "Distribution Expenses" means all costs and expenses incurred in connection with the release, delivery, marketing, distribution and exploitation of the Program and the Rights (as defined in Section 5), including, without limitation, all expenses for advertising, marketing, promotion, merchandizing, and publicity of the Program; all expenses for the full and complete delivery of Delivery Items (as hereinafter defined) and translation thereof; shipping, mailing and insurance costs; storage; cleaning and inspection; mastering, submastering, and duplication costs, duplication of scripts and music cue sheets; residuals; renewal of music synchronization licenses and master use licenses (to the extent same are the responsibility of Licensee); all taxes (other than corporate income taxes), whether sales, gross receipts, value added, withholding, remittance, excise, property, use, transfer or similar taxes, levies, customs duties, imp ort charges, penalties, fines or interest, however denominated, imposed and whether by a governmental authority or taxing authority (whether federal, local , territorial or state of the United States or any country in the Territory); foreign language dubbing and/or subtitling; any Third Party Payments (as defined at Section 9) to the extent paid for by HBO, and all other usual distribution costs customarily incurred.

e.   "Guaranteed Minimum Fees" means the Existing Title Guaranteed Minimum Fee and the New Guaranteed Minimum Fees as set forth in Section 7 below.

f.   "Gross Receipts" means the aggregate of all monies actually received by HBO from the exploitation of the Rights, monies and royalties collected by a collecting society or governmental agency with respect to the exploitation of the Program, retransmission income, secondary broadcasts, tax rebates, less rebates, discounts, reasonable reserves for returns and bad debt (each of which will be liquidated within one (1) year from its establishment), credit adjustments, advertising agency commissions, security deposits, advances or other similar sums received until earned or forfeited or credited and any amounts received and thereafter refunded (except to the extent such sums are non-refundable) related to the Program. All Gross Receipts are the sole and exclusive property of HBO, subject only to 1inMM's contractual entitlements pursuant to Section 11 hereof.

Exhibit 5
Page 48

g. "Latin America" means Anguilla, Antigua, Argentina, Aruba, Bahamas, Barbados, Barbuda, Belize, Bermuda, Bolivia, Bonaire, Brazil, Cayman Islands, Chile, Colombia, Costa Rica, Cuba, Curacao, Dominica, Dominican Republic, Ecuador, El Salvador, French Guiana, Grenada, Guadeloupe, Guatemala, Guyana, Haiti, Honduras, Jamaica, Martinique, Mexico, Montserrat, Nicaragua, Panama, Paraguay, Peru, Saba, St. Barthelemy, St. Eustatius, St. Kitts & Nevis, St. Lucia, St. Maarten, St. Martin, St. Vincent & Grenadines, Suriname, Trinidad & Tobago, Turks & Caicos, Uruguay, Venezuela, and British Virgin Islands.

h. "License Period" shall have the meaning set forth in Section 3.

i. "Program" shall mean the Titles and the New Titles collectively.

j. "Recoupable Costs" means the following costs to the extent reasonable and out of pocket: Minimum Guaranteed Fees, origination costs (i.e., DLT, creations of voice dubs and subtitles, remastering, and new format costs), central marketing costs, TV costs calculated at 6% of Television Gross Receipts, interest at prime plus 3%, delivery costs, and other mutually approved costs.

k. "Television Rights" means the right to exhibit, distribute market, display, transmit, broadcast, perform, transmit, reproduce, advertise, publicize, sell copies of, license, derive revenues from, rent, dispose of, communicate publicly or privately, turn to account and otherwise exploit the Program by any form of television media now known or hereafter devised or commercially exploited (including, but not limited to, subscription pay television, basic television, free television, pay-per-view, on demand, video-on-demand, free-on-demand, free-video-on-demand, subscription-video-on-demand, advertising-supported on demand, near-video-on-demand, hotel/motel, airlines/ship, clip, merchandising, non-theatrical, electronic rental, download to rent, digital rental, electronic sell-through, digital sell-through, download to own, download to burn and on demand retention licensing, audio only, theme park, stage, soundtrack, interactive, etc.), regardless of whether or how paid for, programmed, or marketed to the viewer, and regardless of how delivered to or received by the viewer (whether by over-the-air, cable, satellite, wire, fiber, ADSL, DSL, MDS, Internet, mobile, wireless, closed circuit, or other means, method, process, or device or delivery system now known or hereafter devised, discovered, created, or developed) in all versions, resolutions, formats, and sizes, and shall, for the avoidance of doubt, include without limitation reception on television sets, personal computers, IP-enabled devices, mobile devices, and analogous devices.

l. "Rights" means the rights granted to HBO pursuant to Section 4 hereof.

m. "Territory" shall mean Latin America.

2. License Period. The "License Period" for each Title within the Program, means the period commencing on the Availability Date of such Title and expiring seven (7) years thereafter; provided, however, that the License Period shall include: (i) an additional non-exclusive sell-off period of six (6) months for all licenses in existence as of the last day of the License Period during which HBO may continue to exercise the Rights; and (ii) an additional one (1) year period if HBO has not recouped its costs included pursuant to this Agreement (other than the Catch-Up Payments). Included in Schedule A attached hereto is the Availability Date of each Title. For each New Title, the License Period shall commence upon Final Delivery thereof.

Exhibit 5
Page 49

3. <u>Rights</u>.

a. For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, 1inMM hereby grants to HBO, with respect to each Title within the Program, the exclusive rights throughout the Territory and during the Title's License Period for so long as HBO is not in default of the terms and conditions set forth herein beyond any applicable notice and cure periods, to exploit, and to sublicense to others the right to exploit, the Television Rights in the Title (and all of its themes, materials and other elements), in all formats now known or hereafter devised (including, without limitation, high definition, standard definition and 3D), including the right to (and cause and license others to) market, advertise, publicize, derive revenues from and otherwise exploit the Title. Without limiting the generality of the foregoing, during the a Title's License Period for so long as HBO is not in default of the terms and conditions set forth herein beyond any applicable notice and cure periods and throughout the Territory, 1inMM hereby grants to HBO the sole, exclusive and irrevocable right to: (i) license the rights granted for the Title for exhibition on such terms as it deems appropriate, and HBO shall have complete discretion relating to the promotion and distribution of the Program; (ii) edit and to permit the editing of all prints of the Title to conform to time segment requirements or to the orders of any duly authorized public censorship authority and to insert commercial material at appropriate time intervals during the exhibition of the Title and to dub and subtitle and to permit the dubbing and subtitling of the Title in the Authorized Languages as it sees fit; (iii) translate the title of the Title into any language and, to the extent cultural differences necessitate that the title be changed, to change such title; (iv) manufacture and distribute, or cause to be manufactured and distributed, two-dimensional advertising, publicity and promotional materials of all types and kinds for use solely in connection with the exhibition and distribution of the Title based on the images and materials provided by 1inMM; and (v) include HBO's (or one or more of HBO's affiliates, HBO's or sub-distributor's) name, logo, trademark or emblem in such manner, position, form and substance as HBO may elect on the prints of the Title, and on all advertising and publicity material for the Title together with such words as HBO may elect indicating that the Title is being distributed by HBO or one of its sub distributors, licensees or any of its affiliates.

b. Without limiting the foregoing, for each Title, 1inMM further grants to HBO, during the applicable Title's License Period for so long as HBO is not in default of the terms and conditions set forth herein beyond any applicable notice and cure periods, and throughout the Territory, the right to use and license the use of trailers, excerpts, clips supplied by 1inMM or made by HBO and stills supplied by 1inMM from the Title in connection with the promotion and exploitation of the Program, to collect all copyright royalties, retransmission, private copy or similar monies relating to the Program, and to use the approved names, voices and likenesses, which 1inMM shall provide to HBO in a timely manner, of all persons who appear in, or above-the-line persons who rendered services in connection with, the production of the Title for the purpose of advertising and promoting the Program.

c. 1inMM acknowledges that any inadvertent, unavoidable, incidental and de minimus overspill of an unencrypted satellite signal outside of the Territory shall not constitute a breach of this Agreement, provided HBO takes commercially reasonable steps to eliminate such unencrypted satellite signal outside of the Territory promptly following notice thereof.

d. HBO shall include the following credit information in any version of the Program authorized by 1inMM for exhibition hereunder as well as in all advertising and promotional materials authorized for exhibition or dissemination in association therewith: "[1inMM TO PROVIDE COPYRIGHT NOTICE]".

Exhibit 5
Page 50

4.   <u>Reserved Rights</u>. All rights and licenses in the Program not granted to HBO hereunder (e.g., theatrical, derivative, novelization, souvenir, music publishing and music soundtrack rights, merchandising, publication, commercial tie-in and/or co-promotion (un less approved in writing by 1inMM but in no event on an exclusive basis), product placement, games, videogames, ring tones, alerts, wallpapers, screensavers, messaging applications, digital greeting cards, theme park and location based entertainment, remake, sequel, tv series, live stage/stage play, clip license rights (which excludes , for the avoidance of doubt, the right to use clips for promotional purposes as set forth in Section 4.b.), and all rights to the underlying material to the Program) are reserved by 1inMM and may be exploited by 1inMM without limitation or restriction by HBO except as may be set forth herein.

5.   <u>Delivery</u>. Upon the mutual written agreement of 1inMM and HBO, the parties shall have the right to amend Schedule A to account for new Titles (each, a "<u>New Title</u>"), the license period which will commence upon the thirtieth (30) day after 1inMM, at its sole cost and expense, delivers to HBO all elements, materials, documents and advertising and promotional materials set forth Exhibit B (which is attached hereto and incorporated herein by this reference), with respect to the such new Title(s) (the "<u>Delivery Items</u>"). All Delivery Items shall be of first-class technical quality suitable for the manufacture of first class broadcast quality exhibition materials of the Programs, as determined in HBO's sole discretion. HBO shall provide notice to 1inMM specifying any technical defect within thirty (30) days of receipt of the Delivery Items from 1inMM. Upon such notice to 1inMM, 1inMM shall either (i) correct the defect and redeliver the corrected Delivery Item or (ii) deliver a replacement Delivery Item within thirty (30) days of receipt of HBO's notice. Approval by HBO of less than all Delivery Items or any exploitation of the Program will not be deemed a waiver by HBO of 1inMM's obligation of complete delivery of a New Title.

6.   <u>Distribution Fee</u>. In connection with HBO's exploitation of Rights in the Territory, HBO shall retain a Distribution Fee as set forth in the table below:

| **Gross Receipts** | **Distribution Fee** |
|---|---|
| Gross Receipts equaling or less than US$800.000.00 | 25% |
| Gross Receipts over US$800,000.00 | 45% |

7.   <u>Settlement Payments</u>

   a.   <u>Guaranteed Minimum Fees</u>.

      i.   HBO shall pay 1inMM the following the following guaranteed minimum fees (collectively, the "<u>Existing Title Guaranteed Minimum Fee</u>"):

         1.   $10,365 per Title in the CY2017 Cohort;

         2.   $117,985 per Title in the CY2018 Cohort; and

         3.   $203,218 per Title in the CY2019 Cohort.

Exhibit 5
Page 51

    ii.  HBO shall pay the Existing Title Guaranteed Minimum Fee, totaling $90,261,116.00 within One Hundred and Twenty (120) calendar days of the effective date.

    iii.  In addition to the foregoing, HBO shall pay 1inMM a guaranteed minimum fee for each New Title ("<u>New Guaranteed Minimum Fees</u>"), which shall be set forth on Schedule A at such time as the Schedule is amended to account for such New Title. HBO shall pay 1inMM New Guaranteed Minimum Fees pursuant to the following payment Schedule: (i) forty percent (40%) of the New Guaranteed Minimum Fees within nine (9) months of Delivery of the New Title; (ii) fifty percent (50%) within fifteen (15) days following the calendar quarter after the initial payment; and (iii) ten percent (10%) within fifteen (15) days following the second calendar quarter following after the initial payment.

b.  <u>Catch Up Payments</u>. HBO and 1inMM hereby acknowledge and agree that as of the date hereof, HBO owes an amount to 1inMM equal to $284,600,645.00 (the "<u>Catch Up Amount</u>"). HBO shall pay the Catch Up Amount on or before October 15, 2020 (the "<u>Final Catch Up Date</u>")

c.  <u>Grace Period And Force Majeure.</u> Except for the payments contemplated by Section 7(a), for each payment contemplated by this Section 7 and this Agreement, the Parties understand that, on occasion, circumstances outside of HBO's control will materially affect HBO's ability to make timely payments.

    i.  In the event that such circumstances outside of HBO's control do so materially affect HBO's ability to make timely payments, HBO shall have the right, in its sole discretion, said discretion to be exercised in good faith, to delay payment by up to forty-five (45) days without penalty (the "Grace Period"), **provided, however,** that if HBO elects to delay payment, it will remit $20,000,000.00 to 1inMM on or before the last day of the Grace Period, such amount to be deducted from the remaining balance of the Catch Up Amount on remittance.

    ii.  In the event that such circumstances outside of HBO's control materially affect HBO's ability to make a payment within the Grace Period, HBO shall have the right, in its sole discretion, said discretion to be exercised in good faith, to delay payment by an additional thirty (30) days (the "Extension Period"), **provided, however,** that if HBO elects to delay payment, it will remit $20,000,000.00 to 1inMM on or before the final day of the extension period, and any amounts not paid before or during the extension period shall be subject to 3% interest compounding daily.

    iii.  In the event that such circumstances outside of HBO's control materially affect HBO's ability to make payment for more than thirty (30) days beyond the conclusion of the Extension Period, 1inMM agrees to negotiate a resolution with HBO in good faith, **provided, however,** that: 1) HBO has remitted the fees contemplated by

Exhibit 5
Page 52

subsections 7(c)(i) and 7(c)(ii); 2) the unpaid amounts will continue compounding at 1.5% monthly interest compounding daily while negotiations are ongoing; 3) if no resolution is reached within sixty (60) days of the commencement of negotiations, 1inMM shall have the right, in its sole discretion, to take any and all actions necessary to protect its rights under this Agreement.

8.   Certain Expenses.

a.   Third Party Payments. As between 1inMM and HBO, 1inMM shall be responsible for, and shall pay, all third party  payments (other than performance fees for the public performance of any music contained in the Program) that may become payable as a result of HBO's exploitation of its rights  hereunder ("Third Party Payments") including, without limitation, any and all mechanical reproduction fees, download fees, payments and/or tariffs with respect to exploitation, advertising and promotion of the Program and residuals, reuse fees, and participations in the proceeds (net or gross) of the Program. If 1inMM fails to make such payments, HBO shall have the right (but not the obligation) to make such Third Party Payments and may: (i) deduct from amounts payable to 1inMM hereunder any such amounts paid to third parties; and/or (ii) invoice 1inMM for any such amounts paid to third parties.

9.   Payment of Distribution Expenses. As between 1inMM and HBO, HBO shall be responsible for and shall pay all Distribution Expenses. Distribution Expense(s) incurred by HBO shall be deducted as provided in Section 11 below.

10. Allocation and Payment of Gross Receipts. In full consideration of the Rights and the representations, warranties and  covenants made by 1nMM hereunder, HBO shall pay to 1inMM, for the Program, an amount ("1inMM's Share") equal to one hundred percent (100%) of the Net Receipts (as defined below) derived from the distribution and exploitation of the Program by HBO. As used herein, the term "Net Receipts" shall mean all Gross Receipts less the following deductions: (a) HBO's Distribution Fee as set forth in Section 6 on account of the exploitation of the Program by HBO; (b) all Third Party Payments to the extent paid for by HBO; (c) all Distribution Expenses incurred in connection with the exploitation of the Program by HBO; (d) remaining recoupable costs not yet deducted; provided however that all expenses for origination, advertising, marketing, promotion, and publicity of the Program shall not exceed Ten Percent (10%) of Gross receipts without 1inMM's prior written consent; and (e) Guaranteed Minimum Fee Payments, provided however that Guaranteed Minimum Fee Payments shall only be deducted from Gross Receipts for the New Title in connection with which Guaranteed Minimum Payments were made.

11. Payment and Accounting Statements.

a.   HBO shall have the right to cross-collateralize the Gross Receipts (after HBO deducts its Distribution Fee) earned for exploitation of the Rights in the Program throughout the Territory and the License Term for purposes of recouping the Distribution  Expenses, Third Party Payments, and the Guaranteed Minimum Payment, and calculating 1inMM's Share.

b.   Subject to Section 10 hereof, HBO shall pay 1inMM's Share to 1in1M as follows: ninety (90) days after each quarter for the duration of the License Term.

c.   All payments due hereunder shall be payable in U.S. Dollars. 1inMM hereby directs HBO to make any and all payments due under this Agreement to 1inMM as set forth below:

Exhibit 5
Page 53

Bank Name:
Bank Address:
ABA Number:
Account Number:
Account Name:

    d.   HBO shall account to 1inMM and provide customary participation statements for the following periods in which related Gross Receipts are received: ninety (90) days after each calendar quarter for the three (3) years. Such customary participations statements shall be in a form HBO customarily details such calculations for other licensors. If in any period the deductions allowed pursuant to this Agreement for the Programs exceed Gross Receipts reported for the Programs, such excess shall be deducted from Gross Receipts in each succeeding period, as applicable, until such excess has been totally recouped. Accounting Reports shall be sent to the parties as set forth in Section 20

    e.   If HBO fails to make any payment on the date such payment is due hereunder under Section 11, then, in addition to 1inMM's other rights and remedies, HBO shall pay interest on the deficiency of the amount due at the rate of 2% per month or the maximum amount permitted by law, whichever is greater. In addition, HBO shall be responsible for all costs incurred by 1inMM in the collection of all outstanding amounts, including reasonable legal costs. Such interest shall accrue as of the day such deficiency in payment arose until the date such amount is paid in full including interest and all legal expenses.

    f.   Subject to the further provisions of this Agreement, HBO shall pay all taxes and levies (including, without limitation, withholding taxes on any payments due pursuant to this Agreement) that may be required under the laws of the countries comprising the Territory and HBO shall obtain at its own cost and expense all necessary licenses, approvals and other documentation that may be required in order to comply with the laws of the nations of the Territory, and with the performance of HBO's obligations pursuant to the Agreement.

    12.   <u>Reports and Statements.</u>

    a.   HBO shall report to 1inMM if any payment is due, within seventy-five (75) days after the end of each applicable Accounting Period (as defined below) along with an accounting statement (each, an "***Accounting Statement***"). Accounting Statements shall be based on the books and records maintained by HBO of HBO's exploitation of the Rights and HBO undertakes to keep all such books and records (the "***Records***").

    b.   Following HBO's initial exploitation of the Rights, customary reporting shall be rendered on a quarterly basis for two (2) years, then semi-annually for three (3) years, then annually (as to each, an "***Accounting Period***"). HBO will cause to be rendered such Accounting Statements within seventy five (75) days after the last day of the applicable Accounting Period; ***provided***, ***however***, that no Accounting Statement need be rendered for any Accounting Period in which no Gross Receipts are received, unless requested by 1inMM, and no payment need be issued for any Accounting Period in which monies received by HBO equal less than One Thousand Dollars ($1,000). In the event that no payments are due to 1inMM for two (2) consecutive years, then HBO

Exhibit 5
Page 54

shall have no obligation to render any Accounting Statement until such time as payments are owed to 1inMM hereunder or as requested once per annum by 1inMM.

        c.      1inMM will be deemed to have consented to all Accounting Statements rendered by HBO or its assignees, licensees or successors, which will be binding upon, and not subject to objection by, 1inMM, unless specific written objection to such Accounting Statement or 1inMM's notice that it intends to conduct an audit is received by HBO within one (1) year from the date such Accounting Statement was rendered. 1inMM may have an entertainment industry experienced certified public accountant examine (not retained on a contingency basis) and audit the Records with respect to Programs once (and only once) annually during the Term at 1inMM's sole cost and expense to ensure the accuracy of reporting and payments. Any such audit shall take place at HBO's principal place of business during normal business hours and shall not unreasonably interfere with HBO's course of business. No audit with respect to any Accounting Statement may commence later than twelve (12) months from the rendition of the Accounting Statement, nor may continue for longer than thirty (30) consecutive days. 1inMM's right to examine the Records is limited to records specifically relating to the licensed content in question. In the event of any discrepancies greater than ten percent (10%) of the amount that should have been reported and paid, but no less than US$1,000, HBO shall pay the discrepancy and all reasonable out-of-pocket costs of audit incurred by 1inMM. 1inMM will have one (1) year from the date of a timely written objection to an Accounting Statement or its notice of intention to audit to bring suit or commence an audit; thereafter, 1inMM will be deemed to have finally and conclusively waived its right to bring suit or commence an audit in relation to the respective Accounting Statement only. The forgoing shall be without prejudice to 1inMM's right to audit subsequent Accounting Statements with regards to amounts contained in the cumulative portion of any such Accounting Statement so long as such amounts were not contained in a prior Accounting Statement that has already been the subject of an audit or a dispute and contested in accordance with the foregoing sentence.

        d.      If 1inMM is overpaid by, or indebted to, HBO for any reason, at HBO's election, HBO may deduct and retain for its own account an amount equal to such overpayment or indebtedness from any sums that may become due or payable by HBO to 1inMM or for the account of 1inMM.

        e.      1inMM shall provide HBO with written notice of any non-payment or lack of reporting by HBO, and HBO shall have thirty (30) business days from the date HBO receives such notice to cure any such breach.

    13. 1inMM's Representations and Warranties. 1inMM hereby covenants, warrants and represents to the best of its knowledge, to HBO each and all of the following:

        a.  The Program is protected by all the applicable copyright laws throughout the Territory and that such copyrights are and shall be valid and subsisting throughout the Territory during the Program's License Period.

        b.  The Program, when delivered to HBO and thereafter, will be free and clear of any lien, claim, charge, encumbrance, security interest, restriction, agreement, commitment or arrangement with any third party which would, in any way, interfere with, impair or adversely affect any of the Rights granted to HBO hereunder, and (other than as specifically provided in this Agreement) there are and will be no payments of any kind required to be made by HBO in respect of, or as result of, any use by HBO of such Program hereunder.

Exhibit 5
Page 55

c.   1inMM will not exploit and will not authorize any third party to exploit Television Rights in the Program during the License Period hereunder.

d.   1inMM does not engage in any product placement or product integration with the Program except as set forth in a letter to HBO no later than the Final Delivery Date, signed by 1inMM, setting forth all product placement arrangements entered into by 1inMM in connection with the Program and the consideration provided by both the supplier (e.g., payment, free or discounted product) and the production (e.g., visible display of labels, verbal mention of brand, etc.). For any non-monetary consideration received from suppliers, linMM shall provide HBO an estimate of the value of such consideration (in U.S. Dollars). 1inMM's letter shall be accompanied by available substantiating documentation (e.g., written agreements, confirmation letters) as well as a listing of the footage notations determined on the same basis as the "Combined Continuity, Dialogue and Spotting List" at which all such product placements are seen or heard.

e.   1inMM has obtained all of the rights, permissions and licenses (including all music synchronization licenses) required to enable HBO to fully exploit the Program pursuant to the terms of this Agreement including, without limitation, the right to use any performers' names, voices, likenesses and biographies to advertise and promote such Program.

f.   No part of the Program (including the music contained therein) nor HBO's exercise of any rights granted hereunder will infringe upon the trademark, trade name, copyright, right of privacy, property right or any other right of any person or entity, and no part of the Program shall contain anything defamatory, tortious or which would violate the common law, statutes or regulations of any jurisdiction.

g.   To the extent the Program or any underlying property is based upon or related to, events in the life of real persons, living or dead, or portrays real persons, 1inMM has obtained all personal releases and other rights necessary to permit HBO to exploit the Program in the manner provided herein without violating any third party rights or incurring any obligation to any third party.

h.   1inMM has full power and authority to make this Agreement and has not done and will not do, or permit any person or entity to do, anything which would interfere with the full performance of 1inMM's obligations or HBO's rights hereunder; this Agreement is the legally valid and binding obligation of 1inMM enforceable against 1inMM in accordance with its terms; and 1inMM is a corporation duly formed and validly existing in good standing under the laws of California.

i.   The non-dramatic performing rights to all music contained in the Program are (a) controlled by BMI, ASCAP, SOCAN, SESAC or a performing rights society having jurisdiction in the Territory; (b) in the public domain; or (c) controlled by 1inMM (in which event such rights are hereby licensed to HBO to the extent necessary for the exercise of HBO's rights hereunder). 1inMM does not represent or warrant that HBO may exercise the performing rights in the music without the payment of a performing rights royalty or license fee for music falling within category (a). As between HBO and 1inMM, HBO shall be responsible for the payment of any required performing rights royalty or license fee.

j.   1inMM is familiar with and shall abide by the requirements of the Foreign Corrupt Practices Act and meets all the eligibility requirements for the safe harbor certification set forth in 18 U.S.C. section 2257A(h)(l) and 28 C.F.R. section 75.9(a)(l) -(3).

Exhibit 5
Page 56

k.  All Delivery Items delivered by 1inMM as part of delivery hereunder are complete and accurate, and HBO will incur no liability to any third party from its reliance thereon and/or compliance therewith.

14.  Limitations on Warranties.

a.  The representations and warranties contained in this Agreement are in lieu of all other representations, warranties or guarantees, express or implied, which could be deemed applicable to this Agreement or the Program. HBO acknowledges that 1inMM has made no warranties with respect to the Program, which are solely the responsibility of HBO. **NO EXPRESS WARRANTIES AND NO IMPLIED WARRANTIES AS TO MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE OR USE OR OTHERWISE WITH RESPECT TO THE PROGRAM SHALL APPLY NOR HAVE ANY BEEN MADE BY LICENSOR. LICENSEE HEREBY WAIVES ALL SUCH WARRANTIES OR GUARANTIES, EXPRESS OR IMPLIED, ARISING BY LAW OR OTHERWISE.**

b.  **HBO FURTHER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS SET FORTH IN THIS AGREEMENT, NEITHER 1INMM NOR ANY OF ITS AFFILIATES, EMPLOYEES, AGENTS OR REPRESENTATIVES HAVE MADE ANY PROMISES OR REPRESENTATIONS TO HBO CONCERNING THE SUBJECT MATTER OF THIS AGREEMENT AND THAT ANY PROMISES OR REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT ARE OF NO FORCE OR EFFECT.**

c.  **WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, 1INMM, AND ITS AFFILIATES, MAKES NO REPRESENTATION OR WARRANTY AS TO THE AMOUNT OF GROSS RECEIPTS RELATING TO THE PROGRAM THAT HBO WILL ACHIEVE OR THE QUALITY OR SUCCESS OF THE PROGRAM OR THE LICENSE HEREBY GRANTED.**

d.  **HBO HEREBY ACKNOWLEDGES AND AGREES THAT NEITHER 1INMM NOR ANY OF 1INMM'S AFFILIATES AND/OR ANY AGENTS OR REPRESENTATIVES OF ANY OF THEM SHALL HAVE ANY OBLIGATION WHATSOEVER WITH RESPECT TO SALES, MARKETING OR PROMOTIONAL EFFORTS REGARDING THE LICENSE HEREBY GRANTED EXCEPT AS EXPRESSLY PROVIDED HEREIN. HBO HEREBY REPRESENTS AND WARRANTS THAT IT FULLY UNDERSTANDS THAT IT SHALL HAVE SOLE RESPONSIBILITY WITH RESPECT TO THE SUCCESS OF THE LICENSE HEREBY GRANTED.**

15.  HBO's Representations and Warranties.

a.  HBO hereby covenants, warrants and represents to 1inMM it has the full power and authority to make this Agreement; this Agreement is the legally valid and binding obligation of HBO enforceable against HBO in accordance with its terms; HBO is a corporation duly formed and validly existing in good standing under the laws of the state of California.

16.  HBO hereby covenants, warrants and represents that neither HBO nor its affiliates will engage, facilitate, solicit or endorse a) the unapproved, unauthorized, or non-confirming use of the Program or b) HBO's use of any patent, trademarks, know how, trade secret, idea, process, method, device, letter, word, symbol, character, design or the like on, affixed to, or used in connection with the

Exhibit 5
Page 57

Program other than the intellectual property rights for which 1inMM is responsible pursuant to this Agreement.

17. Ownership Rights.

a.   All rights in and arising from the Program (including trademarks, design, patent and copyright rights which are independently protectable) are reserved to 1inMM. Any such rights which may arise in connection with HBO's use and distribution of the Program shall be the property of 1inMM; provided, that HBO shall have the right, to the extent necessary in exercising its rights hereunder, to the use of such rights during the License Term only in the Territory. All uses of the Program by HBO and any rights that may arise therefrom shall inure to the sole and exclusive benefit of 1inMM.

b.   During and after the License Term, HBO shall NOT, except as set forth herein or otherwise approved by 1inMM:

i.   attack or question the validity of, or assist any person, in attacking or questioning, the title or any rights of or claimed by 1inMM, or its affiliates and licensees and sublicensees in and to the Program and any intellectual property rights associated therewith;

ii.   directly or indirectly seek for itself, or assist any third party or parties to use or acquire, any rights, proprietary or otherwise, in the Program, without the prior written approval of 1inMM;

iii.   file or prosecute one or more trademarks applications regarding HBO's use of the Program anywhere in the world, unless first requested to do so in writing by 1inMM; or

iv.   use or act in concert with any party to use the Program in any manner or form unless such manner or form has been approved by 1inMM pursuant to the this Agreement; moreover HBO shall not use or act in concert with any party to use of any variation of the Program unless such variation is approved pursuant to this Agreement.

18. Indemnification.

a.   Each party hereto (the "Indemnifying Party") shall indemnify, defend and hold harmless the other party, and its successors , licensees, assigns, and employees, officers and directors (collectively, for the purposes of this Section, referred to as "Indemnified Party" from and against any and all liability, loss, damage, cost and expense, including, without limitation, reasonable attorneys' fees (but excluding lost profits or consequential damages) arising out of any breach or alleged breach (including, in the case of 1inMM as Indemnifying Party, a breach of 1inMM's delivery requirements hereunder), or claim by a third party with respect to any warranty, representation or agreement made by the Indemnifying Party herein.

b.   The Indemnified Party shall give prompt written notice to the Indemnifying Party of any claim to which the foregoing indemnification applies and the Indemnifying Party shall undertake, at its own cost and expense, the defense thereof, provided that the failure to provide such notice shall excuse the Indemnifying Party's obligations only to the extent such failure prejudices the Indemnifying Party. The Indemnified Party may, at its option and expense, engage its own counsel. If the Indemnified Party settles or compromises any such suit, claim or proceeding, the amount thereof shall be charged to the Indemnifying Party, provided that the Indemnifying Party's approval, to be reasonably exercised, has been secured. Neither party may settle any claim or action without the prior

Exhibit 5
Page 58

written consent of the other party if such settlement would in any manner materially impair or inhibit the quiet enjoyment of such other party's rights hereunder or would result in any manner of injunctive or injunctive-like relief.

19. <u>Cessation of Rights</u>. Subject only to HBO's rights as set forth in this Agreement, upon expiration or termination of this Agreement for any reason all rights and approvals herein granted to HBO shall cease and all rights shall revert to 1inMM. HBO shall have a thirty-day grace period to discontinue any and all uses of the Program and shall not thereafter exploit the Program or any portion thereof.

20. <u>Default</u>.

   a. 1inMM shall be in default of this Agreement upon the occurrence of any of the following (collectively, the "<u>1inMM Events of Default</u>"): (i) 1inMM fails or refuses to perform its material obligations hereunder or breaches any material provision hereof, or (ii) 1inMM goes into receivership or liquidation, or becomes insolvent, or a petition under any bankruptcy act shall be filed by or against 1inMM (which petition, if filed against 1inMM, shall not have been dismissed within thirty days thereafter), or 1inMM takes advantage of any applicable insolvency, bankruptcy or reorganization or any other like or analogous statute, or experiences the occurrence of any event analogous to the foregoing. If 1inMM fails to cure a 1inMM Event of Default specified in (i) above that is curable within thirty (30) days from receipt of written notice from HBO of such default or immediately upon a 1inMM Event of Default under (ii) above that is not curable under (ii) above, HBO shall have the right to immediately terminate this Agreement. 1inMM acknowledges that the intellectual property rights and licenses in and to the Program granted to HBO herein would be governed by 11 USC Section 365(n) in the event of the commencement of a bankruptcy case by or of 1inMM. 1inMM acknowledges and agrees that, notwithstanding any rejection of this Agreement in any bankruptcy case, HBO may elect to continue to enjoy all exclusive rights and licenses granted in the Program for the entire License Period as provided herein.

21. <u>Copyright</u>. 1inMM hereby acknowledges and agrees that the Program shall contain a copyright notice in the name of the copyright proprietor conforming to and complying with the requirements of the applicable copyright laws of the Territory, and HBO shall not remove or delete such copyright notice. Subject to 1inMM's prior written approval, not to be unreasonably withheld, conditioned or delayed, HBO may, in consultation with 1inMM, in its own name or in the name of the copyright proprietor, take such steps as HBO may deem necessary or appropriate by action at law or otherwise, to prevent any unauthorized reproductions, exhibition or distribution of the Program, any infringement of the copyright of the Program or any impairment of or encumbrance on the rights granted to HBO hereunder, provided that should HBO commence any action in the name of 1inMM, HBO shall indemnify 1inMM against any out-of pocket costs, damages, and reasonable attorney fees. 1inMM agrees that it shall promptly execute and deliver to HBO the Assignment of Distribution Rights Under Copyright which is attached hereto as Exhibit A and incorporated herein by this reference and that upon the request of HBO it shall promptly execute and deliver to HBO such additional documents as HBO may need in connection with the foregoing. 1inMM hereby irrevocably appoints and designates HBO as its attorney-in-fact to exercise and file all such documents requested by HBO pursuant to this Section. This power-of-attorney is coupled with an interest.

22. <u>Distribution</u>. All decisions concerning the advertising, marketing, distribution and exploitation of the Program throughout the Territory during the License Term and the rights herein granted shall be under HBO's sole and exclusive control, it being expressly understood that HBO shall not be required to continuously distribute the Program. The Program will be marketed appropriately as

Exhibit 5
Page 59

determined in HBO's good faith judgment, but in no event shall HBO be required to incur marketing costs. HBO makes no representation, warranty, guarantee or agreement as to the amount of receipts which may be derived from the distribution, exhibition or other exploitation of the Program and the Rights, nor does HBO guarantee the performance of any contract for the exhibition of the Program. Notwithstanding anything to the contrary contained herein, HBO shall have the right, in HBO's sole discretion, to withhold distribution of the Program or to withdraw the Program from distribution anywhere in the Territory at any time during the License Period.

23. Insurance. 1inMM shall secure and maintain standard commercial general liability and errors and omissions liability insurance in the minimum amounts of $5,000,000.00 per occurrence/$5,000,000.00 aggregate with a deductible not larger than $25,000.00 until one (1) year after the expiration of the License Term, which policy(ies) shall be endorsed to name HBO Latin America Holdings, its parents, subsidiaries, licensees, successors, and related and affiliated companies, and their officers, directors, employees, agents, representatives, assigns and its sub-distributors (collectively "Beneficiaries") as additional insureds as their interests may appear and shall contain an endorsement negating the "other insurance clause" therein, together with an endorsement that such policies are primary and that any insurance carried by the Beneficiaries is neither primary nor contributory. 1inMM shall deliver to HBO a certificate and endorsements evidencing such insurance concurrently with the execution of this Agreement. A prior thirty (30) days' notice of cancellation or non-renewal will be provided to HBO.

24. Notices. All notices, claims, certificates, requests, demands and other communications under this Agreement shall be made in writing and shall be delivered by hand or sent by facsimile, or sent, postage prepaid, by express mail, or reputable overnight courier service, and shall be deemed given when so delivered by hand; if faxed, on the business day of receipt as evidenced by a fax confirmation sheet, or two business days after deposit with an express mail or overnight courier to the parties at the following addresses (or at such other address for a party as shall be specified by like notice):

| | |
|---|---|
| If to 1inMM: | 1inMM Capital LLC<br>3129-A S. La Cienega<br>Los Angeles, California 90016<br>Attn: Zachary Horwitz |
| With a copy to: | K&L Gates LLP<br>599 Lexington Avenue, 32nd Floor<br>New York, New York 10022<br>Attention: Luke Steinberger |
| If to HBO: | HBO Latin America Holdings<br>c/o Home Box Office International 2500 Broadway #4<br>Santa Monica, California 90404<br>Attn: Senior Vice President, Sales Planning<br>Facsimile: 1-310-382-3000 |

25. Governing Law/Disputes.

Exhibit 5
Page 60

a.   The internal laws of the State of California (as opposed to the choice of law rules) and the United States of America shall govern the validity, construction and interpretation of this Agreement, the performance by the parties of their respective obligations and all other causes of action (whether sounding in contract, in tort or arising under statute) arising out of or relating to this Agreement or to the Program.

b.   All actions, proceedings, controversies and claims based upon, arising out of or resulting from this Agreement, the breach thereof or its enforcement, arbitrability (including the scope of this arbitration provision) or interpretation shall be submitted to JAMS ("JAMS") for binding arbitration under its Comprehensive Arbitration Rules and Procedures if the matter in dispute is over $250,000 or under its Streamlined Arbitration Rules and Procedures if the matter in dispute is $250,000 or less (the "Rules"). Such Arbitration shall be held solely in Los Angeles, California, in the English language. Each arbitration shall be conducted by an arbitral tribunal (the "Arbitral Board") consisting of a single arbitrator who shall be mutually agreed upon by the parties. If the parties are unable to agree on an arbitrator, the arbitrator shall be appointed by JAMS. The arbitrator shall be a retired judge with at least ten (10) years' experience in commercial matters. Except with respect to requests for interim relief, neither party shall be entitled or permitted to commence or maintain any action in a court of law with respect to any matter in dispute until such matter shall have been submitted to arbitration as herein provided and then only for the enforcement of the Arbitral Board's award. Neither party shall challenge or resist any enforcement action taken by the arbitrator against the losing party. In addition, the prevailing party in any arbitration or legal proceeding relating to this Agreement shall be entitled to all reasonable expenses including, without limitation, reasonable attorney's fees. Each party shall be permitted to engage in formal discovery with respect to any dispute arising out of, in connection with or related to this Agreement, the provisions of Section 1283.05 of the California Code of Civil Procedure being incorporated herein by this reference.

c.   1inMM hereby acknowledges that the Program and the exploitation rights granted to HBO hereunder are of a special, unique, extraordinary and intellectual character which gives them a peculiar value, for the loss of which HBO cannot be reasonably or adequately compensated in damages in any action at law and that a breach of this Agreement by 1inMM will cause HBO irreparable injury and damage. 1inMM therefore expressly agrees that in the event of a breach or threatened breach of this Agreement by 1inMM, HBO shall be entitled to seek injunctive and other equitable relief against 1inMM in HBO's discretion to end or prevent such breach and to secure enforcement of this Agreement. Resort to such equitable relief, however, shall not be construed as a waiver of any other rights or remedies which HBO may have for damages or otherwise.

26.  Miscellaneous Terms.

a.   This Agreement constitutes the entire agreement of the parties and supersedes all prior oral or written agreements between them concerning the same subject. This Agreement may only be amended or modified by a written instrument executed by the parties to this Agreement. No failure or delay on the part of either party in exercising any of its respective rights hereunder upon any failure by the other party to perform or observe any condition, HBO-1inMM covenant or provision herein contained shall operate as a waiver thereof, nor shall any single or partial exercise of any such rights preclude any other or further exercise thereof or the exercise of any other or further exercise thereof or the exercise of any other right hereunder. Without limiting the foregoing, no payment by HBO shall constitute a waiver of any term or condition of this Agreement.

b.   This Agreement may not be assigned without the prior written consent of the other party except that HBO may assign this Agreement, or any part thereof.

Exhibit 5
Page 61

c. Each of the parties shall execute and deliver any further documents or instruments the other may reasonably request to carry out the intent of this Agreement.

d. Nothing contained in this Agreement shall constitute a partnership between, or joint venture by, the parties hereto or constitute either party the agent of the other. Neither party shall hold itself out contrary to the terms of this Agreement and neither party shall become liable by reason of any representation, act or omission of the other contrary to the provisions hereof.

e. Nothing expressed or referred to in this Agreement is intended or shall be construed to give any person or entity, other than the parties to this Agreement, or their permitted successors and assigns , any legal or equitable right, remedy or claim under or in respect thereof or any provision contained herein, it being the intention of the parties that this Agreement is for the sole and exclusive benefit of such parties, and any permitted successors and assigns of this Agreement and for the benefit of no other person or entity.

f. The section headings contained in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

g. This Agreement and all of its terms shall be confidential, and each party agrees that, except as may be required by law, it shall not make any disclosures with regard thereto without the prior written approval of the non-disclosing party. Any breach of confidentiality of a material term by either party is cause for default and the non-disclosing party shall have the right to immediately terminate this agreement.

h. If any provision of this Agreement, or any covenant, obligation or agreement contained herein is determined by a court of competent jurisdiction to be invalid or unenforceable, such determination shall not affect any other provision, covenant, obligation or agreement, each of which shall be construed and enforced as if such invalid or unenforceable provision were not contained herein. Such invalidity or unenforceability shall not affect any valid and enforceable application thereof, and each such provision, coven ant, obligation or agreement, shall be deemed to be effective, operative, made, entered into or taken in the matter and to the full extent permitted by law.

i. In the event of the occurrence of an event of force majeure which materially interferes with the production or delivery of the Program or with the rendition of 1inMM's material obligations hereunder, HBO shall have the right to suspend this Agreement and shall have the right, but not the obligation, to extend this Agreement by the length of any such suspension.

[Signature Page to Follow]

Exhibit 5
Page 62

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by a duly authorized representative as of the date first set forth above.

HBO LATIN AMERICA HOLDINGS                    1INMM CAPITAL LLC


By: _____               By: _____

Name: _____               Name: _____

Title: _____             Title: _____

Exhibit 5
Page 63

# EXHIBIT 6

7:42

ZH

Zach >

Thu, Oct 15, 10:58 AM

Hey man. Please let me know if we receive the wire from hbo today and/or hear anything from them. I assume they would correspond at the very least

Also, if you could send me a screenshot for the sig page, I would really appreciate it. Thanks

Yessir

Thx much on all

Thu, Oct 15, 4:21 PM



IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by a duly authorized representative as of the date first set forth above.

HBO LATIN AMERICA HOLDINGS

By: _____
Name: Xavier Aristimuño
Title: Senior VP Global Licensing

1INMM CAPITAL LLC

By: _____
Name: ZACHARY HORWITZ
Title: MANAGING PARTNER

iMessage

Exhibit 6
Page 64

# EXHIBIT 7

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by a duly authorized representative as of the date first set forth above.

HBO LATIN AMERICA HOLDINGS

By: _____

Name: Xavier Aristimuño

Title: Senior VP Global Licensing

IINMM CAPITAL LLC

By: _____

Name: ZACHARY HORWITZ

Title: MANAGING PARTNER

Exhibit 7
Page 65

# EXHIBIT 8

| FILM TITLE | TERRITORY | SD/HD | PRODUCTION YEAR | RUNTIME | DESCRIPTION | GENRE | PROMOTIONAL MATERIALS | SPANISH LANGUAGE OPTION (Y/N) | SUBTITLE OPTION (Y/N) | PORTUGUESE LANGUAGE OPTION (Y/N) | PORTUGUESE ONLY SUBTITLES OPTION (Y/N) | LICENSED | ADVANCE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| #SCREAMERS | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 8/15/2019 | $1,005,658 |
| 3 From Hell | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 10/14/2019 | $1,000,586 |
| 68 Kill | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 6/17/2019 | $987,398 |
| 7 Days in Entebbe | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 10/17/2019 | $997,978 |
| 7 Days to Vegas | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 12/3/2019 | $1,005,496 |
| A Perfect Plan | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 7/14/2019 | $1,001,491 |
| A.I. Rising | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 9/26/2019 | $1,004,659 |
| Abduction | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 12/6/2019 | $1,009,178 |
| Acceleration | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 7/29/2019 | $1,000,558 |
| All The Devil's Men | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 9/22/2019 | $1,003,639 |
| Allagash | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 11/19/2019 | $1,001,392 |
| American Fighter | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 12/6/2019 | $1,008,258 |
| American Frightfest | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 12/6/2019 | $1,007,628 |
| Among the Shadows | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 8/3/2019 | $1,004,638 |
| An Acceptable Loss | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | | $1,005,893 |
| Anniversary Nightmare | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 8/13/2019 | $1,008,352 |
| Apparition | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 8/16/2019 | $1,004,335 |
| April's Daughter | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 9/17/2019 | $999,405 |
| Arctic | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 6/12/2019 | $1,002,288 |
| Armed | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 9/26/2019 | $1,004,764 |
| Assimilate | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 10/24/2019 | $1,003,820 |
| Awoken | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 8/2/2019 | $1,000,583 |
| Banksy and the Rise of Outlaw Art | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 12/6/2019 | $1,009,066 |
| Becoming | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 5/27/2019 | $985,715 |
| Behind the Walls | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 6/23/2019 | $999,619 |
| Bel Canto | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 9/26/2019 | $998,747 |
| Bitter Harvest | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 10/10/2019 | $999,845 |
| Blood Quantum | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 7/30/2019 | $998,865 |
| Blue Iguana | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 9/26/2019 | $998,186 |
| Body Brokers | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | | $1,007,417 |
| Bottom of the 9th | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 10/14/2019 | $994,021 |
| Brahms: The Boy 2 | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 7/20/2019 | $1,003,639 |
| Buckout Road | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 9/16/2019 | $998,135 |
| Christmas Camp | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 11/13/2019 | $995,011 |
| City of Rock | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 10/28/2019 | $995,519 |
| Clara | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 7/6/2019 | $998,575 |
| Colette | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 11/1/2019 | $1,005,293 |
| Come To Daddy | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 6/29/2019 | $1,001,469 |
| Coyote Lake | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 8/9/2019 | $998,704 |
| Creating Champions | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 8/13/2019 | $997,395 |
| Cruel Peter | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 10/4/2019 | $995,433 |
| Dark Was The Night | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 11/1/2019 | $1,006,417 |
| Dauntless | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 8/13/2019 | $1,000,077 |
| Dead Trigger | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 9/16/2019 | $1,003,258 |
| Depraved | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 6/29/2019 | $1,013,207 |
| Desolation | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 6/23/2019 | $1,004,304 |
| Detective K | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 11/1/2019 | $999,265 |
| Dirt | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 12/4/2019 | $1,008,110 |
| Disturbing the Peace | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | | $1,002,578 |
| Don't Come Back From the Moon | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 6/29/2019 | $993,694 |
| Don't Open Your Eyes | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 7/7/2019 | $1,001,064 |
| Doorman | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 10/21/2019 | $1,003,117 |
| Driver | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 5/20/2019 | $1,001,119 |
| Drone | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 12/4/2019 | $1,009,291 |
| El Fotographo | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 11/2/2019 | $999,983 |
| El Silencio De La Ciudad Blanca | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 10/8/2019 | $1,006,697 |
| Endings, Beginnings | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 11/11/2019 | $1,003,964 |
| Extracurricular | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 5/27/2019 | $978,256 |
| Fear Bay | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 11/13/2019 | $1,002,582 |
| Feedback | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 10/14/2019 | $998,109 |
| First Reformed | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 9/30/2019 | $997,810 |
| Fourplay | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 8/13/2019 | $1,006,638 |
| Funhouse | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 8/13/2019 | $997,836 |
| General Commander | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 11/14/2019 | $999,843 |
| Girls Versus Gangsters | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 11/4/2019 | $997,160 |
| Goalie | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | | $1,005,320 |
| Grand Isle | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 7/29/2019 | $1,005,417 |
| Greener Grass | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 6/28/2019 | $1,003,376 |
| Gun City | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 10/8/2019 | $1,006,137 |
| Hard Night Falling | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 7/29/2019 | $1,005,377 |
| Heidi: Queen of the Mountain | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | | $1,003,874 |
| High Strung Free Dance | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 8/23/2019 | $1,001,942 |
| House of The Disappeared | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 9/19/2019 | $1,009,775 |
| How to Talk to Girls at Parties | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 9/16/2019 | $1,005,293 |
| How to Train Your Husband | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 10/17/2019 | $998,000 |
| I Met a Girl | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | | $1,001,850 |
| Iceman | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 11/3/2019 | $997,615 |
| Indivisible | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 11/1/2019 | $1,002,684 |
| Iron Sky: The Coming Race | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 10/14/2019 | $1,000,618 |
| Journey's End | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 9/7/2019 | $1,001,413 |
| Judy | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 11/8/2019 | $996,498 |
| Judy Small | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 12/3/2019 | $1,007,140 |
| Juliet, Naked | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 11/7/2019 | $1,001,260 |
| Jungle | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 9/7/2019 | $1,004,983 |
| K.O. | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 9/16/2019 | $1,005,316 |
| Kill Chain | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 8/16/2019 | $1,008,696 |
| Killer Man | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 8/7/2019 | $1,006,144 |
| Killing Gunther | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 9/30/2019 | $1,001,219 |
| Kindred Spirits | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 10/17/2019 | $1,005,360 |
| La Melode | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 9/22/2019 | $997,840 |
| Lady Driver | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 12/6/2019 | $1,004,467 |
| Leatherface | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 9/30/2019 | $1,003,934 |
| Legend of Ancient Sword | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 9/12/2019 | $1,006,938 |
| Line of Descent | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 8/9/2019 | $997,221 |
| Look Away | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 8/27/2019 | $1,007,261 |
| Looks That Kill | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 6/21/2019 | $992,368 |
| Loro | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 11/8/2019 | $1,001,847 |
| Lost Girls and Love Hotels | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 7/28/2019 | $1,007,198 |

Exhibit 8
Page 66

| Title | Territory | Format | | | | Genre | | | | | | Date | Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lost Transmissions | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 12/7/2019 | $1,004,467 |
| Lucky Day | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 12/30/2019 | $1,006,314 |
| Maine | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 11/11/2019 | $1,001,985 |
| Malevolent | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 11/7/2019 | $1,001,962 |
| Malicious | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 11/7/2019 | $1,006,277 |
| Marfa | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 7/28/2019 | $1,001,942 |
| Mary | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 12/30/2019 | $1,006,252 |
| Mary Shelly | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 9/20/2019 | $1,000,874 |
| Matriarch | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 8/23/2019 | $1,005,142 |
| Measure of Man | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 11/1/2019 | $1,004,871 |
| Monsters of Man | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 12/3/2019 | $1,001,006 |
| Next Level | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 10/17/2019 | $1,005,182 |
| Nosferatu | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 7/23/2019 | $1,000,728 |
| Now is Everything | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 12/3/2019 | $1,001,800 |
| Nuclear | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 12/30/2019 | $1,005,294 |
| Obsession | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 12/12/2019 | $1,008,416 |
| Olympic Dreams | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 12/6/2019 | $1,003,416 |
| Once Upon A Time in Venice | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 9/16/2019 | $1,000,921 |
| Only | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 7/29/2019 | $1,009,261 |
| Operation Red Sea | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 10/8/2019 | $1,011,083 |
| Ophelia | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 8/27/2019 | $1,003,153 |
| Our House | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 7/4/2019 | $1,008,994 |
| Outback | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 12/4/2019 | $1,007,659 |
| Pegasus | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 10/4/2019 | $999,110 |
| Pharoah's War | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 7/29/2019 | $989,983 |
| Prey | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 12/6/2019 | $1,006,416 |
| Pyewacket | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 7/4/2019 | $1,002,619 |
| Question of Faith | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 10/24/2019 | $994,158 |
| Real | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 10/2/2019 | $1,001,580 |
| Reborn | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 9/16/2019 | $1,004,559 |
| Roads | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 10/4/2019 | $999,159 |
| Run with the Hunted | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 6/20/2019 | $1,004,084 |
| Satanic Panic | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | | $1,002,654 |
| Slasher Party | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 6/10/2019 | $993,617 |
| Sleeping in Plastic | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 12/8/2019 | $1,004,542 |
| Smart Chase | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 8/1/2019 | $999,405 |
| Spacewalk | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 10/2/2019 | $1,009,619 |
| Strain 100 | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 7/28/2019 | $1,005,837 |
| Strange But True | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 11/13/2019 | $992,952 |
| Stratton | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 9/7/2019 | $1,002,916 |
| Stray Dolls | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 12/3/2019 | $1,003,180 |
| Sweet Inspirations | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 10/24/2019 | $999,647 |
| Telsa | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 8/16/2019 | $1,009,459 |
| The Assistant | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 12/6/2019 | $1,008,258 |
| The Bar | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 11/10/2019 | $1,000,376 |
| The Butcher | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 12/10/2019 | $1,005,751 |
| The Dare | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 8/5/2019 | $1,000,810 |
| The Diggers | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 7/20/2019 | $993,980 |
| The Encounter | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 12/7/2019 | $1,006,294 |
| The Etruscan Smile | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 7/10/2019 | $994,980 |
| The Great Alaskan Race | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 7/10/2019 | $997,391 |
| The Insult | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 11/10/2019 | $998,493 |
| The Man With the Iron Heart | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 9/19/2019 | $1,006,638 |
| The Opening Act | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 8/13/2019 | $1,003,934 |
| The Pale Door | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | | $1,006,596 |
| The Shed | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 7/29/2019 | $996,424 |
| The Skin of the Wolf | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 11/10/2019 | $998,137 |
| The Sound of Philadelphia | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 7/15/2019 | $1,014,864 |
| The Super | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 8/11/2019 | $998,983 |
| The Titan | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 9/12/2019 | $1,002,330 |
| The Warning | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 10/8/2019 | $1,006,590 |
| The Witness | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 11/12/2019 | $999,620 |
| The Yellow Birds | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 8/1/2019 | $999,916 |
| Time Freak | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 10/8/2019 | $999,907 |
| Trauma Center | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 8/8/2019 | $1,000,583 |
| Trouble | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 10/4/2019 | $1,003,192 |
| VFW | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | | $996,071 |
| Villain | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | | $1,002,590 |
| Walkaway Joe | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 10/21/2019 | $999,698 |
| Wasp Network | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 8/12/2019 | $1,006,638 |
| Watch List | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 6/20/2019 | $996,401 |
| Wild Rose | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 9/5/2019 | $1,008,937 |
| William | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 11/11/2019 | $1,000,584 |
| You Might be the Killer | ALL LATAM | HD | N/A | N/A | N/A | Thriller or the like | N/A | Y | Y | Y | Y | 7/10/2019 | $999,175 |

Exhibit 8
Page 67

# EXHIBIT 9

7:35 

ZH

Zach >

Heard from Gus that we will hear from them

So let's see

Ok. Thanks - please keep me posted

Today 6:16 PM

Alright so - just heard from HBO... I copy and pasted the email (see below) as it'll give you the full picture rather than explaining...

"Good Afternoon,

Hope you are staying healthy and everyone is well. We wanted to reach out regarding payment of the Catch Up amount portion of our agreement. As stated in the contract, the Catch Up Payment was the to be due today 10/15/2020 but we ask 1inmm for a week to have some

iMessage

Exhibit 9
Page 68

# EXHIBIT 10

7:35

ZH

Zach >

agreement. As stated in the contract, the Catch Up Payment was the to be due today 10/15/2020 but we ask 1inmm for a week to have some important discussions internally regarding the structure in which this payment is remitted to 1inmm.

We apologize that these discussions were not able to take place prior to this date but as you are aware, there are many moving pieces that we must make sure are in place before confirming payment details.

If you would, please confirm that this week grace period is acceptable to 1inmm and we will be back in touch as soon as possible with exact details on payment for the Catch Up portion of our agreement.

Thank you. "

iMessage

Exhibit 10
Page 69

# EXHIBIT 11

7:36 





Zach >

If you would, please confirm that this week grace period is acceptable to 1inmm and we will be back in touch as soon as possible with exact details on payment for the Catch Up portion of our agreement.

Thank you. "

—–

Feel somewhat good about this... always something w them but they could easily just exercise the extension and move on. So the fact that this is being discussed - feels CAUTIOUSLY optimistic.

Today 7:31 PM

Yeah. Thanks for the copy and past. Seems lien a positive sign that tree will get exact details of payment supposedly within a week

 iMessage 

      

Exhibit 11
Page 70

# EXHIBIT 12

6:57



ZH

Zach ›

Today 6:51 PM

Can't send email but just received from HBO business affairs and their CEO...

"Good Afternoon,

We hope the week has been successful and you find yourself healthy and well. Wanted to reach out quickly and inform you that we will be in touch by end of day tomorrow with remittance information regarding the Catch Up Payment.

In addition, we were hoping to connect sometime in the next 1-2 weeks regarding a business opportunity that will be presenting itself Q1 of 2021. As the feature film distribution landscape has shifted drastically over the course of 2020, leaning heavily on titles geared toward PVOD exploitation, we feel that there could be a fruitful opportunity

iMessage

Exhibit 12
Page 71

# EXHIBIT 13

6:58 





ZH

Zach >

1-2 weeks regarding a business opportunity that will be presenting itself Q1 of 2021. As the feature film distribution landscape has shifted drastically over the course of 2020, leaning heavily on titles geared toward PVOD exploitation, we feel that there could be a fruitful opportunity based on the size of 1inMM's content library. Prior to discussing much further, it would be helpful to understand 1inMM's content "ownership" outside of 1inmm/HBO relationship as it relates to type of content (feature film/ television/short form), genre (if applicable), size of production/ budget range and quantity of this content.

We look forward to hearing from you in regard to the above and we will be in touch tomorrow with remittance information.

Thank you."

   iMessage  

Exhibit 13
Page 72

# EXHIBIT 14



**FREEWAY**

# Collection Account Management Agreement

## 1INMM CAPITAL

Dated as of the    29th day of        October 2020

www.freeway-entertainment.com

Exhibit 14
Page 73

## COLLECTION ACCOUNT MANAGEMENT AGREEMENT

### RE: "1INMM"

**AGREEMENT** dated as of the        29th day of        October, 2020

**AMONG:**

(1)    **FREEWAY CAM B.V.** (a company registered under the laws of The Netherlands at Herikerbergweg 238, Luna Arena, 1101CM, Amsterdam Zuidoost, Netherlands) c/o Andrássy út 12, 1061 Budapest, Hungary ("**FCAM**");

(2)    **STICHTING FREEWAY CUSTODY** (a foundation registered under the laws of The Netherlands at Herikerbergweg 238, Luna Arena, 1101CM, Amsterdam Zuidoost, Netherlands) c/o Andrássy út 12, 1061 Budapest, Hungary ("**FCustody**"); and

(3)    **THOSE PERSONS, FIRMS OR OTHER ENTITIES SPECIFIED IN SCHEDULE 1 HERETO** (together with FCAM and FCustody "**Parties**" and individually "**Party**" which expressions shall include each of the Parties successors in title and assigns).

**IT IS HEREBY AGREED** that subject to the terms and conditions herein the Parties jointly appoint and authorise FCustody to open and maintain the "Collection Account" (as defined herein) and that FCustody accepts such appointment.

Furthermore, it is hereby agreed that the Parties jointly appoint FCAM as their sole and exclusive agent to administer the collection and distribution of Collected Gross Receipts on behalf of the Parties in accordance with the provisions of the Schedules hereto and FCAM's Standard Terms of Agreement (attached hereto and incorporated by this reference) and that, in consideration of FCAM's Remuneration (as defined herein), FCAM accepts such appointment and agrees to perform the services set out in this Agreement. In the event of a conflict between FCAM's Standard Terms of Agreement and the Schedules, the Schedules shall control.

Exhibit 14
Page 74

## SCHEDULE 1

### Names and Addresses of the Parties

- **HBO LATIN AMERICA HOLDINGS**, (Company Number: 09381065) a limited liability company incorporated in Miami, FL whose registered office is at 396 Alhambra Circle STE 400 Coral Gables, FL 33134 ("**Licensor**" which expression shall be deemed to include its successors in title and permitted assigns);

- **1INMM CAPITAL LLC**, (Company Number: 11718033) a limited liability company incorporated in California whose registered office is at 3129-A S. La Cienega Blvd Los Angeles, CA 90016 ("**Licensee**" which expression shall be deemed to include its successors in title and permitted assigns);

- **Warner Media, LLC**, a limited liability company incorporated in the State of New York, 30 Hudson Yards New York, NY 10001, United States of America, ("**Commissioning Distributor**" which expression shall be deemed to include its successors in title and permitted assigns);

## SCHEDULE 2
### Definitions

In this Agreement the following words and expressions shall have the meanings hereby ascribed to them which meanings shall apply to this Agreement, including FCAM's Standard Terms of Agreement and the Schedules hereto:

| | |
|---|---|
| **"Accounting Currency"** | United States dollars ("USD"); |
| **"Accounting Period"** | one of the individual periods described in Clauses 4.1, 4.2 and 4.3 of FCAM's Standard Terms of Agreement; |
| **"Agreement"** | this collection account management agreement (including the Schedules hereto and FCAM's Standard Terms of Agreement) made between the Parties hereto; |
| **"Assumption Agreement(s)"** | any or all of the following as applicable: a Distributor's Assumption Agreement and a Buyer's Assumption Agreement; |
| **"Beneficiary (ies)"** | those Persons specified in Schedule 4; |
| **"Benefit Plan Contributions"** | N/A |
| **"Business Day"** | any day excluding Saturdays, Sundays and any days which are public holidays in the country in which any of the Parties has its principal place of business; |
| **"Collected Gross Receipts"** | all Gross Receipts actually received in or credited to the Collection Account, and interest thereon and the Deemed Collected Gross Receipts; |

**"Collection Account"**

a designated, segregated bank account held in the name of FCustody on behalf of each of the Beneficiaries in proportion to their respective Entitlements under this Agreement, and referring to the licensed content into which all Gross Receipts are paid, established with;

City National Bank ("**CA Bank**")

| | |
|---|---|
| Bank Address: | 400 N. Roxbury Drive, Beverly Hills, CA 90210 |
| ABA Routing No.: | 122016066 |
| SWIFT Code: | CINA US6L |
| Account name: | Stichting Freeway Custody RE: "1INMM" |
| Account No.: | 127 717 990; |

**"Commissioning Distributor Payroll Taxes"**

N/A

**"Completion Advances"**

N/A

Exhibit 14
Page 77

**"Master Agreement"**

the licensor's master agreement dated on or around the date hereof and made between the licensor and the licensee, relating to the licensed content;

**"Completion Guarantee"**

N/A

**"Deemed Collected Gross Receipts"**

all Gross Receipts received by or credited to a Party or a Beneficiary or any other third party, which ought to, in accordance with this Agreement, have been credited to the Collection Account. For the avoidance of doubt, any Prior Disbursement Gross Receipts shall for the purpose of calculating the Residuals Set-Aside and Payable Residuals be Deemed Collected Gross Receipts. The Commissioning Distributor shall promptly notify FCAM of any such Person receiving Prior Disbursement Gross Receipts and the exact amounts and the source of such Prior Disbursement Gross Receipts;

Exhibit 14
Page 78

**"Deferees"**                       N/A;

**"Deferments"**                     the following deferments payable to the Deferees: NONE

**"Delivery Date"**                  N/A

**"Distribution Agreement(s)"**      every agreement in connection with the exploitation,
                                     distribution, sale, leasing, license, exhibition,
                                     transmission, or any other form of exploitation of the
                                     Rights in any part of the Territory through any existing or
                                     future product, service or platform;

**"Distributors"**                   those Persons who have entered or will enter into
                                     Distribution Agreements;

**"Distributor's Assumption
Agreement"**                         N/A

**"Distributor's Report"**           a written statement from each Distributor showing Gross
                                     Receipts derived from exploitation of the licensed
                                     content by such Distributor, and, to the extent that
                                     such information is customarily included by the
                                     applicable Distributor in its statements, the date of the
                                     first exhibition (as applicable) on television or in
                                     Supplemental Markets and whether such

Exhibit 14
Page 79

exhibition was on network television, and if so, whether in prime time;

**"Domestic Distributor"**

N/A

**"Entitlement(s)"**

that part of the Collected Gross Receipts payable to a Beneficiary pursuant to the terms of this Agreement;

**"Executing Parties"**

FCAM, FCustody, the Licensor and the Licensee

**"FCAM Expenses"**

all reasonable actual verifiable, customary, non-overhead, duly receipted, out-of-pocket third party expenses properly paid by FCAM directly in relation to its duties and obligations hereunder and, to the extent provided for in this Agreement (excluding overhead and administrative or employee costs which shall not be recoupable) which expenses shall not exceed USD2,500 per annum without Licensor's prior written approval;

**"FCAM's Remuneration"**

N/A

"Content"                 the feature films provisionally entitled "1INMM
                          LIBRARY" a brief specification of which is set out in
                          Schedule 3;

"Forum"                   Subject to Clause 8.7 of the FCAM's Standard Terms of
                          Engagement, the venue for legal proceedings being
                          Florida;

"Gross Receipts"          one hundred per cent (100%) all monies or any other
                          proceeds (including, but not limited to, advances,
                          guarantees, license fees, Overages and deposits and
                          any other revenues generated by the licensed content
                          without any deduction) derived from Distribution
                          Agreements or from any other source of exploitation in
                          the Territory relating to the content or the rights;

Exhibit 14
Page 81

| | |
|---|---|
| **"1INMM First Fee"** | USD 142,300,322; |
| **"1INMM Second Fee"** | USD 142,300,322; |
| **"1INMM Master Agreement"** | the Master Agreement dated on or about the date hereof between 1INMM and Licensor; |
| **"1INMM RESIDUAL FEE"** | USDXX customary statement presented if applicable; |
| **"Intermediate Licensor"** | such Person as may be appointed by the Licensor or the Licensee for any territories usually licensed through an intermediate licensor whereby the Rights are routed through companies of Freeway Entertainment Kft., or any of their affiliates and/or any other intermediate licensor networks; |
| **"Intermediate Licensor Fees"** | any fees retained by an Intermediate Licensor prior to its transfer of Gross Receipts into the Collection Account. Intermediate Licensor Fees shall be considered Deemed Collected Gross Receipts for the purposes of calculating the Residuals Set-Aside and Payable Residuals; |
| **"Interparty Agreement"** | the interparty agreement in respect of the licensed content dated on or about the date hereof and made between (inter alios) the Licensor and the licensee |
| **"Irrevocable Instructions"** | the Irrevocable Instructions And Notice Of Acknowledgement substantially in the form of Schedule 8 attached hereto which contains irrevocable |

Exhibit 14
Page 82

instructions directing the relevant Distributor to remit all Gross Receipts payable under its Distribution Agreement to the Collection Account;

**"Net Profits"**

has the meaning ascribed to the term in Schedule 5;

**"Overages"**

in respect of Distribution Agreements pursuant to which a Distributor has paid a minimum guarantee, those further Gross Receipts paid by such Distributor in excess of the applicable minimum guarantee;

**"Payroll House"**

N/A

**"Payroll House Fees"**

N/A

**"Person"**

any of the Parties or the Beneficiaries or any other individual, entity, corporation, limited liability company or partnership;

Exhibit 14
Page 83

**"Prior Disbursement Gross Receipts"**

any Gross Receipts distributed to any Party, Beneficiary or third party prior to the execution of this Agreement, including any Gross Receipts to the Licensor or any Gross Receipts to the Licensee;

**"Licensee Entitlement"**

the principal amount and any other amounts due, owing, payable or outstanding to Licensee pursuant to the Master Agreement, excluding any Net Profits to which Licensee may be entitled from time to time. The exact total amount of the Licensee Entitlement shall be as timely notified by Licenor to FCAM and the other Parties, whereby FCAM may rely on the accuracy of such notification;

**"Licensee Payment Date"**

the date on which the Licensor notifies FCAM in writing that the Licensee Entitlement has been indefeasibly received and paid in full and the Licensor has no further obligation, actual or contingent, to advance sums pursuant to the Master Agreement or the Interparty Agreement in connection with the licensed content;

**"Pre-Sales Receipts"**

N/A;

**"Presale Territories"**

N/A;

**"1INMM First Fee"**

USD142,300,322;

Exhibit 14
Page 84

**"1INMM Second Fee"**              USD142,300,322;

**"Residuals"**
                                   N/A;

**"Residuals Set-Aside"**
                                   N/A;

**"Residuals Short Fall"**
                                   N/A;

**"Rights"**                       all copyright and similar rights in and to the licensed
                                   content and all allied, ancillary or associated rights
                                   thereto or in the underlying rights thereof;

**"1INMM Premium"**
                                   12.5% flat premium;

**"1INMM Territory"**              Latin America;

**"1INMM Territory Receipts"**     Collected Gross Receipts derived from the 1INMM

Exhibit 14
Page 85

**"Original Agreement re 1INMM Territory"**

the agreement dated on or about the date hereof and made between 1INMM and the Sales Agent relating to the exploitation of the specific title in the 1INMM Territory;

**"Second Cycle Sales"**

the Gross Receipts derived from any and all Distribution Agreements entered into between the Licensor and a Distributor: (i) in respect of Rights which have previously been granted to a Distributor and the term of that initial grant has expired; or (ii) after the expiry of three (3) years from the date hereof, in respect of Rights which have not been previously granted to a Distributor or which have been so granted but such grant has been terminated for reasons other than expiry of the term of the grant with applicable Collected Gross Receipts designated to FCAM by the Licensor;

Exhibit 14
Page 86

"Statement"                        for each Accounting Period, a written statement in the Accounting Currency by FCAM specifying in the Accounting Currency the sources from which Collected Gross Receipts have been derived and their allocation to the Beneficiaries in accordance with their respective Entitlements in a form satisfactory to the Licensor and the Licensee and consistent with Clause 4 of FCAM's Standard Terms of Agreement;

"Territory"                        Latin America;

"US Sales Agent"                   N/A;

"US Sales Agent Commission"        N/A;

"US Territory"                     N/A

"US Territory Receipts"            N/A

1.1     Where the context so admits, words importing the singular shall include the plural and vice versa and words importing the neuter gender shall include the masculine or feminine gender and words importing individuals shall include firms and corporations.

1.2     References to Clauses and Schedules shall, save where otherwise expressly stated, be construed as references to the Clauses of and Schedules to this Agreement.

## SCHEDULE 3

### Content Specification

| | |
|---|---|
| Title: | Multiple Feature Films |
| Writer: | N/A |
| Director: | N/A |
| Individual (s): | N/A |
| Principal Artist(s): | N/A |
| Delivery Date: | means 15 December 2020 subject to such date being extended for up to a further 45 days for an Event of Force Majeure |
| Catch Up Payment (MG/%+/PP): | USD284,600,644 |

Exhibit 14
Page 88

## SCHEDULE 4

### Beneficiaries

-   **FREEWAY CAM B.V.** (a company registered under the laws of The Netherlands at Herikerbergweg 238, Luna Arena, 1101CM, Amsterdam Zuidoost, Netherlands) (EU VAT identification number: NL810347647B01) c/o Andrássy út 12, 1061 Budapest, Hungary;

-   **HBO LATIN AMERICA HOLDINGS** (Company Number: 09381065) a limited liability company incorporated in Miami, FL whose registered office is at 396 Alhambra Circle STE 400 Coral Gables, FL 33134 ("Licensor" which expression shall be deemed to include its successors in title and permitted assigns);

-   **1INMM CAPITAL, LLC**, a limited liability company incorporated in the State of California, United States of America, attention: Zachary Horwitz zach@1inmm.com;

-   **WARNER MEDIA LLC**, a limited liability company incorporated in the State of New York, 30 Hudson Yards New York, NY 10001, United States of America

The contact and bank account details of the above and any additional Beneficiaries shall be provided to FCAM in writing by any Beneficiary or in the absence of such Beneficiaries' input by the Commissioning Distributor. FCAM may rely on the accuracy of the information provided to FCAM in writing by any Beneficiary or the Commissioning Distributor.

## SCHEDULE 5

### Distribution of Collected Gross Receipts

All Collected Gross Receipts shall be distributed by FCAM to the Beneficiaries in the following manner and order (to the extent said amounts have not already been paid or repaid from any other source, in which case the relevant Party or the Commissioning Distributor shall as soon as reasonably possible notify FCAM of such occurrence or with respect to Residuals, such Residuals have been paid through some other source as notified to FCAM in writing :

### Part A: All Collected Gross Receipts

1.      to FCAM in payment of FCAM's Remuneration and the FCAM Expenses; and thereafter

2.      to fund the Residuals Set-Aside in accordance with Schedule 6; and thereafter

3.      the remainder as per Part B and Part C of this Schedule 5, depending on where the Collected Gross Receipts derive from and continuing on to Part D.

### Part B: 1INMM Territory Receipts

1.      To the US Sales Agent:

   a. N/A

   b. With respect to 1INMM Territory Receipts only, to the extent not recouped from the Profit Participation Receipts

   c. With respect to 1INMM Territory Receipts only, to 1INMM in payment of 1INMM's Non-Deferred 1INMM Territory Minimum Guarantees; and thereafter

Exhibit 14
Page 91

2.    to 1INMM:

    (i)    subject to 2(ii) below, in recoupment of USD 142,300,322 of the Catch Up Payment & Premium;

    (ii)    if, prior to 1INMM being paid USD 142,300,322 from 1INMM Territory Receipts and Profit Participation, 1INMM is paid USD 50,000,000 from the 1INMM Territory Receipts only then upon such event subsequent Collected Gross Receipts shall first be paid to 1INMM in repayment of 1INMM's Second Payment and thereafter to 1INMM in recoupment of USD 35,000,000 from 1INMM Profit Participation through Territory Receipts; and thereafter

3.    to 1INMM until it has been paid 1INMM's full second Payment; thereafter

4.    to 1INMM in recoupment of the balance of the Catch Up Payment and Premium; and thereafter

5.    the remaining balance as per items 1 to 10 of Part D of this Schedule 5.

**Part C: Territory Receipts**

1.    N/A; thereafter

2.    N/A

3.    N/A; thereafter

4.    to Licensor in recoupment of the Licensor Entitlement advances; thereafter

Exhibit 14
Page 92

5.    N/A; thereafter

6.    N/A; thereafter

7.    N/A; thereafter

8.    N/A; thereafter

9.    N/A; thereafter

10.   N/A; and thereafter

11.   N/A; thereafter

12.   to 1INMM in recoupment of the Profit Participation to the extent not recouped; and thereafter

13.   the remainder as per items 7 to 10 of Part D of this Schedule 5.

**Part D:        Remaining Collected Gross Receipts**

1.    N/A; thereafter

2.    to 1INMM in recoupment of USD54,000,000 of the 1INMM 2020 Profit Participation; thereafter

3.    to Licensee in recoupment of 2020 Distribution fees; thereafter

4.    N/A; thereafter

"1INMM" – Collection Account Management Agreement

Exhibit 14
Page 93

5.  N/A; thereafter

6.  to 1INMM and Licensee on a pro rata and pari passu basis; thereafter

7.  N/A; thereafter

8.  N/A; and thereafter

9.  N/A; thereafter

10. the remainder shall be considered net profits ("Net Profits") and shall be allocated and paid pro rata, pari passu as follows:

    (i)    75% to 1INMM;
    (ii)   55% to 1INMM;
    (iii)  25% to the Licensee;
    (iv)   45% for Licensee;

Exhibit 14
Page 94

**SCHEDULE 6**

**Residual Payment Procedure**

All Residuals shall be calculated and distributed as follows:

1.    **Engagement of a Payroll House**

    A.    N/A

    B.    N/A

Exhibit 14
Page 95

2.    **Calculation of Residuals**

N/A

A.    N/A

B.    N/A

C.   Distributor's Reports

    (1)   N/A

    (2)   N/A

3.   **Payments of Residuals**

    A.   **Residuals Set-Aside**

        N/A

**B.** **Procedure for Payment of Residuals**

(1)     Residuals (including, Payroll House Fees and Commissioning Distributor Payroll Taxes, if any, in connection with said Residuals) payable on Collected Gross Receipts shall be paid consistent with the Statement and accounting schedule pursuant to Clauses 3 and 4 of FCAM's Standard Terms of Agreement, below and consistent with Clause 3(A) above.

(2)     Upon generation of Collected Gross Receipts (including Lump Sum Payments) and with the same frequency as the Statement described in Clauses 3 and 4 of FCAM's Standard Terms of Agreement, below, FCAM shall forward or concurrently make electronically available to the Licensor and Licensee copies of all Distribution Agreements, Distributor's Reports, Default Allocations, invoices, accounting and other documentation or reports pertaining to all Collected Gross Receipts, including Lump Sum Payments, which are readily available to FCAM.

(3)     The Licensor and Licensee hereby instruct FCAM and FCAM agrees that it shall give an irrevocable instruction to:

(a)     calculate the Residuals that are due and payable in connection with said Collected Gross Receipts in accordance with Clauses 2 (A) and (B) above; and

Exhibit 14
Page 98

(b)   concurrently report the following information to Licensor, Licensee and FCAM in writing, within ten (10) Business Days of receiving said documentation (which information shall hereinafter be referred to collectively as the "**House Report**"):

[i]   the allocation used and the amount of monies required for the payment of the Collected Gross Receipts ("**Payables**");

[ii]   N/A; and

[iii]   N/A

(4)   N/A

Exhibit 14
Page 99

4. **Allocation Among Markets**

A. **Licensee Allocation**. The allocation among markets with respect to Gross Receipts or Lump Sum Payments payable in connection with said Distribution Agreement shall be as follows and such allocations shall be collectively referred to hereinafter as "**Licensee Allocation**".

    (1) Licensor shall provide copies of all Distribution Agreements to FCAM. If the Distribution Agreement includes an allocation of the Lump Sum Payment to the market sold, leased or licensed there under, the Licensor shall be deemed to be in agreement with the allocation contained therein subject to clause 4.B.

    (2) N/A

B. **Dispute regarding Licensee Allocation**. Licensee shall have sixty (60) days from receipt of each House Report, to the extent it expressly states the Licensee Allocation, to dispute the Licensee Allocation (the "**Dispute Period**").

    (1) In the event Licensee does not dispute the Allocation in writing within the Dispute Period, the Allocation shall be deemed accepted and shall govern in the calculation and payment of fees with respect to the Distribution Agreement at issue.

    (2) In the event Licensee disputes the Allocation within the Dispute Period, Licensee shall notify the Licensor and FCAM concurrently in writing of the Disputed Amount and corresponding allocation. (As used herein, the "**Disputed Amount**"

Exhibit 14
Page 100

shall mean the difference between the amount of Fees payable based upon the Allocation on the Lump Sum Payment and the amount of Fees payable based upon the allocation communicated by Licensee of the Lump Sum Payment which Licensor in good faith considers fair and reasonable for the applicable territory.)

(3)   Upon receipt of said notice, FCAM shall set aside the Disputed Amount, to the extent available in the Collection Account, and hold it pending resolution of the dispute (the "**Disputed Amount Set-Aside**").

(4)   Licensor and the Licensee may resolve this dispute under this clause 4.B.(4) by mutual agreement or through the grievance and arbitration procedures contained in the Distribution Agreement.

(5)   Licensee agrees to provide notice of any grievance or arbitration hereunder to the Licensor and concurrently to FCAM and to provide FCAM with written notification regarding resolution of any dispute hereunder within ten (10) days of said resolution.

(6)   FCAM shall continue to allocate and disburse Entitlements not disputed pursuant to this Agreement.

C.   **Default Allocation**. N/A

Exhibit 14
Page 101

(1)   N/A


(2)   N/A


(a)   N/A


(b)   N/A


5.    **All relevant information to FCAM**

A.    Each of the Parties hereby undertakes to provide FCAM in a timely fashion with all relevant information within the knowledge of that Party to enable FCAM to meet its obligations pursuant to this Agreement. The information shall include, but is not limited to:

(1)   Copies of sales reports in relation to the Content in the Territory;

(2)   Copies of each long-form Distribution Agreement and if executed separately from the Distribution Agreement, executed Irrevocable Instructions;

(3)     copies of the names, addresses, telephone, fax numbers and bank details of all Beneficiaries;

(4)     detailed information about agreed expenses, approvals for payment of agreed expenses, etc.;

(5)     information required for payment of Profit Participation;

(6)     if requested, and to the extent available, accounting statements from the Distributor(s);

(7)     notice from the Licensor of Expenses and sub-sales expenses;

(8)     all further information that FCAM may reasonably require to meet its obligations hereunder;

The information shall further include, but is not limited to information on the Content as described in Schedule 3.

B.      N/A

C.      The Licensor and Licensee hereby irrevocably instructs FCAM and FCAM agrees to provide Licensee with written notification regarding each Lump Sum Payment received from a Distributor, which notification shall include the full amount of the payment, and to the extent available the territories.

D.      FCAM agrees to provide Licensee with a copy of the Distribution Agreements, to the extent FCAM has received them.

Exhibit 14
Page 103

E.    N/A

6.    A.    If a Distributor or Qualified Distributor, as defined in the SAG-AFTRA Basic Agreement, acquires the right to distribute the Film in any part of the Territory, the Licensor and Licensee agrees to comply with the provisions of the applicable SAG-AFTRA Basic Agreement with respect to obtaining and delivering to SAG-AFTRA either a separate Distributor's Assumption Agreement (as set forth in the SAG-AFTRA Basic Agreement) or a Qualified Distributor's Letter of Guaranty with a copy thereof to FCAM. Additionally, the Parties hereto agree that neither this Schedule 6 nor any other provision of this Agreement shall be interpreted as a waiver of any of SAG-AFTRA' rights or remedies under the SAG-AFTRA Basic Agreement with respect to Assumption Agreements or the right to timely reporting and payment of Residuals all of which are expressly reserved and concurrently available to SAG-AFTRA. SAG-AFTRA agrees that if an unconditional Distributor's Assumption Agreement or an unconditional Qualified Distributor's Letter of Guaranty is delivered to SAG-AFTRA from a financially responsible Person (as determined in SAG-AFTRA's sole discretion) that is accepted by SAG-AFTRA in writing to FCAM, and the Gross Receipts from exploitation, distribution or exhibition of the Content in this assumed territory are generated, then the Fees Set-Aside will thereafter be applied only to the Gross Receipts generated from the remaining un-assumed territories so long as such Distributor timely and properly reports and pays Fees as notified by SAG-AFTRA. The Parties hereto further agree and acknowledge that any sale of the Film or any Rights therein shall be subject to the Licensor's obligation to obtain appropriate Assumption Agreement(s) pursuant to the SAG-AFTRA Basic Agreement, which obligation, for the duration of this Agreement and as an accommodation to Licensor, shall be fulfilled by the Irrevocable Instructions being executed separately or being included in a Distribution Agreement, unless there is a dispute under this Agreement and the resolution of that dispute under Clause 8.7 of FCAM's Standard Terms of Agreement, below, results in an arbitration judgment requiring an Assumption Agreement to be entered into by the relevant Distributor.

Exhibit 14
Page 104

## SCHEDULE 7

**Relevant Provisions of the SAG-AFTRA Basic Agreement**

## SCHEDULE 8

### Irrevocable Instructions And Notice Of Acknowledgement

VIA FACSIMILE

[Name of Distributor]

[Address]

[City, State, Postal Code]

[Country]

[Distributor] is hereby irrevocably instructed by [Licensor], to pay all proceeds on the Content due and payable to Licensor under the Distribution Agreement dated [.../.../...] directly and without diversion or deduction, into the following Collection Account:

City National Bank ("**CA Bank**")

Bank Address:    400 N. Roxbury Drive, Beverly Hills, CA 90210

ABA Routing No.:    122016066

SWIFT Code:    CINA US6L

Account name:    Stichting Freeway Custody RE: "1INMM"

Account No.:    127 717 990;

Please be further advised that this notice is coupled with an interest and is irrevocable and may not be modified or rescinded except in writing signed by [LICENSOR] and Freeway CAM B.V. c/o Andrássy út 12, 1061 Budapest, Hungary ("FCAM") and Stichting Freeway Custody c/o Andrássy út 12, 1061 Budapest, Hungary. By your signature you agree to make payment only to the CA Bank, as directed above, and also to provide to FCAM copies of any and all statements and notices that accompany such payments or are otherwise created and delivered. You further agree to notify FCAM of any and all conflicting notices that might be received by you and of any claims by any third parties that such third party is entitled to receive all or any portion of any such payments.

Exhibit 14
Page 106

Would you please acknowledge receipt and acceptance of this notice by signing this letter in the space below and returning it directly to FCAM at the above address with a copy to [Licensor].

Very truly yours,


[Licensor]



By: _____

AGREED AND ACKNOWLEDGED:


[Distributor]:

_____


By: _____

Exhibit 14
Page 107

## FCAM'S STANDARD TERMS OF AGREEMENT

1.      **Gross Receipts**

1.1 The Licensor, Distributor, Licensee, and any Party owning or controlling any Rights hereby undertakes with FCAM and the other Parties hereto (i) to issue Irrevocable Instructions to Distributors in substantially the form contained in Schedule 8 to pay all Gross Receipts directly into the Collection Account and (ii) to provide full accounting statements to FCAM together with such payments of Gross Receipts. FCAM shall notify all Parties within one Business Day of receipt of Gross Receipts in the Collection Account of the amount of the payment, any withholding amounts, date of the payment and name of Distributor or other Person who paid, provided that FCAM has received the necessary information in order to be able to provide this information to the Parties.

The Licensor shall either:

-       insert into the Distribution Agreements irrevocable instructions to the Distributors in a form substantially similar to those contained in the Irrevocable Instructions; or

-       have a Distributor sign separately the Irrevocable Instructions to pay all Gross Receipts into the Collection Account.

It is understood that in such instances whereby the Rights are routed through an Intermediate Licensor, the Distributors will first have to pay Gross Receipts to the applicable Intermediate Licensor and thereafter, the applicable Intermediate Licensor shall pay those amounts, net of such Intermediate Licensor's shares, into the Collection Account. For the avoidance of doubt, Intermediate Licensor Fees (if any) shall constitute Deemed Collected Gross Receipts for the purpose of calculating Residuals.

1.2     The Licensor undertakes to promptly notify FCAM of delivery of the Film to the respective Distributor(s), and the Licensor and Licensee undertakes to promptly notify FCAM of delivery of the Film to the Distributors, and, to the extent known, the respective release dates of the Content.

Exhibit 14
Page 108

1.3   If any Party receives or, prior to the effectiveness of this Agreement, has received Gross Receipts itself (and not from FCAM in accordance with this Agreement), that Party will promptly inform FCAM and the Parties in writing of such receipt and shall immediately and simultaneously transfer such Gross Receipts into the Collection Account without deduction (other than any actual, verifiable and standard bank charges) and without delay or offset. For the avoidance of doubt, regardless whether such Party transfers those Gross Receipts into the Collection Account, those Gross Receipts will be considered Deemed Collected Gross Receipts and shall be applied in calculating Fees. In the event the Licensor receives any Gross Receipts directly from Distributors, the Licensor shall within five (5) Business Days of receipt remit such monies to the Collection Account. Pending transfer of such Gross Receipts into the Collection Account such Parties shall hold such Gross Receipts on trust (which trust is hereby declared) for the benefit of the Beneficiaries and to be applied solely in accordance with the terms of this Agreement.

## 2.   FCustody's and FCAM's Obligations

FCustody shall:

2.1   open and maintain the Collection Account and hold all Collected Gross Receipts plus collection account interest in trust (which trust is hereby declared) in trust in the Collection Account for the benefit of the Beneficiaries to the extent of the Beneficiaries' respective Entitlements as specified in this Agreement. The Collection Account shall be a separate interest bearing special purpose trust account. No Collected Gross Receipts under this Agreement shall be crossed or commingled with any other proceeds arising from the exploitation of any other project.

FCAM shall:

2.2   immediately pay into the Collection Account, without set-off or deductions of any kind, any Gross Receipts directly received by FCAM from Distributors, the Licensor or any other Person and promptly notify the Parties upon receipt of any Gross Receipts by FCAM. Pending transfer of such Gross Receipts into the Collection Account, FCAM shall hold such Gross Receipts in trust (which trust is hereby declared) for the benefit of the other Parties and to be applied solely in accordance with the terms of this Agreement;

Exhibit 14
Page 109

2.3     provided FCAM has been given a copy of the relevant completed Distribution Agreement(s), monitor the dates upon which payments of Gross Receipts fall due to be paid to the Collection Account and if payments thereunder are not timely received, FCAM may be requested by any of the Parties to immediately request payment of the same from the relevant Distributor;

2.4     use reasonable commercial efforts to ensure the Collected Gross Receipts earn interest at the most favourable rate available at the CA Bank or wherever the Collection Account may be held for similar accounts and amounts as agreed among the Parties;

2.5     advise all Parties upon request of any of the Parties if payments of Gross Receipts due under the said Distribution Agreement have not been received;

2.6     convert Collected Gross Receipts received in a currency other than the Accounting Currency into the Accounting Currency as soon as possible after receipt thereof at the exchange rate prevailing on the day of such conversion (being the date of which such Collected Gross Receipts are received into the Collection Account) and keep a record of such rate;

2.7     calculate, pay and distribute the amount of Collected Gross Receipts payable to each Beneficiary and pay and distribute Collected Gross Receipts to all Beneficiaries in the manner, amounts and order set out in Schedules 5 and 6;

2.8     on written request promptly provide any Party with copies of statements and/or accounts received by FCAM from the Licensor, or Distributors and it is hereby confirmed that the Licensee request to be provided with copies of such statements;

2.9     notify the Parties in writing (email deemed a writing for purposes hereof) when Gross Receipts have been paid into the Collection Account;

2.10    pay out Entitlements in the Accounting Currency, unless otherwise specified in this Agreement or if FCAM is timely notified otherwise by a relevant Party. In case FCAM is instructed to pay out any Entitlement in another currency than the Accounting Currency, the Entitlement will be converted into the requested currency, at the

Exhibit 14
Page 110

exchange rate prevailing at the time of such conversion and the Collection Account shall be debited with the counter-value in the Accounting Currency at the expense of the requesting Party. For the avoidance of doubt, Entitlements which are being paid in full or in part in a currency which is not the Accounting Currency, shall be reported in Statements as being the sums of amounts (in the Accounting Currency) actually debited from the Collection Account;

2.11   FCAM and FCustody hereby make the following representations and warranties:

2.11.1   FCAM and FCustody are organisations duly organised, validly existing and in good standing under the laws of the Netherlands and have all requisite corporate power and authority to enter into this Agreement and to carry out the terms hereof;

2.11.2   all corporate and other actions and proceedings required to be taken to authorise the execution, delivery, and consummation of this Agreement by FCAM and FCustody have been or will be promptly taken;

2.11.3   FCAM and FCustody have the absolute right to enter into, to execute and deliver this Agreement, and to perform their obligations hereunder;

2.11.4   this Agreement constitutes valid and binding obligations of FCAM and FCustody enforceable in accordance with its terms;

2.11.5   FCAM and FCustody do not require the consent or approval of any other Person to enter into and perform this Agreement;

2.11.6   the execution and delivery of this Agreement is not, and the performance of this Agreement will not, constitute or result in: (a) a breach or violation of any provisions of the articles of incorporation, bylaws or minutes of FCAM and FCustody or any amendment thereto; (b) a material breach of any of the material terms, conditions or provisions of, or a default under, any agreement, instrument, understanding, indenture, mortgage, deed of trust, credit arrangement, note, evidence of indebtedness or other document to which FCAM and FCustody are a party or by which they or their properties are bound; (c) to the best of FCAM's and FCustody's knowledge, following due inquiry, a violation of any statute, decree, judgment, rule, regulation or writ or other order of any court of federal, state, county, municipal, regulatory or governmental authority,

Exhibit 14
Page 111

board, body or agency; or (d) to the best of FCAM's and FCustody's knowledge, an act of bankruptcy, preference, insolvency, or fraudulent conveyance under any bankruptcy act or other law for the protection of debtors and/or creditors in any applicable jurisdiction or (e) there are no threatened or actual claims, causes of action or disputes which would in any way affect FCAM's and FCustody's ability to fulfil their obligations under this Agreement;

2.11.7  FCAM and FCustody shall not change their business or organizational objectives during the term of this Agreement without first providing sixty (60) days written notice to the Parties to this Agreement;

2.11.8  neither FCAM nor FCustody have charged, pledged or otherwise encumbered their respective undertakings or assets (including the Collection Account or the monies standing to the credit of the Collection Account and their respective rights and benefits under this Agreement), by any lien, attachment, pledge, charge or any similar legal instrument;

2.11.9  neither FCAM nor FCustody has or shall encumber or mortgage the Collection Account or the monies standing to the credit of the Collection Account or any of the Collected Gross Receipts; and

2.11.10 there are no threatened or actual claims, causes of action or disputes which would in any way affect FCAM's and FCustody's ability to fulfill all of their obligations under this Agreement.

2.12  FCAM warrants and undertakes to the other Parties that FCAM has no interest in the funds from time to time standing to the credit of the Collection Account (save for FCAM's right to FCAM's Remuneration and the FCAM Expenses) and shall not exercise any right of set-off, counterclaim, defence, cross collateralisation or anything analogous thereto against such funds. The Collected Gross Receipts (together with any interest earned thereon) shall be deemed to be the property of the Beneficiaries in accordance with their respective Entitlements from time to time.

2.13  If one or more Party incurs any liability, loss, damage, costs or expense, including reasonable (legal) counsel's fees, reasonable (legal) counsel's costs or court or arbitration costs, either through a claim or actions arising directly out of, or in

Exhibit 14
Page 112

connection with FCAM's material breach, gross negligence or wilful misconduct, FCAM hereby agrees to reimburse such Party(ies) and agrees to hold such Party(ies) safe, harmless, defended and indemnified against any such liabilities, losses, damages, costs or expenses; provided, however, that FCAM's foregoing agreement to indemnify, defend and hold harmless the Party(ies) applies so long as such liabilities, losses, damages, costs or expenses were not caused by the Party's(ies') breach, misconduct or negligence.

2.14    FCAM and FCustody waive injunctive relief against the Content.

**3.      Distribution of Collected Gross Receipts**

3.1    FCAM shall commence distribution of Collected Gross Receipts from the Collection Account from the last date of the month during which Gross Receipts are first credited to the Collection Account and then at the time that the collection account balance is US 142,300,322.00   ;

3.2    FCAM shall not be obliged to prepare Statements to the Parties and make disbursements from the Collection Account unless at least one Beneficiary is entitled to be paid more than USD500 and to remit Entitlements to any Beneficiary unless such Beneficiary is entitled to be paid not less than USD500 PROVIDED THAT in any event FCAM shall prepare Statements and remit all Entitlements to any Beneficiary on a semi-monthly basis regardless of amounts;

3.3    This Agreement and all receipts, allocations and payments of Collected Gross Receipts hereunder by FCAM shall be subject to the requirements of all applicable present and future laws, regulations or directives including any and all withholding

"1INMM" – Collection Account Management Agreement

Exhibit 14
Page 113

taxes or other taxes or duties, levies, fees or charges imposed by any international, national, multi-national, federal, state, local or other governmental or quasi-governmental authority and the provisions of this Agreement shall be curtailed and limited to the extent necessary to comply with such requirements and FCAM has no obligation to make any payment to a Beneficiary if such payment may be unlawful in any way. FCAM has the right to request and require any Beneficiary to provide FCAM with any Distribution Agreement, any completed and executed tax documents, any tax forms, certifications, supporting materials including any licences, any underlying agreements regarding the Content, including but not limited to any agreements for the provision of services, financing, and any other items reasonably requested by FCAM. The Parties agree that FCAM has the right to make any legally required tax withholding(s) and any other legally required deductions or retentions from any sums payable to any Beneficiary and may without any liability to any Party (or alternatively create a reasonable reserve from Collected Gross Receipts such reserve to be liquidated no later than six (6) months from its creation) make any deposits, payment or other transfer of any such sums to any governmental or quasi-governmental authority;

3.4     N/A

3.5     FCAM shall not be obliged to make any payment out of Collected Gross Receipts if the making of such payment would constitute a breach of any court order or would otherwise be unlawful, provided that FCAM will provide the Parties with prompt written notice of the same and FCAM shall take all reasonable steps in order to find alternative solutions which may enable FCAM to resume making payments to the Beneficiaries as provided for hereunder and that FCAM supplies written evidence of such court order or legal notice explaining such unlawful activity. FCAM shall continue to disburse all Collected Gross Receipts that do not breach any court order or are not otherwise illegal.

4.    **Accounting**

4.1    N/A

4.2    N/A

4.3    N/A

4.4    N/A

4.5     N/A

4.6     Unless specifically requested by the Parties in writing, no Statements shall be provided to the Parties that have received their Entitlement in full. Any such Parties shall have no further rights pursuant to this Agreement after such receipt;

4.7     FCAM will pay the Entitlements by wire transfer simultaneously with or within five (5) Business Days from the issue of a Statement. FCAM may only distribute to itself that part of Collected Gross Receipts due to it under Item 1 of Schedule 5 at the same time as disbursing to Beneficiaries distributions for Entitlements as required by this Clause 4.7;

4.8     FCAM shall at all times keep at its principal place of business as reflected on the front page of this Agreement (which location shall not be changed without prior written notice to each Party) complete and accurate books of account and records relating to all monies received in and paid from the Collection Account;

4.9     N/A

Exhibit 14
Page 116

4.10    Provided FCAM and/or FCustody distributes Collected Gross Receipts in accordance with the terms of this Agreement, no liability shall attach to FCAM and/or FCustody on account of its application of any sums received by FCAM and/or FCustody under this Agreement or for any other obligations on the part of FCAM under this Agreement save as provided for by Clause 4.9 above or in the event of fraud, material breach, gross negligence or wilful misconduct on the part of FCAM. FCAM will make good any underpayments on its part provided that a claim has been lodged in writing with FCAM within 20 Business Days after the date of payment to which such claim relates. Notwithstanding the above but without prejudice to Clause 4.9, if an erroneous payment (i.e., a payment that is not in accordance with the Statement as provided to the Parties for the relevant Accounting Period) is discovered after the aforementioned 20 Business Days period has elapsed, FCAM shall apply existing and future Collected Gross Receipts (if any) to correct any underpayment suffered or overpayment received by any Party as a result of such erroneous payment in accordance with Clause 5.3 below. The Parties (excluding SAG-AFTRA) hereby agree and acknowledge that, in the event that existing and future Collected Gross Receipts are insufficient to correct any underpayment, subject to Clause 4.9, any underpaid Party's recourse shall be against the overpaid Party or Parties and not (in the absence of any fraud, material breach, gross negligence or wilful misconduct on the part of FCAM) against FCAM and/or FCustody unless it is FCAM and/or FCustody that has received such overpayment. Notwithstanding anything to the contrary in this Agreement, to the extent such claim is made by SAG-AFTRA or due to fraud, material breach, gross negligence or wilful misconduct on the part of FCAM and/or FCustody, the twenty (20) Business Days period shall not apply;

4.11    Notwithstanding the foregoing, FCAM shall indemnify the Party(ies) with respect to any liability, loss, damage, cost or expense, including reasonable outside (legal) counsel's fees, reasonable (legal) counsel's costs or court or arbitration costs (but excluding consequential damages and loss profits), arising directly from material breach, gross

Exhibit 14
Page 117

negligence or wilful misconduct on the part of FCAM; provided, however, FCAM's foregoing agreement to indemnify, defend and hold harmless the Party(ies) applies so long as such liabilities, losses, damages, costs or expenses were not caused by the Party's(ies') breach, misconduct or negligence.

## 5.      Obligations of the Parties

Each of the Parties agrees severally and for itself with FCAM, FCustody and with the other Parties:

5.1     that they will not during the term of this Agreement authorize or permit any third party to collect or administer Gross Receipts (other than as Intermediate Licensor) nor will any Party interfere with, frustrate or take any action contrary to the terms of this Agreement without prejudice to any Party's respective rights and remedies (at law or in equity) as a secured party in connection with the Content;

5.2     N/A

5.3     that if any Beneficiary (excluding SAG-AFTRA) receives a disbursement of Collected Gross Receipts hereunder in excess of its Entitlement or if withholding tax on Gross Receipts has to be refunded, the relevant Beneficiary, if also a Party, shall immediately repay such amount into the Collection Account and all Parties shall use reasonable efforts to cause any Beneficiary not being a Party to perform the same. If any such sum is not repaid by the relevant Beneficiary within five (5) Business Days of written notification by FCAM, FCAM shall not be obliged to make any further payments to such Beneficiary until the amount due has been either deducted from the next Entitlement (if any) of the Beneficiary concerned or repaid in full plus interest (calculated from the

Exhibit 14
Page 118

date of receipt of such excess or request to refund withholding tax) at the rate of LIBOR plus 1% p.a. If feasible, with respect to overpayments made to SAG-AFTRA, after written notice to SAG-AFTRA, FCAM will make an adjustment on the next distribution to SAG-AFTRA to address the amount of the overpayment. In no event, however, will SAG-AFTRA-Represented Performer be required to return Residual payments that have already been paid to or on behalf of a SAG-AFTRA-Represented Performer;

5.4    that FCAM shall not be required to incur any third party, out of pocket expense under this Agreement on its account other than the expense of performing its obligations hereunder, nor to make any payment to any Beneficiary save from Collected Gross Receipts, except as stipulated in Clause 4.9 or to the extent such expense arises out of any material breach of this Agreement by FCAM or fraud, gross negligence or wilful misconduct on the part of FCAM;

5.5    to the extent within such Party's possession and control, to provide FCAM prior to the Delivery Date with the following information and such further information as FCAM may require in order to discharge its obligations under this Agreement:

5.5.1   names and addresses of all Beneficiaries as well as W-8 and W-9 tax forms, if applicable, to be arranged by the Commissioning Distributor unless supplied by the relevant Beneficiary;

5.5.2   fees, commissions and incurred expenses of the Distributor;

5.5.3   N/A; and

5.5.4   N/A;

5.6    that excluding SAG-AFTRA and FCustody, the Parties shall indemnify in a joint and several manner FCAM and agree to hold FCAM safe, harmless, defended and indemnified against any liabilities, losses, damages, costs or expenses (including reasonable, outside legal fees and costs and arbitration fees and costs), in the case of more than one Party, such proportion for each such Party to be calculated by reference

"N/A" – Collection Account Management Agreement

Exhibit 14
Page 119

to the amount of such Party's Entitlement after payment of Residuals in relation to the total Entitlements of all indemnifying Parties, by reason of any claim, action or proceeding arising out of or in connection with FCAM's acceptance of or performance under this Agreement (including third party claims and the reasonable costs of any legal advice taken by FCAM pursuant to Clause 7) except for cases of fraud, material breach, gross negligence or wilful misconduct. In no event will FCAM withhold payment due to a Party because another Party has failed to make a payment to FCAM under this provision;

5.7     that the Parties shall not put any lien, charge or any similar legal instrument over the Collection Account or the Collected Gross Receipts or any other monies standing to the credit of the Collection Account, except for the security interest pursuant to clause 5.8, any security interests granted to SAG-AFTRA; and any security interests acknowledged by all Parties and identified in this Agreement;

5.8     to the extent for whatever reason that the trust created by this Agreement in favour of the Beneficiaries is ineffective or otherwise held to be invalid with the result that FCAM and/or FCustody is deemed beneficially entitled in any way to the monies standing to the credit of the Collection Account then each of the Parties is hereby granted by FCAM and FCustody a security interest, subject and subordinate to the security interests granted to SAG-AFTRA, over the Collection Account and the Collected Gross Receipts held therein from time to time, solely to the extent of its Entitlement thereto and solely to secure such Party's right to receive its Entitlement pursuant to the terms hereof;

5.9     neither FCAM nor FCustody has any interest in the funds from time to time standing to the credit of the Collection Account (save for FCAM's right to FCAM's Remuneration and the FCAM Expenses) and neither shall exercise any right of set-off, counterclaim, defense, cross collateralization or anything analogous thereto against such funds. As a result of the trust created by FCustody in favour of the Beneficiaries over the Collection Account and all monies standing to the credit of the Collection Account from time to time, the Collected Gross Receipts (together with any interest earned thereon) shall be deemed to be the property of the Beneficiaries in accordance with their respective Entitlements from time to time and FCAM shall hold all funds from time to time standing to the credit of the Collection Account on trust for the Beneficiaries in accordance with their respective Entitlements from time to time. It is understood and agreed that funds are not the property of FCAM or FCustody nor subject to any

Exhibit 14
Page 120

liquidation, bankruptcy, restructuring or similar proceeding or any action of FCAM or FCustody or their owners, successors, employees, representatives or designees not authorized hereunder;

5.10   the Parties shall each be entitled to exercise in respect of each Party's security interest (if any) all of the rights and remedies available to a secured party at law or in equity and such rights shall arise at such time as such security becomes enforceable. In the event that a Party (excluding the SAG-AFTRA) hereunder exercises its right as a secured party with respect to its Entitlement, it agrees that in so doing it will take all steps necessary to preserve the Entitlements of the other Parties and to ensure that FCAM is able to continue to fulfil its duties hereunder to such other Parties and shall disburse Collected Gross Receipts in accordance with the terms of this Agreement;

5.11   N/A

5.12   All Parties represent and warrant that no accounts into which Gross Receipts are deposited shall be governed by a deposit account control agreement.

**6.      General**

6.1    In the performance of its duties and exercise of its powers under this Agreement, FCAM will be entitled to rely upon any document reasonably believed by FCAM to be genuine and to have been sent or signed by the Person by whom it purports to have been sent or signed and the opinion and statements of any professional advisor selected by FCAM in connection herewith and shall not be liable to any Party for any consequence of any such reliance or related assumption and/or action absent gross negligence, material breach, and/or wilful misconduct. FCAM shall promptly provide to

Exhibit 14
Page 121

the Parties copies of any such documents to the extent it relates to the disbursement of Collected Gross Receipts or the performance of FCAM's duties under this Agreement;

6.2     FCAM and FCustody shall have no duties or obligations pursuant to this Agreement save as expressly set forth herein which includes, but is not limited to, a fiduciary duty to act with reasonable care taking into account the interests of the Beneficiaries in the performance of their obligations hereunder and in good faith at all times;

6.3     In the event that FCAM is in reasonable doubt about or unable to carry out the allocation, accounting or payment of Entitlement(s), or conflicting demands are made, or conflicting instructions or information are given from any Parties, FCAM may retain such Entitlements (the "**Reasonable Doubt Entitlements**") in the Collection Account and FCAM shall not be obliged to make any further payments as regards to the amount(s) of the Reasonable Doubt Entitlements to the Beneficiary(ies), until such uncertainty has been resolved. FCAM shall immediately notify the Parties upon the occurrence of such event as well the details of such Reasonable Doubt Entitlements, including what information it requires.

6.4     If FCAM is unable for reasons outside its control to carry out any of the provisions hereof, FCAM shall notify the Parties in writing of the same and the specific reasons therefor as soon as reasonably practicable and FCAM shall incur no liability as a

Exhibit 14
Page 122

consequence thereof for so long as the relevant situation continues and during such period FCAM shall have no responsibility for its inability to carry out or perform the relevant provisions hereof provided that FCAM shall promptly notify the Parties in writing of such events and provide sufficient details. In such event, FCAM shall hold any Entitlement which it is unable to make payment on until such time that payment may be released to the Beneficiaries. However, the foregoing does not prejudice the right of the Parties to terminate this Agreement in accordance with Clause 9 hereof;

6.5     If FCAM is unable at any time to make payments out of Collected Gross Receipts by reason of the failure of the Parties (or Beneficiaries) to provide any information required by FCAM, FCAM shall notify the Parties (or Beneficiaries) of the same in writing as soon as is reasonably practical and shall not be obliged to make any further payments to any Beneficiary until such time as any Party (or Beneficiary) hereto shall have provided sufficient information to FCAM in order to make such payments provided that FCAM shall promptly make written request for such information from such Party or Beneficiary. In the event that the failure of providing information to FCAM only affects the Entitlements of certain Beneficiaries, FCAM shall pay any other Entitlement to any other Beneficiary in accordance with Schedules 5 and 6;

6.6     FCAM shall have no obligation to protect the copyright or any similar rights in or to the Content in any part of the world whether by registration or otherwise;

6.7     Notwithstanding anything to the contrary of the provisions contained in Clause 6.11, if claims conflicting with the interpretation of the terms of this Agreement are notified to FCAM by any Party relating to the Collection Account or the Collected Gross Receipts, or if any third party should assert claims in respect thereof, FCAM shall be entitled, at FCAM's reasonable discretion and after notifying the Parties hereto in writing of such claims, to:

6.7.1   notwithstanding any other provision herein contained, issue a written notice to all Parties and suspend the disbursement of the affected portion of Collected Gross Receipts without liability to any Party until any conflict is in the reasonable opinion of FCAM resolved, provided that FCAM has notified all Parties of such suspension; and/or

Exhibit 14
Page 123

6.7.2   invoke the arbitration procedure referred to in Clause 8 hereof within a reasonable time;

6.8   Provided that FCAM is not in breach of any of its obligations hereunder, FCAM shall not be obliged to take any action under this Agreement which may in FCAM's reasonable opinion involve any expense or liability on FCAM's part other than those expenses which are incidental to FCAM's or FCustody's compliance with their obligations under Clause 2, 3 or 5 of this Agreement unless FCAM shall have first been furnished with an indemnity from the Parties (except SAG-AFTRA) in a form acceptable to FCAM. Any expense incurred by FCAM pursuant to this Clause 6.8 shall be deemed FCAM Expenses for the purposes of this Agreement provided that such expenses shall not be paid before Fees are paid;

6.9   FCAM shall be entitled without liability to engage in its normal and customary business with any Beneficiary or any affiliate or associate of any Beneficiary provided that nothing in this Clause shall affect the right of the Beneficiaries to receive their Entitlements;

6.10   If any act or payment by FCAM is subject to the approval of one or more of the Parties, and such approval or an explicit objection has not been received in writing by FCAM within 7 Business Days after receipt of a request for the same in writing, such Party shall be deemed to have given its approval to the relevant act or payment and FCAM shall be entitled to perform the relevant act, make the relevant payment or otherwise act in accordance with the terms and conditions of this Agreement;

6.11   This Agreement shall be deemed to be the principal document relating to the distribution of the Collected Gross Receipts;

6.12   N/A

Exhibit 14
Page 124

6.13   N/A

6.14   The Parties agree with each of the others that the terms of Schedule 5 of this Agreement are confidential to the Parties and shall not be disclosed to any third party, save that any Party shall be entitled to reveal such terms to its professional advisors, any assignee and its respective professional advisors, any governmental or regulatory authority and as required by law or judicial proceeding.

6.15   N/A

6.16   The clause and paragraph headings in this Agreement are provided for convenience only and shall not affect the construction, interpretation or effect of this Agreement;

Exhibit 14
Page 125

6.17   N/A

6.18   Nothing herein shall constitute a partnership or joint venture between the Parties hereto or any two or more of them;

6.19   FCAM may not assign or delegate any of its rights or obligations under this Agreement without the prior written approval of all of the other Parties. Any Beneficiary may assign, or designate any other Person(s) to receive, such Beneficiary's Entitlements hereunder at any time by providing FCAM with written notice thereof and an instruction to pay such assignee(s) or designee(s);

6.20   If FCAM may or is to receive a joint notification from two or more of the Parties hereto and one or more of such Parties has gone into administration, receivership, liquidation or any applicable or equivalent process in such Party's particular jurisdiction ("**Bankrupt Party**"), the notification may be done by the other Party or Parties who are to notify FCAM (but not the Bankrupt Party), to the extent this is permitted by the applicable law of the Bankrupt Party, otherwise, if a Party must be represented by a liquidator, administrator, receiver or other external administrator appointed to that Party's assets or business (jointly "**Administrator**"), the Administrator is entitled to represent the Bankrupt Party and give joint instructions and reply on behalf of the Bankrupt Party. However, if such Administrator does not reply on behalf of the Bankrupt Party within ten (10) Business Days (or if known to the Parties, within the deadline applicable to the proceedings of the Administrator under relevant legislation) after a written request for a notification (such time being specified in the notice to the Administrator) then FCAM shall send a second written request to the Administrator. If the Administrator does not reply on behalf of the Bankrupt Party within a further ten (10) Business Days (or if known to the Parties, within the deadline applicable to the proceedings of the Administrator under relevant legislation) after such second written request (such time being specified in such second notice to the Administrator) then, subject to applicable bankruptcy law, the Administrator's failure to respond within the requisite time period will mean "deemed acceptance" and the other Parties may, but

Exhibit 14
Page 126

shall not be obligated to, proceed without the Administrator's involvement in relation to that specific issue only;

6.21   This Agreement may be amended only by written agreement executed by all Parties.

## 7.   Legal Advice

7.1   FCAM may at any time and in its reasonable discretion (with the written approval of each of the Parties providing an indemnity or an agreement to pay) seek independent legal advice with regard to any non-payment of Gross Receipts by any Distributor or to any other matter relating to or affecting the performance of FCAM's duties or powers set out in this Agreement and each Party hereby undertakes to assist FCAM to obtain as fully informed and accurate legal advice as possible by:

7.1.1   providing FCAM with copies of any relevant document in the possession of that Party unless the provision of such document would cause the Party to breach an obligation of confidentiality;

7.1.2   taking all reasonable steps to procure that copies of any relevant documents that have been but are no longer in that Party's possession are provided to FCAM; and

7.1.3   informing FCAM of any relevant information in the knowledge of that Party or (if appropriate) in the knowledge of its officers, servants and/or agents;

7.2   FCAM shall provide to each of the Parties a copy of any legal advice so obtained;

7.3   The Parties (excluding SAG-AFTRA and FCustody) jointly and severally (but only to the extent of and pro rata to their respective Entitlements) indemnify FCAM against all reasonable, third party verifiable costs charges and expenses connected with or directly arising out of obtaining any such pre-approved legal advice and such pre-approved costs charges and expenses shall be deemed to be FCAM Expenses for which FCAM is entitled to be reimbursed in accordance with Schedule 5. If at any time FCAM shall determine that the amount of Collected Gross Receipts then standing credited to the Collection Account is not sufficient to discharge such costs charges and expenses as are to be or have been incurred by FCAM the Parties (excepting

Exhibit 14
Page 127

FCustody and SAG-AFTRA) shall forthwith pay to FCAM the amount of any such shortfall or the estimated amount thereof and shall be jointly and severally responsible therefore. In no event will FCAM withhold payment due to a Party because another Party has failed to make a payment to FCAM under this provision;

7.4     N/A

## 8.     Arbitration

8.1     Subject to Clause 8.7 and excluding SAG-AFTRA, should any dispute arise between any two or more of the Parties with respect to this Agreement, the dispute shall be resolved by binding, final and exclusive arbitration in the Forum under the rules then in force for the IFTA subject to the provisions of this Clause 8;

8.2     FCAM shall provide the Parties with a written notice summarizing the dispute and the relevant Parties shall within ten (10) Business Days after such notification mutually appoint at their own expense a single IFTA approved arbitrator who must be an expert on the motion picture industry and the legal aspects thereof. If the Parties fail to agree upon the appointment of an arbitrator within such period then pursuant to the IFTA rules, the arbitral agent of IFTA will then appoint an arbitrator or as soon as possible after such application. The Parties shall provide the arbitrator with all non-privileged relevant information and documentation within thirty (30) days of the appointment and the arbitration shall commence at a location in the Forum as expeditiously as possible and in any event within thirty (30) Business Days after the appointment of the arbitrator;

8.3     After a decision by the arbitrator, the Parties shall forthwith comply with that decision in accordance with the terms thereof;

8.4     Except if due to FCAM's gross negligence, material breach, fraud, dishonesty or wilful misconduct, all reasonable, direct, actual, verifiable , all reasonable third party out-of-pocket costs, charges and expenses actually incurred by FCAM in relation to the resolution of the dispute, shall be deemed FCAM Expenses, provided that if FCAM

Exhibit 14
Page 128

itself is a party to the arbitration proceedings, the payment of any costs incurred by FCAM shall be subject to any award of costs made by the arbitrator;

8.5     Upon conclusion of the arbitration proceedings, the arbitrator shall immediately render and issue a written decision to FCAM and the Parties to the arbitration (and FCAM shall promptly provide a copy of such decision to each of the other Parties). The arbitration award shall provide for payment by the losing party (i.e., the person(s) against whom the arbitration award is issued) of the reasonable out-of-pocket fees and costs (including, without limitation, the reasonable outside attorneys' fees and costs) paid by the prevailing parties (i.e., all Parties to the arbitration other than those who are losing party(ies)). Each of the Parties (excluding the Guilds). Each of the Parties (excluding SAG-AFTRA) hereto submits to the non-exclusive personal jurisdiction of the courts of the state and county of the Forum, as an appropriate place for compelling an arbitration or giving legal confirmation of the any arbitration award and irrevocably waives any objection which it may now or hereafter have to the venue of any such enforcement proceeding brought in any said courts and any claim of inconvenience forum. Each of the Parties (excluding SAG-AFTRA) hereto agrees to accept service of process for any judicial or other proceedings in the manner provided in Clause 8, hereof and shall be deemed effective as provided therein. Each of the Parties expressly waives application of the procedures of service of process pursuant to The Hague Convention for the Service Board of the Judicial and Extrajudicial Documents in Civil and Commercial Matters;

8.6     FCAM shall only be involved as an arbitration party if the dispute being the subject of the arbitration relates to FCAM's performance of its duties under this Agreement. Upon receipt of an arbitration notice, FCAM shall cease to pay any disputed Entitlement until the earlier of either (1) the arbitrator has notified FCAM in writing of its award, (2) the arbitration parties have each provided FCAM with a copy of the arbitrator's award or a joint notification that the arbitration was abandoned, or (3) the arbitration parties provide mutual written instructions to FCAM regarding the disputed Entitlements; and

8.7     Notwithstanding anything to the contrary in this Agreement, the Parties agree that any dispute to which SAG-AFTRA is a party in interest arising under this Agreement shall be submitted to final and binding arbitration in Los Angeles, California, USA in accordance with the arbitration provisions set forth in the Basic Agreement. Each Party further agrees that any legal action or proceeding to execute or otherwise enforce any

Exhibit 14
Page 129

arbitration award or judgment obtained hereunder by SAG-AFTRA against any Party or Beneficiary to this Agreement shall be governed by the laws of the State of California (without regard to its laws in respect of conflict of laws) and brought exclusively in the Federal or State courts located in Los Angeles, California, and by execution and delivery of this Agreement, each Party hereto irrevocably submits to such exclusive jurisdiction and consents to the service of process in any such action or proceeding by personal delivery, first class mail, or any other method permitted by law, and waives any and all rights to transfer or change of venue of such action or proceeding to any court located outside Los Angeles, California. Notice of any such action or proceeding shall be deemed to have been duly given if made as per Clause 10, below.

9.    **Termination**

9.1   FCAM and FCustody may at any time after the date falling three (3) years after the date of this Agreement request to terminate this Agreement at no cost to the Parties upon sixty (60) Business Days by written notice to all of the Parties provided that FCAM's and FCustody's notice shall specify the arrangements proposed to be made by FCAM and FCustody to pay Entitlements which, apart from such termination, would then have been payable to Beneficiaries under the provisions hereof and FCAM and FCustody shall give good faith consideration to any representations made to FCAM and FCustody concerning such proposed arrangements as any Beneficiary may provide to FCAM and FCustody within fourteen (14) Business Days thereafter. Unless and until such arrangements proposed to be made by FCAM and FCustody are approved by all of the other Parties and such approval to be considered provided sixty (60) Business Days following FCAM's and FCustody's notice, FCAM and FCustody's termination will not be effective, and FCAM and FCustody shall not be released from any of their obligations herein. Notwithstanding the foregoing the three (3) years period will not apply if remaining involved as the collection account manager would materially harm FCAM's reputation, provided the terms in this Clause 9 in connection with engaging a replacement collection account manager shall still apply;

9.2   All the Parties (other than FCAM and FCustody) shall have the right to terminate this Agreement by unanimous written notice to FCAM and FCustody at any time subject to FCAM's right to FCAM's Remuneration and FCAM Expenses properly incurred, undisputed and unpaid at that date from Collected Gross Receipts, provided FCAM is not in material breach of its obligations under this Agreement at the relevant time. In

Exhibit 14
Page 130

addition, the majority of the Parties (provided SAG-AFTRA must be part of such majority) shall jointly have the right to terminate this Agreement at any time if FCAM or FCustody is unable to pay its debts as and when they fall due or has a liquidator, receiver or other external administrator appointed to its assets or business or ceases or threatens to cease carrying on its business, by giving to the other Parties not less than one (1) Business Day notice of such termination;

9.3    N/A

9.4    Upon termination pursuant to this Clause 9, the majority of the Parties (other than FCAM and FCustody) who elected to so terminate this Agreement shall, within twenty one (21) Business Days after such election is made, select a successor collection account manager and instruct FCAM and FCustody in writing (with a copy to the other Parties) to transfer the administration of Collected Gross Receipts less FCAM's Remuneration and FCAM Expenses (provided FCAM is not at the relevant time in material breach of any of its obligations under this Agreement) up to and including the termination date to a successor collection account manager and FCAM shall administer the Collected Gross Receipts on the same terms as set out herein and FCAM shall cooperate with the Parties and any successor collection account manager in order to facilitate the handover of all information.

Exhibit 14
Page 131

9.5     As from the date of termination pursuant to this paragraph and following transfer of all sums in or standing to the credit of the Collection Account to FCAM's successor account manager and the execution of a replacement collection account management agreement with the Parties and successor collection account manager pursuant to this Clause 9, FCAM and FCustody shall have no further obligation to perform their obligations hereunder and shall be fully released and discharged therefrom, without prejudice to any accrued rights and remedies of the Parties in respect of the period prior to such termination, including without limitation of the foregoing, FCAM's right to be paid FCAM's Remuneration and the FCAM Expenses up to and including the date of termination or the Parties' rights against any of the other Parties, including, without limitation, FCAM, for any actions prior to the date of such termination, save that if FCAM and/or FCustody receive any Gross Receipts at any time after the date of termination they will remit any further monies immediately upon receipt of notification received from CA Bank of such Gross Receipts being credited to the terminated Collection Account, remit the same to the successor collection account manager without any set off or deduction (save for actual and verifiable standard bank transfer charges). Notwithstanding the foregoing, FCAM shall hold any Collected Gross Receipts in trust for the Beneficiaries after the date of termination of this Agreement until such Collected Gross Receipts have been transferred to the replacement collection account manager's account as required hereunder;

9.6     It is expressly agreed that any Party who shall have no further obligation under this Agreement and who is not entitled to receive any (further) Entitlement hereunder, shall no longer receive Statements from FCAM or have the right to agree (or disagree as the case may be) on amendments hereto or terminate this Agreement as described in this clause 9, and such Party's consent shall thereafter no longer be required where its consent is required; and

9.7     In the event of a termination of this Agreement, FCAM is not authorised to close the Collection Account until a replacement collection account has been agreed. If such instruction has not been received within the aforementioned period, FCAM may close

Exhibit 14
Page 132

the Collection Account, provided always that the Collection Account may not be closed until all Collect Gross Receipts have been transferred;

**10.    Notices**

10.1    Any notice required or permitted to be given under this Agreement shall be in writing and sent by hand, first class-recorded or registered letter, email (with the exception of notices under Clauses 8) or facsimile addressed to the relevant Party at the Party's address, email address or facsimile number given in this Agreement, or such other address as provided by such Party in writing and according to this notice provision. FCAM shall provide copies of any notice received by FCAM from any other Party to this Agreement to all other Parties.

10.2    Any such notice sent by first-class recorded or registered letter shall be deemed to have been received five (5) Business Days after posting; any such notice sent by email shall be deemed to have been received upon the date of transmission from the sender's email system (if by email) provided that no subsequent transmission error is issued by the sender's email system (further provided that if email notice is transmitted on a day other than a Business Day or later than 5:00pm in the recipient's location, such notice shall be deemed given on the next Business Day following confirmed transmission); any such notice sent by facsimile shall be deemed to have been received at the time of dispatch if during the recipient's business hours and otherwise at the commencement of the next Business Day of the recipient, provided always that the sender shall have received a successful transmission report or electronic receipt. Any such notice sent by hand shall be deemed to have been received at the time of delivery.

10.3    For the purposes of this Agreement, notices in email shall be considered to be in writing.

**11.    Execution**

11.1    This Agreement may be executed in any number of counterparts (each of which shall be deemed an original) and all of which, taken together, shall constitute one and the same agreement and any Party may enter into this Agreement by executing a

Exhibit 14
Page 133

counterpart. A counterpart signature page of this Agreement executed by a Party and sent by facsimile or transmitted electronically in either Tagged Image Format (TIFF) or Portable Document Format (PDF) shall be treated as original fully binding and with full legal force and effect and the Parties waive any rights they may have to object to such treatment;

11.2   If one or more Parties do not execute this Agreement, it shall nevertheless be in full force and effect as between the Parties that have executed this Agreement provided that this Agreement has been duly executed by at least each of the Executing Parties. This Agreement may not be amended without the prior written consent of the Executing Parties. Any Parties who do not sign this Agreement will be treated as Beneficiaries.

## 12.   Severability

If any of the provisions of this Agreement becomes invalid, illegal or unenforceable in any respect under any law or for any other reason whatsoever, the validity, legality and enforceability of the remaining provisions hereof shall not in any way be altered or removed.

## 13.   Governing Law

Subject to Clause 8.7, this Agreement shall be construed and performed in all respects in accordance with and shall be governed by the laws of Florida, without regard to its conflicts or choice of law rules and the Parties irrevocably submit to the arbitration procedure contained in Clause 8 and subject to Clause 8, submit to the exclusive jurisdiction of the federal and state courts in the county of the Forum.

Exhibit 14
Page 134

**AS WITNESS** the hands of the Parties hereto the day and year first above written.

EXECUTED and unconditionally

Delivered as its Agreement by

**FREEWAY CAM B.V.**

————————————————

EXECUTED and unconditionally

Delivered as its Agreement by

**STITCHING FREEWAY CUSTODY**

————————————————

EXECUTED and unconditionally

Delivered as its Agreement by

**HBO LATIN AMERICA HOLDINGS**

————————————————

Exhibit 14
Page 135

**AS WITNESS** the hands of the Parties hereto the day and year first above written.

EXECUTED and unconditionally

Delivered as its Agreement by

**1INMM CAPITAL LLC**

_____

EXECUTED and unconditionally

Delivered as its Agreement by

**WARNER MEDIA LLC**

_____

Exhibit 14
Page 136

# EXHIBIT 15

4:10 ✈



ZH

Zach ›

Will circle back Tom and get statement

Yesterday 2:20 PM

Thanks man. Please let me know what you find out today. I am sure they will be off by midday tomorrow for the holiday weekend and then Monday is payday

Today 2:26 PM

Hi Zach. Do you have an update

Hey man - account has almost $29MM in it.

Sent email blast out yesterday confirming wire and providing wire instructions

Haven't heard anything back but not surprised

Are they just sending you statements or did they give you access to the account?

iMessage

Exhibit 15
Page 137

# EXHIBIT 16

4:11 





Zach >

which I am sure has eased your concerns a bit. Could you send me the most recent statement. Actually seeing 29mm in the account would make me feel better too. I will keep in confidence



**Done**   2011191INMM11-24.pdf

Gross Receipts Report

Thanks. That has to feel better

No doubt – but it'll feel much better in my account lol

And yours

True

Exhibit 16
Page 138

# EXHIBIT 17

# Done  2011191INMM11-24.pdf



## Gross Receipts Report

**FREEWAY**

Date : Nov-24-2020

**" 1INMMCAP "**
Period started : Nov-20-2020
Period ended : Nov-24-2020

AC=Account Currency    LC=Local Currency

| TERRITORY | DISTRIBUTORS | MG/OVERAGES (LC) | PAYMENT EVENTS | DATE RECEIVED | GROSS RECEIPTS (LC) | BALANCE MG (LC) | EXCHANGE RATE | GROSS RECEIPTS (AC) | BANK CHARGES (AC) | WHT (AC) | OTHER DEDUCTIONS (AC) | NET RECEIPTS (AC) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **LATIN AMERICA/BRAZIL** | | | | | | | | | | | | |
| | Home Box Office | | | | | | | | | | | |
| | | USD 6,551,000 | Deposit | 2020-11-23 | USD 6,551,000 | | | USD 6,551,000 | | | | USD 6,551,000 |
| | | USD 6,174,000 | Delivery | 2020-11-24 | USD 6,174,000 | | | USD 6,174,000 | | | | USD 6,174,000 |
| | | USD 3,150,000 | Notice of Delivery | 2020-11-24 | USD 3,150,000 | | | USD 3,150,000 | | | | USD 3,150,000 |
| Totals | | USD 15,875,000 | | | USD 15,875,000 | | | USD 15,875,000 | | | | USD 15,875,000 |
| TOTALS | | USD 15,875,000 | | | USD 15,875,000 | | | USD 15,875,000 | | | | USD 15,875,000 |

| TOTAL RECEIPTS | Gross Entitlement in USD | Net Entitlement in USD |
|---|---|---|
| To CAM: | N/A | N/A |
| To 1INMMCAP: | 28,933,000 | 28,926,727 |
| To LICENSOR: | N/A | N/A |
| Total | 28,933,000.00 | 28,926,727.00 |

Published on 2020-11-24 – 14:35:07
by MovieChainer.com

Exhibit 17
Page 139

# EXHIBIT 18

5:10 ⌇



ZH

Zach ›

Yesterday 3:09 PM

Have we heard anything yet today from hbo about the wire

Yesterday 8:26 PM

No payment was made. Dialogue between lawyers as to receipt of invoice (on their end) and that payment will be processed. We said that they have till Monday or we will have to take further action.

So saga continues – CAM balance is $68M+ so I guess that's a "positive"

But keep you posted on anything else

The thing I don't understand...when I read the cama...it doesn't appear to me that they have the right to hold funds back

What are your lawyers saying?

iMessage

Exhibit 18
Page 140

# EXHIBIT 19

**EL FOTOGRAFO DE MAUTHAUSEN**

(2018) – SPANISH – Drama / History

Cast – Mario Casas / Macarena Gomez / Alain Hernandez

Director – Mar Targarona

Writer – Roger Danes

Logline: Based on real events, Francesc Boix is a Spaniard inmate in the Nazi concentration camp of Mauthausen in Austria who tries to save the evidences of the horrors committed inside its walls.

Price: $739,500.00 --- HBO 6 MONTHS --- $999,983.00

Funding Date: 10/17/19

**THE SKIN OF THE WOLF**

(2018) – SPANISH – Drama

Cast – Mario Casas / Ruth Diaz / Irene Escolar

Director – Samu Fuentes

Writer – Samu Fuentes

Logline: A highlander that lives alone in the mountains buys a wife to relieve his loneliness.

Price: $739,200.00 --- HBO 6 MONTHS --- $998,137.00

Funding Date: 10/17/19

**THE BAR**

(2018) – SPANISH – Horror / Thriller

Cast – Blanca Suarez / Mario Casas / Carmen Machi

Exhibit 19
Page 141

Director – Alex de la Iglesia

Writer – Jorge Guerricaechevarria

Logline: In bustling downtown Madrid, a loud gunshot and two mysterious deaths trap a motley assortment of common urbanites in a decrepit central bar, while paranoia and suspicion force the terrified regulars to turn on each other.

Price: $739,800.00 --- HBO 6 MONTHS --- $1,000,376.00

Funding Date: 10/17/19

---

Exhibit 19

Page 142