FILED
CLERK, U.S. DISTRICT COURT

APR - 5 2021

CENTRAL DISTRICT OF CALIFORNIA
BY: ___RS___ DEPUTY

1  KATHRYN C. WANNER (Cal. Bar No. 269310)
   Email:  wannerk@sec.gov
2  M. LANCE JASPER (Cal. Bar No. 244516)
   Email:  jasperml@sec.gov
3
   Attorneys for Plaintiff
4  Securities and Exchange Commission
   Michele Wein Layne, Regional Director
5  Alka N. Patel, Associate Regional Director
   Amy J. Longo, Regional Trial Counsel
6  444 S. Flower Street, Suite 900
   Los Angeles, California 90071
7  Telephone: (323) 965-3998
   Facsimile: (213) 443-1904
8
9              UNITED STATES DISTRICT COURT
10             CENTRAL DISTRICT OF CALIFORNIA
11
12  SECURITIES AND EXCHANGE          Case No.  2:21-CV-02927-CAS-GJSx
    COMMISSION,
13
                Plaintiff,           DECLARATION OF JAMES
14                                   RUSSELL
          vs.
15
    ZACHARY J. HORWITZ; AND          (FILED UNDER SEAL)
16  1INMM CAPITAL, LLC,
17              Defendants.
18
19
20
21
22
23
24
25
26
27
28

**DECLARATION OF JAMES RUSSELL**

I, James Russell, declare pursuant to 28 U.S.C. § 1746 as follows:

1.      I am over the age of 18 years and have personal knowledge of the facts stated herein, except for those stated upon information and belief, and as to those, I believe them to be true.  I am competent to testify as to the facts stated herein in a court of law and will so testify under oath if called upon to do so.

2.      I am and have been the managing member of Movie Fund, LLC ("Movie Fund"), a Nevada limited liability company, since its creation in September 2017.

3.      In or about March of 2017, a friend, prior and current business associate, Romik Yeghnazary, contacted me about making certain loans (hereinafter, "Movie Loans") to an individual who, Yeghnazary claimed, was purchasing film distribution rights for re-sale in Latin America.

4.      I have true and accurate copies of my email and text correspondence with Yeghnazary regarding the Movie Loans, which copies I have attached as **Exhibit 1** to this Affidavit.

5.      In an email on March 6, 2017, Yeghnazary wrote to me regarding the Movie Loans deal that he had "vetted it." Ten days later, he sent me a text message, repeating, "Vetting is done, it all checks out."

6.      I was concerned about whether the Movie Loans proposal was a risk worth taking, and repeatedly asked Yeghnazary about the security of the proposed loans. On March 16, 2017, Yeghnazary sent me an email, stating "We have vetted everything and are now very comfortable with this investment. We have looked at everyones bank accounts, taxes returns, not to mention Jeremy has also done weeks of research on his end.  Below is the list of items that will keep us secure: 1. HBO/ Netflix / Sony guarantee contract. 2. Promissory note from 1NMM Capital for min guarantee amount. 3. Ownership of the movie while we wait the 6 month period. 4. We will be vetting each contract with someone at HBO International before proceeding forward."

7.      Yeghnazary had previously informed me that Jeremy was Jeremy Salvador, a

Garman Turner
Gordon LLP
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000

1 of 12

1    certified public accountant who had been preparing tax returns for the borrower inquiring about

2    the loans. In his email assuring me of the safety of the Movie Loans deal, Yeghnazary also wrote:

3    "Remember Zach does not need any money from us, he is simply helping Jeremy since they are

4    friends." I understood that Zach was Zachary Horwitz.

5         8.      I was initially informed by Yeghnazary that Horwitz ran a movie company called

6    1 in MM Capital LLC ("1NMM"). Yeghnazary further had informed me that 1NMM was the entity

7    actually purchasing the distribution rights and then selling those rights to Home Box Office

8    International ("HBO"), which would then distribute the movies in Latin America. When

9    Yeghnazary wrote that Zach is "simply helping Jeremy", I understood based on information

10   provided to me by Yeghnazary that: a) Horwitz was giving his friend an opportunity profit on the

11   movie deals by letting his friend be a lender to 1NMM; b) the loan would then allegedly be used

12   by 1NMM to buy the distribution rights that 1NMM intended to sell to HBO; and c) the loan would

13   be paid with interest to Horwitz's friend after the sale of the movie rights to HBO.

14        9.      Still uncertain about whether the business proposition by Yeghnazary was safe, I

15   responded to his March 16, 2017 email with my own email inquiry: "What if the deal goes south,

16   is Jason prepared to pay me back all of the money? Is he guaranteeing the loan and pledging all of

17   his assets?" Yeghnazary had previously informed me that Jason was Jason Page, and Jason Page

18   was: 1) the friend that Horwitz was helping; and 2) the alleged borrower for whom Jeremy

19   Salvador had been preparing the taxes. In response to my inquiry about security for the loan,

20   Yeghnazary wrote: "Our main security is not with Jason but with 1NMM and HBO but we can

21   certainly get more from him also."

22        10.     On March 20, 2017, Yeghnazary wrote another email to me to let me know he had

23   secured an agreement with Jason Page pursuant to which Page would participate in the loans by

24   funding 10% of the loan with his own funds plus he would pledge his assets to secure an additional

25   10% of the loan.

26        11.     On March 21, 2017, Yeghnazary wrote again to assure me the deal was safe: "they

27   are looking at it as a very secure investment given the minimum guarantees from HBO, the fact

28   that you hold the movie and get the promissory note from 1NMM."

Garman Turner
Gordon LLP
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000

2 of 12

12. After I received the assurances in the March 21, 2017 email referenced above, I informed Yeghnazary by a March 22, 2017 email, that I wanted to lend the money he was requesting for the Movie Loans. Nevertheless, I continued to be concerned about the legitimacy of the deal.

13. On March 30, 2017, Yeghnazary wrote to me to tell me that he and Horwitz would be calling "Jennifer Bowen the SVP of international distribution at HBO (the buyer) to confirm the contracts/wires/and deals. We will be the ones dialing the HBO line and being transferred to her."

14. On April 13, 2017, Yeghnazary wrote to me: "We got email verification from Jennifer Bowen on contracts so we have verified everything at this point. The deeper I get into this, the more I see how exclusive it is." By then, Yeghnazary also identified three specific movies that allegedly were going to be purchased.

15. On April 17, 2017, Yeghnazary wrote: "Jason says he can take one of these on his own, or we could take all three and have him place money down on each one. Again, we would own 100% of the collateral, and have HBO contracts in our possession for review before we wire any funds." Later that day, he confirmed the terms of the deal for me: "you would get 11% in 6 months if we fund under 1M and 13% over 6 months if we fund over 1M." I understood that 1M meant one million dollars.

16. On April 20, 2017, I wrote to Yeghnazary and committed to providing $554,000 to fund one of the movie loans allegedly for a movie titled "Mojin." The promissory note was originated on April 27, 2017. A true and accurate copy of the Note is attached as **Exhibit 2**. Pursuant to its terms, the return on investment was 38.10% in six months.

17. I was still nervous about doing the deal; so, I wrote to Yeghnazary on April 20, 2017 before lending the money: "I better not lose money on this deal. I am trusting you to make sure the contracts have been reviewed by an attorney, and are 1000% secure."   Minutes later, he replied to me: "I have your back as always...and when you make 15 points, you will want to do more. Jeremy and I are going to be investing, and from now until you get paid Im [sic] working with a few other investors. Once we get a return, you will always have first right of refusal on all

Garman Turner
Gordon LLP
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000

3 of 12

1   deals no matter what."

2        18.   Later that April 20, 2017, Yeghnazary wrote another email to me to let me know

3   about due diligence on the deal allegedly done by Jeremy Salvador to "vette the deal." Yeghnazary

4   added: "This further validates our transactions in a very big way and Im [sic] sure it will answer

5   some of the other questions you may have." Below that, he copied and pasted allegedly what

6   Salvador had previously emailed to Yeghnazary:

7
8       I just received a call back from one of my contacts that I reached out to for due diligence on these movie deals. He's the CEO of a large movie theater company. He also has an ex-HBO executive as a substantial investor in his company – which he said he'd be willing to get me in contact with.

9
10
11
12
13
14       He told me that he was familiar with the fact that distribution studios use third parties to purchase films from producers – and that it happens very often. He says that the entire supply chain in the movie industry is filled with "middlemen" because of a Supreme Court case from 1948 that restricted vertical integration in the movie industry. He noted that it makes it very inefficient and that gives his company opportunities. He works on the retail side of the supply chain and says that distribution companies cannot own movie theaters, and most theaters use brokers when buying from distribution studios. He believes there may be some similar restrictions between production and distribution, but doesn't know for sure since that's not the part of the industry he plays in.

15
16
17
18
19       I told him the numbers on this Mojin movie deal and he said that they sound like they make sense. He also said that often times film buyers at distribution companies like HBO probably have some autonomy with regard to purchases they make to a certain threshold. The HBO buyer probably can pull the trigger on anything with a minimum guarantee of $1M - $1.5M without anyone else's authorization. So from the perspective of a studio like HBO that's buying a movie in a territory for $200K more than what it was sold for to a middleman for isn't very much money to them. Also if HBO were able to buy the movie from the producer directly, they would likely pay much much more than the spread the broker is making.

20
21
22
23
24       When I asked why HBO would buy a film for such a high percentage mark up, he told me that a studio buyers analyzes a movie from the price not from the return on investment of the broker. They don't care much about how much the broker is making – as long as they think it's a good deal and the movie will do well. Then they pay what they are authorized to pay. It's HBO's money not the buyer's. He says it also helps if the broker has a personal relationship with the buyer at the studio. He says a lot of brokers are former studio buyers and sell to their ex-coworkers.

25
26       Finally, he said that the industry is very relationship based – not as analytical as you might think. There are a lot of artists types who create these films and don't know the business side of things. They are not privy to the intricacies of distribution and need these middlemen. Producers create the film and often need to get some money to pay for production liabilities. That type of mindset makes for a distressed seller who might be taking less money to get funds up front as opposed to waiting 6 months for a studio like HBO to make a minimum guarantee payment.

27
28

Garman Turner
Gordon LLP
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000

19.     On April 24, 2017, I was about to wire the $554,000 pursuant to Yeghnazary's instructions when I wrote to ask him: ""Have you run this by an attorney? I just got this in my lap today. I will need to review before wiring." To which Yeghnazary replied: "We don't need an attorney on this, Jeremy and I have gone over it and it looks good." I answered: "I don't want to lose a dime on this deal, so please make sure the contract is 100% rock solid." Yeghnazary assured me in a three-word email reply: "Contract is good."

20.     After I funded the first deal, Yeghnazary continued to inform me about additional possible Movie Loans. Yeghnazary wanted me to meet with Horwitz and Jason Page in person. Yeghnazary coordinated our meeting and wrote to me about it on June 28, 2017: "Im [sic] just happy that Zach is taking the time to meet with us since One in MM does not need funding. This meeting he is agreeing on is strictly to help his friend with funding."

21.     On June 29, 2017, I traveled to Los Angeles, California for a meeting with Zachary Horwitz, Jason Page, Jeremy Salvador, Romik Yeghnazary and Grant Whitcher. We met at the Four Seasons Hotel bar in Beverly Hills. We then went to a restaurant for dinner and spent most of the evening together. The purpose for the meeting was for us to meet in person and get to know each other better. This was the first time I had direct communication with Horwitz.

22.     During the dinner, I sat next to Horwitz, and we discussed how the movie funding deals worked. Horwitz told me that in the prior year, he had earned approximately $20 million. I assumed that to mean he had earned the $20 million from movie deals similar to the ones we were discussing and perhaps his work as an actor. His claimed success gave me additional reason to rely on the other representations made to me regarding the loans he was seeking.

23.     After the dinner conversation with Horwitz, he gave me the understanding that he profited from the loans because the returns he would get from selling the film rights were sufficient to pay back the loans and profit for himself and his firm, 1NMM. In particular, at the dinner, Horwitz represented to me through his conversation and affirmations of the other dinner conversations that: a) he would identify films that he could purchase and go to HBO to sell the Latin America distribution rights to the film to HBO or other companies that would distribute films; b) if HBO committed to buying the rights, the commitment included a certain, specific

Garman Turner
Gordon LLP
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000

5 of 12

minimum guarantee that HBO was willing to pay 1NMM; c) HBO's initial commitment was informal but would be memorialized in a contract that HBO would execute shortly after Horwitz obtained the film rights; d) the amount Horwitz was borrowing was the amount he was paying for the film; and e) his alleged deals with HBO specified that he would receive the minimum guaranteed amount from HBO six months after the HBO agreement for the film rights was effective.

24.    These details described in paragraph 23 above were what I relied upon when agreeing to the terms of each of the promissory notes Movie Fund and I entered into and funded for 1NMM. The amount needed for 1NMM to purchase the rights described by Horwitz became the amount loaned under the Movie Fund promissory notes. The minimum guarantee HBO would pay for the rights described by Horwitz became the amount paid back by 1NMM to satisfy the promissory notes. The six-month payment period was also how the maturity date of the promissory notes was determined.

25.    I have attached as **Exhibit 3** a true and accurate copies of the promissory note and corresponding alleged HBO distribution agreement for the film "Behind the Walls," which were initially provided to Movie Fund by Yeghnazary allegedly through Jason Page. The promissory notes and distribution agreements for the other films on which Movie Fund loaned money to 1inMM differ only by date, name of the film, and the amount loaned. Otherwise, in sum and substance, they are identical.

26.    In 2018, I began to obtain the promissory notes by direct email from Page to me. These notes and contracts all demonstrate how the terms of the notes were derived directly from the terms of the alleged HBO distribution agreements.

27.    From our dinner meeting on June 29, 2017 and as a result of my conversation with Horwitz, I believed that 1NMM profited by selling the rights to HBO after borrowing the purchase amount and paying back the loan with interest. More specifically, I believed that the 1NMM profits came in the form of royalties that would be paid by HBO to 1NMM after HBO acquired the distribution rights. I relied on the beliefs described in this paragraph and derived from representations by Horwitz to continue Movie Fund's lending to Horwitz and 1NMM.

Garman Turner
Gordon LLP
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000

6 of 12

28. During our dinner meeting on June 29, 2017, I also asked Horwitz what might happen if HBO did not follow through on its alleged informal promise to buy the film rights that Horwitz was borrowing money for 1NMM to buy. Horwitz told me that HBO had never backed out of buying the rights to a film that it committed to buy from 1NMM. Horwitz also represented that if HBO were to back out of a deal it had promised to Horwitz, 1NMM would find another way, such as selling the rights to another distributor, to generate the revenue necessary to satisfy the Movie Fund promissory note regarding the film. I relied on Horwitz's representations described in this paragraph to continue Movie Fund's lending to Horwitz and 1NMM.

29. On July 13, 2017, Yeghnazary wrote and let me know about an allegedly competing group in Chicago that also wanted to fund 1NMM's acquisition of movie rights.

30. On July 17, 2017, Yeghnazary wrote to me to urge me to perform as quickly as possible on new movie deals: "Keep in mind, although I secured us first right of refusal, he has two groups now that are wanting to fund his deals. A few months ago he did not have any of these opportunities, but now that he does, I want to make sure we perform a quickly as we can so he has no reason to go to the others."

31. By September 2017, my business partner, Grant Whitcher, and I had agreed with Jason Page, Jeremy Salvador, and Yeghnazary to form a limited liability company to do more Movie Loans together for 1NMM. We formed Movie Fund LLC for that purpose.

32. On September 18, 2017, Yeghnazary sent me an email with a proposal to make four different Movie Loans totaling more than $2.2 million for a scheduled profit of $408,528.56. In pitching the deals, Yeghnazary wrote to me:

> I spoke to a very prominent movie sales agent, and producer in Hollywood by the name of Emilio Ferrari. He is well aware of exactly what 1NMM is doing and says he can be a source for us as well. They do have plenty of funding, but I was able to get in by offering another source (Emilio's friend) some money on each deal to put me in touch with him. We went over the contracts, and they verified they can do the same I just think it would be nice to have another avenue as a back up.

33. On September 27, 2017, Whitcher, on my and his behalf, wired a total of $2,208,263 to a bank account in the name of 1NMM for funding the first of the Movie Fund deals. On October 6, 2017, Yeghnazary also reported in an email that Jason had provided $245,362.50

Garman Turner
Gordon LLP
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000

7 of 12

1   for the deals.

2         34.    I wanted to see the financials for 1NMM, but Yeghnazary told me that 1NMM was not willing to provide the financials. So I wrote to Yeghnazary: "It is absolutely ridiculous that he does not want to share his financials as we are currently lending 5mil. This is a very common practice to ensure the company is making money, has sales, and has the ability to pay. Sorry, I am not risking millions based upon someone's word, who I don't know." Yeghnazary replied: "Keep in mind please that our HBO contracts we are getting show that they will always [sic] have enough money for us, since HBO is sending them the minimum guarantee funds. Then those are tied directly to our prom not with 1NMM Capital. So the money, is not really coming from them, they are pushing money from HBO to us same day. Also keep in mind i verifies [sic] those contracts diresctlu [sic] with HBO."

12        35.    Yeghnazary wrote in a separate email a few minutes later: "HBO is the one funding our money. It gets wired to them, then wired to us just like the first time. The key to this whole deal, even more important than any other piece of due diligence is the release of the one contact Jennifer Bowen. He made us ask and talk about it for weeks before he had us sign the NDA to release this info. When she verified the hbo contracts...i knew what we had at that point. We did verification on her name as well...every single thing 3rd part verification checked out. Not one thing has been out of line. Jason's bank statements spanning 2.5 years, receiving wires on the day, not a day later for the exact amount as ever prom note. That's 9 deals. Further due dill on zach, etc etc."

21        36.    In the absence of 1NMM's providing its financials to satisfy me, Yeghnazary and Salvador agreed to provide additional security for the deals by participating in the funding and providing promissory notes to guarantee the payment of the outstanding loans to 1NMM. When the 1NMM notes were timely satisfied by 1NMM, Whitcher and I released Yeghnazary and Salvador from the notes they had signed to secure the notes to 1NMM.

26        37.    In late September of 2017, I along with Grant Whitcher, Jason Page, Jeremy Salvador, and Romik Yeghnazary founded Movie Fund LLC. At all times since its creation, Movie Fund's exclusive business has been lending money to 1NMM to purchase distribution rights to

Garman Turner
Gordon LLP
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000

8 of 12

films.

38.     Movie Fund loaned money to 1NMM on a per-film basis. Each transaction was memorialized by a promissory note identifying the film and loan to which it pertains. In total, Movie Fund made one hundred and eight (108) loans to 1NMM between September 2017 and October 2019.

39.     Between June 12, 2019 and October 14, 2019, Movie Fund made twenty-six loans to 1NMM. Each of the promissory notes for these loans matured six months after execution, meaning payment in full, including interest, was due between December 12, 2019 and April 14, 2020. To date, 1NMM has not paid Movie Fund any amount on these promissory notes.

40.     Following 1NMM's initial defaults on December 12, 2020, I engaged Movie Fund's corporate counsel, Gregory Gordillo, Esq., to pursue payment from 1NMM on the defaulted promissory notes. On January 23, 2020, Mr. Gordillo sent a letter to Mr. Horwitz advising of 1NMM's defaults and demanding payment in full. A true and correct copy of Mr. Gordillo's letter is attached hereto as **Exhibit 4**.

41.     Patrick Somers of the law firm Kendall Brill & Kelly LLP responded to Mr. Gordillo's letter on January 29, 2020, advising that he represented 1NMM and requesting Movie Fund take no immediate action in pursuit of repayment other than to engage in discussions with 1NMM. Mr. Gordillo advised that Movie Fund had retained the law firm of Garman Turner Gordon LLP ("GTG") and instructed Mr. Somers to direct further communications to GTG. A true and correct copy of the January 29, 2020 correspondence between Messrs. Gordillo and Somers is attached hereto as **Exhibit 5**.

42.     I have remained in regular, sometimes weekly, often daily contact with Mr. Horwitz throughout 1NMM's default period.

43.     Throughout 1NMM's default period, Mr. Horwitz has consistently represented that he is in communications with HBO regarding payment and that 1NMM will repay Movie Fund all that is owed under the promissory notes. By way of example:

a.     On March 4, 2020, Mr. Horwitz advised that he was meeting with HBO personnel in-person to discuss a new distribution deal and payment of amounts owed. *See* **Exhibit**

Garman Turner
Gordon LLP
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000

9 of 12

1    **6** (a true and correct transcription of some of the pertinent text messages between Mr. Horwitz and

2    me between March 4, 2020 and December 31, 2020) at 1-2.

3              b.       On March 10, 2020, Mr. Horwitz represented he had received an email

4 from HBO including proposed new terms to 1NMM's deal with HBO. He further advised that

5 confidentiality concerns precluded him from disclosing the entirety of his communications with

6

7 HBO. *Id.* at 2.

8              c.       On March 13, 2020, Mr. Horwitz protested that there was any reason for

9 suspicion concerning his dealings with HBO, asserting that he was "clearly [] working diligently

10 to resolve the issue every single day." *Id.* at 3. He further advised that he informed HBO that its

11 proposal to extend payment over a longer period was "UNACCEPTABLE." *Id.*

12              d.       On March 17, 2020, Mr. Horwitz advised that he "should be getting more

13

14 positive information today regarding moving along negotiations of payments." *Id. at 4.*

15              e.       On March 31, 2020, Mr. Horwitz informed me that he had received an

16 email and term sheet from HBO. *Id.* at 4-5. On April 2, 2020, he advised that lawyers were

17 redlining the term sheet and he would call me when he had "actual info." *Id.*

18              f.       On July 7, 2020, Mr. Horwitz advised that HBO's counsel had sent a draft

19 agreement to Mr. Horwitz's counsel, who he claimed had been speaking with HBO. He claimed

20 to have been trying for two hours to reach his counsel but had no success. *Id.* at 5.

21

22              g.       On October 1, 2020, Mr. Horwitz advised me that he had received the

23 "Final HBO contract" and that he would review it and "circle back." *Id.* at 6.

24              h.       The following day (Oct. 2nd), Mr. Horwitz advised that he had executed the

25 HBO contract and sent it back to them. He also said he had authorized his attorney to share the

26 executed contract with my counsel on an attorneys' eyes only basis. *Id.*

27

28              i.       On October 29, 2020, Mr. Horwitz provided me with the name of his

Garman Turner
Gordon LLP
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000

10 of 12

transactional counsel, Luke Steinberger at K&L Gates in New York City, with the understanding my counsel would reach out to Mr. Steinberger to discuss the matter. *Id.*

j.  On November 30, 2020, Mr. Horwitz advised that he had no official word on when HBO would pay, but that based on the balance of the "CAM" account, he believed HBO intended to extend payment through December 2020. *Id.* at 7-8. Significantly, he advised that he fully expected at least a partial payment that week pursuant to his new contract with HBO. *Id.*

k.  On December 1, 2020, Mr. Horwitz stated that HBO had been funding the CAM account, which he represented held over $13 million as of the previous Friday. He claimed the CAM account had multiple triggers to release payment to 1NMM that "mirror the master agreement;" however, he did not identify those triggers or provide a copy of the master agreement that identified such clauses. *Id.*

l.  In response, I inquired of Mr. Horwitz concerning the manner by which he had been verifying the amounts HBO claimed to have put into the CAM account. He responded that he had "not been able to 100% 'verify' but the statement are coming from the CAM company that is a 3rd party company so there shouldn't be any issue there." *Id.* at 9. He also said he was having an "all hands call tomorrow to make sure everyone is on the same page and get details as to payment." *Id.*

44.  On or about October 6, 2020, Mr. Horwitz advised me that 1NMM and HBO had executed a new Distribution Agreement. He further advised the agreement provided for HBO's repayment in full of amounts owed to 1NMM and that 1NMM stood ready to repay Movie Fund commensurate with payments received from HBO.

45.  On or about December 1, 2020, Mr. Horwitz advised that HBO had established an escrow account with Freeway Entertainment ("Freeway") into which HBO had been depositing funds to be used to repay 1NMM the amounts owed, including amounts owed to Movie Fund. He further advised that the terms of the escrow prohibited Freeway from releasing any funds until the

Garman Turner
Gordon LLP
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000

11 of 12

1 | account held 50% of the entire amount HBO/HBO owed 1NMM.  Attached hereto as **Exhibit 7** is

2 | a true and correct copy of a screenshot Mr. Horwitz texted to me purportedly from Freeway's web

3 | portal depicting the balance of the escrow account.

4 |      I declare under penalty of perjury under the laws of the United States of America that the

5 | foregoing is true and correct.

6 |      Executed this _22nd_ day of March 2021.

9 |                  JAMES RUSSELL

Garman Turner
Gordon LLP
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000

12 of 12

# EXHIBIT 1

# EXHIBIT 1

Exhibit 1 Page 13

| From: | Romik Yeghnazary |
|---|---|
| To: | Jim Russell |
| Subject: | Meeting |
| Date: | Monday, March 06, 2017 11:38:52 AM |

Hey Jim,

     Throughout the years we have been focusing primarily on private money loans on real estate as our primary point of focus. I have something that will likely be shifting real estate private money loans into second as far as our priority is concerned. I have vetted it, and I believe the best way to show you this is on my screens here at the office. Can you come by today, tomorrow, or Wednesday after work?

--

*To expedite your process, please CC the production manager Rony@nafloans.com with all replies and documents. You can also contact him at 702 285 5795 directly.*

*Thank you,*

*Romik Yeghnazary*

**Senior Loan Officer | NMLS ID #372980**

*North American Financial*
**375 N. Stephanie St.**
**Henderson NV 89014**
**Mobile: (702)420-0655 (LV)**
**Mobile: (818) 291 6379 (CA)**
**Fax: (888) 316-5151**
*www.nafloans.com*

Home of the Set and Met Guarantee®
**Confidentiality Notice:** This electronic mail message contains information that is intended only for use by the above named recipient. If you are not the above named recipient and you have received this e-mail in error, you should not review the text of this message or otherwise disseminate, distribute or copy this e-mail. Please immediately notify us of the error via a reply to this e-mail and then permanently delete this message from your system.

Exhibit 1 Page 14

--

*To expedite your process, please CC the production manager Rony@naqloans.com with all replies and documents.
You can also contact him at 702 285 5795 directly.*

*Thank you,*

*Romik Yeghnazary*

**Senior Loan Officer | NMLS ID #372980**

*North American Financial*
**375 N. Stephanie St.
Henderson NV 89014**
*Mobile: (702)420-0655 (LV)*
*Mobile: (818) 291 6379 (CA)*
**Fax:** *(888) 316-5151*
*www.naqloans.com*

**Home of the Set and Met Guarantee®**
**Confidentiality Notice:** *This electronic mail message contains information that is intended only for use by the above named recipient. If
you are not the above named recipient and you have received this e-mail in error, you should not review the text of this message or
otherwise disseminate, distribute or copy this e-mail. Please immediately notify us of the error via a reply to this e-mail and then
permanently delete this message from your system.*

Exhibit 1 Page 15

**3/15/2017 2:24 PM**
iPhone (+ 18013629766)

Match is at 8:30 am. I will send you another copy of the schedule. Yes, let's watch the match.

**3/15/2017 2:32 PM (Viewed 3/15/2017 2:40 PM)**

Romick Yeghnazary (7024200655)

No I have the schedule I was just driving

**3/15/2017 2:41 PM**
iPhone (+ 18013629766)

Ok, I'll see you at 5:15 at the club.

**3/15/2017 2:41 PM (Viewed 3/15/2017 3:54 PM)**

Romick Yeghnazary (7024200655)

Sounds good.

**3/15/2017 4:50 PM (Viewed 3/15/2017 5:05 PM)**

Romick Yeghnazary (7024200655)

Joker lost first set against kyrgios

**3/15/2017 4:50 PM (Viewed 3/15/2017 5:05 PM)**

Romick Yeghnazary (7024200655)

5 all in the 2nd

**3/15/2017 5:32 PM (Viewed 3/15/2017 5:34 PM)**

Romick Yeghnazary (7024200655)

An early break!!

**3/16/201711:45 AM**

Romick Yeghnazary (7024200655)

Hey Jim, gonna shoot you an email on the movie deals. Vetting is done, it all checks out.

**3/16/2017 3:00 PM**

Romick Yeghnazary (7024200655)

7pm county club? Thiem wawrinka...

**3/16/2017 3:01 PM**
iPhone (+18013625766)

We have practice at 6

**3/16/2017 3:01 PM**

Romick Yeghnazary (7024200655)

After then...

**3/16/2017 3:01 PM**
iPhone (+18013629766)

Si

**3/17/2017 9:13 AM**
iPhone (+18013629766)

They rejected brocks appeal.  Assholes

**3/17/201710:02 AM**

Romick Yeghnazary (7024200655)

Yeah he really should play 4.5. He hasn't played for so long etc etc...

**3/17/201710:02 AM**

Romick Yeghnazary (7024200655)

U wanna do a late lunch at 3pm to watch the fed match?

134

Exhibit 1 Page 16

| From: | Romik Yeghnazary |
|---|---|
| To: | Jim Russell |
| Subject: | Movie Deals |
| Date: | Thursday, March 16, 2017 1:05:10 PM |

Hey Jim,

We have vetted everything and are now very comfortable with this investment. We have looked at everyones bank accounts, taxes returns, not to mention Jeremy has also done weeks of research on his end. Below is the list of items that will keep us secure:

1. HBO/ Netflix / Sony minimum guarantee contract.

2. Promissory note from IinMM Capital for min guarantee amount.

3. Ownership of the movie while we wait the 6 month period.

4. We will be vetting each contract with someone at HBO International before proceeding forward.

I know you mentioned that the 9% was not enough so I prepared something a little different below. I also wanted to show you what the splits look like so that you can gain a better understanding of who is involved and how the returns are going to be allocated:

Total ROI = 38% - 39%

Jason is willing to pay:

- 15% for deals under IM

- 17% for deals over IM

On deals under IM we would have a gross of 15% from Jason so we could offer 10% to you allowing Jeremy and I to keep 2.5% each.

On deals over 1M we would have a gross of 18% from Jason so we could offer 12% to you keeping Jeremy and I at the same 2.5% each.

After we work all the details out, we can schedule a call with Zach Horowitz with IinMM Capital so that we can go over any questions. Remember Zach does not need any money from us, he is simply helping Jeremy since they are friends.

Exhibit 1 Page 17

| From: | Romik Yeghnazary |
|---|---|
| To: | Jim Russell |
| Subject: | Re: Movie Deals |
| Date: | Thursday, March 16, 2017 1:50:56 PM |

I was planning on asking him for a promissory note as well, and also perhaps asking him to put some skin in the game especially on the first deal. Our main security is not with Jason but with 1inMM and HBO but we can certainly get more from him also.

On Thu, Mar 16, 2017 at 1:41 PM, Jim Russell <jimr@performancesteel.com> wrote:

> Ok, however, is he guaranteeing the deal, and pledging his assets?
>
>
>
> Jim Russell
>
>
> O - 702-322-0020
>
> C – 801-362-9766



> **From:** Romik Yeghnazary [mailto:romik@nafloans.com]
> **Sent:** Thursday, March 16, 2017 1:38 PM
> **To:** Jim Russell
> **Subject:** Re: Movie Deals
>
>
> Ill work on this some more...
>
> 
>
>
> On Thu, Mar 16, 2017 at 1:20 PM, Jim Russell <jimr@performancesteel.com> wrote:

Exhibit 1 Page 18

So, I put up all of the money, make 10%, while Jason makes 25%, and you guys make 5%?  In essence, I am making 25% of the profits on a deal?  What if the deal goes south, is Jason prepared to pay me back all of the money? Is he guaranteeing the loan, and pledging all of his assets?

Jim Russell

O - 702-322-0020

C – 801-362-9766



**From:** Romik Yeghnazary [mailto:romik@nafloans.com]
**Sent:** Thursday, March 16, 2017 1:05 PM
**To:** Jim Russell
**Subject:** Movie Deals

Hey Jim,

We have vetted everything and are now very comfortable with this investment. We have looked at everyones bank accounts, taxes returns, not to mention Jeremy has also done weeks of research on his end. Below is the list of items that will keep us secure:

1. HBO / Netflix / Sony minimum guarantee contract.

Exhibit 1 Page 19

| | |
|---|---|
| **From:** | Romik Yeghnazary |
| **To:** | Jim Russell |
| **Subject:** | Re: Movie Deals |
| **Date:** | Tuesday, March 21, 2017 5:18:09 PM |

Jim I tried to express your concerns but they are looking at it as a very secure investment given the minimum guarantees from HBO, the fact that you hold the movie and get the promissory note from 1inMM. They feel that paying 16% for 6 months and 18% for 6 months over a million is a lot of interest. I know you're looking at it like a business partnership so I see your point, but I can also see where they are coming from as well. As I said in the previous email, this could very well take the place of our note portfolio. I can draft up the LOI contingent on the verification of contracts with HBO international which will give us all the safety we need. Lets jump in on this one, I feel really good about it. The ROI is solid, and I don't want to risk losing them to another investor.

On Mon, Mar 20, 2017 at 2:54 PM, Romik Yeghnazary <Romik@nafloans.com> wrote:
Hey Jim,

I was able to do the following:

1. 10% Skin in the game plus 10% in pledged assets.

2. Deals under 1M went from 15% to us up to 16% in 6 months. Jeremy and I stay the same increasing your return from 10% to 11% in 6 months.

3. Deals over 1M went from 17% to us up to 18% in 6 months. Jeremy and I stay the same increasing your return from 12% to 13% in 6 months.

On Thu, Mar 16, 2017 at 1:04 PM, Romik Yeghnazary <Romik@nafloans.com> wrote:
Hey Jim,

We have vetted everything and are now very comfortable with this investment. We have looked at everyones bank accounts, taxes returns, not to mention Jeremy has also done weeks of research on his end. Below is the list of items that will keep us secure:

1. HBO / Netflix / Sony minimum guarantee contract.

Exhibit 1 Page 20

| | |
|---|---|
| **From:** | Romik Yeghnazary |
| **To:** | Jim Russell |
| **Subject:** | Re: Movie Deals |
| **Date:** | Thursday, March 30, 2017 11:58:33 AM |

Just got on the phone with Zach Horowitz. I will be doing a call with him and Jennifer Bowen the SVP of international distribution at HBO(the buyer) to confirm these contracts/wires/and deals. We will be the ones dialing the HBO line and being transferred to her. Ill keep you posted.

On Wed, Mar 22, 2017 at 9:33 AM, Jim Russell <jimr@performancesteel.com> wrote:

ok, lets see if we can put together a deal.

Jim Russell

O - 702-322-0020

C – 801-362-9766



**From:** Romik Yeghnazary [mailto:romik@nafloans.com]
**Sent:** Tuesday, March 21, 2017 5:18 PM
**To:** Jim Russell
**Subject:** Re: Movie Deals

Jim I tried to express your concerns but they are looking at it as a very secure investment given the minimum guarantees from HBO, the fact that you hold the movie and get the promissory note from 1inMM. They feel that paying 16% for 6 months and 18% for 6 months over a million

Exhibit 1 Page 21

| | |
|---|---|
| **From:** | Romik Yeghnazary |
| **To:** | Jim Russell |
| **Subject:** | Re: Movie Deals |
| **Date:** | Thursday, April 13, 2017 11:43:12 AM |

Hey Jim,

We got email verification from Jennifer Bowen on contracts so we have verified everything at this point. The deeper I get into this, the more I see how exclusive it is. Below are three deals that have come up which will need to close by the end of April. Jason is willing to purchase one of the 3 or we can fund all three and ask him to put money down on each. The terms are the same as described in previous emails.

_____

**FIXED -**

(2017) – ENGLISH – COMEDY Cast – Andy Comeau / Courtney Henggeler / Erinn Hayes / Alan Rusk Director – Alonso Mayo Writer – Alonso Mayo Logline: Allan is a married father of three whose sex life takes a hit when his wife can no longer take the pill. He soon finds himself with an appointment for a vasectomy and a nagging identity crisis. Although he is by all reasonable accounts a good, responsible man, the thought of getting "fixed" drives him to lose himself to an action-packed midlife crisis along with his best friends.

Price: $510,200.00
_____

**Gone Are The Days -**

(2017) – ENGLISH – WESTERN Cast – Danny Trejo / Tom Berenger / Lance Henriksen Director – Mark Landre Gould Writer – Gregory M. Tucker Logline: A once-feared outlaw long past his prime sets out to atone for his gravest sin: abandoning his family and best friend twenty years ago. His quest for redemption however soon transforms into a tale of vengeance when he crosses the paths of a ruthless mining town boss and a legendary lawman with a dark secret.

Price: $588,950.00
_____

**Mojin - The Lost Legend (The Ghouls)**

(2017) – ENGLISH – WESTERN Cast – Danny Trejo / Tom Berenger / Lance Henriksen Director – Mark Landre Gould Writer – Gregory M. Tucker Logline: A once-feared outlaw long past his prime sets out to atone for his

Exhibit 1 Page 22

gravest sin: abandoning his family and best friend twenty years ago. His quest for redemption however soon transforms into a tale of vengeance when he crosses the paths of a ruthless mining town boss and a legendary lawman with a dark secret.

Price: $588,950.00

On Thu, Mar 30, 2017 at 12:30 PM, Romik Yeghnazary <Romik@nafloans.com> wrote:

705pm from here to LAX, then midnight we leave for cancun

On Thu, Mar 30, 2017 at 11:59 AM, Jim Russell <jimr@performancesteel.com> wrote:

Ok, sounds good.  What time are you leaving?

Jim Russell

O - 702-322-0020

C – 801-362-9766



**From:** Romik Yeghnazary [mailto:romik@nafloans.com]
**Sent:** Thursday, March 30, 2017 11:58 AM

**To:** Jim Russell
**Subject:** Re: Movie Deals

Exhibit 1 Page 23

| | |
|---|---|
| **From:** | Romik Yeghnazary |
| **To:** | Jim Russell |
| **Subject:** | Re: Movie Deals |
| **Date:** | Monday, April 17, 2017 10:13:03 AM |

Morning Jim,

Must be a busy Monday for you after your Florida trip so let me know when everything clears up for you and you have some time to discuss these. Jason says he can take one of these on his own, or we could take all three and have him place money down on each one. Again, we would own 100% of the collateral, and have the HBO contracts in our possession for review before we wire any funds.

On Thu, Apr 13, 2017 at 11:42 AM, Romik Yeghnazary <Romik@nafloans.com> wrote:
Hey Jim,

We got email verification from Jennifer Bowen on contracts so we have verified everything at this point. The deeper I get into this, the more I see how exclusive it is. Below are three deals that have come up which will need to close by the end of April. Jason is willing to purchase one of the 3 or we can fund all three and ask him to put money down on each. The terms are the same as described in previous emails.

———————————————

**FIXED -**

(2017) – ENGLISH – COMEDY Cast – Andy Comeau / Courtney Henggeler / Erinn Hayes / Alan Rusk Director – Alonso Mayo Writer – Alonso Mayo Logline: Allan is a married father of three whose sex life takes a hit when his wife can no longer take the pill. He soon finds himself with an appointment for a vasectomy and a nagging identity crisis. Although he is by all reasonable accounts a good, responsible man, the thought of getting "fixed" drives him to lose himself to an action-packed midlife crisis along with his best friends.

Price: $510,200.00

———————————————

**Gone Are The Days -**

(2017) – ENGLISH – WESTERN Cast – Danny Trejo / Tom Berenger / Lance Henriksen Director – Mark Landre Gould Writer – Gregory M. Tucker Logline: A once-feared outlaw long past his prime sets out to atone for his gravest sin: abandoning his family and best friend twenty years ago. His quest for redemption however soon transforms into a tale

Exhibit 1 Page 24

**4/14/2017 10:38 AM (Viewed 4/14/2017 11:34 AM)**

Romick Yeghnazary (7024200655)

Hey Jimmy, I sent you an email on Movie deals available yesterday...with you being in Florida will you be able to reply today? Hope you guys are having fun.

**4/14/2017 11:35 AM**
iPhone (+18013629766)

I will tr

**4/14/2017 11:35 AM**
iPhone (+18013629766)

I will try and review.

**4/14/2017 11:36 AM (Viewed 4/14/2017 12:07 PM)**

Romick Yeghnazary (7024200655)

k

**4/17/2017 3:56 PM (Viewed 4/17/2017 3:57 PM)**

Romick Yeghnazary (7024200655)

Hey Jim, is all of what Brandon owes me done with including the small loan you paid me on last? Any other payment remaining?

**4/17/2017 5:54 PM (Viewed 4/17/2017 6:07 PM)**

Romick Yeghnazary (7024200655)

Hey we are going to be hitting some tennis balls at 6:30 want to join?

**4/17/2017 6:08 PM**
iPhone (+18013629766)

I am going to kick back with Natalia. I'll see you tomorrow.

**4/17/2017 6:18 PM (Viewed 4/17/2017 9:08 PM)**

Romick Yeghnazary (7024200655)

K

**4/18/2017 11:42 AM (Viewed 4/18/2017 12:46 PM)**

Romick Yeghnazary (7024200655)

Hey Jim, calcs emailed...not much of a breakdown, just the same numbers I emailed you from before. You get 11% in 6 months if we fund under 1M and 13% in 6 months if we fund over 1M.

**4/19/2017 9:59 AM (Viewed 4/19/2017 10:02 AM)**

Romick Yeghnazary (7024200655)

Jim can you take a call at 1030?

**4/19/2017 10:35 AM**

Romick Yeghnazary (7024200655)

Call me, the sooner the better, I was able to get more on these...and he is ok with 20 percent down to do more vs putting 43 percent down on all 3

**4/19/2017 10:36 AM**
iPhone (+18013629766)

Dude, I just tried you.

**4/19/2017 10:36 AM (Viewed 4/19/2017 11:19 AM)**

Romick Yeghnazary (7024200655)

Calling u back

138

Exhibit 1 Page 25

| | |
|---|---|
| **From:** | Romik Yeghnazary |
| **To:** | Jim Russell |
| **Subject:** | Re: Movie Deals |
| **Date:** | Thursday, April 20, 2017 11:05:46 AM |

Cool.

On Thu, Apr 20, 2017 at 10:26 AM, Jim Russell <jimr@performancesteel.com> wrote:

I will do the 554k.  I am funding this alone, so no LLC.

Jim Russell

O - 702-322-0020

C – 801-362-9766



**From:** Romik Yeghnazary [mailto:romik@nafloans.com]
**Sent:** Thursday, April 20, 2017 10:18 AM
**To:** Jim Russell
**Subject:** Movie Deals

Morning Jim,

Can you let me know by 12pm if the 554k is possible?. If I don't hear from you by then we will just go with the 500k prom note. We need to fund this by the 26th at the latest so Jeremy are working on the contracts with 1inMM between now and the 24th.

Exhibit 1 Page 26

| From: | Romik Yeghnazary |
|---|---|
| To: | Jim Russell |
| Subject: | Re: Movie Deals |
| Date: | Thursday, April 20, 2017 11:23:37 AM |

**I have your back as always...and when you make the 15 points, you will want to do more. Jeremy and I are going to be investing, and from now until you get paid Im working with a few other investors. Once we get a return, you will always have first right of refusal on all deals no matter what.**

On Thu, Apr 20, 2017 at 11:07 AM, Jim Russell <jimr@performancesteel.com> wrote:

> I better not lose money on this deal. I am trusting you to make sure the contracts have been reviewed by an attorney, and are 1000% secure.
>
>
>
> Jim Russell
>
>
> O - 702-322-0020
>
> C – 801-362-9766
>
> 
>
>
>
> **From:** Romik Yeghnazary [mailto:romik@nafloans.com]
> **Sent:** Thursday, April 20, 2017 11:05 AM
> **To:** Jim Russell
> **Subject:** Re: Movie Deals
>
>
> Cool.
>
> 

Exhibit 1 Page 27

| From: | Romik Yeghnazary |
|---|---|
| To: | Jim Russell |
| Subject: | Fwd: Additional Due Diligence on Movie Deals |
| Date: | Thursday, April 20, 2017 3:58:25 PM |
| Attachments: | image002.png |
| | image001.png |

Hey Jim,

When we initially started due diligence Jeremy had placed some calls to vette the deal, and one of his contacts pretty high up in the food chain in the movie biz just go back to us. Jeremy had called me to explain what he had found but I was a bit busy so I asked him to put it in an email so that I could forward you all the details as well. See below. This further validates our transactions in a very big way and Im sure it will answer some of the other questions you may have.

---------- Forwarded message ----------
From: **Jeremy Salvador** <jeremy@miod-cpa.com>
Date: Thu, Apr 20, 2017 at 3:45 PM
Subject: Additional Due Diligence on Movie Deals
To: Romik Yeghnazary <romik@nafloans.com>


Romik,


I just received a call back from one of my contacts that I reached out to for due diligence on these movie deals. He's the CEO of a large movie theater company. He also has an ex-HBO executive as a substantial investor in his company – which he said he'd be willing to get me in contact with.


He told me that he was familiar with the fact that distribution studios use third parties to purchase films from producers – and that it happens very often. He says that the entire supply chain in the movie industry is filled with "middlemen" because of a Supreme Court case from 1948 that restricted vertical integration in the movie industry. He noted that it makes it very inefficient and that gives his company opportunities. He works on the retail side of the supply chain and says that distribution companies cannot own movie theaters, and most theaters use brokers when buying from distribution studios. He believes there may be some similar restrictions between production and distribution, but doesn't know for sure since that's not the part of the industry he plays in.


I told him the numbers on this Mojin movie deal and he said that they sound like they make sense. He also said that often times film buyers at distribution companies like HBO probably have some autonomy with regard to purchases they make to a certain threshold. The HBO

Exhibit 1 Page 28

buyer probably can pull the trigger on anything with a minimum guarantee of $1M - $1.5M without anyone else's authorization. So from the perspective of a studio like HBO that's buying a movie in a territory for $200K more than what it was sold for to a middleman for isn't very much money to them. Also if HBO were able to buy the movie from the producer directly, they would likely pay much much more than the spread the broker is making.

When I asked why HBO would buy a film for such a high percentage mark up, he told me that a studio buyers analyzes a movie from the price not from the return on investment of the broker. They don't care much about how much the broker is making – as long as they think it's a good deal and the movie will do well. Then they pay what they are authorized to pay. It's HBO's money not the buyer's. He says it also helps if the broker has a personal relationship with the buyer at the studio. He says a lot of brokers are former studio buyers and sell to their ex-coworkers.

Finally, he said that the industry is very relationship based – not as analytical as you might think. There are a lot of artists types who create these films and don't know the business side of things. They are not privy to the intricacies of distribution and need these middlemen. Producers create the film and often need to get some money to pay for production liabilities. That type of mindset makes for a distressed seller who might be taking less money to get funds up front as opposed to waiting 6 months for a studio like HBO to make a minimum guarantee payment.

Respectfully,

JEREMY J SALVADOR



PARTNER

**MIOD AND COMPANY, LLP**

CERTIFIED PUBLIC ACCOUNTANTS

27200 Tourney Road , Suite 290
Valencia, CA 91355-5906
Telephone: (818) 898-9911
Facsimile: (818) 898-9922



777 E. Tahquitz Canyon Way,

SUITE 200-164

Palm Springs, CA 92262

Telephone (760) 779-0990

Facsimile (760) 779-0960

Website: http://miod-cpa.com

Exhibit 1 Page 29

**From:** Romik Yeghnazary
**To:** Jim Russell
**Subject:** Re: Movie Transaction Docs and Wire Instructions
**Date:** Monday, April 24, 2017 1:35:59 PM

Contract is good.


On Mon, Apr 24, 2017 at 1:33 PM Jim Russell <jimr@performancesteel.com> wrote:

> I don't want to lose a dime on this deal, so please make sure the contract is 100% rock solid.
>
>
>
> Jim Russell
>
>
> O - 702-322-0020
>
> C – 801-362-9766
>
> 
>
>
>
> **From:** Romik Yeghnazary [mailto:romik@nafloans.com]
> **Sent:** Monday, April 24, 2017 1:21 PM
> **To:** Jim Russell
> **Subject:** Re: Movie Transaction Docs and Wire Instructions
>
>
> **We don't need an attorney on this, Jeremy and I have gone over it and it
> looks good. If you would like I can run it by Chris so another pair of eyes
> can look over it as well.**
>
> 
>
>
> On Mon, Apr 24, 2017 at 12:59 PM, Jim Russell <jimr@performancesteel.com> wrote:

Exhibit 1 Page 30

Have you run this contract by an attorney?  I just got this in my lap today. I will need to review
before wiring.

Jim Russell

O - 702-322-0020

C – 801-362-9766

Logo



**From:** Romik Yeghnazary [mailto:romik@nafloans.com]
**Sent:** Monday, April 24, 2017 12:01 PM
**To:** Jim Russell
**Subject:** Movie Transaction Docs and Wire Instructions

**Hey Jim,**

**Please see attached for promissory note and the HBO distribution deal. I
have included the wire instructions for 1inMM Capital. Please wire
$554,300 to the below bank:**

**Bank Name:** City National Bank
**Bank Address:** 8641 Wilshire Blvd. Beverly Hills, CA 90211 **ABA Number:** 122016066
**Account Number:** 123820290
**Account Name:** 1INMM CAPITAL LLC

Exhibit 1 Page 31

**Please see if its possible to wire this by tomorrow since they need to have funds no later than the 26th.**



*To expedite your process, <u>please</u> CC the production manager <u>Rony@naqfloans.com</u> with all replies and documents. You can also contact him at <u>702 285 5795</u> directly.*

*Thank you,*

*Romik Yeghnazary*

**Senior Loan Officer | NMLS ID #372980**

*North American Financial*

**375 N. Stephanie St.**

**Henderson NV 89014**

Mobile: **(702)420-0655** *(LV)*

Mobile: **(818) 291 6379** (CA)

Fax: **(888) 316-5151**

<u>*www.naqfloans.com*</u>

**Home of the Set and Met Guarantee®**

**Confidentiality Notice:** *This electronic mail message contains information that is intended only for use by the above named recipient. If you are not the above named recipient and you have received this e-mail in error, you should not review the text of this message or otherwise disseminate, distribute or copy this e-mail. Please immediately notify us of the error via a reply to this e-mail and then permanently delete this message from your system.*

Exhibit 1 Page 32

| | |
|---|---|
| **From:** | Romik Yeghnazary |
| **To:** | Jim Russell |
| **Subject:** | Re: Ca Trip |
| **Date:** | Wednesday, June 28, 2017 12:06:23 PM |

He has a 5pm to 615 pm, then by the time he gets in his car and heads out he will be there at 7pm at the very earliest. Jason can meet with us anytime between 3pm and on, its Zach with One in MM that has the scheduling issue. Im just happy that Zach is taking the time to meet with us since One in MM does not need funding. This meeting he is agreeing on is strictly to help his friend with funding. Im very happy you made the time also, and appreciate you working to make this happen. You will not regret it, and meeting with these guys and working with them in the future will be very good for your portfolio. It was not easy setting this up between you and Zach, but it will be worth it.

On Wed, Jun 28, 2017 at 11:56 AM, Jim Russell <jimr@performancesteel.com> wrote:

> My flight to Chicago is at 1:30 on Friday, so I am cutting it close.  It sucks that the soonest he can meet is 7:30, especially after planning this for weeks.
>
>
>
>
> Jim Russell
>
>
>
> O - 702-322-0020
>
> C – 801-362-9766



> **From:** Romik Yeghnazary [mailto:romik@nafloans.com]
> **Sent:** Wednesday, June 28, 2017 9:50 AM
> **To:** Jim Russell
> **Subject:** Ca Trip

Exhibit 1 Page 33

| From: | Romik Yeghnazary |
|---|---|
| To: | Jim Russell; Grant Whitcher (steelpro2@aol.com) |
| Subject: | Movie Deals |
| Date: | Thursday, July 13, 2017 8:31:03 PM |

Hey Guys,

There is a Chicago group that has approached Jason with an offer of 25 points total. I interviewed when I heard about this in an attempt to swat those guys away and to get us first right of refusal on all deals that come in. As is with the other funds buying the movies, there is a limited supply, so if this Chicago group wins, we will hardly see any deals. Jason has agreed to give us first right of refusal which is great, however Jeremy and I get squeezed too much with this new plan. With 25 to Jason, and 20 to both of you, Jeremy and I are left with 2.5% each for basically putting this whole thing together. We should be able to at least make 4 points each for a total of 8 lowering both of your profits to 17%. The total would then be 15 to Jason, 17 to both of you, and 8 to us.

We have 3 movies we are going to get tomorrow. Ill send them over and perhaps we can get on a conference call to discuss all this.

--

*To expedite your process, please CC the production manager Rony@nafloans.com with all replies and documents. You can also contact him at 702 285 5795 directly.*

*Thank you,*

*Romik Yeghnazary*

**Senior Loan Officer | NMLS ID #372980**

*North American Financial*

**375 N. Stephanie St. Suite #18**
**Henderson NV 89014**
*Mobile: (702)420-0655 (LV)*
*Mobile: (818) 291 6379 (CA)*
*Fax: (888) 316-5151*
*www.nafloans.com*

**Home of the Set and Met Guarantee®**
**Confidentiality Notice:** This electronic mail message contains information that is intended only for use by the above named recipient. If you are not the above named recipient and you have received this e-mail in error, you should not review the text of this message or otherwise disseminate, distribute or copy this e-mail. Please immediately notify us of the error via a reply to this e-mail and then permanently delete this message from your system.

Exhibit 1 Page 34

| From: | Romik Yeghnazary |
|---|---|
| To: | Jim Russell |
| Subject: | Movie deals |
| Date: | Monday, July 17, 2017 10:37:04 AM |

**Morning Jim,**

You want to meet tonight at the club to go over these movie deals or set up a call for later today? Just want to get back to Jason by tonight. Keep in mind, although I secured us first right of refusal, he has two groups now that are wanting to fund his deals. A few months ago he did not have any of these opportunities, but now that he does, I want to make sure we perform as quickly as we can so he has no reason to go to the others.

---

*To expedite your process, please CC the production manager Rony@nafloans.com with all replies and documents. You can also contact him at 702 285 5795 directly.*

*Thank you,*

*Romik Yeghnazary*

**Senior Loan Officer | NMLS ID #372980**

*North American Financial*
**375 N. Stephanie St. Suite #18**
**Henderson NV 89014**
**Mobile: (702)420-0655 (LV)**
**Mobile: (818) 291 6379 (CA)**
**Fax: (888) 316-5151**
*www.nafloans.com*

**Home of the Set and Met Guarantee®**
**Confidentiality Notice:** This electronic mail message contains information that is intended only for use by the above named recipient. If you are not the above named recipient and you have received this e-mail in error, you should not review the text of this message or otherwise disseminate, distribute or copy this e-mail. Please immediately notify us of the error via a reply to this e-mail and then permanently delete this message from your system.

Exhibit 1 Page 35

| From: | Romik Yeghnazary |
|---|---|
| To: | Jim Russell; Grant Whitcher (steelpro2@aol.com) |
| Subject: | September Movie Funding Figures |
| Date: | Monday, September 18, 2017 7:08:20 PM |

Good Evening,

    For September we have the below movies and amounts to fund as soon as we finalize this trust agreement.

## 1. The Sacrifice

- Purchase Price - $607,380
- Funding Amount - $546,642

## 2. Chavela

- Purchase price - $565,500
- Funding Amount - $508,950

## 3. Heavy Water

- Purchase Price - $580,245
- Funding Amount - $522,220.50

## 4. The House October Built 2

- Purchase Price - $700,500
- Funding Amount - $630,450

Total Funding Amount - **$2,208,262.50**

Total profit - **$408,528.56**

I spoke to a very prominent movie sales agent, and producer in Hollywood by the name of Emilio Ferrari. He is well aware of exactly what 1inMM is doing and says he can be a source for us as well. They do have plenty of funding, but I was able to get in by offering another source(Emilio's friend) some money on each deal to put me in touch with him. We went over the contracts, and they verified they can do the same. I just think it would be nice to have another avenue as a back up.

Exhibit 1 Page 36

Thank You,

Romik Yeghnazary
Owner | NMLS#372980



10161 W. Park Run Dr. Ste#150  | Las Vegas, NV 89145
**M :** 702 420 0655  | **O :** 702 515 7444  | **F:** 888 316 5151
Company NMLS ID#1603937

Exhibit 1 Page 37

**From:** Romik Yeghnazary
**To:** Grant Whitcher
**Cc:** Jim Russell
**Subject:** Re: September Movie Funding Figures
**Date:** Wednesday, September 27, 2017 1:53:29 PM

;)

Thank You,

Romik Yeghnazary
Owner | NMLS#372980



10161 W. Park Run Dr. Ste#150  | Las Vegas, NV 89145
**M :** 702 420 0655  | **O :** 702 515 7444  | **F :** 888 316 5151
Company NMLS ID#1603937

On Wed, Sep 27, 2017 at 1:48 PM, Grant Whitcher <steelpro2@aol.com> wrote:
> Smart as are we
>
> Sent from my iPhone
>
> On Sep 27, 2017, at 1:44 PM, Romik Yeghnazary <romik@thelendingarena.com> wrote:
>
>> perfect thanks Grant. Jason sent out his 10% on Heavy Water as well.
>> He is wiring separately for each move so that it is easier to keep track.
>>
>>
>> Thank You,
>>
>> Romik Yeghnazary
>> Owner | NMLS#372980
>>
>> 
>>
>> 10161 W. Park Run Dr. Ste#150  | Las Vegas, NV 89145
>> **M :** 702 420 0655  | **O :** 702 515 7444  | **F :** 888 316 5151
>> Company NMLS ID#1603937
>>
>> On Wed, Sep 27, 2017 at 12:46 PM, Grant Whitcher <steelpro2@aol.com> wrote:
>>> Wire has gone out to chase acct
>>>
>>> Sent from my iPhone

Exhibit 1 Page 38

On Sep 27, 2017, at 11:10 AM, Romik Yeghnazary <romik@thelendingarena.com> wrote:

> No, the funding amount for Chavela is $508,950. Jason will be placing 10% down on the purchase price of $565,500 so he will be wiring $56,550 after 2 pm today.
>
> We are funding 90% of the purchase price on all the movies for now.
>
>
>
> Thank You,
>
>
> Romik Yeghnazary
> Owner | NMLS#372980
>
> 
>
> 10161 W. Park Run Dr. Ste#150  | Las Vegas, NV 89145
> **M :** 702 420 0655  | **O :** 702 515 7444  | **F:** 888 316 5151
> Company NMLS ID#1603937
>
> On Wed, Sep 27, 2017 at 10:53 AM, Grant Whitcher <steelpro2@aol.com> wrote:
>> wire Chavela   only today   $565500.00
>>
>> confirm
>>
>>
>> -----Original Message-----
>> From: Jim Russell <jimr@performancesteel.com>
>> To: Romik Yeghnazary <romik@thelendingarena.com>; Grant Whitcher <steelpro2@aol.com>
>> Sent: Wed, Sep 27, 2017 10:40 am
>> Subject: RE: September Movie Funding Figures
>>
>> Grant, please wire today. I need to go into the branch for the outgoing wires, and need a few hours to plan.
>>
>> Jim Russell
>>
>> O - 702-322-0020
>> C – 801-362-9766
>> <image002.jpg>
>>
>>
>> **From:** Romik Yeghnazary [mailto:romik@thelendingarena.com]
>> **Sent:** Wednesday, September 27, 2017 9:43 AM

Exhibit 1 Page 39

**To:** Grant Whitcher
**Cc:** Jim Russell
**Subject:** Re: September Movie Funding Figures

10/4/2017 on October Built


Thank You,


Romik Yeghnazary
Owner | NMLS#372980



10161 W. Park Run Dr. Ste#150
⊥
Las Vegas, NV 89145
M
:
702 420 0655
|
O
:
 702 515 7444
 |
F: 888 316 5151
Company
NMLS ID#1603937

On Wed, Sep 27, 2017 at 9:42 AM, Grant Whitcher
<steelpro2@aol.com> wrote:
I show the following

Chavela   $565500   9/28
Heavy Water $580245  10/2

The house October buildt $ 700500   not sure on date


-----Original Message-----
From: Jim Russell <jimr@performancesteel.com>
To: Romik Yeghnazary <romik@thelendingarena.com>; Grant
Whitcher (steelpro2@aol.com) <steelpro2@aol.com>
Sent: Wed, Sep 27, 2017 9:33 am
Subject: RE: September Movie Funding Figures

Are we supposed to fund a movie tomorrow?  If so, then we need
the information asap.


Jim Russell

Exhibit 1 Page 40

O - <u>702-322-0020</u>
C – <u>801-362-9766</u>
<image003.jpg>

**From:** Romik Yeghnazary [mailto:romik@thelendingarena.com]
**Sent:** Monday, September 25, 2017 9:58 AM
**To:** Jim Russell; Grant Whitcher (<u>steelpro2@aol.com</u>)
**Subject:** Re: September Movie Funding Figures

Good morning,

Can you please confirm when you have sent the wire from your account to Movie Fund LLC and then from Movie Fund LLC to 1inMM? We have two wires to do before the cutoff. See below for wiring instructions.

1. Purchase price - $607,380
2. Loan Amount - $546,642

3. Jeremy already wired his 10% or $60,738 so that should be in the account.

4. Wire in the amount of $607,380 to be sent to:

**Bank Name:** City National Bank
**Bank Address:** <u>8641 Wilshire Blvd. Beverly Hills, CA 90211</u>

**ABA Number:** 122016066
**Account Number:** 123820290

**Account Name:** 1INMM CAPITAL LLC

Thank You,

Romik Yeghnazary
Owner | NMLS#372980



<u>10161 W. Park Run Dr. Ste#150</u>
⊥
<u>Las Vegas, NV 89145</u>
**M**
:
<u>702 420 0655</u>
|
**O**
:
<u>702 515 7444</u>
|
**F:** <u>888 316 5151</u>
Company
NMLS ID#1603937

Exhibit 1 Page 41

On Mon, Sep 18, 2017 at 7:07 PM, Romik Yeghnazary <romik@thelendingarena.com> wrote:

Good Evening,

    For September we have the below movies and amounts to fund as soon as we finalize this trust agreement.

**1. The Sacrifice**

- Purchase Price - $607,380
- Funding Amount - $546,642

**2. Chavela**

- Purchase price - $565,500
- Funding Amount - $508,950

**3. Heavy Water**

- Purchase Price - $580,245
- Funding Amount - $522,220.50

**4. The House October Built 2**

- Purchase Price - $700,500
- Funding Amount - $630,450

Total Funding Amount - **$2,208,262.50**

Total profit - **$408,528.56**

I spoke to a very prominent movie sales agent, and producer in Hollywood by the name of Emilio Ferrari. He is well aware of exactly what 1inMM is doing and says he can be a source for us as well. They do have plenty of funding, but I was able to get in by offering another source(Emilio's friend) some money on each deal to put me in touch with him. We went over the contracts, and they verified they can do the same. I just think it would be nice to have another avenue as a back up.

Thank You,

Romik Yeghnazary

Exhibit 1 Page 42

| | |
|---|---|
| **From:** | Romik Yeghnazary |
| **To:** | Jim Russell; Grant Whitcher (steelpro2@aol.com) |
| **Subject:** | September Movie Figures |
| **Date:** | Friday, October 06, 2017 11:04:12 AM |
| **Attachments:** | Redcon1 (3).pdf |
| | DropOff (3).pdf |
| | The Forgiven (2).pdf |
| | Chavela Prom Note.pdf |
| | Heavy Water Prom Note.pdf |
| | The Sacrifice Prom Note.pdf |
| | House of October Built Prom Note.pdf |

Hello Gentlemen,

See below for wires out on each movie, and the total returns to be distributed in 6
months. I'll be sending one of these out with the conclusion of each batch so that
you know what to wire each person when the time comes. Let me know if you have
any questions.

| Movie | Wire Out | Return |
|---|---|---|
| | | |
| The Sacrafice | $546,642 | $101,129 |
| Chavela | $508,950 | $94,156 |
| Heavy Water | $522,221 | $96,611 |
| The October Built2 | $630,450 | $116,633 |
| **TOTAL** | **$2,208,263** | **$408,529** |

- Total purchase price of all movies    = $2,453,625.00
- Total profit in LLC account in 6 months  = $934,625
- Total return in LLC account in 6 months  = $3,388,250.00

Breakdown of $3,388,250 of wires to be sent out on April 4th, 2018.

- Jim and Grant - 18.5% on 2,208,263        = $408,528.65
- Jim and Grant - Initial Investment        = $2,208,263

- Romik Yeghnazary - 2.5% plus 1.5% total 4% on 2,208,263   = $88,330.52

- Jeremy Salvador - 2.5% on 2,208,263       = $55,206.57

- Jason Page - Rest of what is in the account    = $382,559.26
- Jason Page - Initial Investment         = $245,362.50

- **Total**                    = 3,388,250

See attached for:

1. Fully executed HBO agreements for August movies funded (3).
2. Prom notes for September funding (4)

Exhibit 1 Page 43

| | |
|---|---|
| **From:** | Romik Yeghnazary |
| **To:** | Jim Russell |
| **Cc:** | Grant Whitcher (steelpro2@aol.com) |
| **Subject:** | Re: November Movies |
| **Date:** | Thursday, November 16, 2017 12:19:24 PM |

Can you call me when you have a chance?

Thank You,

Romik Yeghnazary
Owner | NMLS#372980



10161 W. Park Run Dr. Ste#150  | Las Vegas, NV 89145
**M :** 702 420 0655  | **O :** 702 515 7444  | **F:** 888 316 5151
Company NMLS ID#1603937

On Thu, Nov 16, 2017 at 12:08 PM, Jim Russell <jimr@performancesteel.com> wrote:

> It is absolutely ridiculous that he does not want to share his financials as we are currently lending 5mil.  This is a very common practice to ensure the company is making money, has sales, and has the ability to pay.
>
> Sorry, I am not risking millions based upon someone's word, who I don't know.
>
> Jim Russell
>
> O - 702-322-0020
>
> C – 801-362-9766



Exhibit 1 Page 44

**From:** Romik Yeghnazary [mailto:romik@thelendingarena.com]
**Sent:** Thursday, November 16, 2017 11:51 AM
**To:** Jim Russell; Grant Whitcher (steelpro2@aol.com)
**Subject:** Re: November Movies

Jim I emailed Jason regarding the quarterly financials. The first bold section below is his response to my email asking him for financials. The second bold sentence is him sending a text that was forwarded from Jason to me on what to express to us with regards to 1inMM Capitals assets.

**Hey Romik –**

**Thank you for your email and as I completely understand your stance on the matter and wish I could be more accommodating... this is simply not a precedent that I am going to set. In terms of financial output, I have been completely transparent from day 1 in the fact that I do not want you guys or anyone to invest $1 more than you are comfortable investing. This comfort level needs to be based off of the current situation, due diligence, past and future discussions, confidence in the process etc. Again, on a personal level, I'm sorry that this is the way it has to be but I told you guys from inception that opening the investment past what Jason had currently been doing with us was because I wanted to help him grow and trusted that it would be a longstanding relationship but adding extra layers (even minimally) is not going to fly.**

**In terms of additional deals heading your way/more capital being deployed this is solely due to the request on your guys' behalf; I am more than happy to wait for distros to hit and roll investments as they are returned to you guys in order to keep everyone comfortable.**

**Hope this finds you well and I would love to grab dinner sometime soon. Have to juggle that new baby schedule now but I will make it happen.**

What he means with the second paragraph is that he is more than happy not doing deals until we get paid up on our distributions, and then sink profits back into doing more deals. It would have taken him 10 minutes to doctor up a spreadsheet showing you guys how much money they have. If anything not sending us financials proves to me even more that they are not desperate, they don't need our money, and that this is actually happening. When we fund the November Movies, from what Im told, December is a slow month, so the next funding would not be

Exhibit 1 Page 45

until January. After that our paydays will be coming in each month starting Feb
2nd. I feel this will give you additional comfort, and I strongly recommend we
proceed forward.

Below is a text that he sent Jason after his reply to me via email.

**" Just express to him that at any level anywhere in the vicinity of their
investments...1inMM Cap has more than enough liquid cash(not even
including library) assets to make them whole."**

This is the goose that lays the golden egg guys, lets just hope they keep coming
month after month. My only concern with this investment is finding out for some
reason that it has to stop due to the economy, or perhaps changes with HBO. You
never know when these things can happen so lets ride this baby out as long as we
can. If it would make you feel better I will also sink some money in with you guys,
which I plan to do anyway just not until after January. I have no issues doing that,
and have actually been looking to liquidating my own notes and assets so I can join
the party.

Thank You,

Romik Yeghnazary

Owner | NMLS#372980

10161 W. Park Run Dr. Ste#150

|

Las Vegas, NV 89145

**M**

Exhibit 1 Page 46

:

702 420 0655

|

O

:

702 515 7444

|

**F:** 888 316 5151

Company

NMLS ID#1603937

On Wed, Nov 15, 2017 at 4:07 PM, Romik Yeghnazary <romik@thelendingarena.com> wrote:

Good afternoon!

Just got 4 more movies. See attached for more info on each movie which includes cast, directors, writer, and a short summary.

**1. Love after love - Funding Date 11/27/17**

Purchase Price - $632,650

6 month return - $870,520

W

e would be wiring - $569

,

385

Exhibit 1 Page 47

Jason will wire -

$63,265

## 2. In Darkness - Funding Date 12/04/17

Purchase Price - $640,000

6 month return - $878,600

W

e would be wiring - $576,000

Jason will wire - $64,000

## 3. Submergence - Funding Date 12/06/17

Purchase Price - $610,070

6 month return - $834,210

W

e would be wiring - $549,063

Jason will wire - $61,007

## 4. Ruin Me - Funding Date 12/06/17

Purchase Price - $593,600

6 month return - $823,920

W

Exhibit 1 Page 48

e would be wiring - $534,240

Jason will wire - $59,360

Thank You,

Romik Yeghnazary

Owner | NMLS#372980



10161 W. Park Run Dr. Ste#150

|

Las Vegas, NV 89145

**M**

**:**

702 420 0655

|

**O**

**:**

702 515 7444

|

**F:** 888 316 5151

Company

NMLS ID#1603937

Exhibit 1 Page 49

| From: | Romik Yeghnazary |
| To: | Jim Russell |
| Subject: | Re: 1inMM Info |
| Date: | Friday, November 17, 2017 9:31:43 AM |

Here is the link to the Secretary of State.

https://www.corporationwiki.com/California/Los-Angeles/1inmm-capital-llc/140349723.aspx

HBO is the one funding our money. It gets wired to them, then wired to us just like the first time. The key to this whole deal, even more important than any other piece of due diligence  is the release of the one contact Jennifer Bowen. He made us ask and talk about it for weeks before he had us sign the NDA to release this info. When she verified the hbo contracts...i knew what we had at that point. We did verification on her name as well...every single thing 3rd part verification checked out. Not one thing has been out of line.

Jason's bank statements spanning 2.5 years, receiving wires on the day, not a day later for the exact amount as ever prom note. That's 9 deals. Further due dill on zach, etc etc.

There is a reason why 5M is in play after all this due diligence, and after the meetign with this guy.

Let's see what he is going to send us.

Thanks for the big red flag by the way, it's ingrained in my head now and probably won't be gone for a month due to the size of the fucker.


On Fri, Nov 17, 2017 at 8:51 AM Jim Russell <jimr@performancesteel.com> wrote:

> I am still bewildered, as to why he doesn't just send the financials. It is so much easier than all this crap.  Red Flag!!
>
>
>
> Jim Russell
>
>
> O - 702-322-0020
>
> C – 801-362-9766

Exhibit 1 Page 50

Logo

**From:** Romik Yeghnazary [mailto:romik@thelendingarena.com]
**Sent:** Friday, November 17, 2017 8:47 AM
**To:** Jim Russell
**Subject:** 1inMM Info

Morning Jim,

I found the following when researching the co.

1INMM Capital, LLC Overview:

1INMM Capital, LLC filed as a Domestic in the State of California on Friday, September 13, 2013 and is approximately four years old, as recorded in documents filed with California Secretary of State.

Owner: Zachary Horowitz

Address: 5550 Wilshire Blvd and 341 N Crescent Heights are addresses associated

Also, Jason has asked for some information from Zach via text message after my convo with him last night. Zach is going to send us some sort of documents PowerPoint format of films they are purchasing. It's an internal document showing their quarter, number of films, how much spent etc etc.

I'm working to get you as much as I can.

Exhibit 1 Page 51

Keep in mind please that our HBO contracts we are getting show that they will alsways have enough money for us, since HBO is sending them the minimum guarantee funds. Then those are tied directly to our prom not with 1inMM Capital. So the money, is not really coming from them, they are pushing money from HBO to us same day. Also keep in mind i verifies those contracts diresctlu with HBO.

--

Thank You,

Romik Yeghnazary

Owner | NMLS#372980

10161 W. Park Run Dr. Ste#150

⊥

Las Vegas, NV 89145

M

:

702 420 0655

|

O

:

702 515 7444

Exhibit 1 Page 52

| From: | Romik Yeghnazary |
|---|---|
| To: | Jim Russell |
| Cc: | Grant Whitcher (steelpro2@aol.com) |
| Subject: | Re: movie deals |
| Date: | Thursday, November 30, 2017 10:57:59 AM |

The agreement was on a 425k note to insure 1.7M worth of funding. In this case, we are only funding $1,083,303 which is 64% of $1,700,000. So we are going to assign a note over to both of you that may be worth 425k, but for this transactions, only 63% of that note or $272,000 is for the $1,083,303. I'm working on arranging a meeting in January with Zach which may or may not stop the need for free insurance on our side, and allow us to actually put money in and be compensated, vs placing free insurance with 0 compensation. If by Jan we still need to insure funding with notes, we will release more and more portions to get us into payday season(February 2nd and on). I'm willing to do whatever is necessary to bridge us through to February and am also working on raising additional capital with investors just in case things don't work out in January. We should be getting another movie in the next couple of weeks which we will be funding on our own outside of Movie Fund LLC.

Again, if in January we need to release the remainder of this note ($153,000) to get the additional $616,697 funded, we will do so, but I'm trying to avoid doing this at all cost since we would rather fund then insure with no compensation. I want to thank both of you for the close to 5M invested so far, I'm 100% confident in this investment, and I know we will get past this.


Thank You,


Romik Yeghnazary
Owner | NMLS#372980



10161 W. Park Run Dr. Ste#150  | Las Vegas, NV 89145
**M :** 702 420 0655  | **O :** 702 515 7444  | **F:** 888 316 5151
Company NMLS ID#1603937

On Wed, Nov 29, 2017 at 1:26 PM, Jim Russell <jimr@performancesteel.com> wrote:

Ok, thanks.  Also, please advise as to how we are going to insure this.   I will be traveling tonight, and Thursday, and will return Friday.




Jim Russell



O - 702-322-0020

Exhibit 1 Page 53

# EXHIBIT 2

.

# EXHIBIT 2

Exhibit 2 Page 54

**PROMISSORY NOTE**

**$ (637,445.00)**                                                 **(04/26/2017)**

Promise. 1INMM Capital, LLC, a limited liability entity established in the State of California, (the "Maker"), hereby promises to pay to Lender, JAMES T. RUSSELL, an individual residing at (REDACTED LAS VEGAS, NV REDACTED), (the "Payee"), an amount equal to (SIX HUNDRED THIRTY-SEVEN THOUSAND FOUR HUNDRED FORTY-FIVE) Dollars ($637,445.00) in lawful money of the United States of America, which sum shall be due and payable on (10/26/2017) (the "Maturity Date"), in one (1) balloon payment, in like money at said office. Payment date shall be no later than SIX (6) months post confirmed funds transfer from Payee to Maker in the amount of (FIVE HUNDRED FIFTY-FOUR THOUSAND THREE HUNDRED) Dollars ($554,300.00).

Prepayment Option. Maker may pay down at any time any portion of the principal sum outstanding without any prepayment penalty.

Assignment of Rights. See Appendix A

Compounding of Unpaid Payments. The undersigned agrees that time is of the essence and that in the event payment of principal or interest due under this Note is not made when due, giving effect to any grace period which maybe applicable, the outstanding balance of unpaid payments hereof shall immediately bear interest at the rate of ten (10) percent per month, for so long as such event of default continues.

Validity of Agreement to Conform to Law. All agreements between the undersigned and the holder of this Note are expressly limited so that in no contingency or event whatsoever, whether by reason of advancement of the proceeds hereof, acceleration of maturity of the unpaid principal balance, or otherwise, shall the amount paid or agreed to be paid to the holder hereof for the use, forbearance or detention of money advanced hereunder exceed the highest lawful rate permissible under any law which a court of competent jurisdiction may deem applicable hereto. If, from any circumstances whatsoever, fulfillment of any provision hereof or any instrument securing this Note or any other agreement referred to herein, at the time performance of such provision shall be due, shall involve transcending the limit of validity prescribed by law which a court of competent jurisdiction may deem applicable hereto, then, ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity, and if from any circumstances the holder hereof shall ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the

Exhibit 2 Page 55

reduction of the unpaid principal balance due hereunder and not to the payment of interest. This provision shall control every other provision of all agreements between the undersigned and the holder hereof.

Maker's Default. At the option of the holder hereof exercised by written notice to the undersigned, this Note shall become immediately due and payable upon the maker's failure to pay when due any payment of principal, interest or expenses due hereunder; or (b) failure in the performance or observance of any of the terms or conditions of any mortgage, deed of trust, security agreement or other agreement securing, guaranteeing or otherwise pertaining to this Note after giving effect to any applicable curative period which may be contained therein. Upon the occurrence of any of the following specified Events of Default, as defined under the standard conventions and terminology prescribed for promissory notes drafted under Warren's California Forms for Principal, Interest, Insolvency, Breach of Covenants, Breach of Representation and Warranties, (each herein called an "Event of Default") then, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, the Payee may, by written notice to the Maker, declare the principal of and accrued interest in respect of this Note to be forthwith due and payable, whereupon the principal of and such unpaid accrued interest in respect of this Note shall become forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Maker. Furthermore, This note shall become due and payable before the above-mentioned maturity date immediately upon the happening of any of the following events affecting any maker or indorser thereof, to wit: voluntary or involuntary filing of a petition in bankruptcy or for reorganization, execution of an assignment for the benefit of creditors, calling meeting of creditors, appointment of liquidating agent or committee, offer of composition, entry of a judgment in excess of $ 10,000 which remains unsatisfied or for over 30 days, application for appointment or appointment of any receiver, issuance of warrant of attachment or death of any maker or indorser or on default of any other obligations to the Maker.

Collection Costs. If this Note or any installment of principal or interest is not paid when due, whether at maturity or by acceleration, the undersigned promises to pay all costs of collection, including without limitation, actual attorneys' fees, and all expenses in connection with the protection or realization of the assets and proceeds available this Note or the enforcement of any subsequent memorandum or agreement created in conjunction with this Note incurred by the holder hereof on account of such collection, whether or not suit is filed hereon or thereon; such costs and expenses shall include, without limitation, all costs, expenses and attorneys' fees actually incurred by the holder hereof in connection with any insolvency, bankruptcy, arrangement or other similar proceedings involving the undersigned, or involving any endorser or guarantor hereof, which in anyway affects the exercise by the holder hereof of its rights and remedies under this Note or under any mortgage, deed of trust, security agreement, guaranty or other agreement securing or pertaining to this Note.

Waiver of Notice. Presentment, demand, protest, notices of protest, dishonor and nonpayment of this Note and all notices of every kind are hereby waived by all parties to

Exhibit 2 Page 56

this Note, whether the undersigned, principal, surety, guarantor or endorser, except as
provided herein. To the extent permitted by applicable law, the defense of the statute of
limitations is hereby waived by the undersigned.

Death of Maker. Maker of this note hereby waives all notice and demand and consent that
this note shall become due and payable immediately upon the happening of any of said
events. This note shall become due and payable on the Maturity Date, but payment shall
be accelerated and become due and payable immediately if the Maker shall die. For the
further security of the holder thereof, the undersigned covenants that so long as any part
of the principal or interest of this note is outstanding and unpaid, it will not grant any
security interest to any third party upon its property, or create any lien whatsoever
thereon, without also thereby including therein this note, equally and ratably with every
other evidence of debt, secured by any of the undersigned's property. If, while any part of
the principal or interest is outstanding and unpaid, the maker hereof breaks this covenant,
then the holder hereof may at his or its election, declare and make this note at once due
and payable by written notice delivered to maker, and this remedy will be deemed
cumulative and in addition to any other remedy available to the holder hereof. This note
shall be paid without claim of set-off, counterclaim or deduction of any nature or for any
cause whatsoever.

Extensions Granted by Payee. All indorsers hereunder agree that the holder of this note in
case of non-payment thereof at maturity, or of any installment thereof when due, may
grant to the maker or any indorser of said note any extension or extensions of time of
payment thereof, in whole or in part, without notice to said indorsers or any of them and
any such extension or extensions shall not affect in any way said indorsers' liability upon
note, such indorsers hereby waiving demand, presentment of payment, notice of
nonpayment and protest and do further agree that any holder of this note may in the event
of default in the payment of principal of, or interest upon, this note or any installment
thereof repossess and/or sell the (collateral) held as collateral security for the payment of
this note without in any way relieving said indorsers, or any of them, of any liability by
reason of such repossession and/or sale, applying the proceeds of sale of any such  asset
less all costs to amount due under this note, and all indorsers agree to pay any deficiency
on this note on demand.

Litigation Fees. In any action at law or in equity to enforce or construe any provisions or
rights under this Note, the unsuccessful party or parties to such litigation, as determined
by a court pursuant to a final offer, judgment or decree, shall pay to the successful party
or parties all costs, expenses and reasonable attorneys' fees incurred by such successful
party or parties (including, without limitation, such costs, expenses and fees on any
appeal), which costs, expenses and attorneys' fees shall be included as part of any order,
judgment or decree.

General Provisions. Principal and interest evidenced hereby are payable only in lawful
money of the United States. The receipt of a check shall not, in itself, constitute payment
hereunder unless and until paid in good funds. Whenever any payment on this Note shall
be stated to be due on a day, which is not a business day, such payment shall be made on

Exhibit 2 Page 57

the next succeeding business day and such extension of time shall be included in the computation of the payment of interest of this Note. This Note is to be governed by and construed in accordance with the laws of the State of California except to the extent United States federal law permits the holder to contract for, charge or receive a greater amount of interest. In any action brought under or arising out of this Note, the undersigned hereby consents to the in personam jurisdiction of any state or federal court sitting in the state of California, and waives any claim or defense that such forum is not convenient or proper, and consents to service of process by any means authorized by California and/or Federal law.

THE UNDERSIGNED HEREBY WAIVES, AND COVENANTS THAT THE UNDERSIGNED WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS NOTE, THE SUBJECT MATTER HEREOF OR ANY DOCUMENT RELATING HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING OR WHETHER IN CONTRACT OR IN TORT OR OTHERWISE.

DocuSigned by:

C8BC28B6708B494

4/22/2017

1INMM Capital, LLC
Zachary Horwitz, Manager

Date

Exhibit 2 Page 58

APPENDIX A

## ASSIGNMENT

This assignment ("Assignment") between 1INMM CAPITAL LLC, located at 5550 Wilshire Blvd
#523 Los Angeles, CA 90036 ("Assignor") and JAMES T. RUSSELL, an individual located at
REDACTED Las Vegas, NV REDACTED ("Assignee") is dated effective as of
(04/26/2017).

For good and valuable consideration, the receipt and sufficiency of which hereby
acknowledged, Assignor does hereby irrevocably and unconditionally sell, grant, convey, and
assign unto Assignee all of Assignor's rights, title and interest of every kind and nature,
throughout the universe, until assignee is paid ($637,445.00) at to which time all rights, title
and interest of every kind and nature revert back to Assignor and to that certain motion
picture, currently entitled "MOJIN – THE LOST LEGEND" (the "Picture") based on the original
screenplay entitled "THE GHOULS" (English translation) written by Wu Er-Shan.

1. Assignor hereby represents and warrants:

    1.1.    That Assignor is the sole and exclusive owner of the rights and privileges
            granted or to be granted to Assignee hereunder.
    1.2.    That, as of the effective date hereof, Assignor has the right to enter into this
            Assignment.
    1.3.    That, as of the effective date hereof, no part of the rights herein conveyed has
            in any way been encumbered, conveyed, assigned, transferred or otherwise
            disposed of and all such rights are therefore free and clear of any and all liens,
            claims, charges or encumbrances whatsoever in favor of any party
            whatsoever.

2. Assignor shall indemnify Assignee, its successors, assigns, licensees and officers, and hold
   them harmless from and against any and all claims, liability, losses, damages, costs,
   expenses (including but not limited to attorney's fees) arising out of any breach by
   Assignor of any warranty made by Assignor hereunder.

3. Assignee hereby assumes and agrees to be bound by all future obligations of Assignor
   which accrue after the date hereof.

4. Assignor hereby waives the benefits of any provision of law known as "droit morale" or
   any similar law in any country of the world and agrees not to institute or permit any
   action or lawsuit on the ground that the Picture in any way constitutes an infringement of
   any "droit morale" and Assignor agrees that Assignor shall not, under any circumstances
   (including without limitation, the circumstances of a breach by Assignee) be entitled to
   enjoin the exhibition or other exploitation of the Picture, to terminate or rescind any
   rights granted to Assignee or to obtain any other form of equitable relief, specific
   performance or otherwise, any right to which Assignor expressly waives.

5. This Assignment, and the rights granted hereunder, may not be assigned by Assignor to
   any person, firm or corporation. Assignee may assign this Assignment and the rights and
   services granted herein, together with the results and proceeds thereof, and the
   representations and warranties contained herein, to any person or entity.

Exhibit 2 Page 59

6. This Assignment shall be construed in accordance with the laws of the state of California
   and shall be binding upon and shall inure to the benefit of the parties hereto and their
   respective successors, licensees and assigns. This Assignment cannot be amended or
   modified except in a writing signed by all parties hereto.

IN WITNESS WHEREOF, THE PARTIES HERETO HAVE EXECUTED AND DELIVERED THIS
ASSIGNMENT AS OF THE (26)th DAY OF APRIL 2017.

1INMM CAPITAL, LLC ("Assignor")                    JAMES T. RUSSELL ("Assignee")

By: _____                        By: _____
        C8BC28B6708B4D4

Its: ___Managing Partner___                         Its: _____

Exhibit 2 Page 60

# EXHIBIT 3

# EXHIBIT 3

Exhibit 3 Page 61

### PROMISSORY NOTE

**$ (999,619.00)**                                                                 **(6/13/19)**

Promise. 1INMM Capital, LLC, a limited liability entity established in the State of
California, (the "Maker"), hereby promises to pay to Lender, Movie Fund LLC, an
corporation with addresses at (817 South 7th Street, Las Vegas, NV 89101), (the "Payee"),
an amount equal to (NINE HUNDRED NINETY NINE THOUSAND SIX HUNDRED
NINETEEN) Dollars ($999,619.00) in lawful money of the United States of America,
which sum shall be due and payable on (12/13/19) (the "Maturity Date"), in one (1) balloon
payment, in like money at said office. Payment date shall be no later than six (6) months
post confirmed funds transfer from Payee to Maker in the amount of (SEVEN HUNDRED
FORTY THOUSAND FIVE HUNDRED) Dollars ($740,500.00).

Prepayment Option. Maker may pay down at any time any portion of the  principal sum
outstanding without any prepayment penalty.

Assignment of Rights. See Appendix A

Compounding of Unpaid Payments. The undersigned agrees that time is of the  essence
and that in the event payment of principal or interest due under this Note is not  made
when due, giving effect to any grace period which maybe applicable, the  outstanding
balance of unpaid payments hereof shall immediately bear interest at  the rate of ten (10)
percent per month, for so long as  such event of default continues.

Validity of Agreement to Conform to Law. All agreements between the undersigned and
the holder of this Note are expressly limited so that in no contingency or event
whatsoever, whether by reason of advancement of the proceeds hereof, acceleration of
maturity of the unpaid principal balance, or otherwise, shall the amount paid or agreed to
be paid to the holder hereof for the use, forbearance or detention of money advanced
hereunder exceed the highest lawful rate permissible under any law which a court of
competent jurisdiction may deem applicable hereto. If, from any circumstances
whatsoever, fulfillment of any provision hereof or any instrument securing this Note or
any other agreement referred to herein, at the time performance of such provision shall be
due, shall involve transcending the limit of validity prescribed by law which a court of
competent jurisdiction may deem applicable hereto, then, ipso facto, the obligation to be
fulfilled shall be reduced to the limit of such validity, and if from any circumstances the
holder hereof shall ever receive as interest an amount which would exceed the highest
lawful rate, such amount which would be excessive interest shall be applied to the

Exhibit 3 Page 62

reduction of the unpaid principal balance due hereunder and not to the payment of interest. This provision shall control every other provision of all agreements between the undersigned and the holder hereof.

Maker's Default. At the option of the holder hereof exercised by written notice to the undersigned, this Note shall become immediately due and payable upon the maker's failure to pay when due any payment of principal, interest or expenses due hereunder; or (b) failure in the performance or observance of any of the terms or conditions of any mortgage, deed of trust, security agreement or other agreement securing, guaranteeing or otherwise pertaining to this Note after giving effect to any applicable curative period which may be contained therein. Upon the occurrence of any of the following specified Events of Default, as defined under the standard conventions and terminology prescribed for promissory notes drafted under Warren's California Forms for Principal, Interest, Insolvency, Breach of Covenants, Breach of Representation and Warranties, (each herein called an "Event of Default") then, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, the Payee may, by written notice to the Maker, declare the principal of and accrued interest in respect of this Note to be forthwith due and payable, whereupon the principal of and such unpaid accrued interest in respect of this Note shall become forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Maker. Furthermore, This note shall become due and payable before the above-mentioned maturity date immediately upon the happening of any of the following events affecting any maker or indorser thereof, to wit: voluntary or involuntary filing of a petition in bankruptcy or for reorganization, execution of an assignment for the benefit of creditors, calling meeting of creditors, appointment of liquidating agent or committee, offer of composition, entry of a judgment in excess of $ 10,000 which remains unsatisfied or for over 30 days, application for appointment or appointment of any receiver, issuance of warrant of attachment or death of any maker or indorser or on default of any other obligations to the Maker.

Collection Costs. If this Note or any installment of principal or interest is not paid when due, whether at maturity or by acceleration, the undersigned promises to pay all costs of collection, including without limitation, actual attorneys' fees, and all expenses in connection with the protection or realization of the assets and proceeds available this Note or the enforcement of any subsequent memorandum or agreement created in conjunction with this Note incurred by the holder hereof on account of such collection, whether or not suit is filed hereon or thereon; such costs and expenses shall include, without limitation, all costs, expenses and attorneys' fees actually incurred by the holder hereof in connection with any insolvency, bankruptcy, arrangement or other similar proceedings involving the undersigned, or involving any endorser or guarantor hereof, which in anyway affects the exercise by the holder hereof of its rights and remedies under this Note or under any mortgage, deed of trust, security agreement, guaranty or other agreement securing or pertaining to this Note.

Waiver of Notice. Presentment, demand, protest, notices of protest, dishonor and nonpayment of this Note and all notices of every kind are hereby waived by all parties to

Exhibit 3 Page 63

this Note, whether the undersigned, principal, surety, guarantor or endorser, except as
provided herein. To the extent permitted by applicable law, the defense of the statute of
limitations is hereby waived by the undersigned.

Death of Maker. Maker of this note hereby waives all notice and demand and consent that
this note shall become due and payable immediately upon the happening of any of said
events. This note shall become due and payable on the Maturity Date, but payment shall
be accelerated and become due and payable immediately if the Maker shall die. For the
further security of the holder thereof, the undersigned covenants that so long as any part
of the principal or interest of this note is outstanding and unpaid, it will not grant any
security interest to any third party upon its property, or create any lien whatsoever
thereon, without also thereby including therein this note, equally and ratably with every
other evidence of debt, secured by any of the undersigned's property. If, while any part of
the principal or interest is outstanding and unpaid, the maker hereof breaks this covenant,
then the holder hereof may at his or its election, declare and make this note at once due
and payable by written notice delivered to maker, and this remedy will be deemed
cumulative and in addition to any other remedy available to the holder hereof. This note
shall be paid without claim of set-off, counterclaim or deduction of any nature or for any
cause whatsoever.

Extensions Granted by Payee. All indorsers hereunder agree that the holder of this note in
case of non-payment thereof at maturity, or of any installment thereof when due, may
grant to the maker or any indorser of said note any extension or extensions of time of
payment thereof, in whole or in part, without notice to said indorsers or any of them and
any such extension or extensions shall not affect in any way said indorsers' liability upon
note, such indorsers hereby waiving demand, presentment of payment, notice of
nonpayment and protest and do further agree that any holder of this note may in the event
of default in the payment of principal of, or interest upon, this note or any installment
thereof repossess and/or sell the (collateral) held as collateral security for the payment of
this note without in any way relieving said indorsers, or any of them, of any liability by
reason of such repossession and/or sale, applying the proceeds of sale of any such  asset
less all costs to amount due under this note, and all indorsers agree to pay any deficiency
on this note on demand.

Litigation Fees. In any action at law or in equity to enforce or construe any provisions or
rights under this Note, the unsuccessful party or parties to such litigation, as determined
by a court pursuant to a final offer, judgment or decree, shall pay to the successful party
or parties all costs, expenses and reasonable attorneys' fees incurred by such successful
party or parties (including, without limitation, such costs, expenses and fees on any
appeal), which costs, expenses and attorneys' fees shall be included as part of any order,
judgment or decree.

General Provisions. Principal and interest evidenced hereby are payable only in lawful
money of the United States. The receipt of a check shall not, in itself, constitute payment
hereunder unless and until paid in good funds. Whenever any payment on this Note shall
be stated to be due on a day, which is not a business day, such payment shall be made on

Exhibit 3 Page 64

the next succeeding business day and such extension of time shall be included in the computation of the payment of interest of this Note. This Note is to be governed by and construed in accordance with the laws of the State of California except to the extent United States federal law permits the holder to contract for, charge or receive a greater amount of interest. In any action brought under or arising out of this Note, the undersigned hereby consents to the in personam jurisdiction of any state or federal court  sitting in the state of California, and waives any claim or defense that such forum is not  convenient or proper, and consents to service of process by any means authorized by  California and/or Federal law.

THE UNDERSIGNED HEREBY WAIVES, AND COVENANTS THAT THE UNDERSIGNED WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS NOTE, THE SUBJECT MATTER HEREOF OR ANY DOCUMENT RELATING HERETO, IN EACH CASE WHETHER  NOW EXISTING OR HEREAFTER ARISING OR WHETHER IN CONTRACT OR IN  TORT OR OTHERWISE.

_____                            ___06/13/19_____

1INMM Capital, LLC                                              Date
Zachary Horwitz, Manager

Exhibit 3 Page 65

APPENDIX A

<u>ASSIGNMENT</u>

This assignment ("Assignment") between 1INMM CAPITAL LLC, located at 3129-A S. La Cienega Blvd Los Angeles, CA 90016 ("Assignor") and Movie Fund LLC, a Corporation located at  817 South 7th Street, Las Vegas, NV 89101 ("Assignee") is dated effective as of (06/13/ 2019).

For good and valuable consideration, the receipt and sufficiency of which hereby acknowledged, Assignor does hereby irrevocably and unconditionally sell, grant, convey, and assign unto Assignee all of Assignor's rights, title and interest of every kind and nature, throughout the universe, until assignee is paid ($999,619.00) at to which time all rights, title and interest of every kind and nature revert back to Assignor and to that certain motion picture, currently entitled "BEHIND THE WALLS" (the "Picture") based on the original screenplay entitled "BEHIND THE WALLS" written by James Kondelik.

1.  Assignor hereby represents and warrants:

    1.1.   That Assignor is the sole and exclusive owner of the rights and privileges granted or to be granted to Assignee hereunder.
    1.2.   That, as of the effective date hereof, Assignor has the right to enter into this Assignment.
    1.3.   That, as of the effective date hereof, no part of the rights herein conveyed has in any way been encumbered, conveyed, assigned, transferred or otherwise disposed of and all such rights are therefore free and clear of any and all liens, claims, charges or encumbrances whatsoever in favor of any party whatsoever.

2.  Assignor shall indemnify Assignee, its successors, assigns, licensees and officers, and hold them harmless from and against any and all claims, liability, losses, damages, costs, expenses (including but not limited to attorney's fees) arising out of any breach by Assignor of any warranty made by Assignor hereunder.

3.  Assignee hereby assumes and agrees to be bound by all future obligations of Assignor which accrue after the date hereof.

4.  Assignor hereby waives the benefits of any provision of law known as "droit morale" or any similar law in any country of the world and agrees not to institute or permit any action or lawsuit on the ground that the Picture in any way constitutes an infringement of any "droit morale" and Assignor agrees that Assignor shall not, under any circumstances (including without limitation, the circumstances of a breach by Assignee) be entitled to enjoin the exhibition or other exploitation of the Picture, to terminate or rescind any rights granted to Assignee or to obtain any other form of equitable relief, specific performance or otherwise, any right to which Assignor expressly waives.

5.  This Assignment, and the rights granted hereunder, may not be assigned by Assignor to any person, firm or corporation. Assignee may assign this Assignment and the rights

Exhibit 3 Page 66

and services granted herein, together with the results and proceeds thereof, and the representations and warranties contained herein, to any person or entity.

6.  This Assignment shall be construed in accordance with the laws of the state of California and shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, licensees and assigns. This Assignment cannot be amended or modified except in a writing signed by all parties hereto.

IN WITNESS WHEREOF, THE PARTIES HERETO HAVE EXECUTED AND DELIVERED THIS ASSIGNMENT AS OF THE (13)th DAY OF JUNE 2019.


1INMM CAPITAL, LLC ("Assignor")                    MOVIE FUND LLC ("Assignee")


By: _____          By: _____

Its: MANAGING PARTNER                         Its: _____

Exhibit 3 Page 67

## DISTRIBUTION AGREEMENT

This Distribution Agreement ("Agreement"), dated (06/01/19), confirms the terms and conditions pursuant to which HBO Holdings, Inc. ("HBO"), shall acquire from 1inMM Capital LLC, with an address at 3129-A S. La Cienega Blvd, Los Angeles, California, 90016 ("1inMM"), certain distribution rights in the "Program" in the "Territory" (as such terms are defined below) subject to the terms contained herein, all as set forth below.

1.     Definitions. All capitalized terms set forth herein, unless elsewhere defined, shall have the following meanings:

a.     "Authorized Languages" means all languages, including all dubbed, voice-lectored and subtitled versions.

b.     "Availability Date" shall have the meaning set forth in Section 4.

c.     "Final Delivery" shall mean 1inMM's full, final and complete delivery of the Delivery Items for the Program (including any and all attempts to cure), of quality acceptable to HBO, as confirmed in writing by HBO.

d.     "Distribution Expenses" means all costs and expenses incurred in connection with the release, delivery, marketing, distribution and exploitation of the Program and the Rights (as defined in Section 5), including, without limitation, all expenses for advertising, marketing, promotion, merchandizing, and publicity of the Program; all expenses for the full and complete delivery of Delivery Items (as hereinafter defined) and translation thereof; shipping, mailing and insurance costs; storage; cleaning and inspection; mastering, submastering, and duplication costs, duplication of scripts and music cue sheets; residuals; renewal of music synchronization licenses and master use licenses (to the extent same are the responsibility of Licensee); all taxes (other than corporate income taxes), whether sales, gross receipts, value added, withholding, remittance, excise, property, use, transfer or similar taxes, levies, customs duties, import charges, penalties, fines or interest, however denominated, imposed and whether by a governmental authority or taxing authority (whether federal, local, territorial or state of the United States or any country in the Territory); foreign language dubbing and/or subtitling; any Third Party Payments (as defined at Section 10.a.) to the extent paid for by HBO, and all other usual distribution costs customarily incurred.

e.     "Gross Receipts" means the aggregate of all monies actually received by HBO from the exploitation of the Rights in the Territory, monies and royalties collected by a collecting society or governmental agency with respect to the exploitation of the Program on television from compulsory licenses, retransmission income, secondary broadcasts, tax rebates, less rebates, discounts, reasonable reserves for returns and bad debt (each of which will be liquidated within one (1) year from its establishment), credit adjustments, advertising agency commissions, security deposits, advances or other similar sums received until earned or forfeited or credited and any amounts received and thereafter refunded (except to the extent such sums are non-refundable) related to the Program. All Gross Receipts are the sole and exclusive property of HBO, subject only to 1inMM's contractual entitlements pursuant to Section 11 hereof.

f.     "Latin America" means Anguilla, Antigua, Argentina, Aruba, Bahamas, Barbados, Barbuda, Belize, Bermuda, Bolivia, Bonaire, Brazil, Cayman Islands, Chile, Colombia, Costa Rica, Cuba, Curacao, Dominica, Dominican Republic, Ecuador, El Salvador, French Guiana, Grenada, Guadeloupe, Guatemala, Guyana, Haiti, Honduras, Jamaica, Martinique, Mexico, Montserrat, Nicaragua, Panama, Paraguay, Peru, Saba, St. Barthelemy, St.

Exhibit 3 Page 68

Eustatius, St. Kitts & Nevis, St. Lucia, St. Maarten, St. Martin, St. Vincent & Grenadines, Suriname, Trinidad & Tobago, Turks & Caicos, Uruguay, Venezuela, and British Virgin Islands.

g.    "License Period" shall have the meaning set forth in Section 3.

h.    "Program" means the live action feature length motion picture entitled "BEHIND THE WALLS" that was: (i) originally produced in English; (ii) directed by James Kondelik starring Vanessa Angel, Reggie Lee and Lew Temple and (iii) will be theatrically released in Mexico and/or Brazil on a minimum of 100 screens.

i.    "Television Rights" means the right to exhibit, distribute market, display, transmit, broadcast, perform, transmit, reproduce, advertise, publicize, sell copies of, license, derive revenues from, rent, dispose of, communicate publicly or privately, turn to account and otherwise exploit the Program by any form of television media now known or hereafter devised or commercially exploited (including, but not limited to subscription pay television, basic television, free television, pay-per-view, on demand, video-on-demand, free-on-demand, free-video-on-demand, subscription-video-on-demand, advertising-supported on demand, near-video-on-demand, hotel/motel, non-theatrical, electronic rental, download to rent, digital rental, electronic sell-through, digital sell-through, download to own, download to burn and on demand retention licensing), regardless of whether or how paid for, programmed, or marketed to the viewer, and regardless of how delivered to or received by the viewer (whether by over-the-air, cable, satellite, wire, fiber, ADSL, DSL, MDS, Internet, mobile, wireless, closed circuit, or other means, method, process, or device or delivery system now known or hereafter devised, discovered, created, or developed) in all versions, resolutions, formats, and sizes, and shall, for the avoidance of doubt, include without limitation reception on television sets, personal computers, IP-enabled devices, mobile devices, and analogous devices.

j.    "Territory" shall mean Africa and Latin America.

2.    Conditions Precedent. All of HBO's obligations hereunder will be subject to and conditioned upon the satisfaction of all of the following:

a.    Full execution and delivery to HBO of this Agreement; and

b.    Final Delivery (including HBO's receipt and written approval of: (i) a complete typewritten statement of all third party screen and paid advertising credit, name and likeness, and other third party obligations, restrictions and approval rights (including all third party obligations, restrictions and approvals necessary for HBO's creation of Local Language Versions) as further set forth in Paragraph 5 of the Legal Delivery section of Exhibit B (collectively, the "Paid Ad Restrictions"); (ii) all chain of title documents for the Program and documents necessary to establish 1inMM's valid copyright in the Program, and (iii) all Delivery Items) occurring no later than 12/13/2019 (the "Final Delivery Date").

3.    License Period. The "License Period" means the period commencing on the Program's Availability Date and expiring three (3) years thereafter; provided, however, that the License Period shall include an additional exclusive play-off period of six (6) months for all licenses in existence as of the last day of the License Period during which HBO may continue to exercise the Rights.

4.      Availability Date. The "Availability Date" means day and date with the Program's earliest video-on-demand availability date in the Mexico and/or Brazil, but in no event later than 01/13/2020.

5.      Rights.

a.      For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, 1inMM hereby grants to HBO, with respect to the Program, the exclusive rights throughout the Territory and during the Program's License Period to exploit, and to sublicense others the right to exploit the Television Rights in the Program (and all of its themes, materials and other elements), in all formats now known or hereafter devised (including, without limitation, high definition, standard definition and 3D), including the right to (and cause and license others to) market, advertise, publicize, derive revenues from and otherwise exploit the Program. Without limiting the generality of the foregoing, 1inMM hereby grants to HBO the sole, exclusive and irrevocable right to: (i) license the rights granted for the Program for exhibition on such terms as it deems appropriate, and HBO shall have complete discretion relating to the promotion and distribution of the Program; (ii) edit and to permit the editing of all prints of the Program to conform to time segment requirements or to the orders of any duly authorized public censorship authority and to insert commercial material at appropriate time intervals during the exhibition of the Program and to dub and subtitle and to permit the dubbing and subtitling of the Program in the Authorized Languages as it sees fit; (iii) translate the title of the Program into any language and, to the extent cultural differences necessitate that the title be changed, to change such title; (iv) manufacture and distribute, or cause to be manufactured and distributed, two-dimensional advertising, publicity and promotional materials of all types and kinds for use solely in connection with the exhibition and distribution of the Program based on the images and materials provided by 1inMM; and (v) include HBO's (or one or more of HBO's affiliates, HBO's or sub distributors) name, logo, trademark or emblem in such manner, position, form and substance as HBO may elect on the prints of the Program, and on all advertising and publicity material for the Program together with such words as HBO may elect indicating that the Program is being distributed by HBO or one of its sub distributors, licensees or any of its affiliates.

b.      Without limiting the foregoing, 1inMM further grants to HBO the right to use and license the use of trailers, excerpts, clips supplied by 1inMM or made by HBO and stills supplied by 1inMM from the Program in connection with the promotion and exploitation of the Program, to collect all copyright royalties, retransmission, private copy or similar monies relating to the Program, and to use the approved names, voices and likenesses, which 1inMM shall provide to HBO in a timely manner, of all persons who appear in, or above-the-line persons who rendered services in connection with, the production of the Program for the purpose of advertising and promoting the Program.

c.      1inMM acknowledges that any inadvertent, unavoidable, incidental and de minimus overspill of an unencrypted satellite signal outside of the Territory shall not constitute a breach of this Agreement.

d.      1inMM shall include the following credit information in any version of the Program authorized by 1inMM for exhibition hereunder as well as in all advertising and promotional materials authorized for exhibition or dissemination in association therewith: "[1inMM TO PROVIDE COPYRIGHT NOTICE]."

e.      The rights granted to HBO in this Section 5 shall be referred to herein as the "Rights".

HBO-1inMM

Exhibit 3 Page 70

6.      Reserved Rights. All rights and licenses in the Program not granted to HBO
hereunder (i.e., theatrical, derivative, novelization, souvenir, music publishing and music
soundtrack rights, merchandising, publication, commercial tie-in and/or co-promotion (unless
approved in writing by 1inMM but in no event on an exclusive basis), product placement, games,
videogames, ring tones, alerts, wallpapers, screensavers, messaging applications, digital greeting
cards, theme park and location based entertainment, remake, sequel, tv series, live stage/stage
play, clip license rights (which excludes, for the avoidance of doubt, the right to use clips for
promotional purposes as set forth in Section 5.b.), and all rights to the underlying material to the
Program) are reserved by 1inMM and may be exploited by 1inMM without limitation or
restriction by HBO except as may be set forth herein.

7.      Delivery. No later than thirty (**30) days after the execution of this Agreement,**
1inMM shall, at its sole cost and expense, deliver to HBO all elements, materials, documents and
advertising and promotional materials set forth Exhibit B (which is attached hereto and
incorporated herein by this reference), with respect to the Program (the "Delivery Items"). All
Delivery Items shall be of first class technical quality suitable for the manufacture of first class
broadcast quality exhibition materials of the Programs, as determined in HBO's sole discretion.
HBO shall provide notice to 1inMM specifying any technical defect within thirty (30) days of
receipt of the Delivery Items from 1inMM. Upon such notice to 1inMM, 1inMM shall either (i)
correct the defect and redeliver the corrected Delivery Item or (ii) deliver a replacement Delivery
Item within thirty (30) days of receipt of HBO's notice. Approval by HBO of less than all
Delivery Items or any exploitation of the Program will not be deemed a waiver by HBO of
1inMM's obligation of complete delivery of the Program hereunder. In the event that 1inMM, or
any distributor or licensee of 1inMM, has prepared or subsequently prepares a version of the
Program dubbed and/or subtitled in any Authorized Language ("Local Language Version"),
1inMM shall provide and HBO shall have unrestricted access to such Local Language Version at
no cost, including any dubbed or subtitled tracks of the Program.  In no event shall Final
Delivery (including any and all attempts to cure) occur later the Final Delivery Date.

8.      Distribution Fee. In connection with HBO's exploitation of Rights in the
Territory, HBO shall retain a Distribution Fee as set forth in the table below:

| Gross Receipts | Distribution Fee |
| --- | --- |
| Gross Receipts equaling or less than US$400,000.00 | 25% |
| Gross Receipts over US$400,000.00 | 40% |

9.      Advance. Subject to the terms and conditions of this Agreement and provided all
of the Conditions Precedent have been satisfied (including full and Final Delivery having
occurred by the Final Delivery Date), and 1inMM is not in breach of this Agreement or, for the
avoidance of doubt, any other agreement, HBO shall pay in connection with the Program, a fully
recoupable and cross-collateralized advance (the "Advance") in an amount equal to Nine
Hundred Ninety-Nine Thousand Six Hundred Nineteen U.S. Dollars ($999,619.00), as further set
forth in Section 12. Upon the satisfaction of all of the terms set forth herein, the Advance shall be
due and payable in one lump sum payment six (6) months after HBO's receipt of a valid invoice
from 1inMM.

HBO-1inMM

Exhibit 3 Page 71

10.   Certain Expenses.

a.   Third Party Payments. As between 1inMM and HBO, 1inMM shall be responsible for, and shall pay, all third party payments (other than performance fees for the public performance of any music contained in the Program) that may become payable as a result of HBO's exploitation of its rights hereunder ("Third Party Payments") including, without limitation, any and all mechanical reproduction fees, download fees, payments and/or tariffs with respect to exploitation, advertising and promotion of the Program and residuals, reuse fees, and participations in the proceeds (net or gross) of the Program. If 1inMM fails to make such payments, HBO shall have the right (but not the obligation) to make such Third Party Payments and may: (i) deduct from amounts payable to 1inMM hereunder any such amounts paid to third parties; and/or (ii) invoice 1inMM for any such amounts paid to third parties.

b.   Payment of Distribution Expenses. As between 1inMM and HBO, HBO shall be responsible for and shall pay all Distribution Expenses. Distribution Expense(s) incurred by HBO shall be deducted as provided in Section 11 below.

11.   Allocation of Gross Receipts. In full consideration of the Rights and the representations, warranties and covenants made by 1inMM hereunder, HBO shall pay to 1inMM, for the Program, an amount ("1inMM's Share") equal to one hundred percent (100%) of the Net Receipts (as defined below) derived from the distribution and exploitation of the Program by HBO. As used herein, the term "Net Receipts" shall mean all Gross Receipts less the following deductions in the following order of priority: (a) HBO's Distribution Fee as set forth in Section 8 on account of the exploitation of the Programs by HBO; (b) all Third Party Payments to the extent paid for by HBO; (c) all Distribution Expenses in connection with the exploitation of the Program by HBO; provided, however, that expenses for advertising, marketing, promotion and publicity of the Programs shall not exceed Five Percent (5%) of Gross Receipts without 1inMM's prior written consent, and (d) the Advance.

12.   Payments and Accounting Statements.

a.   HBO shall have the right to cross-collateralize the Gross Receipts (after HBO deducts its Distribution Fee) earned for exploitation of the Rights in the Program throughout the Territory and the Term for purposes of recouping the Distribution Expenses, Third Party Payments, and the Advance, and calculating 1inMM's Share.

b.   Subject to Section 11 hereof, HBO shall credit 1inMM's Share to the Program to 1inMM as follows: ninety (90) days after each quarter for the three (3) years

c.   All payments due hereunder shall be payable in U.S. Dollars. 1inMM hereby directs HBO to make any and all payments due under this Agreement to 1inMM as set forth below:

**Bank Name:** City National Bank
**Bank Address:** 8641 Wilshire Blvd. Beverly Hills, CA 90211
**ABA Number:** 122016066
**Account Number:** 123820290
**Account Name:** 1INMM CAPITAL LLC

d.   HBO shall account to 1inMM and provide customary participations statements for the following periods in which related Gross Receipts are received: ninety (90) days after each quarter for the three (3) years. Such customary participations statements shall be in a form HBO customarily details such calculations for other licensors. If in any period the

deductions allowed pursuant to this Agreement for the Programs exceed Gross Receipts reported for the Programs, such excess shall be deducted from Gross Receipts in each succeeding period, as applicable, until such excess has been totally recouped. Accounting Reports shall be sent to the parties as set forth in Section 20.

   e.  HBO shall not be liable for any default or delay in payments from any licensee of HBO with respect to the Programs, provided that HBO shall take commercially reasonable steps to cause such licensee to pay any monies owed by such licensee in connection with its license of the Programs.

   13.  <u>1inMM's Representations and Warranties</u>. 1inMM hereby covenants, warrants and represents to HBO each and all of the following.

   a.  The Program is protected by all the applicable copyright laws throughout the Territory and that such copyrights are and shall be valid and subsisting throughout the Territory during the Program's License Period.

   b.  The Program, when delivered to HBO and thereafter, will be free and clear of any lien, claim, charge, encumbrance, security interest, restriction, agreement, commitment or arrangement with any third party which would, in any way, interfere with, impair or adversely affect any of the Rights granted to HBO hereunder, and (other than as specifically provided in this Agreement) there are and will be no payments of any kind required to be made by HBO in respect of, or as result of, any use by HBO of such Program hereunder.

   c.  1inMM will not exploit and will not authorize any third party to exploit Television Rights in the Program prior to (and, for the avoidance of doubt, during) the License Period hereunder.

   d.  The Program shall not contain any product placement or product integration, except as set forth in a letter to HBO no later than the Final Delivery Date, signed by 1inMM, setting forth all product placement arrangements entered into in connection with the Program and the consideration provided by both the supplier (e.g., payment, free or discounted product) and the production (e.g., visible display of labels, verbal mention of brand, etc.). For any non-monetary consideration received from suppliers, 1inMM shall provide HBO an estimate of the value of such consideration (in U.S. Dollars). 1inMM's letter shall be accompanied by available substantiating documentation (e.g., written agreements, confirmation letters) as well as a listing of the footage notations determined on the same basis as the "Combined Continuity, Dialogue and Spotting List" at which all such product placements are seen or heard.

   e.  1inMM has obtained all of the rights, permissions and licenses (including all music synchronization licenses) required to enable HBO to fully exploit the Program pursuant to the terms of this Agreement including, without limitation, the right to use any performers' names, voices, likenesses and biographies to advertise and promote such Program.

   f.  No part of the Program (including the music contained therein) nor HBO's exercise of any rights granted hereunder will infringe upon the trademark, trade name, copyright, right of privacy, property right or any other right of any person or entity, and no part of the Program shall contain anything defamatory, tortious or which would violate the common law, statutes or regulations of any jurisdiction.

   g.  To the extent the Program or any underlying property is based upon or related to, events in the life of real persons, living or dead, or portrays real persons, 1inMM has obtained all personal releases and other rights necessary to permit HBO to exploit the Program in

Exhibit 3 Page 73

6

the manner provided herein without violating any third party rights or incurring any obligation to any third party.

h.      1inMM has full power and authority to make this Agreement and has not done and will not do, or permit any person or entity to do, anything which would interfere with the full performance of 1inMM's obligations or HBO's rights hereunder; this Agreement is the legally valid and binding obligation of 1inMM enforceable against 1inMM in accordance with its terms; and 1inMM is a corporation duly formed and validly existing in good standing under the laws of Florida.

i.      The non-dramatic performing rights to all music contained in the Program are (a) controlled by BMI, ASCAP, SOCAN, SESAC or a performing rights society having jurisdiction in the Territory; (b) in the public domain; or (c) controlled by 1inMM (in which event such rights are hereby licensed to HBO to the extent necessary for the exercise of HBO's rights hereunder). 1inMM does not represent or warrant that HBO may exercise the performing rights in the music without the payment of a performing rights royalty or license fee for music falling within category (a). As between HBO and 1inMM, HBO shall be responsible for the payment of any required performing rights royalty or license fee.

j.      1inMM is familiar with and shall abide by the requirements of the Foreign Corrupt Practices Act and meets all the eligibility requirements for the safe harbor certification set forth in 18 U.S.C. section 2257A(h)(1) and 28 C.F.R. section 75.9(a)(1)-(3).

k.      All Delivery Items delivered by 1inMM as part of delivery hereunder are complete and accurate, and HBO will incur no liability to any third party from its reliance thereon and/or compliance therewith.

14.     HBO's Representations and Warranties. HBO hereby covenants, warrants and represents to 1inMM it has the full power and authority to make this Agreement; this Agreement is the legally valid and binding obligation of HBO enforceable against HBO in accordance with its terms; HBO is a corporation duly formed and validly existing in good standing under the laws of the state of California.

15.     Indemnification. Each party hereto (the "Indemnifying Party") shall indemnify, defend and hold harmless the other party, and its successors, licensees, assigns, and employees, officers and directors (collectively, for the purposes of this Section, referred to as "Indemnified Party") from and against any and all liability, loss, damage, cost and expense, including, without limitation, reasonable attorneys fees (but excluding lost profits or consequential damages) arising out of any breach or alleged breach (including, in the case of 1inMM as Indemnifying Party, a breach of 1inMM's delivery requirements hereunder), or claim by a third party with respect to any warranty, representation or agreement made by the Indemnifying Party herein. The Indemnified Party shall give prompt written notice to the Indemnifying Party of any claim to which the foregoing indemnification applies and the Indemnifying Party shall undertake, at its own cost and expense, the defense thereof, provided that the failure to provide such notice shall excuse the Indemnifying Party's obligations only to the extent such failure prejudices the Indemnifying Party. The Indemnified Party may, at its option and expense, engage its own counsel. If the Indemnified Party settles or compromises any such suit, claim or proceeding, the amount thereof shall be charged to the Indemnifying Party, provided that the Indemnifying Party's approval, to be reasonably exercised, has been secured. Neither party may settle any claim or action without the prior written consent of the other party if such settlement would in any manner materially impair or inhibit the quiet enjoyment of such other party's rights hereunder or would result in any manner of injunctive or injunctive-like relief.

HBO-1inMM

Exhibit 3 Page 74

16.    <u>Default</u>. 1inMM shall be in default of this Agreement upon the occurrence of any of the following (collectively, the "<u>1inMM Events of Default</u>"): (i) 1inMM fails or refuses to perform its material obligations hereunder or breaches any material provision hereof, or (ii) 1inMM goes into receivership or liquidation, or becomes insolvent, or a petition under any bankruptcy act shall be filed by or against 1inMM (which petition, if filed against 1inMM, shall not have been dismissed within thirty days thereafter), or 1inMM executes an assignment for the benefit of creditors, or 1inMM takes advantage of any applicable insolvency, bankruptcy or reorganization or any other like or analogous statute, or experiences the occurrence of any event analogous to the foregoing. If 1inMM fails to cure a 1inMM Event of Default specified in (i) above that is curable within thirty (30) days from receipt of written notice from HBO of such default or immediately upon a 1inMM Event of Default under (ii) above that is not curable under (ii) above, HBO shall have the right to immediately terminate this Agreement. 1inMM acknowledges that the intellectual property rights and licenses in and to the Program granted to HBO herein would be governed by 11 USC Section 365(n) in the event of the commencement of a bankruptcy case by or of 1inMM. 1inMM acknowledges and agrees that, notwithstanding any rejection of this Agreement in any bankruptcy case, HBO may elect to continue to enjoy all exclusive rights and licenses granted in the Program for the entire License Period as provided herein.

17.    <u>Copyright</u>. 1inMM hereby acknowledges and agrees that the Program shall contain a copyright notice in the name of the copyright proprietor conforming to and complying with the requirements of the applicable copyright laws of the Territory, and HBO shall not remove or delete such copyright notice. Subject to 1inMM's prior written approval, not to be unreasonably withheld, conditioned or delayed, HBO may, in consultation with 1inMM, in its own name or in the name of the copyright proprietor, take such steps as HBO may deem necessary or appropriate by action at law or otherwise, to prevent any unauthorized reproductions, exhibition or distribution of the Program, any infringement of the copyright of the Program or any impairment of or encumbrance on the rights granted to HBO  hereunder, provided that should HBO commence any action in the name of 1inMM, HBO shall indemnify 1inMM against any out-of pocket costs, damages, and reasonable attorney fees. 1inMM agrees that it shall promptly execute and deliver to HBO the Assignment of Distribution Rights Under Copyright which is attached hereto as Exhibit A and incorporated herein by this reference and that upon the request of HBO it shall promptly execute and deliver to HBO such additional documents as HBO may need in connection with the foregoing. 1inMM hereby irrevocably appoints and designates HBO as its attorney-in-fact to exercise and file all such documents requested by HBO pursuant to this Section. This power-of-attorney is coupled with an interest.

18.    <u>Distribution</u>. All decisions concerning the advertising, marketing, distribution and exploitation of the Program and the rights herein granted shall be under HBO's sole and exclusive control, it being expressly understood that HBO shall not be required to continuously distribute the Program. The Program will be marketed appropriately as determined in HBO's good faith judgment, but in no event shall HBO be required to incur marketing costs. HBO makes no representation, warranty, guarantee or agreement as to the amount of receipts which may be derived from the distribution, exhibition or other exploitation of the Program and the Rights, nor does HBO guarantee the performance of any contract for the exhibition of the Program. Notwithstanding anything to the contrary contained herein, HBO shall have the right, in HBO's sole discretion, to withhold distribution of the Program or to withdraw the Program from distribution anywhere in the Territory at any time during the License Period.

19.   Insurance.  1inMM shall secure and maintain standard commercial general
liability and errors and omissions liability insurance in the minimum amounts of $5,000,000 per
occurrence/$5,000,000 aggregate with a deductible not larger than $25,000 until four (4) years
after the initial exhibition of the Program, which policy(ies) shall be endorsed to name HBO
Holdings, Inc., its parents, subsidiaries, licensees, successors, and related and affiliated
companies, and their officers, directors, employees, agents, representatives, assigns and its
subdistributors (collectively "Beneficiaries") as additional insureds as their interests may appear
and shall contain an endorsement negating the "other insurance clause" therein, together with an
endorsement that such policies are primary and that any insurance carried by the Beneficiaries is
neither primary nor contributory. 1inMM shall deliver to HBO a certificate and endorsements
evidencing such insurance concurrently with the execution of this Agreement. A prior thirty (30)
days notice of cancellation or non-renewal will be provided to HBO and will be shown on the
certificate.

20.   Notices.  All notices, claims, certificates, requests, demands and other
communications under this Agreement shall be made in writing and shall be delivered by hand or
sent by facsimile, or sent, postage prepaid, by express mail, or reputable overnight courier
service, and shall be deemed given when so delivered by hand; if faxed, on the business day of
receipt as evidenced by a fax confirmation sheet, or two business days after deposit with an
express mail or overnight courier to the parties at the following addresses (or at such other
address for a party as shall be specified by like notice):

If to 1inMM:   1inMM Capital LLC
              3129-A S. La Cienega
              Los Angeles, Ca 90016
              Attn: Zachary Horwitz

If to HBO:    HBO Holdings, Inc.
              c/o Home Box Office International
              2500 Broadway #4
              Santa Monica, California 90404
              Attn: Senior Vice President, Sales Planning
              Facsimile: 1-310-382-3000

With a copy to:

              Home Box Office
              2500 Broadway #4
              Santa Monica, California 90404
              Attn: General Counsel
              Facsimile: 1-310-244-0510

21.     Governing Law/Disputes.

        a.      The internal laws of the State of California (as opposed to the choice of law rules) and the United States of America shall govern the validity, construction and interpretation of this Agreement, the performance by the parties of their respective obligations and all other causes of action (whether sounding in contract, in tort or arising under statute) arising out of or relating to this Agreement or to the Program.

        b.      All actions, proceedings, controversies and claims based upon, arising out of or resulting from this Agreement, the breach thereof or its enforcement, arbitrability (including the scope of this arbitration provision) or interpretation shall be submitted to JAMS ("JAMS") for binding arbitration under its Comprehensive Arbitration Rules and Procedures if the matter in dispute is over $250,000 or under its Streamlined Arbitration Rules and Procedures if the matter in dispute is $250,000 or less (the "Rules"). Such Arbitration shall be held solely in Los Angeles, California, in the English language. Each arbitration shall be conducted by an arbitral tribunal (the "Arbitral Board") consisting of a single arbitrator who shall be mutually agreed upon by the parties. If the parties are unable to agree on an arbitrator, the arbitrator shall be appointed by JAMS. The arbitrator shall be a retired judge with at least ten (10) years experience in commercial matters. Except with respect to requests for interim relief, neither party shall be entitled or permitted to commence or maintain any action in a court of law with respect to any matter in dispute until such matter shall have been submitted to arbitration as herein provided and then only for the enforcement of the Arbitral Board's award. Neither party shall challenge or resist any enforcement action taken by the arbitrator against the losing party.  In addition, the prevailing party in any arbitration or legal proceeding relating to this Agreement shall be entitled to all reasonable expenses including, without limitation, reasonable attorney's fees. Each party shall be permitted to engage in formal discovery with respect to any dispute arising out of, in connection with or related to this Agreement, the provisions of Section 1283.05 of the California Code of Civil Procedure being incorporated herein by this reference.

        c.      1inMM hereby acknowledges that the Program and the exploitation rights granted to HBO hereunder are of a special, unique, extraordinary and intellectual character which gives them a peculiar value, for the loss of which HBO cannot be reasonably or adequately compensated in damages in any action at law and that a breach of this Agreement by 1inMM will cause HBO irreparable injury and damage. 1inMM therefore expressly agrees that in the event of a breach or threatened breach of this Agreement by 1inMM, HBO shall be entitled to seek injunctive and other equitable relief against 1inMM in HBO's discretion to end or prevent such breach and to secure enforcement of this Agreement. Resort to such equitable relief, however, shall not be construed as a waiver of any other rights or remedies which HBO may have for damages or otherwise. Notwithstanding any other provision of this Agreement, 1inMM's sole remedy for any breach by HBO of this Agreement shall be an action at law for damages and 1inMM acknowledges that such damages are fully adequate to compensate 1inMM in the case of any breach by HBO hereunder. In no event shall 1inMM have any right to terminate this Agreement or seek or be entitled to rescission, injunctive or other equitable relief.

22.     Miscellaneous Terms.

        a.      This Agreement constitutes the entire agreement of the parties and supersedes all prior oral or written agreements between them concerning the same subject. This Agreement may only be amended or modified by a written instrument executed by the parties to this Agreement. No failure or delay on the part of either party in exercising any of its respective rights hereunder upon any failure by the other party to perform or observe any condition,

covenant or provision herein contained shall operate as a waiver thereof, nor shall any single or partial exercise of any such rights preclude any other or further exercise thereof or the exercise of any other or further exercise thereof or the exercise of any other right hereunder. Without limiting the foregoing, no payment by HBO shall constitute a waiver of any term or condition of this Agreement.

        b.     This Agreement may not be assigned without the prior written consent of the other party except that HBO may assign this Agreement, or any part thereof.

        c.     Each of the parties shall execute and deliver any further documents or instruments the other may reasonably request to carry out the intent of this Agreement.

        d.     Nothing contained in this Agreement shall constitute a partnership between, or joint venture by, the parties hereto or constitute either party the agent of the other. Neither party shall hold itself out contrary to the terms of this Agreement and neither party shall become liable by reason of any representation, act or omission of the other contrary to the provisions hereof.

        e.     Nothing expressed or referred to in this Agreement is intended or shall be construed to give any person or entity, other than the parties to this Agreement, or their permitted successors and assigns, any legal or equitable right, remedy or claim under or in respect thereof or any provision contained herein, it being the intention of the parties that this Agreement is for the sole and exclusive benefit of such parties, and any permitted successors and assigns of this Agreement and for the benefit of no other person or entity.

        f.     The section headings contained in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

        g.     This Agreement and all of its terms shall be confidential, and each party agrees that, except as may be required by law, it shall not make any disclosures with regard thereto without the prior written approval of the non-disclosing party.

        h.     If any provision of this Agreement, or any covenant, obligation or agreement contained herein is determined by a court of competent jurisdiction to be invalid or unenforceable, such determination shall not affect any other provision, covenant, obligation or agreement, each of which shall be construed and enforced as if such invalid or unenforceable provision were not contained herein. Such invalidity or unenforceability shall not affect any valid and enforceable application thereof, and each such provision, covenant, obligation or agreement, shall be deemed to be effective, operative, made, entered into or taken in the matter and to the full extent permitted by law.

        i.     In the event of the occurrence of an event of force majeure which materially interferes with the production or delivery of the Program or with the rendition of 1inMM's material obligations hereunder, HBO shall have the right to suspend this Agreement and shall have the right, but not the obligation, to extend this Agreement by the length of any such suspension.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by a duly authorized representative as of the date first set forth above.

**HBO HOLDINGS, INC.**

By: _____

Its: _____

**1INMM CAPITAL LLC**

By: _____

Its: MP. _____

# EXHIBIT A
## ASSIGNMENT OF DISTRIBUTION RIGHTS
## UNDER COPYRIGHT

For good and valuable consideration, the receipt of which is hereby acknowledged, the undersigned, 1inMM Capital LLC ("1inMM"), hereby licenses, grants, transfers and assigns to

### HBO Holdings, Inc.

*aka* "HBO" (a California corporation) and its successors and assigns ("Distributor"), the sole and exclusive right, under copyright, to exhibit, distribute, market, advertise, license or otherwise exploit the following feature length motion picture ("Program") throughout the Territory for the License Period as defined below, by means of television, howsoever delivered:

> **Title of Program**: BEHIND THE WALLS
>
> **Territory**: Africa and Anguilla, Antigua, Argentina, Aruba, Bahamas, Barbados, Barbuda, Belize, Bermuda, Bolivia, Bonaire, Brazil, Cayman Islands, Chile, Colombia, Costa Rica, Cuba, Curacao, Dominica, Dominican Republic, Ecuador, El Salvador, French Guiana, Grenada, Guadeloupe, Guatemala, Guyana, Haiti, Honduras, Jamaica, Martinique, Mexico, Montserrat, Nicaragua, Panama, Paraguay, Peru, Saba, St. Barthelemy, St. Eustatius, St. Kitts & Nevis, St. Lucia, St. Maarten, St. Martin, St. Vincent & Grenadines, Suriname, Trinidad & Tobago, Turks & Caicos, Uruguay, Venezuela, and British Virgin Islands.
>
> **License Period**: Commences on the Program's Availability Date and expires three (3) years thereafter; provided, however, that the License Period shall include an additional exclusive play-off period of six (6) months for all licenses in existence as of the last day of the License Period during which HBO may continue to exercise the Rights.

1inMM hereby irrevocably appoints Distributor as its attorney-in-fact, with full power and authority to do all such acts and things, and to execute, acknowledge, deliver, file, register and record the Program and all documents pertinent thereto, in the Copyright Office of the United States of America and in any other office or offices in any other jurisdictions in the name, stead and on behalf of the 1inMM, as Distributor may deem necessary or proper to accomplish the same, this being a power coupled with an interest.

Distributor is hereby empowered by 1inMM to bring, prosecute, defend and appear in suits, actions and proceedings of any nature, concerning any copyright in and to the Program or any infringement of such copyright or violation of any of the rights licensed to Distributor herein, but at the cost and expense of Distributor, and, at its option, Distributor may join the 1inMM as a party plaintiff or defendant in any such suit, action or proceeding. Any recovery of damages, penalties, costs or other amounts arising by reason of the infringement of any such copyright(s) or violation of the rights licensed to Distributor herein has been assigned, and shall be paid, to Distributor.

This Assignment is dated as of, and is subject to all of the terms, conditions and provisions of the
Agreement between 1inMM and Distributor dated as of 06/23/2019.

1INMM CAPITAL, LLC

Signed:

By: Z. Holcwitz

Its: M.P. _____ /Authorized Signatory

Exhibit 3 Page 81[14]

# EXHIBIT 4

# EXHIBIT 4

Exhibit 4 Page 82

**March 4, 2020**

JR:      Zach, I just tried you. Please let us know what happened today

ZH:      Hey Guys. At dinner now with Danny (senior manager of programming/acquisitions) and
Jessica (exec assistant to president of distro)... had a good initial meeting this afternoon and will
be meeting with decision makers tomorrow to get all of the real info that we need (including
your talking points - very helpful - appreciate you sending). Then either taking red eye if done
tom night or stay another day to meet with others (if needed).

JR:       OK, please keep us posted.

ZH:      Certainly will!

JR:      Zach, please give us an update.

ZH:      Still here. Will give full rundown ASAP

JR:      Zach, did they give payment dates?

ZH:      Don't have any exact info on dates. Will send update email tonight when I get back to
Room and we will be getting another email from them this week with additional information on
payments

JR:      That is disappointing that they would not provide dates.

        Hi Zach, looking for the email?

ZH:      Hey Jim. Really long day... was actually just sending one that I will dive into everything
on the plane back tomorrow am. In a nutshell - great to get face to face, Gustavo was a huge help
and will continue to be, hbo back office is simply in massive flux and is has been and is dealing
with multiple layers of red tape while assimilating into their new norm of Warner Media while
trying to maintain their relationships with distributors. Clearly we don't care about their issues
and want hard facts on processes and payment moving forward. Will be receiving direct answers
to our questions via email (separate from email promised in first exchange)

JR:      I'm sure it was a long day for you, and we appreciate the efforts. Did he explain to you
why they're holding payment? Did he give you any idea as to when they're going to pay as
agreed? Does he think it's strange that no one's paying you?

ZH:      Apparently many additional layers are being added to all of their processes (buying,
payments, etc) which has caused a delay in payment, should have an indication in email of when
everything will resume but all parties are working to get processes aligned and have their distro
relationships as a top priority (obviously has to say what we want to hear)

JR:      So he gave you no indication as to when you're going to get payment?

Exhibit 4 Page 83

ZH:     Should get clarity in email. This is not isolated to a 1inMM issue so need to figure out
solution all around which will include is. Clearly did not say that directly but it's the reality

JR:     So he said that payment dates will be included in the email that hbo is sending you? But,
he couldn't provide any perspective as to when you're going to get paid? He didn't give you any
clue? So, they have unilaterally decided not to pay? When are they sending the email?

ZH:     Payment processes are being worked out and will be provided ASAP was the recurring
answer. Asked multiple times about dates, one week/one month etc etc... that was the answer and
that they would get us as much clarity as possible as soon as possible but as their chain of
command has changed along with their processes - they will be notifying everyone as soon as
possible.
I have to get some sleep but I will provide any update as soon as I get them

**March 10, 2020**

ZH:     Received email outlining making changes to advance payment schedule (paying what is
owed but over the course a longer period of time) - We are going back immediately stating that
changing terms of past deals is UNACCEPTABLE and that we would be willing to discuss new
payment model for future deals

JR:     Please forward me a copy. Thanks

        Please forward the hbo letter.

ZH:     Hey Jim. I'm advised not to send any email or sensitive info from HBO out to protect
everybody moving forward but we are treating the email as negotiations over a potential new
distribution deal, and our view is that should not apply to the prior deals. They provided various
terms etc etc but we are solely focused on getting payment for the prior deals and when to expect
that, and once we get that information, we will be able to provide it.

JR:     Zach it's going to create an enormous problem if you don't continue to be transparent.
We need to see the document and already signed an NDA. There isn't any reason as to why we
cannot view this document and verify collection efforts are continuing. We have been patient
with this process, but stonewalling us on documents is going to break things down.

ZH:     I will send your message directly to lawyer - he strongly advised not to send any direct
communication from HBO to anyone without their consent. He said he can communicate this to
your guys counsel as well so we are all on the same page. Not trying to cause any more
headaches - just need to be smart about where we are in the process and cannot jeopardize
everyone's deal if HBO decides there has been a confidentiality breach.
Just forwarded him your message - let you know as soon as I hear back. There's nothing in the
email that you guys would care about past what I've already told you - simply trying to extend
payout period of advance is the only thing that would effect investors.
We simply said no

Exhibit 4 Page 84

JR:      Then he is changing an established line of communication as we have been receiving hbo info and working with you. Again we signed the NDA for a reason. If that is your final position, then I need to know ASAP. We have been waiting weeks for this information.

ZH:      Again - I will follow the advise of my legal. But you also have to understand that I need to protect 1inMM, Pure Health, Movie Fund, JJMT and all other investors - you have previously asked about reaching out directly to HBO and other actions including the contents of the demand letter that would seriously negatively impact all parties above so we need to take all the necessary steps to protect everyone if you or anyone decides to put us all in Jeopardy.

JR:      One of the reasons that we have refrained from further legal action is because you and I have been communicating and we put together an NDA to receive docs. We need to feel comfortable with the process and it reduces uncertainty when we see the communications. This feels like a big contradiction from your side and won't sit well over here.

ZH:      I'm totally on board with constant communication and again have shared the contents of the email as with every other update. Let's see what lawyers say this am and go from there. Tensions are high all around so probably best to just take a step back and proceed accordingly

**March 13, 2020**

JR:      Hi Zach, It is disappointing that you have unilaterally changed the agreement we have regarding the transparency of information from IINMM. Nothing has changed from our side and this new hide the ball position that you have taken raises a lot of suspicion. You knew that we wanted a copy of the transmission from HBO, as you have provided in the past. It is important for us to verify that collection efforts are on going, and to understand hbos position. I want to let you know that you are giving me little option to ensure that things are moving in the right direction and that we will be paid.

ZH:      Our lawyers have discussed and will continue to discuss. There should be absolutely no suspicion, as I clearly am working diligently to resolve the issue every single day. My lawyer did not feel comfortable sharing the actual email exchange with any investor. He and I have outlined the contents of the email. We are in active negotiations to get the advance schedule to an acceptable place for all investors. We are making progress and will let you know the moment we hear back from their side.
Clearly due to the current climate - responses are not as quickly as we would like but we will let everyone know as soon as we have information.

JR:      Why the big change? We were receiving information before. It is you guys that have changed everything, and you just want us to sit here and not verify anything. Unfortunately that's not going to work for us. Also you said you outlined what was in the letter? Where is the outline?

ZH:      [indecipherable] Received email outlining making changes to advance payment schedule (paying what is owed but over the course a longer period of time) - We are going back

Exhibit 4 Page 85

immediately stating that changing terms of past deals is UNACCEPTABLE and that we would be willing to discuss new payment model for future deals.
We are now actively negotiating what will work on our end for advances IF there is going to be any change

JR:    Please be specific as to what they said. How long of a period of time did they suggest

ZH:    They suggested 8 quarterly payments (spread over 2 years) - clearly NEVER going to happen
We have already told them absolutely No on that front and actively negotiating a possible situation that works for us with the notion that we do accept any changes at all for prior deals at this point.
Do not**
Accept

**March 17, 2020**

JR:    Zach, evidently the attorneys are working on an agreement to view the hbo transmissions. Again, I am not sure why you're holding back these docs. As you can imagine, confidence from our side is eroding quickly. Please get with your attorney and let my attorney get these docs. Further, what is the latest update?

ZH:    Should be getting more positive information today regarding moving along negotiations of payments... clearly as the world is falling apart -it's adding another layer to the nightmare but working through it.
I'll be reaching out to my side as soon as I get more information today and will have him relay immediately.

**March 31, 2020**

JR:    Did HBO respond today? Please provide any updates. Thanks

ZH:    We just received an email and term sheet of sorts from
Them. Reviewing and will let you know!

JR:    Can you give me the tips of the waves now?

ZH:    Let me look through it a bit and I'll fill you in. Don't have much yet.
For sure has all of our pain points in it - just gathering details with all the legal language
Increased MG/catch up payment/increased fee for additional years

JR:    OK, please provide the details as soon as you can. A lot of anxious people on the side

ZH:    Understandably. Let you know ASAP

JR:    Please provide your attorney a copy as soon as possible, so my attorney can get a copy .

Exhibit 4 Page 86

Let me know if you have time for a call tonight so you can recap it to me, and do I can get a better feel for context.

ZH:     Lawyers have everything so will be able to download everyone tomorrow. Call is tough tonight but we are in a good place once I get clarity tomorrow on the catch up fee - how I believe it reads now is that we will receive bulk payment within X number of days from signing the new amendment that will cover all delinquent deals in the market aka June/July/August/September 2019 deals.
Need clarity that this is in fact the case - if it is then we simply just will be negotiating points that make this new deals better for us in the long run MG % increase / Larger upfront fee for extra years / etc

**April 2, 2020**

JR:     Zach, we have been waiting all day for information from you. As you can imagine this is becoming a frustration.

ZH:     Lawyer/s are actively redlining so won't know anymore until that is complete.
Let you know when I know more detail on that front.
No timeline per say but payments are set to start when amendment is agreed
Clearly will let you know proposed terms as soon as I know!

JR:     It would be helpful if you and I had a call, so we can get caught up on what you do know

ZH:     I'll give you a call as soon as I have actual info - at this point not much to discuss besides what I said above. Certainly tomorrow or latest Friday am - as I'm circling back w hbo Friday

**July 7, 2020**

JR:     Any word on the draft?

ZH:     I have nothing but I've been blowing everyone up all day and apparently HBOs counsel sent a draft to my counsel (who has been speaking w them) – I've been trying to get ahold of him for the past 2 hours (they are in NYC) with no success so I'll keep you posted

JR:     OK thanks. Also your litigation attorney and our attorney had a text exchange regarding the term sheet. Your attorney did not seem like he was on the same page regarding the terms agreement? They are supposed to have a call Monday am.

ZH:     Ughh probably just lawyer bullshit as everything needs to equal hours - let me know if there is an issue after they talk

JR:     OK thanks. Please update us as soon as you see a copy of the draft

ZH:     Definitely will do!

Exhibit 4 Page 87

**August 20, 2020**

JR:     OK thanks. Let us know a time later this week that works. The main thing I'm trying to figure out is how close you guys are. The date of the copy that our attorney received was sometime in June or July. Because it was so heavily redacted, apparently there was not a lot of context. How much back-and-forth is there remaining? If it's just contentions related to verbiage within the agreement, what is so difficult about that? Please ask your attorney to provide an unredacted copy to our attorney. I think that would help. Further, yes we would appreciate a daily update. I'm getting a bad feeling that this is not gonna happen before the 31st
See if your attorney can request an un-redacted or at least less redacted version and I will "approve" for him to send whatever he feels comfortable doing - every time I ask... he just states that your guy officially has to ask.

ZH:     I'll send update tonight and we will find a time this week.

**October 1, 2020**

ZH:     Final HBO contract received! We will take a look and circle back!

That's great news!!!

JR:     That is good news. Please send a copy to your attorney so our attorney can get a copy of the unredacted version. Also, in the meantime let us know if there's anything out of the ordinary. I'm crossing my fingers

ZH:     You and me Both!

JR:     Did they execute their signatures?

ZH:     No - asked us to review/sign/send back... they would counter sign and send hard copies for wet sigs

JR:     
        Gracias
        Zach, I'm sure you're reviewing this. Are there any changes or something glaring?

ZH:     Nope - from my perspective... no issues. Will have a full rundown with legal Tom am
And let you guys know

**October 2, 2020**

ZH:     Executed doc. Having lawyers send back their way

JR:     That's great news Zach! Can you have your attorney send our attorney a copy?
        Good job
        When did they commit to execute?

Exhibit 4 Page 88

ZH:     We chatted last night about it and he said he would be reaching out to your attorney to discuss. As I figured, he does not want to share due to the confidentiality clause in there... I told him that I am totally fine sharing AEO and he said he would talk to your guy and figure it out. So let me know if there are any issues andI'll tackle on this end
They did not specify when they will actually sign but stated that we execute and send back and they will counter sign
So I assume in short order
Ty

JR:     OK, thanks. If you give the blessing then your attorney is going to send the document to us. As you can imagine, you've been negotiating with our rights also, and we want to make sure things are good. I appreciate how hard you have worked on this. It looks like we're finally over the hill.

ZH:     I totally get it

**October 29, 2020**

JR:     Hi Zach, our attorney received another copy of the contract, which was also redacted. It provided additional information, but did not include everything. Our attorney wants to reach out to your transactional attorney regarding the payment clause. Apparently it is subject to interpretation and he wants to discuss this with your site. Please provide me the attorneys information, so we can get in contact with them. Thanks, Jim

ZH:     Sorry for delay - I'll let him know and circle back ASAP.

JR:     Hi Zach, I need that info. Thanks

ZH:     Luke Steinberger
K&L Gates LLP
599 Lexington Avenue
New York, New York 10022
Phone: 212.536.4850
Cell: 305.431.8772
luke.steinberger@klgates.com
www.klgates.com

JR:     Thank you

ZH:     Sorry for delay! Feel free to have your guy reach out with any questions.

**November 30, 2020**

JR:     Good morning Zach, has HBO given you any indication as to whether they intend on

Exhibit 4 Page 89

exercising the 2nd extension, or if they are going to pay everything?  Have you guys reached out to them regarding this?

ZH:      Hope everyone had a great Thanksgiving. No official word yet but account balance in the CAM would indicate another extension (as the full amount isn't in there). Everything has been quiet since Tuesday so I'll reach out on Monday when I have clarity on what's being sent and when.

Have a great weekend.

JR:      Thanks for the update. If the extension is executed, will they do that in writing? Would there be any provision for partial payment?

ZH:      We have been working on getting payment released weekly or bi-weekly (if another extension is exercised). Need HBO to sign off so I'm hoping to pressure them into that or something like that this coming week but tbd as of now.
And yes - it should be in writing

JR:      Sorry guys, I missed this text. Zach, if they take the extension, then they owe 20 million Immediately. Is payment due the first of December? Also it seems crazy that they would want to pay 3% in one month for interest to take the second extension.

ZH:      Hey guys - correct on the above.
—
The below is an email I sent out but figure it would be best to send via text to make sure all parties received it. Talk this week with news!
—
"We have an important and crucial week ahead. I understand that everyone is anxious to move this saga forward in a substantial way (as am I).

In that light, I feel as though it would be most beneficial for me to reach out at the end of each day (starting Monday 11/30) with a full rundown of what transpired.

I appreciate your understanding and look forward to touching base with positive news this week.

Much Appreciated.

Zach

"Hey Guys - Not a ton of communication today but will have an updated CAM balance by tomorrow and payment details by tomorrow or Wednesday.

Meaning partial (if they are extending), payment schedule for release of funds throughout the month or schedule for full payment.

Exhibit 4 Page 90

I will inform as soon as I get the intel.
Thank you for the update

JR:     Are we expecting at the minimum, a partial payment thus week?

ZH:     That's fully expected via the contract so once I get confirmation of what that looks like -
I Will let you guys know!

**December 1, 2020**

JR:     Hi Zach, has there been any communication with HBO? Have they indicated one way or
another as to when they're going to pay, or extend? Looking for any new details

ZH:     They have been funding the CAM account (North of $13M) as of Friday. Will request
another statement today and this Friday. No concrete info past that. Will send out an update this
week (hopefully) as I get more details.

JR:     Zach can you let everyone know what the significance of the CAM account is?

ZH:     The CAM (collection account management) is an escrow account of sorts that allows for
HBO and 3rd party distributors that they exploit the films through to pay directly into the
account. Simply provides transparency and due to the large amount of funds - takes the
collection snd distribution of funds out of HBO/1inMMs hands and into a totally neutral 3rd
party.

JR:     Gotcha. Are you able to distribute any funds from there yet?

ZH:     No - I have no control. Simply get statements that show how much money is in the
account and where it came from.
Basically irrelevant to me/us besides providing peace of mind that money is flowing

JR:     I see. So at what point will they distribute those funds to you?

Multiple triggers that mirror the master agreement

**December 1, 2020**

JR:     Hi Zach, a question came up. How are you verifying the amounts in the CAM account?
You mentioned this is like an escrow account, so HBO cannot access this account?

ZH:     Hey Jim. I guess We have not been able to 100% "verify" but the statements are coming
from the CAM company that is a 3rd party company so there shouldn't be any issue there.

JR:     Hi Zach. Any details on payment or has anyone been in communication with you today?

ZH:     Yes - having an all hands call tomorrow to make sure everyone is on the same page and

Exhibit 4 Page 91

get details as to payment - future payment schedule depending on extension or not and a clear path to closing this thing. Let you know as soon as it takes place and what transpires.

**December 7, 2020**

ZH:     Hey Jim. My grandpa died unexpectedly this am... so I'll be back at it tomorrow or Wednesday. This year just doesn't quit.

HBO did not officially send wire so I know lawyers are on it but I have been out of commission. Please pass along - just didn't want to go into it with everyone on the thread.

If anyone has specific questions - send me an email and I'll respond ASAP. If not - I'll update everyone over the next day or so.

**December 11, 2020**

JR:     Any communication with hbo?

ZH:     Yes but nothing substantial. Circle back today as we have to get something real

JR:     OK, thanks. Have you received a statement from freeway yet? That would seem easy to access? Also please forward over a copy of the escrow instructions. Have you told the attorneys to provide us the info that we are seeking?

ZH:     Yes - I told them that everyone is freaking out and needs clarity so please respond as soon as we have whatever info is needed.

**December 28-31, 2020**

JR:     Zach, are you available to talk right now?
??
???

ZH:     Sorry Jim - in big bear... crazy snow storm and have horrible service. I'll be back tomorrow and give you a call or shoot me an email and I'll try to get any questions answered today

Let's set up a time to talk tomorrow. Safe travels

JR:     Zach, what time are we going to talk today? Please give me a time

ZH:     Hey Jim. Driving back - late afternoon best on my end. Romik asked to get on a call as well... assume wants an update that you can provide after we speak? Or is there anything specific that you are aware of that he would need outside of that?

JR:     Thanks, please let me know what time today so I can schedule.

Exhibit 4 Page 92

ZH:     Between 515-530?

JR:     Sure that works. I'll call you at 5:15

JR:     Good morning Zach, please let me know ASAP regarding reaching out to HBO, and the response from your attorney. Our attorney has been trying to get in touch with your attorney for a week, without a response. This needs to change immediately. Please have your attorney call our attorney today.

ZH:     Reached out to schedule call with him ASAP today. Will let you know when that happens and have him touch base with your guy right after.

Exhibit 4 Page 93

# EXHIBIT 5

# EXHIBIT 5

Exhibit 5 Page 94

**From:** Patrick Somers <psomers@kbkfirm.com>
**Date:** Wednesday, January 29, 2020 at 7:47 PM
**To:** Mark Weisenmiller <mweisenmiller@gtg.legal>
**Cc:** Greg Gordillo <greg@newvisionlaw.com>
**Subject:** Re: Movie Fund, LLC/1inMM Capital LLC - Demand Letter

Thank you

Sent from my iPhone

Patrick J. Somers
Kendall, Brill & Kelly LLP
10100 Santa Monica Blvd., Suite 1725
Los Angeles, CA 90067

Tel: (310) 272-7918
Fax: (310) 556-2705


On Jan 29, 2020, at 7:40 PM, Mark Weisenmiller <mweisenmiller@gtg.legal> wrote:

Yes. 1030 it is.


**From:** Patrick Somers <psomers@kbkfirm.com>
**Sent:** Wednesday, January 29, 2020 7:36:34 PM
**To:** Mark Weisenmiller <mweisenmiller@Gtg.legal>
**Cc:** Greg Gordillo <greg@newvisionlaw.com>
**Subject:** Re: Movie Fund, LLC/1inMM Capital LLC - Demand Letter

Mark,

My apologies. I have a meeting outside of the office that will run until 10. Could we speak at 10:30?

Sent from my iPhone

Patrick J. Somers
Kendall, Brill & Kelly LLP
10100 Santa Monica Blvd., Suite 1725
Los Angeles, CA 90067

Tel: (310) 272-7918

Exhibit 5 Page 95

Fax: (310) 556-2705

On Jan 29, 2020, at 4:46 PM, Mark Weisenmiller <mweisenmiller@gtg.legal> wrote:

I am available anytime before 1130 am tomorrow morning.  Let me know what time
works for you.

**Mark M. Weisenmiller**
Attorney

P 725 777 3000 | F 725 777 3112

GARMAN | TURNER | GORDON

650 WHITE DRIVE, SUITE 100
LAS VEGAS, NV 89119

**website** | **vCard** | **map** | **email**

<image001.png>

<image002.png>

<image003.png>

Effective January 18, 2020, Garman Turner Gordon will be located at 7251
Amigo Street, Suite 210, Las Vegas, Nevada 89119.

**From:** Patrick Somers <psomers@kbkfirm.com>
**Sent:** Wednesday, January 29, 2020 3:49 PM
**To:** Greg Gordillo <greg@newvisionlaw.com>
**Cc:** Mark Weisenmiller <mweisenmiller@Gtg.legal>
**Subject:** RE: Movie Fund, LLC/1inMM Capital LLC - Demand Letter

Thanks, Greg.  Mark, let me know a good time to speak today or tomorrow.

<image004.png>
**Patrick J. Somers**

Tel: (310) 272-7918
Fax: (310) 556-2705
E-mail: psomers@kbkfirm.com

PLEASE NOTE:  This message, including any attachments, may include privileged, confidential and/or inside
information.  Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly
prohibited and may be unlawful.  If you are not the intended recipient, please notify the sender by replying to this
message and then delete it from your system.  Thank you.

**From:** Greg Gordillo [mailto:greg@newvisionlaw.com]
**Sent:** Wednesday, January 29, 2020 3:45 PM
**To:** Patrick Somers <psomers@kbkfirm.com>

Exhibit 5 Page 96

**Cc:** mweisenmiller@gtg.legal
**Subject:** Re: Movie Fund, LLC/1inMM Capital LLC - Demand Letter

Patrick,

I have cc'd Mark Weisenmiller of Garman, Turner, Gordon. He and his firm will be
handling this matter on behalf of Movie Fund LLC. I will remain involved as general
counsel to Movie Fund, but you should direct your future correspondence and
communication directly to Mark. His office phone number is (725) 777-3000.

As a practical matter, I am confident no action is going to happen before you and Mark
confer. Movie Fund must act to protect its rights and interests, but it's first preference is
to resolve this matter amicably.  Of course, just as you have protected your client, I also
state on behalf of Movie Fund that nothing herein should be construed as a waiver of
any right or remedy.  Moreover, it is not intended to be, nor shall it be construed as, a
full statement of applicable facts or law.  All rights are expressly reserved.

Regards,
Greg

|  |  |  |
|---|---|---|
| <image005.jpg> | Gregory A. Gordillo<br>New Vision Law<br>Tel: 702.802.6845<br>700 S. 9th St.<br>Las Vegas, NV 89101<br>www.newvisionlaw.com | <image006.jpg> |

This e-mail message (and any attachments) is for the exclusive use of the intended addressee(s). This message may contain
confidential, privileged, and/or proprietary information, and unauthorized review, use, or distribution by persons other than the intended
addressee(s) is prohibited and may be unlawful. Unintended transmission shall not constitute waiver of the attorney-client or any other
privilege or of any claim to confidentiality. If you have received this e-mail in error, please contact me immediately
at 702.802.6845 and  destroy all electronic, paper, and other versions of this message.

<image007.png>                                              <image008.png>

Employment Law – Individuals 2012-2019          2012-2019
Lawyer of the Year 2015, 2017                    Ohio
Cleveland, Ohio

**From:** Patrick Somers <psomers@kbkfirm.com>
**Date:** Wednesday, January 29, 2020 at 3:21 PM
**To:** Gregory Gordillo <greg@newvisionlaw.com>
**Subject:** RE: Movie Fund, LLC/1inMM Capital LLC - Demand Letter

3

Exhibit 5 Page 97

Thanks, Greg.  Considering your health situation, and what I would like to address in an attempt to resolve the issues raised by your letter, could we have an agreement to put on hold any action (including threats from the demand letter) by either party until substitute counsel has been retained and I've been able to have a discussion with new counsel?  Frankly, there was absolutely no need to escalate the situation with a demand letter, prompting the need to retain counsel.  I firmly believe that the best path forward is an amicable resolution.  That said, my client is prepared to take all appropriate action, if needed.  Please let me know.

Please note nothing herein should be construed as a waiver of any right or remedy.  Moreover, it is not intended to be, nor shall it be construed as, a full statement of applicable facts or law.  All rights are expressly reserved.

Best,

Patrick

<image009.png>
**Patrick J. Somers**

Tel: (310) 272-7918
Fax: (310) 556-2705
E-mail:  psomers@kbkfirm.com

PLEASE NOTE:  This message, including any attachments, may include privileged, confidential and/or inside information.  Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited and may be unlawful.  If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.  Thank you.

**From:** Greg Gordillo [mailto:greg@newvisionlaw.com]
**Sent:** Wednesday, January 29, 2020 2:58 PM
**To:** Patrick Somers <psomers@kbkfirm.com>
**Subject:** Re: Movie Fund, LLC/1inMM Capital LLC - Demand Letter

Hello Patrick,

Thank you for making contact with me. Unfortunately, I am very much under the weather today. Given the urgency of this matter, I am working with my client Movie Fund to retain other counsel. I had hoped to have accomplished that by now. But as soon as it happens, I will make the necessary introductions.

Regards,
Greg

| <image010.jpg> | Gregory A. Gordillo<br>New Vision Law<br>Tel: 702.802.6845<br>700 S. 9th St.<br>Las Vegas, NV 89101<br>www.newvisionlaw.com | <image011.jpg> |
|---|---|---|

This e-mail message (and any attachments) is for the exclusive use of the intended addressee(s). This message may contain confidential, privileged, and/or proprietary information, and unauthorized review, use, or distribution by persons other than the intended addressee(s) is prohibited and may be unlawful. Unintended transmission shall not constitute waiver of the attorney-client or any othe

Exhibit 5 Page 98

privilege or of any claim to confidentiality. If you have received this e-mail in error, please contact me immediately at 702.802.6845 and  destroy all electronic, paper, and other versions of this message.

<image012.png>                                    <image013.png>

Employment Law – Individuals 2012-2019
Lawyer of the Year 2015, 2017
Cleveland, Ohio

2012-2019
Ohio

**From:** Patrick Somers <psomers@kbkfirm.com>
**Date:** Wednesday, January 29, 2020 at 10:50 AM
**To:** Gregory Gordillo <greg@newvisionlaw.com>
**Subject:** Movie Fund, LLC/1inMM Capital LLC - Demand Letter

Dear Greg,

I represent 1inMM Capital LLC, and just called your office and left a message asking you to call me back so that we can discuss the demand letter that you sent my client, dated January 23, 2020.  Please let me know a good time for us to discuss.

Best,

Patrick

<image014.png>
**Patrick J. Somers**
Kendall Brill & Kelly LLP
10100 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067

Tel: (310) 272-7918
Fax: (310) 556-2705
E-mail:  psomers@kbkfirm.com
Web:  www.kbkfirm.com

PLEASE NOTE:  This message, including any attachments, may include privileged, confidential and/or inside information.  Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited and may be unlawful.  If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.  Thank you.

Exhibit 5 Page 99

# EXHIBIT 6

# EXHIBIT 6

Exhibit 6 Page 100

# new visi⬤n law

January 23, 2020

**By U.S. Certified Mail # 7018 3090 0000 1180 6143**

Mr. Zachary Horowitz, Manager
1INMM Capital, LLC
9615 Bolton Road
Los Angeles, CA 90034

Re:   **Lender / Payee: Movie Fund, LLC, a Nevada limited liability company
Borrower / Maker: 1INMM Capital, LLC, a California limited liability
company Outstanding Loans Balance: $8,746,227.81 (with interest, as of
January 23, 2020) NOTICE OF DEMAND FOR PAYMENT**

Dear Mr. Horowitz:

My firm represents Movie Fund LLC regarding its demand for payment on certain loans Move Fund made to 1INMM Capital LLC. In particular, Movie Fund made a series of 8 separate loans to 1INMM Capital LLC, evidenced by Promissory Notes therefor, all as identified on the attached Schedule "1" (the "Loans" and "Notes", respectively). Among other things, Schedule "1" lists the Notes' respective due dates, amounts due, accrued interest, and balance.

**As of January 23, 2020, 1INMM Capital's total outstanding Loans balance (with interest accrued thereon) is $8,746,227.81; interest accrues thereafter at $25,879.13 *per diem*.**

Movie Fund hereby demands **immediate** payment of the full balance (with all accrued interest through the payment date). Please contact our office or James Russell directly for remittance instructions.

If Movie Fund does not receive full payment within five (5) business days, our client intends to exercise its rights and remedies, including providing notification to

January 23, 2020
Page 2 of 4

HBO Holdings, Inc. that the certain rights of distribution regarding the motion picture(s) described in Appendix A to each of the Notes have been assigned by 1INMM Capital to Movie Fund, pursuant to which all payments by HBO Holdings, Inc. should be made immediately and directly to Movie Fund. Furthermore, please consider this correspondence notice of Movie Fund's exercising its right to exploit all of the rights acquired and maintained by 1INMM Capital pursuant to the agreements between 1INMM Capital and HBO regarding each of the described motion pictures.

In addition, if payment is not received from 1INMM Capital within five (5) business days, Movie Fund may take other actions including but not limited to:

1. Seizing, levying, freezing, garnishing, attaching, executing upon
    a. Bank accounts
    b. Wages
    c. Real property
    d. Tangible and intangible personal property
    e. Accounts receivable
    f. Refunds
2. Foreclosing upon other collateral
3. Petitioning the court for a receivership or conservatorship
4. Recovering other costs, including
    a. Collection costs
    b. Attorneys' fees
    c. Court costs
5. Rights arising under the applicable Uniform Commercial Code
6. Effecting change-of-ownership filings for
    a. Trademarks
    b. Copyrights
    c. Other intellectual property

* * * * *

Our client expressly reserves all rights and remedies (at law, equity or otherwise). **PLEASE GOVERN YOURSELF ACCORDINGLY.**

Exhibit 6 Page 102

January 23, 2020
Page 3 of 4

   Feel free to contact me in writing if you have any questions or want to further discuss this.

Sincerely,

**Gregory A. Gordillo**

**THIS IS AN ATTEMPT TO COLLECT A DEBT BY A DEBT COLLECTOR AND ANY
INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

Pursuant to 15 USCA § 1692g(a) you are herein advised that unless you, within thirty (30) days from receipt of this notice, dispute the validity of the debt or any portion thereof, this office will assume this debt is valid. If you notify this office in writing within thirty (30) days that this debt, or any portion thereof, is disputed, this office will obtain verification of the debt and a copy of such verification will be mailed to you. Upon written request by you within the 30-day period, this office will provide you with the name and address of the original creditor, if different from the current creditor.

Exhibit 6 Page 103

January 23, 2020
Page 4 of 4

### Schedule "1"

| Film Name | Promissory Note Date | Note Maturity Date | Principal Balance | Past Due Daily Default Interest | Days Past Due as of 1-23-20 | Total Default Interest | Total Due |
|---|---|---|---|---|---|---|---|
| Pyewacket | 6/12/2019 | 12/12/2019 | 1,002,619.00 | 0.32258% | 42 | $135,838.43 | $1,138,457.43 |
| Desolation | 6/12/2019 | 12/12/2019 | 1,004,304.00 | 0.32258% | 42 | $136,066.72 | $1,140,370.72 |
| Don't Come Back From the Moon | 6/13/2019 | 12/13/2019 | 993,964.00 | 0.32258% | 41 | $131,459.49 | $1,125,423.49 |
| Behind the Walls | 6/13/2019 | 12/13/2019 | 999,619.00 | 0.32258% | 41 | $132,207.41 | $1,131,826.41 |
| Marfa | 7/8/2019 | 1/8/2020 | 1,001,942.00 | 0.32258% | 15 | $48,480.97 | $1,050,422.97 |
| Brahms The Boy II | 7/8/2019 | 1/8/2020 | 1,003,639.00 | 0.32258% | 15 | $48,563.08 | $1,052,202.08 |
| Lost Girls and Love Hotels | 7/9/2019 | 1/9/2020 | 1,007,198.00 | 0.32258% | 14 | $45,486.27 | $1,052,684.27 |
| Only | 7/9/2019 | 1/9/2020 | 1,009,261.00 | 0.32258% | 14 | $45,579.44 | $1,054,840.44 |
| | | | | | **TOTALS:** | **$723,681.81** | **$8,746,227.81** |

Exhibit 6 Page 104

# EXHIBIT 7

# EXHIBIT 7

Exhibit 7 Page 105



Gr... ...ort

**1 of 1**

Date

" 1IN...

Period started : Dec-02-2020
Period ended : Dec-04-2020

AC=Account Currency    LC=Local Currency

| TERRITORY | DISTRIBUTORS | MG/OVERAGES (LC) | PAYMENT EVENTS | DATE RECEIVED | GROSS RECEIPTS (LC) | BALANCE MG (LC) | EXCHANGE RATE | GROSS RECEIPTS (AC) | BANK CHARGES (AC) | WHT (AC) | OTHER DEDUCTIONS (AC) | NET RECEIPTS (AC) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **LATIN AMERICA/BRAZIL** | | | | | | | | | | | | |
| | Home Box Office | | | | | | | | | | | |
| | | USD 7,250,000 | Deposit | 2020-12-02 | USD 7,250,000 | | | USD 7,250,000 | | | | USD 7,250,000 |
| | | USD 7,250,000 | Delivery | 2020-12-03 | USD 7,250,000 | | | USD 7,250,000 | | | | USD 7,250,000 |
| | | USD 7,250,000 | Notice of Delivery | 2020-12-04 | USD 7,250,000 | | | USD 7,250,000 | | | | USD 7,250,000 |
| Totals | | USD 21,750,000 | | | USD 21,750,000 | | | USD 21,750,000 | | | | USD 21,750,000 |
| **TOTALS** | | USD 21,750,000 | | | USD 21,750,000 | | | USD 21,750,000 | | | | USD 21,750,000 |

| TOTAL RECEIPTS | Gross Entitlement in USD | Net Entitlement in USD |
|---|---|---|
| To CAM: | N/A | N/A |
| To 1INMMCAP: | 68,083,000 | 68,076,727 |
| To LICENSOR: | N/A | N/A |
| Total | 68,083,000.00 | 68,076,727.00 |