FILED

APR - 5 2021

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ RS _____ DEPUTY

KATHRYN C. WANNER (Cal. Bar No. 269310)
Email: wannerk@sec.gov
M. LANCE JASPER (Cal. Bar No. 244516)
Email: jasperml@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Director
Amy J. Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. **2:21-CV-02927-CAS-GJSx** |
| Plaintiff, | **DECLARATION OF JACOB WUNDERLIN** |
| vs. | |
| ZACHARY J. HORWITZ; AND 1INMM CAPITAL, LLC, | **(FILED UNDER SEAL)** |
| Defendants. | |

## DECLARATION OF JACOB WUNDERLIN

I, Jacob Wunderlin, declare, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am an individual over 18 years of age and have personal knowledge of the matters set forth herein, except as otherwise noted, and, if called as a witness, I could and would competently testify under oath to the facts stated herein.

2.      I make this declaration at the request of the staff of the U.S. Securities and Exchange Commission ("SEC").

3.      I am a managing member of JJMT Capital, LLC ("JJMT").  The three managing members of JJMT – Joseph deAlteris, Matthew Schweinzger, and myself (collectively, "JJMT members") – met Zachary Horwitz, the founder and managing member of 1inMM Capital ("1inMM"), while attending Indiana University from 2007-2010, where we became friends.

4.      In or about March of 2014, Horwitz presented me with an investment opportunity in 1inMM, whereby I would lend funds in exchange for a promissory note, and the funds would serve to finance and facilitate the licensing of specific media content to a streaming platform.  To induce me to extend the loan, Horwitz made representations regarding 1inMM, which I reasonably believed to be true and accurate, regarding Horwitz's experience and relationships in the media content distribution industry, as well as the investment dynamics, deal structure, potential returns, and associated risks pertaining to the opportunity.  To further induce me to extend the loan, Horwitz personally guaranteed my initial loan.  In reliance upon Horwitz's representations and his personal guarantee, that same month an associate ("EF") and I, loaned approximately $37,000 in exchange for a promissory note with 1inMM.  This initial note was timely repaid in full by 1inMM with the specified amount of interest in or about June 2014.

5.      From in or about September 2014 through March 2015, Horwitz made additional representations to me, as well as to deAlteris and Schweinzger, in order to induce us to lend additional capital to 1inMM in exchange for promissory notes that would finance and

facilitate the licensing of specific media content to streaming platforms.  In reliance on these representations, which I reasonably believed to be true and accurate, and the timely repayment with interest by 1inMM of the initial note described above, the following occurred, among other things:

- deAlteris, Schweinzger, and I agreed to lend additional capital in exchange for promissory notes issued by 1inMM.

- These notes were financed by me, deAlteris, or Chi Town Capital ("CT Capital"), an entity formed by deAlteris, Schweinzger, me, and two other associates ("EF" and "TC") for the purpose of providing financing to 1inMM in exchange for promissory notes.  The capital for these notes was provided by deAlteris, Schweinzger, and me personally, as well as from our friends and associates.

- All of these notes were timely repaid in full by 1inMM with the specified amount of interest.

- The following chart summarizes these loans and the associated media content, as represented by Horwitz and reasonably believed to be true and accurate by me:

| Lender | Title | Transaction Date | Maturity Date | Customer | Loan Amount |
|---|---|---|---|---|---|
| Jacob Wunderlin | Deseo | March 2014 | June 2014 | Sony Pictures | $37,000 |
| Chi Town Capital | Los Olvidados | October 2014 | January 2015 | Sony Pictures | $297,000 |
| Jacob Wunderlin | Fräulein Else | November 2014 | February 2015 | Sony Pictures | $32,500 |
| Jacob Wunderlin | HellFire | December 2014 | June 2015 | HBO Studios | $36,000 |
| Joseph deAlteris | Kickboxer | January 2015 | July 2015 | HBO Studios | $81,100 |
| Chi Town Capital | Wild Night | February 2015 | August 2015 | HBO Studios | $265,000 |
| Chi Town Capital | Anna Waters | February 2015 | August 2015 | HBO Studios | $263,500 |
| Jacob Wunderlin | Skyler | March 2015 | September 2015 | HBO Studios | $38,250 |

6.     Among the representations made by Horwitz to induce deAlteris, Schweinzger, and me to provide financing in exchange for promissory notes to 1inMM as described above, which I reasonably believed to be true, and which I relied upon in agreeing to provide

additional financing in exchange for promissory notes as described below, were the following, among other things:

- Horwitz was well-connected in the content distribution industry as a result of his relationships with Julio Hallivis (his friend), Gustavo Montaudon (Julio's family member), and Javier Salgado (Gustavo's business partner).

- Montaudon was an "industry veteran" with 20+ years' experience in content distribution with direct connections at Netflix/HBO/Sony for the Latin American Markets (https://www.linkedin.com/in/gustavo-montaudon-71989123/; http://www.alebrije.tv/)

- Horwitz had been working for the VC firm Maveron (https://www.maveron.com/), where he had formed relationships with wealthy businessmen Howard Schultz and Dan Levitan.

- Schultz and Levitan were instrumental in creating inroads for Horwitz at platforms such as Netflix, HBO, and Sony and for facilitating the various output deals that 1inMM had in place with these platforms.

- Horwitz had another larger operation called "1inMM Productions" that was financially supported by Schultz and Levitan for the purpose of acquiring titles larger in scale and more speculative in nature.

- In contrast to 1inMM Productions, 1inMM was created specifically to acquire titles that were generally approximately $1 million or less in purchase price.

7.     Throughout our dealings with 1inMM and Horwitz, it was critical to my decisions to provide financing to 1inMM that Horwitz made representations and provided documentation, emails, and other information that I reasonably believed to be true and accurate that 1inMM was licensing content to well-established, well-respected, and well-financed platforms known to be actively seeking and licensing such content in the relevant markets, most notably Netflix and HBO.

8.     From in or about April 2015 through October 2015, in reliance upon Horwitz's representations and the documentation, emails, and other information he provided, which I

reasonably believed to be true and accurate, and the timely repayment with the specified amount of interest by 1inMM of the prior notes, deAlteris, Schweinzger, and I were induced to extend thirteen additional loans to 1inMM in exchange for promissory notes via two entities (JTHD Investments and JJMT Group).  These were entities created either individually or collectively by deAlteris, Schweinzger, and/or me (and a fourth associate, "TC") for the purpose of lending additional capital to 1inMM in exchange for promissory notes.  The capital for these loans was provided by deAlteris, Schweinzger, and me personally, as well as by our family, friends, and associates.  The following chart summarizes these loans and the associated media content, as represented by Horwitz and which I reasonably believed to be true and accurate:

| Lender | Title | Transaction Date | Maturity Date | Customer | Loan Amount |
|---|---|---|---|---|---|
| JTHd Investments | The Muse | April 2015 | October 2015 | HBO Studios | $225,500 |
| JTHd Investments | The Last Five Years | April 2015 | October 2015 | HBO Studios | $325,250 |
| JTHd Investments | Hell & Back | June 2015 | December 2015 | HBO Studios | $265,000 |
| JTHd Investments | Bronco Belle | June 2015 | December 2015 | HBO Studios | $253,500 |
| JJMT Group | Pound of Flesh | August 2015 | February 2016 | HBO Studios | $235,750 |
| JJMT Group | Stolen Dreams | August 2015 | February 2016 | HBO Studios | $170,500 |
| JJMT Group | Sinister 2 | August 2015 | February 2016 | HBO Studios | $416,000 |
| JJMT Group | Eye in the Sky | September 2015 | March 2016 | HBO Studios | $490,750 |
| JJMT Group | The Adderall Diaries | September 2015 | March 2016 | HBO Studios | $266,750 |
| JJMT Group | Beast | September 2015 | March 2016 | HBO Studios | $195,675 |
| JJMT Group | High-Rise | October 2015 | April 2016 | HBO Studios | $680,650 |
| JJMT Group | Carol | October 2015 | April 2016 | HBO Studios | $375,500 |
| JJMT Group | A Year And Change | October 2015 | April 2016 | HBO Studios | $285,950 |

9.     In or about July of 2015, JJMT was created by managing members deAlteris, Schweinzger, and me (along with "TC," who is no longer affiliated with JJMT).  In or about November of 2015, the JJMT members began to utilize JJMT as the primary vehicle to act

as a continued source of promissory note financing for 1inMM. The capital deployed by JJMT was provided by the JJMT members personally, as well as by our family, friends, and associates. During this time, Horwitz made representations and provided documentation, emails, and other information to the JJMT members, which I reasonably believed to be true and accurate, and upon which I relied in agreeing to have JJMT provide financing to 1inMM, that indicated as follows, among other things:

- 1inMM and Horwitz would use loan funds from JJMT to acquire distribution rights for the Latin American marketplace from various Foreign Sales Agents ("FSAs").

- Following acquisition from the FSA, 1inMM and Horwitz would sublicense these distribution rights to Sony, HBO or Netflix.

- Repayment of JJMT's loans, inclusive of the specified amount of interest, to 1inMM would be tied to the repayment of licensing fees from Sony, HBO or Netflix to 1inMM.

- Sony's standard payment term/timeline for any transaction was 3 months following the transaction date with 1inMM.

- HBO's standard payment term/timeline for any transaction was 6 months following the transaction date with 1inMM.

- Netflix's standard payment term/timeline for any transaction was 24 months following the transaction date with 1inMM (later, in 2017, this term/timeline became 12 months).

- As such, JJMT's loans to 1inMM would be outstanding for either 3 months (Sony titles), 6 months (HBO titles) or 24 (later 12) months (Netflix titles) depending on which platform ultimately licensed the content.

- Further, in or about March 2017, 1inMM formed a partnership with Pathe International, a content distribution business in Europe. Using loan funds from JJMT, 1inMM would provide financing to Pathe to acquire the rights to content that Pathe would thereafter sublicense to HBO for the European marketplace. For each of these transactions, Pathe's payment term/timeline was 6 months (consistent with

HBO's standard payment term/timeline).  Pathe would repay 1inMM, and 1inMM would thereafter repay the JJMT notes, inclusive of the specified amount of interest.

- For Pathe transactions, JJMT would provide approximately 80% of the capital for the loans to 1inMM and Horwitz, via ZJH Enterprise LLC ("ZJH"), would provide JJMT with the additional 20% of loan capital.  In turn, ZJH would receive a proportionate share of the interest on these notes upon repayment from 1inMM to JJMT.

- The manner in which 1inMM generated revenue for itself included, but was not limited to, the following: (i) receiving a percentage of the gross receipts that HBO generated from exploiting film rights; (ii) retaining a portion of the profit margin from Netflix-specific transactions; (iii) following the repayment of notes used to finance the acquisition of content rights and the expiration of initial 3-year sublicensing period with platforms such as HBO and Netflix, 1inMM would retain rights to the same content for an additional period of years, thereby enabling 1inMM to continue licensing the content to other parties for 1inMM's sole financial benefit; and (iv) 1inMM would also, as of in or about March 2017, enter into a profit participation arrangement with Pathe and receive a portion of the gross receipts that HBO paid to Pathe.

10.     From the start of the JJMT financing arrangement with 1inMM in or about 2015 until late 2019, JJMT continued to increase the use of the JJMT members' own personal capital, as well as capital from our family, friends, and associates, to provide financing to 1inMM in exchange for promissory notes.  In so doing, I relied upon 1inMM's timely repayment of promissory notes in full with the specified amount of interest, as well as upon Horwitz's continued representations and provision of hundreds of documents, emails, and other information that he claimed, and I reasonably believed, to be true and accurate, regarding 1inMM's operations, investments, revenue, transactions, business relationships, and growing financing opportunities.  For example, Horwitz provided JJMT with what was reported to be 1inMM's "Annual Report" from 2015, a true and correct copy of which is attached hereto as

Exhibit 1.  Additional examples of documents, emails, and other information Horwitz

provided to JJMT include, but are not limited to, the following:

- Foreign Sales Agent (FSA) Purchase Agreements

- Licensing and Distribution Agreements with Netflix and HBO

- 1inMM and JJMT Promissory Notes

- Netflix Proposal

- Due Diligence questions and answers

- Communications with FSAs, Netflix, and HBO

Throughout the course of our dealings, in order to induce continued financing from JJMT in

exchange for promissory notes, Horwitz provided, among other things, more than 400

documents and contracts, as well as emails, and other materials regarding putative content

licensing transactions conducted by 1inMM that Horwitz represented, and I reasonably

believed, to be true and accurate.  Horwitz would provide these materials and other

documents regarding specific content licensing transactions to JJMT via email, secure

messenger application, and/or Box.  For example, Horwitz and 1inMM provided JJMT with

FSA agreements, promissory notes, distribution/licensing agreements, and other relevant

deal documents and communication for the following content titles:

- **HBO:**  *Blood Quantum*; *Look Away*; *Bitter Harvest*.  True and correct copies of

  putative FSA agreements, promissory notes, and distribution/licensing agreements

  dated, respectively, July 16, 12, and 30, 2019 (*Blood Quantum*); August 15, 13, and

  27, 2019 (*Look Away*); October 02, 2019, September 27, 2019, and October 10, 2019

  (*Bitter Harvest*) are attached hereto as Exhibits 2(a)-(c) (*Blood Quantum*); 3(a)-(c)

  (*Look Away*); 4(a)-(c) (*Bitter Harvest*).

- **Netflix**:  *Active Measures*; *Divide & Conquer*; *Lucia's Grace*.  True and correct

  copies of putative FSA agreements, promissory notes, and distribution/licensing

  agreements dated, respectively, December 17, 17, and 21, 2018 (*Active Measures*);

  December 17, 17, and 21, 2018 (*Divide & Conquer*); February 27 and 27, 2019, and

March 4, 2019 (*Lucia's Grace*) are attached hereto as Exhibits 5(a)-(c) (*Active Measures*); 6(a)-(c) (*Divide & Conquer*); 7(a)-(c) (*Lucia's Grace*).

11.      As noted above, JJMT's continued participation in its financing arrangement with 1inMM was induced in part by 1inMM's full and timely repayment with the specified amount of interest of promissory notes.  From the start of the JJMT financing arrangement described above until in or about late 2019, 1inMM did not default on any loans made by JJMT.

12.      From in or about mid 2015 until late 2019, JJMT's financing of 1inMM's content licensing transactions continued to grow.  During this time, JJMT provided financing to 1inMM in exchange for promissory notes with total principal value of approximately $485 million.  The amount repaid by 1inMM to JJMT during this period for these promissory notes, inclusive of specified interest, was approximately $440 million, some of which was redeployed by noteholders for future loans.  At present, JJMT currently has delinquent and unpaid notes owing from 1inMM with principal values of approximately $165MM (exclusive of interest) for amounts loaned in or about 2018 and 2019.  Collectively, the JJMT members represent JJMT's largest noteholders with approximately $42.5 million in principal value of notes outstanding, which is approximately 26% of the outstanding note principal owed to JJMT by 1inMM.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this   29th   day of March, 2021 in   Chicago        ,   Illinois         .

Jacob Wunderlin

# Exhibit 1

Exhibit 1 Page 9

# 1INMM

# CAPITAL

# ANNUAL
# REPORT

**20**
**15**

Exhibit 1 Page 10

# CHEERS TO OUR INVESTORS

**Thank you for your investment and trust in 1inMM Capital over the past year.** Our managing partners have worked tirelessly to provide a landscape that balances the protection of your investment with the proper amount of risk to garnish the profits that you have grown accustomed to obtaining. We could not be more pleased with our progress and we look extremely optimistically into our future.

Over the past year, we have managed our business model with the solid foundation that it was built on. We continue to source quality feature film projects, solidify our reputation and relationships with our current output deals and continuously search for additional profitable partnerships. We are ecstatic to report that over the past year, we have acquired and successfully distributed 49 films through the 1inMM Capital banner without incurring a single loss in the process. But this is only the beginning...

As we look into the future, 1inMM Capital's road ahead is extremely bright. As many of you are aware, we have expanded our business model with HBO Entertainment and NETFLIX to not only service the thriving Latin American marketplace but now are distributing feature films to Australia and New Zealand as well. With this growth, we have the ability to safely and profitably distribute more than 25 additional films per year, creating ample opportunity for investment and substantial growth of our thriving feature film library.

In the following pages, you will see the high level details of our investment overview. If you have any questions in regards to your investment/s or would like additional information in regards to the process, you know that we are always available.

Cheers!
**1inMM Capital Team**

Exhibit 1 Page 11



Exhibit 1 Page 12

FOIA Confidential Treatment Requested

# OUR MANAGING PARTNERS

## ZACH HORWITZ
### *PRINCIPAL*

Zach is responsible for the companies overall strategy, capital transactions, operations, investor relations and content acquisitions. With ample experience working with 1inMM Productions, 1inMM Capital's parent company, Zach brings a wealth of knowledge, reputation and experience when growing 1inMM Capital to a prominent force in the foreign distribution landscape. Zach's main focus is providing investors an unparalleled financial business model in which he highlights gaps in an already profitable marketplace and takes advantage of these niche markets in order to garner returns for investors. Zach is a serial entrepreneur, founding and successfully managing or exiting four companies since his graduation from Indiana University in 2009.

## JULIO HALLIVIS
### *PRINCIPAL*

Julio is responsible for bookkeeping, content acquisition, foreign sales agent relations and head of our Latin America distribution arm. Julio has an unprecedented knowledge of film production that allows him to have the ability of spotting projects at an early stage with the potential to become extremely profitable prior to being shopped at a film market. With these tools, Julio works closely with foreign sales agents to pinpoint projects for acquisition prior to them going on the market and eliminating the chance of a higher acquisition cost. Additionally, Julio has strong roots within the Latin American film landscape that allows 1inMM Capital to get inside access into an extremely difficult territory to capitalize. Julio is a credited commercial and film producer working with brands such as Porsche, Audi and Volkswagen prior to getting into film distribution.

Exhibit 1 Page 13

# OUR MANAGING PARTNERS

## GUSTAVO MONTAUDON
*PRINCIPAL*

Gustavo is responsible for output deal relations with Netflix, Sony and HBO. Gustavo is a veteran in the business of distribution and acquisitions for Latin America. With over three decades of experience, his knowledge of the industry is unsurpassable. Gustavo founded Alebrije Entertainment, a leading programming distribution company for high quality products for television. This venture allowed him to negotiate multiple successful output deals with prominent companies such as Netflix, Sony Worldwide and HBO in Latin America, in addition to distributing Mexican films in the United States Hispanic video market. Prior to forming Alebrije Entertainment, Gustavo was Vice President of TV Distribution in Latin America for 20th Century Fox for 28 years, where he oversaw all sales of TV and Theatrical product in Latin America, including Video On Demand, Pay---Per---View, Free TV, Basic Cable, Internet and Syndication. Gustavo was credited for creating synergies between Fox divisions in Mexico and Latin America to launch Theatrical movies and DVD releases of movies, sequels, TV series and the licensing of products.

Exhibit 1 Page 14

**FOIA Confidential Treatment Requested**

**JJMT-SEC-0004845**



Exhibit 1 Page 15

FOIA Confidential Treatment Requested

# OUR STRATEGIC PARTNERSHIPS



PARENT COMPANY



LEADING LATIN AMERICA DISTRIBUTION COMPANY



FOREIGN SALES PARTNER



DISTRIBUTION PARTNER



FOREIGN SALES PARTNER



FOREIGN SALES PARTNER



FOREIGN SALES PARTNER



ENTERTAINMENT ATTORNEY



DISTRIBUTION PARTNER



DISTRIBUTION PARTNER



PRIMARY BANKING INSTITUTION

Exhibit 1 Page 16

FOIA Confidential Treatment Requested

JJMT-SEC-0004847

# OUR INVESTMENT FOCUS

**We believe that the safety of our investor's funds should always be our first priority.** Due to this notion, our strategy has been and will always be a collateralized investment approach to ensure that solid returns and safe investments are the pillars that solidify our foundation. The acquisition of each film that we acquire uses the asset acquired (Distribution Rights of the film) as collateral against any unexpected negative event that may occur. If, at any point, one of our current output deals (HBO / SONY / NETFLIX) would default on a payment owed to the company; the rights to distribute the film would immediately revert back to the distributor (1inMM Capital) and the distributor would place the film through a

different output deal. Through our solid relationships, we receive confirmation from each of our outputs indicating their desire to acquire the rights to any title we purchase PRIOR to us releasing funds for the film so that in the event of any unexpected occurrence, we are able to recover our investment through an alternative company.

*\*Due to this fact, in the event of one output platform defaulting on payment, 1inMM Capital has confirmation that this title will be acquired by a secondary deal and therefore making the investment whole. Simply stated, in the event that Netflix, HBO or SONY defaults on a payment, declares bankruptcy or displays contractual delinquency in any form, we simply sell the film to one of the two remaining output platforms that already have agreed to license the rights of the film.*

Exhibit 1 Page 17

**FOIA Confidential Treatment Requested**                    **JJMT-SEC-0004848**

# LIBRARY SNAPSHOT



Exhibit 1 Page 18

FOIA Confidential Treatment Requested

# Exhibit 2a

## INTERNATIONAL LICENSE AGREEMENT

THIS AGREEMENT (the "Agreement") is made as of July 16, 2019, between XYZ FILMS ("Sales Agent"), whose address is 3103A S. LA CIENEGA BLVD. LOS ANGELES, CA 90016, as sales agent on behalf of Prospector Films ("Licensor"), and the party named below ("Distributor"). Licensor and Distributor each hereby agree as set forth herein below.

1. **DISTRIBUTOR**: **1INMM CAPITAL LLC**
   Address: 3129-A S. La Cienega Blvd Los Angeles, CA
   Ph. No.: 773.724.0290
   Attn.: Zachary Horwitz
   Email: zach@1inmm.com

2. **PICTURE**:      **"Blood Quantum** (the "Picture").
   Starring: Devery Jacobs and Michael Greyeyes
   Director: Jeff Barnaby
   Writer: Jeff Barnaby

3. **TERRITORY**:

(A)     The **"Latin American Territory"** shall be defined as Anguilla, Antigua, Argentina, Aruba, Bahamas (non-exclusive only), Barbados, Barbuda, Belize, Bolivia, Bonaire, Brazil, Cayman Islands, Chile, Colombia, Costa Rica, Cuba, Curacao, Dominica, Dominican Republic, Ecuador, El Salvador, French Guiana (non-exclusive only), Grenada, Guadeloupe, Guatemala, Guyana, Haiti (non-exclusive only), Honduras, Jamaica, Martinique (non-exclusive only), Mexico, Montserrat, Nicaragua, Panama, Paraguay, Peru, St. Barthelme, St. Lucia, St. Martin, St. Vincent & Grenadines, Suriname (non-exclusive   only), Trinidad & Tobago, Turks & Caicos, Uruguay, Venezuela, Virgin Islands (British), and

(B)     The **"African Territory" shall** be defined as South Africa, Angola, Cape Verde, Ethiopia, Lesotho,   Namibia, Zimbabwe, Botswana, Mozambique, Swaziland, Malawi, Zambia, Kenya, Uganda, Tanzania and Nigeria

(the "Latin American Territory" and "African Territory" shall be collectively defined as the "Territory").

4.     **TERM**: For all Licensed Rights (as defined below) herein, the Term shall commence on full execution of this Agreement and expire Fifteen (15) years thereafter (the "Term").

5.     **AUTHORIZED LANGUAGE (S)**:

(A)     In the Latin American Territory: subtitled and/or dubbed in Spanish and Portuguese (the "Latin American Authorized Language(s)").

(B)     In the African Territory: subtitled and/or dubbed in local languages indigenous to the African Territory (the "African Authorized Language(s)").

(C)     The languages granted in Paragraphs 5(A) and (B) shall be collectively defined as  the "Authorized Language(s)".

(D)     Any and all DVD or Home Video packaging shall be in the Authorized Language(s) only and not in the English language.

6.     **FLAT LICENSE FEE**: Distributor shall pay Licensor a non-returnable License Fee in the amount of Seven Hundred Thirty-Five Thousand United States Dollars (US $735,000.00) net of all taxes and without deduction of any kind (the "License Fee"), payable as follows:

One Hundred Percent (100%) [US$735,000.00] due on full execution of this Agreement.

Distributor's Licensed Rights do not vest until Licensor has received 100% of the License Fee and full payment for the costs of the Delivery Materials. Distributor is not licensed and shall not exploit any of the Licensed Rights until such amounts are paid in full. Sales Agent will not be obligated to deliver to Distributor any Delivery Materials until 100% of the License Fee and full payment for the costs for the Delivery Materials (including shipping) have been remitted by Distributor and received by Sales Agent. Distributor acknowledges and agrees that time is of the essence and the payment schedule set forth herein will be strictly enforced.  Failure to pay by the due dates herein will result in Licensor or Sales Agent having the right to terminate this

Exhibit 2a Page 20

Agreement and pursue all legal and equitable remedies.

All installments of the License Fee, as well as all other monies due to Licensor under this Agreement, including Delivery Materials costs, will be paid by wire transfer to the following account:

[ACCOUNT INFORMATION TO BE PROVIDED WITH INVOICE]

7.    **MATERIALS / DELIVERY**:

(A)    Distributor shall order and pay for the Initial Materials (as defined below) within thirty (30) days following the date that Sales Agent provides Distributor with notice that Sales Agent is ready to effect Delivery (as defined below) of such Initial Materials ("Notice of Delivery"). Distributor acknowledges that (i) there is no guaranteed outside completion date, (ii) the Picture will be ready for delivery to Distributor only when final and complete, and (iii) the determination of finality and related timing for Delivery (taking into account both the completion of the Picture and additional factors affecting the timing of international release such as festival and award considerations) shall be at Licensor's sole discretion.

(B)    Delivery as used herein means delivery (at Distributor's cost of materials and shipping to be fully paid prior to shipment) of the Initial Materials and Additional Materials set forth below and in the Delivery Schedule attached hereto and incorporated herein as Exhibit "A" ("Delivery Materials"). Distributor acknowledges and agrees that it has reviewed the Delivery Materials list below and that no other Delivery Materials are required in order for Distributor to exercise its rights under this Agreement.

Initial Materials:

- Theatrical: 35 mm Print (which may be used);
- Theatrical: Music Cue Sheet (which Sales Agent may provide electronically);
- Video/DVD: Beta or Digital Betacam PAL or NTSC Master (Sales Agent's election following consultation with Distributor) of the Picture; and
- Dialogue List (which Sales Agent may provide electronically)
  Additional Materials (to be delivered only if and when available):

- Key Art (which Sales Agent may provide electronically).

(C)    Distributor will have ten (10) days to review and evaluate the Delivery Materials, and each delivery item delivered hereunder will be deemed acceptable for all purposes hereunder unless Distributor gives Sales Agent written notice of rejection within ten (10) days after Distributor's receipt or access to such item ("Notice of Rejection"). Distributor may only reject Delivery Materials on grounds of technical quality and not for any other reason, including probability of commercial success or artistic grounds. The Notice of Rejection must include a laboratory report from a reputable recognized laboratory in the theatrical motion picture business stating full details of the technical defects in any rejected item(s).

(D)    Sales Agent has thirty (30) days after receipt of a Notice of Rejection to cure such rejection by correcting the asserted defect(s) or delivering replacement item(s), or submit the issue of whether Delivery was effected to arbitration as set forth below. If Sales Agent elects to cure such rejection, then the time periods set forth above for review and cure will be applicable to the delivery of corrected and replaced Delivery Materials as well.

(E)    Distributor hereby acknowledges and agrees that no individual(s) or specification(s), including without limitation the any cast member or the director, and no other specifications is (are) essential for purposes of effectuating Delivery and Distributor may not refuse to accept Delivery should any individual(s) be replaced or specification changed for any reason whatsoever.

(F)    All disputes with regard to Delivery will be resolved by IFTA Arbitration (as further set forth herein). The sole remedy of Distributor in any such IFTA Arbitration for a failure for any reason to deliver the Delivery Materials will be the return of the License Fee or portion thereof previously paid, and under no circumstances will Distributor be entitled to interest, lost profits, consequential damages or any equitable or injunctive relief. Additionally, Distributor shall not be entitled to any such return of the License Fee if the Picture has been released in any medium in the Territory.

2

Exhibit 2a Page 21

**FOIA Confidential Treatment Requested**                                                 **JJMT-SEC-0004851**

(G)      Title to all materials delivered to Distributor in connection with the Picture will remain with Licensor or Sales Agent (as applicable). Distributor will exercise due care in safeguarding all materials and will assume all risk for theft or damage while they are in transit or Distributor's possession. In respect of all materials created or manufactured by Distributor (including without limitation all Picture copies, packaging, artwork, marketing, dub and sub-titled language tracks, so-called "bonus materials," etc.), Licensor is the copyright owner from inception, provided that if such ownership is not allowed under a law in the Territory, Distributor hereby grants (and from creation of each such item shall by the terms hereof grant) to Sales Agent an irrevocable royalty-free license to use all such materials worldwide in perpetuity in all media now known or hereinafter devised.   In all cases, Distributor shall only use such materials during the Term to exploit the Licensed Rights.   The creation of dubbed and sub-titled language tracks and related versions of the Picture, the trailers thereof, and any other materials created or duplicated by Distributor hereunder are to be made at Distributor's sole cost.

(H)      Upon termination of this Agreement, Distributor will, at Sales Agent's election, either:  (i) return to Sales Agent at Distributor's expense all materials in connection with the Picture (including without limitation   all film and digital pre-print and exhibition materials, video inventory, marketing  materials, and  language tracks), whether such materials were delivered to Distributor or created by Distributor or any of its sub -distributors or licensees;   or (ii) destroy all such materials and provide Sales Agent with a customary certificate of destruction executed by an authorized officer of Distributor.

(I)      All costs of Delivery, return and destruction (including shipping charges, import fees, duties, brokerage fees, storage charges and related charges) will be Distributor's sole r e s p o n s i b i l i t y .

8.      **LICENSED RIGHTS / RESERVED RIGHTS / HOLDBACKS**:

(A)      Subject to the condition precedent of timely payment in full of the License Fee without deduction or offset of any kind, Licensor shall license to Distributor the following exclusive distribution rights to the Picture for t h e  Territory, for the duration of the Term, and in the Authorized Language(s) ("Licensed Rights). All rights not specifically licensed herein whether now known or hereafter devised (including without limitation so-called "clip rights" to license excerpts of the Picture for unrelated third party use) are reserved to Licensor ("Reserved Rights").  Distributor is expressly prohibited from exploiting any of the Reserved Rights.

| Licensed Right | Licensed to Distributor | Reserved to Licensor | Distributor's Holdback Period |
|---|---|---|---|
| Cinematic Rights: | | | |
| Theatrical | X | ___ | |
| Non-Theatrical | X | ___ | |
| (including Hotel/Motel Rights) | | | |
| Public Video | X | ___ | |
| Commercial Video | X | ___ | |
| | | | |
| Home Video Rights: | | | |
| Home Video Rental | X | ___ | |
| Home Video Sellthru | X | ___ | |
| | | | |
| Ancillary Rights: | | | |
| Airline | X | ___ | |
| Ship | X | ___ | |
| | | | |
| Pay TV Rights: | | | |
| Terrestrial | X | ___ | * |
| Cable | X | ___ | * |
| Satellite | X | ___ | * |
| | | | |
| Free TV Rights: | | | |
| Terrestrial | X | ___ | * |
| Cable | X | ___ | * |
| Satellite | X | ___ | * |

3

FOIA Confidential Treatment Requested                                                     JJMT-SEC-0004852

| | | |
|---|---|---|
| Free Video-on-Demand | _X_ | _____ |

Other TV Rights:

| | | |
|---|---|---|
| Video-On-Demand ("VOD") | _X_ | _____ |
| Subscription VOD ("SVOD") | _X_ | _____ |
| Near VOD ("NVOD") | _X_ | _____ |
| Pay-Per-View | _X_ | _____ |

Internet Rights: Post Home Video Window

| | | |
|---|---|---|
| VOD (e.g., iTunes) | _X_ | _____ |
| SVOD (e.g., Netflix) | _X_ | _____ |
| Transactional VOD ("TVOD") | _X_ | _____ |
| Electronic Rental | _X_ | _____ * |
| Electronic Sell Thru ("EST") | _X_ | _____ * |

(B)      Holdbacks:

Distributor shall hold back its exploitation of the Licensed Rights marked "*" above until the initial release of the Picture in the United States (the "First US Theatrical Release"), unless otherwise waived or shortened by Sales Agent by written notice.

(C)      All transmissions of the Picture hereunder in exercise of the Pay TV, Satellite Free TV, Other TV, and Internet Rights as set forth herein shall be encrypted or encoded in such manner that may be decrypted or decoded only by the use of authorized decryption or decoding equipment, the sale and use of which equipment is limited to the Territory. Any exercise of the Other TV Rights is expressly conditioned upon Distributor providing Sales Agent with acceptable written documentation verifying implementation of such encryption protections for all exercise of such rights.

(D)      Intentionally deleted.

(E)      Television Runs:

(i)      Pay TV: Unlimited runs.

(ii)      Free TV: Unlimited runs.

(F)      The parties acknowledge that when the Picture is transmitted by satellite and/or cable for reception in the Territory, such transmission may be capable of reception outside the Territory due to the inherent technical capability of satellites to beam down signals and/or cable systems to transmit signals, which are not confined to territorial boundaries ("Distributor Overspill"). Sales Agent agrees that the occurrence of Distributor Overspill shall not constitute a breach of this Agreement, provided that (i) the transmission is not primarily intended for reception outside the Territory and (ii) Distributor receives no direct revenue from such overspill. Additionally, the parties acknowledge that when the Picture is transmitted by satellite and/or cable for reception outside the Territory, such transmission may be capable of reception inside the Territory due to the inherent technical capability of satellites to beam down signals and/or cable systems to transmit signals, which are not confined to territorial boundaries ("Overspill"). Distributor agrees that the occurrence of Overspill shall not constitute a breach of this Agreement by Sales Agent or Licensor, provided, that (i) the transmission is not primarily intended for reception inside the Territory and (ii) Sales Agent and/or Licensors (or their licensees) receive no direct revenue from such overspill.

(G)      Distributor's right to exploit Internet Rights in the Picture are subject to the terms and conditions of the STCs (as hereafter defined), including without limitation a requirement to utilize current commercially reasonable technological safeguards to ensure that accessing, streaming or downloading of the Picture is limited solely to reasonably identifiable locations within the Territory (e.g., geofiltering). Notwithstanding the foregoing, to the extent Distributor is supplied approved promotional clips of the Picture formatted for use on the Internet, Distributor may use up to three (3) minutes in the aggregate of such clips on the Internet solely for purposes of promoting the Picture and provided such clips are posted solely within a domain bearing the identification code of one of the countries of the Territory.

(H)      Distributor shall use its best efforts and skill in the distribution and exploitation of the Picture, and

4

FOIA Confidential Treatment Requested                                    JJMT-SEC-0004853

Distributor shall exercise its rights hereunder in a fair, reasonable, customary and non-discriminatory manner with respect to Licensor or Sales Agent.

9.      **NO DISPOSITION OF GROSS RECEIPTS**: Licensor is licensing the Picture to Distributor on a so-called "flat" basis; therefore, subject to Sales Agent's receipt of the License Fee in accordance with the terms of this Agreement, no other payments whatsoever shall be due to Sales Agent and/or Licensor hereunder.

10.      **ACCOUNTINGS:** Intentionally deleted.

11.      **PAYMENT REQUIREMENTS**:

        (A)      The License Fee shall be paid in the amounts specified and required hereunder, which amounts as stated in this Agreement shall be deemed net sums in respect of which Distributor shall have separately paid at its own expense any required withholding and/or remittance taxes required by laws of the Territory such that no amounts shall be deducted from the payments to Licensor specified in this Agreement.

        (B)      There will be no deductions from any payments due to Licensor, including the License Fee, because of any bank charges, conversion costs, sales use or VAT taxes, "contingents", quotas or any other taxes, levies or charges, all of which shall, if required, be paid separately by Distributor.

        (C)      If it is legally impossible to transmit any monies due to Licensor, then Distributor will immediately so notify Sales Agent in writing. Distributor will then deposit such monies at Distributor's expense in Sales Agent's or Licensor's name, as Sales Agent shall designate, in such depository as may be designated by Sales Agent.

        (D)      All payments to Licensor will be in United States dollars computed at the prevailing exchange rate on the date due at Licensor's bank, provided that the exchange rate for any late payments shall be the most favorable prevailing daily rate for Licensor between the due date and the date of payment.

        (E)      Any payment due Licensor not made by its due date will, in addition to any other right or remedy of Licensor, incur a finance charge at the lesser of the prevailing US Prime rate plus three percent (3%) or the highest applicable legal contract rate until paid in full.

12.      **MARKETING / ADVERTISING**:

        (A)      Intentionally deleted.

        (B)      Intentionally deleted.

        (C)      Any marketing or advertising materials created by Distributor and any alterations by Distributor to any artwork or other marketing materials furnished by Sales Agent must satisfy all of Licensor's and Sales Agent's underlying contractual obligations and shall in all instances be subject to Sales Agent's prior written approval before Distributor shall make any use of such materials.

        (D)      Distributor shall comply with all contractual credit, likeness, dubbing, subtitling, editing, marketing, publicity, promotional or other similar restrictions or requirements provided to Distributor.

        (E)      Intentionally deleted.

        (F)      Intentionally deleted.

        (G)      Intentionally deleted.

        (H)      Intentionally deleted.

13.      **EDITING / BILLING**:

        (A)      Distributor may only cut and edit the Picture to the extent necessary to meet governmental censorship requirements. Any such cutting or editing shall only be permitted with Sales Agent's prior written approval and Distributor shall comply with all editing restrictions and requirements provided by Sales Agent. Except for such editing for censorship, the Picture

5

**FOIA Confidential Treatment Requested**

shall be exhibited and otherwise distributed only in its original continuity as supplied by Licensor without alteration, interpolation, cut or elimination.

(B)      Distributor may include, before or after the Picture and all credits thereof, the credit or logo of Distributor, which precise placement must be pre-approved in writing by Sales Agent.

(C)      Intentionally deleted.

(D)      Distributor shall not do any of the following:

(i)      Change the title of the Picture as it appears in the original language of the Picture (except that Distributor may translate the title in the Authorized Language(s);

(ii)      Alter or delete any credit, logo, copyright notice or trademark notice, or anti-piracy warning appearing on the Picture; and

(iii)      Include any advertisements or other material in the Picture, preceding the Picture, or following the Picture in any medium including Home Video other than an approved anti-piracy warning and commercials for Free TV exploitation (if Free TV rights are licensed herein).

(E)      Distributor's obligations hereunder shall be binding on its subsidiaries, parents, affiliates, agents, sub-distributors and licensees.

14.   15.   **MUSIC CONTAINED IN THE PICTURE**:

(A)      Licensor will be responsible for acquiring all rights necessary to synchronize the music contained in the Picture as delivered to Distributor and on all copies exploited by Distributor hereunder, and for paying all royalties or charges incurred in obtaining and maintaining such synchronization licenses in effect for the Term.

(B)      The Performance Rights with respect to the music contained in the Picture shall either be in the public domain in the Territory, be controlled by Licensor sufficient to allow Distributor to exploit all of Licensed Rights without the necessity of any additional payment, or be available by license from the local music performing rights society in the Territory affiliated with the American Society of Composers, Authors and Publishers (ASCAP), Broadcast Music, Inc. (BMI), or SESAC, Inc. (SESAC). Distributor will be solely responsible for any royalties, however denominated, which any mechanical, performing or authors right society in the Territory attempts to collect in connection with the exploitation of the Picture in the Territory.

16.   **ADDITIONAL TERMS**:

(A)      Distributor acknowledges that the financing for the Picture will be provided by financiers who may require a completion guarantee or other financial assurances. The Distributor agrees to execute within twenty-four (24) hours of receipt such further documentation as may be required by the Licensor to accommodate such interests, including, without limitation, an Acceptance and Acknowledgement of a Notice of Assignment in the form customarily required by such financiers and completion guarantor (if any), and any and all documents or other instruments and acts required by such financiers and/or completion guarantor in connection with the establishment of a collection account or otherwise. In the event Distributor fails to execute and deliver all such documentation within five (5) business days of receipt of written notice thereof, then Distributor agrees that Sales Agent may, as it may elect in its discretion, terminate this Agreement or execute such documentation in the name of Distributor, for which purpose Distributor hereby irrevocably appoints Sales Agent as Distributor's attorney-in-fact, a power coupled with an interest, with full right to execute any and all such documentation.

(B)      Licensor may, in its absolute discretion, require Distributor to establish a Letter of Credit or other such form of payment (by way of example only, a bank guarantee) acceptable to Licensor to secure all or any part of the License Fee. In the event that the Licensor requests any such Letter of Credit(s), Distributor shall open the Letter of Credit and deliver same to Sales Agent within ten (10) working days following the Sales Agent's request. The Letter of Credit and any confirmation which may be required by Licensor or Licensor's bank must be irrevocable and in a format and issued by a bank acceptable to Licensor and Licensor's bank. At Sales Agent's election, any failure on Distributor's part to deliver the Letter of Credit within such ten (10) day period may result in the termination of this Distribution Agreement by written notice to Distributor. All costs of the Letter of the Credit and of any required confirmation shall be paid by Distributor.

6

**FOIA Confidential Treatment Requested**                                    **JJMT-SEC-0004855**

(C)     Neither Licensor nor Sales Agent can guarantee against piracy in the Territory and any piracy of the Picture, whether occurring before or after execution of this Agreement, shall not constitute a breach by Licensor nor a basis for damages claims, payment reductions, or termination hereunder.

(D)     Any delay of action hereunder by Sales Agent shall not be construed as a waiver of any rights or remedies, and any express waiver by Sales Agent of any specific right or remedy hereunder shall not constitute a waiver of any other rights or remedies regarding the same issue (including without limitation any preceding, continuing, or succeeding breach) or any other matter arising under this Agreement.

(E)     Any terms not set forth in this Agreement (including any capitalized words used herein without express definition) will be determined solely by reference to the most current IFTA Standard Terms and Conditions ("STCs") as of the date of this Agreement, which STCs are incorporated in their entirety herein and thereby comprise an integral component of this Agreement. In the event of any inconsistency between the terms of this Agreement and the STCs, the terms of this Agreement prevail.

(F)     Sales Agent is acting solely in its capacity as duly authorized agent on behalf of Licensor in connection with this Agreement.

17.     **NOTICES**: All notices hereunder shall be in writing and shall be sent to the recipients at the address and/or fax number and/or email address set forth above (or such subsequently changed address of which the sending party has received notice hereunder). Notices to Licensor shall be sent to the attention of c/o XYZ FILMS, whose fax number is (310) 827- 7690.

18.     **REPRESENTATIONS AND WARRANTIES**: Distributor represents and warrants to Licensor that:

(A)     It has full authority and capacity to execute this Agreement and full legal and financial ability to perform all of its obligations under this Agreement;

(B)     There are no existing or threatened claims or litigation which would adversely affect or impair Distributor's ability to perform under this Agreement;

(C)     No dubbed or subtitled version of the Picture created by or to be created by Distributor does or will: (a) defame, or hold in a false light, or infringe any privacy or publicity or other personal right of any person; or (b) infringe any copyrights, trademark, patent, trade secret, rights of ideas, or similar property rights of any person;

(D)     It will employ at all times controls in accordance with prevailing customary standards in the Territory as used by major studios to prevent and deter theft, piracy, unauthorized copying, accessing, streaming or downloading (as applicable) of any copy of the Picture where the Picture is made available via any of the Licensed Rights granted herein;

(E)     It will indemnify and hold harmless Licensor and Sales Agent, and their parents, officers, directors, owners, shareholders, employees, attorneys agents, and successors and assigns from all claims, loss, liability, damages or expenses, including reasonable attorney's fees and legal costs, but not including lost profits due to breach of any of Distributor's representations, warranties covenants or conditions under this Agreement.

(F)     It will comply with all credit and talent obligations in connection with Picture as provided to Distributor by Sales Agent.

19.     **DEFAULT AND TERMINATION**:

(A)     Distributor will be in default of this Agreement in the event of any of the following circumstances:

7

**FOIA Confidential Treatment Requested**                                                      **JJMT-SEC-0004856**

(i)   Distributor fails to pay any installment of the License Fee or any other amounts due under this Agreement or any other agreement with Sales Agent when due;

(ii)   Distributor becomes insolvent or fails to pay its debt obligations when due;

(iii)   Distributor makes an assignment for the benefit of creditors, seeks relief under any bankruptcy law or similar law for the protection of debtors, or allows a petition of bankruptcy to be filed against it, or a receiver or trustee to be appointed for substantially all of its assets that is not removed within thirty (30) days;

(iv)   Distributor breaches any material term, covenant or condition of this Agreement or any other agreement with Sales Agent;

(v)   Any affiliate, parent, subsidiary, sub-distributor, or licensee of Distributor breaches any material term, covenant or condition of this Agreement or any other agreement with Sales Agent; term, covenant or condition of this Agreement or any other agreement with Sales Agent;

(vi)   Distributor attempts to make any assignment, transfer, sublicense or appointment of an agent without Sales Agent's prior written approval; or

(vii)   Distributor fails timely to sign a Notice of Assignment as provided below.

(B)   Sales Agent will give Distributor notice of any claimed default. If the default is capable of cure, then Distributor will have ten (10) days after receipt of Sales Agent's notice to cure a monetary default, and twenty (20) days after receipt of Sales Agent's notice to cure a non-monetary default. If the default is incapable of cure, or if Distributor fails to cure within the time provided, then Licensor may proceed against Distributor for available relief, including but not limited to terminating this Agreement or any other agreement with Sales Agent retroactive to the earliest date of default, suspending Delivery of the Picture, and declaring all unpaid amounts due Licensor immediately due and payable.

(C)   As a result of termination of this Agreement or any other agreement between Distributor and Sales Agent, with respect to those pictures as to which all rights are terminated:

(i)   All licensed rights in and to such picture shall automatically revert to Licensor, free and clear of any and all encumbrances and any sub-distribution agreements entered into by Distributor (other than those sub-distribution agreements deemed assigned to Licensor as specified below);

(ii)   All of Distributor's rights under any sub-distribution and license agreements that have been pre-approved in writing by Sales Agent shall be deemed to have been assigned to Licensor (and any such sub-distribution agreements not so approved, shall be deemed automatically terminated) and all payments to be made under such agreements shall be paid directly to Licensor who may notify all relevant parties of such assignment to Licensor;

(iii)   All monies payable by exhibitors or sub-distributors to Distributor in respect to such picture shall be paid to and retained by Licensor;

(iv)   Any portion of the License Fee for this Picture and License Fee(s) for such other picture(s) theretofore paid by Distributor shall be retained by Licensor or Sales Agent and any unpaid portion of the License Fee for this Picture or for such other picture(s), if any, shall accelerate and immediately become due and payable to Licensor or Sales Agent;

(v)   Licensor shall be entitled to immediate possession of all digital and film pre-print and print elements and copies of the Picture and such other picture(s), advertising materials and all other materials (including any Delivery Materials) pertaining to same;

(vi)   Distributor shall execute and deliver all instruments requested by Sales Agent to effectuate a termination of this Agreement and its rights in the Picture or for such other picture(s) as applicable, including without limitation instruments necessary or appropriate to reflect such termination on the public records of governmental agencies and/or with industry organizations in the Territory which maintain records of a similar nature;

(vii)   Distributor shall turn over all records, including books, billing and delivery records to the Picture or such other

8

FOIA Confidential Treatment Requested

picture(s), and all monies on hand, if any, relating to the Picture or such other picture(s); and

(viii)    Distributor hereby irrevocably appoints Sales Agent as Distributor's attorney-in-fact, a power coupled with an interest, with full right to execute any and all assignments and other instruments deemed by Sales Agent to be reasonably necessary or desirable to evidence the transactions provided hereunder and to protect its rights under this Agreement or such other agreement(s) as applicable.

## 20.    <u>TERMINATION OTHER THAN FOR DEFAULT</u>:

(A)    Upon written notice to Distributor, Sales Agent may in its sole discretion terminate this Agreement if principal photography of the Picture has not commenced within twelve (12) months following the date of this Agreement, the Picture is not ready for Delivery to Distributor within twenty-four (24) months following the date of this Agreement, or Licensor or Sales Agent abandons the Picture either prior to or after the commencement of principal photography.

(B)    In the event of such termination, Licensor shall return to Distributor such portion of the License Fee theretofore paid to Licensor by Distributor, and Distributor shall return to Sales Agent any and all materials, including, without limitation, all physical film materials, Delivery Materials, publicity materials and documents theretofore furnished by Sales Agent to Distributor in connection with the Picture. Neither Licensor nor Sales Agent shall have any additional obligation of any kind whatsoever to Distributor, or anyone claiming through Distributor, by reason of such termination.

(C)    Distributor shall execute and deliver all instruments requested by Sales Agent to effectuate a termination of this Agreement and its rights in the Picture, including without limitation instruments necessary or appropriate to reflect such termination on the public records of governmental agencies and/or with industry organizations in the Territory which maintain records of a similar nature. Distributor shall turn over all records, including books, billing and delivery records to the Picture and all monies on hand, if any, relating to the Picture. Distributor hereby irrevocably appoints Sales Agent as Distributor's attorney-in-fact, a power coupled with an interest, with full right to execute any and all assignments and other instruments deemed by Sales Agent to be reasonably necessary or desirable to evidence the transactions provided hereunder and to protect its rights under this Agreement.

## 21.    <u>CHOICE OF LAW / ARBITRATION / FORUM</u>:

(A)    This Agreement shall be subject to the laws of the State of California applicable to agreements wholly executed and performed therein, and all parties hereby irrevocably consent to the exclusive jurisdiction and venue of the Federal and State courts located in Los Angeles County for any court matters arising hereunder.

(B)    Any and all disputes under this Agreement shall be submitted exclusively to binding arbitration ("IFTA Arbitration") in Los Angeles, California under the Rules of International Arbitration of the International Film and Television Alliance ("IFTA Arbitration Rules") in effect as of the date the request for arbitration is filed. Each party waives any right to adjudicate any such dispute in any other court or forum and Distributor waives any and all rights to seek equitable or injunctive relief or to rescind or terminate this Agreement or to seek such rescission or termination. Los Angeles County will be deemed the "Forum" under the IFTA Arbitration Rules. Licensor (and where applicable Sales Agent) and Distributor agree to accept service of process for IFTA Arbitration in accordance with such Rules and to accept service of process for any judicial or other proceedings provided for hereunder by certified mail, return receipt requested, courier, or other personal delivery at the address indicated on this Agreement. Licensor (and where applicable Sales Agent) and Distributor agree to abide by any decision rendered in an IFTA Arbitration, and that any court having jurisdiction may enter judgment affirming such decision and may enforce such judgment in accordance with its powers.

(C)    Without limiting the aforesaid arbitration provisions and notwithstanding the exclusive jurisdiction provisions above, Licensor and Sales Agent shall additionally each have the right to proceed in any court of competent jurisdiction anywhere in the world to either (i) seek such interim protective relief, including equitable remedies as may be considered reasonably necessary to protect their rights and entitlements pursuant to this Agreement, or (ii) seek enforcement of any arbitration award or related judgment hereunder.

(D)    The prevailing party or parties in any arbitration hereunder shall be entitled to an award in such arbitral proceeding for reimbursement of its or their (as applicable) legal fees (including attorneys fees) and costs of arbitration (including discovery and expert witness costs). The prevailing party or parties in any judicial action hereunder shall similarly be entitled to court order or judgment reimbursing it or them (as applicable) for all legal fees (including attorneys fees) and costs incurred in connection with such matter and in connection with any applicable arbitration as aforesaid.

9

**FOIA Confidential Treatment Requested**

22.     **CONFIDENTIALITY**: All terms of this Agreement shall be confidential and not disclosed to any third party except each party's accountants, attorneys and agents, and as necessary to perform each parties' rights and obligations hereunder, and except as required by law or judicial order.

23.     **COUNTERPARTS**:     This Agreement may be executed in counterparts which may be delivered by ink-signed originals, fax or digital copy in pdf or tiff format, each of which shall be deemed to be an original and such counterparts of all parties when taken together shall constitute the fully binding and executed Agreement.

24.     **BINDING AGREEMENT**: This Agreement, any exhibits attached hereto, and the STC's incorporated herein sets forth the entire understanding and agreement between Licensor and Distributor as to the subject matter hereof and supersedes all previous discussions, correspondence, inducements, agreements, warranties or representations, whether oral or written. This Agreement is binding on each of the parties and their respective successors and assigns. Except as expressly provided herein, this Agreement may only be amended in writing signed by Sales Agent on behalf of Licensor and Distributor.

THIS AGREEMENT is executed as of the parties as of the date first above written.

[signatures on the following page]

10

Exhibit 2a Page 29

**FOIA Confidential Treatment Requested**                                                                 **JJMT-SEC-0004859**

**AGREED AND ACCEPTED:**

XYZ FILMS ("Sales Agent") as agent
On behalf of Prospector Films ("Licensor")

By: _____

Its: EVP International Sales _____

1inMM Capital LLC ("Distributor")

By: _____

Its: MANAGING PARTNER

11

Exhibit 2a Page 30

**FOIA Confidential Treatment Requested**

**JJMT-SEC-0004860**

Exhibit "A"

This Exhibit A is attached and incorporated into that certain International License Agreement dated as of July 16, 2019, by and between XYZ FILMS ("Sales Agent") as sales agent on behalf of Prospector Films ("Licensor") and 1inMM Capital LLC ("Distributor") whereby Licensor granted to Distributor certain distribution rights in and to the motion picture entitled "Blood Quantum" (the "Picture").

## LEGAL DELIVERABLES

1.    Clearly legible copies of all chain-of-title documents required by Distributor, evidencing Licensor's proper ownership and permitting the use of any and all literary, dramatic, musical and other material used in the production of the Program or upon which the Program and/or screenplay may be based, together with certificates of authorship and proof of payment in connection with the acquisition of the necessary rights in and to such material and the exercise of all options related thereto.

2.    Evidence satisfactory to Distributor that there is no lien, charge, encumbrance or security interest that would adversely interfere with the Licensed Rights granted to Distributor.

3.    A (a) copyright report issued by a Thomson CompuMark, (b) title report and (c) opinion issued.

4.    A complete typewritten statement of all third party screen and paid advertising credit, name and likeness, and other third party obligations, restrictions and approval rights including, without limitation, all dubbing obligations (if any), director's editing rights, video mastering consultation or approval rights, etc. for each individual and entity named in the billing block with excerpts from each applicable third party agreement setting forth the precise extent and nature of such obligations, restrictions and/or approval rights, in the identical order as listed in the billing block.

5.    The proposed paid ad/packaging summary, credit and billing block layout for both full- and small-sized paid ads.

6.    The final copyright notice, as it appears on the billing block.

7.    Clearly legible copies of fully-executed agreements for all key actors and key production personnel (e.g., director, producer, writer, etc.) and any other talent and/or crew agreements requested by Distributor.

8.    If the Program or underlying materials or properties are based upon or related to events in the real life of real persons, living or dead, or portrays real persons, true and correct copies of all personal releases and other documentation showing that Licensor has all rights necessary to permit Distributor to exploit the Picture in the manner provided herein without violating any third party rights or incurring any obligations to any third party.

9.    A complete written statement showing the exact form and manner of the main and end titles of the Picture.

10.    One (1) typewritten (or computer generated) hard copy and one (1) copy in digital format of a music cue sheet in standard form showing the particulars of all music synchronized with the Program (all versions) and additional cue sheets for the trailer(s) and any other materials in connection with the Program containing original and/or licensed music. All such cue sheets will include for each cue: (i) the title of song; (ii) the name of the songwriter/composer; (iii) the songwriter's/composer's performing rights affiliation (e.g., ASCAP, BMI or SESAC); (iv) the name of publisher; (v) the publisher's performing rights affiliation; (vi) the type of use; (vii) the length of the use; and (viii) an indication of whether or not a master recording was licensed.

11.    Clearly legible, fully-executed copies and proof of payment for any and all synchronization licenses and master use licenses, all valid and sufficient to provide Distributor with the right to use and perform all musical compositions and master recordings contained in the Picture and trailer (if available).

12.    Clearly legible copies of the copyright registration certificate(s) with the US Copyright Office for both the screenplay and Picture.

12

FOIA Confidential Treatment Requested                                    JJMT-SEC-0004861

# Exhibit 2b

PROMISSORY NOTE

$ (998,865.00)                                                                    (07/12/2019)

Promise. 1INMM Capital, LLC, a limited liability entity established in the State of California, (the "Maker"), hereby promises to pay to Lender, JJMT CAPITAL LLC, a Delaware Limited Liability company located at  (541 N Fairbanks Ct. STE 2200 Chicago, IL 60611), (the "Payee"), an amount equal to (NINE HUNDRED NINETY-EIGHT THOUSAND EIGHT HUNDRED SIXTY FIVE) Dollars ($998,865.00) in lawful money  of the United States of America, which sum shall be due and payable on (01/12/2020)  (the "Maturity Date"), in one (1) balloon payment, in  like money at said office. Payment date shall be no later than SIX (6) months post confirmed funds transfer from Payee to Maker in the amount of (SEVEN HUNDRED THIRTY-FIVE THOUSAND) Dollars ($735,000.00).

Prepayment Option. Maker may pay down at any time any portion of the  principal sum outstanding without any prepayment penalty.

Assignment of Rights. See Appendix A

Compounding of Unpaid Payments. The undersigned agrees that time is of the  essence and that in the event payment of principal or interest due under this Note is not  made when due, giving effect to any grace period which maybe applicable, the  outstanding balance of unpaid payments hereof shall immediately bear interest at  the rate of ten (10) percent per month, for so long as  such event of default continues.

Validity of Agreement to Conform to Law. All agreements between the undersigned and the holder of this Note are expressly limited so that in no contingency or event whatsoever, whether by reason of advancement of the proceeds hereof, acceleration of maturity of the unpaid principal balance, or otherwise, shall the amount paid or agreed to be paid to the holder hereof for the use, forbearance or detention of money advanced hereunder exceed the highest lawful rate permissible under any law which a court of competent jurisdiction may deem applicable hereto. If, from any circumstances whatsoever, fulfillment of any provision hereof or any instrument securing this Note or any other agreement referred to herein, at the time performance of such provision shall be due, shall involve transcending the limit of validity prescribed by law which a court of competent jurisdiction may deem applicable hereto, then, ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity, and if from any circumstances the holder hereof shall ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the

FOIA Confidential Treatment Requested                                    JJMT-SEC-0004862

reduction of the unpaid principal balance due hereunder and not to the payment of
interest. This provision shall control every other provision of all agreements between the
undersigned and the holder hereof.

Maker's Default. At the option of the holder hereof exercised by written notice to the
undersigned, this Note shall become immediately due and payable upon the maker's
failure to pay when due any payment of principal, interest or expenses due hereunder; or
(b) failure in the performance or observance of any of the terms or conditions of any
mortgage, deed of trust, security agreement or other agreement securing, guaranteeing or
otherwise pertaining to this Note after giving effect to any applicable curative period
which may be contained therein. Upon the occurrence of any of the following specified
Events of Default, as defined under the standard conventions and terminology prescribed
for promissory notes drafted under Warren's California Forms for Principal, Interest,
Insolvency, Breach of Covenants, Breach of Representation and Warranties, (each herein
called an "Event of Default") then, and in any such event, and at any time thereafter, if
any Event of Default shall then be continuing, the Payee may, by written notice to the
Maker, declare the principal of and accrued interest in respect of this Note to be forthwith
due and payable, whereupon the principal of and such unpaid accrued interest in respect
of this Note shall become forthwith due and payable without presentment, demand,
protest or other notice of any kind, all of which are hereby expressly waived by the
Maker. Furthermore, This note shall become due and payable before the above-
mentioned maturity date immediately upon the happening of any of the following events
affecting any maker or indorser thereof, to wit: voluntary or involuntary filing of a
petition in bankruptcy or for reorganization, execution of an assignment for the benefit of
creditors, calling meeting of creditors, appointment of liquidating agent or committee,
offer of composition, entry of a judgment in excess of $ 10,000 which remains unsatisfied
or for over 30 days, application for appointment or appointment of any receiver, issuance
of warrant of attachment or death of any maker or indorser or on default of any other
obligations to the Maker.

Collection Costs. If this Note or any installment of principal or interest is not paid when
due, whether at maturity or by acceleration, the undersigned promises to pay all costs of
collection, including without limitation, actual attorneys' fees, and all expenses in
connection with the protection or realization of the assets and proceeds available this
Note or the enforcement of any subsequent memorandum or agreement created in
conjunction with this Note incurred by the holder hereof on account of such collection,
whether or not suit is filed hereon or thereon; such costs and expenses shall include,
without limitation, all costs, expenses and attorneys' fees actually incurred by the holder
hereof in connection with any insolvency, bankruptcy, arrangement or other similar
proceedings involving the undersigned, or involving any endorser or guarantor hereof,
which in anyway affects the exercise by the holder hereof of its rights and remedies under
this Note or under any mortgage, deed of trust, security agreement, guaranty or other
agreement securing or pertaining to this Note.

Waiver of Notice. Presentment, demand, protest, notices of protest, dishonor and
nonpayment of this Note and all notices of every kind are hereby waived by all parties to

FOIA Confidential Treatment Requested                                JJMT-SEC-0004863

this Note, whether the undersigned, principal, surety, guarantor or endorser, except as provided herein. To the extent permitted by applicable law, the defense of the statute of limitations is hereby waived by the undersigned.

Death of Maker. Maker of this note hereby waives all notice and demand and consent that this note shall become due and payable immediately upon the happening of any of said events. This note shall become due and payable on the Maturity Date, but payment shall be accelerated and become due and payable immediately if the Maker shall die. For the further security of the holder thereof, the undersigned covenants that so long as any part of the principal or interest of this note is outstanding and unpaid, it will not grant any security interest to any third party upon its property, or create any lien whatsoever thereon, without also thereby including therein this note, equally and ratably with every other evidence of debt, secured by any of the undersigned's property. If, while any part of the principal or interest is outstanding and unpaid, the maker hereof breaks this covenant, then the holder hereof may at his or its election, declare and make this note at once due and payable by written notice delivered to maker, and this remedy will be deemed cumulative and in addition to any other remedy available to the holder hereof. This note shall be paid without claim of set-off, counterclaim or deduction of any nature or for any cause whatsoever.

Extensions Granted by Payee. All indorsers hereunder agree that the holder of this note in case of non-payment thereof at maturity, or of any installment thereof when due, may grant to the maker or any indorser of said note any extension or extensions of time of payment thereof, in whole or in part, without notice to said indorsers or any of them and any such extension or extensions shall not affect in any way said indorsers' liability upon note, such indorsers hereby waiving demand, presentment of payment, notice of nonpayment and protest and do further agree that any holder of this note may in the event of default in the payment of principal of, or interest upon, this note or any installment thereof repossess and/or sell the (collateral) held as collateral security for the payment of this note without in any way relieving said indorsers, or any of them, of any liability by reason of such repossession and/or sale, applying the proceeds of sale of any such asset less all costs to amount due under this note, and all indorsers agree to pay any deficiency on this note on demand.

Litigation Fees. In any action at law or in equity to enforce or construe any provisions or rights under this Note, the unsuccessful party or parties to such litigation, as determined by a court pursuant to a final offer, judgment or decree, shall pay to the successful party or parties all costs, expenses and reasonable attorneys' fees incurred by such successful party or parties (including, without limitation, such costs, expenses and fees on any appeal), which costs, expenses and attorneys' fees shall be included as part of any order, judgment or decree.

General Provisions. Principal and interest evidenced hereby are payable only in lawful money of the United States. The receipt of a check shall not, in itself, constitute payment hereunder unless and until paid in good funds. Whenever any payment on this Note shall be stated to be due on a day, which is not a business day, such payment shall be made on

Exhibit 2b Page 35

the next succeeding business day and such extension of time shall be included in the computation of the payment of interest of this Note. This Note is to be governed by and construed in accordance with the laws of the State of California except to the extent United States federal law permits the holder to contract for, charge or receive a greater amount of interest. In any action brought under or arising out of this Note, the undersigned hereby consents to the in personam jurisdiction of any state or federal court sitting in the state of California, and waives any claim or defense that such forum is not convenient or proper, and consents to service of process by any means authorized by California and/or Federal law.

THE UNDERSIGNED HEREBY WAIVES, AND COVENANTS THAT THE UNDERSIGNED WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS NOTE, THE SUBJECT MATTER HEREOF OR ANY DOCUMENT RELATING HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING OR WHETHER IN CONTRACT OR IN TORT OR OTHERWISE.

_____                    _____07/12/19_____

1INMM Capital, LLC                         Date
Zachary Horwitz, Manager

FOIA Confidential Treatment Requested                    JJMT-SEC-0004865

APPENDIX A

<u>ASSIGNMENT</u>

This assignment ("Assignment") between 1INMM CAPITAL LLC, located at <u>(3129-A S. La Cienega Blvd Los Angeles, CA 90016)</u> ("Assignor") and JJMT CAPITAL LLC, a Delaware Limited Liability company located at ( <u>541 N Fairbank Ct. STE 2200 Chicago, IL 60611</u>) ("Assignee") is dated effective as of (07/12/2019).

For good and valuable consideration, the receipt and sufficiency of which hereby acknowledged, Assignor does hereby irrevocably and unconditionally sell, grant, convey, and assign unto Assignee all of Assignor's rights, title and interest of every kind and nature, throughout the universe, until assignee is paid (<u>$998,865.00</u>) at to which time all rights, title and interest of every kind and nature revert back to Assignor and to that certain motion picture, currently entitled "BLOOD QUANTUM" (the "Picture") based on the original screenplay entitled "BLOOD QUANTUM" written by Jeff Barnaby.

1.  Assignor hereby represents and warrants:

    1.1.   That Assignor is the sole and exclusive owner of the rights and privileges granted or to be granted to Assignee hereunder.
    1.2.   That, as of the effective date hereof, Assignor has the right to enter into this Assignment.
    1.3.   That, as of the effective date hereof, no part of the rights herein conveyed has in any way been encumbered, conveyed, assigned, transferred or otherwise disposed of and all such rights are therefore free and clear of any and all liens, claims, charges or encumbrances whatsoever in favor of any party whatsoever.

2.  Assignor shall indemnify Assignee, its successors, assigns, licensees and officers, and hold them harmless from and against any and all claims, liability, losses, damages, costs, expenses (including but not limited to attorney's fees) arising out of any breach by Assignor of any warranty made by Assignor hereunder.

3.  Assignee hereby assumes and agrees to be bound by all future obligations of Assignor which accrue after the date hereof.

4.  Assignor hereby waives the benefits of any provision of law known as "droit morale" or any similar law in any country of the world and agrees not to institute or permit any action or lawsuit on the ground that the Picture in any way constitutes an infringement of any "droit morale" and Assignor agrees that Assignor shall not, under any circumstances (including without limitation, the circumstances of a breach by Assignee) be entitled to enjoin the exhibition or other exploitation of the Picture, to terminate or rescind any rights granted to Assignee or to obtain any other form of equitable relief, specific performance or otherwise, any right to which Assignor expressly waives.

5.  This Assignment, and the rights granted hereunder, may not be assigned by Assignor to any person, firm or corporation. Assignee may assign this Assignment and the rights and services granted herein, together with the results and proceeds thereof, and the representations and warranties contained herein, to any person or entity.

Exhibit 2b Page 37

FOIA Confidential Treatment Requested

6.  This Assignment shall be construed in accordance with the laws of the state of California and
    shall be binding upon and shall inure to the benefit of the parties hereto and their respective
    successors, licensees and assigns. This Assignment cannot be amended or modified except in a
    writing signed by all parties hereto.

IN WITNESS WHEREOF, THE PARTIES HERETO HAVE EXECUTED AND DELIVERED
THIS ASSIGNMENT AS OF THE (12)th DAY OF JULY 2019.


1INMM CAPITAL, LLC ("Assignor")                    JJMT CAPITAL LLC ("Assignee")


By: _____              By: _____

Its: <u>MANAGING PARTNER</u>                              Its: _____Managing Partner_____

FOIA Confidential Treatment Requested                                   JJMT-SEC-0004867

# Exhibit 2c

## DISTRIBUTION AGREEMENT

This Distribution Agreement ("Agreement"), dated (07/02/19), confirms the terms and conditions pursuant to which HBO Latin America Holdings ("HBO"), shall acquire from 1inMM Capital LLC, with an address at 3129-A S. La Cienega Blvd, Los Angeles, California, 90016 ("1inMM"), certain distribution rights in the "Program" in the "Territory" (as such terms are defined below) subject to the terms contained herein, all as set forth below.

1.     Definitions. All capitalized terms set forth herein, unless elsewhere defined, shall have the following meanings:

a.     "Authorized Languages" means all languages, including all dubbed, voice-lectored and subtitled versions.

b.     "Availability Date" shall have the meaning set forth in Section 4.

c.     "Final Delivery" shall mean 1inMM's full, final and complete delivery of the Delivery Items for the Program (including any and all attempts to cure), of quality acceptable to HBO, as confirmed in writing by HBO.

d.     "Distribution Expenses" means all costs and expenses incurred in connection with the release, delivery, marketing, distribution and exploitation of the Program and the Rights (as defined in Section 5), including, without limitation, all expenses for advertising, marketing, promotion, merchandizing, and publicity of the Program; all expenses for the full and complete delivery of Delivery Items (as hereinafter defined) and translation thereof; shipping, mailing and insurance costs; storage; cleaning and inspection; mastering, submastering, and duplication costs, duplication of scripts and music cue sheets; residuals; renewal of music synchronization licenses and master use licenses (to the extent same are the responsibility of Licensee); all taxes (other than corporate income taxes), whether sales, gross receipts, value added, withholding, remittance, excise, property, use, transfer or similar taxes, levies, customs duties, import charges, penalties, fines or interest, however denominated, imposed and whether by a governmental authority or taxing authority (whether federal, local, territorial or state of the United States or any country in the Territory); foreign language dubbing and/or subtitling; any Third Party Payments (as defined at Section 10.a.) to the extent paid for by HBO, and all other usual distribution costs customarily incurred.

e.     "Gross Receipts" means the aggregate of all monies actually received by HBO from the exploitation of the Rights in the Territory, monies and royalties collected by a collecting society or governmental agency with respect to the exploitation of the Program on television from compulsory licenses, retransmission income, secondary broadcasts, tax rebates, less rebates, discounts, reasonable reserves for returns and bad debt (each of which will be liquidated within one (1) year from its establishment), credit adjustments, advertising agency commissions, security deposits, advances or other similar sums received until earned or forfeited or credited and any amounts received and thereafter refunded (except to the extent such sums are non-refundable) related to the Program. All Gross Receipts are the sole and exclusive property of HBO, subject only to 1inMM's contractual entitlements pursuant to Section 11 hereof.

f.     "Latin America" means Anguilla, Antigua, Argentina, Aruba, Bahamas, Barbados, Barbuda, Belize, Bermuda, Bolivia, Bonaire, Brazil, Cayman Islands, Chile, Colombia, Costa Rica, Cuba, Curacao, Dominica, Dominican Republic, Ecuador, El Salvador, French Guiana, Grenada, Guadeloupe, Guatemala, Guyana, Haiti, Honduras, Jamaica, Martinique, Mexico, Montserrat, Nicaragua, Panama, Paraguay, Peru, Saba, St. Barthelemy, St.

HBO-1inMM                                                                                                    1

FOIA Confidential Treatment Requested                                      JJMT-SEC-0004868

Eustatius, St. Kitts & Nevis, St. Lucia, St. Maarten, St. Martin, St. Vincent & Grenadines, Suriname, Trinidad & Tobago, Turks & Caicos, Uruguay, Venezuela, and British Virgin Islands.

g.      "License Period" shall have the meaning set forth in Section 3.

h.      "Program" means the live action feature length motion picture entitled "BLOOD QUANTUM" that was: (i) originally produced in English; (ii) directed by Jeff Barnaby starring Devery Jacobs, Michael Greyeyes and Forrest Goodluck and (iii) will be theatrically released in Mexico and/or Brazil on a minimum of 120 screens.

i.      "Television Rights" means the right to exhibit, distribute market, display, transmit, broadcast, perform, transmit, reproduce, advertise, publicize, sell copies of, license, derive revenues from, rent, dispose of, communicate publicly or privately, turn to account and otherwise exploit the Program by any form of television media now known or hereafter devised or commercially exploited (including, but not limited to subscription pay television, basic television, free television, pay-per-view, on demand, video-on-demand, free-on-demand, free-video-on-demand, subscription-video-on-demand, advertising-supported on demand, near-video-on-demand, hotel/motel, non-theatrical, electronic rental, download to rent, digital rental, electronic sell-through, digital sell-through, download to own, download to burn and on demand retention licensing), regardless of whether or how paid for, programmed, or marketed to the viewer, and regardless of how delivered to or received by the viewer (whether by over-the-air, cable, satellite, wire, fiber, ADSL, DSL, MDS, Internet, mobile, wireless, closed circuit, or other means, method, process, or device or delivery system now known or hereafter devised, discovered, created, or developed) in all versions, resolutions, formats, and sizes, and shall, for the avoidance of doubt, include without limitation reception on television sets, personal computers, IP-enabled devices, mobile devices, and analogous devices.

j.      "Territory" shall mean Africa and Latin America.

2.      Conditions Precedent. All of HBO's obligations hereunder will be subject to and conditioned upon the satisfaction of all of the following:

a.      Full execution and delivery to HBO of this Agreement; and

b.      Final Delivery (including HBO's receipt and written approval of: (i) a complete typewritten statement of all third party screen and paid advertising credit, name and likeness, and other third party obligations, restrictions and approval rights (including all third party obligations, restrictions and approvals necessary for HBO's creation of Local Language Versions) as further set forth in Paragraph 5 of the Legal Delivery section of Exhibit B (collectively, the "Paid Ad Restrictions"); (ii) all chain of title documents for the Program and documents necessary to establish 1inMM's valid copyright in the Program, and (iii) all Delivery Items) occurring no later than 01/25/2020 (the "Final Delivery Date").

3.      License Period. The "License Period" means the period commencing on the Program's Availability Date and expiring three (3) years thereafter; provided, however, that the License Period shall include an additional exclusive play-off period of six (6) months for all licenses in existence as of the last day of the License Period during which HBO may continue to exercise the Rights.

HBO-1inMM

2

FOIA Confidential Treatment Requested

4.　　Availability Date. The "Availability Date" means day and date with the Program's earliest video-on-demand availability date in the Mexico and/or Brazil, but in no event later than 02/25/2020.

5.　　Rights.

a.　　For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, 1inMM hereby grants to HBO, with respect to the Program, the exclusive rights throughout the Territory and during the Program's License Period to exploit, and to sublicense others the right to exploit the Television Rights in the Program (and all of its themes, materials and other elements), in all formats now known or hereafter devised (including, without limitation, high definition, standard definition and 3D), including the right to (and cause and license others to) market, advertise, publicize, derive revenues from and otherwise exploit the Program. Without limiting the generality of the foregoing, 1inMM hereby grants to HBO the sole, exclusive and irrevocable right to: (i) license the rights granted for the Program for exhibition on such terms as it deems appropriate, and HBO shall have complete discretion relating to the promotion and distribution of the Program; (ii) edit and to permit the editing of all prints of the Program to conform to time segment requirements or to the orders of any duly authorized public censorship authority and to insert commercial material at appropriate time intervals during the exhibition of the Program and to dub and subtitle and to permit the dubbing and subtitling of the Program in the Authorized Languages as it sees fit; (iii) translate the title of the Program into any language and, to the extent cultural differences necessitate that the title be changed, to change such title; (iv) manufacture and distribute, or cause to be manufactured and distributed, two-dimensional advertising, publicity and promotional materials of all types and kinds for use solely in connection with the exhibition and distribution of the Program based on the images and materials provided by 1inMM; and (v) include HBO's (or one or more of HBO's affiliates, HBO's or sub distributors) name, logo, trademark or emblem in such manner, position, form and substance as HBO may elect on the prints of the Program, and on all advertising and publicity material for the Program together with such words as HBO may elect indicating that the Program is being distributed by HBO or one of its sub distributors, licensees or any of its affiliates.

b.　　Without limiting the foregoing, 1inMM further grants to HBO the right to use and license the use of trailers, excerpts, clips supplied by 1inMM or made by HBO and stills supplied by 1inMM from the Program in connection with the promotion and exploitation of the Program, to collect all copyright royalties, retransmission, private copy or similar monies relating to the Program, and to use the approved names, voices and likenesses, which 1inMM shall provide to HBO in a timely manner, of all persons who appear in, or above-the-line persons who rendered services in connection with, the production of the Program for the purpose of advertising and promoting the Program.

c.　　1inMM acknowledges that any inadvertent, unavoidable, incidental and de minimus overspill of an unencrypted satellite signal outside of the Territory shall not constitute a breach of this Agreement.

d.　　1inMM shall include the following credit information in any version of the Program authorized by 1inMM for exhibition hereunder as well as in all advertising and promotional materials authorized for exhibition or dissemination in association therewith: "[1inMM TO PROVIDE COPYRIGHT NOTICE]."

e.　　The rights granted to HBO in this Section 5 shall be referred to herein as the "Rights".

HBO-1inMM

3

FOIA Confidential Treatment Requested　　　　　　　　　　　　　　　　　　　　　　　JJMT-SEC-0004870

6.      Reserved Rights. All rights and licenses in the Program not granted to HBO hereunder (i.e., theatrical, derivative, novelization, souvenir, music publishing and music soundtrack rights, merchandising, publication, commercial tie-in and/or co-promotion (unless approved in writing by 1inMM but in no event on an exclusive basis), product placement, games, videogames, ring tones, alerts, wallpapers, screensavers, messaging applications, digital greeting cards, theme park and location based entertainment, remake, sequel, tv series, live stage/stage play, clip license rights (which excludes, for the avoidance of doubt, the right to use clips for promotional purposes as set forth in Section 5.b.), and all rights to the underlying material to the Program) are reserved by 1inMM and may be exploited by 1inMM without limitation or restriction by HBO except as may be set forth herein.

7.      Delivery. No later than thirty (**30) days after the execution of this Agreement,** 1inMM shall, at its sole cost and expense, deliver to HBO all elements, materials, documents and advertising and promotional materials set forth Exhibit B (which is attached hereto and incorporated herein by this reference), with respect to the Program (the "Delivery Items"). All Delivery Items shall be of first class technical quality suitable for the manufacture of first class broadcast quality exhibition materials of the Programs, as determined in HBO's sole discretion. HBO shall provide notice to 1inMM specifying any technical defect within thirty (30) days of receipt of the Delivery Items from 1inMM. Upon such notice to 1inMM, 1inMM shall either (i) correct the defect and redeliver the corrected Delivery Item or (ii) deliver a replacement Delivery Item within thirty (30) days of receipt of HBO's notice. Approval by HBO of less than all Delivery Items or any exploitation of the Program will not be deemed a waiver by HBO of 1inMM's obligation of complete delivery of the Program hereunder. In the event that 1inMM, or any distributor or licensee of 1inMM, has prepared or subsequently prepares a version of the Program dubbed and/or subtitled in any Authorized Language ("Local Language Version"), 1inMM shall provide and HBO shall have unrestricted access to such Local Language Version at no cost, including any dubbed or subtitled tracks of the Program.  In no event shall Final Delivery (including any and all attempts to cure) occur later than the Final Delivery Date.

8.      Distribution Fee. In connection with HBO's exploitation of Rights in the Territory, HBO shall retain a Distribution Fee as set forth in the table below:

| Gross Receipts | Distribution Fee |
|---|---|
| Gross Receipts equaling or less than US$400,000.00 | 25% |
| Gross Receipts over US$400,000.00 | 40% |

9.      Advance. Subject to the terms and conditions of this Agreement and provided all of the Conditions Precedent have been satisfied (including full and Final Delivery having occurred by the Final Delivery Date), and 1inMM is not in breach of this Agreement or, for the avoidance of doubt, any other agreement, HBO shall pay in connection with the Program, a fully recoupable and cross-collateralized advance (the "Advance") in an amount equal to Nine Hundred Ninety-Eight Thousand Eight Hundred Sixty-Five U.S. Dollars ($998,865.00), as further set forth in Section 12. Upon the satisfaction of all of the terms set forth herein, the Advance shall be due and payable in one lump sum payment six (6) months after HBO's receipt of a valid invoice from 1inMM.

HBO-1inMM

4

FOIA Confidential Treatment Requested

10.    Certain Expenses.

a.      Third Party Payments. As between 1inMM and HBO, 1inMM shall be responsible for, and shall pay, all third party payments (other than performance fees for the public performance of any music contained in the Program) that may become payable as a result of HBO's exploitation of its rights hereunder ("Third Party Payments") including, without limitation, any and all mechanical reproduction fees, download fees, payments and/or tariffs with respect to exploitation, advertising and promotion of the Program and residuals, reuse fees, and participations in the proceeds (net or gross) of the Program. If 1inMM fails to make such payments, HBO shall have the right (but not the obligation) to make such Third Party Payments and may: (i) deduct from amounts payable to 1inMM hereunder any such amounts paid to third parties; and/or (ii) invoice 1inMM for any such amounts paid to third parties.

b.      Payment of Distribution Expenses. As between 1inMM and HBO, HBO shall be responsible for and shall pay all Distribution Expenses. Distribution Expense(s) incurred by HBO shall be deducted as provided in Section 11 below.

11.    Allocation of Gross Receipts. In full consideration of the Rights and the representations, warranties and covenants made by 1inMM hereunder, HBO shall pay to 1inMM, for the Program, an amount ("1inMM's Share") equal to one hundred percent (100%) of the Net Receipts (as defined below) derived from the distribution and exploitation of the Program by HBO. As used herein, the term "Net Receipts" shall mean all Gross Receipts less the following deductions in the following order of priority: (a) HBO's Distribution Fee as set forth in Section 8 on account of the exploitation of the Programs by HBO; (b) all Third Party Payments to the extent paid for by HBO; (c) all Distribution Expenses in connection with the exploitation of the Program by HBO; provided, however, that expenses for advertising, marketing, promotion and publicity of the Programs shall not exceed Five Percent (5%) of Gross Receipts without 1inMM's prior written consent, and (d) the Advance.

12.    Payments and Accounting Statements.

a.      HBO shall have the right to cross-collateralize the Gross Receipts (after HBO deducts its Distribution Fee) earned for exploitation of the Rights in the Program throughout the Territory and the Term for purposes of recouping the Distribution Expenses, Third Party Payments, and the Advance, and calculating 1inMM's Share.

b.      Subject to Section 11 hereof, HBO shall credit 1inMM's Share to the Program to 1inMM as follows: ninety (90) days after each quarter for the three (3) years

c.      All payments due hereunder shall be payable in U.S. Dollars. 1inMM hereby directs HBO to make any and all payments due under this Agreement to 1inMM as set forth below:

> **Bank Name:** City National Bank
> **Bank Address:** 8641 Wilshire Blvd. Beverly Hills, CA 90211
> **ABA Number:** 122016066
> **Account Number:** 127412944
> **Account Name:** 1INMM CAPITAL LLC

d.      HBO shall account to 1inMM and provide customary participations statements for the following periods in which related Gross Receipts are received: ninety (90) days after each quarter for the three (3) years. Such customary participations statements shall be in a form HBO customarily details such calculations for other licensors. If in any period the

HBO-1inMM

5

FOIA Confidential Treatment Requested                                      JJMT-SEC-0004872

deductions allowed pursuant to this Agreement for the Programs exceed Gross Receipts reported for the Programs, such excess shall be deducted from Gross Receipts in each succeeding period, as applicable, until such excess has been totally recouped. Accounting Reports shall be sent to the parties as set forth in Section 20.

  e.     HBO shall not be liable for any default or delay in payments from any licensee of HBO with respect to the Programs, provided that HBO shall take commercially reasonable steps to cause such licensee to pay any monies owed by such licensee in connection with its license of the Programs.

  13.     1inMM's Representations and Warranties. 1inMM hereby covenants, warrants and represents to HBO each and all of the following.

  a.     The Program is protected by all the applicable copyright laws throughout the Territory and that such copyrights are and shall be valid and subsisting throughout the Territory during the Program's License Period.

  b.     The Program, when delivered to HBO and thereafter, will be free and clear of any lien, claim, charge, encumbrance, security interest, restriction, agreement, commitment or arrangement with any third party which would, in any way, interfere with, impair or adversely affect any of the Rights granted to HBO hereunder, and (other than as specifically provided in this Agreement) there are and will be no payments of any kind required to be made by HBO in respect of, or as result of, any use by HBO of such Program hereunder.

  c.     1inMM will not exploit and will not authorize any third party to exploit Television Rights in the Program prior to (and, for the avoidance of doubt, during) the License Period hereunder.

  d.     The Program shall not contain any product placement or product integration, except as set forth in a letter to HBO no later than the Final Delivery Date, signed by 1inMM, setting forth all product placement arrangements entered into in connection with the Program and the consideration provided by both the supplier (e.g., payment, free or discounted product) and the production (e.g., visible display of labels, verbal mention of brand, etc.). For any non-monetary consideration received from suppliers, 1inMM shall provide HBO an estimate of the value of such consideration (in U.S. Dollars). 1inMM's letter shall be accompanied by available substantiating documentation (e.g., written agreements, confirmation letters) as well as a listing of the footage notations determined on the same basis as the "Combined Continuity, Dialogue and Spotting List" at which all such product placements are seen or heard.

  e.     1inMM has obtained all of the rights, permissions and licenses (including all music synchronization licenses) required to enable HBO to fully exploit the Program pursuant to the terms of this Agreement including, without limitation, the right to use any performers' names, voices, likenesses and biographies to advertise and promote such Program.

  f.     No part of the Program (including the music contained therein) nor HBO's exercise of any rights granted hereunder will infringe upon the trademark, trade name, copyright, right of privacy, property right or any other right of any person or entity, and no part of the Program shall contain anything defamatory, tortious or which would violate the common law, statutes or regulations of any jurisdiction.

  g.     To the extent the Program or any underlying property is based upon or related to, events in the life of real persons, living or dead, or portrays real persons, 1inMM has obtained all personal releases and other rights necessary to permit HBO to exploit the Program in

HBO-1inMM

6

FOIA Confidential Treatment Requested

the manner provided herein without violating any third party rights or incurring any obligation to any third party.

    h.  1inMM has full power and authority to make this Agreement and has not done and will not do, or permit any person or entity to do, anything which would interfere with the full performance of 1inMM's obligations or HBO's rights hereunder; this Agreement is the legally valid and binding obligation of 1inMM enforceable against 1inMM in accordance with its terms; and 1inMM is a corporation duly formed and validly existing in good standing under the laws of Florida.

    i.  The non-dramatic performing rights to all music contained in the Program are (a) controlled by BMI, ASCAP, SOCAN, SESAC or a performing rights society having jurisdiction in the Territory; (b) in the public domain; or (c) controlled by 1inMM (in which event such rights are hereby licensed to HBO to the extent necessary for the exercise of HBO's rights hereunder). 1inMM does not represent or warrant that HBO may exercise the performing rights in the music without the payment of a performing rights royalty or license fee for music falling within category (a). As between HBO and 1inMM, HBO shall be responsible for the payment of any required performing rights royalty or license fee.

    j.  1inMM is familiar with and shall abide by the requirements of the Foreign Corrupt Practices Act and meets all the eligibility requirements for the safe harbor certification set forth in 18 U.S.C. section 2257A(h)(1) and 28 C.F.R. section 75.9(a)(1)-(3).

    k.  All Delivery Items delivered by 1inMM as part of delivery hereunder are complete and accurate, and HBO will incur no liability to any third party from its reliance thereon and/or compliance therewith.

   14.  <u>HBO's Representations and Warranties</u>. HBO hereby covenants, warrants and represents to 1inMM it has the full power and authority to make this Agreement; this Agreement is the legally valid and binding obligation of HBO enforceable against HBO in accordance with its terms; HBO is a corporation duly formed and validly existing in good standing under the laws of the state of California.

   15.  <u>Indemnification</u>. Each party hereto (the "Indemnifying Party") shall indemnify, defend and hold harmless the other party, and its successors, licensees, assigns, and employees, officers and directors (collectively, for the purposes of this Section, referred to as "Indemnified Party") from and against any and all liability, loss, damage, cost and expense, including, without limitation, reasonable attorneys fees (but excluding lost profits or consequential damages) arising out of any breach or alleged breach (including, in the case of 1inMM as Indemnifying Party, a breach of 1inMM's delivery requirements hereunder), or claim by a third party with respect to any warranty, representation or agreement made by the Indemnifying Party herein. The Indemnified Party shall give prompt written notice to the Indemnifying Party of any claim to which the foregoing indemnification applies and the Indemnifying Party shall undertake, at its own cost and expense, the defense thereof, provided that the failure to provide such notice shall excuse the Indemnifying Party's obligations only to the extent such failure prejudices the Indemnifying Party. The Indemnified Party may, at its option and expense, engage its own counsel. If the Indemnified Party settles or compromises any such suit, claim or proceeding, the amount thereof shall be charged to the Indemnifying Party, provided that the Indemnifying Party's approval, to be reasonably exercised, has been secured. Neither party may settle any claim or action without the prior written consent of the other party if such settlement would in any manner materially impair or inhibit the quiet enjoyment of such other party's rights hereunder or would result in any manner of injunctive or injunctive-like relief.

HBO-1inMM

7

**FOIA Confidential Treatment Requested**                 **JJMT-SEC-0004874**

16.     Default. 1inMM shall be in default of this Agreement upon the occurrence of any of the following (collectively, the "1inMM Events of Default"): (i) 1inMM fails or refuses to perform its material obligations hereunder or breaches any material provision hereof, or (ii) 1inMM goes into receivership or liquidation, or becomes insolvent, or a petition under any bankruptcy act shall be filed by or against 1inMM (which petition, if filed against 1inMM, shall not have been dismissed within thirty days thereafter), or 1inMM executes an assignment for the benefit of creditors, or 1inMM takes advantage of any applicable insolvency, bankruptcy or reorganization or any other like or analogous statute, or experiences the occurrence of any event analogous to the foregoing. If 1inMM fails to cure a 1inMM Event of Default specified in (i) above that is curable within thirty (30) days from receipt of written notice from HBO of such default or immediately upon a 1inMM Event of Default under (ii) above that is not curable under (ii) above, HBO shall have the right to immediately terminate this Agreement. 1inMM acknowledges that the intellectual property rights and licenses in and to the Program granted to HBO herein would be governed by 11 USC Section 365(n) in the event of the commencement of a bankruptcy case by or of 1inMM. 1inMM acknowledges and agrees that, notwithstanding any rejection of this Agreement in any bankruptcy case, HBO may elect to continue to enjoy all exclusive rights and licenses granted in the Program for the entire License Period as provided herein.

17.     Copyright. 1inMM hereby acknowledges and agrees that the Program shall contain a copyright notice in the name of the copyright proprietor conforming to and complying with the requirements of the applicable copyright laws of the Territory, and HBO shall not remove or delete such copyright notice. Subject to 1inMM's prior written approval, not to be unreasonably withheld, conditioned or delayed, HBO may, in consultation with 1inMM, in its own name or in the name of the copyright proprietor, take such steps as HBO may deem necessary or appropriate by action at law or otherwise, to prevent any unauthorized reproductions, exhibition or distribution of the Program, any infringement of the copyright of the Program or any impairment of or encumbrance on the rights granted to HBO hereunder, provided that should HBO commence any action in the name of 1inMM, HBO shall indemnify 1inMM against any out-of pocket costs, damages, and reasonable attorney fees. 1inMM agrees that it shall promptly execute and deliver to HBO the Assignment of Distribution Rights Under Copyright which is attached hereto as Exhibit A and incorporated herein by this reference and that upon the request of HBO it shall promptly execute and deliver to HBO such additional documents as HBO may need in connection with the foregoing. 1inMM hereby irrevocably appoints and designates HBO as its attorney-in-fact to exercise and file all such documents requested by HBO pursuant to this Section. This power-of-attorney is coupled with an interest.

18.     Distribution. All decisions concerning the advertising, marketing, distribution and exploitation of the Program and the rights herein granted shall be under HBO's sole and exclusive control, it being expressly understood that HBO shall not be required to continuously distribute the Program. The Program will be marketed appropriately as determined in HBO's good faith judgment, but in no event shall HBO be required to incur marketing costs. HBO makes no representation, warranty, guarantee or agreement as to the amount of receipts which may be derived from the distribution, exhibition or other exploitation of the Program and the Rights, nor does HBO guarantee the performance of any contract for the exhibition of the Program. Notwithstanding anything to the contrary contained herein, HBO shall have the right, in HBO's sole discretion, to withhold distribution of the Program or to withdraw the Program from distribution anywhere in the Territory at any time during the License Period.

FOIA Confidential Treatment Requested

19.    Insurance. 1inMM shall secure and maintain standard commercial general liability and errors and omissions liability insurance in the minimum amounts of $5,000,000 per occurrence/$5,000,000 aggregate with a deductible not larger than $25,000 until four (4) years after the initial exhibition of the Program, which policy(ies) shall be endorsed to name HBO Latin America Holdings, its parents, subsidiaries, licensees, successors, and related and affiliated companies, and their officers, directors, employees, agents, representatives, assigns and its subdistributors (collectively "Beneficiaries") as additional insureds as their interests may appear and shall contain an endorsement negating the "other insurance clause" therein, together with an endorsement that such policies are primary and that any insurance carried by the Beneficiaries is neither primary nor contributory. 1inMM shall deliver to HBO a certificate and endorsements evidencing such insurance concurrently with the execution of this Agreement. A prior thirty (30) days notice of cancellation or non-renewal will be provided to HBO and will be shown on the certificate.

20.    Notices. All notices, claims, certificates, requests, demands and other communications under this Agreement shall be made in writing and shall be delivered by hand or sent by facsimile, or sent, postage prepaid, by express mail, or reputable overnight courier service, and shall be deemed given when so delivered by hand; if faxed, on the business day of receipt as evidenced by a fax confirmation sheet, or two business days after deposit with an express mail or overnight courier to the parties at the following addresses (or at such other address for a party as shall be specified by like notice):

If to 1inMM:    1inMM Capital LLC
                3129-A S. La Cienega
                Los Angeles, Ca 90016
                Attn: Zachary Horwitz

If to HBO:      HBO Latin America Holdings
                c/o Home Box Office International
                2500 Broadway #4
                Santa Monica, California 90404
                Attn: Senior Vice President, Sales Planning
                Facsimile: 1-310-382-3000

With a copy to:

                Home Box Office
                2500 Broadway #4
                Santa Monica, California 90404
                Attn: General Counsel
                Facsimile: 1-310-244-0510

HBO-1inMM

9

Exhibit 2c Page 48

FOIA Confidential Treatment Requested

JJMT-SEC-0004876

21.    Governing Law/Disputes.

a.      The internal laws of the State of California (as opposed to the choice of law rules) and the United States of America shall govern the validity, construction and interpretation of this Agreement, the performance by the parties of their respective obligations and all other causes of action (whether sounding in contract, in tort or arising under statute) arising out of or relating to this Agreement or to the Program.

b.      All actions, proceedings, controversies and claims based upon, arising out of or resulting from this Agreement, the breach thereof or its enforcement, arbitrability (including the scope of this arbitration provision) or interpretation shall be submitted to JAMS ("JAMS") for binding arbitration under its Comprehensive Arbitration Rules and Procedures if the matter in dispute is over $250,000 or under its Streamlined Arbitration Rules and Procedures if the matter in dispute is $250,000 or less (the "Rules"). Such Arbitration shall be held solely in Los Angeles, California, in the English language. Each arbitration shall be conducted by an arbitral tribunal (the "Arbitral Board") consisting of a single arbitrator who shall be mutually agreed upon by the parties. If the parties are unable to agree on an arbitrator, the arbitrator shall be appointed by JAMS. The arbitrator shall be a retired judge with at least ten (10) years experience in commercial matters. Except with respect to requests for interim relief, neither party shall be entitled or permitted to commence or maintain any action in a court of law with respect to any matter in dispute until such matter shall have been submitted to arbitration as herein provided and then only for the enforcement of the Arbitral Board's award. Neither party shall challenge or resist any enforcement action taken by the arbitrator against the losing party. In addition, the prevailing party in any arbitration or legal proceeding relating to this Agreement shall be entitled to all reasonable expenses including, without limitation, reasonable attorney's fees. Each party shall be permitted to engage in formal discovery with respect to any dispute arising out of, in connection with or related to this Agreement, the provisions of Section 1283.05 of the California Code of Civil Procedure being incorporated herein by this reference.

c.      1inMM hereby acknowledges that the Program and the exploitation rights granted to HBO hereunder are of a special, unique, extraordinary and intellectual character which gives them a peculiar value, for the loss of which HBO cannot be reasonably or adequately compensated in damages in any action at law and that a breach of this Agreement by 1inMM will cause HBO irreparable injury and damage. 1inMM therefore expressly agrees that in the event of a breach or threatened breach of this Agreement by 1inMM, HBO shall be entitled to seek injunctive and other equitable relief against 1inMM in HBO's discretion to end or prevent such breach and to secure enforcement of this Agreement. Resort to such equitable relief, however, shall not be construed as a waiver of any other rights or remedies which HBO may have for damages or otherwise. Notwithstanding any other provision of this Agreement, 1inMM's sole remedy for any breach by HBO of this Agreement shall be an action at law for damages and 1inMM acknowledges that such damages are fully adequate to compensate 1inMM in the case of any breach by HBO hereunder. In no event shall 1inMM have any right to terminate this Agreement or seek or be entitled to rescission, injunctive or other equitable relief.

22.    Miscellaneous Terms.

a.      This Agreement constitutes the entire agreement of the parties and supersedes all prior oral or written agreements between them concerning the same subject. This Agreement may only be amended or modified by a written instrument executed by the parties to this Agreement. No failure or delay on the part of either party in exercising any of its respective rights hereunder upon any failure by the other party to perform or observe any condition,

HBO-1inMM

10

Exhibit 2c Page 49

FOIA Confidential Treatment Requested                                    JJMT-SEC-0004877

covenant or provision herein contained shall operate as a waiver thereof, nor shall any single or partial exercise of any such rights preclude any other or further exercise thereof or the exercise of any other or further exercise thereof or the exercise of any other right hereunder. Without limiting the foregoing, no payment by HBO shall constitute a waiver of any term or condition of this Agreement.

b.      This Agreement may not be assigned without the prior written consent of the other party except that HBO may assign this Agreement, or any part thereof.

c.      Each of the parties shall execute and deliver any further documents or instruments the other may reasonably request to carry out the intent of this Agreement.

d.      Nothing contained in this Agreement shall constitute a partnership between, or joint venture by, the parties hereto or constitute either party the agent of the other. Neither party shall hold itself out contrary to the terms of this Agreement and neither party shall become liable by reason of any representation, act or omission of the other contrary to the provisions hereof.

e.      Nothing expressed or referred to in this Agreement is intended or shall be construed to give any person or entity, other than the parties to this Agreement, or their permitted successors and assigns, any legal or equitable right, remedy or claim under or in respect thereof or any provision contained herein, it being the intention of the parties that this Agreement is for the sole and exclusive benefit of such parties, and any permitted successors and assigns of this Agreement and for the benefit of no other person or entity.

f.      The section headings contained in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

g.      This Agreement and all of its terms shall be confidential, and each party agrees that, except as may be required by law, it shall not make any disclosures with regard thereto without the prior written approval of the non-disclosing party.

h.      If any provision of this Agreement, or any covenant, obligation or agreement contained herein is determined by a court of competent jurisdiction to be invalid or unenforceable, such determination shall not affect any other provision, covenant, obligation or agreement, each of which shall be construed and enforced as if such invalid or unenforceable provision were not contained herein. Such invalidity or unenforceability shall not affect any valid and enforceable application thereof, and each such provision, covenant, obligation or agreement, shall be deemed to be effective, operative, made, entered into or taken in the matter and to the full extent permitted by law.

i.      In the event of the occurrence of an event of force majeure which materially interferes with the production or delivery of the Program or with the rendition of 1inMM's material obligations hereunder, HBO shall have the right to suspend this Agreement and shall have the right, but not the obligation, to extend this Agreement by the length of any such suspension.

HBO-1inMM

11

Exhibit 2c Page 50

FOIA Confidential Treatment Requested

JJMT-SEC-0004878

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be
executed by a duly authorized representative as of the date first set forth above.

**HBO LATIN AMERICA HOLDINGS**          **1INMM CAPITAL LLC**

By: _____          By: _____

Its: Presidnt of Operations          Its: M.P. _____

Exhibit 2c Page 51

**FOIA Confidential Treatment Requested**                        **JJMT-SEC-0004879**

## EXHIBIT A
## ASSIGNMENT OF DISTRIBUTION RIGHTS
## UNDER COPYRIGHT

For good and valuable consideration, the receipt of which is hereby acknowledged, the undersigned, 1inMM Capital LLC ("1inMM"), hereby licenses, grants, transfers and assigns to

### HBO Latin America Holdings

*aka* "HBO" (a California corporation) and its successors and assigns ("Distributor"), the sole and exclusive right, under copyright, to exhibit, distribute, market, advertise, license or otherwise exploit the following feature length motion picture ("Program") throughout the Territory for the License Period as defined below, by means of television, howsoever delivered:

**Title of Program**: BLOOD QUANTUM

**Territory**: Africa and Anguilla, Antigua, Argentina, Aruba, Bahamas, Barbados, Barbuda, Belize, Bermuda, Bolivia, Bonaire, Brazil, Cayman Islands, Chile, Colombia, Costa Rica, Cuba, Curacao, Dominica, Dominican Republic, Ecuador, El Salvador, French Guiana, Grenada, Guadeloupe, Guatemala, Guyana, Haiti, Honduras, Jamaica, Martinique, Mexico, Montserrat, Nicaragua, Panama, Paraguay, Peru, Saba, St. Barthelemy, St. Eustatius, St. Kitts & Nevis, St. Lucia, St. Maarten, St. Martin, St. Vincent & Grenadines, Suriname, Trinidad & Tobago, Turks & Caicos, Uruguay, Venezuela, and British Virgin Islands.

**License Period**: Commences on the Program's Availability Date and expires three (3) years thereafter; provided, however, that the License Period shall include an additional exclusive play-off period of six (6) months for all licenses in existence as of the last day of the License Period during which HBO may continue to exercise the Rights.

1inMM hereby irrevocably appoints Distributor as its attorney-in-fact, with full power and authority to do all such acts and things, and to execute, acknowledge, deliver, file, register and record the Program and all documents pertinent thereto, in the Copyright Office of the United States of America and in any other office or offices in any other jurisdictions in the name, stead and on behalf of the 1inMM, as Distributor may deem necessary or proper to accomplish the same, this being a power coupled with an interest.

Distributor is hereby empowered by 1inMM to bring, prosecute, defend and appear in suits, actions and proceedings of any nature, concerning any copyright in and to the Program or any infringement of such copyright or violation of any of the rights licensed to Distributor herein, but at the cost and expense of Distributor, and, at its option, Distributor may join the 1inMM as a party plaintiff or defendant in any such suit, action or proceeding. Any recovery of damages, penalties, costs or other amounts arising by reason of the infringement of any such copyright(s) or violation of the rights licensed to Distributor herein has been assigned, and shall be paid, to Distributor.

Exhibit 2c Page 52

FOIA Confidential Treatment Requested                                          JJMT-SEC-0004880

This Assignment is dated as of, and is subject to all of the terms, conditions and provisions of the Agreement between 1inMM and Distributor dated as of 07/30/2019.

1INMM CAPITAL LLC

Signed: _____

By: _____

Its: _____ /Authorized Signatory

**FOIA Confidential Treatment Requested**

# Exhibit 3a

## INTERNATIONAL LICENSE AGREEMENT

THIS AGREEMENT (the "Agreement") is made as of August 15, 2019, between SIERRA/AFFINITY ("Sales Agent"), whose address is 9378 Wilshire Blvd, Beverly Hills, CA 90212, as sales agent on behalf of Ace in the Hole Films ("Licensor"), and the party named below ("Distributor"). Licensor and Distributor each hereby agree as set forth herein below.

1.   **DISTRIBUTOR**: **1INMM CAPITAL LLC**
     Address: 3129-A S. La Cienega Blvd Los Angeles, CA
     Ph. No.: 773.724.0290
     Attn.: Zachary Horwitz
     Email: zach@1inmm.com

2.   **PICTURE**:      **"Look Away** (the "Picture").
     Starring: India Eisley and Jason Isaacs
     Director: Assaf Berstein
     Writer: Assaf Bernstein

3.   **TERRITORY**:

(A)    The **"Latin American Territory"** shall be defined as Anguilla, Antigua, Argentina, Aruba, Bahamas (non-exclusive only), Barbados, Barbuda, Belize, Bolivia, Bonaire, Brazil, Cayman Islands, Chile, Colombia, Costa Rica, Cuba, Curacao, Dominica, Dominican Republic, Ecuador, El Salvador, French Guiana (non-exclusive only), Grenada, Guadeloupe, Guatemala, Guyana, Haiti (non-exclusive only), Honduras, Jamaica, Martinique (non-exclusive only), Mexico, Montserrat, Nicaragua, Panama, Paraguay, Peru, St. Barthelme, St. Lucia, St. Martin, St. Vincent & Grenadines, Suriname (non-exclusive only), Trinidad & Tobago, Turks & Caicos, Uruguay, Venezuela, Virgin Islands (British), and

(B)    The **"African Territory" shall** be defined as South Africa, Angola, Cape Verde, Ethiopia, Lesotho, Namibia, Zimbabwe, Botswana, Mozambique, Swaziland, Malawi, Zambia, Kenya, Uganda, Tanzania and Nigeria

(the "Latin American Territory" and "African Territory" shall be collectively defined as the "Territory").

4.    **TERM**: For all Licensed Rights (as defined below) herein, the Term shall commence on full execution of this Agreement and expire Fifteen (15) years thereafter (the "Term").

5.    **AUTHORIZED LANGUAGE (S)**:

(A)    In the Latin American Territory: subtitled and/or dubbed in Spanish and Portuguese (the "Latin American Authorized Language(s)").

(B)    In the African Territory: subtitled and/or dubbed in local languages indigenous to the African Territory (the "African Authorized Language(s)").

(C)    The languages granted in Paragraphs 5(A) and (B) shall be collectively defined as  the  "Authorized Language(s)".

(D)    Any and all DVD or Home Video packaging shall be in the Authorized Language(s) only and not in the English language.

6.    **FLAT LICENSE FEE**: Distributor shall pay Licensor a non-returnable License Fee in the amount of Seven Hundred Forty-Three Thousand Five Hundred United States Dollars (US $743,500.00) net of all taxes and without deduction of any kind (the "License Fee"), payable as follows:

        One Hundred Percent (100%) [US$743,500.00] due on full execution of this Agreement.

Distributor's Licensed Rights do not vest until Licensor has received 100% of the License Fee and full payment for the costs of the Delivery Materials. Distributor is not licensed and shall not exploit any of the Licensed Rights until such amounts are paid in full. Sales Agent will not be obligated to deliver to Distributor any Delivery Materials until 100% of the License Fee and full payment for the costs for the Delivery Materials (including shipping) have been remitted by Distributor and received by Sales Agent. Distributor acknowledges and agrees that time is of the essence and the payment schedule set forth herein will be strictly enforced.  Failure to pay by the due dates herein will result in Licensor or Sales Agent having the right to terminate this

Exhibit 3a Page 55

FOIA Confidential Treatment Requested                                                      JJMT-SEC-0004882

Agreement and pursue all legal and equitable remedies.

All installments of the License Fee, as well as all other monies due to Licensor under this Agreement, including Delivery Materials costs, will be paid by wire transfer to the following account:

[ACCOUNT INFORMATION TO BE PROVIDED WITH INVOICE]

7.    **MATERIALS / DELIVERY**:

(A)    Distributor shall order and pay for the Initial Materials (as defined below) within thirty (30) days following the date that Sales Agent provides Distributor with notice that Sales Agent is ready to effect Delivery (as defined below) of such Initial Materials ("Notice of Delivery"). Distributor acknowledges that (i) there is no guaranteed outside completion date, (ii) the Picture will be ready for delivery to Distributor only when final and complete, and (iii) the determination of finality and related timing for Delivery (taking into account both the completion of the Picture and additional factors affecting the timing of international release such as festival and award considerations) shall be at Licensor's sole discretion).

(B)    Delivery as used herein means delivery (at Distributor's cost of materials and shipping to be fully paid prior to shipment) of the Initial Materials and Additional Materials set forth below and in the Delivery Schedule attached hereto and incorporated herein as Exhibit "A" ("Delivery Materials"). Distributor acknowledges and agrees that it has reviewed the Delivery Materials list below and that no other Delivery Materials are required in order for Distributor to exercise its rights under this Agreement.

Initial Materials:

- Theatrical:  35 mm Print (which may be used);
- Theatrical: Music Cue Sheet (which Sales Agent may provide electronically);
- Video/DVD: Beta or Digital Betacam PAL or NTSC Master (Sales Agent's election following consultation with Distributor) of the Picture; and
- Dialogue List (which Sales Agent may provide electronically)
  Additional Materials (to be delivered only if and when available):

- Key Art (which Sales Agent may provide electronically).

(C)    Distributor will have ten (10) days to review and evaluate the Delivery Materials, and each delivery item delivered hereunder will be deemed acceptable for all purposes hereunder unless Distributor gives Sales Agent written notice of rejection within ten (10) days after Distributor's receipt or access to such item ("Notice of Rejection"). Distributor may only reject Delivery Materials on grounds of technical quality and not for any other reason, including probability of commercial success or artistic grounds. The Notice of Rejection must include  a laboratory report from a reputable recognized laboratory in  the theatrical motion picture business stating full details of  the technical defects in any rejected item(s).

(D)    Sales Agent has thirty (30) days after receipt of a Notice of Rejection to cure such rejection by correcting the asserted defect(s) or delivering replacement item(s), or submit the issue of whether Delivery was effected to arbitration as set forth below. If Sales Agent elects to cure such rejection, then the time periods set forth above for review and cure will be applicable to the delivery of corrected and replaced Delivery Materials as   well.

(E)    Distributor hereby acknowledges and agrees that no individual(s) or specification(s), including without limitation the any cast member or the director, and no other specifications is (are) essential for purposes of effectuating Delivery and Distributor may not refuse to accept Delivery should any individual(s) be replaced or specification changed for any reason whatsoever.

(F)    All disputes with regard to Delivery will be resolved by IFTA Arbitration (as further set forth herein). The sole remedy of Distributor in any such IFTA Arbitration for a failure for any reason to deliver the Delivery Materials will be the return of the License Fee or portion thereof previously paid, and under no circumstances will Distributor be entitled to interest, lost profits, consequential damages or any equitable or injunctive relief. Additionally, Distributor shall not be entitled to any such return of the License Fee if the Picture has been released in any medium in the Territory.

2

Exhibit 3a Page 56

FOIA Confidential Treatment Requested

JJMT-SEC-0004883

       (G)     Title to all materials delivered to Distributor in connection with the Picture will remain with Licensor or Sales Agent (as applicable). Distributor will exercise due care in safeguarding all materials and will assume all risk for theft or damage while they are in transit or Distributor's possession. In respect of all materials created or manufactured by Distributor (including without limitation all Picture copies, packaging, artwork, marketing, dub and sub-titled language tracks, so-called "bonus materials," etc.), Licensor is the copyright owner from inception, provided that if such ownership is not allowed under a law in the Territory, Distributor hereby grants (and from creation of each such item shall by the terms hereof grant) to Sales Agent an irrevocable royalty-free license to use all such materials worldwide in perpetuity in all media now known or hereinafter devised. In all cases, Distributor shall only use such materials during the Term to exploit the Licensed Rights. The creation of dubbed and sub-titled language tracks and related versions of the Picture, the trailers thereof, and any other materials created or duplicated by Distributor hereunder are to be made at Distributor's sole cost.

       (H)     Upon termination of this Agreement, Distributor will, at Sales Agent's election, either: (i) return to Sales Agent at Distributor's expense all materials in connection with the Picture (including without limitation all film and digital pre-print and exhibition materials, video inventory, marketing materials, and language tracks), whether such materials were delivered to Distributor or created by Distributor or any of its sub-distributors or licensees; or (ii) destroy all such materials and provide Sales Agent with a customary certificate of destruction executed by an authorized officer of Distributor.

       (I)     All costs of Delivery, return and destruction (including shipping charges, import fees, duties, brokerage fees, storage charges and related charges) will be Distributor's sole r e s p o n s i b i l i t y .

8.     **LICENSED RIGHTS / RESERVED RIGHTS / HOLDBACKS**:

       (A)     Subject to the condition precedent of timely payment in full of the License Fee without deduction or offset of any kind, Licensor shall license to Distributor the following exclusive distribution rights to the Picture for t h e Territory, for the duration of the Term, and in the Authorized Language(s) ("Licensed Rights"). All rights not specifically licensed herein whether now known or hereafter devised (including without limitation so-called "clip rights" to license excerpts of the Picture for unrelated third party use) are reserved to Licensor ("Reserved Rights"). Distributor is expressly prohibited from exploiting any of the Reserved Rights.

| Licensed Right | Licensed to Distributor | Reserved to Licensor | Distributor's Holdback Period |
|---|---|---|---|
| Cinematic Rights: | | | |
| Theatrical | X___ | _____ | |
| Non-Theatrical | X___ | _____ | |
| (including Hotel/Motel Rights) | | | |
| Public Video | X___ | _____ | |
| Commercial Video | X___ | _____ | |
| | | | |
| Home Video Rights: | | | |
| Home Video Rental | X___ | _____ | |
| Home Video Sellthru | X___ | _____ | |
| | | | |
| Ancillary Rights: | | | |
| Airline | X___ | _____ | |
| Ship | X___ | _____ | |
| | | | |
| Pay TV Rights: | | | |
| Terrestrial | X___ | _____ | * |
| Cable | X___ | _____ | * |
| Satellite | X___ | _____ | * |
| | | | |
| Free TV Rights: | | | |
| Terrestrial | X___ | _____ | * |
| Cable | X___ | _____ | * |
| Satellite | X___ | _____ | * |

3

Exhibit 3a Page 57

| | | | |
|---|---|---|---|
| Free Video-on-Demand | X | ___ | |

Other TV Rights:

| | | | |
|---|---|---|---|
| Video-On-Demand ("VOD") | X | ___ | |
| Subscription VOD ("SVOD") | X | ___ | |
| Near VOD ("NVOD") | X | ___ | |
| Pay-Per-View | X | ___ | |

Internet Rights: Post Home Video Window

| | | | |
|---|---|---|---|
| VOD (e.g., iTunes) | X | ___ | |
| SVOD (e.g., Netflix) | X | ___ | |
| Transactional VOD ("TVOD") | X | ___ | |
| Electronic Rental | X | ___ | * |
| Electronic Sell Thru ("EST") | X | ___ | * |

      (B)     Holdbacks:

Distributor shall hold back its exploitation of the Licensed Rights marked "*" above until the initial release of the Picture in the United States (the "First US Theatrical Release"), unless otherwise waived or shortened by Sales Agent by written notice.

      (C)     All transmissions of the Picture hereunder in exercise of the Pay TV, Satellite Free TV, Other TV, and Internet Rights as set forth herein shall be encrypted or encoded in such manner that may be decrypted or decoded only by the use of authorized decryption or decoding equipment, the sale and use of which equipment is limited to the Territory. Any exercise of the Other TV Rights is expressly conditioned upon Distributor providing Sales Agent with acceptable written documentation verifying implementation of such encryption protections for all exercise of such rights.

      (D)     Intentionally deleted.

      (E)     Television Runs:

(i)     Pay TV: Unlimited runs.

(ii)     Free TV: Unlimited runs.

      (F)     The parties acknowledge that when the Picture is transmitted by satellite and/or cable for reception in the Territory, such transmission may be capable of reception outside the Territory due to the inherent technical capability of satellites to beam down signals and/or cable systems to transmit signals, which are not confined to territorial boundaries ("Distributor Overspill"). Sales Agent agrees that the occurrence of Distributor Overspill shall not constitute a breach of this Agreement, provided that (i) the transmission is not primarily intended for reception outside the Territory and (ii) Distributor receives no direct revenue from such overspill. Additionally, the parties acknowledge that when the Picture is transmitted by satellite and/or cable for reception outside the Territory, such transmission may be capable of reception inside the Territory due to the inherent technical capability of satellites to beam down signals and/or cable systems to transmit signals, which are not confined to territorial boundaries ("Overspill"). Distributor agrees that the occurrence of Overspill shall not constitute a breach of this Agreement by Sales Agent or Licensor, provided, that (i) the transmission is not primarily intended for reception inside the Territory and (ii) Sales Agent and/or Licensors (or their licensees) receive no direct revenue from such overspill.

      (G)     Distributor's right to exploit Internet Rights in the Picture are subject to the terms and conditions of the STCs (as hereafter defined), including without limitation a requirement to utilize current commercially reasonable technological safeguards to ensure that accessing, streaming or downloading of the Picture is limited solely to reasonably identifiable locations within the Territory (e.g., geofiltering). Notwithstanding the foregoing, to the extent Distributor is supplied approved promotional clips of the Picture formatted for use on the Internet, Distributor may use up to three (3) minutes in the aggregate of such clips on the Internet solely for purposes of promoting the Picture and provided such clips are posted solely within a domain bearing the identification code of one of the countries of the Territory.

      (H)     Distributor shall use its best efforts and skill in the distribution and exploitation of the Picture, and

4

Exhibit 3a Page 58

FOIA Confidential Treatment Requested

Distributor shall exercise its rights hereunder in a fair, reasonable, customary and non-discriminatory manner with respect to Licensor or Sales Agent.

9.     **NO DISPOSITION OF GROSS RECEIPTS**: Licensor is licensing the Picture to Distributor on a so-called "flat" basis; therefore, subject to Sales Agent's receipt of the License Fee in accordance with the terms of this Agreement, no other payments whatsoever shall be due to Sales Agent and/or Licensor hereunder.

10.     **ACCOUNTINGS:** Intentionally deleted.

11.     **PAYMENT REQUIREMENTS:**

(A)     The License Fee shall be paid in the amounts specified and required hereunder, which amounts as stated in this Agreement shall be deemed net sums in respect of which Distributor shall have separately paid at its own expense any required withholding and/or remittance taxes required by laws of the Territory such that no amounts shall be deducted from the payments to Licensor specified in this Agreement.

(B)     There will be no deductions from any payments due to Licensor, including the License Fee, because of any bank charges, conversion costs, sales use or VAT taxes, "contingents", quotas or any other taxes, levies or charges, all of which shall, if required, be paid separately by Distributor.

(C)     If it is legally impossible to transmit any monies due to Licensor, then Distributor will immediately so notify Sales Agent in writing. Distributor will then deposit such monies at Distributor's expense in Sales Agent's or Licensor's name, as Sales Agent shall designate, in such depository as may be designated by Sales Agent.

(D)     All payments to Licensor will be in United States dollars computed at the prevailing exchange rate on the date due at Licensor's bank, provided that the exchange rate for any late payments shall be the most favorable prevailing daily rate for Licensor between the due date and the date of payment.

(E)     Any payment due Licensor not made by its due date will, in addition to any other right or remedy of Licensor, incur a finance charge at the lesser of the prevailing US Prime rate plus three percent (3%) or the highest applicable legal contract rate until paid in full.

12.     **MARKETING / ADVERTISING:**.

(A)     Intentionally deleted.

(B)     Intentionally deleted.

(C)     Any marketing or advertising materials created by Distributor and any alterations by Distributor to any artwork or other marketing materials furnished by Sales Agent must satisfy all of Licensor's and Sales Agent's underlying contractual obligations and shall in all instances be subject to Sales Agent's prior written approval before Distributor shall make any use of such materials.

(D)     Distributor shall comply with all contractual credit, likeness, dubbing, subtitling, editing, marketing, publicity, promotional or other similar restrictions or requirements provided to Distributor.

(E)     Intentionally deleted.

(F)     Intentionally deleted.

(G)     Intentionally deleted.

(H)     Intentionally deleted.

13.     **EDITING / BILLING**:

(A)     Distributor may only cut and edit the Picture to the extent necessary to meet governmental censorship requirements. Any such cutting or editing shall only be permitted with Sales Agent's prior written approval and Distributor shall comply with all editing restrictions and requirements provided by Sales Agent. Except for such editing for censorship, the Picture

Exhibit 3a Page 59

FOIA Confidential Treatment Requested

JJMT-SEC-0004886

shall be exhibited and otherwise distributed only in its original continuity as supplied by Licensor without alteration, interpolation, cut or elimination.

(B)     Distributor may include, before or after the Picture and all credits thereof, the credit or logo of Distributor, which precise placement must be pre-approved in writing by Sales Agent.

(C)     Intentionally deleted.

(D)     Distributor shall not do any of the following:

(i)     Change the title of the Picture as it appears in the original language of the Picture (except that Distributor may translate the title in the Authorized Language(s);

(ii)    Alter or delete any credit, logo, copyright notice or trademark notice, or anti-piracy warning appearing on the Picture; and

(iii)   Include any advertisements or other material in the Picture, preceding the Picture, or following the Picture in any medium including Home Video other than an approved anti-piracy warning and commercials for Free TV exploitation (if Free TV rights are licensed herein).

(E)     Distributor's obligations hereunder shall be binding on its subsidiaries, parents, affiliates, agents, sub-distributors and licensees.

14.     15.     **MUSIC CONTAINED IN THE PICTURE**:

(A)     Licensor will be responsible for acquiring all rights necessary to synchronize the music contained in the Picture as delivered to Distributor and on all copies exploited by Distributor hereunder, and for paying all royalties or charges incurred in obtaining and maintaining such synchronization licenses in effect for the Term.

(B)     The Performance Rights with respect to the music contained in the Picture shall either be in the public domain in the Territory, be controlled by Licensor sufficient to allow Distributor to exploit all of Licensed Rights without the necessity of any additional payment, or be available by license from the local music performing rights society in the Territory affiliated with the American Society of Composers, Authors and Publishers (ASCAP), Broadcast Music, Inc. (BMI), or SESAC, Inc. (SESAC). Distributor will be solely responsible for any royalties, however denominated, which any mechanical, performing or authors right society in the Territory attempts to collect in connection with the exploitation of the Picture in the Territory.

16.     **ADDITIONAL TERMS**:

(A)     Distributor acknowledges that the financing for the Picture will be provided by financiers who may require a completion guarantee or other financial assurances. The Distributor agrees to execute within twenty-four (24) hours of receipt such further documentation as may be required by the Licensor to accommodate such interests, including, without limitation, an Acceptance and Acknowledgement of a Notice of Assignment in the form customarily required by such financiers and completion guarantor (if any), and any and all documents or other instruments and acts required by such financiers and/or completion guarantor in connection with the establishment of a collection account or otherwise. In the event Distributor fails to execute and deliver all such documentation within five (5) business days of receipt of written notice thereof, then Distributor agrees that Sales Agent may, as it may elect in its discretion, terminate this Agreement or execute such documentation in the name of Distributor, for which purpose Distributor hereby irrevocably appoints Sales Agent as Distributor's attorney-in-fact, a power coupled with an interest, with full right to execute any and all such documentation.

(B)     Licensor may, in its absolute discretion, require Distributor to establish a Letter of Credit or other such form of payment (by way of example only, a bank guarantee) acceptable to Licensor to secure all or any part of the License Fee. In the event that the Licensor requests any such Letter of Credit(s), Distributor shall open the Letter of Credit and deliver same to Sales Agent within ten (10) working days following the Sales Agent's request. The Letter of Credit and any confirmation which may be required by Licensor or Licensor's bank must be irrevocable and in a format and issued by a bank acceptable to Licensor and Licensor's bank. At Sales Agent's election, any failure on Distributor's part to deliver the Letter of Credit within such ten (10) day period may result in the termination of this Distribution Agreement by written notice to Distributor. All costs of the Letter of the Credit and of any required confirmation shall be paid by Distributor.

6

Exhibit 3a Page 60

**FOIA Confidential Treatment Requested**                                                                   **JJMT-SEC-0004887**

(C)     Neither Licensor nor Sales Agent can guarantee against piracy in the Territory and any piracy of the Picture, whether occurring before or after execution of this Agreement, shall not constitute a breach by Licensor nor a basis for damages claims, payment reductions, or termination hereunder.

(D)     Any delay of action hereunder by Sales Agent shall not be construed as a waiver of any rights or remedies, and any express waiver by Sales Agent of any specific right or remedy hereunder shall not constitute a waiver of any other rights or remedies regarding the same issue (including without limitation any preceding, continuing, or succeeding breach) or any other matter arising under this Agreement.

(E)     Any terms not set forth in this Agreement (including any capitalized words used herein without express definition) will be determined solely by reference to the most current IFTA Standard Terms and Conditions ("STCs") as of the date of this Agreement, which STCs are incorporated in their entirety herein and thereby comprise an integral component of this Agreement. In the event of any inconsistency between the terms of this Agreement and the STCs, the terms of this Agreement prevail.

(F)     Sales Agent is acting solely in its capacity as duly authorized agent on behalf of Licensor in connection with this Agreement.

17.     **NOTICES**:  All notices hereunder shall be in writing and shall be sent to the recipients at the address and/or fax number and/or email address set forth above (or such subsequently changed address of which the sending party has received notice hereunder). Notices to Licensor shall be sent to the attention of c/o SIERRA/AFFINITY , whose fax number is (310) 587-2381.

18.     **REPRESENTATIONS AND WARRANTIES**: Distributor represents and warrants to Licensor that:

(A)     It has full authority and capacity to execute this Agreement and full legal and financial ability to perform all of its obligations under this Agreement;

(B)     There are no existing or threatened claims or litigation which would adversely affect or impair Distributor's ability to perform under this Agreement;

(C)     No dubbed or subtitled version of the Picture created by or to be created by Distributor does or will: (a) defame, or hold in a false light, or infringe any privacy or publicity or other personal right of any person; or (b) infringe any copyrights, trademark, patent, trade secret, rights of ideas, or similar property rights of any person;

(D)     It will employ at all times controls in accordance with prevailing customary standards in the Territory as used by major studios to prevent and deter theft, piracy, unauthorized copying, accessing, streaming or downloading (as applicable) of any copy of the Picture where the Picture is made available via any of the Licensed Rights granted herein;

(E)     It will indemnify and hold harmless Licensor and Sales Agent, and their parents, officers, directors, owners, shareholders, employees, attorneys agents, and successors and assigns from all claims, loss, liability, damages or expenses, including reasonable attorney's fees and legal costs, but not including lost profits due to breach of any of Distributor's representations, warranties covenants or conditions under this Agreement.

(F)     It will comply with all credit and talent obligations in connection with Picture as provided to Distributor by Sales Agent.

19.     **DEFAULT AND TERMINATION**:

(A)     Distributor will be in default of this Agreement in the event of any of the following circumstances:

7

Exhibit 3a Page 61

FOIA Confidential Treatment Requested                                                    JJMT-SEC-0004888

(i)       Distributor fails to pay any installment of the License Fee or any other amounts due under this Agreement or any other agreement with Sales Agent when due;

(ii)      Distributor becomes insolvent or fails to pay its debt obligations when due;

(iii)     Distributor makes an assignment for the benefit of creditors, seeks relief under any bankruptcy law or similar law for the protection of debtors, or allows a petition of bankruptcy to be filed against it, or a receiver or trustee to be appointed for substantially all of its assets that is not removed within thirty (30) days;

(iv)     Distributor breaches any material term, covenant or condition of this Agreement or any other agreement with Sales Agent;

(v)      Any affiliate, parent, subsidiary, sub-distributor, or licensee of Distributor breaches any material term, covenant or condition of this Agreement or any other agreement with Sales Agent; term, covenant or condition of this Agreement or any other agreement with Sales Agent;

(vi)     Distributor attempts to make any assignment, transfer, sublicense or appointment of an agent without Sales Agent's prior written approval; or

(vii)    Distributor fails timely to sign a Notice of Assignment as provided below.

(B)     Sales Agent will give Distributor notice of any claimed default. If the default is capable of cure, then Distributor will have ten (10) days after receipt of Sales Agent's notice to cure a monetary default, and twenty (20) days after receipt of Sales Agent's notice to cure a non-monetary default. If the default is incapable of cure, or if Distributor fails to cure within the time provided, then Licensor may proceed against Distributor for available relief, including but not limited to terminating this Agreement or any other agreement with Sales Agent retroactive to the earliest date of default, suspending Delivery of the Picture, and declaring all unpaid amounts due Licensor immediately due and payable.

(C)     As a result of termination of this Agreement or any other agreement between Distributor and Sales Agent, with respect to those pictures as to which all rights are terminated:

(i)      All licensed rights in and to such picture shall automatically revert to Licensor, free and clear of any and all encumbrances and any sub-distribution agreements entered into by Distributor (other than those sub-distribution agreements deemed assigned to Licensor as specified below);

(ii)     All of Distributor's rights under any sub-distribution and license agreements that have been pre-approved in writing by Sales Agent shall be deemed to have been assigned to Licensor (and any such sub-distribution agreements not so approved, shall be deemed automatically terminated) and all payments to be made under such agreements shall be paid directly to Licensor who may notify all relevant parties of such assignment to Licensor;

(iii)     All monies payable by exhibitors or sub-distributors to Distributor in respect to such picture shall be paid to and retained by Licensor;

(iv)     Any portion of the License Fee for this Picture and License Fee(s) for such other picture(s) theretofore paid by Distributor shall be retained by Licensor or Sales Agent and any unpaid portion of the License Fee for this Picture or for such other picture(s), if any, shall accelerate and immediately become due and payable to Licensor or Sales Agent;

(v)      Licensor shall be entitled to immediate possession of all digital and film pre-print and print elements and copies of the Picture and such other picture(s), advertising materials and all other materials (including any Delivery Materials) pertaining to same;

(vi)     Distributor shall execute and deliver all instruments requested by Sales Agent to effectuate a termination of this Agreement and its rights in the Picture or for such other picture(s) as applicable, including without limitation instruments necessary or appropriate to reflect such termination on the public records of governmental agencies and/or with industry organizations in the Territory which maintain records of a similar nature;

(vii)    Distributor shall turn over all records, including books, billing and delivery records to the Picture or such other

8

Exhibit 3a Page 62

JJMT-SEC-0004889

picture(s), and all monies on hand, if any, relating to the Picture or such other picture(s); and

(viii)    Distributor hereby irrevocably appoints Sales Agent as Distributor's attorney-in-fact, a power coupled with an interest, with full right to execute any and all assignments and other instruments deemed by Sales Agent to be reasonably necessary or desirable to evidence the transactions provided hereunder and to protect its rights under this Agreement or such other agreement(s) as applicable.

20.    **TERMINATION OTHER THAN FOR DEFAULT**:

(A)    Upon written notice to Distributor, Sales Agent may in its sole discretion terminate this Agreement if principal photography of the Picture has not commenced within twelve (12) months following the date of this Agreement, the Picture is not ready for Delivery to Distributor within twenty-four (24) months following the date of this Agreement, or Licensor or Sales Agent abandons the Picture either prior to or after the commencement of principal photography.

(B)    In the event of such termination, Licensor shall return to Distributor such portion of the License Fee theretofore paid to Licensor by Distributor, and Distributor shall return to Sales Agent any and all materials, including, without limitation, all physical film materials, Delivery Materials, publicity materials and documents theretofore furnished  by Sales Agent to Distributor in connection with the Picture. Neither Licensor nor Sales Agent shall have any additional obligation of any kind whatsoever to Distributor, or anyone claiming through Distributor, by reason of such termination.

(C)    Distributor shall execute and deliver all instruments requested by Sales Agent to effectuate a termination of this Agreement and its rights in the Picture, including without limitation instruments necessary or appropriate to reflect such termination on the public records of governmental agencies and/or with industry organizations in the Territory which maintain records of a similar nature. Distributor shall turn over all records, including books, billing and delivery records to the Picture and all monies on hand, if any, relating to the Picture. Distributor hereby irrevocably appoints Sales Agent as Distributor's attorney-in-fact, a power coupled with an interest, with full right to execute any and all assignments and other instruments deemed by Sales Agent to be reasonably necessary or desirable to evidence the transactions provided hereunder and to protect its rights under this Agreement.

21.    **CHOICE OF LAW / ARBITRATION / FORUM**:

(A)    This Agreement shall be subject to the laws of the State of California applicable to agreements wholly executed and performed therein, and all parties hereby irrevocably consent to the exclusive jurisdiction and venue of the Federal and State courts located in Los Angeles County for any court matters arising hereunder.

(B)    Any and all disputes under this Agreement shall be submitted exclusively to binding arbitration ("IFTA Arbitration") in Los Angeles, California under the Rules of International Arbitration of the International Film and Television Alliance ("IFTA Arbitration Rules") in effect as of the date the request for arbitration is filed. Each party waives any right to adjudicate any such dispute in any other court or forum and Distributor waives any and all rights to seek equitable or injunctive relief or to rescind or terminate this Agreement or to seek such rescission or termination.  Los Angeles County will be deemed the "Forum" under the IFTA Arbitration Rules. Licensor (and where applicable Sales Agent) and Distributor agree to accept service of process for IFTA Arbitration in accordance with such Rules and to accept service of process for any judicial or other proceedings provided for hereunder by certified mail, return receipt requested, courier, or other personal delivery at the address indicated on this Agreement. Licensor (and where applicable Sales Agent) and Distributor agree to abide by any decision rendered in an IFTA Arbitration, and that any court having jurisdiction may enter judgment affirming such decision and may enforce such judgment in accordance with its powers.

(C)    Without limiting the aforesaid arbitration provisions and notwithstanding the exclusive jurisdiction provisions above, Licensor and Sales Agent shall additionally each have the right to proceed in any court of competent jurisdiction anywhere in the world to either (i) seek such interim protective relief, including equitable remedies as may be considered reasonably necessary to protect their rights and entitlements pursuant to this Agreement, or (ii) seek enforcement  of any arbitration award or related judgment hereunder.

(D)    The prevailing party or parties in any arbitration hereunder shall be entitled to an award in such arbitral proceeding for reimbursement of its or their (as applicable) legal fees (including attorneys fees) and costs of arbitration (including discovery and expert witness costs). The prevailing party or parties in any judicial action hereunder shall similarly be entitled to court order or judgment reimbursing it or them (as applicable) for all legal fees (including attorneys fees) and costs incurred in connection with such matter and in connection with any applicable arbitration as aforesaid.

9

Exhibit 3a Page 63

**FOIA Confidential Treatment Requested**

**JJMT-SEC-0004890**

22.     **CONFIDENTIALITY**: All terms of this Agreement shall be confidential and not disclosed to any third party except each party's accountants, attorneys and agents, and as necessary to perform each parties' rights and obligations hereunder, and except as required by law or judicial order.

23.     **COUNTERPARTS**:     This Agreement may be executed in counterparts which may be delivered by ink-signed originals, fax or digital copy in pdf or tiff format, each of which shall be deemed to be an original and such counterparts of all parties when taken together shall constitute the fully binding and executed Agreement.

24.     **BINDING AGREEMENT**: This Agreement, any exhibits attached hereto, and the STC's incorporated herein sets forth the entire understanding and agreement between Licensor and Distributor as to the subject matter hereof and supersedes all previous discussions, correspondence, inducements, agreements, warranties or representations, whether oral or written. This Agreement is binding on each of the parties and their respective successors and assigns. Except as expressly provided herein, this Agreement may only be amended in writing signed by Sales Agent on behalf of Licensor and Distributor.

THIS AGREEMENT is executed as of the parties as of the date first above written.

[signatures on the following page]

10

Exhibit 3a Page 64

**FOIA Confidential Treatment Requested**                                                              **JJMT-SEC-0004891**

**AGREED AND ACCEPTED:**

SIERRA/AFFINITY ("Sales Agent") as agent
On behalf of Ace in the Hole Films ("Licensor")        1inMM Capital LLC ("Distributor")

By:_____        By:_____

Its: EVP International Sales        Its: MANAGING PARTNER

11

**FOIA Confidential Treatment Requested**

### Exhibit "A"

This Exhibit A is attached and incorporated into that certain International License Agreement dated as of August 15, 2019, by and between SIERRA/AFFINITY ("Sales Agent") as sales agent on behalf of Ace in the Hole Films ("Licensor") and 1inMM Capital LLC ("Distributor") whereby Licensor granted to Distributor certain distribution rights in and to the motion picture entitled "Look Away" (the "Picture").

## LEGAL DELIVERABLES

1.   Clearly legible copies of all chain-of-title documents required by Distributor, evidencing Licensor's proper ownership and permitting the use of any and all literary, dramatic, musical and other material used in the production of the Program or upon which the Program and/or screenplay may be based, together with certificates of authorship and proof of payment in connection with the acquisition of the necessary rights in and to such material and the exercise of all options related thereto.

2.   Evidence satisfactory to Distributor that there is no lien, charge, encumbrance or security interest that would adversely interfere with the Licensed Rights granted to Distributor.

3.   A (a) copyright report issued by a Thomson CompuMark, (b) title report and (c) opinion issued.

4.   A complete typewritten statement of all third party screen and paid advertising credit, name and likeness, and other third party obligations, restrictions and approval rights including, without limitation, all dubbing obligations (if any), director's editing rights, video mastering consultation or approval rights, etc. for each individual and entity named in the billing block with excerpts from each applicable third party agreement setting forth the precise extent and nature of such obligations, restrictions and/or approval rights, in the identical order as listed in the billing block.

5.   The proposed paid ad/packaging summary, credit and billing block layout for both full- and small-sized paid ads.

6.   The final copyright notice, as it appears on the billing block.

7.   Clearly legible copies of fully-executed agreements for all key actors and key production personnel (e.g., director, producer, writer, etc.) and any other talent and/or crew agreements requested by Distributor.

8.   If the Program or underlying materials or properties are based upon or related to events in the real life of real persons, living or dead, or portrays real persons, true and correct copies of all personal releases and other documentation showing that Licensor has all rights necessary to permit Distributor to exploit the Picture in the manner provided herein without violating any third party rights or incurring any obligations to any third party.

9.   A complete written statement showing the exact form and manner of the main and end titles of the Picture.

10.   One (1) typewritten (or computer generated) hard copy and one (1) copy in digital format of a music cue sheet in standard form showing the particulars of all music synchronized with the Program (all versions) and additional cue sheets for the trailer(s) and any other materials in connection with the Program containing original and/or licensed music. All such cue sheets will include for each cue: (i) the title of song; (ii) the name of the songwriter/composer; (iii) the songwriter's/composer's performing rights affiliation (e.g., ASCAP, BMI or SESAC); (iv) the name of publisher; (v) the publisher's performing rights affiliation; (vi) the type of use; (vii) the length of the use; and (viii) an indication of whether or not a master recording was licensed.

11.   Clearly legible, fully-executed copies and proof of payment for any and all synchronization licenses and master use licenses, all valid and sufficient to provide Distributor with the right to use and perform all musical compositions and master recordings contained in the Picture and trailer (if available).

12.   Clearly legible copies of the copyright registration certificate(s) with the US Copyright Office for both the screenplay and Picture.

Exhibit 3a Page 66

FOIA Confidential Treatment Requested

JJMT-SEC-0004893

# Exhibit 3b

**PROMISSORY NOTE**

**$ (1,007,261.00)**                                                                  **(08/13/2019)**

<u>Promise</u>. 1INMM Capital, LLC, a limited liability entity established in the State of California, (the "Maker"), hereby promises to pay to Lender, JJMT CAPITAL LLC, a Delaware Limited Liability company located at  (<u>541 N Fairbanks Ct. STE 2200 Chicago, IL 60611)</u>, (the "Payee"), an amount equal to (<u>ONE MILLION SEVEN THOUSAND TWO HUNDRED SIXTY-ONE</u> Dollars (<u>$1,007,261.00</u>) in lawful money  of the United States of America, which sum shall be due and payable on (02/13/2020)  (the "Maturity Date"), in one (1) balloon payment, in  like money at said office. Payment date shall be no later than SIX (6) months post confirmed funds transfer from Payee to Maker in the amount of (<u>SEVEN HUNDRED FORTY-THREE THOUSAND FIVE HUNDRED</u>) Dollars ($743,500.00).

<u>Prepayment Option</u>. Maker may pay down at any time any portion of the  principal sum outstanding without any prepayment penalty.

<u>Assignment of Rights.</u> See Appendix A

<u>Compounding of Unpaid Payments</u>. The undersigned agrees that time is of the  essence and that in the event payment of principal or interest due under this Note is not  made when due, giving effect to any grace period which maybe applicable, the  outstanding balance of unpaid payments hereof shall immediately bear interest at  the rate of ten (10) percent per month, for so long as  such event of default continues.

<u>Validity of Agreement to Conform to Law.</u> All agreements between the undersigned and the holder of this Note are expressly limited so that in no contingency or event whatsoever, whether by reason of advancement of the proceeds hereof, acceleration of maturity of the unpaid principal balance, or otherwise, shall the amount paid or agreed to be paid to the holder hereof for the use, forbearance or detention of money advanced hereunder exceed the highest lawful rate permissible under any law which a court of competent jurisdiction may deem applicable hereto. If, from any circumstances whatsoever, fulfillment of any provision hereof or any instrument securing this Note or any other agreement referred to herein, at the time performance of such provision shall be due, shall involve transcending the limit of validity prescribed by law which a court of competent jurisdiction may deem applicable hereto, then, ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity, and if from any circumstances the holder hereof shall ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the

**FOIA Confidential Treatment Requested**                                                                  **JJMT-SEC-0004894**

reduction of the unpaid principal balance due hereunder and not to the payment of interest. This provision shall control every other provision of all agreements between the undersigned and the holder hereof.

Maker's Default. At the option of the holder hereof exercised by written notice to the undersigned, this Note shall become immediately due and payable upon the maker's failure to pay when due any payment of principal, interest or expenses due hereunder; or (b) failure in the performance or observance of any of the terms or conditions of any mortgage, deed of trust, security agreement or other agreement securing, guaranteeing or otherwise pertaining to this Note after giving effect to any applicable curative period which may be contained therein. Upon the occurrence of any of the following specified Events of Default, as defined under the standard conventions and terminology prescribed for promissory notes drafted under Warren's California Forms for Principal, Interest, Insolvency, Breach of Covenants, Breach of Representation and Warranties, (each herein called an "Event of Default") then, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, the Payee may, by written notice to the Maker, declare the principal of and accrued interest in respect of this Note to be forthwith due and payable, whereupon the principal of and such unpaid accrued interest in respect of this Note shall become forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Maker. Furthermore, This note shall become due and payable before the above-mentioned maturity date immediately upon the happening of any of the following events affecting any maker or indorser thereof, to wit: voluntary or involuntary filing of a petition in bankruptcy or for reorganization, execution of an assignment for the benefit of creditors, calling meeting of creditors, appointment of liquidating agent or committee, offer of composition, entry of a judgment in excess of $ 10,000 which remains unsatisfied or for over 30 days, application for appointment or appointment of any receiver, issuance of warrant of attachment or death of any maker or indorser or on default of any other obligations to the Maker.

Collection Costs. If this Note or any installment of principal or interest is not paid when due, whether at maturity or by acceleration, the undersigned promises to pay all costs of collection, including without limitation, actual attorneys' fees, and all expenses in connection with the protection or realization of the assets and proceeds available this Note or the enforcement of any subsequent memorandum or agreement created in conjunction with this Note incurred by the holder hereof on account of such collection, whether or not suit is filed hereon or thereon; such costs and expenses shall include, without limitation, all costs, expenses and attorneys' fees actually incurred by the holder hereof in connection with any insolvency, bankruptcy, arrangement or other similar proceedings involving the undersigned, or involving any endorser or guarantor hereof, which in anyway affects the exercise by the holder hereof of its rights and remedies under this Note or under any mortgage, deed of trust, security agreement, guaranty or other agreement securing or pertaining to this Note.

Waiver of Notice. Presentment, demand, protest, notices of protest, dishonor and nonpayment of this Note and all notices of every kind are hereby waived by all parties to

FOIA Confidential Treatment Requested

this Note, whether the undersigned, principal, surety, guarantor or endorser, except as
provided herein. To the extent permitted by applicable law, the defense of the statute of
limitations is hereby waived by the undersigned.

<u>Death of Maker</u>. Maker of this note hereby waives all notice and demand and consent that
this note shall become due and payable immediately upon the happening of any of said
events. This note shall become due and payable on the Maturity Date, but payment shall
be accelerated and become due and payable immediately if the Maker shall die. For the
further security of the holder thereof, the undersigned covenants that so long as any part
of the principal or interest of this note is outstanding and unpaid, it will not grant any
security interest to any third party upon its property, or create any lien whatsoever
thereon, without also thereby including therein this note, equally and ratably with every
other evidence of debt, secured by any of the undersigned's property. If, while any part of
the principal or interest is outstanding and unpaid, the maker hereof breaks this covenant,
then the holder hereof may at his or its election, declare and make this note at once due
and payable by written notice delivered to maker, and this remedy will be deemed
cumulative and in addition to any other remedy available to the holder hereof. This note
shall be paid without claim of set-off, counterclaim or deduction of any nature or for any
cause whatsoever.

<u>Extensions Granted by Payee.</u> All indorsers hereunder agree that the holder of this note in
case of non-payment thereof at maturity, or of any installment thereof when due, may
grant to the maker or any indorser of said note any extension or extensions of time of
payment thereof, in whole or in part, without notice to said indorsers or any of them and
any such extension or extensions shall not affect in any way said indorsers' liability upon
note, such indorsers hereby waiving demand, presentment of payment, notice of
nonpayment and protest and do further agree that any holder of this note may in the event
of default in the payment of principal of, or interest upon, this note or any installment
thereof repossess and/or sell the (collateral) held as collateral security for the payment of
this note without in any way relieving said indorsers, or any of them, of any liability by
reason of such repossession and/or sale, applying the proceeds of sale of any such  asset
less all costs to amount due under this note, and all indorsers agree to pay any deficiency
on this note on demand.

<u>Litigation Fees</u>. In any action at law or in equity to enforce or construe any provisions or
rights under this Note, the unsuccessful party or parties to such litigation, as determined
by a court pursuant to a final offer, judgment or decree, shall pay to the successful party
or parties all costs, expenses and reasonable attorneys' fees incurred by such successful
party or parties (including, without limitation, such costs, expenses and fees on any
appeal), which costs, expenses and attorneys' fees shall be included as part of any order,
judgment or decree.

<u>General Provisions.</u> Principal and interest evidenced hereby are payable only in lawful
money of the United States. The receipt of a check shall not, in itself, constitute payment
hereunder unless and until paid in good funds. Whenever any payment on this Note shall
be stated to be due on a day, which is not a business day, such payment shall be made on

FOIA Confidential Treatment Requested                                                    JJMT-SEC-0004896

the next succeeding business day and such extension of time shall be included in the computation of the payment of interest of this Note. This Note is to be governed by and construed in accordance with the laws of the State of California except to the extent United States federal law permits the holder to contract for, charge or receive a greater amount of interest. In any action brought under or arising out of this Note, the undersigned hereby consents to the in personam jurisdiction of any state or federal court sitting in the state of California, and waives any claim or defense that such forum is not convenient or proper, and consents to service of process by any means authorized by California and/or Federal law.

THE UNDERSIGNED HEREBY WAIVES, AND COVENANTS THAT THE UNDERSIGNED WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS NOTE, THE SUBJECT MATTER HEREOF OR ANY DOCUMENT RELATING HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING OR WHETHER IN CONTRACT OR IN TORT OR OTHERWISE.

_____                    _____08/13/19_____

1INMM Capital, LLC                           Date
Zachary Horwitz, Manager

FOIA Confidential Treatment Requested

APPENDIX A


ASSIGNMENT

This assignment ("Assignment") between 1INMM CAPITAL LLC, located at (3129-A S. La
Cienega Blvd Los Angeles, CA 90016) ("Assignor") and JJMT CAPITAL LLC, a Delaware
Limited Liability company located at  ( 541 N Fairbank Ct. STE 2200 Chicago, IL 60611)
("Assignee") is dated effective as of (08/13/2019).

For good and valuable consideration, the receipt and sufficiency of which hereby acknowledged,
Assignor does hereby irrevocably and unconditionally sell, grant, convey, and assign unto Assignee
all of Assignor's rights, title and interest of every kind and nature, throughout the universe, until
assignee is paid ($1,007,261.00.00) at to which time all rights, title and interest of every kind and
nature revert back to Assignor and to that certain motion picture, currently entitled "LOOK
AWAY" (the "Picture") based on the original screenplay entitled "LOOK AWAY" written by
Assaf Bernstein.

1.  Assignor hereby represents and warrants:

    1.1.    That Assignor is the sole and exclusive owner of the rights and privileges granted
            or to be granted to Assignee hereunder.
    1.2.    That, as of the effective date hereof, Assignor has the right to enter into this
            Assignment.
    1.3.    That, as of the effective date hereof, no part of the rights herein conveyed has in
            any way been encumbered, conveyed, assigned, transferred or otherwise disposed
            of and all such rights are therefore free and clear of any and all liens, claims,
            charges or encumbrances whatsoever in favor of any party whatsoever.

2.  Assignor shall indemnify Assignee, its successors, assigns, licensees and officers, and hold
    them harmless from and against any and all claims, liability, losses, damages, costs, expenses
    (including but not limited to attorney's fees) arising out of any breach by Assignor of any
    warranty made by Assignor hereunder.

3.  Assignee hereby assumes and agrees to be bound by all future obligations of Assignor which
    accrue after the date hereof.

4.  Assignor hereby waives the benefits of any provision of law known as "droit morale" or any
    similar law in any country of the world and agrees not to institute or permit any action or
    lawsuit on the ground that the Picture in any way constitutes an infringement of any "droit
    morale" and Assignor agrees that Assignor shall not, under any circumstances (including
    without limitation, the circumstances of a breach by Assignee) be entitled to enjoin the
    exhibition or other exploitation of the Picture, to terminate or rescind any rights granted to
    Assignee or to obtain any other form of equitable relief, specific performance or otherwise, any
    right to which Assignor expressly waives.

5.  This Assignment, and the rights granted hereunder, may not be assigned by Assignor to any
    person, firm or corporation. Assignee may assign this Assignment and the rights and services
    granted herein, together with the results and proceeds thereof, and the representations and
    warranties contained herein, to any person or entity.

Exhibit 3b Page 72

6. This Assignment shall be construed in accordance with the laws of the state of California and shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, licensees and assigns. This Assignment cannot be amended or modified except in a writing signed by all parties hereto.

IN WITNESS WHEREOF, THE PARTIES HERETO HAVE EXECUTED AND DELIVERED THIS ASSIGNMENT AS OF THE (13)th DAY OF AUGUST 2019.

1INMM CAPITAL, LLC ("Assignor")                JJMT CAPITAL LLC ("Assignee")

By: _____              By: _Jospeh deAlteris_____

Its: MANAGING PARTNER                        Its: _____

FOIA Confidential Treatment Requested                                JJMT-SEC-0004899

# Exhibit 3c

## DISTRIBUTION AGREEMENT

This Distribution Agreement ("Agreement"), dated (08/04/19), confirms the terms and conditions pursuant to which HBO Latin America Holdings ("HBO"), shall acquire from 1inMM Capital LLC, with an address at 3129-A S. La Cienega Blvd, Los Angeles, California, 90016 ("1inMM"), certain distribution rights in the "Program" in the "Territory" (as such terms are defined below) subject to the terms contained herein, all as set forth below.

1.    Definitions. All capitalized terms set forth herein, unless elsewhere defined, shall have the following meanings:

a.    "Authorized Languages" means all languages, including all dubbed, voice-lectored and subtitled versions.

b.    "Availability Date" shall have the meaning set forth in Section 4.

c.    "Final Delivery" shall mean 1inMM's full, final and complete delivery of the Delivery Items for the Program (including any and all attempts to cure), of quality acceptable to HBO, as confirmed in writing by HBO.

d.    "Distribution Expenses" means all costs and expenses incurred in connection with the release, delivery, marketing, distribution and exploitation of the Program and the Rights (as defined in Section 5), including, without limitation, all expenses for advertising, marketing, promotion, merchandizing, and publicity of the Program; all expenses for the full and complete delivery of Delivery Items (as hereinafter defined) and translation thereof; shipping, mailing and insurance costs; storage; cleaning and inspection; mastering, submastering, and duplication costs, duplication of scripts and music cue sheets; residuals; renewal of music synchronization licenses and master use licenses (to the extent same are the responsibility of Licensee); all taxes (other than corporate income taxes), whether sales, gross receipts, value added, withholding, remittance, excise, property, use, transfer or similar taxes, levies, customs duties, import charges, penalties, fines or interest, however denominated, imposed and whether by a governmental authority or taxing authority (whether federal, local, territorial or state of the United States or any country in the Territory); foreign language dubbing and/or subtitling; any Third Party Payments (as defined at Section 10.a.) to the extent paid for by HBO, and all other usual distribution costs customarily incurred.

e.    "Gross Receipts" means the aggregate of all monies actually received by HBO from the exploitation of the Rights in the Territory, monies and royalties collected by a collecting society or governmental agency with respect to the exploitation of the Program on television from compulsory licenses, retransmission income, secondary broadcasts, tax rebates, less rebates, discounts, reasonable reserves for returns and bad debt (each of which will be liquidated within one (1) year from its establishment), credit adjustments, advertising agency commissions, security deposits, advances or other similar sums received until earned or forfeited or credited and any amounts received and thereafter refunded (except to the extent such sums are non-refundable) related to the Program. All Gross Receipts are the sole and exclusive property of HBO, subject only to 1inMM's contractual entitlements pursuant to Section 11 hereof.

f.    "Latin America" means Anguilla, Antigua, Argentina, Aruba, Bahamas, Barbados, Barbuda, Belize, Bermuda, Bolivia, Bonaire, Brazil, Cayman Islands, Chile, Colombia, Costa Rica, Cuba, Curacao, Dominica, Dominican Republic, Ecuador, El Salvador, French Guiana, Grenada, Guadeloupe, Guatemala, Guyana, Haiti, Honduras, Jamaica, Martinique, Mexico, Montserrat, Nicaragua, Panama, Paraguay, Peru, Saba, St. Barthelemy, St.

HBO-1inMM                                                                                              1

FOIA Confidential Treatment Requested                                    JJMT-SEC-0004900

Eustatius, St. Kitts & Nevis, St. Lucia, St. Maarten, St. Martin, St. Vincent & Grenadines,
Suriname, Trinidad & Tobago, Turks & Caicos, Uruguay, Venezuela, and British Virgin Islands.

g.     "License Period" shall have the meaning set forth in Section 3.

h.     "Program" means the live action feature length motion picture entitled
"LOOK AWAY" that was: (i) originally produced in English; (ii) directed by Assaf Bernstein
starring India Eisley, Jason Isaacs and Mira Sorvino and (iii) will be theatrically released in
Mexico and/or Brazil on a minimum of 80 screens.

i.     "Television Rights" means the right to exhibit, distribute market, display,
transmit, broadcast, perform, transmit, reproduce, advertise, publicize, sell copies of, license,
derive revenues from, rent, dispose of, communicate publicly or privately, turn to account and
otherwise exploit the Program by any form of television media now known or hereafter devised
or commercially exploited (including, but not limited to subscription pay television, basic
television, free television, pay-per-view, on demand, video-on-demand, free-on-demand, free-
video-on-demand, subscription-video-on-demand, advertising-supported on demand, near-video-
on-demand, hotel/motel, non-theatrical, electronic rental, download to rent, digital rental,
electronic sell-through, digital sell-through, download to own, download to burn and on demand
retention licensing), regardless of whether or how paid for, programmed, or marketed to the
viewer, and regardless of how delivered to or received by the viewer (whether by over-the-air,
cable, satellite, wire, fiber, ADSL, DSL, MDS, Internet, mobile, wireless, closed circuit, or other
means, method, process, or device or delivery system now known or hereafter devised,
discovered, created, or developed) in all versions, resolutions, formats, and sizes, and shall, for
the avoidance of doubt, include without limitation reception on television sets, personal
computers, IP-enabled devices, mobile devices, and analogous devices.

j.     "Territory" shall mean Africa and Latin America.

2.     Conditions Precedent. All of HBO's obligations hereunder will be subject to and
conditioned upon the satisfaction of all of the following:

a.     Full execution and delivery to HBO of this Agreement; and

b.     Final Delivery (including HBO's receipt and written approval of: (i) a
complete typewritten statement of all third party screen and paid advertising credit, name and
likeness, and other third party obligations, restrictions and approval rights (including all third
party obligations, restrictions and approvals necessary for HBO's creation of Local Language
Versions) as further set forth in Paragraph 5 of the Legal Delivery section of Exhibit B
(collectively, the "Paid Ad Restrictions"); (ii) all chain of title documents for the Program and
documents necessary to establish 1inMM's valid copyright in the Program, and (iii) all Delivery
Items) occurring no later than 02/27/2020 (the "Final Delivery Date").

3.     License Period. The "License Period" means the period commencing on the
Program's Availability Date and expiring three (3) years thereafter; provided, however, that the
License Period shall include an additional exclusive play-off period of six (6) months for all
licenses in existence as of the last day of the License Period during which HBO may continue to
exercise the Rights.

HBO-1inMM

2

FOIA Confidential Treatment Requested                                                          JJMT-SEC-0004901

4.  Availability Date. The "Availability Date" means day and date with the Program's earliest video-on-demand availability date in the Mexico and/or Brazil, but in no event later than 03/27/2020.

5.  Rights.

a.  For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, 1inMM hereby grants to HBO, with respect to the Program, the exclusive rights throughout the Territory and during the Program's License Period to exploit, and to sublicense others the right to exploit the Television Rights in the Program (and all of its themes, materials and other elements), in all formats now known or hereafter devised (including, without limitation, high definition, standard definition and 3D), including the right to (and cause and license others to) market, advertise, publicize, derive revenues from and otherwise exploit the Program. Without limiting the generality of the foregoing, 1inMM hereby grants to HBO the sole, exclusive and irrevocable right to: (i) license the rights granted for the Program for exhibition on such terms as it deems appropriate, and HBO shall have complete discretion relating to the promotion and distribution of the Program; (ii) edit and to permit the editing of all prints of the Program to conform to time segment requirements or to the orders of any duly authorized public censorship authority and to insert commercial material at appropriate time intervals during the exhibition of the Program and to dub and subtitle and to permit the dubbing and subtitling of the Program in the Authorized Languages as it sees fit; (iii) translate the title of the Program into any language and, to the extent cultural differences necessitate that the title be changed, to change such title; (iv) manufacture and distribute, or cause to be manufactured and distributed, two-dimensional advertising, publicity and promotional materials of all types and kinds for use solely in connection with the exhibition and distribution of the Program based on the images and materials provided by 1inMM; and (v) include HBO's (or one or more of HBO's affiliates, HBO's or sub distributors) name, logo, trademark or emblem in such manner, position, form and substance as HBO may elect on the prints of the Program, and on all advertising and publicity material for the Program together with such words as HBO may elect indicating that the Program is being distributed by HBO or one of its sub distributors, licensees or any of its affiliates.

b.  Without limiting the foregoing, 1inMM further grants to HBO the right to use and license the use of trailers, excerpts, clips supplied by 1inMM or made by HBO and stills supplied by 1inMM from the Program in connection with the promotion and exploitation of the Program, to collect all copyright royalties, retransmission, private copy or similar monies relating to the Program, and to use the approved names, voices and likenesses, which 1inMM shall provide to HBO in a timely manner, of all persons who appear in, or above-the-line persons who rendered services in connection with, the production of the Program for the purpose of advertising and promoting the Program.

c.  1inMM acknowledges that any inadvertent, unavoidable, incidental and de minimus overspill of an unencrypted satellite signal outside of the Territory shall not constitute a breach of this Agreement.

d.  1inMM shall include the following credit information in any version of the Program authorized by 1inMM for exhibition hereunder as well as in all advertising and promotional materials authorized for exhibition or dissemination in association therewith: "[1inMM TO PROVIDE COPYRIGHT NOTICE]."

e.  The rights granted to HBO in this Section 5 shall be referred to herein as the "Rights".

HBO-1inMM

3

Exhibit 3c Page 77

FOIA Confidential Treatment Requested

JJMT-SEC-0004902

6.      Reserved Rights. All rights and licenses in the Program not granted to HBO hereunder (i.e., theatrical, derivative, novelization, souvenir, music publishing and music soundtrack rights, merchandising, publication, commercial tie-in and/or co-promotion (unless approved in writing by 1inMM but in no event on an exclusive basis), product placement, games, videogames, ring tones, alerts, wallpapers, screensavers, messaging applications, digital greeting cards, theme park and location based entertainment, remake, sequel, tv series, live stage/stage play, clip license rights (which excludes, for the avoidance of doubt, the right to use clips for promotional purposes as set forth in Section 5.b.), and all rights to the underlying material to the Program) are reserved by 1inMM and may be exploited by 1inMM without limitation or restriction by HBO except as may be set forth herein.

7.      Delivery. No later than thirty (**30) days after the execution of this Agreement,** 1inMM shall, at its sole cost and expense, deliver to HBO all elements, materials, documents and advertising and promotional materials set forth Exhibit B (which is attached hereto and incorporated herein by this reference), with respect to the Program (the "Delivery Items"). All Delivery Items shall be of first class technical quality suitable for the manufacture of first class broadcast quality exhibition materials of the Programs, as determined in HBO's sole discretion. HBO shall provide notice to 1inMM specifying any technical defect within thirty (30) days of receipt of the Delivery Items from 1inMM. Upon such notice to 1inMM, 1inMM shall either (i) correct the defect and redeliver the corrected Delivery Item or (ii) deliver a replacement Delivery Item within thirty (30) days of receipt of HBO's notice. Approval by HBO of less than all Delivery Items or any exploitation of the Program will not be deemed a waiver by HBO of 1inMM's obligation of complete delivery of the Program hereunder. In the event that 1inMM, or any distributor or licensee of 1inMM, has prepared or subsequently prepares a version of the Program dubbed and/or subtitled in any Authorized Language ("Local Language Version"), 1inMM shall provide and HBO shall have unrestricted access to such Local Language Version at no cost, including any dubbed or subtitled tracks of the Program.  In no event shall Final Delivery (including any and all attempts to cure) occur later the Final Delivery Date.

8.      Distribution Fee. In connection with HBO's exploitation of Rights in the Territory, HBO shall retain a Distribution Fee as set forth in the table below:

| Gross Receipts | Distribution Fee |
| --- | --- |
| Gross Receipts equaling or less than US$400,000.00 | 25% |
| Gross Receipts over US$400,000.00 | 40% |

9.      Advance. Subject to the terms and conditions of this Agreement and provided all of the Conditions Precedent have been satisfied (including full and Final Delivery having occurred by the Final Delivery Date), and 1inMM is not in breach of this Agreement or, for the avoidance of doubt, any other agreement, HBO shall pay in connection with the Program, a fully recoupable and cross-collateralized advance (the "Advance") in an amount equal to One Million Seven Thousand Two Hundred Sixty-One U.S. Dollars ($1,007,261.00), as further set forth in Section 12. Upon the satisfaction of all of the terms set forth herein, the Advance shall be due and payable in one lump sum payment six (6) months after HBO's receipt of a valid invoice from 1inMM.

HBO-1inMM

4

Exhibit 3c Page 78

FOIA Confidential Treatment Requested                                                                    JJMT-SEC-0004903

deductions allowed pursuant to this Agreement for the Programs exceed Gross Receipts reported for the Programs, such excess shall be deducted from Gross Receipts in each succeeding period, as applicable, until such excess has been totally recouped. Accounting Reports shall be sent to the parties as set forth in Section 20.

        e.     HBO shall not be liable for any default or delay in payments from any licensee of HBO with respect to the Programs, provided that HBO shall take commercially reasonable steps to cause such licensee to pay any monies owed by such licensee in connection with its license of the Programs.

     13.    1inMM's Representations and Warranties. 1inMM hereby covenants, warrants and represents to HBO each and all of the following.

        a.     The Program is protected by all the applicable copyright laws throughout the Territory and that such copyrights are and shall be valid and subsisting throughout the Territory during the Program's License Period.

        b.     The Program, when delivered to HBO and thereafter, will be free and clear of any lien, claim, charge, encumbrance, security interest, restriction, agreement, commitment or arrangement with any third party which would, in any way, interfere with, impair or adversely affect any of the Rights granted to HBO hereunder, and (other than as specifically provided in this Agreement) there are and will be no payments of any kind required to be made by HBO in respect of, or as result of, any use by HBO of such Program hereunder.

        c.     1inMM will not exploit and will not authorize any third party to exploit Television Rights in the Program prior to (and, for the avoidance of doubt, during) the License Period hereunder.

        d.     The Program shall not contain any product placement or product integration, except as set forth in a letter to HBO no later than the Final Delivery Date, signed by 1inMM, setting forth all product placement arrangements entered into in connection with the Program and the consideration provided by both the supplier (e.g., payment, free or discounted product) and the production (e.g., visible display of labels, verbal mention of brand, etc.). For any non-monetary consideration received from suppliers, 1inMM shall provide HBO an estimate of the value of such consideration (in U.S. Dollars). 1inMM's letter shall be accompanied by available substantiating documentation (e.g., written agreements, confirmation letters) as well as a listing of the footage notations determined on the same basis as the "Combined Continuity, Dialogue and Spotting List" at which all such product placements are seen or heard.

        e.     1inMM has obtained all of the rights, permissions and licenses (including all music synchronization licenses) required to enable HBO to fully exploit the Program pursuant to the terms of this Agreement including, without limitation, the right to use any performers' names, voices, likenesses and biographies to advertise and promote such Program.

        f.     No part of the Program (including the music contained therein) nor HBO's exercise of any rights granted hereunder will infringe upon the trademark, trade name, copyright, right of privacy, property right or any other right of any person or entity, and no part of the Program shall contain anything defamatory, tortious or which would violate the common law, statutes or regulations of any jurisdiction.

        g.     To the extent the Program or any underlying property is based upon or related to, events in the life of real persons, living or dead, or portrays real persons, 1inMM has obtained all personal releases and other rights necessary to permit HBO to exploit the Program in

HBO-1inMM

6

Exhibit 3c Page 79

FOIA Confidential Treatment Requested

the manner provided herein without violating any third party rights or incurring any obligation to any third party.

        h.     1inMM has full power and authority to make this Agreement and has not done and will not do, or permit any person or entity to do, anything which would interfere with the full performance of 1inMM's obligations or HBO's rights hereunder; this Agreement is the legally valid and binding obligation of 1inMM enforceable against 1inMM in accordance with its terms; and 1inMM is a corporation duly formed and validly existing in good standing under the laws of Florida.

        i.     The non-dramatic performing rights to all music contained in the Program are (a) controlled by BMI, ASCAP, SOCAN, SESAC or a performing rights society having jurisdiction in the Territory; (b) in the public domain; or (c) controlled by 1inMM (in which event such rights are hereby licensed to HBO to the extent necessary for the exercise of HBO's rights hereunder). 1inMM does not represent or warrant that HBO may exercise the performing rights in the music without the payment of a performing rights royalty or license fee for music falling within category (a). As between HBO and 1inMM, HBO shall be responsible for the payment of any required performing rights royalty or license fee.

        j.     1inMM is familiar with and shall abide by the requirements of the Foreign Corrupt Practices Act and meets all the eligibility requirements for the safe harbor certification set forth in 18 U.S.C. section 2257A(h)(1) and 28 C.F.R. section 75.9(a)(1)-(3).

        k.     All Delivery Items delivered by 1inMM as part of delivery hereunder are complete and accurate, and HBO will incur no liability to any third party from its reliance thereon and/or compliance therewith.

        14.     <u>HBO's Representations and Warranties</u>. HBO hereby covenants, warrants and represents to 1inMM it has the full power and authority to make this Agreement; this Agreement is the legally valid and binding obligation of HBO enforceable against HBO in accordance with its terms; HBO is a corporation duly formed and validly existing in good standing under the laws of the state of California.

        15.     <u>Indemnification</u>. Each party hereto (the "<u>Indemnifying Party</u>") shall indemnify, defend and hold harmless the other party, and its successors, licensees, assigns, and employees, officers and directors (collectively, for the purposes of this Section, referred to as "<u>Indemnified Party</u>") from and against any and all liability, loss, damage, cost and expense, including, without limitation, reasonable attorneys fees (but excluding lost profits or consequential damages) arising out of any breach or alleged breach (including, in the case of 1inMM as Indemnifying Party, a breach of 1inMM's delivery requirements hereunder), or claim by a third party with respect to any warranty, representation or agreement made by the Indemnifying Party herein. The Indemnified Party shall give prompt written notice to the Indemnifying Party of any claim to which the foregoing indemnification applies and the Indemnifying Party shall undertake, at its own cost and expense, the defense thereof, provided that the failure to provide such notice shall excuse the Indemnifying Party's obligations only to the extent such failure prejudices the Indemnifying Party. The Indemnified Party may, at its option and expense, engage its own counsel. If the Indemnified Party settles or compromises any such suit, claim or proceeding, the amount thereof shall be charged to the Indemnifying Party, provided that the Indemnifying Party's approval, to be reasonably exercised, has been secured. Neither party may settle any claim or action without the prior written consent of the other party if such settlement would in any manner materially impair or inhibit the quiet enjoyment of such other party's rights hereunder or would result in any manner of injunctive or injunctive-like relief.

HBO-1inMM                                              7

FOIA Confidential Treatment Requested                                   JJMT-SEC-0004905

16.     Default. 1inMM shall be in default of this Agreement upon the occurrence of any of the following (collectively, the "1inMM Events of Default"): (i) 1inMM fails or refuses to perform its material obligations hereunder or breaches any material provision hereof, or (ii) 1inMM goes into receivership or liquidation, or becomes insolvent, or a petition under any bankruptcy act shall be filed by or against 1inMM (which petition, if filed against 1inMM, shall not have been dismissed within thirty days thereafter), or 1inMM executes an assignment for the benefit of creditors, or 1inMM takes advantage of any applicable insolvency, bankruptcy or reorganization or any other like or analogous statute, or experiences the occurrence of any event analogous to the foregoing. If 1inMM fails to cure a 1inMM Event of Default specified in (i) above that is curable within thirty (30) days from receipt of written notice from HBO of such default or immediately upon a 1inMM Event of Default under (ii) above that is not curable under (ii) above, HBO shall have the right to immediately terminate this Agreement. 1inMM acknowledges that the intellectual property rights and licenses in and to the Program granted to HBO herein would be governed by 11 USC Section 365(n) in the event of the commencement of a bankruptcy case by or of 1inMM. 1inMM acknowledges and agrees that, notwithstanding any rejection of this Agreement in any bankruptcy case, HBO may elect to continue to enjoy all exclusive rights and licenses granted in the Program for the entire License Period as provided herein.

17.     Copyright. 1inMM hereby acknowledges and agrees that the Program shall contain a copyright notice in the name of the copyright proprietor conforming to and complying with the requirements of the applicable copyright laws of the Territory, and HBO shall not remove or delete such copyright notice. Subject to 1inMM's prior written approval, not to be unreasonably withheld, conditioned or delayed, HBO may, in consultation with 1inMM, in its own name or in the name of the copyright proprietor, take such steps as HBO may deem necessary or appropriate by action at law or otherwise, to prevent any unauthorized reproductions, exhibition or distribution of the Program, any infringement of the copyright of the Program or any impairment of or encumbrance on the rights granted to HBO  hereunder, provided that should HBO commence any action in the name of 1inMM, HBO shall indemnify 1inMM against any out-of pocket costs, damages, and reasonable attorney fees. 1inMM agrees that it shall promptly execute and deliver to HBO the Assignment of Distribution Rights Under Copyright which is attached hereto as Exhibit A and incorporated herein by this reference and that upon the request of HBO it shall promptly execute and deliver to HBO such additional documents as HBO may need in connection with the foregoing. 1inMM hereby irrevocably appoints and designates HBO as its attorney-in-fact to exercise and file all such documents requested by HBO pursuant to this Section. This power-of-attorney is coupled with an interest.

18.     Distribution. All decisions concerning the advertising, marketing, distribution and exploitation of the Program and the rights herein granted shall be under HBO's sole and exclusive control, it being expressly understood that HBO shall not be required to continuously distribute the Program. The Program will be marketed appropriately as determined in HBO's good faith judgment, but in no event shall HBO be required to incur marketing costs. HBO makes no representation, warranty, guarantee or agreement as to the amount of receipts which may be derived from the distribution, exhibition or other exploitation of the Program and the Rights, nor does HBO guarantee the performance of any contract for the exhibition of the Program. Notwithstanding anything to the contrary contained herein, HBO shall have the right, in HBO's sole discretion, to withhold distribution of the Program or to withdraw the Program from distribution anywhere in the Territory at any time during the License Period.

HBO-1inMM

8

FOIA Confidential Treatment Requested                          JJMT-SEC-0004906

19.   Insurance. 1inMM shall secure and maintain standard commercial general liability and errors and omissions liability insurance in the minimum amounts of $5,000,000 per occurrence/$5,000,000 aggregate with a deductible not larger than $25,000 until four (4) years after the initial exhibition of the Program, which policy(ies) shall be endorsed to name HBO Latin America Holdings, its parents, subsidiaries, licensees, successors, and related and affiliated companies, and their officers, directors, employees, agents, representatives, assigns and its subdistributors (collectively "Beneficiaries") as additional insureds as their interests may appear and shall contain an endorsement negating the "other insurance clause" therein, together with an endorsement that such policies are primary and that any insurance carried by the Beneficiaries is neither primary nor contributory. 1inMM shall deliver to HBO a certificate and endorsements evidencing such insurance concurrently with the execution of this Agreement. A prior thirty (30) days notice of cancellation or non-renewal will be provided to HBO and will be shown on the certificate.

20.   Notices. All notices, claims, certificates, requests, demands and other communications under this Agreement shall be made in writing and shall be delivered by hand or sent by facsimile, or sent, postage prepaid, by express mail, or reputable overnight courier service, and shall be deemed given when so delivered by hand; if faxed, on the business day of receipt as evidenced by a fax confirmation sheet, or two business days after deposit with an express mail or overnight courier to the parties at the following addresses (or at such other address for a party as shall be specified by like notice):

If to 1inMM:   1inMM Capital LLC
3129-A S. La Cienega
Los Angeles, Ca 90016
Attn: Zachary Horwitz

If to HBO:   HBO Latin America Holdings
c/o Home Box Office International
2500 Broadway #4
Santa Monica, California 90404
Attn: Senior Vice President, Sales Planning
Facsimile: 1-310-382-3000

With a copy to:

Home Box Office
2500 Broadway #4
Santa Monica, California 90404
Attn: General Counsel
Facsimile: 1-310-244-0510

FOIA Confidential Treatment Requested

21.   Governing Law/Disputes.

a.      The internal laws of the State of California (as opposed to the choice of law rules) and the United States of America shall govern the validity, construction and interpretation of this Agreement, the performance by the parties of their respective obligations and all other causes of action (whether sounding in contract, in tort or arising under statute) arising out of or relating to this Agreement or to the Program.

b.      All actions, proceedings, controversies and claims based upon, arising out of or resulting from this Agreement, the breach thereof or its enforcement, arbitrability (including the scope of this arbitration provision) or interpretation shall be submitted to JAMS ("JAMS") for binding arbitration under its Comprehensive Arbitration Rules and Procedures if the matter in dispute is over $250,000 or under its Streamlined Arbitration Rules and Procedures if the matter in dispute is $250,000 or less (the "Rules"). Such Arbitration shall be held solely in Los Angeles, California, in the English language. Each arbitration shall be conducted by an arbitral tribunal (the "Arbitral Board") consisting of a single arbitrator who shall be mutually agreed upon by the parties. If the parties are unable to agree on an arbitrator, the arbitrator shall be appointed by JAMS. The arbitrator shall be a retired judge with at least ten (10) years experience in commercial matters. Except with respect to requests for interim relief, neither party shall be entitled or permitted to commence or maintain any action in a court of law with respect to any matter in dispute until such matter shall have been submitted to arbitration as herein provided and then only for the enforcement of the Arbitral Board's award. Neither party shall challenge or resist any enforcement action taken by the arbitrator against the losing party.  In addition, the prevailing party in any arbitration or legal proceeding relating to this Agreement shall be entitled to all reasonable expenses including, without limitation, reasonable attorney's fees. Each party shall be permitted to engage in formal discovery with respect to any dispute arising out of, in connection with or related to this Agreement, the provisions of Section 1283.05 of the California Code of Civil Procedure being incorporated herein by this reference.

c.      1inMM hereby acknowledges that the Program and the exploitation rights granted to HBO hereunder are of a special, unique, extraordinary and intellectual character which gives them a peculiar value, for the loss of which HBO cannot be reasonably or adequately compensated in damages in any action at law and that a breach of this Agreement by 1inMM will cause HBO irreparable injury and damage. 1inMM therefore expressly agrees that in the event of a breach or threatened breach of this Agreement by 1inMM, HBO shall be entitled to seek injunctive and other equitable relief against 1inMM in HBO's discretion to end or prevent such breach and to secure enforcement of this Agreement. Resort to such equitable relief, however, shall not be construed as a waiver of any other rights or remedies which HBO may have for damages or otherwise. Notwithstanding any other provision of this Agreement, 1inMM's sole remedy for any breach by HBO of this Agreement shall be an action at law for damages and 1inMM acknowledges that such damages are fully adequate to compensate 1inMM in the case of any breach by HBO hereunder. In no event shall 1inMM have any right to terminate this Agreement or seek or be entitled to rescission, injunctive or other equitable relief.

22.   Miscellaneous Terms.

a.      This Agreement constitutes the entire agreement of the parties and supersedes all prior oral or written agreements between them concerning the same subject. This Agreement may only be amended or modified by a written instrument executed by the parties to this Agreement. No failure or delay on the part of either party in exercising any of its respective rights hereunder upon any failure by the other party to perform or observe any condition,

HBO-1inMM                                                                                                                      10

FOIA Confidential Treatment Requested                                          JJMT-SEC-0004908

covenant or provision herein contained shall operate as a waiver thereof, nor shall any single or partial exercise of any such rights preclude any other or further exercise thereof or the exercise of any other or further exercise thereof or the exercise of any other right hereunder. Without limiting the foregoing, no payment by HBO shall constitute a waiver of any term or condition of this Agreement.

b.      This Agreement may not be assigned without the prior written consent of the other party except that HBO may assign this Agreement, or any part thereof.

c.      Each of the parties shall execute and deliver any further documents or instruments the other may reasonably request to carry out the intent of this Agreement.

d.      Nothing contained in this Agreement shall constitute a partnership between, or joint venture by, the parties hereto or constitute either party the agent of the other. Neither party shall hold itself out contrary to the terms of this Agreement and neither party shall become liable by reason of any representation, act or omission of the other contrary to the provisions hereof.

e.      Nothing expressed or referred to in this Agreement is intended or shall be construed to give any person or entity, other than the parties to this Agreement, or their permitted successors and assigns, any legal or equitable right, remedy or claim under or in respect thereof or any provision contained herein, it being the intention of the parties that this Agreement is for the sole and exclusive benefit of such parties, and any permitted successors and assigns of this Agreement and for the benefit of no other person or entity.

f.      The section headings contained in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

g.      This Agreement and all of its terms shall be confidential, and each party agrees that, except as may be required by law, it shall not make any disclosures with regard thereto without the prior written approval of the non-disclosing party.

h.      If any provision of this Agreement, or any covenant, obligation or agreement contained herein is determined by a court of competent jurisdiction to be invalid or unenforceable, such determination shall not affect any other provision, covenant, obligation or agreement, each of which shall be construed and enforced as if such invalid or unenforceable provision were not contained herein.  Such invalidity or unenforceability shall not affect any valid and enforceable application thereof, and each such provision, covenant, obligation or agreement, shall be deemed to be effective, operative, made, entered into or taken in the matter and to the full extent permitted by law.

i.      In the event of the occurrence of an event of force majeure which materially interferes with the production or delivery of the Program or with the rendition of 1inMM's material obligations hereunder, HBO shall have the right to suspend this Agreement and shall have the right, but not the obligation, to extend this Agreement by the length of any such suspension.

Exhibit 3c Page 84

FOIA Confidential Treatment Requested                                                            JJMT-SEC-0004909

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be
executed by a duly authorized representative as of the date first set forth above.

**HBO LATIN AMERICA HOLDINGS**          **1INMM CAPITAL LLC**

By: _____          By: _____

Its: President of Operations            Its: M.P.

HBO-1inMM                                                          12

Exhibit 3c Page 85

**FOIA Confidential Treatment Requested**                              **JJMT-SEC-0004910**

## EXHIBIT A
## ASSIGNMENT OF DISTRIBUTION RIGHTS
## UNDER COPYRIGHT

For good and valuable consideration, the receipt of which is hereby acknowledged, the undersigned, 1inMM Capital LLC ("1inMM"), hereby licenses, grants, transfers and assigns to

### HBO Latin America Holdings

*aka* "HBO" (a California corporation) and its successors and assigns ("Distributor"), the sole and exclusive right, under copyright, to exhibit, distribute, market, advertise, license or otherwise exploit the following feature length motion picture ("Program") throughout the Territory for the License Period as defined below, by means of television, howsoever delivered:

**Title of Program**: LOOK AWAY

**Territory**: Africa and Anguilla, Antigua, Argentina, Aruba, Bahamas, Barbados, Barbuda, Belize, Bermuda, Bolivia, Bonaire, Brazil, Cayman Islands, Chile, Colombia, Costa Rica, Cuba, Curacao, Dominica, Dominican Republic, Ecuador, El Salvador, French Guiana, Grenada, Guadeloupe, Guatemala, Guyana, Haiti, Honduras, Jamaica, Martinique, Mexico, Montserrat, Nicaragua, Panama, Paraguay, Peru, Saba, St. Barthelemy, St. Eustatius, St. Kitts & Nevis, St. Lucia, St. Maarten, St. Martin, St. Vincent & Grenadines, Suriname, Trinidad & Tobago, Turks & Caicos, Uruguay, Venezuela, and British Virgin Islands.

**License Period**: Commences on the Program's Availability Date and expires three (3) years thereafter; provided, however, that the License Period shall include an additional exclusive play-off period of six (6) months for all licenses in existence as of the last day of the License Period during which HBO may continue to exercise the Rights.

1inMM hereby irrevocably appoints Distributor as its attorney-in-fact, with full power and authority to do all such acts and things, and to execute, acknowledge, deliver, file, register and record the Program and all documents pertinent thereto, in the Copyright Office of the United States of America and in any other office or offices in any other jurisdictions in the name, stead and on behalf of the 1inMM, as Distributor may deem necessary or proper to accomplish the same, this being a power coupled with an interest.

Distributor is hereby empowered by 1inMM to bring, prosecute, defend and appear in suits, actions and proceedings of any nature, concerning any copyright in and to the Program or any infringement of such copyright or violation of any of the rights licensed to Distributor herein, but at the cost and expense of Distributor, and, at its option, Distributor may join the 1inMM as a party plaintiff or defendant in any such suit, action or proceeding. Any recovery of damages, penalties, costs or other amounts arising by reason of the infringement of any such copyright(s) or violation of the rights licensed to Distributor herein has been assigned, and shall be paid, to Distributor.

Exhibit 3c Page 86

FOIA Confidential Treatment Requested                                    JJMT-SEC-0004911

This Assignment is dated as of, and is subject to all of the terms, conditions and provisions of the Agreement between 1inMM and Distributor dated as of 08/27/2019.

1INMM CAPITAL LLC

Signed: _____

By: __Z Horovitz_____

Its:___M.P._____/Authorized Signatory

Exhibit 3c Page 87

**FOIA Confidential Treatment Requested**                                    **JJMT-SEC-0004912**

# Exhibit 4a

## INTERNATIONAL LICENSE AGREEMENT

THIS AGREEMENT (the "Agreement") is made as of October 02, 2019, between SIERRA/AFFINITY ("Sales Agent"), whose address is 9378 Wilshire Blvd, Beverly Hills, CA 90212, as sales agent on behalf of Meyer Media Group ("Licensor"), and the party named below ("Distributor"). Licensor and Distributor each hereby agree as set forth herein below.

1.     **DISTRIBUTOR**: 1INMM CAPITAL LLC
       Address: 3129-A S. La Cienega Blvd Los Angeles, CA
       Ph. No.: 773.724.0290
       Attn.: Zachary Horwitz
       Email: zach@1inmm.com

2.     **PICTURE**:     **"Bitter Harvest** (the "Picture").
                        Starring: Aneurin Barnard and Barry Pepper
                        Director: George Mendeluk
                        Writer: Richard Hoover

3.     **TERRITORY**:

(A)     The **"Latin American Territory"** shall be defined as Anguilla, Antigua, Argentina, Aruba, Bahamas (non-exclusive only), Barbados, Barbuda, Belize, Bolivia, Bonaire, Brazil, Cayman Islands, Chile, Colombia, Costa Rica, Cuba, Curacao, Dominica, Dominican Republic, Ecuador, El Salvador, French Guiana (non-exclusive only), Grenada, Guadeloupe, Guatemala, Guyana, Haiti (non-exclusive only), Honduras, Jamaica, Martinique (non-exclusive only), Mexico, Montserrat, Nicaragua, Panama, Paraguay, Peru, St. Barthelme, St. Lucia, St. Martin, St. Vincent & Grenadines, Suriname (non-exclusive only), Trinidad & Tobago, Turks & Caicos, Uruguay, Venezuela, Virgin Islands (British), and

(B)     The **"African Territory" shall** be defined as South Africa, Angola, Cape Verde, Ethiopia, Lesotho, Namibia, Zimbabwe, Botswana, Mozambique, Swaziland, Malawi, Zambia, Kenya, Uganda, Tanzania and Nigeria

(the "Latin American Territory" and "African Territory" shall be collectively defined as the "Territory").

4.     **TERM**: For all Licensed Rights (as defined below) herein, the Term shall commence on full execution of this Agreement and expire Fifteen (15) years thereafter (the "Term").

5.     **AUTHORIZED LANGUAGE (S)**:

(A)     In the Latin American Territory: subtitled and/or dubbed in Spanish and Portuguese (the "Latin American Authorized Language(s)").

(B)     In the African Territory: subtitled and/or dubbed in local languages indigenous to the African Territory (the "African Authorized Language(s)").

(C)     The languages granted in Paragraphs 5(A) and (B) shall be collectively defined as  the "Authorized Language(s)".

(D)     Any and all DVD or Home Video packaging shall be in the Authorized Language(s) only and not in the English language.

6.     **FLAT LICENSE FEE**: Distributor shall pay Licensor a non-returnable License Fee in the amount of Seven Hundred Forty-Two Thousand Two Hundred Fifty United States Dollars (US $739,500.00) net of all taxes and without deduction of any kind (the "License Fee"), payable as follows:

       One Hundred Percent (100%) [US$742,250.00] due on full execution of this Agreement.

Distributor's Licensed Rights do not vest until Licensor has received 100% of the License Fee and full payment for the costs of the Delivery Materials. Distributor is not licensed and shall not exploit any of the Licensed Rights until such amounts are paid in full. Sales Agent will not be obligated to deliver to Distributor any Delivery Materials until 100% of the License Fee and full payment for the costs for the Delivery Materials (including shipping) have been remitted by Distributor and received by Sales Agent. Distributor acknowledges and agrees that time is of the essence and the payment schedule set forth herein will be strictly enforced.  Failure to pay by the due dates herein will result in Licensor or Sales Agent having the right to terminate this

Exhibit 4a Page 89

**FOIA Confidential Treatment Requested**                                                   **JJMT-SEC-0004913**

Agreement and pursue all legal and equitable remedies.

All installments of the License Fee, as well as all other monies due to Licensor under this Agreement, including Delivery Materials costs, will be paid by wire transfer to the following account:

[ACCOUNT INFORMATION TO BE PROVIDED WITH INVOICE]

7.    **MATERIALS / DELIVERY**:

      (A)    Distributor shall order and pay for the Initial Materials (as defined below) within thirty (30) days following the date that Sales Agent provides Distributor with notice that Sales Agent is ready to effect Delivery (as defined below) of such Initial Materials ("Notice of Delivery"). Distributor acknowledges that (i) there is no guaranteed outside completion date, (ii) the Picture will be ready for delivery to Distributor only when final and complete, and (iii) the determination of finality and related timing for Delivery (taking into account both the completion of the Picture and additional factors affecting the timing of international release such as festival and award considerations) shall be at Licensor's sole discretion).

      (B)    Delivery as used herein means delivery (at Distributor's cost of materials and shipping to be fully paid prior to shipment) of the Initial Materials and Additional Materials set forth below and in the Delivery Schedule attached hereto and incorporated herein as Exhibit "A" ("Delivery Materials"). Distributor acknowledges and agrees that it has reviewed the Delivery Materials list below and that no other Delivery Materials are required in order for Distributor to exercise its rights under this Agreement.

      Initial Materials:

- Theatrical:  35 mm Print (which may be used);
- Theatrical: Music Cue Sheet (which Sales Agent may provide electronically);
- Video/DVD: Beta or Digital Betacam PAL or NTSC Master (Sales Agent's election following consultation with Distributor) of the Picture; and
- Dialogue List (which Sales Agent may provide electronically)
  Additional Materials (to be delivered only if and when available):

- Key Art (which Sales Agent may provide electronically).

      (C)    Distributor will have ten (10) days to review and evaluate the Delivery Materials, and each delivery item delivered hereunder will be deemed acceptable for all purposes hereunder unless Distributor gives Sales Agent written notice of rejection within ten (10) days after Distributor's receipt or access to such item ("Notice of Rejection"). Distributor may only reject Delivery Materials on grounds of technical quality and not for any other  reason, including probability of commercial success or artistic grounds. The Notice of Rejection must include  a laboratory report from a reputable recognized laboratory in  the theatrical motion picture business stating full details of   the technical defects in any rejected  item(s).

      (D)    Sales Agent has thirty (30) days after receipt of a Notice of Rejection to cure such rejection by correcting the asserted defect(s) or delivering replacement item(s), or submit the issue of whether Delivery was effected to arbitration as set forth below. If Sales Agent elects to cure such rejection, then the time periods set forth above for review and cure will be applicable to the delivery of corrected and replaced Delivery Materials as   well.

      (E)    Distributor hereby acknowledges and agrees that no individual(s) or specification(s), including without limitation the any cast member or the director, and no other specifications is (are) essential for purposes of effectuating Delivery and Distributor may not refuse to accept Delivery should any individual(s) be replaced or specification changed for any reason whatsoever.

      (F)    All disputes with regard to Delivery will be resolved by IFTA Arbitration (as further set forth herein). The sole remedy of Distributor in any such IFTA Arbitration for a failure for any reason to deliver the Delivery Materials will be the return of the License Fee or portion thereof previously paid, and under no circumstances will Distributor be entitled to interest, lost profits, consequential damages or any equitable or injunctive relief. Additionally, Distributor shall not be entitled to any such return of the License Fee if the Picture has been released in any medium in the Territory.

2

Exhibit 4a Page 90

**FOIA Confidential Treatment Requested**

**JJMT-SEC-0004914**

   (G)  Title to all materials delivered to Distributor in connection with the Picture will remain with Licensor or Sales Agent (as applicable). Distributor will exercise due care in safeguarding all materials and will assume all risk for theft or damage while they are in transit or Distributor's possession. In respect of all materials created or manufactured by Distributor (including without limitation all Picture copies, packaging, artwork, marketing, dub and sub-titled language tracks, so-called "bonus materials," etc.), Licensor is the copyright owner from inception, provided that if such ownership is not allowed under a law in the Territory, Distributor hereby grants (and from creation of each such item shall by the terms hereof grant) to Sales Agent an irrevocable royalty-free license to use all such materials worldwide in perpetuity in all media now known or hereinafter devised. In all cases, Distributor shall only use such materials during the Term to exploit the Licensed Rights. The creation of dubbed and sub-titled language tracks and related versions of the Picture, the trailers thereof, and any other materials created or duplicated by Distributor hereunder are to be made at Distributor's sole cost.

   (H)  Upon termination of this Agreement, Distributor will, at Sales Agent's election, either: (i) return to Sales Agent at Distributor's expense all materials in connection with the Picture (including without limitation all film and digital pre-print and exhibition materials, video inventory, marketing materials, and language tracks), whether such materials were delivered to Distributor or created by Distributor or any of its sub-distributors or licensees; or (ii) destroy all such materials and provide Sales Agent with a customary certificate of destruction executed by an authorized officer of Distributor.

   (I)  All costs of Delivery, return and destruction (including shipping charges, import fees, duties, brokerage fees, storage charges and related charges) will be Distributor's sole responsibility.

8.  **LICENSED RIGHTS / RESERVED RIGHTS / HOLDBACKS**:

   (A)  Subject to the condition precedent of timely payment in full of the License Fee without deduction or offset of any kind, Licensor shall license to Distributor the following exclusive distribution rights to the Picture for the Territory, for the duration of the Term, and in the Authorized Language(s) ("Licensed Rights"). All rights not specifically licensed herein whether now known or hereafter devised (including without limitation so-called "clip rights" to license excerpts of the Picture for unrelated third party use) are reserved to Licensor ("Reserved Rights"). Distributor is expressly prohibited from exploiting any of the Reserved Rights.

| Licensed Right | Licensed to Distributor | Reserved to Licensor | Distributor's Holdback Period |
|---|---|---|---|
| Cinematic Rights: | | | |
| Theatrical | X___ | _____ | |
| Non-Theatrical | X___ | _____ | |
| (including Hotel/Motel Rights) | | | |
| Public Video | X___ | _____ | |
| Commercial Video | X___ | _____ | |
| | | | |
| Home Video Rights: | | | |
| Home Video Rental | X___ | _____ | |
| Home Video Sellthru | X___ | _____ | |
| | | | |
| Ancillary Rights: | | | |
| Airline | X___ | _____ | |
| Ship | X___ | _____ | |
| | | | |
| Pay TV Rights: | | | |
| Terrestrial | X___ | _____ | * |
| Cable | X___ | _____ | * |
| Satellite | X___ | _____ | * |
| | | | |
| Free TV Rights: | | | |
| Terrestrial | X___ | _____ | * |
| Cable | X___ | _____ | * |
| Satellite | X___ | _____ | * |

Exhibit 4a Page 91

**FOIA Confidential Treatment Requested**

**JJMT-SEC-0004915**

| | | |
|---|---|---|
| Free Video-on-Demand | X | |

Other TV Rights:

| | | |
|---|---|---|
| Video-On-Demand ("VOD") | X | |
| Subscription VOD ("SVOD") | X | |
| Near VOD ("NVOD") | X | |
| Pay-Per-View | X | |

Internet Rights: Post Home Video Window

| | | | |
|---|---|---|---|
| VOD (e.g., iTunes) | X | | |
| SVOD (e.g., Netflix) | X | | |
| Transactional VOD ("TVOD") | X | | |
| Electronic Rental | X | | * |
| Electronic Sell Thru ("EST") | X | | * |

(B)     Holdbacks:

Distributor shall hold back its exploitation of the Licensed Rights marked "*" above until the initial release of the Picture in the United States (the "First US Theatrical Release"), unless otherwise waived or shortened by Sales Agent by written notice.

(C)     All transmissions of the Picture hereunder in exercise of the Pay TV, Satellite Free TV, Other TV, and Internet Rights as set forth herein shall be encrypted or encoded in such manner that may be decrypted or decoded only by the use of authorized decryption or decoding equipment, the sale and use of which equipment is limited to the Territory. Any exercise of the Other TV Rights is expressly conditioned upon Distributor providing Sales Agent with acceptable written documentation verifying implementation of such encryption protections for all exercise of such rights.

(D)     Intentionally deleted.

(E)     Television Runs:

(i)     Pay TV: Unlimited runs.

(ii)     Free TV: Unlimited runs.

(F)     The parties acknowledge that when the Picture is transmitted by satellite and/or cable for reception in the Territory, such transmission may be capable of reception outside the Territory due to the inherent technical capability of satellites to beam down signals and/or cable systems to transmit signals, which are not confined to territorial boundaries ("Distributor Overspill"). Sales Agent agrees that the occurrence of Distributor Overspill shall not constitute a breach of this Agreement, provided that (i) the transmission is not primarily intended for reception outside the Territory and (ii) Distributor receives no direct revenue from such overspill. Additionally, the parties acknowledge that when the Picture is transmitted by satellite and/or cable for reception outside the Territory, such transmission may be capable of reception inside the Territory due to the inherent technical capability of satellites to beam down signals and/or cable systems to transmit signals, which are not confined to territorial boundaries ("Overspill"). Distributor agrees that the occurrence of Overspill shall not constitute a breach of this Agreement by Sales Agent or Licensor, provided, that (i) the transmission is not primarily intended for reception inside the Territory and (ii) Sales Agent and/or Licensors (or their licensees) receive no direct revenue from such overspill.

(G)     Distributor's right to exploit Internet Rights in the Picture are subject to the terms and conditions of the STCs (as hereafter defined), including without limitation a requirement to utilize current commercially reasonable technological safeguards to ensure that accessing, streaming or downloading of the Picture is limited solely to reasonably identifiable locations within the Territory (e.g., geofiltering). Notwithstanding the foregoing, to the extent Distributor is supplied approved promotional clips of the Picture formatted for use on the Internet, Distributor may use up to three (3) minutes in the aggregate of such clips on the Internet solely for purposes of promoting the Picture and provided such clips are posted solely within a domain bearing the identification code of one of the countries of the Territory.

(H)     Distributor shall use its best efforts and skill in the distribution and exploitation of the Picture, and

4

Exhibit 4a Page 92

FOIA Confidential Treatment Requested

Distributor shall exercise its rights hereunder in a fair, reasonable, customary and non-discriminatory manner with respect to Licensor or Sales Agent.

9.      **NO DISPOSITION OF GROSS RECEIPTS**: Licensor is licensing the Picture to Distributor on a so-called "flat" basis; therefore, subject to Sales Agent's receipt of the License Fee in accordance with the terms of this Agreement, no other payments whatsoever shall be due to Sales Agent and/or Licensor hereunder.

10.     **ACCOUNTINGS:** Intentionally deleted.

11.     **PAYMENT REQUIREMENTS**:

        (A)     The License Fee shall be paid in the amounts specified and required hereunder, which amounts as stated in this Agreement shall be deemed net sums in respect of which Distributor shall have separately paid at its own expense any required withholding and/or remittance taxes required by laws of the Territory such that no amounts shall be deducted from the payments to Licensor specified in this Agreement.

        (B)     There will be no deductions from any payments due to Licensor, including the License Fee, because of any bank charges, conversion costs, sales use or VAT taxes, "contingents", quotas or any other taxes, levies or charges, all of which shall, if required, be paid separately by Distributor.

        (C)     If it is legally impossible to transmit any monies due to Licensor, then Distributor will immediately so notify Sales Agent in writing. Distributor will then deposit such monies at Distributor's expense in Sales Agent's or Licensor's name, as Sales Agent shall designate, in such depository as may be designated by Sales Agent.

        (D)     All payments to Licensor will be in United States dollars computed at the prevailing exchange rate on the date due at Licensor's bank, provided that the exchange rate for any late payments shall be the most favorable prevailing daily rate for Licensor between the due date and the date of payment.

        (E)     Any payment due Licensor not made by its due date will, in addition to any other right or remedy of Licensor, incur a finance charge at the lesser of the prevailing US Prime rate plus three percent (3%) or the highest applicable legal contract rate until paid in full.

12.     **MARKETING / ADVERTISING**:.

        (A)     Intentionally deleted.

        (B)     Intentionally deleted.

        (C)     Any marketing or advertising materials created by Distributor and any alterations by Distributor to any artwork or other marketing materials furnished by Sales Agent must satisfy all of Licensor's and Sales Agent's underlying contractual obligations and shall in all instances be subject to Sales Agent's prior written approval before Distributor shall make any use of such materials.

        (D)     Distributor shall comply with all contractual credit, likeness, dubbing, subtitling, editing, marketing, publicity, promotional or other similar restrictions or requirements provided to Distributor.

        (E)     Intentionally deleted.

        (F)     Intentionally deleted.

        (G)     Intentionally deleted.

        (H)     Intentionally deleted.

13.     **EDITING / BILLING**:

        (A)     Distributor may only cut and edit the Picture to the extent necessary to meet governmental censorship requirements. Any such cutting or editing shall only be permitted with Sales Agent's prior written approval and Distributor shall comply with all editing restrictions and requirements provided by Sales Agent. Except for such editing for censorship, the Picture

5

FOIA Confidential Treatment Requested

shall be exhibited and otherwise distributed only in its original continuity as supplied by Licensor without alteration, interpolation, cut or elimination.

       (B)      Distributor may include, before or after the Picture and all credits thereof, the credit or logo of Distributor, which precise placement must be pre-approved in writing by Sales Agent.

       (C)      Intentionally deleted.

       (D)      Distributor shall not do any of the following:

       (i)      Change the title of the Picture as it appears in the original language of the Picture (except that Distributor may translate the title in the Authorized Language(s);

       (ii)      Alter or delete any credit, logo, copyright notice or trademark notice, or anti-piracy warning appearing on the Picture; and

       (iii)      Include any advertisements or other material in the Picture, preceding the Picture, or following the Picture in any medium including Home Video other than an approved anti-piracy warning and commercials for Free TV exploitation (if Free TV rights are licensed herein).

       (E)      Distributor's obligations hereunder shall be binding on its subsidiaries, parents, affiliates, agents, sub-distributors and licensees.

    14.      15.      **MUSIC CONTAINED IN THE PICTURE**:

       (A)      Licensor will be responsible for acquiring all rights necessary to synchronize the music contained in the Picture as delivered to Distributor and on all copies exploited by Distributor hereunder, and for paying all royalties or charges incurred in obtaining and maintaining such synchronization licenses in effect for the Term.

       (B)      The Performance Rights with respect to the music contained in the Picture shall either be in the public domain in the Territory, be controlled by Licensor sufficient to allow Distributor to exploit all of Licensed Rights without the necessity of any additional payment, or be available by license from the local music performing rights society in the Territory affiliated with the American Society of Composers, Authors and Publishers (ASCAP), Broadcast Music, Inc. (BMI), or SESAC, Inc. (SESAC). Distributor will be solely responsible for any royalties, however denominated, which any mechanical, performing or authors right society in the Territory attempts to collect in connection with the exploitation of the Picture in the Territory.

16.      **ADDITIONAL TERMS**:

       (A)      Distributor acknowledges that the financing for the Picture will be provided by financiers who may require a completion guarantee or other financial assurances. The Distributor agrees to execute within twenty-four (24) hours of receipt such further documentation as may be required by the Licensor to accommodate such interests, including, without limitation, an Acceptance and Acknowledgement of a Notice of Assignment in the form customarily required by such financiers and completion guarantor (if any), and any and all documents or other instruments and acts required by such financiers and/or completion guarantor in connection with the establishment of a collection account or otherwise. In the event Distributor fails to execute and deliver all such documentation within five (5) business days of receipt of written notice thereof, then Distributor agrees that Sales Agent may, as it may elect in its discretion, terminate this Agreement or execute such documentation in the name of Distributor, for which purpose Distributor hereby irrevocably appoints Sales Agent as Distributor's attorney-in-fact, a power coupled with an interest, with full right to execute any and all such documentation.

       (B)      Licensor may, in its absolute discretion, require Distributor to establish a Letter of Credit or other such form of payment (by way of example only, a bank guarantee) acceptable to Licensor to secure all or any part of the License Fee. In the event that the Licensor requests any such Letter of Credit(s), Distributor shall open the Letter of Credit and deliver same to Sales Agent within ten (10) working days following the Sales Agent's request. The Letter of Credit and any confirmation which may be required by Licensor or Licensor's bank must be irrevocable and in a format and issued by a bank acceptable to Licensor and Licensor's bank. At Sales Agent's election, any failure on Distributor's part to deliver the Letter of Credit within such ten (10) day period may result in the termination of this Distribution Agreement by written notice to Distributor. All costs of the Letter of the Credit and of any required confirmation shall be paid by Distributor.

**FOIA Confidential Treatment Requested**                              **JJMT-SEC-0004918**

(C)     Neither Licensor nor Sales Agent can guarantee against piracy in the Territory and any piracy of the Picture, whether occurring before or after execution of this Agreement, shall not constitute a breach by Licensor nor a basis for damages claims, payment reductions, or termination hereunder.

(D)     Any delay of action hereunder by Sales Agent shall not be construed as a waiver of any rights or remedies, and any express waiver by Sales Agent of any specific right or remedy hereunder shall not constitute a waiver of any other rights or remedies regarding the same issue (including without limitation any preceding, continuing, or succeeding breach) or any other matter arising under this Agreement.

(E)     Any terms not set forth in this Agreement (including any capitalized words used herein without express definition) will be determined solely by reference to the most current IFTA Standard Terms and Conditions ("STCs") as of the date of this Agreement, which STCs are incorporated in their entirety herein and thereby comprise an integral component of this Agreement. In the event of any inconsistency between the terms of this Agreement and the STCs, the terms of this Agreement prevail.

(F)     Sales Agent is acting solely in its capacity as duly authorized agent on behalf of Licensor in connection with this Agreement.

17.     **NOTICES**:  All notices hereunder shall be in writing and shall be sent to the recipients at the address and/or fax number and/or email address set forth above (or such subsequently changed address of which the sending party has received notice hereunder). Notices to Licensor shall be sent to the attention of c/o SIERRA/AFFINITY , whose fax number is (310) 587-2381.

18.     **REPRESENTATIONS AND WARRANTIES**: Distributor represents and warrants to Licensor that:

(A)     It has full authority and capacity to execute this Agreement and full legal and financial ability to perform all of its obligations under this Agreement;

(B)     There are no existing or threatened claims or litigation which would adversely affect or impair Distributor's ability to perform under this Agreement;

(C)     No dubbed or subtitled version of the Picture created by or to be created by Distributor does or will: (a) defame, or hold in a false light, or infringe any privacy or publicity or other personal right of any person; or (b) infringe any copyrights, trademark, patent, trade secret, rights of ideas, or similar property rights of any person;

(D)     It will employ at all times controls in accordance with prevailing customary standards in the Territory as used by major studios to prevent and deter theft, piracy, unauthorized copying, accessing, streaming or downloading (as applicable) of any copy of the Picture where the Picture is made available via any of the Licensed Rights granted herein;

(E)     It will indemnify and hold harmless Licensor and Sales Agent, and their parents, officers, directors, owners, shareholders, employees, attorneys agents, and successors and assigns from all claims, loss, liability, damages or expenses, including reasonable attorney's fees and legal costs, but not including lost profits due to breach of any of Distributor's representations, warranties covenants or conditions under this Agreement.

(F)     It will comply with all credit and talent obligations in connection with Picture as provided to Distributor by Sales Agent.

19.     **DEFAULT AND TERMINATION**:

(A)     Distributor will be in default of this Agreement in the event of any of the following circumstances:

7

FOIA Confidential Treatment Requested

(i)     Distributor fails to pay any installment of the License Fee or any other amounts due under this Agreement or any other agreement with Sales Agent when due;

(ii)     Distributor becomes insolvent or fails to pay its debt obligations when due;

(iii)     Distributor makes an assignment for the benefit of creditors, seeks relief under any bankruptcy law or similar law for the protection of debtors, or allows a petition of bankruptcy to be filed against it, or a receiver or trustee to be appointed for substantially all of its assets that is not removed within thirty (30) days;

(iv)     Distributor breaches any material term, covenant or condition of this Agreement or any other agreement with Sales Agent;

(v)     Any affiliate, parent, subsidiary, sub-distributor, or licensee of Distributor breaches any material term, covenant or condition of this Agreement or any other agreement with Sales Agent; term, covenant or condition of this Agreement or any other agreement with Sales Agent;

(vi)     Distributor attempts to make any assignment, transfer, sublicense or appointment of an agent without Sales Agent's prior written approval; or

(vii)     Distributor fails timely to sign a Notice of Assignment as provided below.

(B)     Sales Agent will give Distributor notice of any claimed default. If the default is capable of cure, then Distributor will have ten (10) days after receipt of Sales Agent's notice to cure a monetary default, and twenty (20) days after receipt of Sales Agent's notice to cure a non-monetary default. If the default is incapable of cure, or if Distributor fails to cure within the time provided, then Licensor may proceed against Distributor for available relief, including but not limited to terminating this Agreement or any other agreement with Sales Agent retroactive to the earliest date of default, suspending Delivery of the Picture, and declaring all unpaid amounts due Licensor immediately due and payable.

(C)     As a result of termination of this Agreement or any other agreement between Distributor and Sales Agent, with respect to those pictures as to which all rights are terminated:

(i)     All licensed rights in and to such picture shall automatically revert to Licensor, free and clear of any and all encumbrances and any sub-distribution agreements entered into by Distributor (other than those sub-distribution agreements deemed assigned to Licensor as specified below);

(ii)     All of Distributor's rights under any sub-distribution and license agreements that have been pre-approved in writing by Sales Agent shall be deemed to have been assigned to Licensor (and any such sub-distribution agreements not so approved, shall be deemed automatically terminated) and all payments to be made under such agreements shall be paid directly to Licensor who may notify all relevant parties of such assignment to Licensor;

(iii)     All monies payable by exhibitors or sub-distributors to Distributor in respect to such picture shall be paid to and retained by Licensor;

(iv)     Any portion of the License Fee for this Picture and License Fee(s) for such other picture(s) theretofore paid by Distributor shall be retained by Licensor or Sales Agent and any unpaid portion of the License Fee for this Picture or for such other picture(s), if any, shall accelerate and immediately become due and payable to Licensor or Sales Agent;

(v)     Licensor shall be entitled to immediate possession of all digital and film pre-print and print elements and copies of the Picture and such other picture(s), advertising materials and all other materials (including any Delivery Materials) pertaining to same;

(vi)     Distributor shall execute and deliver all instruments requested by Sales Agent to effectuate a termination of this Agreement and its rights in the Picture or for such other picture(s) as applicable, including without limitation instruments necessary or appropriate to reflect such termination on the public records of governmental agencies and/or with industry organizations in the Territory which maintain records of a similar nature;

(vii)     Distributor shall turn over all records, including books, billing and delivery records to the Picture or such other

8

Exhibit 4a Page 96

JJMT-SEC-0004920

picture(s), and all monies on hand, if any, relating to the Picture or such other picture(s); and

(viii)    Distributor hereby irrevocably appoints Sales Agent as Distributor's attorney-in-fact, a power coupled with an interest, with full right to execute any and all assignments and other instruments deemed by Sales Agent to be reasonably necessary or desirable to evidence the transactions provided hereunder and to protect its rights under this Agreement or such other agreement(s) as applicable.

20.    **TERMINATION OTHER THAN FOR DEFAULT**:

(A)    Upon written notice to Distributor, Sales Agent may in its sole discretion terminate this Agreement if principal photography of the Picture has not commenced within twelve (12) months following the date of this Agreement, the Picture is not ready for Delivery to Distributor within twenty-four (24) months following the date of this Agreement, or Licensor or Sales Agent abandons the Picture either prior to or after the commencement of principal photography.

(B)    In the event of such termination, Licensor shall return to Distributor such portion of the License Fee theretofore paid to Licensor by Distributor, and Distributor shall return to Sales Agent any and all materials, including, without limitation, all physical film materials, Delivery Materials, publicity materials and documents theretofore furnished  by Sales Agent to Distributor in connection with the Picture. Neither Licensor nor Sales Agent shall have any additional obligation of any kind whatsoever to Distributor, or anyone claiming through Distributor, by reason of such termination.

(C)    Distributor shall execute and deliver all instruments requested by Sales Agent to effectuate a termination of this Agreement and its rights in the Picture, including without limitation instruments necessary or appropriate to reflect such termination on the public records of governmental agencies and/or with industry organizations in the Territory which maintain records of a similar nature. Distributor shall turn over all records, including books, billing and delivery records to the Picture and all monies on hand, if any, relating to the Picture. Distributor hereby irrevocably appoints Sales Agent as Distributor's attorney-in-fact, a power coupled with an interest, with full right to execute any and all assignments and other instruments deemed by Sales Agent to be reasonably necessary or desirable to evidence the transactions provided hereunder and to protect its rights under this Agreement.

21.    **CHOICE OF LAW / ARBITRATION / FORUM**:

(A)    This Agreement shall be subject to the laws of the State of California applicable to agreements wholly executed and performed therein, and all parties hereby irrevocably consent to the exclusive jurisdiction and venue of the Federal and State courts located in Los Angeles County for any court matters arising hereunder.

(B)    Any and all disputes under this Agreement shall be submitted exclusively to binding arbitration ("IFTA Arbitration") in Los Angeles, California under the Rules of International Arbitration of the International Film and Television Alliance ("IFTA Arbitration Rules") in effect as of the date the request for arbitration is filed. Each party waives any right to adjudicate any such dispute in any other court or forum and Distributor waives any and all rights to seek equitable or injunctive relief or to rescind or terminate this Agreement or to seek such rescission or termination.  Los Angeles County will be deemed the "Forum" under the IFTA Arbitration Rules. Licensor (and where applicable Sales Agent) and Distributor agree to accept service of process for IFTA Arbitration in accordance with such Rules and to accept service of process for any judicial or other proceedings provided for hereunder by certified mail, return receipt requested, courier, or other personal delivery at the address indicated on this Agreement. Licensor (and where applicable Sales Agent) and Distributor agree to abide by any decision rendered in an IFTA Arbitration, and that any court having jurisdiction may enter judgment affirming such decision and may enforce such judgment in accordance with its powers.

(C)    Without limiting the aforesaid arbitration provisions and notwithstanding the exclusive jurisdiction provisions above, Licensor and Sales Agent shall additionally each have the right to proceed in any court of competent jurisdiction anywhere in the world to either (i) seek such interim protective relief, including equitable remedies as may be considered reasonably necessary to protect their rights and entitlements pursuant to this Agreement, or (ii) seek enforcement  of any arbitration award or related judgment hereunder.

(D)    The prevailing party or parties in any arbitration hereunder shall be entitled to an award in such arbitral proceeding for reimbursement of its or their (as applicable) legal fees (including attorneys fees) and costs of arbitration (including discovery and expert witness costs). The prevailing party or parties in any judicial action hereunder shall similarly be entitled to court order or judgment reimbursing it or them (as applicable) for all legal fees (including attorneys fees) and costs incurred in connection with such matter and in connection with any applicable arbitration as aforesaid.

9

Exhibit 4a Page 97

**FOIA Confidential Treatment Requested**

**JJMT-SEC-0004921**

22.     **CONFIDENTIALITY**: All terms of this Agreement shall be confidential and not disclosed to any third party except each party's accountants, attorneys and agents, and as necessary to perform each parties' rights and obligations hereunder, and except as required by law or judicial order.

23.     **COUNTERPARTS**:    This Agreement may be executed in counterparts which may be delivered by ink-signed originals, fax or digital copy in pdf or tiff format, each of which shall be deemed to be an original and such counterparts of all parties when taken together shall constitute the fully binding and executed Agreement.

24.     **BINDING AGREEMENT**: This Agreement, any exhibits attached hereto, and the STC's incorporated herein sets forth the entire understanding and agreement between Licensor and Distributor as to the subject matter hereof and supersedes all previous discussions, correspondence, inducements, agreements, warranties or representations, whether oral or written. This Agreement is binding on each of the parties and their respective successors and assigns. Except as expressly provided herein, this Agreement may only be amended in writing signed by Sales Agent on behalf of Licensor and Distributor.

THIS AGREEMENT is executed as of the parties as of the date first above written.

[signatures on the following page]

10

Exhibit 4a Page 98

**FOIA Confidential Treatment Requested**                                    **JJMT-SEC-0004922**

**AGREED AND ACCEPTED:**

SIERRA/AFFINITY ("Sales Agent") as agent
On behalf of Meyer Media Group ("Licensor")          1inMM Capital LLC ("Distributor")

By: _____          By: _____

Its: EVP International Sales          Its: MANAGING PARTNER

11

Exhibit 4a Page 99

**FOIA Confidential Treatment Requested**                    **JJMT-SEC-0004923**

**Exhibit "A"**

This Exhibit A is attached and incorporated into that certain International License Agreement dated as of October 2, 2019, by and between SIERRA/AFFINITY ("Sales Agent") as sales agent on behalf of Meyer Media Group ("Licensor") and 1inMM Capital LLC ("Distributor") whereby Licensor granted to Distributor certain distribution rights in and to the motion picture entitled "Bitter Harvest (the "Picture").

## LEGAL DELIVERABLES

1.    Clearly legible copies of all chain-of-title documents required by Distributor, evidencing Licensor's proper ownership and permitting the use of any and all literary, dramatic, musical and other material used in the production of the Program or upon which the Program and/or screenplay may be based, together with certificates of authorship and proof of payment in connection with the acquisition of the necessary rights in and to such material and the exercise of all options related thereto.

2.    Evidence satisfactory to Distributor that there is no lien, charge, encumbrance or security interest that would adversely interfere with the Licensed Rights granted to Distributor.

3.    A (a) copyright report issued by a Thomson CompuMark, (b) title report and (c) opinion issued.

4.    A complete typewritten statement of all third party screen and paid advertising credit, name and likeness, and other third party obligations, restrictions and approval rights including, without limitation, all dubbing obligations (if any), director's editing rights, video mastering consultation or approval rights, etc. for each individual and entity named in the billing block with excerpts from each applicable third party agreement setting forth the precise extent and nature of such obligations, restrictions and/or approval rights, in the identical order as listed in the billing block.

5.    The proposed paid ad/packaging summary, credit and billing block layout for both full- and small-sized paid ads.

6.    The final copyright notice, as it appears on the billing block.

7.    Clearly legible copies of fully-executed agreements for all key actors and key production personnel (e.g., director, producer, writer, etc.) and any other talent and/or crew agreements requested by Distributor.

8.    If the Program or underlying materials or properties are based upon or related to events in the real life of real persons, living or dead, or portrays real persons, true and correct copies of all personal releases and other documentation showing that Licensor has all rights necessary to permit Distributor to exploit the Picture in the manner provided herein without violating any third party rights or incurring any obligations to any third party.

9.    A complete written statement showing the exact form and manner of the main and end titles of the Picture.

10.    One (1) typewritten (or computer generated) hard copy and one (1) copy in digital format of a music cue sheet in standard form showing the particulars of all music synchronized with the Program (all versions) and additional cue sheets for the trailer(s) and any other materials in connection with the Program containing original and/or licensed music. All such cue sheets will include for each cue: (i) the title of song; (ii) the name of the songwriter/composer; (iii) the songwriter's/composer's performing rights affiliation (e.g., ASCAP, BMI or SESAC); (iv) the name of publisher; (v) the publisher's performing rights affiliation; (vi) the type of use; (vii) the length of the use; and (viii) an indication of whether or not a master recording was licensed.

11.    Clearly legible, fully-executed copies and proof of payment for any and all synchronization licenses and master use licenses, all valid and sufficient to provide Distributor with the right to use and perform all musical compositions and master recordings contained in the Picture and trailer (if available).

12.    Clearly legible copies of the copyright registration certificate(s) with the US Copyright Office for both the screenplay and Picture.

Exhibit 4a Page 100

FOIA Confidential Treatment Requested

JJMT-SEC-0004924

# Exhibit 4b

**PROMISSORY NOTE**

**$ (999,845.00)**                                                                 **(09/27/2019)**

<u>Promise</u>. 1INMM Capital, LLC, a limited liability entity established in the State of California, (the "Maker"), hereby promises to pay to Lender, JJMT CAPITAL LLC, a Delaware Limited Liability company located at  (<u>541 N Fairbanks Ct. STE 2200 Chicago, IL 60611),</u> (the "Payee"), an amount equal to (<u>NINE HUNDRED NINETY-NINE THOUSAND EIGHT HUNDRED FORTY-FIVE)</u> Dollars ($999,845.00) in lawful money  of the United States of America, which sum shall be due and payable on (03/27/2020)  (the "Maturity Date"), in one (1) balloon payment, in  like money at said office. Payment date shall be no later than SIX (6) months post confirmed funds transfer from Payee to Maker in the amount of <u>(SEVEN HUNDRED FORTY-TWO THOUSAND TWO HUNDRED FIFTY)</u> Dollars (<u>$742,250.00</u>).


<u>Prepayment Option</u>. Maker may pay down at any time any portion of the  principal sum outstanding without any prepayment penalty.

<u>Assignment of Rights.</u> See Appendix A

<u>Compounding of Unpaid Payments</u>. The undersigned agrees that time is of the  essence and that in the event payment of principal or interest due under this Note is not  made when due, giving effect to any grace period which maybe applicable, the  outstanding balance of unpaid payments hereof shall immediately bear interest at  the rate of ten (10) percent per month, for so long as  such event of default continues.

<u>Validity of Agreement to Conform to Law.</u> All agreements between the undersigned and the holder of this Note are expressly limited so that in no contingency or event whatsoever, whether by reason of advancement of the proceeds hereof, acceleration of maturity of the unpaid principal balance, or otherwise, shall the amount paid or agreed to be paid to the holder hereof for the use, forbearance or detention of money advanced hereunder exceed the highest lawful rate permissible under any law which a court of competent jurisdiction may deem applicable hereto. If, from any circumstances whatsoever, fulfillment of any provision hereof or any instrument securing this Note or any other agreement referred to herein, at the time performance of such provision shall be due, shall involve transcending the limit of validity prescribed by law which a court of competent jurisdiction may deem applicable hereto, then, ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity, and if from any circumstances the holder hereof shall ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the

**FOIA Confidential Treatment Requested**                                                                 **JJMT-SEC-0004925**

reduction of the unpaid principal balance due hereunder and not to the payment of interest. This provision shall control every other provision of all agreements between the undersigned and the holder hereof.

Maker's Default. At the option of the holder hereof exercised by written notice to the undersigned, this Note shall become immediately due and payable upon the maker's failure to pay when due any payment of principal, interest or expenses due hereunder; or (b) failure in the performance or observance of any of the terms or conditions of any mortgage, deed of trust, security agreement or other agreement securing, guaranteeing or otherwise pertaining to this Note after giving effect to any applicable curative period which may be contained therein. Upon the occurrence of any of the following specified Events of Default, as defined under the standard conventions and terminology prescribed for promissory notes drafted under Warren's California Forms for Principal, Interest, Insolvency, Breach of Covenants, Breach of Representation and Warranties, (each herein called an "Event of Default") then, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, the Payee may, by written notice to the Maker, declare the principal of and accrued interest in respect of this Note to be forthwith due and payable, whereupon the principal of and such unpaid accrued interest in respect of this Note shall become forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Maker. Furthermore, This note shall become due and payable before the above-mentioned maturity date immediately upon the happening of any of the following events affecting any maker or indorser thereof, to wit: voluntary or involuntary filing of a petition in bankruptcy or for reorganization, execution of an assignment for the benefit of creditors, calling meeting of creditors, appointment of liquidating agent or committee, offer of composition, entry of a judgment in excess of $ 10,000 which remains unsatisfied or for over 30 days, application for appointment or appointment of any receiver, issuance of warrant of attachment or death of any maker or indorser or on default of any other obligations to the Maker.

Collection Costs. If this Note or any installment of principal or interest is not paid when due, whether at maturity or by acceleration, the undersigned promises to pay all costs of collection, including without limitation, actual attorneys' fees, and all expenses in connection with the protection or realization of the assets and proceeds available this Note or the enforcement of any subsequent memorandum or agreement created in conjunction with this Note incurred by the holder hereof on account of such collection, whether or not suit is filed hereon or thereon; such costs and expenses shall include, without limitation, all costs, expenses and attorneys' fees actually incurred by the holder hereof in connection with any insolvency, bankruptcy, arrangement or other similar proceedings involving the undersigned, or involving any endorser or guarantor hereof, which in anyway affects the exercise by the holder hereof of its rights and remedies under this Note or under any mortgage, deed of trust, security agreement, guaranty or other agreement securing or pertaining to this Note.

Waiver of Notice. Presentment, demand, protest, notices of protest, dishonor and nonpayment of this Note and all notices of every kind are hereby waived by all parties to

FOIA Confidential Treatment Requested

JJMT-SEC-0004926

this Note, whether the undersigned, principal, surety, guarantor or endorser, except as provided herein. To the extent permitted by applicable law, the defense of the statute of limitations is hereby waived by the undersigned.

Death of Maker. Maker of this note hereby waives all notice and demand and consent that this note shall become due and payable immediately upon the happening of any of said events. This note shall become due and payable on the Maturity Date, but payment shall be accelerated and become due and payable immediately if the Maker shall die. For the further security of the holder thereof, the undersigned covenants that so long as any part of the principal or interest of this note is outstanding and unpaid, it will not grant any security interest to any third party upon its property, or create any lien whatsoever thereon, without also thereby including therein this note, equally and ratably with every other evidence of debt, secured by any of the undersigned's property. If, while any part of the principal or interest is outstanding and unpaid, the maker hereof breaks this covenant, then the holder hereof may at his or its election, declare and make this note at once due and payable by written notice delivered to maker, and this remedy will be deemed cumulative and in addition to any other remedy available to the holder hereof. This note shall be paid without claim of set-off, counterclaim or deduction of any nature or for any cause whatsoever.

Extensions Granted by Payee. All indorsers hereunder agree that the holder of this note in case of non-payment thereof at maturity, or of any installment thereof when due, may grant to the maker or any indorser of said note any extension or extensions of time of payment thereof, in whole or in part, without notice to said indorsers or any of them and any such extension or extensions shall not affect in any way said indorsers' liability upon note, such indorsers hereby waiving demand, presentment of payment, notice of nonpayment and protest and do further agree that any holder of this note may in the event of default in the payment of principal of, or interest upon, this note or any installment thereof repossess and/or sell the (collateral) held as collateral security for the payment of this note without in any way relieving said indorsers, or any of them, of any liability by reason of such repossession and/or sale, applying the proceeds of sale of any such  asset less all costs to amount due under this note, and all indorsers agree to pay any deficiency on this note on demand.

Litigation Fees. In any action at law or in equity to enforce or construe any provisions or rights under this Note, the unsuccessful party or parties to such litigation, as determined by a court pursuant to a final offer, judgment or decree, shall pay to the successful party or parties all costs, expenses and reasonable attorneys' fees incurred by such successful party or parties (including, without limitation, such costs, expenses and fees on any appeal), which costs, expenses and attorneys' fees shall be included as part of any order, judgment or decree.

General Provisions. Principal and interest evidenced hereby are payable only in lawful money of the United States. The receipt of a check shall not, in itself, constitute payment hereunder unless and until paid in good funds. Whenever any payment on this Note shall be stated to be due on a day, which is not a business day, such payment shall be made on

Exhibit 4b Page 104

JJMT-SEC-0004927

the next succeeding business day and such extension of time shall be included in the computation of the payment of interest of this Note. This Note is to be governed by and construed in accordance with the laws of the State of California except to the extent United States federal law permits the holder to contract for, charge or receive a greater amount of interest. In any action brought under or arising out of this Note, the undersigned hereby consents to the in personam jurisdiction of any state or federal court sitting in the state of California, and waives any claim or defense that such forum is not convenient or proper, and consents to service of process by any means authorized by California and/or Federal law.

THE UNDERSIGNED HEREBY WAIVES, AND COVENANTS THAT THE UNDERSIGNED WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS NOTE, THE SUBJECT MATTER HEREOF OR ANY DOCUMENT RELATING HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING OR WHETHER IN CONTRACT OR IN TORT OR OTHERWISE.

_____                          _____ 09/27/19 _____

1INMM Capital, LLC                               Date
Zachary Horwitz, Manager

Exhibit 4b Page 105

FOIA Confidential Treatment Requested

APPENDIX A

<u>ASSIGNMENT</u>

This assignment ("Assignment") between 1INMM CAPITAL LLC, located at <u>(3129-A S. La Cienega Blvd Los Angeles, CA 90016)</u> ("Assignor") and JJMT CAPITAL LLC, a Delaware Limited Liability company located at ( <u>541 N Fairbank Ct. STE 2200 Chicago, IL 60611</u>) ("Assignee") is dated effective as of (<u>09/27/2019</u>).

For good and valuable consideration, the receipt and sufficiency of which hereby acknowledged, Assignor does hereby irrevocably and unconditionally sell, grant, convey, and assign unto Assignee all of Assignor's rights, title and interest of every kind and nature, throughout the universe, until assignee is paid (<u>$999,845.00</u>) at to which time all rights, title and interest of every kind and nature revert back to Assignor and to that certain motion picture, currently entitled "BITTER HARVEST" (the "Picture") based on the original screenplay entitled "BITTER HARVEST" written by Richard Hoover.

1.  Assignor hereby represents and warrants:

    1.1.   That Assignor is the sole and exclusive owner of the rights and privileges granted or to be granted to Assignee hereunder.
    1.2.   That, as of the effective date hereof, Assignor has the right to enter into this Assignment.
    1.3.   That, as of the effective date hereof, no part of the rights herein conveyed has in any way been encumbered, conveyed, assigned, transferred or otherwise disposed of and all such rights are therefore free and clear of any and all liens, claims, charges or encumbrances whatsoever in favor of any party whatsoever.

2.  Assignor shall indemnify Assignee, its successors, assigns, licensees and officers, and hold them harmless from and against any and all claims, liability, losses, damages, costs, expenses (including but not limited to attorney's fees) arising out of any breach by Assignor of any warranty made by Assignor hereunder.

3.  Assignee hereby assumes and agrees to be bound by all future obligations of Assignor which accrue after the date hereof.

4.  Assignor hereby waives the benefits of any provision of law known as "droit morale" or any similar law in any country of the world and agrees not to institute or permit any action or lawsuit on the ground that the Picture in any way constitutes an infringement of any "droit morale" and Assignor agrees that Assignor shall not, under any circumstances (including without limitation, the circumstances of a breach by Assignee) be entitled to enjoin the exhibition or other exploitation of the Picture, to terminate or rescind any rights granted to Assignee or to obtain any other form of equitable relief, specific performance or otherwise, any right to which Assignor expressly waives.

5.  This Assignment, and the rights granted hereunder, may not be assigned by Assignor to any person, firm or corporation. Assignee may assign this Assignment and the rights and services granted herein, together with the results and proceeds thereof, and the representations and warranties contained herein, to any person or entity.

Exhibit 4b Page 106

JJMT-SEC-0004929

6. This Assignment shall be construed in accordance with the laws of the state of California and shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, licensees and assigns. This Assignment cannot be amended or modified except in a writing signed by all parties hereto.

IN WITNESS WHEREOF, THE PARTIES HERETO HAVE EXECUTED AND DELIVERED THIS ASSIGNMENT AS OF THE (27)th DAY OF SEPTEMBER 2019.

1INMM CAPITAL, LLC ("Assignor")                    JJMT CAPITAL LLC ("Assignee")

By: _____                      By: _____

Its: MANAGING PARTNER                              Its: ___Managing Partner_____

Exhibit 4b Page 107

FOIA Confidential Treatment Requested                    JJMT-SEC-0004930

# Exhibit 4c

## DISTRIBUTION AGREEMENT

This Distribution Agreement ("Agreement"), dated (09/11/19), confirms the terms and conditions pursuant to which HBO Latin America Holdings ("HBO"), shall acquire from 1inMM Capital LLC, with an address at 3129-A S. La Cienega Blvd, Los Angeles, California, 90016 ("1inMM"), certain distribution rights in the "Program" in the "Territory" (as such terms are defined below) subject to the terms contained herein, all as set forth below.

1.    Definitions. All capitalized terms set forth herein, unless elsewhere defined, shall have the following meanings:

    a.    "Authorized Languages" means all languages, including all dubbed, voice-lectored and subtitled versions.

    b.    "Availability Date" shall have the meaning set forth in Section 4.

    c.    "Final Delivery" shall mean 1inMM's full, final and complete delivery of the Delivery Items for the Program (including any and all attempts to cure), of quality acceptable to HBO, as confirmed in writing by HBO.

    d.    "Distribution Expenses" means all costs and expenses incurred in connection with the release, delivery, marketing, distribution and exploitation of the Program and the Rights (as defined in Section 5), including, without limitation, all expenses for advertising, marketing, promotion, merchandizing, and publicity of the Program; all expenses for the full and complete delivery of Delivery Items (as hereinafter defined) and translation thereof; shipping, mailing and insurance costs; storage; cleaning and inspection; mastering, submastering, and duplication costs, duplication of scripts and music cue sheets; residuals; renewal of music synchronization licenses and master use licenses (to the extent same are the responsibility of Licensee); all taxes (other than corporate income taxes), whether sales, gross receipts, value added, withholding, remittance, excise, property, use, transfer or similar taxes, levies, customs duties, import charges, penalties, fines or interest, however denominated, imposed and whether by a governmental authority or taxing authority (whether federal, local, territorial or state of the United States or any country in the Territory); foreign language dubbing and/or subtitling; any Third Party Payments (as defined at Section 10.a.) to the extent paid for by HBO, and all other usual distribution costs customarily incurred.

    e.    "Gross Receipts" means the aggregate of all monies actually received by HBO from the exploitation of the Rights in the Territory, monies and royalties collected by a collecting society or governmental agency with respect to the exploitation of the Program on television from compulsory licenses, retransmission income, secondary broadcasts, tax rebates, less rebates, discounts, reasonable reserves for returns and bad debt (each of which will be liquidated within one (1) year from its establishment), credit adjustments, advertising agency commissions, security deposits, advances or other similar sums received until earned or forfeited or credited and any amounts received and thereafter refunded (except to the extent such sums are non-refundable) related to the Program. All Gross Receipts are the sole and exclusive property of HBO, subject only to 1inMM's contractual entitlements pursuant to Section 11 hereof.

    f.    "Latin America" means Anguilla, Antigua, Argentina, Aruba, Bahamas, Barbados, Barbuda, Belize, Bermuda, Bolivia, Bonaire, Brazil, Cayman Islands, Chile, Colombia, Costa Rica, Cuba, Curacao, Dominica, Dominican Republic, Ecuador, El Salvador, French Guiana, Grenada, Guadeloupe, Guatemala, Guyana, Haiti, Honduras, Jamaica, Martinique, Mexico, Montserrat, Nicaragua, Panama, Paraguay, Peru, Saba, St. Barthelemy, St.

FOIA Confidential Treatment Requested      JJMT-SEC-0004931

Eustatius, St. Kitts & Nevis, St. Lucia, St. Maarten, St. Martin, St. Vincent & Grenadines, Suriname, Trinidad & Tobago, Turks & Caicos, Uruguay, Venezuela, and British Virgin Islands.

g.     "License Period" shall have the meaning set forth in Section 3.

h.     "Program" means the live action feature length motion picture entitled "BITTER HARVEST" that was: (i) originally produced in English; (ii) directed by George Mendeluk starring Aneurin Barnard, Barry Pepper and Samantha Barks and (iii) will be theatrically released in Mexico and/or Brazil on a minimum of 100 screens.

i.     "Television Rights" means the right to exhibit, distribute market, display, transmit, broadcast, perform, transmit, reproduce, advertise, publicize, sell copies of, license, derive revenues from, rent, dispose of, communicate publicly or privately, turn to account and otherwise exploit the Program by any form of television media now known or hereafter devised or commercially exploited (including, but not limited to subscription pay television, basic television, free television, pay-per-view, on demand, video-on-demand, free-on-demand, free-video-on-demand, subscription-video-on-demand, advertising-supported on demand, near-video-on-demand, hotel/motel, non-theatrical, electronic rental, download to rent, digital rental, electronic sell-through, digital sell-through, download to own, download to burn and on demand retention licensing), regardless of whether or how paid for, programmed, or marketed to the viewer, and regardless of how delivered to or received by the viewer (whether by over-the-air, cable, satellite, wire, fiber, ADSL, DSL, MDS, Internet, mobile, wireless, closed circuit, or other means, method, process, or device or delivery system now known or hereafter devised, discovered, created, or developed) in all versions, resolutions, formats, and sizes, and shall, for the avoidance of doubt, include without limitation reception on television sets, personal computers, IP-enabled devices, mobile devices, and analogous devices.

j.     "Territory" shall mean Africa and Latin America.

2.     Conditions Precedent. All of HBO's obligations hereunder will be subject to and conditioned upon the satisfaction of all of the following:

a.     Full execution and delivery to HBO of this Agreement; and

b.     Final Delivery (including HBO's receipt and written approval of: (i) a complete typewritten statement of all third party screen and paid advertising credit, name and likeness, and other third party obligations, restrictions and approval rights (including all third party obligations, restrictions and approvals necessary for HBO's creation of Local Language Versions) as further set forth in Paragraph 5 of the Legal Delivery section of Exhibit B (collectively, the "Paid Ad Restrictions"); (ii) all chain of title documents for the Program and documents necessary to establish 1inMM's valid copyright in the Program, and (iii) all Delivery Items) occurring no later than 04/10/2020 (the "Final Delivery Date").

3.     License Period. The "License Period" means the period commencing on the Program's Availability Date and expiring three (3) years thereafter; provided, however, that the License Period shall include an additional exclusive play-off period of six (6) months for all licenses in existence as of the last day of the License Period during which HBO may continue to exercise the Rights.

FOIA Confidential Treatment Requested

4.    Availability Date. The "Availability Date" means day and date with the Program's earliest video-on-demand availability date in the Mexico and/or Brazil, but in no event later than 05/10/2020.

5.    Rights.

a.    For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, 1inMM hereby grants to HBO, with respect to the Program, the exclusive rights throughout the Territory and during the Program's License Period to exploit, and to sublicense others the right to exploit the Television Rights in the Program (and all of its themes, materials and other elements), in all formats now known or hereafter devised (including, without limitation, high definition, standard definition and 3D), including the right to (and cause and license others to) market, advertise, publicize, derive revenues from and otherwise exploit the Program. Without limiting the generality of the foregoing, 1inMM hereby grants to HBO the sole, exclusive and irrevocable right to: (i) license the rights granted for the Program for exhibition on such terms as it deems appropriate, and HBO shall have complete discretion relating to the promotion and distribution of the Program; (ii) edit and to permit the editing of all prints of the Program to conform to time segment requirements or to the orders of any duly authorized public censorship authority and to insert commercial material at appropriate time intervals during the exhibition of the Program and to dub and subtitle and the right to permit the dubbing and subtitling of the Program in the Authorized Languages as it sees fit; (iii) translate the title of the Program into any language and, to the extent cultural differences necessitate that the title be changed, to change such title; (iv) manufacture and distribute, or cause to be manufactured and distributed, two-dimensional advertising, publicity and promotional materials of all types and kinds for use solely in connection with the exhibition and distribution of the Program based on the images and materials provided by 1inMM; and (v) include HBO's (or one or more of HBO's affiliates, HBO's or sub distributors) name, logo, trademark or emblem in such manner, position, form and substance as HBO may elect on the prints of the Program, and on all advertising and publicity material for the Program together with such words as HBO may elect indicating that the Program is being distributed by HBO or one of its sub distributors, licensees or any of its affiliates.

b.    Without limiting the foregoing, 1inMM further grants to HBO the right to use and license the use of trailers, excerpts, clips supplied by 1inMM or made by HBO and stills supplied by 1inMM from the Program in connection with the promotion and exploitation of the Program, to collect all copyright royalties, retransmission, private copy or similar monies relating to the Program, and to use the approved names, voices and likenesses, which 1inMM shall provide to HBO in a timely manner, of all persons who appear in, or above-the-line persons who rendered services in connection with, the production of the Program for the purpose of advertising and promoting the Program.

c.    1inMM acknowledges that any inadvertent, unavoidable, incidental and de minimus overspill of an unencrypted satellite signal outside of the Territory shall not constitute a breach of this Agreement.

d.    1inMM shall include the following credit information in any version of the Program authorized by 1inMM for exhibition hereunder as well as in all advertising and promotional materials authorized for exhibition or dissemination in association therewith: "[1inMM TO PROVIDE COPYRIGHT NOTICE]."

e.    The rights granted to HBO in this Section 5 shall be referred to herein as the "Rights".

HBO-1inMM                                                                                                      3

FOIA Confidential Treatment Requested                                    JJMT-SEC-0004933

6.      Reserved Rights. All rights and licenses in the Program not granted to HBO hereunder (i.e., theatrical, derivative, novelization, souvenir, music publishing and music soundtrack rights, merchandising, publication, commercial tie-in and/or co-promotion (unless approved in writing by 1inMM but in no event on an exclusive basis), product placement, games, videogames, ring tones, alerts, wallpapers, screensavers, messaging applications, digital greeting cards, theme park and location based entertainment, remake, sequel, tv series, live stage/stage play, clip license rights (which excludes, for the avoidance of doubt, the right to use clips for promotional purposes as set forth in Section 5.b.), and all rights to the underlying material to the Program) are reserved by 1inMM and may be exploited by 1inMM without limitation or restriction by HBO except as may be set forth herein.

7.      Delivery. No later than thirty **(30) days after the execution of this Agreement,** 1inMM shall, at its sole cost and expense, deliver to HBO all elements, materials, documents and advertising and promotional materials set forth Exhibit B (which is attached hereto and incorporated herein by this reference), with respect to the Program (the "Delivery Items"). All Delivery Items shall be of first class technical quality suitable for the manufacture of first class broadcast quality exhibition materials of the Programs, as determined in HBO's sole discretion. HBO shall provide notice to 1inMM specifying any technical defect within thirty (30) days of receipt of the Delivery Items from 1inMM. Upon such notice to 1inMM, 1inMM shall either (i) correct the defect and redeliver the corrected Delivery Item or (ii) deliver a replacement Delivery Item within thirty (30) days of receipt of HBO's notice. Approval by HBO of less than all Delivery Items or any exploitation of the Program will not be deemed a waiver by HBO of 1inMM's obligation of complete delivery of the Program hereunder. In the event that 1inMM, or any distributor or licensee of 1inMM, has prepared or subsequently prepares a version of the Program dubbed and/or subtitled in any Authorized Language ("Local Language Version"), 1inMM shall provide and HBO shall have unrestricted access to such Local Language Version at no cost, including any dubbed or subtitled tracks of the Program.  In no event shall Final Delivery (including any and all attempts to cure) occur later the Final Delivery Date.

8.      Distribution Fee. In connection with HBO's exploitation of Rights in the Territory, HBO shall retain a Distribution Fee as set forth in the table below:

| Gross Receipts | Distribution Fee |
| --- | --- |
| Gross Receipts equaling or less than US$400,000.00 | 25% |
| Gross Receipts over US$400,000.00 | 40% |

9.      Advance. Subject to the terms and conditions of this Agreement and provided all of the Conditions Precedent have been satisfied (including full and Final Delivery having occurred by the Final Delivery Date), and 1inMM is not in breach of this Agreement or, for the avoidance of doubt, any other agreement, HBO shall pay in connection with the Program, a fully recoupable and cross-collateralized advance (the "Advance") in an amount equal to Nine Hundred Ninety-Nine Thousand Eight Hundred Forty-Five U.S. Dollars ($999,845.00), as further set forth in Section 12. Upon the satisfaction of all of the terms set forth herein, the Advance shall be due and payable in one lump sum payment six (6) months after HBO's receipt of a valid invoice from 1inMM.

HBO-1inMM

4

Exhibit 4c Page 112

FOIA Confidential Treatment Requested                                                              JJMT-SEC-0004934

deductions allowed pursuant to this Agreement for the Programs exceed Gross Receipts reported for the Programs, such excess shall be deducted from Gross Receipts in each succeeding period, as applicable, until such excess has been totally recouped. Accounting Reports shall be sent to the parties as set forth in Section 20.

      e.    HBO shall not be liable for any default or delay in payments from any licensee of HBO with respect to the Programs, provided that HBO shall take commercially reasonable steps to cause such licensee to pay any monies owed by such licensee in connection with its license of the Programs.

13.    1inMM's Representations and Warranties. 1inMM hereby covenants, warrants and represents to HBO each and all of the following.

      a.    The Program is protected by all the applicable copyright laws throughout the Territory and that such copyrights are and shall be valid and subsisting throughout the Territory during the Program's License Period.

      b.    The Program, when delivered to HBO and thereafter, will be free and clear of any lien, claim, charge, encumbrance, security interest, restriction, agreement, commitment or arrangement with any third party which would, in any way, interfere with, impair or adversely affect any of the Rights granted to HBO hereunder, and (other than as specifically provided in this Agreement) there are and will be no payments of any kind required to be made by HBO in respect of, or as result of, any use by HBO of such Program hereunder.

      c.    1inMM will not exploit and will not authorize any third party to exploit Television Rights in the Program prior to (and, for the avoidance of doubt, during) the License Period hereunder.

      d.    The Program shall not contain any product placement or product integration, except as set forth in a letter to HBO no later than the Final Delivery Date, signed by 1inMM, setting forth all product placement arrangements entered into in connection with the Program and the consideration provided by both the supplier (e.g., payment, free or discounted product) and the production (e.g., visible display of labels, verbal mention of brand, etc.). For any non-monetary consideration received from suppliers, 1inMM shall provide HBO an estimate of the value of such consideration (in U.S. Dollars). 1inMM's letter shall be accompanied by available substantiating documentation (e.g., written agreements, confirmation letters) as well as a listing of the footage notations determined on the same basis as the "Combined Continuity, Dialogue and Spotting List" at which all such product placements are seen or heard.

      e.    1inMM has obtained all of the rights, permissions and licenses (including all music synchronization licenses) required to enable HBO to fully exploit the Program pursuant to the terms of this Agreement including, without limitation, the right to use any performers' names, voices, likenesses and biographies to advertise and promote such Program.

      f.    No part of the Program (including the music contained therein) nor HBO's exercise of any rights granted hereunder will infringe upon the trademark, trade name, copyright, right of privacy, property right or any other right of any person or entity, and no part of the Program shall contain anything defamatory, tortious or which would violate the common law, statutes or regulations of any jurisdiction.

      g.    To the extent the Program or any underlying property is based upon or related to, events in the life of real persons, living or dead, or portrays real persons, 1inMM has obtained all personal releases and other rights necessary to permit HBO to exploit the Program in

HBO-1inMM

6

FOIA Confidential Treatment Requested

the manner provided herein without violating any third party rights or incurring any obligation to any third party.

h.      1inMM has full power and authority to make this Agreement and has not done and will not do, or permit any person or entity to do, anything which would interfere with the full performance of 1inMM's obligations or HBO's rights hereunder; this Agreement is the legally valid and binding obligation of 1inMM enforceable against 1inMM in accordance with its terms; and 1inMM is a corporation duly formed and validly existing in good standing under the laws of Florida.

i.      The non-dramatic performing rights to all music contained in the Program are (a) controlled by BMI, ASCAP, SOCAN, SESAC or a performing rights society having jurisdiction in the Territory; (b) in the public domain; or (c) controlled by 1inMM (in which event such rights are hereby licensed to HBO to the extent necessary for the exercise of HBO's rights hereunder). 1inMM does not represent or warrant that HBO may exercise the performing rights in the music without the payment of a performing rights royalty or license fee for music falling within category (a). As between HBO and 1inMM, HBO shall be responsible for the payment of any required performing rights royalty or license fee.

j.      1inMM is familiar with and shall abide by the requirements of the Foreign Corrupt Practices Act and meets all the eligibility requirements for the safe harbor certification set forth in 18 U.S.C. section 2257A(h)(1) and 28 C.F.R. section 75.9(a)(1)-(3).

k.      All Delivery Items delivered by 1inMM as part of delivery hereunder are complete and accurate, and HBO will incur no liability to any third party from its reliance thereon and/or compliance therewith.

14.     <u>HBO's Representations and Warranties</u>. HBO hereby covenants, warrants and represents to 1inMM it has the full power and authority to make this Agreement; this Agreement is the legally valid and binding obligation of HBO enforceable against HBO in accordance with its terms; HBO is a corporation duly formed and validly existing in good standing under the laws of the state of California.

15.     <u>Indemnification</u>. Each party hereto (the "<u>Indemnifying Party</u>") shall indemnify, defend and hold harmless the other party, and its successors, licensees, assigns, and employees, officers and directors (collectively, for the purposes of this Section, referred to as "<u>Indemnified Party</u>") from and against any and all liability, loss, damage, cost and expense, including, without limitation, reasonable attorneys fees (but excluding lost profits or consequential damages) arising out of any breach or alleged breach (including, in the case of 1inMM as Indemnifying Party, a breach of 1inMM's delivery requirements hereunder), or claim by a third party with respect to any warranty, representation or agreement made by the Indemnifying Party herein. The Indemnified Party shall give prompt written notice to the Indemnifying Party of any claim to which the foregoing indemnification applies and the Indemnifying Party shall undertake, at its own cost and expense, the defense thereof, provided that the failure to provide such notice shall excuse the Indemnifying Party's obligations only to the extent such failure prejudices the Indemnifying Party. The Indemnified Party may, at its option and expense, engage its own counsel. If the Indemnified Party settles or compromises any such suit, claim or proceeding, the amount thereof shall be charged to the Indemnifying Party, provided that the Indemnifying Party's approval, to be reasonably exercised, has been secured. Neither party may settle any claim or action without the prior written consent of the other party if such settlement would in any manner materially impair or inhibit the quiet enjoyment of such other party's rights hereunder or would result in any manner of injunctive or injunctive-like relief.

HBO-1inMM                                                                                        7

FOIA Confidential Treatment Requested                                          JJMT-SEC-0004936

16.    Default. 1inMM shall be in default of this Agreement upon the occurrence of any of the following (collectively, the "1inMM Events of Default"): (i) 1inMM fails or refuses to perform its material obligations hereunder or breaches any material provision hereof, or (ii) 1inMM goes into receivership or liquidation, or becomes insolvent, or a petition under any bankruptcy act shall be filed by or against 1inMM (which petition, if filed against 1inMM, shall not have been dismissed within thirty days thereafter), or 1inMM executes an assignment for the benefit of creditors, or 1inMM takes advantage of any applicable insolvency, bankruptcy or reorganization or any other like or analogous statute, or experiences the occurrence of any event analogous to the foregoing. If 1inMM fails to cure a 1inMM Event of Default specified in (i) above that is curable within thirty (30) days from receipt of written notice from HBO of such default or immediately upon a 1inMM Event of Default under (ii) above that is not curable under (ii) above, HBO shall have the right to immediately terminate this Agreement. 1inMM acknowledges that the intellectual property rights and licenses in and to the Program granted to HBO herein would be governed by 11 USC Section 365(n) in the event of the commencement of a bankruptcy case by or of 1inMM. 1inMM acknowledges and agrees that, notwithstanding any rejection of this Agreement in any bankruptcy case, HBO may elect to continue to enjoy all exclusive rights and licenses granted in the Program for the entire License Period as provided herein.

17.    Copyright. 1inMM hereby acknowledges and agrees that the Program shall contain a copyright notice in the name of the copyright proprietor conforming to and complying with the requirements of the applicable copyright laws of the Territory, and HBO shall not remove or delete such copyright notice. Subject to 1inMM's prior written approval, not to be unreasonably withheld, conditioned or delayed, HBO may, in consultation with 1inMM, in its own name or in the name of the copyright proprietor, take such steps as HBO may deem necessary or appropriate by action at law or otherwise, to prevent any unauthorized reproductions, exhibition or distribution of the Program, any infringement of the copyright of the Program or any impairment of or encumbrance on the rights granted to HBO hereunder, provided that should HBO commence any action in the name of 1inMM, HBO shall indemnify 1inMM against any out-of-pocket costs, damages, and reasonable attorney fees. 1inMM agrees that it shall promptly execute and deliver to HBO the Assignment of Distribution Rights Under Copyright which is attached hereto as Exhibit A and incorporated herein by this reference and that upon the request of HBO it shall promptly execute and deliver to HBO such additional documents as HBO may need in connection with the foregoing. 1inMM hereby irrevocably appoints and designates HBO as its attorney-in-fact to exercise and file all such documents requested by HBO pursuant to this Section. This power-of-attorney is coupled with an interest.

18.    Distribution. All decisions concerning the advertising, marketing, distribution and exploitation of the Program and the rights herein granted shall be under HBO's sole and exclusive control, it being expressly understood that HBO shall not be required to continuously distribute the Program. The Program will be marketed appropriately as determined in HBO's good faith judgment, but in no event shall HBO be required to incur marketing costs. HBO makes no representation, warranty, guarantee or agreement as to the amount of receipts which may be derived from the distribution, exhibition or other exploitation of the Program and the Rights, nor does HBO guarantee the performance of any contract for the exhibition of the Program. Notwithstanding anything to the contrary contained herein, HBO shall have the right, in HBO's sole discretion, to withhold distribution of the Program or to withdraw the Program from distribution anywhere in the Territory at any time during the License Period.

HBO-1inMM                                                                                           8

**FOIA Confidential Treatment Requested**                                        **JJMT-SEC-0004937**

19.   Insurance. 1inMM shall secure and maintain standard commercial general liability and errors and omissions liability insurance in the minimum amounts of $5,000,000 per occurrence/$5,000,000 aggregate with a deductible not larger than $25,000 until four (4) years after the initial exhibition of the Program, which policy(ies) shall be endorsed to name HBO Latin America Holdings, its parents, subsidiaries, licensees, successors, and related and affiliated companies, and their officers, directors, employees, agents, representatives, assigns and its subdistributors (collectively "Beneficiaries") as additional insureds as their interests may appear and shall contain an endorsement negating the "other insurance clause" therein, together with an endorsement that such policies are primary and that any insurance carried by the Beneficiaries is neither primary nor contributory. 1inMM shall deliver to HBO a certificate and endorsements evidencing such insurance concurrently with the execution of this Agreement. A prior thirty (30) days notice of cancellation or non-renewal will be provided to HBO and will be shown on the certificate.

20.   Notices. All notices, claims, certificates, requests, demands and other communications under this Agreement shall be made in writing and shall be delivered by hand or sent by facsimile, or sent, postage prepaid, by express mail, or reputable overnight courier service, and shall be deemed given when so delivered by hand; if faxed, on the business day of receipt as evidenced by a fax confirmation sheet, or two business days after deposit with an express mail or overnight courier to the parties at the following addresses (or at such other address for a party as shall be specified by like notice):

If to 1inMM:   1inMM Capital LLC
3129-A S. La Cienega
Los Angeles, Ca 90016
Attn: Zachary Horwitz

If to HBO:   HBO Latin America Holdings
c/o Home Box Office International
2500 Broadway #4
Santa Monica, California 90404
Attn: Senior Vice President, Sales Planning
Facsimile: 1-310-382-3000

With a copy to:

Home Box Office
2500 Broadway #4
Santa Monica, California 90404
Attn: General Counsel
Facsimile: 1-310-244-0510

FOIA Confidential Treatment Requested

JJMT-SEC-0004938

21.    Governing Law/Disputes.

a.      The internal laws of the State of California (as opposed to the choice of law rules) and the United States of America shall govern the validity, construction and interpretation of this Agreement, the performance by the parties of their respective obligations and all other causes of action (whether sounding in contract, in tort or arising under statute) arising out of or relating to this Agreement or to the Program.

b.      All actions, proceedings, controversies and claims based upon, arising out of or resulting from this Agreement, the breach thereof or its enforcement, arbitrability (including the scope of this arbitration provision) or interpretation shall be submitted to JAMS ("JAMS") for binding arbitration under its Comprehensive Arbitration Rules and Procedures if the matter in dispute is over $250,000 or under its Streamlined Arbitration Rules and Procedures if the matter in dispute is $250,000 or less (the "Rules"). Such Arbitration shall be held solely in Los Angeles, California, in the English language. Each arbitration shall be conducted by an arbitral tribunal (the "Arbitral Board") consisting of a single arbitrator who shall be mutually agreed upon by the parties. If the parties are unable to agree on an arbitrator, the arbitrator shall be appointed by JAMS. The arbitrator shall be a retired judge with at least ten (10) years experience in commercial matters. Except with respect to requests for interim relief, neither party shall be entitled or permitted to commence or maintain any action in a court of law with respect to any matter in dispute until such matter shall have been submitted to arbitration as herein provided and then only for the enforcement of the Arbitral Board's award. Neither party shall challenge or resist any enforcement action taken by the arbitrator against the losing party. In addition, the prevailing party in any arbitration or legal proceeding relating to this Agreement shall be entitled to all reasonable expenses including, without limitation, reasonable attorney's fees. Each party shall be permitted to engage in formal discovery with respect to any dispute arising out of, in connection with or related to this Agreement, the provisions of Section 1283.05 of the California Code of Civil Procedure being incorporated herein by this reference.

c.      1inMM hereby acknowledges that the Program and the exploitation rights granted to HBO hereunder are of a special, unique, extraordinary and intellectual character which gives them a peculiar value, for the loss of which HBO cannot be reasonably or adequately compensated in damages in any action at law and that a breach of this Agreement by 1inMM will cause HBO irreparable injury and damage. 1inMM therefore expressly agrees that in the event of a breach or threatened breach of this Agreement by 1inMM, HBO shall be entitled to seek injunctive and other equitable relief against 1inMM in HBO's discretion to end or prevent such breach and to secure enforcement of this Agreement. Resort to such equitable relief, however, shall not be construed as a waiver of any other rights or remedies which HBO may have for damages or otherwise. Notwithstanding any other provision of this Agreement, 1inMM's sole remedy for any breach by HBO of this Agreement shall be an action at law for damages and 1inMM acknowledges that such damages are fully adequate to compensate 1inMM in the case of any breach by HBO hereunder. In no event shall 1inMM have any right to terminate this Agreement or seek or be entitled to rescission, injunctive or other equitable relief.

22.    Miscellaneous Terms.

a.      This Agreement constitutes the entire agreement of the parties and supersedes all prior oral or written agreements between them concerning the same subject. This Agreement may only be amended or modified by a written instrument executed by the parties to this Agreement. No failure or delay on the part of either party in exercising any of its respective rights hereunder upon any failure by the other party to perform or observe any condition,

FOIA Confidential Treatment Requested                                        JJMT-SEC-0004939

covenant or provision herein contained shall operate as a waiver thereof, nor shall any single or partial exercise of any such rights preclude any other or further exercise thereof or the exercise of any other or further exercise thereof or the exercise of any other right hereunder. Without limiting the foregoing, no payment by HBO shall constitute a waiver of any term or condition of this Agreement.

        b.     This Agreement may not be assigned without the prior written consent of the other party except that HBO may assign this Agreement, or any part thereof.

        c.     Each of the parties shall execute and deliver any further documents or instruments the other may reasonably request to carry out the intent of this Agreement.

        d.     Nothing contained in this Agreement shall constitute a partnership between, or joint venture by, the parties hereto or constitute either party the agent of the other. Neither party shall hold itself out contrary to the terms of this Agreement and neither party shall become liable by reason of any representation, act or omission of the other contrary to the provisions hereof.

        e.     Nothing expressed or referred to in this Agreement is intended or shall be construed to give any person or entity, other than the parties to this Agreement, or their permitted successors and assigns, any legal or equitable right, remedy or claim under or in respect thereof or any provision contained herein, it being the intention of the parties that this Agreement is for the sole and exclusive benefit of such parties, and any permitted successors and assigns of this Agreement and for the benefit of no other person or entity.

        f.     The section headings contained in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

        g.     This Agreement and all of its terms shall be confidential, and each party agrees that, except as may be required by law, it shall not make any disclosures with regard thereto without the prior written approval of the non-disclosing party.

        h.     If any provision of this Agreement, or any covenant, obligation or agreement contained herein is determined by a court of competent jurisdiction to be invalid or unenforceable, such determination shall not affect any other provision, covenant, obligation or agreement, each of which shall be construed and enforced as if such invalid or unenforceable provision were not contained herein. Such invalidity or unenforceability shall not affect any valid and enforceable application thereof, and each such provision, covenant, obligation or agreement, shall be deemed to be effective, operative, made, entered into or taken in the matter and to the full extent permitted by law.

        i.     In the event of the occurrence of an event of force majeure which materially interferes with the production or delivery of the Program or with the rendition of 1inMM's material obligations hereunder, HBO shall have the right to suspend this Agreement and shall have the right, but not the obligation, to extend this Agreement by the length of any such suspension.

FOIA Confidential Treatment Requested

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by a duly authorized representative as of the date first set forth above.

**HBO LATIN AMERICA HOLDINGS**          **1INMM CAPITAL LLC**

By:_____          By:_____

Its:_____          Its:_____

HBO-1inMM

12

Exhibit 4c Page 119

**FOIA Confidential Treatment Requested**

**JJMT-SEC-0004941**

## EXHIBIT A
## ASSIGNMENT OF DISTRIBUTION RIGHTS
## UNDER COPYRIGHT

For good and valuable consideration, the receipt of which is hereby acknowledged, the undersigned, 1inMM Capital LLC ("1inMM"), hereby licenses, grants, transfers and assigns to

### HBO Latin America Holdings

*aka* "HBO" (a California corporation) and its successors and assigns ("Distributor"), the sole and exclusive right, under copyright, to exhibit, distribute, market, advertise, license or otherwise exploit the following feature length motion picture ("Program") throughout the Territory for the License Period as defined below, by means of television, howsoever delivered:

**Title of Program**: BITTER HARVEST

**Territory**: Africa and Anguilla, Antigua, Argentina, Aruba, Bahamas, Barbados, Barbuda, Belize, Bermuda, Bolivia, Bonaire, Brazil, Cayman Islands, Chile, Colombia, Costa Rica, Cuba, Curacao, Dominica, Dominican Republic, Ecuador, El Salvador, French Guiana, Grenada, Guadeloupe, Guatemala, Guyana, Haiti, Honduras, Jamaica, Martinique, Mexico, Montserrat, Nicaragua, Panama, Paraguay, Peru, Saba, St. Barthelemy, St. Eustatius, St. Kitts & Nevis, St. Lucia, St. Maarten, St. Martin, St. Vincent & Grenadines, Suriname, Trinidad & Tobago, Turks & Caicos, Uruguay, Venezuela, and British Virgin Islands.

**License Period**: Commences on the Program's Availability Date and expires three (3) years thereafter; provided, however, that the License Period shall include an additional exclusive play-off period of six (6) months for all licenses in existence as of the last day of the License Period during which HBO may continue to exercise the Rights.

1inMM hereby irrevocably appoints Distributor as its attorney-in-fact, with full power and authority to do all such acts and things, and to execute, acknowledge, deliver, file, register and record the Program and all documents pertinent thereto, in the Copyright Office of the United States of America and in any other office or offices in any other jurisdictions in the name, stead and on behalf of the 1inMM, as Distributor may deem necessary or proper to accomplish the same, this being a power coupled with an interest.

Distributor is hereby empowered by 1inMM to bring, prosecute, defend and appear in suits, actions and proceedings of any nature, concerning any copyright in and to the Program or any infringement of such copyright or violation of any of the rights licensed to Distributor herein, but at the cost and expense of Distributor, and, at its option, Distributor may join the 1inMM as a party plaintiff or defendant in any such suit, action or proceeding. Any recovery of damages, penalties, costs or other amounts arising by reason of the infringement of any such copyright(s) or violation of the rights licensed to Distributor herein has been assigned, and shall be paid, to Distributor.

**FOIA Confidential Treatment Requested**

This Assignment is dated as of, and is subject to all of the terms, conditions and provisions of the Agreement between 1inMM and Distributor dated as of 10/10/2019.

1INMM CAPITAL LLC

Signed: _____

By: Z Hewitt _____

Its: MD _____ /Authorized Signatory

FOIA Confidential Treatment Requested

# Exhibit 5a

## INTERNATIONAL LICENSE AGREEMENT

THIS AGREEMENT (the "Agreement") is made as of December 17, 2018, between SIERRA/AFFINITY ("Sales Agent"), whose address is 9378 Wilshire Blvd, Beverly Hills, CA 90212, as sales agent on behalf of Shooting Films ("Licensor"), and the party named below ("Distributor"). Licensor and Distributor each hereby agree as set forth herein below.

1.      **DISTRIBUTOR**: **1INMM CAPITAL LLC**
        Address: 3129-A S. La Cienega Blvd Los Angeles, CA
        Ph. No.: 773.724.0290
        Attn.: Zachary Horwitz
        Email: zach@1inmm.com

2.      **PICTURE**:      **"Active Measures**  (the "Picture").
                          Featuring: Donald Trump and Vladimir Putin
                          Director: Jack Bryan
                          Writer: Jack Bryan

3.      **TERRITORY**:

(A)     The **"Latin American Territory"** shall be defined as Anguilla, Antigua, Argentina, Aruba, Bahamas (non-exclusive only), Barbados, Barbuda, Belize, Bolivia, Bonaire, Brazil, Cayman Islands, Chile, Colombia, Costa Rica, Cuba, Curacao, Dominica, Dominican Republic, Ecuador, El Salvador, French Guiana (non-exclusive only), Grenada, Guadeloupe, Guatemala, Guyana, Haiti (non-exclusive only), Honduras, Jamaica, Martinique (non-exclusive only), Mexico, Montserrat, Nicaragua, Panama, Paraguay, Peru, St. Barthelme, St. Lucia, St. Martin, St. Vincent & Grenadines, Suriname (non-exclusive only), Trinidad & Tobago, Turks & Caicos, Uruguay, Venezuela, Virgin Islands (British), and

(B)     The **"African Territory" shall** be defined as South Africa, Angola, Cape Verde, Ethiopia, Lesotho,   Namibia, Zimbabwe, Botswana, Mozambique, Swaziland, Malawi, Zambia, Kenya, Uganda, Tanzania and Nigeria

(the "Latin American Territory" and "African Territory" shall be collectively defined as the "Territory").

4.      **TERM**: For all Licensed Rights (as defined below) herein, the Term shall commence on full execution of this Agreement and expire Fifteen (15) years thereafter (the "Term").

5.      **AUTHORIZED LANGUAGE (S)**:

(A)     In the Latin American Territory: subtitled and/or dubbed in Spanish and Portuguese (the "Latin American Authorized Language(s)").

(B)     In the African Territory: subtitled and/or dubbed in local languages indigenous to the African Territory (the "African Authorized Language(s)").

(C)     The languages granted in Paragraphs 5(A) and (B) shall be collectively defined as  the  "Authorized Language(s)".

(D)     Any and all DVD or Home Video packaging shall be in the Authorized Language(s) only and not in the English language.

6.      **FLAT LICENSE FEE**: Distributor shall pay Licensor a non-returnable License Fee in the amount of One Million Four Hundred Twenty-Five Thousand Five Hundred United States Dollars (US $1,425,500.00) net of all taxes and without deduction of any kind (the "License Fee"), payable as follows:

        One Hundred Percent (100%) [US$1,425,500.00] due on full execution of this Agreement.

Distributor's Licensed Rights do not vest until Licensor has received 100% of the License Fee and full payment for the costs of the Delivery Materials. Distributor is not licensed and shall not exploit any of the Licensed Rights until such amounts are paid in full. Sales Agent will not be obligated to deliver to Distributor any Delivery Materials until 100% of the License Fee and full payment for the costs for the Delivery Materials (including shipping) have been remitted by Distributor and received by Sales Agent. Distributor acknowledges and agrees that time is of the essence and the payment schedule set forth herein will be strictly enforced.  Failure to pay by the due dates herein will result in Licensor or Sales Agent having the right to terminate this

Exhibit 5a Page 123

**FOIA Confidential Treatment Requested**                                                          **JJMT-SEC-0004944**

Agreement and pursue all legal and equitable remedies.

All installments of the License Fee, as well as all other monies due to Licensor under this Agreement, including Delivery Materials costs, will be paid by wire transfer to the following account:

[ACCOUNT INFORMATION TO BE PROVIDED WITH INVOICE]

7.     **MATERIALS / DELIVERY**:

      (A)     Distributor shall order and pay for the Initial Materials (as defined below) within thirty (30) days following the date that Sales Agent provides Distributor with notice that Sales Agent is ready to effect Delivery (as defined below) of such Initial Materials ("Notice of Delivery"). Distributor acknowledges that (i) there is no guaranteed outside completion date, (ii) the Picture will be ready for delivery to Distributor only when final and complete, and (iii) the determination of finality and related timing for Delivery (taking into account both the completion of the Picture and additional factors affecting the timing of international release such as festival and award considerations) shall be at Licensor's sole discretion).

      (B)     Delivery as used herein means delivery (at Distributor's cost of materials and shipping to be fully paid prior to shipment) of the Initial Materials and Additional Materials set forth below and in the Delivery Schedule attached hereto and incorporated herein as Exhibit "A" ("Delivery Materials"). Distributor acknowledges and agrees that it has reviewed the Delivery Materials list below and that no other Delivery Materials are required in order for Distributor to exercise its rights under this Agreement.

      Initial Materials:

- Theatrical:  35 mm Print (which may be used);
- Theatrical: Music Cue Sheet (which Sales Agent may provide electronically);
- Video/DVD: Beta or Digital Betacam PAL or NTSC Master (Sales Agent's election following consultation with Distributor) of the Picture; and
- Dialogue List (which Sales Agent may provide electronically)
  Additional Materials (to be delivered only if and when available):

- Key Art (which Sales Agent may provide electronically).

      (C)     Distributor will have ten (10) days to review and evaluate the Delivery Materials, and each delivery item delivered hereunder will be deemed acceptable for all purposes hereunder unless Distributor gives Sales Agent written notice of rejection within ten (10) days after Distributor's receipt or access to such item ("Notice of Rejection"). Distributor may only reject Delivery Materials on grounds of technical quality and not for any other  reason, including probability of commercial success or artistic grounds. The Notice of Rejection must include a laboratory report from a reputable recognized laboratory in the theatrical motion picture business stating full details of  the technical defects in any rejected  item(s).

      (D)     Sales Agent has thirty (30) days after receipt of a Notice of Rejection to cure such rejection by correcting the asserted defect(s) or delivering replacement item(s), or submit the issue of whether Delivery was effected to arbitration as set forth below. If Sales Agent elects to cure such rejection, then the time periods set forth above for review and cure will be applicable to the delivery of corrected and replaced Delivery Materials as   well.

      (E)     Distributor hereby acknowledges and agrees that no individual(s) or specification(s), including without limitation the any cast member or the director, and no other specifications is (are) essential for purposes of effectuating Delivery and Distributor may not refuse to accept Delivery should any individual(s) be replaced or specification changed for any reason whatsoever.

      (F)     All disputes with regard to Delivery will be resolved by IFTA Arbitration (as further set forth herein). The sole remedy of Distributor in any such IFTA Arbitration for a failure for any reason to deliver the Delivery Materials will be the return of the License Fee or portion thereof previously paid, and under no circumstances will Distributor be entitled to interest, lost profits, consequential damages or any equitable or injunctive relief. Additionally, Distributor shall not be entitled to any such return of the License Fee if the Picture has been released in any medium in the Territory.

2

FOIA Confidential Treatment Requested

(G)     Title to all materials delivered to Distributor in connection with the Picture will remain with Licensor or Sales Agent (as applicable). Distributor will exercise due care in safeguarding all materials and will assume all risk for theft or damage while they are in transit or Distributor's possession. In respect of all materials created or manufactured by Distributor (including without limitation all Picture copies, packaging, artwork, marketing, dub and sub-titled language tracks, so-called "bonus materials," etc.), Licensor is the copyright owner from inception, provided that if such ownership is not allowed under a law in the Territory, Distributor hereby grants (and from creation of each such item  shall by the terms hereof grant) to Sales Agent an irrevocable royalty-free license to use all such materials worldwide in perpetuity in all media now known or hereinafter devised.   In all cases, Distributor shall only use such materials during the Term to exploit the Licensed Rights.   The creation of dubbed and sub-titled language tracks and related versions of the Picture, the trailers thereof, and any other materials created or duplicated by Distributor hereunder are to be made at Distributor's sole cost.

(H)     Upon termination of this Agreement, Distributor will, at Sales Agent's election, either:  (i) return to  Sales Agent at Distributor's expense all materials in connection with the Picture (including without limitation   all film and digital pre-print and exhibition materials, video inventory, marketing  materials,  and  language  tracks), whether such materials were delivered to Distributor or created by Distributor or any of its sub -distributors or licensees;   or (ii) destroy all such materials and provide Sales Agent with a customary certificate of destruction executed by an authorized officer of Distributor.

(I)     All costs of Delivery, return and destruction (including shipping charges, import fees, duties, brokerage fees, storage charges and related charges) will be Distributor's sole r e s p o n s i b i l i t y .

8.     **LICENSED RIGHTS / RESERVED RIGHTS / HOLDBACKS**:

(A)     Subject to the condition precedent of timely payment in full of the License Fee without deduction or offset of any kind, Licensor shall license to Distributor the following exclusive distribution rights to the Picture for t h e  Territory, for the duration of the Term, and in the Authorized Language(s) ("Licensed Rights"). All rights not specifically licensed herein whether now known or hereafter devised (including without limitation so-called "clip rights" to license excerpts of the Picture for unrelated third party use) are reserved to Licensor ("Reserved Rights").  Distributor is expressly prohibited from exploiting any of the Reserved Rights.

| Licensed Right | Licensed to Distributor | Reserved to Licensor | Distributor's Holdback Period |
|---|---|---|---|
| Cinematic Rights: | | | |
| Theatrical | | X | |
| Non-Theatrical | X | | |
| (including Hotel/Motel Rights) | | | |
| Public Video | X | | |
| Commercial Video | X | | |
| | | | |
| Home Video Rights: | | | |
| Home Video Rental | X | | |
| Home Video Sellthru | X | | |
| | | | |
| Ancillary Rights: | | | |
| Airline | X | | |
| Ship | X | | |
| | | | |
| Pay TV Rights: | | | |
| Terrestrial | X | | * |
| Cable | X | | * |
| Satellite | X | | * |
| | | | |
| Free TV Rights: | | | |
| Terrestrial | X | | * |
| Cable | X | | * |
| Satellite | X | | * |

3

Exhibit 5a Page 125

FOIA Confidential Treatment Requested

JJMT-SEC-0004946

| | | | |
|---|---|---|---|
| Free Video-on-Demand | X | ____ | |

Other TV Rights:

| | | | |
|---|---|---|---|
| Video-On-Demand ("VOD") | X | ____ | |
| Subscription VOD ("SVOD") | X | ____ | |
| Near VOD ("NVOD") | X | ____ | |
| Pay-Per-View | X | ____ | |

Internet Rights: Post Home Video Window

| | | | |
|---|---|---|---|
| VOD (e.g., iTunes) | X | ____ | |
| SVOD (e.g., Netflix) | X | ____ | |
| Transactional VOD ("TVOD") | X | ____ | |
| Electronic Rental | X | ____ | * |
| Electronic Sell Thru ("EST") | X | ____ | * |

   (B)  Holdbacks:

Distributor shall hold back its exploitation of the Licensed Rights marked "*" above until the initial release of the Picture in the United States (the "First US Theatrical Release"), unless otherwise waived or shortened by Sales Agent by written notice.

   (C)  All transmissions of the Picture hereunder in exercise of the Pay TV, Satellite Free TV, Other TV, and Internet Rights as set forth herein shall be encrypted or encoded in such manner that may be decrypted or decoded only by the use of authorized decryption or decoding equipment, the sale and use of which equipment is limited to the Territory. Any exercise of the Other TV Rights is expressly conditioned upon Distributor providing Sales Agent with acceptable written documentation verifying implementation of such encryption protections for all exercise of such rights.

   (D)  Intentionally deleted.

   (E)  Television Runs:

(i)  Pay TV: Unlimited runs.

(ii)  Free TV: Unlimited runs.

   (F)  The parties acknowledge that when the Picture is transmitted by satellite and/or cable for reception in the Territory, such transmission may be capable of reception outside the Territory due to the inherent technical capability of satellites to beam down signals and/or cable systems to transmit signals, which are not confined to territorial boundaries ("Distributor Overspill"). Sales Agent agrees that the occurrence of Distributor Overspill shall not constitute a breach of this Agreement, provided that (i) the transmission is not primarily intended for reception outside the Territory and (ii) Distributor receives no direct revenue from such overspill. Additionally, the parties acknowledge that when the Picture is transmitted by satellite and/or cable for reception outside the Territory, such transmission may be capable of reception inside the Territory due to the inherent technical capability of satellites to beam down signals and/or cable systems to transmit signals, which are not confined to territorial boundaries ("Overspill"). Distributor agrees that the occurrence of Overspill shall not constitute a breach of this Agreement by Sales Agent or Licensor, provided, that (i) the transmission is not primarily intended for reception inside the Territory and (ii) Sales Agent and/or Licensors (or their licensees) receive no direct revenue from such overspill.

   (G)  Distributor's right to exploit Internet Rights in the Picture are subject to the terms and conditions of the STCs (as hereafter defined), including without limitation a requirement to utilize current commercially reasonable technological safeguards to ensure that accessing, streaming or downloading of the Picture is limited solely to reasonably identifiable locations within the Territory (e.g., geofiltering). Notwithstanding the foregoing, to the extent Distributor is supplied approved promotional clips of the Picture formatted for use on the Internet, Distributor may use up to three (3) minutes in the aggregate of such clips on the Internet solely for purposes of promoting the Picture and provided such clips are posted solely within a domain bearing the identification code of one of the countries of the Territory.

   (H)  Distributor shall use its best efforts and skill in the distribution and exploitation of the Picture, and

4

FOIA Confidential Treatment Requested

Distributor shall exercise its rights hereunder in a fair, reasonable, customary and non-discriminatory manner with respect to Licensor or Sales Agent.

9.      **NO DISPOSITION OF GROSS RECEIPTS**: Licensor is licensing the Picture to Distributor on a so-called "flat" basis; therefore, subject to Sales Agent's receipt of the License Fee in accordance with the terms of this Agreement, no other payments whatsoever shall be due to Sales Agent and/or Licensor hereunder.

10.     **ACCOUNTINGS:** Intentionally deleted.

11.     **PAYMENT REQUIREMENTS**:

        (A)     The License Fee shall be paid in the amounts specified and required hereunder, which amounts as stated in this Agreement shall be deemed net sums in respect of which Distributor shall have separately paid at its own expense any required withholding and/or remittance taxes required by laws of the Territory such that no amounts shall be deducted from the payments to Licensor specified in this Agreement.

        (B)     There will be no deductions from any payments due to Licensor, including the License Fee, because of any bank charges, conversion costs, sales use or VAT taxes, "contingents", quotas or any other taxes, levies or charges, all of which shall, if required, be paid separately by Distributor.

        (C)     If it is legally impossible to transmit any monies due to Licensor, then Distributor will immediately so notify Sales Agent in writing. Distributor will then deposit such monies at Distributor's expense in Sales Agent's or Licensor's name, as Sales Agent shall designate, in such depository as may be designated by Sales Agent.

        (D)     All payments to Licensor will be in United States dollars computed at the prevailing exchange rate on the date due at Licensor's bank, provided that the exchange rate for any late payments shall be the most favorable prevailing daily rate for Licensor between the due date and the date of payment.

        (E)     Any payment due Licensor not made by its due date will, in addition to any other right or remedy of Licensor, incur a finance charge at the lesser of the prevailing US Prime rate plus three percent (3%) or the highest applicable legal contract rate until paid in full.

12.     **MARKETING / ADVERTISING**:

        (A)     Intentionally deleted.

        (B)     Intentionally deleted.

        (C)      Any marketing or advertising materials created by Distributor and any alterations by Distributor to any artwork or other marketing materials furnished by Sales Agent must satisfy all of Licensor's and Sales Agent's underlying contractual obligations and shall in all instances be subject to Sales Agent's prior written approval before Distributor shall make any use of such materials.

        (D)     Distributor shall comply with all contractual credit, likeness, dubbing, subtitling, editing, marketing, publicity, promotional or other similar restrictions or requirements provided to Distributor.

        (E)     Intentionally deleted.

        (F)     Intentionally deleted.

        (G)     Intentionally deleted.

        (H)     Intentionally deleted.

13.     **EDITING / BILLING**:

        (A)     Distributor may only cut and edit the Picture to the extent necessary to meet governmental censorship requirements. Any such cutting or editing shall only be permitted with Sales Agent's prior written approval and Distributor shall comply with all editing restrictions and requirements provided by Sales Agent. Except for such editing for censorship, the Picture

5

**FOIA Confidential Treatment Requested**                                                                        **JJMT-SEC-0004948**

shall be exhibited and otherwise distributed only in its original continuity as supplied by Licensor without alteration, interpolation, cut or elimination.

(B)     Distributor may include, before or after the Picture and all credits thereof, the credit or logo of Distributor, which precise placement must be pre-approved in writing by Sales Agent.

(C)     Intentionally deleted.

(D)     Distributor shall not do any of the following:

(i)     Change the title of the Picture as it appears in the original language of the Picture (except that Distributor may translate the title in the Authorized Language(s);

(ii)    Alter or delete any credit, logo, copyright notice or trademark notice, or anti-piracy warning appearing on the Picture; and

(iii)   Include any advertisements or other material in the Picture, preceding the Picture, or following the Picture in any medium including Home Video other than an approved anti-piracy warning and commercials for Free TV exploitation (if Free TV rights are licensed herein).

(E)     Distributor's obligations hereunder shall be binding on its subsidiaries, parents, affiliates, agents, sub-distributors and licensees.

14.     15.     **MUSIC CONTAINED IN THE PICTURE**:

(A)     Licensor will be responsible for acquiring all rights necessary to synchronize the music contained in the Picture as delivered to Distributor and on all copies exploited by Distributor hereunder, and for paying all royalties or charges incurred in obtaining and maintaining such synchronization licenses in effect for the Term.

(B)     The Performance Rights with respect to the music contained in the Picture shall either be in the public domain in the Territory, be controlled by Licensor sufficient to allow Distributor to exploit all of Licensed Rights without the necessity of any additional payment, or be available by license from the local music performing rights society in the Territory affiliated with the American Society of Composers, Authors and Publishers (ASCAP), Broadcast Music, Inc. (BMI), or SESAC, Inc. (SESAC). Distributor will be solely responsible for any royalties, however denominated, which any mechanical, performing or authors right society in the Territory attempts to collect in connection with the exploitation of the Picture in the Territory.

16.     **ADDITIONAL TERMS**:

(A)     Distributor acknowledges that the financing for the Picture will be provided by financiers who may require a completion guarantee or other financial assurances. The Distributor agrees to execute within twenty-four (24) hours of receipt such further documentation as may be required by the Licensor to accommodate such interests, including, without limitation, an Acceptance and Acknowledgement of a Notice of Assignment in the form customarily required by such financiers and completion guarantor (if any), and any and all documents or other instruments and acts required by such financiers and/or completion guarantor in connection with the establishment of a collection account or otherwise. In the event Distributor fails to execute and deliver all such documentation within five (5) business days of receipt of written notice thereof, then Distributor agrees that Sales Agent may, as it may elect in its discretion, terminate this Agreement or execute such documentation in the name of Distributor, for which purpose Distributor hereby irrevocably appoints Sales Agent as Distributor's attorney-in-fact, a power coupled with an interest, with full right to execute any and all such documentation.

(B)     Licensor may, in its absolute discretion, require Distributor to establish a Letter of Credit or other such form of payment (by way of example only, a bank guarantee) acceptable to Licensor to secure all or any part of the License Fee. In the event that the Licensor requests any such Letter of Credit(s), Distributor shall open the Letter of Credit and deliver same to Sales Agent within ten (10) working days following the Sales Agent's request. The Letter of Credit and any confirmation which may be required by Licensor or Licensor's bank must be irrevocable and in a format and issued by a bank acceptable to Licensor and Licensor's bank. At Sales Agent's election, any failure on Distributor's part to deliver the Letter of Credit within such ten (10) day period may result in the termination of this Distribution Agreement by written notice to Distributor. All costs of the Letter of the Credit and of any required confirmation shall be paid by Distributor.

6

Exhibit 5a Page 128

FOIA Confidential Treatment Requested                                        JJMT-SEC-0004949

(C)      Neither Licensor nor Sales Agent can guarantee against piracy in the Territory and any piracy of the Picture, whether occurring before or after execution of this Agreement, shall not constitute a breach by Licensor nor a basis for damages claims, payment reductions, or termination hereunder.

(D)      Any delay of action hereunder by Sales Agent shall not be construed as a waiver of any rights or remedies, and any express waiver by Sales Agent of any specific right or remedy hereunder shall not constitute a waiver of any other rights or remedies regarding the same issue (including without limitation any preceding, continuing, or succeeding breach) or any other matter arising under this Agreement.

(E)      Any terms not set forth in this Agreement (including any capitalized words used herein without express definition) will be determined solely by reference to the most current IFTA Standard Terms and Conditions ("STCs") as of the date of this Agreement, which STCs are incorporated in their entirety herein and thereby comprise an integral component of this Agreement. In the event of any inconsistency between the terms of this Agreement and the STCs, the terms of this Agreement prevail.

(F)      Sales Agent is acting solely in its capacity as duly authorized agent on behalf of Licensor in connection with this Agreement.

17.    **NOTICES**:  All notices hereunder shall be in writing and shall be sent to the recipients at the address and/or fax number and/or email address set forth above (or such subsequently changed address of which the sending party has received notice hereunder). Notices to Licensor shall be sent to the attention of c/o SIERRA/AFFINITY, whose fax number is (310) 587-2381.

18.    **REPRESENTATIONS AND WARRANTIES**: Distributor represents and warrants to Licensor that:

(A)      It has full authority and capacity to execute this Agreement and full legal and financial ability to perform all of its obligations under this Agreement;

(B)      There are no existing or threatened claims or litigation which would adversely affect or impair Distributor's ability to perform under this Agreement;

(C)      No dubbed or subtitled version of the Picture created by or to be created by Distributor does or will: (a) defame, or hold in a false light, or infringe any privacy or publicity or other personal right of any person; or (b) infringe any copyrights, trademark, patent, trade secret, rights of ideas, or similar property rights of any person;

(D)      It will employ at all times controls in accordance with prevailing customary standards in the Territory as used by major studios to prevent and deter theft, piracy, unauthorized copying, accessing, streaming or downloading (as applicable) of any copy of the Picture where the Picture is made available via any of the Licensed Rights granted herein;

(E)      It will indemnify and hold harmless Licensor and Sales Agent, and their parents, officers, directors, owners, shareholders, employees, attorneys agents, and successors and assigns from all claims, loss, liability, damages or expenses, including reasonable attorney's fees and legal costs, but not including lost profits due to breach of any of Distributor's representations, warranties covenants or conditions under this Agreement.

(F)      It will comply with all credit and talent obligations in connection with Picture as provided to Distributor by Sales Agent.

19.    **DEFAULT AND TERMINATION**:

(A)      Distributor will be in default of this Agreement in the event of any of the following circumstances:

7

**FOIA Confidential Treatment Requested**

(i)      Distributor fails to pay any installment of the License Fee or any other amounts due under this Agreement or any other agreement with Sales Agent when due;

(ii)     Distributor becomes insolvent or fails to pay its debt obligations when due;

(iii)    Distributor makes an assignment for the benefit of creditors, seeks relief under any bankruptcy law or similar law for the protection of debtors, or allows a petition of bankruptcy to be filed against it, or a receiver or trustee to be appointed for substantially all of its assets that is not removed within thirty (30) days;

(iv)    Distributor breaches any material term, covenant or condition of this Agreement or any other agreement with Sales Agent;

(v)     Any affiliate, parent, subsidiary, sub-distributor, or licensee of Distributor breaches any material term, covenant or condition of this Agreement or any other agreement with Sales Agent; term, covenant or condition of this Agreement or any other agreement with Sales Agent;

(vi)    Distributor attempts to make any assignment, transfer, sublicense or appointment of an agent without Sales Agent's prior written approval; or

(vii)   Distributor fails timely to sign a Notice of Assignment as provided below.

(B)     Sales Agent will give Distributor notice of any claimed default. If the default is capable of cure, then Distributor will have ten (10) days after receipt of Sales Agent's notice to cure a monetary default, and twenty (20) days after receipt of Sales Agent's notice to cure a non-monetary default. If the default is incapable of cure, or if Distributor fails to cure within the time provided, then Licensor may proceed against Distributor for available relief, including but not limited to terminating this Agreement or any other agreement with Sales Agent retroactive to the earliest date of default, suspending Delivery of the Picture, and declaring all unpaid amounts due Licensor immediately due and payable.

(C)     As a result of termination of this Agreement or any other agreement between Distributor and Sales Agent, with respect to those pictures as to which all rights are terminated:

(i)      All licensed rights in and to such picture shall automatically revert to Licensor, free and clear of any and all encumbrances and any sub-distribution agreements entered into by Distributor (other than those sub-distribution agreements deemed assigned to Licensor as specified below);

(ii)     All of Distributor's rights under any sub-distribution and license agreements that have been pre-approved in writing by Sales Agent shall be deemed to have been assigned to Licensor (and any such sub-distribution agreements not so approved, shall be deemed automatically terminated) and all payments to be made under such agreements shall be paid directly to Licensor who may notify all relevant parties of such assignment to Licensor;

(iii)    All monies payable by exhibitors or sub-distributors to Distributor in respect to such picture shall be paid to and retained by Licensor;

(iv)    Any portion of the License Fee for this Picture and License Fee(s) for such other picture(s) theretofore paid by Distributor shall be retained by Licensor or Sales Agent and any unpaid portion of the License Fee for this Picture or for such other picture(s), if any, shall accelerate and immediately become due and payable to Licensor or Sales Agent;

(v)     Licensor shall be entitled to immediate possession of all digital and film pre-print and print elements and copies of the Picture and such other picture(s), advertising materials and all other materials (including any Delivery Materials) pertaining to same;

(vi)    Distributor shall execute and deliver all instruments requested by Sales Agent to effectuate a termination of this Agreement and its rights in the Picture or for such other picture(s) as applicable, including without limitation instruments necessary or appropriate to reflect such termination on the public records of governmental agencies and/or with industry organizations in the Territory which maintain records of a similar nature;

(vii)   Distributor shall turn over all records, including books, billing and delivery records to the Picture or such other

8

FOIA Confidential Treatment Requested

JJMT-SEC-0004951

picture(s), and all monies on hand, if any, relating to the Picture or such other picture(s); and

(viii)    Distributor hereby irrevocably appoints Sales Agent as Distributor's attorney-in-fact, a power coupled with an interest, with full right to execute any and all assignments and other instruments deemed by Sales Agent to be reasonably necessary or desirable to evidence the transactions provided hereunder and to protect its rights under this Agreement or such other agreement(s) as applicable.

20.    **TERMINATION OTHER THAN FOR DEFAULT**:

(A)    Upon written notice to Distributor, Sales Agent may in its sole discretion terminate this Agreement if principal photography of the Picture has not commenced within twelve (12) months following the date of this Agreement, the Picture is not ready for Delivery to Distributor within twenty-four (24) months following the date of this Agreement, or Licensor or Sales Agent abandons the Picture either prior to or after the commencement of principal photography.

(B)    In the event of such termination, Licensor shall return to Distributor such portion of the License Fee theretofore paid to Licensor by Distributor, and Distributor shall return to Sales Agent any and all materials, including, without limitation, all physical film materials, Delivery Materials, publicity materials and documents theretofore furnished by Sales Agent to Distributor in connection with the Picture. Neither Licensor nor Sales Agent shall have any additional obligation of any kind whatsoever to Distributor, or anyone claiming through Distributor, by reason of such termination.

(C)    Distributor shall execute and deliver all instruments requested by Sales Agent to effectuate a termination of this Agreement and its rights in the Picture, including without limitation instruments necessary or appropriate to reflect such termination on the public records of governmental agencies and/or with industry organizations in the Territory which maintain records of a similar nature. Distributor shall turn over all records, including books, billing and delivery records to the Picture and all monies on hand, if any, relating to the Picture. Distributor hereby irrevocably appoints Sales Agent as Distributor's attorney-in-fact, a power coupled with an interest, with full right to execute any and all assignments and other instruments deemed by Sales Agent to be reasonably necessary or desirable to evidence the transactions provided hereunder and to protect its rights under this Agreement.

21.    **CHOICE OF LAW / ARBITRATION / FORUM**:

(A)    This Agreement shall be subject to the laws of the State of California applicable to agreements wholly executed and performed therein, and all parties hereby irrevocably consent to the exclusive jurisdiction and venue of the Federal and State courts located in Los Angeles County for any court matters arising hereunder.

(B)    Any and all disputes under this Agreement shall be submitted exclusively to binding arbitration ("IFTA Arbitration") in Los Angeles, California under the Rules of International Arbitration of the International Film and Television Alliance ("IFTA Arbitration Rules") in effect as of the date the request for arbitration is filed. Each party waives any right to adjudicate any such dispute in any other court or forum and Distributor waives any and all rights to seek equitable or injunctive relief or to rescind or terminate this Agreement or to seek such rescission or termination. Los Angeles County will be deemed the "Forum" under the IFTA Arbitration Rules. Licensor (and where applicable Sales Agent) and Distributor agree to accept service of process for IFTA Arbitration in accordance with such Rules and to accept service of process for any judicial or other proceedings provided for hereunder by certified mail, return receipt requested, courier, or other personal delivery at the address indicated on this Agreement. Licensor (and where applicable Sales Agent) and Distributor agree to abide by any decision rendered in an IFTA Arbitration, and that any court having jurisdiction may enter judgment affirming such decision and may enforce such judgment in accordance with its powers.

(C)    Without limiting the aforesaid arbitration provisions and notwithstanding the exclusive jurisdiction provisions above, Licensor and Sales Agent shall additionally each have the right to proceed in any court of competent jurisdiction anywhere in the world to either (i) seek such interim protective relief, including equitable remedies as may be considered reasonably necessary to protect their rights and entitlements pursuant to this Agreement, or (ii) seek enforcement of any arbitration award or related judgment hereunder.

(D)    The prevailing party or parties in any arbitration hereunder shall be entitled to an award in such arbitral proceeding for reimbursement of its or their (as applicable) legal fees (including attorneys fees) and costs of arbitration (including discovery and expert witness costs). The prevailing party or parties in any judicial action hereunder shall similarly be entitled to court order or judgment reimbursing it or them (as applicable) for all legal fees (including attorneys fees) and costs incurred in connection with such matter and in connection with any applicable arbitration as aforesaid.

9

Exhibit 5a Page 131

FOIA Confidential Treatment Requested

22.     **CONFIDENTIALITY**: All terms of this Agreement shall be confidential and not disclosed to any third party except each party's accountants, attorneys and agents, and as necessary to perform each parties' rights and obligations hereunder, and except as required by law or judicial order.

23.     **COUNTERPARTS**:     This Agreement may be executed in counterparts which may be delivered by ink-signed originals, fax or digital copy in pdf or tiff format, each of which shall be deemed to be an original and such counterparts of all parties when taken together shall constitute the fully binding and executed Agreement.

24.     **BINDING AGREEMENT**: This Agreement, any exhibits attached hereto, and the STC's incorporated herein sets forth the entire understanding and agreement between Licensor and Distributor as to the subject matter hereof and supersedes all previous discussions, correspondence, inducements, agreements, warranties or representations, whether oral or written. This Agreement is binding on each of the parties and their respective successors and assigns. Except as expressly provided herein, this Agreement may only be amended in writing signed by Sales Agent on behalf of Licensor and Distributor.

THIS AGREEMENT is executed as of the parties as of the date first above written.

[signatures on the following page]

10

Exhibit 5a Page 132

**FOIA Confidential Treatment Requested**                                                                    **JJMT-SEC-0004953**

**AGREED AND ACCEPTED:**

SIERRA/AFFINITY ("Sales Agent") as agent
On behalf of Shooting Films ("Licensor")

1inMM Capital LLC ("Distributor")

By: _____

By: _____

Its: EVP International Sales

Its: MANAGING PARTNER

11

**FOIA Confidential Treatment Requested**

## Exhibit "A"

This Exhibit A is attached and incorporated into that certain International License Agreement dated as of December 17, 2018, by and between SIERRA/AFFINITY ("Sales Agent") as sales agent on behalf of Shooting Films ("Licensor") and 1inMM Capital LLC ("Distributor") whereby Licensor granted to Distributor certain distribution rights in and to the motion picture entitled "Active Measures" (the "Picture").

## LEGAL DELIVERABLES

1.    Clearly legible copies of all chain-of-title documents required by Distributor, evidencing Licensor's proper ownership and permitting the use of any and all literary, dramatic, musical and other material used in the production of the Program or upon which the Program and/or screenplay may be based, together with certificates of authorship and proof of payment in connection with the acquisition of the necessary rights in and to such material and the exercise of all options related thereto.

2.    Evidence satisfactory to Distributor that there is no lien, charge, encumbrance or security interest that would adversely interfere with the Licensed Rights granted to Distributor.

3.    A (a) copyright report issued by a Thomson CompuMark, (b) title report and (c) opinion issued.

4.    A complete typewritten statement of all third party screen and paid advertising credit, name and likeness, and other third party obligations, restrictions and approval rights including, without limitation, all dubbing obligations (if any), director's editing rights, video mastering consultation or approval rights, etc. for each individual and entity named in the billing block with excerpts from each applicable third party agreement setting forth the precise extent and nature of such obligations, restrictions and/or approval rights, in the identical order as listed in the billing block.

5.    The proposed paid ad/packaging summary, credit and billing block layout for both full- and small-sized paid ads.

6.    The final copyright notice, as it appears on the billing block.

7.    Clearly legible copies of fully-executed agreements for all key actors and key production personnel (e.g., director, producer, writer, etc.) and any other talent and/or crew agreements requested by Distributor.

8.    If the Program or underlying materials or properties are based upon or related to events in the real life of real persons, living or dead, or portrays real persons, true and correct copies of all personal releases and other documentation showing that Licensor has all rights necessary to permit Distributor to exploit the Picture in the manner provided herein without violating any third party rights or incurring any obligations to any third party.

9.    A complete written statement showing the exact form and manner of the main and end titles of the Picture.

10.   One (1) typewritten (or computer generated) hard copy and one (1) copy in digital format of a music cue sheet in standard form showing the particulars of all music synchronized with the Program (all versions) and additional cue sheets for the trailer(s) and any other materials in connection with the Program containing original and/or licensed music. All such cue sheets will include for each cue: (i) the title of song; (ii) the name of the songwriter/composer; (iii) the songwriter's/composer's performing rights affiliation (e.g., ASCAP, BMI or SESAC); (iv) the name of publisher; (v) the publisher's performing rights affiliation; (vi) the type of use; (vii) the length of the use; and (viii) an indication of whether or not a master recording was licensed.

11.   Clearly legible, fully-executed copies and proof of payment for any and all synchronization licenses and master use licenses, all valid and sufficient to provide Distributor with the right to use and perform all musical compositions and master recordings contained in the Picture and trailer (if available).

12.   Clearly legible copies of the copyright registration certificate(s) with the US Copyright Office for both the screenplay and Picture.

12

Exhibit 5a Page 134

FOIA Confidential Treatment Requested

JJMT-SEC-0004955

# Exhibit 5b

**PROMISSORY NOTE**

**$ (1,998,825.00)**                                                    **(12/17/2018)**

<u>Promise</u>. 1INMM Capital, LLC, a limited liability entity established in the State of California, (the "Maker"), hereby promises to pay to Lender, JJMT CAPITAL LLC, a Delaware Limited Liability company located at  (<u>840 West Blackhawk, Unit #2205, Chicago, IL 60642)</u>, (the "Payee") an amount equal to (<u>ONE MILLION NINE HUNDRED NINETY-EIGHT THOUSAND EIGHT HUNDRED TWENTY-FIVE)</u> Dollars (<u>$1,998,825.00)</u> in lawful money  of the United States of America, which sum shall be due and payable on (12/17/2019)  (the "Maturity Date"), in one (1) balloon payment, in  like money at said office. Payment date shall be no later than TWELVE (12) months post confirmed funds transfer from Payee to Maker in the amount of (ONE MILLION FOUR HUNDRED TWENTY-FIVE THOUSAND FIVE HUNDRED) Dollars ($1,425,500.00).


<u>Prepayment Option</u>. Maker may pay down at any time any portion of the  principal sum outstanding without any prepayment penalty.

<u>Assignment of Rights.</u> See Appendix A

<u>Compounding of Unpaid Payments</u>. The undersigned agrees that time is of the  essence and that in the event payment of principal or interest due under this Note is not  made when due, giving effect to any grace period which maybe applicable, the  outstanding balance of unpaid payments hereof shall immediately bear interest at  the rate of ten (10) percent per month, for so long as  such event of default continues.

<u>Validity of Agreement to Conform to Law.</u> All agreements between the undersigned and the holder of this Note are expressly limited so that in no contingency or event whatsoever, whether by reason of advancement of the proceeds hereof, acceleration of maturity of the unpaid principal balance, or otherwise, shall the amount paid or agreed to be paid to the holder hereof for the use, forbearance or detention of money advanced hereunder exceed the highest lawful rate permissible under any law which a court of competent jurisdiction may deem applicable hereto. If, from any circumstances whatsoever, fulfillment of any provision hereof or any instrument securing this Note or any other agreement referred to herein, at the time performance of such provision shall be due, shall involve transcending the limit of validity prescribed by law which a court of competent jurisdiction may deem applicable hereto, then, ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity, and if from any circumstances the holder hereof shall ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the

**FOIA Confidential Treatment Requested**                                                    **JJMT-SEC-0004956**

reduction of the unpaid principal balance due hereunder and not to the payment of interest. This provision shall control every other provision of all agreements between the undersigned and the holder hereof.

Maker's Default. At the option of the holder hereof exercised by written notice to the undersigned, this Note shall become immediately due and payable upon the maker's failure to pay when due any payment of principal, interest or expenses due hereunder; or (b) failure in the performance or observance of any of the terms or conditions of any mortgage, deed of trust, security agreement or other agreement securing, guaranteeing or otherwise pertaining to this Note after giving effect to any applicable curative period which may be contained therein. Upon the occurrence of any of the following specified Events of Default, as defined under the standard conventions and terminology prescribed for promissory notes drafted under Warren's California Forms for Principal, Interest, Insolvency, Breach of Covenants, Breach of Representation and Warranties, (each herein called an "Event of Default") then, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, the Payee may, by written notice to the Maker, declare the principal of and accrued interest in respect of this Note to be forthwith due and payable, whereupon the principal of and such unpaid accrued interest in respect of this Note shall become forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Maker. Furthermore, This note shall become due and payable before the above-mentioned maturity date immediately upon the happening of any of the following events affecting any maker or indorser thereof, to wit: voluntary or involuntary filing of a petition in bankruptcy or for reorganization, execution of an assignment for the benefit of creditors, calling meeting of creditors, appointment of liquidating agent or committee, offer of composition, entry of a judgment in excess of $ 10,000 which remains unsatisfied or for over 30 days, application for appointment or appointment of any receiver, issuance of warrant of attachment or death of any maker or indorser or on default of any other obligations to the Maker.

Collection Costs. If this Note or any installment of principal or interest is not paid when due, whether at maturity or by acceleration, the undersigned promises to pay all costs of collection, including without limitation, actual attorneys' fees, and all expenses in connection with the protection or realization of the assets and proceeds available this Note or the enforcement of any subsequent memorandum or agreement created in conjunction with this Note incurred by the holder hereof on account of such collection, whether or not suit is filed hereon or thereon; such costs and expenses shall include, without limitation, all costs, expenses and attorneys' fees actually incurred by the holder hereof in connection with any insolvency, bankruptcy, arrangement or other similar proceedings involving the undersigned, or involving any endorser or guarantor hereof, which in anyway affects the exercise by the holder hereof of its rights and remedies under this Note or under any mortgage, deed of trust, security agreement, guaranty or other agreement securing or pertaining to this Note.

Waiver of Notice. Presentment, demand, protest, notices of protest, dishonor and nonpayment of this Note and all notices of every kind are hereby waived by all parties to

FOIA Confidential Treatment Requested                                    JJMT-SEC-0004957

this Note, whether the undersigned, principal, surety, guarantor or endorser, except as provided herein. To the extent permitted by applicable law, the defense of the statute of limitations is hereby waived by the undersigned.

<u>Death of Maker</u>. Maker of this note hereby waives all notice and demand and consent that this note shall become due and payable immediately upon the happening of any of said events. This note shall become due and payable on the Maturity Date, but payment shall be accelerated and become due and payable immediately if the Maker shall die. For the further security of the holder thereof, the undersigned covenants that so long as any part of the principal or interest of this note is outstanding and unpaid, it will not grant any security interest to any third party upon its property, or create any lien whatsoever thereon, without also thereby including therein this note, equally and ratably with every other evidence of debt, secured by any of the undersigned's property. If, while any part of the principal or interest is outstanding and unpaid, the maker hereof breaks this covenant, then the holder hereof may at his or its election, declare and make this note at once due and payable by written notice delivered to maker, and this remedy will be deemed cumulative and in addition to any other remedy available to the holder hereof. This note shall be paid without claim of set-off, counterclaim or deduction of any nature or for any cause whatsoever.

<u>Extensions Granted by Payee.</u> All indorsers hereunder agree that the holder of this note in case of non-payment thereof at maturity, or of any installment thereof when due, may grant to the maker or any indorser of said note any extension or extensions of time of payment thereof, in whole or in part, without notice to said indorsers or any of them and any such extension or extensions shall not affect in any way said indorsers' liability upon note, such indorsers hereby waiving demand, presentment of payment, notice of nonpayment and protest and do further agree that any holder of this note may in the event of default in the payment of principal of, or interest upon, this note or any installment thereof repossess and/or sell the (collateral) held as collateral security for the payment of this note without in any way relieving said indorsers, or any of them, of any liability by reason of such repossession and/or sale, applying the proceeds of sale of any such  asset less all costs to amount due under this note, and all indorsers agree to pay any deficiency on this note on demand.

<u>Litigation Fees</u>. In any action at law or in equity to enforce or construe any provisions or rights under this Note, the unsuccessful party or parties to such litigation, as determined by a court pursuant to a final offer, judgment or decree, shall pay to the successful party or parties all costs, expenses and reasonable attorneys' fees incurred by such successful party or parties (including, without limitation, such costs, expenses and fees on any appeal), which costs, expenses and attorneys' fees shall be included as part of any order, judgment or decree.

<u>General Provisions.</u> Principal and interest evidenced hereby are payable only in lawful money of the United States. The receipt of a check shall not, in itself, constitute payment hereunder unless and until paid in good funds. Whenever any payment on this Note shall be stated to be due on a day, which is not a business day, such payment shall be made on

Exhibit 5b Page 138

FOIA Confidential Treatment Requested

JJMT-SEC-0004958

the next succeeding business day and such extension of time shall be included in the
computation of the payment of interest of this Note. This Note is to be governed by and
construed in accordance with the laws of the State of California except to the extent
United States federal law permits the holder to contract for, charge or receive a greater
amount of interest. In any action brought under or arising out of this Note, the
undersigned hereby consents to the in personam jurisdiction of any state or federal
court  sitting in the state of California, and waives any claim or defense that such forum
is not  convenient or proper, and consents to service of process by any means
authorized by  California and/or Federal law.

THE UNDERSIGNED HEREBY WAIVES, AND COVENANTS THAT THE
UNDERSIGNED WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT
OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN
RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION
ARISING OUT OF OR BASED UPON THIS NOTE, THE SUBJECT MATTER
HEREOF OR ANY DOCUMENT RELATING HERETO, IN EACH CASE
WHETHER  NOW EXISTING OR HEREAFTER ARISING OR WHETHER IN
CONTRACT OR IN  TORT OR OTHERWISE.

_____                    12/20/18
                                             _____

1INMM Capital, LLC                           Date
Zachary Horwitz, Manager

FOIA Confidential Treatment Requested                    JJMT-SEC-0004959

APPENDIX A

ASSIGNMENT

This assignment ("Assignment") between 1INMM CAPITAL LLC, located at 5550 Wilshire Blvd #523 Los Angeles, CA 90036 ("Assignor") and JJMT CAPITAL LLC, a Delaware Limited Liability company located at  840 West Blackhawk, Unit #2205, Chicago, IL 60642 ("Assignee") is dated effective as of ( 12 / 17 / 2018).

For good and valuable consideration, the receipt and sufficiency of which hereby acknowledged, Assignor does hereby irrevocably and unconditionally sell, grant, convey, and assign unto Assignee all of Assignor's rights, title and interest of every kind and nature, throughout the universe, until assignee is paid ($1,998,825.00) at to which time all rights, title and interest of every kind and nature revert back to Assignor and to that certain motion picture, currently entitled "ACTIVE MEASURES" (the "Picture") based on the original screenplay entitled "ACTIVE MEASURES" directed by Jack Bryan.

1.  Assignor hereby represents and warrants:

    1.1.    That Assignor is the sole and exclusive owner of the rights and privileges granted or to be granted to Assignee hereunder.
    1.2.    That, as of the effective date hereof, Assignor has the right to enter into this Assignment.
    1.3.    That, as of the effective date hereof, no part of the rights herein conveyed has in any way been encumbered, conveyed, assigned, transferred or otherwise disposed of and all such rights are therefore free and clear of any and all liens, claims, charges or encumbrances whatsoever in favor of any party whatsoever.

2.  Assignor shall indemnify Assignee, its successors, assigns, licensees and officers, and hold them harmless from and against any and all claims, liability, losses, damages, costs, expenses (including but not limited to attorney's fees) arising out of any breach by Assignor of any warranty made by Assignor hereunder.

3.  Assignee hereby assumes and agrees to be bound by all future obligations of Assignor which accrue after the date hereof.

4.  Assignor hereby waives the benefits of any provision of law known as "droit morale" or any similar law in any country of the world and agrees not to institute or permit any action or lawsuit on the ground that the Picture in any way constitutes an infringement of any "droit morale" and Assignor agrees that Assignor shall not, under any circumstances (including without limitation, the circumstances of a breach by Assignee) be entitled to enjoin the exhibition or other exploitation of the Picture, to terminate or rescind any rights granted to Assignee or to obtain any other form of equitable relief, specific performance or otherwise, any right to which Assignor expressly waives.

5.  This Assignment, and the rights granted hereunder, may not be assigned by Assignor to any person, firm or corporation. Assignee may assign this Assignment and the rights

Exhibit 5b Page 140

FOIA Confidential Treatment Requested

and services granted herein, together with the results and proceeds thereof, and the representations and warranties contained herein, to any person or entity.

6.  This Assignment shall be construed in accordance with the laws of the state of California and shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, licensees and assigns. This Assignment cannot be amended or modified except in a writing signed by all parties hereto.

IN WITNESS WHEREOF, THE PARTIES HERETO HAVE EXECUTED AND DELIVERED THIS ASSIGNMENT AS OF THE (17)th DAY OF December 2018.

1INMM CAPITAL, LLC ("Assignor")          JJMT CAPITAL LLC ("Assignee")

By: _____          By: _____

Its: _____          Its: _____

Exhibit 5b Page 141

# Exhibit 5c

LICENSE AGREEMENT

This License Agreement ("Agreement") is entered into as of December 21th, 2018 (the "Effective Date") by and between 1inMM Capital LLC, with its principal place of business at 5550 Wilshire Blvd #523 Los Angeles, CA 90036 ("Licensor") and NETFLIX, INC., a California Corporation, with its principal place of business at 335 N Maple Dr. #353, Beverly Hills, CA 90210 ("Netflix").

<strong>Recitals</strong>

Licensor is a Distributor and owner of all rights hereby granted for "Active Measures" (the "Title"), directed by Jack Bryan and "Divide and Conquer: The Story of Roger Ailes" (the "title"), directed by Alexis Bloom.

Netflix is a digital platform.

Licensor and Netflix desire to enter into a relationship whereby Licensor will grant Netflix, among other things, a license to distribute the Title to subscribers within the Territory, as defined below, all in accordance with the terms and conditions set forth below.

<strong>Agreement</strong>

In consideration of the mutual promises contained herein and such other good and valuable consideration, the parties agree as follows:

1. **Definitions.**

    1.1. "Affiliate" shall mean any business entity which Licensor and Netflix directly or indirectly controls, is controlled by, or is under common control with, where "control" is defined as the ownership of at least fifty percent (50%) of the equity or beneficial interest of such entity or the right to vote for or appoint a majority of the board of directors or other governing body of such entity or otherwise possesses the power to direct the affairs of the entity.

    1.2. "Basic TV" shall mean the delivery and/or exhibition of a motion picture, television show or other entertainment product by means of cable, satellite or any other electronic or non-tangible means (whether analog or digital, or via the Internet or any other electronic or non-tangible medium now known or hereafter devised) where the consumer is charged a recurring fee and/or periodic access charge for the first or lowest tier(s) of service (including a tier that is required to be purchased or accessed before access to other programming services is permitted), regardless of whether such exhibition is on a regularly scheduled basis or made available to the viewer on an on demand basis at the consumer's discretion.

    1.3. "Electronic Sell-Through" or "EST" shall mean the delivery and/or exhibition of a motion picture, television show or other entertainment product, solely on a non-ad supported basis, where the timing and/or selection of same is not pre-determined, but rather is at the consumer's discretion, and for which, and the right to permanently download, retain and/or have access to same, the consumer is charged a transactional fee.

    1.4. "Free TV" shall mean the delivery and/or exhibition of a motion picture, television show or other entertainment product by means of over the air signals (including the retransmission of such signals by cable, satellite or any other electronic or non-tangible means) whether analog or digital, or via the Internet solely on one (1) website owned and operated by one (1) free-to-air broadcaster and branded as such broadcaster's website, where the consumer (i) is not charged a fee (except for the license fee, if any, payable for the right to use a television set in certain territories) and (ii) is required to view or is otherwise exposed to commercial interruptions (display or interstitial).

    1.5. "High Definition" shall mean a resolution of greater than or equal to 720p.

1

FOIA Confidential Treatment Requested

1.6.     "Home Video" shall mean the commercial release of a motion picture, television show or other entertainment product for purchase and/or rent on optical media, such as DVD and/or Blu-ray disc.

1.7.     "Internet Transmission" shall mean the transmission of data via Internet Protocol, including without limitation through use of client software contained on a Blu-ray disc or other optical media.

1.8.     "License Fees" shall mean, collectively, as set forth in more detail in Section 4.1.

1.9.     "Licensed Languages" shall mean, for each Title hereunder, (i) its original language, (ii) neutral or Mexican Spanish (in subtitled form (and, if available, dubbed form) if the original language is other than Spanish), and (iii) Brazilian Portuguese (in subtitled form, if available (and, if available, dubbed form) if the original language is other than Brazilian Portuguese).

1.10.    "Netflix-Enabled Device" or "NED" shall mean any device capable of receiving data via Internet Transmission, subject to the security and copy protection specifications set forth in Section 2.5 or otherwise agreed to by the parties, including without limitation (i) a desktop or laptop computer; (ii) a television set; (iii) a set top box, including a box that offers an integrated personal digital video recorder (DVR); (iv) a DVD and/or Blu-ray player; (v) a game console; (vi) a portable device, including without limitation a mobile phone or tablet; or (vii) a device with a web browser interface or other like capability.

1.11.    "Netflix Service" shall mean a global subscription service that provides subscribers with on-demand access to movies and television content, and delivers such content through Internet Transmission to NEDs (including User Interfaces on same) and/or, currently in the United States only, in optical disc format (e.g., DVD, Blu-ray).

1.12.    "Pay Per View" or "PPV" shall mean the delivery and/or exhibition of a motion picture, television show or other entertainment product, where the timing and/or selection of same is pre-determined, and not at the consumer's discretion, where the consumer is required to view the content over a limited period of time, and for which the consumer is charged a transactional fee.

1.13.    "Pay TV" shall mean the delivery and/or exhibition of a motion picture, television show or other entertainment product by means of cable, satellite or any other electronic or non-tangible means (whether analog or digital, or via the Internet or any other electronic or non-tangible medium now known or hereafter devised) where the consumer is charged a recurring fee and/or periodic access charge in addition to or in a greater amount than any fee payable in order to receive Basic TV, regardless of whether such exhibition is on a regularly scheduled basis or made available to the viewer on an on demand basis at the consumer's discretion.

1.14.    "Source Material" shall mean the source files for the Titles and associated trailers, artwork, promotional materials and metadata (including without limitation audio and closed captioning files), the delivery specifications for which are detailed in Schedule B attached hereto.

1.15.    "Start Date" shall mean, for each Title, the date such Title may first be made available for exhibition on and distribution, as detailed on Schedule A attached hereto or, on the notifications Licensor shall provide to Netflix pursuant to Section 3.1.3.

1.16.    "Subscription Video-on-Demand" or "SVOD" shall mean the delivery and/or exhibition of motion pictures, television and/or other entertainment products on a commercially uninterrupted basis where the consumer is charged a recurring fee and/or periodic access charge for the service.

1.17.    "Taxes" shall mean all federal, state, local, foreign and other net income, gross income, gross receipts, sales, use, value added, goods and services, consumption, ad valorem, transfer, franchise, profits, withholding, payroll, excise, stamp, real or personal property, customs, duties or other taxes, fees, assessments or charges of any

Exhibit 5c Page 144

FOIA Confidential Treatment Requested

JJMT-SEC-0004963

kind whatsoever, including any related royalties and interest, imposed by any federal, territorial, state, local, or foreign government or any agency or political subdivision of any such government.

1.18.  "Term" shall mean the period commencing on the Effective Date and ending on the expiration date of the last to expire Title License Period.

1.19.  "Territory" shall mean the following countries and each of their respective territories, possessions, commonwealths, and trusteeships:

Mexico;

Central America, including Belize, Costa Rica, Guatemala, El Salvador, Honduras, Nicaragua and Panamá;

South America, including Argentina, Bolivia, Brazil, Chile, Colombia, Ecuador, Paraguay, Peru, Uruguay and Venezuela; and

The Caribbean Basin Islands, including Anguilla, Antigua, Barbuda, Aruba, Barbados, British Virgin Islands, Dominica, Dominican Republic, Grenada, Guadeloupe, Haiti, Jamaica, Martinique, Montserrat, the Netherland Antilles, St. Kitts and Nevis, St. Lucia, St. Vincent and the Grenadines, Trinidad, Tobago, and the Turk and Caicos Islands.

1.20.  "Theatrical" shall mean the exhibition of a motion picture, television show or other entertainment product or program (regardless of the means of delivery) in conventional, drive-in or special format (e.g., iMax) theaters that are open to the general public and for which an admission fee is charged.

1.21.  "User Interfaces" shall mean web applications built using Application Programming Interfaces (commonly known as APIs) released by Netflix, which applications enable subscribers and potential subscribers to link to or otherwise use the Netflix Service on NEDs.

1.22.  "Video-on-Demand" or "VOD" shall mean the delivery and exhibition of a motion picture, television show or other entertainment product, where the timing and/or selection of same is not scheduled, but rather is at the consumer's discretion, where the consumer can view the content over a limited period of time, and for which the consumer is charged a transactional fee.

1.23.  "Years" shall mean three (3) successive periods of twelve (12) calendar months during the Term, the first of which shall begin on as detailed on Schedule A.

## 2.  Grant of Licenses.

2.1.  Title License.

2.1.1. Licensor grants to Netflix during the Term the exclusive right and license to exhibit and distribute the Title (and associated Source Material) in any or all of the Licensed Languages within the Territory solely by way of Internet Transmission via SVOD and AVOD, the Netflix Service to NEDs (including User Interfaces on same).

2.1.2. Licensor also grants to Netflix during the Term a limited, non-exclusive right and license to copy, install, compress, uncompress, encode, encrypt, decode, decrypt, display, use, cache, store and transmit the Titles (and associated Source Material) for purposes of such approved exhibition and distribution.

2.2.  Marketing and Promotion.

2.2.1.  Trademark License.  Licensor grants to Netflix during the Term a limited, non-exclusive right and license to copy, install, display, use, cache, store, transmit, exhibit and distribute Licensor's trademark(s) and logo(s) identified on Schedule

3

Exhibit 5c Page 145

C (collectively, "Licensor Marks") for purposes of exercising its rights under this Section 2.

2.2.2.   Marketing; Pre-promotion.  Subject to Section 5.4, Netflix may, commencing sixty (60) calendar days prior to each Title's Start Date, market and promote the availability of such Title through the any Service here granted.

2.2.3.   Introductory Segments; Promotion To Non-Subscribers.  Licensor grants to Netflix during the Term a limited, non-exclusive right and license to cut each Title to create short promotional clips, each of which shall consist of no more than three (3) consecutive minutes in length of a Title, an "Introductory Segment".  Licensor further grants to Netflix during the Term a limited, non-exclusive right and license to (a) exhibit and distribute, solely by way of Internet Transmission, Source Material (excluding Titles) and Introductory Segments to subscribers and potential subscribers for purposes of marketing and promoting the availability of the Titles through the Netflix Service and (b) copy, install, compress, uncompress, encode, decode, encrypt, decrypt, display, use, cache, store and transmit such materials for purposes of such approved exhibition and distribution.  For the avoidance of doubt, Netflix need not encrypt Introductory Segments or trailers.

2.3.   Encryption; Copy Protection.  Netflix shall, at all times during the Term, implement security and copy protection technologies with respect to each Title, including geo-filtering and encryption technologies, that are at least as protective as the then-current industry standard in the Territory and which shall be no less protective than those provided by Netflix to other platforms in the Territory.  Once terminated this Agreement by any cause, Netflix shall destroy, eliminate and/or return to Licensee any and all protection copy.

2.4.   Geo-filtering.  Netflix shall, at all times during the Term, implement geo-filtering technology to restrict access to Titles, via the Netflix Service, to subscribers within the Territory that is at least as protective as the then-current industry standard in the Territory and which shall be no less protective than those provided by Netflix to other platforms in the Territory.  Notwithstanding the foregoing, Licensor acknowledges that Netflix cannot guarantee that current geo-filtering technology shall be effective in every instance.

2.5.   For the avoidance of doubt, Netflix may offer the Netflix Service, including the Titles licensed hereunder, on NEDs where a subscriber is required to use a third party service (including without limitation a User Interface) and/or make payment to such third party to use the Netflix Service (whether such payment is for an additional charge in order to access the Netflix Service and/or for the relevant subscription fee for the Netflix Service itself).  Such third parties may also offer interactive features, such as on-screen chat functionality or simultaneous or coordinated viewing.  By way of example only, the Netflix Service may be offered through a game console such as the Microsoft Xbox, wherein use of the Netflix Service by subscribers through such NED requires the payment of a recurring, material fee to Microsoft Corporation and/or payment of the relevant Netflix Service subscription fee to Microsoft Corporation.

2.6.   Notwithstanding anything to the contrary in this Agreement, but without in any way limiting Netflix's security and related obligations pursuant to Sections 2.5 and 2.6 or Netflix's indemnification obligations pursuant to Section 6.3, Netflix shall not be responsible or liable for any acts or omissions of, or resulting from a consumer's use of, a third party NED and/or any third party software (including any User Interface).

2.7.   Exclusivity; Holdbacks.  Netflix shall be the exclusive SVOD and AVOD licensee in the Territory during such Title's Title License Period.  Further, during the period commencing on the first day of the Term and continuing through the expiration of the Title License Period, as applicable, Licensor (and its Affiliates) shall not, and shall not license or permit any third party to, license, exhibit, distribute or otherwise

4

Exhibit 5c Page 146

exploit such Title in the Territory other than on a Theatrical, Home Video, VOD, or purely EST, (e.g., no Basic TV exploitation, no Pay TV exploitation, no SVOD exploitation, no AVOD).  Holdback against Free TV and Basic Cable only during the first 18 months. Licensor acknowledges that this provision and Licensor's performance of its obligations under this Section is essential to Netflix and its willingness to enter into this Agreement.

**3.  License Fees.**

3.1.  License Fees.  Netflix shall pay Licensor the License Net Fee of $4,200,000.00 (Four Million Two Hundred Thousand US Dollars and 00/100), including Taxes and withholdings, agreeing both parties that any and all discounts, withholdings, taxes or similar will be absorbed by the Netflix.

3.2.  Payment Details.  License Fee shall be due and payable as follows: the amount of $4,200,000.00 (100%) for two (2) Titles due 365 days after the delivery of the required materials as established in this Agreement and as defined on Schedule A.

3.3.  Taxes. Each party shall, as set forth in more detail in Section 5, indemnify the other for failure to pay any Taxes payable by such party pursuant to this Section and/or applicable law.

**4.  Delivery.**

4.1.  Source Material.  Licensor shall create and deliver, at its sole expense, Source Material for each Title set forth on Schedule A as of the Effective Date to Netflix no later than ninety (90) calendar days prior to the applicable Start Date or such other date agreed to in writing by the parties.  Source Material shall be loaned to Netflix for the purpose of encoding and shall be, at Licensor's option, either destroyed or, with written notice, returned to Licensor within ninety (90) calendar days of accepted delivery.  Licensor shall also provide, at Netflix's request, accurate music cue sheets for each Title.

4.2.  Specifications.  All Source Material shall be provided to Netflix in accordance with the specifications set forth in, and accompanied by all information required by, Schedule B.  For the avoidance of doubt, in the event that Source Material is provided in encrypted format, including for example on DVD, Netflix shall be permitted to decrypt such media as necessary prior to encoding and/or encode directly from such media.  Notwithstanding anything to the contrary in this Agreement, no advertising elements (pre-roll, bugs, bumpers, placards, etc.) or overlay branding (either Licensor's or any other third party's) shall be included before, after or within any Source Material for a Title delivered hereunder.  Source Material shall be delivered in the highest quality and resolution available to Licensor (e.g., if not available in 1080p, then delivered in 1080i, or if not available in 1080i, then delivered in 720p), including without limitation High Definition

4.3.  Acceptance.  Upon Netflix's receipt of the Source Material for a Title, Netflix shall have thirty (30) calendar days in which to send Licensor written notice of its acceptance ("Notice of Acceptance") or rejection ("Notice of Rejection") of the Source Material for that Title, such acceptance or rejection to be determined by Netflix based solely upon whether such material complies with Schedule B.

4.4.  Rejection.  Upon Licensor's receipt of a Notice of Rejection, if any, Licensor shall, without delay and at its sole expense, replace the defective Source Material.  In the event that Licensor is unable to provide an acceptable Source Material replacement, Netflix shall not be obligated to pay any License Fee with respect to the relevant Title.

5

FOIA Confidential Treatment Requested

JJMT-SEC-0004966

**5. Representations and Warranties; Indemnification; Limitation on Liability.**

5.1. Netflix.  Netflix represents, warrants and covenants that (i) it has the full right, power, legal capacity and authority to enter into and fully perform its obligations under this Agreement; (ii) there are not now any liens, claims, encumbrances, legal proceedings, agreements or understandings which might conflict or interfere with, limit, derogate from, be inconsistent with any of Netflix's representations, warranties or covenants contained in this Section 6.1. (iii) it has satisfied and shall satisfy during the Term all third party obligations of any kind with respect to the obligations acquired by this Agreement and with any third party, including the viewers of Netflix; (iv) Netflix's distribution and other exploitation of the Titles (and associated Source Material and Introductory Segments) granted by this Agreement to Netflix shall not violate or infringe any rights of any third party, including without limitation any third party intellectual property rights, contract rights, moral rights, rights of publicity, and rights of privacy, or defame or constitute unfair competition against such third party; and (v) Netflix's distribution and other exploitation of same in accordance with this Agreement shall not violate any applicable law, rule or regulation.

5.2. Licensor.  Licensor represents, warrants and covenants that (i) it has the full right, power, legal capacity and authority to enter into and fully perform its obligations under this Agreement, and neither it nor an Affiliate has entered into an agreement with another party which is inconsistent with the terms of this Agreement or would otherwise prevent Licensor from fulfilling its obligations as to the Titles or under this Agreement; (ii) it has and shall maintain during the Term all necessary rights, titles, authorizations, consents and interests, including without limitation from all third party rights holders for each Title, necessary to grant Netflix the licenses granted in this Agreement, including without limitation the right to license to Netflix, on an exclusive basis in accordance with Section 3.2, the Titles designated and delivered by Licensor hereunder; (iii) it has satisfied and shall satisfy during the Term all third party obligations of any kind with respect to the Titles (and associated Source Material and Introductory Segments) and their distribution and exploitation in accordance with this Agreement, including without limitation all guild residuals and participations, and Netflix shall have no obligation for any such past, current or future charges or similar payments; (iv) Netflix's distribution and other exploitation of the Titles (and associated Source Material and Introductory Segments) and Licensor Marks in accordance with this Agreement shall not violate or infringe any rights of any third party, including without limitation any third party intellectual property rights, contract rights, moral rights, rights of publicity, and rights of privacy, or defame or constitute unfair competition against such third party; and (v) the Titles (and associated Source Material and Introductory Segments) and Netflix's distribution and other exploitation of same in accordance with this Agreement shall not violate any applicable law, rule or regulation.

5.3. Indemnification.

5.3.1. Licensor will defend, indemnify and hold harmless Netflix, its directors, officers and employees from any and all loss, damage, claim, liability or expense (including legal fees and costs) actually incurred as a result of a third party claim ("Claim") to the extent arising out of a breach or alleged breach of the representations and warranties made in Section 6.1 or (ii) any failure by Licensor to pay any Taxes required to be paid to any governmental entity on monies earned by Licensor hereunder or as a result of Licensor's performance of its obligations hereunder.

5.3.2. Netflix will defend, indemnify and hold harmless Licensor, its directors, officers, employees from any and all Claim to the extent arising out of a breach or alleged breach of (i) the representations and warranties made in Section 6.2 and/or (ii) any failure by Netflix to pay any Taxes required to

6

FOIA Confidential Treatment Requested

be paid by Netflix to any governmental entity on monies earned by Netflix hereunder or as a result of Netflix's performance of its obligations hereunder.

**6.  Confidentiality.**

6.1 Confidential Information.  Each party acknowledges and agrees that all business and technical information provided to it by the other party pursuant to this Agreement constitutes confidential and/or proprietary information of the other party ("Confidential Information").   Confidential Information shall includes all oral, written or recorded confidential and/or proprietary information about or related to the disclosing party or its business, including without limitation the terms and conditions of this Agreement.  Notwithstanding the foregoing, Confidential Information does not include information that (i) is or becomes publicly available without breach of this Agreement; (ii) can be shown by documentation to have been known to the receiving party prior to its receipt from the disclosing party; (iii) is rightfully received from a third party who did not acquire or disclose such information by a wrongful or tortious act; (iv) can be shown by documentation to have been developed by the receiving party without reference to any Confidential Information; or (v) that the receiving party becomes legally obligated to disclose to a governmental entity with jurisdiction over it.

6.2 Use of Confidential Information.  Neither party shall use the other's Confidential Information for its own use or for any purpose other than as necessary to perform or enforce its rights and/or obligations under this Agreement or as required by law, or disclose such information to any third party (except for attorneys, accountants, and/or the third party contractors identified in Section 9.3, provided such parties have reason to know such information and are bound to a confidentiality agreement at least as protective as this Section 7).  Each party shall take all reasonable measures to protect the secrecy of and avoid disclosure of Confidential Information, which measures shall be no less than reasonable care and shall include all of those measures that the receiving party uses to protect its own Confidential Information.  This Section 7 shall survive expiration or earlier termination of this Agreement.

**7.  Termination.**

7.1.  Either party may terminate this Agreement:

7.1.1.  in the event of a material uncured breach or default by the other party of any of its obligations under this Agreement, provided that (i) notice is provided to the other party in writing and (ii) such breach or default is not cured within thirty (30) calendar days following the date such notice is deemed given, unless such breach or default is by nature uncurable in which case this Agreement shall be terminable on the date of notice; or

7.1.2.  in the event that the other party (i) institutes or otherwise becomes a party, voluntarily or involuntarily, to a proceeding alleging or pertaining to the insolvency or bankruptcy of that party; (ii) is dissolved or liquidated; (iii) makes an assignment of its material assets for the benefit of creditors; and/or (iv) initiates or is subject to reorganization proceedings.  This Agreement shall be terminable on the date written notice is deemed given to such party.

7.2.  No Waiver.  Waiver by either party of a single breach or default or a succession of breaches or defaults shall not deprive such party of the right to terminate this Agreement by reason of any subsequent breach or default.

7.3.   Effect of Termination or Expiration. Upon termination or expiration of this Agreement, the licenses granted hereunder shall immediately terminate. Nothing herein shall be construed to release either party from any obligation that matured prior to the effective date of such termination or expiration (or which may continue beyond such termination or expiration) or to relieve the defaulting party from any and all liabilities at law or in equity to the other for breach of this Agreement.  Further, in the event that this Agreement is terminated due to a material breach or default of Licensor, Licensor shall refund or credit to Netflix, at Netflix's option and within thirty (30) calendar days of the effective date of such termination, a prorated amount of the aggregate License Fees paid to Licensor, calculated as of the effective date of such termination and based upon the amount of time remaining in the relevant Title License Periods.

7.4.   Survival.  Those rights and obligations, which by their very nature are intended to survive termination or expiration of this Agreement, shall survive, including without limitation Sections 1, 2.8, 4.3, 6.3, 6.4, 7, and 8.

## 8.  General Provisions.

8.1.   Governing Law; Dispute Resolution.  This Agreement was fully negotiated and entered into in, and shall be governed by and construed and enforced in accordance with the federal laws of United States of Mexico without regard to its rules on conflict of laws or any other rules that would result in the application of a different body of law.  The parties consent to the exclusive jurisdiction and venue of the Federal and State Courts located in Mexico, Federal District for purposes of any proceeding arising out of or relating to this Agreement.

8.2.   Third Party Contractors.  Netflix may use third party contractors (e.g., backend fulfillment providers that encode, encrypt, store and/or host content) to exercise its rights and fulfill its obligations pursuant to Section 2; provided, however, that Netflix shall be fully responsible for any act or omission, or failure of any right or obligation of this Agreement by such a contractor in the event that such an act, failure or omission, if performed by Netflix instead of such contractor, would constitute a breach by Netflix of this Agreement.

8.3.   Notice.  Notices and other communications required or permitted to be given hereunder shall be given in writing and delivered in person, sent via certified mail or email, or delivered by nationally-recognized courier service, properly addressed and stamped with the required postage, if applicable, to the applicable individuals and addresses specified in the signature block below. Notice shall be deemed effective upon receipt.

8.4.   Assignment.  Neither this Agreement nor any rights, licenses or obligations hereunder may be assigned by either party without the prior written approval of the non-assigning party, which shall not be unreasonably withheld or delayed.  Notwithstanding the foregoing, either party may assign this Agreement to any parent of such party, wholly-owned subsidiary of such party, or any acquirer of all or of substantially all of such party's equity securities or assets, provided that such party provides the non-assigning party with prompt written notice.  Any purported assignment not in accordance with this section shall be void.  Subject to the foregoing, this Agreement will benefit and bind the parties' successors and assigns.

8.5.   Severability.  If any provision of this Agreement, other than a provision going to the essence of the Agreement, is held to be unenforceable pursuant to

8

FOIA Confidential Treatment Requested

Section 9.1, such decision shall not affect the validity or enforceability of any other provision of this Agreement.  Any provision of this Agreement held invalid or unenforceable shall, to the extent practicable, be substituted with a valid and enforceable provision that achieves the results contemplated by the parties in the original provision.

8.6.    Headings.  The headings of Sections and subsections in this Agreement are provided for convenience only and shall not affect its construction or interpretation.

8.7.    Counterparts.  This Agreement may be executed in two counterparts, each of which will be deemed to be an original copy of this Agreement and all of which together shall constitute one and the same Agreement.

8.8.    Entire Agreement.  This Agreement supersedes all prior or contemporaneous negotiations and agreements (whether oral or written) between the parties with respect to the subject matter thereof and constitutes, along with its Exhibits, a complete and exclusive statement of the terms and conditions of the Agreement between the parties with respect to such subject matter.  This Agreement may not be amended or modified except by the written agreement of both parties.  The language of this Agreement is English, and any translations shall have no effect and shall not be binding.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

1INMM CAPITAL LLC                              NETFLIX INC.


By:_____          By:_____
Name: Zachary Horwitz                          Name:  Funa Maduka
Title:   MANAGING PARTNER____          Title:   VP, Content Acquisition

9

Exhibit 5c Page 151

FOIA Confidential Treatment Requested

**Schedule A-1**
**Titles**

| | |
|---|---|
| TITLE: | ACTIVE MEASURES |
| YEAR: | 2018 |
| START DATE: | DECEMBER 21ST, 2018 |
| LICENSE PERIOD: | 36 MONTHS **EXCLUSIVE** for AVOD and SVOD; 18 months for any other licensed right according to the terms conditions of the Agreement. |
| LICENSE PLATFORM: | SVOD, PAY TV, BASIC TV, AVOD |
| LICENSE NET FEE: | $2,100,000.00 |
| FORMAT: | HD |
| TERRYTORY: | ALL LATIN AMERICA INCLUDING BRAZIL |

_____

| | |
|---|---|
| TITLE: | DIVIDE AND CONQUER: THE STORY OF ROGER AILES |
| YEAR: | 2018 |
| START DATE: | DECEMBER 21ST, 2018 |
| LICENSE PERIOD: | 36 MONTHS **EXCLUSIVE** for AVOD and SVOD; 18 months for any other licensed right according to the terms conditions of the Agreement. |
| LICENSE PLATFORM: | SVOD, PAY TV, BASIC TV, AVOD |
| LICENSE NET FEE: | $2,100,000.00 |
| FORMAT: | HD |
| TERRYTORY: | ALL LATIN AMERICA INCLUDING BRAZIL |

_____

10

**FOIA Confidential Treatment Requested**

**JJMT-SEC-0004971**

**Schedule B**
**Source Material Requirements and Specifications**

NETFLIX, INC ("NTFLX") will determine the appropriate source for it's encoding. Examples of sources are listed below. If Content Provider does not have the source NTFLX requests, then NTFLX and Content Provider will mutually agree upon the source.

Per the agreement, it is the Content Provider's obligation to deliver Source Material compliant with the specifications below to NTFLX.

*Requirements*

**Primary Digital Assets**

| File Type (in order of preference) |
| --- |
| 1.  High Definition – MPEG-2 (80 Mbps) |
| 2.  Standard Definition – MPEG-2 (50 Mbps) |

We accept .mpg for MPEG-2 files. For a given title, only one contiguous file can be delivered. Titles cannot be delivered as multi-part files, i.e., if a title is 90 minutes in duration, a single file with 90-minute duration must be delivered. Two (2) files with 45-minute durations will not be accepted. Below in section *3 Primary Digital Asset Specifications* are the technical details for the acceptable formats.

<span style="color:red">**Please ensure that all files do not contain bars and tones, advertisements, slates, ratings cards, FBI warning cards, placards, overlay branding or website link callouts before, during and/or after the program. Also, no commercial blacks can be contained in the program. There are no exceptions to these requirements. All files must consist of the feature program with one (1) second of black at the head and tail of the program.**</span>

11

Exhibit 5c Page 153

**Digital Video Prerequisites**

We require 16x9 (1:1 PAR for HD, 32:27 PAR for SD) versions if available. The following information and table specify the priority order in which NTFLX will accept content.

1. **16x9 (1:1 PAR for HD, 32:27 PAR for SD)**
2. **We will only accept 4x3 content if 16x9 (1:1 PAR for HD, 32:27 for SD) sources do not exist.**
3. HD sources must be in 23.976p format. 60i or 50i sources will only be accepted if feature was originally shot in 60i or 50i.
4. Please refer to the table below for quick reference.

| Preference Priority | Format | DAR | PAR | Frame Rate | Scan Type |
|---|---|---|---|---|---|
| 1 | HD 1920x1080 | 16x9 | 1:1 | 23.976 | Progressive |
| 2 | HD 1920x1080 | 16x9 | 1:1 | 25 or 29.97 or 59.94 | Interlaced or Progressive |
| 3 | HD 1280x720 | 16x9 | 1:1 | 23.976 | Progressive |
| 4 | HD 1280x720 | 16x9 | 1:1 | 25 or 29.97 or 59.94 | Progressive |
| 5 | SD 720x480 | 16x9 | 32:27 | 23.976 | Progressive |
| 6 | SD 720x480 | 16x9 | 32:27 | 25 or 29.97 | Interlaced or Progressive |
| 7 | SD 720x480 | 4x3 | 8:9 | 23.976 | Progressive |
| 8 | SD 720x480 | 4x3 | 8:9 | 25 or 29.97 | Interlaced or Progressive |

**Digital Audio Prerequisites**

Titles with surround sound require 5.1 audio. When 5.1 audio is supplied an additional 2-channel Left Total + Right Total mix (2-channel stereo mix) must be supplied on the same audio track as well. We require a single audio track that contains all 8 channels (6 channels for the 5.1 and 2 channels for the LT/RT mix). We do not accept multi-track audio files.

If a conformed 5.1 audio source is not available, stereo audio (or mono audio if the program is an old black-and-white movie, documentary, etc., as long as the original source was mono) will be accepted.

We use standard channel assignments as shown below:

1. **5.1 audio + 2.0 audio channel assignments**
   a. Channel 1 – Left
   b. Channel 2 – Right
   c. Channel 3 – Center
   d. Channel 4 – LFE
   e. Channel 5 – Left Surround
   f. Channel 6 – Right Surround
   g. Channel 7 – Left Total
   h. Channel 8 – Right Total

12

Exhibit 5c Page 154

**2. Stereo Comp audio only**
   a. Channel 1 – Left Total
   b. Channel 2 – Right Total

**3. Mono Comp audio** (usually old black-and-white movies, etc.)
   a. Channel 1 – Mono Comp
   b. Channel 2 – Mono Comp

Primary Digital Asset Specifications

**MPEG-2 Specifications**

## High Definition – MPEG-2 (80 Mbps)

1. **Video Codec:** MPEG-2
2. **Profile ID:** High Profile
3. **Level ID:** High Level
4. **Video Bitrate:** 80 megabits
5. **Resolution:**
   a. 1920x1080
   b. 1280x720
6. **Audio Codec:**
   **a. Multi-Channel Assignment** (if available)
      i. Acceptable audio codecs
         1. Multi-channel PCM – 16bit, 48 kHz (Little Endian)
         2. Multi-channel AES3 LPCM (302m) – 16 bit, 48 kHz
      ii. Channel Mapping
         1. Channel 1 – Left
         2. Channel 2 – Right
         3. Channel 3 – Center
         4. Channel 4 – LFE
         5. Channel 5 – Left Surround
         6. Channel 6 – Right Surround
         7. Channel 7 – Left Total
         8. Channel 8 – Right Total
   **b. Stereo Assignment** (if multi-channel does not exist)
      i. Acceptable stereo audio codecs
         1. PCM – 16 bit, 48 kHz (Little Endian)
         2. Stereo AES3 LPCM (302m) – 16 bit, 48 kHz
         3. DVD LPCM – 16 bit, 48 kHz
         4. MPEG Layer 1 – 48 kHz, 448 kbps
      ii. Channel Mapping
         1. Channel 1 – Left Total
         2. Channel 2 – Right Total
7. **Frame rate:** *(frame rate should match source)*
   a. 23.976 progressive
   b. 25.00 progressive
   c. 25.00 interlaced
   d. 29.97 progressive
   e. 29.97 interlaced
   f. 59.94 progressive

13

Exhibit 5c Page 155

**JJMT-SEC-0004974**

8. **Aspect Ratio:**
   a. 1:1 square pixels
9. **Intra DC Precision:** 10-bit
10. **Chroma Format:** 4:2:2
11. **GOP Structure:** I-frame ONLY
12. **Closed Captioning:** As defined in section *3.3 Closed Captioning* below
13. **Stream Type:** Transport Stream

## Standard Definition – MPEG-2 (50 Mbps)

1. **Video Codec:** MPEG-2
2. **Profile ID:** High Profile
3. **Level ID:** High Level
4. **Video Bitrate:** 50 megabits
5. **Resolution:**
   a. NTSC or Film: 720x480
   b. PAL: 720x576
6. **Audio Codec:**
   a. PCM – 48 kHz or 44.1 kHz, 16-bit, stereo (Little Endian)
   b. DVD LPCM – 48 kHz, 16-bit, stereo
   c. MPEG Layer 1 – 48 kHz or 44.1 kHz, 16-bit, stereo with minimum data rate of 128 kbps
7. **Frame rate:** *(please ensure all files are de-interlaced, or have had Inverse-Telecine applied, to make sure the content is **progressive** and **not interlaced**)*
   a. 23.976 progressive
   b. 25.00 progressive
   c. 25.00 interlaced
   d. 29.97 progressive
   e. 29.97 interlaced
8. **Aspect Ratio:**
   a. 4x3 if standard
   b. 16x9 if anamorphic
9. **Intra DC Precision:** 10-bit
10. **Chroma Format:** 4:2:2
11. **GOP Structure:** I-frame ONLY
12. **Closed Captioning:** As defined in section *3.3 Closed Captioning* below
13. **Stream Type:** Transport Stream

**Subtitle as a Separate File**

The preferred formats for subtitles are text-based WC3 Timed Text Markup Language (.dfxp) or SubRip (.srt) formats; otherwise they must be one of the acceptable formats listed below. The subtitle file must have time code that is conformed (synced) to the digital video file asset. Raster image-based subtitles will not be accepted.

Acceptable Text-Based Subtitle Files:
- DFXP
- SRT
- SAMI
- DailyScripts
- DVD Nav

14

Exhibit 5c Page 156

- Softitler

Please ensure all subtitle files do not contain advertisements, placards, overlay branding or website link callouts.

If your text-based subtitle format is not listed above please contact NTFLX to discuss other options.

Please follow the file-naming convention specified in section *5 File-Naming Conventions*

**Closed Captioning**

## Closed Captions as Ancillary Data

This is the preferred method of delivery. The primary closed caption data must be carried within the video stream as Line21 data. For MPEG-2 video, the Line21 captions must be carried in the picture user data, as defined in "ATSC Standard: Digital Television Standard (A/53), Revision D, section 5.2."

Please ensure all caption files do not contain advertisements, placards, overlay branding or website link callouts.

## Closed Captioning as Separate File

If closed captioning must be delivered as a separate file, it must be submitted in one of the acceptable formats listed below. The closed caption file must have time code that is conformed (synced) to the digital video file asset. Raster image-based closed captioning will not be accepted.

Acceptable Closed Caption Files:
- SCC
- DFXP
- DailyScripts
- SDI Media
- Softitler
- DVD Nav

Please ensure all caption files do not contain advertisements, placards, overlay branding or website link callouts.

If your closed caption format is not listed above please contact NTFLX to discuss other options.

Please follow the file-naming convention specified in section *5 File Naming Conventions*

**Secondary Digital Assets Specifications**

**Alternate Language Audio as a Separate File**

If alternate language audio tracks are available, then they should be conformed to the primary digital audio/video asset delivered. Acceptable formats for alternate language audio tracks are stereo or multichannel AAC (in an MP4 wrapper) or AES3 LPCM audio

15

Exhibit 5c Page 157

FOIA Confidential Treatment Requested

JJMT-SEC-0004976

(in a MPEG-2 Transport Stream, .mpg). Either format should be encoded at the highest possible bitrate to maintain fidelity. Please follow the file-naming convention described below.

### Acceptable Alternate Language Audio Formats

1. **Audio Codec and Container:**
   a.  AAC (Low Complexity) in an MP4 container (.mp4)
2. **Bitrate:** Highest bitrate possible
3. **Sample rate:** 44.1 kHz or 48 kHz
4. **5.1 Audio Channel Mapping:**
   a.  Channel 1 – Left
   b.  Channel  2 – Right
   c.  Channel  3 – Center
   d.  Channel  4 – LFE
   e.  Channel  5 – Left Surround
   f.  Channel  6 – Right Surround
5. **2.0 Audio Channel Mapping:**
   a.  Channel 1 – Left Total
   b.  Channel 2 – Right Total

*File-Naming Conventions*

**Primary Video Asset File-Naming**

The file-naming convention for the MPEG-2 file is as follows:
**[movieID]_[framerate]_[aspectratio]_[bitrate]_[countrycode].mpg**

The country code is used to specify for which country the asset has rights. If the asset has rights for a specific country, then the 2-letter country code should be used as defined by the ISO 3166-1-alpha-2 code specifications (http://www.iso.org/iso/english_country_names_and_code_elements). If the asset has global rights, then the word "global" should be used in place of the 2-letter country code.

### Example for High-Definition Files

60011152_24_178_80_us.mpg
60028202_60i_185_80_ca.mpg
60028204_60p_178_80_global.mpg

### Example for Standard-Definition Files

60028202_24_235_50_fr.mpg

**Alternate Language Audio File-Naming**

The audio filename should follow the same file-naming convention as the primary asset file name, with the addition of channel mapping with the file name:

**[movieID]_[framerate]_[aspectratio]_[channel1]_[channel2]_..._[channelX]_[2letterLanguageCode].[ext]**

16

Exhibit 5c Page 158

**FOIA Confidential Treatment Requested**

JJMT-SEC-0004977

Please use the 2-letter language codes as defined in the ISO 639-1 specifications
([http://www.loc.gov/standards/iso639-2/php/code_list.php](http://www.loc.gov/standards/iso639-2/php/code_list.php)).

The filename should match the channel mapping of the audio file.

Examples:
70106666_24_178_80_L_R_C_Lfe_Ls_Rs_ca.mp4
70106666_24_178_80_LT_RT_fr.mpg
70106667_30_178_80_L_R_C_Lfe_Ls_Rs_es.mp4

**Subtitle File-Naming**

The file-naming convention of closed caption file is as follows:

**[movieID]_[framerate]_[aspectratio]_[2letterLanguageCode].scc**
or named exactly the same as the video asset except with "_2letterLanguageCode" post-
fixed to the filename of the secondary Closed Caption (CC) file.

Please use the 2-letter language codes as defined in the ISO 639-1 specifications
([http://www.loc.gov/standards/iso639-2/php/code_list.php](http://www.loc.gov/standards/iso639-2/php/code_list.php)).

Example:
60028202_24_235_es.scc
60028202_24_235_en.srt
72343234_30_133_fr.smi
72342123_24_178_pt.smi

**Closed Caption File-Naming**

The file-naming convention of the secondary closed caption file is as follows:

**[movieID]_[framerate]_[aspectratio]_[2letterLanguageCode].scc**

Or named exactly the same as the video asset except with "_2letterLanguageCode"
post-fixed to the filename of the secondary Closed Caption (CC) file.

Please use the 2-letter language codes as defined in the ISO 639-1 specifications
([http://www.loc.gov/standards/iso639-2/php/code_list.php](http://www.loc.gov/standards/iso639-2/php/code_list.php)).

Example:
60028202_24_235_es.scc
60028202_24_235_en.scc
60028202_24_235_fr.scc
60028202_24_235_pt.scc

17

Exhibit 5c Page 159

**FOIA Confidential Treatment Requested**

**Metadata**

**Movie Content Metadata**

Movie metadata is required for all content and is to be submitted via the approved NTFLX Metadata Template to NTFLX@NTFLX.TV

All dubbed and/or subtitled content is to be accompanied with the relevant metadata in the original <u>and</u> alternate language to support the source delivered.

Sample metadata files via XMLs may also be submitted and require NTFLX approval prior to acceptance.

**Primary and Secondary Assets Metadata**

If metadata for the primary and secondary assets is available via vendor API or file (XML,TXT, etc.), NTFLX will require access to the API or sample file for approval prior to acceptance.

**Delivery**

**Network Delivery via Aspera**

Currently, NTFLX uses Aspera exclusively for network delivery. The Content Supplier must push content to NTFLX via Aspera. NTFLX will not pull content.

Please be prepared to provide the following information in order to set up an Aspera account.

- Public outbound IP address(es) for which your host(s) will use for transferring files to us via Aspera.
- Technical contact (name, e-mail and phone number) of the person responsible for setting up the Aspera connection on your end.

**Directory Structure and File Organization**

*The following folder structure must be followed to organize each group of conformed assets. A group of conformed assets must consist of one audio/video muxed primary digital asset and any of its other conformed digital assets.*

*Folder Structure of external hard drive:*

*E:.*
*+---[NFLXMovieID] – (directory)*
*        [DigitalAsset1a] – (file)*
*        [DigitalAsset1b] – (file)*
*        [DigitalAsset1c] – (file)*

*Example:*
*E:.*
*+---61234123*
*|   61234123_24_178_80_us.mpg*
*|   61234123_24_178_80_en.scc*
*|*

18

Exhibit 5c Page 160

```
+---62345234
|   62345234_24_235_80_us.mpg
|
+---7712332
|   7712332_60i_133_80_en.scc
|   7712332_60i_133_80_es.srt
|   7712332_60i_133_80_us.mpg
|
+---79661231
    79661231_30_178_50_ca.mpg
    79661231_30_178_50_en.scc
    79661231_30_178_50_fr.srt
    79661231_30_178_50_LT_RT_es.mp4
    79661231_30_178_50_L_R_C_Lfe_Ls_Rs_fr.mp4
```

*Artwork*

High-resolution images are required for every title and must be submitted a minimum of 30 days in advance of licensing start date to NTFLX via any of these options:

    a. Vendor-provided website
    b. FTP (must request access from NTFLX)
    c. Email: alebrije@alebrije.tv

Artwork is accepted in original and bilingual language formats for all content.

File-naming convention:
[NTFLXMovieID].png (or .tiff or .jpg)

If NTFLX movie ID not known, use movie title:
[MovieTitle].png (or .tiff or .jpg)

Examples:
60028202.jpg
Terminator2.jpg

Below are the requirements for submitting artwork to NTFLX. We seek the highest quality possible to ensure optimal display for the website and NTFLX-ready devices.

| Artwork Attribute | Description |
|---|---|
| Image Aspect Ratio | Box art: 1:1.40 (w:h) aspect ratio. Aspect ratio tolerance: 1:35 through 1:1.45. |
| Image Height (h) | Box art: 800 pixels minimum. Higher is better. |
| Image Width (w) | Box art: Depends on image height. For example, 570 (w) x 800 (h) when art is 1:1.40. |
| Image Resolution | 150 dpi |
| Pixel Aspect Ratio | Square (1.0) |
| Color Mode | RGB Color (8-bits/channel). Conversions from CMYK are undesirable. |
| File Format | Uncompressed (.png, .tiff, etc.). JPEGs acceptable with "maximum |

19

Exhibit 5c Page 161

| | |
|---|---|
| | quality" compression. |
| Black Point | RGB 0 - 0 - 0 |
| White Point | RGB 255 - 255 - 255 |
| Color Profile | No color profiles assigned (a 2.1/2.2 gamma setting on calibrated monitors is assumed). |
| Image Area | Artwork should be two-dimensional and extend over entire image area. No extraneous graphics (borders, frames, drop shadows). |
| Graphical Elements | Art should not have graphical elements (such as Now on DVD, Widescreen, Coming Soon, Available on Blu-ray, etc.). |

20

Exhibit 5c Page 162

JJMT-SEC-0004981

# Exhibit 6a

## INTERNATIONAL LICENSE AGREEMENT

THIS AGREEMENT (the "Agreement") is made as of December 17, 2018, between CINETIC MEDIA ("Sales Agent"), whose address is 555 West 25th St. New York, NY 10001, as sales agent on behalf of A/E IndieFilms ("Licensor"), and the party named below ("Distributor"). Licensor and Distributor each hereby agree as set forth herein below.

1.     **DISTRIBUTOR: 1INMM CAPITAL LLC**
    Address: 3129-A S. La Cienega Blvd Los Angeles, CA
    Ph. No.: 773.724.0290
    Attn.: Zachary Horwitz
    Email: zach@1inmm.com

2.     **PICTURE:**     **"Divide and Conquer: The Story of Roger Ailes**  (the "Picture").
                    Featuring: Roger Ailes and Glenn Beck
                    Director: Alexis Bloom
                    Producer: Alexis Bloom

3.     **TERRITORY**:

(A)     The **"Latin American Territory"** shall be defined as Anguilla, Antigua, Argentina, Aruba, Bahamas (non-exclusive only), Barbados, Barbuda, Belize, Bolivia, Bonaire, Brazil, Cayman Islands, Chile, Colombia, Costa Rica, Cuba, Curacao, Dominica, Dominican Republic, Ecuador, El Salvador, French Guiana (non-exclusive only), Grenada, Guadeloupe, Guatemala, Guyana, Haiti (non-exclusive only), Honduras, Jamaica, Martinique (non-exclusive only), Mexico, Montserrat, Nicaragua, Panama, Paraguay, Peru, St. Barthelme, St. Lucia, St. Martin, St. Vincent & Grenadines, Suriname (non-exclusive   only), Trinidad & Tobago, Turks & Caicos, Uruguay, Venezuela, Virgin Islands (British), and

(B)     The **"African Territory" shall** be defined as South Africa, Angola, Cape Verde, Ethiopia, Lesotho,   Namibia, Zimbabwe, Botswana, Mozambique, Swaziland, Malawi, Zambia, Kenya, Uganda, Tanzania and Nigeria

(the "Latin American Territory" and "African Territory" shall be collectively defined as the "Territory").

4.     **TERM**: For all Licensed Rights (as defined below) herein, the Term shall commence on full execution of this Agreement and expire Fifteen (15) years thereafter (the "Term").

5.     **AUTHORIZED LANGUAGE (S)**:

(A)     In the Latin American Territory: subtitled and/or dubbed in Spanish and Portuguese (the "Latin American Authorized Language(s)").

(B)     In the African Territory: subtitled and/or dubbed in local languages indigenous to the African Territory (the "African Authorized Language(s)").

(C)     The languages granted in Paragraphs 5(A) and (B) shall be collectively defined as  the "Authorized Language(s)".

(D)     Any and all DVD or Home Video packaging shall be in the Authorized Language(s) only and not in the English language.

6.     **FLAT LICENSE FEE**: Distributor shall pay Licensor a non-returnable License Fee in the amount of One Million Three Hundred Ninety-Eight Thousand United States Dollars (US $1,398,000.00) net of all taxes and without deduction of any kind (the "License Fee"), payable as follows:

    One Hundred Percent (100%) [US$1,398,000.00] due on full execution of this Agreement.

Distributor's Licensed Rights do not vest until Licensor has received 100% of the License Fee and full payment for the costs of the Delivery Materials. Distributor is not licensed and shall not exploit any of the Licensed Rights until such amounts are paid in full. Sales Agent will not be obligated to deliver to Distributor any Delivery Materials until 100% of the License Fee and full payment for the costs for the Delivery Materials (including shipping) have been remitted by Distributor and received by Sales Agent. Distributor acknowledges and agrees that time is of the essence and the payment schedule set forth herein will be strictly enforced.  Failure to pay by the due dates herein will result in Licensor or Sales Agent having the right to terminate this

Exhibit 6a Page 164

Agreement and pursue all legal and equitable remedies.

All installments of the License Fee, as well as all other monies due to Licensor under this Agreement, including Delivery Materials costs, will be paid by wire transfer to the following account:

[ACCOUNT INFORMATION TO BE PROVIDED WITH INVOICE]

7. **MATERIALS / DELIVERY**:

(A)     Distributor shall order and pay for the Initial Materials (as defined below) within thirty (30) days following the date that Sales Agent provides Distributor with notice that Sales Agent is ready to effect Delivery (as defined below) of such Initial Materials ("Notice of Delivery"). Distributor acknowledges that (i) there is no guaranteed outside completion date, (ii) the Picture will be ready for delivery to Distributor only when final and complete, and (iii) the determination of finality and related timing for Delivery (taking into account both the completion of the Picture and additional factors affecting the timing of international release such as festival and award considerations) shall be at Licensor's sole discretion).

(B)     Delivery as used herein means delivery (at Distributor's cost of materials and shipping to be fully paid prior to shipment) of the Initial Materials and Additional Materials set forth below and in the Delivery Schedule attached hereto and incorporated herein as Exhibit "A" ("Delivery Materials"). Distributor acknowledges and agrees that it has reviewed the Delivery Materials list below and that no other Delivery Materials are required in order for Distributor to exercise its rights under this Agreement.

Initial Materials:

- Theatrical: 35 mm Print (which may be used);
- Theatrical: Music Cue Sheet (which Sales Agent may provide electronically);
- Video/DVD: Beta or Digital Betacam PAL or NTSC Master (Sales Agent's election following consultation with Distributor) of the Picture; and
- Dialogue List (which Sales Agent may provide electronically)
  Additional Materials (to be delivered only if and when available):

- Key Art (which Sales Agent may provide electronically).

(C)     Distributor will have ten (10) days to review and evaluate the Delivery Materials, and each delivery item delivered hereunder will be deemed acceptable for all purposes hereunder unless Distributor gives Sales Agent written notice of rejection within ten (10) days after Distributor's receipt or access to such item ("Notice of Rejection"). Distributor may only reject Delivery Materials on grounds of technical quality and not for any other reason, including probability of commercial success or artistic grounds. The Notice of Rejection must include a laboratory report from a reputable recognized laboratory in the theatrical motion picture business stating full details of the technical defects in any rejected item(s).

(D)     Sales Agent has thirty (30) days after receipt of a Notice of Rejection to cure such rejection by correcting the asserted defect(s) or delivering replacement item(s), or submit the issue of whether Delivery was effected to arbitration as set forth below. If Sales Agent elects to cure such rejection, then the time periods set forth above for review and cure will be applicable to the delivery of corrected and replaced Delivery Materials as well.

(E)     Distributor hereby acknowledges and agrees that no individual(s) or specification(s), including without limitation the any cast member or the director, and no other specifications is (are) essential for purposes of effectuating Delivery and Distributor may not refuse to accept Delivery should any individual(s) be replaced or specification changed for any reason whatsoever.

(F)     All disputes with regard to Delivery will be resolved by IFTA Arbitration (as further set forth herein). The sole remedy of Distributor in any such IFTA Arbitration for a failure for any reason to deliver the Delivery Materials will be the return of the License Fee or portion thereof previously paid, and under no circumstances will Distributor be entitled to interest, lost profits, consequential damages or any equitable or injunctive relief. Additionally, Distributor shall not be entitled to any such return of the License Fee if the Picture has been released in any medium in the Territory.

2

FOIA Confidential Treatment Requested

(G)     Title to all materials delivered to Distributor in connection with the Picture will remain with Licensor or Sales Agent (as applicable). Distributor will exercise due care in safeguarding all materials and will assume all risk for theft or damage while they are in transit or Distributor's possession. In respect of all materials created or manufactured by Distributor (including without limitation all Picture copies, packaging, artwork, marketing, dub and sub-titled language tracks, so-called "bonus materials," etc.), Licensor is the copyright owner from inception, provided that if such ownership is not allowed under a law in the Territory, Distributor hereby grants (and from creation of each such item shall by the terms hereof grant) to Sales Agent an irrevocable royalty-free license to use all such materials worldwide in perpetuity in all media now known or hereinafter devised.   In all cases, Distributor shall only use such materials during the Term to exploit the Licensed Rights.   The creation of dubbed and sub-titled language tracks and related versions of the Picture, the trailers thereof, and any other materials created or duplicated by Distributor hereunder are to be made at Distributor's sole cost.

(H)     Upon termination of this Agreement, Distributor will, at Sales Agent's election: either:  (i) return to Sales Agent at Distributor's expense all materials in connection with the Picture (including without limitation  all film and digital pre-print and exhibition materials, video inventory, marketing  materials,  and language tracks), whether such materials were delivered to Distributor or created by Distributor or any of its sub -distributors or licensees;  or (ii) destroy all such materials and provide Sales Agent with a customary certificate of destruction executed by an authorized officer of Distributor.

(I)     All costs of Delivery, return and destruction (including shipping charges, import fees, duties, brokerage fees, storage charges and related charges) will be Distributor's sole r e s p o n s i b i l i t y .

8.     **LICENSED RIGHTS / RESERVED RIGHTS / HOLDBACKS**:

(A)     Subject to the condition precedent of timely payment in full of the License Fee without deduction or offset of any kind, Licensor shall license to Distributor the following exclusive distribution rights to the Picture for t h e Territory, for the duration of the Term, and in the Authorized Language(s) ("Licensed Rights"). All rights not specifically licensed herein whether now known or hereafter devised (including without limitation so-called "clip rights" to license excerpts of the Picture for unrelated third party use) are reserved to Licensor ("Reserved Rights").  Distributor is expressly prohibited from exploiting any of the Reserved Rights.

| Licensed Right | Licensed to Distributor | Reserved to Licensor | Distributor's Holdback Period |
|---|---|---|---|
| Cinematic Rights: | | | |
| Theatrical | ____ | X___ | |
| Non-Theatrical | X___ | ____ | |
| (including Hotel/Motel Rights) | | | |
| Public Video | X___ | ____ | |
| Commercial Video | X___ | ____ | |
| | | | |
| Home Video Rights: | | | |
| Home Video Rental | X___ | ____ | |
| Home Video Sellthru | X___ | ____ | |
| | | | |
| Ancillary Rights: | | | |
| Airline | X___ | ____ | |
| Ship | X___ | ____ | |
| | | | |
| Pay TV Rights: | | | |
| Terrestrial | X___ | ____ | * |
| Cable | X___ | ____ | * |
| Satellite | X___ | ____ | * |
| | | | |
| Free TV Rights: | | | |
| Terrestrial | X___ | ____ | * |
| Cable | X___ | ____ | * |
| Satellite | X___ | ____ | * |

3

FOIA Confidential Treatment Requested

JJMT-SEC-0004984

| | | |
|---|---|---|
| Free Video-on-Demand | _X_ | ___ |

Other TV Rights:

| | | |
|---|---|---|
| Video-On-Demand ("VOD") | _X_ | ___ |
| Subscription VOD ("SVOD") | _X_ | ___ |
| Near VOD ("NVOD") | _X_ | ___ |
| Pay-Per-View | _X_ | ___ |

Internet Rights: Post Home Video Window

| | | | |
|---|---|---|---|
| VOD (e.g., iTunes) | _X_ | ___ | |
| SVOD (e.g., Netflix) | _X_ | ___ | |
| Transactional VOD ("TVOD") | _X_ | ___ | |
| Electronic Rental | _X_ | ___ | * |
| Electronic Sell Thru ("EST") | _X_ | ___ | * |

 (B)  Holdbacks:

Distributor shall hold back its exploitation of the Licensed Rights marked "*" above until the initial release of the Picture in the United States (the "First US Theatrical Release"), unless otherwise waived or shortened by Sales Agent by written notice.

 (C)  All transmissions of the Picture hereunder in exercise of the Pay TV, Satellite Free TV, Other TV, and Internet Rights as set forth herein shall be encrypted or encoded in such manner that may be decrypted or decoded only by the use of authorized decryption or decoding equipment, the sale and use of which equipment is limited to the Territory. Any exercise of the Other TV Rights is expressly conditioned upon Distributor providing Sales Agent with acceptable written documentation verifying implementation of such encryption protections for all exercise of such rights.

 (D)  Intentionally deleted.

 (E)  Television Runs:

(i)  Pay TV: Unlimited runs.

(ii)  Free TV: Unlimited runs.

 (F)  The parties acknowledge that when the Picture is transmitted by satellite and/or cable for reception in the Territory, such transmission may be capable of reception outside the Territory due to the inherent technical capability of satellites to beam down signals and/or cable systems to transmit signals, which are not confined to territorial boundaries ("Distributor Overspill"). Sales Agent agrees that the occurrence of Distributor Overspill shall not constitute a breach of this Agreement, provided that (i) the transmission is not primarily intended for reception outside the Territory and (ii) Distributor receives no direct revenue from such overspill. Additionally, the parties acknowledge that when the Picture is transmitted by satellite and/or cable for reception outside the Territory, such transmission may be capable of reception inside the Territory due to the inherent technical capability of satellites to beam down signals and/or cable systems to transmit signals, which are not confined to territorial boundaries ("Overspill"). Distributor agrees that the occurrence of Overspill shall not constitute a breach of this Agreement by Sales Agent or Licensor, provided, that (i) the transmission is not primarily intended for reception inside the Territory and (ii) Sales Agent and/or Licensors (or their licensees) receive no direct revenue from such overspill.

 (G)  Distributor's right to exploit Internet Rights in the Picture are subject to the terms and conditions of the STCs (as hereafter defined), including without limitation a requirement to utilize current commercially reasonable technological safeguards to ensure that accessing, streaming or downloading of the Picture is limited solely to reasonably identifiable locations within the Territory (e.g., geofiltering). Notwithstanding the foregoing, to the extent Distributor is supplied approved promotional clips of the Picture formatted for use on the Internet, Distributor may use up to three (3) minutes in the aggregate of such clips on the Internet solely for purposes of promoting the Picture and provided such clips are posted solely within a domain bearing the identification code of one of the countries of the Territory.

 (H)  Distributor shall use its best efforts and skill in the distribution and exploitation of the Picture, and

4

FOIA Confidential Treatment Requested

JJMT-SEC-0004985

Distributor shall exercise its rights hereunder in a fair, reasonable, customary and non-discriminatory manner with respect to Licensor or Sales Agent.

9.     **NO DISPOSITION OF GROSS RECEIPTS**: Licensor is licensing the Picture to Distributor on a so-called "flat" basis; therefore, subject to Sales Agent's receipt of the License Fee in accordance with the terms of this Agreement, no other payments whatsoever shall be due to Sales Agent and/or Licensor hereunder.

10.    **ACCOUNTINGS:** Intentionally deleted.

11.    **PAYMENT REQUIREMENTS**:

    (A)     The License Fee shall be paid in the amounts specified and required hereunder, which amounts as stated in this Agreement shall be deemed net sums in respect of which Distributor shall have separately paid at its own expense any required withholding and/or remittance taxes required by laws of the Territory such that no amounts shall be deducted from the payments to Licensor specified in this Agreement.

    (B)     There will be no deductions from any payments due to Licensor, including the License Fee, because of any bank charges, conversion costs, sales use or VAT taxes, "contingents", quotas or any other taxes, levies or charges, all of which shall, if required, be paid separately by Distributor.

    (C)     If it is legally impossible to transmit any monies due to Licensor, then Distributor will immediately so notify Sales Agent in writing. Distributor will then deposit such monies at Distributor's expense in Sales Agent's or Licensor's name, as Sales Agent shall designate, in such depository as may be designated by Sales Agent.

    (D)     All payments to Licensor will be in United States dollars computed at the prevailing exchange rate on the date due at Licensor's bank, provided that the exchange rate for any late payments shall be the most favorable prevailing daily rate for Licensor between the due date and the date of payment.

    (E)     Any payment due Licensor not made by its due date will, in addition to any other right or remedy of Licensor, incur a finance charge at the lesser of the prevailing US Prime rate plus three percent (3%) or the highest applicable legal contract rate until paid in full.

12.    **MARKETING / ADVERTISING**:

    (A)     Intentionally deleted.

    (B)     Intentionally deleted.

    (C)     Any marketing or advertising materials created by Distributor and any alterations by Distributor to any artwork or other marketing materials furnished by Sales Agent must satisfy all of Licensor's and Sales Agent's underlying contractual obligations and shall in all instances be subject to Sales Agent's prior written approval before Distributor shall make any use of such materials.

    (D)     Distributor shall comply with all contractual credit, likeness, dubbing, subtitling, editing, marketing, publicity, promotional or other similar restrictions or requirements provided to Distributor.

    (E)     Intentionally deleted.

    (F)     Intentionally deleted.

    (G)     Intentionally deleted.

    (H)     Intentionally deleted.

13.    **EDITING / BILLING**:

    (A)     Distributor may only cut and edit the Picture to the extent necessary to meet governmental censorship requirements. Any such cutting or editing shall only be permitted with Sales Agent's prior written approval and Distributor shall comply with all editing restrictions and requirements provided by Sales Agent. Except for such editing for censorship, the Picture

5

FOIA Confidential Treatment Requested

shall be exhibited and otherwise distributed only in its original continuity as supplied by Licensor without alteration, interpolation, cut or elimination.

(B)     Distributor may include, before or after the Picture and all credits thereof, the credit or logo of Distributor, which precise placement must be pre-approved in writing by Sales Agent.

(C)     Intentionally deleted.

(D)     Distributor shall not do any of the following:

(i)      Change the title of the Picture as it appears in the original language of the Picture (except that Distributor may translate the title in the Authorized Language(s);

(ii)     Alter or delete any credit, logo, copyright notice or trademark notice, or anti-piracy warning appearing on the Picture; and

(iii)    Include any advertisements or other material in the Picture, preceding the Picture, or following the Picture in any medium including Home Video other than an approved anti-piracy warning and commercials for Free TV exploitation (if Free TV rights are licensed herein).

(E)     Distributor's obligations hereunder shall be binding on its subsidiaries, parents, affiliates, agents, sub-distributors and licensees.

14.     15.     **MUSIC CONTAINED IN THE PICTURE**:

(A)     Licensor will be responsible for acquiring all rights necessary to synchronize the music contained in the Picture as delivered to Distributor and on all copies exploited by Distributor hereunder, and for paying all royalties or charges incurred in obtaining and maintaining such synchronization licenses in effect for the Term.

(B)     The Performance Rights with respect to the music contained in the Picture shall either be in the public domain in the Territory, be controlled by Licensor sufficient to allow Distributor to exploit all of Licensed Rights without the necessity of any additional payment, or be available by license from the local music performing rights society in the Territory affiliated with the American Society of Composers, Authors and Publishers (ASCAP), Broadcast Music, Inc. (BMI), or SESAC, Inc. (SESAC). Distributor will be solely responsible for any royalties, however denominated, which any mechanical, performing or authors right society in the Territory attempts to collect in connection with the exploitation of the Picture in the Territory.

16.     **ADDITIONAL TERMS**:

(A)     Distributor acknowledges that the financing for the Picture will be provided by financiers who may require a completion guarantee or other financial assurances. The Distributor agrees to execute within twenty-four (24) hours of receipt such further documentation as may be required by the Licensor to accommodate such interests, including, without limitation, an Acceptance and Acknowledgement of a Notice of Assignment in the form customarily required by such financiers and completion guarantor (if any), and any and all documents or other instruments and acts required by such financiers and/or completion guarantor in connection with the establishment of a collection account or otherwise. In the event Distributor fails to execute and deliver all such documentation within five (5) business days of receipt of written notice thereof, then Distributor agrees that Sales Agent may, as it may elect in its discretion, terminate this Agreement or execute such documentation in the name of Distributor, for which purpose Distributor hereby irrevocably appoints Sales Agent as Distributor's attorney-in-fact, a power coupled with an interest, with full right to execute any and all such documentation.

(B)     Licensor may, in its absolute discretion, require Distributor to establish a Letter of Credit or other such form of payment (by way of example only, a bank guarantee) acceptable to Licensor to secure all or any part of the License Fee. In the event that the Licensor requests any such Letter of Credit(s), Distributor shall open the Letter of Credit and deliver same to Sales Agent within ten (10) working days following the Sales Agent's request. The Letter of Credit and any confirmation which may be required by Licensor or Licensor's bank must be irrevocable and in a format and issued by a bank acceptable to Licensor and Licensor's bank. At Sales Agent's election, any failure on Distributor's part to deliver the Letter of Credit within such ten (10) day period may result in the termination of this Distribution Agreement by written notice to Distributor. All costs of the Letter of the Credit and of any required confirmation shall be paid by Distributor.

6

**FOIA Confidential Treatment Requested**                                   **JJMT-SEC-0004987**

(C)     Neither Licensor nor Sales Agent can guarantee against piracy in the Territory and any piracy of the Picture, whether occurring before or after execution of this Agreement, shall not constitute a breach by Licensor nor a basis for damages claims, payment reductions, or termination hereunder.

(D)     Any delay of action hereunder by Sales Agent shall not be construed as a waiver of any rights or remedies, and any express waiver by Sales Agent of any specific right or remedy hereunder shall not constitute a waiver of any other rights or remedies regarding the same issue (including without limitation any preceding, continuing, or succeeding breach) or any other matter arising under this Agreement.

(E)     Any terms not set forth in this Agreement (including any capitalized words used herein without express definition) will be determined solely by reference to the most current IFTA Standard Terms and Conditions ("STCs") as of the date of this Agreement, which STCs are incorporated in their entirety herein and thereby comprise an integral component of this Agreement. In the event of any inconsistency between the terms of this Agreement and the STCs, the terms of this Agreement prevail.

(F)     Sales Agent is acting solely in its capacity as duly authorized agent on behalf of Licensor in connection with this Agreement.

17.     **NOTICES**: All notices hereunder shall be in writing and shall be sent to the recipients at the address and/or fax number and/or email address set forth above (or such subsequently changed address of which the sending party has received notice hereunder). Notices to Licensor shall be sent to the attention of c/o CINETIC MEDIA, whose fax number is (212) 204-7980.

18.     **REPRESENTATIONS AND WARRANTIES**: Distributor represents and warrants to Licensor that:

(A)     It has full authority and capacity to execute this Agreement and full legal and financial ability to perform all of its obligations under this Agreement;

(B)     There are no existing or threatened claims or litigation which would adversely affect or impair Distributor's ability to perform under this Agreement;

(C)     No dubbed or subtitled version of the Picture created by or to be created by Distributor does or will: (a) defame, or hold in a false light, or infringe any privacy or publicity or other personal right of any person; or (b) infringe any copyrights, trademark, patent, trade secret, rights of ideas, or similar property rights of any person;

(D)     It will employ at all times controls in accordance with prevailing customary standards in the Territory as used by major studios to prevent and deter theft, piracy, unauthorized copying, accessing, streaming or downloading (as applicable) of any copy of the Picture where the Picture is made available via any of the Licensed Rights granted herein;

(E)     It will indemnify and hold harmless Licensor and Sales Agent, and their parents, officers, directors, owners, shareholders, employees, attorneys agents, and successors and assigns from all claims, loss, liability, damages or expenses, including reasonable attorney's fees and legal costs, but not including lost profits due to breach of any of Distributor's representations, warranties covenants or conditions under this Agreement.

(F)     It will comply with all credit and talent obligations in connection with Picture as provided to Distributor by Sales Agent.

19.     **DEFAULT AND TERMINATION**:

(A)     Distributor will be in default of this Agreement in the event of any of the following circumstances:

7

FOIA Confidential Treatment Requested                    JJMT-SEC-0004988

(i)    Distributor fails to pay any installment of the License Fee or any other amounts due under this Agreement or any other agreement with Sales Agent when due;

(ii)    Distributor becomes insolvent or fails to pay its debt obligations when due;

(iii)    Distributor makes an assignment for the benefit of creditors, seeks relief under any bankruptcy law or similar law for the protection of debtors, or allows a petition of bankruptcy to be filed against it, or a receiver or trustee to be appointed for substantially all of its assets that is not removed within thirty (30) days;

(iv)    Distributor breaches any material term, covenant or condition of this Agreement or any other agreement with Sales Agent;

(v)    Any affiliate, parent, subsidiary, sub-distributor, or licensee of Distributor breaches any material term, covenant or condition of this Agreement or any other agreement with Sales Agent; term, covenant or condition of this Agreement or any other agreement with Sales Agent;

(vi)    Distributor attempts to make any assignment, transfer, sublicense or appointment of an agent without Sales Agent's prior written approval; or

(vii)    Distributor fails timely to sign a Notice of Assignment as provided below.

    (B)    Sales Agent will give Distributor notice of any claimed default. If the default is capable of cure, then Distributor will have ten (10) days after receipt of Sales Agent's notice to cure a monetary default, and twenty (20) days after receipt of Sales Agent's notice to cure a non-monetary default. If the default is incapable of cure, or if Distributor fails to cure within the time provided, then Licensor may proceed against Distributor for available relief, including but not limited to terminating this Agreement or any other agreement with Sales Agent retroactive to the earliest date of default, suspending Delivery of the Picture, and declaring all unpaid amounts due Licensor immediately due and payable.

    (C)    As a result of termination of this Agreement or any other agreement between Distributor and Sales Agent, with respect to those pictures as to which all rights are terminated:

(i)    All licensed rights in and to such picture shall automatically revert to Licensor, free and clear of any and all encumbrances and any sub-distribution agreements entered into by Distributor (other than those sub-distribution agreements deemed assigned to Licensor as specified below);

(ii)    All of Distributor's rights under any sub-distribution and license agreements that have been pre-approved in writing by Sales Agent shall be deemed to have been assigned to Licensor (and any such sub-distribution agreements not so approved, shall be deemed automatically terminated) and all payments to be made under such agreements shall be paid directly to Licensor who may notify all relevant parties of such assignment to Licensor;

(iii)    All monies payable by exhibitors or sub-distributors to Distributor in respect to such picture shall be paid to and retained by Licensor;

(iv)    Any portion of the License Fee for this Picture and License Fee(s) for such other picture(s) theretofore paid by Distributor shall be retained by Licensor or Sales Agent and any unpaid portion of the License Fee for this Picture or for such other picture(s), if any, shall accelerate and immediately become due and payable to Licensor or Sales Agent;

(v)    Licensor shall be entitled to immediate possession of all digital and film pre-print and print elements and copies of the Picture and such other picture(s), advertising materials and all other materials (including any Delivery Materials) pertaining to same;

(vi)    Distributor shall execute and deliver all instruments requested by Sales Agent to effectuate a termination of this Agreement and its rights in the Picture or for such other picture(s) as applicable, including without limitation instruments necessary or appropriate to reflect such termination on the public records of governmental agencies and/or with industry organizations in the Territory which maintain records of a similar nature;

(vii)    Distributor shall turn over all records, including books, billing and delivery records to the Picture or such other

8

FOIA Confidential Treatment Requested

JJMT-SEC-0004989

picture(s), and all monies on hand, if any, relating to the Picture or such other picture(s); and

(viii)   Distributor hereby irrevocably appoints Sales Agent as Distributor's attorney-in-fact, a power coupled with an interest, with full right to execute any and all assignments and other instruments deemed by Sales Agent to be reasonably necessary or desirable to evidence the transactions provided hereunder and to protect its rights under this Agreement or such other agreement(s) as applicable.

## 20.   TERMINATION OTHER THAN FOR DEFAULT:

(A)   Upon written notice to Distributor, Sales Agent may in its sole discretion terminate this Agreement if principal photography of the Picture has not commenced within twelve (12) months following the date of this Agreement, the Picture is not ready for Delivery to Distributor within twenty-four (24) months following the date of this Agreement, or Licensor or Sales Agent abandons the Picture either prior to or after the commencement of principal photography.

(B)   In the event of such termination, Licensor shall return to Distributor such portion of the License Fee theretofore paid to Licensor by Distributor, and Distributor shall return to Sales Agent any and all materials, including, without limitation, all physical film materials, Delivery Materials, publicity materials and documents theretofore furnished by Sales Agent to Distributor in connection with the Picture. Neither Licensor nor Sales Agent shall have any additional obligation of any kind whatsoever to Distributor, or anyone claiming through Distributor, by reason of such termination.

(C)   Distributor shall execute and deliver all instruments requested by Sales Agent to effectuate a termination of this Agreement and its rights in the Picture, including without limitation instruments necessary or appropriate to reflect such termination on the public records of governmental agencies and/or with industry organizations in the Territory which maintain records of a similar nature. Distributor shall turn over all records, including books, billing and delivery records to the Picture and all monies on hand, if any, relating to the Picture. Distributor hereby irrevocably appoints Sales Agent as Distributor's attorney-in-fact, a power coupled with an interest, with full right to execute any and all assignments and other instruments deemed by Sales Agent to be reasonably necessary or desirable to evidence the transactions provided hereunder and to protect its rights under this Agreement.

## 21.   CHOICE OF LAW / ARBITRATION / FORUM:

(A)   This Agreement shall be subject to the laws of the State of California applicable to agreements wholly executed and performed therein, and all parties hereby irrevocably consent to the exclusive jurisdiction and venue of the Federal and State courts located in Los Angeles County for any court matters arising hereunder.

(B)   Any and all disputes under this Agreement shall be submitted exclusively to binding arbitration ("IFTA Arbitration") in Los Angeles, California under the Rules of International Arbitration of the International Film and Television Alliance ("IFTA Arbitration Rules") in effect as of the date the request for arbitration is filed. Each party waives any right to adjudicate any such dispute in any other court or forum and Distributor waives any and all rights to seek equitable or injunctive relief or to rescind or terminate this Agreement or to seek such rescission or termination. Los Angeles County will be deemed the "Forum" under the IFTA Arbitration Rules. Licensor (and where applicable Sales Agent) and Distributor agree to accept service of process for IFTA Arbitration in accordance with such Rules and to accept service of process for any judicial or other proceedings provided for hereunder by certified mail, return receipt requested, courier, or other personal delivery at the address indicated on this Agreement. Licensor (and where applicable Sales Agent) and Distributor agree to abide by any decision rendered in an IFTA Arbitration, and that any court having jurisdiction may enter judgment affirming such decision and may enforce such judgment in accordance with its powers.

(C)   Without limiting the aforesaid arbitration provisions and notwithstanding the exclusive jurisdiction provisions above, Licensor and Sales Agent shall additionally each have the right to proceed in any court of competent jurisdiction anywhere in the world to either (i) seek such interim protective relief, including equitable remedies as may be considered reasonably necessary to protect their rights and entitlements pursuant to this Agreement, or (ii) seek enforcement of any arbitration award or related judgment hereunder.

(D)   The prevailing party or parties in any arbitration hereunder shall be entitled to an award in such arbitral proceeding for reimbursement of its or their (as applicable) legal fees (including attorneys fees) and costs of arbitration (including discovery and expert witness costs). The prevailing party or parties in any judicial action hereunder shall similarly be entitled to court order or judgment reimbursing it or them (as applicable) for all legal fees (including attorneys fees) and costs incurred in connection with such matter and in connection with any applicable arbitration as aforesaid.

9

FOIA Confidential Treatment Requested   JJMT-SEC-0004990

22.    **CONFIDENTIALITY**: All terms of this Agreement shall be confidential and not disclosed to any third party except each party's accountants, attorneys and agents, and as necessary to perform each parties' rights and obligations hereunder, and except as required by law or judicial order.

23.    **COUNTERPARTS**:    This Agreement may be executed in counterparts which may be delivered by ink-signed originals, fax or digital copy in pdf or tiff format, each of which shall be deemed to be an original and such counterparts of all parties when taken together shall constitute the fully binding and executed Agreement.

24.    **BINDING AGREEMENT**: This Agreement, any exhibits attached hereto, and the STC's incorporated herein sets forth the entire understanding and agreement between Licensor and Distributor as to the subject matter hereof and supersedes all previous discussions, correspondence, inducements, agreements, warranties or representations, whether oral or written. This Agreement is binding on each of the parties and their respective successors and assigns. Except as expressly provided herein, this Agreement may only be amended in writing signed by Sales Agent on behalf of Licensor and Distributor.

THIS AGREEMENT is executed as of the parties as of the date first above written.

[signatures on the following page]

10

**FOIA Confidential Treatment Requested**                                    **JJMT-SEC-0004991**

**AGREED AND ACCEPTED:**

CINETIC MEDIA ("Sales Agent") as agent
On behalf of A/E IndieFilms ("Licensor")

By: _____

Its: EVP International Sales _____

1inMM Capital LLC ("Distributor")

By: _____

Its: MANAGING PARTNER _____

11

Exhibit 6a Page 174

**FOIA Confidential Treatment Requested**

JJMT-SEC-0004992

## Exhibit "A"

This Exhibit A is attached and incorporated into that certain International License Agreement dated as of December 17, 2018, by and between CINETIC MEDIA ("Sales Agent") as sales agent on behalf of A/E Indiefilms ("Licensor") and 1inMM Capital LLC ("Distributor") whereby Licensor granted to Distributor certain distribution rights in and to the motion picture entitled "Divide and Conquer: The Story of Roger Ailes " (the "Picture").

## LEGAL DELIVERABLES

1.   Clearly legible copies of all chain-of-title documents required by Distributor, evidencing Licensor's proper ownership and permitting the use of any and all literary, dramatic, musical and other material used in the production of the Program or upon which the Program and/or screenplay may be based, together with certificates of authorship and proof of payment in connection with the acquisition of the necessary rights in and to such material and the exercise of all options related thereto.

2.   Evidence satisfactory to Distributor that there is no lien, charge, encumbrance or security interest that would adversely interfere with the Licensed Rights granted to Distributor.

3.   A (a) copyright report issued by a Thomson CompuMark, (b) title report and (c) opinion issued.

4.   A complete typewritten statement of all third party screen and paid advertising credit, name and likeness, and other third party obligations, restrictions and approval rights including, without limitation, all dubbing obligations (if any), director's editing rights, video mastering consultation or approval rights, etc. for each individual and entity named in the billing block with excerpts from each applicable third party agreement setting forth the precise extent and nature of such obligations, restrictions and/or approval rights, in the identical order as listed in the billing block.

5.   The proposed paid ad/packaging summary, credit and billing block layout for both full- and small-sized paid ads.

6.   The final copyright notice, as it appears on the billing block.

7.   Clearly legible copies of fully-executed agreements for all key actors and key production personnel (e.g., director, producer, writer, etc.) and any other talent and/or crew agreements requested by Distributor.

8.   If the Program or underlying materials or properties are based upon or related to events in the real life of real persons, living or dead, or portrays real persons, true and correct copies of all personal releases and other documentation showing that Licensor has all rights necessary to permit Distributor to exploit the Picture in the manner provided herein without violating any third party rights or incurring any obligations to any third party.

9.   A complete written statement showing the exact form and manner of the main and end titles of the Picture.

10.   One (1) typewritten (or computer generated) hard copy and one (1) copy in digital format of a music cue sheet in standard form showing the particulars of all music synchronized with the Program (all versions) and additional cue sheets for the trailer(s) and any other materials in connection with the Program containing original and/or licensed music. All such cue sheets will include for each cue: (i) the title of song; (ii) the name of the songwriter/composer; (iii) the songwriter's/composer's performing rights affiliation (e.g., ASCAP, BMI or SESAC); (iv) the name of publisher; (v) the publisher's performing rights affiliation; (vi) the type of use; (vii) the length of the use; and (viii) an indication of whether or not a master recording was licensed.

11.   Clearly legible, fully-executed copies and proof of payment for any and all synchronization licenses and master use licenses, all valid and sufficient to provide Distributor with the right to use and perform all musical compositions and master recordings contained in the Picture and trailer (if available).

12.   Clearly legible copies of the copyright registration certificate(s) with the US Copyright Office for both the screenplay and Picture.

12

FOIA Confidential Treatment Requested

JJMT-SEC-0004993

# Exhibit 6b

**PROMISSORY NOTE**

**$ (1,994,700.00)**                                                  **(12/17/2018)**

<u>Promise</u>. 1INMM Capital, LLC, a limited liability entity established in the State of California, (the "Maker"), hereby promises to pay to Lender, JJMT CAPITAL LLC, a Delaware Limited Liability company located at  (<u>840 West Blackhawk, Unit #2205, Chicago, IL 60642)</u>, (the "Payee") an amount equal to (<u>ONE MILLION NINE HUNDRED NINETY-FOUR THOUSAND SEVEN HUNDRED)</u> Dollars ($<u>1,994,700.00</u>) in lawful money  of the United States of America, which sum shall be due and payable on (12/17/2019)  (the "Maturity Date"), in one (1) balloon payment, in  like money at said office. Payment date shall be no later than TWELVE (12) months post confirmed funds transfer from Payee to Maker in the amount of (ONE MILLION THREE HUNDRED NINETY-EIGHT THOUSAND) Dollars ($1,398,000.00).

<u>Prepayment Option</u>. Maker may pay down at any time any portion of the  principal sum outstanding without any prepayment penalty.

<u>Assignment of Rights.</u> See Appendix A

<u>Compounding of Unpaid Payments</u>. The undersigned agrees that time is of the  essence and that in the event payment of principal or interest due under this Note is not  made when due, giving effect to any grace period which maybe applicable, the  outstanding balance of unpaid payments hereof shall immediately bear interest at  the rate of ten (10) percent per month, for so long as  such event of default continues.

<u>Validity of Agreement to Conform to Law.</u> All agreements between the undersigned and the holder of this Note are expressly limited so that in no contingency or event whatsoever, whether by reason of advancement of the proceeds hereof, acceleration of maturity of the unpaid principal balance, or otherwise, shall the amount paid or agreed to be paid to the holder hereof for the use, forbearance or detention of money advanced hereunder exceed the highest lawful rate permissible under any law which a court of competent jurisdiction may deem applicable hereto. If, from any circumstances whatsoever, fulfillment of any provision hereof or any instrument securing this Note or any other agreement referred to herein, at the time performance of such provision shall be due, shall involve transcending the limit of validity prescribed by law which a court of competent jurisdiction may deem applicable hereto, then, ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity, and if from any circumstances the holder hereof shall ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the

Exhibit 6b Page 177

reduction of the unpaid principal balance due hereunder and not to the payment of interest. This provision shall control every other provision of all agreements between the undersigned and the holder hereof.

Maker's Default. At the option of the holder hereof exercised by written notice to the undersigned, this Note shall become immediately due and payable upon the maker's failure to pay when due any payment of principal, interest or expenses due hereunder; or (b) failure in the performance or observance of any of the terms or conditions of any mortgage, deed of trust, security agreement or other agreement securing, guaranteeing or otherwise pertaining to this Note after giving effect to any applicable curative period which may be contained therein. Upon the occurrence of any of the following specified Events of Default, as defined under the standard conventions and terminology prescribed for promissory notes drafted under Warren's California Forms for Principal, Interest, Insolvency, Breach of Covenants, Breach of Representation and Warranties, (each herein called an "Event of Default") then, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, the Payee may, by written notice to the Maker, declare the principal of and accrued interest in respect of this Note to be forthwith due and payable, whereupon the principal of and such unpaid accrued interest in respect of this Note shall become forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Maker. Furthermore, This note shall become due and payable before the above-mentioned maturity date immediately upon the happening of any of the following events affecting any maker or indorser thereof, to wit: voluntary or involuntary filing of a petition in bankruptcy or for reorganization, execution of an assignment for the benefit of creditors, calling meeting of creditors, appointment of liquidating agent or committee, offer of composition, entry of a judgment in excess of $ 10,000 which remains unsatisfied or for over 30 days, application for appointment or appointment of any receiver, issuance of warrant of attachment or death of any maker or indorser or on default of any other obligations to the Maker.

Collection Costs. If this Note or any installment of principal or interest is not paid when due, whether at maturity or by acceleration, the undersigned promises to pay all costs of collection, including without limitation, actual attorneys' fees, and all expenses in connection with the protection or realization of the assets and proceeds available this Note or the enforcement of any subsequent memorandum or agreement created in conjunction with this Note incurred by the holder hereof on account of such collection, whether or not suit is filed hereon or thereon; such costs and expenses shall include, without limitation, all costs, expenses and attorneys' fees actually incurred by the holder hereof in connection with any insolvency, bankruptcy, arrangement or other similar proceedings involving the undersigned, or involving any endorser or guarantor hereof, which in anyway affects the exercise by the holder hereof of its rights and remedies under this Note or under any mortgage, deed of trust, security agreement, guaranty or other agreement securing or pertaining to this Note.

Waiver of Notice. Presentment, demand, protest, notices of protest, dishonor and nonpayment of this Note and all notices of every kind are hereby waived by all parties to

Exhibit 6b Page 178

FOIA Confidential Treatment Requested

this Note, whether the undersigned, principal, surety, guarantor or endorser, except as provided herein. To the extent permitted by applicable law, the defense of the statute of limitations is hereby waived by the undersigned.

Death of Maker. Maker of this note hereby waives all notice and demand and consent that this note shall become due and payable immediately upon the happening of any of said events. This note shall become due and payable on the Maturity Date, but payment shall be accelerated and become due and payable immediately if the Maker shall die. For the further security of the holder thereof, the undersigned covenants that so long as any part of the principal or interest of this note is outstanding and unpaid, it will not grant any security interest to any third party upon its property, or create any lien whatsoever thereon, without also thereby including therein this note, equally and ratably with every other evidence of debt, secured by any of the undersigned's property. If, while any part of the principal or interest is outstanding and unpaid, the maker hereof breaks this covenant, then the holder hereof may at his or its election, declare and make this note at once due and payable by written notice delivered to maker, and this remedy will be deemed cumulative and in addition to any other remedy available to the holder hereof. This note shall be paid without claim of set-off, counterclaim or deduction of any nature or for any cause whatsoever.

Extensions Granted by Payee. All indorsers hereunder agree that the holder of this note in case of non-payment thereof at maturity, or of any installment thereof when due, may grant to the maker or any indorser of said note any extension or extensions of time of payment thereof, in whole or in part, without notice to said indorsers or any of them and any such extension or extensions shall not affect in any way said indorsers' liability upon note, such indorsers hereby waiving demand, presentment of payment, notice of nonpayment and protest and do further agree that any holder of this note may in the event of default in the payment of principal of, or interest upon, this note or any installment thereof repossess and/or sell the (collateral) held as collateral security for the payment of this note without in any way relieving said indorsers, or any of them, of any liability by reason of such repossession and/or sale, applying the proceeds of sale of any such  asset less all costs to amount due under this note, and all indorsers agree to pay any deficiency on this note on demand.

Litigation Fees. In any action at law or in equity to enforce or construe any provisions or rights under this Note, the unsuccessful party or parties to such litigation, as determined by a court pursuant to a final offer, judgment or decree, shall pay to the successful party or parties all costs, expenses and reasonable attorneys' fees incurred by such successful party or parties (including, without limitation, such costs, expenses and fees on any appeal), which costs, expenses and attorneys' fees shall be included as part of any order, judgment or decree.

General Provisions. Principal and interest evidenced hereby are payable only in lawful money of the United States. The receipt of a check shall not, in itself, constitute payment hereunder unless and until paid in good funds. Whenever any payment on this Note shall be stated to be due on a day, which is not a business day, such payment shall be made on

Exhibit 6b Page 179

JJMT-SEC-0004996

the next succeeding business day and such extension of time shall be included in the computation of the payment of interest of this Note. This Note is to be governed by and construed in accordance with the laws of the State of California except to the extent United States federal law permits the holder to contract for, charge or receive a greater amount of interest. In any action brought under or arising out of this Note, the undersigned hereby consents to the in personam jurisdiction of any state or federal court  sitting in the state of California, and waives any claim or defense that such forum is not  convenient or proper, and consents to service of process by any means authorized by  California and/or Federal law.

THE UNDERSIGNED HEREBY WAIVES, AND COVENANTS THAT THE UNDERSIGNED WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS NOTE, THE SUBJECT MATTER HEREOF OR ANY DOCUMENT RELATING HERETO, IN EACH CASE WHETHER  NOW EXISTING OR HEREAFTER ARISING OR WHETHER IN CONTRACT OR IN  TORT OR OTHERWISE.

_____          12/20/18
                                          _____

1INMM Capital, LLC                        Date
Zachary Horwitz, Manager

Exhibit 6b Page 180

FOIA Confidential Treatment Requested

APPENDIX A


ASSIGNMENT


This assignment ("Assignment") between 1INMM CAPITAL LLC, located at 5550 Wilshire Blvd #523 Los Angeles, CA 90036 ("Assignor") and JJMT CAPITAL LLC, a Delaware Limited Liability company located at  840 West Blackhawk, Unit #2205, Chicago, IL 60642 ("Assignee") is dated effective as of ( 12 / 17 / 2018).

For good and valuable consideration, the receipt and sufficiency of which hereby acknowledged, Assignor does hereby irrevocably and unconditionally sell, grant, convey, and assign unto Assignee all of Assignor's rights, title and interest of every kind and nature, throughout the universe, until assignee is paid ($1,994,700.00) at to which time all rights, title and interest of every kind and nature revert back to Assignor and to that certain motion picture, currently entitled "DIVIDE AND CONQUER: THE STORY OF ROGER AILES" (the "Picture") based on the original screenplay entitled "ACTIVE MEASURES" directed by Alexis Bloom.

1.  Assignor hereby represents and warrants:

    1.1.    That Assignor is the sole and exclusive owner of the rights and privileges granted or to be granted to Assignee hereunder.
    1.2.    That, as of the effective date hereof, Assignor has the right to enter into this Assignment.
    1.3.    That, as of the effective date hereof, no part of the rights herein conveyed has in any way been encumbered, conveyed, assigned, transferred or otherwise disposed of and all such rights are therefore free and clear of any and all liens, claims, charges or encumbrances whatsoever in favor of any party whatsoever.

2.  Assignor shall indemnify Assignee, its successors, assigns, licensees and officers, and hold them harmless from and against any and all claims, liability, losses, damages, costs, expenses (including but not limited to attorney's fees) arising out of any breach by Assignor of any warranty made by Assignor hereunder.

3.  Assignee hereby assumes and agrees to be bound by all future obligations of Assignor which accrue after the date hereof.

4.  Assignor hereby waives the benefits of any provision of law known as "droit morale" or any similar law in any country of the world and agrees not to institute or permit any action or lawsuit on the ground that the Picture in any way constitutes an infringement of any "droit morale" and Assignor agrees that Assignor shall not, under any circumstances (including without limitation, the circumstances of a breach by Assignee) be entitled to enjoin the exhibition or other exploitation of the Picture, to terminate or rescind any rights granted to Assignee or to obtain any other form of equitable relief, specific performance or otherwise, any right to which Assignor expressly waives.

FOIA Confidential Treatment Requested

5. This Assignment, and the rights granted hereunder, may not be assigned by Assignor to any person, firm or corporation. Assignee may assign this Assignment and the rights and services granted herein, together with the results and proceeds thereof, and the representations and warranties contained herein, to any person or entity.

6. This Assignment shall be construed in accordance with the laws of the state of California and shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, licensees and assigns. This Assignment cannot be amended or modified except in a writing signed by all parties hereto.

IN WITNESS WHEREOF, THE PARTIES HERETO HAVE EXECUTED AND DELIVERED THIS ASSIGNMENT AS OF THE (17)th DAY OF December 2018.

1INMM CAPITAL, LLC ("Assignor")          JJMT CAPITAL LLC ("Assignee")

By: _____          By: _____

Its: _____          Its: _____

Exhibit 6b Page 182

**FOIA Confidential Treatment Requested**

# Exhibit 6c

LICENSE AGREEMENT

This License Agreement ("Agreement") is entered into as of December 21th, 2018 (the "Effective Date") by and between 1inMM Capital LLC, with its principal place of business at 5550 Wilshire Blvd #523 Los Angeles, CA 90036 ("Licensor") and NETFLIX, INC., a California Corporation, with its principal place of business at 335 N Maple Dr. #353, Beverly Hills, CA 90210 ("Netflix").

**Recitals**

Licensor is a Distributor and owner of all rights hereby granted for "Active Measures" (the "Title"), directed by Jack Bryan and "Divide and Conquer: The Story of Roger Ailes" (the "title"), directed by Alexis Bloom.

Netflix is a digital platform.

Licensor and Netflix desire to enter into a relationship whereby Licensor will grant Netflix, among other things, a license to distribute the Title to subscribers within the Territory, as defined below, all in accordance with the terms and conditions set forth below.

**Agreement**

In consideration of the mutual promises contained herein and such other good and valuable consideration, the parties agree as follows:

1. **Definitions.**

    1.1.    "Affiliate" shall mean any business entity which Licensor and Netflix directly or indirectly controls, is controlled by, or is under common control with, where "control" is defined as the ownership of at least fifty percent (50%) of the equity or beneficial interest of such entity or the right to vote for or appoint a majority of the board of directors or other governing body of such entity or otherwise possesses the power to direct the affairs of the entity.

    1.2.    "Basic TV" shall mean the delivery and/or exhibition of a motion picture, television show or other entertainment product by means of cable, satellite or any other electronic or non-tangible means (whether analog or digital, or via the Internet or any other electronic or non-tangible medium now known or hereafter devised) where the consumer is charged a recurring fee and/or periodic access charge for the first or lowest tier(s) of service (including a tier that is required to be purchased or accessed before access to other programming services is permitted), regardless of whether such exhibition is on a regularly scheduled basis or made available to the viewer on an on demand basis at the consumer's discretion.

    1.3.    "Electronic Sell-Through" or "EST" shall mean the delivery and/or exhibition of a motion picture, television show or other entertainment product, solely on a non-ad supported basis, where the timing and/or selection of same is not pre-determined, but rather is at the consumer's discretion, and for which, and the right to permanently download, retain and/or have access to same, the consumer is charged a transactional fee.

    1.4.    "Free TV" shall mean the delivery and/or exhibition of a motion picture, television show or other entertainment product by means of over the air signals (including the retransmission of such signals by cable, satellite or any other electronic or non-tangible means) whether analog or digital, or via the Internet solely on one (1) website owned and operated by one (1) free-to-air broadcaster and branded as such broadcaster's website, where the consumer (i) is not charged a fee (except for the license fee, if any, payable for the right to use a television set in certain territories) and (ii) is required to view or is otherwise exposed to commercial interruptions (display or interstitial).

    1.5.    "High Definition" shall mean a resolution of greater than or equal to 720p.

1

Exhibit 6c Page 184

1.6. "Home Video" shall mean the commercial release of a motion picture, television show or other entertainment product for purchase and/or rent on optical media, such as DVD and/or Blu-ray disc.

1.7. "Internet Transmission" shall mean the transmission of data via Internet Protocol, including without limitation through use of client software contained on a Blu-ray disc or other optical media.

1.8. "License Fees" shall mean, collectively, as set forth in more detail in Section 4.1.

1.9. "Licensed Languages" shall mean, for each Title hereunder, (i) its original language, (ii) neutral or Mexican Spanish (in subtitled form (and, if available, dubbed form) if the original language is other than Spanish), and (iii) Brazilian Portuguese (in subtitled form, if available (and, if available, dubbed form) if the original language is other than Brazilian Portuguese).

1.10. "Netflix-Enabled Device" or "NED" shall mean any device capable of receiving data via Internet Transmission, subject to the security and copy protection specifications set forth in Section 2.5 or otherwise agreed to by the parties, including without limitation (i) a desktop or laptop computer; (ii) a television set; (iii) a set top box, including a box that offers an integrated personal digital video recorder (DVR); (iv) a DVD and/or Blu-ray player; (v) a game console; (vi) a portable device, including without limitation a mobile phone or tablet; or (vii) a device with a web browser interface or other like capability.

1.11. "Netflix Service" shall mean a global subscription service that provides subscribers with on-demand access to movies and television content, and delivers such content through Internet Transmission to NEDs (including User Interfaces on same) and/or, currently in the United States only, in optical disc format (e.g., DVD, Blu-ray).

1.12. "Pay Per View" or "PPV" shall mean the delivery and/or exhibition of a motion picture, television show or other entertainment product, where the timing and/or selection of same is pre-determined, and not at the consumer's discretion, where the consumer is required to view the content over a limited period of time, and for which the consumer is charged a transactional fee.

1.13. "Pay TV" shall mean the delivery and/or exhibition of a motion picture, television show or other entertainment product by means of cable, satellite or any other electronic or non-tangible means (whether analog or digital, or via the Internet or any other electronic or non-tangible medium now known or hereafter devised) where the consumer is charged a recurring fee and/or periodic access charge in addition to or in a greater amount than any fee payable in order to receive Basic TV, regardless of whether such exhibition is on a regularly scheduled basis or made available to the viewer on an on demand basis at the consumer's discretion.

1.14. "Source Material" shall mean the source files for the Titles and associated trailers, artwork, promotional materials and metadata (including without limitation audio and closed captioning files), the delivery specifications for which are detailed in Schedule B attached hereto.

1.15. "Start Date" shall mean, for each Title, the date such Title may first be made available for exhibition on and distribution, as detailed on Schedule A attached hereto or, on the notifications Licensor shall provide to Netflix pursuant to Section 3.1.3.

1.16. "Subscription Video-on-Demand" or "SVOD" shall mean the delivery and/or exhibition of motion pictures, television and/or other entertainment products on a commercially uninterrupted basis where the consumer is charged a recurring fee and/or periodic access charge for the service.

1.17. "Taxes" shall mean all federal, state, local, foreign and other net income, gross income, gross receipts, sales, use, value added, goods and services, consumption, ad valorem, transfer, franchise, profits, withholding, payroll, excise, stamp, real or personal property, customs, duties or other taxes, fees, assessments or charges of any

2

FOIA Confidential Treatment Requested

kind whatsoever, including any related penalties and interest, imposed by any federal, territorial, state, local, or foreign government or any agency or political subdivision of any such government.

1.18.   "Term" shall mean the period commencing on the Effective Date and ending on the expiration date of the last to expire Title License Period.

1.19.   "Territory" shall mean the following countries and each of their respective territories, possessions, commonwealths, and trusteeships:

Mexico;

Central America, including Belize, Costa Rica, Guatemala, El Salvador, Honduras, Nicaragua and Panamá;

South America, including Argentina, Bolivia, Brazil, Chile, Colombia, Ecuador, Paraguay, Peru, Uruguay and Venezuela; and

The Caribbean Basin Islands, including Anguilla, Antigua, Barbuda, Aruba, Barbados, British Virgin Islands, Dominica, Dominican Republic, Grenada, Guadeloupe, Haiti, Jamaica, Martinique, Montserrat, the Netherland Antilles, St. Kitts and Nevis, St. Lucia, St. Vincent and the Grenadines, Trinidad, Tobago, and the Turk and Caicos Islands.

1.20.   "Theatrical" shall mean the exhibition of a motion picture, television show or other entertainment product or program (regardless of the means of delivery) in conventional, drive-in or special format (e.g., iMax) theaters that are open to the general public and for which an admission fee is charged.

1.21.   "User Interfaces" shall mean web applications built using Application Programming Interfaces (commonly known as APIs) released by Netflix, which applications enable subscribers and potential subscribers to link to or otherwise use the Netflix Service on NEDs.

1.22.   "Video-on-Demand" or "VOD" shall mean the delivery and exhibition of a motion picture, television show or other entertainment product, where the timing and/or selection of same is not scheduled, but rather is at the consumer's discretion, where the consumer can view the content over a limited period of time, and for which the consumer is charged a transactional fee.

1.23.   "Years" shall mean three (3) successive periods of twelve (12) calendar months during the Term, the first of which shall begin on as detailed on Schedule A.


2.   **Grant of Licenses.**

2.1.   Title License.

2.1.1.Licensor grants to Netflix during the Term the exclusive right and license to exhibit and distribute the Title (and associated Source Material) in any or all of the Licensed Languages within the Territory solely by way of Internet Transmission via SVOD and AVOD, the Netflix Service to NEDs (including User Interfaces on same).

2.1.2.Licensor also grants to Netflix during the Term a limited, non-exclusive right and license to copy, install, compress, uncompress, encode, encrypt, decode, decrypt, display, use, cache, store and transmit the Titles (and associated Source Material) for purposes of such approved exhibition and distribution.

2.2.   Marketing and Promotion.

2.2.1.   Trademark License.  Licensor grants to Netflix during the Term a limited, non-exclusive right and license to copy, install, display, use, cache, store, transmit, exhibit and distribute Licensor's trademark(s) and logo(s) identified on Schedule

3

FOIA Confidential Treatment Requested

C (collectively, "Licensor Marks") for purposes of exercising its rights under this Section 2.

2.2.2.    Marketing; Pre-promotion.  Subject to Section 5.4, Netflix may, commencing sixty (60) calendar days prior to each Title's Start Date, market and promote the availability of such Title through the any Service here granted.

2.2.3.    Introductory Segments; Promotion To Non-Subscribers.  Licensor grants to Netflix during the Term a limited, non-exclusive right and license to cut each Title to create short promotional clips, each of which shall consist of no more than three (3) consecutive minutes in length of a Title, an "Introductory Segment".  Licensor further grants to Netflix during the Term a limited, non-exclusive right and license to (a) exhibit and distribute, solely by way of Internet Transmission, Source Material (excluding Titles) and Introductory Segments to subscribers and potential subscribers for purposes of marketing and promoting the availability of the Titles through the Netflix Service and (b) copy, install, compress, uncompress, encode, decode, encrypt, decrypt, display, use, cache, store and transmit such materials for purposes of such approved exhibition and distribution.  For the avoidance of doubt, Netflix need not encrypt Introductory Segments or trailers.

2.3.    Encryption; Copy Protection.  Netflix shall, at all times during the Term, implement security and copy protection technologies with respect to each Title, including geo-filtering and encryption technologies, that are at least as protective as the then-current industry standard in the Territory and which shall be no less protective than those provided by Netflix to other platforms in the Territory.  Once terminated this Agreement by any cause, Netflix shall destroy, eliminate and/or return to Licensee any and all protection copy.

2.4.    Geo-filtering.  Netflix shall, at all times during the Term, implement geo-filtering technology to restrict access to Titles, via the Netflix Service, to subscribers within the Territory that is at least as protective as the then-current industry standard in the Territory and which shall be no less protective than those provided by Netflix to other platforms in the Territory.  Notwithstanding the foregoing, Licensor acknowledges that Netflix cannot guarantee that current geo-filtering technology shall be effective in every instance.

2.5.    For the avoidance of doubt, Netflix may offer the Netflix Service, including the Titles licensed hereunder, on NEDs where a subscriber is required to use a third party service (including without limitation a User Interface) and/or make payment to such third party to use the Netflix Service (whether such payment is for an additional charge in order to access the Netflix Service and/or for the relevant subscription fee for the Netflix Service itself).  Such third parties may also offer interactive features, such as on-screen chat functionality or simultaneous or coordinated viewing.  By way of example only, the Netflix Service may be offered through a game console such as the Microsoft Xbox, wherein use of the Netflix Service by subscribers through such NED requires the payment of a recurring, material fee to Microsoft Corporation and/or payment of the relevant Netflix Service subscription fee to Microsoft Corporation.

2.6.    Notwithstanding anything to the contrary in this Agreement, but without in any way limiting Netflix's security and related obligations pursuant to Sections 2.5 and 2.6 or Netflix's indemnification obligations pursuant to Section 6.3, Netflix shall not be responsible or liable for any acts or omissions of, or resulting from a consumer's use of, a third party NED and/or any third party software (including any User Interface).

2.7.    Exclusivity; Holdbacks.  Netflix shall be the exclusive SVOD and AVOD licensee in the Territory during such Title's Title License Period.  Further, during the period commencing on the first day of the Term and continuing through the expiration of the Title License Period, as applicable, Licensor (and its Affiliates) shall not, and shall not license or permit any third party to, license, exhibit, distribute or otherwise

4

FOIA Confidential Treatment Requested                                                    JJMT-SEC-0005003

exploit such Title in the Territory other than in a Theatrical, Home Video, VOD, or purely EST, (e.g., no Basic TV exploitation, no Pay TV exploitation, no SVOD exploitation, no AVOD).  Holdback against Free TV and Basic Cable only during the first 18 months. Licensor acknowledges that this provision and Licensor's performance of its obligations under this Section is essential to Netflix and its willingness to enter into this Agreement.

**3.  License Fees.**

3.1.  License Fees.  Netflix shall pay Licensor the License Net Fee of $4,200,000.00 (Four Million Two Hundred Thousand US Dollars and 00/100), including Taxes and withholdings, agreeing both parties that any and all discounts, withholdings, taxes or similar will be absorbed by the Netflix.

3.2.  Payment Details.  License Fee shall be due and payable as follows: the amount of $4,200,000.00 (100%) for two (2) Titles due 365 days after the delivery of the required materials as established in this Agreement and as defined on Schedule A.

3.3.  Taxes. Each party shall, as set forth in more detail in Section 5, indemnify the other for failure to pay any Taxes payable by such party pursuant to this Section and/or applicable law.

**4.  Delivery.**

4.1.  Source Material.  Licensor shall create and deliver, at its sole expense, Source Material for each Title set forth on Schedule A as of the Effective Date to Netflix no later than ninety (90) calendar days prior to the applicable Start Date or such other date agreed to in writing by the parties.  Source Material shall be loaned to Netflix for the purpose of encoding and shall be, at Licensor's option, either destroyed or, with written notice, returned to Licensor within ninety (90) calendar days of accepted delivery.  Licensor shall also provide, at Netflix's request, accurate music cue sheets for each Title.

4.2.  Specifications.  All Source Material shall be provided to Netflix in accordance with the specifications set forth in, and accompanied by all information required by, Schedule B.  For the avoidance of doubt, in the event that Source Material is provided in encrypted format, including for example on DVD, Netflix shall be permitted to decrypt such media as necessary prior to encoding and/or encode directly from such media.  Notwithstanding anything to the contrary in this Agreement, no advertising elements (pre-roll, bugs, bumpers, placards, etc.) or overlay branding (either Licensor's or any other third party's) shall be included before, after or within any Source Material for a Title delivered hereunder.  Source Material shall be delivered in the highest quality and resolution available to Licensor (e.g., if not available in 1080p, then delivered in 1080i, or if not available in 1080i, then delivered in 720p), including without limitation High Definition

4.3.  Acceptance.  Upon Netflix's receipt of the Source Material for a Title, Netflix shall have thirty (30) calendar days in which to send Licensor written notice of its acceptance ("Notice of Acceptance") or rejection ("Notice of Rejection") of the Source Material for that Title, such acceptance or rejection to be determined by Netflix based solely upon whether such material complies with Schedule B.

4.4.  Rejection.  Upon Licensor's receipt of a Notice of Rejection, if any, Licensor shall, without delay and at its sole expense, replace the defective Source Material.  In the event that Licensor is unable to provide an acceptable Source Material replacement, Netflix shall not be obligated to pay any License Fee with respect to the relevant Title.

FOIA Confidential Treatment Requested

**5.   Representations and Warranties; Indemnification; Limitation on Liability.**

5.1.   Netflix.  Netflix represents, warrants and covenants that (i) it has the full right, power, legal capacity and authority to enter into and fully perform its obligations under this Agreement; (ii) there are not now any liens, claims, encumbrances, legal proceedings, agreements or understandings which might conflict or interfere with, limit, derogate from, be inconsistent with any of Netflix's representations, warranties or covenants contained in this Section 6.1. (iii) it has satisfied and shall satisfy during the Term all third party obligations of any kind with respect to the obligations acquired by this Agreement and with any third party, including the viewers of Netflix; (iv) Netflix's distribution and other exploitation of the Titles (and associated Source Material and Introductory Segments) granted by this Agreement to Netflix shall not violate or infringe any rights of any third party, including without limitation any third party intellectual property rights, contract rights, moral rights, rights of publicity, and rights of privacy, or defame or constitute unfair competition against such third party; and (v) Netflix's distribution and other exploitation of same in accordance with this Agreement shall not violate any applicable law, rule or regulation.

5.2.   Licensor.  Licensor represents, warrants and covenants that (i) it has the full right, power, legal capacity and authority to enter into and fully perform its obligations under this Agreement, and neither it nor an Affiliate has entered into an agreement with another party which is inconsistent with the terms of this Agreement or would otherwise prevent Licensor from fulfilling its obligations as to the Titles or under this Agreement; (ii) it has and shall maintain during the Term all necessary rights, titles, authorizations, consents and interests, including without limitation from all third party rights holders for each Title, necessary to grant Netflix the licenses granted in this Agreement, including without limitation the right to license to Netflix, on an exclusive basis in accordance with Section 3.2, the Titles designated and delivered by Licensor hereunder; (iii) it has satisfied and shall satisfy during the Term all third party obligations of any kind with respect to the Titles (and associated Source Material and Introductory Segments) and their distribution and exploitation in accordance with this Agreement, including without limitation all guild residuals and participations, and Netflix shall have no obligation for any such past, current or future charges or similar payments; (iv) Netflix's distribution and other exploitation of the Titles (and associated Source Material and Introductory Segments) and Licensor Marks in accordance with this Agreement shall not violate or infringe any rights of any third party, including without limitation any third party intellectual property rights, contract rights, moral rights, rights of publicity, and rights of privacy, or defame or constitute unfair competition against such third party; and (v) the Titles (and associated Source Material and Introductory Segments) and Netflix's distribution and other exploitation of same in accordance with this Agreement shall not violate any applicable law, rule or regulation.

5.3.   Indemnification.

5.3.1.   Licensor will defend, indemnify and hold harmless Netflix, its directors, officers and employees from any and all loss, damage, claim, liability or expense (including legal fees and costs) actually incurred as a result of a third party claim ("Claim") to the extent arising out of a breach or alleged breach of the representations and warranties made in Section 6.1 or (ii) any failure by Licensor to pay any Taxes required to be paid to any governmental entity on monies earned by Licensor hereunder or as a result of Licensor's performance of its obligations hereunder.

5.3.2.   Netflix will defend, indemnify and hold harmless Licensor, its directors, officers, employees from any and all Claim to the extent arising out of a breach or alleged breach of (i) the representations and warranties made in Section 6.2 and/or (ii) any failure by Netflix to pay any Taxes required to

6

Exhibit 6c Page 189

be paid by Netflix to any governmental entity on monies earned by Netflix hereunder or as a result of Netflix's performance of its obligations hereunder.

**6.  Confidentiality.**

6.1 Confidential Information.  Each party acknowledges and agrees that all business and technical information provided to it by the other party pursuant to this Agreement constitutes confidential and/or proprietary information of the other party ("Confidential Information").   Confidential Information shall includes all oral, written or recorded confidential and/or proprietary information about or related to the disclosing party or its business, including without limitation the terms and conditions of this Agreement.  Notwithstanding the foregoing, Confidential Information does not include information that (i) is or becomes publicly available without breach of this Agreement; (ii) can be shown by documentation to have been known to the receiving party prior to its receipt from the disclosing party; (iii) is rightfully received from a third party who did not acquire or disclose such information by a wrongful or tortious act; (iv) can be shown by documentation to have been developed by the receiving party without reference to any Confidential Information; or (v) that the receiving party becomes legally obligated to disclose to a governmental entity with jurisdiction over it.

6.2 Use of Confidential Information.  Neither party shall use the other's Confidential Information for its own use or for any purpose other than as necessary to perform or enforce its rights and/or obligations under this Agreement or as required by law, or disclose such information to any third party (except for attorneys, accountants, and/or the third party contractors identified in Section 9.3, provided such parties have reason to know such information and are bound to a confidentiality agreement at least as protective as this Section 7).  Each party shall take all reasonable measures to protect the secrecy of and avoid disclosure of Confidential Information, which measures shall be no less than reasonable care and shall include all of those measures that the receiving party uses to protect its own Confidential Information.  This Section 7 shall survive expiration or earlier termination of this Agreement.

**7.  Termination.**

7.1.   Either party may terminate this Agreement:

7.1.1.   in the event of a material uncured breach or default by the other party of any of its obligations under this Agreement, provided that (i) notice is provided to the other party in writing and (ii) such breach or default is not cured within thirty (30) calendar days following the date such notice is deemed given, unless such breach or default is by nature uncurable in which case this Agreement shall be terminable on the date of notice; or

7.1.2.   in the event that the other party (i) institutes or otherwise becomes a party, voluntarily or involuntarily, to a proceeding alleging or pertaining to the insolvency or bankruptcy of that party; (ii) is dissolved or liquidated; (iii) makes an assignment of its material assets for the benefit of creditors; and/or (iv) initiates or is subject to reorganization proceedings.  This Agreement shall be terminable on the date written notice is deemed given to such party.

7.2.   No Waiver.  Waiver by either party of a single breach or default or a succession of breaches or defaults shall not deprive such party of the right to terminate this Agreement by reason of any subsequent breach or default.

7

FOIA Confidential Treatment Requested

7.3.  Effect of Termination or Expiration. Upon termination or expiration of this Agreement, the licenses granted hereunder shall immediately terminate. Nothing herein shall be construed to release either party from any obligation that matured prior to the effective date of such termination or expiration (or which may continue beyond such termination or expiration) or to relieve the defaulting party from any and all liabilities at law or in equity to the other for breach of this Agreement.  Further, in the event that this Agreement is terminated due to a material breach or default of Licensor, Licensor shall refund or credit to Netflix, at Netflix's option and within thirty (30) calendar days of the effective date of such termination, a prorated amount of the aggregate License Fees paid to Licensor, calculated as of the effective date of such termination and based upon the amount of time remaining in the relevant Title License Periods.

7.4.  Survival.  Those rights and obligations, which by their very nature are intended to survive termination or expiration of this Agreement, shall survive, including without limitation Sections 1, 2.8, 4.3, 6.3, 6.4, 7, and 8.

## 8.  General Provisions.

8.1.  Governing Law; Dispute Resolution.  This Agreement was fully negotiated and entered into in, and shall be governed by and construed and enforced in accordance with the federal laws of United States of Mexico without regard to its rules on conflict of laws or any other rules that would result in the application of a different body of law.  The parties consent to the exclusive jurisdiction and venue of the Federal and State Courts located in Mexico, Federal District for purposes of any proceeding arising out of or relating to this Agreement.

8.2.  Third Party Contractors.  Netflix may use third party contractors (e.g., backend fulfillment providers that encode, encrypt, store and/or host content) to exercise its rights and fulfill its obligations pursuant to Section 2; provided, however, that Netflix shall be fully responsible for any act or omission, or failure of any right or obligation of this Agreement by such a contractor in the event that such an act, failure or omission, if performed by Netflix instead of such contractor, would constitute a breach by Netflix of this Agreement.

8.3.  Notice.  Notices and other communications required or permitted to be given hereunder shall be given in writing and delivered in person, sent via certified mail or email, or delivered by nationally-recognized courier service, properly addressed and stamped with the required postage, if applicable, to the applicable individuals and addresses specified in the signature block below. Notice shall be deemed effective upon receipt.

8.4.  Assignment.  Neither this Agreement nor any rights, licenses or obligations hereunder may be assigned by either party without the prior written approval of the non-assigning party, which shall not be unreasonably withheld or delayed.  Notwithstanding the foregoing, either party may assign this Agreement to any parent of such party, wholly-owned subsidiary of such party, or any acquirer of all or of substantially all of such party's equity securities or assets, provided that such party provides the non-assigning party with prompt written notice.  Any purported assignment not in accordance with this section shall be void.  Subject to the foregoing, this Agreement will benefit and bind the parties' successors and assigns.

8.5.  Severability.  If any provision of this Agreement, other than a provision going to the essence of the Agreement, is held to be unenforceable pursuant to

8

FOIA Confidential Treatment Requested

Section 9.1, such decision shall not affect the validity or enforceability of any other provision of this Agreement.  Any provision of this Agreement held invalid or unenforceable shall, to the extent practicable, be substituted with a valid and enforceable provision that achieves the results contemplated by the parties in the original provision.

8.6.    Headings.  The headings of Sections and subsections in this Agreement are provided for convenience only and shall not affect its construction or interpretation.

8.7.    Counterparts.  This Agreement may be executed in two counterparts, each of which will be deemed to be an original copy of this Agreement and all of which together shall constitute one and the same Agreement.

8.8.    Entire Agreement.  This Agreement supersedes all prior or contemporaneous negotiations and agreements (whether oral or written) between the parties with respect to the subject matter thereof and constitutes, along with its Exhibits, a complete and exclusive statement of the terms and conditions of the Agreement between the parties with respect to such subject matter.  This Agreement may not be amended or modified except by the written agreement of both parties.  The language of this Agreement is English, and any translations shall have no effect and shall not be binding.


IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

1INMM CAPITAL LLC                           NETFLIX INC.


By: _____          By: _____
Name: Zachary Horwitz                     Name: Funa Maduka
Title:   MANAGING PARTNER____      Title:   VP, Content Acquisition

9

Exhibit 6c Page 192

FOIA Confidential Treatment Requested                                        JJMT-SEC-0005008

**Schedule 8**
**Titles**

| | |
|---|---|
| TITLE: | ACTIVE MEASURES |
| YEAR: | 2018 |
| START DATE: | DECEMBER 21ST, 2018 |
| LICENSE PERIOD: | 36 MONTHS **EXCLUSIVE** for AVOD and SVOD; 18 months for any other licensed right according to the terms conditions of the Agreement. |
| LICENSE PLATFORM: | SVOD, PAY TV, BASIC TV, AVOD |
| LICENSE NET FEE: | $2,100,000.00 |
| FORMAT: | HD |
| TERRYTORY: | ALL LATIN AMERICA INCLUDING BRAZIL |

———————————————————————————————————

| | |
|---|---|
| TITLE: | DIVIDE AND CONQUER: THE STORY OF ROGER AILES |
| YEAR: | 2018 |
| START DATE: | DECEMBER 21ST, 2018 |
| LICENSE PERIOD: | 36 MONTHS **EXCLUSIVE** for AVOD and SVOD; 18 months for any other licensed right according to the terms conditions of the Agreement. |
| LICENSE PLATFORM: | SVOD, PAY TV, BASIC TV, AVOD |
| LICENSE NET FEE: | $2,100,000.00 |
| FORMAT: | HD |
| TERRYTORY: | ALL LATIN AMERICA INCLUDING BRAZIL |

———————————————————————————————————

10

FOIA Confidential Treatment Requested

**Schedule B**
**Source Material Requirements and Specifications**

NETFLIX, INC ("NTFLX") will determine the appropriate source for it's encoding. Examples of sources are listed below. If Content Provider does not have the source NTFLX requests, then NTFLX and Content Provider will mutually agree upon the source.

Per the agreement, it is the Content Provider's obligation to deliver Source Material compliant with the specifications below to NTFLX.

*Requirements*

**Primary Digital Assets**

| File Type (in order of preference) |
|---|
| 1. High Definition – MPEG-2 (80 Mbps) |
| 2. Standard Definition – MPEG-2 (50 Mbps) |

We accept .mpg for MPEG-2 files. For a given title, only one contiguous file can be delivered. Titles cannot be delivered as multi-part files, i.e., if a title is 90 minutes in duration, a single file with 90-minute duration must be delivered. Two (2) files with 45-minute durations will not be accepted. Below in section *3 Primary Digital Asset Specifications* are the technical details for the acceptable formats.

**Please ensure that all files do not contain bars and tones, advertisements, slates, ratings cards, FBI warning cards, placards, overlay branding or website link callouts before, during and/or after the program. Also, no commercial blacks can be contained in the program. There are no exceptions to these requirements. All files must consist of the feature program with one (1) second of black at the head and tail of the program.**

11

Exhibit 6c Page 194

**Digital Video Prerequisites**

We require 16x9 (1:1 PAR for HD, 32:27 PAR for SD) versions if available. The following information and table specify the priority order in which NTFLX will accept content.

1. **16x9 (1:1 PAR for HD, 32:27 PAR for SD)**
2. **We will only accept 4x3 content if 16x9 (1:1 PAR for HD, 32:27 for SD) sources do not exist.**
3. HD sources must be in 23.976p format. 60i or 50i sources will only be accepted if feature was originally shot in 60i or 50i.
4. Please refer to the table below for quick reference.

| Preference Priority | Format | DAR | PAR | Frame Rate | Scan Type |
|---|---|---|---|---|---|
| 1 | HD 1920x1080 | 16x9 | 1:1 | 23.976 | Progressive |
| 2 | HD 1920x1080 | 16x9 | 1:1 | 25 or 29.97 or 59.94 | Interlaced or Progressive |
| 3 | HD 1280x720 | 16x9 | 1:1 | 23.976 | Progressive |
| 4 | HD 1280x720 | 16x9 | 1:1 | 25 or 29.97 or 59.94 | Progressive |
| 5 | SD 720x480 | 16x9 | 32:27 | 23.976 | Progressive |
| 6 | SD 720x480 | 16x9 | 32:27 | 25 or 29.97 | Interlaced or Progressive |
| 7 | SD 720x480 | 4x3 | 8:9 | 23.976 | Progressive |
| 8 | SD 720x480 | 4x3 | 8:9 | 25 or 29.97 | Interlaced or Progressive |

**Digital Audio Prerequisites**

Titles with surround sound require 5.1 audio. When 5.1 audio is supplied an additional 2-channel Left Total + Right Total mix (2-channel stereo mix) must be supplied on the same audio track as well. We require a single audio track that contains all 8 channels (6 channels for the 5.1 and 2 channels for the LT/RT mix). We do not accept multi-track audio files.

If a conformed 5.1 audio source is not available, stereo audio (or mono audio if the program is an old black-and-white movie, documentary, etc., as long as the original source was mono) will be accepted.

We use standard channel assignments as shown below:
1. **5.1 audio + 2.0 audio channel assignments**
   a. Channel 1 – Left
   b. Channel 2 – Right
   c. Channel 3 – Center
   d. Channel 4 – LFE
   e. Channel 5 – Left Surround
   f. Channel 6 – Right Surround
   g. Channel 7 – Left Total
   h. Channel 8 – Right Total

12

Exhibit 6c Page 195

JJMT-SEC-0005011

**2. Stereo Comp audio only**
 a. Channel 1 – Left Total
 b. Channel 2 – Right Total

**3. Mono Comp audio** (usually old black-and-white movies, etc.)
 a. Channel 1 – Mono Comp
 b. Channel 2 – Mono Comp

Primary Digital Asset Specifications

**MPEG-2 Specifications**

## High Definition – MPEG-2 (80 Mbps)

1. **Video Codec:** MPEG-2
2. **Profile ID:** High Profile
3. **Level ID:** High Level
4. **Video Bitrate:** 80 megabits
5. **Resolution:**
 a. 1920x1080
 b. 1280x720
6. **Audio Codec:**
 **a. Multi-Channel Assignment** (if available)
  i. Acceptable audio codecs
   1. Multi-channel PCM – 16bit, 48 kHz (Little Endian)
   2. Multi-channel AES3 LPCM (302m) – 16 bit, 48 kHz
  ii. Channel Mapping
   1. Channel 1 – Left
   2. Channel 2 – Right
   3. Channel 3 – Center
   4. Channel 4 – LFE
   5. Channel 5 – Left Surround
   6. Channel 6 – Right Surround
   7. Channel 7 – Left Total
   8. Channel 8 – Right Total
 **b. Stereo Assignment** (if multi-channel does not exist)
  i. Acceptable stereo audio codecs
   1. PCM – 16 bit, 48 kHz (Little Endian)
   2. Stereo AES3 LPCM (302m) – 16 bit, 48 kHz
   3. DVD LPCM – 16 bit, 48 kHz
   4. MPEG Layer 1 – 48 kHz, 448 kbps
  ii. Channel Mapping
   1. Channel 1 – Left Total
   2. Channel 2 – Right Total
7. **Frame rate:** *(frame rate should match source)*
 a. 23.976 progressive
 b. 25.00 progressive
 c. 25.00 interlaced
 d. 29.97 progressive
 e. 29.97 interlaced
 f. 59.94 progressive

13

Exhibit 6c Page 196

**FOIA Confidential Treatment Requested**

**JJMT-SEC-0005012**

    8. **Aspect Ratio:**
   a. 1:1 square pixels
9. **Intra DC Precision:** 10-bit
10. **Chroma Format:** 4:2:2
11. **GOP Structure:** I-frame ONLY
12. **Closed Captioning:** As defined in section *3.3 Closed Captioning* below
13. **Stream Type:** Transport Stream

## Standard Definition – MPEG-2 (50 Mbps)

1. **Video Codec:** MPEG-2
2. **Profile ID:** High Profile
3. **Level ID:** High Level
4. **Video Bitrate:** 50 megabits
5. **Resolution:**
   a. NTSC or Film: 720x480
   b. PAL: 720x576
6. **Audio Codec:**
   a. PCM – 48 kHz or 44.1 kHz, 16-bit, stereo (Little Endian)
   b. DVD LPCM – 48 kHz, 16-bit, stereo
   c. MPEG Layer 1 – 48 kHz or 44.1 kHz, 16-bit, stereo with minimum data rate of 128 kbps
7. **Frame rate:** *(please ensure all files are de-interlaced, or have had Inverse-Telecine applied, to make sure the content is **progressive** and **not interlaced**)*
   a. 23.976 progressive
   b. 25.00 progressive
   c. 25.00 interlaced
   d. 29.97 progressive
   e. 29.97 interlaced
8. **Aspect Ratio:**
   a. 4x3 if standard
   b. 16x9 if anamorphic
9. **Intra DC Precision:** 10-bit
10. **Chroma Format:** 4:2:2
11. **GOP Structure:** I-frame ONLY
12. **Closed Captioning:** As defined in section *3.3 Closed Captioning* below
13. **Stream Type:** Transport Stream

### Subtitle as a Separate File

The preferred formats for subtitles are text-based WC3 Timed Text Markup Language (.dfxp) or SubRip (.srt) formats; otherwise they must be one of the acceptable formats listed below. The subtitle file must have time code that is conformed (synced) to the digital video file asset. Raster image-based subtitles will not be accepted.

Acceptable Text-Based Subtitle Files:
- DFXP
- SRT
- SAMI
- DailyScripts
- DVD Nav

Exhibit 6c Page 197

**FOIA Confidential Treatment Requested**

- Softitler

Please ensure all subtitle files do not contain advertisements, placards, overlay branding or website link callouts.

If your text-based subtitle format is not listed above please contact NTFLX to discuss other options.

Please follow the file-naming convention specified in section *5 File-Naming Conventions*

**Closed Captioning**

## Closed Captions as Ancillary Data

This is the preferred method of delivery. The primary closed caption data must be carried within the video stream as Line21 data. For MPEG-2 video, the Line21 captions must be carried in the picture user data, as defined in "ATSC Standard: Digital Television Standard (A/53), Revision D, section 5.2."

Please ensure all caption files do not contain advertisements, placards, overlay branding or website link callouts.

## Closed Captioning as Separate File

If closed captioning must be delivered as a separate file, it must be submitted in one of the acceptable formats listed below. The closed caption file must have time code that is conformed (synced) to the digital video file asset. Raster image-based closed captioning will not be accepted.

Acceptable Closed Caption Files:
- SCC
- DFXP
- DailyScripts
- SDI Media
- Softitler
- DVD Nav

Please ensure all caption files do not contain advertisements, placards, overlay branding or website link callouts.

If your closed caption format is not listed above please contact NTFLX to discuss other options.

Please follow the file-naming convention specified in section *5 File Naming Conventions*

**Secondary Digital Assets Specifications**

**Alternate Language Audio as a Separate File**

If alternate language audio tracks are available, then they should be conformed to the primary digital audio/video asset delivered. Acceptable formats for alternate language audio tracks are stereo or multichannel AAC (in an MP4 wrapper) or AES3 LPCM audio

15

Exhibit 6c Page 198

JJMT-SEC-0005014

(in a MPEG-2 Transport Stream, .mpg). Either format should be encoded at the highest possible bitrate to maintain fidelity. Please follow the file-naming convention described below.

### Acceptable Alternate Language Audio Formats

1. **Audio Codec and Container:**
   a. AAC (Low Complexity) in an MP4 container (.mp4)
2. **Bitrate:** Highest bitrate possible
3. **Sample rate:** 44.1 kHz or 48 kHz
4. **5.1 Audio Channel Mapping:**
   a. Channel 1 – Left
   b. Channel  2 – Right
   c. Channel  3 – Center
   d. Channel  4 – LFE
   e. Channel  5 – Left Surround
   f. Channel  6 – Right Surround
5. **2.0 Audio Channel Mapping:**
   a. Channel 1 – Left Total
   b. Channel 2 – Right Total

*File-Naming Conventions*

**Primary Video Asset File-Naming**

The file-naming convention for the MPEG-2 file is as follows:
**[movieID]_[framerate]_[aspectratio]_[bitrate]_[countrycode].mpg**

The country code is used to specify for which country the asset has rights. If the asset has rights for a specific country, then the 2-letter country code should be used as defined by the ISO 3166-1-alpha-2 code specifications (http://www.iso.org/iso/english_country_names_and_code_elements). If the asset has global rights, then the word "global" should be used in place of the 2-letter country code.

### Example for High-Definition Files

60011152_24_178_80_us.mpg
60028202_60i_185_80_ca.mpg
60028204_60p_178_80_global.mpg

### Example for Standard-Definition Files

60028202_24_235_50_fr.mpg

**Alternate Language Audio File-Naming**

The audio filename should follow the same file-naming convention as the primary asset file name, with the addition of channel mapping with the file name:

**[movieID]_[framerate]_[aspectratio]_[channel1]_[channel2]_..._[channelX]_[2letterLanguageCode].[ext]**

16

FOIA Confidential Treatment Requested                                    JJMT-SEC-0005015

Please use the 2-letter language codes as defined in the ISO 639-1 specifications
(http://www.loc.gov/standards/iso639-2/php/code_list.php).

The filename should match the channel mapping of the audio file.

Examples:
70106666_24_178_80_L_R_C_Lfe_Ls_Rs_ca.mp4
70106666_24_178_80_LT_RT_fr.mpg
70106667_30_178_80_L_R_C_Lfe_Ls_Rs_es.mp4


**Subtitle File-Naming**
The file-naming convention of closed caption file is as follows:

**[movieID]_[framerate]_[aspectratio]_[2letterLanguageCode].scc**
or named exactly the same as the video asset except with "_2letterLanguageCode" post-
fixed to the filename of the secondary Closed Caption (CC) file.

Please use the 2-letter language codes as defined in the ISO 639-1 specifications
(http://www.loc.gov/standards/iso639-2/php/code_list.php).

Example:
60028202_24_235_es.scc
60028202_24_235_en.srt
72343234_30_133_fr.smi
72342123_24_178_pt.smi


**Closed Caption File-Naming**
The file-naming convention of the secondary closed caption file is as follows:

**[movieID]_[framerate]_[aspectratio]_[2letterLanguageCode].scc**

Or named exactly the same as the video asset except with "_2letterLanguageCode"
post-fixed to the filename of the secondary Closed Caption (CC) file.

Please use the 2-letter language codes as defined in the ISO 639-1 specifications
(http://www.loc.gov/standards/iso639-2/php/code_list.php).

Example:
60028202_24_235_es.scc
60028202_24_235_en.scc
60028202_24_235_fr.scc
60028202_24_235_pt.scc

17

Exhibit 6c Page 200

FOIA Confidential Treatment Requested

**Metadata**

**Movie Content Metadata**

Movie metadata is required for all content and is to be submitted via the approved NTFLX Metadata Template to NTFLX@NTFLX.TV

All dubbed and/or subtitled content is to be accompanied with the relevant metadata in the original <u>and</u> alternate language to support the source delivered.

Sample metadata files via XMLs may also be submitted and require NTFLX approval prior to acceptance.

**Primary and Secondary Assets Metadata**

If metadata for the primary and secondary assets is available via vendor API or file (XML,TXT, etc.), NTFLX will require access to the API or sample file for approval prior to acceptance.

**Delivery**

**Network Delivery via Aspera**

Currently, NTFLX uses Aspera exclusively for network delivery. The Content Supplier must push content to NTFLX via Aspera. NTFLX will not pull content.

Please be prepared to provide the following information in order to set up an Aspera account.

- Public outbound IP address(es) for which your host(s) will use for transferring files to us via Aspera.
- Technical contact (name, e-mail and phone number) of the person responsible for setting up the Aspera connection on your end.

**Directory Structure and File Organization**

*The following folder structure must be followed to organize each group of conformed assets. A group of conformed assets must consist of one audio/video muxed primary digital asset and any of its other conformed digital assets.*

*Folder Structure of external hard drive:*

*E:.*
*+---[NFLXMovieID] – (directory)*
         *[DigitalAsset1a] – (file)*
         *[DigitalAsset1b] – (file)*
         *[DigitalAsset1c] – (file)*

*Example:*
*E:.*
*+---61234123*
*|   61234123_24_178_80_us.mpg*
*|   61234123_24_178_80_en.scc*
*|*

18

Exhibit 6c Page 201

```
+---62345234
|   62345234_24_235_80_us.mpg
|
+---7712332
|   7712332_60i_133_80_en.scc
|   7712332_60i_133_80_es.srt
|   7712332_60i_133_80_us.mpg
|
+---79661231
    79661231_30_178_50_ca.mpg
    79661231_30_178_50_en.scc
    79661231_30_178_50_fr.srt
    79661231_30_178_50_LT_RT_es.mp4
    79661231_30_178_50_L_R_C_Lfe_Ls_Rs_fr.mp4
```

### Artwork

High-resolution images are required for every title and must be submitted a minimum of 30 days in advance of licensing start date to NTFLX via any of these options:

    a. Vendor-provided website
    b. FTP (must request access from NTFLX)
    c. Email: alebrije@alebrije.tv

Artwork is accepted in original and bilingual language formats for all content.

File-naming convention:
[NTFLXMovieID].png (or .tiff or .jpg)

If NTFLX movie ID not known, use movie title:
[MovieTitle].png (or .tiff or .jpg)

Examples:
60028202.jpg
Terminator2.jpg

Below are the requirements for submitting artwork to NTFLX. We seek the highest quality possible to ensure optimal display for the website and NTFLX-ready devices.

| Artwork Attribute | Description |
|---|---|
| Image Aspect Ratio | Box art: 1:1.40 (w:h) aspect ratio. Aspect ratio tolerance: 1:35 through 1:1.45. |
| Image Height (h) | Box art: 800 pixels minimum. Higher is better. |
| Image Width (w) | Box art: Depends on image height. For example, 570 (w) x 800 (h) when art is 1:1.40. |
| Image Resolution | 150 dpi |
| Pixel Aspect Ratio | Square (1.0) |
| Color Mode | RGB Color (8-bits/channel). Conversions from CMYK are undesirable. |
| File Format | Uncompressed (.png, .tiff, etc.). JPEGs acceptable with "maximum |

Exhibit 6c Page 202

FOIA Confidential Treatment Requested

JJMT-SEC-0005018

| | |
|---|---|
| | quality" compression. |
| Black Point | RGB 0 - 0 - 0 |
| White Point | RGB 255 - 255 - 255 |
| Color Profile | No color profiles assigned (a 2.1/2.2 gamma setting on calibrated monitors is assumed). |
| Image Area | Artwork should be two-dimensional and extend over entire image area. No extraneous graphics (borders, frames, drop shadows). |
| Graphical Elements | Art should not have graphical elements (such as Now on DVD, Widescreen, Coming Soon, Available on Blu-ray, etc.). |

20

Exhibit 6c Page 203

JJMT-SEC-0005019

# Exhibit 7a

## INTERNATIONAL LICENSE AGREEMENT

THIS AGREEMENT (the "Agreement") is made as of February 27, 2019, between SIERRA/AFFINITY ("Sales Agent"), whose address is 9378 Wilshire Blvd, Beverly Hills, CA 90212, as sales agent on behalf of Pupkin Productions ("Licensor"), and the party named below ("Distributor"). Licensor and Distributor each hereby agree as set forth herein below.

1.   **DISTRIBUTOR**: **1INMM CAPITAL LLC**
     Address: 3129-A S. La Cienega Blvd Los Angeles, CA
     Ph. No.: 773.724.0290
     Attn.: Zachary Horwitz
     Email: zach@1inmm.com

2.   **PICTURE**:      **"Lucia's Grace** (the "Picture").
     Starring: Alba Rohrwacher and Elio Germano
     Director: Gianni Zanasi
     Writer: Michele Pellegrini

3.   **TERRITORY**:

(A)     The **"Latin American Territory"** shall be defined as Anguilla, Antigua, Argentina, Aruba, Bahamas (non-exclusive only), Barbados, Barbuda, Belize, Bolivia, Bonaire, Brazil, Cayman Islands, Chile, Colombia, Costa Rica, Cuba, Curacao, Dominica, Dominican Republic, Ecuador, El Salvador, French Guiana (non-exclusive only), Grenada, Guadeloupe, Guatemala, Guyana, Haiti (non-exclusive only), Honduras, Jamaica, Martinique (non-exclusive only), Mexico, Montserrat, Nicaragua, Panama, Paraguay, Peru, St. Barthelme, St. Lucia, St. Martin, St. Vincent & Grenadines, Suriname (non-exclusive only), Trinidad & Tobago, Turks & Caicos, Uruguay, Venezuela, Virgin Islands (British), and

(B)     The **"African Territory" shall** be defined as South Africa, Angola, Cape Verde, Ethiopia, Lesotho, Namibia, Zimbabwe, Botswana, Mozambique, Swaziland, Malawi, Zambia, Kenya, Uganda, Tanzania and Nigeria

(the "Latin American Territory" and "African Territory" shall be collectively defined as the "Territory").

4.     **TERM**: For all Licensed Rights (as defined below) herein, the Term shall commence on full execution of this Agreement and expire Fifteen (15) years thereafter (the "Term").

5.     **AUTHORIZED LANGUAGE (S)**:

(A)     In the Latin American Territory: subtitled and/or dubbed in Spanish and Portuguese (the "Latin American Authorized Language(s)").

(B)     In the African Territory: subtitled and/or dubbed in local languages indigenous to the African Territory (the "African Authorized Language(s)").

(C)     The languages granted in Paragraphs 5(A) and (B) shall be collectively defined as the "Authorized Language(s)".

(D)     Any and all DVD or Home Video packaging shall be in the Authorized Language(s) only and not in the English language.

6.     **FLAT LICENSE FEE**: Distributor shall pay Licensor a non-returnable License Fee in the amount of One Million Three Hundred Ninety-Seven Thousand Five Hundred United States Dollars (US $1,397,500.00) net of all taxes and without deduction of any kind (the "License Fee"), payable as follows:

One Hundred Percent (100%) [US$1,397,500.00] due on full execution of this Agreement.

Distributor's Licensed Rights do not vest until Licensor has received 100% of the License Fee and full payment for the costs of the Delivery Materials. Distributor is not licensed and shall not exploit any of the Licensed Rights until such amounts are paid in full. Sales Agent will not be obligated to deliver to Distributor any Delivery Materials until 100% of the License Fee and full payment for the costs for the Delivery Materials (including shipping) have been remitted by Distributor and received by Sales Agent. Distributor acknowledges and agrees that time is of the essence and the payment schedule set forth herein will be strictly enforced.  Failure to pay by the due dates herein will result in Licensor or Sales Agent having the right to terminate this

Exhibit 7a Page 205

**FOIA Confidential Treatment Requested**

Agreement and pursue all legal and equitable remedies.

All installments of the License Fee, as well as all other monies due to Licensor under this Agreement, including Delivery Materials costs, will be paid by wire transfer to the following account:

[ACCOUNT INFORMATION TO BE PROVIDED WITH INVOICE]

7.    **MATERIALS / DELIVERY**:

(A)    Distributor shall order and pay for the Initial Materials (as defined below) within thirty (30) days following the date that Sales Agent provides Distributor with notice that Sales Agent is ready to effect Delivery (as defined below) of such Initial Materials ("Notice of Delivery"). Distributor acknowledges that (i) there is no guaranteed outside completion date, (ii) the Picture will be ready for delivery to Distributor only when final and complete, and (iii) the determination of finality and related timing for Delivery (taking into account both the completion of the Picture and additional factors affecting the timing of international release such as festival and award considerations) shall be at Licensor's sole discretion).

(B)    Delivery as used herein means delivery (at Distributor's cost of materials and shipping to be fully paid prior to shipment) of the Initial Materials and Additional Materials set forth below and in the Delivery Schedule attached hereto and incorporated herein as Exhibit "A" ("Delivery Materials"). Distributor acknowledges and agrees that it has reviewed the Delivery Materials list below and that no other Delivery Materials are required in order for Distributor to exercise its rights under this Agreement.

Initial Materials:

- Theatrical:  35 mm Print (which may be used);
- Theatrical: Music Cue Sheet (which Sales Agent may provide electronically);
- Video/DVD: Beta or Digital Betacam PAL or NTSC Master (Sales Agent's election following consultation with Distributor) of the Picture; and
- Dialogue List (which Sales Agent may provide electronically)
  Additional Materials (to be delivered only if and when available):

- Key Art (which Sales Agent may provide electronically).

(C)    Distributor will have ten (10) days to review and evaluate the Delivery Materials, and each delivery item delivered hereunder will be deemed acceptable for all purposes hereunder unless Distributor gives Sales Agent written notice of rejection within ten (10) days after Distributor's receipt or access to such item ("Notice of Rejection"). Distributor may only reject Delivery Materials on grounds of technical quality and not for any other reason, including probability of commercial success or artistic grounds. The Notice of Rejection must include  a laboratory report from a reputable recognized laboratory in  the theatrical motion picture business stating full details of   the technical defects in any rejected  item(s).

(D)    Sales Agent has thirty (30) days after receipt of a Notice of Rejection to cure such rejection by correcting the asserted defect(s) or delivering replacement item(s), or submit the issue of whether Delivery was effected to arbitration as set forth below. If Sales Agent elects to cure such rejection, then the time periods set forth above for review and cure will be applicable to the delivery of corrected and replaced Delivery Materials as   well.

(E)    Distributor hereby acknowledges and agrees that no individual(s) or specification(s), including without limitation the any cast member or the director, and no other specifications is (are) essential for purposes of effectuating Delivery and Distributor may not refuse to accept Delivery should any individual(s) be replaced or specification changed for any reason whatsoever.

(F)    All disputes with regard to Delivery will be resolved by IFTA Arbitration (as further set forth herein). The sole remedy of Distributor in any such IFTA Arbitration for a failure for any reason to deliver the Delivery Materials will be the return of the License Fee or portion thereof previously paid, and under no circumstances will Distributor be entitled to interest, lost profits, consequential damages or any equitable or injunctive relief. Additionally, Distributor shall not be entitled to any such return of the License Fee if the Picture has been released in any medium in the Territory.

2

Exhibit 7a Page 206

(G)       Title to all materials delivered to Distributor in connection with the Picture will remain with Licensor or Sales Agent (as applicable). Distributor will exercise due care in safeguarding all materials and will assume all risk for theft or damage while they are in transit or Distributor's possession. In respect of all materials created or manufactured by Distributor (including without limitation all Picture copies, packaging, artwork, marketing, dub and sub-titled language tracks, so-called "bonus materials," etc.), Licensor is the copyright owner from inception, provided that if such ownership is not allowed under a law in the Territory, Distributor hereby grants (and from creation of each such item shall by the terms hereof grant) to Sales Agent an irrevocable royalty-free license to use all such materials worldwide in perpetuity in all media now known or hereinafter devised.   In all cases, Distributor shall only use such materials during the Term to exploit the Licensed Rights.   The creation of dubbed and sub-titled language tracks and related versions of the Picture, the trailers thereof, and any other materials created or duplicated by Distributor hereunder are to be made at Distributor's sole cost.

(H)       Upon termination of this Agreement, Distributor will, at Sales Agent's election, either:  (i) return to Sales Agent at Distributor's expense all materials in connection with the Picture (including without limitation all film and digital pre-print and exhibition materials, video inventory, marketing materials, and language tracks), whether such materials were delivered to Distributor or created by Distributor or any of its sub-distributors or licensees;  or (ii) destroy all such materials and provide Sales Agent with a customary certificate of destruction executed by an authorized officer of Distributor.

(I)       All costs of Delivery, return and destruction (including shipping charges, import fees, duties, brokerage fees, storage charges and related charges) will be Distributor's sole r e s p o n s i b i l i t y .

8.    **LICENSED RIGHTS / RESERVED RIGHTS / HOLDBACKS**:

(A)       Subject to the condition precedent of timely payment in full of the License Fee without deduction or offset of any kind, Licensor shall license to Distributor the following exclusive distribution rights to the Picture for t h e Territory, for the duration of the Term, and in the Authorized Language(s) ("Licensed Rights"). All rights not specifically licensed herein whether now known or hereafter devised (including without limitation so-called "clip rights" to license excerpts of the Picture for unrelated third party use) are reserved to Licensor ("Reserved Rights").  Distributor is expressly prohibited from exploiting any of the Reserved Rights.

| Licensed Right | Licensed to Distributor | Reserved to Licensor | Distributor's Holdback Period |
|---|---|---|---|
| **Cinematic Rights:** | | | |
| Theatrical | X___ | _____ | |
| Non-Theatrical | X___ | _____ | |
| (including Hotel/Motel Rights) | | | |
| Public Video | X___ | _____ | |
| Commercial Video | X___ | _____ | |
| | | | |
| **Home Video Rights:** | | | |
| Home Video Rental | X___ | _____ | |
| Home Video Sellthru | X___ | _____ | |
| | | | |
| **Ancillary Rights:** | | | |
| Airline | X___ | _____ | |
| Ship | X___ | _____ | |
| | | | |
| **Pay TV Rights:** | | | |
| Terrestrial | X___ | _____ | * |
| Cable | X___ | _____ | * |
| Satellite | X___ | _____ | * |
| | | | |
| **Free TV Rights:** | | | |
| Terrestrial | X___ | _____ | * |
| Cable | X___ | _____ | * |
| Satellite | X___ | _____ | * |

3

Exhibit 7a Page 207

FOIA Confidential Treatment Requested

JJMT-SEC-0005022

Free Video-on-Demand   __X__   _____

Other TV Rights:
Video-On-Demand ("VOD")   __X__   _____
Subscription VOD ("SVOD")   __X__   _____
Near VOD ("NVOD")   __X__   _____
Pay-Per-View   __X__   _____

Internet Rights: Post Home Video Window
VOD (e.g., iTunes)   __X__   _____
SVOD (e.g., Netflix)   __X__   _____
Transactional VOD ("TVOD")   __X__   _____
Electronic Rental   __X__   _____   *
Electronic Sell Thru ("EST")   __X__   _____   *

  (B)  Holdbacks:

Distributor shall hold back its exploitation of the Licensed Rights marked "*" above until the initial release of the Picture in the United States (the "First US Theatrical Release"), unless otherwise waived or shortened by Sales Agent by written notice.

  (C)  All transmissions of the Picture hereunder in exercise of the Pay TV, Satellite Free TV, Other TV, and Internet Rights as set forth herein shall be encrypted or encoded in such manner that may be decrypted or decoded only by the use of authorized decryption or decoding equipment, the sale and use of which equipment is limited to the Territory. Any exercise of the Other TV Rights is expressly conditioned upon Distributor providing Sales Agent with acceptable written documentation verifying implementation of such encryption protections for all exercise of such rights.

  (D)  Intentionally deleted.

  (E)  Television Runs:

(i)  Pay TV: Unlimited runs.

(ii)  Free TV: Unlimited runs.

  (F)  The parties acknowledge that when the Picture is transmitted by satellite and/or cable for reception in the Territory, such transmission may be capable of reception outside the Territory due to the inherent technical capability of satellites to beam down signals and/or cable systems to transmit signals, which are not confined to territorial boundaries ("Distributor Overspill"). Sales Agent agrees that the occurrence of Distributor Overspill shall not constitute a breach of this Agreement, provided that (i) the transmission is not primarily intended for reception outside the Territory and (ii) Distributor receives no direct revenue from such overspill. Additionally, the parties acknowledge that when the Picture is transmitted by satellite and/or cable for reception outside the Territory, such transmission may be capable of reception inside the Territory due to the inherent technical capability of satellites to beam down signals and/or cable systems to transmit signals, which are not confined to territorial boundaries ("Overspill"). Distributor agrees that the occurrence of Overspill shall not constitute a breach of this Agreement by Sales Agent or Licensor, provided, that (i) the transmission is not primarily intended for reception inside the Territory and (ii) Sales Agent and/or Licensors (or their licensees) receive no direct revenue from such overspill.

  (G)  Distributor's right to exploit Internet Rights in the Picture are subject to the terms and conditions of the STCs (as hereafter defined), including without limitation a requirement to utilize current commercially reasonable technological safeguards to ensure that accessing, streaming or downloading of the Picture is limited solely to reasonably identifiable locations within the Territory (e.g., geofiltering). Notwithstanding the foregoing, to the extent Distributor is supplied approved promotional clips of the Picture formatted for use on the Internet, Distributor may use up to three (3) minutes in the aggregate of such clips on the Internet solely for purposes of promoting the Picture and provided such clips are posted solely within a domain bearing the identification code of one of the countries of the Territory.

  (H)  Distributor shall use its best efforts and skill in the distribution and exploitation of the Picture, and

4

FOIA Confidential Treatment Requested

Distributor shall exercise its rights hereunder in a fair, reasonable, customary and non-discriminatory manner with respect to Licensor or Sales Agent.

9.      **NO DISPOSITION OF GROSS RECEIPTS**: Licensor is licensing the Picture to Distributor on a so-called "flat" basis; therefore, subject to Sales Agent's receipt of the License Fee in accordance with the terms of this Agreement, no other payments whatsoever shall be due to Sales Agent and/or Licensor hereunder.

10.     **ACCOUNTINGS:** Intentionally deleted.

11.     **PAYMENT REQUIREMENTS**:

        (A)     The License Fee shall be paid in the amounts specified and required hereunder, which amounts as stated in this Agreement shall be deemed net sums in respect of which Distributor shall have separately paid at its own expense any required withholding and/or remittance taxes required by laws of the Territory such that no amounts shall be deducted from the payments to Licensor specified in this Agreement.

        (B)     There will be no deductions from any payments due to Licensor, including the License Fee, because of any bank charges, conversion costs, sales use or VAT taxes, "contingents", quotas or any other taxes, levies or charges, all of which shall, if required, be paid separately by Distributor.

        (C)     If it is legally impossible to transmit any monies due to Licensor, then Distributor will immediately so notify Sales Agent in writing. Distributor will then deposit such monies at Distributor's expense in Sales Agent's or Licensor's name, as Sales Agent shall designate, in such depository as may be designated by Sales Agent.

        (D)     All payments to Licensor will be in United States dollars computed at the prevailing exchange rate on the date due at Licensor's bank, provided that the exchange rate for any late payments shall be the most favorable prevailing daily rate for Licensor between the due date and the date of payment.

        (E)     Any payment due Licensor not made by its due date will, in addition to any other right or remedy of Licensor, incur a finance charge at the lesser of the prevailing US Prime rate plus three percent (3%) or the highest applicable legal contract rate until paid in full.

12.     **MARKETING / ADVERTISING**:.

        (A)     Intentionally deleted.

        (B)     Intentionally deleted.

        (C)     Any marketing or advertising materials created by Distributor and any alterations by Distributor to any artwork or other marketing materials furnished by Sales Agent must satisfy all of Licensor's and Sales Agent's underlying contractual obligations and shall in all instances be subject to Sales Agent's prior written approval before Distributor shall make any use of such materials.

        (D)     Distributor shall comply with all contractual credit, likeness, dubbing, subtitling, editing, marketing, publicity, promotional or other similar restrictions or requirements provided to Distributor.

        (E)     Intentionally deleted.

        (F)     Intentionally deleted.

        (G)     Intentionally deleted.

        (H)     Intentionally deleted.

13.     **EDITING / BILLING**:

        (A)     Distributor may only cut and edit the Picture to the extent necessary to meet governmental censorship requirements. Any such cutting or editing shall only be permitted with Sales Agent's prior written approval and Distributor shall comply with all editing restrictions and requirements provided by Sales Agent. Except for such editing for censorship, the Picture

Exhibit 7a Page 209

FOIA Confidential Treatment Requested

JJMT-SEC-0005024

shall be exhibited and otherwise distributed only in its original continuity as supplied by Licensor without alteration, interpolation, cut or elimination.

(B)     Distributor may include, before or after the Picture and all credits thereof, the credit or logo of Distributor, which precise placement must be pre-approved in writing by Sales Agent.

(C)     Intentionally deleted.

(D)     Distributor shall not do any of the following:

(i)     Change the title of the Picture as it appears in the original language of the Picture (except that Distributor may translate the title in the Authorized Language(s);

(ii)    Alter or delete any credit, logo, copyright notice or trademark notice, or anti-piracy warning appearing on the Picture; and

(iii)   Include any advertisements or other material in the Picture, preceding the Picture, or following the Picture in any medium including Home Video other than an approved anti-piracy warning and commercials for Free TV exploitation (if Free TV rights are licensed herein).

(E)     Distributor's obligations hereunder shall be binding on its subsidiaries, parents, affiliates, agents, sub-distributors and licensees.

14.    15.    **MUSIC CONTAINED IN THE PICTURE**:

(A)     Licensor will be responsible for acquiring all rights necessary to synchronize the music contained in the Picture as delivered to Distributor and on all copies exploited by Distributor hereunder, and for paying all royalties or charges incurred in obtaining and maintaining such synchronization licenses in effect for the Term.

(B)     The Performance Rights with respect to the music contained in the Picture shall either be in the public domain in the Territory, be controlled by Licensor sufficient to allow Distributor to exploit all of Licensed Rights without the necessity of any additional payment, or be available by license from the local music performing rights society in the Territory affiliated with the American Society of Composers, Authors and Publishers (ASCAP), Broadcast Music, Inc. (BMI), or SESAC, Inc. (SESAC). Distributor will be solely responsible for any royalties, however denominated, which any mechanical, performing or authors right society in the Territory attempts to collect in connection with the exploitation of the Picture in the Territory.

16.    **ADDITIONAL TERMS**:

(A)     Distributor acknowledges that the financing for the Picture will be provided by financiers who may require a completion guarantee or other financial assurances. The Distributor agrees to execute within twenty-four (24) hours of receipt such further documentation as may be required by the Licensor to accommodate such interests, including, without limitation, an Acceptance and Acknowledgement of a Notice of Assignment in the form customarily required by such financiers and completion guarantor (if any), and any and all documents or other instruments and acts required by such financiers and/or completion guarantor in connection with the establishment of a collection account or otherwise. In the event Distributor fails to execute and deliver all such documentation within five (5) business days of receipt of written notice thereof, then Distributor agrees that Sales Agent may, as it may elect in its discretion, terminate this Agreement or execute such documentation in the name of Distributor, for which purpose Distributor hereby irrevocably appoints Sales Agent as Distributor's attorney-in-fact, a power coupled with an interest, with full right to execute any and all such documentation.

(B)     Licensor may, in its absolute discretion, require Distributor to establish a Letter of Credit or other such form of payment (by way of example only, a bank guarantee) acceptable to Licensor to secure all or any part of the License Fee. In the event that the Licensor requests any such Letter of Credit(s), Distributor shall open the Letter of Credit and deliver same to Sales Agent within ten (10) working days following the Sales Agent's request. The Letter of Credit and any confirmation which may be required by Licensor or Licensor's bank must be irrevocable and in a format and issued by a bank acceptable to Licensor and Licensor's bank. At Sales Agent's election, any failure on Distributor's part to deliver the Letter of Credit within such ten (10) day period may result in the termination of this Distribution Agreement by written notice to Distributor. All costs of the Letter of the Credit and of any required confirmation shall be paid by Distributor.

6

Exhibit 7a Page 210

FOIA Confidential Treatment Requested                    JJMT-SEC-0005025

(C)     Neither Licensor nor Sales Agent can guarantee against piracy in the Territory and any piracy of the Picture, whether occurring before or after execution of this Agreement, shall not constitute a breach by Licensor nor a basis for damages claims, payment reductions, or termination hereunder.

(D)     Any delay of action hereunder by Sales Agent shall not be construed as a waiver of any rights or remedies, and any express waiver by Sales Agent of any specific right or remedy hereunder shall not constitute a waiver of any other rights or remedies regarding the same issue (including without limitation any preceding, continuing, or succeeding breach) or any other matter arising under this Agreement.

(E)     Any terms not set forth in this Agreement (including any capitalized words used herein without express definition) will be determined solely by reference to the most current IFTA Standard Terms and Conditions ("STCs") as of the date of this Agreement, which STCs are incorporated in their entirety herein and thereby comprise an integral component of this Agreement. In the event of any inconsistency between the terms of this Agreement and the STCs, the terms of this Agreement prevail.

(F)     Sales Agent is acting solely in its capacity as duly authorized agent on behalf of Licensor in connection with this Agreement.

17.     **NOTICES**:  All notices hereunder shall be in writing and shall be sent to the recipients at the address and/or fax number and/or email address set forth above (or such subsequently changed address of which the sending party has received notice hereunder). Notices to Licensor shall be sent to the attention of c/o SIERRA/AFFINITY , whose fax number is (310) 587-2381.

18.     **REPRESENTATIONS AND WARRANTIES**: Distributor represents and warrants to Licensor that:

(A)     It has full authority and capacity to execute this Agreement and full legal and financial ability to perform all of its obligations under this Agreement;

(B)     There are no existing or threatened claims or litigation which would adversely affect or impair Distributor's ability to perform under this Agreement;

(C)     No dubbed or subtitled version of the Picture created by or to be created by Distributor does or will: (a) defame, or hold in a false light, or infringe any privacy or publicity or other personal right of any person; or (b) infringe any copyrights, trademark, patent, trade secret, rights of ideas, or similar property rights of any person;

(D)     It will employ at all times controls in accordance with prevailing customary standards in the Territory as used by major studios to prevent and deter theft, piracy, unauthorized copying, accessing, streaming or downloading (as applicable) of any copy of the Picture where the Picture is made available via any of the Licensed Rights granted herein;

(E)     It will indemnify and hold harmless Licensor and Sales Agent, and their parents, officers, directors, owners, shareholders, employees, attorneys agents, and successors and assigns from all claims, loss, liability, damages or expenses, including reasonable attorney's fees and legal costs, but not including lost profits due to breach of any of Distributor's representations, warranties covenants or conditions under this Agreement.

(F)     It will comply with all credit and talent obligations in connection with Picture as provided to Distributor by Sales Agent.

19.     **DEFAULT AND TERMINATION**:

(A)     Distributor will be in default of this Agreement in the event of any of the following circumstances:

7

FOIA Confidential Treatment Requested

JJMT-SEC-0005026

(i)     Distributor fails to pay any installment of the License Fee or any other amounts due under this Agreement or any other agreement with Sales Agent when due;

(ii)    Distributor becomes insolvent or fails to pay its debt obligations when due;

(iii)   Distributor makes an assignment for the benefit of creditors, seeks relief under any bankruptcy law or similar law for the protection of debtors, or allows a petition of bankruptcy to be filed against it, or a receiver or trustee to be appointed for substantially all of its assets that is not removed within thirty (30) days;

(iv)    Distributor breaches any material term, covenant or condition of this Agreement or any other agreement with Sales Agent;

(v)     Any affiliate, parent, subsidiary, sub-distributor, or licensee of Distributor breaches any material term, covenant or condition of this Agreement or any other agreement with Sales Agent; term, covenant or condition of this Agreement or any other agreement with Sales Agent;

(vi)    Distributor attempts to make any assignment, transfer, sublicense or appointment of an agent without Sales Agent's prior written approval; or

(vii)   Distributor fails timely to sign a Notice of Assignment as provided below.

(B)     Sales Agent will give Distributor notice of any claimed default. If the default is capable of cure, then Distributor will have ten (10) days after receipt of Sales Agent's notice to cure a monetary default, and twenty (20) days after receipt of Sales Agent's notice to cure a non-monetary default. If the default is incapable of cure, or if Distributor fails to cure within the time provided, then Licensor may proceed against Distributor for available relief, including but not limited to terminating this Agreement or any other agreement with Sales Agent retroactive to the earliest date of default, suspending Delivery of the Picture, and declaring all unpaid amounts due Licensor immediately due and payable.

(C)     As a result of termination of this Agreement or any other agreement between Distributor and Sales Agent, with respect to those pictures as to which all rights are terminated:

(i)     All licensed rights in and to such picture shall automatically revert to Licensor, free and clear of any and all encumbrances and any sub-distribution agreements entered into by Distributor (other than those sub-distribution agreements deemed assigned to Licensor as specified below);

(ii)    All of Distributor's rights under any sub-distribution and license agreements that have been pre-approved in writing by Sales Agent shall be deemed to have been assigned to Licensor (and any such sub-distribution agreements not so approved, shall be deemed automatically terminated) and all payments to be made under such agreements shall be paid directly to Licensor who may notify all relevant parties of such assignment to Licensor;

(iii)   All monies payable by exhibitors or sub-distributors to Distributor in respect to such picture shall be paid to and retained by Licensor;

(iv)    Any portion of the License Fee for this Picture and License Fee(s) for such other picture(s) theretofore paid by Distributor shall be retained by Licensor or Sales Agent and any unpaid portion of the License Fee for this Picture or for such other picture(s), if any, shall accelerate and immediately become due and payable to Licensor or Sales Agent;

(v)     Licensor shall be entitled to immediate possession of all digital and film pre-print and print elements and copies of the Picture and such other picture(s), advertising materials and all other materials (including any Delivery Materials) pertaining to same;

(vi)    Distributor shall execute and deliver all instruments requested by Sales Agent to effectuate a termination of this Agreement and its rights in the Picture or for such other picture(s) as applicable, including without limitation instruments necessary or appropriate to reflect such termination on the public records of governmental agencies and/or with industry organizations in the Territory which maintain records of a similar nature;

(vii)   Distributor shall turn over all records, including books, billing and delivery records to the Picture or such other

8

Exhibit 7a Page 212

JJMT-SEC-0005027

picture(s), and all monies on hand, if any, relating to the Picture or such other picture(s); and

(viii)     Distributor hereby irrevocably appoints Sales Agent as Distributor's attorney-in-fact, a power coupled with an interest, with full right to execute any and all assignments and other instruments deemed by Sales Agent to be reasonably necessary or desirable to evidence the transactions provided hereunder and to protect its rights under this Agreement or such other agreement(s) as applicable.

20.    **TERMINATION OTHER THAN FOR DEFAULT**:

(A)     Upon written notice to Distributor, Sales Agent may in its sole discretion terminate this Agreement if principal photography of the Picture has not commenced within twelve (12) months following the date of this Agreement, the Picture is not ready for Delivery to Distributor within twenty-four (24) months following the date of this Agreement, or Licensor or Sales Agent abandons the Picture either prior to or after the commencement of principal photography.

(B)     In the event of such termination, Licensor shall return to Distributor such portion of the License Fee theretofore paid to Licensor by Distributor, and Distributor shall return to Sales Agent any and all materials, including, without limitation, all physical film materials, Delivery Materials, publicity materials and documents theretofore furnished  by Sales Agent to Distributor in connection with the Picture. Neither Licensor nor Sales Agent shall have any additional obligation of any kind whatsoever to Distributor, or anyone claiming through Distributor, by reason of such termination.

(C)     Distributor shall execute and deliver all instruments requested by Sales Agent to effectuate a termination of this Agreement and its rights in the Picture, including without limitation instruments necessary or appropriate to reflect such termination on the public records of governmental agencies and/or with industry organizations in the Territory which maintain records of a similar nature. Distributor shall turn over all records, including books, billing and delivery records to the Picture and all monies on hand, if any, relating to the Picture. Distributor hereby irrevocably appoints Sales Agent as Distributor's attorney-in-fact, a power coupled with an interest, with full right to execute any and all assignments and other instruments deemed by Sales Agent to be reasonably necessary or desirable to evidence the transactions provided hereunder and to protect its rights under this Agreement.

21.    **CHOICE OF LAW / ARBITRATION / FORUM**:

(A)     This Agreement shall be subject to the laws of the State of California applicable to agreements wholly executed and performed therein, and all parties hereby irrevocably consent to the exclusive jurisdiction and venue of the Federal and State courts located in Los Angeles County for any court matters arising hereunder.

(B)     Any and all disputes under this Agreement shall be submitted exclusively to binding arbitration ("IFTA Arbitration") in Los Angeles, California under the Rules of International Arbitration of the International Film and Television Alliance ("IFTA Arbitration Rules") in effect as of the date the request for arbitration is filed. Each party waives any right to adjudicate any such dispute in any other court or forum and Distributor waives any and all rights to seek equitable or injunctive relief or to rescind or terminate this Agreement or to seek such rescission or termination.  Los Angeles County will be deemed the "Forum" under the IFTA Arbitration Rules. Licensor (and where applicable Sales Agent) and Distributor agree to accept service of process for IFTA Arbitration in accordance with such Rules and to accept service of process for any judicial or other proceedings provided for hereunder by certified mail, return receipt requested, courier, or other personal delivery at the address indicated on this Agreement. Licensor (and where applicable Sales Agent) and Distributor agree to abide by any decision rendered in an IFTA Arbitration, and that any court having jurisdiction may enter judgment affirming such decision and may enforce such judgment in accordance with its powers.

(C)     Without limiting the aforesaid arbitration provisions and notwithstanding the exclusive jurisdiction provisions above, Licensor and Sales Agent shall additionally each have the right to proceed in any court of competent jurisdiction anywhere in the world to either (i) seek such interim protective relief, including equitable remedies as may be considered reasonably necessary to protect their rights and entitlements pursuant to this Agreement, or (ii) seek enforcement  of any arbitration award or related judgment hereunder.

(D)     The prevailing party or parties in any arbitration hereunder shall be entitled to an award in such arbitral proceeding for reimbursement of its or their (as applicable) legal fees (including attorneys fees) and costs of arbitration (including discovery and expert witness costs). The prevailing party or parties in any judicial action hereunder shall similarly be entitled to court order or judgment reimbursing it or them (as applicable) for all legal fees (including attorneys fees) and costs incurred in connection with such matter and in connection with any applicable arbitration as aforesaid.

9

Exhibit 7a Page 213

**FOIA Confidential Treatment Requested**                                                                                 **JJMT-SEC-0005028**

22.  **CONFIDENTIALITY**: All terms of this Agreement shall be confidential and not disclosed to any third party except each party's accountants, attorneys and agents, and as necessary to perform each parties' rights and obligations hereunder, and except as required by law or judicial order.

23.  **COUNTERPARTS**:   This Agreement may be executed in counterparts which may be delivered by ink-signed originals, fax or digital copy in pdf or tiff format, each of which shall be deemed to be an original and such counterparts of all parties when taken together shall constitute the fully binding and executed Agreement.

24.  **BINDING AGREEMENT**: This Agreement, any exhibits attached hereto, and the STC's incorporated herein sets forth the entire understanding and agreement between Licensor and Distributor as to the subject matter hereof and supersedes all previous discussions, correspondence, inducements, agreements, warranties or representations, whether oral or written. This Agreement is binding on each of the parties and their respective successors and assigns. Except as expressly provided herein, this Agreement may only be amended in writing signed by Sales Agent on behalf of Licensor and Distributor.

THIS AGREEMENT is executed as of the parties as of the date first above written.

[signatures on the following page]

10

Exhibit 7a Page 214

**FOIA Confidential Treatment Requested**

**JJMT-SEC-0005029**

**AGREED AND ACCEPTED:**

SIERRA/AFFINITY ("Sales Agent") as agent
On behalf of Pupkin Productions ("Licensor")          1inMM Capital LLC ("Distributor")

By:_____          By:_____

Its: EVP International Sales          Its: MANAGING PARTNER

11

Exhibit 7a Page 215

**FOIA Confidential Treatment Requested**          **JJMT-SEC-0005030**

## Exhibit "A"

This Exhibit A is attached and incorporated into that certain International License Agreement dated as of February 27, 2019, by and between SIERRA/AFFINITY ("Sales Agent") as sales agent on behalf of Pupkin Productions ("Licensor") and 1inMM Capital LLC ("Distributor") whereby Licensor granted to Distributor certain distribution rights in and to the motion picture entitled "Lucia's Grace" (the "Picture").

## LEGAL DELIVERABLES

1.    Clearly legible copies of all chain-of-title documents required by Distributor, evidencing Licensor's proper ownership and permitting the use of any and all literary, dramatic, musical and other material used in the production of the Program or upon which the Program and/or screenplay may be based, together with certificates of authorship and proof of payment in connection with the acquisition of the necessary rights in and to such material and the exercise of all options related thereto.

2.    Evidence satisfactory to Distributor that there is no lien, charge, encumbrance or security interest that would adversely interfere with the Licensed Rights granted to Distributor.

3.    A (a) copyright report issued by a Thomson CompuMark, (b) title report and (c) opinion issued.

4.    A complete typewritten statement of all third party screen and paid advertising credit, name and likeness, and other third party obligations, restrictions and approval rights including, without limitation, all dubbing obligations (if any), director's editing rights, video mastering consultation or approval rights, etc. for each individual and entity named in the billing block with excerpts from each applicable third party agreement setting forth the precise extent and nature of such obligations, restrictions and/or approval rights, in the identical order as listed in the billing block.

5.    The proposed paid ad/packaging summary, credit and billing block layout for both full- and small-sized paid ads.

6.    The final copyright notice, as it appears on the billing block.

7.    Clearly legible copies of fully-executed agreements for all key actors and key production personnel (e.g., director, producer, writer, etc.) and any other talent and/or crew agreements requested by Distributor.

8.    If the Program or underlying materials or properties are based upon or related to events in the real life of real persons, living or dead, or portrays real persons, true and correct copies of all personal releases and other documentation showing that Licensor has all rights necessary to permit Distributor to exploit the Picture in the manner provided herein without violating any third party rights or incurring any obligations to any third party.

9.    A complete written statement showing the exact form and manner of the main and end titles of the Picture.

10.   One (1) typewritten (or computer generated) hard copy and one (1) copy in digital format of a music cue sheet in standard form showing the particulars of all music synchronized with the Program (all versions) and additional cue sheets for the trailer(s) and any other materials in connection with the Program containing original and/or licensed music. All such cue sheets will include for each cue: (i) the title of song; (ii) the name of the songwriter/composer; (iii) the songwriter's/composer's performing rights affiliation (e.g., ASCAP, BMI or SESAC); (iv) the name of publisher; (v) the publisher's performing rights affiliation; (vi) the type of use; (vii) the length of the use; and (viii) an indication of whether or not a master recording was licensed.

11.   Clearly legible, fully-executed copies and proof of payment for any and all synchronization licenses and master use licenses, all valid and sufficient to provide Distributor with the right to use and perform all musical compositions and master recordings contained in the Picture and trailer (if available).

12.   Clearly legible copies of the copyright registration certificate(s) with the US Copyright Office for both the screenplay and Picture.

12

Exhibit 7a Page 216

FOIA Confidential Treatment Requested

JJMT-SEC-0005031

# Exhibit 7b

**PROMISSORY NOTE**

**$ (1,994,625.00)**                                              **(02/27/2019)**

<u>Promise</u>. 1INMM Capital, LLC, a limited liability entity established in the State of California, (the "Maker"), hereby promises to pay to Lender, JJMT CAPITAL LLC, a Delaware Limited Liability company located at   <u>(541 N Fairbanks Ct. STE 2200 Chicago, IL 60611)</u>, (the "Payee") an amount equal to <u>(ONE MILLION NINE HUNDRED NINETY-FOUR THOUSAND SIX HUNDRED TWENTY-FIVE)</u> Dollars (<u>$1,994,625.00</u>) in lawful money  of the United States of America, which sum shall be due and payable on (02/27/2020)  (the "Maturity Date"), in one (1) balloon payment, in  like money at said office. Payment date shall be no later than TWELVE (12) months post confirmed funds transfer from Payee to Maker in the amount of (ONE MILLION THREE HUNDRED NINETY-SEVEN THOUSAND FIVE HUNDRED) Dollars ($1,397,500.00).


<u>Prepayment Option</u>. Maker may pay down at any time any portion of the  principal sum outstanding without any prepayment penalty.

<u>Assignment of Rights</u>. See Appendix A

<u>Compounding of Unpaid Payments</u>. The undersigned agrees that time is of the  essence and that in the event payment of principal or interest due under this Note is not  made when due, giving effect to any grace period which maybe applicable, the  outstanding balance of unpaid payments hereof shall immediately bear interest at  the rate of ten (10) percent per month, for so long as  such event of default continues.

<u>Validity of Agreement to Conform to Law.</u> All agreements between the undersigned and the holder of this Note are expressly limited so that in no contingency or event whatsoever, whether by reason of advancement of the proceeds hereof, acceleration of maturity of the unpaid principal balance, or otherwise, shall the amount paid or agreed to be paid to the holder hereof for the use, forbearance or detention of money advanced hereunder exceed the highest lawful rate permissible under any law which a court of competent jurisdiction may deem applicable hereto. If, from any circumstances whatsoever, fulfillment of any provision hereof or any instrument securing this Note or any other agreement referred to herein, at the time performance of such provision shall be due, shall involve transcending the limit of validity prescribed by law which a court of competent jurisdiction may deem applicable hereto, then, ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity, and if from any circumstances the holder hereof shall ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the

Exhibit 7b Page 218

**FOIA Confidential Treatment Requested**                                              **JJMT-SEC-0005032**

reduction of the unpaid principal balance due hereunder and not to the payment of interest. This provision shall control every other provision of all agreements between the undersigned and the holder hereof.

Maker's Default. At the option of the holder hereof exercised by written notice to the undersigned, this Note shall become immediately due and payable upon the maker's failure to pay when due any payment of principal, interest or expenses due hereunder; or (b) failure in the performance or observance of any of the terms or conditions of any mortgage, deed of trust, security agreement or other agreement securing, guaranteeing or otherwise pertaining to this Note after giving effect to any applicable curative period which may be contained therein. Upon the occurrence of any of the following specified Events of Default, as defined under the standard conventions and terminology prescribed for promissory notes drafted under Warren's California Forms for Principal, Interest, Insolvency, Breach of Covenants, Breach of Representation and Warranties, (each herein called an "Event of Default") then, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, the Payee may, by written notice to the Maker, declare the principal of and accrued interest in respect of this Note to be forthwith due and payable, whereupon the principal of and such unpaid accrued interest in respect of this Note shall become forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Maker. Furthermore, This note shall become due and payable before the above-mentioned maturity date immediately upon the happening of any of the following events affecting any maker or indorser thereof, to wit: voluntary or involuntary filing of a petition in bankruptcy or for reorganization, execution of an assignment for the benefit of creditors, calling meeting of creditors, appointment of liquidating agent or committee, offer of composition, entry of a judgment in excess of $ 10,000 which remains unsatisfied or for over 30 days, application for appointment or appointment of any receiver, issuance of warrant of attachment or death of any maker or indorser or on default of any other obligations to the Maker.

Collection Costs. If this Note or any installment of principal or interest is not paid when due, whether at maturity or by acceleration, the undersigned promises to pay all costs of collection, including without limitation, actual attorneys' fees, and all expenses in connection with the protection or realization of the assets and proceeds available this Note or the enforcement of any subsequent memorandum or agreement created in conjunction with this Note incurred by the holder hereof on account of such collection, whether or not suit is filed hereon or thereon; such costs and expenses shall include, without limitation, all costs, expenses and attorneys' fees actually incurred by the holder hereof in connection with any insolvency, bankruptcy, arrangement or other similar proceedings involving the undersigned, or involving any endorser or guarantor hereof, which in anyway affects the exercise by the holder hereof of its rights and remedies under this Note or under any mortgage, deed of trust, security agreement, guaranty or other agreement securing or pertaining to this Note.

Waiver of Notice. Presentment, demand, protest, notices of protest, dishonor and nonpayment of this Note and all notices of every kind are hereby waived by all parties to

Exhibit 7b Page 219

FOIA Confidential Treatment Requested

JJMT-SEC-0005033

this Note, whether the undersigned, principal, surety, guarantor or endorser, except as provided herein. To the extent permitted by applicable law, the defense of the statute of limitations is hereby waived by the undersigned.

<u>Death of Maker</u>. Maker of this note hereby waives all notice and demand and consent that this note shall become due and payable immediately upon the happening of any of said events. This note shall become due and payable on the Maturity Date, but payment shall be accelerated and become due and payable immediately if the Maker shall die. For the further security of the holder thereof, the undersigned covenants that so long as any part of the principal or interest of this note is outstanding and unpaid, it will not grant any security interest to any third party upon its property, or create any lien whatsoever thereon, without also thereby including therein this note, equally and ratably with every other evidence of debt, secured by any of the undersigned's property. If, while any part of the principal or interest is outstanding and unpaid, the maker hereof breaks this covenant, then the holder hereof may at his or its election, declare and make this note at once due and payable by written notice delivered to maker, and this remedy will be deemed cumulative and in addition to any other remedy available to the holder hereof. This note shall be paid without claim of set-off, counterclaim or deduction of any nature or for any cause whatsoever.

<u>Extensions Granted by Payee.</u> All indorsers hereunder agree that the holder of this note in case of non-payment thereof at maturity, or of any installment thereof when due, may grant to the maker or any indorser of said note any extension or extensions of time of payment thereof, in whole or in part, without notice to said indorsers or any of them and any such extension or extensions shall not affect in any way said indorsers' liability upon note, such indorsers hereby waiving demand, presentment of payment, notice of nonpayment and protest and do further agree that any holder of this note may in the event of default in the payment of principal of, or interest upon, this note or any installment thereof repossess and/or sell the (collateral) held as collateral security for the payment of this note without in any way relieving said indorsers, or any of them, of any liability by reason of such repossession and/or sale, applying the proceeds of sale of any such  asset less all costs to amount due under this note, and all indorsers agree to pay any deficiency on this note on demand.

<u>Litigation Fees</u>. In any action at law or in equity to enforce or construe any provisions or rights under this Note, the unsuccessful party or parties to such litigation, as determined by a court pursuant to a final offer, judgment or decree, shall pay to the successful party or parties all costs, expenses and reasonable attorneys' fees incurred by such successful party or parties (including, without limitation, such costs, expenses and fees on any appeal), which costs, expenses and attorneys' fees shall be included as part of any order, judgment or decree.

<u>General Provisions.</u> Principal and interest evidenced hereby are payable only in lawful money of the United States. The receipt of a check shall not, in itself, constitute payment hereunder unless and until paid in good funds. Whenever any payment on this Note shall be stated to be due on a day, which is not a business day, such payment shall be made on

Exhibit 7b Page 220

the next succeeding business day and such extension of time shall be included in the computation of the payment of interest of this Note. This Note is to be governed by and construed in accordance with the laws of the State of California except to the extent United States federal law permits the holder to contract for, charge or receive a greater amount of interest. In any action brought under or arising out of this Note, the undersigned hereby consents to the in personam jurisdiction of any state or federal court  sitting in the state of California, and waives any claim or defense that such forum is not  convenient or proper, and consents to service of process by any means authorized by  California and/or Federal law.

THE UNDERSIGNED HEREBY WAIVES, AND COVENANTS THAT THE UNDERSIGNED WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS NOTE, THE SUBJECT MATTER HEREOF OR ANY DOCUMENT RELATING HERETO, IN EACH CASE WHETHER  NOW EXISTING OR HEREAFTER ARISING OR WHETHER IN CONTRACT OR IN  TORT OR OTHERWISE.

_____          ___2/18/19_____

1INMM Capital, LLC                                      Date
Zachary Horwitz, Manager

FOIA Confidential Treatment Requested                    JJMT-SEC-0005035

APPENDIX A

<u>ASSIGNMENT</u>

This assignment ("Assignment") between 1INMM CAPITAL LLC, located at 3129-A S. La Cienega Ave. Los Angeles, CA 90016 Assignor") and JJMT CAPITAL LLC, a Delaware Limited Liability company located at  541 N Fairbanks Ct. STE 2200 Chicago, IL 60611 ("Assignee") is dated effective as of  (02 / 27 / 2019).

For good and valuable consideration, the receipt and sufficiency of which hereby acknowledged, Assignor does hereby irrevocably and unconditionally sell, grant, convey, and assign unto Assignee all of Assignor's rights, title and interest of every kind and nature, throughout the universe, until assignee is paid ($1,994,625.00) at to which time all rights, title and interest of every kind and nature revert back to Assignor and to that certain motion picture, currently entitled "LUCIA'S GRACE" (the "Picture") based on the original screenplay entitled "LUCIA'S GRACE" directed by Gianni Zanasi.

1.   Assignor hereby represents and warrants:

   1.1.   That Assignor is the sole and exclusive owner of the rights and privileges granted or to be granted to Assignee hereunder.
   1.2.   That, as of the effective date hereof, Assignor has the right to enter into this Assignment.
   1.3.   That, as of the effective date hereof, no part of the rights herein conveyed has in any way been encumbered, conveyed, assigned, transferred or otherwise disposed of and all such rights are therefore free and clear of any and all liens, claims, charges or encumbrances whatsoever in favor of any party whatsoever.

2.   Assignor shall indemnify Assignee, its successors, assigns, licensees and officers, and hold them harmless from and against any and all claims, liability, losses, damages, costs, expenses (including but not limited to attorney's fees) arising out of any breach by Assignor of any warranty made by Assignor hereunder.

3.   Assignee hereby assumes and agrees to be bound by all future obligations of Assignor which accrue after the date hereof.

4.   Assignor hereby waives the benefits of any provision of law known as "droit morale" or any similar law in any country of the world and agrees not to institute or permit any action or lawsuit on the ground that the Picture in any way constitutes an infringement of any "droit morale" and Assignor agrees that Assignor shall not, under any circumstances (including without limitation, the circumstances of a breach by Assignee) be entitled to enjoin the exhibition or other exploitation of the Picture, to terminate or rescind any rights granted to Assignee or to obtain any other form of equitable relief, specific performance or otherwise, any right to which Assignor expressly waives.

5.   This Assignment, and the rights granted hereunder, may not be assigned by Assignor to any person, firm or corporation. Assignee may assign this Assignment and the rights

Exhibit 7b Page 222

FOIA Confidential Treatment Requested

and services granted herein, together with the results and proceeds thereof, and the representations and warranties contained herein, to any person or entity.

6. This Assignment shall be construed in accordance with the laws of the state of California and shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, licensees and assigns. This Assignment cannot be amended or modified except in a writing signed by all parties hereto.

IN WITNESS WHEREOF, THE PARTIES HERETO HAVE EXECUTED AND DELIVERED THIS ASSIGNMENT AS OF THE (27)th DAY OF February 2019.

1INMM CAPITAL, LLC ("Assignor")          JJMT CAPITAL LLC ("Assignee")

By: _____          By: _____

Its: Managing Partner                    Its: _Managing Partner_____

Exhibit 7b Page 223

FOIA Confidential Treatment Requested                    JJMT-SEC-0005037

# Exhibit 7c

This License Agreement ("Agreement") is entered into as of March 4th, 2019 (the "Effective Date") by and between 1inMM Capital LLC, with its principal place of business at 5550 Wilshire Blvd #523 Los Angeles, CA 90036 ("Licensor") and NETFLIX, INC., a California Corporation, with its principal place of business at 335 N Maple Dr. #353, Beverly Hills, CA 90210 ("Netflix").

**Recitals**

Licensor is a Distributor and owner of all rights hereby granted for "Yuli" (the "Title"), directed by Iciar Bollain  and "Lucia's Grace" (the "title"), directed by Gianni Zanasi.

Netflix is a digital platform.

Licensor and Netflix desire to enter into a relationship whereby Licensor will grant Netflix, among other things, a license to distribute the Title to subscribers within the Territory, as defined below, all in accordance with the terms and conditions set forth below.

**Agreement**

In consideration of the mutual promises contained herein and such other good and valuable consideration, the parties agree as follows:

1. **Definitions.**

    1.1.    "Affiliate" shall mean any business entity which Licensor and Netflix directly or indirectly controls, is controlled by, or is under common control with, where "control" is defined as the ownership of at least fifty percent (50%) of the equity or beneficial interest of such entity or the right to vote for or appoint a majority of the board of directors or other governing body of such entity or otherwise possesses the power to direct the affairs of the entity.

    1.2.    "Basic TV" shall mean the delivery and/or exhibition of a motion picture, television show or other entertainment product by means of cable, satellite or any other electronic or non-tangible means (whether analog or digital, or via the Internet or any other electronic or non-tangible medium now known or hereafter devised) where the consumer is charged a recurring fee and/or periodic access charge for the first or lowest tier(s) of service (including a tier that is required to be purchased or accessed before access to other programming services is permitted), regardless of whether such exhibition is on a regularly scheduled basis or made available to the viewer on an on demand basis at the consumer's discretion.

    1.3.     "Electronic Sell-Through" or "EST" shall mean the delivery and/or exhibition of a motion picture, television show or other entertainment product, solely on a non-ad supported basis, where the timing and/or selection of same is not pre-determined, but rather is at the consumer's discretion, and for which, and the right to permanently download, retain and/or have access to same, the consumer is charged a transactional fee.

    1.4.    "Free TV" shall mean the delivery and/or exhibition of a motion picture, television show or other entertainment product by means of over the air signals (including the retransmission of such signals by cable, satellite or any other electronic or non-tangible means) whether analog or digital, or via the Internet solely on one (1) website owned and operated by one (1) free-to-air broadcaster and branded as such broadcaster's website, where the consumer (i) is not charged a fee (except for the license fee, if any, payable for the right to use a television set in certain territories) and (ii) is required to view or is otherwise exposed to commercial interruptions (display or interstitial).

    1.5.    "High Definition" shall mean a resolution of greater than or equal to 720p.

1

**FOIA Confidential Treatment Requested**

1.6.   "Home Video" shall mean the commercial release of a motion picture, television show or other entertainment product for purchase and/or rent on optical media, such as DVD and/or Blu-ray disc.

1.7.   "Internet Transmission" shall mean the transmission of data via Internet Protocol, including without limitation through use of client software contained on a Blu-ray disc or other optical media.

1.8.   "License Fees" shall mean, collectively, as set forth in more detail in Section 4.1.

1.9.   "Licensed Languages" shall mean, for each Title hereunder, (i) its original language, (ii) neutral or Mexican Spanish (in subtitled form (and, if available, dubbed form) if the original language is other than Spanish), and (iii) Brazilian Portuguese (in subtitled form, if available (and, if available, dubbed form) if the original language is other than Brazilian Portuguese).

1.10.  "Netflix-Enabled Device" or "NED" shall mean any device capable of receiving data via Internet Transmission, subject to the security and copy protection specifications set forth in Section 2.5 or otherwise agreed to by the parties, including without limitation (i) a desktop or laptop computer; (ii) a television set; (iii) a set top box, including a box that offers an integrated personal digital video recorder (DVR); (iv) a DVD and/or Blu-ray player; (v) a game console; (vi) a portable device, including without limitation a mobile phone or tablet; or (vii) a device with a web browser interface or other like capability.

1.11.  "Netflix Service" shall mean a global subscription service that provides subscribers with on-demand access to movies and television content, and delivers such content through Internet Transmission to NEDs (including User Interfaces on same) and/or, currently in the United States only, in optical disc format (e.g., DVD, Blu-ray).

1.12.  "Pay Per View" or "PPV" shall mean the delivery and/or exhibition of a motion picture, television show or other entertainment product, where the timing and/or selection of same is pre-determined, and not at the consumer's discretion, where the consumer is required to view the content over a limited period of time, and for which the consumer is charged a transactional fee.

1.13.  "Pay TV" shall mean the delivery and/or exhibition of a motion picture, television show or other entertainment product by means of cable, satellite or any other electronic or non-tangible means (whether analog or digital, or via the Internet or any other electronic or non-tangible medium now known or hereafter devised) where the consumer is charged a recurring fee and/or periodic access charge in addition to or in a greater amount than any fee payable in order to receive Basic TV, regardless of whether such exhibition is on a regularly scheduled basis or made available to the viewer on an on demand basis at the consumer's discretion.

1.14.  "Source Material" shall mean the source files for the Titles and associated trailers, artwork, promotional materials and metadata (including without limitation audio and closed captioning files), the delivery specifications for which are detailed in Schedule B attached hereto.

1.15.  "Start Date" shall mean, for each Title, the date such Title may first be made available for exhibition on and distribution, as detailed on Schedule A attached hereto or, on the notifications Licensor shall provide to Netflix pursuant to Section 3.1.3.

1.16.  "Subscription Video-on-Demand" or "SVOD" shall mean the delivery and/or exhibition of motion pictures, television and/or other entertainment products on a commercially uninterrupted basis where the consumer is charged a recurring fee and/or periodic access charge for the service.

1.17.  "Taxes" shall mean all federal, state, local, foreign and other net income, gross income, gross receipts, sales, use, value added, goods and services, consumption, ad valorem, transfer, franchise, profits, withholding, payroll, excise, stamp, real or personal property, customs, duties or other taxes, fees, assessments or charges of any

2

FOIA Confidential Treatment Requested

kind whatsoever, including any related penalties and interest, imposed by any federal, territorial, state, local, or foreign government or any agency or political subdivision of any such government.

1.18.    "Term" shall mean the period commencing on the Effective Date and ending on the expiration date of the last to expire Title License Period.

1.19.    "Territory" shall mean the following countries and each of their respective territories, possessions, commonwealths, and trusteeships:

Mexico;

Central America, including Belize, Costa Rica, Guatemala, El Salvador, Honduras, Nicaragua and Panamá;

South America, including Argentina, Bolivia, Brazil, Chile, Colombia, Ecuador, Paraguay, Peru, Uruguay and Venezuela; and

The Caribbean Basin Islands, including Anguilla, Antigua, Barbuda, Aruba, Barbados, British Virgin Islands, Dominica, Dominican Republic, Grenada, Guadeloupe, Haiti, Jamaica, Martinique, Montserrat, the Netherland Antilles, St. Kitts and Nevis, St. Lucia, St. Vincent and the Grenadines, Trinidad, Tobago, and the Turk and Caicos Islands.

1.20.    "Theatrical" shall mean the exhibition of a motion picture, television show or other entertainment product or program (regardless of the means of delivery) in conventional, drive-in or special format (e.g., iMax) theaters that are open to the general public and for which an admission fee is charged.

1.21.    "User Interfaces" shall mean web applications built using Application Programming Interfaces (commonly known as APIs) released by Netflix, which applications enable subscribers and potential subscribers to link to or otherwise use the Netflix Service on NEDs.

1.22.    "Video-on-Demand" or "VOD" shall mean the delivery and exhibition of a motion picture, television show or other entertainment product, where the timing and/or selection of same is not scheduled, but rather is at the consumer's discretion, where the consumer can view the content over a limited period of time, and for which the consumer is charged a transactional fee.

1.23.    "Years" shall mean three (3) successive periods of twelve (12) calendar months during the Term, the first of which shall begin on as detailed on Schedule A.


## 2.    Grant of Licenses.

2.1.    Title License.

2.1.1. Licensor grants to Netflix during the Term the exclusive right and license to exhibit and distribute the Title (and associated Source Material) in any or all of the Licensed Languages within the Territory solely by way of Internet Transmission via SVOD and AVOD, the Netflix Service to NEDs (including User Interfaces on same).

2.1.2. Licensor also grants to Netflix during the Term a limited, non-exclusive right and license to copy, install, compress, uncompress, encode, encrypt, decode, decrypt, display, use, cache, store and transmit the Titles (and associated Source Material) for purposes of such approved exhibition and distribution.

2.2.    Marketing and Promotion.

2.2.1.    Trademark License.  Licensor grants to Netflix during the Term a limited, non-exclusive right and license to copy, install, display, use, cache, store, transmit, exhibit and distribute Licensor's trademark(s) and logo(s) identified on Schedule

3

FOIA Confidential Treatment Requested                                              JJMT-SEC-0005040

C (collectively, "Licensor Marks") for purposes of exercising its rights under this Section 2.

2.2.2.  Marketing; Pre-promotion.  Subject to Section 5.4, Netflix may, commencing sixty (60) calendar days prior to each Title's Start Date, market and promote the availability of such Title through the any Service here granted.

2.2.3.  Introductory Segments; Promotion To Non-Subscribers.  Licensor grants to Netflix during the Term a limited, non-exclusive right and license to cut each Title to create short promotional clips, each of which shall consist of no more than three (3) consecutive minutes in length of a Title, an "Introductory Segment".  Licensor further grants to Netflix during the Term a limited, non-exclusive right and license to (a) exhibit and distribute, solely by way of Internet Transmission, Source Material (excluding Titles) and Introductory Segments to subscribers and potential subscribers for purposes of marketing and promoting the availability of the Titles through the Netflix Service and (b) copy, install, compress, uncompress, encode, decode, encrypt, decrypt, display, use, cache, store and transmit such materials for purposes of such approved exhibition and distribution.  For the avoidance of doubt, Netflix need not encrypt Introductory Segments or trailers.

2.3.  Encryption; Copy Protection.  Netflix shall, at all times during the Term, implement security and copy protection technologies with respect to each Title, including geo-filtering and encryption technologies, that are at least as protective as the then-current industry standard in the Territory and which shall be no less protective than those provided by Netflix to other platforms in the Territory.  Once terminated this Agreement by any cause, Netflix shall destroy, eliminate and/or return to Licensee any and all protection copy.

2.4.  Geo-filtering.  Netflix shall, at all times during the Term, implement geo-filtering technology to restrict access to Titles, via the Netflix Service, to subscribers within the Territory that is at least as protective as the then-current industry standard in the Territory and which shall be no less protective than those provided by Netflix to other platforms in the Territory.  Notwithstanding the foregoing, Licensor acknowledges that Netflix cannot guarantee that current geo-filtering technology shall be effective in every instance.

2.5.  For the avoidance of doubt, Netflix may offer the Netflix Service, including the Titles licensed hereunder, on NEDs where a subscriber is required to use a third party service (including without limitation a User Interface) and/or make payment to such third party to use the Netflix Service (whether such payment is for an additional charge in order to access the Netflix Service and/or for the relevant subscription fee for the Netflix Service itself).  Such third parties may also offer interactive features, such as on-screen chat functionality or simultaneous or coordinated viewing.  By way of example only, the Netflix Service may be offered through a game console such as the Microsoft Xbox, wherein use of the Netflix Service by subscribers through such NED requires the payment of a recurring, material fee to Microsoft Corporation and/or payment of the relevant Netflix Service subscription fee to Microsoft Corporation.

2.6.  Notwithstanding anything to the contrary in this Agreement, but without in any way limiting Netflix's security and related obligations pursuant to Sections 2.5 and 2.6 or Netflix's indemnification obligations pursuant to Section 6.3, Netflix shall not be responsible or liable for any acts or omissions of, or resulting from a consumer's use of, a third party NED and/or any third party software (including any User Interface).

2.7.  Exclusivity; Holdbacks.  Netflix shall be the exclusive SVOD and AVOD licensee in the Territory during such Title's Title License Period.  Further, during the period commencing on the first day of the Term and continuing through the expiration of the Title License Period, as applicable, Licensor (and its Affiliates) shall not, and shall not license or permit any third party to, license, exhibit, distribute or otherwise

4

FOIA Confidential Treatment Requested

exploit such Title in the Territory other than on a Theatrical, Home Video, VOD, or purely EST, (e.g., no Basic TV exploitation, no Pay TV exploitation, no SVOD exploitation, no AVOD).  Holdback against Free TV and Basic Cable only during the first 18 months. Licensor acknowledges that this provision and Licensor's performance of its obligations under this Section is essential to Netflix and its willingness to enter into this Agreement.

**3.  License Fees.**

3.1.  License Fees.  Netflix shall pay Licensor the License Net Fee of $4,200,000.00 (Four Million Two Hundred Thousand US Dollars and 00/100), including Taxes and withholdings, agreeing both parties that any and all discounts, withholdings, taxes or similar will be absorbed by the Netflix.

3.2.  Payment Details.  License Fee shall be due and payable as follows: the amount of $4,200,000.00 (100%) for two (2) Titles due 365 days after the delivery of the required materials as established in this Agreement and as defined on Schedule A.

3.3.  Taxes. Each party shall, as set forth in more detail in Section 5, indemnify the other for failure to pay any Taxes payable by such party pursuant to this Section and/or applicable law.

**4.  Delivery.**

4.1.  Source Material.  Licensor shall create and deliver, at its sole expense, Source Material for each Title set forth on Schedule A as of the Effective Date to Netflix no later than ninety (90) calendar days prior to the applicable Start Date or such other date agreed to in writing by the parties.  Source Material shall be loaned to Netflix for the purpose of encoding and shall be, at Licensor's option, either destroyed or, with written notice, returned to Licensor within ninety (90) calendar days of accepted delivery.  Licensor shall also provide, at Netflix's request, accurate music cue sheets for each Title.

4.2.  Specifications.  All Source Material shall be provided to Netflix in accordance with the specifications set forth in, and accompanied by all information required by, Schedule B.  For the avoidance of doubt, in the event that Source Material is provided in encrypted format, including for example on DVD, Netflix shall be permitted to decrypt such media as necessary prior to encoding and/or encode directly from such media.  Notwithstanding anything to the contrary in this Agreement, no advertising elements (pre-roll, bugs, bumpers, placards, etc.) or overlay branding (either Licensor's or any other third party's) shall be included before, after or within any Source Material for a Title delivered hereunder. Source Material shall be delivered in the highest quality and resolution available to Licensor (e.g., if not available in 1080p, then delivered in 1080i, or if not available in 1080i, then delivered in 720p), including without limitation High Definition

4.3.  Acceptance.  Upon Netflix's receipt of the Source Material for a Title, Netflix shall have thirty (30) calendar days in which to send Licensor written notice of its acceptance ("Notice of Acceptance") or rejection ("Notice of Rejection") of the Source Material for that Title, such acceptance or rejection to be determined by Netflix based solely upon whether such material complies with Schedule B.

4.4.  Rejection.  Upon Licensor's receipt of a Notice of Rejection, if any, Licensor shall, without delay and at its sole expense, replace the defective Source Material.  In the event that Licensor is unable to provide an acceptable Source Material replacement, Netflix shall not be obligated to pay any License Fee with respect to the relevant Title.

5

**FOIA Confidential Treatment Requested**

**5.   Representations and Warranties; Indemnification; Limitation on Liability.**

5.1.    Netflix.  Netflix represents, warrants and covenants that (i) it has the full right, power, legal capacity and authority to enter into and fully perform its obligations under this Agreement; (ii) there are not now any liens, claims, encumbrances, legal proceedings, agreements or understandings which might conflict or interfere with, limit, derogate from, be inconsistent with any of Netflix's representations, warranties or covenants contained in this Section 6.1. (iii) it has satisfied and shall satisfy during the Term all third party obligations of any kind with respect to the obligations acquired by this Agreement and with any third party, including the viewers of Netflix; (iv) Netflix's distribution and other exploitation of the Titles (and associated Source Material and Introductory Segments) granted by this Agreement to Netflix shall not violate or infringe any rights of any third party, including without limitation any third party intellectual property rights, contract rights, moral rights, rights of publicity, and rights of privacy, or defame or constitute unfair competition against such third party; and (v) Netflix's distribution and other exploitation of same in accordance with this Agreement shall not violate any applicable law, rule or regulation.

5.2.    Licensor.  Licensor represents, warrants and covenants that (i) it has the full right, power, legal capacity and authority to enter into and fully perform its obligations under this Agreement, and neither it nor an Affiliate has entered into an agreement with another party which is inconsistent with the terms of this Agreement or would otherwise prevent Licensor from fulfilling its obligations as to the Titles or under this Agreement; (ii) it has and shall maintain during the Term all necessary rights, titles, authorizations, consents and interests, including without limitation from all third party rights holders for each Title, necessary to grant Netflix the licenses granted in this Agreement, including without limitation the right to license to Netflix, on an exclusive basis in accordance with Section 3.2, the Titles designated and delivered by Licensor hereunder; (iii) it has satisfied and shall satisfy during the Term all third party obligations of any kind with respect to the Titles (and associated Source Material and Introductory Segments) and their distribution and exploitation in accordance with this Agreement, including without limitation all guild residuals and participations, and Netflix shall have no obligation for any such past, current or future charges or similar payments; (iv) Netflix's distribution and other exploitation of the Titles (and associated Source Material and Introductory Segments) and Licensor Marks in accordance with this Agreement shall not violate or infringe any rights of any third party, including without limitation any third party intellectual property rights, contract rights, moral rights, rights of publicity, and rights of privacy, or defame or constitute unfair competition against such third party; and (v) the Titles (and associated Source Material and Introductory Segments) and Netflix's distribution and other exploitation of same in accordance with this Agreement shall not violate any applicable law, rule or regulation.

5.3.    Indemnification.

5.3.1.    Licensor will defend, indemnify and hold harmless Netflix, its directors, officers and employees from any and all loss, damage, claim, liability or expense (including legal fees and costs) actually incurred as a result of a third party claim ("Claim") to the extent arising out of a breach or alleged breach of the representations and warranties made in Section 6.1 or (ii) any failure by Licensor to pay any Taxes required to be paid to any governmental entity on monies earned by Licensor hereunder or as a result of Licensor's performance of its obligations hereunder.

5.3.2.    Netflix will defend, indemnify and hold harmless Licensor, its directors, officers, employees from any and all Claim to the extent arising out of a breach or alleged breach of (i) the representations and warranties made in Section 6.2 and/or (ii) any failure by Netflix to pay any Taxes required to

6

FOIA Confidential Treatment Requested                              JJMT-SEC-0005043

be paid by Netflix to any governmental entity on monies earned by Netflix hereunder or as a result of Netflix's performance of its obligations hereunder.

**6.  Confidentiality.**

6.1 Confidential Information.  Each party acknowledges and agrees that all business and technical information provided to it by the other party pursuant to this Agreement constitutes confidential and/or proprietary information of the other party ("Confidential Information").   Confidential Information shall includes all oral, written or recorded confidential and/or proprietary information about or related to the disclosing party or its business, including without limitation the terms and conditions of this Agreement.  Notwithstanding the foregoing, Confidential Information does not include information that (i) is or becomes publicly available without breach of this Agreement; (ii) can be shown by documentation to have been known to the receiving party prior to its receipt from the disclosing party; (iii) is rightfully received from a third party who did not acquire or disclose such information by a wrongful or tortious act; (iv) can be shown by documentation to have been developed by the receiving party without reference to any Confidential Information; or (v) that the receiving party becomes legally obligated to disclose to a governmental entity with jurisdiction over it.

6.2 Use of Confidential Information.  Neither party shall use the other's Confidential Information for its own use or for any purpose other than as necessary to perform or enforce its rights and/or obligations under this Agreement or as required by law, or disclose such information to any third party (except for attorneys, accountants, and/or the third party contractors identified in Section 9.3, provided such parties have reason to know such information and are bound to a confidentiality agreement at least as protective as this Section 7).  Each party shall take all reasonable measures to protect the secrecy of and avoid disclosure of Confidential Information, which measures shall be no less than reasonable care and shall include all of those measures that the receiving party uses to protect its own Confidential Information.  This Section 7 shall survive expiration or earlier termination of this Agreement.

**7.  Termination.**

7.1.    Either party may terminate this Agreement:

7.1.1.   in the event of a material uncured breach or default by the other party of any of its obligations under this Agreement, provided that (i) notice is provided to the other party in writing and (ii) such breach or default is not cured within thirty (30) calendar days following the date such notice is deemed given, unless such breach or default is by nature uncurable in which case this Agreement shall be terminable on the date of notice; or

7.1.2.   in the event that the other party (i) institutes or otherwise becomes a party, voluntarily or involuntarily, to a proceeding alleging or pertaining to the insolvency or bankruptcy of that party; (ii) is dissolved or liquidated; (iii) makes an assignment of its material assets for the benefit of creditors; and/or (iv) initiates or is subject to reorganization proceedings.  This Agreement shall be terminable on the date written notice is deemed given to such party.

7.2.    No Waiver.  Waiver by either party of a single breach or default or a succession of breaches or defaults shall not deprive such party of the right to terminate this Agreement by reason of any subsequent breach or default.

7

Exhibit 7c Page 231

**FOIA Confidential Treatment Requested**

7.3.   Effect of Termination or Expiration. Upon termination or expiration of this Agreement, the licenses granted hereunder shall immediately terminate. Nothing herein shall be construed to release either party from any obligation that matured prior to the effective date of such termination or expiration (or which may continue beyond such termination or expiration) or to relieve the defaulting party from any and all liabilities at law or in equity to the other for breach of this Agreement.  Further, in the event that this Agreement is terminated due to a material breach or default of Licensor, Licensor shall refund or credit to Netflix, at Netflix's option and within thirty (30) calendar days of the effective date of such termination, a prorated amount of the aggregate License Fees paid to Licensor, calculated as of the effective date of such termination and based upon the amount of time remaining in the relevant Title License Periods.

7.4.   Survival.  Those rights and obligations, which by their very nature are intended to survive termination or expiration of this Agreement, shall survive, including without limitation Sections 1, 2.8, 4.3, 6.3, 6.4, 7, and 8.

## 8.   General Provisions.

8.1.   Governing Law; Dispute Resolution.  This Agreement was fully negotiated and entered into in, and shall be governed by and construed and enforced in accordance with the federal laws of United States of Mexico without regard to its rules on conflict of laws or any other rules that would result in the application of a different body of law.  The parties consent to the exclusive jurisdiction and venue of the Federal and State Courts located in Mexico, Federal District for purposes of any proceeding arising out of or relating to this Agreement.

8.2.   Third Party Contractors.  Netflix may use third party contractors (e.g., backend fulfillment providers that encode, encrypt, store and/or host content) to exercise its rights and fulfill its obligations pursuant to Section 2; provided, however, that Netflix shall be fully responsible for any act or omission, or failure of any right or obligation of this Agreement by such a contractor in the event that such an act, failure or omission, if performed by Netflix instead of such contractor, would constitute a breach by Netflix of this Agreement.

8.3.   Notice.  Notices and other communications required or permitted to be given hereunder shall be given in writing and delivered in person, sent via certified mail or email, or delivered by nationally-recognized courier service, properly addressed and stamped with the required postage, if applicable, to the applicable individuals and addresses specified in the signature block below. Notice shall be deemed effective upon receipt.

8.4.   Assignment.  Neither this Agreement nor any rights, licenses or obligations hereunder may be assigned by either party without the prior written approval of the non-assigning party, which shall not be unreasonably withheld or delayed.  Notwithstanding the foregoing, either party may assign this Agreement to any parent of such party, wholly-owned subsidiary of such party, or any acquirer of all or of substantially all of such party's equity securities or assets, provided that such party provides the non-assigning party with prompt written notice.  Any purported assignment not in accordance with this section shall be void.  Subject to the foregoing, this Agreement will benefit and bind the parties' successors and assigns.

8.5.   Severability.  If any provision of this Agreement, other than a provision going to the essence of the Agreement, is held to be unenforceable pursuant to

8

FOIA Confidential Treatment Requested

Section 9.1, such decision shall not affect the validity or enforceability of any other provision of this Agreement.  Any provision of this Agreement held invalid or unenforceable shall, to the extent practicable, be substituted with a valid and enforceable provision that achieves the results contemplated by the parties in the original provision.

8.6.    Headings.  The headings of Sections and subsections in this Agreement are provided for convenience only and shall not affect its construction or interpretation.

8.7.    Counterparts.  This Agreement may be executed in two counterparts, each of which will be deemed to be an original copy of this Agreement and all of which together shall constitute one and the same Agreement.

8.8.    Entire Agreement.  This Agreement supersedes all prior or contemporaneous negotiations and agreements (whether oral or written) between the parties with respect to the subject matter thereof and constitutes, along with its Exhibits, a complete and exclusive statement of the terms and conditions of the Agreement between the parties with respect to such subject matter.  This Agreement may not be amended or modified except by the written agreement of both parties.  The language of this Agreement is English, and any translations shall have no effect and shall not be binding.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

1INMM CAPITAL LLC                              NETFLIX INC.

By: _____        By: _____
Name: Zachary Horwitz                          Name:  Funa Maduka
Title:   MANAGING PARTNER_____        Title:   VP, Content Acquisition

9

FOIA Confidential Treatment Requested

Exhibit 7c Page 233

JJMT-SEC-0005046

**Schedule 1**
**Titles**

| | |
|---|---|
| TITLE: | YULI |
| YEAR: | 2019 |
| START DATE: | MARCH 04TH, 2019 |
| LICENSE PERIOD: | 36 MONTHS **EXCLUSIVE** for AVOD and SVOD; 18 months for any other licensed right according to the terms conditions of the Agreement. |
| LICENSE PLATFORM: | SVOD, PAY TV, BASIC TV, AVOD |
| LICENSE NET FEE: | $2,100,000.00 |
| FORMAT: | HD |
| TERRYTORY: | ALL LATIN AMERICA INCLUDING BRAZIL |

―――――――――――――――――――――――――――――――――――――――

| | |
|---|---|
| TITLE: | LUCIA'S GRACE |
| YEAR: | 2019 |
| START DATE: | MARCH 04TH, 2019 |
| LICENSE PERIOD: | 36 MONTHS **EXCLUSIVE** for AVOD and SVOD; 18 months for any other licensed right according to the terms conditions of the Agreement. |
| LICENSE PLATFORM: | SVOD, PAY TV, BASIC TV, AVOD |
| LICENSE NET FEE: | $2,100,000.00 |
| FORMAT: | HD |
| TERRYTORY: | ALL LATIN AMERICA INCLUDING BRAZIL |

―――――――――――――――――――――――――――――――――――――――

10

Exhibit 7c Page 234

**FOIA Confidential Treatment Requested**

**JJMT-SEC-0005047**

**Schedule B**
**Source Material Requirements and Specifications**

NETFLIX, INC ("NTFLX") will determine the appropriate source for it's encoding. Examples of sources are listed below. If Content Provider does not have the source NTFLX requests, then NTFLX and Content Provider will mutually agree upon the source.

Per the agreement, it is the Content Provider's obligation to deliver Source Material compliant with the specifications below to NTFLX.

*Requirements*

**Primary Digital Assets**

| File Type (in order of preference) |
|---|
| 1.  High Definition – MPEG-2 (80 Mbps) |
| 2.  Standard Definition – MPEG-2 (50 Mbps) |

We accept .mpg for MPEG-2 files. For a given title, only one contiguous file can be delivered. Titles cannot be delivered as multi-part files, i.e., if a title is 90 minutes in duration, a single file with 90-minute duration must be delivered. Two (2) files with 45-minute durations will not be accepted. Below in section *3 Primary Digital Asset Specifications* are the technical details for the acceptable formats.

<span style="color:red">**Please ensure that all files do not contain bars and tones, advertisements, slates, ratings cards, FBI warning cards, placards, overlay branding or website link callouts before, during and/or after the program. Also, no commercial blacks can be contained in the program. There are no exceptions to these requirements. All files must consist of the feature program with one (1) second of black at the head and tail of the program.**</span>

11

Exhibit 7c Page 235

**Digital Video Prerequisites**

We require 16x9 (1:1 PAR for HD, 32:27 PAR for SD) versions if available. The following information and table specify the priority order in which NTFLX will accept content.

1. **16x9 (1:1 PAR for HD, 32:27 PAR for SD)**
2. **We will only accept 4x3 content if 16x9 (1:1 PAR for HD, 32:27 for SD) sources do not exist.**
3. HD sources must be in 23.976p format. 60i or 50i sources will only be accepted if feature was originally shot in 60i or 50i.
4. Please refer to the table below for quick reference.

| Preference Priority | Format | DAR | PAR | Frame Rate | Scan Type |
|---|---|---|---|---|---|
| 1 | HD 1920x1080 | 16x9 | 1:1 | 23.976 | Progressive |
| 2 | HD 1920x1080 | 16x9 | 1:1 | 25 or 29.97 or 59.94 | Interlaced or Progressive |
| 3 | HD 1280x720 | 16x9 | 1:1 | 23.976 | Progressive |
| 4 | HD 1280x720 | 16x9 | 1:1 | 25 or 29.97 or 59.94 | Progressive |
| 5 | SD 720x480 | 16x9 | 32:27 | 23.976 | Progressive |
| 6 | SD 720x480 | 16x9 | 32:27 | 25 or 29.97 | Interlaced or Progressive |
| 7 | SD 720x480 | 4x3 | 8:9 | 23.976 | Progressive |
| 8 | SD 720x480 | 4x3 | 8:9 | 25 or 29.97 | Interlaced or Progressive |

**Digital Audio Prerequisites**

Titles with surround sound require 5.1 audio. When 5.1 audio is supplied an additional 2-channel Left Total + Right Total mix (2-channel stereo mix) must be supplied on the same audio track as well. We require a single audio track that contains all 8 channels (6 channels for the 5.1 and 2 channels for the LT/RT mix). We do not accept multi-track audio files.

If a conformed 5.1 audio source is not available, stereo audio (or mono audio if the program is an old black-and-white movie, documentary, etc., as long as the original source was mono) will be accepted.

We use standard channel assignments as shown below:

1. **5.1 audio + 2.0 audio channel assignments**
   a. Channel 1 – Left
   b. Channel 2 – Right
   c. Channel 3 – Center
   d. Channel 4 – LFE
   e. Channel 5 – Left Surround
   f. Channel 6 – Right Surround
   g. Channel 7 – Left Total
   h. Channel 8 – Right Total

Exhibit 7c Page 236

**FOIA Confidential Treatment Requested**

JJMT-SEC-0005049

**2. Stereo Comp audio only**
   a. Channel 1 – Left Total
   b. Channel 2 – Right Total

**3. Mono Comp audio** (usually old black-and-white movies, etc.)
   a. Channel 1 – Mono Comp
   b. Channel 2 – Mono Comp

Primary Digital Asset Specifications

**MPEG-2 Specifications**

## High Definition – MPEG-2 (80 Mbps)
1. **Video Codec:** MPEG-2
2. **Profile ID:** High Profile
3. **Level ID:** High Level
4. **Video Bitrate:** 80 megabits
5. **Resolution:**
   a. 1920x1080
   b. 1280x720
6. **Audio Codec:**
   **a. Multi-Channel Assignment** (if available)
      i. Acceptable audio codecs
         1. Multi-channel PCM – 16bit, 48 kHz (Little Endian)
         2. Multi-channel AES3 LPCM (302m) – 16 bit, 48 kHz
      ii. Channel Mapping
         1. Channel 1 – Left
         2. Channel 2 – Right
         3. Channel 3 – Center
         4. Channel 4 – LFE
         5. Channel 5 – Left Surround
         6. Channel 6 – Right Surround
         7. Channel 7 – Left Total
         8. Channel 8 – Right Total
   **b. Stereo Assignment** (if multi-channel does not exist)
      i. Acceptable stereo audio codecs
         1. PCM – 16 bit, 48 kHz (Little Endian)
         2. Stereo AES3 LPCM (302m) – 16 bit, 48 kHz
         3. DVD LPCM – 16 bit, 48 kHz
         4. MPEG Layer 1 – 48 kHz, 448 kbps
      ii. Channel Mapping
         1. Channel 1 – Left Total
         2. Channel 2 – Right Total
7. **Frame rate:** *(frame rate should match source)*
   a. 23.976 progressive
   b. 25.00 progressive
   c. 25.00 interlaced
   d. 29.97 progressive
   e. 29.97 interlaced
   f. 59.94 progressive

13

Exhibit 7c Page 237

8. **Aspect Ratio:**
   a. 1:1 square pixels
9. **Intra DC Precision:** 10-bit
10. **Chroma Format:** 4:2:2
11. **GOP Structure:** I-frame ONLY
12. **Closed Captioning:** As defined in section *3.3 Closed Captioning* below
13. **Stream Type:** Transport Stream

## Standard Definition – MPEG-2 (50 Mbps)

1. **Video Codec:** MPEG-2
2. **Profile ID:** High Profile
3. **Level ID:** High Level
4. **Video Bitrate:** 50 megabits
5. **Resolution:**
   a. NTSC or Film: 720x480
   b. PAL: 720x576
6. **Audio Codec:**
   a. PCM – 48 kHz or 44.1 kHz, 16-bit, stereo (Little Endian)
   b. DVD LPCM – 48 kHz, 16-bit, stereo
   c. MPEG Layer 1 – 48 kHz or 44.1 kHz, 16-bit, stereo with minimum data rate of 128 kbps
7. **Frame rate:** *(please ensure all files are de-interlaced, or have had Inverse-Telecine applied, to make sure the content is **progressive** and **not interlaced**)*
   a. 23.976 progressive
   b. 25.00 progressive
   c. 25.00 interlaced
   d. 29.97 progressive
   e. 29.97 interlaced
8. **Aspect Ratio:**
   a. 4x3 if standard
   b. 16x9 if anamorphic
9. **Intra DC Precision:** 10-bit
10. **Chroma Format:** 4:2:2
11. **GOP Structure:** I-frame ONLY
12. **Closed Captioning:** As defined in section *3.3 Closed Captioning* below
13. **Stream Type:** Transport Stream

### Subtitle as a Separate File

The preferred formats for subtitles are text-based WC3 Timed Text Markup Language (.dfxp) or SubRip (.srt) formats; otherwise they must be one of the acceptable formats listed below. The subtitle file must have time code that is conformed (synced) to the digital video file asset. Raster image-based subtitles will not be accepted.

Acceptable Text-Based Subtitle Files:
- DFXP
- SRT
- SAMI
- DailyScripts
- DVD Nav

14

Exhibit 7c Page 238

- Softitler

Please ensure all subtitle files do not contain advertisements, placards, overlay branding or website link callouts.

If your text-based subtitle format is not listed above please contact NTFLX to discuss other options.

Please follow the file-naming convention specified in section *5 File-Naming Conventions*

**Closed Captioning**

## Closed Captions as Ancillary Data

This is the preferred method of delivery. The primary closed caption data must be carried within the video stream as Line21 data. For MPEG-2 video, the Line21 captions must be carried in the picture user data, as defined in "ATSC Standard: Digital Television Standard (A/53), Revision D, section 5.2."

Please ensure all caption files do not contain advertisements, placards, overlay branding or website link callouts.

## Closed Captioning as Separate File

If closed captioning must be delivered as a separate file, it must be submitted in one of the acceptable formats listed below. The closed caption file must have time code that is conformed (synced) to the digital video file asset. Raster image-based closed captioning will not be accepted.

Acceptable Closed Caption Files:
- SCC
- DFXP
- DailyScripts
- SDI Media
- Softitler
- DVD Nav

Please ensure all caption files do not contain advertisements, placards, overlay branding or website link callouts.

If your closed caption format is not listed above please contact NTFLX to discuss other options.

Please follow the file-naming convention specified in section *5 File Naming Conventions*

**Secondary Digital Assets Specifications**

**Alternate Language Audio as a Separate File**

If alternate language audio tracks are available, then they should be conformed to the primary digital audio/video asset delivered. Acceptable formats for alternate language audio tracks are stereo or multichannel AAC (in an MP4 wrapper) or AES3 LPCM audio

15

Exhibit 7c Page 239

(in a MPEG-2 Transport Stream, .mpg). Either format should be encoded at the highest possible bitrate to maintain fidelity. Please follow the file-naming convention described below.

### Acceptable Alternate Language Audio Formats

1. **Audio Codec and Container:**
   a. AAC (Low Complexity) in an MP4 container (.mp4)
2. **Bitrate:** Highest bitrate possible
3. **Sample rate:** 44.1 kHz or 48 kHz
4. **5.1 Audio Channel Mapping:**
   a. Channel 1 – Left
   b. Channel  2 – Right
   c. Channel  3 – Center
   d. Channel  4 – LFE
   e. Channel  5 – Left Surround
   f. Channel  6 – Right Surround
5. **2.0 Audio Channel Mapping:**
   a. Channel 1 – Left Total
   b. Channel 2 – Right Total

*File-Naming Conventions*

**Primary Video Asset File-Naming**

The file-naming convention for the MPEG-2 file is as follows:
**[movieID]_[framerate]_[aspectratio]_[bitrate]_[countrycode].mpg**

The country code is used to specify for which country the asset has rights. If the asset has rights for a specific country, then the 2-letter country code should be used as defined by the ISO 3166-1-alpha-2 code specifications (http://www.iso.org/iso/english_country_names_and_code_elements). If the asset has global rights, then the word "global" should be used in place of the 2-letter country code.

### Example for High-Definition Files

60011152_24_178_80_us.mpg
60028202_60i_185_80_ca.mpg
60028204_60p_178_80_global.mpg

### Example for Standard-Definition Files

60028202_24_235_50_fr.mpg

**Alternate Language Audio File-Naming**

The audio filename should follow the same file-naming convention as the primary asset file name, with the addition of channel mapping with the file name:

**[movieID]_[framerate]_[aspectratio]_[channel1]_[channel2]_..._[channelX]_[2letterLanguageCode].[ext]**

16

Exhibit 7c Page 240

**FOIA Confidential Treatment Requested**

Please use the 2-letter language codes as defined in the ISO 639-1 specifications
([http://www.loc.gov/standards/iso639-2/php/code_list.php](http://www.loc.gov/standards/iso639-2/php/code_list.php)).

The filename should match the channel mapping of the audio file.

Examples:
70106666_24_178_80_L_R_C_Lfe_Ls_Rs_ca.mp4
70106666_24_178_80_LT_RT_fr.mpg
70106667_30_178_80_L_R_C_Lfe_Ls_Rs_es.mp4

**Subtitle File-Naming**
The file-naming convention of closed caption file is as follows:

**[movieID]_[framerate]_[aspectratio]_[2letterLanguageCode].scc**
or named exactly the same as the video asset except with "_2letterLanguageCode" post-
fixed to the filename of the secondary Closed Caption (CC) file.

Please use the 2-letter language codes as defined in the ISO 639-1 specifications
([http://www.loc.gov/standards/iso639-2/php/code_list.php](http://www.loc.gov/standards/iso639-2/php/code_list.php)).

Example:
60028202_24_235_es.scc
60028202_24_235_en.srt
72343234_30_133_fr.smi
72342123_24_178_pt.smi

**Closed Caption File-Naming**
The file-naming convention of the secondary closed caption file is as follows:

**[movieID]_[framerate]_[aspectratio]_[2letterLanguageCode].scc**

Or named exactly the same as the video asset except with "_2letterLanguageCode"
post-fixed to the filename of the secondary Closed Caption (CC) file.

Please use the 2-letter language codes as defined in the ISO 639-1 specifications
([http://www.loc.gov/standards/iso639-2/php/code_list.php](http://www.loc.gov/standards/iso639-2/php/code_list.php)).

Example:
60028202_24_235_es.scc
60028202_24_235_en.scc
60028202_24_235_fr.scc
60028202_24_235_pt.scc

Exhibit 7c Page 241

FOIA Confidential Treatment Requested                                        JJMT-SEC-0005054

*Metadata*

**Movie Content Metadata**

Movie metadata is required for all content and is to be submitted via the approved
NTFLX Metadata Template to NTFLX@NTFLX.TV

All dubbed and/or subtitled content is to be accompanied with the relevant metadata in
the original and alternate language to support the source delivered.

Sample metadata files via XMLs may also be submitted and require NTFLX approval prior
to acceptance.

**Primary and Secondary Assets Metadata**

If metadata for the primary and secondary assets is available via vendor API or file
(XML,TXT, etc.), NTFLX will require access to the API or sample file for approval prior to
acceptance.

**Delivery**

**Network Delivery via Aspera**

Currently, NTFLX uses Aspera exclusively for network delivery. The Content Supplier
must push content to NTFLX via Aspera. NTFLX will not pull content.

Please be prepared to provide the following information in order to set up an Aspera
account.

- Public outbound IP address(es) for which your host(s) will use for transferring
  files to us via Aspera.
- Technical contact (name, e-mail and phone number) of the person responsible
  for setting up the Aspera connection on your end.

**Directory Structure and File Organization**

*The following folder structure must be followed to organize each group of conformed
assets. A group of conformed assets must consist of one audio/video muxed primary
digital asset and any of its other conformed digital assets.*

*Folder Structure of external hard drive:*

*E:.*
*+---[NFLXMovieID] – (directory)*
*        [DigitalAsset1a] – (file)*
*        [DigitalAsset1b] – (file)*
*        [DigitalAsset1c] – (file)*

*Example:*
*E:.*
*+---61234123*
*|   61234123_24_178_80_us.mpg*
*|   61234123_24_178_80_en.scc*
*|*

18

Exhibit 7c Page 242

**FOIA Confidential Treatment Requested**

```
+---62345234
|   62345234_24_235_80_us.mpg
|
+---7712332
|   7712332_60i_133_80_en.scc
|   7712332_60i_133_80_es.srt
|   7712332_60i_133_80_us.mpg
|
+---79661231
    79661231_30_178_50_ca.mpg
    79661231_30_178_50_en.scc
    79661231_30_178_50_fr.srt
    79661231_30_178_50_LT_RT_es.mp4
    79661231_30_178_50_L_R_C_Lfe_Ls_Rs_fr.mp4
```

***Artwork***

High-resolution images are required for every title and must be submitted a minimum of
30 days in advance of licensing start date to NTFLX via any of these options:

      a. Vendor-provided website
      b. FTP (must request access from NTFLX)
      c. Email: alebrije@alebrije.tv

Artwork is accepted in original and bilingual language formats for all content.

File-naming convention:
[NTFLXMovieID].png (or .tiff or .jpg)

If NTFLX movie ID not known, use movie title:
[MovieTitle].png (or .tiff or .jpg)

Examples:
60028202.jpg
Terminator2.jpg

Below are the requirements for submitting artwork to NTFLX. We seek the highest
quality possible to ensure optimal display for the website and NTFLX-ready devices.

| Artwork Attribute | Description |
| --- | --- |
| Image Aspect Ratio | Box art: 1:1.40 (w:h) aspect ratio. Aspect ratio tolerance: 1:35 through 1:1.45. |
| Image Height (h) | Box art: 800 pixels minimum. Higher is better. |
| Image Width (w) | Box art: Depends on image height. For example, 570 (w) x 800 (h) when art is 1:1.40. |
| Image Resolution | 150 dpi |
| Pixel Aspect Ratio | Square (1.0) |
| Color Mode | RGB Color (8-bits/channel). Conversions from CMYK are undesirable. |
| File Format | Uncompressed (.png, .tiff, etc.). JPEGs acceptable with "maximum |

Exhibit 7c Page 243

FOIA Confidential Treatment Requested

JJMT-SEC-0005056

| | quality" compression. |
|---|---|
| Black Point | RGB 0 - 0 - 0 |
| White Point | RGB 255 - 255 - 255 |
| Color Profile | No color profiles assigned (a 2.1/2.2 gamma setting on calibrated monitors is assumed). |
| Image Area | Artwork should be two-dimensional and extend over entire image area. No extraneous graphics (borders, frames, drop shadows). |
| Graphical Elements | Art should not have graphical elements (such as Now on DVD, Widescreen, Coming Soon, Available on Blu-ray, etc.). |

Exhibit 7c Page 244

FOIA Confidential Treatment Requested                                    JJMT-SEC-0005057