## Exhibit A

**Rogue Black Operating Agreement**

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**ROGUE BLACK, LLC**

**A DELAWARE LIMITED LIABILITY COMPANY**

THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 NOR REGISTERED OR QUALIFIED UNDER ANY STATE SECURITIES LAWS. SUCH SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, IN THE OPINION OF COUNSEL SATISFACTORY TO THE COMPANY, SUCH QUALIFICATION AND REGISTRATION IS NOT REQUIRED. ANY TRANSFER OF THE SECURITIES REPRESENTED BY THIS AGREEMENT IS FURTHER SUBJECT TO OTHER RESTRICTIONS, THE TERMS AND CONDITIONS OF WHICH ARE SET FORTH IN THIS AGREEMENT.

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**ROGUE BLACK, LLC**

**A DELAWARE LIMITED LIABILITY COMPANY**

This Limited Liability Company Agreement is made as of June 1, 2017, by and between the Members party hereto, with reference to the following facts:

A.     The parties desire to form Rogue Black, LLC (the "**Company**") as a limited liability company under the laws of the State of Delaware and, to that end, have caused to be filed a Certificate of Formation with the Delaware Secretary of State.

B.     The parties now desire to adopt a limited liability company agreement to govern their respective rights and obligations as members and managers of the Company.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and for other good and valuable consideration, the receipt of which is acknowledged, the parties agree that the following shall be the Limited Liability Company Agreement of the Company.

Capitalized terms used and not otherwise defined herein have the meanings set forth in Exhibit B, attached hereto.

## ARTICLE I

## ORGANIZATIONAL MATTERS

1.1     <u>Name</u>. The name of the Company shall be "Rogue Black, LLC".  The business of the Company may be conducted under that name or, upon compliance with applicable law, under any other name that the Managers deem appropriate or advisable.

1.2     <u>Term</u>. The term of the Company's existence commenced upon the filing of its Certificate of Formation with the Delaware Secretary of State on June 1, 2017 and shall continue until such time as it is terminated pursuant to ARTICLE IX.

1.3     <u>Office and Agent</u>. The principal office of the Company shall be at 850 New Burton Road, Suite 201, Dover, DE 19904, or at such other place as the Managers may determine from time to time. The Company may also have such other offices within and/or outside of the State of Delaware, as the Managers may from time to time determine. The name and business address of the agent for service of process for the Company in the State of Delaware is Cogency Global, Inc., 850 New Burton Road, Suite 201, Dover, DE 19904, or such other Person as the Managers may appoint from time to time.

1.4     <u>Purpose of Company</u>. The Company may engage in any lawful activity for which a limited liability company may be organized under the Act; however, its primary purpose shall be to finance, produce, and exploit one or more entertainment properties.

1.5     <u>Intent</u>. It is the intent of the Members that the Company shall always be operated in a manner consistent with its treatment as a "partnership" for federal and state income tax purposes.  It also is

the intent of the Members that the Company not be operated or treated as a "partnership" for purposes of Section 303 of the United States Bankruptcy Code. No Member or Manager shall take any action inconsistent with that express intent.

1.6     Members. The names, addresses, Capital Contributions and Percentage Interests of the Members as of the date of this Agreement are set forth in Exhibit A.

1.7     Formation Expenses. The Members hereby authorize the Company to pay the Company's expenses of organization and to pay or reimburse each of ▮▮▮▮ and ZJH for all fees and expenses incurred by them in connection with the formation and organization of the Company, including, without limitation, all legal and accounting fees and expenses incurred by them in connection with the negotiation, preparation, execution and delivery of this Agreement and all related agreements and instruments.  The Company shall pay all filing fees, minimum franchise or other similar taxes and other governmental charges incident to its formation and qualification to do business.

## ARTICLE II

## CAPITAL CONTRIBUTIONS

2.1     Initial Capital Contributions; Additional Capital Contributions. The Capital Contribution of each Member is set forth in Exhibit A.  No Member shall be required (or permitted) to make any additional Capital Contributions without the consent of the Managers and a Majority in Interest of the Members.

2.2     Capital Accounts. The Company shall establish and maintain an individual Capital Account for each Member.

2.3     No Priorities of Members; No Withdrawals of Capital. Except as otherwise specified in ARTICLE VI and in the Act, no Member shall have a priority over any other Member as to any Distribution, whether by way of return of capital or by way of profits, or as to any allocation of Net Profits or Net Losses. No Member shall have the right to withdraw or reduce its Capital Contributions in the Company except as a result of the dissolution of the Company or as otherwise provided in Section 3.2 or the Act, and no Member shall have the right to demand or receive property other than cash in return for its Capital Contributions.

2.4     No Interest. No Member shall be entitled to receive any interest on its Capital Contributions.

2.5     Loans; No Compensation. No Member shall be required to lend any funds to the Company and no Member shall have any personal liability for the repayment of any Capital Contribution of any other Member. No Member shall receive any interest, salary or drawing with respect to its Capital Contributions or its Capital Account or for services rendered on behalf of the Company or otherwise in its capacity as a Member, except as otherwise specifically provided in this Agreement.

## ARTICLE III

## MEMBERS

3.1     Admission of Additional Members. Subject to compliance with applicable law and to the approval of a Majority in Interest of the Members pursuant to Section 4.3, the Managers acting jointly may

admit additional Members to the Company from time to time upon such terms and conditions as the Managers may determine in his or her sole and absolute discretion.

3.2     Withdrawal or Resignation. No Member may withdraw or resign from the Company except with the prior written consent of the Managers and all other Members, which consent may be given or withheld, conditioned or delayed in the Managers' and the other Members' sole discretion.  Any such permitted withdrawal or resignation of a Member shall constitute a Membership Termination Event and, upon the occurrence thereof, that Member's Membership Interest may, at the election of the Managers, be converted to a bare Economic Interest.

3.3     Members Are Not Agents. The management of the Company is vested exclusively in the Managers.  No Member, acting solely in its capacity as a Member, may be an agent of the Company, nor may any Member, in that capacity, bind or execute any agreement, instrument or document on behalf of the Company without the prior written consent of the Managers acting jointly.

3.4     Meetings of Members; Written Consent.

(a)     Meetings.  Nothing in this Agreement is intended to require that meetings of the Members be held, it being the intent of the Members that meetings of the Members are not required.

(b)     Written Consent.  Any action which may be taken by the Members at a meeting may also be taken without a meeting if a consent in writing setting forth the action so taken is signed by Members having not less than the minimum votes that would be necessary to authorize that action at a meeting of the Members duly called and noticed at which all Members entitled to vote were present.  A consent transmitted by electronic transmission by a Member or other Person authorized to act for that Member shall be deemed to be written and signed by that Member for these purposes and the term "electronic transmission" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

3.5     Membership Interest Certificates.  The Company shall not be required to issue certificates evidencing Membership Interests to Members of the Company.

**ARTICLE IV**

**MANAGEMENT AND CONTROL OF THE COMPANY**

4.1     Management of the Company by the Managers.

(a)     Exclusive Management by the Managers.  The business, property and affairs of the Company and its subsidiaries shall be managed exclusively by the Managers acting jointly.  Except for matters as to which the approval of the Members is expressly required by the Act or Section 4.3, the Managers shall have full, complete and exclusive authority, power and discretion to manage and control the business, property and affairs of the Company and its subsidiaries, to make all decisions regarding those matters, to supervise, direct and control the actions of the officers, if any, of the Company and its subsidiaries, and to perform any and all other actions customary or incident to the management of the Company's business, property and affairs.  The Members shall have no power to participate in the management of the Company or its subsidiaries except as expressly authorized by this Agreement or except as expressly required by any non-waivable provision of the Act.  Without the written authorization of the Managers to do so, no Member shall have any power or authority to bind or act on behalf of the Company or its subsidiaries in any way, to pledge its assets or to render it liable for any purpose.

3

(b)      _Agency Authority of the Managers; Delegation by the Managers_.  Either one of the Managers, acting alone, are authorized to endorse all checks, drafts and other evidences of indebtedness made payable to the order of the Company and to execute all agreements, contracts, commitments, checks, instruments and other documents on behalf of the Company.  The Managers may also delegate any or all of their authority, rights or obligations, whether arising hereunder, under the Act or otherwise, to any one or more officers, agents or other duly authorized representatives of the Company.

(c)      _Devotion of Time_.  The Managers shall not be obligated to devote all of their time or business efforts to the affairs of the Company and they shall each devote such time, effort and skill as they deem appropriate for the management and operation of the Company's affairs.

(d)      _Decisions of the Managers_.  In order to constitute the act or decision of the Managers, any decision or action must be taken or approved by both of the Managers (whether verbally or in writing, whether in person or by proxy and whether or not at a formal meeting).  Specifically with respect to investments made by the Company in any entertainment properties, such decisions or actions related thereto may be undertaken by the signature of either one of the Managers, acting alone, provided that Manager has obtained at least verbal authorization to do so from the other Manager. The Managers may, however, delegate to any one or more Managers, acting alone, the authority to make specific decisions.  A consent, authorization, decision or action transmitted by electronic transmission by a Manager or other Person authorized to act for that Manager shall be deemed to be taken by that Manager for these purposes and the term "electronic transmission" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

(e)      _Meetings of Managers_.  Nothing in this Agreement is intended to require that meetings of the Managers be held, it being the intent of the Members that meetings of the Managers are not required.

4.2      _Election and Term of Managers_.  One of the Managers shall be designated by ▋▋ and one of the Managers shall be designated by ZJH.  Each of ▋▋ and ZJH shall have the right to change the identity of the Manager appointed by it at any time and for any reason by written notice to the other Member and each Manager so appointed shall serve in that capacity until he, she or it resigns or is removed by the Member which appointed him, her, or it, in its absolute discretion. Notwithstanding anything herein to the contrary, the failure of any Member to appoint the Manager which that Member is entitled to appoint shall limit the right of the remaining Manager to carry on the business of the Company. Initially, ▋▋ ▋▋ shall be the Manager appointed by ▋▋, and Zach Horwitz (professionally known as Zach Avery) shall be the Manager appointed by ZJH.

4.3      _Limitations on Power of the Managers_.  Notwithstanding any other provisions of this Agreement, the following actions require the affirmative vote or written consent of a Majority in Interest of the Members:

(a)      the sale, exchange or other disposition of all, or a material portion, of the Company's assets occurring as part of a single transaction or plan, or in a series of transactions, except in the orderly liquidation and winding up of the business of the Company upon its duly authorized dissolution;

(b)      any Company borrowing of money;

(c)      any alteration of the primary purpose of the Company set forth in Section 1.4;

4

(d)      any decision to place the Company into Bankruptcy;

(e)      any confession of a judgment against the Company;

(f)      any loan by the Company to any Person, any guaranty by the Company of any other Person's obligations or any investment by the Company in the business of any other Person;

(g)      the merger, consolidation or reorganization of the Company;

(h)      any decision to compromise the obligation of a Member to make a Capital Contribution or to return money or property paid or distributed in violation of the Act;

(i)      any decision to admit a Person as a Member of the Company or to issue Membership Interests or Economic Interests;

(j)      any transaction between the Company and a Member or Manager or any Affiliate of a Member or Manager, or any transaction in which a Member or Manager or any Affiliate of a Member or Manager has a financial interest; or

(k)      any amendment to the Certificate of Formation or this Agreement; provided, however, that (i) an amendment or modification increasing any liability or obligation of a Member, requiring a Member to make any contribution to the Company or changing the provisions of Sections 5.2 or 5.3 with respect to any Member will be effective only with such Member's consent, (ii) an amendment or modification reducing the required percentage of Percentage Interests or the required vote of the Managers for any consent or vote in this Agreement will be effective only with the consent or vote of Members holding the aggregate Percentage Interests theretofore required or the required vote of the Managers set forth in the relevant provision and (iii) an amendment to this Section 4.3(k) will be effective only with the consent of each Member.

For the avoidance of doubt, the Managers shall have the shall have full, complete and exclusive authority, power and discretion to approve or amend any budget adopted in connection with the operations of the Company or any of its subsidiaries, and the consent or approval of any Member shall not be required in connection with any such approval or amendment.

4.4      <u>Officers</u>.  The Managers may, at his or her discretion, appoint officers of the Company at any time to conduct, or to assist the Managers in the conduct of, the day-to-day business and affairs of the Company.  The officers of the Company may include a Chairperson, a President or Chief Executive Officer, one or more Senior Vice Presidents, one or more Vice Presidents, a Secretary, one or more Assistant Secretaries, a Chief Financial Officer, a Treasurer, one or more Assistant Treasurers and a Controller.  The officers shall serve at the pleasure of the Managers acting jointly, subject to all rights, if any, of an officer under any contract of employment.  Any individual may hold any number of offices.  Officers of the Managers may serve as officers of the Company if jointly appointed by the Managers.  The officers shall exercise such powers and perform such duties as are typically exercised by similarly titled officers in a corporation or as shall be determined from time to time by the Managers acting jointly but subject in all cases to the supervision and control of the Managers acting jointly.  If any such officer is entitled to a salary for his or her services, the payment of such salary may be paid by the Company.

4.5      <u>Competitive Activities; Company Opportunities</u>.  The Managers, the Members and their respective Affiliates, and each of the foregoing Person's respective officers, directors, equityholders, partners, members, managers, agents and employees, may engage or invest in, independently or with others, any business activity of any type or description, including without limitation those that might be the same

as or similar to the Company's business and that might be in direct or indirect competition with the Company's business. Neither the Company nor any other Manager or Member shall have the right in or to such other ventures or activities or to the income or proceeds derived therefrom. Neither the Managers nor the Members shall be obligated to present any investment opportunity or prospective economic advantage to the Company or the other Managers or Members even if the opportunity is one of the character that, if presented to the Company or the other Managers or Members, could be taken by the Company or any of the other Managers or Members. The Managers and the Members shall have the right to hold any investment opportunity or prospective economic advantage for their own account or to recommend such opportunity to Persons other than the Company or the other Managers or Members. The Members acknowledge that the Managers and the other Members and their Affiliates own or manage other businesses, including businesses that may compete with the Company and for the Managers' and Members' time. The Members hereby waive any and all rights and claims which they may otherwise have against the Managers, the other Members and their respective Affiliates, and each of the foregoing Person's respective officers, directors, equityholders, partners, members, managers, agents and employees, as a result of any such activities.

## ARTICLE V

### ALLOCATIONS OF NET PROFITS, NET LOSSES AND DISTRIBUTIONS

5.1    Special Allocations; Code Section 704(b) Compliance. In each Fiscal Year, the Company shall (a) make any required allocations to the Members under the rules of "minimum gain chargeback," "partner minimum gain chargeback," and "qualified income offset," all as set forth in the applicable Treasury Regulations under Code Section 704(b); (b) allocate "nonrecourse deductions" to the Members in proportion to their Interests as required by the applicable Treasury Regulations; and (c) allocate "partner nonrecourse deductions" as required by the applicable Treasury Regulations.

5.2    Allocation of Net Profits and Net Losses. After giving effect to the special allocations in Sections 5.1, Net Profits or Net Losses for each Fiscal Year shall be allocated to the Members in accordance with their respective Percentage Interests.

5.3    Distributable Cash. Distributable Cash shall be distributed among the Members at such times as determined by both Managers:

(a)    first, to the Members, in proportion to each Member's Adjusted Capital Contributions, until the Adjusted Capital Contributions of each is reduced to zero (0); and

(b)    second, to the Members in accordance with their respective Percentage Interests.

5.4    Tax Distributions. Prior to the dissolution of the Company, but subject to the restrictions governing distributions under the Act and the availability of Distributable Cash, as soon as practicable after the end of each Fiscal Year, the Company shall distribute to the Members in proportion to their Interests, an amount equal to the excess, if any, of (i) the Assumed Tax Rate multiplied by the federal taxable income of the Company for such Fiscal Year, over (ii) all cash Distributions made to all Interest Holders. during such Fiscal Year.  Distributions made pursuant to this Section 5.4 will be taken into account in computing subsequent Distributions to the Members so that, to the extent possible, each Member receives the same aggregate Distributions it would have received over the term of the Company had all Distributions been made solely pursuant to Sections 5.3 and 9.4.

5.5    Allocation of Net Profits and Losses in Respect of a Transferred Interest. The portion of income, gain, losses, credits, and deductions of the Company for any fiscal year during which a Membership Interest or Economic Interest is Transferred by an Interest Holder that is allocable with respect to such

interest shall be apportioned between the transferor and the transferee of such interest on whatever reasonable, consistently applied basis as is selected by the Managers and permitted by the applicable Treasury Regulations under Code Section 706.

5.6     Tax Allocation Matters. Each Member's allocable share of the taxable income or loss of the Company, depreciation, depletion, amortization and gain or loss with respect to any contributed property, or with respect to revalued property where the Company's property is revalued pursuant to Paragraph (b)(2)(iv)(f) of Section 1.704-1 of the Treasury Regulations, shall be determined in the manner (and as to revaluations, in the same manner as) provided in Section 704(c) of the Code and the Treasury Regulations thereunder.  The Company shall apply Section 704(c)(1)(A) by using the "traditional method" as set forth in Section 1.704-3(b) of the Treasury Regulations.

5.7     Allocation of Liabilities. Each Member's interest in Company profits for purposes of determining that Member's share of the Nonrecourse Liabilities of the Company, as used in Section 1.752-3(a)(3) of the Treasury Regulations, shall be equal to that Member's Percentage Interest.

5.8     Form of Distribution. No Member, regardless of the nature of its Capital Contribution, has the right to demand and receive any Distribution from the Company in any form other than money. No Member may be compelled to accept from the Company a Distribution of any asset in kind in lieu of a proportionate Distribution of money being made to other Member(s) and, except upon a dissolution and the winding up of the Company, no Member may be compelled to accept a Distribution of any asset in kind.

5.9     Amounts Withheld. If the Company, pursuant to the applicable laws of any jurisdiction, is required to withhold from a Member any amount otherwise distributable to such Member, or on the basis of income allocable to such Member, or otherwise: (a) the Company shall withhold the required amount and pay such amount over to the applicable governmental entity (including any taxing jurisdiction); (b) any amount so withheld shall be deemed to have been distributed to such Member; and (c) to the extent the amount required to be withheld is larger than the amount otherwise distributable to such Member, the excess amount shall be treated as an advance against future Distributions to such Member.

**ARTICLE VI**

**TRANSFER OF INTERESTS**

6.1     Transfer of Interests. Except as permitted in Sections 6.2 or 6.3, no Member or Economic Interest Holder shall be entitled to Transfer all or any part of its Membership Interest or Economic Interest except with the prior written consent of a Majority in Interest of the Members, which consent may be given or withheld, conditioned or delayed (as allowed by this Agreement or the Act) as such Members may determine in their sole and absolute discretion. Any attempted Transfer without such prior written consent shall be null and void *ab initio* and the transferee shall not become a Member or an Economic Interest Holder. After the consummation of any permitted Transfer of all or any part of a Membership Interest, the Membership Interest so Transferred shall continue to be subject to the terms and provisions of this Agreement and any further Transfers shall be required to comply with the terms and provisions of this Agreement.

6.2     Permitted Transfers.  Subject to the provisions of Section 6.5, the restrictions upon Transfer specified in Section 6.1 shall not apply to any Transfer of all or any part of a Member's Economic Interest to a corporation, partnership, limited liability company or other entity controlled by that Member. Any transferee(s) permitted under the preceding sentence shall hold the Transferred Economic Interest or part thereof subject to all the provisions of this Agreement.  For the purposes of this ARTICLE VI, "control" of

7

a Person means the ability, by ownership of voting securities, contract or otherwise, to direct the management and affairs of that Person.

      6.3    <u>Right of First Refusal</u>.

      (a)    <u>Bona Fide Offer; Option to Purchase</u>. If a Member (the "**Transferring Member**") decides to Transfer all or any part of its Membership Interest (the "**Offered Interest**") pursuant to a Bona Fide Offer, the Transferring Member shall give written notice to the Company and to the other Members who are not Affiliates of the Transferring Member (the "**Eligible Members**"), setting forth in full the terms of such Bona Fide Offer and the identity of the offeror(s). The Company (acting through the Managers, other than any Manager who is also the Transferring Member, or through a Majority in Interest of the non-Transferring Members, if the sole Manager is the Transferring Member) shall then have the right and option, for a period ending thirty (30) calendar days following its receipt of the written notice, to elect to purchase all or any part of the Offered Interest at the purchase price and upon the terms specified in the Bona Fide Offer and the Eligible Members, pro rata in accordance with the ratio of their Percentage Interests, shall then have the right and option, for a period ending on the earlier of (a) twenty (20) calendar days following receipt of written notice from the Company that it has elected not to purchase all of the Offered Interest and (b) fifty (50) calendar days following their receipt of the original written notice from the Transferring Member with respect to the Offered Interest, to elect to purchase all or any part of the Offered Interest not elected to be purchased by the Company at the purchase price and upon the terms specified in the Bona Fide Offer. Notwithstanding the foregoing, however, to the extent that the Company or any Eligible Member elects to purchase all or any part of the Offered Interest, that purchaser shall be entitled to set off against the purchase price otherwise payable by it hereunder the full amount of all indebtedness then owed by the Transferring Member to that purchaser (without regard to whether or not such indebtedness is then due and payable in whole or in part). If all Eligible Members do not elect to purchase the entire balance of the Offered Interest, then the Eligible Members electing to purchase shall have the right and option, for a period ending on the earlier of (a) ten (10) calendar days following receipt of written notice from the other Eligible Members that they have elected not to purchase all of the Offered Interest and (b) sixty (60) calendar days following their receipt of the original written notice from the Transferring Member with respect to the Offered Interest, and pro rata in accordance with the ratio of their Percentage Interests, to elect to purchase the balance of the Offered Interest available for purchase.

      (b)    <u>Transfer to Proposed Transferee</u>. Notwithstanding the foregoing, however, if the Company or the Eligible Members do not elect to purchase all of the Offered Interest subject to the right of first refusal pursuant to this Section 6.3, the Transferring Member may Transfer all of the Offered Interest to the original proposed transferee upon the terms set forth in the written notice provided to the Company, whereupon the original proposed transferee shall take and hold the Offered Interest subject to this Agreement and to all of the obligations and restrictions upon the Transferring Member and shall observe and comply with this Agreement and with all such obligations and restrictions. Any such Transfer of the Offered Interest to the original proposed transferee must be effected within ninety (90) calendar days after the date of the termination of the Eligible Members' options provided above. If no such Transfer is effected within the ninety (90) calendar day period, then any subsequent proposed Transfer of the Offered Interest shall once again be subject to the provisions of this Section 6.3.

      (c)    <u>Non-Cash Consideration</u>. For these purposes, if any consideration offered for the Offered Interest in the Bona Fide Offer consists of rights, interests or property other than money or an obligation to pay money, the Managers (other than any Manager who is also the Transferring Member), or a Majority in Interest of the non-Transferring Members if the sole Manager is the Transferring Member, shall, in good faith, determine the Fair Market Value of that consideration in monetary terms as of the date the Bona Fide Offer was received by the Transferring Member. The Fair Market Value of that consideration in monetary terms, as so determined, shall be included in the purchase price payable by the Company or

the purchasing Members hereunder, but, in order to exercise their rights of first refusal granted above, neither the Company nor the purchasing Members need transfer to the Transferring Member the actual rights, interests or property offered in the Bona Fide Offer nor afford the Transferring Member the same tax treatment which would have been available to it under the Bona Fide Offer.

(d)     No Transfer of Right of First Refusal. The right of first refusal set forth in this Section 6.3 may not be assigned or transferred.

6.4     Purchase Restrictions Imposed by Law. Notwithstanding anything to the contrary stated herein, the Company's right to exercise any option provided in this ARTICLE VI shall be subject to the restrictions governing prohibited Company Distributions set forth in the Act and such other pertinent federal and state laws, rules, regulations or other governmental restrictions as may now or hereafter be in effect.

6.5     Further Restrictions on Transfer. In addition to any other restrictions found in this Agreement, no Member may Transfer its Membership Interest or any part thereof (a) without compliance with the Securities Act, and any other applicable securities laws or (b) if the Transfer could result in the termination of the Company for federal or state income tax purposes or the Company not being classified as a partnership for federal or state income tax purposes, in each case as determined by both Managers. Any attempted or purported Transfer in violation of this Section 6.5 shall be null and void *ab initio*, and the transferee shall not become either a Member or an Economic Interest Holder.

6.6     Substitution of Members. Notwithstanding anything in this Agreement to the contrary, no transferee of the whole or any part of a Membership Interest shall become a substituted Member in the place of its transferor unless each of the following conditions are satisfied:

(a)     the Transferring Member and the transferee execute and acknowledge such other instrument or instruments as the Managers may deem necessary or desirable to effectuate the admission, including the written acceptance and adoption by the transferee of all of the terms and conditions of this Agreement as the same may have been amended and the spouse or registered domestic partner, if any, of the transferee executes and delivers to the Managers a consent in such form and content as the Managers may deem necessary or desirable; and

(b)     The transferee pays to the Company a transfer fee which is sufficient, in the reasonable discretion of the Managers, to cover all expenses incurred by the Company in connection with the Transfer and substitution.

6.7     Enforcement. The Transfer restrictions contained in this Agreement are of the essence of the ownership of a Membership Interest or an Economic Interest. Upon application to any court of competent jurisdiction, the Company shall be entitled to a decree against any Person violating or about to violate such restrictions, requiring their specific performance, including those requiring a Member to sell all or part of its Membership Interest to the Company or the other Members, or prohibiting a Transfer of all or part of a Membership Interest.

6.8     Effect of Transfers in Violation of Agreement. If, for any reason, a court refuses to enforce the provisions of Section 6.1 to the effect that a transfer in violation of this ARTICLE VI is null and void, then, upon any such Transfer of a Membership Interest or part thereof in violation of this ARTICLE VI, the transferee shall have no right to vote or participate in the management of the business, property and affairs of the Company or to exercise any rights of a Member. The transferee shall only be entitled to become an Economic Interest Holder to the extent of the Membership Interest attempted or purported to be Transferred to it in violation of this Agreement and thereafter shall only receive the share of the Company's Net Profits,

Net Losses, Tax Credits, Distributable Cash and other Distributions to which the Transferring Member would otherwise have been entitled.

## ARTICLE VII

## CONSEQUENCES OF MEMBERSHIP TERMINATION EVENTS

7.1     Dissolution of Company.  The occurrence of a Membership Termination Event as to any Member other than the last and only remaining Member shall not dissolve the Company.  Upon the occurrence of a Membership Termination Event as to the last and only remaining Member, the Company shall dissolve unless the personal representative or other successor-in-interest of the last and only remaining Member consents in writing within ninety (90) days of such Membership Termination Event to the continuation of the Company and to the admission of such personal representative or other successor-in-interest, or its designee or nominee, as a Member, in which case, such personal representative or other successor-in-interest shall be admitted as a Member of the Company in the place and stead of such former Member to the extent of such former Member's Membership Interest.

## ARTICLE VIII

## ACCOUNTING, RECORDS, REPORTING BY MEMBERS

8.1     Books and Records. The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, in accordance with the method of accounting selected by the Managers or as is required to be followed for federal income tax purposes. The books and records of the Company shall reflect all the Company transactions and shall be appropriate and adequate for the Company's business. The Company shall maintain each of the following at its principal office with copies available at all times during normal business hours for inspection upon reasonable notice by any Member or its authorized representatives for any purpose reasonably related to the Membership Interest of that Member: (a) a current list of the full name and last known business, residence or mailing address of each Member, Economic Interest Holder, and Managers; (b) copies of the Certificate of Formation and all amendments thereto, (c) copies of the Company's federal, state and local income tax or information returns and reports, if any, for the six (6) most recent Fiscal Years; (d) copies of this Agreement and any and all amendments thereto; (e) copies of the financial statements of the Company, if any, for the six (6) most recent Fiscal Years; and (f) the Company's books and records pertaining to the internal affairs of the Company for at least the current and past four (4) Fiscal Years; and

8.2     Reports; Annual Statements.

(a)     Governmental Reports. The Managers shall cause to be filed all documents and reports required to be filed with any governmental agency in accordance with the Act.

(b)     Tax Reports. The Company shall cause to be prepared at least annually, at the Company's expense, information necessary for the preparation of the Members' federal and state income tax returns. The Company shall send or cause to be sent to each Member within ninety (90) days after the end of each Fiscal Year such information as is necessary to complete federal and state income tax or information returns.

8.3     Bank Accounts. All funds of the Company shall be deposited in such account or accounts of the Company as may be determined by the Managers and shall not be commingled with the funds of any other Person.

8.4 <u>Tax Matters for the Company Handled by Tax Matters Partner</u>. The Managers shall have authority to cause the Company to make any and all tax elections. The Tax Matters Partner shall represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities and all administrative or judicial proceedings by the Internal Revenue Service or any government authority involving any return of the Company, and shall have the full authority of a "tax matters partner" under the Code, and may expend the Company's funds for professional services and costs associated therewith. All determinations and acts made by, and all omissions of, the Tax Matters Partner shall be final and binding on the Company and the Members in all respects and for all purposes.

8.5 <u>Accounting Matters</u>. All decisions as to accounting matters shall be made by the Managers.

8.6 <u>Revised Partnership Audit Rules Under Bipartisan Budget Act of 2015</u>.

(a) <u>No Early Adoption; Election of Non-application</u>. The Company shall not elect to have the provisions of Subchapter 63C of the Code, as amended by the Bipartisan Budget Act of 2015, P.L. 114-74 ("**New Subchapter 63C**"), apply to the Company before its general effective date, and each year for which New Subchapter 63C is effective, the Company shall duly and timely elect to have New Subchapter 63C not apply to the Company for any such year for which the Company is eligible to make such election and shall notify each Member of such election.

(b) <u>Audit Provisions under New Subchapter 63(c)</u>. If for any reason New Subchapter 63C (other than Code Section 6221(b) thereunder) applies to the Company, notwithstanding anything herein to the contrary. The Tax Matters Partner shall serve as the "partnership representative" ("**Representative**") under Code Section 6223 of New Subchapter 63C, and shall the full authority of a "partnership representative under the Code.

8.7 <u>Confidentiality</u>. All books, records, financial statements, tax returns, budgets, business plans and projections of the Company, all other information concerning the business, affairs and properties of the Company and all of the terms and provisions of this Agreement shall be held in confidence by the Managers and the Members and their respective Affiliates, subject to any obligation to comply with (a) any applicable law, (b) any rule or regulation of any legal authority or securities exchange or (c) any subpoena or other legal process to make information available to the Persons entitled thereto, provided that, to the extent permitted by applicable law, such Person has given the Company prior written notice of such disclosure and an opportunity to contest such disclosure. Such confidentiality shall be maintained to the same degree as each Manager and each Member maintains its own confidential information and shall be maintained until such time, if any, as any such confidential information either is, or becomes, generally available to the public.

**ARTICLE IX**

**DISSOLUTION AND WINDING UP**

9.1 <u>Dissolution</u>. The Company shall be dissolved, its assets disposed of and its affairs wound up upon (and only upon) the first to occur of the following:

(a) the affirmative vote or written consent of a Majority in Interest of the Members; or

(b) the occurrence of a Membership Termination Event as to the last and only remaining Member, if that Member's personal representative or other successor-in-interest fails to consent to the continuation of the Company in accordance with Section 7.1 within ninety (90) days after the occurrence of that event.

9.2     Date of Dissolution. Dissolution of the Company shall be effective on the day on which the event occurs giving rise to the dissolution, but the Company shall not terminate until the assets of the Company have been liquidated and distributed as provided herein. Notwithstanding the dissolution of the Company, prior to the termination of the Company the business of the Company and the rights and obligations of the Members, as such, shall continue to be governed by this Agreement.

9.3     Winding Up. Upon the occurrence of any event specified in Section 9.1, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets and satisfying the claims of its creditors. The Managers shall be responsible for overseeing the winding up and liquidation of the Company, shall take full account of the assets and liabilities of the Company and shall cause the Company to (a) sell or otherwise liquidate all of the Company's assets as promptly as practicable, except to the extent the Managers determine to distribute any assets to the Members in kind, (b) allocate any Net Profits or Net Losses resulting from such sales to the Members' Capital Accounts in accordance with this Agreement, (c) discharge or make reasonable provision for all liabilities of the Company, including all liabilities to the Managers and the Members to the extent permitted by law (other than liabilities for unpaid distributions to Members under the Act), and all costs relating to the dissolution, winding up and liquidation and distribution of assets, (d) establish such reserves as may be reasonably necessary to provide for contingent liabilities of the Company (for purposes of determining the Capital Accounts of the Members, the amounts of such reserves shall be deemed to be an expense of the Company), (e) discharge or make reasonable provision for any remaining liabilities of the Company to the Members, other than on account of their interests in Company capital or profits and to the Managers, and (f) distribute the remaining assets to the Members in the manner specified in Section 9.4.

9.4     Liquidating Distributions to Members. The remaining assets of the Company shall promptly be distributed to the Members in accordance with and Section 5.3.

9.5     Distributions in Kind. Any non-cash asset distributed to one or more Members shall first be valued at its Fair Market Value to determine the Net Profit or Net Loss that would have resulted if that asset had been sold for that value, the Net Profit or Net Loss shall then be allocated pursuant to ARTICLE V and the Members' Capital Accounts shall be adjusted to reflect those allocations. The amount distributed and charged to the Capital Account of each Member receiving an interest in the distributed asset shall be the Fair Market Value of the interest (net of any liability secured by the asset that the Member assumes or takes subject to). The Fair Market Value of that asset shall be determined by the Managers.

9.6     Provision for Debts and Liabilities. The payment of a debt or liability, whether the whereabouts of the creditor is known or unknown, has been adequately provided for if the payment has been provided for by either of the following means:

(a)     payment has been assumed or guaranteed in good faith by one or more financially responsible Persons or by the United States government or any agency thereof and the provision, including the financial responsibility of the Person, was determined in good faith and with reasonable care by the Managers to be adequate at the time of any distribution of the assets pursuant to Section 9.4; or

(b)     the amount of the debt or liability has been deposited as provided in Title 12, Section 1197 of the Delaware Code.

This Section 9.6 shall not prescribe the exclusive means of making adequate provision for debts and liabilities.

9.7     No Liability. Notwithstanding anything to the contrary in this Agreement, upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member

has a negative Capital Account balance (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all Fiscal Years, including the year during which such liquidation occurs), neither that Member nor the Managers or any other Member shall have any obligation to make any contribution to the capital of the Company and the negative balance of that Member's Capital Account shall not be considered a debt owed by that Member or the Managers or any other Member to the Company or to any other Person for any purpose whatsoever.

9.8     <u>Limitations on Payments Made in Dissolution</u>. Each Member shall be entitled to look only to the assets of the Company for the return of that Member's positive Capital Account balance and shall have no recourse for its Capital Contributions or share of Net Profits (upon dissolution or otherwise) against the Managers or any other Member.

9.9     <u>Certificate of Cancellation</u>. Upon completion of the winding up of the Company's affairs, the Managers shall file a Certificate of Cancellation with the Delaware Secretary of State.

9.10    <u>No Action for Dissolution</u>. The Members acknowledge that irreparable damage would be done to the goodwill and reputation of the Company if any Member should voluntarily cause a Membership Termination Event or bring an action in court to dissolve the Company under circumstances where dissolution is not required by Section 9.1. Each of the Members further acknowledges that this Agreement has been drawn carefully to provide fair treatment to all parties and equitable payment in liquidation of the Membership Interests. Accordingly, except as expressly permitted in this Agreement, no Member may take any voluntary action that directly causes the Company to dissolve and, unless the Managers fail to liquidate the Company as required by this ARTICLE IX, each Member waives and renounces its right to initiate legal action to seek the appointment of a receiver or trustee to liquidate the Company or to seek a decree of judicial dissolution of the Company on the ground that it is not reasonably practicable to carry on the business of the Company in conformity with the Certificate of Formation or this Agreement or that dissolution is reasonably necessary for the protection of the rights or interests of the complaining Member.

**ARTICLE X**

**EXCULPATION AND INDEMNIFICATION**

10.1    <u>Exculpation of Covered Persons</u>.

(a)     <u>Standard of Care</u>.  No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage or claim incurred by reason of any action taken or omitted to be taken by such Covered Person in good-faith reliance on the provisions of this Agreement, so long as such action or omission does not constitute fraud or willful misconduct by such Covered Person.

(b)     <u>Good Faith Reliance</u>. A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements (including financial statements and information, opinions, reports or statements as to the value or amount of the assets, liabilities, Net Profits or Net Losses of the Company or any facts pertinent to the existence and amount of assets from which Distributions might properly be paid) of the following Persons or groups: (i) another Manager; (ii) one or more officers or employees of the Company; (iii) any attorney, independent accountant, appraiser or other expert or professional employed or engaged by or on behalf of the Company; or (iv) any other Person selected in good faith by or on behalf of the Company, in each case as to matters that such relying Person reasonably believes to be within such other Person's professional or expert competence. The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in the Act.

10.2    <u>Liabilities and Duties of Covered Persons</u>.

(a)    <u>Limitation of Liability</u>. This Agreement is not intended to, and does not, create or impose any fiduciary duty on any Covered Person. Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by applicable law and, in doing so, acknowledges and agrees that the duties and obligations of each Covered Person to each other and to the Company are only as expressly set forth in this Agreement. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person. The debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company and no Covered Person shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Covered Person.

(b)    <u>Duties</u>. Whenever in this Agreement a Covered Person is permitted or required to make a decision (including a decision that is in such Covered Person's "discretion" or under a grant of similar authority or latitude), the Covered Person shall be entitled to consider only such interests and factors as such Covered Person desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person.

10.3    <u>Indemnification</u>.

(a)    <u>Indemnification</u>. To the fullest extent permitted by the Act, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution or replacement only to the extent that such amendment, substitution or replacement permits the Company to provide broader indemnification rights than the Act permitted the Company to provide prior to such amendment, substitution or replacement), the Company shall indemnify, hold harmless, defend, pay and reimburse any Covered Person against any and all losses, claims, damages, judgments, fines or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines or liabilities, and any amounts expended in settlement of any claims (collectively, "**Losses**") to which such Covered Person may become subject by reason of:

(i)    any act or omission or alleged act or omission performed or omitted to be performed on behalf of the Company, any Member or any direct or indirect subsidiary of the foregoing in connection with the business of the Company; or

(ii)    the fact that such Covered Person is or was acting in connection with the business of the Company as a partner, member, equityholder, controlling Affiliate, manager, director, officer, employee or agent of the Company, any Member or any of their respective controlling Affiliates or that such Covered Person is or was serving at the request of the Company as a partner, member, manager, director, officer, employee or agent of any Person including the Company or any subsidiary of the Company;

*provided*, that (A) such Covered Person acted in good faith and in a manner believed by such Covered Person to be in, or not opposed to, the best interests of the Company and, with respect to any criminal proceeding, had no reasonable cause to believe their conduct was unlawful, and (B) such Covered Person's conduct did not constitute fraud or willful misconduct, in either case as determined by a final, nonappealable order of an arbitrator or a court of competent jurisdiction. In connection with the foregoing, the termination of any action, suit or proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that (x) the Covered Person did not act in good faith, (y) with respect to any criminal proceeding, had reasonable cause to believe that

such Covered Person's conduct was unlawful or (z) that the Covered Person's conduct constituted fraud or willful misconduct.

(b)     Reimbursement. The Company shall promptly reimburse (or advance to the extent reasonably required) each Covered Person for reasonable legal or other expenses (as incurred) of such Covered Person in connection with investigating, preparing to defend or defending any claim, lawsuit or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this Section 10.3; provided, that if it is finally determined by an arbitrator or a court of competent jurisdiction that such Covered Person is not entitled to the indemnification provided by this Section 10.3, then such Covered Person shall promptly reimburse the Company for any reimbursed or advanced expenses.

(c)     Entitlement to Indemnity. The indemnification provided by this Section 10.3 shall not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement or otherwise. The provisions of this Section 10.3 shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this Section 10.3 and shall inure to the benefit of the executors, administrators, legatees and distributees of such Covered Person.

(d)     Insurance. To the extent available on commercially reasonable terms, the Company may purchase, at its expense, insurance to cover Losses covered by the foregoing indemnification provisions and to otherwise cover Losses for any breach or alleged breach by any Covered Person of such Covered Person's duties in such amount, and with such deductibles, as the Managers may determine; provided, that the failure to obtain such insurance shall not affect the right to indemnification of any Covered Person under the indemnification provisions contained herein, including the right to be reimbursed or advanced expenses or otherwise indemnified for Losses hereunder. If any Covered Person recovers any amounts in respect of any Losses from any insurance coverage, then such Covered Person shall, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to such Covered Person by the Company in respect of such Losses.

(e)     Funding of Indemnification Obligation. Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in this Section 10.3 shall be provided out of, and to the extent of, Company assets only and no Member (unless such Member otherwise agrees in writing) shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity by the Company.

(f)     Savings Clause. If this Section 10.3 or any portion hereof shall be invalidated on any ground by any arbitrator or court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this Section 10.3 to the fullest extent permitted by any applicable portion of this Section 10.3 that shall not have been invalidated and to the fullest extent permitted by applicable law.

(g)     Amendment. The provisions of this Section 10.3 shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this Section 10.3 is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound. No amendment, modification or repeal of this Section 10.3 that adversely affects the rights of a Covered Person to indemnification for Losses incurred or relating to a state of facts existing prior to such amendment, modification or repeal shall apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Losses without the Covered Person's prior written consent.

10.4    Survival. The provisions of this ARTICLE X shall survive the dissolution, liquidation, winding up and termination of the Company.

## ARTICLE XI

## MISCELLANEOUS

11.1    Amendments. No amendment to this Agreement may be made without compliance with Section 4.34.3(k).  All amendments to this Agreement must be in writing.

11.2    Offset Privilege. Any monetary obligation owing from the Company to any Member or Manager may be offset by the Company against any monetary obligation then owing from that Member or Manager to the Company.

11.3    Arbitration.

(a)    General. In the event of any dispute, claim or controversy among the parties arising out of or relating to this Agreement or the Certificate of Formation, whether in contract, tort, equity or otherwise, and whether relating to the meaning, interpretation, effect, validity, performance or enforcement of this Agreement or the Certificate of Formation, such dispute, claim or controversy shall be resolved by and through an arbitration proceeding to be conducted under the auspices and the commercial arbitration rules of JAMS (or any like organization successor thereto) in Los Angeles, California. The arbitrability of the dispute, claim or controversy shall likewise be determined in the arbitration. The arbitration proceeding shall be conducted in as expedited a manner as is then permitted by the commercial arbitration rules (formal or informal) of JAMS. Both the foregoing agreement of the parties to arbitrate any and all such disputes, claims and controversies, and the results, determinations, findings, judgments or awards rendered through any such arbitration, shall be final and binding on the parties and may be specifically enforced by legal proceedings in any court of competent jurisdiction.

(b)    Governing Law. The arbitrator(s) shall follow any applicable federal law and Delaware state law (with respect to all matters of substantive law) in rendering an award.

(c)    Costs of Arbitration. The cost of the arbitration proceeding and any proceeding in court to confirm or to vacate any arbitration award, as applicable (including, without limitation, each party's reasonable, documented and out-of-pocket attorneys' fees and costs), shall be borne by the unsuccessful party or, at the discretion of the arbitrator(s), may be prorated between the parties in such proportion as the arbitrator(s) determine(s) to be equitable and shall be awarded as part of the arbitrators' award.

11.4    Remedies Cumulative. Except as otherwise provided herein, the remedies under this Agreement are cumulative and shall not exclude any other remedies to which any Person may be lawfully entitled.

11.5    Notices. Any notice to be given to the Company or any Member, Economic Interest Holder or Manager in connection with this Agreement must be in writing, signed by the sender and will be deemed to have been given and received: (a) when delivered to the address specified by the party to receive the notice by courier or other means of personal service; (b) when received if sent by facsimile, portable document format or other form of electronic transmission (as defined in the Act); or (c) three (3) days after deposit of the notice by first class mail, postage prepaid, or certified mail, return receipt requested. Any such notice must be given to the Company at its principal place of business, and to any Member, Economic Interest Holder or Manager at the address specified in Exhibit A. Any party may, at any time by giving five (5) days' prior written notice to the other parties, designate any other address as the new address to which

notice must be given. In the case of notice by facsimile, portable document format or other form of electronic transmission, a copy thereof shall be personally delivered or sent by registered or certified mail, in the manner specified above, within three (3) business days thereafter.

11.6 <u>Attorneys' Fees</u>. Subject to the provisions of Section 11.3 requiring that disputes be submitted to arbitration, in the event that any dispute between the Company, the Members or the Managers should result in litigation, the prevailing party in that dispute shall be entitled to recover from the other party all reasonable, documented and out-of-pocket fees, costs and expenses of enforcing any right of the prevailing party, including without limitation, reasonable, documented and out-of-pocket attorneys' fees and expenses.

11.7 <u>Governing Law; Jurisdiction</u>. The Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to any conflicts of laws principles of the State of Delaware or any other jurisdiction that would call for the application of the law of any jurisdiction other than the State of Delaware. Subject to the requirement that all disputes are to be submitted to arbitration pursuant to Section 11.3, each Member and Manager consents to the exclusive jurisdiction of the state and federal courts setting in Los Angeles, California in any action on a claim arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement. Each Member and Manager further agrees that personal jurisdiction over it may be effected by service of process by registered or certified mail addressed as provided in Section 11.5 and that when so made shall be as if served upon it personally.

11.8 <u>Complete Agreement</u>. This Agreement and the Certificate of Formation constitute the complete and exclusive statement of agreement among the Members and Managers with respect to their respective subject matters and supersede all prior and contemporaneous written and oral agreements or statements by and among the Members and Managers. No representation, statement, condition or warranty not contained in any such agreement shall be binding on the Members or Managers or have any force or effect whatsoever.

11.9 <u>No Third Party Rights</u>. No Person other than a Member, Manager or a Person entitled to indemnification pursuant to ARTICLE X shall have any legal or equitable right, remedy or claim, or be a beneficiary, under or in respect of this Agreement.

11.10 <u>Binding Effect</u>. Subject to the provisions of this Agreement relating to Transfers, this Agreement shall be binding upon and inure to the benefit of the Members and Managers and their respective permitted successors and assigns.

11.11 <u>Article and Section Headings</u>. All Article, Section and Exhibit headings contained in this Agreement are inserted only for convenience of reference and are not to be considered in the interpretation or construction of any provision of this Agreement.

11.12 <u>Interpretation</u>. In the event any claim is made by any Member or Manager relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or Manager or that Member's or Manager's counsel.

11.13 <u>Severability</u>. If any provision of this Agreement or the application of that provision to any Person or circumstance shall be held invalid, the remainder of this Agreement, or the application of that provision to Persons or circumstances other than those to which it is held invalid, shall not be affected and such provision shall not be affected thereby in any other jurisdiction.

11.14   <u>Multiple Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

[*Remainder of Page Left Intentionally Blank; Signature Page Follows*]

IN WITNESS WHEREOF, all of the Members and Managers of the Company have executed this Agreement, effective as of the date first written above.

MEMBER:

Its: Authorized Signatory

MEMBER:

ZJH ENTERPRISE LLC

By: Zach Horwitz (professionally known as Zach Avery)
Its: Authorized Signatory

MANAGERS:

Its: Authorized Signatory

ZJH ENTERPRISE LLC

By: Zach Horwitz (professionally known as Zach Avery)
Its: Authorized Signatory

## EXHIBIT A
### NAMES, ADDRESSES, CAPITAL CONTRIBUTIONS AND PERCENTAGE INTERESTS OF MEMBERS AND NAME AND ADDRESS OF MANAGER AS OF

### JUNE 1, 2017

| Member's Name | Member's Address | Member's Capital Contribution | Member's Percentage Interest |
|---|---|---|---|
| ███████ | ███████ | Certain services to be provided by the Member to the Company from time to time. | 50% |
| ZJH Enterprise LLC | 341 N Crescent Heights Blvd Los Angeles, CA 90048 | Certain services to be provided by the Member to the Company from time to time. | 50% |

| Manager's Name | Manager's Address |
|---|---|
| ███████ | ███████ |
| ZJH Enterprise LLC | 341 N Crescent Heights Blvd Los Angeles, CA 90048 |



EXHIBIT B
**Definitions and Rules of Construction**

**Definitions.**  When used in this Agreement, the following terms not otherwise defined herein have the following meanings:

"**Act**" means the Limited Liability Company Act of the State of Delaware.

"**Adjusted Capital Account**" of a Member means the Capital Account of that Member increased by the Member's share of Company Minimum Gain and Member Minimum Gain.

"**Adjusted Capital Contribution**" of a Member as of any date of determination means the excess of (a) that Member's Capital Contribution as of that date over (b) the sum of all prior Distributions to that Member pursuant to Sections 5.3(a) and 9.4.

"**Affiliate**" of a Member or Manager means (a) a Person directly or indirectly (through one or more intermediaries) controlling, controlled by or under common control with that Member or Manager; (b) a Person owning or controlling ten percent (10%) or more of the outstanding voting securities or beneficial interests of that Member or Manager; or (c) an officer, director, partner or member, or a member of the immediate family of an officer, director, partner or member, of that Member or Manager; provided, however, that (i) neither the Company nor any of its subsidiaries will be deemed an Affiliate of a Member or Manager and (ii) neither a Member nor a Manager nor any of their respective Affiliates will be deemed an Affiliate of the Company or any of the Company's subsidiaries. For these purposes "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" means this Limited Liability Company Agreement of Rogue Black, LLC, as originally executed and as amended from time to time.

"▓▓▓▓▓" means ▓▓▓▓▓▓▓▓▓▓▓▓ or any permitted successor-in-interest to its entire Membership Interest.

"**Assumed Tax Rate**" means the highest effective marginal combined federal, state and local income tax rate applicable to an individual or corporation resident in Los Angeles, California or New York, New York (as applicable), taking into account the character (e.g., long-term or short-term capital gain or ordinary or tax-exempt) of the applicable income and the deductibility of state and local income tax for federal income tax purposes and by assuming all such items are allocable solely to Los Angeles, California or New York, New York (as applicable).

"**Bankruptcy**" of a Member means the institution of any proceedings under any federal or state law for the relief of debtors, including the filing by or against that Member of a voluntary or involuntary case under the United States Bankruptcy Code, which proceedings, if involuntary, are not dismissed within sixty (60) days after their filing; an assignment of the property of that Member for the benefit of creditors; the appointment of a receiver, trustee or conservator of any substantial portion of the assets of that Member, which appointment, if obtained ex parte, is not dismissed within sixty (60) days thereafter; the seizure by a sheriff, receiver, trustee or conservator of any substantial portion of the assets of that Member; the failure by that Member generally to pay its debts as they become due within the meaning of Section 303(h)(1) of the United States Bankruptcy Code, as determined by the Bankruptcy Court; or that Member's admission in writing of its inability to pay its debts as they become due.

"**Bona Fide Offer**" means an offer in writing to a Member offering (subject to no financing contingencies) to purchase all or any part of that Member's Membership Interest or any interest therein and setting forth all of the material terms and conditions of the proposed purchase from an offeror who is ready, willing and able to consummate the purchase and who is neither the Company nor an Affiliate of that Member.

"**Capital Account**" of a Member means the capital account of that Member determined from the inception of the Company strictly in accordance with the rules set forth in Section 1.704-1(b)(2)(iv) of the Treasury Regulations.

"**Capital Contribution**" of a Member means each amount of money or the gross Fair Market Value of each property on the date contributed (net of any liability assumed by the Company to which that property is subject as determined by the Manager in their sole and absolute discretion) which that Member contributes to the capital of the Company in accordance with the provisions of ARTICLE II.

"**Certificate of Formation**" means the Certificate of Formation of the Company as filed under the Act with the Delaware Secretary of State, as the same may be amended from time to time.

"**Code**" means the Internal Revenue Code of 1986.

"**Company**" has the meaning specified in Recital A.

"**Covered Persons**" means (a) each Member, (b) each officer, director, shareholder, partner, member, controlling Affiliate, employee, agent or representative of each Member and each of their controlling Affiliates and (c) the Manager and each officer of the Company.

"**Disability**" of a Member means any physical or mental disability or impairment that renders that Member unable to function in a reasonably effective manner as a Member of the Company including, without limitation, to make decisions or vote as a Member on matters coming before the Members for a vote.

"**Distributable Cash**" at any time means that portion of the cash then on hand or in bank accounts of the Company available for distribution to the Members, taking into account (a) the amount of cash required for the payment of all current expenses, liabilities and obligations of the Company (whether for expense items, capital expenditures, improvements, retirement of indebtedness or otherwise) and (b) the amount of cash necessary to establish prudent reserves for the payment of future capital expenditures, improvements, retirements of indebtedness, operations and contingencies, known or unknown, liquidated or unliquidated, including, but not limited to, liabilities which may be incurred in litigation and liabilities undertaken pursuant to the indemnification provisions of this Agreement.

"**Distribution**" means the transfer of money or property by the Company to one or more Members without separate consideration.

"**Economic Interest**" means a share, expressed as a percentage, of one or more of the Company's Net Profits, Net Losses, Tax Credits, Distributable Cash or other Distributions, but does not include any other rights of a Member, including, without limitation, the right to vote or participate in the management of the Company or the right to information concerning the business and affairs of the Company.

"**Economic Interest Holder**" means a Person who is not a Member but holds merely an Economic Interest.

"**Eligible Members**" has the meaning specified in Section 6.3(a).

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**Fair Market Value**" means, with respect to an asset, the price at which that asset would be sold for cash payable at closing between a willing buyer and a willing seller, each having reasonable knowledge of all relevant facts concerning the asset and neither acting under any compulsion to buy or sell.

"**Fiscal Year**" means the Company's taxable year, which shall be the calendar year or such other taxable period as required by Section 706 of the Code.

"**Losses**" has the meaning specified in Section 10.3(a).

"**Majority in Interest**" of all the Members means Members holding Percentage Interests which, taken together, exceed fifty percent (50%) of the aggregate of all Percentage Interests held by all Members entitled to vote or grant consent with respect to the matter in question.

"**Manager(s)**" means the one or more managers of the Company selected by the Members pursuant to Section 4.2 and shall be deemed to refer to the sole Manager at all times when there exists only one Manager.

"**Member**" means each Person who (a) is an initial signatory to this Agreement, has been admitted to the Company as a Member in accordance with the Certificate of Formation or this Agreement or is a transferee of a Member who has become a Member in accordance with ARTICLE VI and (b) has not suffered a Membership Termination Event.

"**Membership Interest**" means a Member's total interest as a Member of the Company, including that Member's share of the Company's Net Profits, Net Losses, Tax Credits, Distributable Cash or other Distributions, its right to inspect the books and records of the Company and its right, to the extent specifically provided in this Agreement or in the Act and not otherwise restricted herein, to participate in the business, affairs and management of the Company and to vote or grant consent with respect to matters coming before the Company.

"**Membership Termination Event**" with respect to any Member means one or more of the following:  the insanity, Disability, withdrawal, resignation, Bankruptcy or death of that Member which does not result in a Transfer of that Member's Membership Interest in accordance with the provisions of ARTICLE VI or the occurrence of any other event which terminates the continued membership of that Member in the Company, other than a Transfer of that Member's Membership Interest made in accordance with the provisions of ARTICLE VI.

"**Net Profits**" and "**Net Losses**" means, for each fiscal period, the taxable income and taxable loss, respectively, of the Company determined strictly in accordance with federal income tax principles (including items required to be separately stated, taking into account income that is exempt from federal income taxation, items that are neither deductible nor chargeable to a Capital Account, and rules governing depreciation and amortization), except that in computing taxable income or taxable loss, the "book" value of an asset will be substituted for its adjusted tax basis if the two differ; and the items specially allocated pursuant to Section 5.1 shall be excluded from the computation.

"**New Subchapter 63C**" has the meaning specified in Section 8.6(a).

"**Offered Interest**" has the meaning specified in Section 6.3.

"**Percentage Interest**" means the percentage interest of a Member set forth opposite the name of that Member in Exhibit A, as such percentage may be adjusted from time to time pursuant to the provisions of this Agreement.

"**Person**" means any entity, corporation, company, association, joint venture, joint stock company, partnership (whether general, limited or limited liability), trust, limited liability company, real estate investment trust, organization, individual (including any personal representative, executor or heir of a deceased individual), nation, state, government (including any agency, department, bureau, board, division or instrumentality thereof), trustee, receiver or liquidator.

"**Representative**" has the meaning specified in Section 8.6.

"**Securities Act**" means the Securities Act of 1933.

"**Tax Credits**" means all credits against income or franchise taxes and credits allowable to Members under state, federal or other tax statutes.

"**Tax Matters Partner**" means ███████ or any successor in interest to ███████ 's entire Membership Interest, except as otherwise provided in Section 8.4.

"**Transfer**" means, with respect to a Membership Interest, an Economic Interest or any interest therein, the sale, assignment, transfer, disposition, pledge, hypothecation or encumbrance, whether direct or indirect, voluntary, involuntary or by operation of law, and whether or not for value, of (a) all or any part of that Membership Interest, Economic Interest or interest therein or (b) a controlling interest in any Person which directly or indirectly through one or more intermediaries holds that Membership Interest, Economic Interest or interest therein. Transfer includes any transfer as a result of or in connection with any property settlement or judgment incident to a divorce, dissolution of marriage or separation, and any transfer by decree of distribution or other court order in proceedings arising from the death of any Member or such Member's spouse.

"**Transferring Member**" has the meaning specified in Section 6.3(a).

"**Treasury Regulations**" means the regulations promulgated by the United States Treasury Department pertaining to the federal income tax.

"**United States Bankruptcy Code**" means the United States Bankruptcy Code at Title 11, United States Code.

References in this Agreement to "Articles," "Sections," "Exhibits" and "Schedules" shall be to the Articles, Sections, Exhibits and Schedules of this Agreement, unless otherwise specifically provided; the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; the word "or" is not exclusive; all Exhibits and Schedules to this Agreement are incorporated herein by reference; any of the terms used in this Agreement may, unless the context otherwise requires, be used in the singular or the plural and in any gender depending on the reference; the words "herein", "hereof" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement; and except as otherwise specified in this Agreement, all references in this Agreement (a) to any Person shall be deemed to include such Person's heirs, personal representatives, successors and permitted assigns; (b) to any agreement, any document or any other written instrument shall be a reference to such agreement, document or instrument together with all exhibits, schedules, attachments and appendices thereto, and in each case as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof; (c) to any law,

statute or regulation shall be deemed references to such law, statute or regulation as the same may be supplemented, amended, consolidated, superseded or modified from time to time; and (d) to any law, shall be deemed to include any regulations promulgated thereunder.

"**ZJH**" means ZJH Enterprise LLC or any permitted successor-in-interest to its entire Membership Interest.