Terence G. Banich (SBN 212173)
terence.banich@katten.com
Allison E. Yager (admitted *pro hac vice*)
allison.yager@katten.com
**KATTEN MUCHIN ROSENMAN LLP**
525 W. Monroe St.
Chicago, IL 60661
Telephone: (312) 902-5200
Facsimile: (312) 902-1061

*Attorneys for the Receiver*
Michele Vives

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>ZACHARY J. HORWITZ; and 1inMM CAPITAL, LLC,<br><br>Defendants. | Case No. 2:21-cv-02927-CAS(GJSx)<br><br>**QUARTERLY REPORT OF RECEIVER MICHELE VIVES (SECOND QUARTER 2022)**<br><br>Judge:     Hon. Christina A. Snyder<br>Courtroom: 8D |

# TABLE OF CONTENTS

I.   GENERAL RECEIVERSHIP UPDATE ..................................................................2

    A.   Confirmation of the Ponzi Scheme ..............................................................2

    B.   General Update .............................................................................................3

    C.   Update on the Status of Known Assets ........................................................4

        1.   The Receiver Discovers Additional Film Investments ............................4

        2.   9615 Bolton Road Furniture ....................................................................5

        3.   Rogue Black ..............................................................................................6

        4.   LayJax ........................................................................................................7

    D.   Accounting of Receipts and Disbursements ................................................8

    Attached as Exhibit "E" is a copy of the Standard Fund Accounting Report. Below is a summary of the cash receipts and disbursements from the estate on a cash accounting basis. .....................8

        1.   Cash Receipts ............................................................................................8

        2.   Cash Disbursements ..................................................................................8

        3.   Cash on Hand ............................................................................................8

II.  INVESTIGATION AND PURSUIT OF UNKNOWN ASSETS ...................................9

    A.   Forensic Accounting Discoveries .................................................................9

    B.   Status of Obtaining Bank Records and Other Requests for Information ............10

    C.   Tolling Agreements ....................................................................................10

    D.   Potential Litigation......................................................................................11

III. DETERMINING INVESTORS AND THE ANTICIPATED RECOVERY PROCESS ................................................................................................................12

    A.   Progress Made Identifying 1inMM Investors and Aggregators .........................12

    B.   Website Launch ..........................................................................................12

    C.   Litigation Commenced by End-Investors ..................................................13

IV.  CONCLUSION……………………………………………………………………...15

KATTEN MUCHIN ROSENMAN LLP
525 W. MONROE ST.
CHICAGO, IL 60661
(312) 902-5200

Michele Vives, the duly appointed permanent receiver (the "Receiver") of 1inMM Capital, LLC and its subsidiaries and affiliates ("1inMM"), and over assets that are attributable to funds derived from investors or clients of the Defendants or were fraudulently transferred by the Defendants (collectively, the "Receivership Estate"), pursuant to Local Rule 66-6 and the *Order on Appointment of a Permanent Receiver* ("Order of Appointment") entered on January 14, 2022, hereby submits this quarterly report (the "Report") for the period April 1, 2022 through June 30, 2022 (the "Second Quarter"). The Report details the Receiver's activities and findings during the Second Quarter to protect and administer the receivership estate, identify new assets and lay out the Receiver's general strategy to maximize the recovery for the benefit of harmed investors.

## I.   GENERAL RECEIVERSHIP UPDATE

### A.   Confirmation of the Ponzi Scheme

Over the past 5.5 months, the Receiver has reviewed thousands of pages of documents, interviewed dozens of individuals, and reviewed tens of thousands of pages of financial statements related to 1inMM. From this review, it has become unmistakably clear that, as has been asserted by the Securities and Exchange Commission and the Department of Justice, 1inMM was a Ponzi scheme with no legitimate underlying central business. Remarkably, however, and different from other Ponzi schemes, 1inMM appears to have started out as a Ponzi scheme from the beginning instead of developing into one when financial hardships were encountered.

The forensic accounting work performed by the Receiver and her team has revealed that Horwitz, through 1inMM, was using new monies invested with 1inMM to pay the interest and principal owed to older investors starting as far back as 2013. Horwitz also used a line of credit provided by City National Bank to provide liquidity to his scheme. In the beginning, a new investor would invest by wiring funds to 1inMM's bank account. Horwitz would then transfer the funds to his

personal account, where the monies would either be used for personal purposes, or to perpetuate the Ponzi scheme such as by paying down the line of credit. When an investor would need to be paid out, Horwitz would pay the investor using funds from prior investors, often by drawing down on the line of credit to provide the needed liquidity. As the Ponzi scheme progressed, and cash crunches became frequent, new patterns developed.

To illustrate, the Receiver submits as Exhibit "A" hereto the 1inMM bank account activity on August 1, 2019. The initial bank balance is just $83,017. That day, a wire is received for $1,336,590 from a new investment. Soon thereafter, a wire for $976,667 is sent to pay off an old investment. Later that day, another new investment is received for $892,010 and, again, soon thereafter, a wire for $986,364 is sent to pay off an old investment. Given the initial balance of $83,017, the two investment payoffs occurring that day would not have been possible without the infusion from new investor dollars. This is just one example, on one day. Similar patterns are seen time and time again. The Receiver will be able to provide a more complete itemization and mapping of the Ponzi scheme once her forensic accounting work reaches more advanced stages.

While 1inMM did not appear to have any significant, non-Ponzi related business, Horwitz did make various investments made into other companies and film productions using 1inMM dollars. These amounts, however, were relatively small— only about 3% of the overall funds invested with 1inMM. Conversely, 97% of the funds invested in 1inMM appear to have been used towards perpetuating the Ponzi scheme or other illegitimate uses.

**B.    General Update**

The Receiver's primary goal over the last several months has been to gather and compile all relevant information with a focus on two main objectives: 1) administering and maximizing the value of the currently known assets, and 2) identifying and locating additional new assets as quickly as possible. With regard to

the first objective, the initial size of the estate is limited in terms of monetary value when compared to the overall magnitude of the scheme. The Receiver has consistently been sensitive to this fact.

As is typical with Ponzi scheme receiverships, the initial months are front loaded with a flurry of activity necessary to understand the case, assess the current status of operations, locate assets, and develop a strategy to maximize the recovery for the estate. These endeavors take time and investment to synthesize. Conversely, the recovery for the receivership estate is typically backloaded as the recovery strategy, monetization and litigation takes hold and is brought to fruition. This axiom holds true for this case.

To maximize the estate's recovery, the Receiver and her team have invested time and effort to perform a forensic accounting – detailing over $2 billion in transactions – to determine where assets were siphoned, and to develop a strategy to recover as much of them as possible. One recent example of the forensic accounting process bearing fruit, and which will be discussed in more detail further below, is the Receiver's discovery that Horwitz invested approximately $13 million of 1inMM funds into eight film projects. The Receiver is also working on compiling a list of potential litigation targets. While litigation will likely require upfront time and expense, the Receiver believes it ultimately will lead to a larger recovery for the harmed investors.

  **C.**  **Update on the Status of Known Assets**

As outlined in the Receiver's first quarterly report (the "First Report"), the known assets of the estate were initially limited to the sale proceeds of a residential home, a small investment in a film production company, and a minor investment in an angel investment venture. As detailed below, the Receiver now has a much more thorough understanding of the pool of known and recoverable assets.

  *1.*  *The Receiver Discovers Additional Film Investments*

As a result of the Receiver's forensic accounting investigation, the Receiver

and her staff have identified five additional entities that received more than $13.1 million from 1inMM. These entities are believed to have funded the production of an additional eight previously unknown films. The Receiver continues to investigate these entities, the films, and the best avenue to efficiently maximize the recovery from these investments. The Receiver believes it prudent not to include any additional details on these entities and films in this report so as not to impede, jeopardize, or hamper her investigation. Once additional information has been confirmed, the Receiver will share the relevant information in a future quarterly report.

### 2. *9615 Bolton Road Furniture*

Early in the receivership, the Receiver discovered that, as a result of the sale of Horwitz's home, located at 9615 Bolton Road, Los Angeles, CA 90034 (the "Bolton Property"), the furniture and other household items formerly there were placed into two separate storage units (the "Bolton Furniture"). The Receiver tracked down the location of the storage units and gained control over them near the beginning of the Second Quarter.

After an initial review, the Receiver confirmed the storage units contained various pieces of high-end furniture that previously furnished the Bolton Property. Attached as Exhibit "B" is a copy of an inventory of the contents of the two storage units. The Receiver determined it was in the best interest of the estate to efficiently liquidate the furniture – as storage costs continued to accrue at a monthly clip of $1,550.00 – via auction. To that end, and pursuant to her authority under the Order of Appointment, the Receiver engaged Tranzon Assets Solutions and ThreeSixty Asset Advisors (collectively, the "Auctioneers") to develop and execute a strategy to liquidate the Bolton Furniture. Attached as Exhibit "C" is a copy of the Auctioneers' proposal. Attached as Exhibit "D" is a copy of the agreement executed by the Receiver and the Auctioneers.

The live online auction opened on Friday, July 29, 2022 at 5:00 pm PT and

will continue through August 9, 2022 at 11:00 am PT. A link to the auction can be found at https://360assetadvisors.com/events/secvhorwitz/. The terms of the auction are online bidding only, no in-person preview, 25% buyer's premium, payments due within 72 hours by credit card or wire transfer only, no shipping services, one week removal window (i.e., August 15-19) by appointment only and invoice and matching ID required at pickup. The Receiver will provide an update regarding the results of the auction in the next quarterly report, or as otherwise requested by the Court.

### 3. *Rogue Black*

Rogue Black, LLC ("Rogue Black") is a film company in which Horwitz owned a membership interest that financed and produced independent films. Other than Horwitz's association, Rogue Black itself is not believed to have been involved with the fraudulent conduct alleged in this action. This investment, along with the investment in LayJax referenced below, were initially the only known investments with legitimate, underlying businesses made within the 1inMM Ponzi scheme. Although Rogue Black's operations appear to have been legitimate, Horwitz's reasons for investing were not. As supported by a consulting agreement executed by 1inMM, a significant purpose of the investment in Rogue Black was to further Horwitz's career as an actor by providing him opportunities to engage with industry filmmakers and production entities beneficial to establishing his own career in the entertainment industry. Of the eight films produced by Rogue Black, Horwitz had an acting role in at least two.

Ultimately, 1inMM invested approximately $20 million with Rogue Black, which went on to produce and complete a total of eight films (collectively, the "Produced Films"). As is typical in film productions, however, other investors or lenders were also involved in funding many of the Produced Films. Film accounting is also notoriously complex, making it difficult to estimate future recovery from these films as distribution sales are made around the world. To this end, the Receiver has engaged Ray Reyes, an attorney specializing in film distribution and distressed

film libraries, to assist in determining what the estate may be owed in distributions on account of the Produced Films, how to best recover the monies Rogue Black is owed from these films, and ultimately what the value of the film library would be if their ownership rights were sold. Mr. Reyes is in the midst of drafting his report, and the Receiver will share its principal findings in her next report.

### 4. *LayJax*

LayJax Ventures, LLC ("LayJax") is an angel investment company which invested in early startup business ventures. Similar to Rogue Black, LayJax is not believed to have been involved with the fraudulent conduct alleged in this action. Originally, the Receiver believed that 1inMM had invested $2.5 million into LayJax, which LaxJay in turn invested in twelve different startup business ventures (collectively, the "LayJax Investments").

The businesses in which LayJax invested are broad and diverse. The Receiver continually monitors each for progress, as well as for potential opportunities to generate recoveries. Upon an initial review, the Receiver has categorized each investment into three categories: 1) high potential for some amount of recovery, 2) needs additional time and monitoring, and 3) low chance of any recovery. Generally, the twelve investments break down as follows:

1. Category 1: three investments with an aggregate investment of $1,307,691, or 53% of the total amount invested.

2. Category 2: two investments with an aggregate investment of $50,000, or 2% of the total amount invested.

3. Category 3: Seven investments with an aggregate investment of $1,100,000, or 45% of the total amount invested.

Category 1 holds some promise. The Category 1 investments may result in a two-to-four times multiple of the amount invested which will nicely add to the estate's recovery. The Receiver will continue to monitor these investments carefully and develop an exit strategy for each when the timing is appropriate.

Category 2 contains two investments of $25,000 each. These may provide a small amount of a return. Category 3, which includes seven of the investments, are struggling and are unlikely to provide significant sources of recovery. The projection on these startup businesses shows no significant growth and have very little potential in becoming profitable.

### D.  Accounting of Receipts and Disbursements

Attached as Exhibit "E" is a copy of the Standard Fund Accounting Report. Below is a summary of the cash receipts and disbursements from the estate on a cash accounting basis.

#### 1.  *Cash Receipts*

During the Second Quarter, the receivership estate had cash receipts of $2,417,753. These cash receipts were comprised of (i) $1,417,752.71 related to the turnover of funds from the net sale proceeds of the 9615 Bolton Road property held with the Court Registry Investment System, and (ii) $1,000,000.00 related to the turnover of funds originally held in Rogue Black's bank account.

#### 2.  *Cash Disbursements*

During the Second Quarter, cash disbursements totaled $729,459.36. These disbursements were comprised of (i) $466,677.56 of attorneys' fees, (ii) $249,349.43 of Receiver's Fees, (iii) $6,816.55 of software fees used for the forensic accounting investigation, (iv) $4,695.00 of storage fees related to the Bolton Property furniture, (v) $1,626.43 related to Rogue Black business entity fees, (vi) $262.50 for Rogue Black bookkeeping, and (vii) $31.89 of banking fees.

#### 3.  *Cash on Hand*

As of June 30, 2022, the receivership estate held an ending balance of $1,688,293.35.

//
//
//

## II. INVESTIGATION AND PURSUIT OF UNKNOWN ASSETS

### A. Forensic Accounting Discoveries

Completing a forensic accounting will be an indispensable cornerstone of this receivership. With the sheer magnitude of investments made into the Ponzi scheme, the Receiver has focused on identifying new assets, identifying key individuals or entities that may have integral information or potentially themselves be sources for recovery, and compiling detailed information on the amounts invested, recovered, and net gains/shortfalls made by investors and aggregators.

Over the course of the prior five months, the Receiver and her team have analyzed 1,363 pages of bank statements, spanning over 472 account periods, amounting to nearly 10,000 financial transactions spanning over seven years. Although the forensic accounting is still in process, it is already bearing fruit. A few examples include the recent discovery of eight additional film investments, a significant number of potential clawback targets,[1] and a view of the general and typical uses of investor monies by Horwitz and 1inMM for personal use and to perpetuate the Ponzi scheme.

For instance, the Receiver has determined that more than $209 million flowed through Horwitz's personal bank account, all deriving, directly or indirectly, from investor monies. Further, Horwitz used investor dollars to promote and indulge in luxury living, including:

- $10 million of credit card payments,
- $5.7 million to purchase a personal home,
- $940,000 related to luxury automobile lease payments,
- $590,000 of cash withdrawals,

---

[1] The Receiver is not yet disclosing the names of clawback targets so as not to compromise recovery strategies or jeopardize ongoing settlement negotiations. However, as steps are taken to recover monies from entities and individuals, material updates will be provided in future reports.

- $327,000 on private charted jets, and
- $239,000 on casinos in Las Vegas.

With such a large magnitude of data, the Receiver's staff continually makes new discoveries identifying useful investor information and prime recovery targets.

### B. Status of Obtaining Bank Records and Other Requests for Information

The Receiver has issued subpoenas and sent letter-requests for information to a total of fourteen financial institutions, six individuals/entities of interest (including the investor aggregators), two technology companies holding relevant data, and three law firms. In response, thus far, those respondents have produced more than 22,000 pages of documents.

Despite significant progress in obtaining critical documents, there has been some difficulty obtaining a full list of investors from the aggregators initially identified by the SEC. The Receiver continues to diligently work to obtain this information, which is integral to continued outreach to the investor group as well as to the Receiver's investigation of net winners and net losers.

Using the data obtained, the Receiver anticipates achieving the three goals underpinning the Receivership: 1) obtaining a global view of the financial transactions that took place through 1inMM bank accounts, 2) ascertaining recovery and litigation targets, and 3) gaining a full understanding of how much each end-investor invested, how much they received back, and by how much they are a net winner/loser.

### C. Tolling Agreements

The Receiver and her forensic accounting team have identified several transfers from 1inMM, Horwitz and related entities that occurred almost seven years ago and were thus close to becoming unavoidable due to the expiration of the statute of repose in the California Uniform Voidable Transactions Act, Cal. Civ. Code § 3439.09(c). Many of these transfers were in significant amounts and, absent tolling

agreements, would reduce the amount that the Receiver could pursue in settlement discussions or litigation. Therefore, the Receiver and her team identified transfers that were at risk of becoming unrecoverable due to the expiration of the statute of repose, and contacted the transferees and/or beneficiaries of those transfers to gauge their interest in agreeing to the tolling of the Receiver's potential claims. The other alternative was to file lawsuits against these parties to stop the expiration of the repose period. The Receiver decided the most time and cost-effective approach was to use tolling agreements whenever possible.

This approach has been beneficial. At this time, the Receiver has requested that nine transferees/beneficiaries enter into tolling agreements. Five tolling agreements have been executed and four remain under consideration by the recipient parties. The Receiver will continue to request tolling agreements as needed.

### D.     Potential Litigation

As an additional source of recovery to benefit harmed end-investors, the Receiver and her team are considering commencing litigation under various theories. During the Second Quarter, the Receiver sent demand letters to multiple individuals and entities who received transfers that the Receiver believes are avoidable under the California Uniform Voidable Transactions Act and other applicable law. The Receiver has communicated directly with a majority of these individuals and entities to discuss these demands, negotiate potential settlements, and further the goal of maximizing the recovery for the Receivership Estate. These discussions are sensitive and during this time details will be kept confidential. However, any settlement will be brought before the Court for final authorization and approval.

//
//
//
//
//

## III. DETERMINING INVESTORS AND THE ANTICIPATED RECOVERY PROCESS

### A. Progress Made Identifying 1inMM Investors and Aggregators

Investments in 1inMM relied heavily on personal relationships and word-of-mouth referrals to obtain investors. The Receiver believes that Horwitz raised funds primarily from the five principal aggregators, namely JJMT Capital LLC, Movie Fund LLC, SAC Advisory Group, LLC, Vausse Films and Pure Health Enterprises. These aggregators are believed to have raised funds from more than 200 end-investors, some of whom raised funds from further downstream end-investors.

The Receiver has subpoenaed these aggregators to identify each of the individual downstream end-investors, how much money they each invested and how much money they had received back. This is one source of three (in addition to the forensic accounting and claims procedure) the Receiver will use to obtain the crucial information necessary to determine each investor's net investment. The Receiver continues to make progress in this regard, but as the amount of data is very large, the entire process will take additional time to complete. As the Receiver obtains additional information, she will share it in subsequent reports.

### B. Website Launch

To communicate effectively with the numerous investors in this matter, the Receiver has built and launched a website—www.1inMMReceivership.com—which went live in mid-April 2022 (the "Website"). The Website provides important information for the investors including, for example, the background to the receivership, selected case documents filed with the Court and answers to frequently asked questions (including both general receivership questions and specific questions related to this matter).

In April 2022, upon request of the Receiver, the Department of Justice forwarded a letter from the Receiver to the known end-investors providing information about the Receivership and the website. As the Receiver collects

additional contact information for the end-investors, her staff will sent future notices to individuals who may have not received the initial notice so that they may be kept fully apprised of the Receiver's activities and progress made towards a recovery.

As requested by the motion to approve this report, the Receiver proposes that the Court authorize the Receiver to use the Website as a method of serving investors and other parties in interest with case filings, in lieu of the requirements imposed by Local Rule 66-7.

### C. Litigation Commenced by End-Investors

As the Receiver discussed in her First Report, her initial investigation revealed that various investors had commenced numerous lawsuits in federal and state courts across the country alleging claims associated with Defendants' fraudulent scheme (defined in the First Report as the "Investor Actions"). The investors filed the Investor Actions predominantly against the aggregators and/or their insiders, generally asserting claims that do not belong to the Receivership Estate, such as breach of contract, breach of fiduciary duty and fraud.

Considering that the Investor Actions arise out of Defendants' Ponzi scheme and the plaintiffs (i.e., the investors) are creditors of this estate, the Receiver felt obligated to monitor events in the Investor Actions to assess whether they are having, or are likely to have, an impact on the administration of the Receivership Estate. This was complicated by the fact that the Investor Actions were pending in multiple jurisdictions and were not coordinated in any way. Fortunately, however, counsel on both sides of the Investor Litigation have been cooperative and constructive, and have expressed the desire to assist the Receiver. Nonetheless, it became apparent to the Receiver that the plaintiffs in the Investor Actions feel as though they have no choice but to litigate to recover their investments, and even perceive themselves to be in competition with other investors in a race to obtain a judgment.

The Receiver is mindful that one of the central purposes of a receivership is to establish a claims-and-distribution process into which investors' claims are

channeled. A receivership claims process generally relieves harmed investors of the need to take individual legal action, and ensures that investors do not obtain a legal advantage over other similarly situated investors. Absent a receivership and claims process, there would be a disorderly race to the courthouse resulting in inequity and inefficiency, as assets would be dissipated in piecemeal and duplicative litigation. The pendency of the Investor Litigation potentially threatened such results. This is why, in her First Report, the Receiver stated that she was considering ways to rationalize the Investor Actions so that efforts are not duplicated, including by establishing a more formal level of cooperation with the parties thereto.

There have been very positive developments on this front. On May 13, 2022, the Receiver, her colleague (Douglas Wilson) and her counsel (Katten) attended a series of meetings in Chicago with counsel for several of the parties on both sides of the Investor Actions. Those meetings proved to be extremely constructive and productive. The Receiver personally met several of the lawyers for the plaintiffs and the defendants and, among other things, introduced her team, explained her qualifications, discussed the purposes and objectives of this receivership and—perhaps most importantly—listened to these lawyers discuss their cases, and how they perceive them to relate to the receivership. Generally speaking, all counsel seemed interested in the Receiver's views on the anti-litigation stay in the Order of Appointment, and how the Receiver might be able to bring the parties together for joint settlement discussions.

Several positive upshots resulted from these meetings. One is that the plaintiffs agreed to coordinate their various actions so there would be less duplication of efforts and possibly development of a more unified strategy. In fact, the Receiver understands that counsel for all plaintiffs in the Investor Actions have since entered into a common interest agreement and begun sharing documents and information. That innovation should remedy some of the duplication and other inefficiencies that have heretofore prevailed in the Investor Actions.

Another positive development is that the plaintiffs have informally agreed to pause the prosecution of their respective actions to allow time for the Receiver to get up to speed as to any claims she may have against the same defendants, and once done, for all parties—including the Receiver—to engage in joint settlement discussions, or possibly a mediation. This practical decision by the plaintiffs benefits not just the Receivership Estate, but also the defendants in the Investor Actions, as they will be able to conserve their resources in the meantime. The Receiver believes that the defendants view these developments as positive for the additional reason that they desire a global resolution of *all* claims relating to the 1inMM fraud, and joint discussions with the Receiver further that objective.[2]

As of the end of the Second Quarter, the Receiver understands that counsel for the plaintiffs were in the process of exchanging information and discussing how to coordinate their cases, and the Receiver was reviewing financial and other documents to determine her position on the defendants' potential liability to the Receivership Estate. Defendants have been cooperative throughout.

## IV. CONCLUSION

The Receiver respectfully requests that the Court grant the motion to approve this Report and award the related relief requested therein.

Dated: August 10, 2022

Respectfully submitted,

By:   /s/*Michele Vives*
     Michele Vives, Receiver

---

[2] As a material term of any settlement with the Receiver, the defendants are likely to insist that the Court enter a bar order—that is, a permanent injunction barring any person or entity from suing them on any claim arising out of or related to the 1inMM fraud. Any such person or entity is likely a creditor of the Receivership Estate whose claim would be channeled to a claims-and-distribution process that the Receiver will at the appropriate time ask the Court to approve.