# EXHIBIT D

Agency Agreement

This Agreement is entered into effective this 7th day of June, 2022, between Michele Vives, Receiver in the matter of Zachary Horwitz ("Seller") and ThreeSixty Asset Advisors, LLC and WFS, Inc. dba Tranzon Asset Strategies (collectively, "Agent"), each a "Party" and collectively the "Parties".

**Section 1.** **Purpose of Agreement**.  Seller hereby retains Agent to act as its sole and exclusive agent to sell the home furniture, furnishings, art, musical instruments, sports equipment, electronics and related personal property owned by Zachary Horwitz under its Court Ordered Receivership ("the Matter"), including but not limited to those items listed on the attached Exhibit 'A', (the "Assets") at one or more publicly marketed sales ("Sale"). Agent shall conduct the Sale in a manner intended to maximize recovery given the expedited time frame necessary to vacate the Premises, and utilizing the methods that Agent deems, in its professional judgment, to be appropriate and in the best interest of Seller. Agent hereby agrees to use its professional skill, knowledge, and experience to the best advantage of both Parties but makes no representations or warranties regarding the outcome of the Sale, except to the extent as may be provided for in this Agreement.

**Section 2.** **Location of Assets**.  The Assets are located at the following site(s), collectively referred to as the "Premises":

> Ben Hur Moving & Storage – 8929 Oso Ave, Chatsworth, CA ("Premises 1"), and
>
> Sylmar Storage – 12361 Foothill Blvd, Sylmar, CA ("Premises 2")

**Section 3.** **Date and Time of Sale**.  Agent shall schedule the Sale(s) date to occur approx. 25-30 days from execution of this Agreement ("Sale Date(s)"), with the following caveats and conditions: i) timing requires that access to the storage facility and storage facility support can be arranged to begin on the Monday following agreement execution, and ii) due to conflicts, the sale date cannot occur the weeks of June 18 or June 25.  Removal of the Assets shall occur over a period of 5-7 days beginning the week after the Sale Date ("Removal Period").

**Section 4.** **Sale Process**.

   a. Agent shall be authorized to promote the Sale of the Assets immediately upon execution of this Agreement, and shall be authorized to reference the Matter in all advertising without further consideration;

   b. Agent shall provide staff necessary to photograph and catalog the Assets for Sale;

   c. Seller shall arrange for and fund staffing at each storage facility to: i) remove and unwrap each item from its storage vaults=, and place it in an area to be photographed, cataloged and tagged, ii) rewrap each item and notate atop its wrapping the associated lot number assigned by Agent, and iii) return the item to its storage vault, notating the lot numbers placed within each vault.

   d. Agent shall have the authority to establish appropriate terms of sale consistent with Agent's best practices for Sales of similar nature;


e. Agent shall have the authority to sell the Assets in whole or in part at live, online and/or sealed bid auction(s) and/or thru private sale(s) to the highest and best bidder;

f. The sale shall be without reserve;

g. Agent shall be authorized to accept, as Seller's agent, cash, cashiers' checks, wire transfer, guaranteed checks or credit card (at Seller's risk) as payment for the Assets sold;

h. Agent shall be responsible to collect, report, and remit sales tax collected during the Sale(s);

i. Upon full payment for the Assets by purchaser Seller hereby authorizes Agent to execute on its behalf, all bills of sale, receipts and other documents necessary to transfer title to the Assets as well as to provide Seller's federal employer identification number to purchasers, their agents, customs officials or similar parties for the limited purpose of completing a Shipper's Export Declaration form or any documentation reasonably necessary to facilitate the respective purchaser's export of the Assets;

j. Agent shall provide staff to coordinate the removal process;

k. Seller shall arrange for and fund staffing at each storage facility to: i) remove items from the storage vaults for purchasers as they arrive to pickup their items, ii) obtain a sign-off from each buyer per Agent's instructions for each item removed.

l. Agent shall not be responsible for any purchaser that fails to live up to its obligation to complete a purchase of any of the Assets.

**Section 5.   Compensation**.  The following shall define Agent's fees ("Compensation"):

a. Agent and Seller agree to the following commission:  <u>5% of Sale Proceeds</u>.

b. Agent shall charge a Buyers' Premium on all Sales at a rate of 25%.  The Buyer's Premium will be added to each buyer's invoice and paid directly to Agent by buyers.  The Buyer's Premium shall not be considered part of the sale proceeds or property of the Seller, but rather as Agent's Compensation.

**Section 6.   Costs**.  Agent shall be entitled to reimbursement for sale related expenses incurred by Agent in preparing for and conducting the sale, including labor, marketing, supplies and related costs ("Costs"), estimated at <u>$7,000.</u> All Costs shall be documented in Agent's final settlement package provided to Seller.  The following expenses have not been included in the Costs and are not deemed a responsibility of Agent: occupancy costs, personal property insurance, costs of storage facility personnel, removal of debris and cleanup of the Premises.

**Section 7.   Proceeds Distribution**.  Agent is authorized to deduct Compensation, Costs, Sales Tax and all other funds authorized by this Agreement from the proceeds of the Sale(s) and deposit the remaining proceeds of the Sale(s) ("Net Income") into Agent's segregated trust account. Within 21 days of the Removal Period, Agent shall provide Seller


Agency Agreement

with an accounting of the Sale income and expenses along with payment of the Net Income due Seller. All funds due to Agent under the terms of this Agreement shall be paid to Agent before any payment in satisfaction of any security interest, lien, or encumbrance against the Assets or the proceeds thereof.

**Section 8.** <u>Taxes</u>.  Agent shall be solely responsible for the collection, reporting, and payment of all state and local sales taxes collected.

**Section 9.** <u>Insurance</u>.

a. <u>Personal Property</u>.  Until such time as title to and possession of any Asset is delivered to each sale purchaser, Seller shall obtain and thereafter maintain full fire, vandalism, burglary, theft and liability insurance on the Assets in an amount not less than the full insurable value of the Assets and shall name Agent as an additional insured.  In the event of a loss, Agent shall be paid from any claim for funds due under the terms of this Agreement.

b. <u>Liability</u>.  Agent shall provide Seller with proof of liability insurance with limits of $1,000,000 per occurrence, naming Seller as an additional insured.

**Section 10.** <u>Title to the Assets</u>.  Seller shall be responsible to file such notices and/or comply with such legal processes, as may be required to ensure that Agent shall have the right to convey all Assets to purchasers free and clear of any liens, judgments, or encumbrances whatsoever.  Seller shall be responsible to disclose any UCC-1 filings or leases, which exist that encumber the Assets subject to this Agreement.  If applicable, Seller shall provide written documentation to Agent that authorizes the terms of this Agreement for any Assets secured by a UCC-1 financing statement or a lease Agreement.  All sales of the Assets shall be made by Agent as agent in fact for Seller. Title to the Assets shall remain with the Seller throughout the Sale Term.

**Section 11.** <u>Asset Condition</u>.  The Assets are being sold, "AS IS, WHERE IS, AND WITH ALL FAULTS". Seller and Agent hereby acknowledge and agree that the Parties have no knowledge with respect to, and have no obligation to investigate, the merchantability or fitness for any particular purpose or use of any of the Assets.

**Section 12.** <u>Access to Assets</u>.  Throughout the Sale Term, Agent shall have reasonable access to the Assets, allowing it to conduct the Sale and to allow the removal of the Assets from the Premises.  Seller shall ensure the storage facility rents are paid for and all arrangements are made as provided for herein to ensure Agent's ability to execute its responsibilities.  Following Agent's completion of the Sale, it shall endeavor to leave the Premises in a clean and orderly condition. However, under no circumstances shall Agent be responsible for i) removal of unsold items, ii) removal of items abandoned by buyers, iii) trash and debris resulting from the removal process, or iv) hazardous materials. As a term of sale between Agent and its purchasers, Agent obligates its purchasers to remove all of their purchased items and leave the Premises clean of all trash and debris resulting from their efforts.

**Section 13.** <u>Removal of Sensitive Information</u>.  Agent shall not be responsible for the proper retrieval, storage, removal and/or destruction of any personal or sensitive materials ("PII") which may be located on the Premises.



Agency Agreement

**Section 14.** **Hazardous Materials**.  Agent has no obligation whatsoever to purchase, sell, make, store, handle, treat, dispose, generate, transport or remove any HAZARDOUS SUBSTANCES that may be located at the Premises or otherwise associated with the Assets.  Agent shall have no liability to any party for any environmental action brought (i) because the Assets were involved in, or are somehow related to, the storage, handling, treatment, disposition, generation, or transportation of HAZARDOUS SUBSTANCES or (ii) in connection with any remedial actions associated with the Assets or the Premises.

**Section 15.** **Seller's Obligations**.  Seller shall seek to facilitate the following, where applicable, in such timeframes as necessary to support the time sensitive nature of the Sale: (i) executed Agreement, (ii) access to the storage facilities, and (iii) storage facility staffing support as defined herein.

**Section 16.** **Asset Cancellation**.  Seller agrees that it shall not remove any Asset from the Sale.  In the event Agent is unable to fulfill delivery of a sold Asset to a Buyer by no fault of Agent, Agent shall have been deemed to have fulfilled its responsibilities of this Agreement and shall, therefore, be entitled to an amount equal to its compensation on the sold Asset.

**Section 17.** **Representations of Agent**.  Agent represents and warrants to Seller that:

- a. The person executing this Agreement on behalf of Agent is authorized to do so.
- b. The terms of this Agreement are binding upon and enforceable against Agent.

**Section 18.** **Indemnifications by Agent**.  Agent hereby indemnifies, defends and agrees to hold harmless the Seller and the Seller's officers. agents and employees from and against any and all claims, demands, liabilities, judgments, damages, settlements, costs and expenses (including but not limited to court costs and attorneys fees) that may be sustained or incurred by the Seller as a result of Agent's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in this Agreement.

**Section 19.** **Representations of Seller**.  Seller represents and warrants to Agent that:

- a. The person executing this Agreement on behalf of the Seller is authorized to do so.
- b. The terms of this Agreement are binding upon and enforceable against Seller.
- c. Seller now holds, and at the time of sale shall hold, good and marketable title to the Assets listed in Exhibit A-1.

**Section 20.** **Indemnifications by The Seller**.  Seller hereby indemnifies, defends and agrees to hold harmless Agent and Agent's officers, agents and employees from and against any and all claims, demands, liabilities, judgments, damages, settlements, costs and expenses (including but not limited to court costs find attorneys fees) that may be sustained or incurred by Agent as a result of (i) Seller's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in

this Agreement, (ii) the environmental condition of the Assets or the real property on which the Premises is located, and/or any asserted damage, if any, to adjacent land owners, all as now or may at any time hereafter be in effect; (iii) negligent or intentional acts or omissions of Seller or its agents, employees, representatives and principals in connection with the Sale; and/or (iv) liens, claims, interests and encumbrances asserted against the Assets.

**Section 21. <u>Limitation of Liability</u>.** Notwithstanding any of the terms of this Agreement to the contrary, Agent's maximum liability for (i) any breach of covenants, agreements and/or indemnifications set forth herein, and (ii) any and all damages of any type or nature whatsoever, whether in contract, tort or otherwise, that may be sustained by the Seller or any other person or entity that arises from or is otherwise related to this Agreement or the Sale shall be limited to the aggregate amounts actually received by Agent as compensation under this Agreement.

**Section 22. <u>Force Majeure</u>.** Notwithstanding any of the terms of this Agreement to the contrary, Agent shall not be deemed in default with respect to the performance of any of the terms, covenants and conditions of this Agreement and the Removal Date shall be extended accordingly, if Agent (i) is unable to conduct the Auction, (ii) determines that the Auction should be postponed, or (iii) otherwise is unable to fulfill its obligations hereunder due to or because of any: (a) strike or lockout; (b) civil commotion, war-like operation, invasion, rebellion, terrorist act, hostilities, military or usurped power, sabotage, or acts of governmental; (c) flu, epidemic, serious illness or plagues, disease, emergency or outbreak; (d) widespread power failure or internet disruption; or (e) hurricane, tornado, flood, mudslide, fire, act of God, or any other cause that is beyond the control of Agent (each, a "Force Majeure Event").

**Section 23. <u>Covid-19</u>.** Although the Parties have full knowledge of the existing conditions throughout country, including laws or regulations concerning the outbreak of the COVID-19 virus on the Effective Date, because such national and worldwide laws and responses are continuously developing in unpredictable ways, such knowledge shall in no way limit Agent's contractual right to rely upon the terms of Section 22, if performance of its obligations under this Agreement is or becomes impossible or impracticable as a result of any currently known and/or unforeseen circumstances related to the COVID-19 virus pandemic. Therefore, Agent shall be entitled to rely upon the relief set forth in Section 22 in the event that it determines that it is unable to perform, or must delay the performance of, any of its obligations under this Agreement due to, or as a direct or indirect consequence of, any occurrences relating to, or arising from, the COVID-19 virus pandemic, which may include, but are not limited to: (a) restrictions or regulations imposed by governmental entities or similar regulatory or authoritative agencies on any aspect of private or public life, including, without limitation, travel and business operations, which impact Agent's ability to perform its obligations hereunder; (b) cessation of services by any providers on whose services Agent relies in order to perform its obligations under this Agreement (e.g., internet services, transportation services, etc.); and/or (c) self-imposed corporate policies implemented in response to such laws or public health policy recommendations issued for the purpose of safeguarding and protecting the health and/or safety of the general public and/or Agent's personnel, employees contractors, agents, or similar persons, whose services Agent requires to perform its obligations under this Agreement; any such occurrence shall be considered a "Force Majeure Event" for purposes of this Section.



Agency Agreement

Section 24. **Final Agreement**.  This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior negotiations and understandings and can only be modified by a writing signed by Seller and Agent.

Section 25. **Execution in Counterparts**.  This Agreement may be executed in several counterparts, each of which when so executed shall be deemed to be an original and such counterparts, together, shall constitute one and the same instrument.  Delivery by facsimile or email of this Agreement or an executed counterpart hereof shall be deemed a good and valid execution and delivery hereof or thereof.

Section 26. **Partial Invalidity**.  In the event any term or provision contained within this Agreement shall be deemed illegal or unenforceable, then such offending term or provision shall be considered deleted from this Agreement and the remaining terms shall continue to be in full force and effect.

Section 27. **Technology Disclaimer**.  Agent does not warrant that the functions, features or content contained in Agent's website (including any third party software, products or other materials used in connection with such website) or any third party website used by Agent, will be timely, secure, uninterrupted or error-free, or that defects will be corrected.

Section 28. **Notices**.  Any notice or other communication under this Agreement shall be in writing and may be delivered personally, sent by facsimile or by prepaid registered or certified mail, or by electronic mail, addressed as follows:

If to the Seller:
**Michele Vives, Court Appointed Receiver**
C/O Douglas Wilson Companies
1620 Fifth Ave, Suite 400
San Diego, CA 92101
Telephone: 619-906-4376
Email: mvives@douglaswilson.com


If to Agent:

**ThreeSixty Asset Advisors, LLC**
3075 E. Thousand Oaks Blvd,
Westlake, California 91362
Attention:  Jeffrey J Tanenbaum
Telephone: (805) 496-8087 ext. 117
Email: jeff@360assetadvisors.com

WFS, Inc. dba Tranzon Asset Strategies
9891 Irvine Center Drive, Suite 200
Irvine, CA 92618
Telephone: (949) 727-9011
Email: mwalters@tranzon.com

 Agency Agreement

**Section 29. <u>Agency Relationship.</u>** Nothing contained hereof shall be deemed to create any relationship between Agent and Seller other than an agency relationship. It is stipulated that the parties are not partners or joint venturers.

**Section 30. <u>Jurisdiction</u>.** Any dispute arising under or in connection with this Agreement or related to any matter, which is the subject of this Agreement shall be subject to the exclusive jurisdiction and venue of the Court that appointed the Receiver in theUnited State District Court, Central District of California, and shall be interpreted under and in accordance with the laws of the State of California. To facilitate judicial resolution and save the parties time and expense, any right to trial by jury is hereby waived by the parties. The Agent and Seller further agree that the prevailing party shall be entitled to attorney's fees in any litigation over this agreement.

**Section 31. <u>Additional Provisions</u>.** None.

In witness thereof, the Parties hereto have executed this Agreement on this 8th day of June, 2022.

Seller:

SELLER

*[signature]*

By: Michele Vives - Court Appointed Receiver
Date: 6/8/2022

_____

Agent:

THREESIXTY ASSET ADVISORS, LLC

*[signature]*

By:_____
Date: 6/9/22

Agent:

WFS, INC. dba Tranzon Asset Strategies

*[signature]*

By: Michael Walters
Date: 06-09-22

Agency Agreement

EXHIBIT 'A'

Asset Schedule

The Assets Include, but are not Limited to:

CHATSWORTH STORAGE FACILITY

Gray leather & wood Matthew Hilton dining chairs x 10

Janus et Cie Rattan bar height chairs x 4

Brass & Reptile skin wrapped console table

Guitar - Breedlove stage concert stain E MH limited

Corner Sofa Section (part of Sectional inside warehouse)

5 boxes - decorative items

12' x ?' Handmade Rug - The Rug Company

Box - coffee table books (The Art of Flying, Dior by Avedon, Skin Damien Dufresne, and others)

Black & Brass Table Lamps x 2

Gray leather and wood bar stools x 4

Iron Frame Cream/Gray Upholstered Chair

Cream/Gray with Brass Leg Club Chairs

Blue swivel club chairs x 4

Box - decor accessories - wood sculpture

Box - CDs

Gray zig zag upholstered round ottoman

Black leather high back desk chair

Upholstered Recliner, Zhejiang Morris Fashion Home Co., Ltd Wny2280-92

Life Fitness Row GX Trainer  (Model# ger-alllx-101 class sc)

Life Fitness FlexDeck platinum club series treadmill

Peloton Bike w/ PLTN-RBiV1 Display

Black/White speckle club chair x 2 (not photographed)

Reptile skin wrapped hexagonal tables x 3

Dedon Mbrace rocking chair

Leather & brass accent table

G. Byrne, Pink Wall Limited Edition Signed Photograph

G. Byrne, White Palm Limited Edition Signed Photograph

Tom Ford tuxedo jackets x 2

Brass frame & wood top console tables x 2

Douglas Kirkland,  Brigitte Bardot Mexico 1967 - 24" x 24"

6' black cowhide bench - iron base

77" LG OLED TV

DUX Padded platform

Restoration Hardware 7' antiqued mirror x 2

Cream leather & brass night stand x 2

Wood & brass secretary desk

Mattress

Wood head board

King mattress & 2 piece box spring

Wood Bed frame

Brass table lamps x 2

Box of pillows

Mitchell Gold ottomans (part of sectional inside warehouse)

Cashmere wood & leather chair

Linen upholstered rolling desk chair

White baby changing dresser

Signed boxing glove

Box of Books

Box of designer jeans & Tom ford tuxedos

Brass table lamps x 2

Cream leather & brass dressers x 2

Golf Club Set - Slazenger bag - Taylormade r540 woods, Calloway x20 irons

Section of black 6' heavy duty racking

3' x ?' Handmade Rugs - The Rug Company x 2

10' x ?' Handmade Rugs - The Rug Company x 2

Golf Clubs - Calloway Epic Irons & Woods

Billard Table - AAA Billiards of Beverly Hills

Muhammad Ali vs. Cleveland Williams, Houston Astrodome 1966 photo - limited edition 269/350 - Neil Leifer

Jack Nicholson Photo

Red letters print

Jaguar photo

David Yarrow Photo, Genesis 7 of 12, signed

Brass end table/night stands x 2

Cream & blonde wood chair (matches sofa inside warehouse)

Grey leather coffee table with wood tray

White kids room desk



Agency Agreement

Traeger Wood Pellet Grill

Took box & tools

Bed frame (part of 4 poster bed)

Large ottoman

10' x ? Rug

Rattan round glass top table

Mr. Brainwash - Einstein, Chaplin, Love is the Answer - Signed Painting

Mr. Brainwash Never Give Up Print 4/100 - signed on back

Dog photo on canvas

Monkey prints x2

Sofa frame (matching - cushions & ottoman outside)

7' dining table top (legs outside)

Wood & Upholstered Sectional Sofa

Upholstered Sectional Sofa

Large Fomat Painting on Fabric, Michael (last name unrecognizable)

Wood 4-Post Bed Frame

Yamaha Disklavier Baby Grand Piano - Model GH1

SYLMAR STORAGE FACILITY

1 12ft. Credenza (TV Table) with 5 storage cabinets

1 Sonos Sound Bar

1 Waterfall Fountain (Metal)

2 Dedon Lounge Chairs (Grey/Beige)

2 Patio side tables (Small, Oval, white tops with wooden legs)

8 outdoor dining chairs (Plastic and Metal Tops)

1 Outdoor Storage Shed (Small)

2 boxes of waterfall rocks

1 50" mirrored console table (Restoration Hardware)

Free Weights (5lbs.-50lbs.)

1 Impex GD 3.1 Workout Bench (Ab

1 Life fitness G7 machine

5 TV's (2x 44", 2x 60", 80")

1 Boxing Bag "Dummy"

1 Bench Press Workout Bench

1 Outdoor Dedon White Table and 2 aluminum chairs (dark Grey, "Nest" design)