Terence G. Banich (SBN 212173)
terence.banich@katten.com
Allison E. Yager (*pro hac vice*)
allison.yager@katten.com
**KATTEN MUCHIN ROSENMAN LLP**
525 W. Monroe St.
Chicago, IL 60661
Telephone:  (312) 902-5200
Facsimile:   (312) 902-1061

*Attorneys for the Receiver*
Michele Vives

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>  Plaintiff,<br><br> v.<br><br>ZACHARY J. HORWITZ; and 1inMM CAPITAL, LLC,<br><br>  Defendants. | Case No. 2:21-cv-02927-CAS(GJSx)<br><br>**QUARTERLY REPORT OF RECEIVER MICHELE VIVES (THIRD QUARTER 2022)**<br><br>Judge:     Hon. Christina A. Snyder<br>Courtroom:  8D |

# **TABLE OF CONTENTS**

I.   GENERAL RECEIVERSHIP UPDATE ................................................................. 2
     A.   Upcoming Mediation of JJMT-Related Claims .......................................... 2
     B.   Forensic Accounting ................................................................................... 5
          1.   Total Amount Invested by Investors ................................................. 6
          2.   Remaining Forensic Accounting Tasks and Data Gaps .................... 7
     C.   Asset Updates .............................................................................................. 8
          1.   Rogue Black ....................................................................................... 8
          2.   LayJax .............................................................................................. 10
          3.   Auction of 9615 Bolton Road Furniture ......................................... 10
          4.   Additional Film Investments ........................................................... 11
     D.   Potential Litigation ................................................................................... 11
II.  ACCOUNTING OF RECEIPTS AND DISBURSEMENTS ................................ 12
     A.   Cash Receipts ............................................................................................ 12
     B.   Cash Disbursements .................................................................................. 12
     C.   Cash on Hand ............................................................................................ 12
III. CONCLUSION ..................................................................................................... 13

KATTEN MUCHIN ROSENMAN LLP
525 W. MONROE ST.
CHICAGO, IL 60661
(312) 902-5200

Michele Vives, the duly appointed permanent receiver (the "Receiver") of 1inMM Capital, LLC and its subsidiaries and affiliates ("1inMM"), and over assets that are attributable to funds derived from investors or clients of the Defendants or were fraudulently transferred by the Defendants (collectively, the "Receivership Estate"), pursuant to Local Rule 66-6 and the *Order on Appointment of a Permanent Receiver* ("Order of Appointment") entered on January 14, 2022, hereby submits this quarterly report (the "Report") for the period July 1, 2022 through September 30, 2022 (the "Third Quarter"). The Report details the Receiver's activities and findings during the Third Quarter to protect and administer the receivership estate, identify new assets and lay out the Receiver's general strategy to maximize the recovery for the benefit of harmed investors.

I. **GENERAL RECEIVERSHIP UPDATE**

  A. **Upcoming Mediation of JJMT-Related Claims**

As the Receiver discussed in her First and Second Reports, several investors have commenced numerous lawsuits in courts across the country alleging claims associated with Defendants' fraudulent scheme (defined in the First Report as the "Investor Actions"). It quickly became apparent to the Receiver that the Investor Actions against JJMT and its insiders—all of which are pending in federal and state courts in Chicago—were the most numerous, complex and in need of immediate attention.

The Receiver began monitoring the status and progress of the JJMT Investor Actions soon after her appointment. Before long, the Receiver and her legal team began having regular calls with the lawyers for the various plaintiffs and defendants who are parties to the JJMT Investor Actions regarding their claims and defenses, and how the Receiver might help coordinate those actions and perhaps help resolve them. Efficiently settling the JJMT Investor Actions was consistent with one of the central purposes of this receivership, which is relieving harmed investors of the need

to take individual legal action to recover their losses through the eventual establishment of a claims-and-distribution process into which investors' claims can be channeled. So the Receiver undertook to work with counsel to find ways to rationalize and coordinate the JJMT Investor Actions.

A key turning point in this process occurred on May 13, 2022, when the Receiver, her colleague (Douglas Wilson) and her counsel (Katten) attended a series of meetings in Chicago with counsel for several of the parties on both sides of the JJMT Investor Actions. Those meetings proved to be extremely constructive and productive. At least three positive developments resulted therefrom. First, the plaintiffs agreed to coordinate their various actions so there would be less duplication of efforts and possibility the development of a more unified strategy. Plaintiffs additionally entered into a common interest agreement and began sharing documents and information amongst themselves. Second, the plaintiffs and defendants agreed to stay their respective actions to allow time for the Receiver to explore the possibility of joint settlement discussions or even a formal mediation process involving all litigants. Not only did this result in the conservation of resources, but also it revealed that *all* parties earnestly desired to settle the JJMT actions in concert with the Receiver.

And that led to the third and most important development—the parties' agreement to participate in a formal mediation process. That decision was not taken quickly, however. Counsel for the plaintiffs and defendants to the JJMT actions, the Receiver and the Receiver's counsel (Katten) formed a committee that met several times over Zoom during the summer to discuss the possibility of mediating, the potential scope of the mediation and the selection of a mediator. These meetings were open forums for the participating lawyers and the Receiver team to collaborate and discuss the objectives and details of a mediation. Much of the early effort focused on identifying mediator candidates. The group decided that each

constituency—that is, plaintiffs, defendants and the Receiver—would propose three candidates to serve as mediator, and then follow a process to narrow that list down.

The parties began by identifying their mediator candidates, and subsequently proposing them to the larger group. Once all sides had proposed their candidates, representatives of each constituency then had a period of time to interview the other sides' potential mediators. Naturally, this took a fair amount of time to complete. Once done, the group convened to discuss the final candidates and make a selection. It was soon apparent that the group had reached a consensus candidate—Hon. Sidney I. Schenkier, retired United States Magistrate Judge for the Northern District of Illinois. Judge Schenkier served as a magistrate judge from 1998-2020, and prior to that was a litigation partner at the Chicago office of Jenner & Block LLP. Judge Schenkier is now with JAMS, where he serves as a mediator, arbitrator, special master and neutral evaluator.[1]

After selecting Judge Schenkier, the parties have continued to have multiple meetings amongst themselves and with Judge Schenkier to discuss the background of the underlying Horwitz fraud, the parties' claims and defenses, structure and function of the mediation and scheduling issues. The parties have also agreed to exchange documents and information attendant to the mediation on Rule 408 terms, which has greatly facilitated the frankness and informality of the process, and generally prevented them from "backsliding" into discovery. The mediation is scheduled to occur at JAMS in Chicago during the second week of January 2023.

In sum, the Receiver views these developments as extremely positive. The mediation, if successful, would result in a global resolution of all claims currently in litigation against JJMT and its insiders relating to the 1inMM fraud, as well as the Receiver's potential claims against those same defendants for avoidance and

---

[1] Judge Schenkier's detailed biography is available here: https://www.jamsadr.com/schenkier/

recovery of fraudulent transfers as a result of being "net winners" of Horwitz's Ponzi scheme. Although the details are obviously still under discussion, the Receiver expects that the settling defendants would want to contribute their settlement proceeds to the receivership estate in exchange for entry of a bar order that enjoins any person or entity from suing them on account of any claim arising out of or related to the 1inMM fraud. Under applicable law, any person or entity who believes they hold such a claim would be unable to sue, but instead their claim against JJMT or its insiders would be "channeled" to a claims-and-distribution process that the Receiver will at the appropriate time ask the Court to approve. The Receiver expects to address further developments pertaining to the mediation in her fourth quarter 2022 report.

**B.     Forensic Accounting**

The Receiver and her staff continued to devote a great deal of time and effort to conducting a forensic accounting analysis of the financial transactions involving 1inMM and its insiders and affiliates. This project has and will continue to provide critical insight into (a) identifying new assets, (b) alternative sources of monetary recovery and (c) investor information regarding the amount of funds invested, the amount of funds paid back and the losses or gains made by individual investors.

The Receiver has discovered, for example, that there are over $2 billion in transactions that took place during the eight-year Ponzi scheme. No accounting records existed for 1inMM which required the Receiver to start from scratch. Underscoring the importance of this endeavor, the forensic accounting portion of the receivership encompasses approximately 60% of the time expended by the Receiver and her team. To provide a sense of magnitude, the forensic accounting review now entails the review of over 770 bank statements encompassing over 18,600 transactions. However, the Receiver is also sensitive to fees and, as is reflected in her invoices, the Receiver continually utilizes agents at the lowest rate capable of completing each task.

In the Receiver's Second Quarter Report, which covered the period April 1,

2022 through June 30, 2022, the Receiver was able to confirm, unequivocally, that Zachary Horwitz orchestrated a Ponzi scheme with nearly no underlying legitimate business. In contrast with a typical Ponzi scheme—where a business begins as a legitimate enterprise but then develops into a Ponzi scheme as it encounters financial hardships—1inMM appears to have been a pure Ponzi scheme since the very beginning. Although 1inMM did, in later years, make various investments into purportedly legitimate companies and film productions, those transactions accounted for only about 3% of the funds invested. Conversely, 97% of 1inMM funds appear to have been used towards perpetuating the Ponzi scheme or other illegitimate uses.

The Receiver now turns to discuss (1) the total amount invested by investors and (2) the remaining forensic accounting tasks and the current data gaps.

### 1. *Total Amount Invested by Investors*

Investors would typically invest into one of four separate bank accounts controlled by Mr. Horwitz: 1inMM Capital #1, 1inMM Capital #2, OneNMM Productions or directly into Mr. Horwitz' personal bank account. Through an analysis of these accounts, the Receiver discovered that the aggregate amount invested into the Ponzi scheme was greater than previously thought: *at least* $731,515,594.50 was invested into 1inMM by investors—approximately $40 million more than previously believed.

As the following graph illustrates, Mr. Horwitz' Ponzi scheme had a meteoric rise, growing exponentially each year. The Ponzi scheme peaked in 2019, bringing in a total of $358 million of new investor dollars. Despite this massive infusion of cash, the scheme began to buckle under its own weight as it snowballed. Cracks began to show as repayments to investors became more sporadic and late. This led to a spectacular crash in 2020 when the investment spigot completely turned off. No additional new dollars were invested into 1inMM on and after January 1, 2020.



No doubt the start of the global pandemic in March 2020 did not help, however, it is clear the jig was up much earlier. During this time, panic began to set in as money is seen shuffled around between accounts—amounting to rearranging the deck chairs on the *Titanic*—but no new investments came in to offset repayments due to investors. Mr. Horwitz made Herculean efforts to keep investors at bay, blaming Netflix and HBO for non-payment, but threatening that should investors contact Netflix or HBO directly, any chance of payment would be ruined. Somehow, Mr. Horwitz was able to parry the increasing pressure for over a year, until it ultimately collapsed in early 2021 when the Securities and Exchange Commission (the "SEC") commenced this action.

## 2. *Remaining Forensic Accounting Tasks and Data Gaps*

Determining the amount of money paid back to investors—an inseparable part of the forensic analysis—is much more complicated than determining the amount invested. Within the complex web of transactions the Receiver and her staff are mapping, there remain critical data gaps that require answers before the Receiver can, with certainty, report on the total amount of funds investors were repaid.

One primary data gap is a lack of full and complete information from

aggregators. Although the Receiver can account for how much money has been paid to the various aggregators from 1inMM, it is currently not possible to discern how the aggregators used those funds: how much went to repay investors versus how much went to pay commissions and their insiders. The Receiver continues to pursue this information from the aggregators and their banking institutions.

Further complicating matters, there are significant payments made to various LLCs and other corporate entities, but it is not readily discernible who owns those entities and what the purpose of the payments was. Again, there are no books and records to serve as a Rosetta Stone for the Receiver. In some cases, payments were made for legitimate goods and services, or to investors who set up alternative investment vehicles to receive their repayments. Alternatively, some payments could have been made to purchase previously unknown assets or investment positions, or are simply transfers meant to hide funds. The Receiver is investigating each transaction, above an appropriate threshold, to determine their character and validity.

### C. Asset Updates

In addition to the cash on hand detailed in Part II (below), the receivership assets currently consist of: (1) Rogue Black, LLC ("Rogue Black"), (2) LayJax Ventures, LLC ("LayJax"), (3) the Bolton Furniture and (4) investments made in potentially eight additional films. The updated details to each of these is outlined below.

#### 1. Rogue Black

Rogue Black is a film finance and production company in which Horwitz owned a membership interest and invested using 1inMM funds. Ultimately, 1inMM invested approximately $20 million with Rogue Black, which went on to produce and complete a total of eight films (collectively, the "Produced Films"). The Receiver has focused on two main goals with regards to Rogue Black: first, to understand what is owed to Rogue Black from the Produced Films and, second, to collect on those owed monies.

### a.  *Understanding the Value of the Produced Films*

To address the first goal, the Receiver engaged Ray Reyes, a consultant specializing in film distribution and distressed film libraries. Mr. Reyes is analyzing how much the receivership estate may be owed on account of the Produced Films and how the Receiver might best recover those monies. Film accounting is notoriously complex and Mr. Reyes' investigation has taken longer than anticipated. However, Mr. Reyes anticipates completing his work in early November 2022. The Receiver expects to summarize Mr. Reyes' principal findings in her next report.

### b.  *Collections Made During the Third Quarter*

As to the second goal, collecting monies owed to Rogue Black, Mr. Reyes has already provided substantial assistance. During the third quarter of 2022, Rogue Black collected $144,364.71 on account of distribution of the Produced Films. Further, Mr. Reyes believes that one distributor is in default and owes Rogue Black a significant amount, a matter that the Receiver is currently pursuing.

### c.  *Return of Frozen Funds and Payoff of PPP Loan*

During the third quarter, the Receiver worked with counsel for City National Bank ("CNB") to obtain the funds deposited in an account that have been frozen since the Court entered an asset freeze order at the outset of this case.

The frozen account held a balance of approximately $205,000. Rogue Black also had a Paycheck Protection Program loan (the "PPP Loan") which it had originated with CNB, with a liability balance of approximately $15,000. SEC and the Receiver ultimately reached a stipulation whereby CNB paid off the PPP Loan with the funds in the account, and turned over the net balance of approximately $190,000 to the Receiver. The Receiver received those funds in October 2022, and will be in the Receiver's next quarterly report.

### d.  *Preparation and Filing of Tax Return*

The Receiver engaged Lutz and Carr CPAs LLP, an accounting firm that prepared prior Rogue Black tax returns, to prepare and file the 2021 tax return for

Rogue Black. The federal and state return was filed on September 15, 2022.

### 2. *LayJax*

LayJax is an angel investment company which invested in early startup business ventures. Using 1inMM funds, Horwitz caused LayJax to invest $2.5 million with twelve separate startup business ventures that LayJax had sourced. The businesses in which LayJax invested are broad and diverse. The Receiver continually monitors each for progress, as well as for potential opportunities to generate recoveries.

#### a. *Update on Recovery Potential*

As previously reported, only two or three of LayJax's twelve investments hold a moderate chance of producing a recovery. One investment, made with a company that sells skincare treatments, has recently been the target of an acquisition by an equity investment firm. The Receiver continues to work with the co-manager of LayJax to ensure distributions from this acquisition are accurate and appropriately handled. Any distribution on account of this asset will likely occur in the fourth quarter 2022, which the Receiver anticipates to be approximately $425,000.

#### b. *New Operating Agreement*

The Receiver has entered into a new operating agreement for LayJax. The new operating agreement provides the Receiver more expansive and direct control over the company and clarifies the distribution priority of any monies received by LayJax.

#### c. *Preparation and Filing of Tax Returns*

The Receiver engaged E&M tax Services to prepare the 2021 tax return for LayJax. The federal and state return was filed on September 15, 2021.

### 3. *Auction of 9615 Bolton Road Furniture*

During the sale of Mr. Horwitz's 9615 Bolton Road home in 2021, a majority of the furniture was transferred into two separate storage units (the "Bolton Furniture"). The Receiver located the storage units and gained control early in the second quarter 2022. Pursuant to her authority under the Order of Appointment, the

Receiver engaged Tranzon Assets Solutions and ThreeSixty Asset Advisors (collectively, the "Auctioneers") to develop and execute a strategy to liquidate the Bolton Furniture. After implementing a marketing strategy, the live online auction opened on July 29, 2022. After robust bidding activity, the auction closed on August 9, 2022.

Attached as Exhibit "A" is a copy of the auction settlement report prepared by the Auctioneers which provides a settlement summary, lot report, list of unsold items, details to the marketing and advertising undertaken, bidder engagement, site traffic, costs and expenses, and other relevant information. Overall, the auction grossed $83,131.00 and, after auction commissions ($4,156.55) and expenses ($8,601.81), netted $70,372.64 to the estate. A small number of items remain that either did not sell or were never picked up by the winning bidders. The de minimis value of these items meant there was no justification to pursue further sale efforts. These items were turned over to the storage facility to either donate to charity or have them properly disposed of.

### 4.   *Additional Film Investments*

As a result of the Receiver's forensic accounting investigation, the Receiver and her staff identified five additional entities that received more than $13.1 million from 1inMM. These entities are believed to have funded the production of an additional eight films that were previously unknown to the Receiver. The Receiver continues to investigate these entities, films and the best avenue to efficiently maximize the recovery from these investments. The Receiver believes it prudent not to include any additional details on these entities and films in this report so as not to impede, jeopardize or hamper her investigation. Once the Receiver has additional information, the Receiver will summarize it in a future quarterly report.

### D.   **Potential Litigation**

As an additional source of recovery to benefit harmed end-investors, the Receiver and her team have been assessing the cost/benefit of commencing litigation

against various entities and individuals. During the third quarter, the Receiver sent out additional demand letters, on top of those already sent in the second quarter, to more individuals and entities who received transfers that the Receiver believes are avoidable under the California Uniform Voidable Transactions Act and other applicable law. The Receiver continues to have discussions with many of these individuals and entities to discuss her demands and to negotiate potential settlements, which efforts should further the goal of maximizing the recovery for the Receivership Estate. While these negotiations are pending and ongoing, the Receiver intends to keep details confidential so that the parties can continue to negotiate in good faith. However, any settlement will be brought before the Court for final authorization and approval.

II.     **ACCOUNTING OF RECEIPTS AND DISBURSEMENTS**

Attached as Exhibit "B" is a copy of the Standard Fund Accounting Report. Below is a summary of the cash receipts and disbursements from the estate on a cash accounting basis.

**A.     Cash Receipts**

During the Third Quarter, the receivership estate had cash receipts of $214,737. These cash receipts were comprised of (i) $144,365 related to recoveries made from Rogue Black, and (ii) $70,373 related to the auction of the Bolton Furniture.

**B.     Cash Disbursements**

During the Third Quarter, cash disbursements totaled $594,160.00. These disbursements were comprised of (i) $300,439 of attorneys' fees, (ii) $250,625 of Receiver's Fees, (iii) $26,798 of business expenses related to Rogue Black, (iv) $16,255 of storage fees (v) and $43 related to banking fees.

**C.     Cash on Hand**

As of September 30, 2022, the receivership estate held an ending balance of

$1,308,871.

**III.    CONCLUSION**

The Receiver respectfully requests that the Court grant the motion to approve this Report and award the related relief requested therein.

Dated: November 9, 2022           Respectfully submitted,

                                  By:   /s/*Michele Vives*
                                        Michele Vives, Receiver

# PROOF OF SERVICE

**STATE OF ILLINOIS, COUNTY OF COOK**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Cook, State of Illinois. My business address is 525 W. Monroe St., Chicago, IL 60661.

On November 10, 2022, I served the following document(s) described as:

**QUARTERLY REPORT OF RECEIVER MICHELE VIVES (THIRD QUARTER 2022)**

as follows:

**[ ]   BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed above and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with Katten Muchin Rosenman LLP practice for collecting and processing correspondence for mailing. On the same day that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

**[ ]   BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused the document(s) to be sent from e-mail address terence.banich@katten.com to the persons at the e-mail addresses listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**[ ]   BY OVERNIGHT MAIL (FedEx):** I enclosed said document(s) in an envelope or package provided by FEDEX and addressed to the persons at the addresses listed above. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of FEDEX or delivered such document(s) to a courier or driver authorized by FEDEX to receive documents.

**[ ]   BY PERSONAL SERVICE:** I caused said document to be personally delivered the document(s) to the person at the addresses listed above by leaving the documents in an envelope or package clearly labeled to identify the attorney being served with a receptionist or an individual in charge of the office.

**[X]   E-FILING:** By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

I declare under penalty of perjury under the laws of the State of Illinois that the foregoing is true and correct.

Executed on November 10, 2022, at Chicago, Illinois.

*/s/Terence G. Banich*
Terence G. Banich