Terence G. Banich (SBN 212173)
terence.banich@katten.com
Allison E. Yager (*pro hac vice*)
allison.yager@katten.com
**KATTEN MUCHIN ROSENMAN LLP**
525 W. Monroe St.
Chicago, IL 60661
Telephone:  (312) 902-5200
Facsimile:   (312) 902-1061

*Attorneys for the Receiver*
Michele Vives

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>            Plaintiff,<br><br>     v.<br><br>ZACHARY J. HORWITZ; and 1inMM CAPITAL, LLC,<br><br>            Defendants. | Case No. 2:21-cv-02927-CAS(GJSx)<br><br>**QUARTERLY REPORT OF RECEIVER MICHELE VIVES (FOURTH QUARTER 2022)**<br><br>Judge:       Hon. Christina A. Snyder<br>Courtroom: 8D |

# **TABLE OF CONTENTS**

I. GENERAL RECEIVERSHIP UPDATE ...................................................................... 2
    A. Update on Mediation of JJMT-Related Claims ............................................. 2
    B. Forensic Accounting Update .......................................................................... 5
    C. Current and Pending Settlements with Transfer Recipients and Net Winners ........................................................................................................... 6
        1. Susan Kozlowski ................................................................................. 7
        2. Ongoing Settlement Negotiations ....................................................... 8
    D. Asset Updates ................................................................................................. 8
        1. Rogue Black ........................................................................................ 8
        2. LayJax ............................................................................................... 10
        3. The Additional Investments ............................................................. 11
        4. Additional Film Investments ............................................................ 11
    E. Potential Litigation and Engagement of Conflicts Counsel ......................... 12
II. ACCOUNTING OF RECEIPTS AND DISBURSEMENTS ..................................... 12
    A. Cash Receipts ............................................................................................... 13
    B. Cash Disbursements ..................................................................................... 13
    C. Cash on Hand ............................................................................................... 13
III. CONCLUSION .......................................................................................................... 13

KATTEN MUCHIN ROSENMAN LLP
525 W. MONROE ST.
CHICAGO, IL 60661
(312) 902-5200

Case No. 2:21-cv-02927-CAS(GJSx)
QUARTERLY REPORT OF RECEIVER MICHELE VIVES
(FOURTH QUARTER 2022)

1

Michele Vives, the duly appointed permanent receiver (the "<u>Receiver</u>") of 1inMM Capital, LLC and its subsidiaries and affiliates ("<u>1inMM</u>"), and over assets that are attributable to funds derived from investors or clients of the Defendants or were fraudulently transferred by the Defendants (collectively, the "<u>Receivership Estate</u>"), pursuant to Local Rule 66-6 and the *Order on Appointment of a Permanent Receiver* ("<u>Order of Appointment</u>") entered on January 14, 2022, hereby submits this quarterly report (the "<u>Report</u>") for the period October 1, 2022 through December 31, 2022 (the "<u>Fourth Quarter</u>"). The Report details the Receiver's activities and findings during the Fourth Quarter to protect and administer the receivership estate, identify new assets and lay out the Receiver's general strategy to maximize the recovery for the benefit of harmed investors.

**I.     GENERAL RECEIVERSHIP UPDATE**

   **A.     <u>Update on Mediation of JJMT-Related Claims</u>**

As the Receiver discussed in her first, second and third quarterly reports, several investors have commenced numerous lawsuits in courts across the country alleging claims associated with Defendants' fraudulent scheme (defined in the first quarter 2022 report as the "<u>Investor Actions</u>"). It quickly became apparent to the Receiver that the Investor Actions against JJMT Capital, LLC ("<u>JJMT</u>") and its insiders—all of which are pending in federal and state courts in Chicago—were the most numerous, complex and in need of immediate attention.

In her report for the third quarter of 2022, the Receiver reported that, after several months of working with the lawyers for the parties to the JJMT Investor Actions about ways that the Receiver might help coordinate those actions and perhaps help resolve them, all parties agreed to participate in a formal mediation process. As of the end of the third quarter 2022, the groundwork for the JJMT mediation was established; the parties had met several times over Zoom to discuss various details pertaining to the mediation, including its potential scope, the selection of the mediator and the ways in which a global settlement might work vis

a vis the receivership. The parties also selected the mediator to be Hon. Sidney I. Schenkier, retired United States Magistrate Judge for the Northern District of Illinois, who is now with JAMS, where he serves as a mediator, arbitrator, special master and neutral evaluator.[1]

During the fourth quarter, the Receiver and her counsel worked assiduously to prepare for the JJMT mediation, which Judge Schenkier scheduled to occur on January 30-31, 2023 in Chicago. After selecting Judge Schenkier, the parties had multiple meetings amongst themselves and with Judge Schenkier to discuss the background of the underlying Horwitz fraud, the parties' claims and defenses, structure and function of the mediation and scheduling issues. The parties exchanged documents and information attendant to the mediation on Rule 408 terms, which has greatly facilitated the frankness and informality of the process. Judge Schenkier also assisted the parties to work out and resolve various minor disagreements that arose during the mediation preparation phase.

The time pressure on the Receiver was particularly acute during the fourth quarter because Judge Schenkier set a briefing schedule whereby the Receiver's opening mediation brief was due on December 16, 2022. In practical terms, then, the Receiver and her counsel had to prepare a separate mediation statement for every participant in the mediation who the Receiver contended was a "net winner" of the 1inMM Ponzi scheme and thus potentially liable to the receivership estate under the California Uniform Voidable Transactions Act, Cal. Civ. Code § 3439 *et seq.* ("UVTA"). Determining who is a net winner is largely a function of conducting a forensic accounting of all transfers to and from 1inMM, JJMT and the affected individuals, while explaining to the mediator why those individuals are liable to the receivership estate under UVTA is a legal issue.

---

[1] Judge Schenkier's detailed biography is available here: https://www.jamsadr.com/schenkier/

Therefore, to prepare for the mediation, the Receiver and her staff focused much of their time and attention during the fourth quarter on completing the forensic accounting analysis necessary to determine the extent to which the JJMT insiders were net winners of the 1inMM Ponzi scheme. This turned out to be a monumental task, as it required the Receiver and her professional staff to review and analyze tens of thousands of banking transactions and hundreds of financial records associated with 1inMM, JJMT, its four insiders and Horwitz covering a several-year period, and then verify those transactions against the 1inMM financial transactions and banking records already in the Receiver's possession. The verification step ensured that the final net-profit liability numbers were the product of fully vetted records that reflected no material discrepancies. The Receiver's forensic accounting analysis also required a lot of back-and-forth with the JJMT insiders' counsel to request banking documents, wire detail and other information. Fortunately, the JJMT defendants and their counsel were cooperative and responsive throughout, and provided the Receiver with the documents necessary for her to complete this analysis.

The Receiver directed her counsel to draft the mediation statements, to include a detailed explanation of the applicable legal principles under UVTA. Naturally, this required a considerable amount of legal research, drafting and editing, particularly as each JJMT defendant's potential liability presented a unique set of facts. On top of that, the Receiver expected (correctly, as it turned out) that the JJMT defendants would contend that the transfers to them were not avoidable under UVTA for a whole host of technical reasons, including because the applicable limitations period had passed, and because 1inMM made the transfers indirectly via JJMT. Anticipating these arguments and drafting cogent arguments about them necessitated a considerable amount of original scholarship and persuasive writing.

Ultimately, the Receiver timely submitted her four mediation statements to the mediator on December 16, 2022, wherein she took the position that the JJMT defendants had several million dollars of liability to the estate under UVTA. When

the fourth quarter ended on December 31, 2022, the briefing schedule for the mediation was still in process, and would not be completed until January 25, 2023.

In sum, the Receiver views these developments as extremely positive. The mediation, if successful, would result in a global resolution of all claims currently in litigation against JJMT and its insiders relating to the 1inMM fraud, as well as the Receiver's potential claims against those same defendants for avoidance and recovery of fraudulent transfers as a result of being "net winners" of Horwitz's Ponzi scheme. The Receiver expects that, in any settlement, the settling defendants would want to contribute their settlement proceeds to the receivership estate in exchange for entry of a bar order that enjoins any person or entity from suing them on account of any claim arising out of or related to the 1inMM fraud. Under applicable law, any person or entity who believes they hold such a claim would be unable to sue, but instead their claim against JJMT or its insiders would be "channeled" to a claims-and-distribution process that the Receiver will at the appropriate time ask the Court to approve. The Receiver also anticipates that any settlement will necessarily require a mechanism to reimburse some or all of the attorney's fees that the litigating JJMT investor plaintiffs have incurred to induce them to dismiss their litigation against the settling defendants and consent to the entry of a bar order. This will likely be a critical component of any global deal, as the Receiver understands that the JJMT insiders will not settle with the Receiver on her UVTA absent entry of a bar order.

The Receiver expects to address the outcome of the mediation in her first quarter 2023 report (or sooner, in a motion to approve any settlement she reaches).

**B.     Forensic Accounting Update**

The Receiver has devoted a great deal of time and effort to conducting a forensic accounting analysis of the financial transactions involving 1inMM and its insiders and affiliates. As the Court may recall, because there were no accounting records for 1inMM the Receiver had to start from scratch. Underscoring the importance of this endeavor, forensic accounting tasks encompass approximately

75% of the time expended by the Receiver and her team. To provide a sense of magnitude, the forensic accounting project requires analysis of over 770 bank statements encompassing over 18,600 transactions.

This forensic analysis is critical to determine who may be liable to the Estate for receiving fraudulent transfers, to identify previously unknown assets and to obtain information about 1inMM's investors. The Receiver was also able to confirm, unequivocally, that Zachary Horwitz orchestrated a Ponzi scheme since the very beginning of 1inMM. Although 1inMM did, in later years, make various investments into purportedly legitimate companies and film productions, those transactions accounted for only about 3% of the funds invested. Conversely, 97% of 1inMM funds appear to have been used towards perpetuating the Ponzi scheme or other illegitimate uses. The forensic accounting analysis has also identified potential recovery sources ranging from new investments made by Mr. Horwitz using 1inMM money, to individuals and entities who were net winners of the Ponzi scheme.

The Receiver and her team has nearly completed the forensic accounting analysis, the results of which she expects to share in a future report.

C. **Current and Pending Settlements with Transfer Recipients and Net Winners**

Through the Receiver's forensic accounting, the Receiver has identified investors who were significant net winners (receiving payments far in excess of the amounts they invested) as well as various persons and entities who were transferred very large sums from 1inMM but do not appear to have been investors in the 1inMM Ponzi scheme. By identifying these recipients, the Receiver is able to determine potential fraudulent transfers to both investors and non-investors alike, thereby increasing the pool of potential recovery to the Estate. Settlements that the Receiver reaches with such transferees are likely to be very significant estate assets. The Receiver and her professional staff have, therefore, devoted considerable time and attention to reviewing and analyzing tens of thousands of banking transactions and

associated records associated with 1inMM and Horwitz to identify those persons and entities who may have received transfers that are subject to avoidance and recovery. One such transferee was Susan M. Kozlowski ("Ms. Kozlowski"), who is Horwitz's mother, and two of her affiliated entities.

### 1. *Susan Kozlowski*

During her forensic accounting investigation, the Receiver discovered that 1inMM and Horwitz had made a significant amount of transfers to Ms. Kozlowski. Specifically, the Receiver determined that 1inMM or Horwitz transferred a total of $3,392,310.98 (the "Transfers") to Ms. Kozlowski or her related entities "the "Kozlowski Entities").

On April 4, 2022, the Receiver issued a subpoena to the Kozlowski Entities requesting various documents and communications associated with the Transfers. The Kozlowski Entities subsequently produced several hundred pages of documents to the Receiver. Through discussions and review of documents Ms. Kozlowski produced, the Receiver determined that Ms. Kozlowski was an investor in 1inMM, and the total of her principal invested was $3,150,000. However, 1inMM also transferred $3,240,000 back to Ms. Kozlowski, constituting a return of her principal plus a profit of $90,000. The Receiver also determined that the Kozlowski Entities received additional transfers from 1inMM or Horwitz totaling $152,310.98 that were unrelated to Ms. Kozlowski's investments in 1inMM.

The Receiver and the Kozlowski Entities entered into discussions and spent several months engaged in good-faith, arms-length settlement negotiations. On December 21, 2022, the parties entered into that certain *Settlement Agreement and Mutual Release* (the "Settlement Agreement"). As reflected in the Settlement Agreement, the Kozlowski Entities agreed to pay $300,000 to the estate in full settlement of the Claims. In essence, the Kozlowski Entities agreed to return 100 percent of the money they received from 1inMM and Horwitz—including all of Ms. Kozlowski's profit on her investments in 1inMM—as well as about two percent of

the principal transfers. These percentages reflect the Receiver's assessment of the relative strength of her claims weighed against the risk and cost associated with litigating those claims. On January 25, 2023, the Court entered an order approving the settlement with the Kozlowski Entities.

### 2. *Ongoing Settlement Negotiations*

The Receiver is currently in discussions with a handful of other individuals and entities regarding their net winnings and transfer receipts. Negotiations surrounding these transfers remain ongoing and, in order to not jeopardize these good-faith discussions, the exact details will remain confidential from public filings. However, once a settlement is reached, the Receiver will petition the Court to approve any agreement. Further, should the Receiver determine that a lawsuit need be filed to recoup fraudulent transfer monies, the Receiver will provide additional information in future reports.

### D. Asset Updates

In addition to the cash on hand detailed in paragraph II.C. (below), the receivership assets currently consist of: (1) Rogue Black, LLC ("Rogue Black"), (2) LayJax Ventures, LLC ("LayJax"), (3) investments made into sixteen entities controlled by Jacob Wunderlin, a principal of JJMT (the sixteen entities are referenced as the "Additional Investments"), and (4) investments made in potentially eight additional films. The updated details to each of these is outlined below.

### 1. *Rogue Black*

Rogue Black was a film finance and production company in which Horwitz owned a membership interest and invested using 1inMM funds. Ultimately, 1inMM invested approximately $20 million with Rogue Black, which went on to produce and complete a total of eight films (collectively, the "Produced Films"). The Receiver has focused on two main goals with regard to Rogue Black: first, to understand what is owed to Rogue Black from the Produced Films in the near term and, second, to collect on those owed monies. As to the first goal, the Receiver

engaged Ray Reyes, a consultant specializing in film distribution and distressed film libraries. Mr. Reyes analyzed Rogue Black's film library and distribution agreements to determine current monies owed, as well as future amounts likely to be owed.

### a. *Mr. Reyes' Analysis and Findings*

Mr. Reyes researched and analyzed the Produced Films to identify potential receivables owed to Rogue Black or its subsidiaries over the next five-year period. Film accounting is notoriously complex, and the Produced Films are no exception. Each film has sales agents, subdistributors, equity investors (of which Rogue Black may be one of many), debt financiers, collection agencies and many other participants—each have varying repayment priority payment from revenues generated by the film. All participants are repaid according to a detailed distribution waterfall schedule typically outlined in a Collection Account Management Agreement. Rogue Black's position on the waterfall schedule varies from film to film depending on the funding circumstances.

Therefore, Mr. Reyes reviewed each waterfall, assembled and analyzed the relevant subdistribution agreements, examined statements issued by the applicable collection agents and constructed an analysis for determining outstanding amounts still owed to Rogue Black, and estimating potential future distributions over the next five years. Mr. Reyes compiled a comprehensive report analyzing each film in detail, which he provided to the Receiver in December 2022. As the contents of this report underpin much of the Receiver's strategy to maximize the recovery from these assets, including legal and otherwise, the report itself and details within are not yet being disclosed.

### b. *Collections Made During the Fourth Quarter*

As to the second goal – collecting monies owed to Rogue Black – Mr. Reyes continues to provide substantial assistance. During the fourth quarter of 2022, Rogue Black collected $286,177 on account of distribution of the Produced Films.

      c.    *Payment Dispute and Demand for Arbitration*

Through Mr. Reyes' investigation, it was discovered that Rogue Black is owed a significant amount of money related to distribution rights on one of its films. The Receiver attempted to resolve the issue through discussions with the relevant parties. However, when it became apparent those discussions were no longer making progress, the Receiver initiated a demand for arbitration as granted under the acquisition agreement entered into by the relevant parties. This process has necessitated the need for the Receiver to engage certain members of her counsel's team that have expertise and specialized experience in entertainment law. As these proceedings are in their infancy, and to allow for good faith negotiations to occur, the Receiver is not publicly disclosing details but will provide updates in future reports as progress is made.

    **2.**    **LayJax**

LayJax is an angel investment company which invested in early startup business ventures. Using 1inMM funds, Horwitz caused LayJax to invest $2.5 million with twelve separate startup business ventures that LayJax had sourced. The businesses in which LayJax invested are broad and diverse. The Receiver continually monitors each for progress, as well as for potential opportunities to generate recoveries.

      a.    *Update on Recovery Potential*

As previously reported, only two or three of LayJax's twelve investments hold a moderate chance of producing a recovery. One investment, made with a company that sells skincare treatments, has recently been acquired by an equity investment firm. That transaction closed on October 21, 2022 and the receivership estate received $449,661.24, as a partial return of their original investment. There may be some additional distributions in 2024, which the Receiver will continue to monitor. There has been no new meaningful activity on any of LayJax's other investments.

//

### b. *New Operating Agreement*

The Receiver has entered into a new operating agreement for LayJax. The new operating agreement provides the Receiver more expansive and direct control over the company and clarifies the distribution priority of any monies received by LayJax.

### 3. **The Additional Investments**

As a part of the Receiver's forensic accounting analysis, the Receiver identified investments of more than $5.6 million made by ZJH Enterprises, LLC ("ZJH") or 1inMM into Additional Investments, sixteen (16) investment vehicles. ZJH's sole source of funding came from 1inMM. The entities comprising the Additional Investments are each investment vehicles made for the sole purpose of investing into third party start-up companies. Importantly, however, the Additional Investments are all managed or controlled by a principal of one of the aggregators. On September 8, 2022, the Receiver's professional staff issued a letter to the managing member requesting various documents such as financial statements, agreements, and other supporting documents relating to the Additional Investments.

In reviewing the production of records, the Receiver discovered that ZJH was the largest investor in the Additional Investments. According to bank records, ZJH invested over $5.6 million ("Invested Funds") into the Additional Investments. Additional questions remain, compelling the Receiver to continue her investigation into these entities and make additional document and information requests. Once the Receiver has an understanding of these investments, she will develop a strategy to maximize the recovery to the estate. The Receiver will continue to keep the Court informed as more information becomes available.

### 4. **Additional Film Investments**

As a result of the Receiver's forensic accounting investigation, the Receiver and her staff identified five additional entities that received more than $13.1 million from 1inMM. These entities are believed to have funded the production of an additional eight films that were previously unknown to the Receiver. The Receiver

continues to investigate these entities, films and the best avenue to efficiently maximize the recovery from these investments. The Receiver believes it prudent not to include any additional details on these entities and films in this report so as not to impede, jeopardize or hamper her investigation. Once the Receiver has additional information, the Receiver will summarize it in a future quarterly report.

### E. Potential Litigation and Engagement of Conflicts Counsel

The Receiver and her staff are in the process of investigating the acts, transactions, conduct, assets, liabilities and financial condition of the Defendants and their insiders and affiliates with the objective of identifying assets of the receivership estate, including causes of action that the Receiver may bring against third parties. The Receiver believes that there are several hundred third parties who will potentially become adverse to the Receiver, a small number of which present legal or business conflicts for the Receiver's lead counsel, Katten Muchin Rosenman LLP ("Katten").

Considering that Katten is a large national law firm with tens of thousands of clients, Katten may from time to time determine that it has or may have a conflict of interest as to some additional of those adverse third parties. Because the Receiver believed it appropriate to engage independent counsel to evaluate and investigate any matters in which Katten might have a conflict of interest, the Receiver decided to engage Raines Feldman LLP ("Raines Feldman") to represent her should such a conflict of interest arise. Therefore, on December 7, 2022, the Receiver moved the Court to authorize her to engage Raines Feldman as conflict counsel, and the Court granted that motion on January 3, 2023.

## II. ACCOUNTING OF RECEIPTS AND DISBURSEMENTS

Attached as Exhibit "A" is a copy of the Standard Fund Accounting Report. Below is a summary of the cash receipts and disbursements from the estate on a cash accounting basis.

//

### A. Cash Receipts

During the Fourth Quarter, the receivership estate had cash receipts of $814,938. These cash receipts were comprised of (i) $528,761 related to recoveries made from LayJax (compromised of the $449,661.24 distribution related to the skincare equity sale, and $79,100.00 related to a turnover of cash held by LayJax), and (ii) $286,177 related to collections from Rogue Black films.

### B. Cash Disbursements

During the Fourth Quarter, cash disbursements totaled $597,535.00. These disbursements were comprised of (i) $299,293 of Receiver's fees, (ii) $242,147 of attorneys' fees, (iii) $26,974 of consulting fees related to Rogue Black (iv) $20,000 of mediator fees, (v) $5,032 of software fees, (vi) $4,001 related to LayJax business costs, and (vii) $88 related to banking fees.

### C. Cash on Hand

As of December 31, 2022, the receivership estate held an ending balance of $1,526,274.

### III. CONCLUSION

The Receiver respectfully requests that the Court grant the motion to approve this Report and award the related relief requested therein.

Dated: February 9, 2022

Respectfully submitted,

By: /s/*Michele Vives*
    Michele Vives, Receiver

# PROOF OF SERVICE

**STATE OF ILLINOIS, COUNTY OF COOK**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Cook, State of Illinois. My business address is 525 W. Monroe St., Chicago, IL 60661.

On February 9, 2023, I served the following document(s) described as:

**QUARTERLY REPORT OF RECEIVER MICHELE VIVES (FOURTH QUARTER 2022)**

as follows:

[ ]   **BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed above and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with Katten Muchin Rosenman LLP practice for collecting and processing correspondence for mailing. On the same day that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

[ ]   **BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused the document(s) to be sent from e-mail address terence.banich@katten.com to the persons at the e-mail addresses listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

[ ]   **BY OVERNIGHT MAIL (FedEx):** I enclosed said document(s) in an envelope or package provided by FEDEX and addressed to the persons at the addresses listed above. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of FEDEX or delivered such document(s) to a courier or driver authorized by FEDEX to receive documents.

[ ]   **BY PERSONAL SERVICE:** I caused said document to be personally delivered the document(s) to the person at the addresses listed above by leaving the documents in an envelope or package clearly labeled to identify the attorney being served with a receptionist or an individual in charge of the office.

[X]   **E-FILING:** By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

I declare under penalty of perjury under the laws of the State of Illinois that the foregoing is true and correct.

Executed on February 9, 2023, at Winnetka, Illinois.

*/s/Terence G. Banich*
Terence G. Banich