Terence G. Banich (SBN 212173)
terence.banich@katten.com
Allison E. Yager (*pro hac vice*)
allison.yager@katten.com
**KATTEN MUCHIN ROSENMAN LLP**
525 W. Monroe St.
Chicago, IL 60661
Telephone:  (312) 902-5200
Facsimile:   (312) 902-1061

*Attorneys for the Receiver*
Michele Vives

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. 2:21-cv-02927-CAS(GJSx) |
| Plaintiff, | **NOTICE OF MOTION AND MOTION OF RECEIVER MICHELE VIVES FOR ORDER APPROVING SETTLEMENT WITH JAMES DAINARD AND RELATED ENTITIES; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| v. | |
| ZACHARY J. HORWITZ and 1inMM CAPITAL, LLC, | |
| Defendants. | Date:      March 13, 2023 |
| | Time:      10:00 a.m. PT |
| | Judge:     Hon. Christina A. Snyder |
| | Courtroom: 8D |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT, on March 13, 2023, at 10:00 a.m., or as soon thereafter as the matter may be heard in Courtroom 8D, located at the United States Courthouse, 350 West First Street, Los Angeles, California 90012, Michele Vives, not individually, but solely as the federal equity receiver (the "Receiver") of defendant of 1inMM Capital, LLC and its subsidiaries, affiliates and over the assets more particularly described in the *Order on Appointment of Permanent Receiver*, dated January 14, 2022 [ECF #70] (the "Receiver Order"), will and hereby does move the Court for entry of an order approving the settlement with James Dainard (the "Motion"). The Motion is based on the Memorandum of Points and Authorities below and is supported by the *Declaration of Michele Vives*, dated February 13, 2023 ("Vives Decl."), copy attached as **Exhibit 1**.

This Motion is made following the conference of counsel pursuant to Local Rule 7-3 which took place on February 10 and 13, 2023. **No party requests a hearing on the Motion.**

Dated: February 13, 2023

Respectfully submitted,

**KATTEN MUCHIN ROSENMAN LLP**

By:    /s/*Terence G. Banich*
Terence G. Banich

*Attorneys for the Receiver*
Michele Vives

KATTEN MUCHIN ROSENMAN LLP
525 W. MONROE ST.
CHICAGO, IL 60661
(312) 902-5200

KATTEN MUCHIN ROSENMAN LLP
525 W. MONROE ST.
CHICAGO, IL 60661
(312) 902-5200

## MEMORANDUM OF POINTS AND AUTHORITIES

### Factual Background

**A.    The SEC's enforcement action against Horwitz and 1inMM**

On April 5, 2021, the Securities and Exchange Commission ("SEC") commenced the above-captioned action against Zachary J. Horwitz ("Horwitz") and 1inMM Capital, LLC ("1inMM," and together with Horwitz, the "Defendants"), alleging that they committed an offering fraud and Ponzi scheme[1] in violation of the federal securities laws. (*Complaint*, dated April 5, 2021 [ECF #1] ("Compl."), ¶¶ 1, 4.)

Specifically, the SEC alleges that, since at least March 2014 and continuing until at least December 2019, Defendants raised over $690 million from investors by selling promissory notes issued by 1inMM using fabricated agreements and fake emails with prominent third-party companies with whom Defendants had no actual business relationship. (Compl. ¶¶ 4, 19-33.) Defendants represented to potential investors that the purpose of the offering was to finance 1inMM's acquisition and licensing of distribution rights in specific movies to major media companies, such as Netflix and Home Box Office ("HBO"). (*Id.* ¶¶ 5, 34-38.) To induce investors to purchase 1inMM's promissory notes, Horwitz made various false and misleading statements about his experience and the involvement of major media corporations as his "Strategic Partner[s]," and showed potential investors falsified documents and communications to make his statements more believable. (*Id.* ¶¶ 5-6, 39-48.) The reality, however, was that Defendants had no relationship with Netflix or HBO, and

---

[1] "A Ponzi scheme is a fraudulent arrangement in which an entity makes payments to investors from monies obtained from later investors rather than from any 'profits' of the underlying business venture. The fraud consists of funnelling proceeds received from new investors to previous investors in the guise of profits from the alleged business venture, thereby cultivating an illusion that a legitimate profit-making business opportunity exists and inducing further investment." *In re United Energy Corp.*, 944 F.2d 589, 590 n.1 (9th Cir. 1991) (citing *Cunningham v. Brown*, 265 U.S. 1, 7-8 (1924)).

had never licensed any movie rights to any company. (*Id.* ¶¶ 8, 49.) Horwitz used investor funds to pay purported returns on previous investments, as well as to spend lavishly on his lifestyle. (*Id.* ¶¶ 4, 9-12, 50-61.)

**B.    The Receiver Order**

On December 8, 2021, the SEC filed a motion in this case asking the Court to appoint a receiver over 1inMM and over all assets held by, for the benefit of or under the direct or indirect control of Horwitz (the "Receiver Motion"). [ECF #65] In the Receiver Motion, the SEC argued that appointing an equity receiver was necessary to marshal investor assets that Horwitz misappropriated into a variety of third-party business enterprises or for his own personal benefit. (Receiver Mot. at 1.) The SEC alleged that Defendants raised a staggering $690 million from investors, and subsequently invested about $23 million into startup and film-production companies. (*Id.* at 1, 3-4.) These investments, the SEC asserted, may result in significant monetary returns, so they require the management and supervision of an independent fiduciary in order to maximize recovery to the defrauded investors. (*Id.* at 5-7.)

On January 14, 2022, the Court granted the Receiver Motion and entered the Receiver Order, finding that good cause existed to appoint a permanent receiver over 1inMM as well as assets that are attributable to investor or client funds or that were fraudulently transferred by Defendants, in order to identify and marshal assets to make the defrauded investors as whole as possible. (Receiver Order § I; Vives Decl. ¶ 4.) Ms. Vives is receiver of 1inMM and its subsidiaries and affiliates, as well as over the assets that are attributable to funds derived from investors or clients of Defendants or were fraudulently transferred by Defendants (collectively, the "Estate"). (Receiver Order §§ I-II; Vives Decl. ¶ 4.)

The Receiver Order confers on Ms. Vives "full powers of an equity receiver," and specifically authorizes and directs the Receiver to, among other things: take custody and control over all assets of 1inMM and its subsidiaries and affiliates;

conduct an investigation and discovery as may be necessary to locate and account for the assets of or managed by 1inMM and its subsidiaries and affiliates; and investigate and, where appropriate, prosecute claims and causes of action that the Receiver may possess. (Receiver Order § II; Vives Decl. ¶ 5.)

### C.    The Receiver's investigation of transfers

Pursuant to the authority conferred on her by the Receiver Order, and as the Receiver has discussed in her previous quarterly reports, the Receiver and her staff have devoted a great deal of time and effort to conduct a forensic accounting analysis of the financial transactions involving 1inMM, Horwitz and their respective insiders and affiliates. (Vives Decl. ¶ 6.) This project is critical to determine who may be liable to the Estate for receiving fraudulent transfers, identify previously unknown assets and obtain information about 1inMM's investors. (*Id.*)

The Receiver has determined that 1inMM did not just transfer funds to investors and their feeder funds; 1inMM also transferred very large sums to various persons and entities who do not appear to have been investors in the 1inMM Ponzi scheme. (Vives Decl. ¶ 7.) The Receiver is investigating both types of transfers. (*Id.*) In doing so, the Receiver will be able to identify potential fraudulent transfers to both investors and non-investors alike, thereby increasing the pool of potential recovery to the Estate. (*Id.*) *See, e.g., Donell v. Kowell*, 533 F.3d 762, 767 (9th Cir. 2008) ("[c]ourts have routinely applied [the California Uniform Voidable Transactions Act] to allow receivers or trustees in bankruptcy to recover monies lost by Ponzi-scheme investors").

Settlements that the Receiver reaches with such transferees are likely to be very significant Estate assets. (Vives Decl. ¶ 7.) The Receiver and her professional staff have, therefore, devoted considerable time and attention to reviewing and analyzing tens of thousands of banking transactions and other records associated

KATTEN MUCHIN ROSENMAN LLP
525 W. MONROE ST.
CHICAGO, IL 60661
(312) 902-5200

with 1inMM and Horwitz to identify those persons and entities who may have received transfers that are subject to avoidance and recovery. (*Id.* ¶ 8.)

### D. Transfers to the Dainard Entities and subsequent investigation

During her forensic accounting investigation, the Receiver discovered that 1inMM and Horwitz had made a significant amount of transfers to James M. Dainard ("Mr. Dainard"), both directly as well as to an entity that Mr. Dainard owns and controls, JMD Investments WA, LLC ("JMD Investments"), and to a large financial institution as custodian of Mr. Dainard's individual retirement account (the "Dainard IRA," and collectively with Mr. Dainard and JMD Investments, the "Dainard Entities"). (Vives Decl. ¶ 9.) Specifically, the Receiver determined that, between December 2015 and June 2018, 1inMM Defendants made multiple transfers in the total aggregate amount of $353,034.17 (the "Transfers") to the Dainard Entities. (*Id.* ¶ 10.) The Receiver's forensic accounting analysis of the Transfers indicated that they constituted Mr. Dainard's profits from investing in the 1inMM Ponzi scheme. (*Id.*)

Beginning on or about July 8, 2022, the Receiver, by her counsel, informally requested that Mr. Dainard produce documents pertaining to the Transfers. (Vives Decl. ¶ 11.) Discussions with Mr. Dainard continued periodically over the next several months, and eventually he retained Magnus R. Andersson of Hanson Baker Ludlow Drumheller P.S. in Bellevue, Washington, as his counsel. (*Id.*) Mr. Dainard produced documents to the Receiver in response to her informal request. (*Id.* ¶ 12.) Through discussions with Messrs. Dainard and Andersson and review of documents Mr. Dainard produced, the Receiver determined that Mr. Dainard was an investor in 1inMM, and that in connection therewith he made several investments in 1inMM beginning in October 2013 and continuing to June 2018. (*Id.* ¶ 13.) On various dates between approximately December 21, 2015 and June 12, 2018, 1inMM made 14 transfers to the Dainard Entities in differing amounts for a grand total of

KATTEN MUCHIN ROSENMAN LLP
525 W. MONROE ST.
CHICAGO, IL 60661
(312) 902-5200

$353,034.17. (*Id.* ¶ 14.) These constitute the Transfers, a detailed list of which is annexed to the Vives Declaration as **Exhibit 1-1**. (*Id.* ¶ 15.)

**E.    The parties' claims and defenses as to the Transfers**

The Receiver asserted that she may avoid and recover all of the Transfers as actual fraudulent transfers pursuant to section 3439.04(a)(1) of the California Uniform Voidable Transactions Act, Cal. Civ. Code § 3439 *et seq.* ("UVTA") (the "Claims"). (Vives Decl. ¶ 16.) This was because, the Receiver contended, 1inMM and Horwitz made the Transfers with the actual intent to hinder, delay, or defraud their creditors, as Horwitz pled guilty and admitted that he used 1inMM to operate a Ponzi scheme, which conclusively establishes the intent element for purposes of an actual fraudulent transfer claim under Cal. Civ. Code § 3439.04(a)(1). (*Id.*) Finally, as there was no serious question that the Dainard Entities were either the first transferees of the Transfers or the persons for whose benefit those transfers were made, the Receiver argued that she could recover all of the Transfers from them under Cal. Civ. Code § 3439.08(b)(1)(A). (*Id.* ¶ 17.)

The parties then engaged in good-faith, arms-length settlement negotiations. (Vives Decl. ¶ 18.) The Dainard Entities asserted various defenses to the Claims. (*Id.* ¶ 19.) Their principal defenses were that the Receiver could not avoid or recover the Transfers because the statute of limitations under UVTA had expired, and that some of the Transfers constituted a return of principal, as opposed to profits, and were therefore not avoidable under UVTA. (*Id.*) The Receiver reviewed the financial records and other documents that the Dainard Entities produced in response to her informal requests to assess whether the Transfers at issue were return of principal or profits. (*Id.* ¶ 20.) This process turned out to be somewhat inconclusive for both sides because, despite diligent efforts, some of the banking and financial records pertinent to the older transfers were no longer available. (*Id.*) The Receiver's counsel also sent

KATTEN MUCHIN ROSENMAN LLP
525 W. MONROE ST.
CHICAGO, IL 60661
(312) 902-5200

1   Mr. Andersson a detailed analysis of why the Claims are not barred by the statute of

2   limitations. (*Id.*) This point remained contested during the parties' negotiations. (*Id.*)

3   **F.     The proposed settlement**

4   On February 1, 2023, the parties entered into that certain *Settlement*

5   *Agreement and Mutual Release* (the "Settlement Agreement"), a true and correct

6   copy of which is attached as **Exhibit 2**. (Vives Decl. ¶ 21.)

7   As reflected in the Settlement Agreement, the Dainard Entities agreed to pay

8   $247,000 to the Estate in full settlement of the Claims (the "Settlement Payment").

9   (Vives Decl. ¶ 22; Sett. Agmt. ¶ 2.) The Settlement Payment is 69.9 percent of the

10   amount in controversy of $353,034.17, and reflects the Receiver's assessment of the

11   relative strength of her Claims weighed against the risk and cost associated with

12   litigating those claims, particularly as to the Dainard Entities' asserted defenses.

13   (Vives Decl. ¶ 23.)

14   The Receiver, Mr. Dainard and JMD Investments will exchange mutual

15   general releases of any claims arising out of or relating to the Dainard Entities'

16   transactions and dealings with 1inMM and Horwitz, the Transfers and the Claims.

17   (Vives Decl. ¶ 24; Sett. Agmt. ¶¶ 3-5.) Mr. Dainard and JMD Investments will also

18   waive any right to file, and covenant not to file, a claim against the Estate. (Vives

19   Decl. ¶ 25; Sett. Agmt. ¶ 7.) The validity of the Settlement Agreement, and the

20   parties' obligations thereunder, are subject to the condition precedent that the Court

21   enters an order approving its material terms. (Vives Decl. ¶ 26; Sett. Agmt. ¶ 8.)

22   **Legal Standards**

23   District courts have "extremely broad" power and "wide discretion" in

24   overseeing the administration of a receivership. *Sec. & Exch. Comm'n v. Hardy*, 803

25   F.2d 1034, 1037 (9th Cir. 1986) (internal citations omitted). The Ninth Circuit

26   "affords 'broad deference' to the district court's supervisory role" in receivership

27   cases, and "generally uphold[s] reasonable procedures instituted by the district court

28   that serve th[e] purpose of orderly and efficient administration of the receivership

KATTEN MUCHIN ROSENMAN LLP
525 W. MONROE ST.
CHICAGO, IL 60661
(312) 902-5200

for the benefit of creditors." *Commodity Futures Trading Comm'n v. Topworth Int'l, Ltd.*, 205 F.3d 1107, 1115 (9th Cir. 1999) (quoting *Hardy*, 803 F.3d at 1037-38).

That broad authority to oversee the administration of a receivership extends to approving compromises and settlements. "[N]o federal rules prescribe a particular standard for approving settlements in the context of an equity receivership; instead, a district court has wide discretion to determine what relief is appropriate." *Gordon v. Dadante*, 336 F. App'x 540, 549 (6th Cir. 2009) (citing *Liberte Cap. Grp., LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006)); *see also Sec. & Exch. Comm'n v. Kaleta*, 530 F. App'x 360, 362 (5th Cir. 2013) (affirming order approving receiver's settlement, observing "because this is a case in *equity*, it is neither surprising nor dispositive that there is no case law directly controlling" the district court's order approving the compromise) (original emphasis).

Local Rule 66-8 directs a receiver to "administer the estate as nearly as possible in accordance with the practice in the administration of estates in bankruptcy." LR 66-8. District courts sitting in receivership may look to bankruptcy law for guidance about the administration of a receivership. *See, e.g., Sec. & Exch. Comm'n v. Cap. Consultants, LLC*, 397 F.3d 733, 745 (9th Cir. 2005) (bankruptcy law "analogous" and therefore persuasive in administration of receivership estates). This is largely because "the purpose of bankruptcy receiverships and equity receiverships is 'essentially the same—to marshal assets, preserve value, equally distribute to creditors, and, either reorganize, if possible, or orderly liquidate.'" *Sec. & Exch. Comm'n v. Stanford Int'l Bank, Ltd.*, 927 F.3d 830, 841 (5th Cir. 2019) (quoting *Janvey v. Alquire*, No. 3:09-cv-0724, 2014 WL 12654910, at *17 (N.D. Tex. July 30, 2014)); *accord Sec. & Exch. Comm'n v. Wealth Mgmt. LLC*, 628 F.3d 323, 334 (7th Cir. 2010) ("[t]he goal in both securities-fraud receiverships and liquidation bankruptcy is identical—the fair distribution of the liquidated assets").

Courts in this circuit typically apply bankruptcy principles to evaluate approval of settlements in receivership cases. *Sec. & Exch. Comm'n v. Champion-*

*Cain*, 2022 WL 126114, at *1 (S.D. Cal. Jan. 13, 2022) (applying bankruptcy principles regarding approval of settlements in receivership case); *Sec. & Exch. Comm'n v. Total Wealth Mgmt., Inc.*, 2019 WL 13179068, at *2 (S.D. Cal. Sept. 18, 2019) (same). Bankruptcy courts evaluate whether a compromise is "fair and equitable," taking into consideration "[a] the probability of success in litigation, [b] any difficulties that may be encountered in collection, [c] the complexity of the litigation, the expense, inconvenience, and delay necessarily attending, and [d] the interest of the receivership entities' creditors and their reasonable views." *Champion-Cain*, 2022 WL 126114, at *1 (citing *In re Woodson*, 839 F.2d 610, 620 (9th Cir. 1988)); *see also Martin v. Kane (In re A & C Props.)*, 784 F.2d 1377, 1381 (9th Cir. 1986)).

"The analysis under these factors is holistic; the Court must canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness…[I]t is not necessary to satisfy each of these factors provided that the factors as a whole favor approving the settlement." *Total Wealth Mgmt., Inc.*, 2019 WL 13179068, at *3 (internal citations and quotations omitted); *accord In re Open Med. Inst., Inc.*, 639 B.R. 169, 185 (B.A.P. 9th Cir. 2022) ("a settlement can satisfy the *A & C Properties* test even if the evidence supporting one or more of the four factors is relatively weak"). The Court should consider these factors "as a whole, and not individually in a vacuum, to ascertain whether the settlement is a good deal compared to litigation." *Open Med. Inst.*, 639 B.R. at 185. Further, when assessing a settlement, the Court need not decide issues of disputed fact or questions of law raised in the controversies sought to be settled. *Burton v. Ulrich (In re Schmitt)*, 215 B.R. 417, 423 (9th Cir. BAP 1997).

Courts generally should "give deference to a [receiver's] business judgment in deciding whether to settle a matter for the benefit of the estate." *In re Douglas J. Roger, M.D., Inc., APC*, 393 F. Supp. 3d 940, 961 (C.D. Cal. 2019) (cleaned up); *see also In re Lahijani*, 325 B.R. 282, 289 (B.A.P. 9th Cir. 2005). "Approving a

proposed compromise is an exercise of discretion that should not be overturned except in cases of abuse leading to a result that is neither in the best interests of the estate nor fair and equitable for the creditors." *In re MGS Mktg.*, 111 B.R. 264, 266-67 (B.A.P. 9th Cir. 1990).

## <u>Argument</u>

The Motion should be granted because the settlement is fair, equitable and far preferable to protracted litigation with the Dainard Entities.

<u>First</u>, the Receiver's probability of success litigating the Claims is mixed. *See, e.g., Total Wealth Mgmt.*, 2019 WL 13179068, at *3 ("When determining the probability of success in litigation, a court must canvass the Receiver's litigation risk and determine whether the settlement amount is commensurate to that risk.") (citation and internal quotation omitted). Assessing risk here is largely a function of how controlling law interpreting UVTA limits a receiver's ability to claw back money from investors in a Ponzi scheme.

The Receiver's potential claims against the Dainard Entities arise under UVTA, the purpose of which is "to prevent debtors from placing, beyond the reach of creditors, property that should be made available to satisfy a debt by transferring that property to others." *RPB SA v. Hyla, Inc.*, No. CV-20-04105-JAK, 2021 WL 4980092, at *4 (C.D. Cal. June 24, 2021) (quoting *Chen v. Berenjian*, 33 Cal. App. 5th 811, 817 (2019)) (cleaned up). UVTA enables a creditor to bring an action to avoid a fraudulent transfer of an asset to the extent necessary to satisfy its claim. Cal. Civ. Code § 3439.07(a)(1). A transfer is fraudulent—and thus avoidable—if the debtor transferred the asset either (1) with actual intent to hinder, delay, or defraud any of its creditors, or (2) without receiving reasonably equivalent value in exchange therefor when it had unreasonably small capital or was insolvent (often called "constructive fraud"). *Id.* §§ 3439.04(a)(1)-(2). A creditor may bring an action under

KATTEN MUCHIN ROSENMAN LLP
525 W. MONROE ST.
CHICAGO, IL 60661
(312) 902-5200

1    UVTA against the first transferee of the asset, the person for whose benefit the

2    transfer was made or any subsequent transferees. *Id.* §§ 3439.08(b)(1)(A)-(B).

3        Fraudulent transfer claims—colloquially called "clawback" actions—are

4    among a receiver's most important tools to recover monies lost by Ponzi-scheme

5    investors. *See, e.g., Donell*, 533 F.3d at 767 (courts "have routinely applied" UVTA

6    for this purpose). The Ponzi scheme operator is the "debtor" and each investor is a

7    "creditor," although the investors who profited from the scheme on a net basis—

8    sometimes called "net winners"—are the recipients of the Ponzi scheme operator's

9    fraudulent transfers, and are thus liable under UVTA. *Id.* at 767, 771. An equity

10   receiver has standing to pursue fraudulent transfer claims "to redress injuries that

11   [the receivership entity] suffered when its managers caused [it] to commit waste and

12   fraud." *Id.* at 777; *see also McNamara v. Hallinan*, No. 2:17-CV-02967-GMN, 2019

13   WL 4752265, at *5 (D. Nev. Sept. 30, 2019).

14       Like any UVTA claimant, a receiver may assert that a transfer was actually or

15   constructively fraudulent. *Donell*, 533 F.3d at 770. But the debtor's admission that

16   it operated a Ponzi scheme *conclusively* establishes the debtor's fraudulent intent for

17   a UVTA claim premised on actual fraud (*In re Slatkin*, 525 F.3d 805, 814 (9th Cir.

18   2008)),[2] as well as the debtor's financial distress for a UVTA claim premised on

19   constructive fraud (*Donell*, 533 F.3d at 770-71).[3] To determine whether a Ponzi

20   scheme investor is liable to the estate for receiving fraudulent transfers, courts apply

---

[2] "We now hold that a debtor's admission, through guilty pleas and a plea agreement admissible under the Federal Rules of Evidence, that he operated a Ponzi scheme with the actual intent to defraud his creditors conclusively establishes the debtor's fraudulent intent under 11 U.S.C. § 548(a)(1)(A) and California Civil Code § 3439.04(a)(1), and precludes relitigation of that issue." *Slatkin*, 525 F.3d at 814.

[3] "Proof that transfers were made pursuant to a Ponzi scheme generally establishes that the scheme operator '[w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction,' § 3439.04(a)(2)(A), or '[i]ntended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due,' § 3439.04(a)(2)(B)." *Donell*, 533 F.3d at 770-71.

KATTEN MUCHIN ROSENMAN LLP
525 W. MONROE ST.
CHICAGO, IL 60661
(312) 902-5200

the "netting rule." *Id.* at 771. Under that rule, "the amounts transferred by the Ponzi scheme perpetrator to the investor are netted against the initial amounts invested by that individual. If the net is positive, the receiver has established liability[.]" *Id.* Generally, "innocent" investors may retain the payments they received up to the amount invested, but they must disgorge the "profits" paid to them by the Ponzi scheme as they "do not represent a return on legitimate investment activity." *Id.* (quoting *In re Lake States Commodities, Inc.*, 253 B.R. 866, 872 (Bankr. N.D. Ill. 2000)).

Investors may retain payments returning the amounts invested only if they can prove that they received those transfers in good faith and for reasonably equivalent value. Cal. Civ. Code § 3439.08(a); *see also Donell*, 533 F.3d at 771. But a receiver may, under an actual fraud theory, challenge a winning investor's good faith by seeking to avoid and recover *the entire amount* paid to the investor, including amounts which could be considered "return of principal." *Donell*, 533 F.3d at 771. The investor has the burden of proving the defense that it received transfers returning its principal investment in good faith and for value. Cal. Civ. Code § 3439.08(f)(1). Whether the good-faith defense applies is a question of fact. *See, e.g., Neilson v. E & F Fin. Servs., Inc. (In re Cedar Funding, Inc.)*, No. 08-52709-MM, 2011 WL 5855441, at *5 (Bankr. N.D. Cal. Nov. 22, 2011).

Here, as discussed above, the Receiver believes that the Transfers constitute the Dainard Entities profits from investing in the 1inMM Ponzi scheme, and thus they are "net winners" and liable under UVTA. (Vives Decl. ¶¶ 10, 13-15.) Had the Receiver commenced litigation against the Dainard Entities, the Receiver would have had a high probability of success at avoiding and recovering the transfers of fictitious profits they received as a result of their investments in 1inMM, as they likely would have no defense to that claim. *Cf. In re Walldesign, Inc.*, 872 F.3d 954,

KATTEN MUCHIN ROSENMAN LLP
525 W. MONROE ST.
CHICAGO, IL 60661
(312) 902-5200

965 (9th Cir. 2017) (first transferees are strictly liable); *see also Donell*, 533 F.3d at 772 (UVTA "requires disgorgement" of Ponzi scheme "profits").

It is, however, not a foregone conclusion that litigation would have resulted in the Receiver avoiding and recovering *all* of the Transfers. *Cf. In re ISE Corp.*, No. BR 10-14198 MM 11, 2012 WL 1377085, at *8 (Bankr. S.D. Cal. Apr. 13, 2012) ("the success of litigation also entails consideration of the risk of uncertainty and the desire for expediency"). For one thing, the Dainard Entities contend that *none* of the Transfers is avoidable because the UVTA limitations period has expired. Moreover, even if the Court were to conclude that the Claims were not barred by the statute of limitations, the Dainard Entities also assert that some of the Transfers constitute return-of-principal, not profits, which implicates UVTA's good-faith defense. After closely reviewing the materials produced and the legal arguments presented by Mr. Andersson, the Receiver ultimately concluded that the probability of defeating the Dainard Entities' good-faith defense at trial was uncertain—in part due to the unavailability of older banking and financial records necessary to evaluate that defense—and the cost of litigating that issue through appeal would likely be prohibitive in any event. (Vives Decl. ¶ 27.) That is particularly because a defendant's good faith is a factual question, which would likely have required a trial to resolve. (*Id.*)

It is, therefore, possible that the Court would have sustained some or all of the Dainard Entities' statute-of-limitations defense, and a trial could have resulted in the Dainard Entities prevailing on their good-faith defense. Both outcomes would likely be considerably worse than the parties' settlement. Rather than take those risks, the Receiver agreed to compromise and accept 69.9 percent of the total Transfers. (Vives Decl. ¶ 28.) *See, e.g., Sec. & Exch. Comm'n v. Cap. Cove Bancorp LLC*, No. 8:15-CV-00980-JLS, 2016 WL 11752897, at *2 (C.D. Cal. Dec. 15, 2016) (granting receiver's motion to approve settlement where it "provided a recovery that is proportionate to the successful prosecution of this action when discounts are

KATTEN MUCHIN ROSENMAN LLP
525 W. MONROE ST.
CHICAGO, IL 60661
(312) 902-5200

factored in for the risk, time, and expense of fully litigating the case, and maximizes the funds available for distribution to creditors") (cleaned up); *Open Med. Inst.*, 639 B.R. at 183-84 (affirming order approving settlement where trustee stated in declaration that he had evaluated claims and was uncertain of his success on the merits if he were to pursue them—characterizing the odds of success as a "coin flip"—and "thought it was safer to settle" instead of litigate); *In re MatlinPatterson Glob. Opportunities Partners II L.P.*, 644 B.R. 418, 431 (Bankr. S.D.N.Y. 2022) (approving settlement where court was "satisfied that the negotiated dollar amount falls within the required range of reasonableness when viewed as a matter of litigation-risk-based valuation").

For these reasons, the Receiver respectfully suggests that the settlement appropriately takes into account the mixed probability of success on the merits of her UVTA claims against the Dainard Entities. (Vives Decl. ¶ 29.)

<u>Second</u>, the Receiver is informed and believes that there would be no difficulty in collecting the entire amount of the Transfers from the Dainard Entities. (Vives Decl. ¶ 30.) "Assessing the difficulties in collection is largely a bird-in-the-hand consideration that weighs the certainty of settlement against the potential uncertainty of collection even where a receiver secures a favorable judgment." *Total Wealth Mgmt.*, 2019 WL 13179068, at *3 (S.D. Cal. Sept. 18, 2019) (internal citation omitted). But when collectability is not an issue to either party, this factor is neutral. *See, e.g., In re TBH19, LLC*, No. 2:19-BK-23823-VZ, 2022 WL 16782946, at *7 (B.A.P. 9th Cir. Nov. 8, 2022) (difficulty-in-collection factor "neutral" where it "was not of particular concern to either side"); *see also In re Isom*, No. 4:15-BK-40763, 2020 WL 1950905, at *7 (B.A.P. 9th Cir. Apr. 22, 2020) (affirming order approving compromise even though difficulty-in-collection factor weighed against settlement), *aff'd*, 836 F. App'x 562 (9th Cir. 2020).

<u>Third</u>, it would be complex, expensive and time-consuming for the parties to litigate the issue of Mr. Dainard's good faith. (Vives Decl. ¶ 31.) This factor is

KATTEN MUCHIN ROSENMAN LLP
525 W. MONROE ST.
CHICAGO, IL 60661
(312) 902-5200

particularly important in liquidations like this one where the goal is "obtaining the best possible realization upon the available assets and without undue waste by needless or fruitless litigation." *In re Law*, 308 F. App'x 152, 153 (9th Cir. 2009) (quoting *In re Blair*, 538 F.2d 849, 852 (9th Cir. 1976)). A defendant's good faith under UVTA is a question of fact, which necessarily entails discovery and trial to resolve, along with all of the time and expense associated with it. *See, e.g., Ryan Racing, LLC v. Gentilozzi*, No. 1:12-CV-488, 2015 WL 728468, at *14 (W.D. Mich. Feb. 19, 2015) (denying summary judgment on UFTA good-faith defense because it presented a question of fact for trial).

Given her review of the available evidence, the Receiver believes that such litigation against the Dainard Entities would be expensive and time-consuming, as it would likely require extensive discovery, retention of experts and numerous witnesses. (Vives Decl. ¶ 31.) A trial and appeal would likely take at least two years to complete and cost the estate several hundred thousand dollars in fees and expenses. (*Id.*) This factor, therefore, weighs heavily in favor of approving the settlement. *See, e.g., TBH19*, 2022 WL 16782946, at *3 (complexity element weighed in favor of settlement where dispute would require extensive discovery, cost the estate hundreds of thousands of dollars and take years to complete).

Fourth, the Receiver believes that the Estate's creditors are likely to support the settlement. (Vives Decl. ¶ 32.) "The opposition of the creditors of the estate to approval of a compromise may be considered by the court, but is not controlling and will not prevent approval of the compromise where it is evident that the litigation would be unsuccessful and costly…In short, creditors have a voice but not a veto." *In re Bondanelli*, No. 2:14-BK-27656-WB, 2020 WL 1304140, at *4 (B.A.P. 9th Cir. Mar. 18, 2020) (quoting *Official Unsecured Creditors' Comm. v. Beverly*

KATTEN MUCHIN ROSENMAN LLP
525 W. MONROE ST.
CHICAGO, IL 60661
(312) 902-5200

*Almont Co. (In re The Gen. Store of Beverly Hills)*, 11 B.R. 539, 541 (9th Cir. BAP 1981) (cleaned up)).

Here, the creditors' views of the settlement are presently unknown. As discussed below, the Receiver is giving notice of this Motion to all known creditors of the Estate by posting it on the receivership website (the "<u>Website</u>"), as the Court has previously authorized,[4] along with instructions how to advise the Receiver if any creditor wishes to object to the settlement. (Vives Decl. ¶ 34.) The Receiver will file a status report before the hearing as to whether any creditors objected. (*Id.* ¶ 35.)

\* \* \*

In sum, the Receiver believes that the settlement with the Dainard Entities is fair, equitable and adequate under the circumstances to realize the value of the Estate's interest in the Transfers. Litigation is, of course, an alternative course, but "[w]hile the [Receiver] *might* do better in [] litigation, she is not likely to do so[.]" *In re Tidwell*, No. 2:17-BK-20802 RK, 2018 WL 1162511, at \*3 (Bankr. C.D. Cal. Mar. 1, 2018) (emphasis added). That is the main reason why approving the settlement is appropriate. Moreover, as discussed above, the settlement avoids litigation of intensely factual and complex issues of good faith and value, which would necessarily result in more expense, inconvenience and delay for the Estate in realizing the value of the Transfers. The Motion should, therefore, be granted.

## <u>Notice to Creditors</u>

"Creditors are entitled to 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Perez v. Safety-Kleen Sys., Inc.*,

---

[4] ECF #126 ¶ 5.

KATTEN MUCHIN ROSENMAN LLP
525 W. MONROE ST.
CHICAGO, IL 60661
(312) 902-5200

KATTEN MUCHIN ROSENMAN LLP
525 W. MONROE ST.
CHICAGO, IL 60661
(312) 902-5200

253 F.R.D. 508, 518 (N.D. Cal. 2008) (quoting *Mullane v. Central Hanover Trust Co.*, 339 U.S. 306, 314 (1950)).

The Court has authorized the Receiver to provide creditors of the Estate with notice of filings in this case by posting documents on the Website. [ECF #126 ¶ 5] As the Receiver previously reported, she is still ascertaining the identities and contact information for the investors in 1inMM. While the Receiver has some investors' contact information, the Receiver is presently unsure if she has contact information for all such investors. (Vives Decl. ¶ 33.) In addition to giving notice to the parties and other interested parties by causing the Motion to be electronically filed via the Court's CM/ECF system, the Receiver will email all known creditors of the Estate (or, if represented, their counsel) with a link to this Motion and supporting exhibits. (*Id.* ¶ 34.) The Receiver's email and Website post will include instructions how to advise her of any objections to the Motion by no later than seven days before the hearing. (*Id.*) The Receiver will thereafter file a status report informing the Court if any creditor asserted a timely objection to the Motion. (*Id.* ¶ 35.)

The Court should deem this notice sufficient under the circumstances. *See, e.g., Fed. Trade Comm'n v. Cardiff*, No. CV5:18-2104-SJO, 2020 WL 9938072, at *4 (C.D. Cal. Mar. 10, 2020) (finding receiver's notice of motion to approve settlement was sufficient where receiver posted motion to its website publicly, served on all parties and served on all known creditors and interested parties); *U.S. Commodity Futures Trading Comm'n v. Forex Liquidity LLC*, No. CV-07-01437-CJC, 2008 WL 11334950, at *8 (C.D. Cal. July 14, 2008) (approving receiver's request to limit notice and deviate from Local Rule 66-7 to reduce administrative costs), *aff'd*, 384 F. App'x 645 (9th Cir. 2010).

**WHEREFORE**, the Receiver respectfully requests that the Court enter an order: (a) granting the Motion; (b) finding that notice of the Motion is sufficient under the circumstances and waiving any further notice otherwise required by Local

1  Rule 66-7; (c) approving the terms of the settlement and compromise memorialized

2  in the Settlement Agreement as fair and equitable; (d) authorizing the Receiver to

3  take such further actions as may be necessary to consummate the transactions in the

4  Settlement Agreement; and (e) granting such further relief as the Court deems

5  necessary and appropriate.

6    Dated: February 13, 2023                    Respectfully submitted,

7                                                **KATTEN MUCHIN ROSENMAN LLP**

8                                                By:    /s/*Terence G. Banich*
                                                        Terence G. Banich
9

10                                               *Attorneys for the Receiver*
                                                 Michele Vives
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KATTEN MUCHIN ROSENMAN LLP
525 W. MONROE ST.
CHICAGO, IL 60661
(312) 902-5200

## PROOF OF SERVICE

**STATE OF ILLINOIS, COUNTY OF COOK**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Cook, State of Illinois. My business address is 525 W. Monroe St., Chicago, Illinois 60661. On February 13, 2023, I served the following document(s) described as:

**MOTION OF RECEIVER MICHELE VIVES FOR ORDER APPROVING SETTLEMENT WITH JAMES DAINARD AND RELATED ENTITIES**

as follows:

**[ ]    BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed above and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with Katten Muchin Rosenman LLP practice for collecting and processing correspondence for mailing. On the same day that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

**[X]    BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused the document(s) to be sent from e-mail address terence.banich@katten.com to the persons at the e-mail address(es) listed below. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

Magnus R. Andersson (mandersson@hansonbaker.com) (Dainard counsel)

**[ ]    BY OVERNIGHT MAIL (FedEx):** I enclosed said document(s) in an envelope or package provided by FEDEX and addressed to the persons at the addresses listed above. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of FEDEX or delivered such document(s) to a courier or driver authorized by FEDEX to receive documents.

**[ ]    BY PERSONAL SERVICE:** I caused said document to be personally delivered the document(s) to the person at the addresses listed above by leaving the documents in an envelope or package clearly labeled to identify the attorney being served with a receptionist or an individual in charge of the office.

**[X]    E-FILING:** By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

I declare under penalty of perjury under the laws of the State of Illinois that the foregoing is true and correct.

Executed on February 13, 2023, at Winnetka, Illinois.

*/s/Terence G. Banich*
Terence G. Banich