Terence G. Banich (SBN 212173)
terence.banich@katten.com
Allison E. Yager (*pro hac vice*)
allison.yager@katten.com
**KATTEN MUCHIN ROSENMAN LLP**
525 W. Monroe St.
Chicago, IL 60661
Telephone:  (312) 902-5200
Facsimile:   (312) 902-1061

*Attorneys for the Receiver*
Michele Vives

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>    v.<br><br>ZACHARY J. HORWITZ; and 1inMM CAPITAL, LLC,<br><br>        Defendants. | Case No. 2:21-cv-02927-CAS-PD<br><br>**QUARTERLY REPORT OF RECEIVER MICHELE VIVES (FIRST QUARTER 2023)**<br><br>Judge:        Hon. Christina A. Snyder<br>Courtroom:  8D |

# TABLE OF CONTENTS

I.     GENERAL RECEIVERSHIP UPDATE ................................................................ 2
      A.     Settlements Reached During the First Quarter 2023 ............................ 2
             1.     Settlement of JJMT-Related Claims ......................................... 3
             2.     Settlement with the Law Firm .................................................. 8
      B.     Forensic Accounting Update ................................................................. 9
      C.     Current and Pending Settlements with Transfer Recipients and Net Winners ............................................................................................... 10
             1.     Susan Kozlowski ..................................................................... 10
             2.     James Dainard ......................................................................... 11
             3.     Other Net Winners and Settlement Negotiations ................... 12
      D.     Asset Updates ....................................................................................... 12
             1.     Rogue Black ............................................................................ 13
             2.     LayJax ..................................................................................... 14
             3.     The Additional Investments ................................................... 14
             4.     Additional Film Investments .................................................. 15
      E.     Potential Litigation and Engagement of Conflicts Counsel ............... 15
II.     ACCOUNTING OF RECEIPTS AND DISBURSEMENTS ....................... 16
      A.     Cash Receipts ...................................................................................... 16
      B.     Cash Disbursements ........................................................................... 16
      C.     Cash on Hand ...................................................................................... 16
III.     CONCLUSION ................................................................................................ 17

KATTEN MUCHIN ROSENMAN LLP
525 W. MONROE ST.
CHICAGO, IL 60661
(312) 902-5200

Michele Vives, the duly appointed permanent receiver (the "Receiver") of 1inMM Capital, LLC and its subsidiaries and affiliates ("1inMM"), and over assets that are attributable to funds derived from investors or clients of the Defendants or were fraudulently transferred by the Defendants (collectively, the "Estate"), pursuant to Local Rule 66-6 and the *Order on Appointment of a Permanent Receiver* ("Order of Appointment") entered on January 14, 2022, hereby submits this quarterly report (the "Report") for the period January 1, 2023 through March 31, 2023 (the "First Quarter 2023"). The Report details the Receiver's activities and findings during the First Quarter 2023 to protect and administer the Estate, identify new assets and lay out the Receiver's general strategy to maximize the recovery for the benefit of harmed investors.

## I. GENERAL RECEIVERSHIP UPDATE

### A. Settlements Reached During the First Quarter 2023

The Receiver is pleased to report that, during the First Quarter 2023, she reached three major settlements that, if approved by the Court, will yield a total of ***$14.35 million*** in settlement value for the Estate, before payment of certain administrative claims described below. These settlements are with: (a) the former principals of JJMT Capital, LLC ("JJMT"), which consists of two separate settlement agreements; and (b) a law firm that represented 1inMM, the name of which the Receiver agreed to keep confidential (the "Law Firm"). These settlements are significant for the additional reason that they simultaneously resolve pending or threated litigation by groups of net losing investors in 1inMM.

Although the Receiver will address these proposed settlements in greater detail in motions for their approval (which she expects to file in the coming weeks), the Receiver now explains how these hard-fought compromises came about and summarizes their basic terms.

//

//

1. **Settlement of JJMT-Related Claims**

    a. *The Investor Claims and the Receiver Claims*

As the Receiver discussed in each of her 2022 quarterly reports, several 1inMM investors have commenced numerous lawsuits in courts across the country alleging claims associated with Defendants' fraudulent scheme (defined in the first quarter 2022 report as the "Investor Actions"). It quickly became apparent to the Receiver that the Investor Actions against JJMT and its organizers—all of which are pending in federal and state courts in Chicago—were the most numerous, complex and in need of immediate attention. The principals of JJMT are Joseph deAlteris ("deAlteris"), Jacob Wunderlin ("Wunderlin") and Matthew Schweinzger "Schweinzger," and collectively with deAlteris and Wunderlin, "JJ&M") and Tyler Crookston ("Crookston").[1]

The plaintiffs in the Investor Actions (collectively, the "Investor Plaintiffs") claimed tens of millions of dollars in damages on various legal theories generally asserting that JJ&M and Crookston are liable to them in connection with the 1inMM Ponzi Scheme (collectively, the "Investor Claims"). Crookston and JJ&M vigorously defended the Investor Actions, and asserted several defenses to the Investor Claims that, if sustained, may have resulted in the Investor Plaintiffs taking nothing. The Receiver, meanwhile, asserted that she may avoid and recover certain transfers of money from 1inMM to JJ&M and Crookston as fraudulent transfers under the California Uniform Voidable Transactions Act, Cal. Civ. Code § 3439 et seq. ("UVTA") (the "Receiver Claims").

Early on, counsel for the Investor Plaintiffs sought to work with the Receiver to the extent she had claims against the same defendants, and the Receiver entered

---

[1] The Receiver addresses JJ&M and Crookston separately because they had separate counsel and their settlements are structured differently.

into common interest agreements with them. At the same time, JJ&M and Crookston expressed interest in settling the Receiver's potential claims against them, but only so long as the Receiver could somehow concurrently resolve or eliminate the Investor Actions. The Receiver pursued a collaborative approach, spending several months working with the lawyers for all of those parties about ways she might help coordinate and resolve them.

### b. The Mediation

Ultimately, the result was that the Receiver and those litigants agreed to participate in a formal mediation process with the goal of reaching a global settlement of all claims in the Investor Actions as well as any claims the Receiver may have against the same defendants (the "Mediation"). The parties selected the mediator to be Hon. Sidney I. Schenkier, United States Magistrate Judge for the Northern District of Illinois (retired), and now a neutral with JAMS. Judge Schenkier scheduled the Mediation to occur in Chicago on January 30-31, 2023, with briefs from the Receiver due on December 16, 2022 and January 24, 2023.

To comply with the Judge Schenkier's briefing schedule, the Receiver and her counsel had to prepare a separate mediation statement for every participant in the mediation who the Receiver contended was a "net winner" of the 1inMM Ponzi Scheme and was thus, under applicable law, potentially liable to the Estate under UVTA. Determining who is a net winner is largely a function of conducting a forensic accounting of all transfers to and from 1inMM, JJMT and the affected individuals, while explaining to Judge Schenkier why those individuals are liable to the Estate under UVTA is a legal issue. Therefore, to prepare for the mediation, the Receiver and her staff focused much of their time and attention during the fourth quarter 2002 and first quarter 2023 on completing the forensic accounting analysis necessary to determine the extent to which JJ&M and Crookston were net winners of the 1inMM Ponzi scheme.

This turned out to be a monumental task, as it required the Receiver and her

professional staff to review and analyze tens of thousands of banking transactions and hundreds of financial records associated with 1inMM, JJMT, JJ&M, Crookston and Horwitz covering a several-year period, and then verify those transactions against the 1inMM financial transactions and banking records already in the Receiver's possession. The verification step ensured that the final net-profit liability numbers were the product of fully vetted records that reflected no material discrepancies. The Receiver's forensic accounting analysis also required a lot of back-and-forth with counsel for JJ&M and Crookston to request banking documents, wire detail and other information. Fortunately, JJ&M and Crookston (and their respective counsel) were cooperative and responsive throughout and provided the Receiver with the documents necessary for her to complete this analysis.

The Receiver directed her counsel to draft the mediation statements, to include a detailed explanation of the applicable legal principles under UVTA. Naturally, this required a considerable amount of legal research, drafting and editing, particularly as each JJMT defendant's potential liability presented a unique set of facts. On top of that, the Receiver expected (correctly, as it turned out) that JJ&M and Crookston would contend that the transfers to them were not avoidable under UVTA for a whole host of technical reasons, including because the applicable limitations period had passed, and because 1inMM made the transfers indirectly via JJMT. Anticipating these arguments and drafting cogent arguments about them necessitated a considerable amount of original scholarship and persuasive writing.

The Receiver timely submitted her four mediation statements to Judge Schenkier on December 16, 2022, wherein she took the position that JJ&M and Crookston had several million dollars of liability to the estate under UVTA. JJ&M and Crookston submitted their responsive mediation statement on January 16, 2023, to which the Receiver submitted reply memoranda on January 24, 2023.

    c. <u>Settlement with Tyler Crookston</u>

In the week preceding the Mediation, the Receiver and the Investor Plaintiffs

opened negotiations with Crookston (through his counsel) in an attempt to reach a pre-Mediation settlement. Those discussions—while hard-fought and sometimes tense—were ultimately successful.

After completing an exhaustive forensic accounting analysis, the Receiver determined that Crookston received approximately $6.6 million in net profits or commissions from the 1inMM Ponzi Scheme, which are transfers from 1inMM subject to avoidance under UVTA (i.e., the Receiver Claims against Crookston). Crookston asserted several defenses to the Receiver Claims that, if successful, may have resulted in the Receiver recovering nothing. Crookston also argued that the Investor Claims against him would fail for various reasons. The basic terms of the settlement with Crookston follow.

Crookston agreed to pay the ***$3.85 million*** to the Estate to resolve the Investor Claims and the Receiver Claims, as well as all potential claims that could be filed against him arising out of or relating to the 1inMM Ponzi Scheme. Crookston agreed to pay more than he otherwise would have paid to settle the Receiver Claims only. Even though part of the settlement consideration is to settle the Investor Claims, the Investor Plaintiffs agreed that the entire settlement consideration should be paid into the Estate for the benefit of all creditors. A critical component of the settlement consideration is that the Court enters a "bar order" in Crookston's favor—essentially a permanent injunction barring any other person or entity from suing him on any claim pertaining to the 1inMM Ponzi Scheme, which is a common component of these sorts of settlements. Any such claim that an allegedly aggrieved 1inMM investor might have would be channeled to the claim process that the Receiver will in the future ask this Court to approve.

As noted, the Investor Plaintiffs agreed that Crookston should remit the entirety of the settlement payment to the Estate for the benefit of all of creditors. The Receiver therefore agreed, consistent with applicable law, to ask this Court to allow counsel for the Investor Plaintiffs administrative expense claims against the Estate

in certain negotiated amounts for their reasonable attorney's fees as they helped create a common fund and made a substantial contribution to the Estate. Finally, all parties agreed to exchange mutual general releases of any claims arising out of or relating to the 1inMM Ponzi Scheme.

### d. Settlement with JJ&M

The Investor Plaintiffs, the Receiver and JJ&M mediated their respective claims with Judge Schenkier over two marathon in-person mediation sessions in Chicago on January 30 and 31, 2023. Due in no small part to Judge Schenkier's persistence and wisdom, as well as the parties' creativity and willingness to compromise, the Mediation was a success.

Again as a result of her team's searching and thorough forensic accounting analysis, the Receiver determined that JJ&M received net profits (including commissions) as a result of the 1inMM Ponzi Scheme, which are transfers from 1inMM subject to avoidance under UVTA, in the following approximate amounts: $6.63 million (Schweinzger); $8.30 million (deAlteris); and $9.35 million (Wunderlin), for a total of about $24 million. JJ&M vigorously challenged the Receiver Claims against them on multiple grounds, raising complex and serious issues principally about the Receiver's legal ability to recover the transfers from them on a "mere conduit" theory and the potential expiration of the applicable statute of limitations, among other defensive positions. JJ&M also sharply contested their liability to the Investor Plaintiffs for a multitude of reasons. The basic terms of the settlement with JJ&M follow.

As a result of the Mediation, JJ&M jointly agreed to pay the ***$9 million*** to the Estate to resolve the Investor Claims and the Receiver Claims, as well as all potential claims that could be filed against them arising out of or relating to the 1inMM Ponzi Scheme, which is more than JJ&M would have paid to resolve only the Receiver Claims. Consistent with the Crookston settlement, the Investor Plaintiffs again agreed that the entire $9 million of settlement consideration should be paid into the

Estate for the benefit of all creditors. So the Receiver agreed to seek approval to pay certain negotiated amounts to counsel for the Investor Plaintiffs in recognition of their assistance in creating a common fund in, and for making a substantial contribution to, the Estate. In exchange, the parties will exchange mutual general releases, and the Receiver will ask this Court to enter a bar order enjoining any person or entity from commencing or continuing any claim against JJ&M arising out of or relating to the 1inMM Ponzi Scheme.

### 2. *Settlement with the Law Firm*

During the First Quarter 2023, the Receiver and certain net losing investors in 1inMM (represented by Loftus & Eisenberg, Ltd. ("L&E"), of Chicago, Illinois, the same lawyers who also represented certain Investor Plaintiffs in the JJMT litigation discussed above) (the "Claimant Investors") jointly reached a settlement with the Law Firm that will result in a payment of ***$1.5 million*** to the Estate. A critical component of this settlement is the Receiver's agreement to keep the identity of the Law Firm strictly confidential, so the Receiver must keep her public comments about this settlement general and brief. The Receiver will, of course, disclose the full details about his settlement to the Court in a motion for approval that she expects to file (under seal) in the coming weeks.

The Law Firm represented 1inMM for approximately one year. The Claimant Investors asserted—in private correspondence with the Law Firm as well as its malpractice insurer—that the Law Firm is liable for their losses on theories of malpractice, negligence and aiding and abetting the 1inMM Ponzi Scheme. They threatened legal action against the Law Firm if the parties did not settle. Although the Receiver did not threaten to sue the Law Firm, the Law Firm opened negotiations with the Receiver about the Claimant Investors' potential litigation, as the Law Firm made clear that any settlement must include a bar order enjoining any similar actions against it. Discussions between the Law Firm, its insurer and the Claimant Investors continued for the better part of a year.

The parties eventually agreed to mediate before Bruce Friedman, a JAMS neutral located in Los Angeles. The mediation with Mr. Friedman took place in Los Angeles on March 15, 2023, and was successful. The essential terms of the settlement are that the Law Firm will pay $1.5 million to the Estate to settle both the Investor Claimants' asserted claims as well as any claims that the Estate may have against the Law Firm, in exchange for mutual general releases and a bar order. The bar order would enjoin any person or entity from commencing or continuing any claim against the Law Firm arising out of or relating to the 1inMM Ponzi Scheme. And, as with the JJMT-related settlements discussed above, because the Claimant Investors have agreed that the entire amount of the settlement consideration should be paid to the Estate for the benefit of all creditors, the Receiver agreed to seek approval to pay certain negotiated amounts to L&E, as counsel for the Investor Plaintiffs, in recognition of their assistance in creating a common fund in, and for making a substantial contribution to, the Estate.

### B.     Forensic Accounting Update

As noted in previous reports, the Receiver has devoted a great deal of time and effort to conducting a forensic accounting analysis of the financial transactions involving 1inMM and its insiders and affiliates. As there were no accounting records for 1inMM, as is typical in Ponzi schemes, the Receiver has had to build from scratch. Underscoring the importance of this endeavor, forensic accounting tasks encompass approximately 73% of the time expended by the Receiver and her team during the First Quarter 2023. To provide context to the magnitude of this endeavor, the forensic accounting project requires analysis of over 1,496 bank statements encompassing over 21,600 transactions.

This forensic analysis is critical to determine who may be liable to the Estate for receiving fraudulent transfers, to identify previously unknown assets and to obtain information about 1inMM's investors. The Receiver was also able to confirm, unequivocally, that Zachary Horwitz orchestrated a Ponzi scheme since the very

beginning of 1inMM. Although 1inMM did, in later years, make various investments into purportedly legitimate companies and film productions, those transactions accounted for only about 3% of the funds invested. Conversely, 97% of 1inMM funds appear to have been used towards perpetuating the Ponzi scheme or other illegitimate uses. The forensic accounting analysis has also identified potential recovery sources ranging from new investments made by Mr. Horwitz using 1inMM money, to individuals and entities who were net winners of the Ponzi scheme.

As the Receiver and her team have delved further into the financials, they have discovered a series of sub-aggregators – investment feeder funds that invested into other aggregators which then invested with 1inMM – which have required additional information, data requests and forensic analysis. The Receiver is currently awaiting additional information from these aggregators and sub-aggregators.

### C. Current and Pending Settlements with Transfer Recipients and Net Winners

Through the Receiver's forensic accounting, the Receiver has identified investors who were significant net winners (receiving payments far in excess of the amounts they invested) as well as various persons and entities who were transferred very large sums from 1inMM but do not appear to have been investors in the 1inMM Ponzi scheme. By identifying these recipients, the Receiver is able to determine potential fraudulent transfers to both investors and non-investors alike, thereby increasing the pool of potential recovery to the Estate. Settlements that the Receiver reaches with such transferees are likely to be very significant estate assets. The Receiver and her professional staff have, therefore, devoted considerable time and attention to reviewing and analyzing tens of thousands of banking transactions and associated records associated with 1inMM and Horwitz to identify those persons and entities who may have received transfers that are subject to avoidance and recovery.

#### 1. Susan Kozlowski

One such transferee was Susan M. Kozlowski, who is Horwitz's mother, and

two of her affiliated entities. During her forensic accounting investigation, the Receiver discovered that 1inMM and Horwitz had made a significant amount of transfers to Ms. Kozlowski individually, and her related entities (herein collectively referred to as "Ms. Kozlowski"). The specific details to the transfers related to Ms. Kozlowski are detailed in the Quarterly Report of the Receiver (Fourth Quarter 2022) filed with the Court on February 9, 2023. The Receiver and Ms. Kozlowski entered into discussions and spent several months engaged in good-faith, arms-length settlement negotiations.

On December 21, 2022, the parties entered into an agreement wherein Ms. Kozlowski agreed to pay $300,000 to the estate in full settlement of the claims. In essence, Ms. Kozlowski agreed to return 100 percent of the money she received from 1inMM and Horwitz—including all of the profit on her investments in 1inMM—as well as about two percent of the overall principal transfers. These percentages reflect the Receiver's assessment of the relative strength of her claims weighed against the risk and cost associated with litigating those claims. On January 25, 2023, the Court entered an order approving the settlement with Ms. Kozlowski, and the Receiver has since received the settlement payment in full.

### 2. *James Dainard*

During her forensic accounting investigation, the Receiver discovered that 1inMM and Horwitz had made a significant amount of transfers to James M. Dainard ("Mr. Dainard"), both directly as well as to an entity that Mr. Dainard owns and controls, JMD Investments WA, LLC, and to a large financial institution as custodian of Mr. Dainard's individual retirement account. Specifically, the Receiver determined that, between December 2015 and June 2018, 1inMM made multiple transfers in the total aggregate amount of $353,034.17 to Mr. Dainard and his related entities. The Receiver's forensic accounting analysis of the transfers indicated that they constituted Mr. Dainard's profits from investing in the 1inMM Ponzi scheme.

The Receiver and Mr. Dainard, through his legal counsel Magnus R.

Andersson of Hanson Baker Ludlow Drumheller P.S., engaged in good-faith, arms-length settlement negotiations. On February 1, 2023, the parties entered into that certain *Settlement Agreement and Mutual Release* (the "Dainard Settlement Agreement"). As a part of the Dainard Settlement Agreement, Mr. Dainard agreed to pay $247,000 to the Estate in full settlement of the Claims (the "Dainard Settlement Payment"). The Dainard Settlement Payment is 69.9 percent of the amount in controversy of $353,034.17, and reflects the Receiver's assessment of the relative strength of her claims weighed against the risk and cost associated with litigating those claims, particularly as to the Dainard Entities' asserted defenses.

On March 3, 2023, the Court entered an order approving the Dainard Settlement Agreement, and the Receiver has since received the full amount of the Dainard Settlement Payment.

### 3.   *Other Net Winners and Settlement Negotiations*

As of the end of the First Quarter 2023, the Receiver and her team have identified approximately 112 net winners from the 1inMM Ponzi Scheme. The Receiver is in the process of reviewing the financial details of these identified net winners and anticipates sending settlement proposal letters to them. So as not to jeopardize good-faith settlement discussions, the Receiver is not making the details of these net winning transferees public. Consistent with the Court's directions, the Receiver will continue to file motions to approve any settlements that she reaches. Should the Receiver determine that she must commence litigation against any of these transferees, she will advise the Court in future reports. The Receiver would file any such litigation before this Court pursuant to its ancillary jurisdiction.

### D.   Asset Updates

In addition to the cash on hand detailed in paragraph II.C. (below), the receivership assets currently consist of: (1) Rogue Black, LLC ("Rogue Black"), (2) LayJax Ventures, LLC ("LayJax"), (3) investments made into sixteen entities controlled by Jacob Wunderlin, a principal of JJMT (the sixteen entities are

referenced as the "Additional Investments"), and (4) investments made in potentially eight additional films. The updated details to each of these is outlined below.

### 1. Rogue Black

Rogue Black was a film finance and production company in which Horwitz owned a membership interest and funded using 1inMM cash. Ultimately, 1inMM invested approximately $20 million into Rogue Black, which went on to produce and complete a total of eight films (collectively, the "Produced Films"). The Receiver has focused on understanding what is owed to Rogue Black on account of the Produced Films in the near term and collecting it as efficiently as possible.

So the Receiver engaged Ray Reyes, a consultant specializing in film distribution and distressed film libraries, who analyzed Rogue Black's film library and distribution agreements to determine current monies owed, as well as future amounts likely to be owed. Mr. Reyes researched and analyzed the Produced Films to identify potential receivables owed to Rogue Black or its subsidiaries over the next five-year period and produced a comprehensive report for the Receiver. The Receiver is keeping the contents of this report confidential for the time being.

#### a. Collections Made During the First Quarter

During the First Quarter 2023, Rogue Black collected an additional $56,000 on account of distribution of the Produced Films, which have been deposited into the Estate's bank accounts.

#### b. Payment Dispute and Demand for Arbitration

As a result of Mr. Reyes' investigation, the Receiver discovered that Rogue Black is owed a significant amount of money related to distribution rights on one of its films. The Receiver attempted to resolve the issue through discussions with the relevant parties. However, when it became apparent those discussions were no longer making progress, the Receiver assigned certain lawyers at Katten Muchin Rosenman LLP ("Katten"), her general counsel, who specialize in entertain law and litigation to handle the matter. The Receiver then initiated a demand for arbitration

as required by the acquisition agreement entered into by the relevant parties.

The arbitration is still in its initial phases, and the parties are attempting to agree on an arbitrator. The Receiver will provide updates in future reports as the arbitral proceeding progresses.

### 2. *LayJax*

LayJax is an angel investment company which invested in early startup business ventures. Using 1inMM funds, Horwitz caused LayJax to invest $2.5 million with twelve separate startup business ventures that LayJax had sourced. The businesses in which LayJax invested are broad and diverse. The Receiver continually monitors each for progress, as well as for potential opportunities to generate recoveries. As previously reported, only two or three of LayJax's twelve investments hold a moderate chance of producing a recovery. The Receiver continues to monitor this asset and will provides updates as new or meaningful activity occurs.

### 3. *The Additional Investments*

As a part of the Receiver's forensic accounting analysis, the Receiver identified investments of more than $5.6 million made by ZJH Enterprises, LLC ("ZJH") or 1inMM into the sixteen (16) investment vehicles collectively referred to as the Additional Investments. ZJH's sole source of funding came from 1inMM. The Additional Investments are investment vehicles made for the sole purpose of investing into various start-up companies. Importantly, however, the Additional Investments are all managed or controlled by a principal of one of the aggregators. On September 8, 2022, the Receiver's professional staff issued a letter to the managing member of each Additional Investment entities requesting various documents such as financial statements, agreements and other supporting documents relating to the Additional Investments.

In reviewing the production of records, the Receiver discovered that ZJH was the largest investor in the Additional Investments. According to bank records, ZJH invested over $5.6 million into the Additional Investments. Additional questions

remain, compelling the Receiver to continue her investigation into these entities and make additional document and information requests. With the Receiver wrapping up the forensic accounting and achieving multiple settlements, focus will now shift to make further progress on this potential asset.

### 4. *Additional Film Investments*

As a result of the Receiver's forensic accounting investigation, the Receiver and her staff identified five additional entities that received more than $13.1 million from 1inMM. These entities are believed to have funded the production of an additional eight films. The Receiver continues to investigate these entities, films and the best avenue to efficiently maximize the recovery from these investments. The Receiver has begun to shift more resources to this potential asset and, pending additional investigation, believes it prudent not to include any additional details on these entities and films in this report so as not to impede, jeopardize or hamper her investigation.

### E. Potential Litigation and Engagement of Conflicts Counsel

The Receiver and her staff are in the process of investigating the acts, transactions, conduct, assets, liabilities and financial condition of the Defendants and their insiders and affiliates with the objective of identifying assets of the Estate, including causes of action that the Receiver may bring against third parties. The Receiver believes that there are several hundred third parties who will potentially become adverse to the Receiver, a small number of which present legal or business conflicts for the Receiver's lead counsel, Katten.

Considering that Katten is a large national law firm with tens of thousands of clients, Katten may from time to time determine that it has or may have a conflict of interest as to some additional of those adverse third parties. Because the Receiver believed it appropriate to engage independent counsel to evaluate and investigate any matters in which Katten might have a conflict of interest, the Receiver decided to engage Raines Feldman LLP ("Raines Feldman") to represent her should such a

conflict of interest arise. Therefore, on December 7, 2022, the Receiver moved the Court to authorize her to engage Raines Feldman as conflict counsel, and the Court granted that motion on January 3, 2023.

The Receiver continues to explore identifying potential causes of action whereby the Receiver may seek to recover funds or assets for the benefit of the estate. To that end, the Receiver has issued subpoenas to investigate potential litigation claims. She is in the process of responding to issues raised by various custodians of records, including a motion to quash.

## II. ACCOUNTING OF RECEIPTS AND DISBURSEMENTS

Attached as Exhibit "A" is a copy of the Standard Fund Accounting Report. Below is a summary of the cash receipts and disbursements from the estate on a cash accounting basis.

### A. Cash Receipts

During the First Quarter 2023, the Estate had cash receipts of $604,701. These cash receipts were comprised of (i) $300,000 settlement payment from Ms. Kozlowski, (ii) $247,000 settlement payment from Mr. Dainard, iii) $56,000 receivable related to a Rogue Black film, and (iv) $1,701 receivable related to LayJax.

### B. Cash Disbursements

During the First Quarter 2023, cash disbursements totaled $721,019. These disbursements were comprised of (i) $367,867.61 of attorney's fees, (ii) $336,657.13 of Receiver's fees, (iii) $10,294.29 of consulting fees for Rogue Black, (iv) $4,667.54 of mediation fees, (v) $1,480.50 of software fees, and (vi) $52.33 of banking fees.

### C. Cash on Hand

As of March 31, 2023, the Estate held an ending balance of $1,409,956.

/ / /

/ / /

### III. CONCLUSION

The Receiver respectfully requests that the Court grant the motion to approve this Report and award the related relief requested therein.

Dated: May 5, 2023                    Respectfully submitted,

                                      By:   /s/*Michele Vives*
                                            Michele Vives, Receiver

# PROOF OF SERVICE

**STATE OF ILLINOIS, COUNTY OF COOK**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Cook, State of Illinois. My business address is 525 W. Monroe St., Chicago, IL 60661.

On May 5, 2023, I served the following document(s) described as:

**QUARTERLY REPORT OF RECEIVER MICHELE VIVES (FIRST QUARTER 2023)**

as follows:

**[ ]     BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed above and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with Katten Muchin Rosenman LLP practice for collecting and processing correspondence for mailing. On the same day that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

**[ ]     BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused the document(s) to be sent from e-mail address terence.banich@katten.com to the persons at the e-mail addresses listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**[ ]     BY OVERNIGHT MAIL (FedEx):** I enclosed said document(s) in an envelope or package provided by FEDEX and addressed to the persons at the addresses listed above. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of FEDEX or delivered such document(s) to a courier or driver authorized by FEDEX to receive documents.

**[ ]     BY PERSONAL SERVICE:** I caused said document to be personally delivered the document(s) to the person at the addresses listed above by leaving the documents in an envelope or package clearly labeled to identify the attorney being served with a receptionist or an individual in charge of the office.

**[X]     E-FILING:** By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

I declare under penalty of perjury under the laws of the State of Illinois that the foregoing is true and correct.

Executed on May 5, 2023, at Winnetka, Illinois.

*/s/Terence G. Banich*
Terence G. Banich