# Exhibit 2

**Vives Declaration**

Terence G. Banich (SBN 212173)
terence.banich@katten.com
Allison E. Yager (*pro hac vice*)
allison.yager@katten.com
**KATTEN MUCHIN ROSENMAN LLP**
525 W. Monroe St.
Chicago, IL 60661
Telephone:  (312) 902-5665
Facsimile:   (312) 902-1061

*Attorneys for the Receiver*
Michele Vives

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>           Plaintiff,<br><br>      v.<br><br>ZACHARY J. HORWITZ; and 1inMM CAPITAL, LLC,<br><br>           Defendants. | Case No. 2:21-cv-02927-CAS-PD<br><br>**DECLARATION OF MICHELE VIVES**<br><br>Judge:         Hon. Christina A. Snyder<br>Courtroom: 8D |

I, Michele Vives, declare as follows:

1. I am over the age of eighteen years, am under no disability and am competent to testify to the matters set forth herein. Except as otherwise stated, all facts set forth in this declaration are based upon my personal knowledge and/or my review of documents. If called as a witness in this case, I could and would testify competently to the facts set forth in this declaration.

2. I submit this declaration in support of the *Motion of Receiver Michele Vives for Order Approving Settlement with Tyler Crookston*, dated May 26, 2023 (the "Motion"). Any capitalized terms not defined herein have the meanings ascribed to them in the Motion.

3. I am the President of the Douglas Wilson Companies ("DWC"), an advisory firm that assists companies and entities of all kinds, from financial institutions to operating companies, law firms, state and federal courts, corporations, partnerships, pension funds, REITs and more. DWC has been appointed as receiver or otherwise involved in hundreds of receiver cases over the last 30 years, and has served in other fiduciary roles, such as chapter 11 trustee, chapter 11 examiner, special master, liquidating trustee, assignee for the benefit of creditors and chief restructuring officer.

**A.   The Receiver; investigation of transfers**

4. On January 14, 2022, this Court entered the *Order on Appointment of a Permanent Receiver* [ECF #70] (the "Receiver Order"), which appointed me to be the federal equity receiver of defendant 1inMM Capital, LLC ("1inMM") as well as assets that are attributable to investor or client funds or that were fraudulently transferred by 1inMM or Zachary J. Horwitz ("Horwitz," and together with 1inMM, "Defendants") (collectively, the "Estate").

5. The Receiver Order confers on me "full powers of an equity receiver," and specifically authorizes and directs me to, among other things: take custody and control over all assets of 1inMM and its subsidiaries and affiliates; conduct an

investigation and discovery as may be necessary to locate and account for the assets of or managed by 1inMM and its subsidiaries and affiliates; and investigate and, where appropriate, prosecute claims and causes of action that the Receiver may possess.

## B.     The Investor Actions; the Mediation

6.     Pursuant to the authority conferred on me by the Receiver Order, and as I have discussed in my previous quarterly reports, my staff and I have devoted a great deal of time and effort to conducting a forensic accounting analysis of the financial transactions involving 1inMM, Horwitz and their respective insiders and affiliates. This project is critical to determine who may be liable to the Estate for receiving fraudulent transfers, to identify previously unknown assets and to obtain information about 1inMM's investors.

7.     I have determined that 1inMM did not just transfer funds to investors and their feeder funds; 1inMM also transferred very large sums to various persons and entities who do not appear to have been investors in the 1inMM Ponzi scheme. I am investigating both types of transfers. In doing so, I will be able to identify potential fraudulent transfers to both investors and non-investors alike, thereby increasing the pool of potential recovery to the Estate. Settlements that I reach with such transferees are likely to be very significant Estate assets.

8.     My professional staff and I have, therefore, devoted considerable time and attention to reviewing and analyzing tens of thousands of banking transactions and associated records associated with 1inMM and Horwitz to identify those persons and entities who may have received transfers that are subject to avoidance and recovery.

9.     I determined, among other things, that Horwitz raised investor funds mostly using certain entities that pooled large amounts of money from many individual investors for upstream investment in 1inMM. The largest of these

entities was JJMT Capital, LLC ("JJMT"), of which Tyler Crookston was a member until early 2018.

10. Several investors commenced lawsuits alleging claims associated with Defendants' scheme, including against JJMT and Crookston (the "Investor Actions").

11. The plaintiffs in the Investor Actions (collectively, the "Investor Plaintiffs") claimed millions of dollars generally asserting that Crookston and the other defendants are liable to them in connection with the 1inMM Ponzi Scheme (collectively, the "Investor Claims"). Crookston asserted several defenses that could have resulted in the Investor Plaintiffs taking nothing.

12. Counsel for the Investor Plaintiffs worked with me because I had claims against the same defendants, while the defendants expressed interest in settling my potential claims against them, but only if I could concurrently resolve or eliminate the Investor Actions.

13. After months of negotiations, those litigants and I agreed to mediate, selecting retired U.S. Magistrate Judge Sidney I. Schenkier as mediator.

**C.   The Transfers**

14. As part of the above events, Crookston and his counsel, Margaret Gembala Nelson of Foley & Lardner LLP, worked cooperatively with me. Crookston produced a large volume of financial documents and related information.

15. I determined that Crookston received transfers from 1inMM from January 2016 – November 2019 representing total, pre-tax net winnings of $6,693,255.17 (the "Transfers"). The Transfers constitute Crookston's net winnings from investing in the 1inMM Ponzi Scheme, plus commissions he received.

16. I asserted that I may avoid and recover the Transfers as actual fraudulent transfers pursuant to section 3439.04(a)(1) of the California Uniform

Voidable Transactions Act, Cal. Civ. Code § 3439 *et seq.* ("UVTA") (the "Receiver Claims"). As I contended, 1inMM and Horwitz made the Transfers with the actual intent to hinder, delay, or defraud their creditors, as Horwitz pled guilty and admitted that he used 1inMM to operate a Ponzi scheme, which conclusively establishes intent for purposes of a UVTA actual fraudulent transfer claim.

17. I argued that I could recover the Transfers from Crookston under UVTA § 3439.08(b)(1)(A) as their first transferee, because even though 1inMM made many of the Transfers to him indirectly through JJMT, JJMT was a mere conduit that had no dominion over the money 1inMM transferred to it.

### D. The Settlement

18. Following difficult negotiations, the Investor Plaintiffs and I reached a settlement with Crookston on the eve of the mediation whereby Crookston agreed to pay $3,850,000 to the Estate (the "Settlement Payment") to resolve the Investor Claims and the Receiver Claims (the "Settlement"). The Settlement is documented in the *Settlement Agreement and Mutual Release* (the "Settlement Agreement"), a true and correct copy of which is attached to the Motion as Exhibit 1.

19. The parties to the Settlement Agreement are myself, Crookston, and all Investor Plaintiffs who have sued or threatened to sue Crookston: (a) 42 persons/entities represented by Loftus & Eisenberg, Ltd. who invested in JJMT, listed on Schedule 1 to the Settlement Agreement (collectively, the "L&E Investors"); (b) Nalpak I LP, Nalpak II LP, Nalpak Enterprises LLC and Peter Xilas (collectively, the "Nalpak Investors"); and (c) Steven Aronson and Matthew Aronson (together, the "Aronson Investors").

20. As reflected in the Settlement Agreement, the parties agreed to exchange mutual general releases of any claims arising out of or relating to the 1inMM Ponzi Scheme, and to ask the Court to enter a bar order permanently enjoining all persons and non-governmental units from suing Crookston on any claim arising out of or relating to the 1inMM Ponzi Scheme (the "Bar Order").

Additionally, because the Investor Plaintiffs agreed that the entire Settlement Payment should be paid into the Estate for the benefit of all creditors, I have concluded that the Investor Plaintiffs' counsel created a common fund from which a negotiated amount of their fees—totaling $1,000,000—should be paid. Finally, the validity of the Settlement Agreement is subject to the condition precedent that the Court approves it, including the Bar Order.

21.  I believe the Settlement is in the best interest of the Estate and its creditors—the net losing investors in the 1inMM Ponzi Scheme. The Settlement Payment constitutes a substantial recovery for the Estate without the expense and risk of litigation, and the Settlement represents an equitable, good-faith resolution of both the Receiver Claims and Investor Claims.

22.  While the Investor Plaintiffs and I were confident in the merit of our respective claims, the risk of an adverse result always loomed. Crookston asserted multiple meaningful defenses to all claims asserted against him that, if successful, may have resulted in the Estate and the Investor Plaintiffs recovering nothing. The Settlement thus avoids protracted and expensive litigation, thereby avoiding litigation risk and conserving Estate resources.

23.  The Settlement Payment—57% of the total Transfers—exceeds what Crookston would have paid to resolve the Receiver Claims alone without a bar order. Crookston simultaneously resolved the Investor Claims, so the efforts of Investor Plaintiffs' counsel undoubtedly enhanced the final settlement value, all of which is flowing to the Estate. And because the Investor Plaintiffs agreed that Crookston should remit the entirety of the Settlement Payment to the Estate, the Investor Plaintiffs' counsel helped create a common fund from which a portion of their attorney's fees may be paid.

24.  Moreover, the Settlement resolves a particularly complex multiparty dispute. The Investor Claims and Receiver Claims arise from a common nucleus of operative facts—the 1inMM Ponzi Scheme—but the litigants' objectives were not

necessarily the same. Specifically, the Investor Plaintiffs pursued Crookston to remedy their own personal damages, while I aimed to recover funds for the benefit of *all* Estate creditors. Those goals often conflicted, resulting in disagreements between the Investor Plaintiffs and me about settlement terms and how to proceed.

25. The Investor Actions are, nonetheless, derivative of the Receiver Claims and compete with me for Crookston's assets. The Investor Plaintiffs and I are pursuing the same person on account of the same conduct arising out of the same transactions and occurrences by the same actors. As such, the Investor Actions affected the Estate's assets and ultimate recoveries; every dollar the Investor Plaintiffs managed to recover from Crookston was arguably a dollar I could not recover from him.

26. Crookston wanted to achieve finality with a settlement, which he really could only accomplish through a deal with me. At the same time, I did not think it advisable or practical to exclude the Investor Plaintiffs from those discussions. Because the Investor Plaintiffs collectively constitute a significant percentage of the known population of net losing investors, I considered them to function effectively as an ad hoc creditors committee.

27. Crookston, moreover, made clear from the start that any settlement with me must include a bar order enjoining any further creditor suits against him arising from the 1inMM Ponzi Scheme, so I continually focused on achieving a settlement that met the legal requirements for a bar order. These factors, among others, made the litigation complex and particularly difficult to settle on a global basis.

**G. The Settlement is fair, equitable and in the best interests of the Estate.**

**1. Probability of success**

28. I respectfully submit that the Settlement easily satisfies all four *A&C Properties* factors.

29. In light of the conflicting arguments on the issue of the potential expiration of the UVTA limitations period and their potential impact on Crookston's exposure on the Receiver Claims, I considered his limitations period defenses to be a significant litigation risk factor.

30. In deciding to settle, I took into account that Crookston might successfully reclassify certain transfers of profits/commissions as payments returning his investments, making the good faith/for value defense a litigation risk.

31. The mere conduit issue presented an important litigation risk for me, as the vast majority of the Transfers flowed from 1inMM through JJMT to Crookston. Rather than risk an adverse ruling on this issue, I decided it was preferable to settle with Crookston.

32. In the event of further litigation, the Court may have sustained some of Crookston's defenses, which would be an outcome worse than the Settlement. Rather than take that risk, I compromised.

33. For the reasons discussed above and in the Motion, I respectfully suggest that the Settlement appropriately takes into account the mixed probability of success on the merits of my UVTA claims against Crookston.

### 2. Collection difficulties

34. I understand that Crookston does not have assets that would be sufficient to satisfy a judgment avoiding all of the Transfers ($6,693,000), let alone that *plus* an adverse judgment entered in favor of the Investor Plaintiffs, particularly after expending the costs and fees associated with defending protracted litigation of multiple complex lawsuits.

### 3. Complexity/expense

35. It would be complex, expensive and time-consuming for the parties to litigate Crookston's defenses.

36. Given my review of the available evidence, I believe such litigation against Crookston would be expensive and time-consuming, as it would likely

require extensive discovery, retention of experts and numerous witnesses. A trial and appeal would likely take at least two years to complete and cost the estate several hundred thousand dollars in fees and expenses.

### 4. Creditors

37. I am giving notice of this Motion to all known creditors of the Estate by email, posting it on the receivership website (the "Website"), as the Court has previously authorized, and by publication in two major newspapers, along with instructions on how to advise me if any creditor wishes to comment on or object to the Settlement.

### H. The Court should approve the Bar Order

38. For the reasons discussed in the Motion, I respectfully submit that the Bar Order is fair, equitable and in the best interests of the Estate.

39. The Bar Order is necessary to the Settlement because Crookston would not have settled with me without a bar order enjoining all future claims against him arising out of or relating to the 1inMM Ponzi Scheme and/or JJMT.

### I. The Court should approve the Administrative Claims

40. The Investor Plaintiffs' agreement to pay the entire amount of the Settlement Payment into the Estate for the benefit of all creditors will result in the Estate having more cash for administration and creditor claims. In recognition of that, I agreed that the Investor Plaintiffs' counsel should hold allowed administrative claims in certain negotiated amounts in exchange for their contributions to the Estate (the "Administrative Claims"): $600,000 for the L&E Investors' counsel; $300,000 for the Aronson Investors' counsel; and $100,000 for the Nalpak Investors' counsel.

41. Investor Plaintiffs' counsel—who doggedly pursued the Investor Actions—played an essential role in increasing the amount that Crookston agreed to pay in settlement, all of which cash is coming into the Estate for eventual distribution to the net losing investors.

42. The Investor Plaintiffs' agreement that Crookston should pay *all* of the settlement consideration to the Estate for the benefit of all creditors was, from my perspective, the lynchpin of this three-way compromise. It undeniably caused an increase of the Estate's cash assets available for distribution to creditors beyond what I would have recovered by settling the Receiver Claims alone.

43. I respectfully submit that the Investor Plaintiffs and their counsel helped increase a common fund in the Estate.

44. Finding a way to compensate the Investor Plaintiffs' counsel for their efforts in augmenting the Estate was a hard-fought material term of the overall Settlement. I agreed to the Administrative Claim amounts in the exercise of my business judgment, which I felt was necessary to achieve a global settlement. I therefore ask the Court to approve the Administrative Claims and associated disbursements, which the Court may do pursuant to its wide discretion to approve receivership settlements generally and the common fund doctrine specifically.

**J.  Notice to creditors**

45. I will give notice of the Motion by: (a) CM/ECF to parties/interested parties; (b) email to all known creditors of the Estate (or, if represented, their counsel) with a link to the Motion and supporting exhibits; (c) posting it on the Website; and (d) publishing a notice once in the *Wall Street Journal* and once in the *Los Angeles Times* in the form annexed to the Motion as **Exhibit 7** (the "Published Notice").

46. These communications will include instructions on how to advise me of any objections to the Motion by no later than seven days before the hearing. I will thereafter file a status report.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 26, 2023                    /s/*Michele Vives*
in San Diego, California                    Michele Vives