Terence G. Banich (SBN 212173)
terence.banich@katten.com
Allison E. Yager (*pro hac vice*)
allison.yager@katten.com
**KATTEN MUCHIN ROSENMAN LLP**
525 W. Monroe St.
Chicago, IL 60661
Telephone:  (312) 902-5665
Facsimile:   (312) 902-1061

*Attorneys for the Receiver*
Michele Vives

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> ZACHARY J. HORWITZ; and 1inMM CAPITAL, LLC, <br><br> Defendants. | Case No. 2:21-cv-02927-CAS-PD <br><br> **DECLARATION OF MICHELE VIVES** <br><br> Judge:   Hon. Christina A. Snyder <br> Courtroom: 8D |

I, Michele Vives, declare as follows:

1. I am over the age of eighteen years, am under no disability and am competent to testify to the matters set forth herein. Except as otherwise stated, all facts set forth in this declaration are based upon my personal knowledge and/or my review of documents. If called as a witness in this case, I could and would testify competently to the facts set forth in this declaration.

2. I submit this declaration in support of the *Motion of Receiver Michele Vives for Order Approving Settlement with Joseph deAlteris, Jacob Wunderlin, Matthew Schweinzger and JJMT Capital, LLC, and for Related Relief*, dated July 28, 2023 (the "Motion"). Any capitalized terms not defined herein have the meanings ascribed to them in the Motion.

3. I am the President of the Douglas Wilson Companies ("DWC"), an advisory firm that assists companies and entities of all kinds, from financial institutions to operating companies, law firms, state and federal courts, corporations, partnerships, pension funds, REITs and more. DWC has been appointed as receiver or otherwise involved in hundreds of receiver cases over the last 30 years, and has served in other fiduciary roles, such as chapter 11 trustee, chapter 11 examiner, special master, liquidating trustee, assignee for the benefit of creditors and chief restructuring officer.

**A. The Receiver; investigation of transfers**

4. On January 14, 2022, this Court entered the *Order on Appointment of a Permanent Receiver* [ECF #70] (the "Receiver Order"), which appointed me to be the federal equity receiver of defendant 1inMM Capital, LLC ("1inMM") as well as assets that are attributable to investor or client funds or that were fraudulently transferred by 1inMM or Zachary J. Horwitz ("Horwitz," and together with 1inMM, "Defendants") (collectively, the "Estate").

5. The Receiver Order confers on me "full powers of an equity receiver," and specifically authorizes and directs me to, among other things: take custody and

control over all assets of 1inMM and its subsidiaries and affiliates; conduct an investigation and discovery as may be necessary to locate and account for the assets of or managed by 1inMM and its subsidiaries and affiliates; and investigate and, where appropriate, prosecute claims and causes of action that the Receiver may possess.

### B. The Investor Actions; the Mediation

6. Pursuant to the authority conferred on me by the Receiver Order, and as I have discussed in my previous quarterly reports, my staff and I have devoted a great deal of time and effort to conducting a forensic accounting analysis of the financial transactions involving 1inMM, Horwitz and their respective insiders and affiliates. This project is critical to determine who may be liable to the Estate for receiving fraudulent transfers, to identify previously unknown assets and to obtain information about 1inMM's investors.

7. I have determined that 1inMM did not just transfer funds to investors and their feeder funds; 1inMM also transferred very large sums to various persons and entities who do not appear to have been investors and/or lenders in the Ponzi Scheme. I am investigating both types of transfers. In doing so, I will be able to identify potential fraudulent transfers to both investors and non-investors alike, thereby increasing the pool of potential recovery to the Estate. Settlements that I reach with such transferees are likely to be very significant Estate assets.

8. My professional staff and I have, therefore, devoted considerable time and attention to reviewing and analyzing tens of thousands of banking transactions and associated records associated with 1inMM and Horwitz to identify those persons and entities who may have received transfers that are subject to avoidance and recovery.

9. I determined, among other things, that 1inMM, through Horwitz, raised investor funds mostly using certain entities that pooled large amounts of money from many individual investors or lenders (collectively referred to herein as

"investors") for upstream loans to, or investments in, 1inMM (collectively referred to herein as "investments"). The largest of these entities was JJMT Capital, LLC ("JJMT"), of which Joseph deAlteris, Jacob Wunderlin and Matthew Schweinzger (collectively, "JJM," and with JJMT, "JJM Parties") are members.

10. Several investors commenced lawsuits alleging claims associated with Defendants' scheme, including against the JJM Parties (the "Investor Actions").

11. The plaintiffs in the Investor Actions (collectively, the "Investor Plaintiffs") claimed millions of dollars generally asserting that the JJM Parties and other defendants are liable to them in connection with the Ponzi Scheme, loans from the Investor Plaintiffs to JJMT and loans from JJMT to 1inMM (collectively, the "Investor Claims"). The JJM Parties asserted defenses that could have resulted in the Investor Plaintiffs taking nothing.

12. Counsel for the Investor Plaintiffs worked with me because I had claims against the same defendants, while the defendants expressed interest in settling my potential claims against them, but only if I could concurrently resolve or eliminate the Investor Actions.

13. After months of negotiations, those litigants and I agreed to mediate, selecting retired U.S. Magistrate Judge Sidney I. Schenkier as mediator.

**C. The Transfers**

14. As part of the above events, the JJM Parties and their counsel, Corey Weber of BG Law LLP, Matthew S. Ryan of Cotsirilos, Tighe, Streicker, Poulous & Campbell, Ltd., and James Kopecky of Kopecky Schumacher Rosenburg LLC, worked cooperatively with me. The JJM Parties produced a large volume of financial documents and related information.

15. I determined that JJM were each net winners of the Ponzi Scheme in the following amounts: $8,309,096 (deAlteris); $9,349,741 (Wunderlin); and $6,625,309 (Schweinzger) (collectively, the "Transfers").

16. I asserted that I may avoid and recover the Transfers as actual fraudulent transfers pursuant to section 3439.04(a)(1) of the California Uniform Voidable Transactions Act, Cal. Civ. Code § 3439 *et seq.* ("UVTA") (the "Receiver Claims"). As I contended, 1inMM and Horwitz made the Transfers with the actual intent to hinder, delay, or defraud their creditors, as Horwitz pled guilty and admitted that he used 1inMM to operate a Ponzi scheme, which conclusively establishes intent for purposes of a UVTA actual fraudulent transfer claim.

17. I argued that I could recover the Transfers from JJM under UVTA § 3439.08(b)(1)(A) as their first transferee, because even though 1inMM made many of the Transfers to them indirectly through JJMT, JJMT was a mere conduit that had no dominion over the money 1inMM transferred to it.

**D.    The Settlement**

18. Following the mediation on January 30-31, 2023, the parties reached a settlement ("Settlement") whereby the JJM Parties agreed to pay $9,000,000 to the Estate ("Settlement Payment")—consisting of three payments over a two-year span—to resolve the Investor Claims and the Receiver Claims (collectively, "Claims") in exchange for mutual general releases and entry of an order ("Bar Order") permanently barring and enjoining all persons and non-governmental units from suing the JJM Parties on any claim arising out of or relating to the Ponzi Scheme. The Settlement is documented in the *Settlement Agreement and Mutual Release* (the "Settlement Agreement"), a true and correct copy of which is attached to the Motion as Exhibit 1.

19. The parties to the Settlement Agreement are myself, the JJM Parties and all Investor Plaintiffs who have sued or threatened to sue the JJM Parties: (a) 109 persons/entities represented by Loftus & Eisenberg, Ltd. who invested in JJMT, listed on Schedule 1 to the Settlement Agreement (collectively, the "L&E Investors"); (b) Nalpak I LP, Nalpak II LP, Nalpak Enterprises LLC and Peter

Xilas (collectively, the "Nalpak Investors"); and (c) Steven Aronson and Matthew Aronson (together, the "Aronson Investors").

20. As part of the Settlement, JJMT agreed to assign to me all claims it owns or has the authority to assert against anyone arising out of or relating in any way to the Ponzi Scheme (the "Assigned Claims"), with certain exclusions.

21. Additionally, because the Investor Plaintiffs agreed that the entire Settlement Payment should be paid into the Estate for the benefit of all creditors, I have concluded that the Investor Plaintiffs' counsel created a common fund from which a negotiated amount of their fees—totaling $2,560,000—should be paid. Finally, the validity of the Settlement Agreement is subject to the condition precedent that the Court approves it, including the Bar Order.

22. I believe the Settlement is in the best interest of the Estate and its creditors—the net losing investors in the Ponzi Scheme. The Settlement Payment constitutes a substantial recovery for the Estate without the expense and risk of litigation, and the Settlement represents an equitable, good-faith resolution of all Claims.

23. While the Investor Plaintiffs and I were confident in our respective claims, the risk of an adverse result always loomed. JJM asserted multiple meaningful defenses that, if successful, may have resulted in the Estate and the Investor Plaintiffs recovering nothing. The Settlement thus avoids protracted and expensive litigation, thereby avoiding litigation risk and conserving Estate resources.

24. The Settlement Payment—37% of the total Transfers—exceeds what the JJM Parties would have paid to resolve the Receiver Claims alone without a bar order. The JJM Parties simultaneously resolved the Investor Claims, so the efforts of Investor Plaintiffs' counsel undoubtedly enhanced the final settlement value, all of which is flowing to the Estate. And because the Investor Plaintiffs agreed that the JJM Parties remit the entirety of the Settlement Payment to the

Estate, the Investor Plaintiffs' counsel helped create a common fund from which a portion of their attorney's fees may be paid.

25. Moreover, the Settlement resolves a particularly complex multiparty dispute. The Investor Claims and Receiver Claims arise from a common nucleus of operative facts—the Ponzi Scheme—but the litigants' objectives were not necessarily the same. Specifically, the Investor Plaintiffs pursued the JJM Parties to remedy their own personal damages, while I focused on benefitting the Estate as a whole. Those goals often conflicted, resulting in disagreements between the Investor Plaintiffs and me about settlement terms and how to proceed.

26. The Investor Claims are, nonetheless, derivative of the Receiver Claims and, to the extent that I was to litigate the Receiver Claims and obtain a favorable judgment, compete with me for JJM's assets. The Investor Plaintiffs and I are pursuing the same people arising out of the same transactions and occurrences involving the same actors. As such, the Investor Actions affected the Estate's assets and ultimate recoveries; every dollar the Investor Plaintiffs managed to recover from JJM was arguably a dollar I could not recover from them.

27. JJM wanted to achieve finality with a settlement, which they really could only accomplish through a deal with me. At the same time, I did not think it advisable or practical to exclude the Investor Plaintiffs from those discussions. Because the Investor Plaintiffs collectively constitute a significant percentage of the known population of net losing investors, I considered them to function effectively as an ad hoc creditors committee.

28. JJM, moreover, made clear that any settlement with me must include a bar order enjoining any further creditor suits against them arising from or relating to the Ponzi Scheme, so I continually focused on achieving a settlement that met the legal requirements for a bar order. These factors, among others, made the litigation complex and particularly difficult to settle on a global basis.

### E. The Settlement is fair, equitable and in the best interests of the Estate.

#### 1. Probability of success

29. I respectfully submit that the Settlement easily satisfies all four *A&C Properties* factors.

30. In light of the conflicting arguments on the issue of the potential expiration of the UVTA limitations period and their potential impact on JJM's exposure on the Receiver Claims, I considered their limitations period defenses to be a significant litigation risk factor.

31. The mere conduit issue also presented an important litigation risk for me, as the vast majority of the Transfers flowed from 1inMM through JJMT to JJM. Rather than risk an adverse ruling on this issue, I decided it was preferable to settle.

32. In the event of further litigation, the Court may have sustained some of JJM's defenses, which would be an outcome worse than the Settlement. Rather than take that risk, I compromised.

33. For the reasons discussed above and in the Motion—informed by Judge Schenkier's reactions to the arguments during the parties' two-day mediation—I concluded that the Settlement appropriately takes into account the mixed probability of success on the merits.

#### 2. Collection difficulties

34. I understand that JJM, collectively and/or individually, do not have assets that would be sufficient to satisfy a judgment avoiding all of the Transfers, let alone that *plus* an adverse judgment entered in favor of the Investor Plaintiffs.

#### 3. Complexity/expense

35. It would be complex, expensive and time-consuming for the parties to litigate the Claims.

36. Given the evidence and defense arguments, I believe such litigation against JJM would be expensive and time-consuming, as it would likely require

extensive discovery, retention of experts and numerous witnesses. A trial and appeal would likely take at least two years to complete and cost the estate several hundred thousand dollars in fees and expenses.

### F. The Court should approve the Bar Order

37. For the reasons discussed in the Motion, I respectfully submit that the Bar Order is fair, equitable and in the best interests of the Estate.

38. Absent a settlement, the Investor Plaintiffs and I would be left to litigate claims and, to the extent we obtained favorable judgments, compete for JJM's assets, a result that would have frustrated my pro rata distribution to investors.

39. Because JJMT agreed to assign the Assigned Claims to me, I can step into JJMT's shoes and assert certain claims that I may not otherwise have been able to pursue.

40. The Bar Order is necessary to the Settlement because JJM would not have settled with me without a bar order enjoining all future claims against them arising out of or relating to the Ponzi Scheme and/or JJMT.

### G. The Court should approve the Administrative Claims

41. The Investor Plaintiffs' agreement that JJM pay the entire amount of the Settlement Payment into the Estate for the benefit of all creditors will result in the Estate having more cash for administration and creditor claims. In recognition of that, I agreed that the Investor Plaintiffs' counsel should hold allowed administrative claims in certain negotiated amounts in exchange for their contributions to the Estate (the "Administrative Claims"): $1,610,000 for the L&E Investors' counsel; $450,000 for the Aronson Investors' counsel; and $500,000 for the Nalpak Investors' counsel.

42. It is my opinion that Investor Plaintiffs' counsel—who doggedly pursued the Investor Actions—played an essential role in increasing the amount

that JJM agreed to pay in settlement, all of which cash is coming into the Estate for eventual distribution to the net losing investors.

43. The Investor Plaintiffs' agreement that JJM make the Settlement Payment to the Estate for the benefit of all creditors was, from my perspective, the lynchpin of this three-way compromise. It undeniably increased the Estate's cash assets available for distribution to all creditors.

44. I respectfully submit that the Investor Plaintiffs' counsel helped increase a common fund in the Estate.

45. Finding a way to compensate the Investor Plaintiffs' counsel for their efforts in augmenting the Estate was a hard-fought material term between myself and the Investor Plaintiffs as part of the overall Settlement. I agreed to the Administrative Claim amounts in the exercise of my business judgment, which I felt was necessary to achieve a global settlement.

**J.     Notice to creditors**

46. I will give notice of the Motion by: (a) CM/ECF to parties/interested parties; (b) email to all known creditors of the Estate (or, if represented, their counsel) with a link to the Motion and supporting exhibits; (c) posting it on the Website; and (d) publishing a notice once in the *Wall Street Journal* and once in the *Los Angeles Times* in the form annexed to the Motion as **Exhibit 4** (the "Published Notice").

47. These communications will include instructions on how to advise me of any objections to the Motion by no later than seven days before the hearing. I will thereafter file a status report.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 31, 2023             /s/*Michele Vives*
in San Diego, California              Michele Vives