Terence G. Banich (SBN 212173)
terence.banich@katten.com
Allison E. Yager (*pro hac vice*)
allison.yager@katten.com
**KATTEN MUCHIN ROSENMAN LLP**
525 W. Monroe St.
Chicago, IL 60661
Telephone:  (312) 902-5200
Facsimile:   (312) 902-1061

*Attorneys for the Receiver*
Michele Vives

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>             Plaintiff,<br><br>      v.<br><br>ZACHARY J. HORWITZ and 1inMM CAPITAL, LLC,<br><br>             Defendants. | Case No. 2:21-cv-02927-CAS-PD<br><br>**RESPONSE OF RECEIVER MICHELE VIVES TO OBJECTION OF JEFFREY ASK TO MOTION FOR ORDER APPROVING SETTLEMENT WITH JOSEPH DEALTERIS, JACOB WUNDERLIN, MATTHEW SCHWEINZGER AND JJMT CAPITAL, LLC AND FOR RELATED RELIEF**<br><br>Judge:        Hon. Christina A. Snyder<br>Courtroom:  8D |

Michele Vives, not individually, but solely as the federal equity receiver (the "Receiver") of defendant of 1inMM Capital, LLC and its subsidiaries, affiliates and over the assets more particularly described in the *Order on Appointment of Permanent Receiver*, dated January 14, 2022 [ECF #70], hereby responds to the objection submitted by Jeffrey Ask (the "Objection"), a net losing investor in the 1inMM Ponzi Scheme, to the Receiver's *Motion for Order Approving Settlement With Joseph deAlteris, Jacob Wunderlin, Matthew Schweinzger and JJMT Capital, LLC and for Related Relief*, dated July 31, 2023 [ECF #235] (the "Motion").[1]

## Introduction

1. The Settlement with Joseph DeAlteris, Jacob Wunderlin, Matthew Schweinzger and JJMT Capital, LLC (collectively, the "JJM Parties") is an excellent result for the Estate. As the Receiver explained in the Motion, the JJM Parties agreed to pay the Estate ***$9 million*** to settle all asserted and potential claims against them arising out of or relating in any way to the 1inMM Ponzi Scheme, which will be enforced by a bar order. This incredibly hard-fought compromise was the result of a two-day marathon mediation presided over by a distinguished retired United States Magistrate Judge. The Settlement easily meets the standards for approval of compromises, and has the support of ***all*** creditors of the Estate—except one, Mr. Ask. While Mr. Ask is an engaged and active creditor who is understandably frustrated by his plight, many of his points are merely ad hominem attacks on the JJM Parties without factual basis or evidentiary support. Ultimately, Mr. Ask offers no cogent reason to reject the Settlement. His Objection should be overruled.

## Relevant Background

2. On July 31, 2023, the Receiver filed the Motion. The Motion asks the Court to approve the settlement that the Receiver reached with the JJM Parties pursuant to which the JJM Parties will pay the Estate $9 million in exchange for

---

[1] Capitalized terms not defined herein have the meanings ascribed to them in the Motion.

entry of a bar order in their favor, mutual general releases and dismissal of various litigation pending against them by investors in and/or lenders to 1inMM.

3. In the Motion, the Receiver explains in great detail why the Settlement is in the best interest of the Estate and its creditors and thus should be approved. The Securities and Exchange Commission does not object to the Motion. [ECF #236]

4. The Receiver served the Motion on all known creditors of the Estate by several different methods. [ECF #237, 246, 247] Of the approximately 150-plus net losing investors in the 1inMM Ponzi Scheme who are creditors of the Estate, only Mr. Ask submitted an objection to the Motion. Mr. Ask did not, however, file the Objection with the Court or submit a declaration in support of it.

5. As Mr. Ask is *pro se*, the Receiver filed the Objection as an exhibit to her status report about the Motion. [ECF #260-1]

### Legal Standards

6. Approving a proposed compromise is an exercise of discretion that should be upheld as long as it is in the best interest of the estate and fair and equitable for creditors. *See, e.g., In re MGS Mktg.*, 111 B.R. 264, 266-67 (B.A.P. 9th Cir. 1990). Courts must give deference to the Receiver's business judgment in deciding whether to settle a matter for the benefit of the estate. *See, e.g., In re Douglas J. Roger, M.D. Inc., APC*, 393 F. Supp. 3d 940, 961 (C.D. Cal. 2019); *In re Galloway*, 2014 WL 4212621, at *9 (B.A.P. 9th Cir. Aug. 27, 2014). As the Receiver discussed in detail in the Motion, whether to approve a settlement is a multi-factorial analysis. (Mot. at 7-13.) Ultimately, a court need not find that the settlement offers the "best result obtainable." *In re Martin*, 212 B.R. 316, 319 (B.A.P. 8th Cir. 1997). The Court should only disapprove a settlement if it "falls below the lowest point in the range of reasonableness." *Sec. & Exch. Comm'n v. Total Wealth Mgmt., Inc.*, 2019 WL 13179068, at *3 (S.D. Cal. Sept. 18, 2019).

7. A creditor's opposition to a compromise "is not controlling *and will not prevent approval of the compromise where it is evident that the litigation would be*

*unsuccessful and costly.*" *In re Bondanelli*, No. 2:14-BK-27656-WB, 2020 WL 1304140, at *4 (B.A.P. 9th Cir. Mar. 18, 2020) (original emphasis). Nor may a creditor "arbitrarily veto a settlement that otherwise satisfies the criteria for approval." *O'Connell v. Packles (In re Hilsen)*, 404 B.R. 58, 71 (Bankr. E.D.N.Y. 2009) (citation omitted). "Once there is a showing that the settlement should be approved, the burden then shifts to the objecting party who cannot oppose the settlement by merely demanding more proof." *In re MQVP, Inc.*, No. 10-10982, 2010 WL 11519900, at *5 (E.D. Mich. Aug. 18, 2010). "In short, creditors have a voice but not a veto." *Bondanelli*, 2020 WL 1304140, at *4.

## Response to the Objection

8.   The Objection should be overruled. Mr. Ask, a net losing investor in the 1inMM Ponzi Scheme, is understandably upset that he lost a significant amount of money. His opposition to the Settlement is ironic. The Receiver has been working assiduously to recover as much of that money as possible using the California Uniform Voidable Transactions Act ("UVTA"). *Donell v. Kowell*, 533 F.3d 762, 767 (9th Cir. 2008) (receivers and trustees in bankruptcy routinely use fraudulent transfer law "to recover monies lost by Ponzi-scheme investors"). Her hard-fought Settlement with the JJM Parties—after months of negotiations, reams of briefing and a two-day marathon mediation session—delivers significant value to the Estate. (Mot. at 3-5.) It plainly meets the applicable standards for approval. (*Id.* at 8-13.) As discussed below, none of the several points that Mr. Ask raises is a reason to deny the Motion.

9.   First, Mr. Ask suggests that the Receiver has not provided any "supporting documentation" for why $9 million is the "appropriate amount." (Obj. at 2, ¶ 1.) That is simply untrue. The Receiver submitted an extensive declaration explaining her forensic investigation of the JJM Parties, her assessment of the asserted claims and defenses and why she believes the Settlement—including the $9 million Settlement Amount—is in the best interest of the Estate. [ECF #235-2] More

Case No. 2:21-cv-02927-CAS-PD
RESPONSE OF RECEIVER MICHELE VIVES TO OBJECTION OF JEFFREY ASK
TO MOTION TO APPROVE SETTLEMENT WITH JOSEPH DEALTERIS, ET AL.

3

fundamentally, the relevant "math" here is the Receiver's "risk-weighted calculation" of the Settlement Amount, not what an objecting creditor thinks the claim is worth. *In re Chapman*, No. 6:16-BK-20430-SC, 2019 WL 7372670, at *5 (B.A.P. 9th Cir. Dec. 18, 2019), *aff'd*, No. 20-60009, 2021 WL 4596595 (9th Cir. Oct. 6, 2021). So it is not relevant that Mr. Ask believes the Receiver's claim is worth more than $9 million.

10. Moreover, the amount of a proposed compromise need not be the product of a mathematical calculation, particularly where the disputes being settled are complex. *See, e.g., Young Hui Kim v. Field*, No. CV 18-00168 JAO-KSC, 2018 WL 6184880, at *7 (D. Haw. Nov. 27, 2018) (affirming approval of settlement even though the bankruptcy trustee had no "direct calculation" of how much time or expense it would cost to litigate claims that were "factually complex and difficult"). The various disputes involving the JJM Parties are certainly complex (Mot. at 4-5, 12, 14-15), which Mr. Ask does not contest.

11. <u>Second</u>, Mr. Ask challenges the adequacy of the $9 million Settlement Amount because he asserts that the JJM Parties are able to "retain[]" over $15 million of the $24 million "they admitted stealing from victims." (Obj. at 2, ¶ 1.)[2] That is also untrue. While the Receiver determined that the JJM Parties received approximately $24.2 million of net winnings from the 1inMM Ponzi Scheme (Mot. at 2), the Receiver also concluded that the JJM Parties had viable defenses to potential claims against them and concluded that it was unclear as to whether, if the Receiver filed litigation, she would be able to avoid and recover the asserted net winnings. The issues have not been litigated and the Court has not made any determinations as to the Receiver's claims or the defenses. The Receiver also did *not*

---

[2] Mr. Ask makes essentially the same argument elsewhere in his Objection. (Obj. at 3, ¶ 6.)

conclude that the JJM Parties had $24.2 million of remaining asset value nor *liquidity* to pay an adverse judgment should she proceed to trial and win. Indeed, the Receiver's investigation indicated that the opposite is likely true. The Receiver is informed and believes that the JJM Parties, either collectively or individually, do not have assets sufficient to satisfy a $24 million-plus judgment. (Mot. at 12.) Mr. Ask simply ignores that evidence and offers nothing to contradict it. Notwithstanding Mr. Ask's numerous ad hominem attacks in the Objection, there is no evidence that the JJM Parties engaged in any wrongdoing or were complicit in Horwitz's fraud, the Receiver does not allege that they engaged in any wrongdoing. The JJM Parties have not admitted to "stealing" anything, let alone $24 million. On the contrary, the JJM Parties expressly deny any wrongdoing.[3] [ECF #235-1 at ¶ 36]

12.   Third, Mr. Ask criticizes the Settlement because it does not divest the JJM Parties of *all* of their assets. (Obj. at 2, ¶ 2(a).) But UVTA does not authorize a plaintiff like the Receiver to render transferee-defendant financially destitute, as Mr. Ask apparently believes. It only permits avoidance and recovery of the transfers by the debtor necessary to satisfy the creditor's claim. Cal. Civ. Code § 3439.07(a)(1). That is why the Settlement Amount represents a risk and cost-adjusted percentage of what the Receiver has determined are the net winnings based on the total of the transfers from 1inMM to the JJM Parties as opposed to a percentage of their total assets (or any other alleged types of damages they allegedly caused). (Obj. at 3, ¶ 7.) The Receiver had no warrant to bankrupt these individuals,[4] and in fact pursuing that

---

[3] Again, Mr. Ask has not filed a declaration or any evidence in support of his ad hominem attacks, and instead apparently believes that making the attacks more acerbic strengthens his arguments.

[4] Mr. Ask also states that the JJM Parties own certain business entities funded with money that they "fraudulently acquired" from the 1inMM Ponzi Scheme. (Obj. at 2, ¶ 2(b).) Mr. Ask provides no evidence that these affiliated business entities were funded with net winnings. But even if he is correct, that fact is immaterial. The Receiver's calculation of the JJM Parties' net winnings would be unchanged as it is based on her analysis of bank statements of transfers to and from 1inMM. Likewise, the Receiver's assessment of the risks and costs of litigation would be unchanged.

goal would have been counterproductive. No adverse party would agree to settle with the Receiver at a cost of financial suicide.[5] The Receiver has a duty to marshal assets of the Estate and to maximize recovery for creditors, and that is what she has done in entering into the Settlement with the JJM Parties, subject to Court approval.

13. <u>Fourth</u>, Mr. Ask complains that, if the Settlement is approved, the JJM Parties will receive a bar order and not have to repay the remaining $15.2 million of their net winnings. (Obj. at 2, ¶ 3.) But a settling net winner is not required to disgorge 100 percent of his or her profits—let alone 100 percent of his or her *assets*, resulting in destitution—to justify a bar order. Instead, as the Receiver explained, entry of a bar order is appropriate if the settlement is fair, equitable and in the best interests of the estate, and the bar order is necessary to the settlement. (Mot. at 14.) Those factors are satisfied here (*id.* at 14-17), and Mr. Ask does not assert otherwise. Instead, he believes it wrong to foreclose net losing investors like him from suing the JJM Parties on account of claims pertaining to the 1inMM Ponzi Scheme. (Obj. at 2, ¶ 3.) But the entire point of a bar order is "to curb investors' individual advantage-seeking in order to reach settlements for the aggregate benefit of investors under the court's supervision." *Zacarias v. Stanford Int'l Bank, Ltd.*, 945 F.3d 883, 896 (5th Cir. 2019). If anything, Mr. Ask's argument that creditors of the Estate should retain the right to recover net winnings from the JJM Parties demonstrates why entering a bar order is necessary and appropriate.

14. <u>Fifth</u>, Mr. Ask suggests that the Receiver gave too much credit to the

---

[5] That the Receiver refers in the Motion to bankruptcy law and procedure is not a reason to oppose the Settlement. (Obj. at 2, ¶ 2(c).) Local Rule 66-8 directs a receiver to administer the estate "as nearly as possible in accordance with the practice in the administration of estates in bankruptcy," and district courts routinely look to bankruptcy law and procedure for guidance in administering a receivership. *See, e.g., Sec. & Exch. Comm'n v. Cap. Consultants, LLC*, 397 F.3d 733, 745 (9th Cir. 2005). And while it is generally true that holders of equity interests do not get a distribution from a bankruptcy estate unless all creditors are paid in full, this principle is inapplicable here. The Settlement does not involve a 1inMM equity holder receiving a distribution from the Estate.

JJM Parties' asserted defenses. The Receiver respectfully disagrees. Mr. Ask questions, for example, "why the victims should take a discount" because of the JJM Parties' statute of limitations defense. (Obj. at 2-3, ¶ 4(a).) But the fraudulent transfer claims at issue here belong to *the Estate*, not the individual creditors of 1inMM like Mr. Ask. *See, e.g., Sec. & Exch. Comm'n v. Nationwide Automated Sys. Inc.*, No. CV-14-07249-SJO, 2015 WL 13710945, at *2 (C.D. Cal. Apr. 21, 2015) ("Federal equity receivers have standing to pursue fraudulent transfer claims on behalf of entities in receivership against the recipients of fraudulent transfers.") (citing *Donell*, 533 F.3d at 776-77). 1inMM—and thus the Estate—was harmed by its own fraudulent transfers when Horwitz controlled it and "caused [1inMM] to commit waste and fraud." *Donell*, 533 F.3d at 777. So it was entirely appropriate for the Receiver to consider the Estate's interests as a whole in evaluating the limitations defense. Finally, as the Receiver explained, she asserted claims against the JJM Parties in a timely manner but classified the limitations defense as a risk factor because the Ninth Circuit has not definitively addressed how those arguments apply to federal equity receivers. (Mot. at 9.)

15. Mr. Ask believes that the JJM Parties' conduit defense is "outlandish" and "illogical." (Obj. at 2, ¶ 4(b).) Again, the Receiver disagrees. As the Receiver discussed (Mot. at 10-11), there was a substantial dispute between the Receiver and the JJM Parties about whether JJMT Capital, LLC ("JJMT") was the first transferee of the Transfers (as the JJM Parties contended), or merely a conduit for 1inMM to convey the Transfers to the JJMT's members (as the Receiver contended). This issue generally turned on whether JJMT had dominion over the funds that 1inMM wired to it, and the parties had meaningful arguments in both directions. (Mot. at 10-11.) Dominion—and thus transferee status—required JJMT to have the right to put the money received to its own purposes. *See, e.g., In re Walldesign, Inc.*, 872 F.3d 954, 962 (9th Cir. 2017). That is primarily a factual dispute that could have taken a great deal of litigation (and concomitant expense) to resolve. Mr. Ask paradoxically

asserts that "JJMT had complete dominion over the funds" (Obj. at 3, ¶ 4(b)), which actually undermines his Objection *and* the Receiver's position. If he were right, and the Court were to rule that JJMT indeed had dominion over the funds it received from 1inMM, then the UVTA would likely bar the Receiver from recovering anything from the JJM Parties. Further, if this outcome were to come to fruition, the Receiver's ability to recover from those similarly situated as the JJM Parties (i.e., individuals sitting two degrees removed from 1inMM with an intermediary in between) would be severely compromised. In short, the Receiver's ability to avoid and recover other transfers for the benefit of the Estate would be put at risk. This is precisely why the Receiver considered the conduit issue to be a significant litigation risk meriting a compromise. (Mot. at 11.)

16. <u>Sixth</u>, Mr. Ask seems to take issue with the attorney's fees that the Receiver agreed to pay the Investor Plaintiffs' counsel as part of the overall compromise. (Obj. at 3, ¶ 5.) Resolving the Investor Actions was a critical component of the Settlement, and Investor Plaintiffs' counsel's dogged pursuit of those claims drove the settlement value higher. (Mot. at 18-19.) The entire amount of the Settlement Payment will be paid to the Estate for the benefit of all creditors, including Mr. Ask. (*Id.* at 19.) Having created a common fund in the Estate, the Receiver agreed to pay Investor Plaintiffs' counsel an amount equating to about 28.4% of the Settlement from the Estate's common fund, which is an entirely defensible percentage under applicable law. (*Id.* at 19-20.) Mr. Ask contests *none* of these facts. He simply misunderstands why the Receiver agreed to pay attorney's fees to the Investor Plaintiffs' counsel, and ignores that all of the 113 investors who

Case No. 2:21-cv-02927-CAS-PD
RESPONSE OF RECEIVER MICHELE VIVES TO OBJECTION OF JEFFREY ASK
TO MOTION TO APPROVE SETTLEMENT WITH JOSEPH DEALTERIS, ET AL.

8

participated in the settlement process expressly agreed to those payments.[6] [ECF #235-1 at Schedule 5, ¶ 5]

### Conclusion

17. The Objection is not well-taken and presents no cognizable reason to deny the Motion. While the Receiver certainly understands why Mr. Ask is unhappy with his predicament, by opposing the Settlement he is "seeking merely to gamble with [other] creditors' recovery in the unreasonable hope of hitting a litigation jackpot." *Goldstein v. Weeks St., LLC*, 2017 WL 567254, at *16 (N.D. Cal. Feb. 13, 2017), *aff'd sub nom. In re Weeks St., LLC*, 764 F. App'x 602 (9th Cir. 2019). The Receiver's business judgment to settle with the JJM Parties—which is entitled to deference—prevails over Mr. Ask's idiosyncratic criticisms of it.

18. Consequently, the Receiver respectfully requests that the Court enter an order overruling the Objection, granting the Motion and awarding such further relief as the Court deems necessary and appropriate.

Dated: September 8, 2023

Respectfully submitted,

**KATTEN MUCHIN ROSENMAN LLP**

By:  /s/*Terence G. Banich*
     Terence G. Banich

*Attorneys for the Receiver*
Michele Vives

---

[6] Despite Mr. Ask's suggestions, his former lawyer, Mr. Loftus, is not being paid from Mr. Ask's distribution from the Estate. (Obj. at 3, ¶ 5.) The Receiver has not made any distributions to creditors, and will do so only after the Court has entered an order regulating the process for the filing, reconciliation, allowance/disallowance and payment of claims. The Receiver will pay Mr. Loftus approximately $1.61 million *from the common fund in the Estate*. (Mot. at 17, 19.) The balance of the attorney's fees (i.e., approximately $950,000) will be paid from the common fund in the Estate to the *other* Investor Plaintiffs' counsel—not Mr. Loftus—who had claims pending against the JJM Parties. [ECF #235-1 at ¶ 3(b)(ii)-(iii)]

KATTEN MUCHIN ROSENMAN LLP
525 W. MONROE ST.
CHICAGO, IL 60661
(312) 902-5200

# PROOF OF SERVICE

**STATE OF ILLINOIS, COUNTY OF COOK**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Cook, State of Illinois. My business address is 525 W. Monroe St., Chicago, Illinois 60661. On September 8, 2023, I served the following document(s) described as:

**RESPONSE OF RECEIVER MICHELE VIVES TO OBJECTION OF JEFFREY ASK TO MOTION FOR ORDER APPROVING SETTLEMENT WITH JOSEPH DEALTERIS, JACOB WUNDERLIN, MATTHEW SCHWEINZGER AND JJMT CAPITAL, LLC AND FOR RELATED RELIEF**

as follows:

**[ ]   BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed above and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with Katten Muchin Rosenman LLP practice for collecting and processing correspondence for mailing. On the same day that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

**[X]   BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused the document(s) to be sent from e-mail address terence.banich@katten.com to the persons at the e-mail address(es) listed below. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

Mr. Jeffrey Ask (jeffask@gmail.com)

**[ ]   BY OVERNIGHT MAIL (FedEx):** I enclosed said document(s) in an envelope or package provided by FEDEX and addressed to the persons at the addresses listed above. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of FEDEX or delivered such document(s) to a courier or driver authorized by FEDEX to receive documents.

**[ ]   BY PERSONAL SERVICE:** I caused said document to be personally delivered the document(s) to the person at the addresses listed above by leaving the documents in an envelope or package clearly labeled to identify the attorney being served with a receptionist or an individual in charge of the office.

**[X]   E-FILING:** By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

I declare under penalty of perjury under the laws of the State of Illinois that the foregoing is true and correct.

Executed on September 8, 2023, at Winnetka, Illinois.

*/s/Terence G. Banich*
Terence G. Banich