Terence G. Banich (SBN 212173)
terence.banich@katten.com
Allison E. Yager (*pro hac vice*)
allison.yager@katten.com
**KATTEN MUCHIN ROSENMAN LLP**
525 W. Monroe St.
Chicago, IL 60661
Telephone: (312) 902-5200
Facsimile: (312) 902-1061

*Attorneys for the Receiver*
Michele Vives

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>            Plaintiff,<br><br>     v.<br><br>ZACHARY J. HORWITZ; and 1inMM CAPITAL, LLC,<br><br>            Defendants. | Case No. 2:21-cv-02927-CAS-PD<br><br>**QUARTERLY REPORT OF RECEIVER MICHELE VIVES (FOURTH QUARTER 2023)**<br><br>Judge:      Hon. Christina A. Snyder<br>Courtroom:  8D |

# **TABLE OF CONTENTS**

I. General Receivership Update ................................................................. 2
   A. Settlement Activity During the Fourth Quarter 2023 .......................... 2
      1. Settlement with the Law Firm ........................................................ 3
      2. Settlement with the Professional Services Firm ........................ 5
      3. Settlement with Breakout SPE LLC ............................................. 5
   B. Avoidance and Recovery of Transfers to Net Winners ...................... 7
      1. Overview ........................................................................................ 7
      2. Specific Efforts .............................................................................. 8
   C. Potential Settlement with Financial Institution ................................... 8
   D. Forensic Accounting Background and Update .................................. 8
   E. Preview of the Claims Process ........................................................... 9
   F. Asset Updates ................................................................................... 10
      1. Rogue Black ................................................................................. 10
         a. Payment Dispute and Demand for Arbitration ................. 11
         b. Anticipated Future Sale of Rogue Black's Film Library ........................................................................... 11
      2. LayJax .......................................................................................... 11
         a. Update on Recovery Potential ........................................... 12
      3. The Additional Investments ........................................................ 12
      4. Additional Film Investments ...................................................... 13
   G. Potential Litigation and Engagement of Conflicts Counsel ............. 13
II. ACCOUNTING OF RECEIPTS AND DISBURSEMENTS ....................... 14
   A. Cash Receipts ................................................................................... 14
   B. Cash Disbursements ......................................................................... 14
   C. Cash on Hand .................................................................................... 14
III. CONCLUSION .......................................................................................... 14

KATTEN MUCHIN ROSENMAN LLP

Michele Vives, the duly appointed permanent receiver (the "Receiver") of 1inMM Capital, LLC and its subsidiaries and affiliates ("1inMM"), and over assets that are attributable to funds derived from investors or clients of the above-captioned defendants ("Defendants") or were fraudulently transferred by the Defendants (collectively, the "Estate"), pursuant to Local Rule 66-6 and the *Order on Appointment of a Permanent Receiver* ("Order of Appointment") entered on January 14, 2022, hereby submits this quarterly report (the "Report") for the period October 1, 2023 through December 31, 2023 (the "Fourth Quarter 2023"). This Report details the Receiver's principal activities during the Fourth Quarter 2023 to protect and administer the Estate and to identify new assets, and lays out the Receiver's general strategy to maximize the recovery for the benefit of investors harmed by the Ponzi scheme perpetrated by Defendants (the "1inMM Ponzi Scheme").[1]

## I. GENERAL RECEIVERSHIP UPDATE

### A. Settlement Activity During the Fourth Quarter 2023

The Receiver previously reported that, during the First, Second and Third Quarters 2023, she reached four major settlements that, if approved by the Court, would yield a total of $15,190,000 in settlement value for the Estate, before payment of certain administrative claims. These settlements are with: (a) three former principals of JJMT Capital, LLC ("JJMT"); (b) the fourth former principal of JJMT; (c) a law firm that represented 1inMM, the name of which the Receiver agreed to keep confidential (the "Law Firm"); and (d) Breakout SPE LLC, which was a sub-aggregator of JJMT, and its principals. The Court has since approved all four of those settlements, and the Receiver has since entered into another major settlement.

---

[1] With respect to the Receiver's principal activities and other events that occurred prior to the Second Quarter 2023, the Receiver incorporates by reference her previously filed quarterly reports. [ECF # 93, 120, 142, 173, 208, 238, 292]

All five of these settlements are significant because they simultaneously resolve pending or threatened litigation by groups of net losing investors in 1inMM. Although the Receiver has addressed the existing settlements in greater detail in the motions for their approval, the Receiver now explains how these hard-fought compromises came about, summarizes their basic terms and provides an update of their status through the Fourth Quarter 2023. She also previews the terms of a new settlements that came about during the Third and Fourth Quarters 2023.

During the Fourth Quarter 2023, Messrs. Wunderlin and Schweinzger of JJMT made the first installments of their respective portions of the settlement payment, and Mr. deAlteris made arrangements with the Receiver to remit his first installment in early January 2024.

### 1. *Settlement with the Law Firm*

As the Receiver previously reported, during the First Quarter 2023, she and certain net losing investors in 1inMM (represented by Loftus & Eisenberg, Ltd. ("L&E"), of Chicago, Illinois,) (the "Claimant Investors"), jointly reached a settlement with the Law Firm. A critical component of this settlement is the Receiver's agreement to keep the identity of the Law Firm strictly confidential, so the Receiver must keep her public comments about this settlement general and brief.

The Law Firm represented 1inMM for approximately one year. The Claimant Investors asserted—in private correspondence with the Law Firm as well as its malpractice insurer—that the Law Firm is liable for their losses on theories of malpractice, negligence and aiding and abetting the 1inMM Ponzi Scheme. They threatened legal action against the Law Firm if the parties did not settle. Although the Receiver did not threaten to sue the Law Firm, the Law Firm opened negotiations with the Receiver about the Claimant Investors' potential litigation, as the Law Firm made clear that any settlement must include a bar order enjoining any similar actions against it. Discussions between the Law Firm, its insurer and the Claimant Investors continued for the better part of a year. The parties eventually agreed to mediate

before Bruce Friedman, a JAMS neutral located in Los Angeles. The mediation with Mr. Friedman took place in Los Angeles on March 15, 2023, and was successful.

The essential terms of the settlement are that the Law Firm will pay $1.5 million to the Estate to settle both the Claimant Investors' asserted claims as well as any claims that the Estate may have against the Law Firm, in exchange for mutual general releases and a bar order. The bar order would enjoin any person or entity from commencing or continuing any claim against the Law Firm arising out of or relating to the 1inMM Ponzi Scheme. And, as with the JJMT-related settlements discussed above, because the Claimant Investors have agreed that the entire amount of the settlement consideration should be paid to the Estate for the benefit of all creditors, the Receiver agreed to seek approval to pay certain negotiated amounts to L&E, as counsel for the Claimant Investors, in recognition of their assistance in creating a common fund in the Estate.

During the Second Quarter 2023, counsel for the Receiver, the Claimant Investors and the Law Firm worked on drafting the settlement agreement and related documentation. During the Third and Fourth Quarters 2023, this settlement was approved and consummated. Specifically, on September 1, 2023, the Receiver filed an application for leave to file under seal the motion approving the settlement with the Law Firm. [ECF #255]. On September 22, 2023, the Court held a hearing on the application [ECF #272], and on September 27, 2023 entered an order granting it [ECF #274].

On October 4, 2023, the Receiver filed a motion (under seal) to approve the settlement with the Law Firm. [ECF #276] No party in interest objected to this settlement motion. [ECF #298] On October 13, 2013, the Court entered an order (under seal) approving the settlement with the Law Firm [ECF #289], which order has since become final and unappealable. During the Fourth Quarter 2024, the Receiver received the full settlement payment on account of the settlement with the Law Firm.

### 2. Settlement with the Professional Services Firm

During the Second Quarter 2023, the Receiver reached a settlement with a professional services firm that worked with 1inMM, the name of which the Receiver also agreed to keep confidential (the "Professional Services Firm"). The settlement with the Professional Services Firm, if approved, would yield additional cash for the Estate.

The Receiver, the Claimant Investors and the Professional Services Firm agreed to a mediation, which took place in Chicago on May 3, 2023 before Judge Schenkier of JAMS. This mediation was successful as well. As part of the settlement, it was critical to the Professional Services Firm that the Receiver keep its identity confidential, and that she agree not to disclose any of the settlement's specific financial terms in a quarterly report. Rather, the Receiver will disclose the details of this settlement in a motion for its approval. During the Second, Third and Fourth Quarters 2023, counsel for the Professional Services Firm, the Receiver and the Claimant Investors worked on the basic settlement documentation. During the first quarter 2024, the Receiver expects to file an application for leave to file under seal the settlement motion with the Professional Services Firm.

### 3. Settlement with Breakout SPE LLC

During the Third Quarter 2023, the Receiver also reached a settlement with a sub-aggregator of JJMT, Breakout SPE LLC, as well as its managing members, Duncan Davis and Brandon Labrum (collectively, "Breakout").

Settling with Breakout was particularly complicated and took much of 2023 for the Receiver to achieve. Breakout's principals were not only liable to the Estate for having received transfers from 1inMM that were subject to avoidance and recovery under UVTA as fraudulent transfers, but Breakout was also embroiled in contentious litigation pending in Illinois state court with Nalpak I LP, Nalpak II LP, Nalpak Enterprises LLC and Peter Xilas (collectively, the "Nalpak Investors"), an investor group that had lost about $9 million in the 1inMM Ponzi Scheme. On top

of all that, the Claimant Investors also threatened Breakout with contributing to their losses as part of the 1inMM Ponzi Scheme. So, Breakout presented yet another three-way dispute with which the Receiver had to contend.

The Nalpak Investors—the largest net losing creditors of the Estate—were intent on vindicating their rights against Breakout and thus were not all that inclined to compromise their claims as part of a larger settlement. Confident in their claims, the Nalpak Investors preferred to continue with their litigation against Breakout to judgment. At the same time, however, Breakout was unwilling to settle with the Receiver unless she either simultaneously brokered a settlement with the Nalpak Investors or agreed to ask the Court to enter a bar order that would terminate the Nalpak Investors' litigation *and* enjoin any litigation that the Claimant Investors might commence. Those seemingly diametrically opposed objectives and interests made a settlement elusive for most of 2023, despite two separate mediation sessions with Judge Schenkier.

Fortunately, and after several months of negotiations, the parties' creativity and persistence resulted in a settlement. Under the proposed settlement, Breakout will pay a total of $1,900,000 of cash consideration, with $1,060,000 to the Nalpak Investors and $840,000 to the Estate. The payment to the Estate represents about 67% of the total transfers that the Receiver could have sued to avoid and recover under UVTA and also resolves the Claimant Investors' claims. Breakout will make its payment to the Nalpak Investors directly (i.e., outside of the Estate), so that aspect of the settlement will not require this Court's approval. Breakout will pay the settlement payment over a period of approximately 21 months.

Considering, however, that the Nalpak Investors will receive that $1,060,000 outside of the Estate on account of their 1inMM Ponzi Scheme losses, the Receiver made sure that the Nalpak Investors would not double recover in a receivership claims process. The Receiver did that by requiring the Nalpak Investors to reduce their claim against the Estate on a dollar-for-dollar basis. In other words, the face

amount of the unsecured claim that the Nalpak Investors will eventually file against the Estate for its 1inMM Ponzi Scheme losses will be reduced by the same amount they are receiving from Breakout—$1,060,000.

Finally, as with the settlements discussed above, because the Claimant Investors have agreed that the entire amount of the settlement consideration should be paid to the Estate for the benefit of all creditors, the Receiver agreed to seek approval to pay certain negotiated amounts to L&E, as counsel for the Claimant Investors, in recognition of their assistance in creating a common fund in the Estate.

During the Third Quarter 2023, the parties came to terms on the settlement and worked on the basic documentation, and during the Fourth Quarter 2023 the Receiver sought approval of the settlement. Specifically, on November 13, 2023, the Receiver filed a motion to approve the settlement with Breakout. [ECF #301] No party in interest objected to this settlement motion. On November 27, 2023, the Court entered an order approving the Settlement with Breakout. [ECF #306] That order has since become final and unappealable. Breakout is scheduled to make its first installment payment during the first quarter of 2024.

**B.     Avoidance and Recovery of Transfers to Net Winners**

   *1.     Overview*

Through the Receiver's forensic accounting, the Receiver has identified investors who were significant net winners (receiving payments far in excess of the amounts they invested) as well as various persons and entities who were transferred very large sums from 1inMM but do not appear to have been investors in the 1inMM Ponzi Scheme.

The Receiver has been reviewing the financial details of identified net winners and anticipates initiating settlement conversations and sending settlement demand letters to most of them.

Exact details of the Receiver's negotiations with these net winning transferees obviously must remain confidential for the time being so as not to jeopardize these

good-faith settlement discussions. However, once the Receiver reaches a proposed settlement, she will petition the Court to approve any agreement. Should the Receiver determine that a lawsuit is necessary to recoup fraudulent transfers, the Receiver will proceed appropriately.

### 2. *Specific Efforts*

During the Third and Fourth Quarters 2023, the Receiver engaged in settlement discussions with two aggregators of the 1inMM Ponzi Scheme. The Receiver's forensic accounting analysis indicates that the insiders of those aggregators are significant net winners, and thus liable to the Estate under UVTA for receiving fraudulent transfers.

One of those aggregators and its insiders have agreed to a mediation with the Receiver and the Claimant Investors before Judge Schenkier, which was scheduled to take place in the first quarter 2024. The Receiver is engaged in more informal settlement discussions with the other aggregator, which the Receiver expects will continue in the first quarter 2024.

### C. Potential Settlement with Financial Institution

During the last several calendar quarters, the Receiver has been engaged in settlement discussions with a major financial institution that did business with 1inMM. During the Fourth Quarter 2023, the Receiver and this financial institution exchanged settlement offers. These negotiations are likely to yield a significant settlement that the Receiver expects to present to the Court for approval during the first quarter 2024.

### D. Forensic Accounting Background and Update

Throughout the duration of the Ponzi scheme, 1inMM engaged in tens of thousands of transactions totaling over $1 billion (receipts and disbursements). As there were no accounting records, the Receiver has had to reconstruct 1inMM's transaction history from scratch. To do so has required a continuous forensic accounting analysis that has thus far involved the review of over 2,965 bank

statements and encompassed over 24,800 transactions. These numbers have steadily increased as the Receiver collects new data. The Receiver and her team continue to analyze additional records as she uncovers more detail behind the Ponzi scheme and identifies other potential sources of recovery.

The forensic accounting analysis is a fundamental element of maximizing the Estate's recovery, as it enables the Receiver to determine who may be liable to the Estate for receiving fraudulent transfers, and to identify previously unknown assets and obtaining information about 1inMM's investors.

During the Fourth Quarter 2023, the Receiver and her team continued to obtain and analyze additional bank records from aggregators and sub-aggregators (i.e., investment feeder funds that invested into other aggregators) which provided further data down to the individual investor level. The process continues to help identify both net winners and net losers, and will thus potentially help with the recovery of additional dollars and assist the Receiver's team for the claims process. To date, the Receiver has identified a total of 586 investors. The Receiver and her team are continuing to evaluate each of their net loss or net winning positions.

The forensic accounting project is in the final phase and is nearly complete. The Receiver and her staff believe that they have mapped roughly all transactions of importance, and they have begun to reconcile and verify amounts invested by certain investors. This will assist with the investor claims process that is preliminarily outlined below.

### E. Preview of the Claims Process

The Receiver has begun preparations for an investor claims process that is anticipated to be administered by the receivership estate later in 2024. The investor claims process is an integral step in determining and confirming the full scope of losses incurred by victims of the 1inMM Ponzi Scheme. This figure, in conjunction with the ultimate recovery from assets, forms the fundamental calculation necessary to determine a comprehensive distribution plan for the victims. The Receiver has

purposefully forestalled implementing a claims process until such time that she could ensure all investor victims had been identified so that they may participate in the claims process. Due to the investment structure of 1inMM, which was complicated by using aggregators and sub-aggregators to funnel in investment dollars into the scheme, clouded investor identities by hiding them behind other entities which separately held investor data.

The Receiver now believes she has identified nearly all, if not all, potential investors in the 1iMM Ponzi Scheme. She and her team have begun developing the necessary documents and infrastructure that will be necessary to administer this claims process. The Receiver anticipates petitioning the Court for approval of the investor claims process and structure in the third quarter 2024 before implementation.

### F.   Asset Updates

In addition to the cash on hand detailed in Section II.C. (below), the receivership assets, not including litigation claims, currently consist of: (1) Rogue Black, LLC ("Rogue Black"), (2) LayJax Ventures, LLC ("LayJax"), (3) investments made into sixteen entities of an investor ("Additional Investments") and (4) investments made in potentially eight additional films. The updated details to each of these is outlined below.

#### 1.   *Rogue Black*

Rogue Black was a film finance and production company in which Horwitz owned a membership interest and invested using 1inMM funds. Ultimately, 1inMM invested approximately $21.5 million with Rogue Black, which went on to produce and complete a total of eight films (collectively, the "Produced Films"). The Receiver continues to collect monies owed to Rogue Black in relation to the Produced Films and pursue monies that are owed but have not yet been paid. As noted below, potential further recoveries may be obtained through an eventual sale of the film library.

          *a.*      *Payment Dispute and Demand for Arbitration*

Through an investigation, the Receiver discovered that Rogue Black is owed a significant amount of money related to distribution rights on one of its films. The Receiver attempted to resolve the issue through discussions with the relevant parties which include Iervolino & Lady Bacardi Entertainment S.p.A. ("ILBE") and Orion Releasing LLC ("Orion"). However, when it became apparent those discussions were not progressing, the Receiver demanded arbitration pursuant to the applicable agreement between the relevant parties. The Receiver decided it was best to assign the legal work associated with this project to Katten Muchin Rosenman LLP lawyers resident in its Century City office who practice in the area of entertainment law.

The parties selected an arbitrator, and attended the first arbitration management conference with the arbitrator on July 17, 2023. Subsequently, the parties have exchanged documents they intend to rely on in connection with the forthcoming hearing. Orion served document requests on both the Receiver and ILBE, to which both parties have responded. The discovery deadline has been set for December 8, 2023, and the hearing is currently set for February 6, 2024.

          *b.*      *Anticipated Future Sale of Rogue Black's Film Library*

To maximize the monetary recovery of the estate, the Receiver intends to eventually sell Rogue Black's film library. The Receiver is in the very preliminary stages of evaluating the best format to execute such a sale, and whether the library will fetch the highest price through selling the library piecemeal or as a bundle. As additional details are determined, the Receiver will provide updates in future quarterly reports.

    **2.**    **LayJax**

LayJax is an angel investment company which invested in early startup business ventures. Using 1inMM funds, Horwitz caused LayJax to invest $2.5 million with twelve separate startup business ventures that LayJax had sourced. The businesses in which LayJax invested are broad and diverse.

### a. Update on Recovery Potential

As previously reported, only two or three of LayJax's twelve investments hold a moderate chance of producing a return. One of those investments is a company that sells skincare treatments, which company was acquired on October 21, 2022. Another LayJax investment that has produced a return is a canned adult beverage company, which was acquired on May 20, 2023. While the skincare treatment investment brought in a sizeable return to the Estate (approximately $450,000), the return on the canned adult beverage company will be much more modest. LayJax holds only a 0.889 percent equity interest in that company, so the Receiver anticipates that the Estate will initially receive approximately $40,000 from the initial purchase price. Over the next few years, there are additional yearly earn-out distributions that may potentially add up to a further $130,000. These future earn-out distributions are dependent upon future sales growth and may be difficult to fully exploit. The Estate has not yet received any cash return on this particular LayJax investment, but the Receiver anticipates that it will do so in the future.

The Receiver continually monitors each investment for progress, as well as for potential opportunities to generate recoveries. The Receiver will provide additional updates as new or meaningful activity occurs.

### 3. The Additional Investments

As a part of the Receiver's forensic accounting analysis, the Receiver identified investments of more than $5.6 million made by ZJH Enterprises, LLC ("ZJH") or 1inMM into Additional Investments, sixteen (16) investment vehicles. ZJH's sole source of funding came from 1inMM. The entities comprising the Additional Investments are each investment vehicles made for the sole purpose of investing into third party start-up companies. Importantly, however, the Additional Investments are all managed or controlled by a principal of one of the aggregators.

In reviewing the production of records regarding these investments, the Receiver discovered that ZJH was the largest investor in the Additional Investments.

According to bank records, ZJH invested over $5.6 million ("Invested Funds") into the Additional Investments. Additional questions remain, compelling the Receiver to continue her investigation into these entities and make additional document and information requests.

### 4. *Additional Film Investments*

As a result of the Receiver's forensic accounting investigation, the Receiver and her staff identified five additional entities that received more than $13.1 million from 1inMM, which appear to have funded the production of an additional eight films. The Receiver continues to investigate these entities, films and the best avenue to efficiently maximize the recovery from these investments. The Receiver has begun to shift more resources to this potential asset and, pending additional investigation, continues to believe it prudent not to include any additional details on these entities and films in this report so as not to impede, jeopardize or hamper her investigation.

### G.     **Potential Litigation and Engagement of Conflicts Counsel**

As noted in previous reports, the Receiver moved the Court to authorize her to engage Raines Feldman as conflict counsel, and the Court granted that motion on January 3, 2023. [ECF #166]

The Receiver continues to explore potential causes of action whereby the Receiver may seek to recover funds or assets for the benefit of the estate. To that end, the Receiver has issued subpoenas to investigate potential litigation claims. A subpoena respondent filed a motion to quash the Receiver's subpoena [ECF #195]. After briefing and argument [ECF #202, #203, #206], Magistrate Judge Patricia Donahue granted the motion to quash [ECF #250]. On August 28, 2023, the Receiver filed a motion asking this Court to review Judge Donahue's order [ECF #251]. This Court revised the Magistrate's order and the motion to quash was denied by order entered on October 30, 2023 [ECF #296].

## II. ACCOUNTING OF RECEIPTS AND DISBURSEMENTS

Attached as <u>Exhibit "A"</u> is a copy of the Standard Fund Accounting Report. Below is a summary of the cash receipts and disbursements from the estate on a cash accounting basis.

### A. Cash Receipts

During the Fourth Quarter 2023, the receivership estate had cash receipts of $3,238,231. These cash receipts were comprised of (i) $3,200,000 representing settlement funds received, (ii) $31,859 related to interest income, (iii) $4,750.40 related to turnover of remaining cash in a Rogue Black bank account, and (iv) $1,621.78 related to Rogue Black film income.

### B. Cash Disbursements

During the Fourth Quarter 2023, cash disbursements totaled $1,061,419. These disbursements were comprised of (i) $ 495,000.00 paid to Loftus & Eisenberg as part of the agreement in the settlement with the Law Firm, (ii) $267,337.14 of fees paid to Katten Muchin, the Receiver's counsel, (iii) 241,248.92 of Receiver's fees, (iv) $48,803 to JAMS, the arbitrator in the Rogue Black matter with ILBE and Orion, (v) $4,550 related to LayJax operational costs, (vi) $424 of bank charges, and (vii) $289.65 of forensic account software costs.

### C. Cash on Hand

As of December 31, 2023, the receivership estate held an ending balance of $5,453,689.

## III. CONCLUSION

The Receiver respectfully requests that the Court grant the motion to approve this Report and award the related relief requested therein.

Dated: February 9, 2024              Respectfully submitted,

                                     By:   /s/*Michele Vives*
                                           Michele Vives, Receiver

# PROOF OF SERVICE

**STATE OF ILLINOIS, COUNTY OF COOK**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Cook, State of Illinois. My business address is 525 W. Monroe St., Chicago, IL 60661.

On February 9, 2024, I served the following document(s) described as:

**QUARTERLY REPORT OF RECEIVER MICHELE VIVES (FOURTH QUARTER 2024)**

as follows:

**[ ]   BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed above and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with Katten Muchin Rosenman LLP practice for collecting and processing correspondence for mailing. On the same day that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

**[ ]   BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused the document(s) to be sent from e-mail address terence.banich@katten.com to the persons at the e-mail addresses listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**[ ]   BY OVERNIGHT MAIL (FedEx):** I enclosed said document(s) in an envelope or package provided by FEDEX and addressed to the persons at the addresses listed above. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of FEDEX or delivered such document(s) to a courier or driver authorized by FEDEX to receive documents.

**[ ]   BY PERSONAL SERVICE:** I caused said document to be personally delivered the document(s) to the person at the addresses listed above by leaving the documents in an envelope or package clearly labeled to identify the attorney being served with a receptionist or an individual in charge of the office.

**[X]   E-FILING:** By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

I declare under penalty of perjury under the laws of the State of Illinois that the foregoing is true and correct.

Executed on February 9, 2024, at Winnetka, Illinois.

*/s/Terence G. Banich*
Terence G. Banich