Terence G. Banich (SBN 212173)
terence.banich@katten.com
Allison E. Yager (*pro hac vice*)
allison.yager@katten.com
**KATTEN MUCHIN ROSENMAN LLP**
525 W. Monroe St.
Chicago, IL 60661
Telephone: (312) 902-5200
Facsimile: (312) 902-1061

*Attorneys for the Receiver*
Michele Vives

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>ZACHARY J. HORWITZ; and 1inMM CAPITAL, LLC,<br><br>Defendants. | Case No. 2:21-cv-02927-CAS-PD<br><br>**QUARTERLY REPORT OF RECEIVER MICHELE VIVES (FIRST QUARTER 2024)**<br><br>Judge:      Hon. Christina A. Snyder<br>Courtroom: 8D |

# **TABLE OF CONTENTS**

I.  GENERAL RECEIVERSHIP UPDATE ..................................................................2
   A.  Settlement Activity During the First Quarter 2024 ...........................2
   B.  Potential Settlements..........................................................................3
       1.  Financial Institution ................................................................3
       2.  1inMM Aggregators and Their Insider Net Winners ..............3
           a.  Major Aggregator ........................................................3
           b.  Other efforts.................................................................5
   C.  Avoidance and Recovery of Transfers to Net Winners .....................5
   D.  Forensic Accounting Background and Update ..................................6
   E.  Preview of the Claims Process...........................................................7
   F.  Asset Updates.....................................................................................7
       1.  Rogue Black.............................................................................8
       2.  LayJax ....................................................................................11
       3.  The Additional Investments..................................................11
       4.  Additional Film Investments .................................................12
   G.  Potential Litigation and Engagement of Conflicts Counsel ............12
II. ACCOUNTING OF RECEIPTS AND DISBURSEMENTS ....................13
   A.  Cash Receipts...................................................................................13
   B.  Cash Disbursements.........................................................................13
   C.  Cash on Hand ...................................................................................14
III. CONCLUSION .........................................................................................14

KATTEN MUCHIN ROSENMAN LLP
525 W. MONROE ST.
CHICAGO, IL 60661
(312) 902-5200

Michele Vives, the duly appointed permanent receiver (the "Receiver") of 1inMM Capital, LLC and its subsidiaries and affiliates ("1inMM"), and over assets that are attributable to funds derived from investors or clients of the above-captioned defendants ("Defendants") or were fraudulently transferred by the Defendants (collectively, the "Estate"), pursuant to Local Rule 66-6 and the *Order on Appointment of a Permanent Receiver* ("Order of Appointment") entered on January 14, 2022, hereby submits this quarterly report (the "Report") for the period January 1, 2024 through March 31, 2024 (the "First Quarter 2024"). This Report details the Receiver's principal activities during the First Quarter 2024 to protect and administer the Estate and to identify new assets, and lays out the Receiver's general strategy to maximize the recovery for the benefit of investors harmed by the Ponzi scheme perpetrated by Defendants (the "1inMM Ponzi Scheme").

## I. GENERAL RECEIVERSHIP UPDATE

### A. Settlement Activity During the First Quarter 2024

The Receiver previously reported that, during the Second Quarter 2023, she reached a settlement with a professional services firm that worked with 1inMM, the name of which the Receiver also agreed to keep confidential (the "Professional Services Firm"). The settlement with the Professional Services Firm, if approved, would yield additional cash for the Estate.

The Receiver, the Claimant Investors and the Professional Services Firm agreed to a mediation, which took place in Chicago on May 3, 2023 before Judge Schenkier of JAMS. This mediation was successful. As part of the settlement, it was critical to the Professional Services Firm that the Receiver keep its identity confidential, and that she agree not to disclose any of the settlement's specific financial terms in a quarterly report. During the Second, Third and Fourth Quarters 2023 and the First Quarter 2024, counsel for the Professional Services Firm, the Receiver and the Claimant Investors worked on the basic settlement documentation, which turned out to be very time consuming as the documents were highly

negotiated and intricately drafted. The parties wrapped up the settlement documentation in the First Quarter 2024.

On March 19, 2024, the Receiver filed an application for leave to file under seal the motion approving the settlement with the Professional Services Firm [ECF #328], which the Court granted on March 25, 2024 [ECF #330]. During the second quarter 2024, the Receiver filed the motion (under seal) to approve the settlement with the Professional Services Firm, which the Receiver will address in her report for that period.

### B.   Potential Settlements

#### 1.   *Financial Institution*

During the last several calendar quarters, the Receiver has been engaged in settlement discussions with a major financial institution that did business with 1inMM. During the Fourth Quarter 2023 and First Quarter 2024, the Receiver and this financial institution exchanged settlement offers. These negotiations are likely to yield a significant settlement that the Receiver expects to present to the Court for approval during the second quarter 2024.

#### 2.   *1inMM Aggregators and Their Insider Net Winners*

During the Third and Fourth Quarters 2023 and First Quarter 2024, the Receiver engaged in settlement discussions with two aggregators of the 1inMM Ponzi Scheme. The Receiver's forensic accounting analysis indicates that the insiders of those aggregators are significant net winners (in that they received payments far in excess of the amounts they invested), and thus liable to the Estate under UVTA for receiving fraudulent transfers.

##### a.   *Major Aggregator*

One of those aggregators and its insiders agreed to a mediation with the Receiver and the Claimant Investors before Judge Schenkier, which took place on January 30, 2024 in Walnut Creek, California. It took many months of negotiations and preparatory work to get to that point, however. The aggregator and its insiders

have for a few years been defending litigation and arbitration commenced in various fora by the Claimant Investors, all of which is hotly contested and quite contentious. That was a significant complicating factor, as the aggregator and its insiders were for a long time unwilling to engage in a mediation process at all, let alone one involving the Claimant Investors. But the Receiver patiently and persistently encouraged all parties to at least attempt a mediation.

Only after several months of discussions (many involving the assistance of Judge Schenkier) did the aggregator and its insiders agree to participate in a mediation with the Receiver and the Claimant Investors. And even when the parties reached that agreement, there turned out to be further disagreements about the anticipated scope of the mediation and what consideration the Receiver would (or could) provide in the event of a settlement. On top of all of those difficulties, the principal insider of the aggregator has been recovering from a serious long-term medical condition that made his ability to participate in the mediation something of a touch-and-go affair. The Receiver—while obviously sensitive to this gentleman's health issues—considered his personal involvement in the mediation process to be of paramount importance. That factor alone seriously complicated an already delicate negotiation process. The parties originally planned for the mediation to occur in November 2023, but they rescheduled it to January 30, 2024.

Anticipating that the mediation would eventually occur, the Receiver and her professionals prepared accordingly during the Fourth Quarter 2023 and First Quarter 2024. That required completing an extensive forensic accounting analysis of the aggregator's transactions with 1inMM to determine whether its insiders were net winners of the 1inMM Ponzi Scheme, and if they were, calculating their liability to the estate. The Receiver's forensic accounting work was complicated by the somewhat Byzantine manner in which the aggregator structured its affairs with 1inMM, on the one hand, and its investors, on their other. The aggregator invested directly within 1inMM and also indirectly through two affiliates. Both used different

variations on a participation/profit-sharing model. This complex structure was coupled with a multitude of intercompany transfers and uses of scheme profits to pay the expenses of the insiders' non-1inMM business and a variety of their personal expenses. Sorting all this out required the Receiver to review a voluminous amount of documents. Unfortunately, and despite the Receiver's diligent inquiries, the aggregator and its insiders did not produce all of the subpoenaed documents until October 2023. Only then could the Receiver and her team definitively identify the transfers that are potentially subject to avoidance and recovery under UVTA.

Ultimately, the Receiver determined that the principal insiders of the aggregator were significant net winners of the 1inMM Ponzi Scheme. In compliance with Judge Schenkier's scheduling order, the Receiver drafted and submitted her opening mediation brief on January 12, 2024 and her reply mediation statement on January 25, 2024. As is customary, these mediation statements established liability and damages by evidence and legal argument and responded to the arguments presented by the aggregator. On January 30, 2024, the Receiver and her counsel at Katten attended the mediation in Walnut Creek, which went on for most of the day. Despite all parties' best efforts, the mediation was unfortunately unsuccessful.

Consequently, the Receiver has pivoted to trying to reach a settlement with this aggregator and its insiders by other means. Those discussions were underway as of the end of the First Quarter 2024.

          *b.*    *Other efforts*

Meanwhile, the Receiver has sent settlement proposal letters to the insiders of two other aggregators who are significant net winners of the 1inMM Ponzi Scheme. As of the end of the First Quarter 2024, the Receiver's discussions with those parties were continuing.

**C.**    **Avoidance and Recovery of Transfers to Net Winners**

Through the Receiver's forensic accounting, the Receiver has identified investors who were significant net winners. The Receiver has been reviewing the

financial details of identified net winners and anticipates initiating settlement conversations and sending settlement demand letters to most of them during the second quarter 2024.

Exact details of the Receiver's negotiations with these net winning transferees obviously must remain confidential for the time being so as not to jeopardize these good-faith settlement discussions. However, once the Receiver reaches a proposed settlement, she will petition the Court to approve any agreement. Should the Receiver determine that a lawsuit is necessary to recoup fraudulent transfers, the Receiver will proceed appropriately.

### D. Forensic Accounting Background and Update

Throughout the duration of the Ponzi scheme, 1inMM engaged in tens of thousands of transactions totaling over $750 million (receipts and disbursements). As there were no accounting records, the Receiver has had to reconstruct 1inMM's transaction history from scratch. To do so has required a continuous forensic accounting analysis that has thus far involved the review of over 2,965 bank statements and encompassed over 24,800 transactions. These numbers have steadily increased as the Receiver collects new data. The Receiver and her team continue to analyze additional records as she uncovers more detail behind the Ponzi scheme and identifies other potential sources of recovery.

The forensic accounting analysis is a fundamental element of maximizing the Estate's recovery, as it enables the Receiver to determine who may be liable to the Estate for receiving fraudulent transfers, and to identify previously unknown assets and obtaining information about 1inMM's investors. The process continues to help identify both net winners and net losers, and will thus potentially help with the recovery of additional dollars and assist the Receiver's team for the claims process. To date, the Receiver has identified a total of 586 investors. The Receiver and her team are continuing to evaluate each of their net loss or net winning positions, though oftentimes the Receiver cannot reach a definitive conclusion as to each investor

without additional documentation.

The forensic accounting project is in the final phase and nearly complete. The Receiver and her staff believe that they have mapped roughly all transactions of importance, and they have begun to reconcile and verify amounts invested by certain investors. This will assist with the investor claims process that is preliminarily outlined below.

### E. Preview of the Claims Process

The Receiver has begun preparations for an investor claims process that is anticipated to be proposed to the Court later in 2024. The investor claims process is an integral step in determining and confirming the full scope of losses incurred by victims of the 1inMM Ponzi Scheme. This figure, in conjunction with the ultimate recovery from assets, forms the fundamental calculation necessary to determine a comprehensive distribution plan for the victims. The Receiver has purposefully forestalled implementing a claims process until such time that she could ensure all investor victims had been identified so that they may participate in the claims process. Due to the investment structure of 1inMM, which was complicated by using aggregators and sub-aggregators to funnel investment dollars into the scheme, clouded investor identities by hiding them behind other entities which separately held investor data.

The Receiver now believes she has identified nearly all, if not all, potential investors in the 1iMM Ponzi Scheme. She and her team have begun developing the necessary documents and infrastructure that will be necessary to administer this claims process. The Receiver anticipates petitioning the Court for approval of the investor claims process and structure in the third quarter 2024.

### F. Asset Updates

In addition to the cash on hand detailed in Section II.C. (below), the receivership assets, not including litigation claims, currently consist of: (1) Rogue Black, LLC ("Rogue Black"), (2) LayJax Ventures, LLC ("LayJax"), (3)

investments made into sixteen entities of an investor ("Additional Investments") and (4) investments made in potentially eight additional films. The updated details to each of these is outlined below.

### 1. Rogue Black

Rogue Black was a film finance and production company in which Horwitz owned a membership interest and invested using 1inMM funds. Ultimately, 1inMM invested approximately $21.5 million with Rogue Black, which went on to produce and complete a total of eight films (collectively, the "Produced Films"). The Receiver continues to collect monies owed to Rogue Black in relation to the Produced Films and pursue monies that are owed but have not yet been paid. As noted below, potential further recoveries may be obtained through an eventual sale of the film library.

#### a. ILBE/Orion Arbitration Award

One of the most significant developments during the First Quarter 2024 was the Receiver's total victory in an arbitration relating to amounts owed to Rogue Black that resulted in a large judgment in favor of the estate.

##### (i) Background

Through an investigation, the Receiver discovered that Rogue Black was owed a significant amount of money related to distribution rights on one of its films, *Minimata*, which starred Johnny Depp. The Receiver attempted to resolve the issue through discussions with the relevant parties which include Iervolino & Lady Bacardi Entertainment S.p.A. ("ILBE") and Orion Releasing LLC ("Orion"). However, when it became apparent those discussions were not progressing, the Receiver demanded arbitration pursuant to the applicable agreement between the

relevant parties.[1] The arbitration, styled *Vives v. Iervolino & Lady Bacardi Entertainment S.p.A. and Orion Releasing LLC*, pended before JAMS as Reference No. 5210000275 (the "Arbitration").

The gist of the Receiver's claim against ILBE and Orion was fundamentally a contract dispute. Prior to the commencement of the SEC's case against Horwitz/1inMM, Rogue Black was party to agreements with Orion (a company that develops, produces and distributes motion pictures) whereby Rogue Black and Minimata Film, LLC granted Orion certain exclusive distribution and other rights in *Minimata*. In exchange, Orion agreed to pay a domestic minimum guarantee of $1,500,000. The parties agreed that Orion would release *Minimata* domestically on June 30, 2021. After a United Kingdom court found that Johnny Depp had assaulted his ex-wife (Amber Heard), however, Orion decided it wanted to disassociate itself from *Minimata*. The parties later executed an agreement whereby ILBE assumed Orion's obligations under the original distribution agreement (including the obligation to pay the $1,500,000 minimum domestic guarantee). In connection with that amendment, Orion paid Rogue Black $500,000 of the minimum domestic guarantee, leaving $1,000,000 due and payable.

Neither Orion nor ILBE paid the remaining $1,000,000 due. Upon the Receiver's demand,[2] ILBE refused to pay, and Orion did as well, claiming that it was no longer liable for that obligation. The Receiver contended that Orion remained secondarily liable to pay the domestic minimum guarantee, but Orion disagreed and refused to pay. Consequently, the Receiver, so the Receiver commenced the Arbitration.

---

[1] The Receiver decided it was best to assign the legal work associated with this project to Katten Muchin Rosenman LLP lawyers resident in its Century City office who practice in the area of entertainment law.

[2] ECF #131 ¶ 3 (empowering the Receiver to act for Rogue Black as an affiliate of 1inMM).

The parties selected an arbitrator (Hon. Terry B. Friedman, retired Judge of the Superior Court of California, County of Los Angeles), and attended the first arbitration management conference with Judge Friedman on July 17, 2023. Discovery followed and ended on December 8, 2023. The Arbitration trial commenced on February 6, 2024 in Los Angeles (via Zoom) and continued through February 7.

(ii)   Arbitration Award and Subsequent Developments

On March 15, 2024, Judge Friedman issued his final arbitration award.

The arbitrator found, in short, that ILBE had breached its agreements with Rogue Black, Orion was secondarily liable for the obligations to Rogue Black that ILBE had assumed and both ILBE and Orion are jointly and severally liable for damages in the amount of $1,000,000 (i.e., the remaining balance of the domestic minimum guarantee). The arbitrator additionally awarded the Receiver: (a) prejudgment interest from June 30, 2022 (i.e., the release date of *Minimata*) in the amount of $170,957.28; (b) post-judgment interest accruing at the rate of $273.97 per day from March 15, 2024 (i.e., the date of the award); and (c) $56,554.67 as reimbursement for Arbitration fees (the "Arbitration Award"). The total Arbitration Award was, therefore, $1,227,511.95, plus accruing post-judgment interest.

Orion initially refused to pay the Arbitration Award, so the Receiver decided to file a petition in this Court to confirm the Arbitration Award under the Federal Arbitration Act. That was the state of affairs as of the end of the First Quarter 2024. The Receiver will advise the Court in her second quarter 2024 report about the final resolution of the Arbitration Award.

b.   *Anticipated Future Sale of Rogue Black's Film Library*

To maximize the monetary recovery of the estate, the Receiver intends to eventually sell Rogue Black's film library. The Receiver is in the very preliminary stages of evaluating the best format to execute such a sale, and whether the library will fetch the highest price through selling the library piecemeal or as a bundle. As

additional details are determined, the Receiver will provide updates in future quarterly reports.

### 2. *LayJax*

LayJax is an angel investment company which invested in early startup business ventures. Using 1inMM funds, Horwitz caused LayJax to invest $2.5 million with twelve separate startup business ventures that LayJax had sourced. The businesses in which LayJax invested are broad and diverse.

#### a. *Update on Recovery Potential*

As previously reported, only two or three of LayJax's twelve investments hold a moderate chance of producing a recovery (let alone a profit). One of those investments is a company that sells skincare treatments, which company was acquired on October 21, 2022. Another LayJax investment that has produced a return is a canned adult beverage company, which was acquired on May 20, 2023. While the skincare treatment investment brought in a sizeable return to the Estate (approximately $450,000), the return on the canned adult beverage company will be much more modest. LayJax holds only a 0.889 percent equity interest in that company, so the Receiver anticipates that the Estate will initially receive approximately $40,000 from the initial purchase price. Over the next few years, there are additional yearly earn-out distributions that may potentially add up to a further $130,000. These future earn-out distributions are dependent upon future sales growth and may be difficult to fully exploit. The Estate has not yet received any cash return on this particular LayJax investment, but the Receiver anticipates that it will do so in the future.

The Receiver continually monitors each investment for progress, as well as for potential opportunities to generate recoveries. The Receiver will provide additional updates as new or meaningful activity occurs.

### 3. **The Additional Investments**

As a part of the Receiver's forensic accounting analysis, the Receiver

identified investments of more than $5.6 million made by ZJH Enterprises, LLC ("ZJH") or 1inMM into Additional Investments, sixteen (16) investment vehicles. ZJH's sole source of funding came from 1inMM. The entities comprising the Additional Investments are each investment vehicles made for the sole purpose of investing into third party start-up companies. Importantly, however, the Additional Investments are all managed or controlled by a principal of one of the aggregators.

In reviewing the production of records regarding these investments, the Receiver discovered that ZJH was the largest investor in the Additional Investments. According to bank records, ZJH invested over $5.6 million ("<u>Invested Funds</u>") into the Additional Investments. Additional questions remain, compelling the Receiver to continue her investigation into these entities and make additional document and information requests.

### 4.   *Additional Film Investments*

As a result of the Receiver's forensic accounting investigation, the Receiver and her staff identified five additional entities that received more than $13.1 million from 1inMM, which appear to have funded the production of an additional eight films. The Receiver continues to investigate these entities, films and the best avenue to efficiently maximize the recovery from these investments. The Receiver has begun to shift more resources to this potential asset and, pending additional investigation, continues to believe it prudent not to include any additional details on these entities and films in this report so as not to impede, jeopardize or hamper her investigation.

### G.   **Potential Litigation and Engagement of Conflicts Counsel**

As noted in previous reports, the Receiver moved the Court to authorize her to engage Raines Feldman as conflict counsel, and the Court granted that motion on January 3, 2023. [ECF #166]

The Receiver continued to explore potential causes of action, including a potential claim against City National Bank. During this past quarter, the Receiver

and her counsel determined that the filing of a complaint was appropriate, and a complaint was filed against City National Bank on February 16, 2024. The parties entered into a stipulation to extend certain deadlines, including the time to file a response, and the case remains pending at this time.

## II. ACCOUNTING OF RECEIPTS AND DISBURSEMENTS

Attached as Exhibit "A" is a copy of the Standard Fund Accounting Report. Below is a summary of the cash receipts and disbursements from the estate on a cash accounting basis.

### A. Cash Receipts

During the First Quarter 2024, the receivership estate had cash receipts of $561,286. These cash receipts were comprised of (i) $300,000 representing a payment on the Joe DeAlteris settlement, (ii) $210,000 representing a payment on the Breakout Capital Management settlement, and (iii) $51,286 related to interest income.

### B. Cash Disbursements

During the First Quarter 2024, cash disbursements totaled $1,240,501. These disbursements were comprised of (i) $413,528 of fees and costs paid to Katten Muchin, the Receiver's counsel, (ii) $357,742 paid to Loftus & Eisenberg as part of the agreement in the settlement with JJM, (iii) $194,456 of fees and costs of the Receiver, (iv) $111,111 paid to Armstrong & Teasdale, LLP as part of the JJM settlement, (v) $100,000 paid to Howard & Howard as part of the JJM settlement, (vi) $27,300 paid to Loftus & Eisenberg as part of the Breakout settlement, (vii) $20,200 of costs related to the ILBE/Orion arbitration, (viii) $14,175 paid to Ray Reyes, the Receiver's Rogue Black consultant, (ix) $1,250 related to LayJax consulting charges, (x) $583 of bank charges, and (xi) $156 of other miscellaneous costs.

/ / /

/ / /

**C.     Cash on Hand**

As of March 31, 2024, the receivership estate held an ending balance of $4,774,516.

**III.    CONCLUSION**

The Receiver respectfully requests that the Court grant the motion to approve this Report and award the related relief requested therein.

Dated: May 1, 2024                    Respectfully submitted,

                                     By:   /s/*Michele Vives*
                                           Michele Vives, Receiver

# PROOF OF SERVICE

**STATE OF ILLINOIS, COUNTY OF COOK**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Cook, State of Illinois. My business address is 525 W. Monroe St., Chicago, IL 60661.

On May 1, 2024, I served the following document(s) described as:

**QUARTERLY REPORT OF RECEIVER MICHELE VIVES (FOURTH QUARTER 2024)**

as follows:

**[ ]  BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed above and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with Katten Muchin Rosenman LLP practice for collecting and processing correspondence for mailing. On the same day that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

**[ ]  BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused the document(s) to be sent from e-mail address terence.banich@katten.com to the persons at the e-mail addresses listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**[ ]  BY OVERNIGHT MAIL (FedEx):** I enclosed said document(s) in an envelope or package provided by FEDEX and addressed to the persons at the addresses listed above. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of FEDEX or delivered such document(s) to a courier or driver authorized by FEDEX to receive documents.

**[ ]  BY PERSONAL SERVICE:** I caused said document to be personally delivered the document(s) to the person at the addresses listed above by leaving the documents in an envelope or package clearly labeled to identify the attorney being served with a receptionist or an individual in charge of the office.

**[X]  E-FILING:** By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

I declare under penalty of perjury under the laws of the State of Illinois that the foregoing is true and correct.

Executed on May 1, 2024, at Chicago, Illinois.

*/s/Terence G. Banich*
Terence G. Banich