Terence G. Banich (SBN 212173)
terence.banich@katten.com
Allison E. Yager (*pro hac vice*)
allison.yager@katten.com
**KATTEN MUCHIN ROSENMAN LLP**
525 W. Monroe St.
Chicago, IL 60661
Telephone: (312) 902-5200
Facsimile: (312) 902-1061

*Attorneys for the Receiver*
Michele Vives

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br>ZACHARY J. HORWITZ; and 1inMM CAPITAL, LLC,<br><br>    Defendants. | Case No. 2:21-cv-02927-CAS-PD<br><br>**QUARTERLY REPORT OF RECEIVER MICHELE VIVES (SECOND QUARTER 2024)**<br><br>Judge:     Hon. Christina A. Snyder<br>Courtroom: 8D |

# TABLE OF CONTENTS

I.  GENERAL RECEIVERSHIP UPDATE .................................................................. 2
    A.  Settlement Activity During the First Quarter 2024 ................................. 2
    B.  Potential Settlements ................................................................................ 3
        1.  Financial Institution ....................................................................... 3
        2.  1inMM Aggregators and Their Insider Net Winners ..................... 3
            a.  Major Aggregator .................................................................. 4
            b.  Other efforts ......................................................................... 4
    C.  Avoidance and Recovery of Transfers to Net Winners ........................... 5
    D.  Forensic Accounting Background and Update ........................................ 5
    E.  Preview of the Claims Process ................................................................. 6
    F.  Asset Updates ........................................................................................... 7
        1.  Rogue Black ................................................................................... 7
        2.  LayJax ............................................................................................ 9
        3.  The Additional Investments .......................................................... 9
        4.  Additional Film Investments ......................................................... 9
    G.  Potential Litigation and Engagement of Conflicts Counsel ................. 10
II. ACCOUNTING OF RECEIPTS AND DISBURSEMENTS ....................................... 10
    A.  Cash Receipts ......................................................................................... 11
    B.  Cash Disbursements .............................................................................. 11
    C.  Cash on Hand ......................................................................................... 11
III. CONCLUSION .................................................................................................. 11

Michele Vives, the duly appointed permanent receiver (the "Receiver") of 1inMM Capital, LLC and its subsidiaries and affiliates ("1inMM"), and over assets that are attributable to funds derived from investors or clients of the above-captioned defendants ("Defendants") or were fraudulently transferred by the Defendants (collectively, the "Estate"), pursuant to Local Rule 66-6 and the *Order on Appointment of a Permanent Receiver* ("Order of Appointment") entered on January 14, 2022, hereby submits this quarterly report (the "Report") for the period April 1, 2024 through June 30, 2024 (the "Second Quarter 2024"). This Report details the Receiver's principal activities during the Second Quarter 2024 to protect and administer the Estate and to identify new assets, and lays out the Receiver's general strategy to maximize the recovery for the benefit of investors harmed by the Ponzi scheme perpetrated by Defendants (the "1inMM Ponzi Scheme").

## I. GENERAL RECEIVERSHIP UPDATE

### A. Settlement Activity During the Second Quarter 2024

The Receiver previously reported that, during the Second Quarter 2023, she reached a settlement with a professional services firm that worked with 1inMM, the name of which the Receiver also agreed to keep confidential (the "Professional Services Firm"). The settlement with the Professional Services Firm, if approved, would yield additional cash for the Estate.

The Receiver, the Claimant Investors and the Professional Services Firm agreed to a mediation, which took place in Chicago on May 3, 2023 before Judge Schenkier of JAMS. This mediation was successful. As part of the settlement, it was critical to the Professional Services Firm that the Receiver keep its identity confidential, and that she agree not to disclose any of the settlement's specific financial terms in a quarterly report. During the Second, Third and Fourth Quarters 2023 and the First Quarter 2024, counsel for the Professional Services Firm, the Receiver and the Claimant Investors worked on the basic settlement documentation,

which turned out to be very time consuming as the documents were highly negotiated and intricately drafted. The parties wrapped up the settlement documentation in the First Quarter 2024.

On March 19, 2024, the Receiver filed an application for leave to file under seal the motion approving the settlement with the Professional Services Firm [ECF #328], which the Court granted on March 25, 2024 [ECF #330]. On April 1, 2024, the Receiver filed the motion (under seal) to approve the settlement with the Professional Services Firm [ECF #331], notice of which the Receiver served on all parties in interest [ECF #332] and published in two major national newspapers [ECF #333], along with information about asserting an objection. No party in interest objected to the settlement [ECF #337]. On April 30, 2024, the Court entered an order (under seal) approving the settlement with the Professional Services Firm. [ECF #338] The Receiver expects to receive the payment for this settlement during the third quarter 2024.

### B. Potential Settlements

#### 1. *Financial Institution*

During the last several calendar quarters, the Receiver has been engaged in settlement discussions with a major financial institution that did business with 1inMM. During the Fourth Quarter 2023, First Quarter 2024 and Second Quarter 2024, the Receiver and this financial institution exchanged settlement offers. These negotiations are likely to yield a significant settlement that the Receiver expects to present to the Court for approval during the third quarter 2024.

#### 2. *1inMM Aggregators and Their Insider Net Winners*

During the Third and Fourth Quarters 2023 and the First and Second Quarters 2024, the Receiver engaged in settlement discussions with two aggregators of the 1inMM Ponzi Scheme. The Receiver's forensic accounting analysis indicates that the insiders of those aggregators are significant net winners (in that they received payments far in excess of the amounts they invested), and thus liable to the Estate

under UVTA for receiving fraudulent transfers.

### a. Major Aggregator

One of those aggregators and its insiders agreed to a mediation with the Receiver and the Claimant Investors before Judge Schenkier, which took place on January 30, 2024 in Walnut Creek, California. As the Receiver reported in her report for the First Quarter 2024, the Receiver's forensic accounting work supporting her claims was complicated by the complex and occasionally confusing manner in which the aggregator structured its affairs with 1inMM, on the one hand, and its investors, on their other. Plus, this aggregator and its insiders have for a few years now been defending litigation and arbitration commenced in various fora by the Claimant Investors, all of which is hotly contested and quite contentious. That contributed to the complications of mediating these claims.

As the Receiver explained in more detail in her report for the First Quarter 2024, this mediation unfortunately did not result in a settlement, despite the monumental amount of preparatory work, the good-faith efforts of all parties and wise counsel of Judge Schenkier. In the months that followed, the Receiver and counsel for the aggregator negotiated a tolling agreement and generally attempted to agree on a framework for further settlement discussions. Thankfully, as a result of all parties' patience and determination to avoid litigation, the Receiver and the aggregator agreed to a second settlement conference with Judge Schenkier that is scheduled to take place in October 2024. In anticipation for that conference, the parties exchanged supplementary position statements discussing the asserted claims and defenses.

### b. Other efforts

Meanwhile, the Receiver has sent settlement proposal letters to the insiders of two other aggregators who are significant net winners of the 1inMM Ponzi Scheme. As of the end of the Second Quarter 2024, the Receiver had entered into a tolling agreement with one of those net winners in preparation for substantive settlement

negotiations, which the Receiver expects to occur during the third quarter 2024.

With regard to the other net winner, the Receiver reached a settlement in principle that she expects to present for Court approval during the third quarter 2024.

### C.     Avoidance and Recovery of Transfers to Net Winners

Through the Receiver's forensic accounting, the Receiver has identified investors who were significant net winners. The Receiver has been reviewing the financial details of identified net winners and should she decide it is in the best interest of the Receivership Estate, anticipates initiating settlement conversations and sending settlement demand letters to most of them during the third quarter 2024.

Exact details of the Receiver's negotiations with these net winning transferees obviously must remain confidential for the time being so as not to jeopardize these good-faith settlement discussions. However, should the Receiver reach a proposed settlement, she will petition the Court to approve any agreement. Should the Receiver determine that a lawsuit is necessary to recoup fraudulent transfers, the Receiver will proceed appropriately.

### D.     Forensic Accounting Background and Update

Throughout the duration of the Ponzi scheme, 1inMM engaged in tens of thousands of transactions totaling over $750 million (receipts and disbursements). As there were no accounting records, the Receiver has had to reconstruct 1inMM's transaction history from scratch. To do so has required a continuous forensic accounting analysis that has thus far involved the review of over 2,965 bank statements and encompassed over 24,800 transactions. These numbers have steadily increased as the Receiver collects new data. The Receiver and her team continue to analyze additional records as she uncovers more detail behind the Ponzi scheme and identifies other potential sources of recovery.

The forensic accounting analysis is a fundamental element of maximizing the Estate's recovery, as it enables the Receiver to determine who may be liable to the Estate for receiving fraudulent transfers, and to identify previously unknown assets

and obtaining information about 1inMM's investors. The process continues to help identify both net winners and net losers, and will thus potentially help with the recovery of additional dollars and assist the Receiver's team for the claims process.

To date, the Receiver has identified a total of 586 investors. However, many investments were made through LLC's and various other entities. The Receiver and her team have shifted focus to identifying the originating individuals that invested into the scheme. Some investors made investments through multiple entities and it is important that those investors are viewed holistically. For instance, while an investor may be a net loser through one investment vehicle, through another they may be a substantial net winner. It is critical, from an equitable standpoint, that each investor be viewed as aggregate of their investments, and not through piecemeal entities. This effort will only further assist with the investor claims process to ensure not only accuracy but efficiency as well.

### E.    Preview of the Claims Process

The Receiver has begun preparations for an investor claims process that she anticipates commencing later in 2024. Once the investor claims process is complete and fully administered, the Receiver will be able to ascertain the total universe of allowed loss claims. Holders of allowed loss claims, in turn, will share in the estate's asset recoveries according to a plan of distribution that the Court will have previously approved.

The Receiver has purposefully forestalled implementing a claims process until such time that she could ensure all investor victims had been identified, as noted above, so that they may participate in the claims process. In the meantime, the Receiver has focused her work on clawing back assets into the estate for eventual distribution to holders of allowed claims. The investment structure of 1inMM—which was complicated by its use of aggregators and sub-aggregators to funnel investment dollars into the scheme—clouded investor identities by hiding them behind other entities which separately held investor data. The Receiver and her team

have therefore needed to peel back several layers of different "onions" to identify the ultimate individual and corporate investors.

The Receiver now believes she has identified nearly all, if not all, potential investors in the 1iMM Ponzi Scheme. She and her team continue to develop the necessary documents and infrastructure that will be necessary to administer a claims process. The Receiver anticipates that, in the near- to mid-term, she will move the Court to approve a claims filing, administration, allowance, disallowance and reconciliation process, as well as a plan to distribute assets to holders of allowed claims.

### F.    Asset Updates

In addition to the cash on hand detailed in Section II.C. (below), the receivership assets, not including litigation claims, currently consist of: (1) Rogue Black, LLC ("Rogue Black"), (2) LayJax Ventures, LLC ("LayJax"), (3) investments made into sixteen entities of an investor ("Additional Investments") and (4) investments made in potentially eight additional films. The updated details to each of these is outlined below.

#### 1.    *Rogue Black*

Rogue Black was a film finance and production company in which Horwitz owned a membership interest and invested using 1inMM funds. Ultimately, 1inMM invested approximately $21.5 million with Rogue Black, which went on to produce and complete a total of eight films (collectively, the "Produced Films"). The Receiver continues to collect monies owed to Rogue Black in relation to the Produced Films and pursue monies that are owed but have not yet been paid. As noted below, potential further recoveries may be obtained through an eventual sale of the film library.

##### a.    *ILBE/Orion Arbitration Award*

One of the most significant developments during the First Quarter 2024 was the Receiver's total victory in an arbitration relating to amounts that she alleged

Iervolino & Lady Bacardi Entertainment S.p.A. ("ILBE") and Orion Releasing LLC ("Orion") owed to Rogue Black. This resulted in a large judgment in favor of the estate. The Receiver refers the Court to her report for the First Quarter 2024 for a detailed discussion of the background, underlying claims, arbitral proceeding and other events leading to that arbitral award.

In short, the Receiver obtained an arbitral award against ILBE and Orion in the amount of $1,227,511.95, plus accruing post-judgment interest. As of the end of the First Quarter 2024, the Receiver had commenced an action before this Court to confirm the arbitral award under the Federal Arbitration Act. That was necessary because Orion initially refused to pay the award. During the Second Quarter 2024, however, Orion and the Receiver reached an agreement whereby the Receiver agreed to freeze the further accrual of post-judgment interest in exchange for full payment of the award. The Receiver received the full amount of the award, totaling $1,232,991 including interest, during the Second Quarter 2024.

       b.  *Anticipated Future Sale of Rogue Black's Film Library*

To maximize the monetary recovery of the estate, the Receiver has a commenced a process to bundle and sell Rogue Black's film library. To that end, as of the end of the Second Quarter 2024, the Receiver was negotiating an agreement with a full-service distribution company specializing in film library sales to act as a broker to market and sell some or all of those assets. The Receiver expects to file a motion during the third quarter 2024 asking the Court to authorize her to engage the broker for that purpose. If the Court approves the brokerage agreement, the Receiver expects that the broker will begin a marketing process during the third quarter 2024. Should the broker identify potential buyers, the Receiver will engage with the buyer that offers to deliver the greatest value to the estate and file a motion asking the Court to approve the sale.

To this end, the Receiver and her team are working to ensure all film entities are in good standing, are up to date in tax status and compliance, and preparing files

for the potential sale.

### 2. LayJax

LayJax is an angel investment company which invested in early startup business ventures. Using 1inMM funds, Horwitz caused LayJax to invest $2.5 million with twelve separate startup business ventures that LayJax had sourced. The businesses in which LayJax invested are broad and diverse.

#### a. Update on Recovery Potential

As previously reported, only two or three of LayJax's twelve investments hold a moderate chance of producing a recovery (let alone a profit). One of those investments is a company that sells skincare treatments, which company was acquired on October 21, 2022. Another LayJax investment that has produced a return is a canned adult beverage company, which was acquired on May 20, 2023. While the skincare treatment investment brought in a sizeable return to the Estate (approximately $450,000), the return on the canned adult beverage company will be much more modest. LayJax holds only a 0.889 percent equity interest in that company, so the Receiver anticipates that the Estate will initially receive approximately $40,000 from the initial purchase price. Over the next few years, there are additional yearly earn-out distributions that may potentially add up to a further $130,000. These future earn-out distributions are dependent upon future sales growth and may be difficult to fully exploit. The Estate has not yet received any cash return on this particular LayJax investment, but the Receiver anticipates that it will do so in the future.

The Receiver continually monitors each investment for progress, as well as for potential opportunities to generate recoveries. The Receiver will provide additional updates as new or meaningful activity occurs.

### 3. Additional Film Investments

As a result of the Receiver's forensic accounting investigation, the Receiver and her staff identified five additional entities that received more than $13.1 million

from 1inMM, which appear to have funded the production of an additional eight films. The Receiver continues to investigate these entities, films and the best avenue to efficiently maximize the recovery from these investments. The Receiver has begun to shift more resources to this potential asset and, pending additional investigation, continues to believe it prudent not to include any additional details on these entities and films in this report so as not to impede, jeopardize or hamper her investigation.

### G.  Litigation Against City National Bank

As noted in previous reports, the Receiver moved the Court to authorize her to engage Raines Feldman as conflict counsel, and the Court granted that motion on January 3, 2023. [ECF #166]. The Receiver issued subpoenas in early 2023 to explore potential causes of action whereby the Receiver may seek to recover funds or assets for the benefit of the estate. To that end, one of the subpoena respondents, City National Bank, filed a motion to quash the Receiver's subpoena [ECF #195]. After briefing and argument [ECF #202, #203, #206], Magistrate Judge Patricia Donahue granted the motion to quash [ECF #250]. On August 28, 2023, the Receiver filed a motion asking this Court to review Judge Donahue's order [ECF #251]. This Court revised the Magistrate's order and the motion to quash was denied by order entered on October 30, 2023 [ECF #296].

The Receiver commenced an adversary proceeding against City National Bank by the filing of a complaint in the District Court, assigned Case No. 2:24-cv-01317-CAS-PVC. On April 19, 2024, City National Bank file a Motion To Compel Judicial Reference Under Cal. Code of Civil Procedure Section 638 [ECF #16]. The parties entered into a stipulation to set the hearing date on the motion for July 22, 2024.

## II.  ACCOUNTING OF RECEIPTS AND DISBURSEMENTS

Attached as Exhibit "A" is a copy of the Standard Fund Accounting Report. Below is a summary of the cash receipts and disbursements from the estate on a cash

accounting basis.

### A. Cash Receipts

During the Second Quarter 2024, the receivership estate had cash receipts of $1,286,065. These cash receipts were comprised of (i) $1,232,991 representing the payment from Orion in the ILBE/Orion Arbitration, (ii) $52,932 related to interest income, and (iii) $142 of miscellaneous income.

### B. Cash Disbursements

During the Second Quarter 2024, cash disbursements totaled $485,559. These disbursements were comprised of (i) $340,838 of fees and costs paid to Katten Muchin, the Receiver's counsel, (ii) $127,472 of fees and costs of the Receiver, (iii) $9,758 for professional consultants, (iv) $5,747 for federal and state tax statements, (v) $1,259 of miscellaneous costs, and (vi) $485 of bank charges.

### C. Cash on Hand

As of June 30, 2024, the receivership estate held an ending balance of $5,575,022.

## III. CONCLUSION

The Receiver respectfully requests that the Court grant the motion to approve this Report and award the related relief requested therein.

Dated: August 5, 2024            Respectfully submitted,

                                 By:  /s/*Michele Vives*
                                      Michele Vives, Receiver

# PROOF OF SERVICE

**STATE OF ILLINOIS, COUNTY OF COOK**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Cook, State of Illinois. My business address is 525 W. Monroe St., Chicago, IL 60661.

On August 5, 2024, I served the following document(s) described as:

**QUARTERLY REPORT OF RECEIVER MICHELE VIVES (SECOND QUARTER 2024)**

as follows:

**[ ]    BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed above and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with Katten Muchin Rosenman LLP practice for collecting and processing correspondence for mailing. On the same day that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

**[ ]    BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused the document(s) to be sent from e-mail address terence.banich@katten.com to the persons at the e-mail addresses listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**[ ]    BY OVERNIGHT MAIL (FedEx):** I enclosed said document(s) in an envelope or package provided by FEDEX and addressed to the persons at the addresses listed above. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of FEDEX or delivered such document(s) to a courier or driver authorized by FEDEX to receive documents.

**[ ]    BY PERSONAL SERVICE:** I caused said document to be personally delivered the document(s) to the person at the addresses listed above by leaving the documents in an envelope or package clearly labeled to identify the attorney being served with a receptionist or an individual in charge of the office.

**[X]    E-FILING:** By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

I declare under penalty of perjury under the laws of the State of Illinois that the foregoing is true and correct.

Executed on August 5, 2024, at Winnetka, Illinois.

*/s/Terence G. Banich*
Terence G. Banich