Terence G. Banich (SBN 212173)
terence.banich@katten.com
Allison E. Yager (*pro hac vice*)
allison.yager@katten.com
**KATTEN MUCHIN ROSENMAN LLP**
525 W. Monroe St.
Chicago, IL 60661
Telephone:  (312) 902-5200
Facsimile:  (312) 902-1061

*Attorneys for the Receiver*
Michele Vives

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>ZACHARY J. HORWITZ; and 1inMM CAPITAL, LLC,<br><br>　　　　Defendants. | Case No. 2:21-cv-02927-CAS-PD<br><br>**QUARTERLY REPORT OF RECEIVER MICHELE VIVES (FOURTH QUARTER 2025)**<br><br>Judge:　　Hon. Christina A. Snyder<br>Courtroom:　8D |

# TABLE OF CONTENTS

I.  GENERAL RECEIVERSHIP UPDATE ................................................................. 2
    A.  Settlement Activity During the Fourth Quarter 2025 ............................. 2
        1.  Jeremy Salvador, Grant Whitcher and James Russell ............... 2
        2.  Insider Net Winners of 1inMM Aggregator ................................ 3
        3.  Pure Health Enterprises, Laura Levesque and Related Parties .. 6
        4.  Settlement Efforts with Other Net Winners ................................ 7
    B.  Litigation Against City National Bank ..................................................... 8
    C.  The Claims Process ................................................................................. 9
        1.  The Claims Notice Package ...................................................... 10
        2.  The Receiver's Determined Claim Amount .............................. 10
        3.  Timing ....................................................................................... 11
        4.  Post-Bar Date Claims Analysis ................................................ 12
        5.  Next Steps for Court Approval ................................................. 13
    D.  Asset Updates ........................................................................................ 13
        1.  Rogue Black .............................................................................. 13
        2.  LayJax ....................................................................................... 14
        3.  Additional Film Investments .................................................... 15
II.  ACCOUNTING OF RECEIPTS AND DISBURSEMENTS ........................................ 15
    A.  Cash Receipts ........................................................................................ 15
    B.  Cash Disbursements .............................................................................. 15
    C.  Cash on Hand ........................................................................................ 16
III.  CONCLUSION ................................................................................................ 16

Michele Vives, the duly appointed permanent receiver (the "Receiver") of 1inMM Capital, LLC and its subsidiaries and affiliates ("1inMM"), and over assets that are attributable to funds derived from investors or clients of the above-captioned defendants ("Defendants") or were fraudulently transferred by the Defendants (collectively, the "Estate"), pursuant to Local Rule 66-6 and the *Order on Appointment of a Permanent Receiver* ("Order of Appointment") entered on January 14, 2022, hereby submits this quarterly report (the "Report") for the period October 1, 2025 through December 31, 2025 (the "Fourth Quarter 2025"). This Report details the Receiver's principal activities during the Fourth Quarter 2025 to protect and administer the Estate and to identify new assets, and lays out the Receiver's general strategy to maximize the recovery for the benefit of investors harmed by the Ponzi scheme perpetrated by Defendants (the "1inMM Ponzi Scheme").

## I. GENERAL RECEIVERSHIP UPDATE

### A. Settlement Activity During the Fourth Quarter 2025

#### 1. *Jeremy Salvador, Grant Whitcher and James Russell*

As the Receiver has previously reported, the Receiver determined that Horwitz raised investor funds mostly using certain entities that pooled large amounts of money from many individual investors for upstream loans to, or investments in, 1inMM. One of these entities was Movie Fund, LLC ("Movie Fund"), of which Jeremy Salvador ("Salvador"), James Russell ("Russell"), Grant Whitcher ("Whitcher") and others were members. The purpose of Movie Fund was to be a vehicle for its members to contribute and aggregate money for loans to 1inMM and profit from their transactions with 1inMM.

After the 1inMM Ponzi Scheme became public knowledge, and after receiving other information, the Movie Fund members realized that they had been investors in the 1inMM Ponzi Scheme and that all of the distributions of profits Movie Fund made to its members were likely fictitious profits. This resulted in various inter-Movie Fund disputes, one of which was between Salvador, on the one

hand, and Russell and Whitcher, on the other. Whitcher and Russell contended that Salvador was liable to them because he (and/or various entities he owned) received distributions from Movie Fund in excess of the amounts permissible under Movie Fund's operating agreement, allegations which Salvador denied.

As a result of her forensic accounting work, the Receiver determined that Salvador was a net winner of $1,077,744, and Russell and Whitcher were net losers, of the 1inMM Ponzi Scheme. Ultimately, Salvador, Russell and Whitcher reached a settlement whereby Salvador agreed to pay Russell and Whitcher the sum of $1,077,744—the same amount of Salvador's net winnings—plus interest over ten years, for a total settlement payment of $1,591,071.81. Because Russell and Whitcher had, in effect, engaged in self-help to recover some of their net losses, the Receiver, on August 2, 2024, entered a separate settlement agreement with Salvador, Whitcher and Russell (the "Salvador Settlement"). Under the Salvador Settlement, the Receiver released her potential claims against Salvador, while Whitcher and Russell agreed that their receipt of the settlement payment from Salvador will reduce their claims against the Estate on a dollar-for-dollar basis.

On December 20, 2024, the Receiver filed a motion to approve the Salvador Settlement (the "Salvador Settlement Motion"). [ECF #388] On December 23, 2024, the Receiver served the Salvador Settlement Motion on all known creditors of the Estate. [ECF #390] No creditor objected to the Salvador Settlement Motion. [ECF #400]

On January 9, 2025, the Court entered an order granting the Salvador Settlement Motion. [ECF #396] The Receiver will apply the consideration for the Salvador Settlement during the claims reconciliation and allowance process by reducing the allowed claims held by Whitcher and Russell in specific amounts to be determined.

### 2.   *Insider Net Winners of 1inMM Aggregator*

Continuously since the Third Quarter 2023, the Receiver engaged in

settlement discussions with a large aggregator (the "Subject Aggregator") of the 1inMM Ponzi Scheme. The Receiver's forensic accounting analysis indicates that the insiders of the Subject Aggregator (together, the "Net Winner Insiders") are significant net winners (in that they received payments far in excess of the amounts they invested), and thus liable to the Estate under UVTA and common law unjust enrichment for receiving fraudulent transfers.

The Subject Aggregator and the Net Winner Insiders agreed to a mediation with the Receiver and specific claimant investors (the "Claimant Investors") before U.S. Magistrate Judge Sidney I. Schenkier (retired), which took place on January 30, 2024 in Walnut Creek, California. As the Receiver reported in her report for the First Quarter 2024, the Receiver's forensic accounting work supporting her claims was complicated by the complex and occasionally confusing manner in which the Subject Aggregator structured its affairs with 1inMM, on the one hand, and its investors, on their other. Plus, the Subject Aggregator and the Net Winner Insiders have for a few years now been defending litigation and arbitration commenced in various fora by the Claimant Investors, all of which is contested and contentious. That contributed to the complications of mediating these claims.

As the Receiver explained in more detail in her report for the First Quarter 2024, this mediation unfortunately did not result in a settlement, despite the monumental amount of preparatory work, the good-faith efforts of all parties and wise counsel of Judge Schenkier. In the months that followed, the Receiver and counsel for the Subject Aggregator negotiated a tolling agreement and generally attempted to agree on a framework for further settlement discussions. Thankfully, as a result of all parties' patience and determination to avoid litigation, the Receiver and the Subject Aggregator agreed to a second mediation with Judge Schenkier.

The second mediation took place on October 9, 2024. In anticipation for that conference, the parties exchanged supplementary position statements discussing the asserted claims and defenses. Fortunately, the second mediation was successful, and

resulted in a settlement. During the Fourth Quarter 2024, the parties worked on documenting the settlement, which the Receiver agreed to keep confidential. On December 20, 2024, the parties entered into a settlement agreement. For the next several months, the Receiver and the Subject Aggregator worked together to finalize the documentation necessary to seek Court approval of this confidential settlement, including an application for leave to file the settlement motion and related documents under seal.

On September 19, 2025, the Receiver filed an application to file under seal the motion to approve the settlement with the Subject Aggregator. [ECF #463, 464] That same day, the Court granted the application for leave to file under seal. [ECF #465] On September 22, 2025, the Receiver filed the motion under seal, as the Court permitted her to do. [ECF #466] The Receiver provided notice of a redacted version of the Motion by the Court's CM/ECF system to the parties and interested parties who have requested notice, as well as to counsel for the above-captioned parties. [ECF #467]

The settlement agreement authorized the Receiver to disclose confidential information about the motion provided that the requesting party was creditor of the receivership estate and signed a non-disclosure agreement. The Receiver exchanged emails and had phone calls with nine creditors about the motion, but only eight creditors ultimately signed the non-disclosure agreement. The Receiver sent an unredacted copy of the motion to those creditors who signed the non-disclosure agreement. Ultimately, no creditor objected to the confidential settlement motion. [ECF #470]

On October 20, 2025, the Court held a sealed hearing on the motion. [ECF #471] After colloquy, the Court indicated that it would approve the settlement and grant the motion. On October 28, 2025, the Court entered a sealed order granting the motion and approving the settlement. [ECF #476] On November 6, 2025, the settling parties made the initial installment of the settlement payment. The remaining

installments are due in 2026 and 2027, though the settling parties have the option of prepaying those amounts.

### 3. *Pure Health Enterprises, Laura Levesque and Related Parties*

For the last several calendar quarters, the Receiver has been negotiating with another net winning insider of an aggregator, and those negotiations finally produced a very favorable settlement for the benefit of the estate.

As noted previously, the Receiver determined that Horwitz raised investor funds mostly using certain entities that pooled large amounts of money from many individual investors or lenders for upstream loans to, or investments in, 1inMM. One of these entities was Pure Health Enterprises, Inc. ("Pure Health"), which Laura Levesque ("Levesque") and her then-husband, Jason Page ("Page"), operated in conjunction with Pure Health's affiliate, Movie Matrix, LLC ("Movie Matrix" and together with Pure Health and Levesque, the "Pure Health Parties").

Pure Health became a vehicle for Levesque and Page to aggregate investments in 1inMM from themselves and other persons and entities. Levesque and Page were also the sole members of Movie Matrix, which they formed in 2018 to finance 1inMM's acquisition of movie licensing rights. Movie Matrix was a vehicle for Levesque and Page to aggregate money from other persons and entities for eventual upstream investment into 1inMM so that Levesque and Page could profit therefrom. Through their participation in the 1inMM Ponzi Scheme generally and their retention of returns specifically, Pure Health, Movie Matrix, Page and Levesque realized significant fictitious profits.

The Receiver determined that, between January 30, 2015 and November 29, 2019, 1inMM made avoidable transfers to Levesque via Pure Health, Movie Matrix and other affiliates, resulting in a net profit of over $5.9 million.

The parties have been under a tolling agreement since 2022. Since then, the parties engaged formal settlement position papers and had substantive settlement discussions. While these talks were always constructive, the parties eventually

decided that they needed the assistance of a mediator.

On January 27, 2025, the parties had an in-person mediation before Judge Schenkier in Denver, Colorado. Although the mediation did not immediately result in a settlement, the parties had not reached an impasse and wished to continue their discussions more informally. During the First Quarter 2025, Judge Schenkier continued to serve as an intermediary for the parties and their settlement discussions progressed. During the Second Quarter 2025, the parties reached a settlement in principle and began working on settlement documentation, which continued during the Third Quarter 2025. Under the settlement, the Pure Health Parties agreed to pay the estate a total of $1,800,000 over a period of one year, in exchange for releases and a bar order.

On December 9, 2025, the Receiver filed a motion to approve the settlement with the Pure Health Parties [ECF #484], and on that same day filed an application to advance the hearing on the motion to December 29, 2025 [ECF #485]. On December 10, 2025, the Court granted the application. [ECF #486]

The Receiver served the motion on all investors and creditors of the estate. No creditor objected to the settlement. [ECF #491]

On December 29, 2025, the Court held a hearing on the motion. [ECF #493] After a colloquy, the Court indicated it would approve the Receiver's settlement with the Pure Health Parties. That same day, the Court entered an order granting the settlement motion. [ECF #494]

On December 30, 2025, Levesque, on behalf of herself and the Pure Health Parties, made the initial installment of the settlement payment. The remaining installment is due in late 2026, though the Pure Health Parties have the option of prepaying some or all of that amount.

### 4. *Settlement Efforts with Other Net Winners*

Through the Receiver's forensic accounting, the Receiver has identified several investors who were significant net winners and sent demand letters to them.

During the Second, Third and Fourth Quarters 2025, the Receiver escalated her efforts to resolve these claims. The status of the Receiver's settlement negotiations with these net winners are presently at various stages, as discussed below.

For the last several calendar quarters, the Receiver has been engaged in settlement discussions with the insider of an aggregator who is a net winner of the 1inMM Ponzi Scheme. As of the end of the Second Quarter 2024, the Receiver had entered into a tolling agreement with the net winner. The parties then had substantive settlement negotiations throughout the Third and Fourth Quarters 2024 and the First, Second, Third and Fourth Quarters 2025. While the Receiver is hopeful that these discussions will result in a settlement (with or without the assistance of a mediator), litigation is now a realistic possibility. The Receiver expects that, during the first quarter 2026, this dispute will either be definitively on a settlement path or the subject of active litigation.

As of the end of the Fourth Quarter 2025, the Receiver reached settlements in principle with three other net winners, and those settlements will be submitted to the Court for approval once documentation is completed. The Receiver is pleased with these outcomes, as the settlements have resulted in positive returns for the estate.

The Receiver is engaged in settlement discussions at various stages with other net winning transferees. To avoid jeopardizing these good-faith negotiations, details must remain confidential at this time. If proposed settlements are reached, the Receiver will seek Court approval.

### B. Litigation Against City National Bank

As noted in previous reports, the Receiver moved the Court to authorize her to engage Raines Feldman as conflict counsel, and the Court granted that motion on January 3, 2023. [ECF #166]

On February 16, 2024, the Receiver commenced a civil action against City National Bank ("CNB") by the filing of a complaint in this Court, assigned No. 2:24-cv-01317-CAS-PVCx. On April 19, 2024, City National Bank filed a Motion to

Compel Judicial Reference under Cal. Code of Civil Procedure Section 638 [No. 2:24-cv-01317 ECF #16], which the Receiver opposed. On July 25, 2024, the Court granted that motion [No. 2:24-cv-01317 ECF #30] and the parties later selected Hon. Ann Jones as the referee to oversee the matter, who the Court then appointed (the "Judicial Referee"). [No. 2:24-cv-01317 ECF #32, 33]

Over the next year, the case proceeded before the Judicial Referee. During that time, the Receiver amended her complaint [No. 2:24-cv-01317 ECF #48], and the parties engaged in discovery and motion practice on various issues. On April 7, 2025, CNB filed a motion to dismiss the Receiver's first amended complaint. [No. 2:24-cv-01317 ECF #79] The Receiver opposed the motion to dismiss, and CNB filed a reply. [No. 2:24-cv-01317 ECF #92, 105] Ultimately, on July 1, 2025, the Judicial Referee granted the motion to dismiss and dismissed all counts of the first amended complaint with prejudice. [No. 2:24-cv-01317 ECF #108]

On July 9, 2025, the Receiver filed a motion asking this Court to review the Judicial Referee's order, arguing that the Judicial Referee erred in various respects. [No. 2:24-cv-01317 ECF #114] Following briefing and a hearing, this Court denied the Receiver's motion for review but invited the Receiver to raise her arguments following entry of judgment pursuant to Federal Rules of Civil Procedure 59(e) and 60(b). [No. 2:24-cv-01317 ECF #121]

On October 9, 2025, the Court entered judgment against the Receiver consistent with the Judicial Referee's decision (the "CNB Judgment"). [No. 2:24-cv-01317 ECF #126]

On October 22, 2025, the Receiver filed a motion to reconsider the CNB Judgment, raising many of the same arguments as she had previously. [No. 2:24-cv-01317 ECF #127] As of the end of the Fourth Quarter 2025, the parties were in the process of briefing the motion to reconsider.

### C. The Claims Process

The investor claims process is an integral step in determining and confirming

the full scope of losses incurred by victims of the 1inMM Ponzi Scheme. This figure, in conjunction with the ultimate recovery from assets, forms the fundamental calculation necessary to determine a comprehensive distribution plan for investor victims.

In December 2024, the Receiver finalized the proposed structure of the claims process and thereafter filed a motion with the Court requesting approval to implement the intended claims process (the "Claims Process Motion"). On January 9, 2025, the Court granted the Receiver's unopposed Claims Process Motion [ECF #397], and the Receiver immediately thereafter initiated the approved claims procedure. This included compiling and mailing a claims notice package to each known investor and claimant as detailed below.

### 1. The Claims Notice Package

The claims notice package consisted of: (a) a notice outlining the deadline of when all claims would need to be submitted by; (b) a link to the proof of claim form on the receivership website; (c) a letter outlining the Receiver's Determined Claim Amount (defined below), (d) a W9 Form; (e) a copy of the order granting the Claims Process Motion; and (f) contact information so prospective claimants may reach the Receiver for further assistance (collectively the "Claims Notice Package").

The Receiver sent out the Claims Notice Package to claimants on approximately March 25, 2025. [ECF #417]

### 2. The Receiver's Determined Claim Amount

The Claims Notice Package included a letter from the Receiver outlining her calculation of the individual claimant's respective claim, along with details supporting that calculation. The Receiver calculated all investor claims using a standard "net investment" method, which takes the total principal amount the investor invested in the 1inMM Ponzi Scheme and subtracts that amount by the total amount of distributions the investor received. Through her comprehensive forensic accounting analysis, the Receiver compiled detailed logs of each investor's

investment amounts and distributions received, which she then used to calculate the claim amount to which she believes each investor is entitled (each, a "Determined Claim Amount").

A Determined Claim Amount does not incorporate interest, points, premiums, attorney's fees, damages or any other investment adjustments. If an investor rolled over any investment that matured, only the principal that was originally invested was used and counted once. The Receiver considered each investor on a holistic basis, meaning that even if an investor invested in the 1inMM Ponzi Scheme through one or more entities, the Receiver consolidated those investments to an individual investor level. Therefore, each individual investor has just one Determined Claim Amount, no matter how many channels they used to invest in the 1inMM Ponzi Scheme.

Importantly, even if a claimant has agreed with the Receiver's calculation for their claim, any investor or other claimant still needed to complete and submit a claim form. Failure to do so would result in the Receiver recommending that the Court disallow that investor's claim. If a claimant agrees with the Determined Claim Amount, however, they needed only submit the form and check the box indicating they agree with the Receiver's calculations. No additional supporting documentation was required.

### 3. Timing

Under the Claims Process Motion, the Receiver was required to send the Claims Notice Package to all prospective claimants within 90 days following entry of the Court's order approving it. The Receiver sent out the Claims Notice Package to claimants on approximately March 25, 2025 (the 90-day deadline was calculated as being April 7, 2025). [ECF #417]

Following the noticing of the Claims Notice Package, claimants then had 90 days thereafter to file their claim. The deadline for claimants to file their claim was July 8, 2025 (the "Claims Bar Date"). [ECF #418, 421]

### *4.  Post-Bar Date Claims Analysis*

Following the expiration of the Claims Bar Date on July 8, 2025, the Receiver and her team commenced a thorough review of all investor claims submitted in connection with the 1inMM Capital Ponzi scheme. Prior to the bar date, the Receiver issued a total of 391 Claims Notice Packages to individuals who were identified as potential claimants based on the Receiver's review of records and supporting documentation received from investors, aggregators and sub-aggregators.

Of the 391 Claims Notice Packages that the Receiver served, the Receiver received a total of 368 timely submitted claims. Despite multiple outreach efforts—including emails and other written correspondence from the Receiver's staff reminding those creditors of the Claims Bar Date and the need to file a claim—23 investors failed to submit a completed claim form prior to the deadline. The Receiver's team made reasonable and diligent efforts to encourage full participation in the claims process and considers the final participation rate to be a strong indication of widespread investor engagement.

The Receiver is pleased by the high level of consensus among the investor claimants with respect to the Receiver's calculation of net losses. Of the 368 timely submitted claims, 359 investor claimants—i.e., 97.55 percent of the total—confirmed that they agreed with the Receiver's determination of their loss amounts. Only nine investor claimants initially disagreed with the Receiver's calculation. In response, the Receiver and her team undertook a detailed, individualized review of all documentation submitted in connection with each of the disputed claims. This thorough review involved evaluating the supporting materials provided by the investor claimants and reconciling them with the Receiver's own records and calculations.

As a result of this process, the Receiver has successfully resolved all nine disputes in their entirety, reaching a mutual agreement with each investor claimant regarding the appropriate allowed claim amount. The Receiver is pleased to report

that these resolutions reflect the reliability of the Receiver's claims reconciliation process and the integrity of the underlying calculations.

In addition to the investor claims discussed above, the Receiver has received five claims from non-1inMM individuals or entities. Two claims have been reviewed and resolved, while three remain under review as the Receiver assesses their factual and legal bases and engages with certain claimants to seek resolution. Upon completion of this process, the Receiver will recommend to the Court whether each non-investor claim should be included among the allowed claims eligible for any future distribution.

### 5. Next Steps for Court Approval

Once the Receiver reaches agreements or otherwise finalizes all outstanding and pending claims, she intends to file a motion (or motions) requesting that the Court (a) allow the investor claims in their Determined Claim Amount (or such other amount that the Receiver and the claimant mutually agree); (b) allow or disallow the non-investor claims as the Receiver will recommend as to each such specific claim; and (c) disallow any late-filed or unfiled claims and those claims submitted by individuals or entities who could not be located. In instances where the Receiver is unable to reach an agreement with a claimant, those matters will also be presented to the Court for determination. Once the claims allowance and disallowance process is complete, the Receiver will file a motion proposing a plan of distribution.

### D.  Asset Updates

In addition to the cash on hand detailed in Section II.C. (below), the receivership assets, not including litigation claims, consist of: (1) Rogue Black, LLC ("Rogue Black"), (2) LayJax Ventures, LLC ("LayJax"), (3) investments made into sixteen entities of an investor ("Additional Investments") and (4) investments made in potentially eight additional films. The updated details to each of these is outlined below.

### 1.  Rogue Black

Rogue Black was a film finance and production company in which Horwitz owned a membership interest and invested using 1inMM funds. Ultimately, 1inMM invested approximately $21.5 million with Rogue Black, which went on to produce and complete a total of eight films (collectively, the "Produced Films"). The Receiver continues to collect monies owed to Rogue Black in relation to the Produced Films and pursue monies that are owed but have not yet been paid. As noted below, potential further recoveries may be obtained through an eventual sale of the film library.

To maximize the monetary recovery of the estate, the Receiver has a commenced a process to bundle and sell Rogue Black's film library. The Receiver obtained permission from the Court to engage Resurgence Media Group ("Resurgence"), a full-service distribution company that specializes in film library sales, to act as a broker to market and sell the library.

Resurgence initiated its marketing efforts for the Rogue Black film library toward the end of the Third Quarter 2024 and has continued these efforts through the Second Quarter 2025. Over this period, Resurgence has actively explored potential opportunities for monetizing the film assets through outreach to a variety of parties within the entertainment and media industry.

Most recently, Resurgence has initiated preliminary discussions with a reputable film production company that has expressed interest in acquiring the Rogue Black film library. While these discussions remain in the early stages, the Receiver has elected to temporarily pause the sale process pending the resolution of certain receivables related to the films and in light of new developments concerning the film investments and ownership of the assets.

### 2. LayJax

LayJax is an angel investment company which invested in early startup business ventures. Using 1inMM funds, Horwitz caused LayJax to invest $2.5 million with twelve separate startup business ventures that LayJax had sourced. The

businesses in which LayJax invested are broad and diverse. The Receiver continually monitors each investment in LayJax for progress, as well as for opportunities to generate recoveries—including a sale. However, these investments will likely prove difficult to monetize. The Receiver will provide additional updates as new or meaningful activity occurs.

### 3. *Additional Film Investments*

As a result of the Receiver's forensic accounting investigation, the Receiver and her staff identified five additional entities that received more than $13.1 million from 1inMM, which appear to have funded the production of an additional eight films. The Receiver continues to investigate these entities, films and the best avenue to efficiently maximize the recovery from these investments. The Receiver has begun to shift more resources to this potential asset and, pending additional investigation, continues to believe it prudent not to include any additional details on these entities and films in this report so as not to impede, jeopardize or hamper her investigation.

## II. ACCOUNTING OF RECEIPTS AND DISBURSEMENTS

Attached as Exhibit "A" is a copy of the Standard Fund Accounting Report. Below is a summary of the cash receipts and disbursements from the estate on a cash accounting basis.

### A. Cash Receipts

During the Fourth Quarter 2025, the receivership estate had total cash receipts of $5,537,540. These cash receipts were comprised of business income ($330.00), interest income ($97,880.00) and Settlement Payments ($5,439,330.00).

### B. Cash Disbursements

During the Fourth Quarter 2025, cash disbursements totaled $556,572.53. These disbursements included (i) $65,000.00 paid to Loftus & Eisenberg, LLC related to litigation settlement, (ii) $400,442.18 of fees and costs paid to Katten

Muchin Rosenman LLP, the Receiver's counsel, (iii) $81,485.77 of fees and costs of the Receiver, (iv) $9,209.86 to Franchise Tax Board related to current and past due taxes, and (v) $434.72 related to banking and other miscellaneous expenses.

### C.  Cash on Hand

As of December 31, 2025, the receivership estate held an ending balance of $18,758.861.00.

### III.  CONCLUSION

The Receiver respectfully requests that the Court grant the motion to approve this Report and award the related relief requested therein.

Dated: January 30, 2025         Respectfully submitted,

                                By:   /s/*Michele Vives*
                                      Michele Vives, Receiver

# PROOF OF SERVICE

**STATE OF ILLINOIS, COUNTY OF COOK**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Cook, State of Illinois. My business address is 525 W. Monroe St., Chicago, IL 60661.

On January 30, 2026, I served the following document(s) described as:

**QUARTERLY REPORT OF RECEIVER MICHELE VIVES (FOURTH QUARTER 2025)**

as follows:

**[ ]     BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed above and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with Katten Muchin Rosenman LLP practice for collecting and processing correspondence for mailing. On the same day that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

**[ ]     BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused the document(s) to be sent from e-mail address terence.banich@katten.com to the persons at the e-mail addresses listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**[ ]     BY OVERNIGHT MAIL (FedEx):** I enclosed said document(s) in an envelope or package provided by FEDEX and addressed to the persons at the addresses listed above. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of FEDEX or delivered such document(s) to a courier or driver authorized by FEDEX to receive documents.

**[ ]     BY PERSONAL SERVICE:** I caused said document to be personally delivered the document(s) to the person at the addresses listed above by leaving the documents in an envelope or package clearly labeled to identify the attorney being served with a receptionist or an individual in charge of the office.

**[X]     E-FILING:** By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

I declare under penalty of perjury under the laws of the State of Illinois that the foregoing is true and correct.

Executed on January 30, 2026, at Winnetka, Illinois.

*/s/Terence G. Banich*
Terence G. Banich